UNITES STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AD HOC COMMITTEE OF EQUITY HOLDERS OF TECTONIC NETWORK, INC.,

Plaintiff,

v.

AROL WOLFORD; SHERWIN KRUG; CHARLES MCROBERTS; JOHN MCROBERTS; CHARLES PECCHIO, JR.; LAURA ROGERS; and THEO VANDERBOOM,

Defendants.

No. 06- 665

COMPLAINT

Plaintiff, by its undersigned counsel, for its Complaint against the Defendants, Arol Wolford, Sherwin Krug, Charles McRoberts, John McRoberts, Charles Pecchio, Jr., Laura Rogers, and Theo VanderBoom, alleges as follows:

The Parties

1. Plaintiff, the Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. (the "Ad Hoc Committee"), is an unincorporated association consisting of a group of public shareholders which owned approximately fifty percent (50%) of all non-insider owned stock of Tectonic Network, Inc. ("Tectonic Network"). By order dated April 12, 2006 and entered April 13, 2006 in the matter entitled Tectonic Network, Inc. and Tectonic Solutions, Inc., Debtors (Case Nos. 05-78966 and 05-78955), Tectonic Network abandoned to the Ad Hoc Committee

Tectonic Network's claims against its officers and directors, and the United States Bankruptcy Court for the Northern District of Georgia authorized the Ad Hoc Committee to bring claims against any and all directors and officers of Tectonic Network and Tectonic Solutions, Inc. ("Tectonic Solutions") in a forum outside of those bankruptcy proceedings. The aforesaid order excepted any of the officers, directors, and employees of Tectonic Network, other than any who are members of the Ad Hoc Committee, from sharing in any recovery from any such claims.

2. Each of the members of the Ad Hoc Committee owned common stock of Tectonic Network until the Bankruptcy Court's approval of the Amended Joint Plan of Reorganization of Tectonic Network on or about July 11, 2006 and the cancellation of all issued and outstanding stock of Tectonic Network under said plan.

3. Defendant Arol Wolford ("Wolford") is an individual residing at 1034 Virginia Avenue, Unit 4, Atlanta, Georgia 30306, and is a citizen of the State of Georgia.

4. Defendant Wolford was from in or about October 2001 and is a member of the Board of Directors of Tectonic Network. Defendant Wolford was from in or about February 2002 and is the President of Tectonic Network, and was from in or about July 2002 and is the Chief Executive Officer of Tectonic Network. Since the incorporation of Tectonic Solutions in or about the second half of 2003, Defendant Wolford has been and is the Chief Executive Officer and a member of the Board of Directors of Tectonic Solutions.

5. Sherwin Krug ("Krug") is an individual residing at 4674 Chardonnay Court, Atlanta, Georgia 30338, and is a citizen of the State of Georgia.

6. Defendant Krug was, from in or about January 2003 through on or about November 21, 2005, the Chief Financial Officer and Treasurer of Tectonic Network and was,

from in or about the incorporation of Tectonics Solutions through on or about November 21, 2005, the Chief Financial Officer and Treasurer of Tectonic Solutions.

7. Defendant Charles McRoberts is an individual residing at 7405 Princeton Trace NE, Atlanta, Georgia, and is a citizen of Georgia. Charles McRoberts was from in or about August 2000 and is a member of the Board of Directors of Tectonic Network.

8. Defendant John McRoberts is an individual residing at 4109 Old Leeds Lane, Birmingham, Alabama 35213-3238, and is a citizen of Alabama. John McRoberts was, from in or about August 2000 to in or about July, 2006, a member of the Board of Directors of Tectonic Network.

9. Defendant Charles Pecchio, Jr. is an individual residing at 15 Reynolds Lane, Kingston, Georgia 30145-2112, and is a citizen of Georgia. Charles Pecchio was (a), from in or about August 2000 to in or about July, 2006, a member of the Board of Directors of Tectonic Network, (b), from in or about August 2000 to in or about February 2002, the President of Tectonic Network, and (c), from in or about August 2000 to in or about July 2002, the Chief Executive Officer of Tectonic Network and thereafter and until on or about February 28, 2005 an employee of Tectonic Network

10. Defendant Laura Rogers is an individual residing at 1125 Windsor Place Circle, Grayson, Georgia 30017, and is a citizen of Georgia. Laura Rogers was, from in or about 2002 to in or about November, 2005, a member of the Board of Directors of Tectonic Network.

11. Defendant Theo VanderBoom is an individual residing at 4160 Poplar Spring Court, Norcross, Georgia 30092. Theo VanderBoom was, from in or about 2002 to in or about July, 2006, a member of the Board of Directors of Tectonic Network. (Defendants Charles

McRoberts, John McRoberts, Charles Pecchio, Jr., Laura Rogers, and Theo VanderBoom are hereinafter referred to collectively as the "Director-Defendants")

12. Tectonic Network is and has been since in or about 1990 a corporation organized and existing under the laws of the State of Delaware with its principal place of business currently located at 6621 Bay Circle, Suite 170, Atlanta, GA 30071. At all times relevant herein, Tectonic Network maintained it principal place of business in Kennesaw, Georgia.

13. Prior to the filing of its petition in bankruptcy on or about October 3, 2005, Tectonic Network, formerly known as Return on Investment Corporation (and, prior thereto, Net/Tech International, Inc.), was a publicly traded company. According to its bankruptcy petition, there were 13,867,054 million shares of its common stock outstanding as of the date of the petition, October 3, 2005, of which 6,276,533 shares were then owned by Defendants Wolford, John McRoberts, Charles McRoberts, and Charles Pecchio, Jr.

14. Tectonic Solutions is and has been, since in or about the second half of 2003, a corporation organized and existing under the laws of the State of Delaware with its principal place of business currently located at 6621 Bay Circle, Suite 170, Atlanta, GA 30071, and is and has been, since its organization, a wholly-owned subsidiary of Tectonic Network.

15. On October 3, 2005, each of Tectonic Network and Tectonic Solutions filed a voluntary petition in the United States Bankruptcy Court for the Northern District of Georgia for relief under Chapter 11 of the Bankruptcy Code. By First Amended Joint Plan of Reorganization approved by order of that Court, dated July 11, 2006, Tectonic Network, as reorganized, continues to operate.

16. Pursuant to the aforesaid Plan of Reorganization, all issued and outstanding shares of the stock of Tectonic Network were cancelled and a total of 100,000 shares of common stock

of Tectonic Network was issued, and such shares, constituting all of the currently issued and outstanding shares of stock of Tectonic Network, are owned by Defendant Wolford.

Jurisdiction and Venue

17. This Court has jurisdiction over this action by virtue of 28 U.S.C. § 1332 as this action is between citizens of different States and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000. None of the members of the Ad Hoc Committee is a citizen of the same state of which any of the Defendants is a citizen.

18. Venue is proper in this District under 28 U.S.C. §1391 (a) (2) as a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

Nature of This Action

19. This is an action brought under substantive state law for Defendants' breaches of their fiduciary obligations to Tectonic Network, including Defendants' breaches of their duty of undivided loyalty to Tectonic Network and their self-dealing, and the fraud of Defendants Wolford and Krug on Tectonic Network, all of which led to its insolvency and the loss of all value in its stock.

**BACKGROUND**

The Acquisitions of and Investments in Companies Controlled by Defendant Wolford

20. Tectonic Network had two primary operating subsidiaries through February 2005: (i) Tectonic Solutions and (ii) GO Software, Inc. ("GO Software"). GO Software was in the business of developing, marketing, and selling software and services for processing transactions done by credit card, debit card, or check.

21. In late 2003 and early 2004, Tectonic Network, under the leadership and upon the urging and inducement of Defendant Wolford, acquired three businesses involved in providing information on and advertising for construction products to the construction industry, and Tectonic Network paid, in the aggregate though the issuance of stock and notes, consideration in excess of $6 million for those businesses.

22. Defendant Wolford, as majority shareholder, controlled each of these three businesses. Upon their acquisition by Tectonic Network, the three businesses were combined into Defendant Tectonic Solutions. The three businesses and acquisitions were:

A. On November 18, 2003, Tectonic Network and BBN Acquisition, Inc. ("BBN") consummated a merger whereby BBN was merged with and into Tectonic Solutions pursuant to an Agreement and Plan of Merger dated as of October 29, 2003. At the time of that agreement, Defendant Wolford was the principal and controlling shareholder of BBN, and his daughter was a member of BBN's Board of Directors. Tectonic Network conveyed 750,000 shares of its common stock to the shareholders of BBN in consideration for all of the stock of BBN. Of these 750,000 shares, on or about November 18, 2003, Tectonic Network conveyed to Defendant Wolford 311,671 shares of the common stock of Tectonic Network, which were then valued at $1.82 per share, in return for his ownership of 41.6% of the shares of the common stock of BBN. Before this acquisition, BBN acquired substantially all of the assets of Blue Bolt Network Inc.

B. On November 26, 2003, Tectonic Network purchased the operating assets of Construction Yellow Pages LLC ("CYP") pursuant to an Asset Purchase Agreement dated as of October 29, 2003. Tectonic Network conveyed 750,000 shares of its common stock to the members of CYP and assumed certain of CYP's liabilities in consideration for those assets. Defendant Wolford was the majority equity owner-member of CYP at that time, owning approximately 58% of the membership interest in CYP. As a result of Tectonic Network's purchase of CYP's operating assets, Defendant Wolford received 435,000 shares of the common stock of Tectonic Network, which were then valued at $1.82 per share.

C. On January 2, 2004, Tectonic Network purchased substantially all of the operating assets of SpecSource.com, Inc. ("SpecSource"), pursuant to an Asset Purchase Agreement dated as of October 29, 2003 ("SpecSource Agreement"), in return for a non-interest bearing note in the amount of $533,000 payable to SpecSource and 1,450,000 shares of the common stock of Tectonic Network, then valued at $1.82 per share. Defendant Wolford was then the majority and controlling shareholder of SpecSource, owning approximately 67.6% of the outstanding shares of the common stock of

SpecSource. His daughter was then an employee of SpecSource. As a result of Tectonic Network's purchase of substantially all of SpecSource's operating assets, Defendant Wolford was entitled to receive approximately 980,000 shares of the common stock of Tectonic Network upon the dissolution of SpecSource and 67.6% of any and all payments on the note.

23. In connection with Tectonic Network's acquisition of the assets of SpecSource, Tectonic Network entered into a non-compete agreement with SpecSource's only other shareholder, John White ("White"), and needlessly rewarded him by giving him a non-interest bearing note payable in the amount of $360,000 (the "Non-Compete Payment") in return for his entering into the non-compete agreement, including his promise therein not to compete with the business of SpecSource conveyed to Tectonic Solutions.

24. Prior to Tectonic Network's acquisitions of these businesses, Defendants Wolford and Krug falsely represented to Tectonic Network's Board of Directors and shareholders that these businesses would be greatly profitable and were viable.

25. In a presentation made to Tectonic Network's Board of Directors on October 22, 2003, Wolford represented, as to the three businesses, that "[t]he financials are positive and the risks are manageable."

26. Tectonic Network purchased these businesses based upon false or misleading financial information provided by Defendants Wolford and Krug who knew the information to be false when provided. The acquired businesses were riddled with fraudulent and unethical business practices, unprofitable, and in need of large infusions of cash in order to continue operating.

27. Because Tectonic Network and Tectonic Solutions' CEO, Defendant Wolford, was also a principal shareholder of the acquired businesses, neither of Defendants Wolford and Krug, in breach of their fiduciary duties to Tectonic Network, disclosed to the Board of Directors

of Tectonic Network or in Tectonic Network's public filings with the United States Securities and Exchange Commission ("SEC") the true nature of these businesses and their practices before Tectonic Network acquired the businesses and for many months after the acquisitions.

28. Defendants Wolford and Krug falsely exaggerated the financial performance of the three businesses with false financial data, and caused Tectonic Network to acquire them to benefit Wolford by having Tectonic Network, rather than Wolford, finance their tremendous needs for cash and in the desperate hope that Tectonic Network's investing substantial sums of money in them would yield a highly positive benefit to Tectonic Network and thereby to Wolford whose shareholdings in Tectonic Network were greatly increased through these acquisitions.

29. Wolford controlled the Chief Financial Officer of Tectonic, Sherwin Krug, as Wolford hired Krug for that position and acted as Krug's superior to whom Krug reported. Wolford also effectively determined Krug's compensation, including the stock options and bonuses given to him. Therefore, Krug was beholden to Wolford, and, thereby, Wolford controlled the quality and quantity of the financial information that Krug furnished to the Board of Directors about Tectonic Network, Tectonic Solutions, and the three acquired businesses, both before and after Tectonic Network's acquisition of them.

30. The Form 10-KSB for fiscal year 2004, i.e., the period July 1, 2003 through June 30, 2004, filed by Tectonic Network with the SEC on or about October 12, 2004, discloses that Tectonic Network not only paid Krug a salary of $160,00 for fiscal 2004 but also gave him, during that fiscal year, a bonus of $70,000 and options to acquire 160,000 shares of Tectonic Network's common stock at $1.70 per share, a price which was significantly lower than the interdealer high price for each of the quarters in calendar year 2004 as set forth in the Form 10-

KSB. Wolford caused Tectonic Network to pay Krug another bonus, this time in the amount of at least $100,000, upon the sale of the business of GO Software on or about February 28, 2005.

31. A majority of the Board of Directors was personally interested in approving the acquisitions of the businesses of BBN, SpecSource, and CYP. John McRoberts, Charles McRoberts, and Charles Pecchio, Jr. were, under an agreement entered into in 2000, entitled to the receipt of over three million seven hundred fifty thousand (3,750,000) shares of common stock of Tectonic Network, held in escrow, upon Tectonic Network reaching certain financial results. As of the dates on which the acquisitions of the businesses of BBN, SpecSource, and CYP were first considered by the Board and the date when execution of the acquisition agreements was authorized by the Board, October 29, 2003, Tectonic Network had never achieved those results, and there was no reasonable expectation that it would ever achieve those results.

32. Wolford devised the following scheme whereby those other directors would receive part of the escrowed shares despite the failure of Tectonic Network to reach the specified financial results: all of the escrowed shares would be released from escrow, most of them (approximately 2.85 million shares) would then be used as consideration or partial consideration to be given to the shareholders of BBN, SpecSource, and CYP for the purchases of their businesses, and nearly all of the balance of the shares would be given immediately to Charles McRoberts (309,383 shares), John McRoberts (187,486 shares), and Charles Pecchio (253,131 shares) (with the remaining 168,754 shares to be escrowed again but given to Charles Pecchio, Jr. if certain conditions were met).

33. Acting in their self-interest, i.e., their anticipated receipt of hundreds of thousands of shares of stock in Tectonic Network, John McRoberts, Charles McRoberts, and Charles

Pecchio, Jr. approved the scheme proposed by Wolford and the acquisitions of the three businesses, which were integral to the scheme.

34. Defendant Wolford was interested in the acquisitions and strongly advocated them because (i) acquisition of the three businesses would relieve Wolford, as the principal and controlling shareholder of each, of any further need to invest his own funds in these profitless and cash starved businesses, (2) Tectonic Network would give a note to SpecSource in the amount of $533,000 as part of the consideration for the sale of the SpecSource business to Tectonic Network, to which Wolford would have a 67.6% interest based on his shareholdings in SpecSource, and (iii) Wolford would receive over one million seven hundred thousand (1,700,000) shares of common stock of Tectonic Network as partial consideration for his agreement, as a controlling shareholder of each, to the sale of the three businesses to Tectonic Network.

35. This stock would permit Wolford to profit from these businesses through Tectonic Network should they somehow become profitable as businesses owned by Tectonic Network or its subsidiary, Tectonic Solutions.

The SpecSource Fraud

36. At the time of Tectonic Network's acquisition of SpecSource, SpecSource was in the business of selling advertising space to manufacturers of building construction products on SpecSource's on-line directory or reference database of manufacturers of construction products and their local distributors.

37. The concept underlying SpecSource's business was that purchasers of building construction products, such as general construction contractors, specialty subcontractors, and specifiers, would consult the directory on SpecSource's website to locate suppliers of products

and that advertising in the directory would generate sales for the suppliers who placed ads on SpecSource's on-line directory. In effect, SpecSource's reference database was to function as an on-line directory for the sellers of building construction products.

38. Prior to Tectonic Networks' acquisition of SpecSource, Defendant Wolford was the controlling and majority shareholder of SpecSource.

39. The financial statements for SpecSource as of September 30, 2003 and for the period then ended materially overstated SpecSource's revenues for that period.

40. When the aforesaid financial statements were made part of a schedule to the SpecSource Agreement, Wolford knew that they materially overstated the revenue because they did not give effect to refunds or contract extensions, at no expense to the customers, that would be required to be given to SpecSource's customers because of its misrepresentations to those customers to induce their entering into contracts to place their advertisements on SpecSource's website.

41. Defendant Wolford did not advise the Board of Directors of Tectonic Network of the material overstatement of revenues on the SpecSource financial statements as of September 30, 2003 and the period then ended until James Serio, a former employee of Tectonic Solutions, filed his purported "whistleblower" claims in early 2005, over a year after Tectonic Network acquired SpecSource.

42. Prior to Tectonic Network's acquisition of SpecSource, SpecSource grossly and materially overstated the number of hits on its website (i.e., the number of times viewers accessed the website) (a) to Tectonic Network, (b) in advertising materials given to customers and potential customers, and (c) in usage reports which SpecSource provided to its customers

under its advertising service contracts with them, which SpecSource also provided to Tectonic Network to convince it to purchase SpecSource.

43. In a presentation made to Tectonic Network's Board of Directors on October 22, 2003, Wolford represented that "[m]ore than 7,000 searches are performed on an average business day [on SpecSource's website's reference database]." This representation materially overstated the number of such searches conducted on an average business day.

44. At the time these representations about the number of hits and searches were made, Wolford knew that the representations materially and grossly overstated the number of hits and searches. The number of hits and searches on SpecSource's website was material because the basis of SpecSource's service agreements with its customers was that the website would generate hits and searches on the website which advertised the products of SpecSource's customers.

45. Prior to Tectonic Network's acquisition of SpecSource, SpecSource, including Wolford, represented to Tectonic Network that SpecSource's reference database was complete and accurate.

46. This reference database was SpecSource's main asset and formed the basis for the amount of consideration paid by Tectonic Network to the shareholders of SpecSource for this acquisition.

47. Wolford knew at the time that these representations about the reference database were made that it was materially incomplete and inaccurate.

48. In the months following the acquisition of SpecSource, Tectonic Network discovered that the reference database was materially incomplete and inaccurate, and that several hundred thousands dollars would be required to correct the data.

49. When it discovered the falsity of SpecSource's and Wolford's representations about the accuracy and completeness of the database and the numbers of hits and searches, Tectonic Network then advised SpecSource's customers of the inaccuracy of these representations.

50. Based on the material incompleteness and inaccuracy of the database, and the misrepresentations about the number of hits and searches, customers of SpecSource demanded, and Tectonic Network gave them, refunds of their payments to SpecSource for placing advertising in the reference database or an additional year of advertising at no charge, thereby materially reducing the revenue of the SpecSource business acquired by Tectonic Network.

51. At paragraph 3.16 of the SpecSource Agreement, Wolford, White, and SpecSource represented to Tectonic Network that SpecSource "has not received any notice or has no knowledge to the effect that any current Customer ... may terminate or materially alter its business relations with the Company either as result of the transaction contemplated by this Agreement or otherwise."

52. At paragraph 3.18 of the SpecSource Agreement, Wolford, White, and SpecSource represented to Tectonic Network that "[n]o representation, warranty or covenant made by [SpecSource] or [Wolford and White] in this Agreement (including the schedules hereto) contains any untrue statement of a material fact or omits to state a material fact required to be stated herein or necessary to make the statements contained herein not misleading."

53. Wolford breached the representations and warranty set forth in paragraph 3.16 of the SpecSource Agreement as he had knowledge of the falsity of the representations made by SpecSource to its customers, concerning the completeness and accuracy of the SpecSource's reference database and the number of hits and searches on the database and that such

misrepresentations would ultimately cause a material number of its customers to cancel their contracts, demand and receive refunds, or receive free advertising, thereby terminating or materially altering their relationship to the SpecSource business.

54. At the very least, Wolford breached his representations and warranty set forth in paragraph 3.18 of the SpecSource Agreement as Wolford's failure to disclose in that paragraph his knowledge of the falsity of the representations made by SpecSource to its customers, concerning the completeness and accuracy of the SpecSource's reference database and the number of hits and searches on the database, "omit[ted] to state a material fact required to be stated herein or necessary to make the statements contained herein not misleading."

<u>Wolford's Post Acquisition Fraud</u>

55. Shortly following the first quarter of 2004, Defendants Wolford and Krug falsely represented to Tectonic Network's Board of Directors and shareholders that, during that quarter, Tectonic Solutions achieved over $500,000 in advertising revenue from the three acquired businesses, BBN, CYP, and SpecSource, when, in fact, Tectonic Solutions would have to refund much of those advertising revenues or give free advertising to customers because (i) SpecSource had materially inflated and thereby materially misrepresented the hits and searches on its reference database, (ii) the reference data base was materially incomplete and inaccurate, and (iii) Tectonic Solutions decided not to publish and distribute the number of editions of directories carrying customer advertisements that Tectonic Solutions or CYP had contracted with its customers to publish and distribute.

56. Following Tectonic Network's acquisitions of the three businesses, Defendants Wolford and Krug continued to represent falsely to Tectonic Network's Board of Directors that these business were growing and held out huge promise for future profitability.

57. Upon information and belief, the true nature and condition of each of the three businesses acquired by Tectonic Network was at all times known to Defendant's Wolford and Krug and had such been disclosed to Tectonic Network's Board of Directors and shareholders, Tectonic Network would not have acquired and thereafter invested substantial funds in the businesses.

The Fraudulent Practices in the Acquired Businesses

58. Certain employees of Tectonic Solutions, who were assigned to the SpecSource business after it was acquired by Tectonic Network and placed in Tectonic Solutions, became aware of the longstanding fraudulent business practices of the SpecSource business during 2004 and early 2005 and halted those practices, advised the customers of the misstatements about the numbers of hits and searches, and attempted to retain the customers by offering and giving them either refunds or free advertising for an additional year period.

59. The magnitude of the fraudulent business practices in the SpecSource business and Wolford's and Krug's fraud in inducing the acquisition of that business was reflected by the dramatic reduction in Tectonic Solutions' advertising revenue once it revealed those practices to the customers and took steps to retain them. The first calendar quarter of 2005 yielded less than $100,000 in such advertising revenue for Tectonic Network, far less than the alleged $560,000 in such revenue for Tectonic Network in the first calendar quarter of 2004.

60. In early 2005, James Serio, a former employee of Tectonic Solutions and a putative Sarbanes Oxley Act "whistleblower", filed a complaint alleging that the data used as part of the sales and budgeting efforts at Tectonic Solutions were fraudulent or materially overstated.

61. In breach of their obligation of good faith to Tectonic Networks, Tectonic Network's Board of Directors assigned Defendant Wolford to investigate Serio's complaint, thereby ensuring that it would not be properly investigated.

62. According to Tectonic Network's Form 8-K filed with the SEC on March 24, 2005, "No evidence of any material adverse conditions has been found in connection with the employee's allegations, but if any is, the Company shall take prompt and appropriate action in response." Defendant Wolford signed this document, and he knew the falsity of this statement when it was made.

The Virtual Building Model Fraud

63. In the first three calendar quarters of 2004, Wolford urged the development of a Tectonic Virtual Model Business whereby Tectonic would offer the service of converting two dimensional building construction plans into three-dimensional building models that would expedite the construction of buildings by eliminating the additional time necessary to analyze two-dimensional plans and envision them in a three dimensional framework.

64. Wolford assured the Board of Directors of Tectonic Network that (a) this model business would be the foundation of an overall strategy to move Tectonic Network into the construction information business, and (b) that the Virtual Building Model business would be hugely profitable, generating revenues of approximately $30,000 to $40,000 per project with a thirty percent profit margin. Wolford had no reasonable basis for making these assurances.

65. In order to procure authorization for funding this project from the Board of Directors, Wolford fabricated results for this project and included them in presentations to the Board and in financial statements for Tectonic Network.

66. Wolford falsely represented to Tectonic Network's Board of Directors in August 2004 that Tectonic Network had acquired six (6) new contracts "in only one month" of sales during the third calendar quarter of 2004 to develop Virtual Building Models for the customers, each of these contracts had been completed, and revenue for these contracts was included in Tectonic Networks' financial statements for the quarter ended September 30, 2004 in order to create the false appearance that there was demand for Tectonic Solutions' Virtual Model products or services, when there was none, and that the business would be a huge financial success when it was in a highly speculative, developmental stage.

67. These representations were false and Wolford knew them to be false when he made them.

68. Wolford and Krug also presented in June 2004 to the Board of Directors a budget and forecast for the period July 1, 2004 through December 31, 2004 in which they projected that revenue from the developing Virtual Business Model business of Tectonic Solutions would be $2.4 million.

69. Wolford and Krug knew when they gave these projections that they were not based on any facts or reasonable assumptions.

70. There were no contracts; the work had not been completed; whatever work that was done was for businesses or organizations that Wolford controlled or influenced, principally non-profit organizations in which he was a director; no invoices for the work were paid; and the projected revenue of $2.4 million had no basis in fact.

71. Wolford and Krug intended that the Board of Directors of Tectonic Network rely upon those representations and projections in order to secure their agreement to (a) the sale of GO Software, (b) Tectonic Network's procuring financing during the period August 2004 to

January 2005 to fund Tectonic Solutions' speculative and failing businesses, and (c) Tectonic Network's investment of substantial funds in the new Virtual Model Business. The Board of Directors agreed to all of the foregoing in reliance on the representations and projections.

72. When Wolford first urged the development of a Virtual Model Business, Tectonic Network had neither the funds nor the staff and management time to develop this business but Wolford insisted that the project proceed, and gave the project to an outside contractor, RCMS, to develop.

73. Wolford denied other management members of Tectonic Network any right to audit or oversee RCMS in this project and insisted that Tectonic Network pay RCMS's invoices without audit.

74. Tectonic Network paid over $500,000 to RCMS for this project without any meaningful progress by RCMS.

75. Additionally, RCMS competed with Tectonic Network for the same customers that Tectonic Network targeted for its Virtual Model Business. Wolford failed to procure a non-compete covenant from RCMS before it was retained by him, which would have barred it from soliciting business from the same customers.

76. Upon information and belief, Wolford gave the work to develop the Virtual Model Business to RCMS to advance the career of his nephew who was employed by RCMS.

The National Print Directory Fraud

77. Wolford squandered the assets of Tectonic Network further and attempted to conceal his fraud in the sale of CYP's print directory business to Tectonic Network by insisting that a national print directory be published and distributed by Tectonic Network in early 2005.

78. When Tectonic Network acquired CYP's business in late 2003, CYP was in the business of publishing general print directories for distribution in four regions of the United States, entitled the "Construction Yellow Pages", which listed the addressees and telephone numbers of construction contractors, manufacturers of construction equipment, and manufacturers and distributors of building construction products, and were intended for distribution to all purchasers of construction products.

79. CYP sold advertising space to various of those businesses for which it listed addresses and telephone numbers in the directories.

80. Following the acquisition of CYP's business, Tectonic Network conducted market research on what types of directories would be profitable and preferred by customers. It determined that advertisers preferred to advertise in vertical directories, i.e, directories aimed at a specific audience such as interior designers or roofing contractors, listing only those manufacturers of construction products of interest to the specific audience.

81. Despite the market research, Wolford ordered that, in addition to the vertical market directories, Tectonic Network publish and distribute in the first half of 2005 a general, national directory similar to the general regional directories CYP had distributed previously. The resulting general, national directory, aimed at all purchasers of construction products as were the regional directories distributed by CYP before the acquisition of its business, cost Tectonic Network approximately $500,000 to publish and distribute. Shortly after it was distributed, Wolford decided that Tectonic Network would never again publish and distribute such a general, national directory.

82. Wolford insisted on this one time publication and distribution in an effort to conceal the falsity of his representations to Tectonic Network's Board of Directors that CYP's

operating assets should be purchased because CYP's business of distributing general directories to all purchasers of construction products (rather than to a segment of such purchasers) was viable with a profitable future for Tectonic Network. Accordingly, Wolford wasted significant funds of Tectonic Network, sorely needed by that company, in order to further hide the fraudulent representations made by him about the business of CYP to Tectonic Network to cause its acquisition.

The Sale of GO Software

83. Prior to its sale in February 2005, the GO Software business was the largest generator of revenue for Tectonic Network and the only profitable business among all of those owned by Tectonic Network.

84. For the year ended June 30, 2004, GO Software was responsible for $8,917,666 of the total revenues of $10,586,034 of Tectonic Network and its subsidiaries (including Tectonic Solutions) on a consolidated basis.

85. Beginning in or about the Summer of 2004, Wolford commenced a campaign aimed at convincing the Board of Directors that Tectonic Network should sell its GO Software business to generate funds for the supposedly up and coming Virtual Model Business and to support the three businesses acquired at the end of 2003 and early 2004, i.e., the businesses of BBN, CYP, and SpecSource. Indeed, as part of this campaign, Wolford induced the Board of Directors to approve procuring loans of substantial sums of money to Tectonic Network, including those given in return for secured convertible notes issued by Tectonic Network in August and November 2004, to finance the three acquired businesses and the Virtual Model Business on the basis that the GO Software business would be sold to repay these loans.

86. In addition to his misrepresentations about the Virtual Model Business alleged in paragraphs 64 through 66, 68, and 69 herein, Wolford continued to represent falsely to the Board of Directors, without any reasonable basis, that the SpecSource business was viable and would generate enormous profits in the future and hid from the Board of Directors the material incompleteness of and inaccuracies in the SpecSource reference database, the materially inflation of the numbers of hits and searches on the website, and the materially negative impact that revelation of those misrepresentations to the customers had and would have on the SpecSource business.

87. On December 6, 2004, Tectonic Network entered into an Asset Purchase Agreement with VeriFone, Inc. ("VeriFone") pursuant to which VeriFone purchased substantially all of GO Software's assets. The sale closed on February 28, 2005. Under the terms of the Asset Purchase Agreement, VeriFone paid GO Software $13 million in cash at closing, and VeriFone was obligated to pay GO Software up to an additional $2 million depending upon future events.

88. In early January 2005, Tectonic Network gave two notes to a lender in return for the loan of $5.5 million to Tectonic Network, of which $2,300,000 was used by Tectonic Network to pay the secured convertible notes referred to in paragraph 85 above and another $1,500,000 was used by Tectonic Network to pay other loans procured by Tectonic Network in 2004 used to finance the three acquired businesses and the Virtual Model Business.

89. In reliance on Wolford and Krug's false representations concerning and prior to the acquisitions of the BBN, CYP, and SpecSource businesses, and their false representations concerning the positive contributions of these acquired businesses to Tectonic Solutions in the first quarter of 2004 and thereafter, (a) Tectonic Network's Board of Directors approved

Tectonic Network's investment of millions of dollars to develop Tectonic Solutions and specifically the three acquired businesses, including through the loans alleged above and the sale of the GO Software business, and (b) Tectonic Network's Board of Directors and shareholders approved the sale of GO Software for $13 million so that Tectonic Network could supposedly devote all of its corporate resources to Tectonic Solutions.

90. Also in reliance on the aforesaid representations, Tectonic Network's Board of Directors approved Tectonic Network's securing the aforesaid loans in 2004 totaling approximately $3.8 million to finance the allegedly promising businesses of Tectonic Solutions.

91. Defendant Charles Pecchio, Jr. ("Pecchio") had an interest in the sale of GO Software that only he, Wolford, and White, Wolford's accomplice in the sale of SpecSource's business, and no other shareholder in Tectonic Network had. Wolford and Pecchio advocated and induced the Board's decision that such sale would be deemed a change of control of Tectonic Network, which, under the terms of the employment agreement between Tectonic Network and Pecchio, the note given by Tectonic Network to SpecSource, and the note given by Tectonic Network to White triggered obligations of Tectonic Network to pay $360,000 in monthly installments to Pecchio, pay $533,000 to SpecSource, and pay $360,000 to White.

92. Each of Pecchio and Wolford had a personal interest and benefit at stake in the sale of the assets of GO Software, as the sale proceeds would be able to finance the payment of the note given to SpecSource, of which Wolford was entitled to 67.6%, the payment of the note given to White, and the monthly installment payments to be made to Pecchio. Accordingly, by urging and inducing their fellow members of the Board of Directors to approve the sale, Wolford and Pecchio were interested directors, appearing on both sides of the transaction involving the sale of GO Software's assets.

93. Defendant Wolford allegedly waived his right to receive payment then (but not later) under the change in control provision in his employment contract, which, like the change of control provision in Pecchio's employment contract, provided for 24 consecutive monthly installments totaling $360,000. Wolford did so only because he was then receiving 67.6% of the $473,124 paid on the $533,000 note given to SpecSource by Tectonic Network in connection with the sale of the SpecSource business to Tectonic Network, and Wolford did not want to appear that he was not only profiting in the amount of $473,124 but also another $360,000 in cash from the sale. His receipt of over $800,000 from sale proceeds would make it clear to anyone the fact that he urged the sale of GO Software to benefit himself at the expense of Tectonic Network.

94. Tectonic Network sold the business of its wholly-owned subsidiary, GO Software, in February 2005, costing Tectonic Network more than $2 million in fees.

95. In reliance on the false representations of Defendants Wolford and Krug set forth in paragraphs 24 through 26, 29, 39, 40, 42 through 45, 47, 51 through 56, 62, 64 through 66, 68, 69, 82, and 86 herein, Tectonic Network's Board of Directors decided that, after payment of fees and liabilities in connection with the sale and setting aside $4,000,000 of the sale proceeds to secure most of the loan to Tectonic Network, alleged in paragraph 88 above, the balance of the proceeds of the sale of GO Software's business would be invested in Tectonic Solutions' business consisting of the combined three business that had been acquired and the purported Virtual Model Business as well as in payments to Wolford and others as alleged below.

96. Within two months after the sale of GO Software's business, Tectonic Network and Tectonic Solutions were in desperate financial condition.

The Wrongful Payments to Wolford and His Confederates

97. Following the sale of GO Software's assets on or about February 28, 2005, and from the sales proceeds, Tectonic Network paid SpecSource $473,124 on the note in the amount of $533,000 given to it, paid White the $360,000 principal amount on the note given to him, and commenced paying Pecchio the monthly installments.

98. But for the sale of GO Software's business, Wolford could not have asserted that SpecSource was entitled to any payment on the note given to it. According to the Form 10-KSB filed by Tectonic Network with the SEC on June 30, 2004 and the Form SB-2/A filed by Tectonic Network with the SEC on June 28, 2005, payment under the that note was only required "when [Tectonic Network] has cash, net of debt obligations exceeding $5.25 million, on its quarterly balance sheet."

99. The $5.25 million threshold was never met.

100. In successfully advocating and inducing the sale of GO Software's business, Wolford caused the payment of $473,124, from the sale proceeds, on the note given to SpecSource as the sale of GO Software's business was deemed a change of control of Tectonic Network, triggering payment under the note, and thereby enriching Wolford as the owner of 67.6% percent of the issued and outstanding stock of SpecSource and depriving Tectonic Network of cash that it desperately needed to continue in business.

101. In successfully advocating and inducing the sale of GO Software's business, Defendants Wolford, Krug, and Pecchio also caused Tectonic Network to pay, from the sale proceeds, to John White the amount of the note given to him, i.e., $360,000, and the initial

installments of monthly payments to Pecchio, and thereby deprived Tectonic Network of cash that it desperately needed to continue in business.

102. Defendants Wolford and Krug authorized and caused Tectonic Network to make these payments to insiders, Wolford and Pecchio, and to Wolford's accomplice in the sale of SpecSource's business assets to Tectonic Network, White.

103. As disclosed in Tectonic Network's Statement of Financial Affairs, Schedule 3(b) thereto, filed with the Court in the Bankruptcy, while Tectonic Network had gross revenues of approximately $1.22 million for the year ending June 2005, payments within the prior year to insiders exceeded $1.572 million, including salary, bonuses, and note payments. This disclosure revealed Defendants Wolford, Krug, and Pecchio's self dealing and wrongful stripping of value from Tectonic Network.

104. Less than six months after payment of the notes given to SpecSource and White, and commencement of payment of the monthly installments to Pecchio, Tectonic Network filed for protection under the bankruptcy laws, claiming insolvency.

AS A FIRST CLAIM FOR RELIEF

(Defendants Wolford and Krug - Fraud)

105. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 104 of this Complaint as though fully set forth herein.

106. At the times when Defendants Wolford and Krug made the representations set forth in paragraphs 24 through 26, 29, 39, 40, 42 through 45, 47, 51 through 56, 62, 64 through 66, 68, 69, 82, and 86 herein, those Defendants knew those representations to be false or made

them with reckless disregard for their truth or falsity, and intended that Tectonic Network's Board of Directors rely on the representations.

107. The Board of Directors of Tectonic Network relied on the aforesaid representations in approving the acquisitions of the businesses of BBN, SpecSource, and CYP, investing substantial sums in those businesses after acquisition and in the worthless Virtual Model business, approving the sale of the GO Software business, and approving Tectonic Network's payments to insiders.

108. The members of the Board of Directors of Tectonic Network, except for Wolford, did not know the falsity of the representations when those members relied on the representations.

109. As a result of the false representations and fraud of Defendants Wolford and Krug, Tectonic Network and Plaintiff have all suffered damages in an amount to be determined at trial but in any event in excess of $ 3,000,000.

AS A SECOND CLAIM FOR RELIEF

(Defendant Wolford - Breaches of Fiduciary Duties)

110. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 104 of this Complaint as through fully set forth herein.

111. Defendant Wolford, as President and CEO and a director of Tectonic Network, owed that corporation fiduciary duties.

112. Defendant Wolford breached his fiduciary duties to Tectonic Network.

113. Defendant Wolford breached his duty of undivided loyalty to Tectonic Network and its shareholders, and engaged in self-dealing to enrich himself and to avoid future expenses

in developing the BBN, CYP, and SpecSource businesses and to have Tectonic Network assume those great expenses.

114. As a result of Wolford 's breaches of his fiduciary duties, including his duty of undivided loyalty, and his self-dealing, Tectonic Network and Plaintiff have all suffered damages in an amount to be determined at trial but in any event in excess of $ 3,000,000.

AS A THIRD CLAIM FOR RELIEF

(Defendant Krug - Breaches of Fiduciary Duties)

115. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 104 of this Complaint as through fully set forth herein.

116. Defendant Krug, as Chief Financial Officer and Treasurer of Tectonic Network, owed that corporation fiduciary duties.

117. Defendant Krug breached his fiduciary duties to Tectonic Network.

118. Defendant Krug, as Chief Financial Officer and Treasurer of Tectonic Network, owed a duty of undivided loyalty to Tectonic Network.

119. Defendant Krug breached his duty of undivided loyalty to Tectonic Network, and engaged in self-dealing to enrich himself, and Krug aided and abetted Wolford's breaches of his fiduciary duties to Tectonic Network and self-dealing in order to enrich himself by the salaries, stock options, and bonuses paid or given to him based on Wolford's support and recommendation.

120. As a result of Krug's breaches of his fiduciary duties, including his duty of undivided loyalty, and his self-dealing, Tectonic Network and Plaintiff have all suffered damages in an amount to be determined at trial but in any event in excess of $ 3,000,000.

AS A FOURTH CLAIM FOR RELIEF

(The Director-Defendants - Breaches of Fiduciary Duties)

121. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 104 of this Complaint as though fully set forth herein.

122. The Director-Defendants, as members of Tectonic Network's Board of Directors, owed fiduciary duties to that corporation.

123. Defendant Wolford was not only a member of the Board for Directors of Tectonic Network but he also exercised control or pervasive influence over its members who thereby lacked independence. Both prior to the acquisitions of the businesses of BBN, SpecSource, and CYP and thereafter, he exercised control or pervasive influence over the Board (i) as a close friend and supervisor of Charles McRoberts for many years, to whom Charles McRoberts reported, (ii) because director Theo VanderBoom was a Chief Financial Officer in another company in which Wolford was the Chief Executive Officer to whom VanderBoom reported, and (iii) director Laura Rogers wished to become the President of Tectonic Network and required Wolford's good will and support to secure that position.

124. After the acquisitions of the businesses of BBN, SpecSource, and CYP, Defendant Wolford exercised even greater control or pervasive influence over the members of the Board, who thereby lacked independence, because through those acquisitions he became that the person with the largest shareholding in Tectonic Network, holding a beneficial interest in 24.2% of the outstanding common stock of Tectonic Network. Furthermore, Wolford was the only member of the Board with knowledge of the day to day workings and status of the business of Tectonic Network and its subsidiaries.

125. Lacking independence from Wolford and, in the cases of Wolford, John McRoberts, Charles McRoberts, and Pecchio, acting in their self-interest, the Board of Directors approved, at Wolford's request and recommendation and without serious examination by the other members of the Board, (a) the material investments that Wolford advocated, i.e., (i) the acquisitions of the businesses of BBN, SpecSource, and CYP, (ii) the funding of those businesses after their acquisition, (iii) the funding of the Virtual Model business, and (iv) the publication and distribution of the National Print Directory in 2005 at an expense of about $500,000; and (b) the sale of GO Software's business to invest the net proceeds in the worthless BBN, SpecSource, CYP, and Virtual Model businesses operated by Tectonic Solutions, and to pay $473,124 on the note given to SpecSource, to pay the note given to John White, and to pay the monthly installments to Pecchio.

126. The Board of Directors did not procure any independent evaluations of the potential acquisitions of the businesses of BBN, SpecSource, and CYP.

127. The Board of Directors' decisions to (i) acquire the businesses of BBN, SpecSource, and CYP and thereafter finance them, (ii) fund the Virtual Model business, and (iii) sell the GO Software business to focus on and fund those businesses and pay monies to Wolford, White, and Pecchio constituted decisions that no reasonable person could possibly authorize in good faith because it should have been readily apparent to the Board of Directors that

(a) the BBN, SpecSource, CYP, and Virtual Model businesses would absorb whatever financial resources were available to Tectonic Network, and those resources could not reasonably be expected to make these businesses ever profitable, and if that was not apparent to the Board, each of its members paid no attention to the poor financial condition and prospects of

those businesses and relied in bad faith on the misrepresentations of Wolford and his confederates, including John White;

(b) selling the GO Software business, the only significant generator of revenue and only generator of profit among the businesses owned by Tectonic Network, to support the BBN, SpecSource, CYP, and Virtual Model businesses would be a suicidal decision for Tectonic, and if that was not apparent to the Board, each of its members paid no attention to the poor financial condition and prospects of those businesses and relied in bad faith on the representations of Wolford and his confederates;

(c) Tectonic Network's acquisition of the BBN, SpecSource, and CYP businesses would benefit only Wolford and the other owners of those businesses rather than Tectonic Network because such acquisitions would relieve Wolford and the other owners of any need to invest any further in them while permitting Wolford and the other owners to profit, in the event these businesses somehow ever prospered as owned by Tectonic Network, through the huge amounts of stock of Tectonic Network that they received in partial consideration for selling these businesses to Tectonic Network; and

(d) there was no justification or need for Tectonic Network to give SpecSource a promissory note in the amount of $533,000 and White a promissory note in the amount of $360,000, in addition to the huge blocks of stock of Tectonic Network given to them, in return for the virtually worthless SpecSource business.

128. The Board of Directors' decisions, in or about March, 2005, to authorize payment then of $473,124 of the note given to SpecSource in connection with Tectonic Network's acquisition of the SpecSource business and to pay White on the note given to him also constituted decisions that no reasonable person could possibly authorize in good faith.

129. The Board could not reasonably have concluded in good faith that it was proper or prudent, in or about March, 2005, for Tectonic Network to pay $473,124 on the note given to SpecSource or to pay the note given to White when the acquisition of the SpecSource business was induced by fraud and business was riddled by fraudulent practices at the time of acquisition.

130. Based on the foregoing, the Director-Defendants breached their fiduciary duties to Tectonic Network, and damaged it and Plaintiff.

WHEREFORE, Plaintiff demands judgment in its favor against each of the Defendants:

A. On the First Claim for Relief herein, as against Defendants Wolford and Krug, jointly and severally, in a sum to be determined at trial together with pre-judgment and post-judgment interest thereon;

B. On the Second Claim for Relief herein, as against Defendant Wolford in a sum to be determined at trial together with pre-judgment and post-judgment interest thereon;

C. On the Third Claim for Relief herein, as against Defendant Krug in a sum to be determined at trial together with pre-judgment and post-judgment interest thereon;

D. On the Fourth Claim for Relief herein, as against the Director-Defendants, jointly and severally, in a sum to be determined at trial together with pre-judgment and post-judgment interest thereon;

E. For Plaintiff's attorneys' fees, and the costs and disbursements of this action; and

F. For such other and further relief as the Court may deem just and proper.

Dated: October 27, 2006

Ian Connor Bifferato (#3273)
Linda Richenderfer (#4138)
**BIFFERATO, GENTILOTTI, BIDEN & BALICK**
1308 Delaware Ave.
Wilmington, DE 19806
Telephone: 302-429-1900
Facsimile: 302-429-8600

-and-

**OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP**
Thomas J. Fleming
Herbert C. Ross, Jr.
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Telephone: (212) 451-2300
Facsimile: (212) 451-2222

*Attorneys for Plaintiff*

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

06 - 665

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS:** Ad Hoc Committee of Equity Holders of Tectonic Network, Inc.

**DEFENDANTS:** Arol Wolford; Sherwin Krug; Charles McRoberts; John McRoberts; Charles Pecchio, Jr.; Laura Rogers; and Theo Vanderboom

(b) County of Residence of First Listed Plaintiff : New York County, NY
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: Fulton County, Georgia
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (Firm Name, Address, and Telephone Number) Bifferato, Gentilotti, Biden & Balick LLC, 1308 Delaware Avenue, Wilmington, DE 19806, (302) 429-1900

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated *and* Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☒ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 860 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS – Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District (Specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**)
28 U.S.C. §1332

Brief description of cause:
Breach of Fiduciary Duty / Fraud

## VII. REQUESTED IN COMPLAINT

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
**DEMAND**
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE ____ DOCKET NUMBER ____

**DATE:**
October 27, 2006

SIGNATURE OF ATTORNEY OF RECORD
[signature]

**FOR OFFICE USE ONLY**

RECEIPT # 145203 AMOUNT $350.00 APPLYING IFP — JUDGE — MAG. JUDGE —

2006 OCT 27 PM 4:27

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. 06- 665

## ACKNOWLEDGMENT OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A UNITED STATES MAGISTRATE JUDGE TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF 2 COPIES OF AO FORM 85.

10/27/06
(Date forms issued)

(Signature of Party or their Representative)

Brian E. Grossan
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action