IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AD HOC COMMITTEE OF EQUITY HOLDERS OF TECTONIC NETWORK, INC.<br><br>Plaintiff,<br><br>vs.<br><br>AROL WOLFORD, SHERWIN KRUG, CHARLES McROBERTS, JOHN McROBERTS, CHARLES PECCHIO, JR., LAURA ROGERS and THEO VANDERBOOM<br><br>Defendants. | Civil Action No. 06-665 (KAJ) |

## COMPENDIUM OF CASES CITED IN OPENING BRIEF
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

YOUNG CONAWAY STARGATT & TAYLOR, LLP
William D. Johnston (No. 2123)
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Telephone:  (302) 571-6672

PAUL, HASTINGS, JANOFSKY & WALKER, LLP
J. Allen Maines, Bar No. 466575
John G. Parker, Bar No. 562425
Albert M. Myers, Bar No. 002711
600 Peachtree Street, Suite 2400
Atlanta, GA  30308
Telephone:  (404) 815-2400
Facsimile:  (404) 815-2424

*Attorneys for Defendants*

November 28, 2006

# UNREPORTED CASES

TAB

Benerofe v. Jung Woong Cha, C.A. No. 14614, 1998 WL 83081,
(Del. Ch. Feb. 20, 1998) ...................................................................................................1

Litt v. Wycoff,
No. Civ. A. 19083 NC, 2003 WL 1794724 (Del. Ch. Mar. 28, 2003) ...............................2

Siegman v. Tri-star Pictures, Inc.,
No. Civ. A. No. 9477, 1989 WL 48746 (Del. Ch. May 5, 1989) .......................................3

Stanziale v. Nachtomi,
C.A. No. 01-403 KAJ, 2004 U.S. Dist. LEXIS 15664 (D. Del. Aug. 6, 2004) ..................4

Stein v. Orloff,
No. 7276, 1985 WL 11561 (Del. Ch. May 30, 1985)........................................................5

Stone v. Ritter,
No. 93, 2006, 2006 Del. LEXIS 597 (Del. Nov. 6, 2006) ..................................................6

Tomczak v. Morton Thiokol, Inc.,
Civ. A. No. 7861, 1990 Del. Ch. LEXIS 47 (Del. Ch. Apr. 5, 1990)................................7

Turner v. Bernstein,
No. 16190, 1999 WL 66532 (Del. Ch. Feb. 9, 1999) ........................................................8

# EXHIBIT 1

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 83081 (Del.Ch.)
(Cite as: Not Reported in A.2d)

**H**

Benerofe v. ChaDel.Ch.,1998.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
Mitchell I. BENEROFE and Ronald J. Oleck, Plaintiffs,
v.
Jung Woong CHA, Chang Kim, Donald Winstead, and Inorganic Coatings, Inc., Defendants.
No. 14614.

Feb. 20, 1998.

Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; of counsel: Anthony L. Tersigni, and Paul K. Feldman, of Meyers Tersigni Feldman & Gray, New York, City, for plaintiffs.
Judith Nichols Renzulli, and Robert J. Valihura, Jr., of Duane, Morris & Heckscher, Wilmington, Delaware, for defendants Jung Woong Cha, Chang Kim and Donald Winstead.

**MEMORANDUM OPINION**

CHANDLER, Chancellor.

**\*1** Alleging failure to make pre-suit demand and failure to state claims for which relief may be granted, defendants seek to dismiss plaintiffs' second amended complaint. Plaintiffs allege that defendants have wasted corporate assets, usurped a corporate opportunity, and are engaged in ongoing self-dealing that is depriving class members of their contractual rights as third-party beneficiaries. I deny defendants' first motion to dismiss finding that plaintiffs' allegations raise a reasonable doubt that the majority of the defendant directors are independent. I deny, in part, defendants' second motion to dismiss concluding that plaintiffs have stated a claim for waste of corporate assets. All other claims, however, are dismissed for failure to assert a claim for which relief may be granted.

I. BACKGROUND

For the purpose of the present motions, the following factual allegations of the second amended complaint are accepted as true. Plaintiffs Mitchell I. Benerofe

and Ronald J. Oleck are Class A and Class B shareholders of Inorganic Coatings, Inc. ("ICI"), a Delaware corporation. Defendants are ICI and its Board of Directors: Jung Woong Cha ("Cha"); Chang Kim ("Kim") and Donald Winstead ("Winstead"). In 1994, ICI and Kun Sul Painting Industries Co., Ltd. ("KSP") entered into a Stock Purchase Agreement pursuant to which KSP purchased 8.5 million shares of newly issued ICI Class C stock for $2.6 million. All three classes of ICI stock provided one vote per share. KSP's 8.5 million Class C shares represented 59% of ICI's issued and outstanding shares of all stock classes and provided KSP with voting control of ICI. KSP also obtained the right to elect two of ICI's three directors.

ICI and KSP also entered into a Shareholders' Agreement that provided ICI's Class A and Class B shareholders with rights as third-party beneficiaries. These rights, which included the right to put their shares back to ICI or to sell their shares in a public market, if and when ICI established such a market, were contingent upon the level of ICI's revenues, or at least made more favorable if ICI reached certain revenue levels. Apparently to set aside sufficient funds to cover the cost of any future puts, ICI agreed to place one-half of its net profits into a collateral account in which the third-party beneficiaries were granted a security interest.

II. ANALYSIS

Plaintiffs allege both derivative and class claims. Derivatively they allege that the individual defendants have engaged in corporate waste and have usurped a corporate opportunity for the benefit of KSP by allowing ICI to sell its products to KSP at inadequate prices. Their class claim asserts actions variously described as acts that have caused the defendants to breach the Shareholders' Agreement, acts that have deprived and continue to deprive plaintiffs of their rights under the Agreement, and acts which caused and continue to cause defendants to violate their obligation of good faith and fair dealing.

A. *The Derivative Claims*

**\*2** The second amended complaint provides a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 83081 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 2

succinct description of both derivative claims. First, plaintiffs allege that "[b]y causing ICI to sell its products to KSP for far less than the price ICI could obtain from third party purchasers, the individual defendants are causing, or knowingly permitting, a waste of ICI's assets." [FN1] Second, plaintiffs assert that "[b]y causing ICI to sell products at grossly inadequate prices to KSP, which then sells them in Korea at huge mark-ups for its own exclusive benefit, the individual defendants have deprived ICI of a corporate opportunity, and appropriated that opportunity for the benefit of KSP." [FN2]

> FN1. Second Am. Compl. ¶ 17.

> FN2. *Id.* ¶ 18.

### 1. Is Demand Excused?

This is not the first time that defendants have sought to dismiss plaintiffs' derivative claims for failure to demonstrate that demand is futile and, thus, that it should be excused. On September 12, 1996, I dismissed plaintiffs' derivative claims in the initial complaint for failure to demonstrate that demand on ICI's Board should be excused. [FN3] Although I found that plaintiffs had failed to raise a reasonable doubt that the directors were disinterested and independent or that the directors' acts were otherwise the result of business judgment, I permitted plaintiffs to amend the complaint to add, if they could, sufficient facts to support their contention that demand should be excused. Plaintiffs have since amended their complaint to add, in support of their claim that demand should be excused, the following factual allegations of paragraph eleven.

> FN3. *Benerofe v. Cha,* Del.Ch., C.A. No. 14614, Chandler, V.C. (Sept. 12, 1996).

In addition to being a KSP designee to ICI's Board, Mr. Kim is currently the President and Chief Executive Officer of ICI. KSP caused him to be installed in those offices on or about December 15, 1994. As President and CEO, Mr. Kim replaced Parke Schaffer, who had provided ICI with day to day full-time management. Serving as ICI's President has been, since December, 1994 and is Mr. Kim's full-time employment. Indeed, Mr. Kim bought a house in suburban Philadelphia, near ICI's offices, and moved his principal residence there so he could live near his place of work. His compensation for his services as ICI's President and CEO (which

ICI does not make public) has been and is his principal source of financial support. That is, Mr. Kim earns his living by serving as ICI's President and CEO. He serves as a director of ICI and maintains his principal employment as President and CEO of ICI at KSP's sufferance. In addition, Mr. Kim is a long-time friend of Mr. Cha, their relationship dating back to well before they became ICI directors. [FN4]

> FN4. *Id.* ¶ 11. The second amended complaint elsewhere describes the way in which Kim obtained his positions as CEO, President and director of ICI by stating that KSP "designated Mr. Kim to replace Parke Schaffer as a director, President and CEO of ICI." *Id.* at ¶ 19A.

The second amended complaint also adds reference to the fact that the defendants contend that the sales from ICI to KSP were made pursuant to a Distribution Agreement dated February 18, 1993. Plaintiffs allege that this Agreement is not valid because ICI's former President and CEO did not have the authority to enter into this agreement. They do not, however, request a declaration to this effect and fail to add the former President as a defendant in this action.

*3 In my previous opinion, I noted that plaintiffs' claim was based on the actions of the current Board, rather than any action taken by the previous Board. I am unable to conclude that plaintiffs' second amended complaint changes this focus and read the allegations in paragraphs 19A through 19D to assert that demand should be excused because the actions of the current directors could not possibly be the result of a valid exercise of business judgment. Specifically, these alleged acts include 1) the failure of the Board to determine if the Distribution Agreement was a valid contract and if not, to determine if there was any way in which to terminate the Agreement, 2) the Board's decision to effectuate two amendments to the Agreement and to thereby expand its scope, and 3) the failure of the Board to exercise its authority to increase the price of ICI products sold under the Agreement. Because I conclude that plaintiffs have successfully raised a reasonable doubt that the majority of ICI's Board is independent and, thus, that defendants' motion to dismiss for failure to make pre-suit demand must be denied, I need not consider whether the facts alleged in paragraphs 19A-19D would also excuse demand on the basis that the Board's acts could not possibly be the product of a valid exercise of business

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 83081 (Del.Ch.)
(Cite as: Not Reported in A.2d)

judgment.[FN5]

> FN5. *See Id.* at ¶ 21C (Plaintiffs allege that demand should be excused because "ICI's directors have failed to exercise business judgment in their purported adherence to and ratification of the terms of the Distribution Agreement.").

Paragraph eleven attempts to state facts sufficient to raise a reasonable doubt that the directors are independent. The only facts alleged in paragraph eleven not alleged in the original complaint are the facts that Kim is the President and CEO of ICI, that KSP "caused" Kim to be installed as President and CEO, that Kim's position as President is a full-time position that provides his principal source of income, that Kim moved to live near his place of employment, and that Kim is a long-time friend of Cha. The location of Kim's residence and the allegation that he is a long-time friend of Cha, without more, fails to raise a reasonable doubt that Kim would be able to exercise independent judgment.

Although not stated in the original complaint, I considered the fact that Kim was the President and CEO of ICI and the fact that Kim was alleged to serve these positions at the pleasure of KSP when I first determined that plaintiffs had failed to state sufficient nonconclusory facts to support their claim that demand should be excused.[FN6] As I stated in that Opinion, "the fact that the corporation has one controlling shareholder does not, as a matter of law, establish that its directors are dominated or controlled by that shareholder." [FN7] Because plaintiffs failed to demonstrate that Kim was "beholden" to the controlling shareholder for personal or other reasons, I was unable to conclude that demand should be excused. Specifically, I noted that plaintiffs failed to allege that, as President of ICI, Kim received substantial remuneration that hinged solely on his relationship with KSP.

> FN6. *Benerofe,* Del.Ch., C.A. No. 14614, at 17 (Sept. 12, 1996).

> FN7. *Id.*

As defendants note, the second amended complaint does not allege that KSP directly pays Kim's salary as a director of ICI and does not state the salary Kim receives. Plaintiffs do allege that KSP owns 59% of

ICI, that KSP appointed Kim as President, CEO and director of ICI, and that plaintiffs are unable to state the salary provided by ICI because it is not public information. Accepting plaintiffs' nonconclusory factual allegations as true and recognizing that plaintiffs have not had the benefit of full discovery, I must conclude that plaintiffs' allegations raise a reasonable doubt that Kim, appointed to his positions of director, President and CEO by KSP, would be able to exercise independent judgment free of influence from KSP and its President, Cha, a fellow member of ICI's Board.

*4 In *Aronson v. Lewis,* the Delaware Supreme Court stated that "it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence." [FN8] In *Rales v. Blasband,* the Court concluded that majority shareholders in the positions of Chairman of the Board and Chairman of the Executive Committee were "in a position to exert considerable influence over" a fellow director who, like Kim, was also the President and CEO, even though the President's "continued employment and substantial remuneration may not hinge solely on his relationship with" the majority shareholders.[FN9]

> FN8. Del.Supr., 473 A.2d 805, 816 (1984).

> FN9. Del.Supr., 634 A.2d 927, 937 (1993).

Because I am unable to conclude that the allegations of the second amended complaint should be viewed as presenting a situation any different than presented by *Rales,* I must conclude that plaintiffs have alleged facts sufficient to raise a reasonable doubt that Kim and Cha would be unable to exercise judgment independent of the influence of KSP. Concluding, therefore, that plaintiffs have successfully challenged the independence of two of ICI's three directors, I must conclude that demand would be futile and that it is, thus, excused. Accordingly, I deny defendants' motion to dismiss for failure to make pre-suit demand.

*2. Have plaintiffs alleged a claim of corporate waste?*

Defendants assert that plaintiffs have failed to state a claim of corporate waste. I previously preliminarily

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 83081 (Del.Ch.)
(Cite as: Not Reported in A.2d)

determined that plaintiffs had failed to assert allegations of waste sufficient to excuse demand on the basis that the defendants' actions could not possibly be the product of business judgment. Relying on this preliminary determination made in the context of a request to dismiss for failure to comply with Court of Chancery Rule 23.1, defendants now assert that the claim of waste must be dismissed for failure to state a claim. I am unable to agree. The facts alleged in the second amended complaint, *including the previously missing allegation that ICI sold its products to KSP at prices less than it was able to obtain in the open market for similar products and similar quantities,*[FN10] supports a claim that the prices charged to KSP by ICI for its products (prices that ICI is alleged to have had the ability to increase at any time) were so inadequate that "no person of ordinary, sound business judgment would deem it" a reasonable decision.[FN11] Thus, I would conclude that plaintiffs had stated a claim of corporate waste even if I had concluded that the decisions of ICI's directors were otherwise entitled to the protections of the business judgment rule.

FN10. *See* Second Am. Compl. ¶ 19D.

FN11. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 189 (1988).

### 3. *Have plaintiffs alleged a claim of corporate opportunity?*

Plaintiffs allege that by allowing KSP to purchase ICI products at grossly inadequate prices, the individual defendants have usurped a corporate opportunity from ICI for the benefit of KSP. Defendants contend that plaintiffs' allegations in support of this claim are "wholly conclusory and unsupported statements" that the Court may not accept as true on a motion to dismiss,[FN12] and that plaintiffs have failed to allege that defendants usurped a corporate opportunity for their own benefit, rather than for the benefit of a third party. By this second contention, defendants apparently intend to suggest that if Kim and Cha have or are diverting a corporate opportunity from ICI for the benefit of KSP, that such diversion of benefit from ICI to KSP could not possibly be considered to be a benefit to Kim and Cha, even though their independence from KSP has been sufficiently questioned to withstand a motion a dismiss for failure to make pre-suit demand. I doubt, but have no need to decide, that such an argument would successfully block a properly pled claim of corporate opportunity. But such a claim requires plaintiffs to allege, *inter*

*alia,* that ICI is able to exploit the opportunity allegedly misappropriated by defendants.[FN13] Plaintiffs have failed to make or to support such an allegation.

FN12. *See Id.* at n. 6.

FN13. *See, e.g., Broz v. Cellular Information Systems, Inc.,* Del . Supr., 673 A.2d 148, 155 (1996).

**\*5** Plaintiffs allege that sales of ICI's "products to Korean purchasers is within ICI's line of business and ICI is interested in that opportunity." [FN14] They do not allege that ICI would have been able to sell products in the Korean market without the assistance of KSP, a South Korean company that, according to second amended complaint, engages in business "primarily in the Republic of Korea." [FN15] The second amended complaint further states that in 1992, ICI entered into a "marketing support agreement to locate distributors in Korea or possibly establish a joint venture with a Korean affiliate." [FN16] Thereafter, ICI entered into the Purchase, Shareholders' and Distribution Agreements with KSP. On the basis of these facts, and plaintiffs' failure to allege, and support an allegation, that ICI was or is able to sell its products in Korea, I cannot assume that ICI has the ability to sell products in Korea without the assistance of KSP and must grant defendants' motion to dismiss the claim of corporate opportunity for failure to state a claim.

FN14. Second Am. Compl. ¶ 18.

FN15. *Id.* ¶ 5.

FN16. *Id.*

### B. *The Class Claim*

Plaintiffs' class claim asserts actions variously described as acts that have caused the defendants to breach the Shareholders' Agreement, acts that have deprived and continue to deprive plaintiffs of their rights under that Agreement, and acts that caused and continue to cause defendants to violate their obligation of good faith and fair dealing. All variations of this claim are represented in two paragraphs of the second amended complaint.
By their conduct as set forth above, the individual defendants are minimizing and reducing ICI's revenues. As a result they are depriving members of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 83081 (Del.Ch.)
(Cite as: Not Reported in A.2d)

the Class of their rights as third party beneficiaries of the Shareholders' Agreement, which are expressly tied to ICI's revenues. For example, ICI has no obligation to establish a public market for the Class A and Class B common stock unless its gross revenues equal or exceed $25 million per year for a two consecutive year period. The exercise price of the put conferred by the Stockholders' Agreement is expressly tied to gross annual revenues, and KSP will be relived of its guarantee of the funding of the put price if ICI's revenues do not equal or exceed $10 million for two consecutive years.

By their conduct, the individual defendants are causing ICI to breach the Shareholder's Agreement, and to act in derogation of the obligations of good faith and fair dealing implied therein. By serving interests of KSP to the disadvantage of the Class, the individual defendants have also breached their fiduciary duties to members of the Class.[FN17]

FN17. _Id._ ¶¶ 25-26.

Plaintiffs allege that the individual defendants are causing ICI to breach the Agreement. Yet plaintiffs fail to identify any express term breached by the conduct of any defendant. Plaintiffs allege that the conduct of the individual defendants is "depriving members of the Class of their rights as third party beneficiaries." But plaintiffs fail to identify any way in which their ability to exercise any right has been denied. The only rights that plaintiffs have alleged are the rights to put or to sell their shares. Plaintiffs contend that their claim asserts that they are being "deprived of the benefit of meaningful puts and are being left with a financially worthless contractual right." [FN18] But plaintiffs also note that _ICI remains obligated to pay for the puts, regardless of revenue levels,_[FN19] and plaintiffs do not contend that they have tendered their puts and have been denied the benefit of any right to which they are entitled. As such, their claim is premature.

FN18. Pls.' Ans. Br. at 26.

FN19. _Id._

*6 Finally, plaintiffs allege that individual defendants have breached their implied obligation of good faith and fair dealing. Plaintiffs' reliance on this implied duty, however, is misplaced. The implied obligation of good faith and fair dealing does not alone provide an actionable claim. This duty only arises in relation

to the enforcement of contractual conditions when one party has the sole discretion to determine the scope or occurrence of a condition.[FN20] A successful claim for breach of this implied duty exists when exercise of that discretion is found not to be the product of good faith and fair dealing. While it is possible to rest a claim of breach of the implied covenant of good faith and fair dealing on the assertion that defendants have deliberately prevented the occurrence of conditions precedent, [FN21] plaintiffs here fail to note the existence of any condition or discretionary language that defendants have failed to interpret in accordance with their obligations.

FN20. _Gilbert v. El Paso Co.,_ Del.Ch., 490 A.2d 1050, 1055 (1984), _aff'd,_ Del.Supr., 575 A.2d 1131 (1990).

FN21. _Cf. Gilbert,_ 575 A.2d at 1143 (covenant may preclude a party from "escaping its obligations by deliberately causing the occurrence of a condition precedent").

At most, plaintiffs allege that defendants had the right to raise prices under the Agreement, that they failed to do so, and that this failure has depressed ICI's revenues. But plaintiffs fail to allege that such depressed revenues have lowered the value of their puts or otherwise affected their rights in any way. They also fail to assert that, as third-party beneficiaries, they are entitled to a particular revenue level.[FN22] Moreover, the second amended complaint notes that defendants' right was a right to raise prices "at any time." No claim is made that defendants had an obligation to do so when certain conditions existed or particular determinations were made.

FN22. Plaintiffs' standing as third-party beneficiaries, rather than as parties, to the Agreement limits their rights under the Agreement to those clearly provided by the Agreement. As plaintiffs note, the Agreement provides a number of rights and remedies. For example, plaintiffs note that if ICI were to fail to fund the collateral account, that the third-party beneficiaries would receive a security interest in all of ICI's assets. In addition, if KSP failed to honor its agreement to guarantee ICI's payment of the puts, the third-party beneficiaries would receive KSP's rights to elect ICI's directors. Nowhere do plaintiffs

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 83081 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

       provide the basis for their alleged right to a particular revenue level.

Concluding that plaintiffs have failed to state any class claim for which relief may be granted, I must dismiss Count II without prejudice.    Because plaintiffs seek to add KSP as a defendant for Count II only, and because the addition of KSP as a party would not change the determination that plaintiffs have failed to state a class claim, I deny plaintiffs' motion to amend the complaint a third time.

Counsel should confer and agree upon a form of order that implements this decision.

Del.Ch.,1998.
Benerofe v. Cha
Not Reported in A.2d, 1998 WL 83081 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Westlaw.

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
(Cite as: Not Reported in A.2d)

C

Briefs and Other Related Documents
Litt v. WycoffDel.Ch.,2003.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
H. Allen LITT, Trustee of the H. Allen Litt, Esq.,
P.C. Pension Fund, Dated September 1, 1984,
Derivatively on Behalf of Nominal Defendant,
Progress Financial Corporation, Plaintiff,
v.
W. Kirk WYCOFF, Stephen T. Zarrilli, Joseph R.
Klinger, Charles J. Tornetta, A. John May, Kevin J.
Silverang, William O. Daggett, William L. Mueller,
Paul M. Lanoce, G. Daniel Jones, and John E.F.
Corson, Defendants,
andPROGRESS FINANCIAL CORPORATION, a
Delaware corporation, Nominal Defendant.
No. Civ.A. 19083-NC.

Submitted April 24, 2002.
Decided March 28, 2003.


Norman M. Monhait, of Rosenthal, Monhait, Gross
& Goddess, P.A., Wilmington, Delaware, Sherrie R.
Savett, Carole A. Broderick, Michael T. Fantini, and
Christopher L. Nelson, of Berger & Montague, P.C.,
Philadelphia, Pennsylvania, for Plaintiff.
Kenneth J. Nachbar, and William M. Lafferty, of
Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware, for Defendants W. Kirk Wycoff, Stephen
T. Zarrilli, Joseph R. Klinger, Charles J. Tornetta, A.
John May, Kevin J. Silverang, William O. Daggett,
William L. Mueller, Paul M. Lanoce, G. Daniel
Jones, and John E.F. Corson.

MEMORANDUM OPINION
NOBLE, Vice Chancellor.

I. INTRODUCTION

*1 Plaintiff H. Allen Litt brings this derivative action,
in his capacity as trustee of the H. Allen Litt, Esq.
P.C. Pension Fund,[FN1] on behalf of nominal
defendant, Progress Financial Corporation, a
Delaware corporation and thrift holding company
("Progress Financial" or the "Company"). Progress
Financial, in turn, is the sole shareholder of Progress
Bank, a federally chartered savings bank (the
"Bank").[FN2] The boards of directors of the Company

and the Bank are identical in composition. The
Plaintiff alleges that the directors of Progress
Financial breached their fiduciary duties to the
Company and its shareholders by conducting lending
activities, which the Plaintiff contends were
inappropriate for a thrift entity, through the
TechBanc division:[FN3] by paying bonuses to officers,
in the form of warrants received from lending
customers, for securing business for the TechBanc
division (the "Incentive Compensation Plan"); and by
paying certain other fees and commissions to officers
and directors.

> FN1. The caption lists Mr. Litt as the trustee
> of the pension fund. The Complaint alleges
> that "Plaintiff H. Allen Litt is, and was at all
> relevant times, a shareholder of nominal
> defendant Progress Financial." Compl. ¶ 2.
> Throughout this opinion, I presume standing
> of the Plaintiff, either personally or as
> trustee of the pension fund, on the basis of
> this allegation.

> FN2. The Complaint is often ambiguous
> about which entity, the Company or the
> Bank, took specific actions. For the purposes
> of this Memorandum Opinion, however, the
> differences are not material to my analysis.
> Therefore, I refer to the entities
> nonspecifically throughout this opinion as
> "Progress" wherever distinction is
> unnecessary or impossible.

> FN3. It is unclear whether TechBanc is a
> division of the Company or of the Bank. The
> Complaint refers to TechBanc as "the
> Bank's soon to be defunct division," Compl.
> ¶ 4(e), and as "the Company's 'Special
> Lending Division." ' Id. ¶ 19.

The Defendants have moved to dismiss the action
because the Plaintiff failed to make demand upon
Progress' board of directors as required by Court of
Chancery Rule 23.1. For reasons discussed below,
the motion to dismiss is granted.


II. FACTUAL BACKGROUND [FN4]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 2
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
(Cite as: Not Reported in A.2d)

FN4. The facts upon which I base this decision and, unless otherwise specified, all facts discussed in this opinion are taken from the well-pled allegations of the Complaint and any documents incorporated by reference. *See White v. Panic,* 783 A.2d 543, 547-48 n. 5 (Del.2001).

The Defendants, who are directors of Progress Financial and the Bank, are W. Kirk Wycoff ("Wycoff"), Joseph R. Klinger ("Klinger"), Stephen T. Zarrilli ("Zarrilli"), Charles J. Tornetta ("Tornetta"), A. John May [FN5] ("May"), Kevin J. Silverang [FN6] ("Silverang"), William O. Daggett, Jr. ("Daggett"), William L. Mueller ("Mueller"), Paul M. LaNoce ("LaNoce"), G. Daniel Jones ("Jones"), and John E.F. Corson ("Corson"). Wycoff is, in addition, the President and Chief Executive Officer of both the Company and the Bank and is the Chairman of the Board of the Company. Klinger also serves as Executive Vice President of the Bank.[FN7]

FN5. May is a partner at the law firm of Pepper, Hamilton LLP, which provides legal services to the Company.

FN6. Silverang is a partner at the law firm of Buchanan Ingersoll, which provides legal services to the Company.

FN7. Klinger may be an officer of the Company as well. *See* Compl. ¶ 28 (discussing the Company's award of compensation to its executive officers, including Klinger).

Tornetta's family members are partners in 436 Plymouth Road Associates, L.P. ("Plymouth Road"). Progress Financial has a fifteen-year lease on property owned by Plymouth Road on which Progress Financial makes lease payments totaling $85,000 annually.

Zarrilli was Chief Executive Officer and Chief Financial Officer of U.S. Interactive, Inc. ("USIT"). USIT, under Zarrilli's leadership, was a significant borrower from Progress. During that time, Wycoff and Zarrilli developed a "significant and longstanding relationship." [FN8] Zarrilli became a director of Progress in June 2000 and left his position at USIT on September 15, 2000. USIT filed for bankruptcy in January 2001. Zarrilli is a major shareholder of USIT; USIT's May 1, 2000, proxy statement disclosed that Zarrilli owned nearly

600,000 shares of USIT common stock.

FN8. *Id.* ¶ 5.

The Complaint is primarily focused on the TechBanc division's business. Over time, the lending activities conducted through the TechBanc division had the effect of changing the allocation of Progress' lending and leasing portfolio by increasing the percentage of Progress' assets allocated to commercial loans. [FN9] TechBanc specialized in lending to start-up Internet and technology companies. Following a review and examination of the Bank, the Office of Thrift Supervision ("OTS") issued a directive requiring the Bank to:

FN9. This impact on the portfolio allocation is alleged to have caused the Bank to violate the Home Owners' Loan Act's ("HOLA") qualified thrift lender test, which requires thrift institutions, such as the Bank, to maintain a certain percentage of their portfolio in housing, small business and consumer-related assets. *See* 12 U.S.C. § 1467a(m) (codifying the qualified thrift lender test). The Complaint also asserts that the TechBanc lending activities have resulted in large losses to the Bank. The only specifics given are that as a result of making more loans with higher risks, Progress was required to increase its loss reserves, which resulted in the Company reporting a loss of $1.4 million in the second quarter of 2001. This allegation, however, is amplified by the allegation that the losses reported in 2001 were caused by the need to reverse a $2.6 million gain (reported in 2000) on USIT warrants which had subsequently declined in value.

*2 "(i) reduce its lending to early stage companies; (ii) increase its leverage capital ratio ...; and (iii) increase its valuation allowance and implement improved credit review and monitoring programs." [FN10]

FN10. Compl. ¶ 35 (quoting Progress Financial Corp. Press Release of July 12, 2001).

Progress issued a press release announcing that the directors had approved a resolution to bring the Bank

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 3
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
(Cite as: Not Reported in A.2d)

into compliance with the directive. In addition, Progress announced its intention to "wind down [its] technology-based portfolio of loans to pre-profit clients," [FN11] apparently a decision to discontinue or to change radically the lending activities of the TechBanc division.

FN11. *Id.*

Progress received warrants from borrowers on loans made through TechBanc. In 1999, Progress initiated the Incentive Compensation Plan through which officers and employees received a portion of the warrants that were issued to Progress. The grant of warrants was tied to the making of the loan and was not based on the repayment performance of the borrower. The employees to whom these warrants were transferred could liquidate them 180 days after receipt either in the open market or by having Progress cash out the warrants. Through this plan, Wycoff received warrants to acquire shares in five companies in 1999.[FN12] In 2000, Progress cashed out Wycoff's warrants in three companies for $78,255. The Complaint states, in addition, that it is believed that Klinger also received warrants through the Incentive Compensation Plan.

FN12. *See infra* note 14.

USIT was a lending customer of the TechBanc division and Progress received USIT warrants in conjunction with the loans.[FN13] In 2000 Progress Financial reported a gain of $2.6 million due to a market value adjustment on these warrants. Then, after USIT filed for bankruptcy in January 2001, the Company had to reverse the adjustment and report a loss in the first quarter of 2001. As a result, the financial picture of Progress Financial, as reflected in the 2000 financial statement, was somewhat rosier than would prove to be true. Both Klinger and Wycoff received bonuses and the Compensation Committee determined executive compensation based on the inflated 2000 financial statement.[FN14]

FN13. Some of these warrants were transferred to Wycoff through the Incentive Compensation Plan. The Complaint specifically states that in 1999 Wycoff received warrants to acquire 7,000 shares of USIT at $3.50 per share. The August 1999 initial public offering price of USIT was made at $10.00 per share.

FN14. The Complaint sets forth Wycoff's compensation in some detail. "For the period 1998-2000, Wycoff received base salary from the Company of $1,098.035. In 2000, Wycoff received options to purchase 42,000 shares of Progress Financial stock as part of his compensation.... These options ... have a potential realizable value of almost $800,000. Wycoff further received for the period 1998-2000 ... incentive payments and bonuses totaling $831,040. All of the above does not include the warrants he received personally for making high risk loans to preprofit companies as set forth in ¶ 19." Compl. ¶ 4(a). Wycoff also "receive[d] from the Company perquisites worth $50,000 per year." *Id.* ¶ 4(e).
Wycoff was also rewarded with ten percent of any warrants that were received by the Bank as part of the loan transaction. The warrants Wycoff received in 1999 are described by the Plaintiff as follows:
(a) 12,490 shares of VerticalNet, Inc. at $2.79 per share, which had the first public offering of its stock in February 1999 at a price of $8.00 per share;
(b) 6,001 shares of IQEplc at $4.16 per share, which had the first public offering of its stock in May 1999 at a price of $12.50 per share;
(c) 3,400 shares of Internet Capital Group, Inc. at $5.00 per share, which had the first public offering in August 1999 at a price of $6.00 per share;
(d) 6,250 shares of Ravisent Technologies, Inc. at $3.56 per share, which had the first public offering of its stock in July, 1999 at a price of $12.00 per share;
(e) 7,000 shares of U.S. Interactive, Inc. at $3.50 per share, which had the first public offering of its stock in August of 1999 at a price of $10.00 per share.
*Id.* ¶ 19.

Progress also utilized bonuses to reward employees and, in one case, an outside director for their efforts to accomplish certain goals of the business in areas outside the scope of the Incentive Compensation Plan. For example, Progress paid Wycoff bonuses for efforts to raise capital for limited partnerships-Ben Franklin/Progress Capital Fund, L.P. and NewSpring Ventures, L.P.[FN15]-as well as an incentive payment of over $150,000 on the sale of Procall Teleservices, Inc. ("Procall"), a teleservices subsidiary of the

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
(Cite as: Not Reported in A.2d)

Page 4

Company. Daggett, a director who is not alleged to have been an employee of Progress, also received a payment of more than $150,000 in connection with the sale of Procall. In addition to bonuses and incentive payments, Progress made loans to executive officers, directors, and their affiliates.[FN16]

> FN15. The Complaint alleges that Wycoff is a partner of both limited partnerships but does not give any more information regarding the nature, extent, or origin of the interest.

> FN16. The Company's 2001 proxy materials disclosed that such loans totaled $4.2 million. The 1999 proxy materials disclosed that such loans totaled $6.2 million. The 2000 proxy materials disclosed loans to directors at preferred rates, noting that no individual director had received more than $60,000 in preferred-rate loans. Compl. ¶ 34.

### III. ANALYSIS

*3 Defendants have moved to dismiss the Complaint under Court of Chancery Rule 23.1 for the Plaintiff's failure to make demand on Progress Financial's board of directors (the "Board") or to plead demand futility sufficiently. The Plaintiff admits that demand was not made and instead argues that demand should be excused as futile. Under the two-pronged *Aronson* test, [FN17] demand will be excused as futile where the "particularized facts alleged in the complaint create a reasonable doubt (*i.e.*, reason to doubt) that (1) the directors upon whom the demand would be made were disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." [FN18] Therefore, the Court must determine whether the Complaint includes allegations of "particularized facts creating a reasonable doubt that the actions of the defendants were protected by the business judgment rule." [FN19] The Plaintiff is entitled to the benefit of reasonable inferences that may be drawn from the particularized facts alleged but may not rely upon conclusory allegations.[FN20]

> FN17. *Aronson v. Lewis*, 473 A.2d 805, 814 (Del.1984); *see Brehm v. Eisner*, 746 A.2d 244, 256 (Del.2000).

> FN18. *Zupnick v. Goizueta*, 698 A.2d 384,

386 (Del. Ch.1997); *see also Aronson*, 473 A.2d at 814.

> FN19. *Brehm*, 746 A.2d at 255.

> FN20. *Id.*

The Board, as comprised on August 29, 2001, the date the Complaint was filed, is the board for purposes of evaluating whether demand is required or excused. [FN21] The Complaint names eleven directors as defendants. It is not clear whether these eleven constitute the entire Progress Financial board. For purposes of evaluating the demand requirement, I draw the inference that the eleven individual defendants named in the Complaint were the only directors of Progress Financial as of August 29, 2001.

> FN21. *See, e.g., Haseotes v. Bentas*, 2002 Del. Ch. LEXIS 106, at *14 (Del. Ch.); *Needham v. Cruver*, 1993 Del. Ch. LEXIS 76, at *8-9 (Del. Ch.); *Harris v. Carter*, 582 A.2d 222, 229-32 (Del.1990).

### A. Disinterest and Independence: First Prong of the Aronson Test

In order to excuse demand under the first prong of *Aronson*, a plaintiff must plead particularized facts that raise a reasonable doubt whether a majority of the board upon which demand would be made was disinterested in the challenged transaction or was able to exercise independent business judgment with respect to it.[FN22] A director is "interested" when he or she appears on both sides of the challenged transaction or expects to derive a personal benefit from it, such as in a self-dealing transaction.[FN23] Where self-dealing is not alleged, the benefit accruing to the allegedly interested director must be shown to be material to that director.[FN24] A benefit is material when its importance to the director, in the opinion of the Court, is such that the director probably could not fulfill his or her fiduciary duties to the corporation "without being influenced by [an] overriding personal interest." [FN25] A director is considered "independent" unless the complaint alleges particularized facts to show that the director is unable to base his or her decisions on the corporate merits of the issue before the board.[FN26] For example, the complaint may demonstrate a "direction of corporate conduct in such a way as to comport with the wishes or interests of" the controlling person [FN27] or may plead facts that indicate the director is so "beholden to" or influenced by the controlling person

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 5
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: Not Reported in A.2d)**

that the director is unable to exercise discretion with respect to corporate decisions.[FN28]

> FN22. *Aronson,* 473 A.2d, at 814.

> FN23. *Id.* at 812; *Orman v. Cullman,* 794 A.2d 5, 23 (Del. Ch.2002). *See also Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 362 (Del.1993).

> FN24. *Orman,* 794 A.2d at 23, 25 n. 50.

> FN25. *In re GM Class H S'holders Litig.,* 734 A.2d 611, 617 (Del. Ch.1999).

> FN26. *Aronson,* 473 A.2d at 816.

> FN27. *Kaplan v. Centex Corp.,* 284 A.2d 119, 123 (Del. Ch.1971); *see also Aronson,* 473 A.2d at 816; *Orman,* 794 A.2d at 24.

> FN28. *Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993); *see also Aronson,* 473 A.2d at 815; *Orman,* 794 A.2d at 24.

\*4 The Complaint makes no allegation that Mueller, Jones, Corson, or LaNoce are unable to consider demand disinterestedly and independently. On the other hand, the Defendants concede that Wycoff and Klinger may be considered interested for the purposes of evaluating the Rule 23.1 demand requirement. Thus, demand would not be excused under the first prong of *Aronson* unless the allegations of the Complaint raise a reasonable doubt about the disinterest or independence of at least four of the remaining five directors (Zarrilli, Tornetta, Daggett, May, or Silverang).[FN29]

> FN29. The Plaintiff has not attempted to allege that anyone other than Wycoff dominated the other directors' independent judgment regarding Progress' affairs.

*1. Stephen T. Zarrilli*

Zarrilli was the Chief Executive Officer of USIT until September 15, 2000. He left that position approximately three months after becoming a member of Progress' board in June 2000. While Zarrilli was CEO of USIT, but apparently prior to his service as a director of Progress, USIT received loans from Progress. After Zarrilli left USIT, it filed for bankruptcy-necessitating, for purposes of Progress'

financial statement, a readjustment of the valuation of the USIT warrants received in connection with the loans. Zarrilli holds nearly 600,000 shares of USIT common stock. While Zarrilli was at USIT, he developed a "significant" relationship with Wycoff because Zarrilli controlled USIT's decision to become a lending customer of Progress.

Construing these facts in the light most favorable to the Plaintiff, Zarrilli, in his capacity as an officer of USIT, caused USIT to apply for loans-loans that the Plaintiff alleges turned out to be detrimental to Progress. The Complaint notes ominously that Zarrilli's service on the Board overlapped his employment at USIT for about three months. The pertinent question is not whether a director has been employed by a customer of the corporation. The critical issue, instead, is whether the director was conflicted in his loyalties with respect to challenged board actions. The Complaint contains no allegations of this sort. Significantly missing is any indication that Zarrilli had conflicting loyalties or made any decision based upon conflicting loyalties-that after Zarrilli became a director, for example, Progress made any loans to USIT or that USIT received any preferential treatment in the servicing of its loans. Furthermore, there is no suggestion that any of the actions taken after he became a director of Progress benefited Zarrilli directly or benefited USIT, thereby assisting Zarrilli indirectly as a USIT shareholder. Thus, the Complaint fails to plead particularized facts that raise a reasonable doubt of Zarrilli's disinterest in the challenged transactions.

In addition, the allegation that Zarrilli and Wycoff developed a "relationship" while Zarrilli was at USIT is insufficient to raise a reasonable doubt as to Zarrilli's independence from Wycoff. Neither mere personal friendship alone,[FN30] nor mere outside business relationships alone,[FN31] are sufficient to raise a reasonable doubt regarding a director's independence. Also, the Plaintiff has not made any cognizable allegation that Zarrilli developed a sense of "owingness" to Wycoff as the result of the loans that Progress may have made to USIT before Zarrilli joined the Board.

> FN30. *See, e.g., Crescent/Mach I Partners, L.P. v. Turner,* 2000 Del. Ch. LEXIS 145, at \*40-41 (Del. Ch.).

> FN31. *See, e.g., Goldman v. Pogo.com, Inc.,* 2002 Del. Ch. LEXIS 71, at \*14 (Del. Ch.); *Orman,* 794 A.2d at 26-27; *Crescent/Mach I*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: Not Reported in A.2d)**

*Partners, L.P.,* 2000 Del. Ch. LEXIS 145, at *40-41.

**\*5** Thus, I find that the Complaint fails to raise a reasonable doubt that Zarrilli is disinterested in the challenged transactions or capable of exercising business judgment independently of Wycoff.

### 2. Charles J. Tornetta

The Complaint alleges that Progress leases property from a limited partnership and that Tornetta's "family members" are the partners. The lease is for fifteen years and the lease payments amount to slightly over $7,000 per month to the limited partnership. The particularized factual allegations end there. From this, the Plaintiff would have the Court infer that Tornetta is beholden to Wycoff who may be in a position at the end of the lease to elect not to renew it.[FN32] Again, the factual allegations fall far short of providing a basis for the Court to do so. First, the relationship between Tornetta and the "family members" who are partners of the limited partnership is unspecified. Second, there are no facts supplied from which the Court may infer that the amount of the lease payment represents a significant departure from fair market value or is material to Tornetta or to any of Tornetta's family members. In some circumstances, this Court has determined that material financial interests of close family members may factor into the disinterest and independence analysis under the *Aronson* test.[FN33] Here, however, the failure to allege with particularity both close familial relationship and materiality amounts to a failure to raise a reasonable doubt regarding Tornetta's disinterest and independence.[FN34]

FN32. The Plaintiff may also be suggesting somewhat obliquely that Wycoff would be in a position to cause Progress to breach the lease prior to its expiration and, consequently, Tornetta must stay in Wycoff's good graces to ensure the uninterrupted income to the partnership. When stated directly, the implausibility of the suggestion that for this reason Tornetta has no choice but to keep Wycoff happy-becomes obvious since the limited partnership would doubtless have a remedy at law for breach of the lease.

FN33. *See, e.g., Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 Del. Ch. LEXIS 144, at

*28-29 (Del. Ch.2002) (considering a director's son's primary employment with the corporation as one of several factors supporting a reasonable doubt whether the director could consider demand impartially where such demand was adverse to the interests of the corporate CEO); *Mizel v. Connelly,* 1999 Del. Ch. LEXIS 157, at *11-14 (Del. Ch.) (discussing why one of the directors may be unable to consider demand impartially where such demand was adverse to his grandfather's interests).

FN34. The Complaint does not support any contention that Wycoff, as Chief Executive Officer, is vested with unilateral non-reviewable authority to breach contracts on behalf of Progress, was the unilateral decision-maker for leasing the property in question, or could be expected to be the unilateral decision-maker with respect to renewal of the fifteen-year lease upon its expiration.

I also question whether the renewal or non-renewal of a single fifteen-year lease of property, which is not alleged to be at a rate substantially above market value, could suffice to raise a reasonable doubt of a director's independence or disinterest even if the quantum of income derived from the lease were material to Tornetta or his close family members.

Finally, the Complaint alleges that "Tornetta and his family own substantial tracts of real estate that Defendant Wycoff has caused and will continue to cause to be leased by Progress Financial, in exchange for Tornetta's acquiescence to Wycoff's decisions." Compl. ¶ 7. This allegation, especially when contrasted with the allegations regarding the Plymouth Road lease, lacks the particularity required by Rule 23.1.

### 3. William O. Daggett

The Complaint alleges only one fact with regard to the disinterest or independence of Daggett: that Progress paid Daggett and Wycoff over $150,000 each as a commission for their respective roles in the sale of Procall. The payments are described as "excessive" by the Plaintiff, but there are no allegations related to the value or sale price of Procall or to how Wycoff and Daggett participated in its sale. It is therefore impossible to determine whether the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
(Cite as: Not Reported in A.2d)

payments were excessive, and it would be unreasonable to infer that they were. Furthermore, there are no allegations that either Wycoff or Daggett stood on both sides of the transaction or that either the Procall transaction as a whole or the commission payments specifically were unfair to Progress Financial or its shareholders. I cannot, therefore, ascertain how this single commission earned on a one-time sale of a subsidiary would render Daggett beholden to anyone and thus unable to exercise his independent business judgment. Moreover, this allegation does not call into question Daggett's disinterest in any of the other challenged transactions.

Nonetheless, it is clear that Daggett does have a personal financial interest in this sizeable fee that he received from Progress. In addition, I accept that a single fee of $150,000 for unspecified services may be material to Daggett. Thus, I conclude that the Plaintiff has raised a reasonable doubt as to whether Daggett was disinterested in the commissions paid in connection with the sale of Procall. For all other challenged transactions, however, the Plaintiff has failed to raise a reasonable doubt that Daggett is disinterested and independent.

*6 Thus, I have determined that the Complaint does not raise a reasonable doubt as to the independence or disinterest of Zarrilli, Tornetta, or, for all transactions other than the bonuses paid on the sale of Procall, Daggett. I need not consider, therefore, whether the other directors, May or Silverang, are disinterested and independent. For the reasons stated above, I find that, under the first prong of *Aronson,* demand would not be excused under Court of Chancery Rule 23.1 because at least six of the eleven directors (Zarrilli, Tornetta, Mueller, LaNoce, Jones, and Corson and, for all but one transaction, Daggett, as well) are disinterested and independent and, thus, able to review fairly any demand made pursuant to Rule 23.1.

### B. *Valid Exercise of Business Judgment: Second Prong of the* Aronson *Test*

Even though a majority of the board is determined to be disinterested and independent, demand may be excused under the second prong of the *Aronson* test. In order for demand to be so excused, the plaintiff must allege particularized facts that give rise to a reasonable doubt whether the challenged transaction is entitled to the protection of the business judgment rule.[FN35] A plaintiff may rebut the presumption that the board's decision is entitled to deference by raising

a reasonable doubt whether the action was taken on an informed basis or whether the directors honestly and in good faith believed that the action was in the best interests of the corporation. [FN36] Thus, in order to excuse demand when a majority of the board at the time of demand is found to be disinterested and independent, the plaintiff must plead particularized facts sufficient to raise a reasonable doubt that the action was taken in good faith or a reasonable doubt that the board was adequately informed in making the decision. The Complaint fails to do so.

FN35. *Aronson,* 473 A.2d at 814-15.

FN36. *Id.* at 812.

The Complaint does not allege any particularized facts regarding the process by which the Board initiated or approved the challenged actions, notably approval of the Incentive Compensation Plan. Similarly, the Complaint does not allege that the Board failed to obtain appropriate legal advice or other professional guidance before implementing either the TechBanc program or the Incentive Compensation Plan.

The decision to offer bonuses to employees who bring in business that a company is seeking to attract would normally be within the ambit of a board's business judgment. Indeed, the Complaint fails to allege any specific reasons, except for the possible violation of state and federal banking requirements, why the Board should have been concerned about the propriety of the Incentive Compensation Plan[FN37]-no warnings from banking regulators and no investigation or enforcement activity conducted or contemplated. The Court will not infer that the Board acted recklessly or in bad faith, absent specific particularized allegations of fact giving rise to such an inference.[FN38] Here, read in the light most favorable to the Plaintiff's position, the allegations are that the directors approved an incentive compensation program by which certain officers and employees would receive bonuses for procuring new business in a market niche in which the Board had decided to seek to expand Progress' participation-loans to fledgling technology companies. As it has turned out, this may have been a poor (or poorly timed) decision, but employee compensation decisions made by a fully informed, disinterested, and independent board of directors are usually entitled to the protection of the business judgment rule.[FN39]

Not Reported in A.2d                                                                Page 8
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
(Cite as: Not Reported in A.2d)

FN37. The Complaint does allege that the changes to the Bank's loan and lease portfolio structure, due to the loans made through the TechBanc division, caused banking regulators to issue a directive that Progress reduce lending through the TechBanc division, increase loss reserves, and take various other actions. This, however, does not call into question the Board's exercise of business judgment and does not help the Plaintiff's case for excusing demand because the Complaint also alleges that the Board cooperated and fully complied with the only negative response received from banking regulators with regard to the challenged actions. I refrain, however, from relying upon this allegation to draw an inference that the OTS reviewed and did not find fault with the Incentive Compensation Plan.

FN38. *See Aronson*, 473 A.2d at 814.

FN39. *See 8 Del. C. § 122(5)* (officer and agent compensation); *id.* § 141(h) (director compensation); *White*, 783 A.2d at 553 n. 35 (noting the board's discretion in setting executive compensation); *Brehm*, 746 A.2d at 262 & n. 56 (indicating that when setting executive compensation, the outer limit of the discretion of the board is defined by unconscionable conduct, waste, or fraud); *Grimes v. Donald*, 673 A.2d 1207, 1215 (Del.1996) (observing that when "an independent and informed board, acting in good faith, determines that the services of a particular individual warrant large amounts of money, whether in the form of current salary or severance provisions, the board has made a business judgment. That judgment normally will receive the protection of the business judgment rule unless the facts show that such amounts, compared with the services to be received in exchange, constitute waste or could not otherwise be the product of a valid exercise of business judgment."); *Lewis v. Hirsch*, 1994 Del. Ch. LEXIS 68, at *10-11 (Del. Ch.) (stating that executive compensation is "ordinarily left to the business judgment of a company's board of directors"); *Tate & Lyle PLC v. Staley Cont'l, Inc.*, 1988 Del. Ch. LEXIS 61, at *19-22 (Del. Ch.) (finding business judgment rule did protect disinterested directors' approval of compensation packages for other directors); *see also Telxon Corp. v. Meyerson*, 802 A.2d 257, 265-66 (Del.2002); *In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 Del. Ch. LEXIS 5, at *50-55 (Del. Ch.).

*7 In his brief opposing the motion to dismiss, the Plaintiff defends his failure to allege particularized facts in the Complaint on the basis that the corporate records of Progress Financial, which could provide factual detail for particularized allegations, are in the exclusive possession and control of the Defendants. Because *8 Del. C. § 220* provides shareholders reasonable access to corporate records, this argument is both inaccurate and unavailing. Both this Court and the Supreme Court have admonished plaintiffs to make use of the "tools at hand" on many occasions.[FN40] Plaintiffs who fail to do so act at their own hazard.[FN41]

FN40. Specifically, plaintiffs are encouraged to invoke *8 Del. C. § 220* in order to establish whether the records of the corporation support or refute the suspicion of wrongdoing prior to filing a derivative action. *See, e.g., White*, 783 A.2d at 549 n. 15; *Brehm*, 746 A.2d at 262 n. 57, 266; *Rales*, 634 A.2d at 934-35 n. 10; *Ash v. McCall*, 2000 Del. Ch. LEXIS 144, at *56 n. 56 (Del. Ch.).

FN41. *See White*, 783 A.2d at 555-57 & n. 54; *Mizel*, 2000 Del. Ch. LEXIS 157, at *16 n. 5.

The allegation that the Board's decision to implement the compensation program was illegal and, thus, not entitled to the benefits of the presumptions of the business judgment rule, is more troubling. The Complaint alleges that the Incentive Compensation Plan violated the banking laws of the United States, 18 U.S.C. § 215, and the Commonwealth of Pennsylvania, 7 P.S. § 1413. In addition, it is alleged that the Incentive Compensation Plan transgressed federal banking regulations, specifically 12 C.F.R. § 570 and OTS Regulatory Bulletin 27b. Defendants' alleged violation of these statutory and regulatory provisions, according to the Plaintiff, requires application of a per se rule that illegal conduct authorized by the Board excuses the Plaintiff from any duty to make pre-suit demand upon the Board.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
(Cite as: Not Reported in A.2d)

*1. Bribery Statutes: 18 U.S.C. § 215 and 7 P.S. § 1413*

In order to plead that demand is excused because the challenged corporate act was illegal and not within the scope of the business judgment rule, the Plaintiff must at least plead particularized facts that raise a reasonable doubt about the legality of the corporate act in question.[FN42] However, the allegations in the Complaint fail to support a reasonable inference that adoption of the Incentive Compensation Plan constituted criminal conduct. [FN43]

FN42. For examples of the use of the criminal law to support fiduciary duty claims against corporate directors, see *In re Caremark Int'l Derivative Litig., 698 A.2d 959, 970-72 (Del. Ch.1996); In re Baxter Int'l, Inc. S'holders Litig., 654 A.2d 1268, 1270-71 (Del. Ch.1995).* Both of these cases address a board's supervisory responsibilities; they do not directly address the directors' liability for their own actions as directors. In *Gagliardi v. Trifoods Int'l, Inc.,* 1996 Del. Ch. LEXIS 87 (Del. Ch.), *published in part, 683 A.2d 1049 (Del. Ch.1996),* this Court observed that "[t]he business outcome of an investment project that is unaffected by director self-interest or bad faith cannot itself be an occasion for director liability. That is the hard core of the business judgment doctrine." *Id.* at * *10-11 (footnote omitted). The Court further explained:
"By 'bad faith' is meant a transaction that is authorized for some purpose other than a genuine attempt to advance corporate welfare *or is known to constitute a violation of applicable positive law.* There can be no personal liability of a director for losses arising from 'illegal' transactions if a director were financially disinterested, acted in good faith, and relied on advice of counsel reasonably selected in authorizing a transaction."
*Id.* at * *11 n. 2 (citation omitted) (emphasis added). The Complaint does not allege whether the Board had the benefit of advice of counsel when it approved the Incentive Compensation Plan.

FN43. For purposes of ruling on this motion to dismiss, I consider the text of the pertinent statutes, regulations, and OTS

Regulatory Bulletin 27b, which are integral to the Complaint and incorporated by reference therein. *See In re Santa Fe Pac. Corp. S'holders Litig., 669 A.2d 59, 69-70 (Del.1995).*

Violation of either 18 U.S.C. § 215 or 7 P.S. § 1413 constitutes criminal conduct.[FN44] The plain language of these statutes is designed to prohibit bribery of banking personnel.[FN45] It does not appear to apply in the situation where a bank pays either salary or bonuses to its own employees for doing their jobs. In fact, 18 U.S.C. § 215(c) reads, "This section shall not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." Furthermore, the Plaintiff fails to direct the Court to any precedent for enforcing either statute in the context of bonuses paid by a bank to its own employees, nor to any past, present, or contemplated enforcement actions or investigations of Progress on the basis that the Incentive Compensation Plan violated any applicable law. Thus, the Complaint fails to raise a reasonable doubt that the directors, by adopting and implementing the Incentive Compensation Plan, violated (or facilitated the violation of) either statute and, therefore, does not raise a reasonable doubt whether the decision to implement the plan was not illegal.[FN46]

FN44. 18 U.S.C. § 215(a) provides in pertinent part:
Whoever (1) corruptly gives, offers, or promises anything of value to any person, with intent to influence or reward an officer, director, employee, agent, or attorney of a financial institution in connection with any business or transaction of such institution; or (2) as an officer, director, employee, agent, or attorney of a financial institution, corruptly solicits or demands for the benefit of any person, or corruptly accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution; shall be [punished in accordance with the statute].
Violation of 18 U.S.C. § 215 is a felony punishable by a fine of up to $1 million or three times the value of the consideration offered and up to thirty years in prison, unless the amount offered is less than $1,000. 18 U.S.C. § 215(a).
7 P.S. § 1413(a) provides in pertinent part:

Not Reported in A.2d                                                                                  Page 10
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: Not Reported in A.2d)**

No director, trustee, officer, employee or attorney of an institution or of an affiliate of the institution shall: (i) receive anything of value for procuring or attempting to procure any loan from or investment by the institution.

Violation of 7 P.S. § 1413 is a misdemeanor punishable by a fine of not more than $1,000 plus the amount received and no more than one-year imprisonment. 7 P.S. § 2102(a) (specifying penalty for violation of 7 P.S. § 1413 and other provisions of the Commonwealth's banking code).

FN45. Violation of § 215 is commonly referred to as "bank bribery." *See, e.g., United States v. Kenrick,* 221 F.3d 19, 26 (1st Cir.2000); *United States v. Haese,* 162 F.3d 359, 363 (5th Cir.1998); *United States v. Jennings,* 160 F.3d 1006, 1015 (4th Cir.1998); *United States v. Cohen,* 152 F.3d 321, 323 (4th Cir.1998).

FN46. In this case, there is no allegation that any criminal prosecution or regulatory enforcement action has ever been initiated under either of these statutory provisions. I note that when a plaintiff seeks to invoke a statute, regulation, or regulatory guidance to define the standard against which a corporate board's actions are to be measured and when those actions, in the absence of such a statute, regulation, or guideline, would not otherwise implicate fiduciary duty considerations, there are two factors which, while not precluding judicial intervention here, counsel for caution. First, the absence of any enforcement action, particularly where the regulators are alleged to have been aware of the conduct, suggests that the regulators, who are presumed to have expertise in their particular field, did not consider the conduct worthy of further enforcement proceedings. Second, the Court is being asked to construe statutes and regulations of the federal government and a statute of another state in ways that the Plaintiff does not allege they have ever been interpreted or applied in the past.

*2. Banking Regulations and Guidelines: 12 C.F.R. § 570 and OTS Regulatory Bulletin 27b*

**\*8** In order for the Plaintiff to demonstrate that demand should be excused under the second prong of

*Aronson,* he must demonstrate that the decision to adopt the Incentive Compensation Plan was not entitled to the protection of the business judgment rule at the time the board made the decision. Although it is possible that the Incentive Compensation Plan (or other programs approved by the Board) may have ultimately run afoul of the banking regulations cited by the Plaintiff, the particularized allegations of the Complaint fail to provide a basis for doubting whether the Board's actions, when measured against the relevant regulatory requirements as of the time of the actions, were the product of a valid exercise of business judgment.

Through 12 C.F.R. Part 570, the OTS has adopted safety and soundness standards for savings associations.[FN47] When a thrift institution fails to meet these standards, OTS may require the development and implementation of a compliance plan to address its concerns. The OTS' concerns for excessive executive compensation are addressed, first, in the context of "Operational and Managerial Standards," which, *inter alia,* require thrift institutions to "maintain safeguards to prevent the payment of compensation, fees, and benefits that are excessive or that could lead to material financial loss to the institution." [FN48] Second, and somewhat more specifically, the safety and soundness standards contain a "Prohibition on Compensation That Constitutes an Unsafe and Unsound Practice" which provides:

> FN47. OTS promulgated the regulations under the authority of the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1831p-1. The Interagency Guidelines Establishing Standards for Safety and Soundness are set forth in Appendix A to 12 C.F.R. Part 570.

> FN48. 12 C.F.R. § 570, app. A.II.I.

Excessive compensation is prohibited as an unsafe and unsound practice. Compensation shall be considered excessive when amounts paid are unreasonable or disproportionate to the services performed by an executive officer, employee, director, or principal shareholder considering the following:

1. The combined value of all cash and non-cash benefits provided to the individual;

2. The compensation history of the individual and other individuals with comparable expertise at the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: Not Reported in A.2d)**

institution;

3. The financial condition of the institution;

4. Comparable compensation practices at comparable institutions, based on factors such as asset size, geographic location, and the complexity of the loan portfolio or other assets;

6. Any other connection between the individual and any fraudulent act or omission, breach of trust or fiduciary duty, or inside or abuse with regard to the institution; and

7. Any other factors the agencies determine to be relevant.[FN49]

FN49. 12 C.F.R. § 570, app. A.III.A.

Furthermore, "[c]ompensation that could lead to material financial loss to an institution is prohibited as an unsafe and unsound practice." [FN50]

FN50. 12 C.F.R. § 570 app. A.III.B.

By Regulatory Bulletin 27b, the OTS provides guidance to its examiners regarding reasonable compensation arrangements and to the directors of thrift institutions regarding the performance of their responsibilities in overseeing executive compensation. OTS has specifically addressed the issue of incentive pay for thrift executives:

**\*9** An increasing number of businesses today rely on incentive pay to motivate managers and employees to excel. OTS encourages incentive-based compensation but prohibits arrangements that provide incentives contrary to the safe and sound operation of the association. For example, compensation based primarily on short-term operating results may encourage unreasonable risk-taking to achieve short-term profits. The board of directors should closely monitor compensation tied to current operating results.[FN51]

FN51. Regulatory Bulletin 27(b).

The Board's decision to pursue an aggressive plan for making loans to startup technology companies through TechBanc did not turn out well. The problems arising from Progress' loans to pre-profit companies resulted in a directive from OTS which

required Progress, *inter alia,* to: (i) reduce its lending to early stage technology companies; (ii) increase its leverage capital ratio ... and its total risk-based capital ratio ...; and (iii) increase its valuation allowance and implement approved credit review and monitoring programs.[FN52]

FN52. Compl. ¶ 35 (quoting Progress Financial Corp. Press Release of July 12, 2001).

The Board approved a resolution in July 2001, that implemented the terms of the OTS directive. At that time, Progress announced that it had suspended payment of its quarterly dividend and that it would "exit the business of lending to pre-profit companies and ... wind down [its] technology-based portfolio of loans to pre-profit clients ." [FN53] The Plaintiff does not allege that OTS then, or at any other time, either questioned or challenged the Incentive Compensation Plan.[FN54]

FN53. *Id.*

FN54. The OTS directive that resulted in the July 2001 resolution restricted the granting of "[h]igh risk loans," which were defined to include "certain commercial business loans and other credit relationships that (i) the Bank originates through its Tech-Banc/Specialized Lending Division, (ii) involve the receipt by the Bank or an affiliate of warrants [or] other equity interest, (iii) are made to a pre-profit company or a company reliant on venture capital funding, or (iv) are otherwise determined by the OTS to have a higher than ordinary degree of credit risk." Compl. ¶ 36.

Determining whether the Board's adoption of the Incentive Compensation Plan to stimulate TechBanc loans to pre-profit technology companies was the result of the exercise of its business judgment requires an evaluation of the Board's actions as of the time of that decision. The Plaintiff frames the Complaint as a challenge to the Incentive Compensation Plan and not as a direct attack on the TechBanc lending program. According to the Plaintiff, the Incentive Compensation Plan was imprudent, in part, because it was too successful in achieving its goals: it resulted in too many loans

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 12
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
(Cite as: Not Reported in A.2d)

having been made by TechBanc to pre-profit companies. The Plaintiff has not alleged with particularity facts evidencing that the compensation received by Progress executives was "excessive" when the amount is measured in the context of an enterprise of the Progress' scope. Instead, he alleges that the Incentive Compensation Plan created too great an incentive to make the loans that the Board wanted Progress to make. As a result, these loans ultimately turned out to have been unduly risky and, therefore, caused financial harm to Progress. The Plaintiff argues that the Incentive Compensation Plan, which induced Progress executives to make these loans, violated the regulatory prohibition upon excessive compensation because it "[led] to material financial loss." [FN55] In substance, the Plaintiff asks that the conduct of the Board be measured by the results of the TechBanc pre-profit loan program.

> FN55. See 12 C.F.R. § 570 app. A.II.I.; id. § 570 app. A.III . B. It is not altogether clear that the Plaintiff has successfully alleged that the TechBanc program, in fact, resulted in "material financial loss." Part of the Plaintiff's criticism is that warrants which resulted in a paper profit in one year had to be reversed as an accounting matter when their value plunged. While that caused a loss in the second year, the cumulative effect on income over the two-year period does not appear to have been material. Furthermore, that OTS required Progress to increase its loss reserves because of the TechBanc operations does not necessarily mean that losses, in fact, resulted. It may be that the increase in reserves resulted from perceived risk instead of actual loss. Nevertheless, for purposes of this Memorandum Opinion, the Court will accept the Plaintiff's allegation that the TechBanc program caused "material financial loss."

*10 The exercise of business judgment cannot be evaluated, as the Plaintiff seems to suggest, merely by looking at the results of that business judgment. While challenges are seldom, if ever, made to business judgments that turn out well, the simple fact that the business decision caused significant loss does not dictate how that decision should be classified or evaluated. The Plaintiff's allegations regarding the Board's authorization of the Incentive Compensation Plan (or the TechBanc loan program) are paltry. There are, for example, no particularized allegations

about "comparable compensation at comparable institutions" or that Wycoff's compensation (or the compensation of other executives) was "disproportionate to the services rendered." [FN56]

> FN56. Furthermore, if the focus is on financial losses attributable to the TechBanc loan program, there are few objective factors set forth in the Complaint by which the conduct of the Board, at the time of decision, can be measured. Loans were made to pre-profit technology companies, a concept which, with the hindsight of 2003, may be easy to criticize. At the time of the loans, however, the eventual failure of many of those ventures was not as apparent. In addition, one may wonder, particularly in light of the policies reflected in HOLA, whether it was a wise decision for the directors of a savings institution to view the start-up technology sector as a promising target for new business. Nonetheless, these factors do not support the argument that the decision to implement the TechBanc loan program was beyond the scope of the Board's business judgment.

It may be fair to charge the Board with knowledge that the TechBanc loan program *could* have resulted in material financial loss to Progress because, in the most simplistic sense, any new major venture entails risk and that risk carries potential adverse consequences.[FN57] The decision to run the risks of that loan program, when evaluated as of the time of the Board's decision, was not such an improvident decision as to deny the directors the presumption of the business judgment rule. Thus, the decision of the Board to pay Progress executives incentive compensation to implement the TechBanc loan program does not, even though the incentive pay may have encouraged the executives to make the loans that caused material financial loss to Progress, constitute conduct beyond the scope of the business judgment rule.[FN58]

> FN57. The Plaintiff also focuses on the "short-term" nature of the incentive compensation program because the warrants were awarded to the executives responsible for making the loans without any assurance that the loans would, in fact, turn out to be "profitable ." Although I accept for purposes of this motion to dismiss that the Incentive

Not Reported in A.2d                                                                                          Page 13
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: Not Reported in A.2d)**

Compensation Plan awarded "compensation based on short-term operating results," that conclusion is not as self-evident as the Plaintiff argues. First, one can read "operating results" to refer to short-term profits, thus reflecting a concern that accounting judgments might be affected by the potential for additional compensation. The Plaintiff alludes to this possibility when he questions the profits resulting from the increase in value (during USIT's better times) of the USIT warrants. Compl. ¶ 28. Second, warrants, or their value to Progress' executives, have a time-delayed aspect: not only must Progress' executives wait 180 days to cash out but also the value must be sustained for that period. In theory, at least, warrants may be viewed as a means of affording the opportunity to participate in long-term appreciation in value. Moreover, the guidelines set forth in Regulatory Bulletin 27(b) direct boards to "closely monitor compensation tied to current operating results." Significantly, Regulatory Bulletin 27(b) does not expressly to bar compensation tied to short-term results.

FN58. The Plaintiff relies on several cases from other jurisdictions in support of his claim. None, however, is helpful to his cause. For example, in _Reilly Mortgage Group, Inc. v. Mount Vernon Savings & Loan Ass'n,_ 568 F.Supp. 1067 (E.D.Va.1983), demand on a bank's board of directors was excused because of the cumulative effect of many shortcomings in the directors' conduct including the allegation that the board approved a course of conduct in violation of federal and state regulations, continued to approve the allegedly illegal practices after repeated warnings from state and federal regulators, failed to hold stockholder meetings, and personally profited from the allegedly wrongful conduct. In this case, the TechBanc loan program was halted promptly after regulatory concern was expressed and a large majority of directors has not been alleged with particularity to have personal or financial interest in the Incentive Compensation Program or the TechBanc loan program. Other cases relied upon by the Plaintiff, such as _Amerifirst Bank v. Bomar,_ 757 F.Supp. 1365 (S.D.Fla.1991), emphasize that the analysis

was under a Rule 12(b)(6) standard and did not reflect a requirement that allegations be made with particularity. In _Federal Deposit Ins. Corp. v. Schreiner,_ 892 F.Supp. 869 (W.D.Tex.1995), alleged violations of a federal banking regulation were evaluated in the context of specific examples of objective violations of the regulation as of when the bank's board made the challenged decision (e.g., loans to insiders made on terms not substantially similar to loans to persons not associated with the bank; loans violated bank's own loan policy).

The Plaintiff also cites _Joy v. North,_ 692 F.2d 880 (2d Cir.1982), cert. denied, 460 U.S. 1051 (1983), as providing a yardstick for measuring the Board's conduct. In _Joy,_ however, the challenged loan put the bank in "a classic 'no win' situation." _Id._ at 896. Here, the Board was focused, as it appeared possible at the time, on the significant upside potential of loans to startup technology companies. Moreover, the Complaint does not allege that the Board could not reasonably have concluded that these loans (or the portfolio of these loan evaluated as a whole) would be profitable or that the Board did not consider the potential risks that could be recognized at the time. While it is apparent with the benefit of hindsight that the Board did not give sufficient weight to the risks associated with the TechBanc loan portfolio, the decision to implement the TechBanc loan program, with the aid of the Incentive Compensation Plan, does not allow a challenge by the Plaintiff to the Board's conduct without a prior demand under _Aronson's_ second prong.

The Complaint may also be read as seeking to allege that the Board failed to exercise appropriate supervision over the TechBanc loan program and the Incentive Compensation Program as they were implemented. Compl. ¶ 55(ii). The particularized facts of the Complaint demonstrate that promptly following the directive issued by the OTS which required that the TechBanc loan program be modified (a directive with no alleged mention of the Incentive Compensation Plan), the Board called off the TechBanc loan program and commenced efforts to reduce Progress' exposure to the adverse affects of that program. Thus, there are no particularized allegations that the directors failed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                           Page 14
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
(Cite as: Not Reported in A.2d)

exercise supervision over the TechBanc loan program or the Incentive Compensation Plan (as opposed to their authorization of those programs) that would implicate the standards of *In re Caremark Int'l Deriv. Litig.,* or *In re Baxter Int'l, Inc. S'holders Litig.*

The Plaintiff's theory ultimately proves too much. He looks to the unhappy results of the TechBanc program approved by the directors and implemented with the inducements provided through the Incentive Compensation Plan. With his allegation of material financial harm, he then invokes federal banking regulations which require directors to avoid executive compensation plans that result in "material financial loss." Because the TechBanc program resulted in material financial loss, the directors, in the view of the Plaintiff, are personally liable; that is, in this instance, they are the functional equivalent of guarantors. That, however, is not the province of corporate directors. To adopt the Plaintiff's analytical methodology would discourage risk-taking and would unduly restrict the exercise of the business decision-making process which is contemplated by Section 141 of the Delaware General Corporation Law. Indeed, the Plaintiff's analysis turns on whether the business decision was successful, but such a post-hoc analysis of director conduct is not sponsored by the second prong of *Aronson.*[FN59] In sum, the Plaintiff's allegations about the Incentive Compensation Plan do not excuse demand under *Aronson's* second prong.[FN60]

FN59. As explained in *Gagliardi:*
But directors will tend to deviate from [the] rational acceptance of corporate risk *if* in authorizing the corporation to undertake a risky investment, the directors must assume some degree of personal risk relating to *ex post facto* claims of derivative liability for any resulting corporate loss.
Corporate directors of public companies typically have a very small proportionate ownership interest in their corporations and little or no incentive compensation. Thus, they enjoy (as residual owners) only a very small proportion of any "upside" gains earned by the corporation on risky investment projects. If, however, corporate directors were to be found liable for a corporate loss from a risky project on the ground that the investment was too risky (foolishly risky! stupidly risky! egregiously

risky!-you supply the adverb), their liability would be joint and several for the whole loss (with I suppose a right of contribution). Given the scale of operation of modern public corporations, this stupefying disjunction between risk and reward for corporate directors threatens undesirable effects.
683 A.2d at 1052.
Moreover, although the Plaintiff argues that "the Board knowingly approved corporate action in violation of law," Pl.'s Opp'n to Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Compl. at 26, the Complaint does not allege with particularity that the Board, when it approved the Incentive Compensation Plan or the TechBanc loan program, knew that its actions were illegal.

FN60. It is not clear that the Plaintiff relies upon an alleged violation of HOLA to excuse demand under the second prong of *Aronson.* According to the Plaintiff, the Board failed to meet the "qualified thrift leader" test when it failed to maintain 65% of its "portfolio assets" in housing, small business, and consumer related assets. Compl. ¶ ¶ 3, 33. The Plaintiff alleges that Progress failed that test when only 62.35% of its assets were invested in "qualified thrift investments." *Id.* ¶ 33. There is, however, no allegation that the Board was aware that its lending practices would lead to this result; moreover, there is no allegation that the Board failed to take remedial measures when it learned of the status of the Bank's portfolio.
The Plaintiff does not allege that demand is excused because of other challenged conduct, such as the commissions paid in the Procall sale or the participation in the limited partnerships with which Wycoff was affiliated.

IV. CONCLUSION

The Complaint, when read in the light most favorable to the Plaintiff's position, has failed to allege with particularity facts sufficient to raise a reasonable doubt whether a majority of the board was disinterested and independent or whether the challenged actions were the product of the exercise of the board's business judgment. Demand is therefore not excused and, because demand was not made, the Complaint is dismissed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: Not Reported in A.2d)**

**\*11** IT IS SO ORDERED.

Del.Ch.,2003.
Litt v. Wycoff
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.),
28 Del. J. Corp. L. 1126

Briefs and Other Related Documents <u>(Back to top)</u>

• <u>2001 WL 34820849</u> (Trial Pleading) Derivative
Complaint (Aug. 29, 2001) Original Image of this
Document (PDF)
• <u>2001 WL 34890946</u> (Trial Pleading) Derivative
Complaint (Aug. 29, 2001) Original Image of this
Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

Westlaw.

Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
**(Cite as: Not Reported in A.2d)**

**H**
Siegman for Siegman v. Tri-Star Pictures, Inc.Del.Ch.,1989.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
Joseph SIEGMAN, as Custodian for Gregory SIEGMAN and Michelle Siegman, Plaintiff,
v.
TRI-STAR PICTURES, INC., a Delaware Corporation, CPI Film Holdings, Inc., a Delaware Corporation, the Coca-Cola Company, a Delaware Corporation, Home Box Office, Inc., a Delaware Corporation, Victor A. Kaufman, Martin J. Fuchs, David A. Matalon, E. Thayer Bigalow, Jr., Joseph J. Collins, Patrick M. Williamson, Judd A. Weinberg, Ira C. Herbert, Dan W. Lufkin, and Francis T. Vincent, Jr., Defendants.
**CIV. A. No. 9477.**

Submitted: Sept. 16, 1988.
Decided: May 5, 1989.
Revised: May 30, 1989.

**\*\*223** William Prickett, Michael Hanrahan, Elizabeth M. McGeever, and Philip B. Obbard, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, and Arthur T. Susman and Terry R. Saunders, Susman, Saunders & Buehler, Chicago, Ill., of counsel, for plaintiff.
James F. Burnett, Donald J. Wolfe, Jr., and Peter J. Walsh, Jr., Potter Anderson & Corroon, Wilmington, for defendant Columbia Pictures Entertainment, Inc., formerly Tri-Star Pictures, Inc.
Lawrence C. Ashby and Stephen E. Jenkins, Ashby, McKelvie & Geddes, Wilmington, and Allen Kezsbom, Debra M. Torres, Abraham Rappaport, and Mark S. Cohen, Fried, Frank, Harris, Schriver & Jacobson, New York City, of counsel, for defendants, Victor A. Kaufman, David A. Matalon, Patrick M. Williamson, Judd A. Weinberg, and Dan W. Lufkin.
Lawrence A. Hamermesh, Thomas C. Grimm, and Leone L. Ciporin, Morris, Nichols, Arsht & Tunnell, of Wilmington, and Frank C. Jones and L. Joseph Loveland, King & Spalding, Atlanta, Ga., of counsel, for defendants, The Coca-Cola Company, CPI Film Holdings, Inc., Ira C. Herbert, and Francis T. Vincent, Jr.
Allen M. Terrell, Jr. and Michael J. Feinstein, Richards, Layton & Finger, Wilmington, and Robert C. Myers and Rick Bodgan, Dewey, Ballantine, Bushby, Palmer & Wood, of counsel, for defendants, Home Box Office, Inc., Michael J. Fuchs, E. Thayer Bigelow, Jr., and Joseph J. Collins.

OPINION
**\*\*224** JACOBS, Vice Chancellor.
**\*1** Plaintiff brings this action individually, derivatively, and on behalf of a class of shareholders of Tri-Star Pictures, Inc. ("Tri-Star"). The subject of the complaint is a December, 1987 transaction (referred to as "the Combination") where Tri-Star acquired the entertainment business and related assets (the "Entertainment Sector") of The Coca-Cola Company ("Coca-Cola"). In exchange, Coca-Cola received common stock and other securities of Tri-Star. Named as defendants are Tri-Star, Coca-Cola, CPI Film Holdings, Inc., a subsidiary of Coca-Cola ("CPI"), Home Box Office, Inc. ("HBO"), and the directors of Tri-Star as of December 15, 1987.

The complaint was filed on December 15, 1987, and amended on April 5, 1988. On June 7, 1988, the defendants filed motions to dismiss for failure to claim upon which relief can be granted pursuant to Rule 12(b)(6) and for failure to satisfy the demand requirements of Rule 23.1. This is the Opinion of the Court on those motions.

### I. THE RELEVANT FACTS

On a Rule 12(b)(6) motion to dismiss for failure to state a claim, the movant must demonstrate with reasonable certainty that the nonmoving party cannot prevail and would not be entitled to the relief sought under any set of facts that could be proven to support his claims. *Harman v. Masoneilan Int'l, Inc.,* Del.Supr., 442 A.2d 487, 502 (1982). All well pleaded factual allegations (as distinguished from legal conclusions) will be accepted as true and deemed admitted, and all well supported inferences will be construed in favor of the non-moving party. *Id.; Weinberger v. UOP, Inc.,* Del.Ch., 409 A.2d 1262, 1263-1264 (1979). What follows is a summary of the pertinent, well-pleaded facts alleged in the amended complaint.

Tri-Star was incorporated on April 8, 1985, and on June 3, 1985, it succeeded to the business of a joint venture formed in 1982 by CBS, Inc., Coca-Cola (CPI), and an affiliate of HBO. Tri-Star is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
(Cite as: Not Reported in A.2d)

principally engaged in the production, distribution, and exploitation of feature-length motion pictures and television programs. As of November 10, 1987, Tri-Star had 34,554,583 shares of common stock issued and outstanding.[FN1]

**225 Coca-Cola first became involved in the entertainment business in 1982, when it acquired Columbia Pictures Industries, Inc., the assets and operations of which became Coca-Cola's Entertainment Sector. For several years Coca-Cola was Tri-Star's largest single stockholder, owning 12,708,333 shares (36.8%) of Tri-Star's outstanding common stock.

HBO, a wholly owned subsidiary of Time Incorporated ("Time"), is engaged in programming and marketing pay-television services. HBO co-founded Tri-Star, together with Coca-Cola and CBS, Inc. From the outset, HBO has continued to have significant business relationships with Tri-Star and Coca-Cola. Before the Combination, HBO owned 3,125,000 shares (9%) of Tri-Star's common stock.

Tri-Star had two other major stockholders in addition to Coca-Cola and HBO: Technicolor, Inc. ("Technicolor"), which owned 7.2% of Tri-Star's stock, and Rank America, Inc. ("Rank"), which owned 3.6%. The combined holdings of those four shareholders was 56.6%.[FN2] The plaintiff alleges that by reason of that combined stock ownership, as well as certain contractual arrangements involving those stockholders, Coca-Cola and HBO controlled Tri-Star.

*2 The contractual arrangements among Tri-Star, Technicolor, and Rank obligated Technicolor and Rank to vote their Tri-Star shares in favor of all recommendations made by Tri-Star's board of directors. The shareholders' agreement among Coca-Cola, Tri-Star, and HBO (i) allowed Coca-Cola and HBO (as "Principal Shareholders") each to designate four nominees to Tri-Star's ten director board, (ii) required Coca-Cola and HBO to vote for each other's director nominees, (iii) gave Coca-Cola and HBO a right of first refusal if either Principal Shareholder desired to sell its Tri-Star stock, (iv) prohibited Coca-Cola and HBO from soliciting proxies in opposition to any recommendation by Tri-Star's board, or from subjecting their Tri-Star shares to voting arrangements, such as a voting trust, and (v) prohibited Tri-Star from entering into certain transactions with a Principal Shareholder without the consent of all other Principal Shareholders.

**226 The Combination originated at a meeting in August, 1987, at which Coca-Cola's President proposed to Tri-Star's Chief Executive Officer that the two companies explore a transaction to combine Tri-Star and Coca-Cola's Entertainment Sector. Further negotiations and discussions resulted in an agreement (the "Transfer Agreement") whereby Tri-Star would acquire certain of the assets comprising Coca-Cola's Entertainment Sector.[FN3] In exchange, Coca-Cola would receive shares of newly issued Tri-Star common stock that, when added to the Tri-Star shares it already owned, would increase Coca-Cola's equity interest in Tri-Star to 80%.[FN4] Shortly thereafter, and as part of the transaction, Coca-Cola would declare a dividend to its stockholders, consisting of 31,400,000 of the approximately 75,000,000 Tri-Star shares it would receive in the Combination. As a result, the total number of Tri-Star shares that Coca-Cola beneficially owned would be reduced to approximately 49% of Tri-Star's outstanding common stock.

The Transfer Agreement also provided that Tri-Star would amend its Certificate of Incorporation and by-laws in certain respects. Those Certificate amendments were to be an integral part of the Combination presented to shareholders for their approval. An important condition for shareholder approval was that Coca-Cola would not vote its Tri-Star shares in favor of the Combination, unless a majority of the shares not owned by Coca-Cola first voted in favor.

The Combination as described was unanimously approved by the seven directors who attended the Tri-Star Board meeting held on September 30, 1987. Not attending or voting at that meeting were directors Francis T. Vincent, Jr. and Ira C. Herbert, who were both senior officers of Coca-Cola, and Martin Fuchs, who was a senior officer of HBO. Shortly thereafter, Tri-Star and Coca-Cola executed the written Transfer Agreement embodying the terms of the Combination.

**227 The Combination was submitted to Tri-Star shareholders for approval at a special stockholders meeting held on December 15, 1987. A proxy statement was sent to Tri-Star shareholders on November 24, 1987 in connection with that meeting. The Combination (including the Certificate amendments) was approved by the requisite number of stockholder votes at the December 15, 1987 meeting. The formal closing on the Combination occurred on January 27, 1988.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 3
Not Reported in A.2d, 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
(Cite as: Not Reported in A.2d)

## II. *MOTION TO DISMISS THE CLAIMS AGAINST HBO*

*3 The first matter addressed is HBO's motion to dismiss all claims as to it. Those claims, which are found in Counts I, II, and VI,[FN5] are that (i) HBO breached its fiduciary duties to Tri-Star and its shareholders in connection with the Combination, and that (ii) HBO aided and abetted fiduciary duty breaches by Coca-Cola and Tri-Star's directors. For the reasons now discussed, neither claim alleged against HBO in the complaint is legally sufficient.

### A. *Fiduciary Duty Claims*

The fiduciary duty claims against HBO are insufficient, because the complaint, which incorporates the proxy statement by reference,[FN6] alleges no facts from which it can be inferred that HBO was a fiduciary of Tri-Star or its shareholders. For a shareholder to occupy the status of a fiduciary, it must either have majority stock control or exercise actual domination and control over the corporation's business affairs. *Aronson v. Lewis,* Del.Supr., **228*473 A.2d 805, 815 (1984); *In Re Sea-Land Corp. Shareholders Litig.,* Del.Ch., C.A. No. 8453, Jacobs, V.C. (May 22, 1987) at 9-10, ("*Sea-Land I*"). As a 9% stockholder before the Combination and a 3% stockholder thereafter, HBO was manifestly not a majority stockholder. The question becomes whether it is inferable from the complaint's well pleaded allegations that HBO actually exercised domination and control over Tri-Star's directors. *In Re Sea-Land Corp. Shareholders Litig.,* Del.Ch., C.A. No. 8453, Jacobs, V.C. (May 13, 1988), ("*Sea-Land II*"). That question must be answered in the negative.

Plaintiff argues that the actual exercise of control may be inferred from HBO's (a) participation in the negotiations leading up to the Transfer Agreement, (b) exercise of its voting power, and (c) grant of consent to the Combination. These arguments lack merit on several grounds. First, HBO had no pwoer to exercise actual board control. It had only three designees on Tri-Star's ten person board, one of whom was absent from the meeting at which the Transfer Agreement was approved. Second, factually it cannot be inferred that HBO participated in the negotiations leading up to the Transfer Agreement: the proxy statement discloses that the negotiations were conducted solely between Tri-Star and Coca-Cola.[FN7] Third, the requirement that HBO's consent to the Combination under the Coca-Cola-HBO-Tri-Star shareholders' agreement does not,

without more, create an inference that HBO dominated and controlled Tri-Star. *See Sea-Land I, supra,* at 10. Finally, HBO's voting in favor of the transaction could not constitute the actual exercise of control. Even if HBO's votes were added to those owned by Technicolor, Rank, and Tri-Star's management, 3,523,126 additional shares were still needed to reach the required affirmative vote of 10,923,126 shares (a majority of the shares not owned by Coca-Cola) for Coca-Cola to be entitled to vote its shares.

### B. *Aiding and Abetting Claims*

Alternatively, the plaintiff alleges that HBO aided and abetted breaches of fiduciary duty committed by Coca-Cola and Tri-Star directors. Those allegations also are legally insufficient.

*4 **229 To state a claim for aiding and abetting, a plaintiff must allege (in addition to resulting damage or harm): (1) the existence of a fiduciary relationship and duty, (2) a breach of that duty, and (3) a knowing participation in that breach by defendants who are not fiduciaries. *Gilbert v. El Paso Co.,* 490 A.2d at 1057; *Weinberger v. Rio Grande Indus., Inc.,* Del.Ch., 519 A.2d 116, 131 (1986). Here, the third element, *i.e.,* "knowing participation," has not been adequately pled because the complaint alleges no facts from which knowing participation can be inferred. *See Sea-Land II, supra,* at 9; *Greenfield v. National Medical Care, Inc.,* Del.Ch., C.A. No. 7720, Berger, V.C. (June 6, 1986) at 10. It cannot be inferred that HBO or its representatives were aware of or conspired in any fiduciary breaches committed by Coca-Cola or Tri-Star's directors. HBO was not (to repeat) a party to the negotiations leading up to the Transfer Agreement. And, although three Tri-Star directors were HBO's designees, there is no particularized allegation that any of them was aware of any fiduciary duty breaches by Tri-Star's remaining directors or by Coca-Cola.

For these reasons, the plaintiff has not stated a claim against HBO upon which relief can be granted.

## III. *MOTION TO DISMISS THE CERTIFICATE AMENDMENT CLAIMS*

The defendants also move for dismissal of Count III, which seeks a judicial declaration that Articles Fifth, Sixth, and Seventh of Tri-Star's Certificate of Incorporation are invalid under Delaware law. As previously stated, those amendments (the "Certificate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

amendments") were adopted by shareholders in connection with and as part of their approval of the Combination. The defendants argue that Count III should be dismissed in its entirety because it is not ripe for adjudication, and also because, in any event, the Certificate amendments are valid as a matter of law.

*A. Ripeness*

A critical requirement to properly invoke declaratory judgment jurisdiction is that "the issue involved in the controversy must be ripe for judicial determination." *Stroud v. Milliken Enterprises, Inc.,* Del.Supr., 552 A.2d 476, 479, (1989); *Schick, Inc. v. Amalgamated Clothing and Textile Workers Union,* Del.Ch., **230 533 A.2d 1235, 1238 (1987).*FN8* ' The defendants argue that Count III is not ripe for determination, because no action under the Certificate amendments is presently being taken or alleged to be imminent, and because the plaintiff does not claim that the Certificate amendments infringe any right that he presently seeks to exercise.

In determining whether a given claim is ripe for determination:

... a practical evaluation of the legitimate interest of the plaintiff in a prompt resolution of the question presented and the hardship that further delay may threaten is a major concern. Other necessary considerations include the prospect of future factual development that might affect the determination to be made; the need to conserve scarce resources; and a due respect for identifiable policies of the law touching upon the subject matter of the dispute.

*5 *Schick,* 533 A.2d at 1239. (footnote omitted).

Applying those criteria, and weighing the reasons for not rendering a hypothetical opinion against the benefits to be derived from a declaratory judgment (*Stroud, supra,* 552 A.2d at 480), I conclude that the Certificate amendment claims are clearly ripe for determination.

At issue under Count III is the facial validity of Articles Fifth, Sixth, and Seventh of the newly adopted Certificate amendments. Article Fifth confers exclusive power upon the directors to fill board vacancies and newly created directorships. That delegation of exclusive power to directors is said to be proscribed by 8 *Del.C.* § 223. Article Sixth purports (*inter alia*) to eliminate the liability of Tri-Star's directors for breaches of fiduciary duty in

specified circumstances involving the taking of corporate opportunities belonging to Tri-Star. That exemption from fiduciary liability is claimed to exceed the exemptive authority permitted by 8 *Del.C.* § 102(b)(7). **231 Article Seventh also is claimed to violate § 102(b)(7), insofar as it incorporates all future amendments to the Delaware General Corporation Law ("DGCL") that would authorize corporate action further limiting or eliminating the personal liability of directors.

Given the nature of these declaratory claims, their determination would not be affected by "future factual developments," *Schick,* 533 A.2d at 1239. Moreover, the declaratory claims implicate fundamental policies, *i.e.,* the accountability of directors to shareholders for breaches of fiduciary duty and the shareholders' inherent power to elect directors. The importance of those policies and the practicalities of the situation, counsel that the Certificate amendment claims be decided promptly.

Under Article Sixth, certain Tri-Star directors would arguably be free to engage in conduct (usurpation of a corporate opportunity) that would normally be proscribed, and that could financially harm the corporation. The very enactment of that Article creates a real (and present) possibility that such conduct would occur without prior notice to shareholders. A principal purpose of the Declaratory Judgment Act is to prevent harm before it actually occurs. *FN9* That preventive purpose would not be furthered by a delayed adjudication. Of importance also is the imperative that corporate fiduciaries be given clear notice of what conduct is and is not permitted. No beneficial purpose is served by continued uncertainty in that regard, or by the increased risk of harm occurring to the corporation because of a delayed determination of that issue. The same concerns are posed if an adjudication of the corporate governance issue posed by Article Fifth were delayed. Shareholders and directors are entitled to know which group will be empowered to fill board vacancies and newly created directorships. Where possible, that issue should be resolved before, not after, such directors are selected. To do otherwise risks disrupting the corporation's affairs as well as expensive, time-consuming litigation-a result that would run counter to the purposes of the Declaratory Judgment Act.*FN10*

*6 **232 I now turn to the disputed Certificate amendment claims.

*B. The Certificate Amendments*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
**(Cite as: Not Reported in A.2d)**

## 1. *Article Fifth*

Article Fifth, the first of the challenged Certificate amendments, pertinently states that:

... Subject to the rights of the holders of any series of Preferred Stock, and unless the Board of Directors otherwise determines, all vacancies on the Board of Directors and newly created directorships resulting from any increase in the authorized number of directors shall be filled exclusively by a majority of the directors then in office, although less than a quorum, or by a sole remaining director, and shall not be filled by the stockholders.

The plaintiff contends that exclusive power to fill board vacancies and newly created directorships cannot validly be transferred to the board. He reasons that the inherent power to elect directors is vested in the shareholders, and is made subject only to the exceptions specified in 8 *Del.C.* § 223. Those statutory exceptions, plaintiff asserts, do not authorize a wholesale abdication of the shareholders' power to the directors.

The defendants concede that the shareholders have the inherent power to elect directors to fill vacancies and newly created directorships. Their position is that nothing in the DGCL prohibits shareholders from divesting themselves of that power by means of an appropriate certificate amendment. Defendants conclude that because Article Fifth does nothing more than that, it is valid as a matter of law. I concur.

8 *Del.C.* § 102(b)(1) authorizes provisions in a certificate of incorporation "... creating, defining, *limiting* and regulating**233 *the powers of the* coporation, the directors, and *the stockholders* ... if such provisions are not contrary to the laws of this State." (emphasis added). No provision of the DGCL or case authority is cited that would prohibit shareholders from adopting a certificate amendment divesting themselves of the power to fill board vacancies and newly created directorships and vesting that power exclusively in the board. The statutory provision which bears relevantly on that subject is 8 *Del.C.* § 223(a), which reads:

(a) Unless otherwise provided in the certificate of incorporation or by-laws:

(1) vacancies and newly created directorships resulting from any increase in the authorized number

of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director ...

Plaintiff argues that while § 223 does not expressly prohibit a delegation of such power exclusively to the board, § 223 compels that result implicitly, because if the legislature had intended for directors to have that power exclusively, the statute would have so provided. That argument, however, finds no support in the statute or case authority, and amounts to *ipse dixit*. The permissive language of § 223,[FN11] coupled with the more general authority of § 102(b)(1), is sufficient to authorize a certificate provision that vests exclusive power in the board to fill board vacancies and newly created directorships. *See also Campbell v. Loew's, Inc.*, Del.Ch., 134 A.2d 852, 857 (1957) (where this Court observed that although § 223 did not specifically address whether stockholders could divest themselves of the power to fill newly created directorships, that result could be attained by appropriate "strong by-law language").[FN12]

**\*7 \*\*234** The plaintiff's challenge to the validity of Article Fifth is found to be without legal merit.

## 2. *Article Sixth*

The plaintiff next challenges Article Sixth which, because of its length and complexity, must be described here in summary form.[FN13] Article Sixth contains three sections. Section A recites the Article's purposes, including:

... *to regulate and define the* conduct of certain affairs of [Tri-Star] as they may involve [Coca-Cola and Time] and their respective officers and directors, and *the powers, rights, duties and liabilities of [Tri-Star] and its* officers, *directors* and stockholders in connection therewith. (emphasis added).

Section B, broadly speaking, describes circumstances where Coca-Cola and Time, in their capacity as Tri-Star shareholders, will not be deemed liable to Tri-Star or its stockholders for breach of fiduciary duty as a result of having engaged in the same line of business as Tri-Star or having pursued a corporate opportunity belonging to Tri-Star.

Finally, Section C specifies, (*inter alia*) circumstances where a Tri-Star director who is also a director of Coca-Cola or Time will not be deemed liable for breach of fiduciary duty to Tri-Star or its

Not Reported in A.2d                                                                 Page 6
Not Reported in A.2d, 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
(Cite as: Not Reported in A.2d)

shareholders. Those circumstances generally include cases where Coca-Cola or Time acquires a corporate opportunity that would belong, but is not made available, to Tri-Star.

Plaintiff contends that Article Sixth is invalid as a matter of law, because it eliminates or restricts the directors' liability to the corporation or its shareholders for breaches of their fiduciary duty of loyalty, in violation of 8 *Del.C.* § 102(b)(7). The defendants respond that Article Sixth does not purport to exonerate Tri-Star directors from liability for breaching their fiduciary duty of loyalty. All Article Sixth does, defendants say, is define "those areas of business opportunity in which the corporation does and does not have an interest," and "those situations in which Tri-Star directors receiving an offer of a corporate opportunity will be deemed to have received such an [offer] in his capacity as a Tri-Star director." (Def. Reply Br. p. 45). I cannot agree.

**235 As previously indicated, a motion to dismiss under Rule 12(b)(6) will not be granted unless it appears to a certainty that under no state of facts would the plaintiff be entitled to relief. *Harman v. Masoneilan Int'l, Inc.,* 442 A.2d at 502-503. That standard, as applied in this somewhat unique context, requires that the motion must be denied if under any plausible construction or operation, Article Sixth arguably would contravene 8 *Del.C.* § 102(b)(7).

§ 102(b)(7) explicitly authorizes a provision in the certificate of incorporation "... eliminating or limiting the personal liability of a director to the corporation to its stockholders for monetary damages for breach of fiduciary duty as a director ..." But that statute also admonishes that any such certificate provision

*8 ... shall not eliminate or limit the liability of a director (i) for any breach of the directors' duty of loyalty to the corporation or its stockholders....

The question is whether under at least one plausible state of facts, Article Sixth would arguably operate to eliminate or limit the directors' liability for breach of their duty of loyalty to Tri-Star or its shareholders. I conclude that it would.

Section C of Article Sixth concerns Tri-Star directors who are also directors of Coca-Cola or Time and who learn of a transaction that would be a potential corporate opportunity both for Tri-Star and Coca-Cola or Time. Section C provides that if the opportunity is acquired by Coca-Cola or Time, or is

not directed to Tri-Star, the Tri-Star director "shall not be liable to Tri-Star or its stockholders for breach of any fiduciary duty," so long as he acts in a manner consistent with the policies specified in subsections (i) through (iii). Subsection (ii) relevantly states that:

... a corporate opportunity offered to any person who is a director but not an officer of [Tri-Star], and who is also a director or officer of [Coca-Cola or Time] shall belong to [Tri-Star] if such opportunity is expressly offered to such person in writing solely in his or her capacity as a director of [Tri-Star], and otherwise shall belong to [Coca-Cola or Time], respectively ...

Under this intricately drafted provision, a case could possibly arise where a Tri-Star director who is also a director of Coca-Cola or Time (a) learns of a corporate opportunity that should otherwise be directed to Tri-Star, (b) causes that opportunity to be offered to himself, but not "in writing," (c) alternatively, causes the opportunity**236 to be offered to himself in writing but not "solely in his ... capacity as a [Tri-Star] director," and then (d) directs the opportunity to Coca-Cola or Time but not to Tri-Star. By negative implication, under Article Sixth that director would not be liable to Tri-Star or its shareholders "for breach of *any* fiduciary duty" arising out of that conduct.

Thus, at least one scenario (and perhaps others) could plausibly be constructed where Article Sixth would eliminate or limit the liability of Tri-Star directors for breach of their fiduciary duty of loyalty-a result proscribed by § 102(b)(7). That possibility alone is sufficient to warrant the denial of defendants' motion to dismiss. In this narrow procedural setting the Court need go no further. Any more comprehensive or definitive declaration of the validity of Article Sixth must await a later procedural stage where the merits may be explored in greater depth than was done here.

### 3. *Article Seventh*

Finally, plaintiff challenges the validity of a portion of Article Seventh. That Article, in full text, reads as follows:

A director of the Corporation shall not be personally liable to [Tri-Star] or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to [Tri-Star] or its stockholders, (ii)

Not Reported in A.2d
Not Reported in A.2d, 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
(Cite as: Not Reported in A.2d)

Page 7

for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived any improper personal benefit. *If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of [Tri-Star] shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.* Any repeal or modification of this Article SEVENTH by the stockholders of [Tri-Star] shall not adversely affect any right or protection of a director of [Tri-Star] existing at the time of such repeal or modification.

*9 The plaintiff contends that the underscored language runs afoul of 8 *Del.C.* § 102(b)(7), because that statute "does not authorize an open ended and non-specific limitation or liability based **237 upon whatever additional authority the DGCL may confer at some unspecified point in the future." (Pl.Br., p. 64). Plaintiff further argues that Article Seventh is inconsistent with Article Eleventh, which requires a two thirds vote to amend the restated Certificate.

Plaintiff's position is not supported by § 102(b)(7) or any other authority cited to the Court. Neither the statute or its underlying policy forbids a corporation from exempting its directors from liability as may be authorized by future amendatory legislative enactments. Nor has plaintiff established a conflict between Article Seventh and Article Eleventh, which requires a two thirds vote for amendment. Under Article Seventh, the authority permitting the corporation automatically to take advantage of future amendments to the DGCL is itself a part of the restated Certificate. Should the shareholders desire to amend that provision (or even to repeal Article Seventh), the two thirds vote requirement would apply.

Accordingly, the plaintiff has failed to demonstrate any plausible application or operation of Article Seventh that would contravene the DGCL or other provision of Delaware law.

## IV. *MOTION TO DISMISS UNDER RULE 23.1*

Finally, the defendants have moved to dismiss the complaint pursuant to Chancery Court Rule 23.1. The basis for the motion is that because certain claims alleged in the amended complaint are

derivative, they are subject to dismissal for failure to make a demand upon the directors or to allege facts demonstrating why no demand was required. The plaintiff responds that the claims are not derivative and that, in any event, no demand was required in these circumstances.

These colliding positions frame two issues: (a) whether one or more of the plaintiff's claims is derivative in character, and (b) if so, whether the complaint adequately establishes that no demand was required under Delaware law. Those issues have engendered dozens of pages of learned debate in the briefs, devoted to such intricate and subtle questions as the derivative status of each of the seven counts in the complaint, and the merits of the plaintiff's multitudinous reasons why demand is excused. Having considered all these arguments, the Court has concluded, with gratitude, that the motion can be decided on narrow grounds, thereby avoiding further imposition upon the already prolific literature in this abstract and highly conceptual area of the law. Even assuming without deciding that the complaint alleges derivative claims, the facts pleaded here excuse the making of a demand.

**238 Any derivative claims in the complaint are subject to Chancery Court Rule 23.1, which pertinently requires the plaintiff:

... [to] allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort.

*10 The plaintiff admits that he made no demand. He contends that no demand was required. The burden of satisfying the requirements for demand excusal rests upon the plaintiff. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 (1988). To satisfy those requirements on this motion, the particularized allegations of the complaint must create a reasonable doubt as to (i) the directors' disinterest or independence, or (ii) whether the directors exercised proper business judgment in approving the challenged transaction. *Grobow,* 539 A.2d at 186; *Aronson,* 473 A.2d at 812. The disinterestedness and independence of the board are determined as of the time the complaint was filed. *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 624 (1984). In this case no full-blown *Aronson* analysis is required, because the motion is determinable on the basis of director disinterestedness.

Not Reported in A.2d
Not Reported in A.2d, 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
(Cite as: Not Reported in A.2d)

The entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability. *Aronson,* 473 A.2d at 812. As the Supreme Court held in *Aronson,* the protection of the business judgment rule can only be claimed "by disinterested directors whose conduct otherwise meets the tests of business judgment." *Id.* The *Aronson* Court also stated:

... From the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally. *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717, 720 (1971); *Cheff v. Mathes,* Del.Supr., 199 A.2d 548, 554 (1964); *David J. Greene & Co. v. Dunhill International, Inc.,* Del.Ch., 249 A.2d 427, 430 (1968). *See also,* 8 *Del.C.* § 144. Thus, if such director interest is present, and the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application whatever in determining demand futility. *See* 8 *Del.C.* § 144(a)(1).

***239** *Id.*

The Tri-Star board, at the time it approved the Combination (September 30, 1987) and at the time this action was filed (December 15, 1987), consisted of ten directors. Thus, for that board to be capable of functioning properly (*i.e.,* impartially) in considering a demand, six of those directors (a majority) must have been free of any disabling conflict of interest. The question is whether the particularized factual allegations of the complaint create a reasonable doubt that a majority of Tri-Star directors were disinterested. In my opinion, two circumstances create such a reasonable doubt.

The first is the fact that three of Tri-Star's directors, Messrs. Ira C. Herbert, Francis T. Vincent, Jr., and Patrick M. Williamson, were senior executives of either Coca-Cola or (in the case of Mr. Williamson) a Coca-Cola affiliate. Those relationships would cause one reasonably to question whether these directors were economically motivated to favor the interests of their employer, Coca-Cola, in considering a shareholder demand. That is because any such demand would be that the board take remedial action that could be adverse to Coca-Cola's interests. As persons arguably beholden to Coca-Cola, those Tri-Star directors would have been on both sides of a transaction where the interests of Tri-Star and Coca-

Cola were in conflict.[FN14] *See Aronson, supra; Weinberger v. UOP, Inc.,* 457 A.2d at 710. Hence, those directors would have "divided loyalties" that would negate the presumption of disinterest that normally would protect their decision. *Pogostin,* 480 A.2d at 624.

***11** There is a second, independent circumstance that creates a reasonable doubt as to the disinterestedness of Messrs. Herbert, Vincent, and Williamson, as well as three other Tri-Star directors, Judd A. Weinberg, Dan W. Lufkin, and David A. Matalon. These six directors owned substantial shares of Coca-Cola. As Coca-Cola stockholders, they would be receiving a *pro rata* share of the special (31,400,000 Tri-Star share) dividend that Coca-Cola would pay to ***240** its stockholders as part of the Combination. In that manner, those six directors stood to gain a personal financial benefit from the challenged transaction that would not be equally shared by Tri-Star's other stockholders. *Aronson,* 473 A.2d at 812; *Pogostin,* 480 A.2d at 624. On that basis, the complaint creates a reasonable doubt as to the ability of a majority of the board to consider impartially a demand.

In response, the defendants have interposed an array of arguments, all aimed towards their proffered conclusion that the special dividend did not create a disabling financial conflict of interest in these six recipients. The defendants argue that (i) Messrs. Williamson, Herbert, and Vincent owned only a *de minimis* equity interest in Coca-Cola, and directors Weinberg, Lufkin, and Matalon owned a proportionately greater equity interest in Tri-Star than in Coca-Cola;[FN15] (ii) the dividend did not add to those directors' personal wealth, because it did not increase the value of their Coca-Cola shares but "... merely redistributed assets between Coca-Cola and its shareholders," (Def. Reply Br., p. 34) and that therefore (iii) "... any injury allegedly suffered by Tri-Star as a result of the Combination allegedly affected recipients of the [dividend] as much as it allegedly affected plaintiff." *Id.*

These arguments labor under two infirmities. The first is that for the defendants' position to prevail, the Court must conclude as a matter of law that the dividend could not have increased the personal wealth of these six directors, and therefore could not have constituted a financial inducement capable of creating a conflict of interest. However, on this record such a legal conclusion would be pure *ipse dixit.* The defendants' proposition is not conceded by the complaint, nor is it compelled by the

Not Reported in A.2d                                                                Page 9
Not Reported in A.2d, 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
(Cite as: Not Reported in A.2d)

complaint's particularized factual allegations.

That leads to the second, and conceptually more significant, infirmity, which is that at this procedural stage the defendants' arguments miss the mark. In reality they are affirmative evidentiary **241 contentions going to the merits of the entire "director disinterest" issue. As such they are inappropriate on a motion to dismiss the complaint under Rule 23.1. In this limited procedural context, the question is not whether the dividend was, as a matter of adjudicated fact, an inducement sufficient to impair these directors' impartiality in considering a demand. Rather, it is simply whether there is a *reasonable doubt*, based solely upon the particularized allegations of the complaint, that the board was disinterested. If such a reasonable doubt is found, that finding would authorize further exploration of that and other issues (including the merits of the derivative claim itself), by allowing the case to go forward into the discovery stage.

*12 It follows that on a Rule 23.1 motion to dismiss, a finding that a reasonable doubt exists as to the directors' disinterest in the challenged transaction, has very limited significance. Such a tentative conclusion is not, nor could it represent, an adjudication that a majority of Tri-Star's directors were, in fact, interested in the challenged transaction because of the anticipated dividend. Indeed, and in fact, the opposite may be true. However, any such determination must be made at a later procedural stage, after the parties have been afforded an opportunity to develop a proper evidentiary record and to present their affirmative factual arguments on both sides of the question.[FN16] It is at that later stage that arguments of the kind defendants advance here will be entertained and appropriately weighed.

For the above reasons, I conclude that the plaintiff has alleged facts that excuse his failure to make a demand.

## V. *CONCLUSION*

To summarize the rulings made herein: (1) HBO's motion to dismiss pursuant to Rule 12(b)(6) is granted; (2) the defendants' motion to dismiss Count III pursuant to Rule 12(b)(6) is granted with respect to Articles Fifth and Seventh of the Restated Certificate of Incorporation, and is denied with respect to Article Sixth; and **242 (3) the

defendants' motion to dismiss pursuant to Rule 23.1 is denied. IT IS SO ORDERED.

FN1. Following the Combination, Tri-Star's name was changed to Columbia Pictures Entertainment, Inc., but for purposes of clarity, it will be referred to as "Tri-Star."

FN2. Broken down as follows: Coca-Cola (36.8%), HBO (9%), Technicolor (7.2%), and Rank (3.6%).

FN3. Most, but not all, of the assets of the Entertainment Sector would be transferred to Tri-Star. Carved out of the transaction was a dividend that Coca-Cola declared to itself from the Entertainment Sector's assets, consisting of $300 million in cash plus an inter-company receivable of $240 million. Coca-Cola elected also to retain the stock of certain real estate companies, as well as certain real estate and data processing assets that were also part of the Entertainment Sector.

FN4. Coca-Cola would also (i) receive an additional 500,000 shares of Tri-Star common stock, (ii) the right to purchase $100 million of a newly created Tri-Star Preferred stock that was superior to the common stock as to dividends and liquidation rights.

FN5. The remaining Counts either do not allege a claim against HBO or do so in a facially invalid manner. Count III challenges the validity of the amendments to Tri-Star's Certificate of Incorporation, but does not charge HBO with culpability or seek relief against HBO. Count IV challenges certain disclosures made in the proxy statement, but its allegations do not fairly charge HBO with culpability therefor. Count V alleges that Coca-Cola and HBO manipulated Tri-Star's corporate machinery to the detriment of the public stockholders. However, the complaint does not specify what role HBO played in the alleged manipulation. Moreover, HBO was not a party to the Transfer Agreement, and the proxy statement clearly discloses that as a result of the Combination, HBO lost its right to nominate directors to the Tri-Star Board and to withhold its consent to certain

Not Reported in A.2d                                                                                    Page 10
Not Reported in A.2d, 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
(Cite as: Not Reported in A.2d)

transactions involving Tri-Star. Finally, HBO's ownership percentage declined from 9% to 3% of Tri-Star's outstanding shares. For those reasons, HBO's motion to dismiss Counts III, IV, and V as to it, is granted.

FN6. *Lewis v. Straetz,* Del.Ch., C.A. No. 7859, Hartnett, V.C. (February 12, 1986).

FN7. Even if HBO's representatives had participated in those negotiations, plaintiff cites not authority that would equate that participation with the actual exercise of board control. *See Gilbert v. El Paso Co.,* Del.Ch., 490 A.2d 1050, 1055 (1984).

FN8. Ripeness is one of four prerequisites for invoking declaratory relief:
[The action] ... (1) ... must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between the parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.
*Stroud v. Milliken Enterprises, Inc.,* 552 A.2d at 479-480, quoting *Rollins Int'l Hydronics Corp.,* Del.Supr., 303 A.2d 660 (1973).

FN9. *Hampson v. State,* Del.Supr., 233 A.2d 155 (1967); *Clemente v. Greyhound Corp.,* Del.Super., 155 A.2d 316 (1959).

FN10. A similar "ripeness" argument was made and rejected in *Moran v. Household Int'l, Inc.,* Del.Ch., 490 A.2d 1059, 1072 (1985), *aff'd,* Del.Supr., 500 A.2d 1346 (1985). *Moran* involved a claim for a declaration that a "poison pill" rights plan, adopted as a preventive antitakeover measure (and not in the context of any specific hostile bid), was invalid under Delaware law. The defendants argued that the declaratory claims were not ripe because no event had occurred that would trigger the Rights Plan. In language applicable to this case, this Court held that the declaratory action had not been:
... instituted to resolve the future effect of contingent events. [Here] the plaintiffs ...

are seeking a declaration that the Rights Plan, because of its deterrent features, presently affects shareholders' fundamental rights and is illegal under Delaware Law. *Moran,* 490 A.2d at 1072.

FN11. § 223(a) provides that vacancies and newly created directorships "... *may* be filled by a majority of directors then in office ... or by a sole remaining director ..." (emphasis added).

FN12. In his Report to the 1967 Corporation Law Revision Committee, Professor Ernest L. Folk, III suggested that § 223 "could be clarified" to make it explicit that the shareholders' inherent power to fill board vacancies and newly created directorships can be vested in that body. Plaintiff asserts that the General Assembly's reenactment of § 223 without any such clarifying language means that that body did not intend to permit shareholders to divest themselves of that power. That argument also finds no support in legal precedent or rule of statutory construction of which this Court is aware.

FN13. The full text of Article Sixth is attached as an addendum to this Opinion.

FN14. In a similar vein, plaintiff argues that prior employment relationships of directors Kaufman, Matalon and Lufkin with Coca-Cola also created a disabling conflict. Those three persons were officers or directors of Columbia Pictures or its affiliates before Coca-Cola acquired Columbia Pictures in 1982. All three left Columbia Pictures shortly thereafter. At the time the Combination was approved in December, 1987, those directors were no longer officers or directors of any Coca-Cola subsidiary or affiliate. Plaintiff advances no cogent reason, and cites no authority, for his position that these past associations create a reasonable doubt as to the disinterest of Messrs. Kaufman, Matalon, and Lufkin.

FN15. While in no way essential to this Court's ruling, it should be noted that the proxy statement discloses other facts that, in an evidentiary hearing, would arguably detract from the force of defendants' statement that these directors' holdings in Coca-Cola were *de minimis.* Although that

Not Reported in A.2d                                                          Page 11
Not Reported in A.2d, 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
**(Cite as: Not Reported in A.2d)**

is correct from a control standpoint, those directors' Coca-Cola shares did represent a substantial investment. With the exception of Mr. Lufkin, the dollar value of those directors' investment in Coca-Cola exceeded the value of their investment in Tri-Star. *See* Proxy Statement, pp. 41, 86-87, 96 and F-42.

FN16. For example, the defendants' arguments in support of their position that the dividend could not have caused the Tri-Star directors to have a conflict of interest, could be presented on a motion for summary judgment pursuant to Rules 23.1 and 56. On such a motion the parties would be entitled to develop an evidentiary record in affidavit or other appropriate form.

Del.Ch.,1989.
Siegman v. Tri-Star Pictures, Inc.
Not Reported in A.2d, 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

LEXSEE

**CHARLES STANZIALE, Plaintiff, v. MORRIS NACHTOMI, et al., Defendants.**

**Civil Action No. 01-403 KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2004 U.S. Dist. LEXIS 15664**

**August 6, 2004, Decided**

**PRIOR HISTORY:** Stanziale v. Nachtomi, 2004 U.S. Dist. LEXIS 7375 (D. Del., Apr. 20, 2004)

**DISPOSITION:** [*1] Plaintiff's motion for reargument was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, the trustee of a Chapter 7 corporate debtor, filed a motion for reargument of an order granting defendant corporate directors' motion to dismiss a derivative action.

**OVERVIEW:** The trustee moved for reargument and/or alteration or amendment of an order granting a motion to dismiss filed by the directors. The trustee contended that the court erroneously imposed the heightened pleading standard of Fed. R. Civ. P. 23.1, which applied to shareholder derivative suits, in dismissing his claims. The court found that the trustee's argument was not well founded. The memorandum opinion did not rely upon, apply, or even mention Rule 23.1 in dismissing the complaint. The court further found that the trustee failed to comprehend that the business judgment rule applied to the case. Because the business judgment rule applied to the case, the trustee was required to rebut the presumption of that rule with well-pleaded facts, not conclusory allegations. The trustee's conclusory allegations that the directors breached their fiduciary duties of care, loyalty, and good faith did not rebut the presumption of the business judgment rule. Finally, the court found that the trustee did not allege any new, well-pleaded facts that were not available at the time the directors' motion to dismiss was granted.

**OUTCOME:** The court denied the trustee's motion for reargument.

**CORE TERMS:** business judgment rule, motion to dismiss, well-pleaded, reargument, duty of care, recon- sideration, self-dealing, shareholder, conclusory, misap- prehended, oversight, rebut, legal error, particularity, unsupported, wrongfully, systematic, derivative, height- ened, issuance, premised, survive, pleaded, monitor, pled

**LexisNexis(R) Headnotes**

*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
[HN1] Motions for reconsideration or reargument should be granted only "sparingly."

*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
[HN2] Motions for reconsideration are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues pre- sented by the parties, or has made an error not of reason- ing, but of apprehension.

*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
[HN3] Courts should be particularly vigilant that motions for reargument or reconsideration are not used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously de- cided.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
*Civil Procedure > Judgments > Relief From Judgment > Newly Discovered Evidence*
[HN4] A district court should grant a motion for recon- sideration that alters, amends, or offers relief from a

judgment only when: (1) there has been an intervening change in the controlling law; (2) there is newly discovered evidence that was not available to the moving party at the time of judgment; or (3) there is a need to correct a legal or factual error that has resulted in a manifest injustice.

*Business & Corporate Law > Unincorporated Associations*
*Civil Procedure > Class Actions > Derivative Actions > General Overview*
*Civil Procedure > Class Actions > Prerequisites > General Overview*
[HN5] Fed. R. Civ. P. 23.1 specifies several pleading requirements in a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right that may properly be asserted by it. Among those requirements is that the complaint allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Civil Procedure > Class Actions > Derivative Actions > General Overview*
*Civil Procedure > Judgments > General Overview*
[HN6] A plaintiff may prevent the application of the business judgment rule with well-pleaded facts establishing that the directors acted out of self-interest. In order to overcome the presumption of the business judgment rule, in the absence of any allegations of self-dealing, plaintiffs must allege with particularity facts that establish that the contested decision was not a product of valid business judgment.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Defenses > Business Judgment Rule*
[HN7] The requirement of well-pleaded facts to overcome the business judgment rule, which is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company, is well established in Delaware. The requirement also applies where a bankruptcy trustee

brings suit against former directors and officers of the debtor.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Defenses > Business Judgment Rule*
*Estate, Gift & Trust Law > Trusts > Trustees > Duties & Powers > General Overview*
[HN8] A plaintiff bears the burden of alleging well-pleaded facts to overcome the presumption of the business judgment rule and survive a motion to dismiss. Absent well-pleaded allegations of specific acts of self-dealing or even bad faith, plaintiffs cannot overcome the presumption afforded by the business judgment rule that the directors acted reasonably and in good faith.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > General Overview*
[HN9] A director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and the failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by non-compliance with applicable legal standards.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
[HN10] Generally, where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation only a sustained or systematic failure of the board to exercise oversight will establish the lack of good faith that is a necessary condition to liability. Such a test of liability, lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight, is quite high.

**COUNSEL:** For CHARLES A. STANZIALE, plaintiff: John Leonard Reed, Duane Morris LLP, Wilmington, DE.

For STEVEN L. GELBAND, STEPHEN A. OSBORN, HENRY P. BAER, LEO-ARTHUR KELMENSON, ELI J. SEGAL, TERRY V. HALLCOM, defendants: Bruce E. Jameson, Prickett, Jones & Elliott, Wilmington, DE.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Kent A. Jordan

**OPINION:**

### MEMORANDUM ORDER

#### I. Introduction

Presently before me is a motion (Docket Item ["D.I."] 34; the "Motion") filed by plaintiff Charles A. Stanziale, Jr., in his capacity as Chapter 7 Trustee of Tower Air, Inc. ("Plaintiff"), seeking reargument of the Memorandum Opinion dated April 20, 2004 (D.I. 33) in which I granted the motion to dismiss filed by defendants Morris K. Nachtomi, Stephen L. Gelband, Stephen A. Osborn, Henry P. Baer, Leo-Arthur Kelmenso, Eli J. Segal, and Terry V. Hallcom (collectively the "Defendants"). I have jurisdiction over this case pursuant to 28 U.S.C. § 1334. For the reasons that follow, the motion will be denied.

#### II. Background

Because the factual and procedural history of this case is set forth in the Memorandum [*2] Opinion dated April 20, 2004 (D.I. 33), it will not be repeated here. Rather, the facts pertinent to the motions currently before me are incorporated in the discussion below.

#### III. Standard of Review

[HN1] Motions for reconsideration or reargument should be granted only "sparingly." *Karr v. Castle*, 768 F. Supp. 1087, 1090 (D. Del. 1991). In this district, [HN2] motions for reconsideration are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990) (citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983)). [HN3] "Courts should be particularly vigilant that motions for reargument or reconsideration are not used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." *Id.*

Further, [HN4] a district court should grant a motion for reconsideration which alters, amends, or offers relief from a judgment only when: (1) there [*3] has been an intervening change in the controlling law; (2) there is newly discovered evidence which was not available to the moving party at the time of judgment; or (3) there is a need to correct a legal or factual error which has resulted in a manifest injustice. *See Max's Seafood Cafe by Lou Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citation omitted).

#### IV. Discussion

Plaintiff "moves for reargument and/or for alteration or amendment" of the April 20, 2004 Memorandum Opinion because the Plaintiff believes that I erroneously imposed the "heightened" pleading standard of Fed. R. Civ. P. 23.1, n1 which applies to shareholder derivative suits, in dismissing its claims. (D.I. 34 at 3-4.) Plaintiff claims that this is not a derivative lawsuit, but is "brought directly by the Debtor against former officers and directors for harm committed by them." (*Id.* at 7.)

> n1 Rule 23.1 [HN5] specifies several pleading requirements "in a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it ..." Among those requirements is that the complaint "allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

[*4]

Plaintiff's argument that I "misapprehended the proper standard or committed legal error in applying the Rule 23.1 standard" (*Id.*) is not well founded for several reasons. First, the April 20, 2004 Memorandum Opinion does not rely upon, apply, or even mention Rule 23.1 in dismissing Plaintiff's Amended Complaint. Second, although I cited *In re General Motors Class E Sec. Litig.*, 694 F. Supp. 1119, 1132 (D. Del. 1988) and *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000), both of which involve shareholder derivative suits, Plaintiff wrongly believes that I applied the Rule 23.1 pleading standard by citing those cases. I cited *In re General Motors* and *Brehm* for the proposition that [HN6] "may prevent the application of the business judgment rule with well-pleaded facts establishing that the directors acted out of self-interest," and that "in order to overcome the presumption of the business judgment rule," in the absence of any allegations of self-dealing, "plaintiffs must allege with particularity facts which establish that the contested decision was not a product of valid business judgment." *In re General Motors*, 694 F. Supp. at 1132. [*5]

[HN7] The requirement of well-pleaded facts to overcome the business judgment rule, which is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good

faith, and in the honest belief that the action taken was in the best interest of the company, is well established in Delaware. n2 The requirement also applies where, as here, a bankruptcy trustee brings suit against former directors and officers of the Debtor. In In re RSL Com Primecall, Inc., 2003 Bankr. LEXIS 1635, Nos. 01-11457 et. al., 2003 WL 22989669 (Bankr. S.D.N.Y. Dec. 11, 2003), the trustee alleged that the defendants wrongfully concealed RSL's insolvency and wrongfully prolonged the corporate existence of RSL. In granting defendant's motion to dismiss several of the trustee's duty of care claims, n3 the court held that [HN8] a "plaintiff bears the burden of alleging well pleaded facts to overcome the presumption [of the business judgment rule] and survive a motion to dismiss," and that "absent well pleaded allegations of specific acts of self-dealing or even bad faith, Plaintiff's cannot overcome the presumption afforded by the business judgment rule that the directors acted reasonably [*6] and in good faith." 2003 Bankr. LEXIS 1635, [WL] at *9-10.

n2 See Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156 (Del. 1995) ("unless effectively pled factual allegations in the ... plaintiff's complaint successfully rebut the presumption of the business judgment rule, the Directors would be protected by the substantive operation of the business judgment rule"); Crescent/Mach I Partners L.P., 846 A.2d 963, 984 (Del. Ch. 2000) ("In order for plaintiffs' duty of care claims to survive a motion to dismiss, they must sufficiently plead facts which if true would take defendants' actions outside the protection afforded by the business judgment rule."); Ash v. McCall, 2000 Del. Ch. LEXIS 144, No. Civ. A. 17132, 2000 WL 1370341 at *10 (Del. Ch. Sept. 15, 2000) ("This Court has stated on several occasions that mere allegations that directors made a poor decision - absent some showing of self-dealing or suspect motivation -- does not state a cause of action ...").

n3 The court denied defendants' motion to dismiss the claims premised on the alleged issuance of $ 1.6 billion guarantee of the outstanding debt of the parent corporation by RSL USA, without any board approval, at a time both entities were allegedly insolvent. 2000 Del. Ch. LEXIS 144, [WL] at *11. In permitting the trustee to proceed on claims for breach of the director's duty of care relating to the issuance of the guarantees, the court determined that the trustee's factual allegations "adequately alleged self-dealing." 2000 Del. Ch. LEXIS 144, [WL] at *11-12.

[*7]

Plaintiff cites Grimes v. Donald, 673 A.2d 1207 (Del. 1996) and Pereira v. Cogan, 2001 U.S. Dist. LEXIS 2461, 2001 WL 243537 (S.D.N.Y. Mar. 13, 2001) for the notion that in breach of duty cases that are direct, the less stringent notice pleading standards of Fed. R. Civ. P. 8 apply, rather than the heightened standards of Rules 9or 23.1. Plaintiff states that "the Court was required to assume the truthfulness of all well-pleaded allegations in the Amended Complaint and dismiss the [Plaintiff's] claims only if it determined with reasonable certainty that the [Plaintiff] could not have prevailed on any set of facts that could be inferred from the Amended complaint." (D.I. 34 at 8-9.) I do not disagree with Plaintiff with respect to what the pleading standards of Rule 8 require.

However, what Plaintiff evidently fails to comprehend is that the business judgment rule applies to this case and means that Plaintiff was required to rebut the presumption of that rule with well-pleaded facts, not conclusory allegations. See Grobow v. Perot, 539 A.2d 180, 188 n.6 (Del. 1988) ("Even under the less stringent standard of a [Rule [*8] 12(b)(6)] motion to dismiss, all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true, but neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true"); McMillan v. Intercargo Corp., 768 A.2d 492, (Del. Ch. 2000) (granting motion dismissing claims for breach of fiduciary duties because "as on a Rule 12(b)(6) motion ... a court ... will not rely upon conclusory allegations of wrongdoing or bad motive unsupported by pled facts"); Weinberger v. UOP, Inc., 409 A.2d 1262, 1264 (Del. 1979); Cohen v. Mayor of Wilmington, 34 Del. Ch. 39, 99 A.2d 393, 395 (Del. Ch. 1953).

Plaintiff's conclusory allegations that the Defendants breached their fiduciary duties of care, loyalty, and good faith did not rebut the presumption of the business judgment rule, and that is the holding of the April 20, 2004 Memorandum Opinion. (D.I. 33 at 8, 10, 15, 16, 17.) Because I have neither misapprehended nor committed legal error in granting the Defendants' motion to dismiss, and because Plaintiff has not alleged any new, well-pleaded [*9] facts that were not available at the time Defendants' motion to dismiss was granted, Plaintiff's Motion must be denied.

Plaintiff also believes that I "misapprehended and/or erred as a matter of law" in interpreting Delaware case law governing claims with respect to a board of directors' duty to oversee the corporation's affairs. (D.I. 34 at 4.) Specifically, Plaintiff states that my construction of

*Caremark Int'l, Inc., Deriv. Litig.* 698 A.2d 959 (Del. Ch. 1996)) "is premised on a misapprehension of the law." (D.I. 34 at 14.) In the April 20, 2004 Memorandum Opinion, I held that *Caremark* was inapplicable to Plaintiff's claim that the Defendants were liable for their failure to monitor the conditions or activities of the corporation because Plaintiff did not allege that the Defendants failed to comply with the law. (D.I. 33 at 13.) In *Caremark,* Chancellor Allen stated:

[HN9] a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses [*10] caused by non-compliance with applicable legal standards.

698 A.2d at 970. Even if Chancellor Allen intended "applicable legal standards" to include "the legal standards governing the fiduciary duties owed by directors," n4 as Plaintiff alleges (D.I. 34 at 14-15), and not just compliance with criminal and regulatory law (which defendant Caremark violated, resulting in $ 250 million in costs and liability being imposed on the corporation), this case is not one of the "circumstances" where the directors will be liable.

n4 Specifically, the duty of care, which, according to Plaintiff, includes a duty to monitor. (See D.I. 34 at 15.)

In *Caremark,* Chancellor Allen said:

[HN10] Generally, where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation ... only a sustained or systematic failure of the board to exercise oversight ... will establish the lack of good faith that is a necessary condition to liability. [*11] Such a test of liability -- lack of good faith as evidence by sustained or systematic failure of a director to exercise reasonable oversight -- is quite high.

698 A.2d at 971. In this case, as in *Caremark,* there apparently "is no evidence that the director defendants were guilty of a sustained failure to exercise their oversight function." *Id. (See* D.I. 33 at 13-15.) More to the point, though, there are no facts alleged to support "the conclusion that the defendants either lacked good faith in the exercise of their monitoring responsibilities or conscientiously permitted a known violation of law by the corporation to occur." 698 A.2d at 972; *see also Guttman v. Huang,* 823 A.2d 492, 506-507 (Del. Ch. 2003) (to proceed on *Caremark* claim, plaintiff must plead a conscious dereliction of duty; plaintiff's "conclusory complaint is empty of the kind of fact pleading that is critical to a *Caremark* claim ..."). Therefore, Plaintiff's Motion must be denied.

**V. Conclusion**

Accordingly, IT IS HEREBY ORDERED that Plaintiff's motion for reargument (D.I. 34) is denied.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

August 6, 2004
Wilmington, [*12] Delaware

# EXHIBIT 5

Westlaw.

Not Reported in A.2d                                                              Page 1
Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312
**(Cite as: Not Reported in A.2d)**

# H

STEIN v. ORLOFFDel.Ch. 1985
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
STEIN
v.
ORLOFF
**No. 7276**

May 30, 1985

In this derivative action, plaintiff shareholder, on behalf of all shareholders of the corporation, brought suit challenging the actions of the directors. Plaintiff claimed that directors' actions constituted breach of fiduciary duties concerning the appointment of directors amounting to the sale of corporate offices. Plaintiff also charged defendants with wastes of corporate assets in connection with the setting of stock option prices, compensation to officers, and sale of two of the corporation's divisions.

The court of chancery, per Vice-Chancellor Hartnett, held that because plaintiff had not alleged sufficient facts to demonstrate demand futility, the complaint must be dismissed for failure to make a pre-suit demand as applies to all allegations except those involving waste of corporate assets since suit contained sufficient allegations to state a claim for the latter action.

**[1] Corporations 101 ⟨⟩206(4)**

101 Corporations
   101IX Members and Stockholders
      101IX(C) Suing or Defending on Behalf of Corporation
         101k206 Refusal of Corporation, Officers, or Stockholders to Act
            101k206(4) k. Excuse for Failure to Demand. Most Cited Cases
A motion to dismiss under Rule 23.1 where there has been no pre-suit demand requires that the court of chancery must decide whether the particular facts alleged give rise to a reasonable doubt that the directors were disinterested and independent or that the challenged transaction is protected by the business judgment rule from further judicial scrutiny. DEL. CH. CT. R. 23.1.

**[2] Corporations 101 ⟨⟩206(4)**

101 Corporations
   101IX Members and Stockholders
      101IX(C) Suing or Defending on Behalf of Corporation
         101k206 Refusal of Corporation, Officers, or Stockholders to Act
            101k206(4) k. Excuse for Failure to Demand. Most Cited Cases
Where challenged transactions occurred over a period of time so that the composition of the board of directors was not the same at all times material to the challenged actions, the issue of whether a pre-suit demand would have been futile will be determined with reference to the circumstances existing at the time of commencement of the action.

**[3] Corporations 101 ⟨⟩206(4)**

101 Corporations
   101IX Members and Stockholders
      101IX(C) Suing or Defending on Behalf of Corporation
         101k206 Refusal of Corporation, Officers, or Stockholders to Act
            101k206(4) k. Excuse for Failure to Demand. Most Cited Cases
The allegation of control, designation, and participation and approval of the transaction without allegations of facts to support the allegations are insufficient to excuse the failure to make a presuit demand pursuant to Delaware Chancery Court Rule 23.1.

**[4] Corporations 101 ⟨⟩320(8)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k320 Actions Between Shareholders and Officers or Agents
            101k320(8) k. Allegations as to Right to Sue. Most Cited Cases
In shareholder's derivative action, mere allegations of business relationships by corporate directors and major stockholder that do not state facts with particularity are not sufficient to show that there is a reasonable doubt that the directors were independent or disinterested.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 2
Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312
(Cite as: Not Reported in A.2d)

**[5] Corporations 101 ☜310(2)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to
Corporation and Its Members
            101k310 Management of Corporate Affairs
in General
                101k310(2) k. Degree of Care Required
and Negligence. Most Cited Cases
 Unless facts are alleged from which it could be
shown that board members acted in a grossly
negligent manner in approving a challenged
transaction, such board members will not be denied
the protection of the business judgment rule.

**[6] Corporations 101 ☜312(7)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to
Corporation and Its Members
            101k312 Corporate Property, Funds, and
Securities
                101k312(7) k. Right to Question
Transactions, and Estoppel and Acquiescence. Most
Cited Cases
 Where waste of corporate assets is alleged, the test
for finding waste of corporate assets is whether the
consideration received by the corporation was so
inadequate that no person of ordinary sound business
judgment would deem it worth that which the
corporation paid.

**[7] Corporations 101 ☜320(7)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to
Corporation and Its Members
            101k320 Actions Between Shareholders and
Officers or Agents
                101k320(7) k. Bill, Petition, or
Complaint in General. Most Cited Cases
 In a stockholder's derivative action, a complaint
alleging preexisting options on which the option price
was reduced without any consideration being
received for the reduction is a sufficient allegation of
facts to state a claim for waste.

**314** Irving Morris, Esquire, and Joseph A.
Rosenthal, Esquire, of Morris and Rosenthal,

Wilmington, Delaware; and Bruce E. Gerstein,
Esquire, and Scott W. Fisher, Esquire, of Garwin,
Bronzaft & Gerstein, New York, New York, for
plaintiff.
 Charles F. Richards, Jr., Esquire, and Samuel Nolen,
Esquire, of Richards, Layton & Finger, Wilmington,
Delaware, for individual defendants and defendant
NVF Company.
 Victor F. Battaglia, Esquire, and Pamela S. Tikellis,
Esquire, of Biggs & Battaglia, Wilmington,
Delaware, for defendant Evans Products Company.
 HARTNETT, *Vice-Chancellor*
**1 **314 This is a stockholder's derivative action
brought by the plaintiff purportedly on behalf of all
the shareholders of Evans Products Company
challenging a number of transactions involving the
corporation. Plaintiff made no demand on the Board
of the corporation to take action regarding the alleged
wrongful transactions prior to the commencement of
this suit. Defendants assert that, because plaintiff has
not alleged sufficient specific facts to demonstrate
demand futility, the complaint must be dismissed
pursuant to Chancery Court Rule 23.1 for failure to
make a pre-suit demand. A careful review of the
complaint shows that it does not adequately allege
that the Board was incapable of independently
considering a pre-suit demand if it had been made as
to the claims asserted in the Complaint except as to a
claim of waste of corporate assets. The complaint
does contain sufficient allegations so as to state a
claim of waste of corporate assets in connection with
the reduction of the purchase price of certain stock
options and therefore it will not be dismissed as to
those allegations.

I

[1] The Delaware Supreme Court recently stated that
'. . . in determining demand futility the Court of
Chancery in the proper exercise of its discretion must
decide whether, under the particularized facts
alleged, a reasonable doubt is created that: (1) the
directors are disinterested and independent and (2)
the challenged transaction was otherwise the product
of a valid exercise of business judgment.'

*Aronson v. Lewis*, Del. Supr., 473 A.2d 805 (1984),
at 814.

 In considering a motion to dismiss I am limited to a
consideration of the allegations of the complaint and
cannot consider other pleadings. *Id.* It is therefore my
duty, when faced with a motion to dismiss under
Rule 23.1, where there has been no pre-suit demand,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312
(Cite as: Not Reported in A.2d)

to carefully scrutinize the factual allegations of the complaint to determine whether they give rise to a reasonable doubt that the directors were disinterested and independent or that the challenged transaction is protected by the business judgment rule from further judicial scrutiny. There are 83 separate allegations in the complaint.

## II

The facts set forth are gleaned from the Amended and Supplemental Complaint ('the Complaint'). Evans Products Company is **315 a Delaware corporation engaged in the business of manufacturing and distributing building materials, shelter products, automotive heating and ventilating products, and transportation equipment for trucks and railways, as well as the leasing of rail cars. Its common stock is listed and traded on the New York Stock Exchange, and as of May 4, 1983, there were over 12 million shares outstanding.

Victor Posner, the primary subject of the allegations of the Complaint, has large holdings of stock in a number of corporations which in turn have holdings in the same or other corporations. It was not alleged, however, that he owns 50% or more of the common stock of any one of these corporations. He is also Chairman of the Board, President, or Chief Executive Officer, or holds a combination of these offices with a number of these corporations. These corporations include Sharon Steel Corp. ('Sharon'), Summit Systems, Inc. ('Summit'), NVF Company ('NVF'), DWG Corporation ('DWG'), APL Corporation ('APL'), and Southeastern Public Services Company ('Southeastern'). Also involved is Security Management Corp.-described in the Complaint as 'a privately held Posner family corporation.'

*2 During 1980 and 1981 two of these corporations, Sharon and Summit, purchased shares of Evans Products Company's common stock. On November 12, 1981, these corporations held over 43% of Evans Products' outstanding common shares.

[2] The plaintiff challenges several transactions which were undertaken by the Board of Directors of Evans Products Company. The composition of the Board was not the same at all the times material to the challenged actions, but the issue of whether a presuit demand would have been futile will be determined with reference to the circumstances existing at the time of commencement of the action. *Aronson v. Lewis, supra.*

## III

On February 17, 1982, six of the director-defendants were granted five-year employment contracts and another director-defendant's existing employment contract was amended. These contracts guaranteed payment of the then present value of all payments due under the contracts unless there was a termination for cause or the employee chose to terminate the contract in accordance with its provisions. Termination at the employee's option was to be permitted in the event of (1) a merger, consolidation, or sale of assets of the corporation, (2) an acquisition of more than 50% of the outstanding **316 shares of the corporation by a single stockholder, or (3) the then current membership of the Board of Directors of the corporation was reduced to less than 60% of the total Board. If an employee so chose to terminate for one of the stated reasons then he would be entitled to receive 12 months salary. Amendments extending the duration of the contracts or increasing the yearly minimum salary were subsequently made to two of these agreements.

On February 19, 1982, two days after these employment agreements were made, Evans Products Company entered into an agreement in principle to merge with Sharon Steel Corporation. Under the agreement Sharon's parent, NVF, would have held approximately 56% of the stock of the resulting entity. The proposed merger was never consummated, however, because Evans Products Company was advised in April of 1983 that its creditors would not approve the merger.

The Complaint further alleges that the employment agreements were designed so that the proposed, and thus foreseeable, merger would automatically trigger the benefits.

It is also alleged that after the merger attempt failed Mr. Orloff, the Chairman of the Board of Evans Products Company, and Mr. Posner entered into a plan whereby each would designate half the members of the Board of Evans Products Company.

At the Evans Products Company Board meeting on April 20, 1983, a number of changes took place. The Board of Directors expanded its number from 14 to 16. Three members of the Board resigned and two days later a fourth resigned, while four new members were elected (including Mr. Posner and his son,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312
(Cite as: Not Reported in A.2d)

Stephen Posner). Mr. Orloff then resigned as Chairman of the Board in favor of Mr. Posner, and Stephen Posner was appointed Vice Chairman. Mr. Orloff, Mr. Posner and Stephen Posner were then appointed as the three members of Evans Products Company's Executive Committee.

**\*3** A Board composed of 16 directors was elected at a shareholders' meeting on June 8, 1983. The Complaint alleges that Mr. Posner designated eight of the members and that Mr. Orloff designated the other eight members.

The Complaint alleges that as an inducement to Mr. Orloff to allow the changes on Evans Products Company's Board, he was elected to the Boards of both Sharon and NVF and as President, Chief Executive and member of the Board of DWG. He was given a five-year employment contract with DWG for $390,000 per year. This contract is alleged to be a sham and allegedly intended as 'payment for the sale of offices and directorships which are assets **\*\*317** belonging exclusively to Evans Products Company.' The DWG contract is alleged to be in violation of Mr. Orloff's contract with Evans Products Company which requires his full-time services in exchange for a minimum salary of almost $600,000.

In January of 1984 a number of changes occurred in Evans Products Company's senior management. Mr. Posner was named Chief Executive Officer. Mr. Colvin, a Senior Vice President of Sharon and NVF and a member of the Posner family, replaced Mr. Robinson on the Board of Directors and was made a Senior Vice President. A number of other people who also hold positions with other corporations in which Mr. Posner holds substantial interests were appointed to management positions with Evans Products Company. Among these is Tracy Posner-Mr. Posner's then 21-year-old daughter-a recent college graduate who was appointed Vice President, Assistant Secretary, and Assistant Treasurer.

In response to this management shift, several high-ranking employees of Evans Products Company resigned-including Mr. Bragdon who resigned from the Board of Directors.

As will be seen, these allegations do not adequately state facts with sufficient particularity to excuse the failure to have made a presuit demand.

IV

**[3]** It is now well settled that mere conclusory allegations of domination and control, as well as allegations that a benefitted shareholder designated the directors and that they owe their positions to him, are insufficient to excuse a pre-suit demand under Chancery Rule 23.1. See *Aronson, supra.* In order to excuse demand there must be allegations of fact which raise a reasonable doubt as to the actual independence of the directors and these facts must demonstrate that the directors are beholden to the controlling person through personal and other relationships. *Id.* Mere allegations of participation in the approval of the transaction are similarly insufficient. *Id.*
'Directorial interest exists whenever divided loyalties are present, or a director either has received or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders. The question of independence flows from an analysis of the factual allegations pertaining to the influences upon the directors' performance of their duties generally, and more specifically in respect to the challenged transaction.'

**\*4 \*\*318** *Pogostin v. Rice,* Del. Supr., 480 A.2d 619 (1984), at 624 (citations omitted).
The allegation of control, designation, and participation and approval of the transaction without allegations of facts to support the allegations are therefore insufficient to excuse the failure to make a pre-suit demand pursuant to Chancery Rule 23.1.

**[4]** The Complaint also contains allegations of extensive business relationships between the various directors and Mr. Posner. The existence of these relationships, absent more, is also insufficient to excuse the failure to make a pre-suit demand. No facts are alleged which suggest that the directors would not have retained their other positions unless they acted in accordance with Mr. Posner's wishes. See *Kaufman v. Belmont,* Del. Ch., 479 A.2d 282, 288 (1984).

The allegations of lack of independence of the directors, therefore, do not state facts with particularity which would lead me to conclude that there is a reasonable doubt that the directors were independent or disinterested. The directors therefore could have impartially entertained a pre-suit demand.

V

Not Reported in A.2d
Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312
(Cite as: Not Reported in A.2d)

[5] It is also clear that no facts are alleged in the Complaint which would give rise to a reasonable doubt that the Board members had acted in such a grossly negligent manner in approving the challenged transactions as to deny themselves the protection of the business judgment rule See *Smith v. van Gorkom*, Del. Supr., 488 A.2d 858 (1985).

The Complaint does contain an allegation that the realignment of the Board in April of 1983 constituted a sale of corporate offices by Mr. Orloff who allegedly received certain positions and compensation with other corporations for his part in the organization. Unfortunately for the plaintiff, however, there is no allegation of facts in the Complaint which, if true, show that any of the members of the Board at the time suit was filed, let alone a majority of them, were beholden to and controlled by Mr. Orloff.

## VI

Some of the allegations of wastes of corporate assets are, however, sufficient to raise a reasonable doubt that the challenged transactions were the product of a valid exercise of business judgment.

Evans Products Company's 1979 Stock Option Plan ('1979 **319 Plan') provides for a price determination for the exercise of options by a Stock Option Committee which must be no less than 'fair market value of the stock.' The fair market value is defined in the 1979 Plan as being the value of the stock as of the date of granting of the option. The 1979 Plan was approved by Evans Products Company's shareholders at the annual meeting in May of 1979. No provision of the 1979 Plan allows the Board of Directors to amend the terms of previously granted options.

In January of 1983 the Board purported to approve an amendment to the 1979 Plan to allow the Stock Option Committee to reduce the option price of previously granted options although the price still must be no less than 'fair market value'. This amendment was not presented to the shareholders.

*5 The Complaint alleges that the amendment was designed to permit the lowering of the exercise price of the options to the then lower market price and thus to enable holders of the options to benefit from an 'inevitable' rise in market price even if that rise still kept the price substantially below the original option price.

At the same time that the amendment to the stock option plan was purportedly made, the Stock Option Committee reduced the exercise price of outstanding options for 225,000 shares of Evans Products Company's stock from $20.125 to $12.625 per share effective three months later in April of 1983. Seven members of the then Board of Directors held options as to more than 3/4 of these shares. Five of these directors were still members of the Board at the time this suit was brought.

It is alleged that the reduction in option price was given without consideration and constituted a waste of corporate assets. It is further alleged that the amendment to the 1979 Plan had to be approved by the shareholders.

[6][7] The test for finding a waste of corporate assets is whether the consideration received by the corporation was so inadequate that no person of ordinary, sound business judgment would deem it worth that which the corporation paid. *Saxe v. Brady*, Del. Ch., 184 A.2d 602 (1962). The Complaint alleges pre-existing options on which the option price was reduced without any consideration being received for the reduction. This is a sufficient allegation of facts to state a claim for waste and therefore to create a reasonable doubt that the transaction was the result of a valid exercise of business judgment. See *Michelson v. Duncan*, Del. Supr., 407 A.2d 211 (1979).

## **320 VII

The compensation granted to Posner family members and others by Evans in 1984 is also alleged by the plaintiff as not being related to their experience in managing Evans Products Company's affairs and as such to be lacking in consideration and to be a gift and a waste of corporate assets.

The allegations as to the compensation granted to the Posner family are, however, not sufficient to state a claim of waste. There is no assertion of fact which creates a reasonable doubt that these people were performing services for Evans so inadequate as to be insufficient consideration for their fees. This is, therefore, an insufficient allegation of waste for demand excusal purposes on the excessive compensation claims.

Waste is not alleged as to the 1982 employment contracts. Even if these contracts with their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312

(Cite as: Not Reported in A.2d)

termination provisions were, however, in contemplation of a foreseen merger, no allegation is made that the employees did not continue in their jobs and perform valuable services for Evans Products Company. The fact that Mr. Orloff accepted employment with other corporations may be a breach of his promise to provide substantially all of his business time to Evans Products Company but it does not convert the contract into a waste of corporate assets.

## VIII

The Complaint also alleges that in March of 1984 Evans Products Company sold two of its divisions. The Shelter Products Group ('Shelter Group') was sold to APL for $45 million, and the Evans Fiber Products Group ('Fiber Group') was sold to DWG for $30 million. These prices are alleged to have been substantially less than the fair market value of each of the divisions and thus a waste of corporate assets.

*6 The Complaint alleges that substantive inquiries were made by other companies wishing to purchase one or the other or both of the divisions. It is alleged that these inquiries were not pursued before the sale of the two divisions to corporations in which Mr. Posner had substantial holdings of stock.

At the time the Complaint was supplemented to allege these new wrongs seven of the members of the Evans Products Company's Board of Directors were also directors or officers of DWG and four were also directors or officers of APL-both corporations allegedly controlled by Mr. Posner.

**321 The Complaint contains allegations that there had been substantive inquiries made by others seeking to purchase the Fiber Group and the Shelter Group divisions. The only offer which is specifically mentioned, however, is an offer from a group organized by Dr. Zenczak who was formerly a director of Evans Products Company and President of the Fiber Group. The offer was allegedly for $34 million for the Fiber Group which was sold to DWG for $30 million. There is no allegation that the terms, other than price, were the same, nor is there an allegation as to the timing of the Zenczak offer. It is reasonably likely that a difference in terms could have accounted for the acceptance of the lower price if the two offers had been considered together. These allegations, therefore, do not sufficiently allege such facts as to create a reasonable doubt that the Board properly exercised its business judgment.

Del.Ch. 1985

Stein v. Orloff

Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

LEXSEE

**WILLIAM STONE AND SANDRA STONE, derivatively on behalf of Nominal Defendant AmSOUTH BANCORPORATION, Plaintiffs Below, Appellants, v. C. DOWD RITTER, RONALD L. KUEHN, JR., CLAUDE B. NIELSEN, JAMES R. MALONE, EARNEST W. DAVENPORT, JR., MARTHA R. INGRAM, CHARLES D. McCRARY, CLEOPHUS THOMAS, JR., RODNEY C. GILBERT, VICTORIA B. JACKSON, J. HAROLD CHANDLER, JAMES E. DALTON, ELMER B. HARRIS, BENJAMIN F. PAYTON, and JOHN N. PALMER, Defendants Below, Appellees, and AmSOUTH BANCORPORATION, Nominal Defendant Below, Appellee.**

No. 93, 2006

**SUPREME COURT OF DELAWARE**

2006 Del. LEXIS 597

October 5, 2006, Submitted
November 6, 2006, Decided

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**PRIOR HISTORY:** Court Below -- Court of Chancery of the State of Delaware, in and for New Castle County. C.A. No. 1570-N.

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff shareholders appealed a judgment of the Court of Chancery of the State of Delaware, in and for New Castle County, which granted defendant current and former corporate directors' motion to dismiss the shareholders' derivative action alleging a violation of the directors' duty of good faith regarding banking law violations. The chancery court dismissed the derivative complaint under Del. Ch. Ct. R. 23.1.

**OVERVIEW:** The bank and corporation paid fines and civil penalties for the bank's failure to file Suspicious Activity Reports in violation of the Bank Secrecy Act, 31 U.S.C.S. § 5318(g), in relation to a money laundering scheme. The shareholders alleged that the directors failed to implement any statutorily required monitoring, reporting, or information controls that would have enabled them to learn of the problems. On a appeal, the court found that the chancery court applied the correct standard. A necessary condition for director oversight liability was a sustained or systematic failure of the board of directors to exercise oversight. A consultant's report reflected that the directors not only discharged their oversight responsibility to establish an information and reporting system but also proved that the system was designed to permit the directors to periodically monitor the bank's compliance with regulations. Although there were ultimately failures by employees to report deficiencies, there was no basis for an oversight claim seeking to hold the directors personally liable for such failures by the employees.

**OUTCOME:** The court affirmed the judgment.

**CORE TERMS:** oversight, reporting, derivative, board of directors, failure to act, fiduciary, Bank Secrecy Act, necessary condition, fiduciary duty, regulations, systematic, excused, utter, duty of loyalty, assessing, derivative action, duty to act, suspicious, investors, training, fine, personal liability, loyalty, Chancery Rule, ensure compliance, anti-money-laundering, oversight-such, stockholder, monitoring, doctrinal

**LexisNexis(R) Headnotes**

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance***

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > General Overview*
[HN1] Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, only a sustained or systematic failure of the board to exercise oversight, such as an utter failure to attempt to assure a reasonable information and reporting system exists, will establish the lack of good faith that is a necessary condition to liability.

*Banking Law > Bank Activities > Bank Accounts > Deposit Accounts > General Overview*
*Banking Law > Federal Acts > Bank Secrecy Act*
[HN2] The Bank Secrecy Act, 31 U.S.C.S. § 5318 et seq., and the regulations promulgated thereunder require banks to file with the Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury known as "FinCEN," a written "Suspicious Activity Report" (known as a SAR) whenever, inter alia, a banking transaction involves at least $5,000 and the bank knows, suspects, or has reason to suspect that, among other possibilities, the transaction involves funds derived from illegal activities or is intended or conducted in order to hide or disguise funds or assets derived from illegal activities. 31 U.S.C.S. § 5318(g); 31 C.F.R. § 103.18(a)(2) (2006).

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > Procedures*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Class Actions > Derivative Actions > Demand Futility*
*Civil Procedure > Class Actions > Derivative Actions > Demand Requirement*
[HN3] It is a fundamental principle of the Delaware General Corporation Law that the business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors. Del. Code Ann. tit. 8, § 141(a) (2006). Thus, by its very nature, a derivative action impinges on the managerial freedom of directors. Therefore, the right of a stockholder to prosecute a derivative suit is limited to situations where either the stockholder has demanded the di-

rectors pursue a corporate claim and the directors have wrongfully refused to do so, or where demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation. Del. Ch. Ct. R. 23.1, accordingly, requires that the complaint in a derivative action allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or the reasons for the plaintiff's failure to obtain the action or for not making the effort.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > Procedures*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Class Actions > Derivative Actions > Demand Futility*
[HN4] Allegations of demand futility under Del. Ch. Ct. R. 23.1 must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Del. Ch. Ct. R. 8(a).

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > Procedures*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Class Actions > Derivative Actions > Demand Futility*
[HN5] To excuse demand under Rales, a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
[HN6] Absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists.

liability, the fiduciary duty violated by that conduct is the duty of loyalty.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*

[HN7] The duty to act in good faith to be informed cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Care*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*

[HN8] A failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence). A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Loyalty*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > General Overview*

[HN9] The phraseology used in Caremark describing the lack of good faith as a necessary condition to liability is deliberate. The purpose of that formulation is to communicate that a failure to act in good faith is not conduct that results, ipso facto, in the direct imposition of fiduciary liability. The failure to act in good faith may result in liability because the requirement to act in good faith is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty. It follows that because a showing of bad faith conduct is essential to establish director oversight

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Care*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Loyalty*

[HN10] The view of a failure to act in good faith results in two additional doctrinal consequences. First, although good faith may be described colloquially as part of a triad of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty. Only the latter two duties, where violated, may directly result in liability, whereas a failure to act in good faith may do so, but indirectly. The second doctrinal consequence is that the fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith. A director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > General Overview*

[HN11] Caremark articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*

*Business & Corporate Law > Corporations > Share-holders > Actions Against Corporations > Derivative Actions > General Overview*

*Civil Procedure > Class Actions > Derivative Actions > General Overview*

*Civil Procedure > Appeals > Standards of Review > De Novo Review*

[HN12] An appellate court reviews de novo a court of chancery's decision to dismiss a derivative suit under Del. Ch. Ct. R. 23.1.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*

*Business & Corporate Law > Corporations > Share-holders > Actions Against Corporations > Derivative Actions > Procedures*

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*

*Civil Procedure > Class Actions > Derivative Actions > General Overview*

[HN13] For plaintiffs' derivative complaint to withstand a motion to dismiss, only a sustained or systematic failure of the board to exercise oversight--such as an utter failure to attempt to assure a reasonable information and reporting system exists--will establish the lack of good faith that is a necessary condition to liability. Such a test of liability, a lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight, is quite high. But, a demanding test of liability in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to good faith performance of duty by such directors.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*

[HN14] In the absence of red flags, good faith in the context of oversight must be measured by the directors' actions to assure a reasonable information and reporting system exists and not by second-guessing after the occur-

rence of employee conduct that results in an unintended adverse outcome.

**COUNSEL:** Brian D. Long, Esquire (argued) and Seth D. Rigrodsky, Esquire, of Rigrodsky & Long, P.A., Wilmington, Delaware, for appellants.

Jesse A. Finkelstein, Esquire, Raymond J. DiCamillo, Esquire, and Lisa Zwally Brown, Esquire, of Richards, Layton & Finger, Wilmington, Delaware, David B. Tulchin, Esquire (argued), L. Wiesel, Esquire, and Jacob F. M. Oslick, Esquire, of Sullivan & Cromwell LLP, New York, New York, for appellees.

**JUDGES:** Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices (constituting the Court en Banc).

**OPINION BY:** HOLLAND

**OPINION: HOLLAND,** Justice:

This is an appeal from a final judgment of the Court of Chancery dismissing a derivative complaint against fifteen present and former directors of AmSouth Bancorporation ("AmSouth"), a Delaware corporation. [*2] The plaintiffs-appellants, William and Sandra Stone, are AmSouth shareholders and filed their derivative complaint without making a pre-suit demand on AmSouth's board of directors (the "Board"). The Court of Chancery held that the plaintiffs had failed to adequately plead that such a demand would have been futile. The Court, therefore, dismissed the derivative complaint under Court of Chancery Rule 23.1.

The Court of Chancery characterized the allegations in the derivative complaint as a "classic *Caremark* claim," a claim that derives its name from *In re Caremark Int'l Deriv. Litig.* n1 In *Caremark*, the Court of Chancery recognized that: [HN1] "[g]enerally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation . . . only a sustained or systematic failure of the board to exercise oversight--such as an utter failure to attempt to assure a reasonable information and reporting system exists--will establish the lack of good faith that is a necessary condition to liability." n2

---

n1 *In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d 959 (Del. Ch. 1996).

[*3]

n2 *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d at 971; *see also David B. Shaev Profit Sharing Acct. v. Armstrong*, 2006 Del. Ch. LEXIS 33, 2006 WL 391931, at *5 (Del. Ch.); *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003).

In this appeal, the plaintiffs acknowledge that the directors neither "knew [n]or should have known that violations of law were occurring," *i.e.*, that there were no "red flags" before the directors. Nevertheless, the plaintiffs argue that the Court of Chancery erred by dismissing the derivative complaint which alleged that "the defendants had utterly failed to implement any sort of statutorily required monitoring, reporting or information controls that would have enabled them to learn of problems requiring their attention." The defendants argue that the plaintiffs' assertions are contradicted by the derivative complaint itself and by the documents incorporated therein by reference.

Consistent with our opinion in *In re Walt Disney Co. Deriv. Litig*, we hold that *Caremark* articulates the necessary conditions for assessing director [*4] oversight liability. n3 We also conclude that the *Caremark* standard was properly applied to evaluate the derivative complaint in this case. Accordingly, the judgment of the Court of Chancery must be affirmed.

n3 *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2006).

**Facts**

This derivative action is brought on AmSouth's behalf by William and Sandra Stone, who allege that they owned AmSouth common stock "at all relevant times." The nominal defendant, AmSouth, is a Delaware corporation with its principal executive offices in Birmingham, Alabama. During the relevant period, AmSouth's wholly-owned subsidiary, AmSouth Bank, operated about 600 commercial banking branches in six states throughout the southeastern United States and employed more than 11,600 people.

In 2004, AmSouth and Amsouth Bank paid $40 million in fines and $10 million in civil penalties to resolve government and regulatory

investigations pertaining principally to the failure by bank employees to file "Suspicious [*5] Activity Reports" ("SARs"), as required by the federal Bank Secrecy Act ("BSA") n4 and various anti-money-laundering ("AML") regulations. n5 Those investigations were conducted by the United States Attorney's Office for the

Southern District of Mississippi ("USAO"), the Federal Reserve, FinCEN and the Alabama Banking Department. No fines or penalties were imposed on AmSouth's directors, and no other regulatory action was taken against them.

n4 31 U.S.C. 5318 (2006) *et seq.* [HN2] The Bank Secrecy Act and the regulations promulgated thereunder require banks to file with the Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury known as "FinCEN," a written "Suspicious Activity Report" (known as a "SAR") whenever, *inter alia*, a banking transaction involves at least $5,000 "and the bank knows, suspects, or has reason to suspect" that, among other possibilities, the "transaction involves funds derived from illegal activities or is intended or conducted in order to hide or disguise funds or assets derived from illegal activities. . . ." 31 U.S.C. 5318(g) (2006); 31 C.F.R. 103.18(a)(2) (2006).

[*6]

n5 *See, e.g.*, 31 C.F.R. 103.18(a)(2) (2006).

The government investigations arose originally from an unlawful "Ponzi" scheme operated by Louis D. Hamric, II and Victor G. Nance. In August 2000, Hamric, then a licensed attorney, and Nance, then a registered investment advisor with Mutual of New York, contacted an AmSouth branch bank in Tennessee to arrange for custodial trust accounts to be created for "investors" in a "business venture." That venture (Hamric and Nance represented) involved the construction of medical clinics overseas. In reality, Nance had convinced more than forty of his clients to invest in promissory notes bearing high rates of return, by misrepresenting the nature and the risk of that investment. Relying on similar misrepresentations by Hamric and Nance, the AmSouth branch employees in Tennessee agreed to provide custodial accounts for the investors and to distribute monthly interest payments to each account upon receipt of a check from Hamric and instructions from Nance.

The Hamric-Nance scheme was discovered in March 2002, when the investors [*7] did not receive their monthly interest payments. Thereafter, Hamric and Nance became the subject of several civil actions brought by the defrauded investors in Tennessee and Mississippi (and in which AmSouth also was named as a defendant), and also the subject of a federal grand jury investigation in the Southern District of Mississippi.

Hamric and Nance were indicted on federal money-laundering charges, and both pled guilty.

The authorities examined AmSouth's compliance with its reporting and other obligations under the BSA. On November 17, 2003, the USAO advised AmSouth that it was the subject of a criminal investigation. On October 12, 2004, AmSouth and the USAO entered into a Deferred Prosecution Agreement ("DPA") in which AmSouth agreed: first, to the filing by USAO of a one-count Information in the United States District Court for the Southern District of Mississippi, charging AmSouth with failing to file SARs; and second, to pay a $40 million fine. In conjunction with the DPA, the USAO issued a "Statement of Facts," which noted that although in 2000 "at least one" AmSouth employee suspected that Hamric was involved in a possibly illegal scheme, AmSouth failed to file SARs in [*8] a timely manner. In neither the Statement of Facts nor anywhere else did the USAO ascribe any blame to the Board or to any individual director.

On October 12, 2004, the Federal Reserve and the Alabama Banking Department concurrently issued a Cease and Desist Order against AmSouth, requiring it, for the first time, to improve its BSA/AML program. That Cease and Desist Order required AmSouth to (among other things) engage an independent consultant "to conduct a comprehensive review of the Bank's AML Compliance program and make recommendations, as appropriate, for new policies and procedures to be implemented by the Bank." KPMG Forensic Services ("KPMG") performed the role of independent consultant and issued its report on December 10, 2004 (the "KPMG Report").

Also on October 12, 2004, FinCEN and the Federal Reserve jointly assessed a $10 million civil penalty against AmSouth for operating an inadequate anti-money-laundering program and for failing to file SARs. In connection with that assessment, FinCEN issued a written Assessment of Civil Money Penalty (the "Assessment"), which included detailed "determinations" regarding AmSouth's BSA compliance procedures. FinCEN found that "AmSouth [*9] violated the suspicious activity reporting requirements of the Bank Secrecy Act," and that "[s]ince April 24, 2002, AmSouth has been in violation of the anti-money-laundering program requirements of the Bank Secrecy Act." Among FinCEN's specific determinations were its conclusions that "AmSouth's [AML compliance] program lacked adequate board and management oversight," and that "reporting to management for the purposes of monitoring and oversight of compliance activities was materially deficient." AmSouth neither admitted nor denied Fin-CEN's determinations in this or any other forum.

## Demand Futility and Director Independence

[HN3] It is a fundamental principle of the Delaware General Corporation Law that "[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors . . . ." n6 Thus, "by its very nature [a] derivative action impinges on the managerial freedom of directors." n7 Therefore, the right of a stockholder to prosecute a derivative suit is limited to situations where either the stockholder has demanded the directors pursue a corporate claim and the directors have wrongfully refused [*10] to do so, or where demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation. n8 Court of Chancery Rule 23.1, accordingly, requires that the complaint in a derivative action "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors [or] the reasons for the plaintiff's failure to obtain the action or for not making the effort." n9

n6 Del. Code Ann. tit. 8, 141(a) (2006). *See Rales v. Blasband,* 634 A.2d 927, 932 (Del. 1993).

n7 *Pogostin v. Rice,* 480 A.2d 619, 624 (Del. 1984).

n8 *Aronson v. Lewis,* 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del. 2000).

n9 Ch. Ct. R. 23.1. [HN4] Allegations of demand futility under Rule 23.1 "must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)." *Brehm v. Eisner,* 746 A.2d at 254.

[*11]

In this appeal, the plaintiffs concede that "[t]he standards for determining demand futility in the absence of a business decision" are set forth in *Rales v. Blasband.* n10 [HN5] To excuse demand under *Rales,* "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." n11 The plaintiffs attempt to satisfy the *Rales* test in this proceeding by asserting that the incumbent defendant directors "face a substantial likelihood of liability" that renders them "per-

sonally interested in the outcome of the decision on whether to pursue the claims asserted in the complaint," and are therefore not disinterested or independent. n12

n10 *Rales v. Blasband*, 634 A.2d 927 (Del. 1993).

n11 *Id.* at 934.

n12 The fifteen defendants include eight current and seven former directors. The complaint concedes that seven of the eight current directors are outside directors who have never been employed by AmSouth. One board member, C. Dowd Ritter, the Chairman, is an officer or employee of AmSouth.

[*12]

Critical to this demand excused argument is the fact that the directors' potential personal liability depends upon whether or not their conduct can be exculpated by the section 102(b)(7) provision contained in the AmSouth certificate of incorporation. n13 Such a provision can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty. n14 The standard for assessing a director's potential personal liability for failing to act in good faith in discharging his or her oversight responsibilities has evolved beginning with our decision in *Graham v. Allis-Chalmers Manufacturing Company*, n15 through the Court of Chancery's *Caremark* decision to our most recent decision in *Disney*. n16 A brief discussion of that evolution will help illuminate the standard that we adopt in this case.

n13 Del. Code Ann. tit. 8, 102(b)(7) (2006).

n14 *Id.*; see *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2006).

n15 *Graham v. Allis-Chalmers Mfg. Co.*, 41 Del. Ch. 78, 188 A.2d 125 (Del. 1963).

n16 *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2006).

[*13]

### Graham and Caremark

*Graham* was a derivative action brought against the directors of Allis-Chalmers for failure to prevent violations of federal anti-trust laws by Allis-Chalmers employees. There was no claim that the Allis-Chalmers directors knew of the employees' conduct that resulted in the corporation's liability. Rather, the plaintiffs claimed that the Allis-Chalmers directors *should have known* of the illegal conduct by the corporation's employees. In *Graham*, this Court held that " [HN6] *absent cause for suspicion* there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists." n17

n17 *Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d at 130 (emphasis added).

In *Caremark*, the Court of Chancery reassessed the applicability of our holding in *Graham* when called upon to approve a settlement of a derivative lawsuit brought against the directors of Caremark International, [*14] Inc. The plaintiffs claimed that the Caremark directors should have known that certain officers and employees of Caremark were involved in violations of the federal Anti-Referral Payments Law. That law prohibits health care providers from paying any form of remuneration to induce the referral of Medicare or Medicaid patients. The plaintiffs claimed that the *Caremark* directors breached their fiduciary duty for having "allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance." n18

n18 *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

In evaluating whether to approve the proposed settlement agreement in *Caremark*, the Court of Chancery narrowly construed our holding in *Graham* "as standing

for the proposition that, absent grounds to suspect deception, neither corporate boards nor senior officers can be charged with wrongdoing [*15] simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf." n19 The *Caremark* Court opined it would be a "mistake" to interpret this Court's decision in *Graham* to mean that:

> corporate boards may satisfy their obligation to be reasonably informed concerning the corporation, without assuring themselves that information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance. n20

n19 *Id.* at 969.

n20 *Id.* at 970.

To the contrary, the *Caremark* Court stated, "it is important that the board exercise a good faith judgment that the corporation's information and reporting system is in concept and design adequate to assure the [*16] board that appropriate information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility." n21 The *Caremark* Court recognized, however, that [HN7] "the duty to act in good faith to be informed cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise." n22 The Court of Chancery then formulated the following standard for assessing the liability of directors where the directors are unaware of employee misconduct that results in the corporation being held liable:

> Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, as in *Graham* or in this case, . . . only a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information

and reporting system exists-will establish the lack of good faith that is a necessary condition to liability. n23

n21 *Id.*

n22 *Id.* at 971.
[*17]

n23 *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d at 971.

### *Caremark Standard Approved*

As evidenced by the language quoted above, the *Caremark* standard for so-called "oversight" liability draws heavily upon the concept of director failure to act in good faith. That is consistent with the definition(s) of bad faith recently approved by this Court in its recent *Disney* n24 decision, where we held that [HN8] a failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence). n25 In *Disney*, we identified the following examples of conduct that would establish a failure to act in good faith:

> A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known [*18] duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient. n26

n24 *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2006).

n25 *Id.* at 66.

n26 *Id.* at 67.

The third of these examples describes, and is fully consistent with, the lack of good faith conduct that the *Caremark* court held was a "necessary condition" for director oversight liability, i.e., "a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists . . . ." n27

Indeed, our opinion in *Disney* cited *Caremark* with approval for that proposition. n28 Accordingly, the Court of Chancery applied the correct standard in assessing whether demand was excused in this case where failure to exercise oversight was the basis or theory of the plaintiffs' [*19] claim for relief.

n27 *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996).

n28 *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d at 67 n.111.

It is important, in this context, to clarify a doctrinal issue that is critical to understanding fiduciary liability under *Caremark* as we construe that case. [HN9] The phraseology used in *Caremark* and that we employ here--describing the lack of good faith as a "necessary condition to liability"--is deliberate. The purpose of that formulation is to communicate that a failure to act in good faith is not conduct that results, *ipso facto*, in the direct imposition of fiduciary liability. n29 The failure to act in good faith may result in liability because the requirement to act in good faith "is a subsidiary element[,]" i.e., a condition, "of the fundamental duty of loyalty." n30 It follows that because a showing of bad faith conduct, in the sense described in *Disney* and *Caremark*, is essential [*20] to establish director oversight liability, the fiduciary duty violated by that conduct is the duty of loyalty.

n29 That issue, whether a violation of the duty to act in good faith is a basis for the direct imposition of liability, was expressly left open in *Disney*. 906 A.2d at 67 n.112. We address that issue here.

n30 *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003).

[HN10] This view of a failure to act in good faith results in two additional doctrinal consequences. First, although good faith may be described colloquially as part of a "triad" of fiduciary duties that includes the duties of care and loyalty, n31 the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty. Only the latter two duties, where violated, may directly result in liability, whereas a failure to act in good faith may do so, but indirectly. The second doctrinal consequence is that the fiduciary duty of [*21] loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith. As the Court of Chancery aptly put it in *Guttman*, "[a] director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest." n32

n31 *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

n32 *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003).

We hold that [HN11] *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability [*22] requires a showing that the directors knew that they were not discharging their fiduciary obligations. n33 Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, n34 they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith. n35

n33 *Id.* at 506.

n34 *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

n35 *See Guttman v. Haung*, 823 A.2d at 506.

**Chancery Court Decision**

The plaintiffs contend that demand is excused under Rule 23.1 because AmSouth's directors breached their oversight duty and, as a result, face a "substantial likelihood of liability" as a result of their "utter failure" to act in good faith to put into place policies and procedures to ensure compliance with BSA and AML obligations. The Court of Chancery found that the plaintiffs did not plead the existence of "red flags" -- "facts showing [*23] that the board ever was aware that AmSouth's internal controls were inadequate, that these inadequacies would result in illegal activity, and that the board chose to do nothing about problems it allegedly knew existed." In dismissing the derivative complaint in this action, the Court of Chancery concluded:

> This case is not about a board's failure to carefully consider a material corporate decision that was presented to the board. This is a case where information was not reaching the board because of ineffective internal controls. . . . With the benefit of hindsight, it is beyond question that AmSouth's internal controls with respect to the Bank Secrecy Act and anti-money laundering regulations compliance were inadequate. Neither party disputes that the lack of internal controls resulted in a huge fine--$50 million, alleged to be the largest ever of its kind. The fact of those losses, however, is not alone enough for a court to conclude that a majority of the corporation's board of directors is disqualified from considering demand that AmSouth bring suit against those responsible. n36

[HN12] This Court reviews *de novo* a Court of Chancery's decision to dismiss a derivative suit [*24] under Rule 23.1. n37

n36 *Stone v. Ritter,* 2006 Del. Ch. LEXIS 20, C.A. No. 1570-N (Del. Ch. 2006) (Letter Opinion).

n37 *Beam ex rel. Martha Stewart Living Omnimedia Inc. v. Stewart,* 845 A.2d 1040, 1048 (Del. 2004).

### *Reasonable Reporting System Existed*

The KPMG Report evaluated the various components of AmSouth's longstanding BSA/AML compliance program. The KPMG Report reflects that AmSouth's

Board dedicated considerable resources to the BSA/AML compliance program and put into place numerous procedures and systems to attempt to ensure compliance. According to KPMG, the program's various components exhibited between a low and high degree of compliance with applicable laws and regulations.

The KPMG Report describes the numerous AmSouth employees, departments and committees established by the Board to oversee AmSouth's compliance with the BSA and to report violations to management and the Board:

> **BSA Officer.** Since 1998, AmSouth has had a "BSA Officer" "responsible for all BSA/AML-related [*25] matters including employee training, general communications, CTR reporting and SAR reporting," and "presenting AML policy and program changes to the Board of Directors, the managers at the various lines of business, and participants in the annual training of security and audit personnel[;]"

> **BSA/AML Compliance Department.** AmSouth has had for years a BSA/AML Compliance Department, headed by the BSA Officer and comprised of nineteen professionals, including a BSA/AML Compliance Manager and a Compliance Reporting Manager;

> **Corporate Security Department.** AmSouth's Corporate Security Department has been at all relevant times responsible for the detection and reporting of suspicious activity as it relates to fraudulent activity, and William Burch, the head of Corporate Security, has been with AmSouth since 1998 and served in the U.S. Secret Service from 1969 to 1998; and

> **Suspicious Activity Oversight Committee.** Since 2001, the "Suspicious Activity Oversight Committee" and its predecessor, the "AML Committee," have actively overseen AmSouth's BSA/AML compliance program. The Suspicious Activity Oversight Committee's mission has for years been to "oversee the [*26] policy, procedure, and process issues affecting the Corporate Security and BSA/AML Compliance Programs, to ensure that an effective program exists at AmSouth to

deter, detect, and report money launder-ing, suspicious activity and other fraudu-lent activity."

The KPMG Report reflects that the directors not only discharged their oversight responsibility to establish an information and reporting system, but also proved that the system was designed to permit the directors to peri-odically monitor AmSouth's compliance with BSA and AML regulations. For example, as KPMG noted in 2004, AmSouth's designated BSA Officer "has made annual high-level presentations to the Board of Directors in each of the last five years." Further, the Board's Audit and Community Responsibility Committee (the "Audit Committee") oversaw AmSouth's BSA/AML compliance program on a quarterly basis. The KPMG Report states that "the BSA Officer presents BSA/AML training to the Board of Directors annually," and the "Corporate Secu-rity training is also presented to the Board of Directors."

The KPMG Report shows that AmSouth's Board at various times enacted written policies and procedures designed to ensure compliance with [*27] the BSA and AML regulations. For example, the Board adopted an amended bank-wide "BSA/AML Policy" on July 17, 2003--four months before AmSouth became aware that it was the target of a government investigation. That policy was produced to plaintiffs in response to their demand to inspect AmSouth's books and records pursuant to section 220 n38 and is included in plaintiffs' appendix. Among other things, the July 17, 2003, BSA/AML Policy directs all AmSouth employees to immediately report suspicious transactions or activity to the BSA/AML Compliance Department or Corporate Security.

n38 Del. Code Ann. tit. 8, 220 (2006).

**Complaint Properly Dismissed**

In this case, the adequacy of the plaintiffs' assertion that demand is excused depends on whether the com-plaint alleges facts sufficient to show that the defendant *directors* are potentially personally liable for the failure of non-director bank *employees* to file SARs. Delaware courts have recognized that "[m]ost of the decisions [*28] that a corporation, acting through its human agents, makes are, of course, not the subject of director attention." n39 Consequently, a claim that directors are subject to personal liability for employee failures is "pos-sibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." n40

n39 *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d at 968.

n40 *Id.* at 967.

[HN13] For the plaintiffs' derivative complaint to withstand a motion to dismiss, "only a sustained or sys-tematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable informa-tion and reporting system exists--will establish the lack of good faith that is a necessary condition to liability." n41 As the *Caremark* decision noted:

> Such a test of liability--lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight--is quite high. But, a demanding test of liability [*29] in the oversight con-text is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimu-lus to *good faith performance of duty* by such directors. n42

n41 *Id.* at 971.

n42 *Id.* (emphasis in original).

The KPMG Report--which the plaintiffs explicitly incorporated by reference into their derivative complaint--refutes the assertion that the directors "never took the necessary steps . . . to ensure that a reasonable BSA compliance and reporting system existed." KPMG's find-ings reflect that the Board received and approved rele-vant policies and procedures, delegated to certain employees and departments the responsibility for filing SARs and monitoring compliance, and exercised over-sight by relying on periodic reports from them. Although there ultimately may have been failures by employees to report deficiencies to the Board, there is no basis for [*30] an oversight claim seeking to hold the directors personally liable for such failures by the employees.

With the benefit of hindsight, the plaintiffs' com-plaint seeks to equate a bad outcome with bad faith. The lacuna in the plaintiffs' argument is a failure to recognize that the directors' good faith exercise of oversight re-sponsibility may not invariably prevent employees from

violating criminal laws, or from causing the corporation to incur significant financial liability, or both, as occurred in *Graham*, *Caremark* and this very case. [HN14] In the absence of red flags, good faith in the context of oversight must be measured by the directors' actions "to assure a reasonable information and reporting system exists" and not by second-guessing after the occurrence of employee conduct that results in an unintended adverse outcome. n43 Accordingly, we hold that the Court of Chancery properly applied *Caremark* and dismissed the plaintiffs' derivative complaint for failure to excuse demand by alleging particularized facts that created rea-

son to doubt whether the directors had acted in good faith in exercising their oversight responsibilities.

n43 *Id.* at 967-68, 971.

[*31]

### Conclusion

The judgment of the Court of Chancery is affirmed.

# EXHIBIT 7

LEXSEE

**JOHN TOMCZAK and STUART D. WECHSLER, Plaintiffs, v. MORTON THIOKOL, INC., CHARLES S. LOCKE, ROBERT C. HYNDMAN, RALPH M. BARFORD, WILLIAM T. CRESON, DENNIS C. FILL, EVERETT A. GILMOUR, ROBERT T. MARSH, NEIL McKAY, BARRY J. SHILLITO, ROBERT S. SMALL, A. DEAN SWIFT, HARRY H. WETZEL, and THE DOW CHEMICAL COMPANY, Defendants**

Civil Action No. 7861

Court of Chancery of Delaware, New Castle

1990 Del. Ch. LEXIS 47; Fed. Sec. L. Rep. (CCH) P95,327

Submitted: November 30, 1989
April 5, 1990, Decided

**DISPOSITION:** [*1]

ON MORTON THIOKOL, INC. AND INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT: GRANTED; ON TH DOW CHEMICAL COMPANY'S MOTION FOR SUMMARY JUDGMENT: GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff stockholders instituted a derivative action against defendants, corporation, its board of directors (directors), and company. The matter came before the court on the motions for summary judgment of the corporation, directors, and company.

**OVERVIEW:** The stockholders alleged that the corporation's sale of one of its divisions to the company constituted a violation of the business judgment rule by the directors and that the company had aided and abetted the directors' breach of their fiduciary duties. The court granted summary judgment to the corporation, directors, and company. It found that the business judgment rule applied to the directors' actions, because they showed that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed and they showed good faith and reasonable investigation. The court also found that the directors showed that the defensive mechanism was reasonable in relation to the threat posed. It held that the stockholders' argument that the directors were not fully independent and wholly disinterested failed because the stockholders failed to ad-

duce any facts to support these claims. The court concluded that the stockholders' claims against the company were without merit because they failed to establish the existence of any breach of fiduciary duty by the directors and there was no evidence that the company knowingly participated in any such breach.

**OUTCOME:** The court granted summary judgment to the corporation, the directors, and the company in the stockholders' derivative action.

**CORE TERMS:** stock, business judgment rule, tender offer, stockholder's, defensive, takeover, adduce, per share, creeping, business judgment, segment, investment banker, divestiture, inside, enhanced, summary judgment, acquisition, entitled to summary judgment, disinterested, takeover bid, profitable, removing, disputed, reasonable investigation, gross negligence, rebut, regularly scheduled, judicial scrutiny, common stock, market price

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Summary judgment is employed to avoid a useless trial where there is no issue of material fact. A mo-

1990 Del. Ch. LEXIS 47, *; Fed. Sec. L. Rep. (CCH) P95,327

tion for summary judgment, however, will be granted only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Del. Ch. Ct. R. 56(c).

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
[HN2] The proponent of a motion for summary judgment has the burden to prove clearly the absence of any genuine issue of fact which would affect the result, and any doubt should be resolved against the moving party.

*Administrative Law > Agency Adjudication > Decisions > General Overview*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > General Overview*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Defenses > Business Judgment Rule*
[HN3] The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. The presumption, however, attaches only to the decisions of directors who are fully independent and wholly disinterested. When the business judgment rule applies, it insulates directors from liability, and imposes upon the party challenging the decision the burden of rebutting the presumption. A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be attributed to any rational business purpose.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Defenses > Business Judgment Rule*
*Business & Corporate Law > Mergers & Acquisitions > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers*
*Civil Procedure > Judgments > General Overview*
[HN4] When the business judgment rule applies to the adoption of a defensive mechanism, in response to a takeover threat, an initial burden of showing that the business judgment rule applies falls upon the directors. Initially the directors must show that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed, and they satisfy that burden by showing good faith and reasonable investigation. If the initial burden is satisfied, the directors must also show that the defensive mechanism was reasonable in relation to the threat posed. Furthermore, a showing by the direc-

tors is materially enhanced where a majority of the board favoring the proposal consists of outside independent directors who have acted in accordance with the foregoing standards.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Defenses > Business Judgment Rule*
*Civil Procedure > Judgments > General Overview*
[HN5] The protections of the business judgment rule can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment. In order to be disinterested, directors can neither appear on both sides of the transaction nor expect to derive an personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Defenses > Business Judgment Rule*
*Evidence > Inferences & Presumptions > General Overview*
[HN6] It is the plaintiff's burden to allege with particularity that the improper motive in a given set of circumstances, that is, perpetuation of self in office or otherwise in control, was the sole or primary purpose of the wrongdoer's conduct. Furthermore, in order to overcome the protection afforded directors by the business judgment rule, plaintiffs must point to facts indicating that the board's action was motivated solely or principally for the impermissible purpose of retaining office for personal reasons and not for reasons relating to the corporation's welfare.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
[HN7] Unsupported allegations are insufficient to establish an entrenchment motive.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Civil Procedure > Judgments > General Overview*
[HN8] The party attacking a board decision as uninformed must rebut the presumption that its business judgment was an informed one. The determination of whether a business judgment is an informed one turns on whether the directors have informed themselves prior to

making a business decision, of all material information reasonably available to them.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Negligent Acts of Directors & Officers***

[HN9] The standard for determining whether directors are liable for breaching their duty of care to properly inform themselves is predicated on concepts of gross negligence. In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview***
***Civil Procedure > Judgments > General Overview***

[HN10] Where plaintiffs fail to rebut the presumption of propriety of the business judgment rule, a court is not required to further scrutinize the terms of the transaction, including the fairness of the price. Fairness becomes an issue only if the presumption of the business judgment rule is defeated.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview***

[HN11] In order to prove a claim of waste of assets, a plaintiff must show that what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid. If it can be said that ordinary businessmen might differ on the sufficiency of the terms, then the court must validate the transaction.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview***
***Business & Corporate Law > Mergers & Acquisitions > Takeovers & Tender Offers > General Overview***

[HN12] Under Delaware law there are, generally speaking and without excluding other possibilities, two circumstances which may implicate a board's duties of obtaining the best possible price. The first, and clearer one, is when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company. However, these duties may also be triggered where, in response to a bidder's offer, a target abandons its long-range strategy

and seeks an alternative transaction also involving the breakup of the company. If, however, the board's reaction to a hostile tender offer is found to constitute only a defensive response and not an abandonment of the corporation's continued existence, duties of obtaining the best possible price are not triggered, though duties to exercise good business judgment attach.

***Criminal Law & Procedure > Accessories > Aiding & Abetting***
***Governments > Fiduciary Responsibilities***
***Torts > Intentional Torts > Breach of Fiduciary Duty > Elements***

[HN13] A claim for aiding and abetting liability requires that three elements be alleged and ultimately established: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in that breach any by the defendants who are not fiduciaries.

**COUNSEL:**

Joseph A. Rosenthal, Esquire, and Kevin Gross, Esquire, MORRIS, ROSENTHAL, MONHAIT & GROSS, Wilmington, Delaware; OF COUNSEL: Michael P. Fuchs, Esquire, WOLF POPPER ROSS WOLF & JONES, New York, New York, Attorneys for plaintiffs.

Lawrence C. Ashby, Esquire, and Stephen E. Jenkins, Esquire, ASHBY, McKELVIE & GEDDES, Wilmington, Attorneys for defendant Morton Thiokol, Inc.

A. Gilchrist Sparks, III, Esquire, and Thomas C. Grimm, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware, Attorneys for the defendant directors of Morton Thiokol, Inc. OF COUNSEL: WACTHELL, LIPTON, ROSEN & KATZ, New York, New York.

Charles S. Crompton, Jr., Esquire, and Donald J. Wolfe, Jr., Esquire, POTTER ANDERSON & CORROON, Wilmington, Delaware, OF COUNSEL: William J. F. Roll, III, Esquire, SHEARMAN & STERLING, New York, New York, Attorneys for defendant The Dow Chemical Company.

**JUDGES:**

Before HARTNETT, Vice Chancellor.

**OPINION BY:**

HARTNETT

**OPINION:**

HARTNETT, Vice Chancellor

In this purported stockholder's derivative action, plaintiffs challenge the sale by defendant Morton [*2] Thiokol, Inc. ("Morton Thiokol") of its Texize Household Products Division ("Texize") to defendant, The Dow Chemical Company ("Dow"). The members of Morton Thiokol's Board of Directors are also named as defendants. Plaintiffs allege that the approval of the transaction by the Morton Thiokol directors constituted a breach of their fiduciary duties and a waste of corporate assets, that the sale was consummated to thwart an alleged Dow takeover threat, so as to perpetuate the individual defendants in office. The plaintiffs also claim that Dow "knowingly aided and abetted" the alleged breach of fiduciary duties by the Morton Thiokol Board by participating in the transaction.

The Morton Thiokol defendants moved for summary judgment, asserting, inter alia, that the decision of Morton Thiokol's Board to sell Texize to Dow is protected from judicial scrutiny by the business judgment rule. Dow also moved for summary judgment on the grounds that it owed no fiduciary duty to the stockholders of Morton Thiokol. Because there are no disputed material facts and because plaintiffs' suit is without merit, as a matter of law, both motions for summary judgment on behalf of the defendants must be [*3] granted.

I

Although the parties have different views of this case, the material facts are not disputed and the primary dispute involves the inferences to be drawn from these facts.

At all times material to the present dispute, the Morton Thiokol Board was comprised of twelve individuals, all of whom are named defendants in this action. Only two of the twelve directors were "inside" directors, that is, members of Morton Thiokol management: Charles S. Locke, Chairman of the Board and Chief Executive Officer, and Robert C. Hyndman, President and Chief Operating Officer. The other ten Morton Thiokol directors were "outside" directors, all of whom were experienced executives.

As a result of a 1982 merger and restructuring, Morton Thiokol had been operating four major business segments: Aerospace, Specialty Chemicals, Salt, and Household Products. The Household Products segment was operated by the Texize Division and marketed a number of household cleaners and insecticides.

After Morton Thiokol's restructuring in 1982, the Specialty Chemicals and Aerospace business segments quickly became Morton Thiokol's chief businesses. In 1983 and 1984, Morton Thiokol experienced dramatic growth, which [*4] was attributable to its Specialty Chemicals and Aerospace segments, while the growth of the Texize Household Products segment lagged behind. Consequently, Morton Thiokol's two inside directors, Messrs. Locke and Hyndman, became concerned about the future of the Texize Division, and began considering divestiture of Texize, despite the fact that it was still profitable. They expressed concerns over the ability of Texize to achieve targeted growth rates, the existence of increasing competition, and the fact that Texize was reaching maturity in some of its major markets. The outside directors of Morton Thiokol shared management's concern with the future prospects of Texize, and were aware of the possibility that Texize might be divested.

In addition, the emergence of Morton Thiokol's Aerospace and Specialty Chemicals segments as profitable businesses set Morton Thiokol in a new direction, away from consumer products similar to those sold by Texize with their heavy emphasis on advertising. Immediately following the 1982 restructuring of Morton Thiokol, Goldman Sachs & Co. (the investment banker that advised Morton Thiokol on an on-going basis) discussed with Morton Thiokol's management [*5] the lack of "strategic fit" of Texize with the company's other business segments, and the possibility of a divestiture of Texize.

Despite their concerns over the future of Texize, Morton Thiokol's Board continually rebuffed the interest that a number of companies, including Dow, expressed in purchasing the Texize Division. Messrs. Locke and Hyndman claim that Morton Thiokol was not in a hurry to "shop" Texize at that time because Texize was still profitable and because Morton Thiokol's primary emphasis was on growth and that cash received from the sale of Texize would not contribute to growth. Rather, they assert that Morton Thiokol's executive management was interested in pursuing a possible swap of Texize for a business that would strengthen Morton Thiokol's other businesses preferably specialty chemicals. In the alternative, they believed Morton Thiokol might find an opportunity whereby Texize could be divested and the consideration received in the sale could be immediately redeployed into Morton Thiokol's other businesses. However, no such opportunities immediately arose.

As stated previously, Dow was one of the companies that had expressed interest in acquiring Texize commencing [*6] in 1982. Morton Thiokol, however, refused to negotiate with Dow at that time, although Morton Thiokol allegedly informed Dow that it might be interested in a "swap" transaction. Dow, however, remained interested in Texize, and in early 1984, Dow began to make market purchases of Morton Thiokol's common stock, through its investment banker, Morgan Stanley & Co., Inc. ("Morgan Stanley").

1990 Del. Ch. LEXIS 47, *; Fed. Sec. L. Rep. (CCH) P95,327

On April 9, 1984, Dow filed a Schedule 13D with the Securities and Exchange Commission which set forth that it had purchased nearly one million shares, or 5.9% of Morton Thiokol's common stock. The Schedule 13D also stated:

"Although the purchases of shares of [Morton Thiokol] Common Stock . . . have been made for investment, at some future time Dow might decide that it is desirable to seek to acquire [Morton] or to seek to control or otherwise influence the management and policies of [Morton Thiokol]."

After speaking with Paul Oreffice, Dow's Chairman of the Board, Mr. Locke, Morton Thiokol's Chairman of the Board and Chief Executive Officer, was not convinced that Dow was only interested in Morton Thiokol as an investment. Mr. Locke believed that Dow's investment in Morton Thiokol might be the first [*7] step of a creeping tender offer which would allow Dow to acquire Morton Thiokol without paying any premium to Morton's stockholders.

On April 10, 1984, Mr. Locke and other members of Morton Thiokol's management met with the corporation's attorneys, Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton"), and Goldman Sachs to discuss Morton Thiokol's options. Goldman Sachs suggested and discussed possible reponses to Dow, including continued close monitoring of the situation, an inquiry to Dow concerning its intentions and an examination of possible transactions that could be proposed by Dow or Morton Thiokol. Goldman Sachs also noted that Dow's stock position in Morton, together with its previously expressed interest in Texize, could be viewed as an opportunity to divest Texize. Ultimately, it was decided that Mr. Locke should meet with Mr. Oreffice of Dow.

On April 11, 1984, Mr. Locke and Mr. Oreffice met privately to discuss Dow's intentions regarding Morton Thiokol. Mr. Oreffice affirmed Dow's statement in its Schedule 13D that the purchases were for investment purposes, and consequently, Mr. Locke did not receive any specific commitments from Dow, except that Mr. Oreffice did orally [*8] agree that Dow would not buy any more Morton Thiokol stock without first informing Mr. Locke.

During the next regularly scheduled meeting of the Morton Thiokol Board of Directors on April 26, 1984, Mr. Locke reported to the Board on Dow's investment in Morton Thiokol. The meeting focused on the possibility that Dow might be launching a creeping tender offer, with the Board discussing how to deal with Dow, including the option of putting Morton Thiokol "into play" if necessary. Although Morton Thiokol was considered a takeover target, the Board did not formally adopt any

defensive measures at the April 26th meeting. The Morton Thiokol Board did, however, adopt a resolution at the April 26th meeting reconfirming the Company's expressed policy of remaining independent. The Morton Thiokol Board allegedly remained open, nonetheless, to the possibility of a takeover at a fair price. Since Dow had not made any offer, Morton Thiokol adopted a "wait and see" approach.

On April 27, 1984, Mr. Locke and Mr. Oreffice again spoke privately to discuss Dow's holdings in Morton Thiokol. During the conversation, Mr. Locke allegedly made a general proposal that Morton Thiokol buy back Dow's interest [*9] in Morton Thiokol. Mr. Oreffice informed Mr. Locke that although Dow was never interested in "selling for a quickie profit," he would be interested in a specific buy-back proposal. Mr. Locke then informed Mr. Oreffice that he would instruct Morton Thiokol's investment bankers to make a proposal through appropriate channels.

During the ensuing months, Morton Thiokol's investment banker, Goldman Sachs, explored a range of alternative responses to Dow's accumulation of Morton's stock. Goldman Sachs' study included an analysis of the value of Texize and considered the possible sale of Texize to a third party and the effect of such a sale upon Morton Thiokol. In a May 4, 1984 internal memorandum, Goldman Sachs concluded that the anticipated range of values for a sale of Texize to a third party was $ 225-250 million. Goldman Sachs' valuation was based upon: (1) an analysis of the historical and projected financial information concerning Morton Thiokol, including budgets, balance sheets, projected growth rates, and after-tax income for each of its four business segments, including Texize; (2) a comparison of Texize with similar companies in terms of products, profitability, capitalization [*10] and financial resources; (3) a review of the historic market price performance, market value and price earnings ratios of stocks of substantially similar companies; and (4) a review of acquisitions of such companies in previous years, including a comparison of the market value of those companies in the acquisitions relative to their earnings and book values.

On May 7, 1984, Goldman Sachs discussed its study with Morton Thiokol's executive management, and distributed a written report. Goldman Sachs cautioned that its valuation was limited because, as a division, Texize was not a publicly listed company and it therefore did not have a market value that could be directly compared with similar companies. Morton Thiokol's management, therefore, decided not to approach Dow or its financial advisor, Morgan Stanley, with a proposal at that time. Rather, Morton Thiokol requested Goldman Sachs to continually monitor the situation and to periodically advise Morton Thiokol regarding its alternatives.

. The next several months produced no further purchases of Morton Thiokol stock by Dow. Morton Thiokol's inside directors, however, continued to discuss the possible divestiture of Texize, recognizing [*11] that the sale of Texize to Dow might have the added benefit of deterring Dow from any further takeover overtures.

During that period, Morton Thiokol's management learned that the specialty chemical business of Bee Chemical was for sale, and began to explore the possibility of Morton Thiokol acquiring it.

At the Annual Meeting of Morton Thiokol's stockholders in October of 1984 the stockholders approved the Board's declaration of a three-for-one stock split to stockholders, which increased the number of authorized shares from ) million to 200 million shares. Morton Thiokol claims, however, that such a move was not a defensive measure designed as an anti-takeover device. Rather, it claims that the split was recommended by Goldman Sachs before Dow appeared on the scene, and that the purpose of the split was to allow more people to buy Morton's stock.

On November 7th and 8th, 1984, Dow purchased additional shares of Morton Thiokol stock, bringing its total ownership of Morton Thiokol to approximately 8.23%. On November 9, 1984, Dow amended its Schedule 13D to report its additional purchases, and filed materials necessary under the Hart-Scott-Rodino Antitrust Improvement Act of 1976 (Pub. [*12] L. No. 94-435, 90 Stat. 1383, codified as amended in various sections of Titles 15, 18 and 28 U.S.C.). The Hart-Scott-Rodino filing would have allowed Dow, after a 30-day waiting period, to increase its holdings in Morton Thiokol to more than 10%, but less than 15%, of the outstanding shares of Morton Thiokol.

In response to this activity, on November 9, 1984, Morton Thiokol stock traded as high as 94 1/4 which was a rise in the market of almost 10 points over the price on the preceding two days.

Despite Dow's statements to the contrary, Morton Thiokol's inside directors recognized the possibility that Dow was in the second stage of a creeping tender offer. Consequently, Morton Thiokol's executive management (not its complete Board of Directors) met again with Goldman Sachs on November 9th or 10th to discuss its options, including selling Texize to Dow in exchange for cash and Dow's shares of Morton Thiokol. Goldman Sachs believed that such a sale would have the dual benefits of profitably divesting Texize and removing the threat of a possible creeping tender offer by Dow. On November 11, 1984, Morton Thiokol instructed Goldman Sachs to approach Dow, through Morgan Stanley, to see [*13] if Dow was interested in such a deal.

During this critical period, Goldman Sachs conducted a comprehensive analysis, similar to that done in May of 1984, in order to update its prior analysis of Texize, including an evaluation of its operations, financial performance and future projections. The updated analysis was consistent with Goldman Sachs' earlier valuation of Texize, setting an approximate range of values of Texize at $ 225-250 million. Thus, when Goldman Sachs contacted Morgan Stanley on November 11th regarding Morton Thiokol's proposed transaction, Goldman Sachs suggested that the aggregate consideration should be $ 250 million for Texize.

While Morgan Stanley was surprised by such a proposal, it nonetheless reviewed it with Dow. Dow's Chairman and CEO, Mr. Oreffice, viewed $ 250 million as reasonable because Morgan Stanley had valued Texize within a range of $ 240-320 million. Consequently, Mr. Oreffice authorized Robert Keil, Dow's Chief Financial Officer, to negotiate the deal, if reasonable. Mr. Keil then instructed Morgan Stanley to advise Goldman Sachs that Dow was interested.

On November 12, 1984, Goldman Sachs provided Morgan Stanley with some non-public information [*14] it had regarding Texize. Morgan Stanley was disappointed with the actual performance of Texize, as reflected in this information, because i gas lower than Morgan Stanley expected based on its earlier analysis of public information. Mr. Keil of Dow assumed that the merit of the offer must be based on the value of the Morton Thiokol stock held by Dow, and decided that the deal would be desirable if the stock was valued at between $ 83-92 per share. Consequently, a meeting was set for the next day between Morgan Stanley and Goldman Sachs to further negotiate the transaction.

At the November 13th meeting between Morgan Stanley and Goldman Sachs, Morgan agreed that the value of Texize was $ 250 million, the value developed previously by Goldman Sachs. The parties then considered alternative methods of valuing the Morton Thiokol stock held by Dow in order to determine the cash component of the deal. Morgan Stanley urged that the value of Morton Thiokol's stock owned by Dow should reflect the then current market price of $ 92 per share as of the close of business on November 9th. Goldman Sachs, on the other hand, argued that the stock should be valued at $ 75 per share which was Dow's average [*15] acquisition cost per share.

Ultimately, Morgan Stanley and Goldman Sachs agreed in principle to an exchange of Texize for Dow's 1.4 million shares of Morton Thiokol's stock, plus $ 131 million in cash, without attributing an express value to the stock. In essence, however, Morton Thiokol paid approximately $ 85 per share for the Morton Thiokol

stock held by Dow. Morton Thiokol and Dow also entered a standstill agreement under which Dow agreed to refrain from purchasing Morton Thiokol's common stock for ten years. When the investment bankers reported back to their respective principals, the management of both Morton Thiokol and Dow agreed to submit the proposal to their respective Boards.

On November 14, 1984, the day prior to the regularly scheduled meeting of Morton Thiokol's Board, Mr. Locke held a dinner meeting for the outside directors. During the meeting, which lasted 2-3 hours, Mr. Locke explained, in general terms, the deal that had been negotiated with Dow and which the Board would formally consider the next day.

At the regularly scheduled Morton Thiokol Board meeting on November 15th, the proposed Letter Agreement between Morton Thiokol and Dow was submitted to the Morton [*16] Thiokol Board. Two of Morton's outside directors were absent from the meeting. The Board meeting lasted approximately two hours, with about half that time devoted to considering the proposed transaction. Each of the directors received a copy of the proposed Letter Agreement, and the discussion of the proposed deal included presentations from Mr. Locke, Goldman Sachs, and Wachtell Lipton. Mr. Locke stated his reasons for recommending the transaction and the Board discussed: (1) the long-term prospects for Texize; (2) the capability of Texize to effectively compete in the household products industry; (3) the financial impact of the transaction on Morton Thiokol's balance sheet; and (4) the threat of a creeping tender offer by Dow, which the transaction would eliminate.

A Goldman Sachs representative summarized Goldman Sachs' role in the transaction and detailed the terms of the transaction. After answering the directors' questions, the Goldman Sachs representative informed the Morton Thiokol Board of Goldman Sachs' opinion that the transaction was fair. An attorney from Wachtell Lipton also advised the Morton Thiokol Board that a decision approving the transaction would fall within [*17] the parameters of their business judgment. A number of the outside directors also allegedly did independent calculations as to the value of Texize and all concluded that $ 250 million was a good price for Morton Thiokol. The Morton Thiokol Board then voted unanimously to approve the sale of Texize to Dow on the terms set forth in the Letter Agreement and such consistent changes as might be approved by the managements of Morton Thiokol and Dow.

The plaintiffs, as Morton Thiokol stockholders, filed their complaint on November 26, 1984, challenging the sale of Texize to Dow. A final agreement, however, was executed by Morton Thiokol and Dow on December 21,

1984 and the transaction closed on January 4, 1985. On the same day, Morton Thiokol acquired Bee Chemical for $ 77 million in cash.

The plaintiffs then moved for a preliminary injunction seeking to require Dow to hold separately the acquired division, which was denied by Opinion dated February 13, 1985. Tomczak v. Morton Thiokol, Inc., 1985 Del. Ch. LEXIS 448, Del. Ch., C.A. No. 7861-NC, Hartnett, V.C. (Feb. 13, 1985). Shortly thereafter, the defendants filed a Motion to Dismiss for failure of the plaintiffs to have made a pre-suit demand pursuant to Chancery [*18] Court Rule 23.1. Before that motion was decided, however, plaintiffs filed a Motion for Leave to File an Amended Complaint, which was granted. Tomczak v. Morton Thiokol, Inc., 1985 Del. Ch. LEXIS 504, Del. Ch., C.A. No. 7861-NC, Hartnett, V.C. (June 4, 1985).

Finally, the defendants' Motion to Dismiss was denied by Opinion dated May 7, 1986. In that Opinion, the Court was bound to accept the allegations of the Amended Complaint as being true and these allegations were found to have raised a reasonable probability that the decision of the Morton Thiokol Board to sell Texize to Dow was not protected by the business judgment rule because the allegations "paint[ed] a picture very similar to that found in Smith v. Van Gorkom, Del. Supr., 488 A.2d 858 (1985)." Tomczak v. Morton Thiokol, Inc., 1986 Del. Ch. LEXIS 418, *8, Del. Ch., C.A. No. 7861-NC, Hartnett, V.C. (May 7, 1986).

All defendants now have moved for summary judgment.

II

[HN1] Summary judgment is employed to avoid a useless trial where there is no issue of material fact. Bershad v. Curtiss-Wright, Del. Supr., 535 A.2d 840 (1987); Nicolet, Inc. v. Nutt, Del. Supr., 525 A.2d 146 (1987); H.S. Mfg. Co. v. Benjamin F. Rich Co., Del. Ch., 39 Del. Ch. 380, 164 A.2d 447 (1960). [*19] A motion for summary judgment, however, will be granted only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Chancery Court Rule 56(c); Empire of America Relocation Services, Inc. v. Commercial Credit Co., Del. Supr., 551 A.2d 433, 435 (1988); Wilson v. Joma, Inc., Del. Supr., 537 A.2d 187, 188 (1988).

[HN2] The proponent of a motion for summary judgment has the burden to prove clearly the absence of any genuine issue of fact which would affect the result, and any doubt should be resolved against the moving party. Brown v. Ocean Drilling & Exploration Co., Del. Supr., 403 A.2d 1114, 1115 (1979); Nash v. Connell, Del. Ch., 34 Del. Ch. 20, 99 A.2d 242 (1953);

Weinberger v. United Financial Corp. of Cal., 1983 Del. Ch. LEXIS 443, *15-16, Del. Ch., C.A. No. 5915-NC, Hartnett, V.C. (Oct. 13, 1983). But see Hammond v. Colt Ind. Operating Corp., Del. Super., 565 A.2d 558 (1989); Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Kellam Energy, Inc. v. Duncan, D.Del., 668 F. Supp. 861 (1987).

III

The defendants contend that they [*20] are entitled to summary judgment because the presumptions of the business judgment rule shield from further judicial scrutiny the decision of the Morton Thiokol directors to sell Morton's Texize Division to Dow. [HN3] The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Aronson v. Lewis, Del. Supr., 473 A.2d 805, 812 (1984). Smith v. Van Gorkom, Del. Supr., 488 A.2d 858, 872 (1985). The presumption, however, attaches only to the decisions of directors who are fully independent and wholly disinterested. Aronson, 473 A.2d at 812. When the business judgment rule applies, it insulates directors from liability, and imposes upon the party challenging the decision the burden of rebutting the presumption. Id. "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be 'attributed to any rational business purpose.'" Unocal Corp. v. Mesa Petroleum Co., Del. Supr., 493 A.2d 946, 954 (1985). [*21] citing Sinclair Oil Corp. v. Levien, Del. Supr., 280 A.2d 717, 720 (1971).

The plaintiffs contend, however, that the Morton Thiokol directors must first meet the two-step "enhanced duty" articulated in Unocal Corp. v. Mesa Petroleum Co., Del. Supr., 493 A.2d 946, 954 (1985), "which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred." Id. In Unocal, the Delaware Supreme Court held that [HN4] when the business judgment rule applies to the adoption of a "defensive mechanism," in response to a takeover threat, an initial burden of showing that the business judgment rule applies falls upon the directors. Id. See also Moran v. Household Int'l, Inc., Del. Supr., 500 A.2d 1346, 1356 (1985). If the rule of Unocal applies, initially the "directors must show that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed," and "they satisfy that burden 'by showing good faith and reasonable investigation . . .'." Unocal, 493 A.2d at 955, citing Cheff v. Mathes, Del. Supr., 41 Del. Ch. 494, 199 A.2d 548, 554-55 (1964). [*22] See also Moran, 500 A.2d at 1356. If the initial burden is satisfied, the directors must also show that the "defensive mechanism" was "reasonable in

relation to the threat posed." Moran, 500 A.2d at 1356, citing Unocal, 493 A.2d at 955. Furthermore, a showing by the directors is "materially enhanced," where, as in this case, "a majority of the board favoring the proposal consisted of outside independent directors who have acted in accordance with the foregoing standards." Moran, 500 A.2d at 1356, citing Unocal, 493 A.2d at 955.

The Morton Thiokol directors argue, however, that the "enhanced duty" espoused in Unocal does not apply because, in selling Texize to Dow, they were not implementing a "defensive measure" in response to a "pending takeover bid" such as the discriminatory self-tender present in Unocal. They further contend that Dow's market purchases of Morton Thiokol stock did not rise to the level of a takeover bid.

The plaintiffs counter that there need not be an actual takeover bid in order for the enhanced Unocal standard to apply; rather, they argue that [*23] Unocal applies if there is an "exercise of corporate power to forestall a takeover bid." Unocal, 493 A.2d at 955 (emphasis added).

The director-defendants' argument that Unocal applies only when there is a "pending takeover bid" fails in light of Moran v. Household Int'l, Inc., Del. Supr., 500 A.2d 1346 (1985). In Moran, the Delaware Supreme Court applied the Unocal standard to the adoption of a defensive mechanism (poison pill) which was put in place "to ward off possible future advances and not [as] a mechanism adopted in reaction to a specific threat." Moran, 500 A.2d at 1350. Furthermore, the Delaware Supreme Court recently stated that the Unocal standard applies to any corporate board decision or action that is "reasonably determined to be defensive." Paramount Communications, Inc. v. Time Inc., Del. Supr., 571 A.2d 1140, 1152, Horsey, J. (1990).

In the present dispute, Dow made no specific takeover proposal to Morton Thiokol, although Dow had purchased approximately 8.23% of Morton Thiokol's outstanding stock through [*24] market transactions. Although the Morton Thiokol directors concede that the sale of Texize to Dow had the effect of removing Dow as a potential takeover threat, they assert that their actions should not be viewed as an act that triggers the application of the Unocal standard. In essence, they argue that the sale of Texize to Dow had an independent business purpose apart from removing Dow as a takeover threat; that is, the profitable divestiture of a division whose "strategic fit" with the rest of the company had been questioned.

The sale of a single division, like Texize, is clearly different from other defensive measures, like poison pills (Moran) and discriminatory self-tenders (Unocal), which

are clearly defensive measures with little or no other independent business purposes. From all the facts and circumstances, however, it is clear that Morton Thiokol sold Texize to Dow, at least in part, to remove Dow as a possible takeover threat. It is undisputed that Morton Thiokol's Board feared the possibility that Dow was conducting a creeping tender offer, and that Morton Thiokol instructed its investment banker, Goldman Sachs, to try to negotiate the disputed transaction with [*25] Dow's investment banker, Morgan Stanley, just a few days after Dow had increased its stock holdings in Morton Thiokol to 8.23%, and consequently, the Unocal standard applies.

In order to receive the protection of the business judgment rule, therefore, the Morton Thiokol directors must satisfy the two prongs of the Unocal standard. First, Morton Board must show that it had "reasonable grounds for believing there was a danger to corporate policy and effectiveness" from Dow. Unocal, 493 A.2d at 954-55. The Morton Thiokol Board can satisfy this prong by "showing good faith and reasonable investigation." Id. Furthermore, the showing by the directors is materially enhanced where "a majority of the board favoring the proposal consisted of outside independent directors who have acted in accordance with the foregoing standards." Moran, 500 A.2d at 1356.

Here, the vote by all outside directors present (with 2 absent), coupled with the advice rendered by the investment banker (Goldman Sachs) and legal counsel (Wachtell Lipton), constitute a prima facie showing of good faith and reasonable investigation. Polk v. Good, Del. Supr., 507 A.2d 531, 537 (1986). [*26] See also Moran, 500 A.2d at 1356; Smith, 488 A.2d at 872-73. With 8 of the 10 Morton Thiokol directors who approved the sale of Texize to Dow being independent, the plaintiffs bear "a heavy burden of overcoming the presumptions thus attaching to the board's decisions." Polk, 507 A.2d at 537. See also Unocal, 493 A.2d at 955; Aronson, 473 A.2d at 812. "Plaintiffs here have failed to adduce any facts sufficient to overcome this prima facie showing by the board of their good faith and reasonable investigation.

The second prong of the Unocal standard requires the Morton Thiokol directors to establish that their action was "reasonable in relation to the threat posed." Unocal, 493 at 955. Here, the threat perceived by the Morton Board was the possibility of a creeping tender offer by Dow which would avoid or minimize the payment of any premium to the stockholders of Morton Thiokol. See generally Telvest v. Bradshaw, 697 F.2d 576, 577 n.1 (4th Cir. 1983) (stating that a "creeping tender offer" is an "acquisition device which avoids or minimizes the control premium [*27] which a would-be acquiror is usually required to pay in a conventional tender offer"). Removing this threat by profitably divesting Texize was

reasonable for several reasons. First, unlike many defensive actions, the sale of Texize to Dow did not have a direct negative impact on the value of Morton Thiokol. The price received by Morton for Texize was within the range of values placed on Texize by Morton's investment banker, Goldman Sachs, and essentially no premium was paid by Morton Thiokol for the stock it repurchased from Dow. Second, Morton Thiokol's management had informally considered the possible divestiture of Texize since Morton Thiokol's restructuring in 1982, although Morton's management determined that it was not in the company's best interests to actively "shop" Texize. When Dow entered the picture, however, it presented Morton with a good opportunity to divest Texize at a fair price, while at the same time removing a takeover threat. The sale of Texize also gave Morton the opportunity to use some of the cash from the sale of Texize to purchase Bee Chemical Co., whose specialty chemical business was a better "strategic fit" with Morton's other divisions than was [*28] Texize's household products business.

The Morton Thiokol directors have, therefore, met their burden of showing compliance with the "enhanced duties" espoused in Unocal. Consequently, Morton Thiokol's decision to sell Texize to Dow is protected from further judicial scrutiny by the presumption of propriety afforded by the business judgment rule, unless plaintiffs can show facts that remove the action of the Board from the protection of the rule. Aronson v. Lewis, Del. Supr., 473 A.2d 805 (1984); Tanzer v. International Gen. Indus. Inc., Del. Ch., 402 A.2d 382 (1979).

As will be seen, plaintiffs have cited no such facts in the record.

IV

Plaintiffs first argue that the business judgment rule should not shield the Morton Thiokol Board's decision to sell Texize to Dow because "there is substantial evidence that the directors did not act in good faith in the best interests of the corporation and its shareholders, but acted in their own self-interests."

Plaintiffs set forth five reasons in support of their broadly stated claim that the Morton Thiokol Board did not act in good faith and was not disinterested. None of them are persuasive. They [*29] are: (1) that the Morton directors were opposing a potential takeover regardless of price because of an April 1, 1984 resolution of the Morton Board to remain independent; (2) that Mr. Oreffice concluded that Morton Thiokol "did not want to be taken over no matter what" based on his discussions with Mr. Locke; (3) that Morton Thiokol ordered Goldman Sachs to come up with an offer to sell Texize to Dow for a price that would provide Dow with a "quickie profit" a price that was based on Goldman Sachs' perception of

what Dow would pay, rather than the inherent and fair value of Texize; (4) that Goldman Sachs failed to set a proper price for the Morton Thiokol stock owned by Dow, because Goldman Sachs set a price for the stock at $ 2 per share higher than Dow would have sold the stock, thus causing the cash component of the transaction to be lower than it otherwise would have been; and (5) that Morton Thiokol had rejected earlier expressions of interest in Texize.

The plaintiffs correctly assert that [HN5] the protections of the business judgment rule "can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment." Aronson v. Lewis, Del. Supr., 473 A.2d 805, 812 (1984). [*30] In order to be disinterested, "directors can neither appear on both sides of the transaction nor expect to derive a personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." Id. (citations omitted).

The Morton Thiokol Board that voted to sell Texize to Dow was comprised of ten members, eight of whom were outside directors (normally twelve persons sit on the Morton Thiokol Board, but two outside directors were absent from the meeting at which the sale was approved). Only two inside directors sat on the Morton Thiokol Board Mr. Locke and Mr. Hyndman. There are no facts indicating that they dominated or controlled the other eight outside directors. As stated in the prior opinion in this case denying plaintiffs' Motion For a Preliminary Injunction:

"The Board of Directors, however, consists of 12 persons [10 were present at the meeting] -- 10 [8 were present at the meeting] of whom are outside directors. The record shows no evidence that these 10 [8] directors are controlled by anyone and only two of the directors have been selected since Mr. Locke was hired by the corporation."

[*31]

Tomczak v. Morton Thiokol, Inc., 1985 Del. Ch. LEXIS 448, *13, Del. Ch., C.A. No. 7861-NC, Hartnett, V.C. (Feb. 13, 1985). Since that holding, plaintiffs have failed to adduce any facts suggesting that the inside directors, in any way, dominated or controlled the outside directors or that the outside directors were in any way "beholden" to the inside directors. See Aronson, 473 A.2d at 815; Mayer v. Adams, Del. Ch., 39 Del. Ch. 496, 167 A.2d 729, 732, aff'd., Del. Supr., 40 Del. Ch. 94, 174 A.2d 313 (1961).

The plaintiffs have also failed to adduce any evidence showing that a majority of the Morton Thiokol directors were on both sides of the transaction or expected to derive any personal financial benefit from it in the sense of self-dealing. Aronson, 473 A.2d at 812. In

fact, the record conclusively indicates that the eight outside directors had no personal, financial interest in the sale of Texize. Consequently, there could be no self-dealing that would make Morton Thiokol's sale of Texize to Dow an "interested transaction" under Aronson.

Despite the fact that eight of the ten directors who approved the transaction were outside directors, [*32] plaintiffs still claim that the Morton Thiokol Board approved the sale of Texize to Dow for entrenchment purposes. Under Pogostin v. Rice, Del. Supr., 480 A.2d 619, 627 (1984), however, [HN6] "[i]t is the plaintiff's burden to allege with particularity that the improper motive in a given set of circumstances, i.e., perpetuation of self in office or otherwise in control, was the sole or primary purpose of the wrongdoer's conduct." Furthermore, in order to overcome the protection afforded directors by the business judgment rule, plaintiffs must point to facts indicating that "the board's action [was] motivated solely or principally for the impermissible purpose of retaining office for personal reasons and not for reasons relating to the corporations's welfare." In re Anderson, Clayton Shareholders Litigation, Del. Ch., 519 A.2d 680, 688 (1986), citing Bennett v. Propp, Del. Supr., 41 Del. Ch. 14, 187 A.2d 405 (1962); Cheff v. Mathes, Del. Supr., 41 Del. Ch. 494, 199 A.2d 548 (1964); Unocal Corp. v. Mesa Petroleum Co., Del. Supr., 493 A.2d 946 (1985).

Plaintiffs' Amended Complaint alleges that certain business relationships [*33] between Morton Thiokol and various businesses in which seven of the ten outside directors are or were associated with, and the $ 15,000 per year retainers received by each of the Board members, are evidence of an entrenchment motive. Apparently, however, plaintiffs' allegations were so weak that they declined to even mention those allegations in their Opening Brief. In any case, [HN7] unsupported allegations are insufficient to establish an entrenchment motive. Tanzer v. International Gen'l Indus., Inc., Del. Ch., 402 A.2d 382 (1979). The plaintiffs have failed to adduce any evidence indicating that the alleged business relationships between Morton Thiokol and its outside directors or any retainer fees influenced the directors' ability to make independent and impartial decisions regarding Morton Thiokol's sale of Texize to Dow. See, e.g., Kaplan v. Wyatt, Del. Supr., 499 A.2d 1184 (1985); Aronson, supra; Stein v. Orloff, 1985 Del. Ch. LEXIS 418, Del. Ch., C.A. No. 7276-NC, Hartnett, V.C. (May 30, 1985).

Consequently, the plaintiffs' argument that the Morton Thiokol directors were not "fully independent and wholly disinterested" fails because plaintiffs [*34] failed to adduce any facts to support these claims.

V

The plaintiffs next attempt to rebut the presumption of propriety afforded by the business judgment rule by arguing that the Morton Thiokol directors, in approving the sale of Texize to Dow, failed to exercise their business judgment on an informed basis -- that is, that they failed to fulfill their duty of due care. Clearly, the plaintiffs bear the burden of overcoming the presumption of the business judgment lie in these circumstances. As the Delaware Supreme Court held in Smith v. Van Gorkom, 488 A.2d 858 (1985):

[HN8]

"[T]he party attacking a board decision as uninformed must rebut the presumption that its business judgment was an informed one.

The determination of whether a business judgment is an informed one turns on whether the directors have informed themselves 'prior to making a business decision, of all material information reasonably available to them.'"

Smith v. Van Gorkom, 488 A.2d at 872, quoting Aronson v. Lewis, Del. Supr., 473 A.2d 805, 812 (1984).

The Delaware Courts have consistently held that [HN9] the standard for determining whether directors are liable [*35] for breaching their duty of care to properly inform themselves is "predicated on concepts of gross negligence." Aronson, 473 A.2d at 812; Smith v. Van Gorkom, 488 A.2d at 873; Moran v. Household Int'l Inc., Del. Supr., 500 A.2d 1346, 1356 (1985). In the corporate context, gross negligence means "reckless indifference to or a deliberate disregard of the whole body of stockholders" or actions which are "without the bounds of reason." See Allaun v. Consolidated Oil Co., Del. Ch., 16 Del. Ch. 318, 147 A. 257, 261 (1929); Gimbel v. Signal Companies, Inc., Del. Ch., 316 A.2d 599, 615, aff'd., Del. Supr., 316 A.2d 619 (1974); Solash v. Telex Corp., 1988 Del. Ch. LEXIS 7, *22-24, Del. Ch., C.A. Nos. 9518-NC, 9528-NC, 9525-NC, Allen, C. (Jan. 19, 1988) (gross negligence is a "high standard" requiring proof of "reckless indifference" or "gross abuse of discretion").

Earlier in this dispute, this Court refused to dismiss the plaintiffs' Amended Complaint because the "[p]laintiffs' allegations paint[ed] a picture very similar to that found in Smith v. Van Gorkom, Del. Supr., 488 A.2d 858 (1985), [*36] and supported "a claim of violation of fiduciary duty." Tomczak v. Morton Thiokol, Inc., 1986 Del. Ch. LEXIS 418, *7-8, Del. Ch., C.A. No. 7861-NC, Hartnett, V.C. (May 7, 1986). At that stage of the proceedings, however, this Court was bound to accept the allegations of the plaintiffs' Amended Complaint as being true. At the present stage, however, after over three years of discovery, it is clear that the plaintiffs have failed to adduce any facts to support their allegations of gross negligence.

At the November 14, 1984 dinner meeting, Mr. Locke generally explained the terms of the proposed deal to the outside directors of Morton Thiokol. The following day, at the regularly scheduled board meeting, the proposed Letter Agreement between Morton and Dow regarding the sale of Texize was formally submitted to the Morton Thiokol Board. The November 15th meeting lasted approximately two hours, with about half of the time devoted to considering the proposed sale of Texize to Dow. Each of the Morton directors received a copy of the proposed agreement and the discussion of the proposed deal included presentations from Mr. Locke, Goldman Sachs and Wachtell Lipton.

Mr. Locke voiced his reasons for recommending [*37] the transaction and the Morton Board discussed: (1) the long-term prospects for Texize; (2) the capability of Texize to effectively compete in the household products industry; (3) the financial impact of the transaction on Morton Thiokol's balance sheet; and (4) the threat of a creeping tender offer by Dow, which the transaction would eliminate. A Goldman Sachs representative reviewed the terms of the transaction and after answering the directors' questions, informed the Morton Board of Goldman Sachs' opinion that the transaction was fair to Morton Thiokol. Wachtell Lipton also advised the Morton Board that, in its opinion, a decision approving the deal would properly fall within the realm of the directors' business judgment.

In addition, the Morton Thiokol Board had a solid background of information upon which to consider the sale of Texize to Dow. The November 15th board meeting was not the first time the Morton Thiokol directors had discussed the possible divestiture of Texize, although it was the first time that the Board considered a specific proposal. The Morton Board was aware of management's concerns about the profitability of Texize and its "strategic fit" with Morton's other [*38] businesses. The directors also knew for over a year before the disputed transaction that the divestiture of Texize was a possibility. In fact, the Morton Thiokol Board had been supplied with enough information on the performance and earnings of Texize so that a number of directors were able to independently assess the merits of the deal in light of their own basic evaluations of Texize.

It is therefore undisputed that the plaintiffs have failed to adduce facts sufficient to support a claim that Morton Thiokol's decision to sell Texize to Dow was grossly negligent. Although Morton Thiokol's decision to sell Texize to Dow may have been made hastily, it was not made in a grossly negligent manner. And even if it could be shown that Dow would have paid somewhat more for Texize, this, standing alone, would not constitute gross negligence by the Morton Thiokol Board.

The plaintiffs, therefore, have failed to rebut the presumption of propriety afforded by the business judgment rule, and consequently, Morton Thiokol's decision to sell Texize to Dow is protected from further judicial scrutiny.

## VI

Plaintiffs also allege in the Amended complaint that the price received by Morton Thiokol for [*39] Texize was so low that it constitutes a waste of corporate assets. The assertion is without merit.

As previously noted, the decision of the Morton Thiokol directors to sell Texize to Dow must be afforded [HN10] the presumption of propriety of the business judgment rule, and the plaintiffs have failed to rebut that presumption. Subsequently, the Court is not required to further scrutinize the terms of the transaction, including the fairness of the price. "Fairness becomes an issue only if the presumption of the business judgment rule is defeated." Grobow v. Perot, Del. Supr., 539 A.2d 180, 187 (1988), citing Aronson v. Lewis, Del. Supr., 473 A.2d 805, 812-17 (1984).

. Nevertheless, the price received by Morton Thiokol for Texize was not so low as to possibly constitute a waste of assets. [HN11] In order to prove a claim of waste of assets, a plaintiff must show that "what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid." Saxe v. Brady, Del. Ch., 40 Del. Ch. 474, 184 A.2d 602, 610 (1962). "If it can be said that ordinary businessmen might differ [*40] on the sufficiency of the terms, then the court must validate the transaction." Id. The plaintiffs have failed to adduce any facts supporting their claim that the price received by Morton Thiokol for Texize was so low as to be "unconscionable." Saxe, 184 A.2d at 611.

To the contrary, the undisputed evidence shows that the transaction in question was negotiated at arm's-length by Morton Thiokol's and Dow's investment bankers -- Goldman Sachs and Morgan Stanley, respectively. The $ 250 million price agreed on by Goldman Sachs and Morgan Stanley (and eventually Morton Thiokol and Dow) was at the top of the range of value ($ 225-$ 250 million) for Texize determined by Goldman Sachs. The price received by Morton was also within the range of values placed on Texize by Morgan Stanley ($ 240-$ 320 million), albeit at the low end of the range. Furthermore, the price paid for the shares repurchased by Morton Thiokol (approximately $ 85 per share) was below the market price on the last business day before the negotiations began ($ 92 per share) and was approximately equal to the market price on November 7th when Dow began making additional purchases of Morton Thiokol [*41] stock. Moreover, even if the stock had been valued as low as $ 75 per share (Dow's average acquisition cost) as

plaintiffs incorrectly urge, Morton Thiokol still would have received approximately $ 236 million for Texize, which falls within the range of values placed on Texize by Goldman Sachs.

## VII

Plaintiffs' claim for waste was so weak apparently, that they failed to even address that claim in their brief. Plaintiffs instead argued that there is an issue of "whether the Morton directors fulfilled their duties of obtaining the best possible price as mandated by Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., Del. Supr., 506 A.2d 173 (1986)."

The Delaware Supreme Court, however, recently held:

[HN12] "Under Delaware law there are, generally speaking and without excluding other possibilities, two circumstances which may implicate Revlon duties. The first, and clearer one, is when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company. See, e.g., Mills Acquisition Co. v. Macmillan, Inc., Del. Supr., 559 A.2d 1261 (1988). However, Revlon [*42] duties may also be triggered where, in response to a bidder's offer, a target abandons its long-range strategy and seeks an alternative transaction also involving the breakup of the company. Thus, in Revlon, when the board responded to Pantry Pride's offer by contemplating a "bust-up" sale of assets in a leveraged acquisition, we imposed upon the board a duty to maximize immediate shareholder value and an obligation to auction the company fairly. If, however, the board's reaction to a hostile tender offer is found to constitute only a defensive response and not an abandonment of the corporation's continued existence, Revlon duties are not triggered, though Unocal duties attach. See, e.g., Ivanhoe Partners v. Newmont Mining Corp., Del. Supr., 535 A.2d 1334, 1345 (1987)." Paramount Communications, Inc. v. Time, Inc., 571 A.2d 1140, 1150-1151, (1990).

The sale of Texize to Dow represented the sale of only one of four divisions of Morton Thiokol and did not constitute the sale of the entire company, or even most of the company, nor was Morton seeking to [*43] effect a business reorganization involving a clear break-up of the company. Furthermore, the sale of Texize was not a situation where Morton Thiokol, in response to a bidder's offer, abandoned its long-term strategy and sought a transaction involving the break-up of the company. Rather, the Texize transaction was merely the profitable sale of one division of Morton, with the sale being consistent with the company's long-term plans. Consequently, the sale of Texize could not trigger any Revlon duties.

Viewing the undisputed facts in a light most favorable to the plaintiffs, I find that the plaintiffs have failed to adduce any facts sufficient to support their claim for waste of assets or their claim that Revlon applies in this case. Consequently, defendants are entitled to summary judgment on these issues.

VIII

Plaintiffs' final claim is that Dow is liable as an aider and abettor of the alleged violations of fiduciary duty engaged in by the Morton Thiokol directors in approving the sale of Texize to Dow. Plaintiffs' Amended Complaint in paragraph No. 47 states:

"through a preconceived plan and scheme of directly and indirectly threatening to assume control of [Morton] and [*44] coercing the directors of Morton to cause it to buy back, at a price substantially in excess of its fair market value, the Morton stock held by Dow, and to sell to Dow at an unconscionably low price the Texize Division, Dow succeeded in obtaining an agreement for the aforesaid wrongful transaction with knowledge that such transactions constituted a breach of the fiduciary duties of the defendant directors."

In essence, plaintiffs argue that Dow improperly pressured Morton into selling Texize to it in return for Dow's Morton Thiokol shares and an inadequate amount of cash. Plaintiffs also seem to assert that Dow somehow actively cooperated or participated in the decision of Morton Thiokol's Board to sell Texize for an allegedly inadequate amount.

[HN13] A claim for aiding and abetting liability "requires that three elements be alleged and ultimately established: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in that breach any by the defendants who are not fiduciaries." Weinberger v. Rio Grande Indus., Inc., Del. Ch., 519 A.2d 116, 131 (1986). See also Gilbert v. El Paso Co., Del. Ch., 490 A.2d 1050, 1057

(1984); [*45] Penn Mart Realty Co. v. Becker, Del. Ch., 298 A.2d 349, 351 (1972).

Here, it is clear that the Morton Thiokol directors stood in a fiduciary relationship to the plaintiffs. As noted previously, however, the plaintiffs have failed to establish the existence of any breach of fiduciary duty by the Morton Thiokol defendants. Even assuming, arguendo, that plaintiffs had established a breach of fiduciary duty by the Morton Thiokol defendants, there is no evidence that Dow "knowingly participated" in any such breach.

As this Court recognized at the preliminary injunction stage, Dow owed no fiduciary duties to Morton Thiokol's stockholders at the time Morton Thiokol sold Texize to Dow. Tomczak v. Morton Thiokol, Inc., 1985 Del. Ch. LEXIS 448, *9-10, Del. Ch., C.A. No. 7861-NC, Hartnett, V.C. (Feb. 13, 1985). Dow's 8.23% holdings in Morton Thiokol prior to the disputed transaction did not approach the threshold of control of Morton Thiokol. Weinberger v. United Financial Corp. of California, 1983 Del. Ch. LEXIS 443, *35, Del. Ch., C.A. No. 5915-NC, Hartnett, V.C. (Oct. 13, 1983). Although Dow's purchases certainly had the effect of putting economic pressure on Morton Thiokol, what Dow essentially [*46] did was to simply pursue arm's-length negotiations with Morton Thiokol through their respective investment bankers in an effort to obtain Texize at the best price that it could. Dow, therefore, is entitled to summary judgment in its favor.

IX

In summary, I find, from the undisputed facts, that Morton Thiokol and the members of its Board of Directors are entitled to summary judgment as a matter of law on all of plaintiffs' claims against them. Furthermore, I find from the undisputed facts, that Dow is also entitled to summary judgment on all of plaintiffs' claims against it.

IT IS SO ORDERED.

# EXHIBIT 8

**Westlaw**

Not Reported in A.2d                                                                                          Page 1
Not Reported in A.2d, 1999 WL 66532 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**

Briefs and Other Related Documents

Turner v. BernsteinDel.Ch.,1999.Only the Westlaw
citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Stuart TURNER and Richard A. Bernstein, Plaintiffs,
v.
Joel E. BERNSTEIN, M.D., James L. Currie, Frank
A. Ehmann, Neal S. Pennys, M.D., Jeremy
Silverman, Laura Pearl, Henry Kuehn, and Genderm
Corporation, Defendants.
No. 16190.

Feb. 9, 1999.

James L. Holzman and Ronald A. Brown, Jr.,
Esquires, of Prickett, Jones, Elliott, Kristol & Schnee,
Wilmington, Delaware; and Frank P. DiPrima and
David M. Hoffman, Esquires, of Diprima & 
Hoffman, Madison, New Jersey, Attorneys for
Plaintiff.
Gregory V. Varallo and Russell C. Silberglied,
Esquires, of Richards, Layton & Finger, Wilmington,
Delaware; and Michael S. Poulos and Jennifer A.
Barrett, Esquires, of Rudnick & Wolfe, Chicago,
Illinois, Attorneys for Defendant Joel E. Bernstein,
M.D.
R. Judson Scaggs, Jr. and Christopher F. Carlton,
Esquires, of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware; and David J. Zott and
Geoffrey M. Davis, Esquires, of Kirkland & Ellis,
Chicago, Illinois, Attorneys for Defendants Currie,
Ehmann, Penneys, Silverman, Pearl and Kuehn.
Henry N. Herndon, Jr. and Michael A. Weidinger,
Esquires, of Morris, James, Hitchens & Williams,
Wilmington, Delaware; and Troy B. Froderman and
Merritt L. Bingham, Esquires, of Bryan Cave LLP.,
Phoenix, Arizona, Attorneys for Defendant GenDerm
Corporation.

MEMORANDUM OPINION
JACOBS, Vice Chancellor.
*1 Pending are two motions. The first is the
defendants' motion to dismiss the three-count
complaint in this action, which is brought
individually and on behalf of a shareholder class.[FN1]
The second is the plaintiffs' motion for an order
granting them partial summary judgment on Count

One of their complaint. This case involves a
challenge to a merger of GenDerm Corporation
("GenDerm") into a wholly owned subsidiary of
Medicis Pharmaceutical Corporation ("Medicis") in
December 1997. The plaintiffs' claim is that the
merger was invalid because (i) GenDerm's
shareholders did not receive material information
regarding their right to seek an appraisal (Count
One), (ii) the surviving corporation failed to comply
with the statutory requirements for a certificate of
merger (Count Two), and (iii) a former GenDerm
director was involved in self-dealing transactions that
diminished the corporation's worth (Count Three).

> FN1. The class is said to consist of all
> GenDerm common stock holders and their
> successors in interest, transferees, and
> assigns who owned GenDerm common
> stock on December 3, 1997, excluding the
> defendants and their affiliates.

For the reasons discussed below, Counts Two and
Three will be dismissed as to all defendants for
failure to state a legally valid claim. Count One,
which is found to state a valid claim against the
former GenDerm directors, will be dismissed only as
to the remaining defendants; and the plaintiff's
motion for partial summary judgment on Count One
will be denied.

I. BACKGROUND

A. The Parties

1. GenDerm and Medicis

Before it was acquired by Medicis in the merger,
GenDerm [FN2] was a non-public Delaware corporation
that developed and marketed pharmaceutical products
for topical application. GenDerm was founded in
1984 by Dr. Joel E. Bernstein ("Dr.Bernstein"), who
served as Chairman of the Board from GenDerm's
inception until December 1997. At the time of the
merger, GenDerm had issued and outstanding
11,545,801 shares of common stock held by
approximately 150 stockholders of record. On
December 3, 1997, GenDerm was merged into

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 66532 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Medicis, a Delaware corporation whose shares are publicly traded on NASDAQ.

> FN2. Although GenDerm retained that name after the merger, for purposes of clarity the pre-merger entity is referred to as "GenDerm," and the post-merger entity is referred to as "Medicis."

### 2. The Plaintiffs and the Director Defendants

The plaintiffs are former stockholders of GenDerm who together own 110,000 shares of GenDerm common stock. Both plaintiffs were cashed out in the merger. The individual defendants are the former directors of GenDerm, one of whom is Dr. Bernstein.[FN3]

> FN3. The GenDerm Board at the time of the merger consisted of Dr. Bernstein, Neal S. Penneys, James L. Currie, Frank A. Ehmann, Jeremy Silverman, and Laura Pearl. Dr. Bernstein is not related to the plaintiff Richard A. Bernstein.

### B. The Merger

GenDerm entered into an agreement to merge with Medicis (the "Merger Agreement") on December 1, 1997. Under the Merger Agreement GenDerm's stockholders would receive, in exchange for each share of their GenDerm stock, $3.64 per share cash, plus the right to receive additional future contingent payments of up to $2.33 per share. The Merger Agreement also designated two of GenDerm's former directors, Dr. Bernstein and Jeremy Silverman, and a former officer, Henry Kuehn,[FN4] to serve as Target Stockholder Representatives ("TSRs"). The duties of the TSRs involved coordinating the distribution of the merger consideration and answering questions posed by the GenDerm stockholders.

> FN4. The plaintiffs contend that Mr. Kuehn is liable to them under Count One by reason of his position as a TSR. *See infra* note 28.

### C. The Consent Solicitation Package

**\*2** GenDerm's by-laws required that the merger be approved by a two-thirds shareholder vote. GenDerm's directors unanimously favored the merger and collectively owned enough shares to guarantee

the merger's approval. Nonetheless, the board caused to be mailed to selected GenDerm shareholders a Consent Solicitation Package ("CSP") dated December 1, 1997. The plaintiffs, it appears, were not included among the recipients. The CSP included a two-page written consent form that stockholders were asked to sign; a copy of the Delaware appraisal statute, *8 Del. C.* § 262; a copy of the Merger Agreement without disclosure schedules; and a Consent Solicitation Letter (the "Consent Letter").

The Consent Letter was addressed to "COMMON STOCKHOLDERS AND SERIES C PREFERRED STOCKHOLDERS OF GENDERM CORPORATION." The Consent Letter recipients were asked to sign and date the enclosed consent forms, which evidenced (i) the shareholders' approval of the Merger Agreement and of a proposed amendment to GenDerm's Certificate of Incorporation, and (ii) their waiver of certain merger-related rights-including the right to elect appraisal. The Consent Letter stated that "[t]he closing of the transaction is expected to occur on or about next Wednesday, December 3, 1997" and that "[g]iven the December 3 target date for the transaction, [the directors]...ask that you return your signed consent of stockholder *immediately.*"[FN5]

> FN5. Emphasis in original.

The plaintiffs allege that they never received the CSP or any of the information it contained, or any other information that would inform their decision whether to accept the merger consideration or elect the appraisal remedy. The plaintiffs also point out that because the CSP mailing date (December 1, 1997) was only two days before the stated December 3, 1997 merger closing date, even those stockholders who did receive the CSP had, at most, one day to review its contents.

### D. The Merger is Approved

On December 3, 1997, a majority of GenDerm's shareholders, most of whom were either directors or affiliated with members of GenDerm's board of directors, approved the GenDerm-Medicis merger by written consent in lieu of a meeting. On that same date, a Certificate of Merger was filed with the Delaware Secretary of State in accordance with *8 Del. C.* § 251. As a consequence of the merger, GenDerm became a wholly owned subsidiary of Medicis.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 66532 (Del.Ch.)
(Cite as: Not Reported in A.2d)

In their complaint the plaintiffs allege that the Certificate of Merger was defective because it did not recite that the shareholders had approved the merger by written consent in accordance with 8 Del. C. § 228. On April 15, 1998, after this lawsuit was filed and in response to that claim, a certificate correcting that alleged "mistake" (the "Certificate of Correction") was filed with the Delaware Secretary of State.

### E. The Notice of Appraisal Rights and the Transmittal Letter

On December 12, 1997, Medicis sent to each record holder of GenDerm stock a notice of the merger (the "Merger Notice") in accordance with 8 Del. C. § 262(b)(2).[FN6] The Merger Notice informed each GenDerm shareholder that the Merger Agreement and the merger had been approved. The Merger Notice also included a copy of 8 Del. C. § 262, advised shareholders of their right to seek appraisal under that statute, and informed them that the merger had become effective on December 3, 1997.

> FN6. Both the Merger Agreement and 8 Del. C. § 262 required Medicis to notify former stockholders of their appraisal rights under Delaware law. The Merger Agreement relevantly stated that:
> Within ten days after the Effective Time, the Buyer [Medicis] and the Surviving Corporation [New GenDerm] shall notify each Target Stockholder as provided in Section 262(d)(2) of the Delaware Corporation Law."
> Merger Agreement, § 2(e). 8 Del. C. 262(d)(2) pertinently states that:
> If the merger or consolidation was approved pursuant to § 228 or § 253 of this title, each constituent corporation, either before the effective date of the merger or consolidation or within 10 days thereafter, shall notify each of the holders of any class or series of stock of such constituent corporation who are entitled to appraisal rights of the approval of the merger or consolidation and that appraisal rights are available for any or all shares of such class or series of stock of such constituent corporation, and shall include in such notice a copy of this section; provided that, if the notice is given on or after the effective date of the merger or

consolidation, such notice shall be given by the surviving or resulting corporation to all such holders of any class or series of stock of a constituent corporation that are entitled to appraisal rights.

**\*3** As previously noted, the Merger Agreement designated Dr. Bernstein, and Messrs. Silverman and Kuehn as TSRs, who would receive and disburse the merger consideration from escrow accounts established for that purpose. To facilitate the distribution of the merger consideration, the TSRs sent a Transmittal Letter to all GenDerm stockholders. The Transmittal Letter-which was separate from and in addition to the Merger Notice disseminated by Medicis-(i) advised shareholders that the merger had been approved and described the merger consideration; (ii) explained that shareholders could receive the merger consideration by signing and returning the Transmittal Letter, and (iii) advised shareholders who had additional questions to contact the TSRs' counsel.

Importantly, both the Letter of Transmittal and the Merger Notice informed the GenDerm shareholders that by accepting the merger consideration, they would waive any rights to demand an appraisal of the fair value of their shares. [FN7] The plaintiffs elected, however, to accept the merger consideration, and executed and returned the Transmittal Letters to the TSRs. Indeed, all of GenDerm's former stockholders elected to receive the merger consideration; none of them elected to pursue the appraisal remedy.

> FN7. The Transmittal Letter stated, in bold-faced capital letters, that:
> THE UNDERSIGNED UNDERSTANDS THAT (1) SUBMISSION OF THIS LETTER OF TRANSMITTAL TO THE TARGET STOCKHOLDERS REPRESENTATIVE CONSTITUTES A WAIVER OF HIS, HER OR ITS RIGHT TO DEMAND PAYMENT OF THE FAIR VALUE OF HIS, HER OR ITS SHARES PURSUANT TO SECTION 262 OF THE GENERAL CORPORATION LAW OF THE STATE OF DELAWARE AND (2) IF HE, SHE OR IT HAS PREVIOUSLY FILED A DEMAND FOR APPRAISAL WITH RESPECT TO HIS, HER OR ITS SHARES, SUBMISSION OF THIS LETTER OF TRANSMITTAL TO THE TARGET STOCKHOLDERS REPRESENTATIVE CONSTITUTES A

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 66532 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 4

WITHDRAWAL OF SUCH DEMAND. THE UNDERSIGNED ACKNOWLEDGES THAT HE, SHE OR IT HAS RECEIVED A COPY OF SECTION 262 OF THE GENERAL CORPORATION LAW OF THE STATE OF DELAWARE.

**F. Dr. Bernstein's Alleged Self-Dealing Transactions**

Count Three of the complaint alleges that Dr. Bernstein was involved in two self-dealing transactions. The first, which took place in connection with the merger, involved (a) the extension of a preexisting License Agreement with Medicis under which Dr. Bernstein received royalties for topical uses of Civamide,[FN8] and (b) an alleged severance payment to Dr. Bernstein of $1,377,580 in cash.

> FN8. Civamide is a patented compound that Dr. Bernstein invented. It is chemically related to capsaicin, the active ingredient in ZOSTRIX. Civamide is claimed to have significant potential in a cream for relief of pain from rheumatoid arthritis, osteoarthritis, painful diabetic neuropathy, post-herpetic neuralgia, muscle aches and pains, and certain pain resulting from cancer and pain following surgery. Civamide is also claimed to have potential for other non-topical uses, including intranasal and internal applications.

Under the License Agreement, Medicis agreed to pay Dr. Bernstein a sign-up fee of $75,000 within 30 days, another $75,000 within 18 months, another $500,000 within 30 days of FDA approval, and a 7% royalty for the life of a patent or for 10 years if no patent was issued. The License Agreement provided that if there were no sales of Civamide, Dr. Bernstein would still be guaranteed at least $4,450,000 over the next eight years, and that if Medicis failed to make those payments, Dr. Bernstein (through a privately owned entity) would obtain the ownership rights to Civamide.

The second transaction occurred several months before the merger, in June 1997. According to the complaint, Dr. Bernstein negotiated and approved the divestiture and sale of old GenDerm's European subsidiary, Euroderma Ltd. ("Euroderma"), a United Kingdom ("UK") Corporation, to Bioglan Ltd. ("Bioglan"), another UK corporation. Euroderma held the European rights to GenDerm's key products

and marketed certain of those products in the UK. Present and future sales of GenDerm's products in the UK and elsewhere in Europe were subject to licenses calling for the payment of royalties to Dr. Bernstein or his privately owned and controlled entities. The plaintiffs allege that in addition to paying approximately $2 million to GenDerm for Euroderma, Bioglan agreed to extend certain of Dr. Bernstein's royalty rights for an additional six years.[FN9] The plaintiffs claim that Dr. Bernstein sold Euroderma at a bargain basement price to obtain the six year extension of his royalty stream, and thereby breached his duty of loyalty to GenDerm.

> FN9. The royalty rights, which allegedly would expire in the year 2002, were extended to approximately 2008.

### II. THE CONTENTIONS

*4 The Complaint contains three counts. Count One alleges that the former directors of GenDerm (including Dr. Bernstein) failed to provide material information about GenDerm that would enable its stockholders to decide whether or not to execute a written consent approving the merger or demand appraisal. Specifically, the plaintiffs claim that they were not furnished basic financial information concerning GenDerm's business; information about business plans or recent or planned transactions or agreements; or any description of GenDerm's material products, pharmacological categories, or markets in which such products compete. That failure to disclose is said to constitute a breach of the former GenDerm directors' fiduciary duties of loyalty and disclosure, and to entitle the shareholder class to damages and an accounting in a "quasi-appraisal action" to determine GenDerm's fair value.

Count Two alleges that the merger itself was void or voidable, because the Certificate of Merger was by statute required to-but did not-recite that the shareholders had approved the merger by written consent in accordance with 8 Del. C. § 228. That statutory violation, the plaintiffs claim, entitles the shareholder class to compensatory and/or rescissory damages from Medicis.

Count Three alleges that Dr. Bernstein breached his fiduciary duties of loyalty to GenDerm by renegotiating the License Agreement and by selling GenDerm's UK subsidiary, Euroderma, on the terms described above. The plaintiffs claim also that GenDerm's former outside directors knowingly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 5
Not Reported in A.2d, 1999 WL 66532 (Del.Ch.)
(Cite as: Not Reported in A.2d)

participated with Dr. Bernstein in those breaches of fiduciary duty.

All defendants have moved to dismiss the complaint.[FN10] The plaintiffs oppose that motion and have moved for partial summary judgment on Count One.

> FN10. Where appropriate, the defendants adopt each other's respective arguments.

Because the parties' lengthy (and oft-times repetitive) paper submissions were less than clear,[FN11] the parties' positions needed to be, and eventually were, clarified at the October 27, 1998 oral argument. As a result of that clarification, it now appears that the former GenDerm directors contend that Count One is dismissable on the ground that Medicis and its directors-but not the former GenDerm directors-owed the former GenDerm shareholders statutory, contractual, and fiduciary duties to disclose material appraisal-related information. Medicis denies liability on the grounds that no claim is asserted against it in Count One, and that even if a claim is being asserted, the claim is dismissable because Medicis had no contractual, statutory, or fiduciary duty to disclose such information to GenDerm's shareholders. The plaintiffs claim that some party defendant-either GenDerm's former directors or Medicis-owed GenDerm's shareholders a duty to disclose material appraisal-related information, and that under either scenario Count One states a legally valid claim.

> FN11. Nine separate briefs plus numerous letter submissions were filed with the Court in connection with these motions.

Medicis also argues that Count Two fails to state a legally cognizable claim, because 8 Del. C. § 251(c), the controlling statute, does not require certificates of merger to recite the details or mechanics of the approving shareholder vote. Specifically, Medicis contends that where a certificate of merger is filed, § 251(c) does not incorporate 8 Del. C. § 228(d)'s requirement of a statement that the merger was approved by written consent. Alternatively, Medicis argues that even if § 251(c) could be read to mandate that requirement, the April 1998 Certificate of Correction included such a statement, thereby curing any arguable defect in the original Certificate of Merger.

*5 Finally, Dr. Bernstein contends that Count Three must be dismissed because it alleges derivative claims that, as a result of the merger, the plaintiffs no longer have standing to assert. The plaintiffs respond that Count Three alleges an individual (and class) claim, based on "the cash value dilution" theory announced in In re Tri-Star Pictures, Inc., Litig. (" Tri-Star ").[FN12]

> FN12. Del.Supr., 634 A.2d 319 (1993).

These contentions are now addressed.

### III. ANALYSIS

To prevail on a motion to dismiss under Court of Chancery Rule 12(b)(6), a plaintiff must allege facts that, when taken as true, establish each and every element of a claim upon which relief could be granted.[FN13] A motion to dismiss "does not concede conclusory allegations of law or fact where there are no allegations of specific fact that would support such conclusions," but rather "concedes only well pleaded allegations of fact." [FN14] That is, while "all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true... neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true." [FN15] Each Count is analyzed under this well established standard.

> FN13. Lewis v. Honeywell, Inc., Del. Ch., C.A. No. 8651, mem. op at 8, Jacobs, V.C. (July 28, 1987).

> FN14. Id.

> FN15. Grobow v. Perot, Del.Supr., 539 A.2d 180, 187 n. 6 (1988).

### A. Motion To Dismiss Count One

For purposes of this motion, the Court assumes (as Count One alleges) that GenDerm's former shareholders did not receive all material information necessary to an informed decision on whether or not to elect their appraisal remedy. From that assumption two separate issues flow. The first is which party, GenDerm or Medicis-the "merging" or the surviving corporation-had the duty to disclose that material information. The second issue (which goes to the

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 66532 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 6

plaintiffs' motion for summary judgment) is whether the plaintiffs, by accepting the merger price, waived their statutory rights to elect appraisal and/or attack the merger on appraisal-related disclosure grounds.

### 1. Which Defendant Had The Disclosure Duty?

GenDerm's former directors argue that they had no contractual, statutory, or fiduciary duty to provide disclosure about appraisal rights to GenDerm's former shareholders, because that duty had shifted to Medicis. The reason, the former directors argue, is that Medicis had both a contractual duty (under the Merger Agreement) and a statutory duty (under 8 *Del. C.* 262(d)) to provide "notice" of the appraisal action to GenDerm's former shareholders.

Medicis disagrees. It argues that GenDerm's former directors owed a fiduciary duty to disclose, pre-merger, material information to GenDerm's former shareholders, and that no contract or statute relieved the former directors of that duty. I conclude, for the following reasons, that Medicis is correct, and that the disclosure duty which Count One seeks to enforce fell exclusively to the former GenDerm directors.

The fiduciary duty of disclosure flows from the broader fiduciary duties of care and loyalty.[FN16] That disclosure duty is triggered (*inter alia* ) where directors (as GenDerm's former directors did here) present to stockholders for their consideration a transaction that requires them to cast a vote and/or make an investment decision, such as whether or not to accept a merger or demand appraisal.[FN17] Stockholders confronted with that choice are entitled to disclosure of the available material facts needed to make such an informed decision.[FN18] Specifically in the merger context, the directors of a constituent corporation whose shareholders are to vote on a proposed merger, have a fiduciary duty to disclose to the shareholders the available material facts that would enable them to make an informed decision, *pre-merger,* whether to accept the merger consideration or demand appraisal. [FN19]

FN16. *Cinerama, Inc. v. Technicolor, Inc.,* Del.Supr., 663 A.2d 1156, 1163 (1995); *Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773, 778 (1993) ( "*Zirn I* "). *See generally,* Lawrence A. Hamermesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty,* 49 Vand. L.Rev. 1087 (1996).

FN17. *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.,* Del. Ch., 532 A.2d 1324, 1340 (1987) ("The defendants' duty of candor required them to provide the minority stockholders with sufficient information to enable them to make an informed, reasoned investment decision.").

FN18. *See Sealy,* 532 A.2d at 1340 (holding that defendant directors breached fiduciary duty plaintiffs because "plaintiffs should not be required to make...choices [between selecting a merger price or electing appraisal] in the informational vacuum into which the defendants have thrust them."); *see also Zirn v. VLI Corp,* Del.Supr., 681 A.2d 1050, 1059 (1996) ("*Zirn II* ") (holding that majority stockholder seeking to complete short-form merger bears burden of disclosure of all material facts relevant to minority shareholder's decision whether to accept short-form merger consideration or seek an appraisal); *Smith v. Shell Petroleum, Inc .,* Del. Ch., C.A. No. 8395, Hartnett, V.C. (Nov. 26, 1990), *rehearing denied* (Jan. 2, 1991), *aff'd,* Del.Supr., 606 A.2d 112, 114 (1992) (holding that majority shareholder must disclose all material facts relevant to minority shareholder's decision whether to accept merger consideration or seek appraisal); *Seagraves v. Urstadt Property Co.,* Del. Ch., C.A. No. 10307, mem. op. at 12-13, Jacobs, V.C. (Apr. 1, 1996) ("Delaware law imposes a fiduciary obligation to disclose all material information that would affect a minority stockholder's decision whether to accept the merger consideration or to seek an appraisal or other available litigation remedy."); *Nebel v. Southwest Bancorp, Inc.,* Del. Ch., C.A. No. 13618, mem. op. at 9, Jacobs, V.C. (July 5, 1995) ("The defendants' duty was to disclose all facts material to the minority stockholders' decision whether to accept the short form merger consideration or seek an appraisal.").

FN19. Where, as here, the directors own sufficient stock to control the outcome of that vote, the case for the application of fiduciary disclosure standards is even more compelling. *Sealy,* 532 A.2d at 1338; *Wacht v. Continental Hosts. Ltd.,* Del. Ch., C.A. No. 7954, Berger, V.C. (April 11, 1986).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 66532 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 7

*6 GenDerm's former directors do not dispute that they had that disclosure duty at one point in time. What they argue is that in this case the duty was shifted from themselves to Medicis by operation of statute and contract. They point to 8 _Del. C._ § 262(d)(2), which provides that "if [appraisal] notice is given on or after the effective date of the merger or consolidation, such notice shall be given by the surviving or resulting corporation." That language, the former directors claim, shifted the disclosure duty to the surviving corporation (Medicis). To buttress their position, the former directors also rely upon the descriptive language in _Arnold v. Society for Sav. Bancorp, Inc._ ("_Arnold_") that "[t]he duty of disclosure is a judicially imposed fiduciary duty which applies as a _corollary_ to the statutory requirements."[FN20]

> FN20. Del.Supr., 678 A.2d 533, 537 (1996) (emphasis added); _see also Stroud v. Grace,_ Del.Supr., 606 A.2d 75, 87 (1992).

The former directors advance a similar, parallel argument based upon the Merger Agreement. They contend that because that Agreement fixes upon Medicis the responsibility to notify GenDerm's former stockholders of their appraisal rights under 8 _Del. C._ § 262, that responsibility also imposed upon Medicis a concomitant ("corollary") duty to disclose, in connection with that notice, all facts material to a shareholder decision whether to exercise those rights.[FN21] That is, the former directors argue that Medicis' limited duty under the contract (and the statute) to provide appraisal notice became enlarged so as to encompass a broader duty to disclose all material information relating to the merits of the merger.

> FN21. The Merger Agreement provided that: "Within ten days of the Effective Time, the Buyer [Medicis] and the Surviving Corporation [New GenDerm] shall notify each Target Stockholder as provided in Section 262(d)(2) of the Delaware Corporation Law."

That is, the former directors now take the position that although these statutory and contractual provisions themselves literally required only a narrow, specific kind of disclosure, those provisions had the "corollary" legal effect of imposing on Medicis a broader duty to make disclosures that were coextensive with the fiduciary duty of disclosure. As

a consequence, the former directors conclude, they were relieved of any fiduciary duty of disclosure they otherwise might have owed to GenDerm's stockholders.

Medicis responds that this argument finds no basis in any statute, contract, or common law principle; and that it (Medicis) never owed any such all-inclusive disclosure obligation to the GenDerm former shareholders. Indeed, as Medicis points out, Count One does not even charge Medicis with a disclosure violation, and advances the disclosure claim only against the former directors.[FN22] Medicis contends that (i) its only disclosure duty was imposed by the Merger Agreement and consisted of the limited obligation to provide notice of the appraisal rights prescribed by 262(d)(2); and (ii) there is no claim that Medicis did not provide such notice. Medicis also contends that it had no fiduciary or other relationship with GenDerm's former shareholders that could have given rise to any broader disclosure obligation. Finally, Medicis argues that the fiduciary duty of disclosure owed to GenDerm's former shareholders could only be owed by fiduciaries-GenDerm's former directors. The duty could not be, and was not, owed by Medicis because Medicis never occupied a fiduciary relationship to the former shareholders.

> FN22. Nevertheless, the plaintiffs argue that Medicis is potentially liable under Count One.

*7 Medicis' arguments are correct. Count One charges only GenDerm's former directors-not Medicis-with having failed to provide shareholders with information that would have been material to their investment decision. Delaware law imposed upon the GenDerm directors a fiduciary duty to provide that information.[FN23] Statutory and contractual provisions that required the surviving corporation (Medicis) to give notice of appraisal rights _after_ the merger could not diminish or extinguish the bedrock fiduciary duties that the former directors owed to the shareholder plaintiffs _before_ the merger when shareholder approval was being sought.

> FN23. _See Sealy,_ 532 A.2d at 1340.

Nor does the plaintiffs' claim that the appraisal statute and the Merger Agreement imposed a fiduciary disclosure obligation upon Medicis find any basis in law.[FN24] The plaintiffs' reliance on _Shell Petroleum,_

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Inc. v. Smith* [FN25] is misplaced. *Shell* holds that a parent corporation owes fiduciary duties to its subsidiary's minority shareholders only where it is the majority shareholder of the subsidiary.[FN26] Our Supreme Court so recognized in *Arnold*:

> FN24. *Arnold*, 678 A.2d at 539; *Gaffin v. Teledyne*, Del. Ch., C.A. No. 5786, mem. op. at 6, Hartnett, V.C. (Oct. 9, 1987), *rev'd on other grounds*, Del.Supr., 611 A.2d 467 (1992) ("liability for breach of a director's fiduciary obligation cannot run against the corporation itself"); *Emerald Partners v. Berlin*, Del. Ch., C.A. No. 9700, mem. op. at 20, Steele, V.C. (Sept. 22, 1995) (the "corporation itself is not liable for a breach of fiduciary duties by its directors").

> FN25. Del.Supr., 606 A.2d 112 (1992) ("*Shell Petroleum* ").

> FN26. *Id.* at 113; *see also Zirn II*, 681 A.2d at 1059; *Bershad v. Curtiss-Wright Corp.*, Del.Supr., 535 A.2d 840, 845 (1987); *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 703 (1983).

*Shell Petroleum* does not support the imposition of liability on an unaffiliated third party simply because that party participates substantially in the preparation of disclosure materials. Holdings was a majority stockholder attempting to squeeze out the minority shareholders of Shell. As such, it directly owed fiduciary duties to these stockholders.[FN27]

> FN27. *Arnold*, 678 A.2d at 541.

Because the plaintiffs do not allege that Medicis was a majority or controlling stockholder of GenDerm, no valid claim that Medicis owed fiduciary duties to GenDerm's former shareholders, is stated.

The former directors also contend that at the time the disclosures were required to be made (*i.e.*, after the merger), their fiduciary relationship and any duties flowing therefrom had ceased to exist because they were no longer directors. That argument is unresponsive, because the plaintiffs do not base their claim upon alleged deficiencies in the *post-merger* appraisal notice. Rather, the plaintiffs allege that the former directors failed to provide material information *before* the vote on the merger, at which time the directors did have a fiduciary duty of disclosure.

In summary, I conclude that Count One states a cognizable claim against the GenDerm former directors, but not against the remaining defendants.[FN28]

> FN28. The plaintiff also contends that even though defendant Kuehn, one of the TSRs, was not a director of GenDerm, he was a fiduciary to the GenDerm shareholders in his capacity as a TSR, and thus had a parallel duty of disclosure. I disagree. The complaint levels no allegations against Mr. Kuehn in his capacity as a TSR. Nor does it claim that the TSRs owed or breached any fiduciary duty of disclosure to the shareholders. In any event, Mr. Kuehn owed no fiduciary duty of disclosure in that capacity, because the TSRs' duties under the Merger Agreement did not include any duty of disclosure.

Accordingly, Count One will be dismissed as to all defendants except GenDerm's former directors.

2. Did The Plaintiffs Make An Informed Waiver?

The second Count One-related issue implicates the plaintiffs' motion for partial summary judgment. The defendants argue that by accepting the merger consideration, the plaintiffs waived their appraisal rights and their right to challenge the validity of the merger. In response, the plaintiffs contend that they waived no rights, because as a matter of law the "waiver" was not fully informed. The reason, they urge, is that they were not provided sufficient information to make an informed waiver. Therefore, plaintiffs conclude, the Court should deny the motion to dismiss Count One, and should grant their motion for partial summary judgment on that Count.

*8 Our case law recognizes that a stockholder who surrenders his shares in a merger and accepts the merger consideration and the other benefits of the merger, will be deemed to have waived his right to seek appraisal or otherwise to challenge the transaction, provided that the decision to accept the merger was fully informed.[FN29] The question presented here is whether the undisputed facts are sufficient to establish as a matter of law that the plaintiffs were not fully informed when they elected to accept the merger consideration.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 66532 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 9

FN29. *Bershad,* 535 A.2d at 848 ("when an informed minority shareholder either votes in favor of the merger, or...accepts the benefits of the transaction, he or she cannot thereafter attack its fairness"); *Iseman v. Liquid Air Corp.,* Del. Ch., C.A. No. 9694, mem. op. at 4, Berger, V.C. (Feb. 11, 1993) (only "where an informed minority stockholder accepts the offered merger consideration [may] he or she...not later challenge the transaction"); *Siegman v. Columbia Pictures Entertainment, Inc.,* Del. Ch., C.A. No. 11152, mem. op. at 16-21, Hartnett, V.C. (Jan. 12, 1993) (holding that "[t]he prohibition against the right to continue to maintain a suit...expressly applies only to an informed minority shareholder who voted for the merger or surrendered his shares").

Summary judgment is appropriate where the moving party can demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.[FN30] On a motion for summary judgment the Court must treat all facts in the light most favorable to the non-moving party (here, the former GenDerm directors)[FN31] and it must deny summary judgment where "there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or inferences to be drawn therefrom."[FN32] Summary judgment may also be denied if the court, upon reviewing the record, determines that "it is more desirable to inquire into or develop more thoroughly the facts in order to clarify application of the law to the circumstances."[FN33]

FN30. Court of Chancery Rule 56(c).

FN31. *Arnold,* 678 A.2d at 535.

FN32. *Seagraves, supra* note 18, at 7; *Smith v. Wallace,* Del.Supr., 701 A.2d 86, 89-90 (1997) (involving record that was ambiguous over plaintiffs knowledge of material facts and the timing thereof); *In re Asbestos Litig.,* Del. Supr., 673 A.2d 159, 163 (1996) (finding summary judgment inappropriate when material factual disputes exist regarding party's knowledge).

FN33. *Mentor Graphics Corp. v. Quickturn*

*Design Systems, Inc.,* Del. Ch., C.A. No. 16584, 16588, mem. op. at 7, Jacobs, V.C. (Oct. 9, 1998).

The former directors argue that the record on this issue involves disputed fact questions. They contend that the plaintiffs received GenDerm's most recent financial statements shortly before the merger. They also point out that plaintiff Bernstein and GenDerm's former president and CEO, Mr. DiPrima, had a long-standing relationship that was a potential channel for plaintiffs to have private access to information about GenDerm's pre-merger financial status. The defendants underscore that both plaintiffs signed consent forms that expressly and pointedly told them that signing the consents would operate as a waiver of appraisal rights, and that the plaintiffs then accepted the merger consideration. Lastly, the defendants point out that although the Letter of Transmittal invited the recipients to call a telephone number if they needed more information, the plaintiffs did not do so. These facts, the defendants argue, create sufficient reason to doubt the plaintiffs' professions of ignorance of GenDerm's pre-merger financial condition, and preclude the entry of judgment as a matter of law.

I agree that a grant of summary judgment would be imprudent. Further discovery is needed to flesh out what specific facts the plaintiffs knew or had available to them when they decided to accept the merger consideration. Because the present record on that issue is not adequate, the plaintiffs' motion for partial summary judgment on Count One will be denied.

## B. Motion to Dismiss Count Two

On December 3, 1997, Medicis filed, as 8 Del. C. § 251(c) required, a Certificate of Merger that included the following recital:
**\*9** An Agreement of Merger (the "Merger Agreement") has been approved, adopted, certified, executed and acknowledged by each constituent corporation and Medicis Corporation (that parent of the Transitory Subsidiary) in accordance with the requirements of Section 251 of the General Corporation Law of the State of Delaware.

The plaintiffs contend that the Certificate of Merger failed to comply with the statutory requirement set forth in 8 Del. C. § 228(d), that:In the event that the action which is consented to is such as would have required the filing of a certificate under any other

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 66532 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

section of this Title, if such action had been voted on by stockholders or by members at a meeting thereof, the certificate filed under such other section shall state, in lieu of any statement required by such section concerning any vote of stockholders or members, that written consent has been given in accordance with this section.

Specifically, the plaintiffs argue as follows: § 251(c) mandates that a Certificate of Merger must include a statement concerning the shareholders' approving vote. Section 228(d) requires that whenever a statute requires a statement concerning a shareholder vote and where that vote is accomplished by written consent, the fact that the approval was by written consent must be included in the required statement. Plaintiffs argue that those two statutory requirements, when read together, compel the conclusion that the statement required by § 228 must be included in a certificate of merger executed and filed under § 251(c). Accordingly, plaintiffs conclude, because Medicis failed to state in the Certificate of Merger that the merger was approved by written shareholder consent in accordance with § 228(d), the merger was a legal nullity.

Medicis argues that this claim is dismissable because (i) § 251(c) does not require "any statement...concerning any vote of stockholders or members" in a certificate of merger; (ii) accordingly, § 228 did not, in this case, require a recital in the Certificate of Merger a recital that the shareholders approved the merger by written consent; and (iii) therefore, Count Two fails to state a legally valid claim. Alternatively, Medicis argues that, in any event, the filing of the Certificate of Correction in April 1998 pursuant to § 103(f) retroactively cured any arguable deficiency in the original Certificate of Merger.

For present purposes, it is unnecessary for the Court to address the parties' statutory construction arguments, because the Certificate of Correction added to the Certificate of Merger the language that the plaintiffs claim was required by § 251(c) and § 228(d). Accordingly, the sole issue to be decided whether the Certificate of Correction cured the alleged defect. I find that it did.

Under 8 *Del. C.* § 103(f), a corporation may correct any inaccurate or defectively executed instrument authorized under the Delaware General Corporation Law to be filed with the Delaware Secretary of State.[FN34] That section also provides that the

correction will operate retroactively to the date of the original certificate, except as to persons who would be "substantially and adversely" affected by the correction.[FN35] The complaint does not allege that any persons have been or would be adversely affected by the Certificate of Correction that Medicis filed on April 15, 1998. Therefore, assuming without deciding that the originally-filed Certificate of Merger was defective, the Certificate of Correction operated to cure any defect and mooted the invalidity claim set forth in Count Two.

> FN34. The statute reads in relevant part that: Whenever any instrument authorized to be filed with the Secretary of State under any provision of this title, has been so filed and is an inaccurate record of the corporate action therein referred to, or was defectively or erroneously executed, sealed or acknowledged, the instrument may be corrected by filing with the Secretary of State a certificate of correction of the instrument which shall be executed, acknowledged and filed in accordance with this section. The certificate of correction shall specify the inaccuracy or defect to be corrected and shall set forth the portion of the instrument in corrected form.... An instrument corrected in accordance with this section shall be effective as of the date the original instrument was filed, except as to those persons who are substantially and adversely affected by the correction and as to those persons the instrument as corrected shall be effective from the filing of date. 8 *Del. C.* § 103(f).

> FN35. 8 *Del. C.* 103(f); *See also Siegman v. Palomar Medical Technologies,* Del. Ch., C.A. No. 15894, mem. op. at 11-15, Jacobs, V.C. (Mar. 9, 1998).

### C. Motion to Dismiss Count Three

**\*10** Count Three of the complaint alleges that Dr. Bernstein[FN36] mismanaged and wasted GenDerm's assets in connection with both the sale of Euroderma (GenDerm's UK subsidiary), and the License Agreement for Civamide. Dr. Bernstein contends that these claims belonged solely to GenDerm, and that the plaintiffs lost standing to maintain them derivatively by reason of the merger between GenDerm and Medicis.[FN37] I concur.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 11
Not Reported in A.2d, 1999 WL 66532 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN36. The plaintiffs maintain that all former outside directors are liable under Count Three. Because this Court finds that Count Three's claims are derivative, the plaintiffs lack standing to pursue them, and Count Three will be dismissed as to all director defendants including the former outside directors.

FN37. *See Lewis v. Anderson,* Del.Supr., 477 A.2d 1040, 1049 (1984).

Once a plaintiff who sues derivatively on behalf of a corporation is no longer a shareholder, "whether by reason of a merger or for any other reason, [he or she] loses standing to continue a derivative suit." [FN38] The plaintiffs contend that Count Three states an individual (and not a derivative) claim, for which reason they continue to have standing to maintain the action.

FN38. *Id.* at 1049; *In re First Interstate Bancorp Consolidated Shareholder Litig.,* Del. Ch., C.A. No. 14623, mem. op. at 29, Lamb, V.C. (October 7, 1998); 8 *Del. C. §* 327 (derivative stockholder must be stockholder at time of alleged wrong and throughout the course of litigation). *See also Kramer v. Western Pac. Indus., Inc.,* Del.Supr., 546 A.2d 348, 351 (1988); *Parnes v. Bally Entertainment Corp.,* Del. Ch., C.A. No. 15192, mem. op. at 5, Chandler, C. (Feb. 3, 1998) ("Absent a showing that the injury was a direct harm to the shareholder and independent of any wrong suffered by the corporation, plaintiff may not proceed with an individual claim."); *rev'd on other grounds,* Del.Supr., ____ A.2d ____, C.A. No. 85, 1998, Berger, J. (Jan. 25, 1999).

Whether or not a claim is individual turns on the existence of direct or "special" injury to the plaintiff stockholder. [FN39] A special injury occurs when either the plaintiff has suffered a wrong that was not suffered by all other stockholders generally, or where the wrong involves contractual stockholder rights, such as the right to vote. [FN40] If neither of these prongs is satisfied, the claim is regarded as derivative, not direct. [FN41]

FN39. *First Interstate, supra* note 38, at 13;

FN40. *Tri-Star,* 634 A.2d at 330.

FN41. *Katell v. Morgan Stanley Group, Inc.,* Del. Ch., C.A. No. 12343, mem. op. at 7, Chandler, V.C. (Jan. 14, 1993); *Kramer,* 546 A.2d at 352 (citations omitted)(to determine whether the claim is derivative or individual in nature, the Court must look to "the nature of the wrong alleged and the relief, if any, which could result if plaintiff were to prevail," and to "the body of the complaint, not to the Plaintiff's designation or stated intention.").

As our Supreme Court recently recognized in *Parnes v. Bally Entertainment Corporation* ("*Parnes* "), [FN42] a thin grey line often marks the difference between derivative and individual claims that arise in the merger context. *Parnes* holds that "[i]n order to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price." [FN43] On the other hand, challenges to alleged wrongs that are *associated* with the merger but do not involve a challenge to the validity of the merger itself, are derivative claims. [FN44]

FN42. Del.Supr., ____ A.2d ____, C.A. No. 85, 1998, mem. op. at 4, Berger, J. (Jan. 25, 1999) (noting the difficulty in determining "whether a stockholder is challenging the merger itself, or alleged wrongs associated with the merger, such as the award of golden parachute employment contracts.").

FN43. *Parnes, supra* note 38, at 6.

FN44. *Id.; see Kramer,* 546 A.2d at 350 (finding as derivative a claim that alleged corporations' directors breached their fiduciary duties by "diverting to themselves eleven million dollars...of sale proceeds through their receipt of stock options and golden parachutes and incurring eighteen million dollars of excessive or unnecessary fees and expenses in connection with the sale of Western Pacific.").

*Parnes* exemplifies the distinction. There, the plaintiffs directly challenged the fairness of the process and price in a merger between Bally

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 66532 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Corporation and Hilton Hotels Corporation. Bally's CEO and Chairman, had allegedly demanded that any potential acquiror would have to obtain his consent, and pay him substantial sums of money (and valuable Bally assets), to obtain his approval of any merger. The complaint alleged that the CEO had breached his fiduciary duty of loyalty by so preferring his interests over those of Bally and its stockholders; and that Bally's other directors had acquiesced in these self-interested actions by approving a merger that involved side payments to the CEO with a resulting unfair merger price paid to Bally shareholders. The Supreme Court concluded that the plaintiff had stated a direct claim because the complaint alleged that the merger price was unfair and had resulted from unfair dealing.[FN45]

FN45. *Id.* at 9.

In this case, the plaintiffs contend that because Dr. Bernstein's wrongful actions did not affect all GenDerm shareholders equally, their claims are not derivative and, thus, were not extinguished by the merger. Plaintiffs rest their argument on the cash value dilution concept articulated in *In re Tri-Star Pictures, Inc., Litig.* ("*Tri-Star* ").[FN46] They claim that Dr. Bernstein, the shareholder who received the exclusive benefit from the extension of the License Agreement and the sale of Euroderma, caused a cash value dilution of the shares owned by GenDerm's other shareholders (*i.e.*, the class). Plaintiffs argue that the challenged transactions directly diverted to Dr. Bernstein, value that all remaining shareholders would (absent any wrongdoing) have received. In essence, the plaintiffs argue that in a merger, where a significant stockholder enters into a related transaction with the corporation for no or inadequate consideration that involves that stockholder receiving value that is not shared with the remaining shareholders, the resulting "cash value dilution" may be challenged in an individual claim.

FN46. *Del.Supr.*, 634 A.2d 319 (1993).

*11 The plaintiffs misread *Tri-Star.* Their effort to characterize their claim as direct by forcing it into the *Tri-Star* "cash value dilution" mold, fails for two reasons. First, in challenging the Bernstein transactions, the plaintiffs have not (as *Parnes* requires) "question[ed] the fairness of the price offered in the merger or the manner in which the agreement was negotiated." [FN47] All the plaintiffs have alleged (in the language of *Parnes* ) is

FN47. *Parnes, supra* note 38, at 5.

a claim alleging corporate mismanagement, and a resulting drop in the value of the company's stock...is a classic derivative claim; the alleged wrong harms the corporation directly and all of its stockholders indirectly....[T]hat such a claim is asserted in the context of a merger does not change its fundamental nature.[FN48]

FN48. *Id.* at 6; *see also Kramer,* 546 A.2d at 353 ("[W]here a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of the alleged director mismanagement, his cause of action is derivative in nature.").

Second, the pleaded facts do not square with the cash value dilution concept described in *Tri-Star.* There, the plaintiffs, who were former minority shareholders of Tri-Star Pictures, Inc. ("Tri-Star"), challenged a transaction between Tri-Star and Coca-Cola Company ("Coca-Cola"), a 36.8% stockholder,[FN49] wherein Coca-Cola's entertainment division assets were sold to Tri-Star in exchange for Tri-Star stock. Before the transaction, the Tri-Star public stockholders owned 43.4% of Tri-Star's common voting stock.[FN50] The complaint alleged that Coca-Cola (and significant stockholders allied with it) had wrongfully manipulated the transaction so as to cause Coca-Cola to receive excessive Tri-Star shares in exchange for Coca-Cola assets having a lesser value. As a result, Coca-Cola obtained an 80% controlling stock interest, and the public shareholders ended up with a 20% stock interest, and a corresponding dilution of the asset value of that stock interest.[FN51]

FN49. 634 A.2d at 321.

FN50. *Id.*

FN51. *Id.* at 330-31.

The *Tri-Star* plaintiffs argued that the assets-for-stock transaction diluted not only the cash value of their Tri-Star shares, but also their percentage ownership of the company, thereby leaving them with diluted voting power as well.[FN52] Because Coca-Cola did not suffer a similar dilution, the *Tri-Star* plaintiffs argued, they had suffered a special injury

Not Reported in A.2d                                                Page 13
Not Reported in A.2d, 1999 WL 66532 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

not shared equally by all shareholders, that rendered their claim individual in nature.[FN53] The Supreme Court agreed, holding that "although...claims of waste are derivative, a claim of stock dilution and a corresponding reduction in a stockholder's voting power is an individual claim." [FN54]

> FN52. *Id.* at 330.

> FN53. *Tri-Star,* 634 A.2d at 330.

> FN54. *Id.* (emphasis added).

In this case, the plaintiffs' cash value dilution claim is legally insufficient because such a claim, in my view, arises only in transactions where a significant stockholder sells its assets to the corporation in exchange for the corporation's stock, and influences the transaction terms so that the result is (i) a decrease (or "dilution") of the asset value and voting power of the stock held by the public stockholders and (ii) a corresponding increase (or benefit) to the shares held by the significant stockholder. The complaint here does not plead a transaction of that kind. It alleges a waste of corporate funds, which is classically derivative. Because that claim was extinguished by the merger,[FN55] the plaintiffs no longer have standing to maintain Count Three, and that Count must be dismissed.

> FN55. *Parnes, supra* note 38, at 4.

### IV. CONCLUSION

*12 For the foregoing reasons, the motion to dismiss Count Two and Three of the complaint is granted. The defendants' motion to dismiss Count One is denied as to the former GenDerm directors, and is granted as to all other defendants. The Plaintiffs' motion for partial summary judgment is denied. IT IS SO ORDERED.

Del.Ch.,1999.
Turner v. Bernstein
Not Reported in A.2d, 1999 WL 66532 (Del.Ch.)

Briefs and Other Related Documents (Back to top)

• 1999 WL 34000969 (Trial Pleading) Answer to Plaintiffs' Complaint (Feb. 26, 1999) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on November 28, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Ian Connor Bifferato
> Linda Richenderfer
> Joseph K. Koury
> Bifferato, Gentilotti, Biden & Balick
> 1308 Delaware Ave.
> Wilmington, DE 19806

I further certify that on November 28, 2006, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY FEDERAL EXPRESS**

Thomas J. Flemming
Herbert C. Ross, Jr.
Olshan, Grundman, Frome,
Rosenzweig, & Wolosky LLP
65 East 55th Street
New York, NY 10022

YOUNG CONAWAY STARGATT & TAYLOR, LLP

William D. Johnston (No. 2123)
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
(302) 571-6600
apoff@ycst.com