IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AD HOC COMMITTEE OF EQUITY HOLDERS OF TECTONIC NETWORK, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>AROL WOLFORD, SHERWIN KRUG, CHARLES McROBERTS, JOHN McROBERTS, CHARLES PECCHIO, JR., LAURA ROGERS and THEO VANDERBOOM,<br><br>Defendants. | Civil Action No. 06-665 (KAJ) |

## AFFIDAVIT OF ADAM W. POFF, ESQUIRE

STATE OF DELAWARE      :
                                      :      SS:
COUNTY OF NEW CASTLE   :

I, Adam W. Poff, Esquire, being duly sworn according to law, do hereby depose and say the following:

1.      I am an associate at the firm of Young Conaway Stargatt, & Taylor, LLP, Delaware counsel to defendants in the captioned matter.

2.      I am over 21 years of age and fully competent to make this Affidavit. I make this Affidavit of my own personal knowledge and in support of Defendants' Motion to Dismiss the captioned matter.

3.      Attached hereto as Exhibit A is a true and correct copy of a Notice of Hearing for In Re: Tectonic Network, Inc. and Tectonic Solutions, Inc., filed in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division on November 8, 2005.

4.    Attached hereto as Exhibit B is a true and correct copy of the United States Trustee's Objection to Motion for Appointment of an Official Committee of Equity Holders filed in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division on December 9, 2005.

5.    Attached hereto as Exhibit C is a true and correct copy of a Stipulation and Consent Order (a) Resolving Certain Motions by the Ad Hoc Committee (Docket # 119) (b) Lifting the Automatic Stay to Permit Members of the Ad Hoc Committee of Equity Holders the Right to Pursue Claims Against the Debtors' Officers and Directors and (c) Authorizing the Debtors to Abandon Such Claims filed in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division on April 12, 2006.

6.    Attached hereto as Exhibit D is a true and correct copy of a First Amended Disclosure Statement With Regard to Chapter 11 Plan of Reorganization Submitted by Tectonic Network, Inc.  Debtors and Debtors in Possession filed in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division on March 16, 2006.

7.    Attached hereto as Exhibit E is a true and correct copy of a Verified Statement of Olshan Grundman Frome Rosenzweig & Wolosky LLP and Cohen Pollock Merlin Axelrod & Small, P.C. Pursuant to Fed. Bankr. P. 2019 filed in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division on January 12, 2006.

8.    Attached hereto as Exhibit F is a true and correct copy of a form 10KSB for the period ended June 30, 2004, filed by Tectonic Network, Inc. with the Securities and Exchange Commission on October 12, 2004.

9.    Attached hereto as Exhibit G is a true and correct copy of a Form 8-K for the period ended February 24, 2005 filed by Tectonic Network, Inc. with the Securities and Exchange Commission on February 24, 2005.

10.    Attached hereto as Exhibit H is a true and correct copy of a EX-99.1, 8-K for the period ended October 3, 2005 filed by Tectonic Network, Inc. with the Securities and Exchange Commission on October 7, 2005.

11.    Attached hereto as Exhibit I is a true and correct copy of a 10KSB40 for the period ended on June 30, 2001 filed by the Tectonic Network, Inc. on October 2, 2001.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Adam W. Poff (No. 3990)


SWORN TO AND SUBSCRIBED before me, a Notary Public for the State and County aforesaid, on this 28th day of November, 2006.

_____
Notary Public
My Commission Expires:  2\16\09

000000.0

# EXHIBIT A

UITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE:<br><br>TECTONIC NETWORK, INC., and<br>TECTONIC SOLUTIONS, INC.,<br><br>Debtors. | CHAPTER 11<br><br>CASE NO. 05-78966<br>CASE NO. 05-78955<br><br>JUDGE MASSEY<br><br>(Jointly administered Under<br>CASE NO. 05-78966) |

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that the Ad Hoc Committee of Equity Holders has filed a Motion for an Order Approving the Appointment of an Official Committee of Equity Holders Pursuant to 11 U.S.C. § 1102(a)(2) with the Court.

A HEARING will be held on the **13th day of December, 2005, at 11:00 a.m. in the United States Bankruptcy Court, Courtroom 1404, 75 Spring Street, S.W., Atlanta, Georgia 30303.**

Your rights may be affected by the court's ruling on these pleadings. You should read these pleadings carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.) If you do not want the court to grant the relief sought in these pleadings or if you want the court to consider your views, then you and/or your attorney must attend the hearing. You may also file a written response to the pleading with the Clerk at the address stated below, but you are not required to do so. If you file a written response, you must attach a certificate stating when, how and on whom (including addresses) you served the response. Mail or deliver your response so that it is received by the Clerk at least five business days before the hearing. The address of the Clerk's Office is Clerk, U.S. Bankruptcy Court,1340 United State Courthouse, 75 Spring Street, S.W., Atlanta, Georgia 30303. You must also mail a copy of your response to the undersigned at the address below.

SIGNATURES CONTINUED ON FOLLOWING PAGE

Dated: November 8, 2005

By: /s/ Gus H. Small
   Gus H. Small
   GA Bar No.: 653200
   3350 Riverwood Parkway
   Suite 1600
   Atlanta, Georgia 30339
   Telephone: (770) 857-4806
   Fax: (770) 857-4807
   E-Mail: gsmall@cpmas.com

Counsel for Ad Hoc Committee of Equity Holders

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| TECTONIC NETWORK, INC., and TECTONIC SOLUTIONS, INC., | CASE NO. 05-78966 CASE NO. 05-78955 |
| Debtors. | JUDGE MASSEY |
| | (Jointly administered Under CASE NO. 05-78966) |

## MOTION FOR AN ORDER APPROVING THE APPOINTMENT OF AN OFFICIAL COMMITTEE OF EQUITY HOLDERS PURSUANT TO 11 U.S.C. § 1102(a)(2)

The Ad Hoc Committee Equity Holders, by its undersigned counsel, for its Motion for an Order Approving the Appointment of an Official Committee of Equity Holders Pursuant to 11 U.S.C. § 1102(a)(2), respectfully represents as follows:

### Introduction

1.     The Ad Hoc Committee of Equity Holders (the "Ad Hoc Committee") is a group of public shareholders owning approximately fifty percent (50 %) of all non-insider owned stock of the Debtor Tectonic Network, Inc. ("Debtor" or "Tectonic Network").     The Ad Hoc Committee files this motion seeking the appointment of an official equity committee, for the purpose of investigating and pursuing claims which the Ad Hoc Committee believes may provide a meaningful recovery to shareholders.     The bulk of these claims are against current insiders of the Debtors who precipitated millions of dollars in losses.     The Committee believes the formation of an official equity committee is necessary to complete its investigation, identify all defendants, and pursue claims for the benefit of the estate.

1

2.    As explained in detail below, the Debtors' business was created by acquiring various businesses, many of which were owned or controlled by current insider(s) of the Debtors. Based upon preliminary information reviewed by the Ad Hoc Committee, it appears these businesses were purchased based upon false or misleading financial information. Because the Debtors' president and CEO, Mr. Arol Wolford, was also a principal shareholder of the acquired business, there was no oversight and/or incentive to bring the true nature and scope of the problems to light. The Ad Hoc Committee believes that Mr. Wolford and others caused the Debtors to spend millions of dollars on these businesses through deception and without any sound business justification.

3.    Based on the assets in the Estate, the Debtors are not "hopelessly insolvent" and appointment of an official equity committee in this case is essential to assure the public shareholders of the Debtors that their interests will be protected and value maximized. There are no official statutory committee's in this case, thus leaving shareholders and the estate inadequately represented.

4.    As set forth below, an official equity committee is needed for the following reasons:

> (i) to investigate and review possible fraud and wrongful conduct by Mr. Wolford and others by inducing the sale of his companies to the Debtors;
>
> (ii) to investigate related party and/or self-dealing transactions which diverted value from the Estate to insiders;
>
> (iii) to investigate significant payments to insiders within the year preceding the Petition Date; and
>
> (iv) to determine whether the officers and directors fulfilled their fiduciary duties in a manner consistent with applicable law.

2

475094-4

## BACKGROUND

5.      Tectonic, formerly Return on Investment Corporation, is a public company with approximately 13,867,054 issued and outstanding public shares. Tectonic Network had two primary operating subsidiaries through February 2005; (i) Tectonic Solutions, Inc. ("Tectonic Solutions"), a Debtor in this case and (ii) GO Software, Inc. ("GO Software").[1]

6.      On October 3, 2005 (the "Petition Date"), each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Each Debtor continues to operate as a debtor-in-possession pursuant to Section s 1107 and 1108 of the Bankruptcy Code. Each Debtor operates from its principal places of business located at 400 Perimeter Center Terrace, Suite 900, Atlanta, Georgia 30346, and at 2501 Ninth Street, #102 Berkeley, California 94710.

7.      No trustee or examiner has been appointed in this case. Likewise, no official statutory committees have been appointed.

8.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).

9.      The statutory predicates for the relief requested herein are sections 105 and 1102 of the Bankruptcy Code.

### Potential Claims Relating to Tectonic Solutions

10.      In late 2003, the Debtor Tectonic, under the leadership of its CEO Arol Wolford, acquired three businesses involved in providing building product information for the construction industry, paying aggregate consideration in excess of $6 million. Each of these businesses was also controlled by Wolford as a majority shareholder. The three companies were

---

[1] The Ad Hoc Committee is uncertain why GO is not a debor in this case.

475094-4

combined into Debtor Tectonic Solutions, a wholly-owned subsidiary of Tectonic. The acquisitions were:

> A.    On November 18, 2003, the Company and BBN Acquisition, Inc., ("BBN"), consummated a merger whereby BBN was merged with and into Tectonic Solutions, pursuant to an Agreement and Plan of Merger, dated as of October 29, 2003. Arol Wolford, the Debtors' CEO, President and Director, was a principal shareholder of BBN and his daughter was also a member of the Board of Directors of BBN.

> B.    On November 26, 2003, the Company purchased the operating assets of Construction Yellow Pages LLC, a ("CYP"), by agreement dated as of October 29, 2003. Mr. Wolford was a principal shareholder of CYP.

> C.    On January 2, 2004, the Company purchased substantially all of the operating assets of SpecSource.com, Inc., ("SpecSource"), by agreement, dated as of October 29, 2003. Mr. Wolford was the controlling shareholder of SpecSource and his daughter was also an employee of SpecSource.

11.    Wolford assured the Board of Tectonic and its shareholders that these businesses were promising and viable. During the first quarter of 2004, Tectonic Solutions achieved over $500,000 in advertising revenue, according to Wolford and others at the Company. In reliance on Wolford's promises and this apparent robust beginning, the board of Tectonic invested millions of dollars to develop the Tectonic Solutions subsidiary. The Board even decided to sell Tectonic's larger business, Go Software, for $13 million so that it could devote all of its corporate resources to Tectonic Solutions. The sale of Go Software was accomplished in February 2005, costing Tectonic more than $2 million in fees. The Board determined that the proceeds of the sale, after payment of fees and liabilities, would be devoted to Tectonic Solutions. During 2004, Tectonic also raised funds from shareholders to build this allegedly promising business.

12.    Within months after the sale of Go Software, Tectonic Solutions was in shambles. In October 2005, the business was sold for approximately $1.35 million – a shocking number in

475094-4

light of the multi-million dollar investment that Tectonic and its shareholders had made over the prior two years.

13.    According to our preliminary investigation, there is substantial evidence that the businesses comprised in Tectonic Solutions were acquired, maintained, and operated through numerous fraudulent representations, all under the supervision of Arol Wolford.  The fraud involved, among other things, misstatements concerning the websites offered by Tectonic Solutions as well as irregularities in the fulfillment of contractual obligations for its advertisements.  Upon information and belief, the true nature of these businesses was at all times known to Mr. Wolford and, had it been disclosed to Tectonic's Board of Directors and its shareholders, no rational person would have proceeded with the investment.  Wolford simply took three losing businesses, hyped their performance with false financial data, and transferred them to Tectonic in the desperate hope that throwing additional money at them would yield some positive benefit.

14.    Our preliminary investigation indicates that many individuals employed by Tectonic Solutions became aware of its severe problems during 2004 and early 2005 and attempted to take corrective action to preserve its operations.  These corrective actions resulted in a dramatic reduction in advertising revenue, with the first quarter of 2005 yielding less than $100,000 in revenue, a far cry from the $560,000 reportedly produced in 2004.  The revenue numbers for 2005 confirm that the figures for Tectonic Solutions in 2004 were false in all respects.

15.    Tectonic's Board received other storm warnings of trouble at this subsidiary, but apparently did nothing.  On September 27, 2004, the Debtors' then public auditor, BDO Seidman, LLP ("BDO"), advised management and the audit committee that certain audit

5

adjustments were necessary related to the Company's accounting for, inter-alia, "non-routine financing transactions" and accounting for certain customer contracts, related to the Company's newly acquired subsidiary (described above).   BDO reported that such problems appeared symptomatic of material weaknesses in internal controls in these areas.  BDO thereafter resigned as public auditor.

16.     In early 2005, a Sarbanes Oxley Act "whistleblower" filed a complaint alleging that the data used as part of the Debtor's sales and budgeting efforts at Tectonic Solutions were fraudulent or overstated, placing in jeopardy its customer base.  The Board apparently delegated Wolford to investigate this charge.  According to the Debtors' March 24, 2005 Form 8-K, "No evidence of any material adverse conditions has been found in connection with the employee's allegations, but if any is, the Company shall take prompt and appropriate action in response." This document was signed by Wolford, who was well aware of its falsity.

17.     Given the magnitude of the potential damages, the Estate may have viable claims in excess of $10 million.  Among other things, the investigation needs to determine not only Mr. Wolford's culpability, but to what extent the Directors of Tectonic either joined in his deceptive behavior, exercised total disregard for their fiduciary obligations, or were themselves victims of his deception.  Because the investigation focuses on bringing charges against dishonest officers and directors, it is clear that Mr. Wolford and his friends on the Board are disqualified.  Debtors have Directors & Officers' insurance policies with $10,000,000 in coverage, which may supply a source of recovery for the Estate.

18.     In light of the possibility of a large recovery, the Court should appoint an Equity Committee so that the investigation may be completed as soon as possible.

475094-4

## Additional Questionable Insider Payments

19.     Several other related party transactions appear to present viable claims.

20.     In connection with the SpecSource asset purchase, the Debtors, inter alia, entered into a non-interest bearing seller-note, payable in the amount of $533,000 (the "SpecSource Note"). Upon information and belief, the Company also simultaneously entered into a non-compete agreement paying $360,000 to one of the stockholders of SpecSource (the "Non-Compete Payment"). The Ad Hoc Committee believes that the Non-Compete Payment and SpecSource Note were procured through fraudulent statements regarding SpecSource's business. Accordingly, a valid claim exists to recapture these funds.

21.     The Ad Hoc Committee also seeks to investigate other issues surrounding repayment of the SpecSource Note.

22.     On December 6, 2004, the Debtors entered into an Asset Purchase Agreement with VeriFone, Inc. ("VeriFone") pursuant to which VeriFone purchased substantially all of GO Software's assets. The sale closed on February 28, 2005. Under the terms of the Asset Purchase Agreement, VeriFone paid GO $13 million in cash at closing, and VeriFone was obligated to pay GO Software up to an additional $2 million depending upon future events.

23.     According to the Debtors June 30, 2004 Form 10KSB, filed with the SEC, the SpecSource Note was "payable to one of the stockholders of SpecSource." Upon information and belief, this "stockholder" was, in fact, Mr. Arol Wolford, the President, CEO, and Director, of the Debtors.

24.     As a result of the sale of the GO Software assets, a total of $423,124 was paid under the SpecSource Note and, upon information and belief, "change in control" payments in the amount of $360,000 are to be made to yet another insider (the "Change in Control

7

Payment"). (The "Non-Compete Payment, SpecSource Note Payment and Change in Control Payment are collectively referred to as the "Insider Payments").

25.    However, according to the Form 10KSB, payment under the SpecSource Note was only required if "the Company has cash, net of debt obligations exceeding $5.25 million, on its quarterly balance sheet." It is apparent that the $5.25 million threshold was never met, and the Ad Hoc Committee believes this payment must be investigated. The Debtors' March 31, 2005 balance sheet, filed with the June 28, 2005 Registration Statement, reveals $7,855,622 in cash and cash equivalents, with $4,646,624 in total current liabilities, and an additional $1,175,693 in long term debt.

26.    The Change in Control payment is also suspect. There was never any change in Debtor's board and there was no reason to make a change in control payment.

27.    Equally disturbing, as recently disclosed in the Tectonic Network Statement of Financial Affairs, Schedule 3(b) thereto, filed with the Court, while Tectonic Network had gross revenues of approximately $1.22 million for the year ending June 2005, payments within the last year to insiders exceeded $1.572 million (salary, bonuses, note payments). This disclosure reveals self dealing and an unabashed stripping of value from shareholders.

28.    An official equity committee must be formed to investigate and, if cause exists, to recover these Insider Payments.

### Additional Value for the Estate

29.    The information provided by Debtors confirms that it is likely that creditors will be paid in full. According to Debtor's Exhibit 2 (annexed hereto), the aggregate unsecured obligations of the Debtors are approximately $1.581 million and upon the sale of Tectonic Solutions approximately $533,000 will be available to pay these claims, leaving a balance of

$1.028 million. However, the Ad Hoc Committee has identified at least $425,000 in payments to insiders among the unsecured claims that are questionable, including further payments to Wolford's company, SpecSource. After eliminating these questionable claims, the aggregate unsecured claims would be approximately $800,000.

30.     The Go Software Sale Agreement may result in future payments of $1.5 million, if certain contingencies are met. In addition, as set forth above, the Ad Hoc Committee has identified approximately $1 million in questionable payments related to the tainted acquisitions or to insiders. Recoveries on these claims would inure to the benefit of the equity, after payment in full of all creditors. In addition, Debtors' most significant asset may be its claims related to the tainted acquisitions. Because the equity holders have, by far, the greatest interest in this claim, it is appropriate that the committee be formed to investigate the claim and pursue recoveries.

## I.

### BASIS FOR RELIEF

### THIS COURT SHOULD APPOINT AN OFFICIAL EQUITY COMMITTEE

#### *Applicable Legal Standard for the Appointment of an Official Equity Committee*

31.     Under Bankruptcy Code § 1102(a)(2), upon the request of a party-in-interest, the Court may order the appointment of a committee of equity security holders if necessary to assure "adequate representation" thereof. Because Bankruptcy Code § 1102 does not define what constitutes "adequate representation" of equity security holders, it is determined on a case-by-case basis. In re Wang Laboratories, Inc., 149 B.R. 1, 2 (Bankr. D.Mass. 1992). To make that determination, courts have considered the following factors: (1) the number of shareholders; (2)

9

the complexity of the case; (3) the solvency of the debtor; (4) whether the cost to the estate outweighs the adequate representation interest of shareholders; and (5) whether the interests of shareholders are already represented.  See In re Exide, 2002 U.S. Dist. LEXIS 27210 (D. Del. Dec. 23, 2002) (Robinson, J.); Wang Laboratories, Inc., 149 B.R. at 2; In re Eastern Me. Elec. Coop., 121 B.R. 917, 932 (Bankr. D. Me. 1990); In re Beker Industries corp., 55 B.R. 945 (Bankr. S.D.N.Y. 1985).  No one factor is dispositive, and the relative weight that should be accorded to the various factors depends on the circumstances of the particular reorganization case. In re Kalvar Microfilm, Inc., 195 B.R. 599, 600 (Bankr. D. Del. 1996).[2]

32.    As Collier's on Bankruptcy states, "The key consideration in determining whether to form an equity committee should be whether formation is more likely accelerate or impede the reorganization process." Collier's on Bankruptcy, (15th Edition) at 1102-23

33.    This case clearly meets the standards for the appointment of an Equity Committee.

---

[2] Equity committee have been appointed in at least twenty-five cases in twelve separate jurisdictions across the nation since 2000.  See THCR/LP Corporation (Case Nos. 04-46898 through 04-46925 D.N.J.); Interstate Bakeries Corporation (Case No. 04-45814 W.D. Mo.); Bush Industries (Case No. 04-12295 W.D.N.Y); Impath (Case No. 03-16113 S.D.N.Y.); Solutia (Case No. 03-17949 S.D.N.Y.); Peregrine Systems, Inc. (Case No. 02-12740 D.Del.); Footstar (Case No. 0422350 S.D.N.Y.); Cone Mills (Case No. 03-12944 D. Del); Gadzooks (Case No. 04-31806 N.D. Tex.); Federal Mogul Corporation (Case No. 01-10578, D. Del.); Seitel (Case No. 03-12227 D. Del.); Exide Technologies (Case No. 02-11125 D. Del.); Imperial Distributing (Case No. 01-00140 D. Del.); Adelphia Communications Corporation (Case No. 02-41729 S.D.N.Y.); Finova Corporation (Case No. 01-00697 D. Del.); Heilig-Meyers (Case No. 00-34533, E.D. Va.); Coram Healthcare Corp. (Case No. 00-03299 D. Del.); Pathmark Stores, Inc. (Case No. 02-2963 D. Del.); American Banknote (Case No. 99-11577, S.D.N.Y.); Kmart Corporation (Case No. 02-02474 N.D. Ill.); Comdisco (Case No. 01-24795, N.D. Ill.); LTV Steel Company (Case No. 00-43866 N.D. Ohio); Amresco, Inc. (Case No. 01-35327 N.D. Texas).  Equity Committees were appointed in at least the following cases across the nation prior to 2000; Harnischfeger Industries (D. Delaware); Continental Airlines Holdings, Inc. (D. Delaware); El Paso Electric Company (N.D. Texas); America West Airlines (D. Arizona); Roses Stores, Inc. (D. N. Carolina); Sizzler International (C.D. California); Caldor Corporation (S.D.N.Y.); Leslie Fay Companies (S.D.N.Y.); Johns-Manville (S.D.N.Y.); Wang Laboratories (D. Mass.); Beker Industries (S.D.N.Y.); Evans Products (S.D. Florida); and Columbia Gas (D. Delaware).

10

**I.**    **The Debtors Have Many Public Shareholders**

34.    Tectonic is a publicly traded company. According to the bankruptcy petition, there are 13,867,054 million shares outstanding. Of this amount, 6,276,533 shares are held by insiders. Upon information and belief, the actual number of public shareholders exceed 350.

35.    Thus, the only way to ensure that the diverse shareholder body as a whole receives meaningful representation in this case is to appoint an equity committee to represent their interests.

36.    Moreover, the members of the Ad Hoc Equity Committee cannot protect the rights of all shareholders because they owe no fiduciary duty to the entire group. They are not a substitute for an official committee, and the fact that they were able to form the Ad Hoc Equity Committee and file this Motion should not be used as a reason to deny official committee status. As the court in <u>Beker</u> noted:

> The members of the Ad Hoc Equity Committee, absent official status, do not owe a fiduciary duty to other shareholders to protect the interests of the entire group numbering (as set forth below) hundreds of holders. As such, even though other shareholders may assume that the members of the Ad Hoc Equity Committee will act in the best interest of equity holders generally, there is no obligation for them to do so – individual, smaller, or non-institutional shareholder may be left unprotected.

**II.**    **The Cost to the Estate is Not Outweighed By the Benefits of Adequate Representation**

37.    Appointment of an equity committee is important not only to protect a particular group of shareholders but, as Congress recognized, <u>to assure public investors that their interests</u> will be protected. "Such assurances should not be left to a plan negotiated by a debtor in distress and senior or institutional debtors who will have their own best interest to look after." S. Rep. No. 989, 958 H. Cong. 2d Sess. 10 (1978), reprinted in 1978 U.S. Code & Cong. News 5787,

5796. One of a committee's most important functions is to negotiate the plan. <u>Johns-Mansville</u>, 68 B.R. at 161; <u>see also</u> 11 U.S.C. § 1103(c)(3). As the legislative history indicates, an important purpose of an equity committee is "to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtors would expect to do business, at the expense of small common and scattered public investors." <u>Id</u>. Thus, appointment of an Official Committee of Equity Security Holders is the appropriate and Congressionally recognized safeguard to protect all of the public investors in this Company.

38.    Here, the cost to the estate is not outweighed by the benefits of appointing an official equity committee as it appears that the <u>best</u> chance shareholders have to receive a meaningful distribution is only through the appointment such an official committee. Moreover, as the Court may recall, there exists a substantial officer and director insurance policy which could provide the basis for a significant distribution.

**III.    The Case is Factually and Legally Complex**

39.    As mentioned above, the facts of this case are complex and demand investigation and review. This case arrived in bankruptcy court saddled with significant liquidity issues, accounting irregularities, whistle blower allegations, insider/self dealing transactions and a conflicted internal management team, lead by insider shareholders. While the purpose of the Debtors' chapter 11 filing was apparently to allow it to sell substantially all of its assets, participation of all key constituents, included equity holders (unaffiliated with management), is necessary to assure that the adequate exploration of all alternatives will actually occur and that an investigation into the apparent significant causes of action is conducted.

40.    In this vein, it is significant to note that the Debtors' Amended Sale Motion reveals that certain insiders may work for the stalking horse bidder. This revelation alone,

12

together with the integrity of a court sanctioned sale, mandates oversight by an official committee.

## IV.    The Shareholders' Interest Are Not Adequately Represented

41.    In this case, the non-insider equity holders are a primary, if not the primary, stakeholders. However, non-insider shareholders' interests will not be adequately protected by any other party in these cases. Neither the Debtors nor the insider shareholders can or will adequately represent the interests of non-insider equity holders here. Indeed, many of the insider-shareholders have conflicts of interest in investigating and pursuing causes of action against themselves.

42.    In that regard, the non-insider shareholders cannot trust or rely upon the Debtors to protect their interests. Simply said, an estate fiduciary is essential. Because there has been no official creditors committee appointed in this case, and there are no other official committees to substitute as adequate representatives of the estates and public shareholders, an official equity committee is required to ensure that shareholders' interests are adequately represented.

43.    Simply put, an official Equity Committee should be appointed, as equity holders need official status with a seat at the negotiating table in order to assist in maximizing value for all shareholders and to interact with the other parties-in-interests. The integrity of the Chapter 11 process requires that an official Equity Committee be formed now, before the Debtors take further action pursuant to the scheme to sell the remaining assets in a way that negatively impacts the potential value of the Debtors' enterprise and the claims and interests asserted against that value. If the Court delays ordering the appointment of an Equity Committee, the course for the restructuring of the Debtors, which has already began, may be completed, all to the detriment of the Debtors' existing owners.

13

### V.    Equity Exists, as the Debtors Are Not Hopelessly Insolvent

44.    The most commonly applied legal standard for determining whether equity exists in this context is analyzing whether the debtor is "hopelessly insolvent." See In re Exide, 2002 U.S. Dist. LEXIS 27210 at *4-5 (determining that appointment of an official committee of equity security holders was necessary to assure adequate representation where the debtor was not hopelessly insolvent; court upheld decision to appoint equity committee even "with the admittedly speculative prospects for a recovery for equity"); Wang Laboratories, 149 B.R. at 2 (same); Beker, 55 B.R. at 950 (same). The appropriate test is not whether recovery to the Debtors' shareholders is guaranteed, but merely whether there is "credible evidence." See Exide, 2002 U.S. Dist. LEXIS 27210 at *5-6. See also In re Emons Indus., Inc. 50 B.R. 692,694 (Bankr. S.D.N.Y. 1985) (appointing equity committee where legitimate).

45.    Here, the facts present ample evidence that equity exists and the Debtors are not hopelessly insolvent. First, the Tectonic Network chapter 11 Petition discloses $6,014,527 in total assets, and $5,353,414 in total liabilities. Second, the estate may be entitled to the remaining $1,500,000 from the GO sale. Finally, the remaining estate assets are likely causes of action for (i) recovery of the Insider Payments (which are not less than $1.25 million) (ii) breach of fiduciary duty (iii) other potential actions against insiders, for which there is no estate fiduciary capable of investigating and pursuing. Given the Debtors $10 million officer and director policy, the Ad Hoc Committee believes a meaningful recovery is achievable.

### Conclusion

46.    The non-insider shareholders have the real economic stake in this case, and they should have official status as an official committee to protect and preserve the interests of the

estate and its shareholders.  For the reasons described above, the Ad Hoc Committee respectfully

requests that an official committee be appointed.

Dated:      November 8, 2005

> **OLSHAN GRUNDMAN FROME ROSENZWEIG
> & WOLOSKY LLP**
>
> Thomas J. Fleming, Esq.
> Michael S. Fox, Esq.
> Adam H. Friedman, Esq.
> Park Avenue Tower
> 65 East 55th Street
> New York, New York 10022
> Telephone: (212) 451-2300
> Facsimile: (212) 451-2222
>
> - AND -
>
> **COHEN POLLOCK MERLIN AXELROD
> & SMALL, P.C.**
>
> By:  /s/ Gus H. Small_____
>     Gus H. Small
>     GA Bar No.: 653200
>     3350 Riverwood Parkway
>     Suite 1600
>     Atlanta, Georgia 30339
>     Telephone: (770) 857-4806
>     Fax: (770) 857-4807
>     E-Mail: gsmall@cpmas.com
>
> Counsel for Ad Hoc Committee of Equity Holders

15

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| TECTONIC NETWORK, INC., and<br>TECTONIC SOLUTIONS, INC., | CASE NO. 05-78966<br>CASE NO. 05-78955 |
| Debtors. | JUDGE MASSEY |
| | (Jointly administered Under<br>CASE NO. 05-78966) |

## CERTIFICATE OF SERVICE

I, Gus H. Small, of Cohen Pollock Merlin Axelrod and Small, P.C., certify that I am over the age of 18 and that on November 8, 2005, I served a copy of the Motion for an Order Approving the Appointment of an Official Committee of Equity Holders Pursuant to 11 U.S.C. § 1102(a)(2), respectfully represents as follows: by first class U.S. Mail, with adequate postage prepaid on the following persons or entities at the addresses stated:

Gregory D. Ellis
Lamberth, Cifelli, Stokes & Stout, PA
3343 Peachtree Road, NE Suite 550
Atlanta, GA 30326-1022


Leroy Culton
U.S. Trustee
362 Richard Russell Bldg.
75 Spring Street, SW
Atlanta, GA 30303


SIGNATURES CONTINUED ON FOLLOWING PAGE

Dated:   November 8, 2005

**OLSHAN GRUNDMAN FROME ROSENZWEIG**
**& WOLOSKY LLP**

Thomas J. Fleming, Esq.
Michael S. Fox, Esq.
Adam H. Friedman, Esq.
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Telephone:  (212) 451-2300
Facsimile: (212) 451-2222

- AND -

**COHEN POLLOCK MERLIN AXELROD**
**& SMALL, P.C.**

By:  /s/ Gus H. Small
Gus H. Small
GA Bar No.: 653200
3350 Riverwood Parkway
Suite 1600
Atlanta, Georgia 30339
Telephone:  (770) 857-4806
Fax: (770) 857-4807
E-Mail: gsmall@cpmas.com

Counsel for Ad Hoc Committee of Equity Holders

# EXHIBIT  B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | **CHAPTER 11** |
| | : | |
| **TECTONIC NETWORK, INC.,** | : | **CASE NO.: 05-78966** |
| **TECTONIC SOLUTIONS, INC.,** | : | **CASE NO.: 05-78955** |
| | : | **(Jointly Administered** |
| | : | **under Case No.: 05-78966)** |
| | : | |
| **DEBTORS.** | : | **JUDGE MASSEY** |

_____

**UNITED STATES TRUSTEE'S OBJECTION
TO MOTION FOR APPOINTMENT OF AN
OFFICIAL COMMITTEE OF EQUITY HOLDERS**

The United States Trustee for Region 21 in furtherance of her administrative responsibilities imposed pursuant to 28 U.S.C. § 586(a) files this Objection to Motion for Appointment of An Official Committee of Equity Holders, and in support therefor states as follows:

1.    Tectonic Network, Inc., and Tectonic Solutions, Inc. (the "Debtors"), filed separate, voluntary petitions under Chapter 11 of the Bankruptcy Code on October 3, 2005, and remain as debtors-in-possession.

2.    Tectonic Network, Inc., effectively, operates as the holding company for Tectonic Solutions, Inc.

3.    By Order entered October 13, 2005, the court approved the joint administration of the Debtors' cases.

4.    The Schedules filed by Tectonic Solutions, Inc., show secured liabilities in the amount of approximately $827,674.00 with no unsecured and no priority liabilities. Tectonic Network, Inc., values its assets at $0.00.

5.    The Schedules filed by Tectonic Network, Inc., show secured liabilities in the amount

of approximately $827,674.00 (apparently, held jointly and severally with Tectonic Solutions, Inc.), unsecured liabilities in the amount of approximately $2,025,651.00, and priority liabilities in the amount of approximately $21,888.00. Tectonic Network, Inc., values its assets at approximately $2,910,411.00.

6.    Accordingly, the Debtors cases represent relatively small cases.

7.    Determining that reorganization is not possible, the Debtors filed that certain Motion for Order (1) Authorizing Sale of Assets Free and Clear of Liens, Claims and Encumbrances Under Section 363 of the Bankruptcy Code; (2) Approving Terms for Submission of Competing Offers and Auction Procedures etc. (the "Sale Motion") pursuant to which the Debtors sought approval for the sale of substantially all of their assets to an entity called Boston Equities Company ("BEC") for a price of approximately $2,000,000.00 with credit given BEC for amounts outstanding under a post-petition loan agreement between the Debtors and BEC.

8.    By Order entered October 12, 2005, the court approved the Sale Motion.

9.    A so-called Ad Hoc Committee of Equity Holders (the Ad Hoc Committee") has now filed a Motion for An Order Approving the Appointment of An Official Committee of Equity Holders.

10.    The United States Trustee does not believe that the appointment of a Committee of Equity Holders is in the best interest of creditors and the Debtors' estates.

11.    11 U.S.C. § 1102 grants the United States Trustee certain authority with respect to the appointment of committees in chapter 11 cases. Section (a)(1) of this provision directs the United States Trustee to form committees of unsecured creditors in chapter 11 cases and authorizes the United States Trustee to exercise her discretion to appoint other committees. Section (a)(2) authorizes a party in interest to seek to compel the United States Trustee to appoint other

committees, including a committee of equity holders, "if necessary to assure adequate representation."

12.    Clearly, congress envisioned that the appointment of committees other than committees of unsecured creditors would be an extraordinary occurrence. Therefore, any party seeking to compel the United States Trustee to appoint an equity committee has the burden of demonstrating that such a committee is necessary. In re Edison Bros. Stores, Inc., 1996 WL 534853; In re Johns-Manville Corp., 68 B.R. 155, 158 (S.D.N.Y. 1986).

13.    The court must consider many factors to determine whether or not the appointment of an equity holders committee is necessary. Such factors should include whether the debtor is hopelessly insolvent (*In re Emons Indus, Inc.*, 50 B.R. 692 (Bankr. S.D.N.Y. 1985)); whether the stock is publicly traded and widely held (*In re Wang Labs.*, Inc., 149 B.R. 1 (Bankr. D. Mass. 1992) and *In re Johns-Manville Corp.*, 68 B.R. 155 (S.D.N.Y. 1986)); whether a case is complex (financially as compared with operationally) (*In re Edison Bros. Stores, Inc.*, 1996 WL 534853 (D. Del. Sept. 17, 1996)); timeliness of the request for the committee (*In re Kalvar Microfilm, Inc.*, 195 B.R. 599 (Bankr. D. Del. 1996)); additional cost to the estate, *id.*; and alternative sources of adequate representation (*Edison Bros. Stores*, Inc., supra; *In re Hills Stores Co.*, 137 B.R. 4 (Bankr. S.D.N.Y. 1992)).

14.    As previously mentioned, the Debtors' cases are small cases and, therefore, not particularly complex.

15.    The Ad Hoc Committee is not without adequate representation. The Debtors' boards of directors are still in place and the directors of such boards still owe a fiduciary duty to the equity holders once the Debtors became insolvent and filed bankruptcy petitions. Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985); In re Lionel, 30 B.R. 327 (Bankr.

S.D.N.Y. 1983).

16.    The Ad Hoc Committee alleges in its motion that an official committee of equity holders needs to be appointed because certain causes of actions may exist against the Debtors' directors and officers which could produce sufficient assets to pay claims of the equity holders. Since it does not appear that the Ad Hoc Committee has even done any discovery with respect to alleged claims against the Debtors' directors and officers, any such statements by the Ad Hoc Committee are mere speculation which, if pursue, may fritter away substantial portions of the limited resources of the Debtors' estates.

Wherefore, the United States Trustee prays for the entry of an Order denying the Ad Hoc Committee's Motion for the Appointment of An Official Committee of Equity Holders and for such further relief as the court deems appropriate.

FELICIA S. TURNER
UNITED STATES TRUSTEE
Region 21

By: s/ Leroy Culton
Leroy Culton
Trial Attorney
Georgia Bar No.: 170919

United States Trustee
362 Richard Russell Federal Building
75 Spring Street
Atlanta, GA 30303
(404) 331-4437

## CERTIFICATE OF SERVICE

_____I Hereby Certify that a true and correct copy of the United States Trustee's Objection to

Motion for Appointment of An Official Committee of Equity Holders was sent by First Class Mail

and E-Mail to the following parties in interest:

Gus H. Small, Esq.
Cohen, Pollock, Merlin, et al.
3350 Riverwood Parkway
Suite 1600
Atlanta, GA 30339
gsmall@cpmas.com

William D. Matthews, Esq.
Gregory D. Ellis, Esq.
Lamberth, Cifelli, Stokes, et al.
3343 Peachtree Road, N.E.
Suite 550
Atlanta, GA 30326-1022
wdm@lcsslaw.com
gellis@lcsslaw.com

Done this 9th day of December, 2005.

By: s/ Leroy Culton _____
        Leroy Culton
        Trial Attorney

# EXHIBIT  C

**ENTERED ON DOCKET**

**APR 1 3 2006**

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| TECTONIC NETWORK, INC., and | : | CASE NO. 05-78966 |
| TECTONIC SOLUTIONS, INC., | : | CASE NO. 05-78955 |
| | : | |
| Debtors. | : | JUDGE MASSEY |
| | : | (Jointly Administered Under |
| | : | CASE NO. 05-78966) |
| | : | |

**STIPULATION AND CONSENT ORDER (a) RESOLVING CERTAIN
MOTIONS BY THE AD HOC COMMITTEE (DOCKET # 119),
(b) LIFTING THE AUTOMATIC STAY TO PERMIT MEMBERS OF THE AD HOC
COMMITTEE OF EQUITY HOLDERS THE RIGHT TO PURSUE CLAIMS AGAINST
THE DEBTORS' OFFICERS AND DIRECTORS AND
(c) AUTHORIZING THE DEBTORS TO ABANDON SUCH CLAIMS**

WHEREAS, the Ad Hoc Committee of Equity Holders (the "Committee") whose

members are shareholders of one of the Debtors, Tectonic Network, Inc. ("Network") has moved

this Court for an order converting the within Chapter 11 cases to Chapter 7 (the "Committee

Conversion Motion", Docket # 59);

WHEREAS, the Debtors have moved this Court for an order authorizing them (1) to

settle certain accounts receivable and (2) to license certain source codes (the "Debtors' Accounts

Motion") and the Committee has filed an Objection thereto (the " Committee's Objection");

WHEREAS, the Committee has moved this Court for an Order approving the

Appointment of an official committee of equity holders ("Equity Committee Motion") and the

Debtors have objected thereto, which motion has been adjourned from time to time;

~4392047.doc

WHEREAS, the Equity Committee Motion sought authority to investigate and pursue any and all claims against the Debtors' directors and officers, including but not limited to claims for fraud, breach of fiduciary duty and breach of the duty of care and loyalty which were assertable prior to the filing of these chapter 11 cases, and claims for fraudulent conveyances (the "Claims"). For the purposes of this Stipulation and Consent Order, the Claims do not include the cause of action the Estate has or may have against the Debtors' directors and officers for preferential transfers pursuant to either Bankruptcy Code § 547 or any applicable state law authorizing the recovery of such preferential transfers (the "Preference Claims");

WHEREAS, the Debtors filed a Joint Plan of Reorganization, dated March 24, 2006 (as same may be amended from time to time, the "Plan"). The Plan provided for releases and exculpation (the "Releases") of all claims against officers and directors, including the Claims, to which Releases the Committee objects;

WHEREAS, the Estate and the Debtors believe it is impractical and not an effective use of Estate resources to prosecute the Claims, have declined to do so and do not oppose the lifting of the automatic stay to permit the prosecution of same by the members of the Committee, either individually or by class action;

WHEREAS, the Debtors, their bankruptcy estate (the "Estate") and the Committee have negotiated in good faith to resolve their differences with regard to the three above-referenced motions and wish to resolve those differences by the withdrawal of the Committee Conversion and Equity Committee Motions, the withdrawal of the Committee Objection and the covenants and agreements set forth below;

-2-

~4392047.doc

WHEREAS, the relief granted herein is in the best interested of the estate and is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings herein, and upon due deliberation and sufficient cause appearing;

It is hereby stipulated and agreed by and between the Debtors, the Estate and the Committee and Ordered by the Court as follows.

1.        The above recitals are incorporated herein.

2.        The Committee hereby withdraws the Conversion Motion without prejudice, and the Equity Committee Motion and the Committee Objection with prejudice.

3.        Pursuant to Bankruptcy Code §§ 105, 362, 363 and 554(a), and Bankruptcy Rules 4001 and 9019, the automatic stay of 11 U.S.C. Section 362 shall be terminated to permit the members of the Committee as shareholders of Network to pursue the Claims (which excludes the Preference Claims) against the Debtors' directors and officers in a forum outside of the within chapter 11 proceedings.

4.        Upon the entry of this Order, and subject to objection as set forth below, the Claims shall be deemed to be abandoned.

5.        The Estate shall not be responsible or liable for any costs incurred by the Committee or its members in their pursuit of the Claims. Unless a member of the Committee, no officer, director or employee of the Debtors, may share in any recovery from any of the Claims and recoveries from the

~4392047.doc

Claims shall inure solely to the benefit of the Committee or its members subject to any applicable law requiring the Committee to share any recoveries with similarly situated members of the class.

6. All Preference Claims against officers, directors and employees are retained by the Estate subject to the disposition it deems proper and subject to further order of this court.

7. In the event circumstances arise in this or any future proceeding or action which, in the sole discretion of the Committee and/or its members pursuing the Claims, require the Estate or the Debtors to execute any further documents or the Court to enter any further orders to formally assign, deliver or abandon the Claims to the Committee and/or its members, the Estate and the Debtors shall execute such documents, and fully cooperate with the Committee to effectuate such relief.

8. This Court shall retain jurisdiction to take any future action necessary to effectuate any action which permits the Committee to pursue the Claims, including without limitation supplementing or amending this order to effectuate such relief in favor of the Committee's derivative right to pursue the Claims.

9. Neither the Plan nor any order of this or any other court, including a confirmation order of the Plan, may approve any releases of the Claims, which Claims are hereby preserved for the benefit of the Committee. No Plan may be confirmed which is inconsistent with the terms hereof.

-4-                                              ~4392047.doc

10.         Debtors' counsel shall serve this Stipulation and Consent Order on all creditors of the Debtors, all parties who have filed Notices of Appearance, the United States Trustee, all current and past officers and directors of the Debtors who served at any time on or after October 1, 2001 and all shareholders of Network on or before April 14, 2006.

11.         Any person who objects to the terms of this Stipulation and Consent Order **shall file** a written objection, stating the grounds therefore, on or before the close of business[1] on the 17th day of May, 2006 with the Clerk, U.S. Bankruptcy Court, 1340 U.S. Courthouse, 75 Spring Street, S.W., Atlanta, Georgia 30303-3367, and **shall serve** a copy on the attorneys for Debtors and attorneys for the Committee at the addresses set forth below.

12.         Any objection not timely filed and served as set forth herein is deemed waived.  If no objection is filed as set forth above, this Stipulation and Consent Order shall thereupon stand approved without further notice or hearing.

---

[1]Objections filed electronically may be filed up to 11:59:59 p.m.  All other objections must be filed by delivery to the Clerk's Office at or before 4:00 p.m.

~4392047.doc

13.    If an objection is filed, a hearing will be held in Courtroom1404, U.S. Courthouse, 75 Spring Street, S.W., Atlanta, Georgia at 10:00 a.m. on the 23rd day of May, 2006.

It is **SO ORDERED** this ___12___ day of April, 2006.

_____
JAMES E. MASSEY
UNITED STATES BANKRUPTCY JUDGE

Prepared by and Consented to:

OLSHAN GRUNDMAN FROME
  ROSENZWEIG & WOLOSKY LLP
Attorneys for the Ad Hoc Committee of Equity
Holders
    Thomas J. Fleming, Esq.
    Michael S. Fox, Esq.
    Adam H. Friedman, Esq.
    Park Avenue Tower
    65 East 55th Street
    New York, New York 10022
    Telephone:  (212) 452-2300
    Facsimile:  (212) 451-2222

-AND-

COHEN POLLOCK MERLIN AXELROD
  & SMALL, P.C.

By: /s/ Gus H. Small
    Gus H. Small
    GA Bar No.: 653200
    3350 Riverwood Parkway, Suite 1600
    Atlanta, Georgia 30339
    Telephone: (770) 857-4806
    Fax: (770) 857-4807
    E-Mail: gsmall@cpmas.com

Prepared by and Consented to:

LAMBERTH, CIFELLI, STOKES
  & STOUT, P.A.
Attorneys for Debtors

By: /s/ Gregory D. Ellis
    Gregory D. Ellis
    Georgia Bar No. 245310
    William D. Matthews
    Georgia Bar No. 480865
    3343 Peachtree Road NE,
    Suite 550
    Atlanta, Georgia 30326-1022
    Telephone:  (404) 262-7373
    E-Mail: gellis@lcsslaw.com

**Identification of parties to be served pursuant to BLR 9013-3(c)(2) NDGa.:**

Gregory D. Ellis, Lamberth, Cifelli, Stokes & Stout, P.A., 3343 Peachtree Rd., NE, Suite 550, Atlanta, Georgia 30326

-6-

~4392047.doc

# EXHIBIT  D

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11-JEM |
| | ) | |
| TECTONIC NETWORK, INC. | ) | CASE NO. 05-78966 |
| TECTONIC SOLUTIONS, INC. | ) | CASE NO. 05-78955 |
| | ) | |
| | ) | (Jointly administered under |
| | ) | 05-78966) |
| _____ | ) | |

**FIRST AMENDED DISCLOSURE STATEMENT WITH REGARD TO
CHAPTER 11 PLAN OF REORGANIZATION
SUBMITTED BY TECTONIC NETWORK, INC. AND
TECTONIC SOLUTIONS, INC.
DEBTORS AND DEBTORS IN POSSESSION**

May 22, 2006

Filed by:

TECTONIC NETWORK, INC. AND
TECTONIC SOLUTIONS, INC.
Debtors and Debtors in Possession

Attorneys for Debtors:

Gregory D. Ellis
Georgia Bar No. 245310
LAMBERTH, CIFELLI, STOKES
& STOUT, P.A.
3343 Peachtree Road, NE, Suite 550
Atlanta, Georgia 30326
(404) 262-7373

202223.wpd

## I.  SUMMARY OF PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS

### A.  Introduction and Overview

Tectonic Network, Inc. and Tectonic Solutions, Inc., as debtors and debtors-in-possession in the above-captioned chapter 11 case, submits this Disclosure Statement pursuant to Section 1125 of the United States Bankruptcy Code with respect to the First Amended Plan of Reorganization filed by the Debtors and dated May 22, 2006.  A copy of the Plan is attached hereto as **Appendix "A"**.

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is Impaired under the Plan, to make an informed decision in exercising your right to accept of reject the Plan.

On or about May 23 , 2006, after notice and a hearing, the Bankruptcy Court entered an Order approving this Disclosure Statement as containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable investor, typical of the Holder of Claims Impaired and entitled to vote under the Plan, to make an informed decision to accept or reject the Plan.

APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED N THIS DISCLOSURE STATEMENT.

### B.  Classification and Treatment of Claims

The Bankruptcy Code affords certain types of Claims a priority over other Claims.  In compliance with the Bankruptcy Code, the Plan divides Claims against and Interests in the Debtors  into seven (7) different Classes.

202223.wpd

The classification of Claims under the Plan is as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Secured Claims | Unimpaired | No |
| 2 | Priority Claims | Unimpaired | No |
| 3 | Prepetition Lender Claim | Impaired | No |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Unsecured Convenience Claims | Impaired | Yes |
| 6 | Subordinated Claims | Impaired | No |

The classification of Interests under this Plan are as follows:

| | | | |
|---|---|---|---|
| 7A | Tectonic Interests | Impaired | No |
| 7B | Solutions Interests | Unimpaired | No |

A summary of the Classes and the treatment of each Class is set forth below:

| Class | Treatment | Estimated Claims and Recovery |
|---|---|---|
| Class 1<br>Other Secured Claims | The legal, equitable and contractual rights of the Holders of Class 1 Claims are unaltered by the Plan. | The Debtors do not believe that any claims in this Class exist<br><br>Recovery<br><br>100% |
| Class 2<br>Priority Claims | All Priority Claim shall be paid in full, in cash, on or before the Effective Date | $10,000<br><br>Recovery<br><br>100% |
| Class 3<br>Prepetiton Lender Claim | The Holder of the Class 3 Claim (Laurus) shall receive any payments that it is entitled to under the Laurus Settlement Agreement. | $120,000<br><br>Recovery<br><br>Contingent on Go Earnout |

-3-

202223.wpd

| | | |
|---|---|---|
| Class 4<br>General Unsecured Claims | The Debtors shall make an initial payment on the Effective Date of $100,000 less any amounts necessary to pay Class 2 Priority Claims and Class 5 Unsecured Convenience Claims and four additional annual payments of $100,000 each payable on July 1, 2007, 2008, 2009, and 2010. Each Holder of a Class 4 Claim shall receive five (5) annual payments in the amount of that Holder's Pro-Rata share of each payment. | Estimated Claims<br><br>$1,000,000<br><br>Estimated Recovery<br><br>44% |
| Class 5<br>Unsecured Convenience Claims | Each Class 5 Unsecured Convenience Claim shall receive, in full and final satisfaction of such Holder's Allowed Class 5 Claim, a Cash payment in an amount equal to twenty-five percent (25%) of such Holder's Allowed Class 5 Unsecured Convenience Claim. | Claim Amount<br>$80,000<br><br>Recovery<br>25% |
| Class 6<br>Subordinated Claims | The Holders of Subordinated Claims will receive no distributions on account of their respective Claims and all rights with respect thereto will be cancelled and fully extinguished on the Effective Date of the Plan. | Claim Amount<br>$762,100.00 plus administrative claims for salary and directors fees<br><br>Recovery<br>0% |

202223.wpd

| Class 7 Interests | Reorganized Tectonic shall retain its Interests in Solutions. The Holders of Class 7A Interests in Tectonic will receive no distributions on account of such Interests and such Interests will be cancelled and fully extinguished pursuant to, and on the Effective Date of, the Plan | N/A<br><br>Recovery 0% |

A complete description of the treatment of each Class is set forth in the Plan and the Disclosure Statement. Parties should refer to the Plan and Disclosure Statement for a complete description of each Class.

In addition to classified Claims there are certain unclassified Claims as set forth below:

| Priority Tax Claims | Each Holder of an Allowed Priority Tax Claim shall be paid, in full, on or before 6 years after the date of assessment of such Claim, through annual payments commencing on the Initial Distribution Date, which is projected to be July 1, 2006, and accruing interest at a rate of 8% | Claim Amount $37,500<br><br>Recovery 100% |
| Administrative Claims | All Administrative Claims shall be paid in full, in cash, on or before the Effective Date | Claim Amount<br><br>Recovery 100% |

-5-

202223.wpd

## DISCLAIMER

*All Creditors and Interest Holders are advised and encouraged to read this Disclosure Statement and the Plan in their entirety. Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the appendixes, and the Disclosure Statement as a whole.*

*This Disclosure Statement has been prepared in accordance with § 1125 of the Bankruptcy Code and Rule 3016(c) of the Federal Rules of Bankruptcy Procedure and not in accordance with federal or state securities laws. This Disclosure Statement has neither been approved nor disapproved by the Securities and Exchange Commission ("SEC"), nor has the SEC passed on the accuracy or adequacy of the statements contained herein. This Disclosure Statement was prepared to provide holders of Claims and Interests in the Debtors with "adequate information" (as defined in the Bankruptcy Code) so that they can make an informed judgment about the Plan.*

*As to contested matters, adversary proceedings, and other actions or threatened actions, this Disclosure Statement shall not constitute nor be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.*

*The information contained in this Disclosure Statement is included herein for the purpose of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to make a judgment with respect to, and how to vote on, the Plan.*

*This Disclosure Statement shall not be admissible in any nonbankruptcy proceeding involving the Debtors and any party, nor shall it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to Holders of Claims against, or Interests in, the Debtors; provided, however, that in the event the Debtors defaults under the Plan, the Disclosure Statement may be admissible in a proceeding relating to such default for the purpose of establishing the existence of such default.*

202223.wpd

II.    **INTRODUCTION AND GENERAL INFORMATION**

This disclosure statement ("Disclosure Statement") is submitted by Tectonic Network, Inc. and Tectonic Solutions, Inc., (the "Debtors"), to provide information to parties in interest about the Chapter 11 Plan (the "Plan") filed by the Debtors. This introductory section is qualified in its entirety by the detailed explanations which follow and the provisions of the Plan.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition history and significant events that have occurred during the Debtors' Chapter 11 Case. This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and voting procedures that Holders of Claims in impaired Classes must follow for their votes to be counted.

This Disclosure Statement contains summaries of certain provisions of the Plan, statutory provisions, documents related to the Plan, events in the Debtors' Chapter 11 Cases, and financial information. Although the Debtors believe that the Plan and related document summaries are fair and accurate, such summaries are qualified to the extent that they do not set forth the entire text of such documents or statutory provisions. To the extent of any discrepancy between the Disclosure Statement and Plan, the Plan terms shall govern. Factual information contained in this Disclosure Statement has been provided by the Debtors' management, except where otherwise specifically noted. The Debtors are unable to warrant or represent that the information contained herein, including the financial information, is without any inaccuracy or omission. The financial data set forth herein, except as otherwise specifically noted, has not been subjected to an independent audit.

Nothing contained herein shall (1) constitute an admission of any fact or liability by any party, (2) be admissible in any nonbankruptcy proceeding involving the Debtors or any other party; provided, however, that in the event the Debtors default under the Plan, the Disclosure Statement may be admissible in a proceeding relating to such default for the purpose of establishing the existence of such default, or (3) be deemed conclusive advice on the tax or other legal effects of the Debtors' Plan as to Holders of Claims or Interests. You should consult your personal counsel or tax advisor on any questions or concerns regarding tax or other legal consequences of the Plan.

Except for historical information, all the statements, expectations, and assumptions, including expectations and assumptions contained in this Disclosure Statement, are forward looking statements that involve a number of risks and uncertainties. Although the Debtors have used their best efforts to be accurate in making these forward-looking statements, it is possible that the assumptions made by the Debtors may not materialize. In addition, other important factors could affect the prospect of recovery to Creditors including, but not limited to, the inherent risks of litigation and the amount of Allowed Claims.

Parties voting on the Plan should read both the Plan and this Disclosure Statement.

202223.wpd

### A.     Definitions

Unless otherwise defined, capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan.

### B.     The Disclosure Statement

The primary purpose of this Disclosure Statement is to provide parties entitled to vote on the Plan with adequate information so that they can make a reasonably informed decision prior to exercising their right to vote to accept or reject the Plan.

The Bankruptcy Court's approval of this Disclosure Statement constitutes neither a guaranty of the accuracy or completeness of the information contained herein, nor an endorsement of the Plan by the Bankruptcy Court.

When and if confirmed by the Bankruptcy Court, the Plan will bind the Debtors and all Holders of Claims against and Interests in the Debtors, whether or not they are entitled to vote or did vote on the Plan and whether or not they receive or retain any Distributions or property under the Plan. Thus, you are encouraged to read this Disclosure Statement carefully. In particular, Holders of impaired Claims who are entitled to vote on the Plan are encouraged to read this Disclosure Statement, the Plan, and any exhibits and appendixes to the Plan and Disclosure Statement, carefully and in their entirety before voting to accept or reject the Plan. This Disclosure Statement contains important information about the Plan, the method and manner of distributions under the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Bankruptcy Case.

### III.     VOTING ON THE PLAN AND THE CONFIRMATION PROCESS

### A.     Who May Vote

Only a Holder of an Allowed Claim classified in an impaired Class is entitled to vote on the Plan. Under § 1124 of the Bankruptcy Code, your Class is impaired under the Plan unless the Plan (1) leaves unaltered your legal, equitable, and contractual rights, or (2) cures any defaults under your contract, reinstates its maturity, compensates you for damages, and does not otherwise alter your rights.

### B.     Allowance of Claims

In order to have an Allowed Claim you must (1) have timely filed a proof of claim or (2) been listed in the Schedules as having a Claim that is not contingent, unliquidated or disputed. You are not required to file proof of your Claim if your Claim is listed by the Debtors in the Schedules and is not shown as being contingent, unliquidated or disputed. If your Claim was

-8-

202223.wpd

scheduled as contingent, unliquidated or disputed, you do not have an Allowed Claim, cannot vote, and will not participate in any distributions under the Plan until your Claim becomes an Allowed Claim.

A analysis of claims is attached as **Appendix "B"**.

Only Holders of Allowed Claims in an impaired Class that receive distributions and are not insiders may vote on the Plan. Creditors whose Claims are unclassified, unimpaired, or who receive nothing under the Plan, may not vote. Under the Plan, Administrative Expense Claims, Postconfirmation Administrative Expense Claims and Priority Tax Claims are unclassified and not entitled to vote on the Plan. Under the Plan, Classes 1,2 are unimpaired and are deemed to have accepted the Plan. Classes 3, 4, and 5 are impaired and entitled to vote on the Plan. Class 6 will receive nothing and is deemed to have rejected the Plan.

Holders of Interests are not entitled to vote under the Plan. The Holders of Interests in Tectonic Networks, Inc. will receive nothing under the Plan and are deemed to have rejected the Plan. The Holder of Interests in Tectonic Solutions, Inc. will retain its Interest and is deemed to have accepted the Plan.

### C.    Voting Instructions

Voting instructions are attached hereto as **Appendix "C"**. Please read the instructions carefully to ensure that your vote will count.

IN ORDER FOR YOUR BALLOT TO COUNT IT MUST BE RECEIVED WITHIN THE TIME INDICATED ON THE BALLOT AND THE BALLOT MUST CLEARLY INDICATE YOUR CLAIM, THE CLASS OF YOUR CLAIM, AND THE AMOUNT OF YOUR CLAIM.

BY ENCLOSING A BALLOT, THE DEBTORS ARE NOT ADMITTING THAT YOU ARE ENTITLED TO VOTE ON THE PLAN, ARE NOT ADMITTING THAT YOUR CLAIM IS ALLOWED AS SET FORTH ON THE BALLOT, AND ARE NOT WAIVING ANY RIGHTS TO OBJECT TO YOUR VOTE OR YOUR CLAIM.

### D.    Requirements of Confirmation

The Bankruptcy Court can confirm the Plan only if all the requirements of § 1129 of the Bankruptcy Code are met. Those requirements include the following:

1.    The Plan classifies Claims and Interests in a permissible manner;

2.    The contents of the Plan comply with the technical requirements of the Bankruptcy Code;

-9-                                         202223.wpd

3.    The Plan has been proposed in good faith and not by any means forbidden by law;

4.    The disclosures concerning the Plan are adequate and include information concerning all payments made or promised in connection with the Plan, as well as the identity, affiliations, and compensation to be paid to all officers, directors, and other insiders; and

5.    The principal purpose of the Plan is not the avoidance of tax or the avoidance of the securities laws of the United States.

In addition to the confirmation requirements described above, the Plan must also be approved by all impaired Classes of Claims entitled to vote. If, however, the Plan has not been approved by all impaired Classes of Claims, the Court may nevertheless "cram down" the Plan over the objections of a dissenting Class. The Plan may be "crammed down" so long as it does not discriminate unfairly, is fair and equitable with respect to each dissenting Class of Claims, and at least one impaired Class has voted in favor of the Plan without regard to any votes of insiders.

### E.    Acceptance or Rejection of the Plan and Cram Down

The Class containing your Claim will have accepted the Plan by the favorable vote of majority in number and two thirds in amount of Allowed Claims actually voting. In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan if an impaired Class accepts it and if, as to each impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." If you hold a Claim that is an Allowed Unsecured Claim and not entitled to priority under § 507 of the Bankruptcy Code, the Plan is fair and equitable if you receive property of a value equal to the allowed amount of your Claim, or of the Holder of any Claim or Interest that is junior to the Claims in your class will not receive or retain under the plan on account of such junior Claim or interest any property.

### F.    Confirmation Hearing

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan ("Confirmation Hearing") at the time indicated in the Order Approving Disclosure Statement and Notice of Confirmation Hearing. The Confirmation Hearing may be adjourned from time to time without further notice except for announcement at the Confirmation Hearing or notice to those parties present at the Confirmation Hearing.

### G.    Objections to Confirmation

As will be set forth in the Order Approving Disclosure Statement and Notice of Confirmation Hearing, any objections to confirmation of the Plan must be in writing, set forth the objector's standing to assert any such objection, and must be filed with the Bankruptcy Court

-10-

202223.wpd

and served on counsel for the Debtors. The Order Approving Disclosure Statement and Notice of Confirmation Hearing contains all relevant procedures relating to the submission of objections to confirmation and should be reviewed in its entirety by any party who has an objection to confirmation.

## IV.    HISTORICAL BACKGROUND

### A.    Description of the Debtors

Detailed information regarding the Debtors' financial history and operations through March 31, 2005 is contained in the public filings of Tectonic located at www.sec.gov and can be found by utilizing the Edgar search system with the name Tectonic. Creditors voting on the plan are urged to review these documents for more detailed historical information.

As discussed below, Tectonic's prior name was Return on Investment Corporation, Inc. ("ROI"). ROI functioned as a holding company for the Debtors' payment processing software business which assets and business were in the entity Go Software, Inc. ("GO") and for Tectonic Solutions, Inc. which assets and business were in the construction software industry.

Debtors historically had two primary sources of revenue: (1) consulting fees and (2) advertising revenue. Consulting fees were earned by providing services to customers, including services primarily in the development of customizable web sites for building product manufacturers or from 3D virtualization of building product manufacturers product lines for insertion into 3D computer aided design models as well as database analysis and website design. Advertising revenue was generated from the listings of advertisements in print and electronic directories, the sale of banner, sponsorship, and text-link advertisements, including sponsored search advertisements and by photographing and displaying products, including their attributes, on Debtors' proprietary websites.

The two industries that Debtors historically had operations in are unrelated and are not synergistic in nature. Management believed that future prospects would be greatly enhanced by focusing on the construction information industry rather than the payment processing industry. While GO had achieved success, achieving revenue growth and becoming a market leader, management recognized that competitors in the payment processing industry had much greater financial resources and that the continued success of GO would be put at risk due without substantial additional capital investment. Additionally, management was concerned about the continued costs and expenses that would need to be incurred to protect the payment processing information from unauthorized access. Accordingly, management decided to sell GO and concentrate on the Tectonic operations. On December 6, 2004, ROI and GO entered into an Asset Purchase Agreement with VeriFone, Inc. ("VeriFone") pursuant to which VeriFone purchased substantially all of GO's assets on February 28, 2005. In connection therewith, on February 25, 2005, ROI's stockholders approved changing the Company's name to Tectonic Network, Inc and On March 10, 2005, ROI changed its name to Tectonic Network, Inc.

202223.wpd

Through February 2005, Tectonic functioned as a holding company with businesses in both the payment processing and, more recently, the construction information industries. Tectonic operated through two primary operating subsidiaries: (i) Tectonic Solutions, Inc. which developed and marketed building product information solutions for the construction industry including the virtualization of building product manufacturers product lines for insertion into 3D computer aided design models, printed directories, a searchable online building product information database, an online studio for the search, visualization and selection of carpet, paint and other textiles and customized web based solutions for organizing building product manufacturer databases for easier search and selection and (ii) GO Software, Inc. which developed and marketed software and services for credit card, debit card and check transactions processing with offerings including payment processing software for virtually any computing platform, including Windows, Unix and Linux.

As of February 2005, the product lines of the Debtors could be broken out into two product lines, the "Solutions Product" which consists of source code, programs, methodologies, schema, proprietary content, workflow processes, design documents and applications used to develop a custom searchable online building product information database. The other product is the "Virtual Product" which consists of source code, programs, methodologies, schema, proprietary content, workflow processes, design documents and applications used to virtualize building product manufactured product lines for insertion into 3D computer aided design models, costing of goods and services used in the construction industry, and a searchable online building product information database that allows remote access and manipulation of the database.

The Debtors have never made a profit. After the sale of GO the Debtors anticipated that losses and negative cash flow were likely to continue for the foreseeable future and profitability would be dependent upon significantly increasing Debtors' revenues from new and existing customers, as well as reducing expenses. The Debtors' negative cash flow continued and the Debtors, as a result of their inability to raise capital to fund their business plan, filed for bankruptcy relief on October 3, 2005.

A copy of the Debtors' financial results for the period of March 31, 2005 through September 30, 2005 is attached as **Appendix "D"**.

### B.     Ownership

Tectonic had 13,867,054 shares of common stock outstanding as of the Filing Date. Arol Wolford, Tectonic's President and Chief Executive Officer, Charlie McRoberts, a director, and Charlie Pechio, a former director, directly or indirectly controlled 6,276,533 shares or 45.3% of the outstanding shares. The majority of the remaining shares are held by non-insider third parties.

202223.wpd

### C.    Insiders of the Debtors

As of the Filing Date, the Debtors' board of directors consisted of John W. McRoberts, Arol R. Wolford, Charlie A. McRoberts, Laura C. Rogers and Theo Vanderboom. The Debtors' President and Chief Executive Officer was Arol Wolford. The Debtors' Chief Financial Officer was Sherwin Krug. Ms. Rogers and Mr. Krug resigned shortly after the Filing Date.

### D.    Pre-Petition Assets and Liabilities

Debtors' assets at the Petition Date consisted primarily of intellectual property and associated contract rights; approximately $27,000.00 balance in bank accounts, excluding outstanding checks of $86,872.94; and approximately $570,000.00 in accounts receivable, without reserve for doubtful accounts. In addition GO is entitled to payment upon certain future events and conditions of additional funds arising from the sale of its assets to VeriFone. If these events occur, which must occur before June 30, 2006, the Debtors estimate that GO will be entitled to approximately $1.5 million. The only remaining creditors of GO are the secured claim of Laurus in the amount of $120,000, claims for state income taxes amounting to approximately $200,000, and two disputed claims in litigation, both of which the Debtors believe are subject to meritorious defenses. After resolution of these claims, Tectonic Network would be entitled to any remaining funds. Based on discussions with Verifone, the Debtors are doubtful that the earnout will be triggered.

Debtors' primary liabilities, at the Petition Date, were (a) approximately $830,000.00 of secured claims to Laurus;(b) approximately $50,000 in  and (b) approximately $1,720,000.00 of unsecured claims, in the total amount of approximately to $2,550,000.00.

### V.    THE CHAPTER 11 CASE

### A.    Initial Matters

Soon after the Petition Date, Debtors filed motions requesting emergency relief to maintain Debtors' pre-petition bank accounts and honor outstanding pre-petition checks; authorize payment of sales and other trust fund taxes, and provide emergency financing pending a sale to Boston Equities Corporation. The Court held a series of hearings in October and eventually entered orders approving the motions with certain modifications. The net result of the modifications were that pursuant to the various orders, the Debtors stopped payment on outstanding checks of $54,694.64, the Debtors were authorized to and did borrow $130,000 from Boston Equities Corporation to fund operations, pending a hearing on the sale to Boston Equities to be held on October 28, 2005.

### B.    Boston Equities Transaction

On October 28, 2005, the Bankruptcy Court entered an "Order Pursuant to Bankruptcy Code Sections 105(a), 362, 363, 365, and 1146(c) (A) Authorizing the Debtors' Sale to Tectonic, Inc. of

202223.wpd

Substantially all of their Assets Free and Clear of Liens, Claims, and Encumbrances; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases" (the "Sale Order"). The Sale Order authorized the sale of all of Debtors' assets in the construction information industry to Tectonic, Inc., a subsidiary of Boston Equities Corporation ("Boston Equities") , pursuant to the terms of an Asset Purchase Agreement dated as of October 3, 2005, as amended by Amendment No. 1 dated October 12, 2005, Amendment No. 2 dated October 28, 2005 (collectively the "Boston Equities APA") for a purchase price of (i) $1,350,000 in cash, plus (ii) cash in the amount of any operating expenses actually incurred or accrued between October 31, 2005 and the Closing Date, plus (iii) any amounts outstanding under the Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement between the Buyer and Debtors in the principal amount of $130,000 (the "Loan Agreement").

Pursuant to the terms of the Sale Order and Boston Equities APA, Boston Equities made an initial nonrefundable payment of $250,000 after the entry of the Sale Order. The closing of the sale was to occur on or before November 8, 2005, but Boston Equities did not have the funds to close. Pursuant to the terms of Amendment No. 3 to the Boston Equities APA, the Closing Date was amended to permit a closing to occur on or before November 15, 2005 and in consideration for this extension, Boston Equities made an additional nonrefundable payment of $200,000. The Court approved Amendment No. 3 by Order entered November 16, 2005. Boston Equities was unable to close by November 15, 2005. Pursuant to the terms of Amendment No. 4 to the Boston Equities APA, the Closing Date was amended to permit a closing to occur on or before January 31, 2006. In consideration for this extension, on December 21, Boston Equities made an additional nonrefundable payment of $300,000, and paid an additional fee of $50,000 to Debtors to compensate Debtors for interest and expenses incurred in connection with the extension of the Closing Date, and credited $130,000 principal  and interest accrued under the Loan Agreement. The Court approved Amendment No. 4 by Order entered December 21, 2005.

Despite the $800,000 in payments and satisfaction of the $130,000 DIP loan made by Boston Equities, Boston Equities did not close by January 31, 2006 and defaulted under the Boston Equities APA. In late February 2006 it became apparent that Boston Equities would be unable to fund its contractual commitments under the Boston Equities APA. On March 10, 2006 an involuntary petition was commenced against Boston Equities Corporation, Case no. 06-450- M7 in the United States Bankruptcy Court for the Southern District of California. An order for relief was entered against Boston Equities Corporation on April 3, 2006. On May 4, 2006, Boston Equities Corporation converted its case to a Chapter 11 case. The Debtors doubt that they can collect on any claim for the breach of the Boston Equities APA.

Notwithstanding the fact that Boston Equities Corporation's default under the Boston Equities APA, Boston Equities Corporation apparently has filed a Claim against the Debtors for $1,800,000. As of May 18, 2006 such claim was not on the docket, but a copy of a claim was received in the mail by Debtors' counsel on May 17, 2006. There is no documentation attached to the Claim. The Debtors intend to object to the Claim.

202223.wpd

In addition, the acquiring entity under the Boston Equities APA, Tectonic, Inc failed to pay its obligations. A number of vendors have asserted that the Debtors need to pay the outstanding obligations of Tectonic, Inc.. Additionally, a number of employees of Tectonic, Inc. have filed administrative claims against the Debtors for salary and expenses incurred during the employ of Tectonic, Inc. These claims amount to approximately $120,000. The Debtors have moved for authority to pay these expenses in their business judgment. The Debtors intend to make a proposal to pay the expenses of the Tectonic, Inc. employees after confirmation of the Plan, which amount to approximately $45,000 to resolve these claims. Approximately 50% of the $45,000 is claimed by employees whom the Debtors have rehired at a reduced rate and, accordingly, Debtors believe that this proposal will assist the Debtors in its reorganization effort.

### C.    Laurus

As permitted by stipulations in the Debtors' cases and orders of the Court, Debtors made payments to Laurus in the total amount of $750,000. Such payments were subject to the Debtors' right to investigate the claim of Laurus.

Laurus timely filed a proof of claim (the "Laurus Proof of Claim") in each of the above-described Chapter 11 cases, asserting in each of the Debtors' cases a Claim as of the Petition Date of $827,673.00. The Laurus Proof of Claim asserted that Laurus had, as of the Petition Date, a properly-perfected, first priority security interest in virtually all property of the Debtors, together with the proceeds thereof pursuant to the documents, instruments and agreements described therein, and that, pursuant to § 506(b) of the Bankruptcy Code, interest and reasonable fees and expenses accrued after the Petition Date with regard to the Claim were also secured by and payable from the Collateral. After the Petition Date, Laurus asserted that interest and reasonable fees and expenses accrued by Laurus on its Claim exceed $83,000.

On or about November 28, 2005, the Debtors initiated an adversary proceeding against Laurus seeking disallowance of certain fees and interest asserted by Laurus, and equitable subordination or recharacterization of Laurus's Claim.

On February 15, 2006, Debtors and Laurus entered into a Stipulation and Agreement which, subject to Court approval, resolved the outstanding issues with respect to claims between the Debtors and Laurus. In general, the stipulation provided for the resolution of the claims filed by Laurus against the Debtors by allowing Laurus a $870,000 secured claim, inclusive of all cost, interests, and charges, for the secured claim to be satisfied by application of the $750,000 in adequate protection payments made during the course of the case and any contingent payments from the sale of GO, for Laurus to release its security interest against all property of the Debtors except for its interest in any contingent payments from the sale of GO, for Laurus to have an unsecured deficiency claim up to $120,000, and for the Debtors to release their claims against Laurus (including the claims raised by the Debtors in the Adversary Proceeding).

On February 16, 2006, Debtors filed a motion to approve the settlement with Laurus. Debtors served a notice scheduling a hearing on the settlement motion for March 21, 2006. No

-15-

202223.wpd

parties appeared at the hearing or objected to the relief sought in the settlement motion, but a dispute arose between Laurus and Debtors with regard to the effect of the stipulation.

Specifically, Debtors, on the one hand, and Laurus, on the other, disagreed with regard to the effect on the parties with regard to Laurus's security interests and claims in and to its collateral constituting assets of the Debtors in the event that Laurus is required to disgorge, repay, recredit, reapply, reconsider, recharacterize or subordinate any payments ("Payments") that Laurus has received during the course of the Debtors' bankruptcy cases, which have been applied towards the satisfaction of the indebtedness of the Debtors to Laurus under the Loan Documents, or that any such Payment is otherwise revoked (any such event, a "Disgorgement").

In order to resolve the dispute and to finalize the settlement proposed in the Stipulation and to protect Laurus in the case of a Disgorgement, to define the responsibilities of the Debtors and Laurus's rights against the Debtors and their assets, and to otherwise address in part the disagreement described in the previous paragraph, Debtors and Laurus executed and delivered an Agreement Regarding Indemnification of Laurus Master Fund, Ltd. with Respect to the Prior Settlement Agreement and Related Provisions along with the Indemnification Agreement (collectively "Agreement for Indemnification").

The Agreement for Indemnification provides that Debtors will indemnify and hold Laurus (the "Indemnitee") harmless from and against any and all losses, costs, damages, expenses, settlements and other amounts actually imposed on, incurred or suffered by, Indemnitee (the "Losses"), in any way relating to or arising out of any Disgorgement, or any demand, claim, suit, action, appeal or other proceeding, at law or in equity, whether civil, criminal, administrative or investigative in nature, brought against the Indemnitee, or to which the Indemnitee is, was, is to be or is threatened to be made a party (a "Suit") seeking a Disgorgement.

Additionally, the Debtors agreed that Laurus' claim in the Debtors' bankruptcy cases based on the obligation of either Debtor under the Agreement for Indemnification (an "Indemnification Claim") shall be estimated for purposes of allowance as a $300,000 general unsecured claim pursuant to section 502(c)(1) of the Bankruptcy Code (the "Estimated Claim").

A motion to approve the Agreement for Indemnification and related stipulations with regard to Laurus' claims was filed on March 28, 2006. The matter was heard by the Court on April 10, 2006 and an order entered approving the settlement, stipulations regarding Laurus' Claim and Agreement for Indemnification on April 13, 2006.

### D.    Continuation of Business Operations after Default of Boston Equities

Since the Petition Date, the Debtors have continued to operate their business as debtors in possession in accordance with Sections 1107 and 1108 of the Bankruptcy Code. Arol Wolford at all times remained an employee of the Debtors.

202223.wpd

After the default of Boston Equities, Arol Wolford, the Chief Executive Officer and President of each of the Debtors, and Charlie McRoberts, a director of the Debtors, attempted to find other parties to purchase all or some of the Debtors' assets, which generally consist of two software product lines which the Debtors refer to as the "Virtual Product" and the "Solutions Product". The Debtors received indications of interest for the Solutions Product but the economic vale of the proposal was negligible. With respect to the "Virtual Product" the Debtors did not receive any offers for the purchase. The Debtors also attempted to find financing for continued operations. While the Debtors have received indication of interest after confirmation of a Plan, the Debtors were unable to obtain any commitments during the pendency of the case.

After considering their options, the Debtors determined that continuation of operations would be the best result for creditors and parties in interest. Accordingly four of the Debtors employees were rehired effective March 1, 2006 at a rate of $3,000 per month. An additional five employees were rehired effective April 1, 2006. During April all nine employees were paid a salary of $5,000 per month. For May, June and July three of the employees have agreed to temporarily defer payment to provide the Debtors with additional cash liquidity. Additionally, Mr. Wolford, whose salary is $15,000 per month has agreed not to seek any salary through March 31, 2006 and defer his salary thereafter. The Debtors anticipate that the employees will be paid after confirmation of the Plan.

Mr. Wolford has indicated a willingness to potentially lend money to the Debtors prior to confirmation of the Plan if funds are needed to complete new orders. A motion to authorize the use of these funds on an unsecured basis was heard on April 11th, 2006 and the Court thereafter entered an order. As of May 18, 2006 the Debtors have not borrowed any such funds and the Debtors currently believe that no such borrowings will be required if the Plan is confirmed before July 15, 2006..

Debtors' postpetition operations are summarized in its monthly financial reports which show as follows: (a) for the period of October 3, 2005 through October 31, 2005, total cash available for operations totaled $291,322.98, total disbursements totaled $221,742.61, leaving a positive ending cash balance of $69,580.37; (b) for the period of November 1, 2005 through November 30, 2005, total cash available for operations totaled $588,440.63, total cash disbursements totaled $496,668.95, leaving a positive ending cash balance of $91,771.68; (c) for the period from December 1, 2005 through December 30, 2005, total cash available for operations totaled $468,198.69, total cash disbursements totaled $305,248.07, leaving a positive ending cash balance of $159,950.62; (d) for the period from January 1, 2006 through January 31, 2006, total cash available for operations totaled $217,015.67, total cash disbursements totaled $24,711.23, leaving a positive ending cash balance of $192,304.44; (e) for the period from February 1, 2006 through February 28, 2006  total cash available for operations totaled $231,198.24, total cash disbursements totaled $22,929.83, leaving a positive ending cash balance of $208,268.41; (f) for the period for March 1, 2006 through March 31, 2006  total cash available for operations totaled $248,348.41, total cash disbursements totaled $23,886.01, leaving a positive ending cash balance of $224,262.40; and (g) for the period from April 1, 2006

202223.wpd

through April 30, 2006 total cash available for operations totaled $255,819.40, total cash disbursements totaled $179,597.08, leaving a positive ending cash balance of $ 76,222.32.

The Debtors began the case with a cash balance of $27,838.46.  The cumulative sources of cash received after the Filing Date through April 30, 2006 was $1,322,967.64.  The primary sources were $130,000 from the DIP loan made by Boston Equities Corporation, $850,000 in payments on the purchase contract with Boston Equities Corporation, $54,694.64 in stopped payments on pre-petition checks, and $283,174.42 in receivable collections.

The total cash disbursements between the Filing Date and April 30, 2006 was $1,274,583.78.  The primary uses were $750,000 in payments to Laurus, $250,032.24 in payroll and payroll taxes; and $77,330.47 in professional fees.

Included with Exhibit "F" is a comparison of the Debtors' projections included in its proposed disclosure statement filed on March 24, 2006 with actual results for the March, April and May period through May 18, 2006 adjusted for the end of the month payroll. The primary reason for the timing difference for March and April was the delay of approval of the settlement with Laurus. As of May 18, 2006, the Debtors project they will have an actual cash balance of $67,720 as of May 31, 2006, which is $21,784 less than the balance of $89,504 set forth on the projections filed in March 24, 2006.

### E.    Ad Hoc Equity Committee

On or about November 8, 2005, attorney Gus H. Small filed a "Motion for an Order Approving the Appointment of an Official Committee of Equity Holders Pursuant to 11 U.S.C. § 1102(a)(2)" (the "Ad Hoc Committee Motion"). The Ad Hoc Committee Motion was filed on behalf of the "Ad Hoc Committee of Equity Holders." The Ad Hoc Committee Motion does not identify the members of the "Ad Hoc Committee of Equity Holders" except to indicate that it is "a group of public shareholders owning approximately fifty percent (50%) of all non-insider stock of the Debtor Tectonic Network, Inc." (Ad Hoc Committee Motion at Paragraph 1)

On December 20, 2005, Gus H. Small served via electronic mail on Debtors' counsel a subpoena for the production of documents.  The subpoena includes eight (8) pages of preliminary instructions and definitions and commands that documents listed in seventeen (17) categories be produced on December 29, 2005.

The subpoena commanded the production of all minutes of meetings of Tectonic Network's board or any committees for a two year period, all materials provided to the Board for any such meeting, all documents relating to the committee of the board designated to investigate the claims of James Serio, documents relating to Tectonic Network's acquisition of three businesses, all documents provided to the board concerning each such acquisition, monthly financial statements for a 20-month period for Tectonic Network and two subsidiaries, all documents relating to any

202223.wpd

write-downs of good will or balance sheet items relating to the acquisitions of three businesses, complete financial statements for the year ended June 30, 2005 for Tectonic Network and two subsidiaries, all agreements, orders and invoices between Tectonic and five other persons or entities, all documents relating to or referring to the claim made by James Serio and any investigation of his claim, every virtual building contract entered into by Debtors for a one-year period, all contracts for Tectonic print directories for a six-month period, all documents relating to payments by Tectonic Network or its subsidiaries to six persons or entities, all documents relating to the decision by Tectonic Network's board to undertake asset sales, all documents relating to the decision by Tectonic Network's board to file bankruptcy, all documents relating to any actual or proposed sale of securities by Tectonic Network from January 1, 2004 to the present, all documents relating to the employment of any family member of Arol Wolford, and all communications by Tectonic and its subsidiaries and outside accountants relating to Tectonic Solutions, the claim of James Serio, or the adequacy of internal controls.

On February 2, 2006, counsel for Debtors proceeded to produce all non-privileged documents to counsel for the Ad Hoc Committee

The Ad Hoc Committee has asserted that an official equity committee is needed "for the purpose of investigating and pursuing claims which the Ad Hoc Committee believes may provide a meaningful recovery to shareholders." The Ad Hoc Committee contends that an investigation is needed to focus on "bringing charges against dishonest officers and directors" and that "Debtors have Directors & Officers insurance policies with $10,000,000 in coverage which may supply a source of recovery for the Estate." Ad Hoc Committee Motion at Paragraph 17. The Debtors Directors & Officers policy is actually $5,000,000.

Debtors' counsel has reviewed the allegations of Ad Hoc Committee with regard to (a) whether claims for negligence should be pursued against members of Debtors' board of directors; (b) whether payments allegedly made to insiders were improper or preferential; and (c) whether fraud was committed with respect to the acquisition by Debtors of three businesses connected to Debtors' president and CEO, Mr. Arol Wolford. (The three businesses are: BBN Acquisition, Inc. (a/k/a Blue Bolt), Construction Yellow Pages LLC, and SpecSource.com, Inc.).[1]

Based upon Debtors' counsel review of documents produced to the Ad Hoc Committee in response to the Ad Hoc Committee subpoena and based on applicable case law, Debtors' counsel

---

[1] The Ad Hoc Committee alleges that a "preliminary investigation" reveals that "there is substantial evidence that the businesses comprised in Tectonic Solutions were acquired, maintained, and operated through numerous fraudulent representations, all under the supervision of Arol Wolford." Further the Ad Hoc Committee asserts: "Upon information and belief, the true nature of these business was at all times known to Mr. Wolford and, had it been disclosed to Tectonic's Board of Directors and its shareholders, no rational person would have proceeded with the investment."

has concluded that the allegations made in the Ad Hoc Committee Motion are without merit and are not viable.

The reasons for this conclusion are as follows: First, the Debtors' corporate charter makes it clear that any claims for negligence on the part of the directors in the exercise of their duties were waived by the corporations. The Certificate of Incorporation for Debtor's predecessor entity (Net/Tech International, Inc.) provides:

> Paragraph Eighth: No director shall be liable to the corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except with respect to (1) a breach of the directors' duty of loyalty to the corporation or its stockholders, (2) actor or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (3) liability under Section 174 of the Delaware General Corporation Law or (4) a transaction from which the director derived an improper personal benefit, **it being the intention of the foregoing provision to eliminate the liability of the corporation's directors to the corporation or its stockholders to the fullest extent permitted by Section 102(b)(7) of the Delaware General Corporation Law, as amended from time to time. The corporation shall indemnify to the fullest extent permitted by Sections 102(b)(7) and 145 of the Delaware General Corporation Law, as amended from time to time, each person that such Sections grant the corporation the power to indemnify.**

Certificate of Incorporation of Net/Tech International, Inc. (Exhibit 3.1 of Form 10KSB40 filed on October 2, 2001). There is current case law that holds that such corporate waivers of claims for negligence against directors are enforceable.

Further, since the Debtors have agreed to indemnify the directors pursuant to the Certificate of Incorporation, a suit against the directors that fails will result in the Debtors' liability for indemnification. This indemnity obligation could potentially be an administrative expense of the Debtors' bankruptcy cases.

As to the Ad Hoc Committee's allegations of fraud with respect to the acquisition by Debtors of three businesses connected to Debtors' president and CEO, Mr. Arol Wolford, Debtors show that Form 10QSB filed with the SEC prior to the closing of the acquisitions now challenged by the Ad Hoc Committee clearly reveal the relationship between the acquired companies and Arol Wolford. Further, the Form 10QSB makes it clear that the company would continue to face challenges after the acquisition.

202223.wpd

Specifically, Form 10QSB filed on November 13, 2003 reveals the following (in Note 6 to the Financial Statements):

On October 29, 2003, the Company also entered into a definitive agreement to acquire BBN Acquisition, Inc. ("BlueBolt"), an online design resource for design professionals in the commercial interiors industry. The BlueBolt acquisition will extend the Company's strategic push into the commercial construction products market by enhancing its offerings with BlueBolt's aggregated product information web site. Arol Wolford owns approximately 39% of the outstanding common stock of BlueBolt and his daughter, Kristin Wolford, is a member of BlueBolt's board of directors. Under the terms of the acquisition, the Company will issue 750,000 shares of restricted ROI common stock to the shareholders of BlueBolt and BlueBolt will merge with the Company's subsidiary, Tectonic Solutions, Inc. The acquisition is subject to customary closing conditions and approvals and is expected to close before the end of the calendar year.

On October 29, 2003, the Company also entered into a definitive agreement to acquire all the assets of SpecSource.com, Inc., an online directory of commercial construction products manufacturers and their local supply chain of product representatives and distributors. The SpecSource acquisition will give the Company a leading online directory of resources in the commercial construction products industry. Arol Wolford is the controlling shareholder of SpecSource, owning approximately 91% of its equity. Under the terms of the acquisition, the Company, through its subsidiary Tectonic Solutions, Inc., will acquire substantially all of SpecSource's assets for 1,450,000 shares of restricted ROI common stock, a promissory note for $533,500 and the assumption of certain liabilities of SpecSource incurred in the ordinary course of business. The number of shares is subject to increase up to 2,000,000 and the note to a corresponding decrease in principal value if the Company's common stock trades below $1.57 at the date of closing. The note will be interest free and, until it matures in 10 years, payments will be contingent on the Company having a minimum of $5 million in cash, net of debt obligations, on its quarterly balance sheet. The acquisition is subject to customary closing conditions and approvals and is expected to close before January 15, 2004. In connection with a non-competition agreement entered into by one of the principals of SpecSource, the Company will also issue a $360,000 note on substantially the same terms as the note above.

On October 29, 2003, the Company also entered into a definitive agreement to acquire all the assets of Construction Yellow Pages LLC, a publisher of two regional comprehensive print directories for the commercial construction

202223.wpd

industry. Construction Yellow Pages complements ROI's entry into the commercial construction products database market with its comprehensive print directories that are specialized for local markets. Arol Wolford is the controlling member of Construction Yellow Pages, directly owning approximately 48% of its equity and indirectly owning an additional 12% by virtue of his controlling interest in SpecSource. Under the terms of the acquisition, the Company, through its subsidiary Tectonic Solutions, Inc., will acquire substantially all of Construction Yellow Pages' assets for 750,000 shares of restricted ROI common stock and the assumption of certain liabilities of Construction Yellow Pages incurred in the ordinary course of business. The agreement is subject to customary closing conditions and approvals and is expected to close before the end of the calendar year.

http://www.sec.gov/Archives/edgar/data/866492/000109380103001419/0001093801-03-001419.txt (Form 10QSB filed November 11, 2003).

The same Form 10QSB makes it clear that the Debtors would not be profitable following the acquisitions. Specifically, Form 10QSB discloses:

The Company also launched a new construction vertical division in March 2003. This division will provide technology products to the construction industry and management believes that this will be a significant growth area for the Company and will enable the Company to achieve profitability at a quicker rate.

In June 2003, the Company entered into a $500,000, receivables based line of credit with a bank. In addition, certain board members have formally committed to infuse the Company with up to $500,000 on an as needed basis for working capital purposes through September 30, 2004. On October 29, 2003, the Company also closed a private placement offering in the amount of $643,000 **and also announced that it has entered in definitive agreements for the purchase of three companies (see Note 6 in the Notes to Consolidated Financial Statements). Certain of these acquisitions may require additional funding and in this regard, the Company is also considering raising additional capital through investment banking resources. To the extent that the Company obtains additional financing, the terms of such financing may involve rights, preferences or privileges senior to our common stock and the common stockholders may experience dilution. The Company cannot provide any assurances that any of the above attempts to rise outside capital will be successful.** At this time, we have no other available credit lines or other loan facilities in place, although we believe that current cash reserves and cash flow from operations in the normal course of

-22-

business in conjunction with the line of credit and commitment by board members will be adequate through September 2004. At a minimum, this will require the sustainability of current revenue levels and effective management of costs, which we believe is likely, though no absolute assurances can be given for this. **If we cannot maintain current revenue levels or manage our costs, immediate action to reduce costs will be required unless additional capital resources can be obtained.**

Form 10QSB (emphasis added).

The Debtors assert that the public records show that the business judgment exercised by the board of directors in acquiring the three businesses referenced by Ad Hoc Committee was not an undisclosed transaction and was, in fact, the subject of a press release by the Debtors issued on October 29, 2003. The press release discloses Mr. Wolford's interest in the three businesses being acquired by Debtors and discloses that the acquisition was approved by independent directors.

Ad Hoc Committee also allege that a committee should be appointed to "investigate significant payments to insiders within the three years preceding the Petition Date." (Ad Hoc Committee Motion at Paragraph 4. Specifically, Ad Hoc Committee question the propriety of payments made under the "SpecSource Note" as a result of the sale of GO Software assets and question the propriety of a "Change in Control" payment to be made to another insider (Ad Hoc Committee Motion at Paragraph 24). Questions 3(b) and 23 to the Statement of Financial Affairs of the Debtors set forth payments within the year prior to the filing, including payments made shortly after the sale on March 3, 2005. A copy of the response to questions 3(b) 23 is attached as **Appendix "E".**

Based upon Debtors' counsel investigation and review of documents produced to the Ad Hoc Committee in response to the Ad Hoc Committee subpoena, Debtors' counsel believes that the Ad Hoc Committee's claims with regard to these payments are not viable.

First, Notes executed by Debtor's predecessor (Return on Investment Corporation) in connection with the SpecSource transaction indicate that all unpaid principal will be due and payable upon a "Change in Control" and the Notes define "Change in Control" to mean: (a) change in ownership of the Maker of the notes (i.e. Return on Investment Corp.) whereby a Person or Persons become the Beneficial Owner of more than 50% of Maker's then outstanding securities; (b) any consolidation or merger of the Maker in which the Maker is not the continuing or surviving corporation; or (c) "The closing of a sale, transfer, liquidation of all or substantially all of the assets of the Maker."

-23-

Thus, under the definition contained in the SpecSource notes of a "change in control," payments were due when Tectonic sold the assets of GO Software.

Second, Debtors' counsel's investigation and review of documents make it clear that the payments to insiders questioned by the Ad Hoc Committee did not render the Debtors insolvent. The Debtors' March 31, 2005 balance sheet (filed with the Debtors' June 28, 2005 Registration Statement) lists $7,855,622 in cash and cash equivalents as assets and $4,646,624 in total current liabilities, and an additional $1,175,693 in long term debt.

Finally, there is a question as to whether the payment was even made by the Debtors, as the funds were derived from the sale of GO.

Therefore, based on investigation and review of documents, Debtors' counsel believes that Debtors' estates have no viable claims for recovery of the payments made in connection with the SpecSource transaction and has concluded that the payments, even if made by the Debtors, were not improper and did not render the Debtors insolvent.

On March 15, 2006 after being advised of the Debtors' position with regard to the claims of the Ad Hoc Committee, the Ad Hoc Committee filed a motion to convert the Bankruptcy Cases to a Chapter 7 Proceeding. After the filing of the Debtors' Plan, the Debtors and Ad Hoc Committee entered into negotiations to resolve the conversion motion as well as other objections filed by the Ad Hoc Committee. As a result of these discussions the Ad Hoc Committee and the Debtors agreed to a Stipulation and Order which was entered in the Bankruptcy Case on April 13, 2006. In general, it provides that the Debtors abandoned claims for fraud, breach of fiduciary duty and breach of the duty of care and loyalty which were assertable prior to the filing of these chapter 11 cases against directors and officers of the Debtors, and authorize the members of the Ad Hoc Committee to pursue the claims against the Debtors' directors and officers in a forum outside of the within chapter 11 proceedings. Creditors of the Debtors were afforded an opportunity to object. No objections were filed.

## VI.    DETAILED DESCRIPTION OF PLAN

### A.    Retention of Property by the Debtors

Upon confirmation, the Reorganized Debtors will retain all property of the estate. The Reorganized Debtors will have the rights and powers to assert any and all Causes of Actions (defined as all causes of action, choses in action, claims, rights, suits, accounts or remedies belonging to or enforceable by the Debtors, including avoidance Actions, whether or not matured or unmatured, liquidated or unliquidated, contingent or noncontingent, known or unknown, or whether in law or in equity, and whether or not specifically identified in the Debtors' Schedules).

-24-

202223.wpd

**B.    Discharge of Debtors**

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or in the Confirmation Order, the distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), of Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Confirmation Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the Effective Date occurring.

**C.    Compromises and Settlements**

Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims against them and (b) Causes of Action that they have against other Persons up to and including the Effective Date. After the Effective Date, such right shall pass to the Reorganized Debtors as contemplated in Article 8.1 of the Plan, without the need for further approval of the Bankruptcy Court, except as otherwise set forth in the Plan.

**D.    Release by Debtors of Certain Parties**

Pursuant to section 1123(b)(3) of the Bankruptcy Code, but subject to Article 8.4 of the Plan, effective as of the Effective Date, each Debtor, in its individual capacity and as a debtor-in-possession for and on behalf of its Estate, shall release and discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission,

-25-

occurrence or event in any manner related to any such Claims, Interests, restructuring or the Chapter 11 Cases.

The term "Released Parties" means collectively, all officers of each of the Debtors as of the Petition Date, all members of the boards of directors of each of the Debtors as of the Petition Date, and all employees of the Debtors as of the date of the hearing on the Disclosure Statement, provided that if an officer or director of the Debtors, such officer or director's Claim is a Class 6 Subordinated Claim.

The Plan provides that the Reorganized Debtors and any other representative of the Estates shall be bound, to the same extent the Debtors are bound, by all of the releases set forth above.

### E.    Setoffs

Subject to Article 8.6 of the Plan, the Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Holder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

### F.    Limitations of Liability

The Plan contains provisions concerning the Indemnification Rights of Indemnitees. The term "Indemnitee" means all directors, officers, employees, agents or representatives of the Debtors who are entitled to assert Indemnification Rights as well as Laurus. The term "Indemnification Rights" means any obligations or rights of the Debtors to indemnify, reimburse, advance, or contribute to the losses, liabilities or expenses of an Indemnitee pursuant to the respective Debtor's certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtors. The term "Continuing Indemnification Rights" means those Indemnification Rights held by any Indemnitee who is a Released Party and serves as a director, officer or employee (or in any similar capacity) of the Reorganized Debtors immediately following the occurrence of the Effective Date together with any Indemnification Rights held by any Indemnitee on account of events occurring on or after the Petition Date. The Plan provides that "Continuing Indemnification Rights" shall not be available to any directors, officers, employees, agents or representatives of the Debtors, who assert a Claim, other than a Class 6 Subordinated Claim, in the Cases.

202223.wpd

Subject to Article 8.6 of the Plan, in satisfaction and compromise of the Indemnities' Indemnification Rights: (a) all Indemnification Rights shall be released and discharged on and as of the Effective Date except for indemnification obligations of the Debtors to Laurus under the terms of the Laurus Settlement Agreement and Laurus's Prepetition Credit Agreement and Continuing Indemnification Rights (which shall remain in full force and effect to the fullest extent allowed by law or contract on and after the Effective Date and shall not be modified, reduced, discharged, or otherwise affected in any way by the Chapter 11 Cases).

## A. INJUNCTION

**Subject to Article 8.7 of the Plan, the satisfaction, release, and discharge provisions of the Plan shall act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof and shall specifically include a bar and permanent injunction against any demand or request for, or prosecution, enforcement or effecting of, and a release of, any action, cause of action, suit, debt, due, sum of money, account, reckoning, bond, bill, specialty, covenant, contract, controversy, agreement, promise, variance, trespass, damages, judgment, extent, execution, setoff, recoupment, claim or demand whatsoever, in law, admiralty or equity, which arises from or is based on or related to the Asset Purchase Agreement dated as of October 3, 2005 between the Debtors and Boston Equities Corporation, any amendment thereof, or any payment in relation thereto, which might otherwise have been brought, prosecuted, enforced, sought, or effected by or on behalf of any of Boston Equities Corporation, any employee, owner or affiliate thereof, or any of their successors, creditors, designees, assigns, agents or representatives, including, without limitation, the estate of any of the foregoing created or to be created at any time by or in a bankruptcy case or any similar proceeding or case filed by or against such entity, or any fiduciary, agent or other representative**

The effect of this provision is that any Person holding a Claim against the Debtors is enjoined from continuing or initiating any suit or other legal action to collect a Claim against the

202223.wpd

Debtors that has been discharged or satisfied under the Plan and such Person's Person's rights are limited to the rights under the Plan. Such injunction is necessary so that creditors who hold Claims against the Debtors are bound by the terms of the Plan. Otherwise the modification of rights under the Plan would be ineffective as creditors could proceed to assert and enforce their legal and contractual remedies irrespective of the modification of such rights by the Plan.

This provision's effect on claims or causes of action of any Person, whether against the Debtors or any other Persons, which arise from, are based on or are related to the Asset Purchase Agreement described above is generally that they are forever barred and enjoined by the Plan's confirmation.

### G. Continuation of Business Operations

Following confirmation, the Reorganized Debtors will continue the Debtors' business operations. Management of the Reorganized Debtors will continue with the Debtors' current management and board of directors. The Reorganized Debtors will retain all rights and interests in the Debtors' receivables and income generated in the ordinary course of business.

### H. Parties Responsible for Implementation of the Plan

Upon confirmation, the Reorganized Debtors will be charged with administration of the Case. The Reorganized Debtors will be authorized and empowered to take such actions as are required to effectuate the Plan, including the prosecution and enforcement of Causes of Action. The Reorganized Debtors will file all post-confirmation reports required by the United States Trustee's office. The Reorganized Debtors will also file the necessary final reports and will apply for a final decree as soon as practicable after substantial consummation, the completion of the claims analysis and objection process, and following entry of Final Orders in all Bankruptcy Court litigation.

### I. Enforcement of Causes of Action

Under the Plan, the Reorganized Debtors retain all Actions, which include, without limitation, all Actions for avoidance of preferential transfers under the Bankruptcy Code and all contractual claims against current or former customers, whether specified herein or not. The failure to specifically identify an Action either in this Disclosure Statement or in the Schedules shall not be deemed to be a waiver by the Reorganized Debtors of that Action and no Defendant may assert that the failure to so identify such Action bars the Reorganized Debtors from pursuing them at this time.

202223.wpd

## J. Liabilities of the Reorganized Debtors

The Reorganized Debtors will not have any liabilities except those expressly assumed under the Plan. The Reorganized Debtors will be responsible for all operational expenses (consisting of normal and ordinary costs and expenses of operating the Debtors' business, including, without limitation, payroll and related taxes, insurance premiums, bank charges, maintenance costs, inventory costs, and all other costs of operations of any type arising after the Petition Date in connection with the operation of the Debtors' business, unless specifically excluded under the Plan) incurred by the Debtors in the ordinary course of business after the Petition Date, and those operational expenses will be paid in the ordinary course of business as they become due or as agreed upon by the Holder of an operational expense claim.

## K. Objection to Claims

The Claims Bar Date was May 15, 2006. As of May 18, 2006 approximately 70 claims have been filed against Tectonic totaling approximately $1,440,000, excluding the claim of Laurus, the claim of Boston Equities Corporation and duplicative filings. Of this amount approximately $535,000 was filed as priority claims, with $120,000 filed by former employees of the Debtors for services rendered and expenses incurred while employed Tectonic, inc. the acquiring entity owned by Boston Equities Corporation . While there may be disputes with regard to several of these claims, the substantial claims in dispute (those being over $50,000 in dispute) are the $75,000 priority claim of Marinsoft,, a $125,000 claim filed by Mainstreet Bank, and a $415,477.68 claim filed by the Internal Revenue Service. With respect to the claim of Marinsoft, the Debtors believe that the claim is invalid on the basis that such claim is resolved pursuant to the order approving the recission of the Marinsoft agreement entered January 27, 2006. With respect to the claim of Mainstreet Bank, the Debtors believe it is a claim arising from a third party's purchase of stock and that therefore the claim is invalid. With respect to the claim of the Internal Revenue Service, such claim is an estimate for payroll taxes of Tectonic for 2000, 2001 and 2002. At that time Tectonic was a holding company, and all payroll taxes were paid by its operating company and therefore no taxes are due. The Debtors intend to file objections to these claims such that they will be heard or resolved prior to July 11, 2006 which is Bankruptcy's Court's next scheduled hearing date to set a hearing on objections to claims. If the priority claims of the IRS or Marinsoft were allowed it would likely render the Debtors' Plan not feasible.

As of March 18, 2006 six (6) claims have been filed against Solutions totaling in aggregate $8,124.26, excluding the claim of Laurus and duplicative filings. Resolution of these claims will not effect the feasibility of the Plan or have a meaningful impact on creditors distributions under the Plan.

202223.wpd

### L.    Preservation of Causes of Action and Avoidance Claims

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions. The Debtors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), and will not be required to seek further approval of the Bankruptcy Court for such action. The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.

Attached to the Debtors' Statement of Financial Affairs is a list of payments made by the Debtors to creditors within the 90 days prior to the petition date. As a general matter, a "preference" under the Bankruptcy Code is a payment made by a debtor to a creditor within the 90 days prior to the petition date if the payment is on account of a pre-existing debt owed by the debtor to such creditor.

Under the Bankruptcy Code, a debtor may attempt to recover such "preferential transfers" by bringing suit against those vendors, suppliers, lenders, and other creditors who received payment. However, the Bankruptcy Code affords such persons a number of defenses to a preference suit. For instance, a vendor that supplies a debtor with additional goods, but does not receive payment for such goods, may in certain circumstances credit the unpaid value of such goods against any preference claim that the debtor may have. Such credit is called "new value." Thus, as a general matter, a creditor that provides a debtor with "new value" after the creditor has received a payment from the debtor, which "new value" remains unpaid as of the petition date, can deduct the amount of the "new value" from the previous preferential transfer. Similarly, payments made by a debtor on account of goods and services acquired in the ordinary course of the debtor's business, and paid in accordance with the ordinary course of the debtor's and the creditor's business relationship and according to ordinary terms in the parties' business, may be exempt from recovery by a debtor under the preference statutes. This so-called "ordinary course" defense is designed to protect vendors who continue to provide goods and services to a debtor in the ordinary course of business, and who are paid in the ordinary course of business. However, creditors whose payment terms vary - for instance, if they are paid more quickly than was historically the case - may be precluded from taking advantage of the "ordinary course" defense.

Debtors' counsel has preliminary reviewed transfers made by the Debtors to all persons on account of antecedent debt within the 90-day preference period (or one year for insiders) which aggregate $10,000 or more, excluding payments to any recipient whose executory contract is being assumed pursuant to the Plan.

202223.wpd

The claims against insiders are discussed above. Debtors' counsel has identified potential preference claims against Paul, Hastings, Janofsky & Walker and Inverness Properties. There are also potential claims against Saggi Capital and Bridge Ventures. An analysis of the "new value" defense has not been done. Such transfers would also be subject to the "ordinary course" defense. The "ordinary course" defense requires a very fact-intensive analysis, including calculation of the average days payable outstanding with respect to each creditor and all creditors as a whole. Application of the "ordinary course" defense therefore is subject to a number of uncertainties and litigation risks, plus costs associated with filing complaints and prosecuting preference actions against individual preference recipients. Moreover, it is probable that the certain defendants may challenge whether the Debtors were insolvent at the time the alleged preferential payments were made.

Given the estimated costs of litigation to the potential preference actions, and after considering the risks of pursuing such litigation against preference defendants, the Debtors believe that in a liquidation under Chapter 7 of the Bankruptcy Code, that a Chapter 7 trustee would only pursue the action against Paul Hastings Janosfky & Walker. Since the analysis of this claim is not complete any recovery of estimates is not included in the Liquidation Analysis discussed later in this Disclosure Statement.

As pointed out above, actual recoveries on preference actions are difficult to estimate. The outcome of any particular preference action against a preference defendant is not free from doubt.

### M.   New Capital and Cancellation of Existing Securities

The Plan provides that on the Effective Date, Tectonic will authorize the issuance of 100,000 shares of New Common Stock and all Existing Securities will be cancelled, null and void.. Reorganized Tectonic will issue the New Common Stock in exchange for $100,000 in New Capital. Mr. Wolford will purchase 80% of the stock for $80,000. The remaining 20% will be purchased by Mr. McRoberts for $20,000. The Reorganized Tectonic expects that it may issue additional stock after the Effective Date to attract employees and or investors. Any such issuance shall be subject to applicable state and federal securities laws and are not being issued pursuant to the limited transactional exemption contained in Section 1145(a) of the Bankruptcy Code. Additionally, Mr. Wolford has indicated that if the Reorganized Debtors can not attract funding, that he would fund operations until there were sufficient revenues to attract future funding.

### N.   Corporate Action

Each of the matters provided for under the Plan involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be taken by or required of any Debtor or Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as

202223.wpd

provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

## VII.  POST-CONFIRMATION OPERATIONS

### A. Post-Confirmation Management

Arol Wolford will continue as the President and Chief Executive officer of the Debtors. Mr. Wolford has been involve in the building products information industry for the past 30 years. He founded Manufacturers' Survey Group in 1975 and five years later entered the construction information industry with the start up of Construction Market Data (CMD) in Atlanta, Georgia.

As President and CEO of CMD, Arol oversaw the CMD Group of companies which included such well known information sources as Association Construction Publications, Architects' First Source, Buildcore Product Source, CanaData, Clark Reports, Construction Market Data (CMD), Cordell Building Information Services, Manufacturers' Survey Associates, and R.S. Means. CMD Group was also part owner of BIMSA/Mexico and Burwood Reports in Southeast Asia. Arol sold CMD Group to Cahners (now Reed Construction Data) in 2000.

Mr. Wolford  also served as General Manager of Southam Construction Information News Service (COINS) for five years where he led the construction information businesses throughout North America.

In addition to dealing with the Debtors, Mr. Wolford owns 35% of Realty Empowerment Systems, Inc. which provides software products to the residential real estate agencies. Mr. Wolford also owns 35% of Barcham, Inc. which provides software used to cost roads and sewers. There are no transactions between these entities and the Debtors and the Debtors do not antcipate any such transactions as the products are completely unrelated.

In June 1997, Arol was named honorary member of The American Institute of Architects in recognition of his outstanding contribution to the architectural profession. Mr. Wolford  holds a degree in biology from Westmont College of California.

Dennis Neeley will continue as Senior Vice-President and oversee the day to day operations of the Debtors. He has 35 years of experience focused on the practice and automation of the architectural, engineering, construction and real estate professions. Mr. Neeley is a registered architect and was also the founder and president of an architectural design, a real estate development

202223.wpd

and a construction company during the 1970's and 1980's. He has Bachelor's and Master's degrees in Architecture from the University of California – Berkeley.

It is anticipated that Mr. Wolford and Mr. McRoberts will be the directors of the Reorganized Debtors.

### B. Compensation of Officers and Directors

The Debtors intend to pay Mr. Wolford a salary of up to $180,000 depending on operational success. Mr. McRoberts will receive $96,000. Mr. Wolford's daughter, Kristin Tiliakos, will receive $84,000.

### C. Post-Confirmation Cash Flows

Attached hereto, as **Appendix "F"** is a projection forecasting Debtors' cash flow through June 2010. As shown on Appendix "F", Debtors believe they will generate sufficient cash flow to fund all payments to Creditors and its operational expenses. The reader should note that the projection on Appendix "F" is a forward looking analysis and involves a number of risks and uncertainties. Although the Debtors have used their best efforts to be accurate in making this forward-looking analysis, it is possible that the assumptions made by the Debtors may not materialize.

### VIII. TAX CONSEQUENCES

Tax consequences resulting from confirmation of the Plan can vary greatly among the various Classes of Creditors and Holders of Interests, or within each Class. Significant tax consequences may occur as a result of confirmation of the Plan under the Internal Revenue Code and pursuant to state, local, and foreign tax statutes. Because of the various tax issues involved, the differences in the nature of the Claims of various Creditors, the taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims, as well as the possibility that events subsequent to the date hereof could change the tax consequences, this discussion is intended to be general in nature only. No specific tax consequences to any Creditor or Holder of an Interest are represented, implied, or warranted. Each Holder of a Claim or Interest should seek professional tax advice, including the evaluation of recently enacted or pending legislation, because recent changes in taxation may be complex and lack authoritative interpretation.

THE PROPONENT ASSUMES NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONSUMMATION OF THE PLAN WILL HAVE ON ANY GIVEN HOLDER OF A CLAIM OR INTEREST. HOLDERS OF CLAIMS OR INTERESTS ARE STRONGLY URGED TO

202223.wpd

CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN TO THEIR INDIVIDUAL SITUATION.

The receipt by a Creditor or Interest Holder of cash or property in full or partial payment of its Claim or Interest may be a taxable event. To the extent that a portion of the cash or the fair market value of any property received is attributable to accrued and unpaid interest on a Claim being paid, a Creditor may recognize interest income. A Creditor or Interest Holder may also recognize gain or loss equal to the difference between the sum of the amount of cash received and the adjusted basis in the Claim or Interest for which the Holder receives amounts under the Plan. Such gain or loss may be treated as ordinary or capital depending upon whether the Claim or Interest is a capital asset. Under the backup withholding rules of the Tax Code, a Holder of a Claim may be subject to backup withholding at the rate of thirty-one percent (31%) with respect to Distributions made pursuant to the Plan unless such Holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that it is not subject to backup withholding due to a failure to report all dividends and interest. Any amount so withheld will be credited against the Holder's federal income tax liability.

## IX. BEST INTERESTS TEST AND LIQUIDATION ANALYSIS

### A. Best Interests Test

To confirm a Plan under the Best Interests Test, unless all Classes of Impaired Claims accept the Plan, the Bankruptcy Court must determine that the Plan is in the best interest of all Creditors which do not accept the Plan. The "Best Interest Test" requires that the Plan provide each member of each impaired Class a recovery that has a present value at least equal to the present value of the distribution which each Creditor would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

If the Debtors were liquidated under Chapter 7, a Court-appointed trustee with no prior knowledge of the Debtors' operations or the transactions that would fund a distribution to Creditors would liquidate the assets of the Debtors and distribute the proceeds in accordance with the legal priorities established under the Bankruptcy Code. All expenses of the Chapter 7 case, including fees of the trustee, the attorneys' fees for the trustee's counsel, accountants, and other professionals appointed in the Chapter 7 case, are paid in full before any distribution may be made on account of Administrative Claims in the Chapter 11 case, which in turn must be paid in full before any distribution would be made to prepetition Creditors. The Debtors do not believe that Creditors will receive as much under Chapter 7 as they would under the Plan, since conversion would eliminate the going concern value of the Debtors and would adversely affect the value of the Debtors' property

-34-

that is collateral for some of the Debtors' Creditors. Not only would a conversion to Chapter 7 reduce the amounts otherwise available to Creditors, but it also would delay distributions to Creditors in the event that there were any funds available. In a Chapter 7, disbursements to Creditors are not generally made until the case is fully administered and after the Court approves a final report submitted by the Chapter 7 trustee. Accordingly, the Debtors believe Creditors will receive payment faster under the Plan than they would in a Chapter 7 and the Debtors believe that confirmation of the Plan is in the best interest of Creditors.

### B. Liquidation Analysis

Debtors possess unencumbered equipment which Debtors estimate have a liquidation value of approximately $25,000. Debtors estimate that, as of May 18, 2006, it could collect approximately $50,000 of its accounts receivable in the event of liquidation. Debtors further estimate that, as of May 31, 2006, they will hold approximately [$115,000] of cash. Thus, the total available assets in the event of liquidation would be approximately [$297,000.] From those funds, distributions would then be made in accordance with priorities of the Bankruptcy Code.

Claims entitled to priority are accrued expenses of post-petition operations, consisting primarily of unpaid consulting fees. Debtors estimate that as of May 31, 2006 this totals approximately $90,000, not including $30,000 for Arol Wolford. Also paid would be other administrative expenses such as payment of professionals, including attorney fees, which as of May 18, 2006 were approximately $100,000 in excess of pre-petition retainers, accountant fees for preparation final tax returns, and Chapter 7 trustee fees.

The Debtors estimate that all additional administrative expense fees will total at least $75,000. Finally, amounts owed to taxing authorities would be required to be paid. The Debtors estimate that these amounts are approximately $50,000. Thus, In the event of liquidation, Debtors predict no funds would remain for unsecured claims.

### X.    PURPOSE OF DISCLOSURE STATEMENT

This Disclosure Statement has been prepared and presented for the purpose of permitting you to make an informed judgment to accept or reject the Plan. Please read the Plan in full and consult with your counsel if you have questions. If the Plan is confirmed, its terms and conditions will be binding on all parties in interest, regardless of whether the Holders of particular Claims or Interests voted to the accept the Plan or did not oppose confirmation of the Plan. The Debtors believe that acceptance of the Plan is in the best interest of the Holders of Allowed Claims and that confirmation of the Plan will provide the best recovery for Creditors.

202223.wpd

## XI.   CONCLUSION

The Debtors urge Creditors to vote in favor of the Plan.

Dated this 22nd day of May, 2006.

Respectfully Submitted,

LAMBERTH, CIFELLI, STOKES &
STOUT, P.A.
Attorneys for Debtors


  /s/ Gregory D. Ellis
Gregory D. Ellis
Georgia Bar No. 245310
3343 Peachtree Road, NE
East Tower, Suite 550
Atlanta, Georgia 30326-1022
(404) 262-7373

Tectonic Network, Inc.

  /s/ Arol R. Wolford
By:    Arol R. Wolford
Its: President

Tectonic Solutions, Inc.

  /s/ Arol R. Wolford
By:    Arol R. Wolford
Its: President

-36-

202223.wpd

**Appendix "A" Follows**

**Appendix "B" Follows**

196804.wpd

## Appendix B

**Priority Claims**

| Proof (P) Scheduled (S) | Creditor Name | Amount | Agreed Amount | Basis for Dispute |
|---|---|---|---|---|
| P | Marinsoft | $75,000.00 | 0.00 | Rescinded Per Court order |
| P | Internal Revenue Service | $415,477.68 | 0.00 | Returns and taxes paid by Operating Subsidiaries |
| P | Georgia Dept of Revenue | $20,931.26 | $20,931.26 | N/A |

202296.wpd

**Class 4 General Unsecured Claims**

| Proof (P) Scheduled (S) | Creditor Name | Amount | Agreed Amount | Basis for Dispute |
|---|---|---|---|---|
| P | Boston Equities Corporation | $1,800,000.00 | 0.00 | No Legal Basis for Claim |
| P | ABGI Corp. as Assignee of CMYK Graphics, inc. | $220,536.13 | $220,536.13 | N/A |
| P | Main Street Bank | $125,009.44 | 0.00 | Stock Claim |
| P | Laurus Master Fund, Ltd. | $120,000.00 | $120,000.00 | N/A |
| S | John White | $100,000.00 | $100,000.00 | N/A |
| P | Nelson-McLean, LLC | $80,044.42 | $70,529.34 | Limited by 11 U.S.C. Section 502 |
| S | RCMS Group | $65,000.00 | $65,000.00 | N/A |
| P | BDO Seidman | $57,872.50 | $57,872.50 | N/A |
| P | Winston Tire Corp | $50,000.00 | 0.00 | Unliquidated No Preference Liability Claim Not Signed |
| S | Duke Realty Corp | $48,668.00 | $48,668.00 | N/A |
| P | C. Ames Byrd Donna M. Byrd | $25,000.00 | 0.00 | Stock Claim |
| P | Filed Claims under $25,000 Not Analyzed | $69,842.15 | Unknown | Unknown |
| S | Scheduled Claims Between $1,000 and $25,000 | $400,669.03 | Unknown | Unknown |

Total Estimate                                 $1,000,000

202296.wpd

**Class 5 Convenience Claims**

| Proof (P) Scheduled (S) | Creditor Name | Amount | Agreed Amount | Basis for Dispute |
|---|---|---|---|---|
| S | Scheduled Claims under $1,000 | $93,989.58 | Unknown | Unknown |

**Class 6 Subordinated Claims**

| Proof (P) Scheduled (S) | Creditor Name | Amount | Agreed Amount | Basis for Dispute |
|---|---|---|---|---|
| S | Specsource.com | $143,000.00 | 0.00 | Subordinated |
| S | Arol Wolford | $360,000.00 | 0.00 | Subordinated |
| S | Charles Pechio | $259,099.89 | 0.00 | Subordinated |

Totals                    $762,100.00

202296.wpd

**Appendix "D" Follows**

196804.wpd

Tectonic Network, Inc.
Profit (Loss) Statements

| | Apr-05 | May-05 | Jun-05 | Q4 Total | | Jul-05 | Aug-05 | Sep-05 | Q1 Total |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | 99,672 | 97,019 | 181,176 | 378,067 | | 37,430 | 71,960 | 29,853 | 139,237 |
| Returns | | 1,421 | 413 | 1,834 | | (63) | - | - | (63) |
| Net Revenue | 99,672 | 95,440 | 181,589 | 376,250 | | 37,367 | 71,933 | 29,853 | 139,224 |
| | | | | | | | | | |
| Cost of Goods Sold | | 5,000 | 390,177 | 395,177 | | 2,370 | 4,359 | 3,133 | 9,862 |
| Net-Net Revenue | 99,672 | 93,440 | (208,589) | (19,277) | | 34,996 | 67,544 | 26,520 | 129,382 |
| | | | | | | | | | |
| Salaries | 394,916 | 380,068 | 266,508 | 1,041,511 | | 352,027 | 201,731 | 176,290 | 735,335 |
| | | | | | | | | | |
| Employee Benefits | | | | | | | | | |
| Payroll Taxes | 27,332 | 22,742 | 22,426 | 72,500 | | 18,271 | 14,370 | 11,604 | 44,245 |
| Fringe Benefits | 37,482 | 29,640 | 25,106 | 92,228 | | 26,789 | 17,273 | 3,998 | 48,071 |
| Sub-Total Benefits | 64,814 | 52,382 | 47,534 | 164,730 | | 45,070 | 31,643 | 15,602 | 92,316 |
| | | | | | | | | | |
| Total Personnel Expenses | 459,730 | 432,469 | 344,042 | 1,206,241 | | 397,877 | 233,374 | 184,532 | 825,883 |
| | | | | | | | | | |
| Advertising & Marketing | | | | | | | | | |
| Marketing | 7,315 | 17,715 | 9,494 | 34,525 | | 934 | 2,350 | 185 | 3,469 |
| Trade Show | 26,477 | 23,132 | 14,592 | 64,201 | | 843 | | 10,348 | 11,191 |
| Sub-Total Adv & Mktg | 33,793 | 40,849 | 24,085 | 98,726 | | 1,776 | 2,350 | 10,543 | 14,661 |
| | | | | | | | | | |
| Consultants & Outside Services | | | | | | | | | |
| Contract Services | | | 14,619 | 14,619 | | - | - | - | 0 |
| Legal Services | 74,129 | 37,361 | 109,691 | 218,185 | | 84,304 | 2,876 | 40,227 | 127,407 |
| Financial Services | 14,537 | 26,161 | 57,169 | 97,857 | | 490 | 7,740 | 34,674 | 42,714 |
| Professional Services | (705) | 27,332 | 229,447 | 256,122 | | 21,636 | 33,752 | 35,005 | 89,434 |
| Sub-Total Outside Serv | 87,962 | 90,816 | 411,897 | 590,784 | | 106,091 | 44,338 | 110,208 | 260,676 |
| | | | | | | | | | |
| Rent & Occup | 35,449 | 45,740 | 407,722 | 491,911 | | 42,777 | 49,591 | 40,176 | 132,634 |
| | | | | | | | | | |
| Telephone / Online | 12,500 | 12,994 | 32,118 | 57,421 | | 11,292 | 19,025 | 23,825 | 61,152 |
| | | | | | | | | | |
| Travel Expenses | 60,642 | 38,573 | 46,558 | 145,472 | | 25,547 | 16,214 | 8,973 | 50,835 |
| | | | | | | | | | |
| Other Expenses | | | | | | | | | |
| Supplies | 4,078 | 2,191 | 2,514 | 8,724 | | 944 | 173 | 1,794 | 2,911 |
| Recruiting | 145 | 1,933 | | 2,078 | | - | - | - | 0 |
| Moving Expenses | | 535 | | 535 | | - | - | - | 0 |
| Processing Fees | 8,297 | 1,424 | 92,377 | 102,098 | | 46,537 | 52,009 | 103,064 | 201,610 |
| Copier Rental | 1,732 | 2,174 | 615 | 4,521 | | 490 | 233 | 586 | 1,309 |
| Insurance/Taxes/License | 43 | 8,993 | 1,159 | 9,207 | | 26,695 | 47,103 | 5,955 | 79,953 |
| Computer Expense | 19,649 | 15,961 | (259) | 35,347 | | 2,365 | 5,345 | 13,651 | 21,361 |
| Employee Recognition | | 101 | | 101 | | 54 | - | - | 54 |
| Meetings/Training | 3,944 | 3,490 | 2,434 | 9,868 | | 900 | 376 | 498 | 1,776 |
| Training | | | | 0 | | - | - | - | 0 |
| Donations | | | | 0 | | - | - | (82) | (82) |
| Association Dues | 3,576 | | 859 | 4,435 | | - | - | - | 0 |
| Provision for bad debts | 29,177 | 12,977 | 7,690 | 49,844 | | 51,561 | 24,417 | 58,978 | 133,857 |
| Postage & Shipping | 5,453 | 1,276 | 3,586 | 10,322 | | 1,566 | 1,077 | 2,939 | 6,602 |
| Miscellaneous | 212 | 2,916 | (12,462) | (9,332) | | - | - | - | 0 |
| Franchise & Use Taxes | | | | 0 | | 15,067 | | 36,494 | 51,562 |
| Sub-Total Other Expenses | 76,691 | 62,954 | 99,464 | 228,120 | | 146,059 | 131,636 | 226,296 | 503,992 |
| | | | | | | | | | |
| Total Operating Expenses | 770,545 | 662,282 | 1,384,207 | 2,817,035 | | 729,221 | 493,557 | 673,853 | 1,896,631 |
| | | | | | | | | | |
| EBITDA | (670,874) | (568,842) | (1,572,795) | (2,836,312) | | (694,223) | (426,013) | (647,033) | (1,767,269) |
| | | | | | | | | | |
| Other Income & Expenses | 51,745 | (11,806) | 4,534,135 | 4,574,076 | | 28,055 | 21,882 | 1,394,637 | 1,444,573 |
| Depreciation | 9,185 | 8,341 | 52,497 | 69,823 | | 3,283 | 3,326 | 3,324 | 9,932 |
| Amortization | 116,444 | 116,444 | 116,444 | 349,331 | | - | - | - | 0 |
| | | | | | | | | | |
| NBT | (848,051) | (701,818) | (6,275,840) | (7,825,710) | | (725,561) | (451,519) | (2,044,993) | (3,222,074) |

# Appendix "E" Follows

196804.wpd

Statement of Financial Affairs
3(b)

| Name and Address of Insider | Relationship | Dates of Payment | Amount Paid | Amount Still Owing |
|---|---|---|---|---|
| **Arol R. Wolford**<br>**1034 Virginia Avenue,**<br>**Unit 4        Atlanta,**<br>**GA  30306** | **President and CEO** | | | |
| Salary | | 12 months ended<br>September 30, 2005 | $        90,000.00 | |
| Bonus | | 12 months ended<br>September 30, 2005 | $        90,000.00 | |
| Repayment of<br>SpecSource.com, Inc.<br>loan (majority owned by<br>Arol Wolford) | | March 9, 2005 | $      390,000.00 | $ 143,000.00 |
| Repayment of<br>Promissory Note | | March 3, 2005 | $        96,355.16 | |
| **Sherwin Krug**<br>**4674 Chardonnay Court**<br>**Dunwoody, GA 30338** | **CFO** | | | |
| Salary | | 12 months ended<br>September 30, 2005 | $      182,306.20 | |
| Bonus Fiscal 2004 | | March 3, 2005 | $        73,547.95 | |
| Bonus Fiscal 2005 | | March 18, 2005 | $      150,000.00 | |
| Repayment of<br>Promissory Note | | March 3, 2005 | $        56,123.29 | |
| **John McRoberts**<br>**4109 Old Leeds Lane**<br>**Birmingham, AL  35213** | **Director** | | | |
| Repayment of<br>Promissory Note | | March 3, 2005 | $      139,726.03 | |
| **Charlie A. McRoberts**<br>**7405 Princeton Trace**<br>**Atlanta, GA  30328** | **Director and Employee** | | | |
| Base salary | | 12 months ended<br>September 30, 2005 | $        75,653.00 | |
| Commissions | | 12 months ended<br>September 30, 2005 | $        57,850.00 | |
| Bonus Fiscal 2004 | | March 3, 2005 | $        23,777.00 | |
| Bonus Fiscal 2005 | | March 18, 2005 | $          7,543.00 | |
| **Pecchio, Charles Jr.**<br>**15 Reynolds Lane**<br>**Kingston, GA 30145** | **Former Chairman** | | | |

Statement of Financial Affairs
3(b)

| | | | | |
|---|---|---|---|---|
| Salary | 6 months ended March 31, 2005 | $ | 45,000.00 | |
| Bonus | 6 months ended March 31, 2005 | $ | 45,000.00 | |
| Employee Non-compete | 3 months ended June 30, 2005 | $ | 45,724.00 | $304,824.30 |

**Laura C. Rogers,**
**1125 Windsor Place**
**Circle**
**Grayson, GA  30017    Director**

| | | | |
|---|---|---|---|
| Directors Fees | April 7 and May 12, 2005 | $ | 2,000.00 |

**Theo P. VanderBoom**
**4160 Poplar Spring Ct.**
**Norcross, GA 30092    Director**

| | | | |
|---|---|---|---|
| Directors Fees | April 7 and May 12, 2005 | $ | 2,000.00 |
| | | $ | 1,572,606.63 | $447,824.30 |

9

None ☐   b. If the debtor is a corporation, list all officers and directors of the corporation, and each stockholder who directly or indirectly owns, controls, or holds 5 percent or more of the voting or equity securities of the corporation.

| NAME AND ADDRESS | TITLE | NATURE AND PERCENTAGE OF STOCK OWNERSHIP |
|---|---|---|
| John R. McRoberts 4109 Old Leeds Lane Birmingham, AL 35213 | Director | 7.1% |
| Arol R. Wolford 1034 Virginia Ave Unit 4 Atlanta, GA 30306 | President, CEO and Director | 24.9% |
| Charlie A. McRoberts 7405 Princeton Trace Atlanta, GA 30328 | Director | 7.6% |
| Charles Pecchio, Jr. 15 Reynolds Lane Kingston, GA 30145 | Former Chairman | 5.7% |
| Laura C. Rogers 1125 Windsor Place Circle Grayson, GA 30017 | Director | 0% |
| Theo P. VanderBoom 4160 Poplar Spring Ct Norcross, GA 30092 | Director | 0% |
| Sherwin Krug 4674 Chardonnay Court Atlanta, GA 30338 | CFO | 0% |

### 22 . Former partners, officers, directors and shareholders

None ☒   a. If the debtor is a partnership, list each member who withdrew from the partnership within one year immediately preceding the commencement of this case.

| NAME | ADDRESS | DATE OF WITHDRAWAL |
|---|---|---|

None ☐   b. If the debtor is a corporation, list all officers, or directors whose relationship with the corporation terminated within one year immediately preceding the commencement of this case.

| NAME AND ADDRESS | TITLE | DATE OF TERMINATION |
|---|---|---|
| Charles Pecchio, Jr. 15 Reynolds Lane Kingston, GA 30145 | Former Chairman | July 11, 2005 |

### 23 . Withdrawals from a partnership or distributions by a corporation

None ☐   If the debtor is a partnership or corporation, list all withdrawals or distributions credited or given to an insider, including compensation in any form, bonuses, loans, stock redemptions, options exercised and any other perquisite during one year immediately preceding the commencement of this case.

| NAME & ADDRESS OF RECIPIENT, RELATIONSHIP TO DEBTOR | DATE AND PURPOSE OF WITHDRAWAL | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| Arol R. Wolford 1034 Virginia Ave, Unit 4 Atlanta, GA 30306 President and CEO | 12 months ended 9/30/2005; Salary | $90,000.00 |

10

| NAME & ADDRESS OF RECIPIENT, RELATIONSHIP TO DEBTOR | DATE AND PURPOSE OF WITHDRAWAL | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| Arol R. Wolford 1034 Virginia Ave. Unite 4 Atlanta, GA 30306 President and CEO | 12 months ended September 30, 2005; Bonus | $90,000.00 |
| Sherwin Krug 4674 Chardonnay Court Atlanta, GA 30338 CFO | 12 months ended September 30, 2005; Salary | $180,306.20 |
| Sherwin Krug 4674 Chardonnay Court Atlanta, GA 30338 CFO | March 3, 2005; Bonus Fiscal 2004 | $73,547.95 |
| Sherwin Krug 4674 Chardonnay Court Atlanta, GA 30338 CFO | March 18, 2005; Bonus Fiscal 2005 | $150,000.00 |
| Sherwin Krug 4674 Chardonnay Court Atlanta, GA 30338 CFO | March 3, 2005; Repayment of Promissory Note | $56,123.29 |
| John McRoberts 4109 Old Leeds Lane Birmingham, AL 35213 Director | March 3, 2005; Repayment of Promissory Note | $139,726.03 |
| Laura C. Rogers 1125 Windsor Place Circle Grayson, GA 30017 Director | April 7 and May 12, 2005; Director's fee | $2,000.00 |
| Theo P. VanderBoom 4160 Poplar Springs Ct. Norcross, GA 30092 Director | April 7 and May 12, 2005; Director's fee | $2,000.00 |
| Charlie A. McRoberts 7405 Princeton Trace Atlanta, GA 30328 Director and Employee | 12 months ended September 30, 2005; Base Salary and Commission | $130,984.00 |
| Charlie A. McRoberts 7405 Princeton Trace Atlanta, GA 30328 Director and Employee | March 3, 2005; Bonus Fiscal 2004 | $23,777.00 |
| Charlie A. McRoberts 7405 Princeton Trace Atlanta, GA 30328 Director and Employee | March 18, 2005; Bonus Fiscal 2005 | $7,543.00 |
| Charles Pecchio, Jr. 15 Reynolds Lane Kingston, GA 30145 Former chairman | 6 months ended March 31, 2005; Salary | $45,000.00 |
| Charles Pecchio, Jr. 15 Reynolds Lane Kingston, GA 30145 Former Chairman | 6 months ended March 31, 2005; Bonus | $45,000.00 |

11

| NAME & ADDRESS OF RECIPIENT, RELATIONSHIP TO DEBTOR | DATE AND PURPOSE OF WITHDRAWAL | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| **Charles Pecchio, Jr.**<br>**15 Reynolds Lane**<br>**Kingston, GA 30145**<br>    **Former chairman** | **3 months ended June 30, 2005; Employee**<br>**Non-compete** | **$45,724.00** |

**24. Tax Consolidation Group.**

None ☐  If the debtor is a corporation, list the name and federal taxpayer identification number of the parent corporation of any consolidated group for tax purposes of which the debtor has been a member at any time within the six-year period immediately preceding the commencement of the case.

NAME OF PARENT CORPORATION                                             TAXPAYER IDENTIFICATION NUMBER
Tectonic Network, Inc. fka Return on Investment Corporation              22-3038309

**25. Pension Funds.**

None ☐  If the debtor is not an individual, list the name and federal taxpayer identification number of any pension fund to which the debtor, as an employer, has been responsible for contributing at any time within the six-year period immediately preceding the commencement of the case.

NAME OF PENSION FUND                                                    TAXPAYER IDENTIFICATION NUMBER
**The Principal Group - Tectonic Network, Inc. 401(k) Profit Sharing Plan**   22-3038309
**Union Central - Results Oriented Integration Corp 401(k) Profit Sharing Plan**   58-2230667

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| TECTONIC NETWORK, INC., and TECTONIC SOLUTIONS, INC., | : | CASE NO. 05-78966 CASE NO. 05-78955 |
| Debtors. | : | JUDGE MASSEY |

## AMENDMENT TO STATEMENT OF FINANCIAL AFFAIRS

COMES NOW Tectonic Network, Inc., Debtor herein, and hereby amends its **Statement of Financial Affairs, Question 3(b) – Payments to creditors, insiders**, to add the following:

| Name and Address of Insider | Relationship | Date of Payment / Type | Amount Paid | Amount Still Owing |
|---|---|---|---|---|
| Kristin Tiliakos 1025 Clinton Street #204 Philadelphia, PA 19107 | Daughter of Arol Wolford | 11/15/04 Salary | 1,666.67 | |
| | | 11/30/04 Salary | 1,666.67 | - |
| | | 12/15/04 Salary | 1,666.67 | - |
| | | 12/31/04 Salary | 1,666.67 | - |
| | | 1/1/05 - 9/30/05 Salary | 63,361.57 | - |
| Justin Clark 6871 Peachtree-Dunwoody #206 Atlanta, GA 30328 | Nephew of Arol Wolford | 1/1/05-9/30/05 Salary | 16,055.73 | |

196491.doc

A verification by the Debtor as to this amendment is attached hereto as Exhibit "A".

This 16th day of March, 2006.

LAMBERTH, CIFELLI, STOKES
& STOUT, P.A.
Attorneys for the Debtors

/s/ Gregory D. Ellis
Gregory D. Ellis
Georgia Bar No. 245310

3343 Peachtree Rd., N.E.
East Tower, Suite 550
Atlanta, GA 30326
404/262-7373

196491.doc

EXHIBIT "A"

<u>VERIFICATION</u>

I, Arol R. Wolford, President and CEO of Tectonic Network, Inc., declare under penalty of perjury that I have read the answers contained in the foregoing Amendment to Statement of Financial Affairs and any attachments thereto and that they are true and correct to the best of my knowledge, information and belief.

3-16-2006
Date

Arol R. Wolford, President and CEO
Tectonic Network, Inc.

196491.doc

## CERTIFICATE OF SERVICE

This is to certify that I have served the foregoing **AMENDMENT TO STATEMENT OF FINANCIAL AFFAIRS** this date by regular first class mail to the following:

> Office of the U. S. Trustee
> 362 Richard Russell Bldg.
> 75 Spring Street, S.W.
> Atlanta, GA 30326

This 16th day of March, 2006.

                                          /s/ Gregory D. Ellis
                                          Gregory D. Ellis

196491.doc

Appendix "F" Follows

196804.wpd

**Tectonic Network, Inc.**
**Cash Flow**
**2006**

| | ORIGINAL (submitted 3/24/06) | | |
| --- | --- | --- | --- |
| | Mar-06 | Apr-06 | May-06 |
| **Total Consolidated** | | | |
| Opening Cash Balance | $ 233,225 | $ 168,234 | $ 166,561 |
| | | | |
| **EBITDA Forecast** | | | |
| Total Company EBITDA | $ (29,250) | $ (109,746) | $ (18,512) |
| **Total Operating Cash** | $ (29,250) | $ (109,746) | $ (18,512) |
| | | | |
| **Capital Spend** | $ - | $ (13,000) | $ (5,000) |
| | | | |
| Non-cash revenue | $ (15,000) | $ (53,138) | $ (73,871) |
| Receivables –Expected Cash Flow | $ 32,251 | $ 55,576 | $ 90,826 |
| 1-time cash to bring payables in line | $ (97,242) | | |
| Sales Tax | | | # # |
| Change in Payables | $ 44,250 | $ 118,633 | $ (70,500) |
| Deposits required for rent, utilities etc. NEWCC | $ - | $ - | $ - |
| **Total Other** | $ (35,741) | $ 121,072 | $ (53,545) |
| | | | |
| **Closing Cash Balance** | $ 168,234 | $ 166,561 | $ 89,504 |
| | | | |
| Monthly Cash Flow | $ (64,991) | $ (1,674) | $ (77,057) |

Tectonic Network, Inc.
Cash Flow - Forecast
2006

| | Mar-06 | Apr-06 | May-06 | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total Consolidated** | | | | | | | | | | |
| Opening Cash Balance | $ 233,225 | $ 168,235 | $ 166,561 | $ 89,505 | $ 89,155 | $ 22,808 | $ (32,357) | $ (87,604) | $ (128,432) | $ (128,829) |
| | | | | | | | | | | |
| **EBITDA Forecast** | | | | | | | | | | |
| Total Company EBITDA | $ (28,280) | $ (103,746) | $ (18,512) | $ (36,787) | $ (46,329) | $ (32,675) | $ (19,540) | $ 9,038 | $ (35,125) | $ 15,826 |
| Total Operating Cash | $ (28,280) | $ (103,746) | $ (18,512) | $ (36,787) | $ (46,229) | $ (32,675) | $ (19,540) | $ 9,038 | $ (35,125) | $ 15,826 |
| | | | | | | | | | | |
| Capital Spend | $ - | $ (13,000) | $ (5,000) | $ (5,000) | $ (10,000) | $ (5,000) | $ (10,000) | $ (10,000) | $ (5,000) | $ (5,000) |
| | | | | | | | | | | |
| Non-cash revenue | $ (15,000) | $ (53,158) | $ (73,871) | $ (53,589) | $ (80,221) | $ (97,538) | $ (127,688) | $ (208,458) | $ (194,229) | $ (194,229) |
| Receivables - Expected Cash Flow | $ 32,251 | $ 55,576 | $ 90,888 | $ 116,035 | $ 116,035 | $ 79,375 | $ 98,875 | $ 183,000 | $ 234,005 | $ 209,875 |
| 1-time cash to bring payables in line | $ (97,242) | | | | | | | | | |
| Sale Tax | | | | | | | | | | |
| Charge In Payables | $ 44,250 | $ 116,833 | $ (70,500) | $ 8,000 | $ (49,833) | $ 1,763 | $ 2,915 | $ (14,208) | $ 333 | $ (650) |
| Deposits required for rent, utilities etc. NEWCC | $ - | | | | | | | | | |
| Total Other | $ (35,741) | $ 121,072 | $ (63,646) | $ 51,439 | $ (18,019) | $ (17,500) | $ (25,698) | $ (39,664) | $ 40,728 | $ 14,994 |
| | | | | | | | | | | |
| Closing Cash Balance | $ 168,235 | $ 166,561 | $ 89,505 | $ 89,155 | $ 22,808 | $ (32,357) | $ (87,604) | $ (128,432) | $ (128,829) | $ (103,306) |
| | | | | | | | | | | |
| Monthly Cash Flow | $ (64,991) | $ (1,674) | $ (77,057) | $ 9,652 | $ (76,348) | $ (55,179) | $ (55,438) | $ (40,827) | $ (397) | $ 25,521 |

3/23/2006
3:51 PM
Cash Flow
Confidential

Tectonic, Inc.
2006 - 2010
P&L

| | 2006 | 2007 | 2008 | 2009 | 2010 | |
|---|---|---|---|---|---|---|
| Gross Revenue | 1,159,057 | 3,966,897 | 6,770,098 | 9,138,682 | 12,795,485 | |
| % Increase | | 242% | 71% | | | |
| **COGS** | | | | | | |
| Salaries, Fringe & Merit Increase | 301,400 | 988,652 | 1,825,050 | 2,372,665 | 3,321,591 | |
| Consultants | 185,369 | 200,000 | 150,000 | 150,000 | 165,000 | |
| Directory Printing/Shipping | - | - | - | - | - | |
| Hosting Fees | 35,000 | 49,000 | 68,600 | 89,180 | 107,016 | 40% |
| | 521,799 | 1,237,652 | 2,043,650 | 2,611,745 | 3,593,607 | |
| % Gross Revenue | 45% | 31% | 30% | 29% | 28% | |
| | | | | | | |
| Gross Margin | 637,258 | 2,729,245 | 4,726,448 | 6,527,887 | 9,201,878 | |
| | 55% | 69% | 70% | 71% | 72% | |
| **Sales** | | | | | | |
| Salaries, Fringe & Merit Increase | 214,800 | 476,938 | 710,186 | 923,216 | 1,200,180 | |
| Sales Support / Customer Care | | 250,000 | 500,000 | 650,000 | 1,000,000 | |
| Travel | 35,000 | 80,252 | 118,022 | 154,729 | 232,093 | |
| | 250,800 | 808,090 | 1,328,188 | 1,727,944 | 2,432,273 | |
| % Gross Revenue | 22% | 20% | 20% | 19% | 19% | |
| | | | | | | |
| **Marketing & Advertising** | | | | | | |
| Salaries, Fringe & Merit Increase | 48,000 | 180,000 | 312,000 | 405,600 | 446,160 | |
| Other Marketing & Advertising | | 200,822 | 365,010 | 474,513 | 711,769 | |
| | 48,000 | 380,822 | 677,010 | 880,113 | 1,157,929 | |
| % Gross Revenue | 4% | 10% | 10% | 10% | 10% | |
| | | | | | | |
| **G&A** | | | | | | |
| Salaries, Fringe & Merit Increase | 122,400 | 276,400 | 434,400 | 564,720 | 734,136 | |
| Legal | 130,000 | 150,000 | 200,000 | 240,000 | 250,000 | |
| Audit & Accounting | | 100,000 | 100,000 | 100,000 | 100,000 | |
| Rent & Occup | 28,000 | 100,000 | 175,000 | 210,000 | 273,000 | |
| Telephone / Online / Internet / Cell | 29,000 | 79,000 | 529,000 | 634,800 | 825,240 | |
| Travel | 18,000 | 19,800 | 21,780 | 26,136 | 33,977 | 10% |
| Supplies | 9,500 | 20,255 | 29,227 | 35,072 | 45,594 | |
| Bank Fees | 5,000 | 5,500 | 6,050 | 7,260 | 9,438 | 10% |
| Copier Rental | - | 2,500 | 3,125 | 3,750 | 4,875 | 25% |
| Insurance/Taxes/License | 27,000 | 33,750 | 42,188 | 50,625 | 65,813 | 25% |
| Expensed Hardware/Software | 2,000 | 4,264 | 6,153 | 7,384 | 9,589 | |
| Computer Supplies / Periphirals | 6,750 | 14,391 | 20,766 | 24,920 | 32,368 | |
| Bad Debt | 7,669 | 79,338 | 135,402 | 162,482 | 211,227 | |
| Postage & Shipping | 7,750 | 16,523 | 23,843 | 28,611 | 37,195 | 50% |
| Miscellaneous | 9,000 | 20,000 | 10,000 | 50,000 | 100,000 | |
| | 402,069 | 923,722 | 1,736,934 | 2,145,760 | 2,732,465 | |
| % Gross Revenue | 35% | 23% | 26% | 23% | 21% | |
| | | | | | | |
| **R&D** | | | | | | |
| Salaries, Fringe & Merit Increase | 97,800 | 243,000 | 243,000 | 486,000 | 729,000 | |
| Other | 15,000 | 100,000 | 125,000 | 150,000 | 300,000 | |
| | 112,800 | 343,000 | 368,000 | 636,000 | 1,029,000 | |
| % Gross Revenue | 10% | 9% | 5% | 7% | 8% | |
| | | | | | | |
| Total Operating Expenses | 813,669 | 2,455,633 | 4,111,131 | 5,389,817 | 7,351,690 | |
| | | | | | | |
| EBITDA | (176,401) | 272,612 | 615,317 | 1,138,070 | 1,850,188 | |
| | -15% | 7% | 9% | 12% | 14% | |
| | | | | | | |
| **Headcount** | | | | | | |
| Production | 4 | 7 | 10 | | | |
| Sales | 2 | 5 | 7 | | | |
| Marketing & Advertising | 1 | 3 | 5 | | | |
| General & Administrative | 1 | 3 | 5 | | | |
| R&D | 1 | 2 | 2 | | | |
| | 9 | 20 | 28 | | | |
| | | | | | | |
| Sales per rep | 883,476 | 907,853 | 1,029,820 | | | |
| Revenue per production employee | 185,403 | 200,004 | 150,004 | | | |
| Labor Multiplier | 2.4 | 3.3 | 3.4 | 3.6 | 3.7 | |
| Rent per employee | 3,043 | 5,088 | 6,163 | | | |
| A/P metric | 493,068 | 1,055,396 | 1,820,165 | 2,189,462 | 2,641,231 | |
| | | | | | | |
| | 1,335,488 | 3,694,285 | 6,154,781 | | | |

# EXHIBIT  E

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

---

TECTONIC NETWORK, INC. AND
TECTONIC SOLUTIONS, INC.,

    Debtors.

Case No. 05-78966
05-78955

(Jointly Administered
  Case No. 05-78966)

Judge Massey

---

**VERIFIED STATEMENT OF OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP AND COHEN POLLOCK MERLIN
AXELROD & SMALL, P.C. PURSUANT TO FED. R. BANKR. P.2019**

TO THE HONORABLE JAMES E. MASSEY
UNITED STATES BANKRUPTCY JUDGE:

    Olshan Grundman Frome Rosenzweig & Wolosky LLP ("Olshan") and Cohen

Pollock Merlin Axelrod & Small P.C. ("Cohen"), co-counsel to the Ad Hoc Committee of Equity

Security Holders ("Ad Hoc Committee") makes the following statement pursuant to rule 2019 of

the Federal Rules of Bankruptcy Procedure on behalf of itself, the Ad Hoc Committee:

    1.    **Names and Addresses Of Members Of Ad Hoc Committee**

    As of the date hereof, the respective names and addresses of members of

the Ad Hoc Committee are as follows:

| | Name | Shares |
|---|---|---|
| 1. | Diane Will<br>9 Prospect Hill Ext.<br>Pine Plains, NY 12567 | 30,000 |

475221-2

| | | |
|---|---|---|
| 2. | Bridge Ventures Inc.<br>Harris Frie<br>1241 Gulf of Mexico Drive<br>Longbrook Key, FL 34228 | 249,750 |
| 3. | Terri Watson<br>104 Old Post Road<br>Millerton, NY 1246 | 8,000 |
| 4. | Stephen M. Dalt Family Trust<br>DTD 7/21/01<br>700 Cass St., Suite 200<br>Monterey, CA 93940 | 100,000 |
| 5. | Justin W. Dart Trust<br>DTD 9/6/61<br>700 Cass St., St. 200<br>Monterey, CA 93940 | 100,000 |
| 6. | Dart Family Partnership II, L.P.<br>DTD 9/6/61<br>700 Cass St., St. 200<br>Monterey, CA 93940 | 100,000 |
| 7. | Ronny Doran<br>P.O. Box 7029<br>Ft. Worth, TX 76111 | 20,000 |
| 8. | Sharon Will<br>3014 S.W. 41st Ave.<br>Ocala, FL 34474 | 140,000 |
| 9. | Best Source Publishin<br>c/o Scott McLean<br>2025 E. Beltine Avenue<br>Grand Rapids, MI 49546 | 262,500 |
| 10. | Saggi Capital Corp.<br>9 Prospect Hill Ext.<br>Pine Plains, NY 12567 | 70,400 |
| 11. | Laura W. Dart Trust DTD 10/29/40<br>700 Cass St.<br>Monterey, CA 93940 | 100,000 |

2

475221-2

| | | |
|---|---|---|
| 12. | Richard R. Rast<br>1611 Castle Pointe Drive<br>Castle Rock, CO 80104 | 398,824 |
| 13. | Joseph R. Roselle<br>56 Gillespie Avenue<br>Fair Haven, NJ 07704 | 40,000 |
| 14. | Dutchess Foundation<br>Muehle bach Strasse 6<br>Zurich, Switzerland CH 8008 | 215,000 |
| 15. | Saggi Capital<br>9 Prospect Hill Ext.<br>Pine Plains, NY 12567 | 97,600 |
| 16. | Don Will<br>150 N. Anoka Avenue<br>Avon Park, FL 33825 | 14,000 |
| 17. | White Rock Investments<br>c/o Joe Giamanco<br>4 White Rock Terrace<br>Holmdel, NJ 07733 | 140,000 |
| 18. | Lee Johnson<br>14750 El Camino Rd<br>Del Mar, CA 92014 | 75,000 |
| 19. | Lawrence Gorelick<br>Lawrence Gorelick DDS<br>  PC Retirement Trust<br>530 Route 6<br>Mahopac, NY 10451 | 34,500 |
| 20. | Peter Janowski<br>121 East 60th Street 6th Floor<br>New York, NY 10022 | 10,000 |
| 21. | Sharon Fuerst<br>389 Cousins Street<br>Yarmouth ME 04096 | 20,000 |
| 22. | Martin Beck<br>614 N. June Street<br>Los Angeles CA 90004 | 10,000 |

3

| | | |
|---|---|---|
| 23. | Gary Kaplowitz<br>451 Run Creek Road<br>Suite 103<br>Henderson, NC 27536 | 2,700 |
| 24. | Henderson Orthopedics<br>451 Run Creek Road<br>Suite 103<br>Henderson, NC 27536 | 26,300 |
| 25. | David Iacometta<br>18 Woodbury Road<br>Hauppauge, NY 11788 | 18,000 |
| 26. | C. Ames Byrd<br>513 Market Street<br>Pocomoke City, MD 21851 | 10,000 |
| 27. | Stanley Ast<br>7 Clay Street<br>New City, NY 10956-7011 | 22,000 |
| 28. | Paul Becker<br>131 Mineola Blvd.<br>Mineola, NY 11501 | 7,285 |
| 29. | Donald Karsten<br>121 East 60th Street<br>6th Floor<br>New York, NY 10022 | 109,500 |
| 30. | Albert Saphier<br>4922 Bayway Place<br>Tampa, FL 33629 | 10,000 |
| 31. | Susan Freedman<br>180 Beech Street<br>Roslindale, MA 02131 | 9,500 |
| 32. | Theodore Miller<br>238 East 95th 6A<br>New York, NY 10128-3850 | 700 |

475221-2

| | | |
|---|---|---|
| 33. | Robert Karsten<br>121 East 60th Street<br>6th Floor<br>New York, NY 10022 | 109,500 |
| 34. | Robert Wax<br>400 East 56th Street 32N<br>New York, NY 10022 | 10,000 |
| 35. | Murray Alon<br>64-40 Ellwell Crescent<br>Regal Park, NY 11374 | 65,000 |

### 2.    Nature of Claims

The members of the Ad Hoc Committee hold Equity Security interests in Debtors. The members of the Ad Hoc Committee have advised Olshan that, as of the date hereof, such members hold approximately $2,000,000 shares. Olshan reserves the right to revise and supplement these statements, including in particular as to the aggregate amount of claims held by the members of the Ad Hoc Committee.

### 3.    Facts And Circumstances Of Counsel's Engagement

The Ad Hoc Committee was formed subsequent to the commencement of these cases. The Ad Hoc Committee asked Olshan together with Cohen to serve as legal representative to the Ad Hoc Committee in these cases.

### 4.    Claims or Interest of Counsel

To he best of our knowledge, neither Olshan nor Cohen holds any claims or interests in the Debtors.

5

Date:   New York, NY
January 12, 2006

**OLSHAN GRUNDMAN FROME**
   **ROSENZWEIG & WOLOSKY LLP**
Michael S. Fox, Esq.
Thomas J. Fleming, Esq.
Frederick J. Levy, Esq.
Park Avenue Tower
65 East 55th Street
New York, New York  10022


By: /s/ Michael Fox _____


Date:   Atlanta, GA
January 12, 2006

**COHEN POLLOCK MERLIN**
**AXELROD**
   **& SMALL, P.C.**
Gus Small, Esq.
3350 Riverwood Parkway
Suite 1600
Atlanta, Georgia 30339
Telephone: (770) 818-1606


By: /s/ Gus Small _____


6

475221-2

# EXHIBIT  F

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# 10KSB

**Filed on 10/12/2004 − Period: 06/30/2004**
File Number 000−33279



LIVEDGAR  Information Provided by Global Securities Information, Inc.
202-628-5155
www.gsionline.com

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-KSB

[X]    ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF
1934

For the fiscal year ended June 30, 2004

[_]    TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT
OF 1934

For the transition period from _____ to _____

Commission file number 033-36198

RETURN ON INVESTMENT CORPORATION
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| DELAWARE | 22-3038309 |
|---|---|
| (State or other jurisdiction of incorporation) | (IRS Employer Identification No.) |

| 1825 BARRETT LAKES BLVD, SUITE 260, KENNESAW, GEORGIA | 30144 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

REGISTRANT'S TELEPHONE NUMBER: (770) 517-4750

Securities registered under Section 12(b) of the Exchange Act:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| None | |

Securities registered under Section 12(g) of the Exchange Act:

Common Stock, par value $.01 per share

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes [X] No [_]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-B is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-KSB or any amendment to this Form 10-KSB. [X]

State registrant's revenues for its most recent fiscal year: $10,586,034.

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was sold, or the average bid and asked price of such common equity, as of a specified date within the past 60 days: $23,718,825 based on the closing sales price of $1.80as of September 21, 2004 as reported on the OTC Bulletin Board. State the number of shares outstanding of each of the registrant's classes of common equity, as of the latest practicable date: 13,867,054 shares as of September 21, 2004.

Documents Incorporated by Reference: None.

Transitional Small Business Disclosure Format (check one): Yes [_] No [X]

ii

RETURN ON INVESTMENT CORPORATION

2003 FORM 10-KSB ANNUAL REPORT

TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| **PART I.** | | |
| Item 1. | Description of Business | 1 |
| Item 2. | Description of Properties | 7 |
| Item 3. | Legal Proceedings | 7 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 7 |
| **PART II.** | | |
| Item 5. | Market for Common Equity and Related Stockholder Matters | 8 |
| Item 6. | Management's Discussion and Analysis or Plan of Operation | 9 |
| Item 7. | Financial Statements | 22 |
| Item 8. | Changes In and Disagreements with Accountants on Accounting and Financial Disclosure | 22 |
| Item 8A. | Controls and Procedures | 22 |
| **PART III.** | | |
| Item 9. | Directors, Executive Officers, Promoters and Control Persons; Compliance with Section 16(a) of the Exchange Act | 22 |
| Item 10. | Executive Compensation | 25 |
| Item 11. | Security Ownership of Certain Beneficial Owners and Management | 27 |
| Item 12. | Certain Relationships and Related Transactions | 27 |
| Item 13. | Exhibits and Reports on Form 8-K | 28 |
| Item 14. | Principal Accountant Fees and Services | 30 |
| | Signatures | 32 |
| | Index to Exhibits | 33 |
| | Financial Statements | F-1 |

iii

PART I

ITEM 1. DESCRIPTION OF BUSINESS

GENERAL

Return On Investment Corporation d/b/a ROI Corporation (the "Company" or "ROI") was incorporated in Delaware in 1990 as Net/Tech International, Inc. ("NTTI"). On August 10, 2000, the Company completed a reverse merger whereby Results Oriented Integration Corporation was merged into a wholly-owned subsidiary of NTTI, which at the time had no operations. The name of the company was changed to Return On Investment Corporation. The Company's principal executive offices are located at 1825 Barrett Lakes Boulevard, Kennesaw, Georgia 30144 and the Company's telephone number is (770) 517-4750 and its website can be found at www.roicoporation.com. Information contained in the Company's website does not constitute part of this report.

During fiscal 2004, ROI's operations have been conducted through two primary subsidiaries: (i) Tectonic Solutions, Inc. ("Tectonic" or "Tectonic Network") which develops and markets building product information solutions for the construction industry including printed directories, a searchable online building product information database, an online studio for the search, visualization and selection of carpet, paint and other textiles and customized web based solutions for organizing building product manufacturer databases for easier search and selection and (ii) GO Software, Inc. ("GO" or "GO Software") which currently develops and markets software and services for credit card, debit card and check transactions processing with offerings including payment processing software for virtually any computing platform, including Windows, Unix and Linux and will begin offering in fiscal 2005, a secure, scalable Internet only solution in the form of an application service provider model as a result of a recent acquisition described below.

PROPOSED DIVESTITURE

On September 27, 2004, the Company announced that it has retained an advisor to assist in the divestiture of GO. The proposed divestiture is part of ROI's business strategy to focus on its construction information product offerings through Tectonic.

Historically, ROI has functioned as a holding company with businesses in both the payment processing and, more recently, the construction information industries. These industries are unrelated and are not synergistic in nature. Management has determined that the Company's future prospects would be greatly enhanced by focusing on the construction information industry rather than the payment processing industry. While GO has achieved success under ROI, achieving revenue growth and becoming a market leader, management has recognized that competitors in the payment processing industry have much greater financial resources than ROI and that the continued success of GO would be put at risk due to the undercapitalization of ROI. Thus, it is in the best interests of the Company and its stockholders that the Company pursue a path where it believes the odds of future success are greatly improved. The construction information industry is a highly fragmented industry with no dominant companies and there exist numerous opportunities for growth by providing services to an underserved marketplace. By divesting of GO, the Company will improve its liquidity. Management believes that this improved liquidity position will provide an opportunity for our executive management team to focus on an industry where they have the most experience.

ROI has received a number of offers for the sale of GO Software and intends to complete the proposed divestiture as soon as practicable, subject to negotiation of a definitive agreement, receipt of stockholder approval and satisfaction of all other conditions precedent.

Except where specifically noted below, this report discusses the operations of Tectonic and GO as historically operated by the Company.

OPERATIONS

Tectonic Network

The introduction of Tectonic business in fiscal 2003 represented a new strategy for the Company as it sought to develop a vertical market to take advantage of core knowledge of the construction industry within the Company's management team as well as take advantage of what management believes represents an opportunity for

1

significant growth. This subsidiary provides marketing and sales solutions that facilitate the way building product information is organized, displayed, and distributed by building product manufacturers and distributors. These solutions enable designers and builders to more easily locate, understand, select, and purchase building products. Management believes that the Tectonic Solutions product and service offerings will be in high demand given the highly fragmented nature of the $997 billion U.S. construction industry (U.S. Census Bureau, 2004) and the lack of other fully comprehensive competing products.

In fiscal 2004, the Company completed three acquisitions to increase Tectonics' capabilities in the construction information industry as follows:

On November 18, 2003, the Company and BBN Acquisition, Inc., a North Carolina corporation ("BBN"), consummated a merger whereby BBN was merged with and into Tectonic, pursuant to an Agreement and Plan of Merger, dated as of October 29, 2003. Tectonic survived the merger as a wholly-owned subsidiary of ROI. In connection with the merger, the Company issued approximately 750,000 shares of its common stock for all of the issued and outstanding shares of BBN's common stock. The BBN assets acquired comprise an online design resource for design professionals in the commercial interiors industry allowing users to search and compare building product manufacturer's commercial interior finishes by attribute such as style, thickness, color or specific patterns. BBN's product line BlueBolt was renamed Tectonic Studio subsequent to the merger.

On November 26, 2003, the Company and Construction Yellow Pages LLC, a Michigan limited liability company ("CYP"), consummated the transactions contemplated by an Asset Purchase Agreement, dated as of October 29, 2003, whereby Tectonic purchased substantially all of the operating assets of CYP. In connection with the asset purchase, the Company issued 750,000 shares of the Company's common stock as consideration for substantially all of the operating assets of CYP. Prior to the asset purchase, CYP was a publisher of regional comprehensive print directories for the commercial construction industry. CYP's product line was renamed Tectonic Print Directory subsequent to the asset purchase. Using the CYP assets, Tectonic publishes a comprehensive directory of the Architectural, Engineering and Contractor ("AEC") community including building product manufacturers, their distributors and sales representatives, for the commercial construction industry. These regional directories are also targeted at specific local markets with local providers appearing in the front and national and regional providers listed in the back.

On January 2, 2004, the Company and SpecSource.com, Inc., an Indiana corporation ("SpecSource"), consummated the transaction contemplated by an Asset Purchase Agreement, dated as of October 29, 2003, whereby Tectonic purchased substantially all of the operating assets of SpecSource. In connection with the SpecSource asset purchase and as consideration for substantially all of the operating assets of SpecSource, the Company issued 1,450,000 shares of the Company's common stock, entered into a non-interest bearing note payable in the amount of $533,000 and simultaneously entered into a non-compete agreement with one of the stockholders of SpecSource for $360,000. The SpecSource assets enable Tectonic to provide an online directory of commercial building product manufacturers and their local supply chain of product representatives and distributors searchable by key word, Construction Specification Institute ("CSI") Master Format code, company name or construction trade name. SpecSource's product line was renamed Tectonic Online Directory subsequent to the asset purchase.

GO Software

GO develops and markets payment processing and connectivity software, including PCCharge, RiTA and JavaCard. The software provides the connectivity and communications to facilitate the processing of credit card, debit card, and check transactions which are passed through our software by merchants to the processors. ROI customers for payment processing products and services range from small to large retailers, mail and phone order companies and Internet marketers.

To enhance GO's product offering in the electronic marketplace, on January 7, 2004, the Company purchased certain foreclosed assets of Atomic Software, Inc., ("Atomic") by issuing approximately 600,000 shares of its common stock. The purchased assets, primarily Atomic's gateway code, have complemented the Company's existing GO product line of Windows based software payment processing solutions enabling GO to offer a completely Internet based application that can be accessed from any Internet browser and is not software dependent. This internet based application enables a merchant to accept credit cards in their business in the same manner as GO's other software products; however, using an application service provider model to provide the credit card service. Through this Internet model, GO's customers are not required to purchase and pay for expensive software

2

licenses upfront, but rather using an Internet browser pay as they use the service, on a transaction-by-transaction basis. This enables merchants to benefit from the latest updates without waiting for the next software upgrade, frees them from dependence on a single PC, creates greater reporting and tracking capabilities and for small merchants reduces the cost of accepting credit cards.

STRATEGY

Beginning with the launch of Tectonic in fiscal 2003, the Company has pursued independent parallel strategies through its two subsidiaries. The Tectonic subsidiary has pursued the goal of becoming a preferred provider of sales and marketing solutions to building product manufacturers in the highly fragmented construction industry. The GO subsidiary has pursued the goal of becoming a recognized leader in providing payment processing solutions to merchants and end users through its reseller network in North America. As explained above, the Company is pursuing a divestiture of GO. Upon completion of the sale of GO, the Company will pursue one unified strategy through its Tectonic Subsidiary as outlined below. If the Company is not able to divest of GO in a timely manner or on terms currently anticipated, the Company's strategy going forward will be reformulated to focus on a strategy for GO. The following discussion assumes that the GO divestiture will occur as anticipated and that the Company will be able to pursue its unified Tectonic strategy. The following are the key elements of the Tectonic strategy:

o   Up-Sell Products and Services. Tectonic is gaining traction in the market by offering a suite of products to solve building product manufacturer sales and marketing needs. Subsequent to acquiring through acquisition the complementary products lines described above, the Company has determined that building product manufacturers prefer the Company's multi-faceted solutions which are better able to solve their needs than the same products when sold individually. In addition, by offering a bundled sale of products, the Company has experienced higher price points and renewal rates than when these products were sold separately by their prior owners.

o   Enhance our Product Offerings. To compete effectively, and expand our market share, Tectonic must continually develop and introduce new products and enhancements that reflect technological developments and emerging industry standards. Tectonic will improve and expand its product and service offerings on an ongoing basis through both internal research and development efforts as well as through acquisitions.

o   Develop a focused vertical market in the construction industry. The Company believes that developing a construction information product vertical will enable deeper penetration into this specific market segment, which will allow for greater growth than it has historically achieved with GO's broad base payment processing software.

o   Leverage Existing Distribution Channels and Develop New Strategic Partnerships. Tectonic has a significant number of high level relationships with many building product manufacturers, distributors, large architectural practices and associations and will seek to develop these further. In this regard, Tectonic Online Directory has become the search engine of choice embedded in over 60 local chapters of the 17,000 member Construction Specification Institute, and is also the embedded search engine in the Door Hardware Institute (DHI) among others. Tectonic personnel also are affiliated with the Building Owners and Managers Association (BOMA), the Construction Managers Association of America (CMAA), the American Society of Professional Estimators (ASPE) among others and sit on various boards such as the highly prestigious Design Futures Council and various committees of the American Institute of Architects (AIA).

o   Acquire Complementary Businesses and Products. An element of our growth strategy has been to pursue potential acquisitions that offer opportunities to increase our sales channels, gross margins and market shares. By acquiring businesses that offer products that complement Tectonic's existing products, we believe we can decrease the time required to build products and get them to market and also increase the likelihood that our suite of products will meet the needs of our existing and potential customers. In the past fiscal year the Company acquired three entities to compliment its existing Tectonic Solution product line.

3

PRODUCTS

### Tectonic Network

The integrated Company, Tectonic Network, combines seasoned professionals from the design, construction, building products and architecture, engineering and construction information industry with the latest information, technology and tools to connect buyers and sellers of commercial building products and services.

Tectonic began operations as a custom solution provider in fiscal 2003 with its Tectonic Solutions product which provides custom software solutions to help building product manufacturers and distributors improve the way they organize, display and distribute their product information. These solutions allow architects, distributors, building owners and contractors to search for products based on attribute or applications, compare products within a product line or between lines, configure products to fit a specific application and choose, visualize and incorporate product information into design documents and specifications. Tectonic Solutions generates revenue through consulting fees.

Tectonic then significantly enhanced its product line through the acquisition and integration of three companies in the building product information business as follows:

BBN, now Tectonic Studio, offers online resources for design professionals in the commercial interiors industry. Through its patented technology, Tectonic Studio provides product information and color-accurate imagery for more than 50 brands of commercial interior finishes, allowing comparisons of finishes by attribute such as style, thickness, color or specific patterns. Tectonic Studio generates revenue through advertising and subscriptions.

CYP, now Tectonic Print Directories, is a publisher of comprehensive regional "yellow pages" print directories for the commercial construction industry. These directories include specialization for local markets. Tectonic Print Directory also serves as the print manifestation to the electronic database of SpecSource.com, and through a print medium, provides access to the large portions of the commercial construction marketplace that are not yet online. Tectonic Print Directories generates revenue through advertising.

SpecSource.com, now Tectonic Online Directory, is an online directory of commercial construction product manufacturers and their local supply chain of product representatives and distributors. Tectonic Online Directory provides design professionals with information about building product manufacturers, including local contact information. Tectonic Online Directory's online offering also profiles thousands of architects, engineers and contractors who are currently active in the commercial construction market. The online search capabilities of Tectonic Online Directory allow contractors and other buyers of construction products to find resources in their location where they can buy a desired product as most manufacturers do not sell directly to contractors but sell through local distributors and independent sales representatives. Tectonic Online Directory generates revenue through advertising.

### GO Software

GO develops and markets software and provides software support. GO's primary products are packaged software used by merchants for payment processing, including PCCharge, JavaCard and RiTA. PCCharge provides payment processing for Windows based applications, GO JavaCard operates on IBM midrange computer systems and RiTA is designed to work on virtually any computer hardware or software platform including Windows, Unix, Linux, OS/390, OS/400 and Sun Solaris. In addition, the Company recently acquired an Internet based payment gateway that will extend the Company's offering from a software only platform to an internet based application service provider.

GO is one of the industry's leading suppliers of payment processing products. PCCharge products such as, PCCharge Express, PCCharge Pro, PCCharge Payment Server, RiTA Server and JavaCard are currently being used by tens of thousands of merchants to process credit card transactions in conventional brick and mortar, as well as, e-Commerce businesses. An Internet pioneer, GO introduced the first IP-enabled payment processing engine for Windows environments. RiTA is expected to be the foundation for the next generation of GO payment processing software products written in Java and XML.

4

GO charges license fees for the use of these software products. The retail prices for a single license range significantly, from hundreds of dollars for a PC to tens of thousands of dollars for our middleware solutions, RiTA and JavaCard. The total license fee depends upon the platform, the functionality, and the number of connections required to process transactions. In addition, GO offers annual support and update services typically priced at a percentage of the license fee.

GO's payment processing software products support virtually all electronic payments including credit/debit cards, checks, check conversions, ACH (Automated Clearing House) transactions, electronic benefit transfers (EBT), and stored value, gift and loyalty cards. The products can support all levels of transaction volume and operate in any merchant environment, including retail point-of-sale, phone/mail order, and Internet e-commerce. They also offer fast authorization time, security, encryption and advanced fraud protection and cardholder authentication, which can result in lower transaction fees for the merchant. GO's payment processing software can be interfaced with any application software via standard programming languages. With this software, the merchant can use any major bank or financial network to authorize and settle payment transactions.

TECHNICAL SUPPORT AND CONSULTING SERVICES

Tectonic provides technical support through a help desk accessible during business hours supporting manufacturers' data contained within Tectonic's products, providing, for example, help with adding or deleting data from a database hosted by Tectonic. Due to the nature of the product lines 24/7 support is not required.

GO offers customers varying levels of technical support services 24 hours a day, seven days a week including periodic software updates and access to telephone support and support-related information via the Internet. GO also offers training and consulting services. Through our active alliance partner program, we recruit consulting, application software, and system integration firms to market and implement our software solutions.

CUSTOMERS

Tectonic customers are primarily building product manufacturers and their distributors and independent sales organizations, but also include general contractors, subcontractors and heavy equipment dealers. These customers range in size from small businesses to large fortune 500 customers. The primary targeted customer for Tectonic products is a building product manufacturer that would purchase a custom solution product and at the same time purchases advertising in both our electronic and print directories.

GO has sold over 140,000 licenses for use of its software. Customers who purchase GO's payment processing products and services range from small to very large merchants. GO has products in many vertical markets and business types including retailers, mail and phone order companies, and Internet marketers.

None of our customers accounted for more than 5% of operating revenues for the fiscal year ending June 30, 2004.

SALES

Tectonic Network

Tectonic has a direct sales team, comprised of personnel with an average tenure of 13 years in the construction information industry, primarily focused on selling products similar to its current offering to building product manufacturers. These products include advertising products as well as sales and marketing solutions. In addition an inside sales force is used to sell advertising in both our print and online directory products.

Tectonic's products and services are focused on the construction industry. The Company's direct sales staff has substantial knowledge of the Tectonic product and service offerings as well as the in-depth needs of the construction industry and most notably building product manufacturers. Management believes the extensive knowledge of the construction industry by our sales personnel as well as our internal consultants is a key competitive advantage which has enabled Tectonic to achieve credibility rapidly upon entering this market. For example, Tectonic received an Electronic Innovation Award from the 17,000 member Construction Specification Institute in March 2004 and, despite its recent launch, has secured brand name customers such as Sherwin-Williams, Milliken and Delta Faucet.

5

GO Software

To reach its potential customer base, GO has several distribution channels, including a direct sales force and hundreds of strategic alliances with software developers, systems integrators, financial institutions, consultants and financial transaction processors that make up its reseller network. GO's reseller network primarily consists of customers in two channels, the financial channel which includes independent sales organizations, electronic payment processors and financial value added resellers and the developer channel, which includes software developers, integrators and dealers.

An important element of the GO sales strategy is to expand relationships with its reseller and developer channels to increase market awareness and acceptance of its software and services. GO also provides training and other support necessary for resellers and developers to aid in the promotion and sale of its products.

GO's products and services are used by many types of customers in various industries. GO's direct sales staff has substantial knowledge of its product and service offerings and GO continues to recruit and train its sales force.

MARKETING

The Company's marketing personnel perform all marketing functions except investor relations. The Company's marketing department has responsibility for product marketing, marketing communications and public relations, and also produces collateral material for distribution to prospects including demonstrations, presentation materials, white papers, case studies, articles, brochures, and data sheets.

The Company utilizes focused marketing programs such as preparing trade show specific marketing collateral for attendees at industry trade shows such as the American Institute of Architects or CSI trade shows attended by Tectonic or the Food Service Technology trade show and the National Retail Federation trade show attended by GO. These programs attract potential customers in our target markets and are also used to promote the respective subsidiaries, and brands. We also use seminars, advertising, telemarketing, direct mail, speaking engagements, public relations campaigns, partner conferences, and web site marketing to promote our products and services. Internally, we devote substantial resources to supporting our sales team with high quality sales tools and collateral materials.

Tectonic

Tectonic targets sales of its construction information solutions products to small to large building product manufacturers including their distributors and independent sales organizations through a variety of methods. While building product manufacturers and their distributors and sales representatives are the primary purchasers of Tectonics products, this group has a need to influence the buying decision of their direct customers such as general contractors and subcontractors as well as the product selection decision of building owners, architects, specifiers and designers. Tectonic therefore targets marketing efforts to the manufacturers' product end-users such as building owners, architects, specifiers, designers, contractors and subcontractors who will actually make the product selection decision or buy and install the product.

Tectonic targets these groups through different methods which includes the hardcopy distribution of its print directories which approximates 225,000 in any calendar year, and through a variety of online internet based methods including proprietary searchable websites based on product attribution, which are hosted directly by us but which also may be the search engine embedded in the websites of our partners such as in over 60 local chapters of the 17,000 member Construction Specifications Institute. In addition, our direct sales force targets building product manufacturers for customized website design including product configuration.

GO Software

The target market for our GO payment processing products and services is extensive. Application software, such as retail point-of-sale software and e-commerce shopping cart software, typically does not provide payment processing capabilities. GO's software provides connectivity and communications to facilitate the processing of credit card, debit card, and check transactions. The market for our IBM midrange software products and services includes companies that need e-mail capabilities on their IBM midrange systems and companies that need to connect

6

their IBM midrange systems to other computer systems or devices, such as barcode data collection equipment and materials handling equipment. GO's marketing personnel have an in-depth understanding of the payment processing software and services marketplace and the IBM midrange marketplace and the needs of customers in those marketplaces, as well as experience in all of the key marketing disciplines. These personnel also have a broad knowledge of GO's products and services and how they can meet customer needs.

RESEARCH AND PRODUCT DEVELOPMENT

Products contained within the Tectonic Network brand will continue to undergo refinement and development to determine those which best suit our customers needs. While these products generally have a technology component, they are not considered highly technological and are not subject to significant threat by competing technologies. Tectonic will continue to develop new variations of existing products and will, from time to time, research and develop completely new products to serve its target market.

The market for GO products is characterized by rapidly changing technologies and evolving industry standards. GO's future growth will depend to a substantial degree upon its ability to enhance its existing products and to develop and introduce, on a timely and cost-effective basis, new products such as the recently acquired internet payment gateway, and add new features that meet changing customer requirements and emerging and evolving industry standards such as compliance with Credit Information Security Program ("CISP"). GO anticipates continued investments in research and development costs in all its products, with an emphasis on its RiTA product including new versions, certifications and enhancements and further development until the launch of the internet payment gateway.

Research and development expenses for fiscal 2004 and 2003 were $1,530,464 and $1,325,531, respectively. Research and development expense for the Tectonic subsidiary was primarily incurred in the development of new product lines and amounted to $277,861 in fiscal 2004 and $0 in 2003. The remainder of such expenses was incurred for enhancement of the GO products. Following the proposed divestiture of GO, the Company expects research and development expenses to occur at the same percentages of revenue for the Tectonic subsidiary as in fiscal 2004, and while Tectonic will continue to develop new products and will provide enhancements to existing products, the nature of the products sold by the Tectonic subsidiary do not require as significant a research and development effort as do GO's products.

COMPETITION

Tectonic Network

Tectonic operates in the construction industry, which is the third largest industry in the U.S. after defense and healthcare. The market for Tectonic's products and services is highly fragmented and served by numerous firms, many of which address only specific aspects of a particular portion of the construction market. We believe the principal competitive factors that are faced by Tectonic are reputation and quality of service, relative price and performance, time to market, industry expertise, and product fit. Known competitors include certain multi-national consulting and publishing firms that have product lines focused on the broader market but lack domain expertise or the suite of products that we currently offer. These competitors include certain product lines of the McGraw-Hill companies, web site development firms and the Blue Book of Construction. Presently, management does not believe that any Tectonic competitor offers a suite of products as broad and with the same level of service offered by the Tectonic products. Further, while certain Tectonic competitors in the area of customized web site development provide similar products, they do so across all industry lines whereas Tectonic specifically focuses on building product manufacturers and as a result has greater industry expertise and is better able to apply domain knowledge.

7

GO Software

GO operates in the payment processing industry. GO's market is served by a limited number of large entities that dominate this space. While GO has become a leader in Windows based deployments of its software, the industry continues to undergo consolidation with smaller niche players being absorbed into larger entities. We believe the principal competitive factors that are faced by GO are reputation and quality of service, relative price and performance, time to market for new product introductions, adherence to ever changing industry standards, technical expertise, and new product availability. In addition, many of our direct competitor product lines are owned by entities that have significant financial resources giving them the ability to compete more effectively.

In the Windows market, GO's primary competitor is IC Verify. In the IBM midrange market, IBM Websphere's Payment Manager and Integrated Systems Design are GO's primary competitors. Competition in the Windows and IBM midrange markets is expected to grow and companies with greater resources than GO continue to enter the market.

RiTA, GO's Java-based payment processing software, operates on virtually any computing platform. Although competitors exist on each different type of computer platform on which RiTA operates, we are not aware of any competitive product that operates on all of the platforms supported by RiTA. In the Unix market, GO's primary competitor is Southern DataComm.

The payment gateway acquired by GO in fiscal 2004 (which will be formally launched in the second quarter of fiscal 2005) will also enter a highly competitive market where competition exists from many companies including Authorize.net, Verisign and Cybersource. We believe that the current positioning of GO with its strong brand name and relationships with its resellers, independent sales organizations and developers will however give the gateway an advantage on its introduction into the marketplace.

INTELLECTUAL PROPERTY

The Company's success is dependent upon developing, protecting, and maintaining its intellectual property assets. Tectonic holds a patent on computer software which generates storyboards used in interior design. Both Tectonic and GO have registered and unregistered copyrights and trademarks. The Company relies upon a combination of patent, copyright, trademark, and trade secrecy protections, along with contractual provisions, to protect our intellectual property rights in software, documentation, data models, methodologies, data processing systems, and related written materials. Copyright protection is generally available under United States laws and international treaties for our software and printed materials. The effectiveness of these various types of protection can be limited, however, by variations in laws and enforcement procedures from country to country.

EMPLOYEES

At June 30, 2004, we had a total of 168 full time employees including 53 individuals employed by Tectonic, 112 individuals employed by GO and three individuals in corporate roles. Many of our employees are highly skilled and our continued success is dependent on our ability to attract and retain qualified employees. Our employees are not represented by a union or a collective bargaining agreement. We have employment agreements with our Chief Executive Officer and our Chairman of the Board.

ITEM 2. DESCRIPTION OF PROPERTIES

The Company leases its administrative, marketing, and research and development facilities under long-term operating leases. The corporate headquarters and about 13% of GO's personnel are located in approximately 7,300 square feet in Kennesaw, Georgia pursuant to leases expiring in 2005. GO's headquarters are located in approximately 14,800 square feet in Savannah, Georgia pursuant to leases expiring in 2006. The Company's Tectonic subsidiary is located in approximately 4,100 square feet in Englewood, Colorado pursuant to leases expiring in 2005. The Company assumed several other leases in connection with various business combinations during 2004, including approximately 5,700 square feet in Durham, North Carolina, approximately 6,300 square feet in Indianapolis, Indiana, and approximately 3,800 square feet in Grand Rapids, Michigan. These leases expire through 2009 taking into account all renewal options. The Company currently intends to terminate its lease in

8

Durham, North Carolina at the end of October 2004, which lease is currently running on a month-to-month basis. In addition, the Company plans to exit its facility in Indianapolis, Indiana in November 2004 and further, depending on the results of the proposed divestiture of GO, the Company may exit its facility in Kennesaw, Georgia and move to a new facility in Atlanta, Georgia for its corporate office location.

The Company believes that its facilities are adequate for its current needs and that suitable additional or substitute space will be available as needed to accommodate expansion of the Company's operations.

ITEM 3. LEGAL PROCEEDINGS

The Company filed an action against UniComp, Inc. ("UniComp") in May 2002 in the Superior Court of Cherokee County, Georgia, alleging breach of promissory note and seeking attorneys' fees. The Complaint alleges that UniComp failed to pay $500,000, plus interest, due to the Company by October 2001 under a Promissory Note duly executed by UniComp. UniComp filed an answer and counterclaims in August 2002 denying liability. Defendant's counterclaims allege misappropriation of trade secrets and confidential information, violation of fiduciary duties, conversion, tortious interference with contractual and business relationships, and seeks punitive damages.

In February 2003 and again in May 2003, the parties filed a Consent Motion to extend the time for completion of discovery on the grounds that the parties had discussed the possibility for settlement and were actively pursuing mediation in an effort to resolve the dispute. Unicomp requested a postponement of mediation until June 19, 2004 or a mutually agreeable time thereafter. In consideration of the request for postponement, on June 13, 2003, the parties agreed that Unicomp would pay the Company $100,000, over a one year period in four installments of $25,000. The Company received the four installments under the agreement. The one year term embodied in the order granting postponed mediation and extension of the discovery period expired on July 19, 2004.

On August 2, 2004, ROI filed with the Court an order enforcing its July 21, 2003 Order Granting Postponed Mediation and Extension of Discovery Period, and provided defendant Unicomp ten days from the date of the new order to contact counsel for ROI to reschedule the postponed mediation. In response to the filing, Unicomp again requested that the Mediation be postponed and agreed that Unicomp will pay the Company $50,000 in two $25,000 installments, the first due on December 20, 2004 and the second on March 21, 2005, and at that time Mediation will commence.

Because of the postponement of the mediation, the early stage of the litigation and the fact that discovery has not been completed, it is premature to predict whether an unfavorable outcome in this action is either probable or remote or to estimate the amount or range of potential loss, if any, to the Company in the event of an unfavorable outcome. Management believes UniComp's allegations to be without merit.

ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

PART II

ITEM 5. MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

MARKET FOR COMMON STOCK

    The Company's common stock is traded on the OTC Bulletin Board ("OTCBB") under the market symbol ROIE. OTCBB reported the following high and low sales prices for each quarter for the last two years.

| QUARTER ENDED | HIGH | LOW |
| --- | --- | --- |
| 9/30/02 | 2.07 | 1.05 |
| 12/31/02 | 1.40 | .65 |
| 3/31/03 | 1.75 | 0.63 |
| 6/30/03 | 2.35 | 1.10 |
| 9/30/03 | 2.10 | 1.26 |
| 12/31/03 | 3.20 | 1.26 |
| 3/31/04 | 2.55 | 1.74 |
| 6/30/04 | 2.42 | 1.61 |

    The OTCBB is a more limited trading market than the Nasdaq SmallCap Market or Nasdaq National Market and timely, accurate quotations of the price of the Company's common stock may not always be available. There is generally an expectation of low trading volumes in such a market. Consequently, the activity of only a few shares may affect the market and may result in wide swings in price and in volume. Additionally, the foregoing quotations reflect inter-dealer prices, without retail markup, markdown, or commission and may not necessarily represent actual retail transaction prices.

HOLDERS

    According to the records of the Company's transfer agent, the Company had approximately 306 stockholders of record as of September 21, 2004.

DIVIDEND POLICY

    The Company's policy has been to reinvest earnings and cash flows to fund future growth. Accordingly, the Company has not paid dividends and does not anticipate declaring dividends on its common stock in the foreseeable future, however, there are no contractual restrictions on the payment of such dividends.

RECENT SALES OF UNREGISTERED SECURITIES

    On June 22, 2004, the Company completed a private placement of its common stock to accredited investors for aggregate proceeds of $575,000. The Company issued 287,500 unregistered shares of common stock at a purchase price of $2.00 per share. The Company provided piggy-back registration rights to all the participants in the private placement. No underwriting or placement discounts or commissions were paid.

    The foregoing sales of stock was made in reliance on the exemption from registration under Section 4(2) of the Securities Act of 1933, as amended, provided for transactions by an issuer not involving any public offering.

10

ITEM 6. MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION

The following discussion should be read in conjunction with the Consolidated Financial Statements and related Notes thereto included elsewhere in this Annual Report on Form 10-KSB. Except for the historical financial information, the matters discussed in this document may be considered "forward-looking" statements. Such statements include declarations regarding our current intent, belief or expectations. Such forward-looking statements are not guarantees of future performance and involve a number of risks and uncertainties. Actual results may differ materially from those indicated by such forward-looking statements. Important factors that could cause actual results to differ materially from those indicated by such forward-looking statements include but are not limited to, those set forth under the "Factors Affecting Future Results" heading below.

OVERVIEW

The Company had two primary operating subsidiaries during fiscal 2004: (i) Tectonic Network which develops and markets building product information solutions for the construction industry including printed directories, a searchable online building product information database, an online studio for the search, visualization and selection of carpet, paint and other textiles and customized web based solutions for organizing building product manufacturer databases for easier search and selection and (ii) the GO Software subsidiary which currently develops and markets software and services for credit card, debit card and check transactions processing with offerings including payment processing software for virtually any computing platform, including Windows, Unix and Linux and will begin offering in fiscal 2005, a secure, scalable Internet only solution in the form of an application service provider model.

The Company has received a number of offers for the sale of GO and intends to divest of its interests in GO as soon as practicable, subject to negotiation of a definitive agreement, receipt of stockholder approval, and satisfaction of all other conditions precedent. This management's discussion and analysis contains a discussion of the historical operations of the Company including the financial results of both subsidiaries of the Company on a consolidated basis. We expect that in light of the proposed divestiture, GO will qualify for treatment as a discontinued operation in reporting periods subsequent to the divestiture. Currently the ongoing operations of GO and the operations of Tectonic, are consolidated with all of the other existing subsidiaries and ROI.

The Company has categorized its primary sources of revenue into: (1) license fees, (2) support and update service fees, (3) consulting fees and (4) advertising revenue. License fees are earned by granting licenses to the Company's customers to use the Company's proprietary software products. Revenue from support and update services is comprised of fees for providing customer support, 24 hours a day, 365 days a year, and periodic updates to the Company's software products as part of the continuing effort to provide complete customer service and access to the latest available technology. Consulting fees are earned by providing services to customers, including database analysis and website design, systems analysis and design, programming, and training. Advertising revenue is generated from the listings of advertisements in print and electronic directories, the sale of banner, sponsorship, and text-link advertisements, including sponsored search advertisements and from the photography and display of products including their attributes on websites.

The Company's revenues may vary from quarter to quarter due to market conditions, the budgeting and purchasing cycles of customers, and the effectiveness of the Company's sales force and alliance partners. The Company does not have a material backlog of unfilled software orders, and product and consulting revenue in any quarter is substantially dependent upon orders received during that quarter although the Company's Tectonic Network subsidiary continues to sign many two and three year contracts and at June 30, 2004 had signed but unbilled two and three year contracts under which payments to Tectonic will equal approximately $1,076,000. This amount is in addition to approximately $1,767,000 in deferred revenue included on the balance sheet at June 30, 2004 for both Tectonic Network and GO Software. Customers invoiced by the Company are generally granted 30 day terms. Operating expenses are based on anticipated revenue levels and are relatively fixed over the short term. Variations in the timing of generation of revenues may therefore cause significant fluctuations in operating results from one quarter to the next. Fluctuations in operating results may result in volatility in the price of the Company's common stock. The Company's operating results may fluctuate significantly as a result of these factors, many of which are beyond the control of the Company's management.

11

CRITICAL ACCOUNTING POLICIES

The consolidated financial statements were prepared in conformity with accounting principles generally accepted in the United States. As such, management is required to make certain estimates, judgments and assumptions it believes are reasonable based upon the information available. These estimates and assumptions affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods presented. The significant accounting policies which management believes are the most critical to aid in fully understanding and evaluating our reported financial results include the following:

Revenue Recognition

The Company recognizes revenues from licenses of computer software once (i) a non-cancelable license agreement has been signed, (ii) the software and related documentation have been shipped, (iii) there are no material uncertainties regarding customer acceptance, (iv) collection of the resulting receivable is deemed probable, and (v) no significant other vendor obligations exist. The revenue associated with any license agreements containing cancellation or refund provisions is deferred until such provisions lapse. In cases of future obligations, if such obligations are insignificant, then related costs are accrued immediately. If the obligations are significant, then the software product license revenues are deferred. Future contractual obligations can include software customization, requirements to provide additional products in the future and to port products to new platforms. Contracts that require significant software customization are accounted for on the percentage-of-completion basis. Revenues related to significant obligations to provide future products or to port existing products are deferred until the new products or ports are completed.

The Company's revenue recognition policies are designed to comply with American Institute of Certified Public Accountants Statement of Position ("SOP") 97-2 "Software Revenue Recognition," as modified by SOP 98-9 "Modification of SOP 97-2, Software Revenue Recognition, With Respect to Certain Transactions," and under SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements." Revenues recognized from multiple-element software license contracts are allocated to each element of the contracts based on the fair values of the elements, such as licenses for software products, maintenance, or professional services. The determination of fair value is based on objective evidence which is specific to the Company. We limit our assessment of objective evidence for each element to either the price charged when the same element is sold separately, or the price established by management having the relevant authority to do so for an element not yet sold separately. If evidence of fair value of all undelivered elements exists but evidence does not exist for one or more delivered elements, then revenue is recognized using the residual method. Under the residual method, the fair value of the undelivered elements is deferred and the remaining portion of the arrangement fee is recognized as revenue.

Support and update services revenues, including revenues bundled with original software product license revenues, are deferred and recognized over the related contract period, which is generally one year. Support and update service revenues are primarily earned by the GO Software subsidiary.

Consulting fee revenues are generated from professional consulting and training services and are recognized when the services are performed or if included in a medium term consulting agreement, than according to percentage-of-completion basis. Consulting fee revenue is earned by both the GO Software and Tectonic Network subsidiaries.

Advertising revenue is generated from the listings of advertisements in directories, the sale of banner, sponsorship, and text-link advertisements, including sponsored search advertisements and from the photography and display of products on our websites. Advertising revenue connected to the sale of advertising in print directories is only recognized upon the publication and shipment of those directories. Revenue from the sale of advertising or photography for the display on our websites is recognized over the contract subscription period, which is generally one year. Advertising revenue is only earned at the Tectonic Network subsidiary.

Goodwill and Other Intangible Assets

Goodwill represents the excess of consideration paid in business combinations over the estimated fair value of the assets acquired. Other intangible assets consist primarily of acquired technology, database assets and proprietary concepts ("Technology based intangibles"); customer lists and customer contracts ("Customer-related

12

intangibles") and non-competition agreements ("Marketing-related intangibles") related to acquisitions accounted for under the purchase method of accounting. Intangible assets, except for goodwill, are amortized on a straight-line basis over their estimated useful lives, and are reviewed for impairment in accordance with Statement of Financial Accounting Standards SFAS No. 144, "Accounting for Impairment or Disposal of Long-Lived Assets." Goodwill is no longer amortized but is subject to an annual impairment test in accordance with SFAS No. 142, "Goodwill and Intangible Assets". This approach requires that a two-step transitional impairment test be performed on all goodwill. In the first step, the fair value of the Company's goodwill is compared to its carrying value. If the fair value exceeds the carrying value, goodwill is not impaired and no further testing is performed. If the carrying value exceeds the fair value, then the second step must be performed, and the implied fair value of the Company's goodwill must be determined and compared to the carrying value of the goodwill. If the carrying value exceeds its implied fair value, then an impairment loss equal to the difference will be recorded.

The Company completes its annual goodwill impairment tests for its payment processing reporting unit as of June 30 of each year and will test its construction information reporting unit goodwill on December 31, of each year. As of June 30, 2004 and 2003, the estimated fair values of the payment processing reporting unit exceeded the carrying values of the reporting unit; therefore, no impairment charge was recognized in the results of operations and financial position. Additionally, the Company tests between annual dates if indications of potential impairment exist. There were no such indications of impairment during fiscal 2004. If it is determined in the future that an impairment of goodwill and other intangibles assets exists, the Company would incur impairment charges of up to $3,160,681 and $5,034,414 for goodwill and intangibles assets, respectively. In fiscal 2004, goodwill and intangible assets arose from the acquisition of various entities including the purchase of specific assets out of foreclosure from a third party. In the third quarter of fiscal 2003, the Company reduced the estimated useful life of its acquired software from five to three years as a result of management's consideration of various factors including industry standards and the condition of the underlying assets.

### Software Development Costs

Costs incurred, such as planning, designing, coding and testing, for computer software to be sold, leased or otherwise marketed are expensed as incurred prior to establishing the technological feasibility of a product. Technological feasibility is generally achieved when the detail program design or a working model has been completed. For the period between the establishment of technological feasibility and the time a product is available for general release, such costs are capitalized in accordance with SFAS No. 86, "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed." No such costs were capitalized during the fiscal years ended June 30, 2004 and 2003. Amortization of such costs is computed as the greater of (1) the ratio of current revenues to expected revenues from the related product sales, or (2) a straight line basis over the expected economic life of the product (not to exceed five years).

### Reserves and Estimates

In the ordinary conduct of our business, management make estimates and assumptions that affect the reported amounts of assets and liabilities (including reserves) and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

13

RESULTS OF OPERATIONS

| STATEMENT OF OPERATIONS DATA | YEARS ENDING JUNE 30, | |
|---|---|---|
| | 2004 | 2003 |
| **REVENUE** | | |
| License fees | $6,705,502 | $5,420,108 |
| Support and update services | 2,212,164 | 1,641,956 |
| Advertising revenue | 1,052,598 | - |
| Consulting fees | 615,770 | 799,198 |
| Total revenue | 10,586,034 | 7,861,262 |
| **OPERATING EXPENSES** | | |
| Cost of revenues | 1,169,949 | 615,275 |
| General and administrative | 8,382,652 | 5,210,362 |
| Sales and marketing | 3,402,307 | 1,828,938 |
| Research and development | 1,530,464 | 1,325,531 |
| Depreciation and amortization | 1,963,137 | 1,697,877 |
| Total operating expenses | 16,448,509 | 10,677,983 |
| Operating loss | (5,862,475) | (2,816,721) |
| Interest expense, net | (421,181) | (318,454) |
| Other income | 285,904 | - |
| Net loss | $(5,997,752) | $(3,135,175) |

STATEMENT OF OPERATIONS DATA AS
A PERCENTAGE OF NET REVENUES

| | YEARS ENDING JUNE 30, | |
|---|---|---|
| | 2004 | 2003 |
| **REVENUE** | | |
| License fees | 63.4 % | 68.9 % |
| Support and update services | 20.9 | 20.9 |
| Advertising revenue | 9.9 | 0.0 |
| Consulting fees | 5.8 | 10.2 |
| Total revenue | 100.0 % | 100.0 % |
| **OPERATING EXPENSES** | | |
| Cost of revenues | 11.1 | 7.8 |
| General and administrative | 79.2 | 66.2 |
| Sales and marketing | 32.1 | 23.3 |
| Research and development | 14.5 | 16.9 |
| Depreciation and amortization | 18.5 | 21.6 |
| Total operating expenses | 155.4 | 135.8 |
| Operating loss | (55.4) | (35.8) |
| Interest expense, net | (4.0) | (4.1) |
| Other income | 2.7 | 0.0 |
| Net loss | (56.7) % | (39.9) . % |

2004 ACQUISITIONS

The introduction of the Tectonic business segment in fiscal 2003 represented a new strategy for the Company as it sought to develop a vertical market to take advantage of core knowledge of the construction industry within the Company's management team as well as take advantage of what management believes represents an opportunity for significant growth. In fiscal 2004, the Company completed three acquisitions to increase Tectonics' capabilities in the construction information industry. As a result of these new acquisitions, the Tectonic business generated revenues of approximately $1.2 million and had a loss of approximately $4.2 million in 2004.

To enhance GO's product offering in the electronic marketplace, on January 7, 2004, the Company purchased certain foreclosed assets of Atomic Software, Inc. The acquisition of the Atomic assets did not have a significant impact on the revenues of the Company during 2004.

REVENUES

The Company had total revenues of $10,586,034 in fiscal 2004 compared to $7,861,262 in fiscal 2003. Total revenues increased by $2,724,772 or 34.7% from 2003 to 2004. The increase was partially due to the Company's new Tectonic subsidiary, which had total revenues of $1,167,777 in fiscal 2004. Tectonic had no revenues in fiscal 2003. The remaining increase of $1,556,995 was a result of increases within GO's operations, primarily the result of additional PCCharge sales as we continued to sign up additional resellers and distributors now totaling over 1,600, coupled with a significant increase in sales of our more expensive RiTA middleware products to customers who are again purchasing higher dollar middleware software as the economy continues to improve over the prior year. Annual support and update service revenue at GO also exhibited increased growth as the customer base for this support continues to increase. The top 10 customers at GO comprised 18.4% of revenues in 2004 versus 15.6% in 2003. The top 10 customers at Tectonic comprised 19.0% of revenues in 2004.

License fee revenue received by GO continues to be the primary source of revenue, generating 63.4% of total revenues in 2004, compared to 68.9% in 2003. License fee revenue increased by $1,285,394 or 23.7% from fiscal 2003 to 2004 and represents continued growth of our lower end PCCharge suite of products and the benefit of increased sales we have seen from our RiTA middleware products. The Company's pricing structure remained substantially the same during 2004 as compared to 2003 and for the majority of its products, the Company continues to have lower prices than its major competitors.

Support and update services provided by GO comprised 20.9% of sales in both 2004 and 2003. Support and update services increased by $570,208 or 34.7% from fiscal 2003 to 2004. Support and update services increases are generated by providing technical support on continued sales of software licenses and the retention of our existing customers. The Company offers various forms of support to its customers including telephone support, on-site support, online and e-mail inquiry. In addition, the customer base continues to grow and with the Company recently surpassing the 140,000 mark of unique licenses sold, the number of customers requiring annual support continues to increase.

Advertising revenues were $1,052,598 in 2004, or 9.9% of total revenue. There were no advertising revenues earned in 2003. Advertising revenues are earned by Tectonic, which commenced operations in March 2003, but did not have revenues until fiscal 2004. In periods subsequent to the proposed sale of GO, directory advertising revenues will become a larger portion of total revenue.

Consulting fee revenue comprised 5.8% of sales in 2004 compared to 10.2% in 2003. Consulting fee revenue decreased by $183,428 or 23.0% from fiscal 2003 to 2004 and was primarily due to fiscal 2003 consulting fee revenues including revenues from Campana Data which was closed in fiscal 2003. This was partially offset with consulting fees earned on website development by Tectonic. In periods subsequent to the proposed sale of GO, we believe consulting revenues will become the largest component of total revenues earned by the Tectonic subsidiary due to the consulting portion having a higher price point than advertising revenues.

COST OF REVENUES

Cost of revenues of $1,169,949 in 2004 and $615,275 in 2003 represented approximately 11.1% of 2004 revenues and 7.8% of 2003 revenues. Cost of revenues increased by $554,674 or 90.2%, from 2003 to 2004, primarily as a result of costs of $539,286 incurred by Tectonic during 2004. Tectonic commenced operations in

15

March 2003, but did not have any cost of sales until fiscal 2004. Cost of revenues at GO represented 6.7% of revenues in 2004 and 7.8% in 2003. Cost of revenues comprise printing and distribution costs for the Tectonic print directories and the costs of shipping, product manuals and shipping materials for shrink wrap software distributed by GO.

GENERAL AND ADMINISTRATIVE EXPENSES

General and administrative expenses of $8,382,652 in 2004 and $5,210,362 in 2003 represented approximately 79.2% of 2004 revenues and 66.2% of 2003 revenues. General and administrative expenses increased by $3,172,290 or 60.9%, from 2003 to 2004. General and administrative expenses consist primarily of personnel related costs for executive, administrative, finance, human resources, internal information system and other support services costs including the operating of customer call centers. In addition, substantial professional fees associated with SEC filings and reporting as well as legal, insurance and accounting are included as part of this cost. Facility costs for the rental of various properties are also included. The increase in general and administrative expense over the prior fiscal year is primarily a result of the newly acquired businesses within our Tectonic subsidiary including the costs associated with the integration of the various acquisitions under a unified management team. General and administrative costs incurred by Tectonic were $3,021,996 during 2004. The Company continuously reassesses its level of expenditure to eliminate costs inconsistent with the expansion of our core competency in construction information and electronic transaction processing solutions. In subsequent periods, Tectonic general and administrative expenses are expected to occur at the same levels as fiscal 2004 as the full year effect of the increased management personnel from the various acquisitions is offset with the integration costs of those acquisitions that represented one time costs in fiscal 2004. Subsequent to the proposed sale of GO, general and administrative expenses associated with the planned divestiture are expected to be significant and will include the costs of engaging advisors for the planned sale, legal, accounting and filing fees associated with the planned transaction as well as other charges related to the separation of back office functions.

SALES AND MARKETING EXPENSES

Sales and marketing expenses of $3,402,307 in 2004 and $1,828,938 in 2003 represented approximately 32.1% of 2004 revenues and 23.3% of 2003 revenues. Sales and marketing expenses increased by $1,573,369 or 86.0%, from 2003 to 2004. Sales and marketing expenses consist primarily of salaries of sales and marketing personnel, travel expenses, commissions, advertising, website maintenance, trade show attendance and marketing materials. Payment processing products are primarily sold through our reseller network and independent sales organizations which we continue to develop. GO also sells its payment processing products through an internal sales force, which include both telephone sales and direct sales. The increase in sales and marketing expenses over the prior fiscal year is primarily a result of the newly acquired businesses within our Tectonic subsidiary as the various sales forces were consolidated into a single national sales force selling all product lines as well as a single combined inside sale force. In addition, a combined branding and marketing effort was undertaken with all acquired businesses and product lines re-branded under the single umbrella brand of Tectonic. Sales and marketing expenses incurred by Tectonic were $1,133,541 in 2004. The higher level of sales and marketing expense at GO was focused on retaining and growing license fee and support revenue and on increasing our market share of units sold. This included new branding and a new logo for GO. The concerted effort in the sales and marketing arena was the result of a decision to continue to strengthen our brand awareness through the continued development of indirect channels and alliance partners as well as greater trade show attendance. The Company believes that without this additional effort in the sales and marketing arena, sales of construction information solutions and payment processing products would have been adversely affected. In periods subsequent to the proposed sale of GO, sales commissions for the Tectonic subsidiary are expected to increase as sales continue to increase although marketing expenses will decline as branding efforts at the level of fiscal 2004 will be curtailed.

RESEARCH AND DEVELOPMENT

Research and development expenses of $1,530,464 in 2004 and $1,325,531 in 2003 represented approximately 14.5% of 2004 revenues and 16.9% of 2003 revenues. Research and development expenses increased by $204,933 or 15.5% from 2003 to 2004. Research and development expenses consist primarily of salaries and related costs of development personnel. Research and development expense for the Tectonic subsidiary was primarily incurred in the development of new product lines and amounted to $277,861 in fiscal 2004 and $0 in 2003. The remainder of these expenses were incurred for enhancement of the GO products. GO continues to add functionality and enhancements to its product family including maintaining an ever increasing list of processor

16

certifications. In October 2003, the Company released RiTA 2.1, a Java-based payment processing solution which is operating system, database and machine independent, and is a highly scalable transaction switch that supports high-volume, multi-threaded transaction processing. In addition, in July 2004, the Company released PCCharge Version 5.7, its flagship PC-based payment processing solution with enhanced security and which required extensive quality assurance testing and encryption coding using Advanced Encryption Standards ("AES") to ensure the highest level of customer data protection. The Company had the product audited by an external audit firm that determined the use of PCCharge Version 5.7 would not prohibit a merchant from meeting the Credit Information Security Program ("CISP") requirements when implemented into a secure environment. These new releases and improvements are intended to provide GO's customers with more powerful, secure and user friendly solutions for their payment processing needs. The Company also incurred an additional $288,575 of research and development spending on the payment gateway asset acquired by GO in January 2004, in the form of additional programmers brought onboard to ensure greater scalability and security of the acquired gateway. This gateway will be placed into service in the second quarter of fiscal 2005. In periods subsequent to the proposed sale of GO, the Company expects research and development expenses to occur at the same percentages of revenue for the Tectonic subsidiary as in fiscal 2004, and while Tectonic will continue to develop new products and will provide enhancements to existing products, the nature of the products sold by the Tectonic subsidiary do not require as significant a research and development effort as do GO's products.

## DEPRECIATION AND AMORTIZATION

Depreciation and amortization expense amounted to $1,963,137 in 2004 and $1,697,877 in 2003. This represented approximately 18.5% of 2004 revenues and 21.6% of 2003 revenues. Depreciation and amortization expenses increased by $265,260 or 15.6%, from 2003 to 2004. This increase was primarily a result of amortization of newly-acquired intangible assets of $753,806 during 2004 in the Company's Tectonic subsidiary. In fiscal 2003 depreciation and amortization expense included approximately $458,133 of software and intangibles from the original acquisition of GO which were almost fully depreciated in that period.

## INTEREST EXPENSE

Interest expense amounted to $421,181 in 2004 and $318,454 in 2003, and represented approximately 4.0% of 2004 revenues and 4.1% of 2003 revenues. Interest expense increased by $102,727 or 32.3%, from 2003 to 2004. The increase is due to the interest charges on additional borrowings during 2004, including the line of credit and the notes payable discussed below. Approximately $333,333 of 2004 interest expense represents non-cash charges related to the referral and reseller agreement noted below. This agreement was completed on September 17, 2004 and these non-cash charges will not reoccur. The Company will however incur significant non-cash finance charges in the amount of $801,000 in the first quarter of fiscal 2005 resulting from the issuance of warrants in connection with the various debt financings noted below.

## OTHER INCOME

Other income amounted to $285,904 in 2004 and $0 in 2003 and represented a one time gain on the sale of a product line to a third party.

## LIQUIDITY AND CAPITAL RESOURCES

Cash and cash equivalents amounted to $223,333 and $347,339 at the end of fiscal 2004 and 2003, respectively.

Cash used in operations amounted to $3,187,254 and $877,721 for fiscal 2004 and 2003, respectively. The Company's fiscal 2004 and 2003 losses of $5,997,752 and $3,135,175 continued to be the main factor in the use of the operating cash flow. During 2004, the Company's Tectonic subsidiary which included the acquisition of three separate companies generated a loss of $4,171,403, compared with a loss of $283,261 in 2003. This was offset by the Company's GO Software subsidiary generating income of $196,350 in 2004 compared with a loss of $599,629 in 2003. In addition, corporate and other expenses amounted to $2,022,699 in 2004 and $2,252,285 in 2003. Non-cash charges in fiscal 2004 and 2003 for depreciation and amortization, interest accretion on warrants and non-cash compensation amounted to $2,262,349 and $1,982,661, respectively. The Company's net changes in working capital items for fiscal 2004 and 2003 amounted to net cash provided of $548,149 and $274,793, respectively. This was primarily due to the increase in both accounts payable and accrued expenses over the prior year of $750,258 and

17

$388,664, respectively. Accounts payable increased primarily due to the increased level of expenditure resulting from the acquisition by Tectonic of the three separate companies and accrued expenses increased primarily due to the timing of bonus payments to the management of the GO Software subsidiary.

Cash used in investing activities amounted to $596,907 and $133,293 in fiscal 2004 and 2003, respectively. In 2004, the amount represented cash paid for equipment and software including a new customer relationship management system at GO in the amount of $174,838 and for the acquisitions of three companies by the Tectonic subsidiary. During 2003, the amount represented primarily cash paid for equipment and software purchases at GO.

Cash provided by financing activities amounted to $3,660,155 and $543,198 in fiscal 2004 and 2003, respectively, and primarily comprised the following items:

In fiscal 2004, $2,864,082 in proceeds was raised from the sale of 1,540,736 shares of common stock at prices ranging between $1.70 and $2.00, and $45,000 was received as the result of the exercise of warrants to purchase 150,000 shares. In fiscal 2003, $572,500 in proceeds was raised from the sale of 435,000 shares of the Company's common stock at prices ranging between $1.25 and $1.50 per share to an officer and two employees of the Company.

In fiscal 2003, the Company received $85,000 of proceeds under a stockholder note payable. The note was unsecured and non-interest bearing, and was repaid during 2004.

On September 17, 2001, the Company received an advance payment from a customer in the amount of $1,000,000 which was accounted for as a debt financing. In accordance with the agreement, the advance is repaid in referrals and software sales in stepped increments over a three-year period from the effective date of the agreement. The Company was also required to place certain of its software source codes in escrow, with the other party named as beneficiary, in the event of the Company's default on the agreement. Other remedies for default include, among other things, the other party's right to terminate the agreement, to demand repayment of unpaid portions of the advance, or to meet the payment milestone which was the basis for the default, or to convert the outstanding portion of the advance to unregistered shares of the Company's common stock at various exercise prices. Once the risk of default for each portion of the agreement has passed, (i.e. when the milestones are met on or before the September 17th deadlines), then that portion of the debt will be forgiven and recorded as revenue in the statement of operations.

During the first one-year measurement period ended September 17, 2002, the Company was required to sell products for the other party to earn referral fees totaling $225,000 in order to satisfy the contractual stipulations of the Referral Agreement. The Company only achieved sales and referral fees of approximately $127,000 during that period and, consequently, was required to pay approximately $98,000 in cash to the other party to satisfy the shortfall. The amount of sales and referral fees required for the next one-year measurement period ended September 17, 2003, was $375,000. The Company only achieved sales of approximately $214,000 in referral fees toward this amount and, consequently, was required to pay approximately $161,000 on October 10, 2003 to satisfy the shortfall. The remaining amount of sales and referral fees for the one year period ending September 17, 2004 amounted to $400,000. Through September 17, 2004, the Company has achieved sales of approximately $345,025 toward this final amount. The Company did not reach the $400,000 of sales in referral fees as of September 17, 2004, and consequently the Company had to pay the other party the shortfall in cash of $54,975. Subsequent to September 17, 2004, the Company has no further obligation in regards to this financing.

On June 16, 2003, the Company entered into a $500,000 receivables based line of credit with a bank. Advances under the line are limited to 80% of the Company's gross eligible receivables. Advances under the line bore interest at 1.25% per month and are secured by all the assets of the Company. On May 14, 2004 the line of credit was modified to include a bridge loan feature under which the Company borrowed $500,000 immediately and will borrow another $500,000 upon the presentation to the lender of an acceptable letter of intent to divest its GO business. The bridge loan is due at the earlier of 120 days from the first advance or upon closing the sale of the GO business. The modification increased the interest rate on the line of credit and bridge loan to 1.35% per month. As of June 30, 2004, $691,529 was outstanding under the line of credit (including the bridge loan feature).

Subsequent to year end the following events occurred which have an impact on liquidity and capital resources.

On August 2, 2004 the bridge loan feature of the line of credit was modified to allow the Company to borrow an additional $250,000 immediately (total of $750,000) and provide for the Company to borrow another $750,000 (representing an increase of $250,000 over the prior commitment) upon the presentation to the lender of an acceptable letter of intent to divest of its GO business. The modification increased the interest rate on the bridge loan portion of the line of credit to 1.5% per month. The bridge loan was extended to the earlier of November 27, 2004 or the date of the closing of the proposed sale of GO Software. In the event the bridge loan is not paid in full by the due date, the Company will pay the lender a weekly success fee of $10,000 increasing in $2,500 increments until repayment.

On August 18, 2004, the Company borrowed $1,500,000 under senior second secured convertible notes issued by the Company in a private placement. The notes are secured by a junior lien on substantially all of the tangible and intangible assets of the Company. The notes bear interest at an effective rate of 19%, and are due on the earlier of February 1, 2005 or the closing of the sale of GO Software. The notes have a conversion feature, and contain some restrictions on the Company's ability to incur debt. The conversion feature allows holders of these notes to participate in any of the Company's future financings, other than one involving only debt and debt securities, by converting the notes into securities to be issued at a conversion price equal to 80% of the price paid by other participants in the financing. Arol Wolford, the Company's President and CEO executed a Guaranty, Pledge and Security Agreement whereby Mr. Wolford agreed to guaranty payment of the notes and has secured that guaranty with a first-priority security interest in all the shares of the Company which he owns.

On September 30, 2004, the Company borrowed the additional $750,000 under the bridge loan feature of its line of credit on the presentation to the lender of a series of acceptable letters of intent for the sale of GO.

The Company has proposed the sale of GO as disclosed above. Historically, all of the Company's operating income and substantially all of its operating cash flow has been generated by the GO operations. Tectonic is in an early stage of its development and has not been able to generate sufficient cash for its operations. Management believes that the proceeds received from the anticipated sale of GO will provide the Company with sufficient cash to operate for the next 12 months. Additionally, certain board members have formally committed to infuse the Company with up to $1,000,000 on an as needed basis for working capital purposes through June 30, 2005. At this time, we have no other available credit lines or other loan facilities in place. While certain of the current outstanding indebtedness of the Company attracts penalties if not paid by the due date, management believe that it will be able to refinance such debt if needed given its current progress toward the proposed sale of GO. If the Company is unable to sell GO in a timely manner, the Company may need to raise additional capital from outside sources either through the incurrence of additional indebtedness or the sale of equity. If the Company is unable to raise additional capital and secure adequate liquidity as described above, the operations of the Company could be materially impaired. In this regard, the Company would have to take immediate action to reduce costs which may include headcount and salary reductions, cessation of all research and development efforts and the implementation other short-term programs in an effort to increase cash flow including the curtailment of currently unprofitable lines of business.

OFF BALANCE SHEET ARRANGEMENTS

The Company has not identified any off balance sheet arrangements.

NEW ACCOUNTING PRONOUNCEMENTS

Financial Accounting Standards Board ("FASB") Interpretation No. (FIN) 46(R), "Consolidation of Variable Interest Entities", issued in December 2003, requires that if a business enterprise has a controlling financial interest in a variable interest entity, and is considered the primary beneficiary, the assets, liabilities and results of the activities of the variable interest entity shall be included in the consolidated financial statements of the business enterprise. (FIN) 46(R) is effective for the Company in the fourth quarter of fiscal 2004. Based on the Company's evaluation of the requirements of (FIN) 46(R), no variable interest entities that are subject to consolidation were identified and, as such, the adoption of (FIN) 46(R) for fiscal year 2004 had no impact on the Company's consolidated financial position or results of operations.

In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity". SFAS 150 establishes standards on the classification and measurement of financial instruments with characteristics of both liabilities and equity. The statement was effective for most financial instruments entered into or modified after May 31, 2003, and otherwise was effective at the beginning of our first quarter for fiscal 2004. The adoption of this Statement did not have a significant impact on the Company's consolidated financial position or result of operations.

19

FACTORS AFFECTING FUTURE RESULTS

As described by the following factors, past financial performance should not be considered to be a reliable indicator of future performance, and investors should not use historical trends to anticipate results or trends in future periods.

This filing contains forward-looking statements within the safe harbor provisions of the Private Securities Litigation Reform Act. These statements include or are related to our financial condition, results of operations and future results, including certain projections and business trends. Assumptions relating to forward-looking statements involve judgments with respect to, among other things, future economic, competitive and market conditions and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond our control. When used in this filing, the words "estimate," "project," "intend," "believe," "expect," "anticipate", "plan", "seek," and similar expressions are intended to identify forward-looking statements. Although we believe that assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate, and we may not realize the results contemplated by the forward-looking statement. Management decisions are subjective in many respects and susceptible to interpretations and periodic revisions based on actual experience and business developments, the impact of which may cause us to alter our business strategy or capital expenditure plans that may, in turn, affect our results of operations. In light of the significant uncertainties inherent in the forward-looking information included in this filing, you should not regard the inclusion of such information as our representation that we will achieve any strategy, objective or other plans. The forward-looking statements contained in this filing speak only as of the date of this filing as stated on the front cover, and we have no obligation to update publicly or revise any of these forward-looking statements.

These and other statements that are not historical facts are based largely on management's current expectations and assumptions and are subject to a number of risks and uncertainties that could cause actual results to differ materially from those contemplated by such forward-looking statements. Some of such risks and uncertainties are described below:

The Company may be unable to fund additional capital requirements.

Although the Company currently has sufficient cash for immediate operations, it has recently announced its intention to divest of its GO subsidiary, which management believes will improve the Company's liquidity and enable the further expansion and development of its construction information properties. If the Company is unable to divest of GO in the near term or at an acceptable price, then additional financing through debt or equity will be required to maintain and support our operations and to expand our product offerings, particularly with respect to our new Tectonic subsidiary. The Company may not be able to obtain such financing on acceptable terms or at all when and if required.

The Company's success depends on its ability to compete in the highly competitive information technology industry.

The Company's GO subsidiary's success depends on its ability to compete in an industry that is intensely competitive, continues to undergo consolidation and is subject to rapid change. The Company's management believes that technological and creative skills of its personnel, new product developments, frequent product enhancements, name recognition, technical support capabilities and delivery of reliable product support are essential to establishing and maintaining its market position. Based on our industry knowledge, we believe that GO is the dominant company in the United States in the IBM midrange market in terms of number of licenses granted for payment processing software. Competition in the IBM midrange market is expected to grow and companies with greater resources than GO have entered the market. Management also believes that GO has significant market share in payment processing software on Microsoft platforms. GO, markets payment processing software for computer systems running Windows, Unix, and Linux. Management cannot be assured that our competitors will not develop technologies that are similar to ours. IC Verify, a product line of First Data Corp is the main competitor in this Windows based market. Many of our competitors are much larger and more established and are significantly better capitalized, leaving us at a substantial disadvantage. If the Company is unable to divest of GO in the near term, its operations may suffer for lack of resources.

20

The Company's Tectonic Network subsidiary operates in the construction information industry. The market for the Company's products and services is highly fragmented and served by numerous firms, many of which address only specific aspects of a particular market. We believe the principal competitive factors that are faced at Tectonic Network are reputation and quality of service, relative price and performance, time to market, industry expertise, and product fit.

If the Company fails to compete successfully, our business and financial prospects may be materially adversely affected. Some of our current and potential competitors, including certain multi-national consulting and publishing firms, have longer operating histories and substantially greater competitive resources than we have. As a result, our competitors may be able to adapt more quickly to changes in customer needs or to devote greater resources to sales, marketing and product development. Tectonic may be unable to compete successfully with existing or new competitors.

If the Company is unable to adjust to rapid technological change and to introduce new products and services, it could incur further losses.

The payment processing industry is characterized by rapid technological advances, numerous changes in customer requirements and frequent new product introductions and enhancements that could disrupt our business and render our products obsolete. Because of the potentially rapid changes in the market, the life cycle of the GO's software products is difficult to estimate. Products, capabilities or technologies others develop may render the Company's products or technologies obsolete or noncompetitive or shorten the life cycle of the Company's products. In attempting to satisfy this industry's demands, the Company may incur substantial costs that may not result in increased revenues due to the short life cycles for our products. Satisfying the increasingly sophisticated needs of our customers requires developing and introducing enhancements to our products and technologies in a timely manner that keeps pace with technological developments, emerging industry standards and customer requirements while keeping products priced competitively. Failure by the Company to develop and introduce new or enhanced products that compete with other available products could materially and adversely affect our business, results of operations and financial condition.

Company operating results may fluctuate significantly as a result of a variety of factors, many of which are beyond our control.

It is difficult to forecast revenues from the Company's software products and services accurately because of the unpredictability inherent in:

- o    the timing of orders from our customers;
- o    customer spending patterns and budgetary constraints;
- o    our ability to generate new customers;
- o    the start-up nature of our Tectonic subsidiary;
- o    the evolving nature of our Tectonic subsidiary products including market acceptance;
- o    the timing of introductions of or enhancements to our products;
- o    the evolving product lifecycle of our products;
- o    changes in our pricing policies or those of our competitors;
- o    our ability to anticipate and adapt effectively to developing markets and rapidly changing technologies;
- o    our ability to attract, retain and motivate qualified personnel, particularly within our sales and marketing and research and development organizations;
- o    the publication of opinions or reports about the Company, its products, our competitors or their products;
- o    unforeseen events affecting the market;
- o    changes in general economic conditions;
- o    the integration of acquisitions;
- o    actions our competitors take, including new product introductions and enhancements; and
- o    the Company's ability to control costs.

In addition, Company management bases the expense levels, which are relatively fixed in the short term, in significant part on our expectations of future product revenues and service demands. If demand for Company products and services are below expectations, Company results of operations could be adversely affected.

Delays in the introduction of our products could cause the Company to lose, or fail to gain, market share.

The Company has previously experienced delays in developing and introducing new products, and may experience delays in the future. A delay in any potential product development and introduction may have an adverse effect on the product's success and on the Company's reputation and results of operations. In particular, we are continuing to develop products to support our Tectonic subsidiary which focuses on the construction industry. Delays in the introduction of products to support Tectonic as well as market acceptance of our Tectonic product line may have an adverse affect on the Company. Additionally, competitors may introduce products and gain market share during any delays. Our failure to introduce new products and product enhancements that respond to market conditions and customer requirements may have an adverse effect on the Company's business, results of operations and financial condition. Furthermore, our complex software products may contain undetected errors when first introduced or when new versions are released. Current and future releases of our products may contain errors that will result in loss or delay of market acceptance of Company products.

Illegal use of the Company's proprietary technology and databases and could result in substantial litigation costs and divert management resources.

Much of our future success depends on our ability to protect our proprietary technology and databases. The Company relies principally on a patent, trade secret and copyright law, as well as nondisclosure agreements and other contractual arrangements, to protect its proprietary technology. However, these measures may be inadequate to protect our technologies and databases from infringement by others or prevent misappropriation of our proprietary rights. Despite the Company's efforts to protect its proprietary rights, unauthorized parties may attempt to copy aspects of products or to obtain and use information that we regard as proprietary. Policing unauthorized use of our products is difficult. While we cannot determine the extent to which piracy of our software products occurs, we expect software piracy to be a persistent problem. In addition, the laws of some foreign countries do not protect our proprietary rights to the same extent as do the laws of the United States. If we fail to or are unable to protect our proprietary or licensed technologies, it could have a material adverse effect on the Company's business, operating results and financial condition. There can be no assurance that the steps we have taken will prevent misappropriation of our technology, and such protections do not preclude competitors from developing products with functionality or features similar to our products. We may initiate claims or litigation against third parties for infringement of our proprietary rights or to establish the validity of our proprietary rights. Litigation, either as a plaintiff or defendant, would cause us to incur substantial costs and divert management resources from productive tasks whether or not the litigation is resolved in our favor, which could have a material adverse effect on the Company's business, operating results and financial condition.

The Company's websites, information systems and software products may be targeted by hackers.

Like other companies, our websites, information systems and software products may be targets for sabotage, disruption or misappropriation by hackers. GO's offerings of payment processing solutions, including through the web, may present a higher profile target. Although we believe we have sufficient controls in place to prevent disruption and misappropriation, and to respond to such situations, we expect these efforts by hackers to continue. In addition, these attacks may also continue directly against customers that utilize our software products. If these efforts are successful, our operations, reputation and sales could be adversely affected.

The Company's operating results will depend on successful product development.

The Company's continued success depends on its ability to develop, produce and transition technologically complex and innovative products that meet customer needs. Inherent in this process are various risks that we must manage to achieve favorable operating results. The process of developing new technology products is complex and uncertain, requiring innovative designs and features that anticipate customer needs and technological trends. The Company's products, once developed, must be distributed in sufficient volumes at acceptable costs to meet demand. The development of these products involves risks and uncertainties, including but not limited to risk of product demand, market acceptance, economic conditions, competitive products and pricing, commercialization, technology and other risks.

22

Market acceptance of the Company's products and services will be impeded if we do not continue to establish and maintain strategic relationships.

The Company has established strategic relationships with a number of organizations that we believe are important to our sales, marketing and support activities and to the implementation of our products. Failure to maintain existing strategic relationships with alliance partners, or to establish new relationships in the future, could have a material adverse effect on our business. Our current and potential customers may also rely on third-party systems integrators to interface application software with our products. If we do not adequately train a sufficient number of system integrators, or if these integrators do not have, or do not devote, the resources necessary to implement our products, our business, operating results and financial condition could be materially and adversely affected.

The Company's success depends on its ability to hire and retain technical personnel and key employees.

The Company's success depends in part on our ability to attract, hire, train and retain qualified managerial, technical, and sales and marketing personnel. Competition for these types of personnel is intense. We may be unsuccessful in attracting and retaining the technical personnel we require to conduct and expand our operations successfully.

In some instances the Company has experienced difficulties in integrating the operations of companies that it has acquired.

Integrating the business operations of the companies that have been acquired, or that we may acquire, has been and may continue to be a complex, time-consuming and expensive process. The Company may also experience difficulty in retaining key employees of those companies. After each acquisition, we must operate as a combined organization using common information and communication systems, operating procedures, financial controls and human resource practices, including benefits, training and professional development programs. There may be difficulties, costs and delays involved in integrating the companies that we acquire, including distracting management from the business, potential incompatibility of corporate cultures and costs and delays in implementing common systems and procedures.

Company growth has and may continue to depend on our ability to identify and make appropriate acquisitions.

Part of our growth strategy is based on our ability to acquire companies that are likely to promote our business objectives. Since 2001, we have made six such acquisitions. The Company may not be able to identify or acquire additional companies on terms agreeable to us, if at all. If the Company fails to make such acquisitions on agreeable terms, this may have a material adverse effect on the Company's business, its ability to compete and ability to operate profitably. In addition, the companies acquired may affect our business adversely or in unforeseen ways.

The market price of our common stock is highly volatile and several factors that are beyond our control could adversely affect its market price.

The Company's stock price is subject to significant volatility and will likely be adversely affected if our revenues or earnings in any quarter fail to meet the investment community's expectations. Additionally, the market price of our common stock could be subject to significant fluctuations in response to:

o   announcements of a change in direction of the Company including its new planned strategic focus;

o   announcements of new products or services offered by the Company or its competitors;

o   actual or anticipated variations in quarterly operating results;

o   changes in financial estimates by securities analysts;

o   changes in the market's perception of the Company's or the nature of its business;

o   sales of our common stock;

o   loss of key customer or distributor relationships;

o   general conditions in the construction industry and/or the transaction processing industry; or

o   other events or factors.

23

Furthermore, in recent years, the stock market in general, and the market for shares of stock in technology companies in particular and micro caps in general, have experienced extreme price fluctuations. These fluctuations could materially and adversely affect the market price of our common stock in the future.

Shares eligible for future sale, the release of escrowed shares and the exercise of options and warrants may adversely affect the market for our common stock.

The Company has issued shares and will issue additional shares considered "restricted securities" that may only be sold pursuant to Rule 144 of the Securities Act of 1933 or another available exemption from registration, unless we register the shares for sale to the public. The sale in the public market of our common stock may adversely affect prevailing market prices of the common stock. The exercise of outstanding options and warrants will dilute the percentage ownership of our stockholders. Sales in the public market of common stock underlying such options or warrants may adversely affect prevailing market prices of common stock. Moreover, the terms upon which we will be able to obtain additional equity capital may be adversely affected in such a case because the holders of such outstanding securities can be expected to exercise their respective rights therein at a time when we would, in all likelihood, be able to obtain any needed capital on terms more favorable to us than those provided in such securities.

Some of the Company's stockholders have control over matters requiring stockholder approval.

Some of the Company's current officers and directors together beneficially own a significant portion of our outstanding common stock and are able to exercise significant influence over matters requiring stockholder approval, including the election of directors and the approval of mergers, consolidations and sales of our assets. This may prevent or discourage tender offers for our common stock.

ITEM 7. FINANCIAL STATEMENTS

The information required by this item appears beginning on page F-1 of this report.

ITEM 8. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

ITEM 8A. CONTROLS AND PROCEDURES

As of the end of the period covered by this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's President and Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Exchange Act Rule 13a-15. Based upon that evaluation, the Company's President and Chief Executive Officer and the Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective as of the end of the period covered by this report. During the fourth quarter of fiscal 2004, there have been no changes in the Company's internal control over financial reporting that has materially affected or is reasonably likely to materially affect, the Company's internal control over financial reporting. Management necessarily applied its judgment in assessing the costs and benefits of such controls and procedures, which, by their nature, can provide only reasonable assurance regarding management's control objectives.

24

PART III

ITEM 9. DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS; COMPLIANCE WITH SECTION 16(A) OF THE EXCHANGE ACT

EXECUTIVE OFFICERS AND DIRECTORS

The following table sets forth certain information regarding our executive officers and directors.

| NAME | AGE | POSITION | DIRECTOR SINCE |
|------|-----|----------|----------------|
| Charles A. McRoberts | 56 | Director | 2000 |
| John W. McRoberts | 51 | Director | 2000 |
| Charles Pecchio, Jr. | 57 | Chairman of the Board | 2000 |
| Arol R. Wolford | 51 | President, Chief Executive Officer, and Director | 2001 |
| Theo P. VanderBoom | 57 | Director | 2002 |
| Laura C. Rogers | 44 | Director | 2002 |
| Sherwin Krug | 38 | Chief Financial Officer | N/A |

CHARLES A. MCROBERTS (brother of John W. McRoberts) serves as a director and functions in the role of Vice President of Developer Channel Sales for GO Software, Inc., an ROI subsidiary. He served as Chairman of the Board of Results Oriented Integration Corporation from 1996 until its reverse merger in August 2000 and as Chairman of the Board of the Company through June 2002. He previously was President and CEO of Mastiff Systems, a company that marketed and serviced security systems. Mr. McRoberts joined Mastiff in 1982 and served as President and CEO from 1987 until the sale of the company in 1996. Prior to joining Mastiff, Mr. McRoberts was Branch Manager of Wells Fargo Alarm Services.

JOHN W. MCROBERTS (brother of Charles A. McRoberts) serves as a director and is a member of both the Audit Committee and Compensation Committee. He served as a director of Results Oriented Integration Corporation from 1996 until its reverse merger in August 2000. Since July 2003, he has served as Chairman of the Board of Directors, President and Chief Executive Officer of Meadowbrook Healthcare, Inc., a privately-owned healthcare services company operating in the physical rehabilitation industry. Since December 2000, he has been the Managing Member of CannonGate Partners LLC, a private equity firm. Since 1999 he has served as a director of Foresite LLC, a privately-owned company that owns, leases and develops communication towers. He was a co-founder, and served as President and Chief Executive Officer of Capstone Capital Corporation, a NYSE listed real estate investment trust, from 1993 to 1998, when Capstone was acquired by Healthcare Realty Trust in a transaction valued at approximately $900 million. Prior to that, Mr. McRoberts was a senior officer of AmSouth Bank of Alabama (formerly AmSouth Bank N.A.), where he was employed from 1977 to 1993.

CHARLES PECCHIO, JR., has served as Chairman of the Board since July 2002. He served as a director of Results Oriented Integration Corporation from 1996 until its reverse merger in August 2000 and served as President of the Company through January 2002 and Chief Executive Officer of the Company through June 2002. Since October 2003, Mr. Pecchio has also served as Chairman, President and Chief Executive Officer of Verification Solutions, Inc. which markets systems and services for real-time verification of insurance coverage. Since 1993, he has provided several companies with consulting services related to business development, mergers, and acquisitions. In 2002, Mr. Pecchio founded Community Catalyst Corporation, a non-profit organization that serves youth, senior citizens, and the handicapped, and he serves as Chairman of this corporation. Since 2002, he has served as a director of 3001, Inc., a geospatial data company based in Louisiana, and has served as Interim CEO of 3001 since March 2004. From 1992 to 2002, he served as a director of Hoffman & Co, Inc., a provider of photogrammetric, computer mapping and GIS services. From 1988 to 1992, he served as a director of Spiro International SA, a Swiss public company, and as an officer and director of several affiliated companies. Mr. Pecchio's previous experience includes financial, sales, and management positions with IBM Corporation, General Computer Corp., TeleVideo Systems, and NEC Information Systems.

25

AROL R. WOLFORD has served as President since February 2002, as Chief Executive Officer since July 2002, and as a director since October 2001. He also serves as Chairman of Realty Empowerment Systems, a provider of technology tools to real estate professionals. He also serves as a director of Campbell-Stone, a non-profit provider of residential housing and services to senior adults. In 1980, he established Construction Market Data (CMD Group) in Atlanta, Georgia, and served as President until December 2001. CMD Group is a provider of quality project news, building product information, and cost data for the international construction industry. In May 2000, CMD Group was acquired for $300 million by Cahners Business Information, a part of the London based Reed Elsevier.

THEO P. VANDERBOOM serves as a director and is Chairman of the Audit Committee and is also a member of the Compensation Committee. He also serves as a director and Chief Financial Officer of Realty Empowerment Systems, a provider of technology tools to real estate professionals. From 1996 to 2000, he served as Chief Financial Officer of CMD Group. From 1982 to 1996, Mr. VanderBoom was with Southam Business Communications, Inc., where he served as Vice President of several Southam subsidiaries in Canada and the United States. Mr. VanderBoom earned a BS in mathematics and an MBA from York University and is a Certified Management Accountant.

LAURA C. ROGERS serves as a director and is Chairman of the Compensation Committee and is also a member of the Audit Committee. She is currently the founder and CEO of PinnaclePay Merchant Services, Inc. a payment processing company. From 1995 to 2002, she was with Paymentech, L.P., a processor of payment transactions. At Paymentech, she held management and executive positions in product management and marketing from 1995 to 2000. From 2000 to 2002, she served as Chief Administrative Officer, responsible for human resources, corporate training, employee communications, legal, quality management, and mergers and acquisitions. From 1985 to 1995, Ms. Rogers was with Global Payment Systems (formerly National Data Corporation), a processor of payment transactions, where she held positions in human resources and then served as Director of Strategy Management for Retail Integrated Payment Systems.

SHERWIN KRUG has served as Chief Financial Officer since January 2003. Prior to joining ROI as Chief Financial Officer, from 1998 to 2002, Mr. Krug served as Vice President of Finance and Chief Financial Officer for CMD Group. Prior to CMD Group, from 1989 to 1998 Mr. Krug was an audit Senior Manager with Ernst & Young in their Entrepreneurial Services Group both in Johannesburg, South Africa, and Atlanta, Georgia. Mr. Krug holds a Bachelor of Commerce degree from the University of the Witwatersrand and a Bachelor of Accounting Science Honors from the University of South Africa. He is a Chartered Accountant, is a member of the Association of Chartered Accountants in the United States, and is an associate member of the Georgia Society of CPAs.

COMMITTEES OF THE BOARD OF DIRECTORS

The Compensation Committee consists of Laura C. Rogers (Chairman), Theo P. VanderBoom and Christine Seymour (employee). The Compensation Committee has the authority to review all compensation matters relating to the Company and setting the compensation levels of our executive officers. If a member of the Compensation Committee is an employee of the Company, when his or her compensation is being reviewed, he or she is not permitted to be present or to participate.

All of the directors presently serve on the Stock Option Committee. The Stock Option Committee has full power and authority to interpret the provisions of and supervise the administration of the Company's Stock Option Plans.

The Audit Committee consists of Theo P. VanderBoom (Chairman) and Laura C. Rogers. The Audit Committee recommends to the Board of Directors the independent public accountants to be selected to audit the Company's annual financial statements and approves any special assignments given to such accountants. The Audit Committee also reviews the overall scope and plans for the annual audit, the auditors' independence from management, any changes in accounting principles, discussing with management and the independent auditors the adequacy and effectiveness of the accounting and financial controls, including our systems to monitor and manage business risk, and legal and ethical compliance programs; and reviewing the interim and annual financial statements to be included in our SEC filings. The Board of Directors has determined that Theo P. VanderBoom is an Audit Committee Financial Expert and is independent as defined by the rules and regulations of the SEC.

All of our Directors serve on the Nominating Committee, which is responsible for evaluating and recommending candidates for our Board of Directors. Although there are no formal procedures for stockholders to recommend nominations, the Nominating Committee will consider stockholder recommendations. Such recommendations should be addressed to the Company's Secretary, at our principal executive offices.

26

The Board of Directors may from time to time establish certain other committees to address certain aspects of our Company's business.

DIRECTOR COMPENSATION

Nonemployee directors receive 25,000 stock options on joining the Board of Directors and 25,000 stock options on each one year anniversary thereafter. The exercise price of the options is equal to the fair market value of the common stock on the date of grant of the options. The options vest on the one-year anniversary of the grant date. The options expire ten years from the date of grant. No additional monetary compensation is paid for serving on the Board of Directors or on a committee.

COMPLIANCE WITH SECTION 16(A) OF THE EXCHANGE ACT

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires the Company's officers, directors and persons who own more than ten percent of the Company's Common Stock (collectively, "Reporting Persons") to file reports of ownership and changes in ownership with the SEC. Reporting Persons are required by SEC regulations to furnish the Company with copies of all Section 16(a) forms they file.

Based solely on its review of the copies of such reports received or written representations from certain Reporting Persons, the Company believes that during fiscal 2003, all Reporting Persons complied with all applicable filing requirements.

ITEM 10. EXECUTIVE COMPENSATION

The following summary compensation table sets forth the compensation earned by certain executive officers serving at the end of fiscal 2004.

SUMMARY COMPENSATION TABLE

| NAME AND PRINCIPAL POSITION | FISCAL YEAR | ANNUAL COMPENSATION | | LONG-TERM COMPENSATION AWARDS |
|---|---|---|---|---|
| | | SALARY | BONUS | SECURITIES UNDERLYING OPTIONS |
| Charles Pecchio, Jr. Chairman of the Board (2) | 2004 | $ 90,000 | $ 90,000 | - |
| | 2003 | $ 94,500 | $ 94,500 | - |
| | 2002 | $ 87,083 | $ 382,606(1) | - |
| Arol R. Wolford President and CEO (3) | 2004 | $ 90,000 | $ 90,000 | - |
| | 2003 | $ 85,500 | $ 85,500 | - |
| | 2002 | $ 15,000 | $ 15,000 | 425,000 |
| Sherwin Krug Chief Financial Officer (4) | 2004 | $160,000 | $ 70,000 | 160,000 |
| | 2003 | $ 72,000 | $ - | 150,000 |

(1)    Includes sales commissions

(2)    Mr. Pecchio served as President through January 2002 and as CEO through June 2002. He is currently Chairman of the Board.

(3)    Mr. Wolford has served as President since February 2002 and as CEO since July 2002.

(4)    Mr. Krug has served as Chief Financial Officer since January 2003.

27

OPTION GRANTS IN LAST FISCAL YEAR

The following table sets forth all individual grants of stock options during the fiscal years ended June 30, 2003 and 2004, to each of the Named Executive Officers:

| NAME AND PRINCIPAL POSITION | FISCAL YEAR GRANTED | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED | PERCENT OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE OR BASE PRICE PER SHARE(1) | EXPIRATION DATE |
|---|---|---|---|---|---|
| Charles Pecchio, Jr. Chairman of the Board | - | - | - | - | - |
| Arol R. Wolford President and CEO | 2003 2003 | 175,000(2) 250,000(3) | 26.9% 38.5% | $2.00 1.00 | 7/26/2012 2/26/2013 |
| Sherwin Krug Chief Financial Officer | 2004 2003 | 160,000(3) 150,000(3) | 24.5% 23.1% | $1.70 1.00 | 10/29/2013 12/31/2012 |

(1) The exercise price of the options was equal to or greater than fair market value of the underlying stock on the date of grant.

(2) Grant becomes vested and exercisable two years from the date of grant.

(3) Grant becomes vested and exercisable in a period of one year from date of grant.

AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR AND
FISCAL YEAR-END OPTION VALUES

| NAME AND PRINCIPAL POSITION | SHARES ACQUIRED ON EXERCISE | VALUE REALIZED | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT FISCAL YEAR END | | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AT FISCAL YEAR END | |
|---|---|---|---|---|---|---|
| | | | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| Charles Pecchio, Jr. Chairman of the Board | - | - | - | - | - | - |
| Arol R. Wolford President and CEO | - | - | 425,000 | - | $ 250,000 | - |
| Sherwin Krug Chief Financial Officer | - | - | 150,000 | 160,000 | $ 150,000 | $48,000 |

EMPLOYMENT AGREEMENTS, TERMINATION OF EMPLOYMENT AND CHANGE-IN-CONTROL ARRANGEMENTS

Under the Employment Agreement between the Company and Charles Pecchio, Jr., effective February 1, 2002, and amended as of July 1, 2002, the Company has agreed to pay Mr. Pecchio an annual base salary of $90,000 and a performance bonus as determined by the Company's Compensation Committee and ratified by the Board of Directors. Mr. Pecchio will also be paid an annual bonus draw of $90,000 against the performance bonus. Any bonus draw in excess of the total amount of the actual performance bonus earned by Mr. Pecchio for each fiscal period shall not be recoverable by the Company. The agreement requires a minimum performance of 20 hours per week. If Mr. Pecchio's employment under the Employment Agreement is terminated by the Company other than for cause, or if a change of control occurs, or if Mr. Pecchio terminates his employment for good reason, Mr. Pecchio shall be paid by the Company a $360,000 termination payment over a period of two years. If Mr. Pecchio's

28

employment is terminated for any reason, Mr. Pecchio has agreed that, for one year after such termination, he will not directly or indirectly solicit or divert business from the Company or assist any business in attempting to do so or solicit or hire any person who was an employee of the Company during the term of his Employment Agreement or assist any business in attempting to do so or provide services to any business located in Florida, Georgia, Illinois or New York which is engaged in or conducts a business selling products or performing services substantially the same as the products sold or services performed by the Company.

Under the Employment Agreement between the Company and Arol R. Wolford effective February 1, 2002, and amended as of July 1, 2002, the Company has agreed to pay Mr. Wolford an annual base salary of $90,000 and a performance bonus as determined by the Company's Compensation Committee and ratified by the Board of Directors. Mr. Wolford will also be paid an annual bonus draw of $90,000 against the performance bonus. Any bonus draw in excess of the total amount of the actual performance bonus earned by Mr. Wolford for each fiscal period shall not be recoverable by the Company. The agreement requires a minimum performance of 20 hours per week. If Mr. Wolford's employment under the Employment Agreement is terminated by the Company other than for cause, or if a change of control occurs, or if Mr. Wolford terminates his employment for good reason, Mr. Wolford shall be paid by the Company a $360,000 termination payment over a period of two years. If Mr. Wolford's employment is terminated for any reason, Mr. Wolford has agreed that, for one year after such termination, he will not directly or indirectly solicit or divert business from the Company or assist any business in attempting to do so or solicit or hire any person who was an employee of the Company during the term of his Employment Agreement or assist any business in attempting to do so or provide services to any business located in Florida, Georgia, Illinois or New York which is engaged in or conducts a business selling products or performing services substantially the same as the products sold or services performed by the Company.

ITEM 11. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth information as of September 21, 2004 with respect to beneficial ownership of shares by (i) each person known to the Company to be the beneficial owner of 5% of the outstanding common stock, (ii) each of the Company's directors, (iii) the executive officers of the Company named in the Summary Compensation Table (the "named executives") and (iv) all current directors and officers as a group. Unless otherwise indicated the address for each person listed is the address of the Company.

Stock ownership information has been furnished to the Company by the named person. Beneficial ownership as reported in this section was determined in accordance with Securities and Exchange Commission regulations and includes shares as to which a person possesses sole or shared voting and/or investment power and shares a person has the right to acquire beneficial ownership of within 60 days of September 21, 2004. Except as otherwise stated in the footnotes below, the named persons have sole voting and investment power with regard to the shares shown as beneficially owned by such persons.

| NAME OF BENEFICIAL OWNER/RELATIONSHIP TO COMPANY | COMMON STOCK NO. OF SHARES | PERCENT OF CLASS |
|---|---|---|
| Charles A. McRoberts/Director | 1,052,640 (1) | 7.6% |
| John W. McRoberts/Director | 987,525 (2) | 7.1% |
| Charles Pecchio, Jr./Chairman of the Board | 784,241 (3) | 5.7% |
| Arol R. Wolford/President, CEO, Director | 3,452,127 (4) | 24.2% |
| Sherwin Krug/CFO | 310,000 (5) | 2.2% |
| Laura C. Rogers/Director | 50,000 (6) | *% |
| Theo P. VanderBoom/Director | 50,000 (7) | *% |
| All current executive officers and directors as a group (7 persons) | 6,686,533 | 45.5% |

29

-------------------

\* Represents less than 1.0%.

(1)  Includes 6,000 shares of common stock held by his spouse,  and 8,100 shares of common stock held by his minor children.

(2)  Includes 60,000 shares of common stock held by his spouse, and 4,000 shares of common stock held by his minor children.

(3)  Includes 11,331 shares of common stock held by his spouse.

(4)  Includes  1,450,000 shares of common stock registered in the name of SpecSource.com, Inc. a company in which Arol R. Wolford owns 67.6% of the equity and based on that holding will receive  980,000 shares of the Company's common stock on the final dissolution of SpecSource and  425,000 shares Mr. Wolford  has the right to purchase under outstanding stock options.

(5)  Mr. Krug has the right to purchase  these shares under  outstanding stock options.

(6)  Ms. Rogers has the right to purchase these shares under  outstanding stock options.

(7)  Mr. VanderBoom  has the  right to  purchase  these  shares  under outstanding stock options.

EQUITY COMPENSATION PLAN INFORMATION

| PLAN CATEGORY | (a)  NUMBER OF SECURITIES TO BE ISSUED UPON EXERCISE OF OUTSTANDING OPTIONS, WARRANTS AND RIGHTS | (b)  WEIGHTED-AVERAGE EXERCISE PRICE OF OUTSTANDING OPTIONS, WARRANTS AND RIGHTS | (c)  NUMBER OF SECURITIES REMAINING AVAILABLE FOR FUTURE ISSUANCE UNDER EQUITY COMPENSATION PLANS (EXCLUDING SECURITIES REFLECTED IN COLUMN (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders.................................. | 1,763,917 | $3.67 | 229,333 |
| Equity compensation plans not approved by security holders.............................. | | | |
| Total...................................... | 1,763,917 | $3.67 | 229,333 |

ITEM 12. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

On October 29, 2003, the Company completed a $643,000 private placement of common stock and warrants.  The Company issued 378,236 shares of common stock at a purchase  price of $1.70 per share and warrants to purchase  378,236 shares of common stock at an  exercise price of $2.50 per share.  Participants in the private placement  included Arol Wolford,  the Company's  President and CEO, who purchased 103,000  shares and received a warrant to purchase 103,000 shares of common stock, and John McRoberts,  the Company's director, who purchased 100,000 shares and received a warrant to purchase  100,000  shares of common stock.  The Company has agreed to register the common stock subject to the private placement after one year if the shares cannot then be sold without registration, or within six months after the Company's  common stock becomes accepted for listing on the NASDAQ Small Cap or National Markets.

On November 18, 2003,  the Company and BBN Acquisition, Inc.  ("BBN") consummated  a merger  (the  "Merger") whereby BBN was merged  with and into Tectonic Solutions, Inc., a Georgia corporation and a wholly-owned subsidiary of the Company ("Tectonic"),  pursuant to an Agreement and Plan of Merger, dated as of October 29, 2003.  In  connection  with the  Merger,  the  Company  issued approximately 750,000 shares of its  common  stock for all of the  issued  and outstanding shares of BBN's common stock. Arol Wolford,  the Company's President and CEO,  held  approximately 41.6% of the  outstanding  shares of BBN's common stock and received  311,671 shares of the Company's  common stock as a result of the Merger. Mr. Wolford's daughter served on the Board of Directors of BBN.

On November 26,  2003,  the Company and Construction Yellow  Pages LLC ("CYP"),  consummated  the  transactions  contemplated by an  Asset  Purchase Agreement,  dated  as  of October 29, 2003,  whereby  Tectonic  purchased substantially all of the  operating  assets of CYP (the "Asset Purchase").  In connection  with the  Asset  Purchase,  the  Company  issued  750,000 shares of the Company's common stock as consideration for substantially all of the operating assets of CYP. Arol Wolford,  the Company's President and CEO held approximately 58% of the outstanding  shares of CYP's common stock and received 435,000 shares of the Company's common stock as a result of the Asset Purchase.

On January 2, 2004, the Company and SpecSource.com, Inc. ("SpecSource"), consummated the transactions contemplated by an Asset Purchase Agreement, dated as of October 29, 2003, whereby Tectonic Solutions, Inc., a Georgia corporation and a wholly-owned subsidiary of the Company ("Tectonic") acquired substantially all of the operating assets of SpecSource (the "SpecSource Asset Purchase"). In connection with the SpecSource Asset Purchase, and as consideration for substantially all of the assets of SpecSource, the Company issued 1,450,000 shares of the Company's common stock, entered into a non-interest bearing note payable in the amount of $533,000 and simultaneously entered into a non-compete agreement with one of the stockholders of SpecSource for $360,000. Arol Wolford, the Company's President and CEO, holds approximately 67.6% of the outstanding shares of SpecSource common stock and, based on that holding, will receive approximately 980,000 shares of the Company's common stock on the final dissolution SpecSource.

ITEM 13. EXHIBITS AND REPORTS ON FORM 8-K

(a)    Exhibits:

A list of exhibits required to be filed as part of this Annual Report is set forth in the Index to Exhibits, which immediately follows the signature page and is incorporated herein by reference.

(b)    Reports on Form 8-K:

The Company filed no reports on Form 8-K during the quarter ended June 30, 2004.

On May 17, 2004, the Company furnished a Form 8-K which attached a press release announcing the Company's financial results for the fiscal quarter ended March 31, 2004.

ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

AUDIT FEES

The aggregate fees and expenses billed by BDO Seidman, LLP, the Company's independent auditors, for professional services rendered for the audit of our annual financial statements and for the reviews of the financial statements included in our quarterly reports on Form 10-QSB was approximately $124,000, for fiscal 2003 and $140,000 for the fiscal year ended June 30, 2004.

AUDIT-RELATED FEES

During fiscal 2003 and fiscal 2004, the aggregate fees and expenses billed by BDO Seidman, LLP for audit related services in fiscal years 2003 and 2004 were $15,000 and $28,000 respectively. Fiscal 2003 audit related services comprised of fees primarily related to meetings and proxy filing reviews. Fiscal 2004 audit related services comprised of fees and expenses related to Form 8-K filings, proxy filings and meetings.

TAX FEES

The aggregate fees billed by BDO Seidman, LLP for services rendered to the Company for tax compliance, tax advice and tax planning for the year ended June 30, 2003 and 2004 was approximately $17,000 and $23,000, respectively.

31

ALL OTHER FEES

During fiscal 2003 and 2004, BDO Seidman, LLP did render any other services or bill the Company any other fees not included above.

FEE PRE-APPROVAL POLICY

The Audit Committee has approved the engagement of BDO Seidman, LLP and has approved a budget for certain audit, audit related and tax related fees for services to be rendered for our 2005 fiscal year. The Audit Committee, or a member of the committee, must pre-approve all services provided to us by the Company's independent auditor. All of the services rendered by BDO Seidman during fiscal 2004 were pre-approved by the Audit Committee. The Audit Committee also approved the engagement of BDO Seidman, LLP for the audit and audit related services performed for our fiscal year ended June 30, 2004.

SIGNATURES

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

RETURN ON INVESTMENT CORPORATION

Date: October 12, 2004

By: /s/ Arol R. Wolford
------------------------------------
Arol Wolford
President and Chief Executive Officer

In accordance with the Exchange Act, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| NAME | TITLE | DATE |
| ---- | ----- | ---- |
| /s/ Arol R. Wolford<br>------------------------------------<br>Arol R. Wolford | President, Chief Executive Officer and Director (Principal Executive Officer) | October 12, 2004 |
| /s/ Sherwin Krug<br>------------------------------------<br>Sherwin Krug | Chief Financial Officer (Principal Financial and Accounting Officer) | October 12, 2004 |
| /s/ Charles Pecchio, Jr.<br>------------------------------------<br>Charles Pecchio, Jr. | Chairman of the Board | October 12, 2004 |
| /s/ Charles A. McRoberts<br>------------------------------------<br>Charles A. McRoberts | Director | October 12, 2004 |
| /s/ John W. McRoberts<br>------------------------------------<br>John W. McRoberts | Director | October 12, 2004 |
| /s/ Theo P. VanderBoom<br>------------------------------------<br>Theo P. VanderBoom | Director | October 12, 2004 |
| /s/ Laura C. Rogers<br>------------------------------------<br>Laura C. Rogers | Director | October 12, 2004 |

33

INDEX TO EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION |
| --- | --- |
| 2.1 | Agreement and Plan of Merger and Exchange of Stock, dated as of December 17, 1999, by and among Results Oriented Integration Corporation, Net/Tech International, Inc., Net/Tech Acquisition Corporation, Charles A. McRoberts, John W. McRoberts and Charles Pecchio, Jr. (incorporated by reference to exhibit 2 to Return On Investment Corporation's Report on Form 8-K, filed September 5, 2000). |
| 3.1 | Certificate of Incorporation of Return On Investment Corporation, a Delaware corporation (incorporated by reference to exhibit 3.1 to Return On Investment Corporation's Annual Report on Form 10-KSB, filed October 2, 2001). |
| 3.1A | Certificate of Amendment to the Certificate of Incorporation of Return On Investment Corporation, a Delaware corporation (filed herewith). |
| 3.2 | By-laws, as amended October 29, 2001, of Return On Investment Corporation, a Delaware corporation (incorporated by reference to exhibit 3.1 to Return On Investment Corporation's Report on Form 10-QSB, filed February 14, 2002). |
| 10.1* | Return On Investment Corporation 2003 Stock Incentive Plan (incorporated by reference to Appendix B to the Return On Investment Corporation's Definitive Proxy Statement filed April 9, 2003). |
| 10.2* | ROI Corporation Common Stock Long Term Incentive Plan (incorporated by reference to exhibit 10.3 to Return On Investment Corporation's Annual Report on Form 10-KSB, filed October 2, 2001). |
| 10.3* | Employment Agreement, dated as of February 1, 2002, by and between Return On Investment Corporation and Charles Pecchio, Jr. (incorporated by reference to Exhibit 10.1 to Return On Investment Corporation's Annual Report on Form 10-KSB, filed September 30, 2002). |
| 10.3A* | Amendment to Employment Agreement, dated as of July 1, 2002, by and between Return On Investment Corporation and Charles Pecchio, Jr. (incorporated by reference to Exhibit 10.1A to Return On Investment Corporation's Annual Report on Form 10-KSB, filed September 30, 2002). |
| 10.4* | Employment Agreement, dated as of February 1, 2002, by and between Return On Investment Corporation and Arol Wolford (incorporated by reference to Exhibit 10.5 to Return On Investment Corporation's Annual Report on Form 10-KSB, filed September 30, 2002). |
| 10.4A* | Amendment to Employment Agreement, dated as of July 1, 2002, by and between Return On Investment Corporation and Arol Wolford (incorporated by reference to Exhibit 10.5A to Return On Investment Corporation's Annual Report on Form 10-KSB, filed September 30, 2002). |
| 21.1 | List of subsidiaries of the Company (filed herewith). |
| 31.1 | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) under the Securities Exchange Act of 1934 (filed herewith). |
| 31.2 | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) under the Securities Exchange Act of 1934 (filed herewith). |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith). |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith). |

* Indicates management contract or compensatory plan.

RETURN ON
INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

--------------------------------------------------------------------------------

CONSOLIDATED FINANCIAL STATEMENTS

YEARS ENDED JUNE 30, 2004 AND 2003

F-1

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONTENTS

--------------------------------------------------------------------------------

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM        F3

CONSOLIDATED FINANCIAL STATEMENTS

    Consolidated balance sheets                               F4 - F5

    Consolidated statements of loss                           F6

    Consolidated statements of stockholders' equity           F7

    Consolidated statements of cash flows                     F8

    Notes to consolidated financial statements                F9 - F29

F-2

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders
of Return On Investment Corporation and Subsidiaries d/b/a ROI Corporation

We have audited the accompanying consolidated balance sheets of Return On Investment Corporation and subsidiaries d/b/a ROI Corporation as of June 30, 2004 and 2003, and the related consolidated statements of loss, stockholders' equity and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ROI Corporation and subsidiaries as of June 30, 2004 and 2003 and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

/s/ BDO Seidman, LLP

Atlanta, Georgia
September 30, 2004

F-3

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED BALANCE SHEETS

| June 30, | 2004 | 2003 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT** | | |
| Cash and cash equivalents | $ 223,333 | $ 347,339 |
| Accounts receivable, less allowance for doubtful accounts of $142,437 and $65,953, respectively (Note 15) | 1,453,265 | 835,771 |
| Prepaid expenses and other current assets | 386,249 | 107,957 |
| Total current assets | 2,062,847 | 1,291,067 |
| PROPERTY AND EQUIPMENT, NET (Notes 4 and 14) | 494,738 | 335,475 |
| GOODWILL, NET (Note 5) | 3,160,681 | 195,002 |
| INTANGIBLE ASSETS, NET (Note 6) | 5,034,414 | 943,970 |
| | $10,752,680 | $2,765,514 |

See accompanying notes to consolidated financial statements.

F-4

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED BALANCE SHEETS

--------------------------------------------------------------------------

| June 30, | 2004 | 2003 |
|---|---|---|
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $    1,185,951 | $    123,950 |
| Accrued expenses (Note 10) | 1,242,141 | 805,034 |
| Notes payable- related parties (Note 7) | 305,200 | 85,000 |
| Deferred revenue | 1,766,625 | 1,002,182 |
| Line of credit (Note 8) | 691,529 | |
| Other financing, net of unamortized discount (Note 9) | 316,672 | 358,336 |
| Notes payable (Note 2) | 893,000 | - |
| Total current liabilities | 6,401,118 | 2,374,502 |
| COMMITMENTS AND CONTINGENCIES (Notes 2, 9, 12, 15, and 16) | - | - |
| STOCKHOLDERS' EQUITY | | |
| Common stock, .01 par value (25,000,000 shares authorized, 13,717,054 and 11,323,494 outstanding) | 137,170 | 113,235 |
| Additional paid-in capital | 21,287,863 | 11,353,496 |
| Accumulated deficit | (17,073,471) | (11,075,719) |
| Total stockholders' equity | 4,351,562 | 391,012 |
| | $10,752,680 | $  2,765,514 |

--------------------------------------------------------------------------

See accompanying notes to consolidated financial statements.

F-5

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED STATEMENTS OF LOSS

| Years ended June 30, | 2004 | 2003 |
|---|---|---|
| **REVENUE** | | |
| License fees | $ 6,705,502 | $ 5,420,108 |
| Support and update services | 2,212,164 | 1,641,956 |
| Advertising revenue | 1,052,598 | - |
| Consulting fees | 615,770 | 799,198 |
| Total revenue | 10,586,034 | 7,861,262 |
| **OPERATING EXPENSES** | | |
| Cost of revenues (Note 1) | 1,169,949 | 615,275 |
| General and administrative (including non-cash consulting fees of $115,761 in 2004 and non-cash compensation expense $78,020 in 2003 - Note 12) | 8,382,652 | 5,210,362 |
| Sales and marketing | 3,402,307 | 1,828,938 |
| Research and development | 1,530,464 | 1,325,531 |
| Depreciation and amortization (Notes 4 and 14) | 1,963,137 | 1,697,877 |
| Total operating expenses | 16,448,509 | 10,677,983 |
| Operating loss | (5,862,475) | (2,816,721) |
| Interest income | 2,902 | 14,674 |
| Interest expense (Note 12) | (424,083) | (333,128) |
| Gain on sale of assets | 285,904 | - |
| **NET LOSS** | $(5,997,752) | $(3,135,175) |
| BASIC AND DILUTED LOSS PER SHARE | $    (0.50) | $    (0.28) |
| BASIC AND DILUTED WEIGHTED AVERAGE SHARES OUTSTANDING | 11,940,665 | 11,236,535 |

See accompanying notes to consolidated financial statements.

F-6

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

| | Common Stock | | Redeemable Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| BALANCE, July 1, 2002 | 11,093,780 | $109,285 | - | $ - | $10,706,926 | $(7,940,544) | $ 2,875,667 |
| Repurchase and cancellation of common stock under earn-out (Note 2) | (257,194) | (2,572) | - | - | - | - | (2,572) |
| Issuance of common stock for compensation (Note 2) | 60,502 | 605 | - | - | 67,762 | - | 68,367 |
| Surrender of shares by former stockholder (Note 2) | (115,500) | (1,155) | - | - | - | - | (1,155) |
| Stock option compensation expense and other | 106,906 | 2,722 | - | - | 10,658 | - | 13,380 |
| Common stock sold to employees | 435,000 | 4,350 | - | - | 568,150 | - | 572,500 |
| Net loss | - | - | - | - | - | (3,135,175) | (3,135,175) |
| BALANCE, June 30, 2003 | 11,323,494 | 113,235 | - | - | 11,353,496 | (11,075,719) | 391,012 |
| Return of escrow shares | (2,847,176) | (28,472) | - | - | 28,472 | - | - |
| Issuance of common stock for cash | 1,540,736 | 15,407 | - | - | 2,848,675 | - | 2,864,082 |
| Exercise of warrants | 150,000 | 1,500 | - | - | 43,500 | - | 45,000 |
| Issuance of common stock for acquisitions | 3,550,000 | 35,500 | - | - | 6,833,500 | - | 6,869,000 |
| Issuance of warrants to consultants and lenders | - | - | - | - | 180,220 | - | 180,220 |
| Net loss | - | - | - | - | - | (5,997,752) | (5,997,752) |
| BALANCE, June 30, 2004 | 13,727,054 | $137,270 | - | $ - | $21,287,863 | $(17,073,471) | $ 4,351,562 |

See accompanying notes to consolidated financial statements.

F-7

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED STATEMENTS OF CASH FLOWS

| Years ended June 30, | 2004 | 2003 |
|---|---|---|
| **OPERATING ACTIVITIES** | | |
| Net loss | $(5,997,752) | $(3,135,175) |
| Adjustments to reconcile net loss to | | |
| net cash used in operating activities: | | |
| Depreciation and amortization | 1,963,137 | 1,697,877 |
| Interest accretion on warrants, net (Note 9) | 333,333 | 333,333 |
| Non-cash referral fees (Note 9) | (214,341) | (126,569) |
| Non-cash consulting fees (Note 12) | 115,761 | - |
| Non-cash interest expense (Note 12) | 64,459 | - |
| Non-cash compensation | - | 78,020 |
| Changes in working capital items: | | |
| Accounts receivable | (22,727) | (42,112) |
| Prepaid expenses and other current assets | (215,867) | 19,079 |
| Accounts payable | 750,258 | (268,907) |
| Accrued expenses | 388,664 | 478,777 |
| Deferred revenues | (352,179) | 87,956 |
| Cash used in operating activities | (3,187,254) | (877,721) |
| **INVESTING ACTIVITIES** | | |
| Purchase of property and equipment | (382,505) | (133,293) |
| Cash paid for acquisitions and intangibles (Note 2) | (214,402) | - |
| Cash used in investing activities | (596,907) | (133,293) |
| **FINANCING ACTIVITIES** | | |
| Proceeds from the issuance of common stock (Note 11) | 2,864,082 | 572,500 |
| Proceeds from line of credit (Note 8) | 691,529 | - |
| Proceeds from director, officer and loans (Note 7) | 305,200 | 85,000 |
| Proceeds from the exercise of warrants | 45,000 | - |
| Repayment under director, officer and loans (Note 7) | (85,000) | - |
| Repayment under debt financing agreement (Note 9) | (160,656) | (98,428) |
| Repayments of long term debt | - | (15,874) |
| Cash provided by financing activities | 3,660,155 | 543,198 |
| NET DECREASE IN CASH AND CASH EQUIVALENTS | (124,006) | (467,816) |
| CASH AND CASH EQUIVALENTS, beginning of year | 347,339 | 815,155 |
| CASH AND CASH EQUIVALENTS, end of year | $ 223,333 | $ 347,339 |
| CASH PAID FOR INTEREST | $ 26,291 | $ - |

See accompanying notes to consolidated financial statements.

F-8

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
------------------------------------------------------------------------

1.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

NATURE OF OPERATIONS

Return On Investment  Corporation  d/b/a ROI Corporation ("ROI" or the "Company")
has  two  primary  operating  subsidiaries.   The  Tectonic  Network  subsidiary
("Tectonic") which develops and markets building product  information  solutions
for  the  construction  industry  and  includes  i)  printed  directories,  ii) a
searchable online building product information  database,  iii) an online studio
for the search,  visualization and selection of carpet, paint and other textiles
and  iv)  customized  web based  solutions  for organizing   building  product
manufacturer databases for easier search and selection.

The GO Software subsidiary ("GO") develops and markets software and services for
credit card, debit  card and check transactions processing with  offerings
including  payment  processing  software for virtually  any computing  platform,
including  Windows,  Unix and Linux.  The recent purchase of an Internet gateway
solution will compliment the current software based payment processing solutions
by offering a secure, scalable internet only solution.

BASIS OF PRESENTATION

The accompanying  consolidated  financial statements include the accounts of ROI
and its wholly owned  subsidiaries.  All intercompany  accounts and transactions
have been eliminated.

USE OF ESTIMATES

The preparation of financial  statements in conformity with generally  accepted
accounting principles requires management to make estimates and assumptions that
affect  the  reported  amounts  of assets  and  liabilities  and  disclosure  of
contingent  assets and  liabilities at the date of the financial  statements and
the  reported  amounts of revenues  and expenses  during the  reporting  period.
Actual results could differ from those estimates.

CASH AND CASH EQUIVALENTS

The company considers all highly liquid  short-term  investments with maturities
of three months or less when purchased to be cash equivalents.

ACCOUNTS RECEIVABLE

Accounts receivable represent customer obligations due under normal trade terms.
The Company's GO subsidiary sells its products  primarily  through resellers and
independent sales organizations while the Tectonic subsidiary sells its products
directly to building  product manufacturers,  distributors,  independent  sales
organizations, general contractors,  subcontractors and heavy equipment dealers.
The Company performs  continuing credit evaluations of its customers'  financial
condition and depending on the term of credit,  the amount of the credit granted
and management's past history with a customer,  the Company does not require the
debtor  to  pledge  collateral  for  the  receivable  in  the  ordinary  course of
business.

F-9

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS

Management reviews accounts receivable on a regular basis to determine if any such amounts will potentially be uncollectible. The Company includes any balances that are determined to be uncollectible, along with a general reserve, in its overall allowance for doubtful accounts. The general reserve is based on current economic factors in conjunction with historical collection results. After all attempts to collect a receivable have failed, the receivable is written off against the allowance. Based on the information available to management, it believes the Company's allowance for doubtful accounts as of June 30, 2004 and 2003 is adequate. However, actual write-offs might exceed the recorded allowance.

PROPERTY AND EQUIPMENT

Property and equipment are stated at cost, net of accumulated depreciation and amortization. Depreciation is calculated using the straight-line method over the estimated useful lives of the assets, generally ranging from three to five years. Leasehold improvements are amortized using the straight-line method over the lesser of the lease term and the estimated useful lives of the related assets.

GOODWILL

Goodwill is tested for impairment on an annual basis as of June 30, for its payment processing business goodwill and December 31, for its construction information business goodwill. The Company tests between annual tests if indicators of potential impairment exist, using a fair-value approach. This approach requires that a two-step transitional impairment test be performed on all goodwill. In the first step, the fair value of the Company's goodwill is compared to its carrying value. If the fair value exceeds the carrying value, goodwill is not impaired and no further testing is performed. If the carrying value exceeds the fair value, then the second step must be performed, and the implied fair value of the Company's goodwill must be determined and compared to the carrying value of the goodwill. If the carrying value exceeds its implied fair value, then an impairment loss equal to the difference will be recorded. No impairment of goodwill has been identified during any of the periods presented.

INTANGIBLE ASSETS

Intangible assets consist primarily of acquired technology, database assets and proprietary concepts ("Technology based intangibles"); customer lists and customer contracts ("Customer-related intangibles") and non-competition agreements ("Marketing-related intangibles") related to acquisitions accounted for under the purchase method of accounting. Intangible assets are amortized using the straight-line method over their estimated period of benefit, estimated to be three years.

The Company identifies and records impairment losses on intangible assets when events and circumstances indicate that such assets might be impaired. The Company considers factors such as significant changes in the regulatory or business climate and projected future cash flows from the respective asset. No impairment of intangible assets has been identified during any of the periods presented.

STOCK-BASED COMPENSATION PLANS

The Company accounts for its stock-based compensation plans under the provisions of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees"("APB 25"). Under APB

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
--------------------------------------------------------------------------

25, when the exercise price of the Company's stock options equals or exceeds the market price of the underlying stock on the date of grant, no compensation expense is recorded. The Company presents the disclosure requirements of SFAS No. 123, "Accounting for Stock-based Compensation." SFAS No. 123 requires that companies which elect not to account for stock-based compensation as prescribed by that statement shall disclose, among other things, the pro forma effects on net loss and basic net loss per share as if SFAS No. 123 had been adopted.

Based on the additional disclosure requirements of SFAS 148, "Accounting for Stock Based Compensation--Transition and Disclosure--an Amendment to SFAS 123", the following illustrates the assumptions and the effect on net loss and net loss per share if the Company had applied the fair value recognition provisions of SFAS 123.

| Years Ending June 30, | 2004 | 2003 |
|---|---|---|
| Net loss, as reported | $(5,997,752) | $(3,135,175) |
| Add stock-based employee compensation expense included in reported net earnings | - | 13,380 |
| Less total stock-based employee compensation expense determined under fair value based methods for all awards | (614,214) | (282,721) |
| Net loss, pro forma | $(6,611,966) | $(3,402,516) |
| | | |
| Basic and diluted loss per share, as reported | $ (0.50) | $ (0.28) |
| Basic and diluted loss per share, pro forma | $ (0.55) | $ (0.30) |

The fair value of stock options used to compute pro forma net loss and loss per share disclosures is the estimated present value at grant date using the Black-Scholes option-pricing model with the following weighted average assumptions:

| Years Ending June 30, | 2004 | 2003 |
|---|---|---|
| Risk free interest rate | 1.69% | 1.60% |
| Volatility factor | 85% | 129% |
| Expected option life (years) | 1.7 | 1.4 |

The weighted average fair value of options granted during the years ended June 30, 2004 and 2003 was $0.85 and $0.69 per share, respectively.

F-11

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
-----------------------------------------------------------------------

REVENUE RECOGNITION

The Company recognizes revenues from licenses of computer software once (i) a non-cancelable license agreement has been signed, (ii) the software and related documentation have been shipped, (iii) there are no material uncertainties regarding customer acceptance, (iv) collection of the resulting receivable is deemed probable, and (v) no significant other vendor obligations exist. The revenue associated with any license agreements containing cancellation or refund provisions is deferred until such provisions lapse. In cases of future obligations, if such obligations are insignificant, then related costs are accrued immediately. If the obligations are significant, then the software product license revenues are deferred. Future contractual obligations can include software customization and requirements to provide additional products in the future and to port products to new platforms. Contracts that require significant software customization are accounted for on the percentage-of-completion basis. Revenues related to significant obligations to provide future products or to port existing products are deferred until the new products or ports are completed.

The Company's revenue recognition policies are designed to comply with American Institute of Certified Public Accountants Statement of Position ("SOP") 97-2 "Software Revenue Recognition," as modified by SOP 98-9 "Modification of SOP 97-2, Software Revenue Recognition, With Respect to Certain Transactions," and under SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements." Revenues recognized from multiple-element software license contracts are allocated to each element of the contract based on the fair values of the elements, such as licenses for software products, maintenance, or professional services. The determination of fair value is based on objective evidence which is specific to the Company. We limit our assessment of objective evidence for each element to either the price charged when the same element is sold separately, or the price established by management having the relevant authority to do so for an element not yet sold separately. If evidence of fair value of all undelivered elements exists but evidence does not exist for one or more delivered elements, then revenue is recognized using the residual method. Under the residual method, the fair value of the undelivered elements is deferred and the remaining portion of the arrangement fee is recognized as revenue.

The historical rate of product returns for the Company's software products is negligible. Further, the Company did not have any transactions during the years ended June 30, 2004 or 2003 involving reciprocal arrangements where goods or services were purchased from an organization at the same time that the Company licensed software or provided services to that organization.

Support and update services revenues, including revenues bundled with original software product license revenues, are deferred and recognized over the related contract period, generally one year.

Consulting fee revenues are generated from professional consulting and training services and are recognized when the services are performed or if part of a medium term consulting agreement, than according to percentage-of-completion basis.

Advertising revenue is generated from the listings of advertisements in print and electronic directories, the sale of banner, sponsorship, and text-link advertisements, including sponsored search advertisements and from the photography and display of products on websites. Advertising revenue connected to the sale of advertising in print directories is only recognized upon the publication and shipment of those directories. Revenue from the sale of advertising or photography for the display on websites is recognized over the contract subscription period, which is generally one year.

F-12

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS

------------------------------------------------------------------------

COST OF REVENUE

Cost of revenue consists primarily of costs related to the manufacturing, packaging, documentation and distribution of GO Software products and printing and distribution costs related to Tectonic print directories.

ADVERTISING COSTS

Advertising costs are expensed during the period in which they are incurred. Total advertising expenses for the fiscal years ended June 30, 2004, and 2003 were $107,016 and $206,501, respectively.

SHIPPING AND HANDLING FEES

In accordance with Emerging Issues Task Force ("EITF") 00-10, the Company records all shipping and handling fees associated with shipping and handling its licensed software to customers in general and administrative expenses.

RESEARCH AND DEVELOPMENT AND SOFTWARE DEVELOPMENT COSTS

Under the criteria set forth in SFAS No. 86, "Accounting for the Cost of Computer Software to be Sold, Leased or Otherwise Marketed", development costs incurred in the research and development of new software products are expensed as incurred until technological feasibility in the form of a working model has been established at which time such costs are capitalized and recorded at the lower of unamortized cost or net realizable value. Historically, the costs incurred subsequent to the establishment of a working model but prior to general release of the product have not been significant and to date, the Company has not capitalized any costs related to the development of software for external use.

INCOME TAXES

The Company accounts for income taxes in accordance with SFAS No. 109, Accounting for Income Taxes, which requires an asset and liability approach. This approach results in the recognition of deferred tax assets (future tax benefits) and liabilities for the expected future tax consequences of temporary differences between the book carrying amounts and the tax basis of assets and liabilities. The deferred tax assets and liabilities represent the future tax return consequences of those differences, which will either be deductible or taxable when the assets and liabilities are recovered or settled. Future tax benefits are subject to a valuation allowance when management believes it is more likely than not that the deferred tax assets will not be realized.

NET LOSS PER SHARE

Net loss available to common stockholders per share is presented in accordance with SFAS No. 128, "Earnings Per Share." Basic and diluted net loss available to common stockholders per share is based on the weighted average number of shares of common stock outstanding during the period. In periods in which they have a dilutive effect, common shares contingently issuable and those issuable upon exercise of stock options and warrants will be included in the diluted earnings per share calculation.

F-13

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS

As a result of the net losses incurred in the years ended June 30, 2004 and 2003, the following common shares were antidilutive and accordingly, were excluded from the computation of loss per share:

|  | 2004 | 2003 |
|---|---|---|
| Stock options | 1,763,917 | 1,243,317 |
| Warrants | 2,247,400 | 1,866,664 |
|  | 4,011,317 | 3,109,981 |

## FAIR VALUES OF FINANCIAL INSTRUMENTS

The Company has a number of financial instruments, including cash, trade receivables, trade payables, and long term debt none of which are held for trading purposes. The Company estimates that the fair value of the financial instruments does not differ materially from the aggregate carrying values recorded in the balance sheet. The estimated fair value amounts have been determined by the Company using available market information and appropriate valuation methodologies. Considerable judgment is required in interpreting market data to develop these estimates of fair value and, accordingly, the estimates are not necessarily indicative of the amounts that the Company could realize in a current market exchange.

## RISKS AND UNCERTAINTIES

The Company is subject to risks and uncertainties in the normal course of business including customer acceptance of its products, rapid technological changes, delays in introducing and market acceptance of new products, competition, e-business developments, ability to attract and retain qualified personnel, ability to protect its intellectual property, and other matters inherent in the software industry.

## RECLASSIFICATION

Certain prior year amounts have been reclassified to conform to current year presentation.

## IMPACT OF RECENTLY ISSUED ACCOUNTING STANDARDS

Financial Accounting Standards Board (FASB) Interpretation No. (FIN) 46(R), "Consolidation of Variable Interest Entities", issued in December 2003, requires that if a business enterprise has a controlling financial interest in a variable interest entity, and is considered the primary beneficiary, the assets, liabilities and results of the activities of the variable interest entity shall be included in the consolidated financial statements of the business enterprise. (FIN) 46(R) is effective for the Company in the fourth quarter of fiscal 2004. Based on the Company's evaluation of the requirements of (FIN) 46(R), no variable interest entities that are subject to consolidation were identified and, as such, the adoption of (FIN) 46(R) for fiscal year 2004 had no impact on the Company's consolidated financial position or results of operations.

In May 2003, the FASB issued SPAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity". SPAS 150 establishes standards on the classification and measurement of financial instruments with characteristics of both liabilities and equity. The statement was effective for most financial instruments entered into or modified after May 31, 2003, and otherwise was effective at the beginning of our first quarter for fiscal 2004. The adoption of this Statement did not have a significant impact on the Company's consolidated financial position or result of operations.

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
--------------------------------------------------------------------------------

2.  BUSINESS COMBINATIONS

BBN Acquisition

On November 18, 2003, the Company, and BBN Acquisition, Inc., a North Carolina corporation ("BBN"), consummated a merger (the "Merger") whereby BBN was merged with and into Tectonic Solutions, Inc. d/b/a Tectonic Network, a Georgia corporation and a wholly-owned subsidiary of the Company ("Tectonic"), pursuant to an Agreement and Plan of Merger, dated as of October 29, 2003. Tectonic survived the Merger as a wholly-owned subsidiary of ROI. BBN provides an online design resource for design professionals in the commercial interiors industry. The BBN acquisition will extend the Company's strategic push into the commercial construction products market by enhancing its offerings with BBN's aggregated product information web site.

In connection with the Merger, the Company issued approximately 750,000 shares of its common stock for all of the issued and outstanding shares of BBN's common stock. The shares were valued at $1.82 per share based on the closing price of the Registrant's common stock, as quoted on the Over-The-Counter Bulletin Board ("OTCBB"), for a reasonable period before and after the terms of the Merger were announced. The shares issued to the former BBN shareholders have not been registered under the Securities Act of 1933, as amended (the "Securities Act"). Arol Wolford, the Company's President and CEO, held approximately 41.6% of the outstanding shares of BBN's common stock and received 311,671 shares of the Company's common stock as a result of the Merger. Mr. Wolford's daughter served on the Board of Directors of BBN.

The following table presents the total purchase price of the Merger:

| | |
|---|---|
| Value of ROI common stock issued | $1,365,000 |
| Cash acquired | (1,956) |
| Transaction costs | 91,682 |
| Total Purchase Price Consideration | $1,454,726 |

The aggregate purchase price has been allocated based on fair values as of the date of the completion of the Merger as follows:

| | |
|---|---|
| Receivables | $ 17,871 |
| Prepaid expenses | 12,029 |
| Property and equipment | 18,044 |
| Goodwill | 584,927 |
| Intangible assets | 1,036,457 |
| Accounts payable | (69,841) |
| Deferred revenue | (129,853) |
| Other current liabilities | (14,908) |
| | $ 1,454,726 |

F-15

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
--------------------------------------------------------------------------

CYP Acquisition

On November 26, 2003, the Company and Construction Yellow Pages LLC, a Michigan limited liability company ("CYP"), consummated the transactions contemplated by an Asset Purchase Agreement, dated as of October 29, 2003, whereby Tectonic purchased substantially all of the operating assets of CYP (the "Asset Purchase"). CYP is a publisher of regional comprehensive print directories for the commercial construction industry. CYP's products complement the Company's entry into the commercial construction products database market with its comprehensive print directories that are specialized for local markets.

In connection with the Asset Purchase, the Company issued 750,000 shares of the Company's common stock as consideration for substantially all of the operating assets of CYP. The shares were valued at $1.82 per share based on the closing price of the Company's common stock, as quoted on the OTCBB, for a reasonable period before and after the terms of the Asset Purchase were announced. The shares issued to CYP have not been registered under the Securities Act. Arol Wolford, the Company's President and CEO held approximately 58% of the outstanding shares of CYP's common stock and received 435,000 shares of the Company's common stock as a result of the Asset Purchase.

The following table presents the total purchase price of the Asset Purchase:

| | |
|---|---|
| Value of ROI common stock issued | $ 1,365,000 |
| Cash acquired | (54,626) |
| Transaction costs | 94,536 |
| | |
| Total Purchase Price Consideration | $ 1,404,910 |

The aggregate purchase price has been allocated based on fair values as of the date of the completion of the Asset Purchase as follows:

| | |
|---|---|
| Receivables | $ 325,416 |
| Prepaid expenses | 1,771 |
| Property and equipment | 11,862 |
| Goodwill | 487,204 |
| Intangible assets | 1,037,000 |
| Accounts payable | (39,079) |
| Accrued expenses | (22,210) |
| Deferred revenue | (396,195) |
| Other current liabilities | (859) |
| | |
| | $ 1,404,910 |

F-16

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
--------------------------------------------------------------------------------

SpecSource Acquisition

On January 2, 2004, the Company and SpecSource.com, Inc., an Indiana corporation ("SpecSource"), consummated the transaction contemplated by an Asset Purchase Agreement, dated as of October 29, 2003, whereby Tectonic purchased substantially all of the operating assets of SpecSource (the "SpecSource Asset Purchase"). SpecSource is an online directory of commercial construction products manufacturers and their local supply chain of product representatives and distributors.

In connection with the SpecSource Asset Purchase and as consideration for substantially all of the operating assets of SpecSource, the Company issued 1,450,000 shares of the Company's common stock; entered into a non-interest bearing note payable in the amount of $533,000 payable to one of the stockholders of SpecSource; and simultaneously entered into a non-compete agreement with one of the stockholders of SpecSource in exchange for a $360,000 non-interest bearing note. Due to the uncertainty that incremental payments will be made beyond one year, no imputed interest was calculated. The shares were valued at $1.82 per share based on the closing price of the Company's common stock, as quoted on the OTCBB, for a reasonable period before and after the terms of the Asset Purchase were announced. The shares issued to SpecSource have not been registered under the Securities Act. Arol Wolford, the Company's President and CEO, holds approximately 67.6% of the outstanding shares of SpecSource common stock and will receive approximately 980,000 shares of the Company's common stock as a result of the SpecSource Asset Purchase. The notes issued are interest free and will mature in 10 years. Until maturity, payments under the note will only be required when the Company has cash, net of debt obligations exceeding $5.25 million, on its quarterly balance sheet. At any time such cash threshold is met, the Company will make a payment on the note in an amount by which the Company's cash exceeds $5 million. As a result of matters discussed in Note 19, these obligations are reflected as current liabilities.

The following table presents the total purchase price of the Asset Purchase:

| | |
|---|---:|
| Value of ROI common stock issued | $ 2,639,000 |
| Notes issued | 893,000 |
| Transaction costs | 65,171 |
| Total Purchase Price Consideration | $ 3,597,171 |

The aggregate purchase price has been allocated based on fair values as of the date of the completion of the SpecSource Asset Purchase as follows:

| | |
|---|---:|
| Receivables | $ 270,364 |
| Prepaid expenses | 18,625 |
| Property and equipment | 7,710 |
| Goodwill | 1,893,548 |
| Intangible assets | 2,158,000 |
| Accounts payable | (185,694) |
| Accrued expenses | (10,466) |
| Deferred revenue | (554,916) |
| | $ 3,597,171 |

F-17

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
--------------------------------------------------------------------------

Under the purchase method of accounting pursuant to SFAS 141, the total purchase prices as shown in the tables above were allocated to acquired entities net tangible and intangible assets based on their estimated fair values as of the date of the completion of the acquisition. Any excess of the purchase price over the fair value of the net tangible assets/liabilities and identifiable intangible assets acquired were recorded as goodwill. In accordance with the SFAS 142, goodwill and intangible assets with indefinite lives resulting from business combinations have not been amortized but instead will be tested for impairment at least annually (more frequently if certain indicators are present) while identifiable intangible assets with finite lives are amortized over their estimated useful lives. In the event that the management of the Company determines that the value of goodwill or intangible assets has become impaired, the Company will incur an accounting charge for the amount of impairment during the fiscal quarter in which the determination is made. The results of operations of the acquired entities have been included in ROI's results of operations from the date of the closing of the respective acquisitions.

SUPPLEMENTAL PRO-FORMA DISCLOSURES

Supplemental pro-forma disclosures of the results of operations for the year ended June 30, 2004 and 2003, as though the above acquisitions of BBN, CYP and SpecSource had been completed as of July 1, 2002, are as presented below. These pro-forma results have been prepared for comparative purposes only and do not purport to be indicative of what operating results would have been had the acquisitions actually taken place on July 1, 2002.

|  | Year Ended June 30, | |
|  | 2004 | 2003 |
| --- | --- | --- |
| Total Revenues | $11,182,209 | $ 8,793,278 |
| Net Loss | (8,038,662) | (7,460,585) |
| Basic and Diluted Loss per share | $ (0.61) | $ (0.53) |

EARN OUT PROVISIONS

In conjunction with certain of the Company's pre-2004 acquisitions, a total of 300,000 shares were contingently issuable based on the achievement of certain earn out provisions in then future periods. In accordance with these provisions, a total of 60,502 shares were earned by a former stockholder of Net400, Inc. during fiscal 2003. In accordance with APB 16, these shares were determined to be compensation for services and as such, the fair value of the common stock received was expensed. The remaining shares held under the Net400 earn out agreement which expired on January 31, 2003 were cancelled.

On March 25, 2003, the former majority stockholder of S.A.F.E. Systems, Inc. ("S.A.F.E.") returned 115,500 shares of the Company's issued and outstanding common stock back to the Company. The stock related to part of the original consideration received by the stockholder for the sale of S.A.F.E. to the Company. The return of stock was agreed to by the stockholder and the Company for mutual releases and covenants not to sue resulting from the original transaction.

F-18

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
--------------------------------------------------------------------------------

3.    ASSET ACQUISITION

On January 7, 2004, the Company purchased certain foreclosed assets of Atomic Software, Inc., ("Atomic") for approximately $1,560,000 including transaction costs of $19,595 and assumed liabilities of approximately $60,000. The purchased assets, primarily Atomic's gateway code, will complement the Company's existing GO Software product line of Windows based software payment processing solutions by now offering a completely Internet based application that can be accessed from any Internet browser and is not software dependent. This has been accounted for as an acquisition of specific assets and not as a business combination as, in accordance with Emerging Issues Task Force, EITF 98-3 "Determining Whether a Nonmonetary Transaction Involves Receipt of Productive Assets or of a Business", the definition of a business has not been met due to the lack of the necessary elements including inputs, processes and outputs. The gateway asset has also not yet been placed into service and is still undergoing further development to increase stability, scalability and adequate security in the form of the Credit Information Security Program ("CISP") audit compliance.

In connection with the purchase, the Company issued approximately 600,000 shares of its common stock for acquired foreclosed net assets of Atomic. The shares have been valued for accounting purposes at $2.50 per share based on the closing price of the Registrant's common stock, as quoted on the Over-The-Counter Bulletin Board ("OTCBB"), for a reasonable period before and after the terms of the purchase was announced. The shares issued to the former owners of Atomic have not been registered under the Securities Act of 1933, as amended (the "Securities Act").

4.    PROPERTY AND EQUIPMENT

Property and equipment are summarized by major classifications as follows at June 30:

|  | 2004 | 2003 |
|---|---|---|
| Computer equipment | $   292,282 | $    203,167 |
| Furniture and fixtures | 80,918 | 206,150 |
| Purchased software | 759,747 | 1,200,482 |
|  | 1,132,947 | 1,609,799 |
| Less accumulated depreciation and amortization | (638,209) | (1,274,324) |
|  | $   494,738 | $    335,475 |

Depreciation expense was approximately $264,000 and $574,000 for the years ended June 30, 2004 and 2003, respectively.

5.    GOODWILL

Changes in the carrying amount of goodwill for fiscal 2003 and 2004 by segment are as follows:

|  | Balance as of June 30, 2003 | Acquisitions | BALANCE AS OF JUNE 30, 2004 |
|---|---|---|---|
| Payment processing solutions | $195,002 | - | $    195,002 |
| Construction information systems | - | $2,965,679 | 2,965,679 |
| Total | $195,002 | $2,965,679 | $ 3,160,681 |

F-19

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
--------------------------------------------------------------------------------

6.    INTANGIBLE ASSETS

The components of finite-lived intangible assets are as follows:

| | 2004 | | | 2003 | | |
|---|---|---|---|---|---|---|
| | COST | ACCUMULATED AMORTIZATION | NET BOOK VALUE | Cost | Accumulated Amortization | Net Book Value |
| Technology based | $5,285,020 | $2,846,745 | $2,438,275 | $2,667,800 | $1,723,830 | $943,970 |
| Customer related | 2,332,000 | 422,528 | 1,909,472 | - | - | - |
| Marketing related | 840,000 | 153,333 | 686,667 | - | - | - |
| | $8,457,020 | $3,422,606 | $5,034,414 | $2,667,800 | $1,723,830 | $943,970 |

Intangible assets are amortized using the straight-line method over their estimated period of benefit, generally considered to be three years. Amortization expense related to purchased intangible assets was $1,698,776 and $1,123,575 for the years ended June 30, 2004 and 2003, respectively.

Estimated future amortization expense related to purchased intangible assets at June 30, 2004 is as follows:

| | |
|---|---|
| 2005 | $1,915,505 |
| 2006 | 1,915,505 |
| 2007 | 1,203,404 |
| Total | $5,034,414 |

7.    NOTES PAYABLE - RELATED PARTIES

At June 30, 2003, the Company has a note payable to a stockholder in the amount of $85,000. The note was unsecured and non-interest bearing, and was repaid during 2004.

At June 30, 2004, the Company had notes payable to a director, officers and an employee in the aggregate amount of $305,200. The notes are unsecured, bear interest at 10.00% and are due on demand.

8.    LINE OF CREDIT

On June 16, 2003, the Company entered into a $500,000 receivables based line of credit with a bank. Advances under the line are limited to 80% of the Company's gross eligible receivables. Advances under the line bore interest at 1.25% per month or 15.00% per year and are secured by all the assets of the Company. At June 30, 2003, no amounts had been drawn under the line of credit.

On May 14, 2004 the line of credit was modified to include a bridge loan feature under which the Company borrowed $500,000 immediately and will borrow another $500,000 upon the presentation to the lender of an acceptable executed letter of intent to divest of its GO Software business. The bridge loan, secured by all of

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
--------------------------------------------------------------------------------

the Company's assets, is due at the earlier of 120 days from the first advance or upon closing the sale of the GO Software business. The modification increased the interest rate on the line of credit and bridge loan to 1.35% per month or 16.20% per year. As of June 30, 2004, $691,529 was outstanding under the line of credit (including the bridge loan feature).

On August 2, 2004 the bridge loan feature of the line of credit was modified to allow the Company to borrow an additional $250,000 at that date (total of $750,000) and to provide for the Company to borrow another $750,000 (representing an increase of $250,000 over the prior commitment) upon the presentation to the lender of an acceptable letter of intent to divest of its GO Software business. The modification increased the interest rate on the bridge loan portion of the line of credit to 1.50% per month or 18.00% per year. The bridge loan was extended to the earlier of November 27, 2004 or the date of the closing of the proposed sale of GO Software. In the event the bridge loan is not paid in full by the due date, the Company will pay the lender a weekly success fee of $10,000 increasing in $2,500 increments until repayment.

On September 30, 2004, the Company borrowed the additional $750,000 under the bridge loan feature of its line of credit on the presentation to the lender of a series of acceptable letters of intent for the proposed sale of GO.

9.    DEBT FINANCING AND ISSUANCE OF WARRANTS

On September 17, 2001, the Company received an advance payment from a customer in the amount of $1,000,000 which was accounted for as a debt financing. In accordance with the terms of the agreement governing the payment advance (the "Referral Agreement"), the advance is required to be repaid in referrals and software sales in increasing increments over a three-year period from the effective date of the Referral Agreement. The Company is also required to keep certain of its software source code in escrow, with the other party named as beneficiary, in the event of the Company's default under the Referral Agreement. Other remedies in the event of default include, among other things, the other party's right to terminate the Referral Agreement, demanding repayment of unpaid portions of the advance, meeting the payment milestone which served as the basis for the default, or conversion of the outstanding portion of the advance to unregistered shares of the Company's common stock at various exercise prices. Once the risk of default for each portion of the Referral Agreement has passed, (i.e. when the milestones are met on or before the September 17th deadlines), then that portion of the debt will be forgiven and recorded as revenue in the statement of operations.

During the first one-year measurement period ended September 17, 2002, the Company was required to sell products for the other party to earn referral fees totaling $225,000 in order to satisfy the contractual stipulations of the Referral Agreement. The Company only achieved sales and referral fees of approximately $127,000 during that period and, consequently, was required to pay approximately $98,000 in cash to the other party to satisfy the shortfall. The amount of sales and referral fees required for the next one-year measurement period ended September 17, 2003, was $375,000. The Company only achieved sales of approximately $214,000 in referral fees toward this amount and, consequently, was required to pay approximately $161,000 on October 10, 2003 to satisfy the shortfall. The remaining amount of sales and referral fees for the one year period ending September 17, 2004 amounted to $400,000. Through September 17, 2004, the Company had achieved sales of approximately $345,245 toward this final amount. The Company did not reach the $400,000 of sales in referral fees as of September 17, 2004, and consequently the Company had to pay the other party the shortfall in cash of $54,975.

F-21

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
--------------------------------------------------------------------------------

The other party has also received vested and exercisable warrants to purchase an aggregate of $5,000,000 in shares at $4 per share during the first year of the agreement and $5 per share subsequent to that date. These warrants are antidilutive because of the default provisions above. As a result, $1,000,000 was recorded as representative of the value of the warrants sold as paid in capital. In accordance with APB 14, the Company recorded a debt discount for the value of the warrants (limited to proceeds of $1,000,000 in accordance with EITF 00-27). In periods beyond September 17, 2001, the debt discount will be ratably charged to income over the three-year life of the agreement. This amounts to an $83,333 non-cash charge per quarter and $333,333 for each of the years ended June 30, 2004 and 2003.

10.   ACCRUED EXPENSES

Accrued expenses consisted of the following at June 30:

|  | 2004 | 2003 |
|---|---|---|
| Compensation | $  949,929 | $549,293 |
| Consulting fees and other | 231,263 | 178,738 |
| Sales tax | 60,949 | 77,003 |
|  | $1,242,141 | $805,034 |

11.   PRIVATE PLACEMENTS

On October 29, 2003, the Company completed a private placement of its common stock and warrants in the amount of $643,000. The Company issued 378,236 shares of common stock at a purchase price of $1.70 per share and warrants to purchase 378,236 shares of common stock at an exercise price of $2.50 per share. Participants in the private placement included Arol Wolford, the Company's President and CEO, who purchased 103,000 shares and received a warrant to purchase 103,000 shares of common stock, and John McRoberts, a director of the Company, who purchased 100,000 shares and received a warrant to purchase 100,000 shares of common stock. The Company has agreed to register the common stock issued in the private placement after one year if the shares cannot then be sold without registration or within six months after the Company's common stock becomes accepted for listing on the NASDAQ Small Cap or National Markets.

On March 15, 2004, the Company completed a private placement of its common stock in the amount of $1,750,000. The Company issued 875,000 unregistered shares of common stock at a purchase price of $2.00 per share. The company utilized a registered broker dealer as a selling agent for a portion of the transaction and incurred fees in the amount of $104,000. The Company provided piggy-back registration rights to all the participants in the private placement.

On June 22, 2004, the Company completed a private placement of its common stock in the amount of $575,000. The Company issued 287,500 unregistered shares of common stock at a purchase price of $2.00 per share. The Company provided piggy-back registration rights to all the participants in the private placement.

F-22

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS

--------------------------------------------------------------------------------

12.    STOCK OPTIONS, WARRANTS AND OTHER EQUITY

STOCK OPTIONS

In August 2000, the Company adopted an incentive Stock Option Plan (the "2000 Plan") whereby total options to purchase 1,000,000 shares of the Company's common stock may be granted to employees at a price not less than the fair market value at the time the options are granted and that have a minimum of a one year vesting period. The options are exercisable for a period not to exceed ten years. The Company also assumed the stock options of NTTI. Such options were converted at the applicable rates used to issue the Company's common stock in the reverse merger.

On May 21, 2003 at a Special Meeting of the Company's stockholders, the Company's stockholders approved and ratified the Company's 2003 Stock Option Plan (the "2003 Plan") and reserved 1,000,000 shares of the Company's common stock for issuance under this plan. Options to purchase shares of the Company's common stock may be granted to employees at a price not less than the fair market value at the time the options are granted and have a minimum of a one year vesting period. The options are exercisable for a period not to exceed ten years.

Information regarding the option plans are as follows:

|  | 2004 | | 2003 | |
|---|---|---|---|---|
|  | SHARES | WEIGHTED AVERAGE EXERCISE PRICE | Shares | Weighted Average Exercise Price |
| Outstanding, beginning of year | 1,244,217 | $1.66 | 261,342 | $3.88 |
| Granted | 652,000 | 1.95 | 1,045,000 | 1.34 |
| Exercised | - | - | - | - |
| Forfeited | (132,300) | 3.03 | (62,125) | 5.53 |
| Outstanding, end of year | 1,763,917 | $1.67 | 1,244,217 | $1.66 |
| Exercisable, end of year | 764,917 |  | 194,317 |  |

F-23

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
--------------------------------------------------------------------------

The following table summarizes information about the Company's outstanding stock options as of June 30, 2004.

| | Options Outstanding | | | | Options Exercisable | |
|---|---|---|---|---|---|---|
| Range of Exercise Price | Number Outstanding at June 30, 2004 | Weighted-Average Remaining Contractual Life | Weighted Average Exercise Price | Number Exercisable at June 30, 2004 | | Weighted Average Exercise Price |
| | | (years) | | | | |
| $ 1.00 - $1.70 | 1,164,667 | 7.2 | $ 1.29 | 658,667 | | $ 1.01 |
| $ 2.00 - $2.50 | 498,000 | 5.6 | 2.20 | 5,000 | | 2.00 |
| $ 3.00 - $5.00 | 101,250 | 3.7 | 3.36 | 101,250 | | 3.36 |
| | 1,763,917 | 6.4 | $ 1.67 | 764,917 | | $ 1.32 |

### WARRANTS

In conjunction with the Company's original private placement, warrants to purchase common stock were issued to several parties. These warrants were issued as a direct incentive to complete a successful offering. In total, 856,664 warrants were issued on or prior to August 10, 2000, they were immediately vested and exercisable at exercise prices ranging from $.30 to $3.00 per share and will expire in 2005. At June 30, 2004, 706,664 of these warrants were outstanding.

As mentioned in Note 8 above, during 2004 the Company issued warrants to purchase 37,500 shares of common stock at an exercise price of $2.00 per share in connection with the renewal of the Company's line of credit. The fair value of these warrants, which amounted to $64,459, was charged to interest expense.

As mentioned in Note 9 above, the Company entered into a "Referral and Reseller" agreement with an unrelated party on September 17, 2001. As part of this agreement, the other party received vested and exercisable warrants to purchase an aggregate of $5,000,000 in shares at $4 per share during the first year of the agreement and $5 per share subsequent to that date. The right to exercise these warrants expired on September 17, 2004

As mentioned in Note 11 above, during 2004 the Company issued warrants to purchase 378,236 shares of common stock at an exercise price of $2.50 per share in connection with a private placement of Common Stock.

During 2004, the Company issued warrants to purchase an aggregate of 115,000 shares of common stock at an exercise price of $2.50 to various consultants. The fair value of these warrants, which amounted to $115,761, was charged to general and administrative expense.

### OTHER

In conjunction with a reverse merger on August 10, 2000, with Net/Tech International, Inc. ("NTTI"), a total of 3,765,930 shares of common stock were placed in escrow in the names of two officers of the Company and one director. At that time, the Company entered into an escrow agreement with three current members of its Board of Directors, Charles McRoberts, John McRoberts and Charles Pecchio, Jr. The escrow agreement provided that approximately 3,765,930 shares of the Company's common stock would be held in escrow for release to these directors (i) when certain financial milestones are reached, or (ii) upon a change of control. While these shares were held in escrow, the directors exercised voting rights with respect to the escrowed shares. However, the Company's management analyzed the directors' ownership of the Company's shares in the escrow account and concluded that having approximately 33% of the outstanding common stock in escrow was not conducive to the Company's strategic plans.

F-24

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
----------------------------------------------------------------------

Accordingly, on October 29, 2003, a settlement was reached with the three
directors, providing for a release of 750,000 of the escrowed shares on a pro
rata basis to the three directors based on their ownership interests, with an
additional 168,754 shares to remain in escrow through October 2006, to be
released to Mr. Pecchio, the Chairman of the Board, if the trading price of the
Company's common stock reaches and maintains certain price targets. None of
these targets were met in 2004. Under the terms of the escrow settlement
agreement, the remaining 2,847,176 shares were forfeited by the directors back
to the Company and were placed in the treasury. The release of the 750,000
shares did not result in any stock based compensation as the previously escrowed
shares in total represented their proportionate interests in the Company at the
time of its reverse merger in 2000.

13.  INCOME TAXES

Provisions for Federal and state income taxes in the statements of operations
consist of the following:

| Years Ending June 30, | 2004 | 2003 |
|---|---|---|
| Deferred Federal income tax benefit | $(2,123,100) | $(1,410,900) |
| Deferred state income tax benefit, net of Federal tax benefit | (374,700) | (248,900) |
| Change in valuation allowance | 2,497,800 | 1,659,800 |
|  | $ - | $ - |

As of June 30, 2004 and 2003, deferred tax assets comprised the following:

| Years ended June 30, | 2004 | 2003 |
|---|---|---|
| DEFERRED TAX ASSETS |  |  |
| Net operating loss carry-forwards - Federal | $ 5,885,200 | $ 4,106,100 |
| Net operating loss carry-forwards - state | 1,038,600 | 724,600 |
| Non cash compensation not currently deductible | 33,000 | 31,200 |
| Intangible assets | 722,300 | 370,500 |
| Reserves not currently deductible | 159,300 | 108,200 |
| Total deferred tax asset | 7,838,400 | 5,340,600 |
| Valuation allowance | (7,838,400) | (5,340,600) |
|  | $ - | $ - |

The Company has net operating loss carry-forwards available to reduce future
taxable income, if any, of approximately $17,310,000 for Federal and state tax
purposes. The benefits from these carry-forwards expire through 2024. As of June
30, 2004, management believes it cannot be determined that it is more likely
than not that these carry-forwards and its other deferred tax assets will be
realized, and accordingly, fully reserved for these deferred tax assets. Other
than the effect of state income taxes and the change in the valuation allowance,
the differences between the effective income tax rate and statutory income tax
rates are not material.

F-25

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
--------------------------------------------------------------------------------

14.  CHANGE IN ACCOUNTING ESTIMATE

In conjunction with the implementation of SFAS No. 142, and in connection with
the Company's annual evaluation of the remaining useful lives of its fixed and
intangible assets, management determined during the year ended June 30, 2003,
that the estimated useful lives of such assets should be reduced from
approximately five to seven years to approximately three to five years.
Management considered various factors including industry standards and the
condition of the underlying assets.  This change in accounting estimate resulted
in additional depreciation and amortization expense of $62,005 and $396,128,
respectively, and in the aggregate increased basic and diluted net loss
applicable to common stockholders by $0.04 per share for the year ended June 30,
2003.

15.  CONCENTRATION OF CREDIT RISK

Financial instruments, which potentially subject the Company to concentration of
credit risk, consist principally of trade receivables.  The Company places its
cash with high quality financial institutions and, by policy, limits the amounts
of credit exposure to any one financial institution.

As of June 30, 2004 the Company's net accounts receivable were approximately
$1,453,265.  During 2004 no sales to individual customers exceeded 5% of total
revenues.  The Company believes any risk of accounting loss is significantly
reduced due to provision considered at the date of sale for returns and
allowances and ongoing credit evaluations of its customers' financial condition
as deemed necessary.  The Company generally does not require cash collateral or
other security to support customer receivables.

16.  COMMITMENTS

The Company leases office facilities and certain equipment under non-cancellable
operating leases having original terms ranging from one to five years.
Approximate future minimum rent payments, by year and in the aggregate, under
non-cancellable operating leases with remaining terms of more than one year are
as follows:

| Year | Operating |
|------|-----------|
| 2005 | $  751,005 |
| 2006 |    391,218 |
| 2007 |     96,313 |
| 2008 |     64,641 |
| 2009 |     40,475 |
| Total | $1,343,652 |

Rent expense relating to these operating leases was approximately $581,000 and
$433,000 for 2004 and 2003, respectively.

F-26

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
--------------------------------------------------------------------------

17.   PENSION PLAN

The Company adopted a 401(k) retirement plan on March 9, 1998. The plan covers
all employees who are at least 21 years of age with one or more years of
service. The Company currently makes a discretionary matching contribution of
50% of the employee's contributions elected as a salary deferral by eligible
employees, up to 7.5% of each employee's salary. Prior to June 2003, the Company
made discretionary matching contributions of 25% of the employee's contributions
elected as a salary deferral by eligible employees, up to 15% of each employee's
salary. The Company's matching contributions for the years ended June 30, 2004
and 2003 were approximately $126,158 and $112,108, respectively.

18.   SEGMENTS

Based on the quantitative thresholds specified in SFAS No. 131, in the year
ended June 30, 2004, the Company has determined that it has two reportable
segments: payment processing solutions and construction information solutions.
The construction information business develops and markets building product
information solutions for the construction industry while the payment processing
software business develops and markets software and services for credit card,
debit card and check transaction processing.

The accounting policies of the operating segments are the same as those
described in the Summary of Significant Accounting Policies. The Company's chief
operating decision maker evaluates performance of the segments based on
operating income. Costs excluded from this profit measure primarily consist of
allocated corporate expenses, interest/other expense and income taxes. Corporate
expenses are primarily comprised of corporate overhead expenses. Assets not
allocable to any individual segment are corporate assets, which are primarily
comprised of receivables, prepaid expenses and property and equipment.

Summary information by segment follows:

| Year ended June 30, 2004 | Payment Processing Solutions | Construction Information Solutions | Corporate and Other | Total |
| --- | --- | --- | --- | --- |
| Total revenue | $9,418,257 | $1,167,777 | $      - | $10,586,034 |
| Depreciation and amortization | 1,095,239 | 813,314 | 54,584 | 1,963,137 |
| Net income (loss) | 196,350 | (4,171,403) | (2,022,699) | (5,997,752) |
| Goodwill | 195,002 | 2,965,679 | - | 3,160,681 |
| Total assets | 3,401,754 | 8,108,973 | 318,082 | 11,828,809 |

| Year ended June 30, 2003 | Payment Processing Solutions | Construction Information Solutions | Corporate and Other | Total |
| --- | --- | --- | --- | --- |
| Total revenue | $7,861,262 | $      - | $      - | $ 7,861,262 |
| Depreciation and amortization | 1,348,551 | 8,946 | 340,380 | 1,697,877 |
| Net loss | (599,629) | (283,261) | (2,252,285) | (3,135,175) |
| Goodwill | 195,002 | - | - | 195,002 |
| Total assets | 2,536,894 | 106,405 | 122,215 | 2,765,514 |

19.   SUBSEQUENT EVENTS

Proposed Divestiture of GO

On September 27, 2004, the Company announced that it has retained an advisor to assist in a proposed divestiture of GO. The proposed divestiture is part of ROI's new business strategy to focus on its construction information product offerings through Tectonic.

Historically, ROI has functioned as a holding company with businesses in both the payment processing and, more recently, the construction information industries. These industries are unrelated and are not synergistic in nature. Management has determined that the Company's future prospects would be greatly enhanced by focusing on the construction information industry rather than the payment processing industry. While GO has achieved success under ROI, achieving revenue growth and becoming a market leader, management has recognized that competitors in the payment processing industry have much greater financial resources than ROI and that the continued success of GO would be put at risk due to the undercapitalization of ROI. Thus, it is in the best interests of the Company and its stockholders that the Company pursue a path where it believes the odds of future success are greatly improved. The construction information industry is a highly fragmented industry with numerous opportunities for growth and service needs that are yet unserved by the marketplace. By divesting of GO, the Company will greatly improve its liquidity. Management believes that this improved liquidity position will provide an opportunity for our executive management team to focus on an industry where they have the most experience.

ROI has received a number of offers for the sale of GO Software and intends to complete the proposed divestiture as soon as practicable, subject to negotiation of a definitive agreement, receipt of stockholder approval and satisfaction of all other conditions precedent.

Financings

As discussed in Note 8, on August 2, 2004 the bridge loan feature of the Company's line of credit was modified to allow the Company to borrow an additional $250,000 at that date (total of $750,000) and to provide for the Company to borrow another $750,000 (representing an increase of $250,000 over the prior commitment) upon the presentation to the lender of an acceptable executed letter of intent to divest of its GO Software business. The modification increased the interest rate on the bridge loan portion of the line of credit to 1.50% per month or 18.00% per year. The bridge loan was extended to the earlier of November 27, 2004 or the date of the closing of the proposed sale of GO Software. In the event the bridge loan is not paid in full by the due date, the Company will pay the lender a weekly success fee of $10,000 increasing in $2,500 increments until repayment.

On September 30, 2004, the Company borrowed the additional $750,000 under the bridge loan feature of its line of credit on the presentation to the lender of a series of acceptable letters of intent for the sale of GO.

On August 18, 2004, the Company borrowed $1,500,000 under senior second secured convertible notes, held by an investment company. The notes are secured by a junior lien on substantially all of the tangible and intangible assets of the Company. The notes bear interest at an effective rate of 19.00% per annum, and are due on the earlier of February 1, 2005 or the closing of the sale of GO Software. The notes have a

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED NOTES TO THE FINANCIAL STATEMENTS
-------------------------------------------------------------------------------

conversion feature, and contain some restrictions on the Company's ability to incur other debt. In connection with this transaction, the Company also issued warrants to the lender to purchase 500,000 shares of common stock at a price of $1.52 per share to the holder of the notes. The conversion feature allows holders of these notes to participate in any of the Company's future financings, other then one involving only debt and debt securities, by converting the notes into securities to be issued at a conversion price equal to 80% of the price paid by other participants in the financing. Arol Wolford, the Company's President and CEO executed a Guaranty, Pledge and Security Agreement whereby Mr. Wolford agreed to guaranty payment of the notes and has secured that guaranty with a first-priority security interest in all the shares of the Company which he owns.

While no absolute assurances can be given, the Company believes that its liquidity as funded by its operations and financing activities in conjunction with the proposed divestiture of GO will be sufficient for it to continue as a going concern for the next year. Should the timing of the proposed divestiture be significantly delayed, the Company will need to adjust its business plan to address any cash flow needs at that time.

F-29

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# EX−21.1

**10KSB Filed on 10/12/2004 − Period: 06/30/2004**
File Number 000−33279



BY EDGAR® Information provided by EDGAR Online, Inc. — www.edgar-online.com
800.519.4113
www.gsionline.com

EXHIBIT 21.1

Return On Investment Corporation - wholly-owned subsidiaries:

| SUBSIDIARY | JURISDICTION OF INCORPORATION |
| --- | --- |
| GO Software, Inc. | Georgia |
| Results Oriented Integration Corp. | Georgia |
| Net 400, Inc. | Georgia |
| Campana Data, Inc. | Georgia |
| S.A.F.E Systems, Inc. | Illinois |
| Tectonic Solutions, Inc. | Georgia |
| GO Gateway, Inc. | Georgia |

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# EX−31.1

**10KSB Filed on 10/12/2004 − Period: 06/30/2004**
File Number 000−33279



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 31.1

CERTIFICATION

I, Arol Wolford, certify that:

1.  I have reviewed this Annual Report on Form 10-KSB for the period ended June 30, 2004 of Return On Investment Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: October 12, 2004

By: /s/ Arol R. Wolford
    ----------------------------------
    Arol R. Wolford
    President and Chief Executive Officer
    (Principal Executive Officer)

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# EX−31.2

**10KSB Filed on 10/12/2004 − Period: 06/30/2004**
File Number 000−33279



LIVEDGAR information provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 31.2

CERTIFICATION

I, Sherwin Krug, certify that:

1.  I have reviewed this Annual Report on Form 10-KSB for the period ended June 30, 2004 of Return On Investment Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: October 12, 2004

By: /s/    Sherwin Krug
---------------------------------------
Sherwin Krug
Chief Financial Officer
(Principal Financial and Accounting Officer)

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# EX−32.1

**10KSB Filed on 10/12/2004 − Period: 06/30/2004**
File Number 000−33279



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Return On Investment Corporation (the "Company") on Form 10-KSB for the period ended June 30, 2003 (the "Report"), I, Arol Wolford, President and Chief Executive Officer, certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By: /s/ Arol R. Wolford
    ------------------------------
    Arol R. Wolford
    President and Chief Executive Officer
    (Principal Executive Officer)
    October 12, 2004

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# EX−32.2

**10KSB Filed on 10/12/2004 − Period: 06/30/2004**
File Number 000−33279



EDGAR Online, Information Provided by Global Securities Information, Inc.
800-669-1154
www.gsionline.com

EXHIBIT 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Return On Investment Corporation (the "Company") on Form 10-KSB for the period ended June 30, 2003 (the "Report"), I, Sherwin Krug, Vice President and Chief Financial Officer, certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By: /s/ Sherwin Krug
-------------------------------------
Sherwin Krug
Chief Financial Officer
(Principal Financial and Accounting Officer)
October 12, 2004

# EXHIBIT G

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# 8–K

**Filed on 02/24/2005 – Period: 02/24/2005**
File Number 000–33279



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 8-K

CURRENT REPORT
PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): February 24, 2005

RETURN ON INVESTMENT CORPORATION
(Exact name of registrant as specified in its charter)

| DELAWARE | 033-36198 | 22-3038309 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

1825 Barrett Lakes Blvd., Suite 260
Kennesaw, Georgia 30144
(Address of Principal
Executive Offices)

(770) 517-4750
(Registrant's telephone number, including area code)

None
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligations of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

ITEM 8.01          OTHER EVENTS

Return on Investment Corporation (the "Company") has received a complaint from a former employee of its subsidiary, Tectonic, Inc. ("Tectonic") alleging production and usage tracking problems with certain directory products of Tectonic which allegedly may have led to shortfalls in production numbers and incorrect statistics being furnished to certain customers. Such former employee has also made allegations of constructive discharge and of whistleblower retaliation with respect to his treatment by the Company and Tectonic, which claims are believed to be baseless. No complaint has been filed by the former employee. Management of the Company, with the advice of counsel and under the direction of the Board of Directors of the Company, is conducting an investigation with respect to the issues alleged by such former employee. No evidence of any material adverse conditions has been found in connection with the employee's allegations, but if any is, the Company shall take prompt and appropriate action in response.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

RETURN ON INVESTMENT CORPORATION

Date: February 24, 2005

By: /s/ Arol R. Wolford
    ----------------------------------
    Arol R. Wolford
    President and Chief Executive Officer

# EXHIBIT H

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# EX−99.1

**8−K Filed on 10/07/2005 − Period: 10/03/2005**
File Number 000−33279



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made as of October 3, 2005 by and among Tectonic Network, Inc., a Delaware corporation and its subsidiary Tectonic Solutions, Inc., a Georgia corporation, debtors and debtors-in-possession in the Case (as defined below) (each a "Seller" and collectively the "Seller"), and Boston Equities Corporation, a Nevada corporation, or designee (the "Buyer"), with respect to the following facts:

A. Seller operates an information management services and software development business with product and service offerings targeted to the construction industry (the "Business").

B. On October 3, 2005 (the "Petition Date"), each Seller filed a Chapter 11 bankruptcy case in the United States Bankruptcy Court for the Northern District of Georgia (the "Court"), Case No. 0578966-JEM (Tectonic Networks, Inc.) and case No. 5578955-JEM (Tectonic Solutions, Inc.) (the "Bankruptcy Case") and since that date, Seller has remained in possession and control of each estate as a debtor-in-possession.

C. Seller desires to sell to Buyer and Buyer desires to acquire from Seller substantially all of the tangible and intangible assets used in the operation of the Business, on the terms and conditions set forth herein.

IN CONSIDERATION OF the premises and mutual covenants contained in this Agreement, and for good and valuable consideration, the parties agree as follows:

1. Purchase and Sale of Assets. On the Closing Date (as defined below), in consideration of the covenants, representations and obligations of Buyer hereunder, and subject to the conditions set forth in this Agreement, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller all of Seller's right, title and interest as of the Closing Date in and to the assets used by Seller in connection with the Business, wherever located, tangible or intangible, (collectively, the "Assets"), free and clear of all liens, security interests or other encumbrances of any character whatsoever (the "Encumbrances") other than the Assumed Liabilities (as defined in this Agreement). The Assets include, without limitation the following:

1.1 Leases and contacts. Seller's right, title and interest in:

(a) the leases for real property for the facilities located at 400 Perimeter Center Terrace, Suite 900, Atlanta GA 30346, and 2501 Ninth Street, #102 Berkeley, CA 94710 as more particularly described in Exhibit A (the "Real Property Leases");

(b) the equipment and personal property leases, rental agreements and similar agreements identified on Exhibit B (the "Personal Property Leases"); and

(c) those other specific contracts or agreements to which Seller is a party that are identified on Exhibit C (the "Seller Contracts").

Notwithstanding the introductory language of Section 1 to the contrary, (i) only the Real Property Leases, the Personal Property Leases and the Seller's Contracts (collectively, the "Section 365 Agreements") shall be assumed by Seller and assigned to Buyer pursuant to the provision of Section 365 of the Bankruptcy Code, and (ii) Buyer hereby reserves the right not to assume any of the Section 365 Agreements and to amend Exhibits A, B and C to delete any Section 365 Agreement, which reservation of rights shall expire the day before the Court hearing on the motion to approve the sale transactions contemplated by this Agreement.

1.2 Personal Property. All of the fixtures, furniture, equipment and tangible personal property used in connection with the Business, including those

items described on Exhibit D (the "Personal Property").

1.3 Intangible Property. All of Seller's intangible personal property used in connection with the Business, including without limitation, all software, patents, patent applications, trademarks, copyrights, trade secrets, licenses, research, development, know-how inventions, technical information, tradenames, registrations, service marks, applications with respect to any of the foregoing, Seller's name, and other intangible rights and property owned or held by Seller, including going concern value, goodwill, telephone, telecopy and e-mail addresses and listings and those items specifically listed on Exhibit E, customer and vendor lists, files, documents, books, records, computer programs, advertising and sales materials, prepaid charges, and like items pertaining to the Business, in each case whether owned by Seller or licensed to others, together with all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors in connection with products or services of the Business or affecting the Assets (collectively, the "Intangible Property"). Notwithstanding the foregoing, the Intangible Property shall not include: (i) any materials containing privileged communications or information about employees, the disclosure of which would violate an employee's reasonable expectation of privacy, or (ii) any other materials which are subject to attorney-client or any other privilege or requirement to maintain confidential; provided, however, that the Intangible Property shall not include books and records related to the corporate existence of the Seller .

1.4 Inventories. All supplies, goods, materials, work in process, raw materials, inventory, and stock in trade owned by Seller that are used in or are held for sale in connection with the Business.

1.5 Insurance. All liability insurance (including any premium refunds due and owing thereunder now or after the date hereof) and any insurance proceeds, claims and causes of action with respect to or arising in connection with the Assets to the extent insuring Seller with respect to the Assumed Liabilities (as defined below) assumed by Buyer to the extent assignable.

1.6 Deposits. Seller's right title and interest in all utility deposits, deposits with trade creditors, security deposits and similar deposits with landlords or other contracting parties under the Section 365 Agreements, including without limitation those deposits identified on Exhibit F.

2

2. Excluded Assets. Notwithstanding the foregoing, Buyer is not purchasing the following (the "Excluded Assets"):

(a) those items excluded listed on Exhibit G;

(b) all cash, cash equivalents and short-term investments;

(c) all accounts receivable;

(d) the Section 365 Agreements terminated or expired prior to the Closing Date in accordance with their terms or in the ordinary course of the Business;

(e) all preference or avoidance claims and actions of Seller, including without limitation, any such claims and actions arising under Sections 542, 543, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code or under comparable state law provisions;

(f) Seller's rights which accrue or will accrue under this Agreement and all cash and non-cash consideration payable or deliverable to Seller pursuant to the terms and provisions hereof;

(g) liability insurance (including any premium refunds due and owing thereunder now or after the date hereof) and any insurance proceeds, claims and causes of action with respect to or arising in connection with any assets that are not Assets to the extent insuring Seller with respect to liabilities not assumed by Buyer, including, without limitation, claims under any directors and officers policy;

(h) all Inventory transferred or used by Seller in the ordinary course of the Business from the date hereof prior to the Closing Date;

(i) all claims for refund of taxes and other governmental charges of whatever nature; and

(j) all rights in any pre-petition retainer or professional fee escrow held by or paid to any professional employed by Seller as set forth on Exhibit G.

3. Assumed Liabilities. As of the Closing Date, subject to the terms of this Agreement, Buyer shall assume and pay, perform, discharge and have responsibility for the performance and satisfaction of the following liabilities of Seller (collectively, the "Assumed Liabilities") as the same shall exist on the Closing Date: (a) all executory obligations and liabilities of Seller pursuant to the terms of the Section 365 Agreements arising after the Closing Date; and (b) all costs and liabilities pro rated to Buyer as set forth in Section 4 below. At the Closing, Seller shall cure any and all monetary defaults and pay all unpaid payments and obligations owed under the Section 365 Agreements as of the date of the Closing (in the amounts as determined or approved by the Court), as a condition of Buyer's assumption of the Section 365 Agreements. Buyer shall be solely obligated to discharge, pay, perform and satisfy all of the duties, liabilities and obligations of Seller pursuant to or under the Section 365 Agreements that first become due after the Closing Date. Except as expressly provided in this Agreement or any document executed in connection herewith, Buyer is not assuming any pre-Closing liabilities or obligations of Seller under the Section 365 Agreements, or otherwise. At the Closing, Seller shall assign its interests in the Section 365 Agreements effective as of the close of business on the Closing Date. Buyer shall accept the assignment and assume and be responsible for all obligations pursuant to the Section 365 Agreements arising after the Closing Date. At the Closing, Buyer and Seller shall execute an Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit H (the "Assignment Agreement"). Buyer is not assuming any liabilities other than the Assumed Liabilities. Without limiting the generality of the foregoing, will not be responsible for any obligations to employees, including without limitation claims for unpaid wages, severance, vacation pay, sick leave, any rights or obligations under any employment agreements, whether or not in writing, and all rights in connection with and assets of any employee benefit plans.

3

4. Purchase Price.

4.1 Calculation of Purchase Price. The total consideration to be paid by the Buyer for the Assets and the assumption of the Assumed Liabilities shall be cash in the amount of $2,000,000 (the "Purchase Price") with a portion thereof paid pursuant to an offset of amounts outstanding under the Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement of even date herewith between Seller and Buyer (the "Loan Agreement").

4.2 Payments at the Closing. On the Closing Date, Buyer shall pay and deliver the Purchase Price to Seller by wire transfer in the amount of the Purchase Price less all amounts owed to Buyer under the Loan Agreement (including unpaid principal and accrued and unpaid interest). Buyer shall also deliver to Seller the original of the Promissory Note executed pursuant to the Loan Agreement marked "Paid In Full". The portion of the Purchase Price due at Closing shall have been deposited into escrow or into the Client Trust Account of Duane Morris LLP, attorneys for Buyer, prior to the hearing in the Bankruptcy Case at which the Court will consider the motion for entry of an order approving the sale of the Assets to Buyer and the transactions contemplated by this Agreement (the "Sale Order"), and Buyer shall provide Seller with evidence (reasonably acceptable to Seller) of such deposit prior to said hearing.

4.3 Allocation of Purchase Price Consideration. The Purchase Price shall be allocated among the Assets as set forth on Exhibit I. Following the Closing, Buyer and Seller (in connection with their respective U.S. Federal, State and local income tax returns and other filings) shall not take any position inconsistent with such allocation.

4.4 Taxes. Seller shall pay any and all sales, use, transfer or other tax or similar charge due with respect to the transactions contemplated hereby. Seller shall have the responsibility to collect the tax and file any required tax reports or returns. Buyer represents to Seller that Buyer's purchase of any Assets which are inventory, materials or work in process are purchased for resale, and Buyer will sell such items pursuant to a reseller's license as necessary in order to assure that the sale of any such items to Buyer is exempt from sales tax.

4

5. Closing Transactions.

5.1 Closing. The closing of the transactions provided for herein (the "Closing") shall take place at the offices of Duane Morris LLP, 1180 West Peachtree Street, Suite 700, Atlanta, Georgia 30309.

5.2 Closing Date. Closing shall occur at such time as all conditions to closing set forth in this Agreement have been met, but in no event later than: two (2) business days after entry of the Sale Order and expiration of the stay on the effectiveness of such Sale Order, whichever is later (the "Closing Date"). The parties may mutually agree in writing on an earlier or later date. Provided however that in no event shall Closing occur after December 31, 2005.

5.3 Seller's Deliveries to Buyer at Closing. Seller shall make the following deliveries at Closing:

(a) The Assignment Agreement, duly executed by Seller, pursuant to which Seller assigns the Section 365 Agreements to Buyer, and Buyer agrees to perform and discharge the Assumed Liabilities and in respect thereof;

(b) A Bill of Sale in substantially the form attached hereto as Exhibit J;

(c) Assignments, on the appropriate official forms, of any of Seller's registered trademarks, copyrights or other intellectual property transferred under this Agreement;

(d) Assignments, on the appropriate official forms, of any of Seller's patents registered, transferred under this Agreement; and

(e) Such other documents as Buyer may reasonably request in form and substance acceptable to Buyer.

5.4 Buyer's Deliveries to Seller at Closing. Buyer shall make the following deliveries at Closing:

(a) Via wire transfer the amount of the Purchase Price to be paid at Closing in accordance with Section 4.1 and 4.2, plus costs and prorations (the "Prorations") to be paid to Seller under Section 5.5.

(b) The original promissory note under the Loan Agreement marked "Paid in Full".

5

(c) A counterpart original of the Assignment Agreement duly executed by Buyer.

(d) If applicable, a certified copy of its resolution or consent action authorizing the purchase of the Assets and an incumbency certificate and such other organizational related documents as Seller shall reasonably request.

(e) Such other documents as Seller may reasonably request in form and substance acceptable to Seller.

5.5 Prorations.

(a) Rental and lease charges related to the Section 365 Agreements, current taxes related to the Real Property Leases or the Personal Property, or other similar items of expense, and utilities related to the Real Property Leases or the Personal Property (collectively, the "Proration Items") shall be prorated between Seller and Buyer as of the Closing Date. All Proration Items that represent obligations due or accrued in respect of periods prior to the Closing shall be paid in full or otherwise satisfied by Seller, and all Proration Items that represent obligations due and accrued in respect of periods after Closing shall be paid in full or otherwise satisfied by Buyer.

(b) As soon as reasonably practicable after the Closing Date, representatives of Seller and Buyer shall examine all relevant books and records as of the Closing Date in order to make the determination of Proration Items that were not settled at the Closing. Payments for taxes related to the Real Property Leases and the Personal Property (the "Tax Item") shall be determined based on the assumption that the tax obligations for the current year are one hundred and five percent (105%) of the tax obligations for the prior year. The parties expressly acknowledge and agree that the determination of the Tax Items based on such assumption shall be final and binding on the parties, regardless of the actual taxes that will be due and owing once the current year's tax bills are rendered. Payments in respect of Proration Items shall be made to the appropriate party by wire transfer within five business days after determination.

(c) In the event that any party (the "Payor") pays a Proration Item to which the other party (the "Payee") is obligated in whole or in part, the Payor shall present to the Payee evidence of payment and a statement setting forth the Payee's proportionate share of such Proration Item, and the Payee shall promptly pay such share to the Payor. In the event that any party receives payment of a Proration Item to which the other party is entitled in whole or in part, under this Agreement, the receiving party shall promptly pay the other party's share to the other party.

5.6 Possession. Right to possession of the Assets shall transfer to Buyer on the Closing Date. Seller shall transfer and deliver to Buyer on the Closing Date such keys, lock and safe combinations and other similar items as Buyer shall require to obtain immediate and full occupation and control of the Assets, and Seller shall also make available to Buyer at their then existing locations all documents in Seller's possession that are required to be transferred to Buyer by this Agreement, provided, however, that Seller may, for the express and limited purpose of administering the Bankruptcy Case, retain a duplicate copy of all files, papers, computer files, customer lists and records, advertising materials, promotional materials, studies, reports and books and accounting and business records of Seller in any medium relating to the Business or Assets with costs and expenses for producing such duplicates to be paid by Seller . Seller will treat all such records as confidential information of the Buyer and shall use such information only for the purposes set forth above. Following the termination of the Bankruptcy Case, Seller will return all such information to Buyer or destroy all of the copies and provide Buyer with confirmation of the destruction.

6

6. Conditions Precedent to Closing

6.1 Conditions to Seller's Obligations. Seller's obligation to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver by Seller of each of the following conditions:

(a) Buyer shall have performed in all material respects each of the covenants and obligations to be performed by Buyer prior to the Closing.

(b) Buyer shall have executed and delivered to Seller all of those documents, instruments and agreements required to be executed by Buyer to Seller pursuant to Section 5.4 of this Agreement.

(c) Seller shall have either reached satisfactory agreements with the other parties to the Section 365 Agreements as to the amounts owing thereunder (the "Cure Amounts") as of the Closing Date and the nature and timing of cures of any defaults thereunder, or Seller shall obtain an order of the Court, as part of the approval of this Agreement, confirming that the cure amounts estimated by Seller as set forth on Exhibit K are the cure amounts which Seller must pay as a condition of Buyer's assumption of the Section 365 Agreements.

(d) No action, suit or proceeding shall have been commenced before any court to restrain or prevent the carrying out of the transactions contemplated by this Agreement.

(e) Seller and Buyer shall have agreed on mutually acceptable procedures for the conduct of the sale of the Assets.

(f) This Agreement and the transactions contemplated herein shall have been approved by the Court and the Court shall have entered the Sale Order in the Bankruptcy Case so approving, concurrently with findings of fact and conclusions of law to be contained in a separate document (the "Findings"), and the Sale Order shall have become "final" unless, as part of the Sale Order, the Court has expressly ordered that the Sale Order and matters approved therein are expressly not stayed for the ten (10) day period after the Court's entry of the Sale Order.

7

6.2 Conditions Precedent to Buyer's Closing. Buyer's obligation to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver by Buyer of each of the following conditions:

(a) Seller shall have performed in all material respects each of the covenants and obligations to be performed by Buyer prior to the Closing.

(b) All representations and warranties of Seller as set forth herein shall be true and accurate in all material respects as of the Closing.

(c) Seller shall have executed and delivered to Buyer all of those documents, instruments and agreements required to be executed by Buyer to Seller pursuant to Section 5.3 of this Agreement.

(d) All matters incident to the transactions contemplated hereby shall be in form and substance satisfactory to Buyer and Buyer's counsel.

(e) No action, suit or proceeding shall have been commenced before any court to restrain or prevent the carrying out of the transactions contemplated by this Agreement.

(f) Seller and Buyer shall have agreed on mutually acceptable procedures for the conduct of the sale of the Assets.

(g) This Agreement and the transactions contemplated herein shall have been approved by the Court and the Court shall have entered an Sale Order in the Bankruptcy Case so approving, concurrently with the "Findings", and the Sale Order shall have become "final" unless, as part of the Sale Order, the Court has expressly ordered that the Sale Order and matters approved therein are expressly not stayed for the ten (10) day period after the Court's entry of the Sale Order. The Sale Order and Findings shall have terms reasonably acceptable to Buyer and Buyer's counsel, and shall provide among other things that the Assets are transferred to Buyer free and clear of all Encumbrances and interests (within the meaning of 11 U.S.C. ss. 363(f) and including without limitation all claims, liens, encumbrances and successor liability other than the Assumed Liabilities).

(h) There shall have been no materially adverse change in the business, operations or prospects of the Business.

7. Seller's Representations and Warranties and Related Covenants. Seller makes the following representations and warranties, which shall survive full execution of this Agreement and which shall survive the Closing:

7.1 Organization. Seller is a corporation duly organized, validly existing and in good standing under the jurisdiction of its organizations. Seller has all requisite corporate power and corporate authority to own, lease and operate its properties, to carry on the Business as now being conducted, except as limited by the Bankruptcy Code. Upon obtaining the Sale Order, Seller shall have the corporate power, and corporate authority to execute, deliver and perform this Agreement and all documents and agreements related hereto.

8

7.2 Valid Agreement. All corporate action on the part of Seller as a debtor in possession necessary for the authorization, execution, and delivery of this Agreement by Seller, has been, or will be by the Closing, duly taken. Upon obtaining the Sale Order, this Agreement shall constitute the validity and binding obligation of the Seller, enforceable in accordance with its terms.

7.3 No Conflicts. Upon obtaining the Sale Order, the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the performance of, fulfillment of and compliance with the terms and conditions hereof by Seller do not and will not: (i) conflict with or result in a breach of the certificate of incorporation or bylaws of Seller; or (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority.

7.4 Title. Seller has good and marketable title to the Assets owned by Seller and valid leasehold interests in the Assets leased by Seller. The Assets constitute all of the assets necessary for the operation of the Business as currently conducted by the Seller. There are no known or alleged liens, interests, or other adverse claims affecting title to the owned Assets, whether voluntarily or involuntary created, including tax liens, except for contractual warranties on Seller Contracts which are being assumed. There are no known or suspected arbitrations, lawsuits, civil, criminal or administrative proceedings, adversary proceedings or other actions pending or threatened known to Seller which relate to title to, or any claimed interest in, the Assets. At the Closing, Buyer will acquire all of Seller's right, title and interest in and to all of the Assets free and clear of any liens and encumbrances to the extent so provided in the Sale Order.

7.5 No Infringement. To the knowledge of Seller, there is no infringement or alleged infringement by Seller on any patent, trademark, or copyright, registered or unregistered, which relates to the software, patents, trademarks, copyrights or any of the intangible property used in the operation of the Business. Seller has not received any written citation, violation notice or similar notice of any such claimed infringement.

7.6 No Violations of Law. Except as set forth on EXHIBIT L to the knowledge of Seller there is no known or alleged infringement of any law affecting any of the Assets or the operation of the Business, including OSHA, building code, zoning violations, health and safety regulations, past or present and Seller has not received any written citation, violation notice or similar notice of any such claimed violation.

8. Indemnification and Related Matters.

8.1 Indemnification by Seller. Subject to the provisions of this Article 8, Seller, for a period of 180 days after the Closing Date, agrees to indemnify, defend and hold Buyer and each director, officer, employee, stockholder, partner or affiliate thereof harmless from and against:

9

(a) any and all liabilities, obligations, damages and expenses resulting from the failure of Seller to comply in all material respects with any of the covenants contained in this Agreement which are required to be performed by Seller after the Closing Date;

(b) the breach of any representation or warranty contained in this Agreement;

(c) any and all third party claims for liabilities, obligations, damages and expenses relating to Seller's ownership or management of the Business or the Assets (other than the Assumed Liabilities); and

(d) all actions, suits, proceedings, costs and expenses, including reasonable attorneys' fees, incident to the foregoing.

8.2 Indemnification by Buyer. Subject to the provisions of this Article 8, Buyer, for a period of 180 days after the Closing Date, agrees to indemnify and hold Seller and each director, officer, employee, stockholder, partner or affiliate of Seller harmless from and against:

(a) any and all liabilities, obligations, damages and expenses resulting from the failure of Buyer to comply in all material respects with any of the covenants contained in this Agreement which are required to be performed by Buyer;

(b) any and all third party claims for liabilities, obligations, damages and expenses relating to Buyer's ownership or management of the Business or the Assets; and

(c) all actions, suits, proceedings, costs and expenses, including reasonable attorneys' fees, incident to the foregoing.

8.3 Notice of Indemnification. In the event any legal proceeding is threatened or instituted or any claim or demand is asserted by any person (including a party hereto) in respect of which payment or other indemnification may be sought by one party hereto from the other party under the provisions of this Article 8, the party seeking indemnification ("Indemnitee") will promptly cause written notice of the assertion of any such claim of which it has knowledge which is covered by this indemnity to be forwarded to the other party ("Indemnitor"). Any notice of a claim by reason of any of the representations, warranties or covenants contained in this Agreement will state specifically the representation, warranty or covenant with respect to which the claim is made, the facts giving rise to an alleged basis for the claim, and the amount of the liability asserted against the Indemnitor by reason of the claim.

8.4 Indemnification Procedure for Third-Party Claims. In the event of the initiation of any legal proceeding against an Indemnitee by a third party, the Indemnitor will have the absolute right after the receipt of notice, at its option and at its own expense, to be represented by counsel of its choice, and to defend against, negotiate, settle or otherwise deal with any proceeding, claim, or demand which relates to any loss, liability or damage indemnified against hereunder; provided, however, that the Indemnitee may participate in any such proceeding with counsel of its choice and at its expense. The parties will cooperate fully with each other in connection with the defense, negotiation or settlement of any such legal proceeding, claim or demand. To the extent the Indemnitor elects not to defend such proceeding, claim or demand, and the Indemnitee defends against or otherwise deals any such proceeding, claim or demand, the Indemnitee may retain counsel, at the expense of the Indemnitor, and control the defense of such proceeding. Neither the Indemnitor nor the Indemnitee may settle any such proceeding without the consent of the other party, such consent not to be unreasonably withheld. After any final judgment or award has been rendered by a court, arbitration board or administrative agency or competent jurisdiction and the time in which to appeal therefrom has expired, or a settlement has been consummate, or the Indemnitee and the Indemnitor have arrived at a mutually binding agreement with respect to each separate matter alleged to be indemnified by the Indemnitor hereunder, the Indemnitee will forward to the Indemnitor notice of any sums due and owing by it with respect to such matter and the Indemnitor will pay all of the sums so owing to the Indemnitee by wire transfer, certified or bank cashier's check within thirty (30) days after the date of such notice.

10

9. Conduct Prior to Closing.

9.1 Access to Information. Between the date of this Agreement and the Closing Date, and upon reasonable advance notice received from Buyer, Seller shall (a) afford Buyer and its representatives full and free access, during regular business hours, to Seller's personnel, properties, contracts, books and records and other documents and data, in each case, related to the Business, such rights of access to be exercised in a manner that does not unreasonably interfere with the operations of Seller; (b) furnish Buyer with copies of all such contracts, books and records and other existing documents and data, in each case, related to the Business, as Buyer may reasonably request; (c) furnish Buyer with such additional financial, operating and other relevant data and information, in each case, related to the Business, as Buyer may reasonably request; and (d) otherwise cooperate and assist, to the extent reasonably requested by Buyer, with Buyer's investigation of the properties, assets and financial condition related to Seller's Business.

9.2 Operation of the Business Pending Closing. From the date of this Agreement through the Closing Date, Seller shall operate the Business in the usual and ordinary course, consistent with past practice in all material respects, subject to compliance with the Bankruptcy Code, any orders entered by the Court in the Bankruptcy Case and applicable law. Notwithstanding the foregoing, Seller may take actions to reduce employments and to shut down locations under leases for real property that are not part of the Real Property Leases being transferred hereunder.

9.3 Seller's Employees. At any time and from time to time up to the Closing, Buyer may interview any of Seller's employees, and in connection therewith, Buyer may in its sole discretion, offer employment to any such employees to commence after the Closing Date on such terms and conditions as Buyer, in its discretion, shall determine. Seller shall make reasonable efforts, as requested by Buyer, to cooperate with Buyer in its efforts to interview and retain such employees. Buyer will be responsible for any employment agreements made with Seller's former employees commencing after the Closing Date. Buyer is not assuming any liabilities with respect to Seller's employees prior to the Closing Date. Seller represents that it has not taken, and the transactions contemplated by this Agreement will not constitute, a plant closing or mass lay off within the meaning of the Worker Adjustment and Retraining Notification Act (the "WARN Act"). Seller shall be responsible for any liabilities arising under the WARN Act, or any similar state law.

11

9.4 Bankruptcy Approval.

(a) As promptly as practicable after the date hereof but in no event later than October 7, 2005 Seller will file motions with the Court seeking (i) an order in form satisfactory to Buyer authorizing performance by Seller of its obligations under Sections 9.5, 9.6 and 9.7 of this Agreement, setting the sale hearing date and notice requirements for the motion for the Sale Order, and authorizing sale of the Assets pursuant to Section 363 of the Bankruptcy Code ("Preliminary Order") and (ii) the Sale Order which shall, among other things, compel a change of name of Seller to a name that does not include "Tectonic" or any similar name, provided, however, that Seller may, where necessary, state that it was formerly known as Tectonic. Seller will promptly make any filings, take all actions and use its best efforts to obtain any and all other approvals and orders necessary or appropriate for the consummation of the transactions contemplated hereby. The Sale Order will, among other provisions reasonably required by Buyer, contain a finding that the Buyer is a buyer in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and will grant the parties relief from stay in the performance of all provisions of this Agreement.

(b) If the Preliminary Order, the Sale Order or any other orders of the Court relating to this Agreement are appealed by any party (or a post hearing motion, including without limitation a motion for amended findings or reconsideration petition for certiorari or motion for rehearing or reargument is filed with respect to such appeal), Seller will take all steps as may be reasonable and appropriate to prosecute such appeal, petition or motion, or defend against such appeal, petition or motion, and Buyer will cooperate in such efforts, and Seller will use its best efforts to obtain an expedited resolution of any such appeal; provided, however, nothing herein will preclude Seller and Buyer form consummating the transactions contemplated herein and waiving the requirement that the Sale Order or other orders are final.

9.5 Break-Up Fee. In the event the Court enters an order authorizing Seller to sell substantially all of the Business (through a sale of assets, sale of stock, merger or otherwise) to a third party pursuant to an offer made in response to notice of the motion for the Sale Order ("Alternative Transaction"), and provided this Agreement has not been terminated because of a material breach of Buyer's obligations, representations or warranties hereunder, and provided neither Buyer nor any other person or entity controlled by Buyer has appealed the order of the Court approving the Alternative Transaction, and subject to the further provisions of this Section 9.5, Seller will pay to Buyer One Hundred Thousand Dollars ($100,000.00) ("Break-up Fee"), plus Buyer's aggregate actual and reasonable out-of-pocket expenses incurred in connection with this Agreement including without limitation Buyer's attorney's fees and costs incurred in connection with this Agreement and the Loan Agreement (not to exceed an additional Fifty Thousand Dollars ($50,000.00) ("Buyer's Expenses")). The Break-up Fee will become due in immediately available funds upon, but will only become due in the event of, the earlier to occur (if either) of (a) closing of an Alternative Transaction, or (b) failure of Seller to offer irrevocably to Buyer the Assets pursuant to order of the Court and on the terms of this Agreement, as improved to Seller by Buyer (if at all) at the hearing on the motion for the Sale Order, within ten (10) days after entry of the order of the Court approving the Alternative Transaction (or, in the event such order is stayed pending appeal, within the earlier of twenty (20) days after entry of such order or ten (10) days after lifting of such stay), subject only to Buyer closing such purchase of Assets within ten (10) days after such offer (or, if applicable, after the lifting of such stay). Buyer will submit a summary of out-of-pocket expenses and attorneys fees to Seller for payment. Buyer and Seller shall submit the expenses for the approval of the Court, only in the event of a dispute of Buyer and Seller over the reasonableness of such expenses.

9.6 Bidding Increment. Seller will not consider an Alternative Transaction unless, at a minimum, the Alternative Transaction (i) provides for aggregate consideration of at least One Hundred Thousand Dollars ($100,000.00) in excess of the value of the Purchase Price and the Break-up Fee, (ii) is on terms not materially more burdensome or conditional to Seller than the terms of this Agreement, (iii) is not conditioned on the outcome of unperformed due diligence by the offeror with respect to Seller beyond dates specified herein with respect to Buyer's due diligence, (iv) is not subject to the accuracy of representations and warranties or the satisfaction of conditions materially more burdensome to Seller than those set forth in this Agreement, and (v) provides for payment in full of all obligations under the Loan Agreement. Buyer will have the right to further bid in excess of any such overbid.

9.7 Third Party Bidders. To the extent consistent with the Seller's obligations as a debtor-in-possession, Seller may respond to inquiries from, provide information to and answer questions of third parties who express an interest in acquiring the assets of Seller.

10. Termination.

10.1 Termination. Either or both parties, as applicable, may terminate this Agreement only under the circumstances set forth below:

(a) Seller and Buyer may terminate this Agreement at any time prior to the Closing by mutual written consent.

(b) Either Seller or Buyer may terminate this Agreement by written notice to the other in the event of any material breach or default of any provision hereof by the other party; provided, however, that neither Seller nor Buyer may terminate this Agreement by delivery of such notice of termination while such party is in breach or default of its obligations hereunder.

13

(c) Buyer may terminate this Agreement by written notice to Seller if: (i) there is a material adverse effect on the Business or operations of Seller or Buyer is dissatisfied with the results of its due diligence investigation, (ii) there is a material, uncured default under the Loan Agreement, (iii) the Preliminary Order has not been entered by the Court by October 15, 2005, (iv) the Sale Order has not been entered by the Court prior to December 1, 2005, (v) the Interim Order (as defined in the Loan Agreement) approving the loan under the Loan Agreement has not been entered by the Court by October 15, 2005, or (vi) the Final Order (as defined in the Loan Agreement) on the loan under the Loan Agreement has not been entered by the Court by December 1, 2005.

(d) This Agreement shall automatically terminate upon the closing of a transaction with a third-party that purchases assets from Seller that is substantially a sale of the Assets.

10.2   Effect of Other Termination.   In the event that the Agreement is terminated pursuant to Section 10.1 the rights and obligations of the parties hereunder shall terminate, without liability of any party to the other party; provided however that Seller shall remain obligated to repay its obligations under the terms of the Loan Agreement. Notwithstanding the foregoing, (i) in the event that this Agreement is terminated by Buyer under Section 10.1(b) because of a material default by Seller, then, in addition to repayment of Seller's obligations under the Loan Agreement, Seller shall reimburse Buyer for its aggregate actual and reasonable out-of-pocket expenses incurred in connection with this Agreement and the Loan Agreement, including without limitations attorney's fees and costs incurred in connection with this Agreement and the Loan Agreement and (ii) in the event of a termination under Section 10.1(d) then in addition to repayment of Seller's obligations under the Loan Agreement, Seller shall pay to Buyer the Break-Up Fee.

11.  Post-Closing Covenants.

11.1 Amounts held in Trust.   Following the Closing, any amounts paid to Seller in connection with the Assets shall be held in trust by Seller for the benefit of Buyer and tendered and paid to Buyer as soon as reasonably practicable after the receipt thereof. Following the Closing any amounts paid to Buyer in connection with the Excluded Assets shall be held in trust by the Buyer for the benefit of Seller and tendered and paid to Seller as soon as reasonably practicable after the receipt thereof.

11.2 Further Assurances.   At any time from time to time after the Closing Seller and Buyer shall, at the request of the other party, take any and all reasonable actions necessary to fulfill their obligations hereunder, to put Buyer in actual possession and operating control of the Assets, and execute and deliver such further instruments of conveyance, sale, transfer and assignment, and take such other actions necessary or desirable to effectuate, record or perfect the transfer of the Assets to Buyer, to confirm the title of the Assets to Buyer, to assist Buyer in exercising rights relating thereto, and to otherwise effectuate or consummate any of the transactions contemplated hereby.

14

12. Miscellaneous.

12.1 Entire Agreement. This Agreement and the written agreements referred to herein and executed in connection herewith constitute the entire understanding among the parties with respect to the subject matter hereof, and supersede all negotiations, prior discussions or other agreements, oral or written.

12.2 Governing Law; Venue. This Agreement shall be governed by and construed in accordance with the internal laws of State of California, without reference or regard to the principles of conflict of laws. Any action arising out of this Agreement may be brought and maintained in the Court, and the parties hereto consent to the jurisdiction of such Court.

12.3 Counterparts. This Agreement may be executed in counterparts. Duly acknowledged facsimile signatures shall be deemed as originals.

12.4 Fees and Costs. Except as otherwise provided in Section 10.2, each party shall bear its own attorneys' fees and expenses in connection with the negotiation, preparation and consummation of this Agreement. Seller shall bear all United States Trustee's quarterly fees pursuant to 28 U.S.C. 1930(a)(6).. If any proceeding is instituted to enforce the terms or provisions of this Agreement, the prevailing party in such action shall be entitled to collect as part of its recovery all reasonable costs, charges and fees, including but not limited to its expert witness fees and attorneys' fees and costs, incurred in connection with such action.

12.5 Amendment. This Agreement may only be amended or modified by the written agreement of the parties.

12.6 Severability. If any of the provisions of this Agreement are held invalid under any law, such invalidity shall not affect the remainder of the Agreement.

12.7 Assignment. Buyer shall have the right to assign its rights and obligations under this Agreement to any entity controlling, controlled by or under common control with Buyer at any time prior to Closing upon notice to Seller.

12.8 Further Assurances. Each party agrees to perform any further action and to execute and deliver any further documents reasonably necessary or proper to carry out the intent of this Agreement.

12.9 Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties.

12.10 Headings. The headings of the various sections of this Agreement are for convenience only and are not intended to explain or modify any of the provisions of this Agreement.

12.11 Broker's Fees. Each party represents to the other that the warranting party has not incurred any obligation to compensate any broker, finder or similar person for any commission, finder's fee, broker's fee or similar fee as a result of any of the transactions contemplated herein.

15

12.12  Notices.  All notices to be given by any party to this Agreement to the other party shall be in writing, and shall be given (i) by certified or registered United States mail, return receipt requested, postage prepaid, to the other; (ii) sent by telefax or facsimile transmission; or (iii) personally delivered, at the addresses set forth below (or at such other address for a party as specified by like notice) and shall be deemed given when received if sent by facsimile transmission or personally delivered, or if mailed as provided herein, on the second business day after it is so placed in the mail.

The addresses referred to above are:

| | |
|---|---|
| Buyer: | Ross Lyndon-James<br>Boston Equities Corporation<br>1660 Union Street, Suite 200<br>San Diego, CA 92101 |
| With a copy to: | James A. Mercer III<br>Duane Morris LLP<br>101 W. Broadway, Suite 900<br>San Diego, CA 92101 |
| Seller: | Arol Wolford<br>Tectonic Network, Inc. and<br>Tectonic Solutions, Inc.<br>400 Perimeter Center Terrace NE, Suite 900<br>Atlanta, GA 30346 |
| With a copy to: | Gregory D. Ellis<br>Lamberth, Ciffelli, Stokes and Stout. P.A.<br>3343 Peachtree Street NE, Suite 550<br>Atlanta, GA 30326 |
| and: | Elizabeth Noe<br>Paul, Hastings, Janofsky and Walker LLP<br>600 Peachtree Street, Suite 2400<br>Atlanta, GA 30308 |

Any party at any time may give notice to the other party of a different address other than that set forth above in accordance with the provisions of this Section 12.12.

12.13  Representations and Warranties.  Each party signing this Agreement represents and warrants that it has the legal authority to enter into this Agreement and agreements executed in connection herewith and bind the entity upon whose behalf it signs (except that Seller's authority and the binding nature of this Agreement upon Seller is subject to approval of the Court).

16

12.14 Survival of Obligations. All representations, warranties and obligations of the parties set forth in this Agreement shall survive the Closing and Closing Date.

12.15 Effect of Course of Dealing. No course of dealing between the parties in exercising any of their respective rights under this Agreement shall operate as a waiver of any such rights, except where expressly waived in writing.

12.16 Time. Time is of the essence of this Agreement and each and every provision hereof.

17

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be fully executed as of the day and year first above written.

TECTONIC NETWORK, INC.,
a Delaware corporation
as debtor and debtor-in-possession

/s/ Arol R. Wolford
--------------------------------------
By:    Arol R. Wolford
Its:   President and CEO


TECTONIC SOLUTIONS, INC.,
a Georgia corporation
as debtor and debtor-in-possession

/s/ Arol R. Wolford
--------------------------------------
By:    Arol R. Wolford
Its:   President and CEO


BOSTON EQUITIES CORPORATION,
a Nevada corporation

/s/ Ross Lyndon-James
--------------------------------------
By:    Ross Lyndon-James
Its:   President and CEO

EXHIBIT A

LEASES

1. Lease Agreement dated June 27, 2005, between HQ Global Workplaces, Inc. and Tectonic Network, Inc. for the property located at 400 Perimeter Center Terrace, Suite 900, Atlanta, GA 30346.

2. Lease Agreement dated December 14, 2004, between Zoom Eyeworks, Inc. and Tectonic Network, Inc. for the property located at 2501 Ninth Street, #102 Berkeley, CA 94710.

A-1

EXHIBIT B

PERSONAL PROPERTY LEASES


1. Wells Fargo Financial Leasing - contract for Minolta Digital Copier in Atlanta.

2. Data 393 Holdings, LLC. - contract dated June 9, 2005 for server and rackspace rental through June 9, 2006 currently at $1,814 per month.

3. Rackspace Managed Hosting - month to month contract dated February 6, 2004, for server rackspace rental in the amount of $699 per month.

B-1

EXHIBIT C

SELLER CONTRACTS

1. All sales agreements, contracts and invoices.

2. Software Purchase Agreement between Tectonic Network, Inc. and Marinsoft, Inc. dated May 5, 2005. Under this agreement the Company has agreed to purchase certain software necessary in its business. The first installment of $25,000 was to be paid upon execution of the agreement and the second installment of $50,000 was payable upon later of July 31, 2005 and 30 days after the date the seller has fulfilled 40 hours of technical support. The Company shall also pay the seller a royalty until earlier of April 30, 2007 or the date the royalty fee equals $75,000, calculated as set forth in the agreement. At the time of this agreement Marinsoft, Inc. has amounts due to the Company of $38,400.

3. Bronto Mail, Inc. - month to month contract dated February 19, 2003, for email distribution service - e-newsletter in the amount of $2,220 per quarter.

4. Intercall, Inc. - contract dated March 5, 2005, for web presentations and teleconferencing through March 31, 2006. Price dependent on usage after a total $5,000 minimum commitment.

5. The Rogers Company - amounts owed for storage and construction on the Trade Show booth in the amount of $14,202.84

6. Next Step CAD - amounts owed for CAD modeling services in the amount of $3,150.00

7. Roger Grant - amounts owed for e-newsletter consulting services in the amount of $1,350.00

C-1

EXHIBIT D

TANGIBLE PERSONAL PROPERTY

| Asset/Description | Vendor | Location | Date In Service | Total | Accum Depr 9/30/05 | Book Value 9/30/05 |
|---|---|---|---|---|---|---|
| Workstation M70 - James Jackson | Dell | Atlanta, GA | 4/1/2005 | $9,928 | $1,655 | $8,273 |
| Workstation 670 - James Jackson | Dell | Atlanta, GA | 4/1/2005 | $6,536 | $1,089 | $5,446 |
| Projector | Dell | Berkeley, CA | 4/1/2005 | $2,346 | $ 391 | $1,955 |
| Trade Show Booth | Rogers Co | Ohio | 5/31/2005 | $36,651 | $10,384 | $26,267 |
| Laptop - Andrew Arnold | Dell | Berkeley, CA | 04/30/03 | $3,048 | $2,540 | $ 508 |
| Power Workstation - Blaine Wishart | Dell | Berkeley, CA | 04/30/03 | $4,302 | $3,585 | $ 717 |
| Laptop & Monitor | Gateway | Englewood, CO | 08/21/03 | $4,328 | $3,126 | $1,202 |
| Latitude Laptop - Marc Goldman | Dell | Englewood, CO | 08/29/03 | $3,191 | $2,305 | $ 886 |
| Latitude Laptop | Dell | Atlanta, GA | 10/31/03 | $3,184 | $2,123 | $1,061 |
| Latitude Laptop | Dell | Englewood, CO | 01/30/04 | $3,280 | $1,913 | $1,366 |
| Laptop - Julie Culey | Dell | Grand Rapids,MI | 3/1/2004 | $2,701 | $1,351 | $1,351 |
| Laptop - Nora Scherer | Dell | Atlanta, GA | 4/1/2004 | $2,402 | $1,201 | $1,201 |
| Server | Dell | Englewood, CO | 7/28/2004 | $4,483 | $1,868 | $2,615 |
| Laptop - (prev Richard Rast) | Dell | Englewood, CO | 9/30/2004 | $2,923 | $1,055 | $1,867 |
| Server | Dell | Englewood, CO | 9/30/2004 | $6,997 | $2,527 | $4,470 |
| Netscreen Firewall VPN | Illumen Group | Englewood, CO | 10/31/2004 | $2,696 | $ 899 | $1,797 |
| Studio Server | | Englewood, CO | 5/1/2005 | $2,126 | $ 177 | $1,949 |
| Laser Printer - 6250N Color | Zones | Englewood, CO | 1/13/2005 | $2,123 | $ 354 | $1,769 |
| Software License | Macromedia & Studio | Englewood, CO | 11/18/03 | $3,027 | $1,934 | $1,093 |
| Cocoabase Software | Thought, Inc | Berkeley, CA | 01/20/04 | $11,400 | $6,650 | $4,750 |
| Great Plains Upgrade | Ironware | Englewood, CO | 01/06/2005 | $5,510 | $1,378 | $4,133 |
| Great Plains - Intercompany Module | Ironware | Englewood, CO | 03/07/2005 | $4,667 | $ 907 | $3,759 |
| Laptop-Sherwin Krug | | Atlanta, GA | 03/31/05 | $2,950 | $ 344 | $2,606 |
| | | | | $130,799 | $49,755 | $81,043 |

D-1

EXHIBIT E

INTANGIBLE ASSETS

1.    Patents
Patent No. US  6,459,435B1  filed  October 1, 2003.  Methods,  Systems and
Computer  Program  Products for Generating  Storyboards of Interior Design
Surface Treatments for Interior Design Spaces

2. Trade Marks - Registered
Trademark Register International Class 9 No. 2,670,112 Trademark Principal
Register:  BlueBolt  Studio  For:  Computer  software  that  provides  for
searching,  comparing,  matching,  selecting,  composing and communication
sample boards and sample ordering of textiles,  floor coverings  including
carpets and vinyl flooring, wall finishes,  moldings, textile, leather and
vinyl  upholstery,  laminates and solid  surfaces for interior  designers,
architects and facilities  planners via a global computer network in class
9. Registered December 31, 2002

3. Trade Names and Service Marks - Unregistered

[GRAPHIC OMITTED]

| | |
|---|---|
| Tectonic Network | tectonic network |
| Tectonic Directory | tectonic Directory |
| Tectonic Studio | tectonic Studio |
| Tectonic Solutions | tectonic Solutions |
| Tectonic Virtual Products | |

4. Software

Custom Solutions

Configurator - Code for managing data bases of information  about products
that  compares  relationships  between  data  based upon a set of rules to
determine a selection set matching the search criteria.

Product Data Manager - Software  framework for loading  product data to be
used to generate websites.

E-1

Selector - Search tool for finding information created by Tectonic for display on the Internet.

Content Management System - Tools to dynamically generate information about a product. The Content Management System allows Tectonic and customers to update or add product and marketing product data that is then displayed on the Internet.

Project Folder - Software that allows Tectonic to keep track of selections made by the user of the site so they can at anytime come back to the Tectonic site to view their selections. Tectonic can keep track of this information to be shared with the product manufacturer.

Software Management Tools - Code that manages "third-party" software to perform various functions and Internet displays.

Studio

Color Board Tool - Software that creates a "color-board" from a collection of user selections for presentations.

Image Manager - Software that allows images to be entered into our database and then displayed as requested by the user.

Sample Order Tool - Software that allows the customer to request samples be sent to them from the manufacturer.

Software Management Tools - Code that manages "third-party" software to perform various functions and Internet displays.

Models

Assembly Builder - Software that allows the user to define assemblies with specific materials. Contains the formulas needed to calculate quantities.

Quantity take-off - Software that manages and integrates data coming from the Revit model and the Assembly Builder to generate quantity counts and display the counts in multiple formats.

Library - Software for managing product data and images. This software includes a search tool to find and display the data requested and to also allow Revit virtual products to be moved to the Revit drawing.

Directory

Database Management and Search - Software for storing data and display of the data based upon a customer search request.

E-2

5. Domain Names

| Domain | Registrant Name | Create Date | Expiration Date |
|---|---|---|---|
| bluebolt.com | Tectonic Network | 03/12/00 | 03/12/07 |
| bluebolt.net | Tectonic Network | 06/04/99 | 06/04/06 |
| blueboltconnect.com | Tectonic Network | 12/06/00 | 12/06/06 |
| blueboltnetworks.com | Tectonic Network | 06/07/99 | 06/07/06 |
| blueboltstudio.com | Tectonic Network | 12/06/00 | 12/06/06 |
| buildcertified.com | Tectonic Network | 01/10/01 | 01/10/06 |
| constructionYellowPages.com | Tectonic Network | 06/21/02 | 06/21/07 |
| specsource.com | Tectonic Network | 11/09/99 | 11/09/05 |
| specsource.net | Tectonic Network | 11/19/97 | 11/18/05 |
| tectonicconstructiondirectory.biz | Tectonic Network | 01/24/04 | 01/23/06 |
| tectonicconstructiondirectory.com | Tectonic Network | 01/24/04 | 01/24/06 |
| tectonicconstructiondirectory.net | Tectonic Network | 01/24/04 | 01/24/06 |
| tectonicconstructiondirectory.us | Tectonic Network | 01/24/04 | 01/23/06 |
| tectonicdirectories.biz | Tectonic Network | 01/30/04 | 01/29/06 |
| tectonicdirectories.com | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicdirectories.net | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicdirectories.us | Tectonic Network | 02/03/04 | 02/02/06 |
| tectonicdirectory.biz | Tectonic Network | 01/24/04 | 01/23/06 |
| tectonicdirectory.com | Tectonic Network | 01/24/04 | 01/24/06 |
| tectonicdirectory.net | Tectonic Network | 01/24/04 | 01/23/06 |
| tectonicdirectory.us | Tectonic Network | 01/30/04 | 01/29/06 |
| tectonicengineeringapplications.biz | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicengineeringapplications.com | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicengineeringapplications.net | Tectonic Network | 02/03/04 | 02/02/06 |
| tectonicengineeringapplications.us | Tectonic Network | 01/30/04 | 01/29/06 |
| tectonicnetwork.biz | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicnetwork.com | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicnetwork.net | Tectonic Network | 02/03/04 | 02/02/06 |
| tectonicnetwork.us | Tectonic Network | 01/30/04 | 01/29/06 |
| tectonicsolution.biz | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicsolution.com | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicsolution.net | Tectonic Network | 02/03/04 | 02/02/06 |
| tectonicsolution.us | Tectonic Network | 01/30/04 | 01/29/06 |
| tectonicsolutions.biz | Tectonic Network | 02/12/03 | 02/12/06 |
| tectonicsolutions.com | Tectonic Network | 02/12/03 | 02/12/06 |
| tectonicsolutions.net | Tectonic Network | 02/03/04 | 02/02/06 |
| tectonicsolutions.us | Tectonic Network | 01/30/04 | 01/29/06 |
| tectonicstudio.biz | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicstudio.com | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicstudio.net | Tectonic Network | 02/03/04 | 02/02/06 |
| tectonicstudio.us | Tectonic Network | 06/08/04 | 06/08/06 |
| tectonicvirtualbuildings.com | Tectonic Network | 06/08/04 | 06/08/06 |
| tectonicvirtualbuildings.net | Tectonic Network | 01/30/04 | 01/29/06 |
| tectonicvirtualconstruction.biz | Tectonic Network | | |

E-3

| | | | |
|---|---|---|---|
| tectonicvirtualconstruction.com | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicvirtualconstruction.net | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicvirtualconstruction.us | Tectonic Network | 02/03/04 | 02/02/06 |
| tectonicvirtualmodel.biz | Tectonic Network | 01/30/04 | 01/29/06 |
| tectonicvirtualmodel.com | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicvirtualmodel.net | Tectonic Network | 01/30/04 | 01/30/06 |
| tectonicvirtualmodel.us | Tectonic Network | 02/03/04 | 02/02/06 |
| tectonicvirtualproducts.com | Tectonic Network | 06/08/04 | 06/08/06 |
| tectonicvirtualproducts.net | Tectonic Network | 06/08/04 | 06/08/06 |
| virtualConstruction.biz | Tectonic Network | 01/30/04 | 01/29/06 |
| virtualconstruction.us | Tectonic Network | 02/03/04 | 02/02/06 |
| virtualmodels.us | Tectonic Network | 02/03/04 | 02/02/06 |
| tectonicvirtualmodels.com | Tectonic Network | 09/24/04 | 09/24/06 |
| tectonicvirtualmodels.net | Tectonic Network | 09/24/04 | 09/24/06 |
| tectonicmodels.com | Tectonic Network | 12/13/04 | 12/13/05 |
| tectonicmodels.net | Tectonic Network | 12/13/04 | 12/13/05 |
| tectonicbuildings.com | Tectonic Network | 12/13/04 | 12/13/05 |
| tectonicbuildings.net | Tectonic Network | 12/13/04 | 12/13/05 |
| tectoniclibrary.com | Tectonic Network | 12/13/04 | 12/13/05 |
| tectoniclibrary.net | Tectonic Network | 12/13/04 | 12/13/05 |
| tectonicproducts.com | Tectonic Network | 12/13/04 | 12/13/05 |
| tectonicproducts.net | Tectonic Network | 12/13/04 | 12/13/05 |

6. Other Intellectual Property

Servers containing Tectonic Models and Tectonic Virtual Products. Best Practices document for modeling within Revit software. Diagrams, schema, models and source code related to Tectonic Models and Tectonic Virtual Products. Repository and Indexing/Classification System for Tectonic Virtual Products including repository of generic and proprietary Virtual Products. Tools for users of Revit software to perform quantity counts of the total design model, link product quantities with unit costs, and report them. Tools for automatic testing and deployment of Repository and Count software services.

Servers containing Tectonic Studio Images and Data. Diagrams, schema and source code related to Tectonic Studio including Indexing/Classification system. Product information and color-accurate imagery for commercial interior finishes which provides for comparisons of finishes by attributes including style, thickness, color or specific patterns.

Servers containing Tectonic Online Directory Data. Directory data of commercial construction product manufacturers and their local supply chain of product representatives and distributors including online search mechanisms, directory structure.

Servers containing Tectonic Solutions Data. Source code, programs, methodologies. schema, proprietary content, workflow processes, configurators, design documents and applications.

E-4

EXHIBIT F

SECURITY DEPOSITS

| | | | |
|---|---|---|---|
| Zoom Eyeworks, Inc. | Berkeley, CA office security deposit | $ | 808 |
| USPO | Directory postage balance | $ | 6,543 |
| HQ Global Workplaces, Inc. | Atlanta, GA office security deposit | $ | 3,264 |
| Co-Denver Corporate Center, LLC. | Englewood, CO office security deposit | $ | 2,680 |

G-1

EXHIBIT G

EXCLUDED ASSETS

## TANGIBLE PROPERTY

| | |
|---|---|
| Restricted cash balance - North Fork Bank | |
| Restricted cash balance - Certificate of Deposit - Silicon Valley Bank | |
| Inverness Properties | |
| Cape Ann Properties | |
| John White | |
| Marc Goldman | |
| Citizen's Gas | |
| Indianapolis Power | |
| Duke Realty Corp. | |
| Deposit Retainer - Paul, Hastings, Janofsky and Walker LLP | |
| Deposit Retainer - Babush, Neiman, Kornman & Johnson, LLP | |
| Deposit/Retainer - Lambert, Cifelli, Stokes and Stout P.A. | |

| | |
|---|---|
| Laurus Master Fund, Term Note | $3,272,728 |
| Inverness Properties, Englewood lease deposit | $ 130,000 |
| Englewood, CO office security deposit | $ 20,000 |
| Manchester, MA office security deposit | $ 750 |
| Rent & storage fees receivable | $ 4,656 |
| Employee advance | $ 10,163 |
| Indianapolis security deposit | $ 570 |
| Indianapolis security deposit | $ 940 |
| Indianapolis office security deposit | $ 8,374 |
| Corporate legal counsel retainer | $ 10,000 |
| Tax return and 401(k) audit preparation retainer. | $ 63,000 |
| Bankruptcy counsel retainer | $ 17,286 |

## EXCLUDED CONTRACTS

1. Laurus Master Fund, Limited, Secured Convertible Term Note and Convertible Minimum Borrowing Note in the original principal amount of $4,000,000 with a current alleged balance at September 30, 2005 of $3,272,728, excluding interest and penalties.

2. Laurus Master Fund, Limited, Secured Revolving Note in the original principal amount of $1,500,000 with a current alleged balance at September 30, 2005 of $500,000.

3. Promissory Note, dated January 2, 2004, in the original principal amount of $360,000 with a current principal amount of $100,000 from the Company to John White

4. Promissory Note, dated January 2, 2004, in the original principal amount of $533,000 with a current principal amount of $143,000 from the Company to SpecSource.com, Inc.

5. Indebtedness for alleged severance under Charlie Pecchio Employment Agreement and Non-Compete, in the aggregate amount of $320,312.

6. Grand Rapids, MI, Sublease Agreement by and between Return On Investment Corporation and Nelson-McLean, LLC. For premises located at 2025 E. Beltline Ave. Suite 101, Grand Rapids, MI 49546.

7. Indianapolis, IN, Lease Agreement by and between Return On Investment Corporation and Dugan Realty LLC Limited Partnership. For premises located at 5855 West 74th Street, Indianapolis, IN 46278.

8. Englewood, CO Lease Agreement by and between Tectonic Solutions, Inc. and Inverness Properties. For premises located at 160 Inverness Drive, West, Suite 200, Englewood CO 80112.

9. CBeyond Communications Agreement with Tectonic Solutions, Inc. for phone service in Englewood, CO dated February 10, 2005.

10. Georgia Greater Life Agreement providing voluntary life insurance as well as ST and LT Disability Insurance.

11. BlueCross, Blue Shield of Georgia Medial and Dental Agreement

12. Principal Group 401(k) Plan

13. Hartford Fire Insurance Company Directors and Officers Insurance Policy dated August 10, 2006.

14. Litigation and pending Mediation with Unicomp, Inc. for the recovery of amounts advanced under a promissory note.

15. Asset Purchase Agreement among Return On Investment Corporation, GO Software, Inc. and Verifone, Inc. dated December 6, 2005, including without limitation any right to the Contingent Earnout Payment.

16. Lease Agreement with Neopost, Inc. and Tectonic Solutions, Inc. for postage machine dated April 9, 2002.

17. Lease Agreement for copier with De LaAge Landen Financial Services for Konica copier dated April 19, 2005.

G-3

EXHIBIT L

LITIGATION

In January 2005, Return On Investment Corporation and its subsidiary Tectonic Solutions, Inc. received a letter of complaint from a former employee, a Mr. James Serio, alleging production and usage tracking problems with certain directory products of Tectonic which allegedly may have led to shortfalls in production numbers and incorrect statistics being furnished to certain customers. Such former employee has also made allegations of constructive discharge and of whistleblower retaliation with respect to his treatment by the Company, which claims are believed by the Company to be baseless. The former employee has filed a complaint with Occupational Safety and Health Administration ("OSHA"), and no litigation may be commenced until OSHA makes an initial determination, issues a right to sue letter or fails to act for six months. A special committee of the Board of Directors (comprised of members of the Audit Committee) was formed to conduct an investigation of the issues alleged by the former employee. No evidence supporting the former employee's claims has been found in connection with the employee's allegations.

In April 2005 American Mint, LLC ("American Mint") and certain of its overseas affiliates filed a complaint in the United States District Court for the Middle District of Pennsylvania against GO Software, Inc. ("GO") (whose liabilities were retained by Return On Investment Corporation upon the sale of GO's assets). The complaint alleges that GO's software malfunctioned, which caused American Mint's overseas affiliates to overcharge customers purchasing collectible coins. The complaint further alleges that GO improperly instructed the overseas affiliates in the installation of the software, resulting in the billing of many credit card customers in amounts up to 100 times greater than the actual purchase amounts. American Mint asserts claims for breach of contract, breach of various express and implied warranties, negligence, and negligent misrepresentation, and seeks compensatory damages of $981,758, including $281,758 in charges associated with correction of the improper charges and lost anticipated profits of $700,000. The Company intends to oppose the lawsuit vigorously, and has filed a motion to dismiss the action and to limit the damages to $10,995, the purchase price of the software

The Company's subsidiary GO Software, Inc. is the subject of a claim in Los Angeles County, California Superior Court. When Return On Investment Corporation sold GO's assets, it retained its liabilities, including with respect to litigation. Plaintiff Bankcard USA Merchant Services, Inc. ("Bankcard") sued Capital Video Corporation ("Capital Video") to recover amounts that Bankcard allegedly was required to pay to MasterCard International in penalties as a result of fraudulent transactions having been processed through Capital Video as a result of its use of non-conforming payment processing software. The total demanded is $86,700 and attorneys' fees. On January 18, 2005, Capital Video filed a third-party claim against GO and others for breach of contract, equitable indemnity, and breach of warranty, alleging that defects in the payment processing software of Atomic Software, Inc. ("Atomic Software"), under which GO allegedly does business, were responsible for the fraudulent transactions. Capital Video seeks damages in the amount of any liability it incurs to Bankcard, plus attorneys' fees. GO has filed an answer denying all liability and asserting that it is not a proper party to the litigation, based on the fact that the underlying transactions were conducted by Atomic Software before GO purchased its assets and Atomic retained its liabilities in that transaction. In addition, GO has filed a motion for sanctions for frivolous litigation. Management believes it possesses substantial defenses to the action and presently are in negotiation to settle this case for an amount of $2,000.

GO Software, Inc. is also the subject of a third-party complaint in an action pending in the Court of Common Pleas, Lake County, Ohio. Plaintiff Nova Info. Systems, Inc. alleges that defendant Current Directions, Inc. ("Current Directions") is liable for $27,497 related to charge-backs refunded for unauthorized credit card charges. Current Directions, in turn, alleges that GO (along with Visa, Mastercard, and Merchant Warehouse) owes Current Direction indemnification for any and all amounts it is obligated to pay to Nova. In addition, Current Directions seeks unspecified damages for loss of business, cost of merchandise shipped, shipping costs, bank fees, and defamation in the business community. Approximately, three years ago Return On Investment Corporation received approximately $50,000 from a customer, Winston Tire, as payment for software sold to Winston Tire. Subsequently, Winston Tire declared bankruptcy. In January, 2004, Company received a letter from an attorney representing the Winston Tire's bankruptcy estate. The letter states that the $50,000 payment to Company was a fraudulent conveyance under bankruptcy law and that Company must return the $50,000 payment to the Winston Tire bankruptcy estate.

On September 12, 2005, Tectonic Network, Inc. and its subsidiary Tectonic Solutions, Inc. received a summons in a civil action from Nelson-McLean, LLC. for breach of contract relating to premises held under a sublease agreement at 2025 East Beltline SE, Grand Rapids, MI. Total amounts claimed under the sublease amount to $80,044.22. The Company has not yet responded to the summons.

EXHIBIT H

ASSIGNMENT AND ASSUMPTION AGREEMENT

[attached]

H-1

ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT ("Agreement") dated as of October __, 2005, is entered into between Tectonic Network, Inc. and Tectonic Solutions, Inc. (collectively, "Seller"), and Boston Equities Corporation, or designee ("Buyer").

A. Seller and Buyer are parties to an Asset Purchase Agreement dated September __, 2005 ("Asset Purchase Agreement"), pursuant to which Seller, effective upon the close of escrow (the "Closing") is transferring and conveying to Buyer certain of the assets of Seller, and pursuant to which certain leases, contracts and other agreements are to be assigned to and assumed by Buyer.

B. All capitalized words and phrases not defined in this Agreement shall have the meaning ascribed to them in the Asset Purchase Agreement.

THEREFORE, FOR VALUABLE CONSIDERATION, BUYER AND SELLER HEREBY AGREE AS FOLLOWS:

1. Effective at Closing, Seller hereby assigns to Buyer all of its right, title and interest, if any, in and to the Section 365 Agreements.

2. Buyer hereby accepts, assumes and agrees to discharge, pay, perform and satisfy, effective as of the close of business on the date hereof, all of the duties, liabilities and obligations and covenants of Seller pursuant to or under the Section 365 Agreements, including without limitation all amounts coming due thereunder from and after Closing and all performance obligations thereunder. Buyer is not assuming or otherwise responsible for any duties, liabilities and obligations and covenants of Seller pursuant to or under the Section 365 Agreements which came due prior to Closing.

3. Buyer is not accepting or assuming or agreeing to discharge, pay, perform on the date hereof or satisfy any duties, liabilities or obligations other than those under the Section 365 Agreements.

4. Buyer agrees to defend, indemnify and hold Seller for losses or damages arising out of or in connection with Buyer's performance of or failure to perform the obligations of Seller to be performed under any of the Section 365 Agreements after the Closing on the terms set forth in the Asset Purchase Agreement.

5. Seller agrees to defend, indemnify and hold Buyer and its successors, officers, directors, shareholders, employees and assigns harmless against any and all losses or damages arising out of or in connection with Seller's performance of or failure to perform the obligations of Seller to be performed under any of the Section 365 Agreements prior to Closing on the terms set forth in the Asset Purchase Agreement.

6. This Agreement is entered into pursuant to the Asset Purchase Agreement. The assignments made hereunder are made with respect to the representations, warranties and covenants contained in the Asset Purchase Agreement.

7. If any action, including any arbitration proceeding, is instituted to enforce the terms or provisions of this Agreement, including an action instituted after the bankruptcy of a party, the prevailing party in such action shall be entitled to collect as part of its recovery all reasonable costs, charges and fees, including but not limited to its expert witness fees and attorneys' fees and costs, incurred in connection with such action.

8. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Georgia, without regard to the principles of conflict of laws. Any action arising out of this Agreement shall be brought and maintained in the Court as defined in the Asset Purchase Agreement.

9. All notices to be given by any party to this Agreement to the other party shall be in writing, and shall be given as set forth in the Asset Purchase Agreement for the giving of notices.

10. This Agreement shall be binding upon, and shall inure to the benefit of, Buyer and Seller and their respective successors and assigns.

11. This Agreement and the Asset Purchase Agreement contain the entire understanding of the parties hereto with regard to the subject matter contained herein, and supersedes all prior agreements or understandings between or among the parties hereto relating to such subject matter.. This Agreement may not be amended, modified or terminated except in writing signed by both Buyer and Seller.

[Remainder of page intentionally left blank]

H-3

12. This Agreement may be executed in one or more counterparts and by facsimile, each of which shall be considered an original instrument, but all of which shall be considered one and the same instrument, and shall become binding when one or more counterparts have been signed by each party hereto and delivered to the other party hereto.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement on the day and year first above written.

TECTONIC NETWORK, INC.
a Delaware corporation

By: _____

Its: _____


BOSTON EQUITIES CORPORATION
a Nevada corporation

By: _____

Its: _____

H-4

EXHIBIT I

ALLOCATION OF PURCHASE PRICE

I-1

EXHIBIT J

BILL OF SALE

[attached]

J-1

BILL OF SALE

Tectonic Network, Inc., a Delaware corporation ("Seller"), for good and valuable consideration, receipt of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement dated as of October __, 2005 (the "Asset Purchase Agreement") between Seller and Boston Equities Corporation, or designee ("Buyer"), does hereby sell, convey, assign, transfer and deliver to Buyer free and clear of any Encumbrances other than the Assumed Liabilities (each as defined in the Asset Purchase Agreement), all of Seller's right, title and interest in and to the following (the "Assets"):

1.   Personal Property.  All of the fixtures, furniture, equipment and tangible personal property used in connection with the Business, including those items described on Exhibit A attached hereto (the "Personal Property").

2. Intangible Property.  All of Seller's intangible personal property used in connection with the Business, including without limitation, all software, patents, patent applications, trademarks, copyrights, trade secrets, licenses, research, development, know-how inventions, technical information, tradenames, registrations, service marks, applications with respect to any of the foregoing, Seller's name, and other intangible rights and property owned or held by Seller, including going concern value, goodwill, telephone, telecopy and e-mail addresses and listings and those items specifically listed on Exhibit B attached hereto, customer and vendor lists, files, documents, books, records, computer programs, advertising and sales materials, prepaid charges, and like items pertaining to the Business, in each case whether owned by Seller or licensed to others, together with all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufactures an contractures in connection with products or services of the Business or affecting the Assets (collectively, the "Intangible Property").  Notwithstanding the foregoing, the Intangible Property shall not include: (i) any materials containing privileged communications or information about employees, the disclosure of which would violate an employee's reasonable expectation of privacy, or (ii) any other materials which are subject to attorney-client or any other privilege or requirement to maintain confidential.

3.   Inventories.  All supplies, goods, materials, work in process, raw materials, inventory, supplies and stock in trade owned by Seller that are used for sale in connection with the Business.

4.  Insurance.  All liability insurance (including any premium refunds due and owing thereunder now or after the date hereof) and any insurance proceeds, claims and causes of action with respect to or arising in connection with the Assets to the extent insuring Seller with respect to the Assumed Liabilities (as defined in the Asset Purchase Agreement) assumed by Buyer.

5.  Deposits.  Seller's right title and interest in all utility deposits, deposits with trade creditors, security deposits and similar deposits with landlords or other contracting parties under the Section 365 Agreements, including without limitation those deposits identified on Exhibit C attached hereto.

J-2

The Assets do not include the Excluded Assets as set forth in the Asset Purchase Agreement.

This Bill of Sale is entered into pursuant to the Asset Purchase Agreement. The terms and conditions applicable to the transfers herein shall be those as set forth in, and are governed pursuant to, the Asset Purchase Agreement. In the event of any conflict or ambiguity between the terms hereof and the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern and be controlling.

Nothing in this Bill of Sale is intended to confer upon any person other than Seller and Buyer, or their permitted successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Bill of Sale.

No amendment or waiver of any provision of this Bill of Sale will be effective unless the same is in writing and executed by both of the parties hereto.

This Bill of Sale will be binding upon, and inure to the benefit of, Seller and Buyer, and their respective successors and assigns.

This Bill of Sale shall be governed by and construed and enforced in accordance with the internal laws of the State of California, without reference or regard to the principles of conflict of laws.

IN WITNESS WHEREOF, Seller has caused the same to be signed on its behalf as of _____, 2005.

                              TECTONIC NETWORK, INC.
                              a Delaware corporation


                              ----------------------------------------
                              By:
                              ----------------------------------------
                              Its:
                              ----------------------------------------


                              J-3

BILL OF SALE

Tectonic Solutions, Inc., a Georgia corporation ("Seller"), for good and valuable consideration, receipt of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement dated as of October __, 2005 (the "Asset Purchase Agreement") between Seller and Boston Equities Corporation, or designee ("Buyer"), does hereby sell, convey, assign, transfer and deliver to Buyer free and clear of any Encumbrances other than the Assumed Liabilities (each as defined in the Asset Purchase Agreement), all of Seller's right, title and interest in and to the following (the "Assets"):

1.    Personal Property. All of the fixtures, furniture, equipment and tangible personal property used in connection with the Business, including those items described on Exhibit A attached hereto (the "Personal Property").

2. Intangible Property. All of Seller's intangible personal property used in connection with the Business, including without limitation, all software, patents, patent applications, trademarks, copyrights, trade secrets, licenses, research, development, know-how inventions, technical information, tradenames, registrations, service marks, applications with respect to any of the foregoing, Seller's name, and other intangible rights and property owned or held by Seller, including going concern value, goodwill, telephone, telecopy and e-mail addresses and listings and those items specifically listed on Exhibit B attached hereto, customer and vendor lists, files, documents, books, records, computer programs, advertising and sales materials, prepaid charges, and like items pertaining to the Business, in each case whether owned by Seller or licensed to others, together with all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufactures an contractures in connection with products or services of the Business or affecting the Assets (collectively, the "Intangible Property"). Notwithstanding the foregoing, the Intangible Property shall not include: (i) any materials containing privileged communications or information about employees, the disclosure of which would violate an employee's reasonable expectation of privacy, or (ii) any other materials which are subject to attorney-client or any other privilege or requirement to maintain confidential.

3.    Inventories. All supplies, goods, materials, work in process, raw materials, inventory, supplies and stock in trade owned by Seller that are used for sale in connection with the Business.

4.    Insurance. All liability insurance (including any premium refunds due and owing thereunder now or after the date hereof) and any insurance proceeds, claims and causes of action with respect to or arising in connection with the Assets to the extent insuring Seller with respect to the Assumed Liabilities (as defined in the Asset Purchase Agreement) assumed by Buyer.

5.    Deposits. Seller's right title and interest in all utility deposits, deposits with trade creditors, security deposits and similar deposits with landlords or other contracting parties under the Section 365 Agreements, including without limitation those deposits identified on Exhibit C attached hereto.

J-4

The Assets do not include the Excluded Assets as set forth in the Asset Purchase Agreement.

This Bill of Sale is entered into pursuant to the Asset Purchase Agreement. The terms and conditions applicable to the transfers herein shall be those as set forth in, and are governed pursuant to, the Asset Purchase Agreement. In the event of any conflict or ambiguity between the terms hereof and the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern and be controlling.

Nothing in this Bill of Sale is intended to confer upon any person other than Seller and Buyer, or their permitted successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Bill of Sale.

No amendment or waiver of any provision of this Bill of Sale will be effective unless the same is in writing and executed by both of the parties hereto.

This Bill of Sale will be binding upon, and inure to the benefit of, Seller and Buyer, and their respective successors and assigns.

This Bill of Sale shall be governed by and construed and enforced in accordance with the internal laws of the State of California, without reference or regard to the principles of conflict of laws.

IN WITNESS WHEREOF, Seller has caused the same to be signed on its behalf as of _____, 2005.

                                TECTONIC SOLUTIONS, INC.,
                                a Georgia corporation


                                ----------------------------------------
                                By:
                                ----------------------------------------
                                Its:
                                ----------------------------------------


                                J-5

# EXHIBIT I

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# 10KSB40

**RETURN ON INVESTMENT CORPORATION**
**Filed on 10/02/2001 ~ Period: 06/30/2001**
File Number 033~36198



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-KSB

[X]  ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE  SECURITIES  EXCHANGE ACT OF
1934

For the fiscal year ended June 30, 2001

[ ]  TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES  EXCHANGE ACT
OF 1934

For the transition period from _____ to _____

Commission file number 033-36198

RETURN ON INVESTMENT CORPORATION
(NAME OF SMALL BUSINESS ISSUER IN ITS CHARTER)

DELAWARE                              22-3038309
(State or other jurisdiction of    (IRS Employer Identification No.)
incorporation)

1825 BARRETT LAKES BLVD, SUITE 260, KENNESAW, GEORGIA        30144
(Address of principal executive offices)            (Zip Code)

ISSUER'S TELEPHONE NUMBER: (770) 517-4750

Securities registered under Section 12(b) of the Exchange Act:

Title of each class                  Name of each exchange on which
                                              registered

        None
------------------------------       ------------------------------
------------------------------       ------------------------------

Securities registered under Section 12(g) of the Exchange Act: None

Check  whether  the issuer (1) filed all  reports  required  to be filed by
Section 13 or 15(d) of the Securities Exchange Act during the past 12 months (or
for such shorter  period that the registrant was required to file such reports),
and (2) has been subject to such filing requirements for the past 90 days.
Yes [ ] No [X]

Check if there is no disclosure  of  delinquent  filers in response to Item
405 of Regulation S-B is not contained in this form,  and no disclosure  will be
contained,  to the best of  registrant's  knowledge,  in  definitive  proxy  or
information statements incorporated by reference in Part III of this Form 10-KSB
or any amendment to this Form 10-KSB. [X]

State issuer's revenues for its most recent fiscal year: $3,774,664.

State the aggregate market value of the voting and non-voting common equity
held by  non-affiliates  computed by  reference to the price at which the common
equity was sold, or the average bid and asked price of such common equity, as of
a specified date within the past 60 days:  $24,322,147 based on the average bid
and asked price as of August 31, 2001.

State the number of shares  outstanding of each of the issuer's  classes of
common equity, as of the latest practicable date: 11,047,974 shares as of August
31, 2001.

Documents Incorporated by Reference: None.

Transitional Small Business Disclosure Format (check one): Yes [ ] No [X]

RETURN ON INVESTMENT CORPORATION

2001 FORM 10-KSB ANNUAL REPORT

TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| **PART I.** |  |  |
| Item 1. | Description of Business | 1 |
| Item 2. | Description of Properties | 5 |
| Item 3. | Legal Proceedings | 6 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 6 |
| **PART II.** |  |  |
| Item 5. | Market for Common Equity and Related Stockholder Matters | 7 |
| Item 6. | Management's Discussion and Analysis or Plan of Operation | 8 |
| Item 7. | Financial Statements | F1-F26 |
| Item 8. | Changes In and Disagreements with Accountants on Accounting and Financial Disclosure | 14 |
| **PART III.** |  |  |
| Item 9. | Directors, Executive Officers, Promoters and Control Persons | 15 |
| Item 10. | Executive Compensation | 16 |
| Item 11. | Security Ownership of Certain Beneficial Owners and Management | 17 |
| Item 12. | Certain Relationships and Related Transactions | 18 |
| Item 13. | Exhibits and Reports on Form 8-K | 18 |
|  | Signatures | 19 |

PART I

ITEM 1.   DESCRIPTION OF BUSINESS

OVERVIEW

Return On Investment  Corporation d/b/a ROI Corporation (the "Company") and its subsidiaries market  software and services that provide  connectivity  and communications for credit card, debit card and check transaction processing. ROI offerings  include (i) payment  processing  software for virtually any computing platform including Windows,  Unix,  Linux, AIX, OS/390,  OS/400, and Sun Solaris; (ii)  transaction  processing  services  for  credit,  debit,  checks, ACH, international transactions,  and stored value/gift cards; and (iii) software for IBM midrange  computers that facilitates  e-mail and e-commerce  communications, system  and  device  connectivity,  and  business-to-business  and business-to-consumer transactions.

Application software,  such as retail point-of-sale software and e-commerce shopping  cart  software,  typically  does not provide  payment  processing capabilities. Our software provides the  connectivity  and  communications  to facilitate  the processing of credit card,  debit card,  and check transactions which are passed to our software by a wide variety of application software. Our customers for payment processing products and services range from small to large Internet marketers, retailers,  and mail and phone order companies.  Our IBM midrange  software products and  services  provide  e-mail  capabilities  and connectivity and communications  to other computer systems or devices, such as barcode data collection equipment and materials handling equipment.

Our  products and services  are branded  according to the  subsidiary  that markets them. Our subsidiary,  GO Software, Inc. ("GO Software") markets payment processing software,  including PCCharge,  RiTA, AS/400 Support for POS-port and JavaCard.  Our subsidiary,  S.A.F.E.  Systems,  Inc.  ("S.A.F.E.")  markets  a host-based, magnetic  stripe stored value/gift  card system and markets credit card processing and other transaction-based  products and services to merchants. Another subsidiary,  Net400, Inc. ("Net 400") markets software for IBM midrange computers  that facilitates  e-mail and e-commerce  communications, system and device  connectivity,  and  business-to-business  and  business-to-consumer transactions, including Mail400, Serial400 and Socket400 products.

We were  incorporated in Delaware in 1990 as Net/Tech  International,  Inc. ("NTTI").  On August 10,  2000, we completed a reverse merger that merged Results Oriented  Integration Corporation ("ROI") into a wholly-owned subsidiary of NTTI, which at the time had no  operations.  The name of the  company  was  changed to Return On Investment Corporation. Our principal executive offices are located at 1825 Barrett Lakes Boulevard,  Kennesaw,  Georgia 30144 and our telephone number is (770) 517-4750.

RECENT ACQUISITIONS

Until February 2001, we provided payment  processing  software only for IBM midrange computer systems (IBM iSeries and IBM AS/400) in the United States. Our strategy  included  using some of the  capital  provided  by our August 10,  2000 private  placement  to  develop  versions  of our software  for other  computer systems, such as Unix, Linux and Windows systems.  However, our primary strategy was to pursue  acquisitions  of other  software  companies  whose products  are complementary to our products.

In February 2001,  we acquired Net400, which provides  software  that facilitates  e-mail  and  e-commerce  communications,  system  and  device connectivity,  and business-to-business  and business-to-consumer  transactions. All of the issued and  outstanding  shares of Net400 common stock were exchanged in the merger for 300,000 shares of our common stock.  Of those shares,  100,000 shares were delivered to the former Net400  shareholders and 200,000 shares are being held in  escrow,  to be  released  based on sales of Net400  products  and services  during the two-year period ending January 31, 2003, at the rate of one share for each $3.50 in sales.  All escrowed shares are subject to release if we are acquired.

In February 2001,  we acquired S.A.F.E.,  which provides a host-based, magnetic  stripe stored value/gift  card system and markets credit card processing and other transaction-based products and services to merchants. All of the

1

issued and outstanding shares of S.A.F.E. common stock were exchanged in the merger for 400,000 shares of our common stock. Of those shares, 300,000 shares were delivered to the former S.A.F.E. shareholders and 100,000 shares are being held in escrow, to be released if at least $5,000,000 has been contributed to our net revenue by the sale of S.A.F.E. software and services (excluding equipment sales) for the period commencing with the effective date of the merger and ending June 30, 2002. All escrowed shares are subject to release if we are acquired.

In May 2001, we acquired GO Software, from Network Commerce, Inc. ("Network Commerce"). GO Software is recognized as a leader in Windows based payment processing solutions with over 35,000 activations of its PCCharge products. In addition, GO's new Java engine, RiTA, is designed to work on virtually any platform including Windows, Unix, Linux, OS/390, OS/400, and Sun Solaris. RiTA complements the new product design that we recently created and is expected to be the foundation for the next generation of our products. The consideration for the acquisition was $1,000,000 in cash and 1,000,000 shares of our common stock, valued at approximately $2,340,000. The merger agreement stipulated that if these shares were not registered with the SEC in an appropriate filing and that filing declared effective by the SEC by August 31, 2001, then the Company would repurchase 166,667 of these shares at $3 per share. Since these were not registered by August 31, 2001, we repurchased the requisite number of shares by September 17, 2001.

These acquisitions have allowed us to broaden our offerings to include (i) payment processing software for virtually any computing platform including Windows, Unix, Linux, AIX, OS/390, OS/400, and Sun Solaris; (ii) transaction processing services for credit, debit, checks, ACH, international transactions, and stored value/gift cards; and (iii) software for IBM midrange computers that facilitates e-mail and e-commerce communications, system and device connectivity, and business-to-business and business-to-consumer transactions.

STRATEGY

Our short-term goal is to be a recognized leader in providing payment processing software and services to merchants in the United States and later expand internationally. The following are the key elements of our strategy:

o   Cross-sell Products and Services. As we have grown by acquisition, we have acquired new customers that could benefit from additional products and services that we sell. We also have acquired new product and service lines that could benefit our existing customers. By taking advantage of opportunities to cross-sell our products and services, we believe we can decrease our cost of sales and increase our revenues and gross margins.

o   Acquire Complementary Businesses and Products. A key element of our growth strategy has been to pursue potential acquisitions that offer opportunities to increase our sales revenues, gross margins and market share. By acquiring businesses that offer products that complement our existing products, we decrease the training time required for our sales force to become familiar with the product and increase the likelihood that one or more of our products will meet the needs of existing and potential customers.

o   Improve our Product Offerings. To compete effectively, and expand our market share, we must continually develop and introduce new products and enhancements that reflect technological developments and emerging industry standards. We plan to improve and expand our product and service offerings on an ongoing basis through acquisitions of complementary product lines and our internal research and development efforts.

o   Expand our Operations into International Markets. We believe there is a significant opportunity to establish ROI as a recognized provider of e-transaction middleware in international markets. To capitalize on this opportunity, we plan to globalize our suite of products and services and form strategic alliances with international partners to provide global distribution channels.

o   Leverage Existing and Develop New Strategic Partnerships. We have strategic partnerships with hundreds of application software marketing, consulting, computer systems and transaction processing firms. These companies recommend our products and in many cases buy our products and resell them to their customers. We intend to fully support their efforts to maximize sales and plan to continue to recruit new companies as partners.

PRODUCTS AND SERVICES

Products

Our subsidiary, GO Software, markets payment processing software, including PCCharge, JavaCard, AS/400 Support for POS-port, and RiTA. PCCharge provides payment processing for Windows based application. JavaCard and AS/400 Support for POS-port operate on IBM midrange computer systems. RiTA is designed to work on virtually any platform including Windows, Unix, Linux, OS/390, OS/400 and Sun Solaris. RiTA is expected to be the foundation for the next generation of ROI payment processing software products written in Java and XML. The Company charges license fees for the use of these software products. The retail prices for a single license range significantly, from hundreds of dollars for a PC to thousands of dollars for an IBM midrange system to tens of thousands of dollars for a mainframe system. The total license fee depends upon the platform, the functionality and the number of connections required to process the transactions. In addition, we offer annual support and update service typically priced at a percentage of the license fee.

GO Software's payment processing software products support credit/debit cards, checks, ACH transactions, and stored value/gift/loyalty cards. The products can support all levels of transaction volume and operate in any merchant environment, including retail point-of-sale, phone/mail order, and Internet e-commerce. The products offer fast authorization time, security, encryption, advanced fraud protection and advanced cardholder authentication, which can result in lower transaction fees for the merchant. GO's payment processing software can be interfaced with any application software via standard programming languages. With this software, the merchant can use any major bank or financial network to authorize and settle payment transactions.

Our subsidiary, S.A.F.E., processes magnetic stripe stored value, gift, and loyalty cards, credit cards, debit cards and checks. It also provides other transaction-based services to merchants. Charges are based upon functionality, usage and volume and range from a few cents to a dollar or more per transaction. The transactions are communicated to S.A.F.E.'s data center and passed on to other processors for authorization and settlement, except for private label credit card, stored value, gift card, and loyalty card transactions which are processed by S.A.F.E.

NetMail*400 products, provided by our Net400 subsidiary, empower IBM midrange systems to perform e-mail, principally in the area of electronic commerce. IBM midrange systems applications and users need to be able to communicate with customers and vendors using e-mail. Examples of application enablement for e-mail include: order confirmation, shipment notification, customer relationship management (CRM), and customer support. Using NetMail*400 products, an IBM midrange systems application can also send e-mail alert messages, send messages to alphanumeric pagers, and send e-mail messages to wireless PCS devices.

The other primary Net400 products, Serial and Sockets, provide communications and connectivity for IBM midrange systems applications to other systems and devices, such as barcode data collection equipment and materials handling equipment. Net400 Serial and Sockets products simplify programming by handling all of the protocol conversion required for communications.

Technical and Support Services

We offer customers varying levels of technical support services including periodic software updates and twenty-four hour, seven days a week access to telephone support and support-related information via the Internet. We also offer training and consulting services. Through our active alliance partner program, we recruit consulting, application software, and system integration firms to market and implement our software. We also offer customers technical consulting and outsourcing of computer operations, primarily related to transaction processing.

CUSTOMERS

We have licensed over 40,000 PC systems to use our PCCharge payment processing software. We have licensed over 1,600 systems in the IBM midrange market (IBM iSeries and AS/400 computer systems) to use our other software. Our customers for payment processing products and services range from small to large Internet marketers, retailers, and mail and phone order companies. Our Net400 products are used by companies across a wide variety of

3

industries. Our S.A.F.E. customers are typically retail chains, although we do provide services to smaller merchants. No one customer accounts for more than 10% of operating revenues.

SALES

To reach our potential customer base, we have several distribution channels, including a direct sales force and over 200 strategic alliances with consultants, software developers, systems integrators, financial institutions and financial transaction processors.

Our products and services are used by many types of customers in various industries. Our direct sales staff has substantial knowledge of our products and service offerings and we will continue to recruit and train sales people. An important element of our sales strategy is to expand our relationships with the alliance partners described above to increase market awareness and acceptance of our software and services. Some of our sales people are dedicated to working with our alliance partners. We also provide training and other support necessary to our alliance partners to aid in the promotion and sale of our products.

MARKETING

The target market for our payment processing products and services range from small to large Internet marketers, retailers, and mail and phone order companies. Application software, such as retail point-of-sale software and e-commerce shopping cart software, typically does not provide payment processing capabilities. Our software provides connectivity and communications to facilitate the processing of credit card, debit card, and check transactions. The market for our IBM midrange software products and services includes companies that need e-mail capabilities on their IBM midrange systems and companies that need to connect their IBM midrange systems to other computer systems or devices, such as barcode data collection equipment and materials handling equipment.

Our corporate marketing staff performs core marketing functions for all subsidiaries, including product marketing, marketing communications, public relations and investor relations. The corporate marketing department also produces collateral material for distribution to prospects including demonstrations, presentation materials, white papers, case studies, articles, brochures and data sheets.

Our marketing staff has an in-depth understanding of the payment processing software and services marketplace and the IBM midrange marketplace and the needs of customers in those marketplaces, as well as experience in all of the key marketing disciplines. Our staff also has broad knowledge of our products and services and how they can meet customer needs. We utilize focused marketing programs that are intended to attract potential customers in our target markets and to promote ROI, our subsidiaries, and our brands. We use seminars, advertising, telemarketing, direct mail, tradeshows, speaking engagements, public relations campaigns, partner conferences and web site marketing. We devote substantial resources to supporting the sales team with high quality sales tools and collateral materials.

RESEARCH AND PRODUCT DEVELOPMENT

The markets for our products are characterized by rapidly changing technologies and evolving industry standards. Our future success will depend to a substantial degree upon our ability to enhance our existing products and to develop and introduce, on a timely and cost-effective basis, new products and features that meet changing customer requirements and emerging and evolving industry standards. We anticipate an increase in research and development costs with the vast majority of our research and development focusing on the enhancement and evolution of our RiTA product line.

COMPETITION

The markets for our products and services are highly fragmented and served by numerous firms, many of which address only specific aspects of a particular market. We believe the principal competitive factors that we face are reputation and quality of service, relative price and performance, time to market for new product introductions, adherence to industry standards, technical expertise and product availability.

4

Based on our industry experience, we believe that we are a dominant company in the United States in the IBM midrange market in terms of number of licenses granted for payment processing software. Competition in the IBM midrange market is expected to grow and companies with greater resources than we have may enter the market. However, we believe that our premier position will help us maintain a substantial market share.

We also believe we have significant market share in payment processing software on Microsoft platforms. First Data Corp. is currently the leading company in the payment processing software market through its recent purchase of the assets of IC Verify from the CyberCash bankruptcy sale.

RiTA, our Java-based payment processing software, operates on virtually any computing platform. Although competitors exist on each different type of computer platform on which RiTA operates, we are not aware of any competitive product that operates on all of the platforms supported by RiTA.

In the IBM midrange e-mail software market, our primary competitors are Computer Keyes and Evergreen. No single company in this market has a dominant position. In the IBM midrange connectivity and communications software market, there are numerous small competitors and the market is highly fragmented.

There are many competitors offering magnetic stripe stored value/gift card systems, credit card processing and other transaction-based products and services to merchants. The size of this potential market allows for many companies to be able to achieve significant sales and to grow sales at a rapid rate.

INTELLECTUAL PROPERTY

Our success is dependent upon developing, protecting and maintaining our intellectual property assets. We rely upon combinations of copyright, trademark and trade secrecy protections, along with contractual provisions, to protect our intellectual property rights in software, documentation, data models, methodologies, data processing systems and related written materials. Copyright protection is generally available under United States laws and international treaties for our software and printed materials. The effectiveness of these various types of protection can be limited, however, by variations in laws and enforcement procedures from country to country. There are no legal lives on any of our intellectual property.

GOVERNMENT REGULATION

Not Applicable

EMPLOYEES

As a result of growth in our business and our recent acquisitions, we have significantly increased our number of employees. As of June 30, 2001, we had a total of 119 full time employees. Our continued success is dependent on our ability to attract and retain qualified employees. Due to the competitiveness in the market for employees, we may experience future difficulty in recruiting and retaining staff. Our employees are not represented by a union or a collective bargaining agreement.

ITEM 2.   DESCRIPTION OF PROPERTIES

The Company leases its administrative, marketing, and research and development facilities under long-term operating leases. Our corporate headquarters and Net400 are located in approximately 14,000 square feet in Kennesaw, Georgia pursuant to a lease expiring in 2005. GO Software is located in approximately 9,785 square feet in Savannah, Georgia pursuant to a lease expiring in 2004. S.A.F.E. is located in approximately 12,500 square feet in Batavia, Illinois pursuant to a lease expiring in 2006.

The Company believes that its facilities are adequate for its current needs and that suitable additional or substitute space will be available as needed to accommodate expansion of the Company's operations.

ITEM 3.    LEGAL PROCEEDINGS

As of the date of this filing, we were not engaged in any legal proceedings that are expected, individually or in the aggregate, to have a material adverse effect on our business.

ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

On May 9, 2001, the shareholders, by written consent, approved the acquisition of GO Software, with 6,540,257 shares voting in favor, no shares voting against, and 3,501,717 shares not voting.

6

PART II

ITEM 5.   MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

MARKET FOR COMMON STOCK

The Company's common stock is traded on the Over The Counter Bulletin Board ("OTCBB") under the market symbol ROIE. OTCBB reported the following high and low sales prices for each quarter for the last year since the reverse merger on August 10, 2000.

| QUARTER ENDED | HIGH | LOW |
|---|---|---|
| 9/30/00(1) | $6.875 | $ 3.00 |
| 12/31/00 | 6.25 | 3.40 |
| 3/31/01 | 4.25 | 2.125 |
| 6/30/01 | 3.80 | 2.375 |

(1)  Represents period from date of reverse merger (August 10, 2000) through September 30, 2000.

The OTCBB is a more limited trading market than the Nasdaq SmallCap Market or Nasdaq National Market and timely, accurate quotations of the price of the Company's common stock may not always be available. You may expect trading volume to be low in such a market. Consequently, the activity of only a few shares may affect the market and may result in wide swings in price and in volume. Additionally, the foregoing quotations reflect inter-dealer prices, without retail markup, markdown, or commission and may not necessarily represent actual retail transaction prices.

HOLDERS

According to the records of the Company's transfer agent, the Company had approximately 1,050 stockholders of record as of August 31, 2001.

DIVIDEND POLICY

The Company's policy has been to reinvest earnings and cash flows to fund future growth. Accordingly, the Company has not paid dividends and does not anticipate declaring dividends on its common stock in the foreseeable future, though there are no restrictions on the payment of such dividends.

RECENT SALES OF UNREGISTERED SECURITIES

On May 14, 2001 the Company completed its acquisition of GO Software and issued the sole shareholder of GO Software 1,000,000 shares of the Company's common stock. 866,667 shares were delivered to the former shareholder of GO Software and 133,333 shares are being held in escrow, to be released on July 10, 2002, less any amounts due (at the rate of $3.00 per share) based on representations made as part of the agreement related to the acquisition.

On February 9, 2001, the Company completed its acquisition of Net400. 100,000 shares were delivered to the former Net400 shareholders and 200,000 shares are being held in escrow, to be released based on sales of Net400 products and services during the two year period ending January 31, 2003, at the rate of one share for each $3.50 in sales. All escrowed shares are subject to release if the Company is acquired.

On February 15, 2001, the Company completed its acquisition of S.A.F.E. 300,000 shares were delivered to the former S.A.F.E. shareholders and 100,000 shares are being held in escrow, to be released if at least $5,000,000 has been contributed to the Company's net revenue by the sale of S.A.F.E. software and services (excluding equipment

7

sales) for the period commencing with the effective date of the merger and ending June 30, 2002. All escrowed shares are subject to release if the Company is acquired.

In November and December of 2000, the Company issued an aggregate of 96,000 shares of common stock in exchange for certain debt which had a carrying value of $302,775.

On August 10, 2000, the Company issued 37,500 shares of common stock to Glenn E. Cohen in connection with his termination agreement with the Company.

On August 10, 2000, the Company issued 2,600,000 shares of common stock for an aggregate consideration of approximately $6.5 million in a private placement to approximately 90 accredited investors. The placement agent for the private placement was First Montauk Securities Corp. who received $646,961 in commission and expenses. Net proceeds after deduction of all related expenses amount to $5,867,927.

On August 10, 2000, we completed a reverse merger that merged ROI into NTTI, a public company that had no significant operations and changed the name of the combined company to Return On Investment Corporation (the "Company"). In accordance with the agreement, NTTI issued (after a 1-for-20 reverse split) a total of 6,118,918 shares of NTTI's Common Stock in exchange for all of the issued and outstanding shares of ROI common stock. All share and per share data have been restated to reflect the stock issuance as a recapitalization of ROI.

All issuances of securities described above were made in reliance on the exemption from registration provided by Section 4(2) of the Securities Act of 1933, as amended, for transactions by an issuer not involving a public offering.

ITEM 6.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

OVERVIEW

Our Company markets (i) merchant and financial systems and services, (ii) software and services for IBM midrange computer systems (IBM iSeries and IBM AS/400) and (iii) related computer consulting services. The merchant and financial systems and services are typically used in applications related to retail, mail and phone order, and Internet e-commerce. The IBM midrange systems software is categorized as "e-transaction middleware," meaning that it provides the connectivity and communications to facilitate the processing of electronic transactions, primarily related to credit card, debit card, and check processing.

On August 10, 2000, we completed a reverse merger that merged ROI into NTTI, a public company that had no significant operations and changed the name of the combined company to Return On Investment Corporation (the "Company"). As a result of the reverse merger, ROI's shareholders gained a controlling interest in the Company and ROI management replaced NTTI's management. As such, the transaction was accounted for as a reverse merger. The historical financial statements of ROI replaced the financial statements of NTTI and ROI's year end of June 30 was adopted by the Company. In accordance with the agreement, NTTI issued (after a 1-for-20 reverse split) a total of 6,118,918 shares of NTTI's Common Stock in exchange for all of the issued and outstanding shares of ROI common stock. All share and per share data have been restated to reflect the stock issuance as a recapitalization of ROI.

Our results of operations include the operations of Return On Investment Corporation (the "Company") and its subsidiaries. Operations for the subsidiaries acquired during 2001 are included from the date of acquisition. Accordingly, the 2001 results of operations include Net400 and S.A.F.E., since February 2001, and include GO Software, since May 2001.

Due to our acquisition activities, year-to-year comparisons of results of operations are not necessarily meaningful. Additionally, as a result of our pursuit of a growth strategy focusing on marketing, sales, and software development synergies gained as a result of eliminating duplicate functions, the results of operations are significantly different than the result of combining the previous operations of each acquired company into our

8

Company. As a result, pro forma comparisons are not necessarily meaningful. See "Acquisitions During Fiscal 2001" below for more information about our recent acquisitions.

For fiscal 2001, we have categorized our three primary sources of revenue as license fees, support and update services, and consulting fees. In future periods, we will report transaction processing as an additional source of revenue. License fees are earned by granting customers licenses to use the Company's proprietary software products. Revenue from support and update services is comprised of fees for providing customer support, 24 hours a day, 365 days a year, and periodic updates to our software products as part of our continuing effort to provide total customer service and access to the latest technology available. Consulting fees are earned by providing services to customers including systems analysis and design, programming, training, and outsourcing of computer operations. Transaction processing revenue will be comprised of fees for providing merchants with stored value/gift card processing and a gateway that allows access to financial networks for payment processing related to credit cards, debit cards, checks and similar items.

Our revenues may vary from quarter to quarter due to market conditions, the budgeting and purchasing cycles of customers and the effectiveness of our sales force and our alliance partners. We typically do not have a material backlog of unfilled software orders, and product revenue in any quarter is substantially dependent upon orders received in that quarter. Because our operating expenses are based on anticipated revenue levels and are relatively fixed over the short term, variations in the timing of generation of revenues can cause significant variations in operating results from quarter to quarter. Fluctuations in operating results may result in volatility in the price of our common stock. Our operating results may fluctuate significantly as a result of a variety of factors, many of which are beyond our control.

RESULTS OF OPERATIONS

During fiscal 2001, our net loss was $2,614,444 on $3,774,664 in revenues compared to a net loss of $666,484 on $2,193,265 in revenues in fiscal 2000. During 2001, pre-acquisition products and services growth was 23% and accretive sales from our acquisitions created additional growth of 49%.

Increased losses during 2001 as compared to 2000 were largely the result of planned expenditures from the proceeds of our August 2000 private placement for research and development, sales and marketing, corporate infrastructure, expenses related to the integration of our newly acquired subsidiaries and non-cash expenses related to depreciation and amortization.

REVENUES

| CATEGORY: | YEARS ENDING JUNE 30, | | |
| | 2001 | CHANGE | 2000 |
| License Fees and Other | $2,395,468 | 44% | $1,659,091 |
| Percentage of Revenue | 64% | | 76% |
| Support and Update Services | $ 771,575 | 44% | $ 534,174 |
| Percentage of Revenue | 20% | | 24% |
| Consulting Fees | $ 607,621 | 100% | -- |
| Percentage of Revenue | 16% | | 0% |

The increase in license fee revenue during 2001 was due to stronger demand for the Company's payment processing software which was the result of additional marketing efforts, while the remaining increase was primarily the result of the acquisition of GO Software which contributed additional license fee revenue of approximately $500,000. Exclusive of acquisitions, the Company's pricing structure remained substantially the same during 2001 as compared to 2000. The acquisition of GO Software did not alter the Company's pricing structure for our existing products which operate on IBM midrange computers. Pricing for GO Software's products covers a broad range because software pricing is typically based on the computer platform on which the software operates.

The increase in support and update services was due to continued sales of licenses creating new customers for these services and strong retention of our existing customers. Our growth was parallel to our license fee revenue increases.

Consulting fee revenue for 2001 primarily represents fees for providing programming and computer support services by S.A.F.E., which was acquired in February 2001. In prior years there were no such revenues.

OPERATING EXPENSES

| | YEARS ENDING JUNE 30, | | |
|---|---|---|---|
| OPERATING EXPENSES: | 2001 | CHANGE | 2000 |
| Sales & Marketing | $ 889,442 | 112% | $ 419,651 |
| Percentage of Revenue | 24% | | 19% |
| General And Administrative | $4,044,704 | 99% | $2,031,583 |
| Percentage of Revenue | 107% | | 93% |
| Research and Development | $ 736,627 | 100% | -- |
| Percentage of Revenue | 20% | | -- |
| Depreciation and Amortization | $ 618,921 | 91% | $ 323,464 |
| Percentage of Revenue | 16% | | 15% |
| Merger Expenses | $ 243,264 | 100% | -- |
| Percentage of Revenue | 6% | | -- |

SALES AND MARKETING EXPENSES

We have made the strategic decision to exert significant efforts to grow both domestic sales and ultimately international sales through continued development of indirect channels and alliance partners. However, we also sell our products through our direct sales force, which we will continue to develop. Sales and marketing expenses in 2001 increased primarily due to more aggressive and expanded sales and marketing efforts. These efforts reflect management's commitment to increase sales to expanding markets, both within our traditional IBM midrange systems marketplace, as well as the new markets we have entered through our acquisitions. As a result, sales commissions increased $98,000 in line with our increased sales. Expenses related to the marketing efforts of GO Software resulted in additional charges of $135,000 while the remaining increase in expenses related primarily to additional payroll and payroll related expenses related to our hiring initiatives required for our planned growth. We expect to continue our aggressive marketing efforts at a similar percentage of revenues in 2002 as we seek to claim additional market share.

GENERAL AND ADMINISTRATIVE EXPENSES

General and administrative expenses consist primarily of salaries and occupancy costs for administrative, executive, and finance personnel. These expenses increased primarily due to the ramping up of our infrastructure and administration in accordance with our long-term strategic growth objectives. As a result, costs of facilities increased $165,000, strategic consulting fees related to advisory and capital development increased $309,000, incremental general and administrative expenses related to acquired subsidiaries resulted in an increase of $1,075,000, while the remaining increase in expenses was directly due to our growth objectives related primarily to additional payroll and payroll related expenses based on our hiring initiatives required for our planned growth. Professional fees increased $150,000 in 2001 primarily as a result of incremental accounting and legal services incurred due to our acquisitive activities this year and our first full year of SEC reporting requirements. Depreciation and amortization increased $295,457 primarily as a result of additional depreciation due to our increased investment in fixed assets as well as the amortization of intangible costs associated with our acquisitions.

10

RESEARCH AND DEVELOPMENT

Research and development expenses totaled $736,267 in 2001compared to zero in 2000. Initiation of research and development expenses and the rate of spending for fiscal year 2001 was due to planned expenditures in accordance with our long-term objectives which in part revolves around the belief that such expenditures are essential to maintain our competitive position. The Company spent $508,000 enhancing our JavaCard product and $160,000 in developing stored value/gift card software. We expect these costs to continue to constitute a similar percentage of revenues in 2002 as we anticipate an increase in research and development costs with the vast majority of our focus on the enhancement and evolution of our RiTA product line. It is expected that 33% of research and development resources during 2002 will be spent on RiTA enhancement, 35% for PCCharge enhancement, 20% for JavaCard enhancement, 10% for stored value/gift card systems and the remainder on other projects.

MERGER-RELATED EXPENSES

During fiscal year 2001, the Company expensed $243,264 of direct merger-related costs in conjunction with the reverse merger of the Company with NTTI. Costs primarily consisted of legal and accounting and other professional fees, together with expenses paid in conjunction with the merger.

ACQUISITIONS DURING FISCAL 2001

On February 9, 2001 and February 15, 2001 we acquired 100% of the outstanding stock of Net400 and S.A.F.E., respectively. Net400 provides software that facilitates e-mail and e-commerce communications and business transactions. As consideration, we issued 100,000 shares of common stock valued at approximately $204,000. S.A.F.E. provides a host-based, magnetic stripe stored value card system and markets credit card processing and other transaction based products and services to merchants. As consideration, we issued 300,000 shares of common stock valued at approximately $612,000. Both acquisitions were recorded using the purchase method of accounting and, therefore, the results of operations since their acquisition dates have been included within the consolidated financial statements. In conjunction with the above acquisitions, a total of 300,000 shares are contingently issuable based on the achievement of certain earn out provisions in future periods.

On May 14, 2001 ("Closing Date"), we acquired 100% of the outstanding stock of GO Software from Network Commerce. This acquisition was accounted for in accordance with the purchase method of accounting and therefore since the acquisition date the results of GO's operations have been included within the consolidated financial statements. The consideration for the acquisition was $1,000,000 in cash and 1,000,000 shares of our common stock, valued at approximately $2,340,000. The merger agreement stipulated that if these shares were not registered with the SEC and in an appropriate filing and that filing declared effective by the SEC by August 31, 2001, then the Company would repurchase 166,667 of these shares at $3 per share. Since these were not registered by August 31, 2001, we repurchased the requisite number of shares by September 17, 2001.

The merger agreement contains put and call provisions which expire 18 months subsequent to the Closing Date. The put provision states that Network Commerce may elect to sell back to the Company any or all of the shares of the our common stock that it holds in the event that the stock price, at any given time, is less than 67% of the market value of the stock as of the closing date. The call provision states that we may elect to repurchase the shares issued to Network Commerce if the stock price has exceeded 133% of the market value of the stock as of the Closing Date.

LIQUIDITY AND CAPITAL RESOURCES

In 2001, cash used in operations was primarily the result of our net loss of $2,614,444 offset by non-cash charges of $238,159 for bad debts and $618,921 for depreciation and amortization. Our bad debt expense includes a $150,000 write-down of a $500,000 note receivable from a third party. Increases in accounts receivable used cash of $270,623 while increases in deferred revenue provided cash of $511,136. Increases in accounts receivable were caused primarily by increased revenues during the year. Increased deferred revenue was also caused by our revenue growth as well as longer software installation periods. In 2001, cash used for operations primarily was in accordance with management's strategic plan for increased infrastructure costs, increased sales and marketing expenditures, substantial research and development costs, and costs associated with the integration of newly merged subsidiaries.

11

In 2000, cash provided by operations of $123,514 was primarily the result of our net loss of $666,484 being offset by non-cash charges of $407,975 and increases in deferred revenues of $503,785.

Cash provided by financing activities in 2001 was primarily the result of our $6,500,000 private placement which resulted in net proceeds of $5,867,927. We utilized these proceeds, in part to reduce our long-term debt and notes payable by an aggregate of $895,692.

Cash used in investing activities in 2001 was primarily the result of cash paid for acquisitions of $1,420,582, increases in notes receivable of $500,000 and property and equipment purchases of $206,004. The note receivable arose in anticipation of a business combination that ultimately did not close. The debtor has represented to us that payment will be remitted during our second quarter, 2002.

On September 17, 2001 we received an advance payment from a customer in the amount of $1,000,000 to be applied to license fees and referral fees earned by us over a three year period. Under the agreement, we have escrowed certain software that is subject to release to the customer upon default by us. We used $454,118 from this advance to pay off the balance of the $500,000 note to Network Commerce that arose on August 31, 2001 in accordance with the GO Software merger agreement, under the terms of which 166,667 shares of our common stock that was issued in connection with that acquisition were returned to us. $545,882 of the advance has been retained by our Company as working capital.

The acquisition of GO Software has caused duplication and excess capacity in certain areas. We are in the process of realigning personnel and implementing a cost reduction plan in the first quarter of fiscal 2002. Reductions relate to areas not essential to the production of revenue or customer support and areas that are not expected to contribute to profitability during 2002.

We have taken assertive action to make cash flow from operations positive for this fiscal year. A substantial amount of the cash used in 2001 was the result of non-recurring expenses including reverse merger costs of $243,264, expenditures related to the integration of acquisitions of approximately $750,000, increased professional fees in conjunction with the mergers and filing of statements with regulatory authorities of approximately $120,000. We have no long-term debt at this time and we have built our infrastructure in accordance with our growth plans and should not require material additional funds for expansion. We have determined to forego any further acquisitions in the near term and to focus on current operations within the core competencies of our existing business. This should allow us to achieve positive cash flow from operations during the current fiscal year, though no assurances can be made.

In order to meet our strategic objectives, we may require certain reductions of planned expenditures for tactical operating commitments. We are currently exploring financing opportunities with respect to certain assets (i.e. accounts receivable and property). In addition we have increased collection efforts to ameliorate a slower than desired days in accounts receivable which approximated 113 during 2001. We are considering raising additional capital through investment banking resources. To the extent that we obtain additional financing, the terms of such financing may involve rights, preferences or privileges senior to our common stock and stockholders may experience dilution. We cannot provide any assurances that any of the above attempts to raise capital will be successful. At this time, we have no available credit lines or other loan facilities in place, though we believe that current cash reserves and cash flow from operations in the normal course of business will be adequate in 2002. At a minimum, this will require the sustainability of current revenue levels, which we believe is likely, though no absolute assurances can be given. If we cannot maintain current revenue levels, immediate action to reduce costs will be required unless capital sources can be identified.

In accordance with the GO Software merger, there exist certain put and call provisions which expire 18 months subsequent to the May 14, 2001 closing date. The put provision states that Network Commerce, GO Software's former parent company, may elect to sell back to us any or all of the shares of common stock it holds in the event that the stock price, at any given time, is less than 67% of the market value of the stock as of the closing date, which was $3.00 per share. The call provision states that we may elect to repurchase the shares issued to Network Commerce if the stock price has exceeded 133% of the market value of the stock as of the closing date. If the put provision is exercised by Network Commerce, the obligation would result in Network Commerce becoming a general unsecured creditor of ours.

12

FORWARD-LOOKING STATEMENTS

As described by the following factors, past financial performance should not be considered to be a reliable indicator of future performance, and investors should not use historical trends to anticipate results or trends in future periods.

This filing contains forward-looking statements within the safe harbor provisions of the Private Securities Litigation Reform Act. These statements include or are related to our financial condition, results of operations and future results, including certain projections and business trends. Assumptions relating to forward-looking statements involve judgments with respect to, among other things, future economic, competitive and market conditions and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond our control. When used in this filing, the words "estimate," "project," "intend," "believe," "expect," "anticipate", "plan", "seek," and similar expressions are intended to identify forward-looking statements. Although we believe that assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate, and we may not realize the results contemplated by the forward-looking statement. Management decisions are subjective in many respects and susceptible to interpretations and periodic revisions based on actual experience and business developments, the impact of which may cause us to alter our business strategy or capital expenditure plans that may, in turn, affect our results of operations. In light of the significant uncertainties inherent in the forward-looking information included in this filing, you should not regard the inclusion of such information as our representation that we will achieve any strategy, objective or other plans. The forward-looking statements contained in this filing speak only as of the date of this filing as stated on the front cover, and we have no obligation to update publicly or revise any of these forward-looking statements.

These and other statements that are not historical facts are based largely on management's current expectations and assumptions and are subject to a number of risks and uncertainties that could cause actual results to differ materially from those contemplated by such forward-looking statements.

13

ITEM 7.    FINANCIAL STATEMENTS

RETURN ON
INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED FINANCIAL STATEMENTS
YEARS ENDED JUNE 30, 2001 AND 2000

RETURN ON
INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

========================================================================

CONSOLIDATED FINANCIAL STATEMENTS
YEARS ENDED JUNE 30, 2001 AND 2000

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONTENTS

=================================================================

REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS                2

CONSOLIDATED FINANCIAL STATEMENTS

    Consolidated balance sheets                                 3-4

    Consolidated statements of loss                               5

    Consolidated statements of redeemable common stock and
    shareholders' equity (capital deficit)                        6

    Consolidated statements of cash flows                         7

    Notes to consolidated financial statements                 8-26

REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

To the Board of Directors and Shareholders
of Return On Investment Corporation and Subsidiaries d/b/a ROI Corporation

We have audited the accompanying consolidated balance sheets of Return On Investment Corporation and subsidiaries d/b/a ROI Corporation as of June 30, 2001 and 2000, and the related consolidated statements of loss, redeemable common stock and shareholders' equity (capital deficit) and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ROI Corporation and subsidiaries as of June 30, 2001 and 2000 and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

/s/ BDO Seidman, LLP

Atlanta, Georgia
September 24, 2001

F-2

| June 30, | 2001 | 2000 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT** | | |
| Cash and cash equivalents (Note 1) | $ 1,244,031 | $ 28,568 |
| Accounts receivable, less allowance for doubtful accounts of $157,900 and $51,800, respectively | 1,513,429 | 612,308 |
| Note receivable, less allowance of $150,000 (Note 4) | 350,000 | -- |
| Prepaid expenses and other current assets | 182,711 | 131,503 |
| Total current assets | 3,290,171 | 772,379 |
| PROPERTY AND EQUIPMENT, NET (Note 3) | 1,589,354 | 939,685 |
| GOODWILL AND OTHER INTANGIBLES, NET (Note 2) | 3,755,382 | -- |
| OTHER | 190,000 | -- |
| | $ 8,824,907 | $ 1,712,064 |

F-3

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED BALANCE SHEETS

| June 30, | 2001 | 2000 |
|---|---|---|
| LIABILITIES AND REDEEMABLE COMMON STOCK AND SHAREHOLDERS' EQUITY (CAPITAL DEFICIT) | | |
| CURRENT LIABILITIES | | |
| Line of credit (Note 5) | $ -- | $ 200,000 |
| Accounts payable | 249,527 | 104,673 |
| Accrued expenses | 596,439 | 230,076 |
| Note payable- shareholder (Note 6) | 118,100 | -- |
| Current portion of long - term debt - shareholder (Note 7) | -- | 198,484 |
| Current portion of long - term debt - other (Note 7) | 14,560 | 22,292 |
| Deferred revenue (Note 1) | 1,478,491 | 683,062 |
| Other | 200,000 | 72,000 |
| Total current liabilities | 2,657,117 | 1,510,587 |
| Long - term debt - shareholder, less current portion (Note 7) | -- | 490,548 |
| Long - term debt - other, less current portion (Note 7) | 12,878 | 16,701 |
| Other long - term liabilities | -- | 257,025 |
| Total liabilities | 2,669,995 | 2,274,861 |
| COMMITMENTS (Notes 2, 9 and 13) | | |
| REDEEMABLE COMMON STOCK ($3 PER SHARE REDEMPTION VALUE) (Note 2) | 2,340,000 | -- |
| SHAREHOLDERS' EQUITY (CAPITAL DEFICIT) (Note 1) | | |
| Common stock, 0.01 par value (100,000,000 shares authorized) | 97,480 | 61,189 |
| Additional paid-in capital | 6,984,223 | 28,361 |
| Accumulated deficit | (3,266,791) | (652,347) |
| Total shareholders' equity (capital deficit) | 6,154,912 | (562,797) |
| | $ 8,824,907 | $ 1,712,064 |

See accompanying notes to consolidated financial statements.

F-4

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED STATEMENTS OF LOSS

| Years ended June 30, | 2001 | 2000 |
|---|---|---|
| **REVENUE** (Note 1) | | |
| License fees | $ 2,355,330 | $ 1,642,569 |
| Support and update services | 771,575 | 534,174 |
| Consulting fees | 607,621 | -- |
| Other | 40,138 | 16,522 |
| Total revenue | 3,774,664 | 2,193,265 |
| **OPERATING EXPENSES** | | |
| Research and development costs | 736,627 | -- |
| General and administrative (including non-cash compensation expense of $0 and $84,511 in 2001 and 2000, respectively) | 4,663,625 | 2,355,047 |
| Sales and marketing | 889,442 | 419,651 |
| Merger costs (Note 1) | 243,264 | -- |
| Total operating expenses | 6,532,958 | 2,774,698 |
| Operating loss | (2,758,294) | (581,433) |
| Interest income | 181,708 | -- |
| Interest expense | (37,858) | (85,051) |
| NET LOSS | $ (2,614,444) | $ (666,484) |
| BASIC AND DILUTED LOSS PER COMMON SHARE (Note 1) | $ (0.28) | $ (0.11) |
| BASIC AND DILUTED WEIGHTED AVERAGE COMMON SHARES OUTSTANDING (Note 1) | 9,414,476 | 6,064,414 |

See accompanying notes to consolidated financial statements.

F-5

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED STATEMENTS OF REDEEMABLE COMMON STOCK
AND SHAREHOLDERS' EQUITY (CAPITAL DEFICIT)
YEARS ENDED JUNE 30, 2001 AND 2000

| | Common Stock | | Redeemable Common Stock | | Additional Paid-In Capital | Retained Earnings (Deficit) | Total |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| BALANCE, June 30, 1999 | 5,955,407 | $ 1,333 | -- | $ -- | $ 14,237 | $ -- | $ 15,470 |
| Recapitalization | -- | 58,221 | -- | -- | (58,221) | -- | -- |
| Stock options exercised | 163,511 | 1,635 | -- | -- | 86,582 | -- | 88,217 |
| Net loss | -- | -- | -- | -- | -- | (666,484) | (666,484) |
| BALANCE, June 30, 2000 | 6,118,918 | 61,189 | -- | -- | 28,361 | (652,347) | (562,797) |
| Common stock issued in connection with reverse acquisition | 527,056 | 5,271 | -- | -- | -- | -- | 5,271 |
| Common stock issued in private placement, net of related expenses | 2,600,000 | 26,000 | -- | -- | 5,841,927 | -- | 5,867,927 |
| Redeemable common stock issued in acquisition of business | -- | -- | 1,000,000 | 2,340,000 | -- | -- | 2,340,000 |
| Common stock issued on conversion of debt | 96,000 | 960 | -- | -- | 301,815 | -- | 302,775 |
| Common stock issued in acquisition of businesses | 400,000 | 4,000 | -- | -- | 812,000 | -- | 816,000 |
| Stock options exercised | 6,000 | 60 | -- | -- | 120 | -- | 180 |
| Net loss | -- | -- | -- | -- | -- | (2,614,444) | (2,614,444) |
| BALANCE, June 30, 2001 | 9,747,974 | $ 97,460 | 1,000,000 | $ 2,340,000 | $ 6,964,223 | $(3,266,791) | $ 6,154,912 |

See accompanying notes to consolidated financial statements.

F-6

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

CONSOLIDATED STATEMENTS OF CASH FLOWS

| Years ended June 30, | 2001 | 2000 |
|---|---|---|
| **OPERATING ACTIVITIES** | | |
| Net loss | $ (2,614,444) | $ (666,484) |
| Adjustments to reconcile net loss to | | |
| net cash provided by (used in) operating activities: | | |
| Non-cash compensation expense | -- | 84,511 |
| Bad debt expense | 238,159 | |
| Depreciation and amortization | 618,921 | 323,464 |
| Changes in working capital items, net of effect of businesses acquired | | |
| Accounts receivable | (270,623) | (211,987) |
| Prepaid expenses and other current assets | (50,850) | (131,503) |
| Accounts payable | (63,482) | 41,652 |
| Accrued expenses | (49,183) | 180,076 |
| Deferred revenues | 511,136 | 503,785 |
| Cash provided by (used in) operating activities | (1,680,366) | 123,514 |
| **INVESTING ACTIVITIES** | | |
| Cash paid for acquisition of businesses, net of cash acquired | (1,420,582) | -- |
| Increase in notes receivable | (500,000) | -- |
| Purchase of property and equipment | (206,004) | (40,431) |
| Cash used in investing activities | (2,126,586) | (40,431) |
| **FINANCING ACTIVITIES** | | |
| Proceeds from the exercise of stock options | 180 | 3,706 |
| Proceeds from the issuance of common stock | 5,867,927 | -- |
| Repayments of long term debt | (695,692) | (193,523) |
| Advances (repayments) under note payable | (200,000) | 200,000 |
| Other liabilities | 50,000 | (64,698) |
| Cash provided by (used in) financing activities | 5,022,415 | (54,515) |
| NET INCREASE IN CASH | 1,215,463 | 28,568 |
| CASH AND CASH EQUIVALENTS, beginning of year | 28,568 | -- |
| CASH AND CASH EQUIVALENTS, end of year | $ 1,244,031 | $ 28,568 |

See accompanying notes to consolidated financial statements.

F-7

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

====================================================================

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

NATURE OF OPERATIONS

Return On Investment Corporation and subsidiaries d/b/a ROI Corporation (the "Company") markets (i) merchant and financial systems and services, (ii) software and services for IBM midrange computer systems (IBM iSeries and IBM AS/400) and (iii) related computer consulting services. The merchant and financial systems and services are typically used in applications related to retail, mail and phone order, and Internet e-commerce. The IBM midrange systems software is categorized as "e-transaction middleware," meaning that it provides the connectivity and communications to facilitate the processing of electronic transactions, primarily related to credit card, debit card, and check processing.

On August 10, 2000, the Company completed a reverse merger that merged Results Oriented Integration Corporation ("ROI") into Net/Tech International, Inc. ("NTTI"), a public company that had no significant operations and changed the name of the combined company to Return On Investment Corporation. As a result of the reverse merger, ROI's shareholders have a controlling interest in the Company and ROI management replaced NTTI's management. As such, the transaction was accounted for as a reverse merger. The historical financial statements of ROI replaced the financial statements of NTTI and ROI's year end of June 30 was adopted by the Company. In accordance with the agreement, NTTI issued (after a 1-for-20 reverse split) a total of 6,118,918 shares of NTTI's Common Stock in exchange for all of the issued and outstanding shares of ROI common stock. All share and per share data have been restated to reflect the stock issuance as a recapitalization of ROI. Merger expenses in conjunction with the revenue merger amounted to $243,264.

In conjunction with the reverse merger, a total of 3,765,930 shares of common stock were placed in escrow in the names of two officers of the Company and one director. Those shares represent the balance of shares issued by NTTI for these individuals' prior proportionate interest in ROI. The shares, since issued, have been fully voting and subject to all the rights and privileges afforded to all shareholders. These shares will be released from escrow from time to time over a six year period based on predetermined financial thresholds or in full upon acquisition of the Company. There is no requirement for the officers to remain employees of the Company in order to receive their escrowed shares.

F-8

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

========================================================================

PRINCIPLES OF CONSOLIDATION

The accompanying consolidated financial statements include the accounts of ROI and its wholly owned subsidiaries. All intercompany accounts and transactions have been eliminated.

PROPERTY AND EQUIPMENT

Property and equipment are stated at cost, net of accumulated depreciation and amortization. Depreciation is provided using the straight-line method over the estimated useful lives of the assets, generally ranging from three to seven years. Leasehold improvements are amortized using the straight-line method over the lesser of the lease term and the estimated useful lives of the related assets.

REVENUE RECOGNITION

Revenue from software sales is recognized when all shipment obligations have been met, fees are fixed and determinable, collection of the sales proceeds is deemed probable and persuasive evidence that an agreement exists.

During 2001 and 2000, a majority of revenues were derived from the shipment of software (license fees). License fees are recognized as revenue once the underlying software is accepted by the customer. This is the time at which the Company believes that revenue recognition as described above, has occurred.

Maintenance and support revenue is deferred and recognized ratably over the contractual maintenance period, generally one year.

Revenue from other services is recognized as the services are provided.

CASH AND CASH EQUIVALENTS

The company considers all highly liquid short-term investments with maturities of three months or less when purchased to be cash equivalents.

F-9

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

=======================================================================

SOFTWARE DEVELOPMENT COSTS

Costs incurred, such as planning, designing, coding and testing, for computer software to be sold, leased or otherwise marketed are expensed as incurred prior to establishing the technological feasibility of a product. Technological feasibility is generally achieved when the detail program design or a working model has been completed. For the period between the establishment of technological feasibility and the time a product is available for general release, such costs are capitalized. No such costs were capitalized during either year.

ADVERTISING COSTS

Advertising is charged to expenses during the period in which it is incurred. Total advertising expenses for the fiscal years ended June 30, 2001, and 2000 were $280,404 and $286,712, respectively.

INCOME TAXES

The Company accounts for income taxes in accordance with Statement of Financial Accounting Standards (SFAS) No. 109, Accounting for Income Taxes, which requires an asset and liability approach. This approach results in the recognition of deferred tax assets (future tax benefits) and liabilities for the expected future tax consequences of temporary differences between the book carrying amounts and the tax basis of assets and liabilities. The deferred tax assets and liabilities represent the future tax return consequences of those differences, which will either be deductible or taxable when the assets and liabilities are recovered or settled. Future tax benefits are subject to a valuation allowance when management believes it is more likely than not that the deferred tax assets will not be realized.

NET LOSS PER SHARE

Net loss available to common stockholders per share is presented in accordance with SFAS No. 128, "Earnings Per Share." Basic and diluted net loss available to common stockholders per share is based on the weighted average number of shares of common stock outstanding during the period. In periods in which they have

F-10

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

================================================================

a dilutive effect, common shares contingently issuable and those issuable upon exercise of stock options and warrants will be included in the diluted earnings per share calculation.

As a result of the net losses incurred in the years ended June 30, 2001 and 2000, the following common shares were antidilutive and accordingly, were excluded from the computation of loss per share:

|  | 2001 | 2000 |
|---|---|---|
| Contingently issuable shares | 300,000 | -- |
| Stock options | 325,567 | 9,300 |
| Warrants | 856,664 | -- |
|  | 1,482,231 | 9,300 |

All periods presented have been restated to reflect the effect of the Company's 3.35-for-1 stock split and the 1-for-3 reverse stock split, effective November 1, 1999.

USE OF ESTIMATES

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

GOODWILL AND OTHER INTANGIBLE ASSETS

Intangible assets consist primarily of acquired technology, proprietary concepts, customer lists, contracts and goodwill related to acquisitions accounted for under the purchase method of accounting. The Company identifies and records impairment losses on intangible and other assets when events and circumstances indicate that such assets might be impaired. The Company considers factors such as significant changes in the regulatory or business climate and projected future cash flows from the respective asset. When any such impairment exists the related assets will be written down to fair value.

F-11

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Amortization of these purchased intangibles is provided on the straight-line basis as follows:

| Goodwill | 3-5 years |
| Acquired technology | 5 years |
| Contracts | 2 years |

STOCK-BASED COMPENSATION PLANS

The Company accounts for its stock-based compensation plans under the provisions of Accounting Principles Board Opinion ("APB") No. 25, "Accounting for Stock Issued to Employees." In Note 9, the Company presents the disclosure requirements of Statement of Financial Accounting Standards ("SFAS") No. 123, "Accounting for Stock-based Compensation." SFAS No. 123 requires that companies which elect not to account for stock-based compensation as prescribed by that statement shall disclose, among other things, the pro forma effects on net loss and basic net loss per share as if SFAS No. 123 had been adopted.

IMPACT OF RECENTLY ISSUED ACCOUNTING STANDARDS

In June 1998, the Financial Accounting Standards Board issued SFAS No. 133, Accounting for Derivative Instruments and Hedging Activities. SFAS No. 133 establishes accounting and reporting standards requiring that every derivative instrument, including certain derivative instruments imbedded in other contracts, be recorded in the balance sheet as either an asset or liability measured at its fair value. The statement also requires that changes in the derivative's fair value be recognized in earnings unless specific hedge accounting criteria are met. SFAS No. 137 delayed the effective date of SFAS No. 133 to fiscal years beginning after June 15, 2000. The Company's adoption of SFAS No. 133 did not have a material impact on its financial position or results of operations.

The Financial Accounting Standards Board ("FASB") issued Interpretation No. 44 ("Interpretation"), "Accounting for Certain Transactions involving Stock Compensation, an Interpretation of APB Opinion No. 25" which was effective July 1, 2000. The interpretation clarified (a) the definition of employee for purposes of applying Opinion 25, (b) the criteria for determining whether a stock compensation plan qualifies as a noncompensatory plan, (c) the

F-12

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

==========================================================================

accounting consequence of various modifications to the terms of a previously fixed stock option or award, and (d) the accounting for an exchange of stock compensation awards in a business combination. Adoption of the provisions of the Interpretation did not have a significant impact on the Company's financial statements.

In June 2001, the Financial Accounting Standards Board finalized FASB Statements No. 141, Business Combinations (SFAS 141), and No. 142, Goodwill and Other Intangible Assets (SFAS 142). SFAS 141 requires the use of the purchase method of accounting and prohibits the use of the pooling-of-interests method of accounting for business combinations initiated after June 30, 2001. SFAS 141 also requires that the Company recognize acquired intangible assets apart from goodwill if the acquired intangible assets meet certain criteria. SFAS 141 applies to all business combinations initiated after June 30, 2001 and for purchase business combinations completed on or after July 1, 2001. It also requires, upon adoption of SFAS 142, that the Company reclassify the carrying amounts of intangible assets and goodwill based on the criteria in SFAS 141.

SFAS 142 requires, among other things, that companies no longer amortize goodwill, but instead test goodwill for impairment at least annually. In addition, SFAS 142 requires that the Company identify reporting units for the purposes of assessing potential future impairments of goodwill, reassess the useful lives of other existing recognized intangible assets, and cease amortization of intangible assets with an indefinite useful life. An intangible asset with an indefinite useful life should be tested for impairment in accordance with the guidance in SFAS 142. SFAS 142 is required to be applied in fiscal years beginning after December 15, 2001 to all goodwill and other intangible assets recognized at that date, regardless of when those assets were initially recognized. SFAS 142 requires the Company to complete a transitional goodwill impairment test six months from the date of adoption. The Company is also required to reassess the useful lives of other intangible assets within the first interim quarter after adoption of SFAS 142.

The Company's previous business combinations were accounted for using the purchase method. As of June 30, 2001, the net carrying amount of goodwill and other intangible assets is $3,755,382. Amortization expense during the period ended June 30, 2001 was $204,044. Currently, the Company is assessing but has not yet

F-13

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

================================================================================

determined how the adoption of SFAS 141 and SFAS 142 will impact its financial position and results of operations.

In September 2000, the FASB issued Statement No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities." FASB No. 140 revises the standards for accounting for securitizations and other transfers of financial assets and collateral, and is effective for transfers and servicing of financial assets and extinguishments of liabilities occurring after March 31, 2001. FASB No. 140 did not have a material effect on the financial statements during fiscal year 2001.

F-14

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

==========================================================================

### FAIR VALUES OF FINANCIAL INSTRUMENTS

The Company has a number of financial instruments, including cash, trade receivables, trade payables, and long term debt none of which are held for trading purposes. The Company estimates that the fair value of the financial instruments does not differ materially from the aggregate carrying values recorded in the balance sheet. The estimated fair value amounts have been determined by the Company using available market information and appropriate valuation methodologies. Considerable judgment is required in interpreting market data to develop these estimates of fair value and, accordingly, the estimates are not necessarily indicative of the amounts that the Company could realize in a current market exchange.

### RISKS AND UNCERTAINTIES

The Company is subject to risks and uncertainties in the normal course of business including customer acceptance of its products, rapid technological changes, delays in introducing and market acceptance of new products, competition, e-business developments, ability to attract and retain qualified personnel, ability to protect its intellectual property, and other matters inherent in the software industry.

### RECLASSIFICATION

Certain prior year amounts have been reclassified to conform to current year presentation

2.  BUSINESS COMBINATIONS

On February 9, 2001 and February 15, 2001 the company acquired 100% of the outstanding stock of Net400, Inc. ("Net400") and S.A.F.E. Systems, Inc. ("S.A.F.E."), respectively. Net400 provides software that facilitates e-mail and e-commerce communications and business transactions. As consideration, the Company issued 100,000 shares of common stock valued at approximately $204,000. S.A.F.E. provides a host-based, magnetic stripe stored value card system and markets credit card processing and other transaction based products and services to merchants. As consideration, the Company issued 300,000 shares of common stock valued at approximately $612,000. Both acquisitions were recorded using the purchase method of accounting and, therefore, the results of operations since their

· F-15

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

========================================================================

acquisition dates have been included within the consolidated financial statements. In conjunction with the above acquisitions, a total of 300,000 shares are contingently issuable based on the achievement of certain earn out provisions in future periods.

On May 14, 2001 ("closing date"), the company acquired 100% of the outstanding stock of GO Software, Inc. ("GO") from Network Commerce, Inc. This acquisition was accounted for in accordance with the purchase method of accounting and therefore since the acquisition date the results of GO's operations have been included within the consolidated financial statements. The consideration for the acquisition was $1,000,000 in cash and 1,000,000 shares of the Company's common stock, valued at approximately $2,340,000. The merger agreement stipulated that if these shares were not registered with the SEC in an appropriate filing and that filing declared effective by the SEC by August 31, 2001, then the Company would repurchase 166,667 of these shares at $3 per share. Since these were not registered by August 31, 2001, the Company did repurchase the requisite number of shares on September 17, 2001.

The merger agreement contains put and call provisions which expire 18 months subsequent to the closing date. The put provision states that Network Commerce may elect to sell back to the Company any or all of the shares of the Company's common stock in the event that the stock price, at any given time, is less than 67% of the quoted market value of the stock as of the closing date, which was $3.00 per share. Should the put provision be exercised by Network Commerce, the obligation would result in they becoming a general unsecured creditor of the Company. The call provisions state that the Company may elect to repurchase the shares issued to Network Commerce if the stock price has exceeded 133% of the quoted market value of the stock as of the closing date. GO is recognized as a leader in Windows based payment processing solutions with over 35,000 activations of PCCharge products. In addition, GO's new Java engine, RiTA, is designed to work on virtually any platform including Windows, Unix, Linux, OS/400, and Sun Solaris. RiTA complements ROI's new product design and is expected to be the foundation for the next generation of ROI products.

Due to the put provisions described above, the common stock issued in conjunction with the GO acquisition has been classified outside of equity as redeemable common stock. It is uncertain at this time if the put provisions will be exercised. At such time that the exercise of the put becomes probable, the carrying amount of the redeemable common stock will be adjusted to its fair value.

F-16

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

================================================================

The following table summarizes the fair values of the assets acquired, liabilities assumed and consideration given in connection with the 2001 acquisitions accounted for as purchases:

| | |
|---|---:|
| Accounts receivable | $    662,362 |
| Cash | 89,147 |
| Prepaid expenses | 56,654 |
| Property and equipment | 858,582 |
| Goodwill | 1,241,626 |
| Acquired technology | 2,667,800 |
| Other intangible assets | 240,000 |
| Deferred revenue | (284,293) |
| Accounts payable and accrued expenses | (623,883) |
| Notes payable | (236,995) |
| Net assets acquired | $ 4,671,000 |

These acquisitions were funded as follows:

| | |
|---|---:|
| Common stock | $ 3,156,000 |
| Cash and advances | 1,515,000 |
| | $ 4,671,000 |

The following unaudited proforma information presents the consolidated results of operations of the company as if the acquisitions had occurred as of the beginning of each of the periods presented. The proforma information is not necessarily indicative of what would have occurred had the acquisitions been made as of such periods, nor is it indicative of future results of operations.

| Pro Forma Amounts | 2001 | 2000 |
|---|---:|---:|
| Revenue | $ 7,615,944 | $ 6,317,276 |
| Net Loss | (3,914,327) | (4,049,957) |
| Net loss per share | (0.37) | (0.54) |

F-17

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

========================================================================

3.   PROPERTY AND EQUIPMENT

Property and equipment are summarized by major classifications as follows at June 30:

|  | 2001 | 2000 |
|---|---|---|
| Computer equipment | $    644,640 | $    38,955 |
| Furniture and fixtures | 444,557 | 70,343 |
| Purchased software | 1,628,209 | 1,543,521 |
|  | 2,717,406 | 1,652,819 |
| Less accumulated depreciation and amortization | (1,128,052) | (713,134) |
|  | $ 1,589,354 | $   939,685 |

Depreciation expense was approximately $414,900 and $323,400 for the years ended June 30, 2001 and 2000, respectively.

4.   NOTE RECEIVABLE

In April 2000, the Company entered into a note receivable agreement with a third party, due in October 2001, in the amount of $500,000. The note bears interest at 10% per annum and is secured by substantially all of the assets of the third party. The Company has subsequently determined that the loan has become partially impaired and as such recorded a reserve against the balance in the amount of $150,000 at June 30, 2001.

5.   LINE OF CREDIT

The Company had a line of credit with a bank with interest at the bank's prime rate (9.5% at June 30, 2000) plus 1%. Advances under the line of credit were limited to a maximum of $200,000. The line of credit was secured by substantially all of the Company's assets as well as personal guarantees signed by two shareholders of the Company. The balance outstanding under this line of credit was paid off in August 2000 and, subsequently, the line was canceled by the bank.

F-18

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

===============================================================================

6.  NOTE PAYABLE-SHAREHOLDER

The Company has an unsecured note payable for $118,100 to a shareholder bearing no interest and is due on demand.

7.  LONG TERM DEBT

Long term debt consisted of the following June 30:

|  | 2001 | 2000 |
|---|---|---|
| 7.25% note payable to shareholder paid off in full in August 2000 | $   -- | $   663,255 |
| 8.75% note payable to a bank paid off in full in August 2000 | -- | 38,993 |
| Unsecured Credit Card advances by a shareholder payments at rates varying from 9% to 9.7%. Paid off in full in August 2000 | -- | 25,777 |
| Other | 27,438 | -- |
| Total long term debt | 27,438 | 728,025 |
| Less current portion | (14,560) | (220,776) |
|  | $   12,878 | $   507,249 |

Maturities of long-term debt are as follows:

| Year | Amount |
|---|---|
| 2002 | $   14,560 |
| 2003 | 12,878 |
|  | $   27,438 |

F-19

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

================================================================

8.  ACCRUED EXPENSES

Accrued expenses consisted of the following at June 30:

|  | 2001 | 2000 |
|---|---|---|
| Compensation | $    497,374 | $    79,932 |
| Consulting fees | 52,500 | 150,000 |
| Other | 46,565 | 144 |
|  | $    596,439 | $    230,076 |

9.  STOCK OPTIONS AND WARRANTS

Stock Options

In January 1999, the Company adopted its incentive stock option plan (the "plan") whereby total options to purchase 3,000,000 shares may be granted to key employees at a price not less than fair market value at the time the options are granted and are exercisable after the employee has been with the Company for a period of one or two years. The options are exercisable for a period not to exceed ten years. The Company has also assumed the stock options of NTTI. Such options were converted at the applicable rates used to issue the Company's common stock in the reverse merger. Information regarding the option plan is as follows:

|  | 2001 | | 2000 | |
|---|---|---|---|---|
|  | SHARES | WEIGHTED AVERAGE EXERCISE PRICE | Shares | Weighted Average Exercise Price |
| Outstanding, beginning of year | 235,801 | $    34.15 | 226,501 | $    35.55 |
| Granted | 320,767 | 3.22 | 179,811 | 0.03 |
| Exercised | (6,000) | 0.03 | (163,511) | 0.03 |
| Cancelled | (5,751) | 100.00 | (7,000) | 0.03 |
| Outstanding, end of year | 544,817 | $    15.58 | 235,801 | $    34.15 |
| Exercisable, end of year | 224,050 | | 226,501 | |

F-20

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

===================================================================

The following table summarized information about the Company's outstanding stock options as of June 30, 2001.

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Price | Number Outstanding at June 30, 2001 | Weighted-Average Remaining Contractual Life | Weighted Average Exercise Price | Number Exercisable at June 30, 2001 | Weighted Average Exercise Price |
| | | (years) | | | |
| $0.03 | 3,300 | 1.6 | $ 0.03 | 3,300 | $ 0.03 |
| 1.50 - 3.75 | 320,767 | 4.5 | 3.22 | - | - |
| 5.00 - 10.00 | 36,500 | 2.4 | 6.92 | 36,500 | 6.92 |
| 25.00 - 50.00 | 184,250 | 1.3 | 39.10 | 184,250 | 39.10 |
| | 544,817 | 2.7 | $15.58 | 224,050 | $33.15 |

The weighted average fair value of options granted during the year ended June 30, 2001 was $3.22 per share. The weighted average remaining life of options outstanding at June 30, 2001 was 2.7 years.

The Company applies Accounting Principles Board Opinion No. 25 (APB No. 25), Accounting for Stock Issued to Employees and related interpretations in accounting for its stock option plans. Options granted to employees and directors are accounted for under APB No. 25 and compensation expense is recognized for the intrinsic value of the options granted.

As noted above, the plan states that shares may be granted to employees at a price not less than fair market value at the time of the grant. Notwithstanding the foregoing, it was subsequently determined that the fair market value of options issued during the year ended June 30, 2000 was $.50 per share. This was caused by the Company's eventual reverse merger into a public shell subsequent to year-end, which created a public market for the newly combined companies' stock. As a result, compensation expense of $84,511 was recorded during the year ended June 30, 2000 to reflect the options granted at a discount.

The Company has adopted the disclosure-only provisions of SFAS No. 123, "Accounting for Stock-Based Compensation". Had compensation cost been determined based on the fair value at the grant date for awards in 2001, the Company's net loss and loss per share would have changed as indicated by the pro forma amounts below:

F-21

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

===================================================================

| Years Ending June 30, | 2001 | 2000 |
|---|---|---|
| Net loss, as reported | $(2,614,444) | $ (666,484) |
| Pro forma | (2,711,561) | (668,282) |

===================================================================

| | 2001 | 2000 |
|---|---|---|
| Basic and diluted loss per share, as reported | $ (0.28) | $ (0.11) |
| Pro forma | (0.29) | (0.11) |

===================================================================

The fair value of stock options used to compute pro forma net loss and loss per share disclosures is the estimated present value at grant date using the Black-Scholes option-pricing model with the following weighted average assumptions:

| Years Ending June 30, | 2001 | 2000 |
|---|---|---|
| Risk free interest rate | 5.05% | 5.94% |
| Volatility factor | 91% | 75% |
| Expected option life | 3 | 5 |

===================================================================

Warrants

In anticipation of and in conjunction with the Company's private placement, warrants to purchase common stock were issued to several parties. These warrants were issued as a direct incentive to complete a successful offering. In total, 856,664 warrants were issued on or prior to August 10, 2000, they were immediately vested and exercisable at exercise prices ranging from $.30 to $3.00 per share and will expire in 2005. All warrants are outstanding as of June 30, 2001.

F-22

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

=================================================================

10. INCOME TAXES

Provisions for federal and state income taxes in the statements of operations consist of the following:

| Years Ending June 30, | 2001 | 2000 |
|---|---|---|
| Deferred federal income tax benefit | $(1,037,000) | $ (223,900) |
| Deferred state income tax benefit, net of federal tax benefit | (183,300) | (41,000) |
| Change in valuation allowance | 1,220,300 | 264,900 |
| | $ -- | $ -- |

=================================================================

As of June 30, 2001 and 2000, deferred tax assets (liabilities) comprised the following:

| Years ended June 30, | 2001 | 2000 |
|---|---|---|
| DEFERRED TAX ASSETS | | |
| Net operating loss carryforward | $ 753,000 | $ 301,000 |
| Stock option compensation not currently deductible | 33,800 | 33,800 |
| Deferred revenue | 591,400 | -- |
| Reserves not currently deductible | 117,000 | 33,600 |
| Total deferred tax assets | 1,495,200 | 368,400 |
| DEFERRED TAX LIABILITIES | | |
| Accumulated depreciation | -- | (93,500) |
| Total deferred tax liabilities | -- | (93,500) |
| Net deferred tax asset | 1,495,200 | 274,900 |
| Valuation allowance | (1,495,200) | (274,900) |
| | $ -- | $ -- |

=================================================================

F-23

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

================================================================

The Company has net operating loss carryforwards available to reduce future taxable income, if any, of approximately $1,883,000. The benefits from these carryforwards expire through 2021. As of June 30, 2001, management believes it cannot be determined that it is more likely than not that these carryforwards and its other deferred tax assets will be realized, and accordingly, fully reserved for these deferred tax assets. Differences between the effective income tax rate and statutory income tax rates are not material.

11. STOCK SPLITS

On November 1, 1999, the Board of Directors declared a 3.35-for-1 stock split to stockholders of record of the Company's Common Stock on that date. In addition to the stock split on November 1, 1999, the Board of Directors declared a one-for-three reverse stock split to shareholders of record on that date. These splits were declared due to the reverse merger which occurred in August 2000.

All references to share and per share data and have been restated to reflect the stock split and reverse stock split. The statements of Shareholders' Equity (Capital Deficit) reflect the actual share amounts outstanding for each period presented.

12. CONCENTRATION OF CREDIT RISK

Financial instruments, which potentially subject the Company to concentration of credit risk, consist principally of trade receivables. The Company places its cash with high quality financial institutions and, by policy, limits the amounts of credit exposure to any one financial institution.

As of June 30, 2001 the Company's net accounts receivable are approximately $1,513,000. The Company believes any risk of accounting loss is significantly reduced due to provision considered at the date of sale for returns and allowances and ongoing credit evaluations of its customers' financial condition as deemed necessary. The Company generally does not require cash collateral or other security to support customer receivables.

F-24

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

==========================================================================

13.  COMMITMENTS

The Company leases office facilities and certain equipment under noncancellable operating leases having original terms ranging from one to five years. Additionally, the Company leases certain equipment under capital leases having original terms of three years. Approximate future minimum rent payments, by year and in the aggregate, under noncancellable operating leases with remaining terms of more than one year are as follows:

| Year | Operating |
|------|-----------|
| 2002 | $ 697,561 |
| 2003 | 693,447 |
| 2004 | 634,280 |
| 2005 | 337,251 |
| 2006 | 21,911 |
| Total | $ 2,384,450 |

Rent expense relating to these operating leases was approximately $297,000 and $49,200 for 2001 and 2000, respectively.

In conjunction with the reverse merger, the company entered into consulting agreements with two separate parties. Under the terms of the consulting agreements, one party will receive $5,000 per month for two years from the reverse merger date and the other will receive $5,000 per month for four years from the reverse merger date to assist with future identification of merger candidates, sources of capital and assistance with general business matters.

14.  PENSION PLAN

The Company adopted a 401(k) retirement plan on March 9, 1998. The plan covers all employees who are at least 21 years of age with one or more years of service. The Company currently makes a discretionary matching contribution of 25% of the employee's contributions elected as a salary deferral by eligible employees. The Company's matching contributions for the years ended June 30, 2001 and 2000 were approximately $23,400 and $15,300, respectively.

F-25

RETURN ON INVESTMENT CORPORATION
AND SUBSIDIARIES
D/B/A ROI CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

========================================================================

The Company also sponsors a defined contribution profit sharing plan covering substantially all eligible participants. Contributions are decided by the board of directors each year, however, contributions cannot exceed 15% of each eligible employee's salary. Contributions were $0 for both of the years ended June 30, 2001 and 2000, respectively.

15. SUBSEQUENT EVENTS

On September 17, 2001 the company entered into a referral and reseller agreement with a third party whereby ROI would refer merchants to the third party for the receipt of processing services. Upon execution of the agreement ROI received $1,000,000 as an advance on referral fees and product fees. Under the agreement, the advance is to be repaid in referrals in stepped increments over a 3 year period from the effective date of the agreement. In accordance with the agreement, ROI is required to place certain of its software source codes in escrow, with the third party named as beneficiary, in event of the Company's default on the agreement. The third party has also received vested and exercisable options to purchase an aggregate of $5,000,000 in shares at a rate of $4 per share during the first year of the agreement and $5 per share subsequent to that date. As a result, it is expected that the Company will account for these options in accordance with EITF 96-18, "Accounting for Equity Instruments that are issued to other than employees for acquiring or in conjunction with selling, goods and services."

16. SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION

|  | 2001 | 2000 |
|---|---|---|
| Cash paid for interest during the year | $ 37,858 | $ 85,051 |

During 2001, the Company issued common stock in satisfaction of outstanding debts amounting to $302,775

17. FOURTH QUARTER ADJUSTMENTS

During the fourth quarter of the year-end June 30, 2001, the company recorded a reduction in revenues of approximately $594,000 representing amounts to be deferred per SOP 97-2 "Software revenue recognition".

18. SEGMENTS

Based on the standards described in SFAS No. 131, "Disclosures about Segments of an Enterprise and Related Information", the Company has determined it operates in a single operating segment: a provider of software, services and related consulting in the electronic transaction environment.

F-26

ITEM 8.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
          FINANCIAL DISCLOSURE

On March 20, 2000, NTTI appointed BDO Seidman, LLP as its independent
auditors. On March 20, 2000, NTTI dismissed Mirsky, Furst & Associates as its
independent public accountants. The decision to change independent accountants
was recommended and approved by the Board of Directors. During the two most
recent fiscal years, none of the reports on the Company's financial statements
contained an adverse opinion or a disclaimer of opinion or was qualified or
modified as to uncertainty, audit scope or accounting principles. In connection
with its audits for the two most recent fiscal years and any subsequent interim
period, there have been no disagreements with the Company's independent
accountants on any matter of accounting principles or practices, financial
statement disclosure, or auditing scope or procedure.

14

PART III

ITEM 9.   DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS

EXECUTIVE OFFICERS AND DIRECTORS

The following table sets forth certain information  regarding our executive officers and directors.

| NAME | AGE | POSITION |
| ---- | --- | -------- |
| Charles A. McRoberts . | 51 | Chairman of the Board |
| John W. McRoberts .... | 48 | Director |
| Charles Pecchio, Jr .. | 54 | President, Chief Executive Officer, and Director |
| Guy R. Wilcox ........ | 43 | Chief Financial Officer |

CHARLES A. MCROBERTS  (brother of John W. McRoberts)  serves as Chairman of the Board of ROI and functions in the role of Alliances Manager, responsible for establishing  and maintaining  strategic  alliances with consultants,  referral partners, and resellers.  He served as Chairman of the Board of Results Oriented Integration  Corporation  from 1996 until its reverse  merger in August 2000. He previously was President and CEO of Mastiff Systems, a company that marketed and serviced  security  systems.  Mr. McRoberts joined Mastiff in 1982 and served as President  and CEO from 1987  until the sale of the  company in 1996.  Prior to joining Mastiff, Mr. McRoberts was Branch Manager of Wells Fargo Alarm Services. Mr. McRoberts  was a  Second Lieutenant  in the U. S. Army  at Fort Benning, Georgia.  He managed a military  police platoon and was Officer in Charge of the Narcotic and Drug Detection Squad.

JOHN W. MCROBERTS  (brother of Charles A. McRoberts)  serves as a director. He served as a director of Results  Oriented  Integration  Corporation from 1996 until its reverse  merger in August 2000. Since  December 2000, he has been the Managing Member of Canmongate Partners LLC, a private equity firm. Since 1999 he has served as Managing Member of Foresite  Towers LLC. He was a co-founder,  and served as President and Chief Executive Officer of Capstone Capital Corporation, a NYSE listed real estate investment trust, from 1993 to 1998. While Capstone was acquired by Healthcare Realty Trust for $900 million. Prior to that,  Mr. McRoberts was a senior officer of AmSouth Bank of Alabama (formerly AmSouth Bank N.A.), where he was employed from 1977 to 1993.

CHARLES PECCHIO,  JR., is our President and Chief Executive  Officer and a director.  He served as a director of Results Oriented Integration Corporation from 1996 until its reverse  merger in August 2000.  Since 1993, he has provided consulting  services  related  to mergers  and acquisitions  to Atlanta  area companies  and has served as a director of Hoffman & Co,  Inc., an engineering firm.  From 1988 to 1992, he served as a director of Spiro International  SA, a Swiss  public company,  and as an officer and  director of several  affiliated companies in the U.S., the U.K, Germany,  France,  and Switzerland.  Mr. Pecchio was a co-founder,  and served as President and CEO of  International  Management Group,  Ltd. (IMG), a venture  management  company,  from 1985 until its sale to Spiro in 1988.  He negotiated  the acquisition  by IMG of Honest Face Systems, Inc., a check guaranty and financial  transaction  processing  company,  from Telecredit  (now Equifax).  He served as President  and CEO of Honest Face from 1986 to 1988 and  negotiated  its sale to Comdata  Holdings  Corporation  (now a subsidiary of Ceridian Corporation).  Mr. Pecchio's previous experience includes financial,  sales,  and management  positions with  IBM Corporation,  General Computer Corp., TeleVideo Systems, and NEC Information Systems.

GUY R. WILCOX has served as our Chief  Financial  Officer  since  September 2000. Mr. Wilcox is a Certified Public Accountant.  From 1997 until 2000, he was Chief  Financial  Officer of a $500 million  Atlanta based hedge fund.  Prior to establishing  his own practice in 1990, he held CPA positions  with Jones & Kolb and  BDO  Seidman, LLP.  Mr. Wilcox  has a BS and an MTX  from Georgia State University.

COMMITTEES OF THE BOARD OF DIRECTORS

The Compensation  Committee  includes  John McRoberts,  LaWanda Moore (employee),  and Sharon Penn (outside advisor).  The Compensation  Committee has the authority to review all compensation matters relating to the

15

Company. If a director is an employee of the Company, when his or her compensation is being reviewed, that director is not permitted to be present or to participate.

All of the directors presently serve on the Stock Option Committee. The Stock Option Committee has full power and authority to interpret the provisions of and supervise the administration of the Company's 2000 Stock Option Plan.

The Audit Committee consists of Guy R. Wilcox (Chief Financial Officer), John W. McRoberts (Director), and Timothy R. Minster (outside advisor). The Audit Committee recommends to the Board of Directors the independent public accountants to be selected to audit the Company's annual financial statements and approves any special assignments given to such accountants. The Audit Committee also reviews the planned scope of the annual audit, any changes in accounting principles and the effectiveness and efficiency of our internal accounting staff.

The Human Resources Committee includes Barry E. Flink (outside advisor), LaWanda S. Moore (employee), Sharon W. Penn (outside advisor) and Catherine Rager (outside advisor). The Human Resources Committee was created to guide the organization in effective employee recruitment, motivation, and retention practices while maintaining a legally compliant working environment.

The Marketing Committee consists of Linda Gray Pecchio (employee), Miriam K. McDonald (employee), Frederick P. Lutz (consultant), James Pollack (outside advisor) and Chris Coleman (outside advisor). Focusing on strategic market plans for the individual business units, the Marketing Committee helps insure that ROI continues to maintain and expand our overall corporate branding/image and market share.

The Technology Committee is still in the development stage and we are in the process of evaluating several candidates to serve on this committee.

All of our Directors serve on the Nominating Committee, which is responsible for evaluating and recommending candidates for our Board of Directors. Although there are no formal procedures for stockholders to recommend nominations, the Nominating Committee will consider stockholder recommendations. Such recommendations should be addressed to the Company's Secretary, at our principal executive offices.

The Board of Directors may from time to time establish certain other committees to address certain aspects of our Company's business.

DIRECTOR AND OUTSIDE ADVISOR COMPENSATION

None of our Directors receives additional monetary compensation for serving on the Board of Directors or on a committee. Outside advisors are granted stock options to purchase shares of our common stock. Outside advisors that serve as committee chairpersons receive 7,000 options, while those who serve as committee members receive 5,000 options. The exercise price of the options is equal to the fair market value of the common stock on the date of grant and the options vest on the two-year anniversary of the grant date and expire five years from the date of grant.

ITEM 10.  EXECUTIVE COMPENSATION

The following summary compensation table sets forth the compensation earned by certain executive officers serving at the end of fiscal 2001. None of our other executive officers who served in fiscal 2001 earned $100,000 in aggregate compensation for that year.

SUMMARY COMPENSATION TABLE

| NAME AND PRINCIPAL POSITION | FISCAL YEAR | SALARY | BONUS (1) | ALL OTHER COMPENSATION |
|---|---|---|---|---|
| Charles Pecchio, Jr. Chief Executive Officer and President | 2001 | $85,000 | $113,997 | -- |
| | 2000 | $80,000 | $ 94,376 | -- |
| | 1999 | $68,678 | $ 68,512 | -- |

(1)  Includes sales commissions

16

EMPLOYMENT AGREEMENTS, TERMINATION OF EMPLOYMENT AND CHANGE-IN-CONTROL ARRANGEMENTS

Under the Employment Agreement between ROI and Charles Pecchio, Jr., dated August 10, 2000, ROI has agreed to pay Mr. Pecchio an annual base salary of $85,000, commissions and a performance bonus as determined by the Board of Directors of ROI, in its sole discretion. If Mr. Pecchio's employment is terminated for any reason, Mr. Pecchio has agreed that, for one (1) year after such termination, he will not directly or indirectly solicit or divert business from ROI or assist any business in attempting to do so or solicit or hire any person who was an employee of ROI during the term of his Employment Agreement or assist any business in attempting to do so.

Under the Termination Agreement between the Company and Glenn E. Cohen, dated as of August 10, 2000, and the related Services Agreement, the Company granted Mr. Cohen 37,500 shares of restricted common stock with piggyback registration rights in exchange for the termination of his Employment Agreement. Under the terms of the Services Agreement, Mr. Cohen will be paid $2,000 per month for consulting services for a period of thirty-six (36) months.

ITEM 11.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth information as of September 18, 2001 with respect to beneficial ownership of shares by (i) each person known to the Company to be the beneficial owner of 5% of the outstanding common stock, (ii) each of the Company's directors, (iii) the executive officers of the Company named in the Summary Compensation Table (the "named executives") and (iv) all current directors and officers as a group. Unless otherwise indicated the address for each person listed in the address of the Company.

Stock ownership information has been furnished to the Company by the named person. Beneficial ownership as reported in this section was determined in accordance with Securities and Exchange Commission regulations and includes shares as to which a person possesses sole or shared voting and/or investment power. Except as otherwise stated in the footnotes below, the named persons have sole voting and investment power with regard to the shares shown as beneficially owned by such persons.

| NAME OF BENEFICIAL OWNER/RELATIONSHIP TO COMPANY | COMMON STOCK NO. OF SHARES | PERCENT OF CLASS |
|---|---|---|
| Network Commerce Inc./None(1) | 833,333 | 7.5% |
| Charles A. McRoberts/Chairman of the Board | 2,449,867 (2) | 22.2% |
| John W. McRoberts/Director | 1,414,740 (3) | 12.8% |
| Charles Pecchio, Jr./President, CEO, Director | 2,002,931 (4) | 18.1% |
| All current Directors as a group (3 persons) | 5,867,538 | 53.1% |

--------------------------

(1)  The address of Network Commerce is 411 First Avenue South, Suite 200 N, Seattle, Washington 98104. A proxy for voting these shares has been granted to the Company's Chairman through October 31, 2001. In accordance with the GO Software merger agreement, there exist certain put and call provisions which expire 18 months subsequent to the May 14, 2001closing date. The put provision states that Network Commerce may elect to sell back to us any or all of the shares of common stock it holds in the event that the stock price, at any given time, is less than 67% of the market value of the stock as of the closing date, which was $3.00 per share. The call provision states that we may elect to repurchase the shares issued to Network Commerce if the stock price has exceeded 133% of the market value of the stock as of the closing date.

(2)  Includes 6,000 shares of common stock held by his spouse, 12,200 shares of common stock held by his minor children, and 1,553,485 shares held in escrow that can be voted but not sold until either the Company is acquired or certain milestones are achieved.

17

(3) Includes 60,000 shares of common stock held by his spouse, 8,000 shares of common stock held by his minor children, and 941,412 shares held in escrow that can be voted but not sold until either the Company is acquired or certain milestones are achieved.

(4) Includes 11,111 shares of common stock held by his spouse and 1,271,033 shares held in escrow that can be voted but not sold until either the Company is acquired or certain milestones are achieved.

ITEM 12.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

None.

ITEM 13.  EXHIBITS AND REPORTS ON FORM 8-K

(a)  Exhibits:

A list of exhibits required to be filed as part of this Annual Report is set forth in the Index to Exhibits, which immediately precedes such exhibits and is incorporated herein by reference.

(b)  Reports on Form 8-K:

A report on Form 8-K was filed on September 5, 2000, describing the reverse merger of Results Oriented Integration Corporation with Net/Tech International, Inc. The items reported thereunder were Item 1 (Change in Control of Registrant), Item 2 (Acquisition of Assets), Item 5 (Other Events), and Item 7 (Financial Statements and Exhibits).

A report on Form 8-K/A was filed on October 26, 2000, adding the audited financial statements to the Form 8-K filed August 10, 2000. The item reported thereunder was Item 7 (Financial Statements and Exhibits).

A report on Form 8-K was filed on February 23, 2001, describing the Company's acquisition of Net400, Inc. The item reported thereunder was Item 5 (Other Events and Regulation FD Disclosure).

A report on Form 8-K was filed on March 2, 2001, describing the Company's acquisition of S.A.F.E. Systems, Inc. The items reported thereunder were Item 2 (Acquisition of Assets) and Item 7 (Financial Statements and Exhibits).

A report on Form 8-K/A was filed on April 13, 2001, adding the audited financial statements to the Form 8-K filed March 2, 2001. The item reported thereunder was Item 7 (Financial Statements and Exhibits).

A report on Form 8-K was filed on May 25, 2001, describing the Company's acquisition of GO Software, Inc. and the resignation of Glenn E. Cohen as a Director. The items reported thereunder were Item 2 (Acquisition of Assets), Item 6 (Resignation of Registrant's Director), and Item 7 (Financial Statements and Exhibits).

18

SIGNATURES

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

RETURN ON INVESTMENT CORPORATION

Date: September 28, 2001

By:/s/Charles Pecchio, Jr.

Charles Pecchio, Jr.
President and Chief Executive Officer

In accordance with the Exchange Act, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| NAME | TITLE | DATE |
| ---- | ----- | ---- |
| /s/ Charles Pecchio, Jr. <br> ------------------------ <br> Charles Pecchio, Jr. | President, Chief Executive Officer and Director | September 28, 2001 |
| /s/ Guy R. Wilcox <br> ------------------------ <br> Guy R. Wilcox | Chief Financial Officer | September 28, 2001 |
| /s/ Charles A. McRoberts <br> ------------------------ <br> Charles A. McRoberts | Chairman of the Board | September 28, 2001 |

19

INDEX TO EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 2.1 | Agreement and Plan of Merger and Exchange of Stock, dated as of May 10, 2001, by and among Return on Investment Corporation, GO Software, Inc., Network Commerce Inc. and GO Acquisition, Inc. (incorporated by reference to exhibit 2 to Return On Investment Corporation's Report on Form 8-K, filed September 5, 2000). |
| 2.2 | Agreement and Plan of Merger and Exchange of Stock, dated as of January 31, 2001, by and among Return on Investment Corporation, Net400 Acquisition Corporation, Net400, Inc., Wilton M. Rooks and Elizabeth P. Murdoch (filed herewith). |
| 2.3 | Agreement and Plan of Merger and Exchange of Stock, dated as of January 10, 2001, by and among Return on Investment Corporation, S.A.F.E. Acquisition Corporation, S.A.F.E. Systems, Inc., Denise Beiermann, Gordon W. Johnson, Brandon D. Lenore and John J. Spaccapaniccia (incorporated by reference to exhibit 2 to Return On Investment Corporation's Report on Form 8-K, filed March 2, 2001). |
| 2.4 | Agreement and Plan of Merger and Exchange of Stock, dated as of December 17, 1999, by and among Results Oriented Integration Corporation, Net/Tech International, Inc., Net/Tech Acquisition Corporation, Charles A. McRoberts, John W. McRoberts and Charles Pecchio, Jr. (incorporated by reference to exhibit 2 to Return On Investment Corporation's Report on Form 8-K, filed September 5, 2000). |
| 3.1 | Certificate of Incorporation of Return On Investment Corporation, a Delaware Corporation (filed herewith). |
| 3.1A | Amendment to the Certificate of Incorporation of Net/Tech International, Inc., a Delaware Corporation (incorporated by reference to exhibit 99.1 to Return On Investment Corporation's Report on Form 8-K, filed September 5, 2000). |
| 3.2 | By-laws of Return On Investment Corporation, a Delaware Corporation (filed herewith). |
| 4.1 | Form of Registration Rights Agreement by and among Return On Investment Corporation and the Holders of common stock acquired in the private placement of August 10, 2000 (filed herewith). |
| 10.1* | Employment Agreement, dated as of August 10, 2000, by and between Return On Investment Corporation d/b/a ROI Corporation and Charles Pecchio, Jr. (incorporated by reference to Schedule A to exhibit 2 to Return On Investment Corporation's Report on Form 8-K, filed September 5, 2000). |
| 10.2* | Termination Agreement, dated as of August 10, 2000, by and between Net/Tech International, Inc. and Glenn E. Cohen (incorporated by reference to Schedule A to exhibit 2 to Return On Investment Corporation's Report on Form 8-K, filed September 5, 2000). |
| 10.3 | ROI Corporation Common Stock Long Term Incentive Plan (filed herewith). |
| 10.4 | Promissory Note of Return On Investment Corporation between Return On Investment Corporation and Network Commerce Inc. (incorporated by reference to Schedule B to exhibit 2 to Return On Investment Corporation's Report on Form 8-K, filed May 25, 2001). |
| 16.1 | Letter from Mirsky, Furst & Associates, P.A. regarding change in certifying accountant, dated April 12, 2000 Cohen (incorporated by reference to exhibit 16 to Net/Tech International, Inc.'s Amended Report on Form 8-K/A, filed April 14, 2000). |
| 21.1 | List of subsidiaries of the Company (filed herewith). |

* Indicates management contract or compensatory plan.

20

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# EX−2.2

**AGREEMENT AND PLAN OF MERGER**
**10KSB40 Filed on 10/02/2001 − Period: 06/30/2001**
File Number 033−36198



GSI EDGAR Information Provider - Global Securities Information, Inc.
1-800-
www.gsionline.com

EXHIBIT 2.2

AGREEMENT AND PLAN OF MERGER AND EXCHANGE OF STOCK
--------------------------------------------------

THIS AGREEMENT AND EXCHANGE OF STOCK ("Agreement") is made and entered into as of the 31st day of January, 2001, by and among RETURN ON INVESTMENT CORPORATION, a corporation organized and existing under the laws of the State of Delaware ("ROI", whose address is 1825 Barrett Lakes Blvd., Suite 260, Kennesaw, GA 30144, NET400 ACQUISITION CORPORATION, a corporation organized and existing under the laws of the State of Georgia and a wholly-owned subsidiary of ROI (the "Subsidiary"), whose address is 1825 Barrett Lakes Blvd., Suite 260, Kennesaw, GA 30144, NET400, INC., a corporation organized and existing under the laws of the State of Georgia ("Net400"), whose address is 166 Towne Lake Parkway, Woodstock, GA 30188, Wilton M. Rooks, an individual resident of Florida ("Rooks"), whose address is 151 Santa Monica Avenue, St. Augustine, FL 32084, and Elizabeth P. Murdock, an individual resident of Georgia ("Murdock"), whose address is 1062 Atherton Lane, Woodstock, GA 30189 (Rooks and Murdock, individually referred to as a "Net400 Shareholder" and collectively referred to as the "Net400 Shareholders").

W I T N E S S E T H:
--------------------

WHEREAS, the Net400 Shareholders are the owners of over 80% of the issued and outstanding shares of the no par value common stock of Net400; and

WHEREAS, the parties hereto desire to merge the Subsidiary with and into Net400 by exchanging all of the issued and outstanding shares of Net400 common stock (the "Net400 Common Stock") for a total of 300,000 shares of the $.01 par value common stock of ROI as restricted in accordance with securities laws, ROI's bylaws, and the Escrow Agreement as defined herein (the "ROI Common Stock"), all subject to the terms, provisions, conditions and limitations set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises, the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto do hereby mutually covenant and agree as follows:

1.    THE MERGER

(a) THE MERGER. Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with and in accordance with Section 14-2-1101, et seq. of the Georgia Business Corporation Code (the "GBCC"), the Subsidiary shall be merged with and into Net400 at the Effective Time (as defined in Section 1(c) hereof). Following the Effective Time, the separate corporate existence of the Subsidiary shall cease, and Net400 shall continue as the surviving corporation (the "Surviving Corporation") under the name Net400, Inc. and shall succeed to and assume all the rights and obligations of Net400 and the Subsidiary in accordance with the GBCC.

(b) THE CLOSING; EFFECTIVE DATE. The closing of the Merger contemplated by this Agreement (the "Closing") shall take place on February 1, 2001, or at such other time and on such other date as is agreed to by the parties (the "Closing Date"), which (subject to satisfaction or waiver of the conditions set forth in Section 7) shall be no later than the second business day after satisfaction or waiver of the conditions set forth in Section 7 at such location as the parties may agree. If all of the parties hereto do not agree in writing to extend the Closing Date beyond March 31, 2001, and the Closing does not occur on or prior to such date, any party to this Agreement may, at its sole option, terminate this Agreement by notifying the other parties in writing of such termination. Upon such termination, each party shall be responsible for its own costs and expenses related to this Agreement and no party shall have any obligation hereunder except for those obligations that have been expressly agreed to herein or agreed to in writing in a separate document as surviving the termination of this Agreement.

(c) EFFECTIVE TIME. Subject to the provisions of this Agreement, the parties shall file articles of merger (the "Articles of Merger") executed in accordance with Section 14-2-1105 of the GBCC and shall make all other filings or records required under the GBCC as soon as practical on or after the Closing Date. The Merger shall become effective at such time as the Articles of Merger are accepted for record by the Secretary of State of the State of Georgia or at such other time as the Subsidiary and Net400 shall agree as specified in the Articles of Merger but

not exceeding 30 days after the date the Articles of Merger are accepted for record by the Secretary of State of the State of Georgia (the "Effective Time").

(d)  EFFECT OF MERGER ON THE CONSTITUENT CORPORATIONS.

(1)  GENERAL.  The Merger shall have the effect set forth in Section 14-2-1106 of the GBCC. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time of the Merger, (i) the Surviving Corporation shall possess all assets and property of every description, and every interest therein, wherever located, and the rights, privileges, immunities, powers, franchises and authority, of a public as well as of a private nature, of each of the Subsidiary and Net400 (together, the "Constituent Corporations"), (ii) all obligations belonging to or due each of the Constituent Corporations shall be vested in, and become the obligations of, the Surviving Corporation without further act or deed, (iii) title to any real estate or any interest therein vested in either of the Constituent Corporations shall not revert or in any way be impaired by reason of the Merger, (iv) all rights of creditors and all liens upon any property of either of the Constituent Corporations shall be preserved unimpaired, and (v) the Surviving Corporation shall be liable for all of the debts and obligations of each of the Constituent Corporations, and any claim existing, or action or proceeding pending, by or against either of the Constituent Corporations may be prosecuted to judgment with right of appeal, as if the Merger had not taken place.

(2)  ARTICLES OF INCORPORATION OF THE SURVIVING CORPORATION.  The Articles of Incorporation of Net400, in effect as of the Effective Time, shall become the Articles of Incorporation of the Surviving Corporation from and after the Effective Time and until thereafter amended as provided by law.

(3)  BYLAWS OF THE SURVIVING CORPORATION.  The Bylaws of Net400 shall be the Bylaws of the Surviving Corporation from and after the Effective Time and until thereafter altered, amended or repealed in accordance with the GBCC, the Articles of Incorporation of the Surviving Corporation and said Bylaws.

(4)  DIRECTORS.  The Board of Directors of Net400 at the Effective Time shall, from and after the Effective Time, be the Board of Directors of the Surviving Corporation until their successors have been duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the Surviving Corporation's Articles of Incorporation and applicable law.

(5)  OFFICERS.  The officers of Net400 at the Effective Time shall, from and after the Effective Time, be the officers of the Surviving Corporation until their successors have been duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the Surviving Corporation's Articles of Incorporation and Bylaws.

(6)  ASSETS, LIABILITIES.  At the Effective Time, the assets, liabilities, reserves and accounts of each of the Constituent Corporations shall be taken upon the books of the Surviving Corporation at the amounts at which they respectively shall be carried on the books of said corporations immediately prior to the Effective Time, except as otherwise set forth in this Agreement and subject to such adjustments, or elimination of intercompany items, as may be appropriate in giving effect to the Merger in accordance with generally accepted accounting principles.

(7)  TAX TREATMENT.  The parties hereto acknowledge that for federal income tax purposes, it is intended that the Merger shall qualify as a reorganization under the provisions of Sections 368(a)(1)(A) and 368(a)(2)(E) of the Code.

2.  EFFECT OF THE MERGER ON THE STOCK OF THE CONSTITUENT CORPORATIONS; EXCHANGE OF CERTIFICATES.

(a)  EFFECT ON STOCK.  As of the Effective Time, by virtue of the Merger and without any action on the part of any holder of any stock of either of the Constituent Corporations:

(1)  CANCELLATION OF TREASURY STOCK.  Each share of Subsidiary Stock that is owned by the Subsidiary or by any subsidiary of the Subsidiary shall automatically be canceled and retired and shall cease to exist, and no Merger Consideration (as hereinafter defined) shall be delivered in exchange therefor.

(2) CONVERSION OF COMPANY STOCK. All of the issued and outstanding shares of Net400 Common Stock shall at the Effective Time be converted into 300,000 shares of ROI Common Stock reduced by the number of shares at the rate of $3.75 each for any amount over $200,000.00 in the net difference between the Net400 liabilities and the cash and receivables as of the Closing Date (the "Merger Consideration"). The number of shares of ROI Common Stock referred to throughout this Agreement shall be adjusted from time to time to reflect any stock splits or stock dividends or reclassification of capital structure that occur after the date of this Agreement. As of the Effective Time, all such Net400 Common Stock shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each holder of a certificate evidencing any Net400 Common Stock shall cease to have any rights with respect thereto, except the right to receive the Merger Consideration to be issued in consideration therefor upon surrender of such certificate in accordance with Section 2(b) hereof.

(3) SUBSIDIARY STOCK. As of the Effective Time, all of the issued and outstanding shares of Subsidiary common stock shall be converted into 1,000 shares of Net400 Common Stock.

(b) EXCHANGE OF CERTIFICATES. Upon the terms, subject to the conditions and in reliance upon the representations and warranties contained herein and subject to the Escrow Agreement, upon the proper surrender at Closing to ROI by the Net400 Shareholders of the certificate or certificates which immediately prior to the Closing represented outstanding shares of Net400 Common Stock (the "Certificates") that are to be exchanged pursuant to Section 2(a) for the Merger Consideration, the Net400 Shareholders shall be entitled to receive in exchange therefor the Merger Consideration set forth opposite such Net400 Shareholder's name on the Net400 Shareholders List (as defined in Section 6(d) hereof) subject to adjustment as described herein.

3.   CLOSING OBLIGATIONS.

(a) Closing Obligations of Net400 and the Net400 Shareholders. At the Closing, Net400 and the Net400 Shareholders shall deliver to ROI the following:

(1) certificates representing all of the Net400 Common Stock, duly endorsed (or accompanied by duly executed stock powers) for transfer to ROI along with a release from each shareholder in form and substance satisfactory to ROI;

(2) an executed Employment Agreement between ROI and Murdock, the form of which is attached hereto as Schedule A-1;

(3) an executed Services Agreement between ROI and Rooks, the form of which is attached hereto as Schedule A-2;

(4) a certificate, dated the Closing Date, stating that (i) the representations and warranties of Net400 and the Net400 Shareholders contained in this Agreement or any Schedule are true and correct in all material respects on and as of the Closing Date, and (ii) Net400 and the shareholders of Net400 have performed in all material respects all obligations required to be performed by them under this Agreement at or prior to the Closing.

(5) an executed Escrow Agreement, the form of which is attached hereto as Schedule B.

(6) an executed Proxy from each shareholder, the form of which is attached hereto as Schedule C.

(b) Closing Obligations of ROI. At the Closing, ROI shall deliver to the Net400 Shareholders the following:

(1) the Merger Consideration (or evidence that the ROI Common Stock certificates representing the Merger Consideration have been duly ordered from ROI's stock transfer agent less any shares that may be required for adjustments as described herein);

3

(2) an executed Employment Agreement between ROI and Murdock, the form of which is attached hereto as Schedule A-1;

(3) an executed Services Agreement between ROI and Rooks, the form of which is attached hereto as Schedule A-2;

(4) a certificate, dated the Closing Date, stating that (i) the representations and warranties of ROI contained in this Agreement or any Schedule are true and correct in all material respects on and as of the Closing Date, (ii) ROI has performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing.

(5) an executed Escrow Agreement, the form of which is attached hereto as Schedule B.

4.  APPROVALS.

(a) The Net400 Shareholders and Net400 have approved this Agreement and the transactions contemplated herein. Prior to the Closing Net400 and the Net400 Shareholders shall have taken any and all action required for the Merger.

(b) The ROI Board of Directors has approved this Agreement and the transactions contemplated herein. The shareholders holding at least 65% of the outstanding shares of common stock of ROI must approve the Merger prior to the Closing. If such approval is not obtained on or before March 31, 2001, any party to this Agreement may, at its sole option, terminate this Agreement by notifying the other parties in writing of such termination. Upon such termination, each party shall be responsible for its own costs and expenses related to this Agreement and, except as expressly agreed to herein, no party shall have any obligation hereunder.

5.  REPRESENTATIONS AND WARRANTIES OF ROI. Except for the approvals described in 4(b) hereof, ROI represents and warrants to the Net400 Shareholders that the following representations and warranties are true and correct in all material respects as of the Closing:

(a) ROI is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has the corporate power and authority and all licenses, permits, and authorizations necessary to carry on the businesses in which it is engaged and to own and use the properties owned and used by it.

(b) ROI has the requisite corporate power and authority to execute and deliver this Agreement and the Employment Agreement and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Employment Agreement by ROI and the consummation by ROI of the transactions contemplated herein and therein have been duly authorized by ROI's Board of Directors and, except for the approval of the ROI shareholders, no other corporate or other proceedings on the part of ROI or the ROI shareholders are necessary to authorize this Agreement and the Employment Agreement or for ROI to consummate the transactions contemplated hereunder and thereunder. This Agreement has been duly and validly executed and delivered by ROI and constitutes, and the Employment Agreement when executed and delivered at Closing will constitute, a valid and binding agreement of ROI, enforceable against ROI in accordance with their terms, except as enforceability may be limited by creditors' rights, bankruptcy, insolvency and general principles of equity.

(c) Neither the execution, delivery or performance of this Agreement or the Employment Agreement by ROI, nor the consummation by ROI of the transactions contemplated hereunder or thereunder, will (i) conflict with or result in any breach of any provision of the Articles of Incorporation or Bylaws of ROI, (ii) require a filing with, or a permit, authorization, consent or approval of, any federal, state, local or foreign court, arbitral tribunal, administrative agency or commission or other governmental or other regulatory authority or administrative agency or commission, except for filings or approvals required under applicable federal or state securities laws and the filing of the Articles of Merger, (iii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, or result in the creation of any mortgage, pledge, security interest, encumbrance, lien, claim or charge of any kind or right of others of whatever nature, on any property or asset of ROI pursuant to any of the terms, conditions or provisions of any contract, agreement, lease, intellectual property license, note, bond, mortgage, indenture, license, or other instrument or obligation to which ROI is a party or by which it is bound or (iv) to the best knowledge of ROI,

4

violate any law, order, writ, injunction, decree, statute, rule or regulation of any governmental entity applicable to ROI or any of its properties or assets, except, in the case of clauses (ii), (iii) and (iv), where failures to make such filing or obtain such violations, consent or approval would not have, or where such violations, breaches or defaults or liens would not have, individually or in the aggregate, a material adverse effect.

(d) To the best of ROI's knowledge, the representations contained in this subsection (d) are complete and accurate. Any and all securities issued by ROI have been issued in compliance with Federal and State securities laws. ROI has filed with the Securities and Exchange Commission all of the documents ("ROI SEC Documents") that it was required to file through the date of this Agreement. As of their respective dates, the ROI SEC Documents did not contain any untrue statements of material facts or omit to state material facts required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. As of their respective dates, the ROI SEC Documents complied in all material respects with the applicable requirements of the Securities Act of 1933 and the Securities Exchange Act of 1934 and the rules and regulations promulgated under such statutes. The financial statements contained in the ROI SEC Documents, together with the notes thereto, have been prepared in accordance with generally accepted accounting principles consistently followed throughout the periods indicated (except as may be indicated in the notes thereto or, in the case of the unaudited financial statements, as permitted by Form 10-Q), reflect all known liabilities of ROI required to be stated therein, including all known contingent liabilities as of the end of each period reflected therein, and present fairly the financial condition of ROI at said date and the results of operations and cash flows of ROI for the periods then ended.

6.  REPRESENTATIONS AND WARRANTIES OF NET400 AND ROOKS. Net400 and Rooks respectively (and not jointly) represents and warrants to ROI that the following representations and warranties pertaining to Net400 contained herein are true and correct in all material respects as of the Closing:

(a) Net400 is a corporation duly organized, validly existing and in good standing under the laws of the State of Georgia and has the corporate power and authority and all licenses, permits, and authorizations necessary to carry on the businesses in which it is engaged and to own and use the properties owned and used by it. Complete and correct copies of Net400's charter documents and all amendments thereof to date, certified by the Secretary of State of Georgia, and the by-laws, as amended to date, certified by an officer of Net400 will be delivered to ROI at the Closing.

(b) Net400 and the Net400 Shareholders have the requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated herein and therein have been duly authorized by Net400's Board of Directors and the Net400 Shareholders and no other corporate or other proceedings on the part of Net400 or the Net400 Shareholders are necessary to authorize this Agreement and the Employment Agreement or to consummate the transactions contemplated hereunder and thereunder. This Agreement has been duly and validly executed and delivered by Net400 and the Net400 Shareholders and constitutes a valid and binding agreement of Net400 and the Net400 Shareholders, enforceable against Net400 and the Net400 Shareholders in accordance with its terms, except as enforceability may be limited by creditors' rights, bankruptcy, insolvency and general principles of equity.

(c) Neither the execution, delivery or performance of this Agreement or the Employment Agreement, nor the consummation of the transactions contemplated hereunder or thereunder, will (i) conflict with or result in any breach of any provisions of the Articles of Incorporation or Bylaws of Net400, (ii) require a filing with, or a permit, authorization, consent or approval of, any federal, state, local or foreign court, arbitral tribunal, administrative agency or commission or other governmental or other regulatory authority or administrative agency or commission, except for filings or approvals required under applicable federal or state securities laws and the filing of the Articles of Merger, (iii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, or result in the creation of any mortgage, pledge, security interest, encumbrance, lien, claim or charge of any kind or right of others of whatever nature, on any property or asset of Net400 pursuant to any of the terms, conditions or provisions of any contract, agreement, lease, intellectual property license, note, bond, mortgage, indenture, license, or other instrument or obligation to which Net400 is a party or by which it is bound or (iv) to the best knowledge of Net400, violate any law, order, writ, injunction, decree, statute, rule or regulation of any governmental entity applicable to ROI or any of its properties or assets, except, in the case of clauses (ii), (iii) and (iv), where failures to make such

5

filing or obtain such authorization, consent or approval would not have, or where such violations, breaches or defaults or liens would not have, individually or in the aggregate, a material adverse effect.

(d)  Prior to the Closing, Net400 shall provide ROI with a list of all shareholders of Net400 containing the name, address, social security number, and number of Net400 shares owned by each shareholder immediately prior to the Closing (the "Net400 Shareholder List"). The Net400 Shareholder List will contain a complete and accurate listing of all outstanding shares and other securities of Net400 of any kind, whether debt or equity. There are no outstanding options or warrants of any kind for the purchase of shares or any other securities of Net400, whether debt or equity.

(e)  Net400 and the shareholders listed on the Net400 Shareholder List have the requisite authority and capacity to perform the Merger.

(f)  The Net400 Shareholders are the owners of record of over 80% of the Net400 Common Stock and the shareholders listed on the Net400 Shareholder List are the owners of record of all of the Net400 Common Stock and are entitled to transfer such Net400 Common Stock in accordance herewith.

(g)  By virtue of acquiring the Net400 Common Stock hereunder, ROI shall be entitled to any and all rights and privileges to which the shareholders listed on the Net400 Shareholder List are entitled by virtue of owning the Net400 Common Stock.

(h)  Other than the Net400 Common Stock as shown on the Net400 Shareholder List, each of the shareholders owns no other shares of common stock of Net400 and has not transferred or caused Net400 to issue any shares of common stock of Net400 to anyone else.

(i)  There is no material litigation pending or threatened against or relating to the shareholders listed on the Net400 Shareholder List, or any of them, that would affect the Net400 Common Stock or the transaction contemplated by this Agreement.

(j)  There is no effective order, decree or judgment of any court to which the shareholders listed on the Net400 Shareholder List, or any of them, are a party that would affect the Net400 Common Stock or the transaction contemplated by this Agreement.

(k)  The shareholders listed on the Net400 Shareholder List have good title to the Net400 Common Stock to be transferred pursuant to this Agreement; such Net400 Common Stock are validly issued and outstanding, and are paid for in full; and each of the shareholders listed on the Net400 Shareholder List has full legal right, power and authority to sell, assign and transfer the Net400 Common Stock to ROI pursuant to this Agreement.

(l)  Schedule E, which is attached hereto and thereby made an integral part hereof, contains the unaudited financial statements of Net400 for the fiscal years ended December 31, 1998, 1999, and 2000. All such financial statements are accurate and complete in all material respects. Except as disclosed on Schedule E, there is no material litigation pending or threatened against Net400 and there are no delinquent taxes of any kind. Schedule E-1, which is attached hereto and thereby made an integral part hereof, contains a list of the intellectual property of Net400 indicating whether or not each such item of intellectual property is reflected on the Balance Sheet. Except as noted on said Schedule E-1, Net400 is the owner of all such intellectual property and has granted no rights of any kind related to the intellectual property to any other party except for licenses granted in the ordinary course of business and said licenses are listed on Schedule E-1. Schedule E-2, which is attached hereto and thereby made an integral part hereof, contains a list of tangible assets of Net400 whether or not such assets are reflected on the Balance Sheet. Except as set forth in Schedule E-2, none of the personal property listed therein is held under any lease, security agreement, conditional sales contract or other title retention or security arrangement. Except as noted on Schedule E-2, Net400 is the owner of all such assets and has granted no rights of any kind related to the assets to any other party. Except as noted on the Schedules, Net400 has good, valid and marketable title to all of its property and assets (whether real, personal or mixed and whether tangible or intangible) free and clear of all liens. Net400 does not own any real property.

(m)  Schedule F attached hereto contains a correct and complete list of every written contract, agreement, relationship or commitment, and every material oral contract, commitment, agreement or relationship, to which the Company is a party or by which the Company is bound (collectively, the "Material Contracts"). True and complete copies of all Material Contracts have been furnished to ROI. Except as set forth on Schedule F, (a) all of the Material

6

Contracts are in full force and effect, (b) Net400 is not in default, and no event has occurred which with the giving of notice or the passage of time or both would constitute a default by Net400, under any Material Contract or any other obligation owed by Net400, and (c) to the knowledge of Net400 and the Net400 Shareholders, no event has occurred which with the giving of notice or the passage of time or both would constitute such a default by any other party to any such Material Contract or obligation. Net400 does not have any material debts, liabilities or obligations of any nature (whether accrued, absolute, contingent, direct, indirect, perfected, inchoate, unliquidated or otherwise, whether due or to become due), except (a) liabilities and obligations under Material Contracts or other liabilities and obligations described on the attached Schedule F, (b) liabilities and obligations included in the financial statements on Schedule E, and (c) liabilities and obligations which have arisen after December 31, 2000, in the ordinary course of business, consistent with past custom and practice (none of which is a liability resulting from breach of contract, environmental matters, breach of warranty tort, infringement, claims or lawsuits).

(n) Except as set forth on Schedule E, Net400 (i) has timely filed all Tax Returns (as hereinafter defined) required to be filed by it for all periods ending on or prior to the Closing, and such tax returns are true, correct and complete in all material respects, (ii) has duly paid in full or made adequate provision for the payment of all Taxes for all periods ending at or prior to the Closing (whether or not shown on any Tax Return), and (iii) has not filed for an extension to file any Tax Return not yet filed. No claim has been made by any authority in a jurisdiction where Net400 does not file a Tax Return that Net400 is or may be subject to tax in such jurisdiction. No waivers of statutes of limitation have been given by or requested with respect to any Taxes of Net400. Except as set forth on Schedule E, Net400 has not agreed to any extension of time with respect to any Tax deficiency. The liabilities and reserves for Taxes reflected in the Net400 Financial Statements are adequate to cover all Taxes for all periods ending on or prior to December 31, 2000, and there are no liens for Taxes upon any property or asset of Net400, except for liens for Taxes not yet due. Except as set forth on Schedule E, Net400 has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder, or other third party.

(o) Any and all securities issued by Net400 have been issued in compliance with Federal and State securities laws. Any and all filings required any governmental authority have been filed by Net400 on a timely basis and such filings are true and correct in all material respects.

(p) Net400 does not have, directly or indirectly, any ownership interest in any other entity.

(q) Since December 31, 2000, Net400 has conducted its business only in the ordinary course of business consistent with past custom and practice, and has incurred no liabilities other than in the ordinary course of business consistent with past custom and practice and there has been no material adverse change in the assets, condition (financial or otherwise), operating results, employee or customer relations, business activities or business prospects of Net400. Without limitation of the foregoing and except as described herein, since December 31, 2000, and through the Closing Date, Net400 has not and will not have:

(i) sold, assigned or transferred any of the assets of its business or mortgaged, pledged or subjected them to any Lien, charge or other restriction;

(ii) sold, assigned, transferred, abandoned or permitted to lapse any licenses or permits which, individually or in the aggregate, are material to its business or any portion thereof, or any of the intellectual property or other intangible assets, or disclosed any material proprietary confidential information to any person, granted any license or sublicense of any rights under or with respect to any intellectual property;

(iii) made or granted any increase in, or amended or terminated, any existing plan, program, policy or arrangement;

(iv) conducted its cash management customs and practices (including the timing of collection of receivables and payment of payables and other current liabilities) and maintained its books and records other than in the usual and ordinary course of business consistent with past custom and practice;

(v) made any loans or advances to, or guarantees for the benefit of, or entered into any transaction with any employee, officer or director;

7

(vi) suffered any material loss, damage, destruction or casualty loss to its business or waived any rights of material value, whether or not covered by insurance and whether or not in the ordinary course of business;

(vii) declared, set aside or paid any dividend or distribution of cash or other property to any stockholder or purchased, redeemed or otherwise acquired any shares of its capital stock, or made any other payments to any stockholder;

(viii) amended or authorized the amendment of its charter documents or by-laws;

(ix) made any capital expenditures or commitments therefor in excess of $10,000;

(x) paid any bonuses or compensation other than regular salary payments, or increased the salaries, or paid any debt, to any stockholder, director, officer, or employee, or entered into any employment, severance, or similar contract with any director, officer, or employee;

(x) changed its authorized or issued capital stock; granted any stock option or right to purchase shares of its capital stock; issued any security convertible into such capital stock; granted any registration rights; purchased, redeemed retired, or otherwise acquired any shares of any such capital stock; or declared or paid any dividend or other distribution or payment in respect of shares of capital stock;

(xi) cancelled or waived any claims or rights with a value in excess of $10,000;

(xii) materially changed its accounting methods;

(xiii) entered into any other material transaction, other than in the ordinary course of business consistent with past custom and practice; or

(xiv) committed to any of the foregoing.

(r) Net400 has not at any time made or committed to make any payments for illegal political contributions or made any bribes, kickback payments or other illegal payments.

(s) Schedule G attached hereto contains a correct and complete list setting forth (a) the name, job title, current salary, accrued vacation and years of employment for each employee of Net400, and (b) the names and total annual compensation for all independent contractors who render services on a regular basis to Net400. Except as set forth on Schedule G, no employee or independent contractor of Net400 has received any bonus or increase in compensation and there has been no general increase in the compensation or rate of compensation payable to any employees or independent contractors of Net400 since December 31, 2000, nor has there been any change in any Employee Benefit Plan or any promise by Net400 to employees or independent contractors orally or in writing of any bonus or increase in compensation or a general increase or change in any Employee Benefit Plan, whether or not legally binding. Net400 is not a party to or obligated with respect to any (a) outstanding contracts with current or former employees, agents, consultants, advisers, salesmen, sales representatives, distributors, sales agents or dealers, or (b) collective bargaining agreements or contracts with any labor union or other representative of employees or any employee benefits provided for by any such agreement. No strike, union organizational activity, allegation, charge or complaint of employment discrimination or other similar occurrence has occurred during Net400's operation of its business, or is pending or, to the knowledge of Net400 and the Net400 Shareholders, threatened against Net400; nor does Net400 or the Net400 Shareholders know any basis for any such allegation, charge, or complaint. Net400 has materially complied with all applicable legal requirements relating to the employment of labor, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining and the withholding and payment of social security, unemployment and other Taxes. There are no administrative charges or court complaints pending or, to the knowledge of Net400 and the Net400 Shareholders, threatened against Net400 before the U.S. Equal Employment Opportunity Commission or any Governmental Entity concerning alleged employment discrimination or any other matters relating to the employment of labor; there is no unfair labor practice charge or complaint relating to the business of Net400 pending or, to the knowledge of Company and the Net400 Shareholders, threatened against Net400 before the National Labor Relations Board or any similar state or local body; and, to the knowledge of Net400 and the Net400 Shareholders, no such charges or complaints have been brought against Net400.

8

(t)  Schedule H is a complete and accurate list of the company names, contact names, addresses, phone and facsimile numbers of all customers of Net400 who have purchased services and/or goods from Net400 since inception and all of the sales prospects of Net400,  and Net400 will deliver to Purchaser within ten (10) days after the Closing an updated list of all customers and prospects with any and all information Net400 has regarding such customers and prospects. Net400 has not received any written or, to the knowledge of Net400 and Net400 Shareholders, oral notice,  and Net400 does not have any knowledge, that any customer of Net400 intends to discontinue or substantially diminish or change its relationship with Net400 on account of the transactions contemplated herein or otherwise (except as noted on Schedule H).

(u)  None of Net400, the shareholders listed on the Net400 Shareholder List, or any of their affiliates has employed or used the services of any finder or broker in connection with the transactions contemplated herein.

7.  CONDITIONS PRECEDENT TO CLOSING. The parties covenant and agree that the Closing of the Merger shall be subject to the fulfillment of each of the following covenants and agreements, each of which constitutes a condition precedent to the obligations of the parties hereunder:

(a)  The shareholders holding at least 65% of the outstanding shares of common stock of ROI shall have approved the Merger.

(b)  Net400 shall make available to ROI any and all data, records, and other information as ROI, in its sole discretion, deems necessary to perform due diligence prior to the Closing and said Closing shall be contingent upon ROI's approval based on the results of said due diligence.

(c)  At the Closing,  Murdock shall enter into the Employment Agreement with ROI.

(d)  At the Closing, Rooks shall enter into the Services Agreement with ROI.

(e)  At the Closing, Rooks and ROI shall enter into the Escrow Agreement.

(f)  Prior to or at the Closing,  ROI and Patrick Townsend and Associates shall enter into an agreement related to the software marketed by Net400 on terms and conditions acceptable to ROI.

8.  LEGEND ON SHARES; PIGGYBACK REGISTRATION. Each certificate for shares of ROI Common Stock issued hereunder, unless at the time of exercise such shares are registered under the Act, shall bear the following legend (and any additional legend required by the any national securities exchanges upon which such shares may, at the time of such exercise, be listed or under applicable securities laws):

The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended (the "Act"), or the securities laws of any state. They may not be sold, transferred, assigned, pledged, hypothecated, encumbered, or otherwise disposed of in the absence of registration under said Act and all other applicable securities laws, unless an exemption from registration is available.

The shareholders listed on the Net400 Shareholder List each will agree to hold the shares of ROI Common Stock for a minimum of two (2) years after the Closing. Except for the foregoing minimum holding period, the shareholders shall have unlimited piggyback registration rights for any shares of ROI Common Stock issued hereunder. If, after the foregoing minimum holding period, ROI at any time proposes for any reason to register any of its securities under the Securities Act of 1933, as amended (the "Act"), it shall each such time promptly give written notice to the shareholders of its intention to do so, and upon the written request, given within thirty (30) days after receipt of any such notice, of any of the shareholders to register any shares of ROI Common Stock held by any of them, ROI shall cause all such shares to be registered under the Act, all to the extent requisite to permit the sale or other disposition by any of the shareholders of the shares respectively held by them so registered. ROI, at its sole expense, shall take all actions required and prepare and file any and all documents required under the Act or any other securities or "blue sky" laws of any jurisdictions reasonably requested by the shareholders or by the Securities and Exchange Commission or any other regulatory agency.

9

9.  ASSIGNMENT.  Except as permitted herein, none of the parties to this Agreement may assign its respective rights and obligations hereunder without the prior written consent of the other parties hereto.

10.  TERMINOLOGY AND SECTION HEADINGS. All personal pronouns in this Agreement, whether used in the masculine, feminine or neuter gender shall include all other genders; the singular shall include the plural and the plural shall include the singular.  Titles of Paragraphs are for convenience only, and neither limit nor amplify the provisions of this Agreement.

11.  BINDING EFFECT. Subject to the restrictions on assignments set forth in this Agreement, this Agreement and the rights of the parties hereunder shall inure to the benefit of and be binding upon the parties and their respective legal representatives, successors and assigns. Whenever in this Agreement a reference is made to one of the parties, such reference shall be deemed to include a reference to the legal representatives, successors and assigns of such party.

12.  SEVERABILITY. This Agreement shall be governed by and construed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of this Agreement, or the application thereof to any person or circumstance, shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

13.  INTERPRETATION. In construing the terms and provisions of this Agreement, it is understood and agreed that no court or other interpretive body shall apply a presumption that the terms of this Agreement shall be more strictly or particularly construed against one party hereto by reason of the fact that said party, either directly or through its agents, prepared this Agreement, it being understood and agreed that all parties, either directly or through their agents, have fully participated in the preparation hereof.

14.  GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, excluding any conflict of law provisions. Any litigation to enforce or interpret this Agreement shall take place in the state courts of Cobb County, Georgia, or the federal courts for the Northern District of Georgia.

15.  ENTIRE AGREEMENT.  Except as specifically provided in this Agreement to the contrary, this Agreement constitutes the entire agreement between the parties hereto regarding the subject matter hereof, and no modification hereof shall be effective unless made a supplemental agreement in writing executed by all of the parties hereto.

16.  PUBLIC DISCLOSURE. Except as required by law, no party to this Agreement other than ROI is permitted to make any written or oral statements or disclose any information related to this Agreement and the transactions contemplated hereby without the prior written consent of ROI.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed in multiple counterparts, each of which shall be deemed an original, with their respective seals affixed thereto all as of the date and year first above written.

RETURN ON INVESTMENT CORPORATION

Attest: /s/ NORMAN HAYES      By: /s/ CHARLES PECCHIO, JR.
--------------------          --------------------------------
Its: Secretary               Its: President

[CORPORATE SEAL]

NET400 ACQUISITION CORPORATION

Attest: /s/ NORMAN HAYES      By: /s/ CHARLES A. MCROBERTS
--------------------          --------------------------------
Its: Secretary               Its: President

[CORPORATE SEAL]

NET400, INC.

Attest: /s/ WILTON M. ROOKS      By: /s/ WILTON M. ROOKS
--------------------          --------------------------------
Its: Secretary               Its: President

[CORPORATE SEAL]

NET400 SHAREHOLDERS:

/s/ WILTON M. ROOKS (SEAL)
--------------------------------
WILTON M. ROOKS

/s/ ELIZABETH P. MURDOCK(SEAL)
--------------------------------
ELIZABETH P. MURDOCK

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# EX−3.1

**CERTIFICATE OF INCORPORATION**
**10KSB40 Filed on 10/02/2001 − Period: 06/30/2001**
File Number 033−36198



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 3.1

CERTIFICATE OF INCORPORATION
OF
NET/TECH INTERNATIONAL, INC.

In order to form a corporation under and pursuant to the laws of the State of Delaware, the undersigned does hereby set forth as follows:

PARAGRAPH FIRST: The name of the corporation is

NET/TECH INTERNATIONAL, INC.

PARAGRAPH SECOND: The address of the initial registered and principal office of this corporation in this state is c/o TAQ, Incorporated, 15 East North Street, in the City of Dover, County of Kent, State of Delaware, 19901 and the name of the registered agent at said address is TAQ, Incorporated.

PARAGRAPH THIRD: The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the corporation laws of the State of Delaware.

PARAGRAPH FOURTH: The corporation shall be authorized to issue the following shares:

| Class | Number of Shares | Par Value |
| --- | --- | --- |
| COMMON | 7,500,000 | $.01 |

PARAGRAPH FIFTH: The initial Board of Directors, to hold office until the first annual meeting of the stockholders or until successors are elected and qualify, shall consist of one (1); the name and the address of the director constituting the initial Board are as follows:

| Name | Address |
| --- | --- |
| Rodger Kolsky | 1909 Evva Drive<br>Schenectady, New York 12303 |

PARAGRAPH SIXTH: The name and address of the incorporator are as follows:

```
NAME                    ADDRESS
----                    -------
Patrice Brier           9 East 40th Street
                        New York, New York  10016
```

PARAGRAPH SEVENTH: The following provisions are inserted for the management of the business and for the conduct of the affairs of the corporation, and for further definition, limitation and regulation of the powers of the corporation and of its directors and stockholders:

(1) The number of directors of the corporation shall be such as from time to time shall be fixed by, or in the manner provided in the by-laws. Election of directors need not be by ballot unless the by-laws so provide.

(2) The Board of Directors shall have power without the assent or vote of the stockholders:

(a) To make, alter, amend, change, add to or repeal the By-Laws of the corporation: to fix and vary the amount to be reserved for any proper purpose; to authorize and cause to be executed mortgages and liens upon all or any part of the property of the corporation; to determine the use and disposition of any surplus or net profits; and to fix the times for the declaration and payment of dividends.

(b) To determine from time to time whether, and to what times and places, and under what conditions the accounts and books of the corporation (other than the stock ledger) or any of them, shall be open to the inspection of the stockholders.

(3) The directors in their discretion may submit any contract or act for approval or ratification at any annual meeting of the stockholders or at any meeting of the stockholders called for the purpose of considering any such act or contract, and any contract or act that shall be approved or be ratified by the vote of the holders of a majority of the stock of the corporation which is represented in person or by proxy at such meeting and entitled to vote thereat (provided that a lawful quorum of stockholders be there represented in person or by proxy) shall be as valid and as binding upon the corporation and upon all the stockholders of the corporation, whether or not the contract or act would otherwise be open to legal attack because of directors' interest, or for any other reason.

(4) In addition to the powers and authorities hereinbefore or by statute expressly conferred upon them, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the corporation; subject, nevertheless, to the provisions of the statutes of Delaware, of this certificate, and

to any by-laws from time to time made by the stockholders; provided, however, that no by-laws so made shall invalidate any prior act of the directors which would have been valid if such by-law had not been made.

PARAGRAPH EIGHTH: No director shall be liable to the corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except with respect to (1) a breach of the director's duty of loyalty to the corporation or its stockholders, (2) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (3) liability under Section 174 of the Delaware General Corporation Law or (4) a transaction from which the director derived an improper personal benefit, it being the intention of the foregoing provision to eliminate the liability of the corporation's directors to the corporation or its stockholders to the fullest extent permitted by Section 102(b)(7) of the Delaware General Corporation Law, as amended from time to time. The corporation shall indemnify to the fullest extent permitted by Sections 102(b)(7) and 145 of the Delaware General Corporation Law, as amended from time to time, each person that such Sections grant the corporation the power to indemnify.

PARAGRAPH NINTH: Whenever a compromise or arrangement is proposed between this corporation and its creditors or any class of them and/or between this corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware, may, on the application in a summary way of this corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this corporation under the provisions of Section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this corporation under the provisions of Section 279 Title 8 of the Delaware Code order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, summoned in such manner as the said court directs. If a majority in number representing three-fourths (3/4) in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all

the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this corporation, as the case may be, and also on this corporation.

PARAGRAPH TENTH: The corporation reserves the right to amend, alter, change or repeal any provision contained in this certificate of incorporation in the manner now or hereafter prescribed by law, and all rights and powers conferred herein on stockholders, directors and officers are subject to this reserved power.

IN WITNESS WHEREOF, the undersigned hereby executes this document and affirms that the facts set forth herein are true under the penalties of perjury this ninth day of January, Nineteen Hundred & Ninety.

/s/ PATRICE BRIER
------------------
Patrice Brier, Incorporator

STATE OF DELAWARE
CERTIFICATE OF AMENDMENT
OF CERTIFICATE OF INCORPORATION

Net/Tech International, Inc., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware.

DOES HEREBY CERTIFY:

FIRST: That at a meeting of the Board of Directors of Net/Tech International, Inc. resolutions were duly adopted setting forth a proposed amendment of the Certificate of Incorporation of said corporation, declaring said amendment to be advisable and calling a meeting of the stockholders of said corporation for consideration thereof. The resolution setting forth the proposed amendment is as follows:

RESOLVED, that the Certificate of Incorporation of this corporation be amended by changing the Article thereof numbered "paragraph fourth" so that, as amended, said Article shall be and read as follows:

The corporation shall be authorized to issue the following shares:
Class: Common        Number of Shares: 20,000,000
                     par value $.01 per share

SECOND: That thereafter, pursuant to resolution of its Board of Directors, a special meeting of the stockholders of said corporation was duly called and held upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware at which meeting the necessary number of shares as required by statute were voted in favor of the amendment.

THIRD: That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

FOURTH: That the capital of said corporation shall not be reduced under or by reason of said amendment.

IN WITNESS WHEREOF, said Glenn E. Cohen has caused this certificate to be signed by Glenn E. Cohen, an Authorized Officer, this 21st day of February, 1997.

By: /s/ Glenn E. Cohen
    ------------------------------
    Title of Officer: President

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

NET/TECH INTERNATIONAL, INC.

The undersigned corporation, in order to amend its Certificate of Incorporation, hereby certifies as follows:

FIRST: The name of the corporation is: NET/TECH INTERNATIONAL, INC.

SECOND: The corporation hereby amends its Certificate of Incorporation as follows:

Paragraph FOURTH of the Certificate of Incorporation, relating to the capital structure of the corporation, is hereby amended to read as follows:

"FOURTH: THE TOTAL NUMBER OF SHARES OF STOCK WHICH THIS CORPORATION IS AUTHORIZED TO ISSUE IS: 20,500,000 SHARES, PAR VALUE $.01, OF WHICH 20,000,000 SHALL BE COMMON SHARES AND 500,000 SHALL BE PREFERRED SHARES WITH THEIR PREFERENCES, DESIGNATIONS, AND RIGHTS TO BE DETERMINED BY THE BOARD OF DIRECTORS AS ISSUED BY THE BOARD OF DIRECTORS."

THIRD: The amendment effected herein was authorized by the affirmative vote of the holders of a majority of the outstanding shares entitled to vote thereon at a meeting of shareholders pursuant to Section 222 and 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, I hereunto sign my name and affirm that the statements made herein are true under penalties of perjury, this 15th day of May, 1998.

/s/ Glenn E. Cohen
-------------------------------
Glenn E. Cohen, Chairman of the Board

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

NET/TECH INTERNATIONAL, INC.

The undersigned corporation, in order to amend its Certificate of Incorporation, here certifies as follows:

FIRST: The name of the corporation is NET/TECH INTERNATIONAL, INC.

SECOND: The corporation hereby amends its Certificate of Incorporation as follows:

"FIRST: THE NAME OF THE CORPORATION IS: RETURN ON INVESTMENT CORPORATION."

"FOURTH: THE TOTAL NUMBER OF SHARES OF STOCK WHICH THIS CORPORATION IS AUTHORIZED TO ISSUE IS: 100,500,000 SHARES, PAR VALUE, PAR VALUE $.01, OF WHICH 100,000,000 SHALL BE COMMON SHARES AND 500,000 SHALL BE PREFERRED SHARES WITH THEIR PREFERENCES, DESIGNATIONS, AND RIGHTS TO BE DETERMINED BY THE BOARD OF DIRECTORS AS ISSUED BY THE BOARD OF DIRECTORS."

THIRD: At 5:00 p.m. E.S.T., on August 10, 2000 the filing of this Certificate of Amendment to the Certificate of Incorporation, all outstanding shares of Common Stock held by each holder of record on such date shall be automatically combined at the rate of one-for-twenty without any further action on the part of the holders thereof or this Corporation. Any fractional shares shall be increased to the next higher whole number.

FOURTH: The amendment effected herein was authorized by the affirmative vote of the holders of a majority of the outstanding shares entitled to vote thereon at a meeting of shareholders pursuant to Section 222 and 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, I hereunto sign my name and affirm that the statements made herein are true under penalties of perjury, this 10th day of August, 2000.

NET/TECH INTERNATIONAL, INC.

By: /s/ Anna Capozzi
-----------------------------
Anna Capozzi, Assistant Secretary

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# EX−3.2

**BY LAWS**
**10KSB40 Filed on 10/02/2001 − Period: 06/30/2001**
File Number 033−36198



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 3.2

BY LAWS
OF
NET/TECH INTERNATIONAL, INC.

ARTICLE I - OFFICES
-------------------

The principal office of the Corporation shall be located in the City, County and State so provided in the Certificate of Incorporation. The Corporation may also maintain offices at such other places within or without the State of Delaware as the Board of Directors may, from time to time, determine and the business may require.

ARTICLE II - SHAREHOLDERS
-------------------------

1.   Place of Meetings.
     ------------------

Meetings of shareholders shall be held at the principal office of the Corporation, or at such other places within or without the State of Delaware as the Board shall authorize.

2.   Annual Meetings.
     ---------------

The annual meeting of the shareholders of the Corporation shall be held at 2:00PM on the last Tuesday of the third month in each year after the close of the fiscal year of the Corporation, if such date is not a legal holiday and if a legal holiday, then on the next business day following at the same hour, at which time the shareholders shall elect a Board of Directors, and transact such other business as may properly come before the meeting.

3.   Special Meetings.
     ----------------

Special meetings of the shareholders may be called at any time by the Board or by the President, and shall be called by the President or the Secretary at the written request of the holders of ten (10%) per cent of the outstanding shares entitled to vote thereat, or as otherwise required by law.

4.   Notice of Meetings.
     ------------------

Written notice of each meeting of shareholders, whether annual or special, stating the time when and place where it is to be held, shall be served either personally or by mail. Such notice shall be served not less than ten (10) nor more than sixty (60) days before the meetings upon each shareholder of record entitled to vote at such meeting, and to any other shareholder to whom the giving of notice may be required by law. Notice of a special meeting shall also state the purpose or purposes for which the meeting is called,

and shall indicate that it is being issued by the person calling the meeting. If at any meeting, action is proposed to be taken that would, if taken, entitle shareholders to receive payment for their shares, the notice of such meeting shall include a statement of that purpose and to that effect. If mailed, such notice shall be directed to each such shareholder at his address, as it appears on the records of the shareholders of the Corporation, unless he shall have previously filed with the Secretary of the Corporation a written request that notices intended for him be mailed to some other address, in which event, it shall be mailed to the address designated in such request.

5.   Waiver.
     ------

Notice of any meeting need not be given to any shareholder who submits a signed waiver of notice either before or after a meeting. The attendance of any shareholder at a meeting, in person or by proxy, shall constitute a waiver of notice by such shareholder.

6.   Fixing Record Date.
     ------------------

For the purpose of determining the shareholders entitled to notice of or to vote at any meeting of shareholders or any adjournment thereof, or to express consent to or dissent from any proposal without a meeting, or for the purpose of determining shareholders entitled to receive payment of any dividend or the allotment of any rights, or for the purpose of any other action, the Board shall fix, in advance, a date as the record date for any such determination of shareholders. Such date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action. If no record date is fixed, it shall be determined in accordance with the provisions of law.

7.   Quorum.
     ------

(a) Except as otherwise provided by the Certificate of Incorporation, at all meetings of shareholders of the Corporation, the presence at the commencement of such meetings, in person or by proxy, of shareholders holding a third of the total number of shares of the Corporation then issued and outstanding on the records of the Corporation and entitled to vote, shall be necessary and sufficient to constitute a quorum for the transaction of any business. If a specified item of business is required to be voted on by a class or classes, the holder of a majority of the shares of such class or classes shall constitute a quorum for the transaction of such specified item of business. The withdrawal of any shareholder after the commencement of a meeting shall have no effect on the existence of a quorum, after a quorum has been established at such meeting.

(b) Despite the absence of a quorum at any annual or special meeting of shareholders, the shareholders, by a majority of the votes cast by the holders of shares entitled to vote thereon, may adjourn the meeting.

8.   Voting.
     ------

(a)  Except  as  otherwise   provided  by  statute  or  by  the  Certificate  of
Incorporation,

     (1) directors shall be elected by a plurality of the votes cast; and

     (2) all  other  corporate  action  to be taken by vote of the  shareholders,
     shall be authorized by a majority of votes cast;

at a meeting of shareholders by the holders of shares entitled to vote thereon.

(b)  Except  as  otherwise   provided  by  statute  or  by  the  Certificate  of
Incorporation,  at each meeting of shareholders, each holder of record of shares
of  the  Corporation  entitled  to vote,  shall be  entitled to one vote for each
share of stock registered in his name on the books of the Corporation.

(c) Each shareholder entitled to vote or to express consent or dissent without a
meeting, may do so by proxy; provided,  however, that the instrument authorizing
such  proxy to act shall  have  been  executed  in  writing  by  the  shareholder
himself, or by his  attorney-in-fact  duly authorized in writing. No proxy shall
be voted or acted upon after three (3) years, unless the proxy shall specify the
length of time it is to continue in force.  The proxy shall be  delivered to the
Secretary at the meeting and shall be filed with the records of the Corporation.
Every proxy shall be revocable at the pleasure of the shareholder  executing it,
unless the proxy states that it is irrevocable,  except as otherwise provided by
law.

(d) Any action  that may be taken by vote may be taken  without  a  meeting  on
written consent.  Such action shall constitute  action by such shareholders with
the  same  force and effect as if the same had been  approved  at a duly  called
meeting of  shareholders  and  evidence  of such  approval  signed by all of the
shareholders shall be inserted in the Minute Book of the Corporation.

                    ARTICLE III - BOARD OF DIRECTORS
                    --------------------------------

1.   Number.
     ------

The number of the  directors  of the  Corporation  shall be up to (4)  four until
otherwise  determined  by a vote of the Board,  and it shall in no event be less
than  three,  unless all of the  outstanding  shares are owned of record by less
than three  shareholders,  in which event,  the number of directors shall not be
less than the number of shareholders.

2.   Election.
     --------

Except  as  may  otherwise  be  provided   herein  or  in  the   Certificate  of
Incorporation,  the members of the Board need not be  shareholders  and shall be
elected by a majority  of the votes  cast at a meeting of  shareholders,  by the
holders of shares entitled to vote in the election.

3.    Term of Office.
      --------------

Each  director  shall hold office until the annual  meeting of the  shareholders
next succeeding his election,  and until his successor is elected and qualified,
or until his prior death, resignation or removal.

4.    Duties and Powers.
      -----------------

The Board shall be  responsible  for the control and  management of the affairs,
property and  interests of the  Corporation,  and may exercise all powers of the
Corporation,  except those powers  expressly  conferred  upon or reserved to the
shareholders.

5.    Annual Meeting.
      --------------

Regular  annual  meetings of the Board shall be held  immediately  following the
annual meeting of shareholders.

6.    Regular Meetings and Notice.
      ---------------------------

The Board may provide by resolution  for the holding of regular  meetings of the
Board of Directors, and may fix the time and place thereof.

Notice of regular meetings shall not be required to be given and, if given, need
not specify  the purpose of the  meeting;  provided,  however,  that in case the
Board  shall fix or change the time or place of any regular  meeting,  notice of
such  action be given to each  director  who shall not have been  present at the
meeting at which  such  action was taken  within the  time  limited,  and in the
manner set forth at Section 7 of this Article  III,  unless such notice shall be
waived.

7.    Special Meetings and Notice.
      ---------------------------

(a) Special meetings of the Board shall be held whenever called by the President
or by one of the  directors,  at such time and place as may be  specified in the
respective notices or waivers of notice thereof.

(b)  Notice of  special  meetings  shall be mailed  directly  to each  director,
addressed to him at the address  designated by him for such purpose at his usual
place of business,  at least two (2)  business  days before the day on which the
meeting is to be held,  or delivered to him  personally  or given to him orally,
not later than the  business  day  before the day on which the  meeting is to be
held.

(c)  Notice of a  special  meeting  shall  not be  required  to be given to any
director  who shall  attend  such  meeting,  or who  submits a signed  waiver of
notice.

8.   Chairman.
     --------

At all meetings of the Board, the Chairman, if present, shall preside. If there shall be no Chairman, or he shall be absent, then the President shall preside. In his absence, the Chairman shall be chosen by the Directors present.

9.   Quorum and Adjournments.
     -----------------------

(a) At all meetings of the Board, the presence of a majority of the entire Board shall be necessary to constitute a quorum for the transaction of business, except as otherwise provided by law, by the Certificate of Incorporation, or by these By-laws. Participation of any one or more members of the Board by means of a conference telephone or similar communications equipment, allowing all persons participating in the meeting to hear each other at the same time, shall constitute presence in person at any such meeting.

(b) A majority of the directors present at any regular or special meeting, although less than a quorum, may adjourn the same from time to time without notice, until a quorum shall be present.

10.  Manner of Acting.
     ----------------

(a) At all meetings of the Board, each director present shall have one vote.

(b) Except as otherwise provided by law, by the Certificate of Incorporation, or these By-Laws, the action of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board. Any action authorized, in writing, by all of the directors entitled to vote thereon and filed with the minutes of the Corporation shall be the act of the Board with the same force and effect as if the same had been passed by unanimous vote at a duly called meeting of the Board.

11.  Vacancies.
     ---------

Any vacancy in the Board of Directors resulting from an increase in the number of directors, or the death, resignation, disqualification, removal or inability to act of any director, shall be filled for the unexpired portion of the term by a majority vote of the remaining directors, though less than a quorum, at any regular meeting or special meeting of the Board called for that purpose.

12.  Resignation.
     -----------

Any director may resign at any time by giving written notice to the Board, the President or the Secretary of the Corporation. Unless otherwise specified in such written notice, such resignation shall take effect upon receipt thereof by the Board or such officer, and the acceptance of such resignation shall not be necessary to make it effective.

13.  Removal.
     -------

Any director may be removed,  with or without cause,  at any time by the holders
of a majority of the shares then  entitled to vote at an election of  directors,
at a special  meeting of the  shareholders  called for that purpose,  and may be
removed for cause by action of the Board.

14.  Compensation.
     ------------

No compensation  shall be paid to directors as such, for their services,  but by
resolution of the Board,  a fixed sum and expenses for actual  attendance may be
authorized  for  attendance  at each  regular or  special  meeting of the Board.
Nothing  herein  contained  shall be construed  to preclude  any director  from
serving  the  Corporation  in any  other  capacity  and  receiving  compensation
therefor.

15.  Contracts.
     ---------

(a) No contract or other  transaction  between  this  Corporation  and any other
business shall be affected or  invalidated,  nor shall any director be liable in
any way by reason of the fact that a director of this  Corporation is interested
in, or is financially  interested  in such other business,  provided such fact is
disclosed to the Board.

(b) Any director  may be a party to or may be  interested  in any  contract  or
transaction of this Corporation individually, and no director shall be liable in
any way by reason of such interest, provided that the fact of such participation
or  interest  be  disclosed  to the Board  and provided  that the  Board  shall
authorize or ratify such contract or  transaction  by the vote (not counting the
vote of any such  director)  of a majority  of a quorum,  notwithstanding  the
presence of any such director at the meeting at which such action is taken. Such
director may be counted in determining the presence of a quorum at such meeting.
This  Section  shall not be  construed  to invalidate  or in any way affect any
contract  or other  transaction  which  would  otherwise  be valid under the law
applicable thereto.

16.  Committees.
     ----------

The Board,  by resolution  adopted by a majority of the entire  Board,  may from
time to time  designate  from among its members an executive  committee and such
other committees,  and alternate members thereof,  as they deem desirable,  each
consisting  of three or more  members,  which such powers and  authority  (to the
extent  permitted  by law) as may be  provided  in such  resolution.  Each  such
committee shall remain in existence at the pleasure of the Board.  Participation
of any one or more members of a committee by means of a conference  telephone or
similar  communications  equipment  allowing  all persons  participating  in the
meeting to hear each  other at the same  time,  shall  constitute  a director's
presence in person at any such meeting. Any action authorized in writing by all
of the members of a committee and filed with the minutes of the committee  shall
be the act of the  committee  with the same  force and effect as if the same had
been passed by unanimous vote at a duly called meeting of the committee.

ARTICLE IV OFFICERS
-------------------

1.   Number of Qualifications.
     ------------------------

The officers of the Corporation  shall consist of a President,  one or more Vice
Presidents,  a Secretary,  a  Treasurer,  and such other  officers,  including a
Chairman  of the Board,  as the Board of  Directors  may from time to time deem
advisable.  Any officer  other than the Chairman of the Board may be, but is not
required to be, a director of the  Corporation. Any two or more  offices may be

held by the same person, except the offices of President and Secretary.

2.    Election.

The officers of the Corporation shall be elected by the Board at the regular annual meeting of the Board following the annual meeting of shareholders.

3.    Term of Office.

Each officer shall hold office until the annual meeting of the Board next succeeding his election, and until his successor shall have been elected and qualified, or until his death, resignation or removal.

4.    Resignation.

Any officer may resign at any time by giving written notice thereof to the Board, the President or the Secretary of the Corporation. Such resignation shall take effect upon receipt thereof by the Board or by such officer, unless otherwise specified in such written notice. The acceptance of such resignation shall not be necessary to make it effective.

5.    Removal.

Any officer, whether elected or appointed by the Board, may be removed by the Board, either with or without cause, and a successor elected by the Board at any time.

6.    Vacancies.

A vacancy in any office by reason of death, resignation, inability to act, disqualification, or any other cause, may at any time be filled for the unexpired portion of the term by the Board.

7.    Duties.

Unless otherwise provided by the Boar, officers of the Corporation shall each have such powers and duties as generally pertain to their respective offices, such powers and duties as may be set forth in these by-laws, and such powers and duties

as may be specifically provided for by the Board. The President shall be the chief executive officer of the Corporation.

8.    Sureties and Bonds.

At the request of the Board, any officer, employee or agent of the Corporation shall execute for the Corporation a bond in such sum, and with such surety as the Board may direct, conditioned upon the faithful performance of his duties to the Corporation, including responsibility for negligence and for the accounting for all property, funds or securities of the Corporation which may come into his hands.

9.    Shares of Other Corporations.

Whenever the Corporation is the holder of shares of any other corporation, any right or power of the Corporation as such shareholder shall be exercised on behalf of the Corporation in such manner as the Board may authorize.

ARTICLE V - SHARES-OF-STOCK

1.    Certificates.

(a) The certificates representing shares in the Corporation shall be in such form as shall be approved by the Board and shall be numbered and registered in the order issued. They shall bear the holder's name and the number of shares and shall be signed by (i) the Chairman of the Board or the Vice Chairman of the Board or the President or a Vice President, and (ii) the Secretary or Treasurer, or any Assistant Secretary or Assistant Treasurer, and shall bear the corporate seal.

(b) Certificate representing shares shall not be issued until they are fully paid for.

(c) The Board may authorize the issuance of certificates for fractions of a share which shall entitle the holder to exercise voting rights, receive dividends and participate in liquidating distributions, in proportion to the fractional holdings.

2.    Lost or Destroyed Certificates.

Upon notification by the holder of any certificate representing shares of the Corporation of the loss or destruction of one or more certificates representing the same, the Corporation may issue new certificates in place of any certificates previously issued by it, and alleged to have been lost or destroyed. Upon production of evidence of loss or destruction, in such form as the Board in its sole discretion may require, the Board may require the owner of the lost or destroyed certificates to provide the Corporation with a bond in such sum as the Board may direct, and with such surety as may be satisfactory to the Board, to indemnify the Corporation against any claims, loss, liability or damage it may suffer on account of the issuance of the new certificates. A new certificate may be

issued without requiring any such evidence or bond when, in the judgment of the Board, it is proper to do so.

3.   Transfers of Shares.
     --------------------

(a) Transfers of shares of the Corporation may be made on the share records of the Corporation solely by the holder of such records, in person or by a duly authorized attorney, upon surrender for cancellation of the certificates representing such shares, with an assignment or power of transfer endorsed thereon or delivered therewith, duly executed and with such proof of the authenticity of the signature, and the authority to transfer, and the payment of transfer taxes as the Corporation or its agents may require.

(b) The Corporation shall be entitled to treat the holder of record of any shares as the absolute owner thereof for all purposes and shall not be bound to recognize any legal, equitable or other claim to, or interest in, such shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise expressly provided by law.

(c) The Corporation shall be entitled to impose such restrictions on the transfer of shares as may be necessary for the purpose of electing or maintaining Subchapter S status under the Internal Revenue Code or for the purpose of securing or maintaining any other tax advantage to the Corporation.

4.   Record Date.
     -----------

In lieu of closing the share records of the Corporation, the Board may fix, in advance, a date not less than ten (10) days nor more than sixty (60) days, as the record date for the determination of shareholders entitled to receive notice of, and to vote at, any meeting of shareholders, or to consent to any proposal without a meeting, or for the purpose of determining shareholders entitled to receive payment of any dividends, or allotment of any rights, or for the purpose of determining shareholders entitled to receive payment of any dividends, or allotment of any rights, or for the purpose of any other action. If no record date is fixed, the record date for the determination of shareholders entitled to notice of or to vote at a meeting of shareholders shall be at the close of business on the day immediately preceding the day on which notice is given, or, if notice is waived, at the close of business on the day immediately preceding the day on which the meeting is held; the record date for determining shareholders for any other purpose shall be at the close of business on the day on which the resolution of the directors relating thereto is adopted. The record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the Board is necessary, shall be the day on which the first written consent is expressed. When a determination of shareholders of record entitled to notice of or to vote at any meeting of shareholders has been made as provided for herein, such determination shall apply to any adjournment thereof, unless the directors fix a new record date for the adjourned meeting.

ARTICLE VI - DIVIDENDS
-----------------------

Subject to this Certificate of Incorporation and to applicable law, dividends may be declared and paid out of any funds available therefor, as often, in such amount, and at such time or times as the Board may determine. Before payment of any dividends, there may be set aside out of the net profits of the Corporation available for dividends, such sum or sums as the Board, from time to time, in its sole discretion, deems proper as a reserve fund to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the Board shall think conducive to the interests of the Corporation, and the Board may modify or abolish any such reserve.

ARTICLE VII - FISCAL YEAR
-------------------------

The fiscal year of the Corporation shall be fixed by the Board from time to time, subject to applicable law.

ARTICLE VIII - CORPORATE SEAL
------------------------------

The corporate seal, if any, shall be in such form as shall be approved from time to time by the Board.

ARTICLE IX - AMENDMENTS
-----------------------

1.    By Shareholders.
      ---------------

All by-laws of the Corporation shall be subject to revision, amendment or repeal, and new by-laws may be adopted from time to time by a majority of the shareholders who are at such time entitled to vote in the election of directors.

2.    By Directors.
      ------------

The Board of Directors shall adopt changes per the Certificate of Incorporation.

      The undersigned Incorporator certifies that he has adopted the foregoing by-laws as the first by-laws of the Corporation, in accordance with the requirements of the Business Corporation Law.

Dated:  January 9, 1990
        ---------------

                              /s/ PATRICE BRIER
                              ------------------
                              Patrice Brier, Incorporator

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# EX–4.1

**REGISTRATION RIGHTS AGREEMENT**
**10KSB40 Filed on 10/02/2001 – Period: 06/30/2001**
File Number 033–36198



LIVEDGAR Information provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 4.1

REGISTRATION RIGHTS AGREEMENT

REGISTRATION RIGHTS AGREEMENT (the "Agreement"), dated as of _____, 2000, executed and delivered by Net/Tech International, Inc., a Delaware corporation (the "Company") which has its principal place of business at One West Front street, Suite 30, Red Bank, New Jersey 07701, in favor of the Holders (as defined below) whose names appear on Exhibit A annexed hereto.

RECITALS

WHEREAS, simultaneously with the execution and delivery of this Agreement, the Company, pursuant to terms and conditions set forth in the Confidential Private Offering Memorandum of the Company, dated May 2, 2000, including the exhibits thereto and any and all supplements thereof and amendments thereto, and all documents incorporated by reference therein (collectively, the "Memorandum") is offering (the "Offering") up to 3,000,000 shares ("Shares") of Common Stock (the "Common Stock") through First Montauk Securities Corp., as placement agent;

WHEREAS, pursuant to the Offering, the Shares are being offered on a "best efforts all or none" basis as to 2,000,000 shares and on a "best efforts" basis as to the remaining 1,000,000 Shares;

WHEREAS, the terms and conditions of the Offering provide for the execution and delivery of this Agreement by the Company and grant to all subscribers in the Offering the rights contained herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Company, the Company hereby agrees as follows:

1.    PIGGYBACK REGISTRATION.

(a) If at any time the Company proposes to prepare and file with the Securities and Exchange Commission (the "SEC") one or more registration statements or amendments, including post-effective amendments, or supplements thereto covering any equity or debt securities of the Company, or any such securities of the Company held by its stockholders, other than in connection with a merger or acquisition or pursuant to a registration statement on Form S-4 or Form S-8 or any successor form (for purposes of this Section 1, collectively, a "Piggyback Registration Statement"), the Company will give written notice of its intention to do so by registered or certified mail ("Notice"), at least thirty (30) business days prior to the filing of each such Piggyback Registration Statement, to each Person (as defined below) who holds Shares (such Shares are referred to herein as the "Registrable Shares") and each of the successors, assigns and transferees of each of such Persons (individually, a "Holder" and collectively, "Holders"). "Person" as used herein shall mean any individual, sole proprietorship, partnership, corporation, association, joint venture, trust, unincorporated entity or other entity, or the government of any country or sovereign state, or of any state, province, municipality or other political subdivision thereof. Upon the written request of a Holder or Holders, made within twenty (20) days after receipt of the Notice, that the Company include any or all of the Registrable Shares held by such Holder or Holders ("Piggyback Securities") in the proposed Piggyback Registration Statement (each such Holder, a "Requesting Holder"), the Company shall use its best efforts to cause such Piggyback Registration Statement to be declared effective under the Securities Act of 1933, as amended (the "Act"), by the SEC, so as to permit the public sale by the Requesting Holders of their Piggyback Securities pursuant thereto, at the Company's sole cost and expense and at no cost or expense to the Requesting Holder (other than any underwriting or other commissions, discounts or fees of any counsel or advisor to the Holder which shall be payable by the Holder, as further provided in Section 4(d) hereof) (the "Piggyback Registration").

(b) If securities are proposed to be offered for sale pursuant to such Piggyback Registration Statement by other security holders of the Company and the total number of the Securities to be offered by the Requesting Holders and such other selling security holders is required to be reduced pursuant to a request from the underwriter or managing underwriter (which request shall be made in writing), the aggregate

number of Piggyback Securities to be offered by the Requesting Holders pursuant to such Piggyback Registration Statement shall equal the number which bears the same ratio to the maximum number of securities that the underwriter or managing underwriter believes may be included for all the selling security holders (including the Requesting Holders) as the original number of Piggyback Securities proposed to be sold by the Requesting Holders bears to the total original number of securities proposed to be offered by the Requesting Holders and the other selling securityholders.

(c) Notwithstanding the preceding provisions of this Section, the Company shall have the right at any time after it shall have given written notice pursuant to this Section 1 (irrespective of whether any written request for inclusion of Piggyback Securities shall have already been made) to elect not to file any proposed Piggyback Registration Statement contemplated pursuant to this Section 1, or to withdraw the same after the filing but prior to the effective date thereof.

2.    AUTOMATIC REGISTRATION.

(a) In the event that the Company has not registered all of the Registrable Securities pursuant to Section 1 hereof within 180 days of the final closing of the Offering then the Company shall use its best efforts to file a registration statement with the SEC, at the sole expense of the Company, and such other documents, including a prospectus, as may be necessary (in the opinion of counsel for the Company), in order to comply with the provisions of the Act, so as to permit the public sale of the Registrable Shares by the Holders. The registration statement required to be filed pursuant to this Section 2 shall be filed within 15 days of expiration of such 180 day period, and the Company shall use its best efforts to obtain effectiveness of the registration statement so filed as soon as possible.

(b) Once effective, the Company covenants and agrees to use its best efforts to maintain the effectiveness of the Registration Statement until the earlier of (i) 12 months following the date of effectiveness, or (ii) the date that the Holders of the Registrable Shares receive an opinion of counsel to the Company that all of the Registrable Shares may be freely traded (without limitation or restriction as to quantity or timing and without registration under the Act) pursuant to Rule 144 or otherwise, except that, the Company may suspend the use of the Registration Statement for a period not to exceed 45 days in any 12-month period for valid business reasons (not including avoidance of the Company's obligations hereunder), including the acquisition or divestiture of assets, public filings with the SEC, pending corporate developments and similar events.

3. REGISTRABLE SHARES. For purposes of this Agreement, the term "Registrable Shares" shall also include any securities issued or issuable with respect to the Shares by way of stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization or otherwise. For purposes hereof, the term "Registrable Shares" shall include all Shares sold by the Company in the Offering. Anything herein contained to the contrary notwithstanding, the term "Registrable Shares" as used in this Agreement shall not include, Shares after they have been sold by a Holder pursuant to an effective Registration Statement under the Act or Shares which may be sold without volume limitation pursuant to Rule 144k.

4. ADDITIONAL COVENANTS OF THE COMPANY WITH RESPECT TO REGISTRATION. The Company covenants and agrees as follows:

(a) In connection with any registration under Section 2 above, the Company shall file the Registration Statement as expeditiously as possible, but in no event later than ten (10) business days following expiration of the 180 day period referenced in Section 2, and use its best efforts to have such Registration Statement declared effective at the earliest possible time.

(b) In connection with any registration of Registrable Shares pursuant to Sections 1 or 2 above, the Company shall furnish each Holder of Registrable Shares included in a Registration Statement with such reasonable number of copies of such Registration Statement, related preliminary prospectus and prospectus meeting the requirements of the Act, and other documents necessary or incidental to the registration and

public offering of such Registrable Shares, as shall be reasonably requested by the Holder to permit the Holder to make a public distribution of such Registrable Shares.

(c) If any stop order shall be issued by the SEC in connection with any Registration Statement filed pursuant to Sections 1 or 2 above, the Company will use its best efforts to obtain the removal of such order. Any stop order declared by the SEC, or any registration statement prepared and filed pursuant hereto due to a material misstatement or omission on behalf of the Company, shall be without penalty to any of the registration rights granted hereunder.

(d) The Company shall pay all costs, fees, and expenses in connection with all Registration Statements filed pursuant to Sections 1 and 2 above, including, without limitation, the Company's legal and accounting fees, printing expenses, and blue sky fees and expenses; provided, however, that the Holders shall be solely responsible for the fees of any counsel retained by the Holders in connection with such registration and any transfer taxes or underwriting discounts, commissions or fees applicable to the Registrable Shares sold by the Holders pursuant thereto.

(e) The Company will use its best efforts to qualify, at its sole expense, any Registrable Shares included in a Registration Statement for sale in such states as the Holders of such securities shall reasonably request, provided that no such qualification will be required in any jurisdiction where, solely as a result thereof, the Company would be subject to general service of process or to taxation or qualification as a foreign corporation doing business in such jurisdiction.

5.    INDEMNIFICATION.

(a) In the event of any registration of any the Registrable Shares under the Act, the Company shall indemnify and hold harmless each Holder, the affiliates of each such Holder, the directors, partners, officers, employees and agents of each such Holder and any person who controls any such Holder within the meaning of the Act or the Securities Exchange Act of 1934, as amended (the "Exchange Act"), against any and all losses, claims, damages or liabilities, joint or several, to which they or any of them may become subject under the Act, the Exchange Act or other Federal or State statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) caused by, arising out of or based on any untrue statement or alleged untrue statement of a material fact contained in any registration statement under which such securities were registered under the Act, any preliminary prospectus, final prospectus or summary prospectus contained therein, or any amendment or supplement thereto, or arise out of or are based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and agrees to reimburse each such indemnified party, as incurred, for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that (i) the Company will not be liable in any case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with written information furnished to the Company by or on behalf of any such Holder specifically for inclusion therein, (ii) the Company will not be liable to any indemnified party under this indemnity agreement with respect to any Registration Statement or Prospectus to the extent that any such loss, claim, damage or liability of such indemnified party results from the use of the Prospectus during a period when the use of the Prospectus has been suspended in accordance with Section 4(c) hereof, provided that the Holders received prior notice of such suspension, which notice shall be deemed to have been received by such Holders within 48 hours after the giving thereof; and (iii) the Company shall not be liable to any indemnified party with respect to any preliminary Prospectus to the extent that any such loss, claim, damage or liability of such indemnified party results from the fact that such indemnified party sold Registrable Securities to a person as to whom there was not sent or given, at or prior to the written confirmation of such sale, a copy of the Prospectus or of the Prospectus as then amended or supplemented in any case where such delivery is required by the Act, if the loss, claim, damage or liability of such indemnified party results from an untrue statement or omission of a material fact contained in the preliminary Prospectus which was corrected in the Prospectus or in the Prospectus as then amended or supplemented. This indemnity agreement will be in addition to any liability which the Company may otherwise have. The Company also agrees to indemnify and provide contribution

to each person who may be deemed to be an underwriter (for purposes of the Act) with respect to the Registrable Shares ("Underwriter" or "Underwriters"), their officers and directors, and each person who controls each such Underwriter, on substantially the same basis as that of the indemnification of and contribution to the Holders provided in this Section 5.

(b) As a condition to including any of the Registrable Shares in any registration statement filed pursuant to this Agreement, the Holder of the Registrable Shares, as a prospective seller of the Registrable Shares hereby agrees to indemnify and hold harmless (in the same manner and to the same extent as set forth in subdivision (a) of this Section 5) the Company, each director of the Company, each officer, employee or agent of the Company and each Underwriter of the Registrable Shares and each other person or entity, if any, which controls the Company or such Underwriter within the meaning of the Act, with respect to any statement or alleged statement in, or omission or alleged omission from, such registration statement, any preliminary Prospectus, Prospectus or summary Prospectus contained therein, or any amendment or supplement thereto, if such statement or alleged statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company by the Holder for use in the preparation of such registration statement, preliminary Prospectus, Prospectus, summary Prospectus, amendment or supplement. Any such indemnity shall remain in full force and effect, regardless of any investigation made by or on behalf of the Company or any such director, officer or controlling person and shall survive the transfer of such securities by Holder. Anything in this Agreement contained to the contrary notwithstanding the liability of each Holder for indemnification or contribution hereunder shall be limited to the amount of proceeds received by such Holder in the Offering giving rise to such liability.

(c) Promptly after receipt by an indemnified party of notice of the commencement of any action or proceeding involving a claim referred to in the preceding subdivisions of this Section 5, such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party, give written notice to the latter of the commencement of such action, provided that the failure of any indemnified party to give notice as provided herein shall not relieve the indemnifying party of its obligations under the preceding subdivisions of this Section 5, except to the extent that the indemnifying party is materially prejudiced by such failure to give notice. In case any such action is brought against an indemnified party, unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist in respect of such claim, the indemnifying party shall be entitled to participate in and to assume the defense thereof, jointly with any other indemnifying party similarly notified, to the extent that the indemnifying party may wish, with counsel reasonably satisfactory to such indemnified party, and after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof other than reasonable costs of investigation. Notwithstanding the indemnifying party's election to appoint counsel to represent the indemnified party in an action, the indemnified party shall have the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel (and local counsel) if (i) the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with a conflict of interest, (ii) the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party, (iii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action or (iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party. An indemnified party shall not settle or compromise any action for which it seeks indemnification or contribution hereunder without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld. An indemnifying party will not, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such

settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding.

(d) In the event that the indemnity provided in Section 5(a) or 5(b) is unavailable to or insufficient to hold harmless an indemnified party for any reason, then each applicable indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the aggregate losses, claims, damages and liabilities (including legal or other expenses reasonably incurred in connection with investigating or defending same) (collectively "losses") to which such indemnified party may be subject in such proportion as is appropriate to reflect the relative benefits received by such indemnifying party, on the one hand, and such indemnified party, on the other hand, from the Registration Statement which resulted in such losses.

(e) The provisions of this Section 5 shall remain in full force and effect regardless of any investigation made by or on behalf of any Holder or the Company or any other persons who are entitled to indemnification pursuant to the provisions of this Section 5, and shall survive the sale by a Holder of Registrable Shares pursuant to the Registration Statement.

6. AMENDMENTS. This Agreement may not be amended, modified or supplemented, and waivers of or consents to departures from the provisions of this Agreement may not be given, unless it would not have an adverse effect upon the rights of any of the Holders and the Company has obtained the written consent of Holders then holding a majority of the Registrable Shares.

7. NOTICES. Except as otherwise provided in this Agreement, all notices, requests and other communications (which shall include publication) to any person provided for hereunder shall be in writing and shall be given by hand delivery, registered or certified mail or by any courier providing overnight delivery (i) if to the Company or the initial Holder, at the address set forth in the Subscription Agreement and (ii) if to a subsequent Holder, to the address set forth on the books and records of the Company. All such notices, requests or communications shall not be effective until received.

8. ASSIGNMENT. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto. In addition, and whether or not any express assignment shall have been made, the provisions of this Agreement which are for the benefit of Holder shall also be for the benefit of and enforceable by any subsequent holder of the Registrable Shares. Holder agrees, by accepting any portion of the Registrable Shares after the date hereof, to the provisions of this Agreement.

9. GOVERNING LAW.

(a) THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF DELAWARE WITHOUT REFERENCE TO THE PRINCIPLES OF CONFLICTS OF LAWS.

(b) Each of the Company and Holder hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the United States District Court for the District of New Jersey (the "New Jersey Courts") for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in such courts), waives any objection to the laying of venue of any such litigation in the New Jersey Courts and agrees not to plead or claim that such litigation brought in any New York Jersey has been brought in an inconvenient forum.

10. COUNTERPARTS. This Agreement may be executed by facsimile and may be signed simultaneously in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute one and the same instrument.

11. ENTIRE AGREEMENT. This Agreement embodies the entire agreement of between the Company relating to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

12. SEVERABILITY. If any provision of this Agreement, or the application of such provisions to any person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

13. THIRD PARTY BENEFICIARIES. The Holders from time to time shall each be a third party beneficiary of the agreements of the Company contained herein.

14. HEADINGS. The headings which are contained in this Agreement are for the sole purpose of convenience of reference, and shall not limit or otherwise affect the interpretation of any of the provisions hereof.

15. FURTHER ASSURANCES. The Company will from time to time after the date hereof take any and all actions, and execute, acknowledge and deliver any and all documents and instruments, at its cost and expense, as any Holder may from time to time reasonably request in order to more fully perfect or protect the rights intended to be granted to it hereunder.

16. INTERPRETATION. As used in this Agreement, unless the context otherwise requires: words describing the singular number shall include the plural and vice versa; words denoting any gender shall include all genders; words denoting natural persons shall include corporations, partnerships and other entities, and vice versa; and the words "hereof", "herein" and "hereunder", and words of similar import, shall refer to this Agreement as a whole, and not to any particular provision of this Agreement.

17. WAIVER. The failure of the Company or any Holder to at any time enforce any of the provisions of this Agreement shall not be deemed or construed to be a waiver of any such provision, nor to in any way affect the validity of this Agreement or any provision hereof or the right of the Company or any Holder to thereafter enforce each and every provision of this Agreement.

18. AGENT FOR HOLDERS. The Company and the Holders hereby agree that First Montauk Securities Corp. may, at the election of the Holders evidenced by written notice to the Company, serve as agent on behalf of the Holders in connection with the receipt or delivery of any required notice hereunder.

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Agreement as of the date first above written.

NET/TECH INTERNATIONAL, INC.

By:_____
Name:
Title:

HOLDERS

NAME                          ADDRESS                          SHARES

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# EX−10.3

**STOCK OPTION PLAN**
**10KSB40 Filed on 10/02/2001 − Period: 06/30/2001**
File Number 033−36198



LIVEDGAR Information Provided by Global Securities Information, Inc.
www.gsionline.com

EXHIBIT 10.3

ROI CORPORATION
COMMON STOCK LONG TERM INCENTIVE
STOCK OPTION PLAN

1.  PURPOSE.  This  Plan  as  authorized  by  the  shareholders of Return On Investment  Corporation  d/b/a  ROI Corporation (the "Company") on July 26, 2000, and  adopted  by  the  Board  of  Directors  as of August 10, 2000, is intended to provide an incentive to employees of the Company to encourage them to own Common Stock of the Company and to encourage  them to remain in the  employment  of the Company.

2. DEFINITIONS. As used herein, the following definitions apply:

(a) "BOARD" means the Board of Directors of the Company.

(b) "CAUSE" means (i) conduct of an Employee amounting to fraud, dishonest, gross negligence,  willful  misconduct or excessive  absences from work, or (ii) violating or engaging in activities prohibited by any confidentiality  agreement or other written agreement entered into between the Company and an Employee,  or (iii) conviction for a felony.

(c) "CODE" means the Internal Revenue Code of 1986, as amended from time to time.

(d) "DISABILITY" means any illness or other physical or mental condition of an Employee  which  renders the  Employee  incapable of  performing  his or her customary  and usual  duties for the  Company,  or any  medically  determinable illness,  or other physical or mental condition  resulting from a bodily injury, disease or mental  disorder which in the judgment of the Stock Option  Committee ("Committee")  is permanent and continuous in nature.  The Committee may require such  medical  or other  evidence as it deems  necessary  to judge the nature and permanency of the Employee's condition.

(e) "COMMON STOCK" means the common stock, $.01 par value, of the Company.

(f) "COMPANY" means Return On Investment Corporation d/b/a ROI Corporation, a Delaware corporation.

(g) "COMMITTEE" means the Stock Option Committee if one is appointed by the Board in accordance with Paragraph (a) of Section 4 of the Plan.

(h) "CONTINUOUS EMPLOYMENT" or "CONTINUOUS STATUS AS AN EMPLOYEE" means the absence of any  interruption or  termination of  employment  of an Employee by either the Employee or by the Company or any Parent or Subsidiary of the Company whether or not such Parent or Subsidiary now exists or hereafter is organized or acquired by or acquires the Company. Continuous Employment is not interrupted in the case of transfers  between  locations of the Company or between the Company, its Parent, its Subsidiaries or its successor.

(i)  "DISPOSITION" means any  transfer,  whether  outright or as security, inter vivos  or  testamentary,  with  or  without  consideration,  voluntary  or involuntary,  of all or any part of any right, title or interest  (including but not limited to voting rights) in or to any Shares.

(j) "EMPLOYEE" means (i) any person,  including an officer or director, who is an Employee of the Company for  withholding tax and FICA tax purposes or who is an  employee  for such  purposes of any Parent or  Subsidiary  of the Company which now exists or  hereafter  is  organized or acquired by or  acquires  the Company, (ii) any member of the Board of Directors of the Company, and (iii) any member of any committee of the Board of Directors of the Company.

(k) "OPTION" means a stock option granted pursuant to the Plan.

(l) "OPTIONS" means the aggregate of each and every option granted pursuant to the Plan.

(m) "OPTION PRICE" means the option price for the Shares to be issued pursuant to any Option granted under the Plan as set forth in Section 8 of the Plan.

(n) "OPTIONED SHARES" means stock subject to an option granted pursuant to this Plan.

(o) "OPTIONEE" means an Employee who receives an Option.

(p) "PARENT" means a "parent corporation" which is any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if, at the time of the granting of the Option, each of the corporations other than the Company owns stock possessing fifty (50%) percent or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(q) "PLAN" means the ROI Corporation Common Stock Long Term Incentive Stock Option Plan, as amended from time to time.

(r) "SHARE" means a share of the Common Stock of the Company, as adjusted in accordance with Section 11 of the Plan.

(s) "SHARES" means the aggregate of each and every Share of the Common Stock of the Company, as adjusted in accordance with Section 11 of the Plan.

(t) "SHAREHOLDER" means a holder of Shares.

(u) "SHAREHOLDERS" means holders of Shares.

(v) "SUBSIDIARY" means a "subsidiary corporation" which is any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if, at the time of the granting of the Option, each of the corporations other than the last corporation in the unbroken chain owns stock possessing fifty (50%) percent or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(w) "VEST" or "VESTED" means for an Option or Options to pass to the control of and to become fixed as property in the possession of an Optionee.

3. STOCK SUBJECT TO THE PLAN. Subject to the provisions of Section 11 of the Plan, the maximum aggregate number of shares which may be optioned and sold under the Plan is One Million (1,000,000) shares of Common Stock. Such shares may be authorized but unissued, or may be treasury shares.

If an Option should expire or become unexercisable for any reason without having been exercised in full, the unpurchased Shares which were subject thereto shall, unless the Plan shall have been terminated, become available for other Options granted under the Plan.

4. ADMINISTRATION OF THE PLAN.

(a) PROCEDURAL RULES. The Plan shall be administered by the Board. The Board may appoint a Committee consisting of not less than three (3) members who may or may not be members of the Board to administer the Plan on behalf of the Board, subject to such terms and conditions as the Board may prescribe; provided, however, if the Company has a Chief Executive Officer, one member of the Committee shall be the Chief Executive Officer of the Company. Once appointed, the Committee shall continue to serve until otherwise directed by the Board. From time to time, the Board may increase the size of the Committee and appoint additional members thereof, remove members (with or without cause) and appoint new members in substitution therefor, fill vacancies

2

however caused and remove all members of the Committee and, thereafter, directly administer the Plan. A majority of the entire Committee shall constitute a quorum and the action of a majority of the members present at any meeting at which a quorum is present shall be deemed the action of the Committee. In addition, any decision or determination reduced to writing and signed by all of the members of the Committee shall be fully as effective as if it has been made by a majority vote at a meeting duly called and held. The Committee may appoint a secretary to keep minutes of its meetings and may make such rules and regulations for the conduct of its business as it deems advisable.

If no Committee has been appointed, members of the Board who are either eligible for Options or have been granted Options may vote on any matters affecting the administration of the Plan or the grant of any Options pursuant to the Plan except that no such member shall act upon the granting of any Option to himself or herself, but any such member may be counted in determining the existence of a quorum at any meeting of the Board during which action is taken with respect to the granting of Options to him or her.

If a Committee has been appointed, the members of the Committee shall be eligible to receive Options.

As hereinafter used in this Plan and in any Option granted hereunder, the term "Committee" shall refer to either the Committee or the Board if no Committee is then designated.

(b) POWERS OF THE COMMITTEE. Subject to the provisions of the Plan, the Committee shall have authority: (i) to determine the Employees to whom, and the time or times at which Options shall be granted, and the number of shares to be represented by each Option; (ii) to interpret the Plan; (iii) to prescribe, amend and rescind rules and regulations relating to the Plan; (iv) to determine the terms and provisions of each Option granted under the Plan (which need not be identical) and, with the consent of the holder thereof, modify or amend each Option; (v) to accelerate any exercise date of any Option; (vi) to authorize any person to execute on behalf of the Company any instrument required to effectuate the grant of an Option previously granted by the Committee; (vii) to permit payment by the Company to an Optionee delivering shares to the Company at their then book value; (viii) to authorize loans or cash bonus compensation to any Optionee in connection with the grant or exercise of any Option; and (ix) to make all other determinations deemed necessary or advisable for the administration of the Plan.

(c) EFFECT OF COMMITTEE'S DECISION. All decisions, determinations and interpretations of the Committee shall be final and binding on all Optionees and other holders of any Options granted under this Plan.

5. ELIGIBILITY. Options may be granted only to (i) Employees, (ii) individuals who were Employees within the immediately preceding twelve (12) months of the grant of the Option, and (iii) individuals to whom offers of employment with the Company have been made with such Options being contingent upon employment with the Company. Any Employee who has been granted an Option may, if he or she is otherwise eligible, be granted an additional Option or Options.

6. TERM OF PLAN. The Plan shall become effective upon its adoption by the Board or its approval by vote of the holders of a majority of the outstanding Shares of the Company entitled to vote on the adoption of the Plan, whichever is earlier. It shall continue in effect until August 10, 2010, unless sooner terminated under Section 13 of the Plan. No Option may be issued after the Plan is terminated.

7. TERM OF OPTION. The term of each Option granted under the Plan shall not be in excess of ten (10) years from the date of grant thereof.

8. OPTION PRICE. The option price for the Shares to be issued pursuant to any Option granted under the Plan shall be determined by the Committee at the time the Option is granted.

3

9. VESTING AND EXERCISE OF OPTION.

(a) PROCEDURE OF VESTING AND EXERCISE. Any Option granted hereunder is Vested and is exercisable at such times and under such conditions as are permissible under the terms of the Plan and of the particular Option granted to an Optionee.

An Option is not Vested and is not be exercisable for fractional Shares.

An Option is exercised when written notice of such exercise has been given to the Company in accordance with the terms of the Option by the person entitled to exercise the Option and full payment of the Shares with respect to which the Option is exercised has been received by the Company. Until the issuance of the stock certificates (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder exists with respect to Optioned Shares notwithstanding the exercise of the Option. No adjustment will be made for a dividend or other rights for which the record date is prior to the date the stock certificates are issued except as provided in Section 11 of the Plan.

(b) EXERCISE DURING EMPLOYMENT OR FOLLOWING DEATH OR DISABILITY. An Option may be exercised by the Optionee only while he or she is an Employee and, provided he or she is not terminated for Cause, for a period not to exceed ninety (90) days from the date of termination of his or her Continuous Status As An Employee, except if his or her Continuous Employment terminates by reason of his or her death or disability, then to the extent that the Optionee would have been entitled to exercise the Option immediately prior to his or her death or disability, such Option of the deceased or disabled Optionee may be exercised during the period the Option would have been exercisable if the deceased or disabled Optionee had not died or become disabled and had remained in Continuous Employment and for a period of three hundred sixty-five (365) days from the death or disability of the Optionee, by the person or persons (including his or her estate) to whom his or her rights under such Option shall have passed by will or by laws of descent and distribution.

10. NON-TRANSFERABILITY OF OPTIONS. An Option may not be sold, pledged, assigned, hypothecated, transferred or disposed of in any manner other than by will or by the laws of descent or distribution and may be exercised, during the lifetime of the Optionee, only by such Optionee.

11. ADJUSTMENTS UPON CHANGES IN CAPITALIZATION.

(a) ADJUSTMENT OF NUMBER OF SHARES. Upon each adjustment of the Option Price as provided in Section 11(b) of the Plan, the Optionee is entitled to purchase, at the Option Price resulting from such adjustment, the number of Shares obtained by multiplying the Option Price in effect immediately prior to such adjustment by the number of Shares purchasable pursuant to the Plan immediately prior to such adjustment and dividing the product thereof by the Option Price resulting from such adjustment.

(b) ADJUSTMENT OF OPTION PRICE. The Option Price shall be subject to adjustment from time to time as follows:

(i) If, at any time during the term of an Option as set forth in Section 7 of the Plan, the number of shares of Common Stock issued and outstanding is increased by a stock dividend payable in shares of Common Stock or by a subdivision or split-up of shares of Common Stock, then, immediately following the record date fixed for the determination of holders of Common Stock entitled to receive such stock dividend, subdivision or split-up, the Option Price shall decrease in proportion to such increase in outstanding shares and the number of such Shares issuable upon the exercise of an Option shall increase in proportion to such increase in outstanding shares.

(ii) If, at any time during the term of an Option as set forth in Section 7 of the Plan, the number of shares of Common Stock issued and outstanding is decreased by a combination of the outstanding shares of Common Stock, then, immediately following the record date for such combination, the Option Price shall increase in proportion to such decrease in outstanding shares and the number of

4

Shares issuable upon the exercise of an Option shall decrease in proportion to such decrease in outstanding shares.

(iii) In case, at any time during the term of an Option as set forth in Section 7 of the Plan, of any capital reorganization, or any reclassification of the stock of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a stock dividend or subdivision, split-up or combination of shares), or the consolidation or merger of the Company with or into another corporation (other than a consolidation or merger in which the Company is the continuing operation and which does not result in any change in the Common Stock) or of the sale of all or substantially all the properties and assets of the Company as an entirety to another person, the Options shall, after such reorganization, reclassification, consolidation, merger or sale, be exercisable for the kind and number of shares of stock or other securities or property of the Company or of the corporation resulting from such consolidation or surviving such merger or to which such properties and assets shall have been sold to which such holder would have been entitled if he had held the Shares which he would have held had he exercised the Options immediately prior to such reorganization, reclassification, consolidation, merger or sale.

(iv) Whenever the number of Shares or the amount of the Option Price shall be adjusted as provided in this Section 11, the Company shall forthwith mail a notice setting forth the adjusted Option Price and the adjusted number of Shares then purchasable under Options to the holders of the Options at their address as it shall appear on the registration records of the Company, but failure to give or receive such notice, or any defects therein, or in the mailing thereof, shall not affect such adjustment in the number of Shares or in the amount of the Option Price. Where appropriate, such notice may be given in advance and may be included as part of the notice required to be mailed under the provisions of this Section 11(b)(vi) of the Plan.

(v) Adjustments made pursuant to Sections 11(b)(i) and (ii) of the Plan shall be made on the date such dividend, subdivision, split-up or combination, as the case may be, is made, and shall become effective at the opening of business on the business day next following the record date for the determination of stockholders entitled to such dividend, subdivision, split-up or combination.

(vi) In the event the Company shall propose to take any action of the types described in Sections 11(b)(i), (ii) or (iii) of the Plan, the Company shall give notice to the holders of the Options in the manner set forth in Section 11(b)(iv) of the Plan, which notice shall specify the record date, if any, with respect to any such action and the date on which such action is to take place. In the case of any action which would require the fixing of a record date, such notice shall be given at least twenty (20) days prior to the date so fixed, and in the case of all other action, such notice shall be given at least thirty (30) days prior to the taking of such proposed action. Failure to give such notice, or any defect therein, shall not affect the legality or validity of any such action.

(vii) In any case in which the provisions of this Section 11 of the Plan shall require that an adjustment shall become effective immediately after a record date for an event, the Company may defer, until the occurrence of such event, issuing to the holders of all or any part of the Options which are exercised after such record date and before the occurrence of such event any additional Shares issuable upon such exercise by reason of the adjustment required by such event over and above the Shares issuable upon such exercise before giving effect to such adjustment; provided, however, that the Company shall deliver to such holders a due bill or other appropriate instrument evidencing such holder's right to receive such additional Shares upon the occurrence of the event requiring such adjustment.

12. TIME OF GRANTING OPTIONS. The date of grant of an Option under the Plan is the date on which the Committee makes the determination granting such Option; a notice of the determination is to be given to each Employee to whom an Option is so granted within a reasonable time after the date of such grant.

5

13. AMENDMENT AND TERMINATION OF THE PLAN. The Board may not amend or terminate the Plan without the affirmative vote of a majority of the Options granted as such granted Options are voted by the holders thereof, each such granted Option to acquire a Share permitting the holder thereof to one vote for each such granted Option to acquire a Share held by such holder. The Options granted only have the right to vote with respect to the matters set forth in this Section 13 and the Options have no right to vote with respect to any other matters whatsoever.

14. CONDITIONS UPON ISSUANCE OF SHARES. Shares shall not be issued with respect to an Option granted under the Plan unless the exercise of such Option and the issuance and delivery of such Shares pursuant thereto shall comply with all relevant provisions of law, including, without limitation, the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the rules and regulations promulgated thereunder, and the requirements of any stock exchange upon which the shares may then be listed, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

As a condition to the exercise of any Option, the Company may require the person exercising such Option to represent and warrant at the time of any such exercise that:

   (a) The Shares are being purchased for such person's own account without the participation of any other person, with the intent of holding the Shares for investment and without the intent of participating, directly or indirectly, in a distribution of the Shares and not with a view to, or for resale in connection with, any distribution of the Shares or any portion thereof, nor is such person aware of the existence of any distribution of the Company's securities;

   (b) Such person is not acquiring the Shares based upon any representation, oral or written, by any person with respect to the future value of, or income from, the Shares but rather upon an independent examination and judgment as to the prospects of the Company;

   (c) The Shares were not offered to such person by means of publicly disseminated advertisements or sales literature, nor is such person aware of any offers made to other persons by such means.

The person exercising an Option must further acknowledge that he or she must continue to bear the economic risk of the investment in the Shares for an indefinite period and recognizes that the Shares may not be (i) sold without registration under any state or federal law relating to the registration of securities for sale; (ii) issued and sold in reliance on the exemption from registration under the applicable securities act of any state, including, but not limited to, the Georgia Securities Act of 1973, as amended (the "Act"), provided by Section [(m) (now codified as O.C.G.A. Section 10-5-9(13)) of the Act; and (iii) issued and sold in reliance on an exemption from registration under applicable state law; and (iv) issued and sold in reliance on the exemption from registration under the Securities Act of 1933 (the "1933 Act") provided by Section 4(2) of the 1933 Act.

As a condition to the exercise of any Option, the Company may further require the person exercising such Option to agree at the time of any such exercise as follows:

   (d) The Shares will not be offered for sale, sold or transferred other than pursuant to (i) an effective registration under the Act or in a transaction which is otherwise in compliance with the Act; (ii) an effective registration under applicable state law or in a transaction which is otherwise in compliance with applicable state law; (iii) an effective registration under the 1933 Act or in a transaction otherwise in compliance with the 1933 Act; and (iv) evidence satisfactory to the Company of compliance with the applicable securities laws of other jurisdictions. The Company shall be entitled to rely upon an opinion of counsel satisfactory to it with respect to compliance with the above laws;

   (e) The Company will be under no obligation to register the Shares or to comply with any exemption available for sale of the Shares without registration, and the information or conditions necessary to

6

permit routine sales of securities of the Company under Rule 144 of the 1933 Act are not now available and no assurance has been given that they will become available. The Company is under no obligation to act in any manner so as to make Rule 144 available with respect to the Shares;

(f) The Company may, if it so desires, refuse to permit the transfer of the Shares unless the request for transfer is accompanied by an opinion of counsel acceptable to the Company to the effect that neither the sale nor the proposed transfer will result in any violation of the 1933 Act or the securities laws of any other jurisdiction;

(g) A legend indicating that the Shares have not been registered under such laws and referring to the restrictions on transferability and sale of the Shares may be placed on the certificate or certificates delivered to the undersigned or any substitute therefor and any transfer agent of the Company may be instructed to require compliance therewith.

15. RESERVATION OF SHARES. The Company, during the term of the Plan, will at all times reserve and keep available, the number of Shares as shall be sufficient to satisfy the requirements of the Plan.

Inability of the Company to obtain from any regulatory body having jurisdiction authority deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder shall relieve the Company of any liability in respect to the non-issuance or sale of such Shares as to which such requisite authority shall not have been obtained.

16. LIABILITY OF COMPANY. The Company, its Parent or any Subsidiary which is in existence or hereafter comes into existence, shall not be liable to an Optionee or other person if it is determined for any reason by the Internal Revenue Service or any court of competent jurisdiction that any Options intended to be Incentive Stock Options granted hereunder are not Incentive Stock Options.

17. EFFECT OF PLAN ON ASSOCIATION. Neither the adoption of the Plan nor the granting of any Option pursuant to it shall be deemed to create any right in any individual to be retained or continued in association with the Company nor to affect in any way any provision concerning termination of such association in any contract between such individual and the Company.

18. INDEMNIFICATION AND EXCULPATION. Each person who is or shall have been a member of the Board or of the Committee shall be indemnified and held harmless by the Company against expenses actually and necessarily incurred by him or her in connection with the defense of any action, suit or proceeding in which he or she may be or become a party by reason of any action taken or failure to act under this Plan and against and from any and all amounts paid by him or her in settlement thereof (with the Company's written approval) or paid by him or her in satisfaction of a judgment in any such action, suit or proceeding, except in relation to matters as to which he or she is adjudged in such action, suit or proceeding to be liable for negligence or misconduct in the performance of duty and to such matters settled by agreement predicated on the existence of such liability; subject, however, to the condition that upon the institution of any claim, action, suit or proceeding against him or her, he or she must in writing give the Company an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it on his or her own behalf. The foregoing right of indemnification shall not be exclusive of any other right to which such person may be entitled as a matter of law or otherwise, or any power that the Company may have to indemnify him or her or hold him or her harmless.

Each member of the Board or of the Committee, and each officer and Employee of the Company is fully justified in relying or acting in good faith upon any information furnished in connection with the administration of this Plan by any appropriate person or persons other than himself or herself. In no event shall any person who is or shall have been a member of the Board or of the Committee, or an officer or Employee of the Company be held liable for any determination made or other action taken or any commission to act in reliance upon any such information, or for any action (including the furnishing of information) taken or any failure to act, if in good faith.

7

19. USE OF PROCEEDS. The proceeds received from the sale of the Common Stock pursuant to the Plan will be used for general corporate purposes.

Adopted as of this 10th day of August, 2000, by the undersigned, being all of the Directors of the Company.

/S/ JOHN W. MCROBERTS      (SEAL)          /S/ CHARLES A. MCROBERTS  (SEAL)
--------------------------------          --------------------------------
John W. McRoberts                         Charles A. McRoberts


/S/ CHARLES PECCHIO, JR.   (SEAL)          /S/ GLENN E. COHEN        (SEAL)
--------------------------------          --------------------------------
Charles Pecchio, Jr.                      Glenn E. Cohen

8

# Tectonic Network, Inc (TNWKQ)

1825 BARRETT LAKES BLVD
STE 260
KENNESAW, GA 30144
770. 517.4750

# EX–21.1

**SUBSIDIARIES OF REGISTRANT**
**10KSB40 Filed on 10/02/2001 – Period: 06/30/2001**
File Number 033–36198



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 21.1

Return On Investment Corporation - wholly-owned subsidiaries:
----------------------------------------------------------

GO Software, Inc., a Washington corporation
5000 Business Center Drive, Suite 1000
Savannah, GA 31405

Net400, Inc., a Georgia corporation
1825 Barrett Lakes Boulevard, Suite 260
Kennesaw, Georgia 30144

Results Oriented Integration Corporation, a Georgia corporation
1825 Barrett Lakes Boulevard, Suite 260
Kennesaw, Georgia 30144

ROI Payment Services, Inc., a Georgia corporation
1825 Barrett Lakes Boulevard, Suite 260
Kennesaw, Georgia 30144

S.A.F.E. Systems, Inc., an Illinois corporation
901 North Batavia Avenue, Suite 301
Batavia, Illinois 60510

# EXHIBIT J

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| AD HOC COMMITTEE OF EQUITY HOLDERS OF TECTONIC NETWORK, INC.<br><br>                    Plaintiff,<br>     vs.<br><br>AROL WOLFORD, SHERWIN KRUG, CHARLES McROBERTS, JOHN McROBERTS, CHARLES PECCHIO, JR., LAURA ROGERS and THEO VANDERBOOM<br><br>                    Defendants. | Civil Action No. 06-665 |

### DECLARATION OF JOHN McROBERTS

John McRoberts deposes and says:

1.     I am a defendant in this action.

2.     Since June 2004, my residence has been 122 Camp Creek Point, Panama City Beach, FL 32413.

I declare under penalty of perjury that the foregoing is true and correct.

<br>

_John McRoberts_
John McRoberts

LEGAL_US_E # 73248603.1

## CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on November 28, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Ian Connor Bifferato
> Linda Richenderfer
> Joseph K. Koury
> Bifferato, Gentilotti, Biden & Balick
> 1308 Delaware Ave.
> Wilmington, DE 19806

I further certify that on November 28, 2006, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY FEDERAL EXPRESS**

> Thomas J. Flemming
> Herbert C. Ross, Jr.
> Olshan, Grundman, Frome,
> Rosenzweig, & Wolosky LLP
> 65 East 55th Street
> New York, NY 10022

YOUNG CONAWAY STARGATT & TAYLOR, LLP

William D. Johnston (No. 2123)
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
(302) 571-6600
apoff@ycst.com