IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AD HOC COMMITTEE OF EQUITY HOLDERS OF TECTONIC NETWORK, INC., | No. 06-665 |
| Plaintiff, | |
| v. | |
| AROL WOLFORD; SHERWIN KRUG; CHARLES MCROBERTS; JOHN MCROBERTS; CHARLES PECCHIO, JR.; LAURA ROGERS; and THEO VANDERBOOM, | |
| Defendants. | |

## COMPENDIUM OF CASES CITED IN PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Ian Connor Bifferato (#3273)
Linda Richenderfer (#4138)
BIFFERATO, GENTILOTTI, BIDEN
& BALICK LLC
1308 Delaware Avenue
Wilmington, Delaware 19801
(302) 429-1900

and

Thomas J. Fleming, Esquire
Herbert C. Ross, Jr., Esquire
OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP
65 East 55th Street
New York, New York 10022
Telephone: 212-451-2300

*Attorneys for Plaintiff*

Dated: Wilmington, Delaware
          December 12, 2006

## TABLE OF CONTENTS

*Alidina v. Internet.com Corp.*, 2002 WL 31584292 (Del. Ch. Nov. 6, 2002) ................................1

*Allstate Ins. Co. v. Dinkins*, CIV.A. No. 87-6164, 1988 WL 26476 (E.D.Pa. Mar. 11, 1988) ...................................................................................................................2

*Borah, M.D., P.C. v. Monumental Life Ins..Co., No. Civ.A. 04-3617*, 2005 WL 83261 (E.D. Pa. Jan. 14, 2005) .............................................................................3

*Epic Systems Corp. v. Acacia Research Corp., No. CIVA 06-255*, 2006 WL 3355185 (D.Del. Nov. 16, 2006) .............................................................................4

*In re Emerging Communications, Inc. Shareholders Litig., No. Civ.A. 16415*, 2004 WL 1305745 (Del. Ch. May 3, 2004) ......................................................5

*In re Veritas Software Corp. Securities Litig.*, No. 04-831-SLR, 2006 WL 1431209 (D.Del. May 23, 2006) ..........................................................................6

*IT Litigation Trust v. D'Aniello*, No. 04-1268, 2005 WL 3050611 (D.Del. Nov. 15, 2005) .............................................................7

*Khanna v. McMinn, No. Civ.A 20545*, 2006 WL 1388744 (Del. Ch. May 9, 2006) ......................8

*Lord v. Living Bridges,  No. CIV.A. 97-6355*, 1998 WL 792179 (E.D. Pa. Nov. 10, 1998) ...............................................................................................................9

*Shamrock Holdings, Inc. v. Arenson*, __ F.Supp.2d __, 2006 WL 2802913 (D.Del. Sept. 29, 2006) .........................................................................10

*Stone v. Ritter*, No. 93, 2006, 2006 WL 3169168 (Del. Nov. 6, 2006) .........................................11

*Street Search Partners, L.P. v. Ricon Int'l L.L.C.*, C.A. No. 04C-09-191-PLA, 2006 WL 1313859 (Del. Super. May 12, 2006) .......................................................12

# EXHIBIT 1



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Alidina v. Internet.com Corp.Del.Ch.,2002.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
Ariff ALIDINA, David Swart, Mohamed Alidina, and Marion Jack Rickard, Plaintiffs,
v.
INTERNET.COM CORPORATION, Alan Meckler, Christopher S. Cardell, Wayne A. Martino, Walter H.
Lippincott, Gilbert F. Bach, Beverly C. Chell, Michael J. Davies and Charles R. Ellis, Defendants.
**No. Civ.A. 17235-NC.**

Submitted Oct. 3, 2002.
Decided Nov. 6, 2002.

Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Sanford P. Dumain,
Samuel H. Rudman and Susan M. Greenwood, of Milberg Weiss Bershad Hynes & Lerach LLP, New York, New
York, for Plaintiffs, of counsel.
Allen M. Terrell, Jr. and Dominick Gattuso, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Stephen
Greiner, Albert M. Myers III and Barbara B. Farley, of Willkie Farr & Gallagher, New York, New York, for
Defendants, of counsel.

*MEMORANDUM OPINION*

CHANDLER, J.
**\*1** This class action arises out of a tender offer for shares of a Delaware corporation followed by a merger between it
and the acquiring company. Certain shareholders who tendered their stock filed this lawsuit, challenging the two-step
transaction. They charge the directors who approved and recommended the transaction with breaches of their
fiduciary duties of care, loyalty and candor. Similar to other recent cases in this Court, the challenged transactions
involve a chief executive officer/director who negotiated most of the terms of the transaction, including one aspect in
which the officer/director was clearly self-interested. The defendants have moved to dismiss all of the asserted claims,
which I deny for the reasons set forth below.

## I. INTRODUCTION

In late 1998, Penton Media, Inc. (?Penton?) purchased Mecklermedia Corporation (?Mecklermedia? or the
?Company?). This two-step transaction (?Transaction?) was accomplished by way of a tender offer followed by a
merger, pursuant to an Agreement and Plan of Merger among Mecklermedia, Penton and Internet World Media Inc.,
dated October 7, 1998.

The plaintiff shareholders of Mecklermedia brought this class action challenging the fairness of the Transaction,
alleging that the individual board members breached their fiduciary duties. They allege that these breaches resulted in
merger consideration that was ?grossly unfair,? largely due to the concurrent sale of an 80.1% interest in Internet.com
(the ?iWorld transaction?), Mecklermedia's wholly owned subsidiary, at an allegedly unfair price to Alan Meckler
(?Meckler?), who was a 26% shareholder, board member, and the CEO of Mecklermedia. Plaintiffs allege that
Meckler demanded this sale in exchange for his approval of the Transaction and that this sale diverted funds from the
Company to Meckler. Because of this, plaintiffs contend that the board members could not have approved and
recommended the Transaction and iWorld transaction (collectively, the ?Transactions?) in good faith. Last, plaintiffs
allege that the board members were grossly negligent in the negotiation and approval of the Transactions and in
failing to disclose all material facts to the shareholders. In short, plaintiffs' complaint alleges breaches of the directors'
fiduciary duties of loyalty, care, and disclosure.

## II. STATEMENT OF FACTS

Mecklermedia was an internet media company providing internet information to industry professionals via trade

shows, conferences and print publications. Internet.com was its wholly owned subsidiary that disseminated internet information electronically through a network of web sites.

Penton, the acquiror, is also a company that specializes in internet industry trade shows and print publications and maintains web sites for the purpose of advertising these trade shows and print publications. The Transactions combining Penton and Mecklermedia came about after Mecklermedia had explored business combinations with at least three other suitors throughout 1998.

**\*2** Mecklermedia began exploring potential business combinations in early 1998 with the assistance of its investment banker, Allen & Company (?Allen & Co.?). Mecklermedia first discussed a potential combination with Advanstar Holdings, Inc. (?Advanstar?). In June, after approximately three months of negotiations, Advanstar proposed a transaction in which it would conduct a cash tender offer for all Mecklermedia stock and then sell the publishing and internet assets to a newly-formed entity that would be majority-owned by Meckler. Allen & Co. consulted Deloitte & Touche LLP (?D & T?) regarding the tax consequences of the various acquisition scenarios proposed. D & T provided this tax information and at the same time valued Internet.com at $50 million. Negotiations with Advanstar did not result in a letter of intent.

Mecklermedia concurrently explored a potential transaction with Miller Freeman, the United States division of United News & Media (?United News?) in June. Shortly after Miller Freeman's overtures, United News approached Meckler to propose its potential acquisition of Mecklermedia. United News eventually offered to purchase all Mecklermedia shares for $270 million.[FN1] The last offer United News delivered to Mecklermedia included an agreement for Meckler to purchase a 50% interest in Internet.com for $17.5 million.

> FN1. Plaintiffs provide different figures representing United News' offer to Mecklermedia without accounting for the discrepancy in the figures. Although more than one offer was received, it is difficult to determine from the pleadings the value of the highest offer. The $270 million offer is the only offer that refers to a purchase of all Mecklermedia shares, and is the offer that plaintiffs contend should have been disclosed to the shareholders. Thus, this is the figure I employ throughout the opinion.

After negotiations failed with each prior suitor, Mecklermedia found its match. On September 21, 1998, Thomas L. Kemp, Penton's Chairman and CEO, contacted Meckler regarding Penton's acquisition of Mecklermedia. During this conversation, plaintiffs contend that Meckler emphasized the importance of the iWorld transaction and insinuated that prior negotiations had fallen through because the terms of this side deal had not been favorable.

Penton then presented a draft letter of intent to Meckler on September 24, 1998, offering to purchase Mecklermedia. For unexplained reasons, this initial draft letter did not include the iWorld transaction. The next day, the two parties executed a letter of intent that provided for Penton to acquire the Company at $29 per share (or $274 million for all shares). This new letter additionally agreed to sell a 50% interest in Internet.com to Meckler for $15 million. Continuing negotiations resulted in an increase in Meckler's share of Internet.com at a lower price per share (from 50% at $15 million to 80.1% at $18 million) while there was no increase in the per share purchase price of Mecklermedia.

As a result, the parties agreed to value Internet.com at $22.5 million in the sale, as compared to the earlier value of $30 million. The lower value allegedly was a function of the amount Meckler was willing to pay for his equity interest (80.1% at $18 million = 100% at $22.5 million). According to the tender offer materials, this amount was significantly higher than Internet.com's value based upon its historical accounting, and represented six times the company's revenue and three times its tangible assets.

**\*3** The Transactions were subjected to various evaluations by advisors to both Mecklermedia and Penton. Mecklermedia's investment bankers, Allen & Co., determined that the merger consideration in the Transactions as structured was fair to the shareholders of Mecklermedia from a financial point of view. Penton and Penton's advisor, Donaldson, Lufkin & Jenrette (?DLJ?), analyzed the purchase price and concluded it was a fair price for Mecklermedia's trade show and publishing assets alone, excluding Internet.com.[FN2] Plaintiffs emphasize that Penton was earlier cautioned by PriceWaterhouseCoopers LLC (?PwC?) to further analyze Meckler's purchase of Internet.com from an economic and legal standpoint to determine whether the transaction treated Mecklermedia's shareholders equally and whether Internet.com was being sold at a fair price. There is no allegation in the complaint as to whether such further analysis was ever undertaken by either Penton or Mecklermedia. Plaintiffs also stress that the Mecklermedia board specifically considered forming, and declined to form, a special committee to review the Transactions.

FN2. DLJ gave Penton an oral opinion regarding the $30 million valuation of Internet.com. Plaintiffs fail to disclose the result of this verbal report, although it carries little relevance since the final valuation of Internet.com agreed upon was $22.5 million, not $30 million. Regardless, plaintiffs do not assert that DLJ orally opined that a $30 million valuation was unfair.

After three meetings of the Mecklermedia board, one of which included a presentation to the board by Allen & Co., the board unanimously approved the Transactions on October 7, 1998. At the same time, Meckler signed a Tender, Voting and Option Agreement, which obligated him to tender his Mecklermedia shares to Penton. The next day, Penton issued a press release announcing the tender offer. Penton then filed a Schedule 14D-1 (the ?14D-1?) with the SEC on October 15, which formally commenced the tender offer. Attached as exhibits to the 14-D-1 were the Offer to Purchase, the Merger Agreement, the Tender, Voting and Option Agreement, as well as a Services Agreement.

The same day Penton filed its 14D-1, Mecklermedia filed its Schedule 14D-9 Solicitation/Recommendation Statement (the ?14D-9?) with the SEC. This statement announced that Mecklermedia's board had unanimously approved the tender offer and Merger Agreement, had determined that the Transactions were fair, and recommended that the shareholders accept the offer to tender their shares. This 14D-9 attached the fairness opinion of Allen & Co. Mecklermedia filed an amended Schedule 14D-9 (the ?Amended 14D-9?) on Nov. 12, 1998, to provide more information regarding the iWorld transaction, which extended the tender offer period and included Meckler's opinion that the iWorld transaction (and his purchase of 80.1% of Internet.com at $18 million) was fair to the shareholders of Mecklermedia.

On November 24, 1998, the tender offer ended and 97.9% of the shares were tendered and not withdrawn. The Transaction and iWorld transaction were completed, and Internet.com was spun-off and renamed internet.com (?New internet.com?).

Five months later, New internet.com announced its intent to go public. On June 25, 1999, New internet.com completed its initial public offering and sold 3,400,000 shares of common stock at $14 per share. This action was filed that same month and was amended on November 7, 2000, and again on November 9, 2001. Defendants have now moved to dismiss the entire complaint on the basis that it fails to state a claim.

III. ANALYSIS

*4 Defendants' motion to dismiss is based upon two main theories: 1) the board did not breach any fiduciary duties; and 2) in any event, plaintiffs acquiesced in any alleged misconduct by tendering their shares. Plaintiffs counter these theories by reaffirming allegations that the board breached its fiduciary duties of loyalty, care, and disclosure, and that they could not have acquiesced by tendering their shares because they were not fully informed.

*A. Standard of Review on a Motion to Dismiss*

Defendants have moved to dismiss plaintiffs' complaint pursuant to Court of Chancery Rule 12(b)(6), asserting that the complaint fails to state a claim upon which relief can be granted. In deciding a motion to dismiss, a trial court must assume the truth of all well-pled, non-conclusory allegations in the complaint.[FN3] The court must additionally extend the benefit of all reasonable inferences that can be drawn from those allegations to the non-moving party, the plaintiffs here.[FN4] The court may, however, exclude allegations that are conclusory and lack factual support.[FN5] Thus, a court will dismiss the claim only when the plaintiffs fail to plead facts supporting an element of the claim, or when the facts pled could not support a claim for relief under any reasonable interpretation of those facts.[FN6] Defendants also move to dismiss New internet.com as a defendant.

FN3. *Loudon v. Archer-Daniels-Midland Co., 700 A.2d 135, 140 (Del.1997).*

FN4. *Id.*

FN5. *In re Walt Disney Co. Derivative Litig., 731 A.2d 342, 353 (Del. Ch.1998).*

FN6. *Del. State Troopers Lodge v. O'Rourke, 403 A.2d 1109, 1110 (Del. Ch.1979).*

*B. Did the Board Breach Its Fiduciary Duties?*

The plaintiffs allege that the Mecklermedia Board breached its fiduciary duties of loyalty, care, and disclosure in considering, approving and recommending the Transaction and the iWorld transaction.

*1. Duty of Loyalty*

Defendants argue that the plaintiffs' duty of loyalty claim should be dismissed for two reasons. First, defendants stress that plaintiffs failed to allege facts sufficient to indicate that the Mecklermedia board was self-interested or lacked independence. Second, defendants assert that plaintiffs failed to allege facts sufficient to indicate that the board acted in bad faith or had no rational basis for its decision to approve or recommend the transaction.

Plaintiffs have effectively conceded that the board was not *apparently* self-interested or lacking independence.[FN7] They counter, however, by alleging that this independent, disinterested board nevertheless must have acted in bad faith because it approved a transaction that was so far beyond the bounds of reasonable judgment that it was inexplicable on any other ground.

> FN7. ?Defendants' arguments concerning whether the directors were interested in the transaction or lacked independence are beside the point.? (Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss the Second Am. Compl. at 24 n. 4.)

Although the business judgment rule normally prevents a court from reviewing the decisions of an independent, disinterested board that are made in good faith and in the exercise of due care, there is one narrow ?escape hatch.?[FN8] The business judgment rule may be rebutted ?in those *rare* cases where the decision under attack is ?so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.? ? [FN9] The decision must be ?egregious,? lack ?any rational business purpose,? constitute a ?gross abuse of discretion,? or be so thoroughly defective that it carries a ?badge of fraud.?[FN10]

> FN8. *In re J.P. Stevens & Co.,* 542 A.2d 770, 780-81 & n. 5 (Del. Ch.1988) (?This ?escape hatch? language has been variously stated in the Delaware opinions: ?egregious' decisions are said to be beyond the protections of the business judgment rule, as are decisions that cannot ?be attributed to any rational business purpose?, or decisions that constitute ?a gross abuse of discretion.? ?) (internal citations omitted).
>
> FN9. *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243, 1246 (Del.1999) (quoting *In re J.P. Stevens & Co.,* 542 A.2d at 780-81) (emphasis added).
>
> FN10. *In re J.P. Stevens & Co.,* 542 A.2d at 781 n. 5.

**\*5** The Court's responsibility at this stage is to determine whether any reasonable interpretation of the facts in plaintiffs' complaint could support a claim for relief. Thus, plaintiffs must allege sufficient facts that could reasonably lead to an inference that the board's act was so egregious that it must have been the product of disloyalty or bad faith. Here, the complaint alleges facts that, if proven, could support a claim that Meckler and the Mecklermedia board members breached their fiduciary duty of loyalty.[FN11]

> FN11. Many of these allegations border upon conclusory statements, yet I am reluctant to summarily dismiss them at this stage, as I must assume the truth of all well-pled facts and give plaintiff the benefit of all reasonable inferences. I would stress, however, that plaintiffs must meet their burdensome task of supporting these allegations (such as the bald assertion that Meckler demanded and received a ?bribe?) with more specific facts to survive the summary judgment stage. Although I have assumed the truth of most of the facts in plaintiffs' complaint, I have disregarded an allegation that Meckler was provided with a vehicle to induce four other affiliates to approve or facilitate the transaction. Even though Meckler had the option to provide four others with a small equity interest in New internet.com, plaintiffs have failed to allege any facts that even remotely indicate that Meckler employed or even considered using this method to facilitate the approval of the transaction.

Similar to the plaintiffs in *Parnes v. Bally Entm't Corp.*[FN12] and *Crescent/Mach I Partners, L.P. v. Turner,*[FN13] the plaintiffs here have alleged that this disinterested, independent board approved of an unfairly negotiated transaction

that benefited Meckler at the expense of the other Mecklermedia shareholders. In *Parnes,* the plaintiffs alleged that the company's CEO, Mr. Goldberg, controlled the merger negotiations and extracted substantial cash payments and assets that lacked consideration and were conditioned upon completion of the merger.[FN14] These benefits were offered in exchange for his consent, which he claimed was mandatory to the sale.[FN15] Further, it was alleged that he discouraged other bidders who would not consent to these bribes and who may have paid a higher price for the company otherwise.[FN16] These allegations of bribery and unfair dealing by the CEO who negotiated the transaction, even in the context of an independent, non-conflicted board, provided enough substance to persuade the Supreme Court to overturn this Court's earlier dismissal of the *Parnes* complaint.

FN12. 722 A.2d 1243 (Del.1999).

FN13. C.A. No. 17455, 2000 Del. Ch. LEXIS 145 (Sept. 29, 2000) [hereinafter *Crescent/Mach* ].

FN14. These payments and asset transfers included: (1) a termination payment of $21 million (which exceeded the amount arguably due to Goldberg by approximately $14.4 million); (2) a transfer to Goldberg for $250,000 of a warrant worth $5 million for the purchase of 20% of Bally Total Fitness Holding Corporation's common stock and the forgiveness of $15.2 million of Bally Fitness indebtedness to Bally; (3) the merger of Bally's Casino Holdings, Inc., a shell corporation, into Bally and the conversion of the Casino Holdings preferred stock, all owned by Goldberg, into Bally and Bally Total Fitness stock worth approximately $43 million; (4) the transfer to Goldberg of 20% of Bally's interest in a Maryland race track project; and (5) the transfer to Goldberg of 40% of Bally's interest in a proposed Mexican gaming venture. *Parnes,* 722 A.2d at 1246.

FN15. *Id.* at 1245.

FN16. *Id.* at 1246.

In *Crescent/Mach,* this Court found that Mr. Turner, CEO, controlling shareholder and Chairman of the Board, secured ?a substantial transfer of ... assets and substantial financial remuneration? for himself that were not made available to the minority shareholders, similar to the benefits obtained in *Parnes.*[FN17] Even though the board received a fairness opinion based upon three different valuation methods, the court denied the defendants' motion to dismiss because Mr. Turner's alleged breach of his fiduciary duties was so egregious that they tainted the entire merger process.[FN18] Thus, the board's approval of the transaction alone was enough to rebut the business judgment rule because the board ?fail[ed] to protect the interests of the corporation and the minority stockholders.? [FN19]

FN17. *Crescent/Mach,* 2000 Del. Ch. LEXIS 145 at *43 & n. 47. The import of these ?side-deals? is that Turner stood to gain a substantial equity interest in Bottling Group while Holdings and ABC would become wholly owned subsidiaries of Bottling Group. For example, these alleged ?side-deals? included: 1) the Turner Family Partnership contracting with Bottling Group to contribute one million shares of Holdings' stock, owned and controlled by Turner, to Bottling Group in exchange for 250,000 shares of Bottling Group thereby securing for Turner a substantial equity interest in the surviving entity; 2) CAI and Carlyle Bottling contracting for a stock exchange with Bottling Group in which they agreed to exchange their stock in ABC for stock in Bottling Group; 3) Holdings redeeming approximately 6 million shares of its stock owned or controlled by Turner or the Turner Family Partnership for $25 per share thereby securing for Turner certain tax advantages not offered to other stockholders; 4) making the merger contingent on the sale of JLT Beverages' claimed brand name Deja Blue and franchise rights in Snapple brand products for $15 million to Bottling Group; 5) CSI and Carlyle Bottling agreeing to each purchase $75 million of Bottling Group's stock after the consummation of the merger; 6) Cadbury Schweppes agreeing to purchase $150 million of Bottling Group's subordinated debt; 7) Turner, Bottling Group, CSI, Carlyle Bottling, and the Turner Family Partnership entering into an agreement to retain Turner on the board of directors of the surviving entity for so long as he is employed by the Bottling Group at a base salary of $900,000 including bonuses and stock options; 8) Turner receiving shares in the surviving entity which would ?facilitate realization of a profit by the Turner interests through an initial public offering of Bottling Group's stock-an opportunity not afforded to other stockholders; 9) Carlyle Bottling and the Turner Family Partnership agreeing that the Bottling Group stock acquired in the transactions by the Turner Family Partnership, CSI and Carlyle Bottling would be treated as a tax free exchange; 10) CSI and Carlyle Bottling agreeing to purchase the Holdings' stock that Turner and the Turner Family Partnership were to have redeemed in the event the Merger was enjoined. *Id.* at *8-*10.

FN18. *Id.* at *45.

FN19. *Id.* at *37, *45.

Similar to the allegations of asset transfers in these cases, the allegations here charge Meckler with receiving Internet.com at a grossly unfair price in exchange for his presentation, recommendation, and approval of the Transaction. [FN20] The asset transfers in *Parnes* and *Crescent/Mach* allegedly lacked *any* consideration. In this case, Meckler paid $18 million for his share of Internet.com. Nevertheless, it follows that a *grossly inadequate* purchase price for Internet.com should lead to the same result as an agreement wholly lacking consideration. A grossly inadequate purchase price would still wrongly divert Company funds to Meckler. Thus, the complaint adequately asserts that Meckler violated his fiduciary duties by unfairly demanding that Penton sell Internet.com to him ?on the cheap.? This allegedly coercive purchase may have diverted Company funds to Meckler, resulting in the shareholders receiving a grossly unfair price.

> FN20. The complaint also alleges that Meckler's receipt of a $100,000 consulting agreement and Penton's provision of a Services Agreement to New internet.com amounted to a ?windfall? to Meckler. These may be additional circumstances that will provide fuel for the fire of a suspicious mind. I note, however, that the complaint indicates the Services Agreement was a customary agreement between Penton and its business affiliates. *See* Second Amended Class Action Compl. ¶ 51 (?As part of our agreement, we will sign a service agreement between the trade shows/magazines and Internet.com to maintain the mutual benefit and support of all three product lines. The services agreement will be similar to our Index and Findlay agreement, which is largely based on barter.?).

*6 Contrary to defendants' assertion, the fact that $274 million was the highest offer entertained does not lead to the conclusion that Internet.com was sold at a fair price. Although the total merger consideration of $274 million was higher than the $270 million offered by United News, both offers included the sale of Internet.com to Meckler for a similar price. If this price was grossly inadequate as plaintiffs allege, both offers would have diverted significant funds from the Company to Meckler and both prices would have been unfair to the shareholders. Because I must give plaintiffs the benefit of all reasonable inferences in their complaint, I must accept plaintiffs' assertion that Internet.com was grossly undervalued when it was sold to Meckler. [FN21]

> FN21. Additionally, plaintiffs allege that several other sources indicated that Internet.com should have commanded a much higher value, such as the earlier $50 million estimate provided by D & T.

Further, if the board members acquiesced in such unfair dealing to the detriment of the Mecklermedia shareholders, they too may have breached their fiduciary duty of loyalty. Plaintiffs allege that the board members knew Meckler allegedly sought out an interested merging partner, dictated the terms of the Transaction, secured a valuable asset of the Company at a grossly unfair price, and diverted funds away from the Company to himself. With these allegations, the plaintiffs have sufficiently pled that the directors' acquiescence to this process, passive or otherwise, was beyond the bounds of reasonableness. Just as the CEOs' conduct in both *Parnes* and *Crescent/Mach* ?tainted the entire process,? if plaintiffs' assertions in this case are accepted as true, Meckler's conduct would have been so egregious that the Mecklermedia board likely could not have approved the Transactions in good faith. Thus, I conclude that plaintiffs have sufficiently alleged that the directors may have breached their duty of loyalty. Defendants' motion to dismiss the duty of loyalty claim is denied.

### 2. *Duty of Care*

Defendants argue that plaintiffs failed to allege any facts that would establish that the directors breached their duty of care. And, even if a duty of care claim were established, it should be dismissed because Mecklermedia's charter contained an exculpatory § 102(b)(7) provision.

Plaintiffs counter by enumerating several instances in which they believe the board members failed to use due care in the negotiation and approval of the transactions. Additionally, plaintiffs contend that the § 102(b)(7) exculpatory provision may not be used to dismiss the duty of care claims at this stage because of the presence of an adequately pled duty of loyalty claim.

### a. Breach of the Duty of Care

Plaintiffs have alleged sufficient facts to show the Mecklermedia board breached its duty of care to the Mecklermedia shareholders. Delaware law provides that the ?business and affairs of every corporation ... shall be managed by or under the direction of a board of directors.? [FN22] When the board of a corporation acts, Delaware courts ordinarily review that act under the presumption of the business judgment rule.[FN23] The business judgment rule is a ?presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.? [FN24] Thus, as long as the board was informed and not self-interested, this presumption will not be disturbed if the board's business decision can be attributed to ?any rational business purpose.? [FN25]

FN22. 8 *Del. C.* § 141(a).

FN23. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984).

FN24. *Id.*

FN25. *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971).

**\*7** Plaintiffs contend that the board breached its duty of care by yielding to Meckler's negotiations, by not using a special committee, and by not appropriately educating itself on the value of Internet.com. Here, the board was admittedly not self-interested. It was within the board's business judgment to delegate the negotiation of the Transactions to its CEO. There is nothing inherently wrong with allowing an interested CEO to negotiate a transaction. [FN26] What does matter is whether the directors sufficiently oversee such negotiations by scrutinizing the resulting transaction in order to assure themselves that it is fair to the shareholders and to the company. There is no automatic requirement that the board employ a special committee to perform this evaluation, especially when a majority of the board is disinterested and independent. Here, the board considered whether a special committee was needed and explicitly found that one was not. This is a valid exercise of the board's business judgment. Therefore, the only questions remaining are whether the board was informed and whether its decision was based on a rational business purpose.

FN26. *In re Ply Gem Indus., Inc. S'holders Litig.,* 2001 Del. Ch. LEXIS 84, at \*28 (Del. Ch. June 26, 2001).

In evaluating the Transactions, the board informed itself through several rounds of board deliberations, reports by experts and by conducting a market ?survey.? As noted in the complaint, the board met several times to discuss the proposed Transactions. It retained investment bankers to assist in structuring and evaluating a business combination strategy. It received written and oral reports from this investment banker regarding the overall combination.

These evaluative measures, however, were all flawed to some degree according to the complaint. Although the board had no duty to engage a special committee, the board did have a duty to scrutinize the Transactions more closely to ensure that the shareholders were being treated fairly. Here, plaintiffs allege, the board failed to ensure that the shareholders were receiving adequate consideration for Internet.com. The board was aware of the amount of the earlier United News offer, but this offer may not have sufficiently reflected the value of the Company and Internet.com. Because the prior offer also included a sale of Internet.com at a similar (and allegedly discounted) price to Meckler, this market ?survey? would have resulted in a similarly depressed price. Thus, according to the plaintiffs, the market ?survey? may not have been a sufficient indication of the value of the shares of Mecklermedia.

Although no other bidders came forward after the Penton negotiations were underway, such potential bidders may have shied away from bidding because of the conflicts of interest involved. Plaintiffs allege that Meckler made it clear that he would not sell the Company without retaining a majority interest in Internet.com. Consequently, the fact that there were no other bidders for the Company does not establish that it was sold at a fair price.

**\*8** Additionally, the board received no fairness opinion regarding the iWorld transaction. Even though Allen & Co. opined upon the overall fairness of the Transactions, it did not separately consider the fairness of the iWorld transaction.[FN27] The only possible way for the board to have known whether the shareholders were receiving a fair price for their shares in Mecklermedia was to have had some assurance that Meckler was paying a fair price for his equity interest in Internet.com. According to the complaint, the expert advice the board relied upon failed to provide this assurance.

FN27. *Cf. Levco Alternative Fund Ltd. v. The Reader's Digest Assoc ., Inc.*, 803 A.2d 428 (Del.2002).

Plaintiffs' complaint also alleges that the board had no information about the value of Internet.com to enable it to make an informed decision. The facts in the complaint suggest that the board had every reason to doubt the adequacy of the price Meckler paid for his interest in Internet.com. The board knew that its CEO had retained complete control over the negotiation of a self-dealing transaction. The board knew that Allen & Co. did not separately opine on the fairness of the iWorld transaction. The board knew the ?agreed upon? value of Internet.com dropped from $30 million to $22.5 million during negotiations (a 25% decrease in value) because Meckler could afford to pay no more than $18 million for his 80.1% interest. At the same time, there was no corresponding increase in the per share purchase price of Mecklermedia. Presumably, the board would also have known that PwC warned Penton to take a closer look at the iWorld transaction from an economic and legal standpoint and that D & T valued Internet.com at $50 million when consulted by Allen & Co. All of this information arguably should have compelled the board, at a minimum, to further scrutinize the iWorld transaction's fairness independently. Otherwise, the board assertedly would have had no reasonable basis upon which to conclude that the Mecklermedia shareholders were being treated fairly.

Because the complaint arguably alleges that the directors were not fully informed when they approved the Transactions, I do not need to address whether the board had a rational business purpose.[FN28] Thus, at this juncture, I conclude that the plaintiffs have sufficiently alleged that the Mecklermedia directors were not fully informed when evaluating and approving the Transactions.

FN28. Several rational business purposes have been given for the business combination and the resulting ownership structure of New internet.com. It seems irreconcilable, however, to find that the approval of the transactions arguably exceeded all bounds of rational decisionmaking for the purposes of the duty of loyalty, but also find that the very same decision was rational for the purposes of evaluating the board's duty of care.

### b. Section 102(b)(7)

At this stage, I cannot dismiss plaintiffs' duty of care claim based upon an exculpatory provision contained in the Mecklermedia charter. As *Malpiede,* [FN29] and *Emerald Partners* [FN30] instruct, when a duty of care breach is not the *exclusive* claim, a court may not dismiss based upon an exculpatory provision.[FN31] Because the duty of loyalty is implicated in this case, the § 102(b)(7) provision cannot operate to negate plaintiffs' duty of care claim on a motion to dismiss.

FN29. *Malpiede v. Townson*, 780 A.2d 1075 (Del.2001).

FN30. *Emerald Partners v. Berlin*, 787 A.2d 85 (Del.2001).

FN31. *Id.* at 91 (?Since its enactment, Delaware courts have consistently held that the adoption of a charter provision, in accordance with Section 102(b)(7), bars the recovery of monetary damages from directors for a successful shareholder claim that is based *exclusively* upon establishing a violation of the duty of care.?) (emphasis added).

### 3. *Duty to Disclose*

Plaintiffs contend that defendants failed to disclose all material information to the shareholders in the 14D-9 and Amended 14D-9. Defendants assert that all relevant information was disclosed and that the claim should therefore be dismissed.

**\*9** A fact is material if ?there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote.? [FN32] The plaintiff must demonstrate there was a substantial likelihood that the omitted fact would have ?significantly altered the ?total mix? of information made available? to the stockholders.[FN33] In order to state a claim for relief, plaintiff must: 1) allege that there are facts missing from the disclosure; 2) identify specific facts that were omitted or misleading; 3) state why those facts were material; and 4) demonstrate how the omitted or missing fact caused injury.[FN34]

FN32. *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del.1997).

FN33. *Id.* at 143; *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985).

FN34. *Skeen v. Jo-Ann Stores, Inc.,* 750 A.2d 1170, 1173 (Del.2000).

Plaintiffs assert that Mecklermedia's 14D-9 and Amended 14D-9 were materially false and misleading and that this information would have altered the total mix of information available to the shareholders if disclosed accurately. Plaintiffs contest four main portions of the tender offer materials: 1) the failure to disclose the source of the $22.5 million valuation of Internet.com; 2) the failure to disclose details about the United News negotiation; 3) the failure to disclose the ?true reason? for the iWorld transaction; and 4) the allegedly false characterization of the merger consideration as ?fair.? The contents of the challenged tender offer materials will be considered on this motion to dismiss because they were incorporated by reference in the complaint. <u>FN35</u>

FN35. *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 69-70 (Del.1995).

### a. Internet.com Valuation

Plaintiffs successfully contend that the tender offer materials did not adequately disclose the source of the $22.5 million valuation of Internet.com. The Amended 14D-9 parenthetically explains that the agreed valuation of iWorld was ?based upon [Meckler's] payment of $18 million for an 80.1% equity interest in iWorld.? <u>FN36</u> This statement-which was buried in a subpart of multiple factors Meckler considered when opining upon the fairness of the iWorld transaction-fails to point out the fact that no independent valuation of iWorld was ever attempted. Instead, the Amended 14D-9 compared this agreed-upon value to other factors, such as historical accounting data, revenues, tangible assets, and the value per page viewed on the web site. Although shareholders are generally able to draw their own conclusions about valuations when given the valuation method and results, here there was no attempt to provide the shareholders with a valuation of Internet.com, leaving them with no basis, other than Meckler's own self-serving fairness opinion, to determine whether they were receiving adequate value for their stake in Internet.com. Thus, it seems reasonable that further disclosure regarding the $22.5 million valuation of Internet.com may have altered the total mix of information available to the shareholders.

FN36. Amended Schedule 14D-9, item 8(d).

### b. United News Negotiation

Plaintiffs assert that defendants should have disclosed more details regarding the United News negotiation, even though United News' $270 million offer was lower than Penton's $274 million offer. The information disclosed in the Schedule 14D-9 was limited to a statement that ?the Company reached an oral understanding regarding an approximate three week period of exclusivity with one of the companies interested in a potential strategic combination; however, the period of exclusivity expired prior to a letter of intent being executed with such company.?

**\*10** Plaintiffs allege that the board should have further disclosed that it was United News making the bid, that the oral offer was to purchase all shares of the company for $270 million and included a similar side transaction to sell Internet.com to Meckler, and that negotiations failed due to United News' attempt to change the terms of the side deal. Because the United News negotiation never progressed to the letter of intent stage, it would not have been material for a stockholder to know the identity of one potential buyer. Nor have plaintiffs explained how this additional information would have altered the total mix of information available to the Mecklermedia stockholders. If the negotiation terminated over the terms of the iWorld transaction, however, this information likely would have been material to Mecklermedia's shareholders because it would imply that the Company's value was somehow tied to the successful negotiation of a side deal with Meckler for iWorld. Thus, plaintiffs have alleged a claim based on the partial disclosure regarding the United News negotiation.

### c. The ?True Reason? for the iWorld Transaction

Plaintiffs assert that the tender offer materials omitted the ?true reason? for the iWorld transaction, which they allege was to provide a windfall to Meckler. Besides having no basis for this assertion, a board is only required to present the material facts of the transaction; it is not required to cast those facts in a negative light.<u>FN37</u> Thus, the board would not have been required to engage in ?self-flagellation? of this sort.<u>FN38</u>

FN37. *Loudon, 700 A.2d at 143; In re Gen. Motors Class H S'holders Litig., 734 A.2d 611, 628 (Del. Ch.1999).*

FN38. *Loudon, 700 A.2d at 143.*

### d. Board Representation Regarding Fairness

Plaintiffs assert that the board members' representation regarding the fairness of the Transaction and iWorld transaction was false and misleading and that the board members lacked a reasonable basis for this opinion. Plaintiffs contend that the terms were in fact *unfair* to the Company's shareholders for four reasons: 1) the shareholders did not receive any consideration for Internet.com; 2) Meckler participated in unfair dealing when negotiating the iWorld transaction; 3) the board approved the transaction to provide an ?economic windfall? to Meckler; and 4) the board lacked a reasonable basis for opining that the Transaction was fair.

I conclude that some of these allegations cannot withstand scrutiny on a motion to dismiss, as the board does not have to cast its decisionmaking in a negative light, and because they are refuted by the information contained in the tender offering documents. First, contrary to plaintiffs' allegations, the Mecklermedia shareholders were not deprived of their interest in Internet.com without *any* consideration. The shareholders were informed of the amount Meckler paid for his interest in Internet.com in the 14D-9 before deciding whether to accept or reject the tender offer. To the extent that the shareholders may have received *inadequate* consideration for their interest in Internet.com, however, the transaction may have been unfair. This conclusion, obviously, is one that cannot be drawn at this juncture because Internet.com was not separately valued and thus there is not enough information to determine whether the shareholders were improperly deprived of their interest in Internet.com. Thus, plaintiffs have adequately alleged that the transaction may have been unfair and that the Mecklermedia board members' fairness opinion was false or misleading.

**\*11** Second, if the transaction (and the negotiations leading up to it) were in fact unfair to the shareholders, the Mecklermedia board was not required to *characterize* it as illegal or wrong. As discussed above, a board is not required to engage in self-flagellation in its disclosure materials. Thus, both allegations, including the board's alleged desire to bestow a ?windfall? upon Meckler and the negative characterization of Meckler's negotiation tactics, were not required disclosures in the tender offer materials. What was required of the board was already disclosed. The tender offer materials fully described the material portions of the negotiation and its resulting terms as well as Meckler's self-interest. Having failed to allege how further disclosure of Meckler's self-interest is more than redundant or how a shareholder would consider it material in deciding whether to tender her shares, this aspect of plaintiffs' disclosure claim fails as a matter of law.

Last, the fairness opinion may have been misleading if the board members in fact lacked a reasonable basis for their fairness statement. Although the board was entitled to rely upon the fairness opinion of Allen & Co.,[FN39] the board arguably should have evaluated the fairness of the iWorld transaction separately as noted above. A reasonable stockholder may have been misled by the Allen & Co. fairness opinion to believe that Internet.com *itself* was being sold for a fair price when it may not have been. A board does not necessarily need to disclose specific details regarding the analysis underlying the report,[FN40] but a stockholder would likely have found the inadequacies of, or limitation on, the fairness opinion material to her decision whether to tender her shares. This Court has held that ?stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely.?[FN41] Although the material terms of the Transactions were disclosed, as well as Meckler's self-interest and resulting equity in Internet.com, a reasonable shareholder may have been misled to believe that Allen & Co.'s opinion regarding the Transactions encompassed the fairness of these factors without having received the underlying data the investment banker relied upon. Further, if the board itself was not fully informed (allegedly) regarding the iWorld transaction, it can hardly be argued that it adequately informed the stockholders regarding the fairness of this very same transaction. Therefore, plaintiffs have stated a claim for breach of the board's duty of disclosure in this respect.

FN39. *McMillan v. Intercargo Corp., 768 A.2d 492, 505 n. 55 (Del. Ch.2000).*

FN40. *Skeen, 750 A.2d at 1174; In re Best Lock Corp. S'holder Litig., 2001 Del. Ch. LEXIS 134, \*35 (Oct. 29, 2001).*

FN41. *In re Pure Resources, Inc.,* 2002 Del. Ch. LEXIS 112 at *80-*81 (Oct. 1, 2002) (finding that disclosure of a banker's fairness opinion provided stockholders with ?nothing other than a conclusion, qualified by a gauze of protective language designed to insulate the banker from liability?).

*C. Did the Shareholders Acquiesce in the Board's Conduct by Tendering Their Shares?*

Last, defendants assert that all of plaintiffs' claims should be dismissed because all material facts were disclosed to plaintiffs before they tendered their shares. Thus, they argue, the act of tendering their shares shows that the plaintiffs thereby acquiesced in the Transaction and iWorld transaction and cannot now challenge it. Plaintiffs counter by alleging that they could not have acquiesced by tendering their shares because they were not fully informed.

**\*12** I pause a moment to consider what plaintiffs do not allege in this instance. Plaintiffs do not assert that they were ?under protest? when they tendered their shares, which would negate a finding of acquiescence.[FN42] Additionally, plaintiffs do not allege that the tender offer was in any way coercive, which would have prevented meaningful choice and similarly negated a finding of acquiescence. Plaintiffs rely solely upon the allegation that the shareholders were not sufficiently informed. This entire argument relies upon their earlier assertion that the board breached its duty to disclose all material information to the shareholders. If the board did not breach its duty to disclose all material information regarding the transaction to the shareholders, then the shareholders were fully informed when they tendered.

FN42. *Kahn v. Household Acquisition Corp.,* 1982 Del. Ch. LEXIS 580 at *6 (Jan. 19, 1982).

Because plaintiffs have adequately alleged that the board breached its duty of disclosure, I cannot, at this stage, conclude as a matter of law that the shareholders were fully informed when they tendered their shares. Although the material terms of the Transactions were disclosed, as well as Meckler's conflict of interest and resulting equity interest in Internet.com, the shareholders may have been misled into believing that the iWorld transaction was independently evaluated as ?fair? when it had not been. Neither the board nor Allen & Co. separately opined upon the fairness of the iWorld transaction. Instead, both Transactions were categorically lumped into a single fairness opinion that plaintiffs contend did not fully inform the shareholders of the value of Internet.com. In addition, plaintiffs insist they were not provided with full and complete information regarding how the $22.5 million valuation for iWorld was determined. Accordingly, because plaintiffs have adequately pled disclosure claims, I cannot conclude that their complaint is barred by the doctrine of acquiescence.

*D. Should the Court Impose a Constructive Trust over Internet.com?*

Plaintiffs cite *O'Malley v. Boris*[FN43] for their assertion that a constructive trust should be imposed upon New internet.com. Although it is debatable whether such a remedy would be advisable, as in *O'Malley* I am reluctant to dismiss New internet.com from the case at this point. The company is majority owned by Meckler and this ownership arose from the transactions in dispute. Thus, if this ownership was ?ill-gotten,? it follows that a constructive trust may be placed upon Meckler's equity interest in New internet.com so that he is not unjustly enriched at the expense of the Mecklermedia shareholders. For this reason, I decline to dismiss New internet.com as a defendant.

FN43. 2002 Del. Ch. LEXIS 33 (March 18, 2002).

IV. CONCLUSION

In sum, defendants' motion to dismiss the complaint is denied. Plaintiffs have stated a claim for a breach of the duties of loyalty, care and disclosure against the Mecklermedia board. The § 102(b)(7) provision cannot operate to immunize the duty of care claim at this juncture. The affirmative defense of acquiescence fails because plaintiffs adequately alleged that the board did not fully inform the shareholders before they tendered their shares. Further, New internet.com is not dismissed as a defendant at this time as it may be a necessary party in connection with a potential remedy.

**\*13** IT IS SO ORDERED.

Del.Ch.,2002.
Alidina v. Internet.com Corp.
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2



Not Reported in F.Supp.
Not Reported in F.Supp., 1988 WL 26476 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Allstate Ins. Co. v. DinkinsE.D.Pa.,1988.Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
ALLSTATE INSURANCE COMPANY
v.
DINKINS, Mary A. and Zimmerman, Eleanor C. and American Economy Insurance Co.
**CIV.A. No. 87-6164.**

March 11, 1988.

Gerard Bruderle, LaBrum and Doak, Philadelphia, Pa., for plaintiff.
Allan C. Molotsky, Philadelphia, Pa., for American Economy Insurance Company.
Steven M. Lipschutz, Steven M. Lipschutz & Associates, P.C., Philadelphia, Pa., for E.C. Zimmerman, Mary A. Dinkins.

*MEMORANDUM ORDER*
CLIFFORD SCOTT GREEN, District Judge.
*1 Plaintiff Allstate Insurance Company (?Allstate?) commenced the above captioned diversity action seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 that its insured, defendant Mary A. Dinkins, was not entitled to recover under Pennsylvania's Uninsured Motorist Act for damages sustained in an automobile accident. Besides Ms. Dinkins, defendants include the alleged tortfeasor Eleanor C. Zimmerman and her insurer, American Economy Insurance Co. (?American?).

Ms. Dinkins has moved to dismiss for failure to state a claim and in the alternative for summary judgment. American, on its own behalf and that of its insured Zimmerman, has likewise moved for dismissal on several grounds. First, American argues that this court lacks subject matter jurisdiction since ?[i]t is well established under Pennsylvania law that all questions of coverage and recovery concerning an uninsured motorist coverage are within the jurisdiction of uninsured motorist arbitration.? (American's Memorandum of Law in Support of Defendants' Motion to Dismiss, p. 2). Contrary to American's contention, Pennsylvania's Uninsured Motorist Act, 40 P.S. § 2000, does not require automatic submission to arbitration of disputes arising between insureds and their carriers with regard to uninsured motorists. Rather the statute mandates the inclusion in any policy of automobile liability insurance a provision guaranteeing recovery to insureds ?who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease....? 40 P.S. § 2000(a).

Whether or not the present dispute between plaintiff and defendant Dinkins is subject to arbitration must be determined by a reading of the policy of insurance itself. However, no party to that contract has raised this issue, and defendants Zimmerman and American lack standing to enforce any arbitration clause which may exist in the insurance contract between Allstate and Dinkins. *See Alco Standard Corp. v. Benalal,* 345 F.Supp. 14 (E.D.Pa.1972); *Framlau Corp. v. Kling,* 233 Pa.Super. 175, 334 A.2d 780 (1975); *Peifer v. McCarthy,* 71 Pa.D. & C.2d 740 (Ct.Com.Pl.1974).

Second, American contends that diversity does not exist since defendant Dinkins should be realigned with plaintiff thereby destroying diversity. It is settled law that parties to a lawsuit cannot confer diversity jurisdiction upon the federal courts by their own designation of plaintiffs and defendants. *City of Indianapolis v. Chase National Bank,* 314 U.S. 63, 69 (1941). Rather the federal courts must ?look beyond the pleadings? and realign the parties in accordance with their ultimate interests, *City of Dawson v. Columbia Avenue Saving Fund, Safe Deposit, Title & Trust Co.,* 197 U.S. 178, 180 (1905), as determined by ?the principal purpose of the suit? and ?the primary and controlling matter in dispute.? *City of Indianapolis,* 314 U.S. at 69.

Realignment is required in the instant case since the underlying basis of plaintiff's suit against defendant Zimmerman is a tort action by defendant Dinkins, a Pennsylvania resident, against Zimmerman, another Pennsylvania resident. With Dinkins realigned as plaintiff, diversity jurisdiction is absent.

**\*2** This defect does not mandate dismissal of the entire action since defendant Zimmerman is not indispensable nor necessary to the just adjudication of the present matter. In accordance with both case law and the Federal Rules, this court may dismiss ?non-diverse parties whose presence is not essential to the suit in order to preserve and perfect its diversity jurisdiction....? *Field v. Volkswagenwerk AG, 626 F.2d 293 (3d Cir.1980). See also,* Fed.R.Civ.P. 21 (Misjoinder and Non-joinder of Parties). Thus, Zimmerman shall be dismissed as a defendant in this action and this court shall retain jurisdiction on diversity grounds of the declaratory judgment action of Allstate against Dinkins.

With Zimmerman eliminated as a defendant, American's third argument that no actual case or controversy exists has merit. American's role in this lawsuit is only that of an insurer who stands in the shoes of the insured Ms. Zimmerman by virtue of its duty to defend. Hence, as between Allstate and American, I am unable to conclude that the present action evidences a justiciable controversy of a character ?definite and concrete, touching the legal relations of parties having adverse legal interests.? *Aetna Life Insurance Co. of Hartford, Conn. v. Haworth, et al.,* 300 U.S. 227, 240-41 (1937). Consequently, American shall also be dismissed as a defendant in this action.

Yet unresolved is defendant Dinkins' motion for dismissal or in the alternative summary judgment. Addressing said motion, this court first notes that plaintiff has sufficiently stated a claim. Ms. Zimmerman's denial of involvement in the accident relates to a disputed issue of fact which cannot constitute a ground for dismissal at this stage of the proceedings. This court, however, shall entertain Dinkins' motion as a motion for summary judgment, but shall first permit all parties a reasonable time for discovery and to file supplemental affidavits or memoranda.

Accordingly, this 11th day of March, 1988, IT IS ORDERED that:

1. Plaintiff's complaint is DISMISSED without prejudice as to defendants Zimmerman and American only; and

2. The remaining parties shall have thirty (30) days from the date of this order to file supplemental affidavits or memoranda in regard to defendant Dinkins' motion for summary judgment.

E.D.Pa.,1988.
Allstate Ins. Co. v. Dinkins
Not Reported in F.Supp., 1988 WL 26476 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 83261 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Borah v. Monumental Life Ins. Co.E.D.Pa.,2005.Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Bishnu C. BORAH, M.D., P.C., and Bishnu Borah, M.D., Plaintiffs,
v.
MONUMENTAL LIFE INSURANCE COMPANY, et al., Defendants.
**No. Civ.A.04-3617.**

Jan. 14, 2005.

Steven J. Fram, Archer & Greiner, PC, Haddonfield, NJ, for Plaintiffs.
Charles L. Becker, Reed Smith LLP, Christopher P. Leise, White & Williams LLP, Robert M. Bovarnick, Two Penn Center Plaza, Philadelphia, PA, for Defendants.

MEMORANDUM AND ORDER

SCHILLER, J.
*1 Plaintiffs Bishnu Borah (?Borah?) and Bishnu C. Borah, M.D., P.C. (?Borah, M.D.?) bring this fourteen-count complaint alleging RICO violations, violations of the New Jersey Racketeering Act and the New Jersey Consumer Fraud Act, fraud, negligent misrepresentation, breach of fiduciary duty, respondeat superior, and conspiracy. Now before the Court is Defendants' Monumental Life Insurance Company (?Monumental?) and AEGON USA, Inc. (?AEGON?), motion to dismiss under Rule 12(b)(5) for insufficiency of service of process and under Rule 12(b)(6) for the failure to state a claim upon which relief can be granted. For the reasons below, this Court denies the motions in their entirety.

I. BACKGROUND

Borah practices medicine through Borah, M.D. Defendants are insurance companies, insurance salespersons, financial services companies, and financial planners. According to Plaintiffs' complaint, Defendants have engaged in a long-running scheme to induce Plaintiffs to participate in a program of life insurance known as Continuous Group (?C-Group?) life insurance. Various Defendants marketed this ?C-Group? life insurance through Voluntary Employee Benefit Associations (?VEBA?). (Compl.¶ 1.) Although these VEBA plans were presented as tax-deductible options in which medical corporations, like Borah, M.D., could participate, Plaintiffs claim Defendants knew that contributions to the plan were not tax-deductible. (*Id.*) According to Plaintiffs, although the IRS expressly took no position on the issue, Defendants deceived employers into believing that the IRS had ruled that contributions to VEBAs were tax deductible. (*Id.* ¶ 48.) Beginning in 1990, Plaintiffs claim Defendants engaged in deceptive conduct that led Plaintiffs to contribute over $100,000 to the VEBA program, contributions that have subsequently been lost. (*Id.* ¶¶ 90, 94, 96-97.) Plaintiffs assert that Monumental and AEGON created, issued and sold the relevant life insurance policies knowing and participating in the deceptive conduct that is the subject of this action. (*Id.* ¶ 12.)

Plaintiffs filed suit on July 30, 2004, but did not initiate service on Monumental and AEGON until November 22, 2004. Monumental was served via certified mail addressed to Henry Hagan, Monumental's President and CEO, at Monumental's offices in Baltimore, Maryland. (V.S. of Stephen J. Fram ¶ 3.) AEGON was also served by certified mail addressed to Eric Goodman, President and Chief Investment Officer, at AEGON's offices in Cedar Rapids, Iowa. (*Id.* Ex. B.)

II. STANDARD OF REVIEW

The fundamental purpose for requiring proper service of process is to ensure that the defendant receives notice of the commencement of a legal action and is afforded an opportunity to present his objections. *Perlberger v. Caplan & Luber, LLP,* 152 F.Supp.2d 650, 653 (E.D.Pa.2001); *see also Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (?An elementary and fundamental requirement of due process in any

proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.?) The plaintiff bears the burden of burden establishing proper service. *See Kumar v. Temple Univ. Cancer Ctr.,* Civ. A. No. 95-7832, 1996 WL 363915, at *2 (E.D.Pa. July 1, 1996) (*citing Grand Entm't Group v. Star Media Sales,* 988 F.2d 476, 488 (3d Cir.1993)). A court may look outside of the pleadings to determine whether service was proper. *See Cooper v. The Frankford Hosp.,* Civ. A. No. 99-0292, 1999 WL 600536, at *1 (E.D.Pa. Aug.10, 1999) (holding party could satisfy burden through an affidavit of service).

### III. DISCUSSION

#### 1. Proper Service on a Domestic Corporation

**\*2** Domestic corporations may be validly served by either (1) delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process; or (2) pursuant to the law of the state in which the district court is located, or in which the service is effected under Federal Rule of Civil Procedure 4(e)(1). Fed. R. Civ. P. 4(h)(1). Service on out-of-state corporations under Pennsylvania law is covered by Pennsylvania Rules of Civil Procedure 403 and 404. Rule 404 permits service outside the Commonwealth by mail in the manner provided by Rule 403. Pa. R. Civ. P. 404(2). In turn, Rule 403 provides that ?a copy of the process should be mailed to the defendant by any form of mail requiring a receipt signed by the defendant or his authorized agent.? Pa. R. Civ. P. 403. Finally, Rule 424 provides for hand delivery of service upon an executive officer, person in charge, or agent authorized by the corporation to receive process. Pa. R. Civ. P. 424. Although Rule 424 appears to require hand delivery of service on a corporation, certified mail is a proper method of service on out-of-state corporations under Pennsylvania law. *McKinnis v. Hartford Life,* 217 F.R.D. 359, 361 (E.D.Pa.2003) (citations omitted); *see also Morton v. F.H. Paschen, Inc.,* Civ. A. No. 96-7179, 1997 WL 381777, at *3 (E.D.Pa. June 27, 1997) (concluding that a Pennsylvania corporation may serve a foreign corporation by mail); *Reichert v. TRW, Inc. Cutting Tools Div.,* 385 Pa.Super. 416, 561 A.2d 745, 754 (Pa.1992) (holding that Rule 424 did not abolish the option of serving foreign corporations by mail but simply specified those individuals who may be served on behalf of a corporation when service of process is made by hand delivery).

A plaintiff has one hundred and twenty days from the filing of a complaint to serve the summons and complaint; the failure to serve within that time frame leaves the plaintiff open to dismissal of the complaint. Fed. R. Civ. P. 4(m).

The procedural thicket described above directs that Plaintiffs in this case may, pursuant to the Federal Rules of Civil Procedure, properly serve Monumental and AEGON either under the Federal Rules, the laws of Pennsylvania or the laws of Maryland (in the case of Monumental) or the laws of Iowa (in the case of AEGON). It is also clear that Plaintiffs have one hundred and twenty days to serve.

#### 2. Service on Monumental

Monumental asserts that Plaintiffs failed to properly serve it for two reasons.[FN1] First, although addressed to Hagan, the President and CEO of Monumental, the service was signed for by a mail clerk and then delivered to a secretary assigned to Hagan. According to Monumental, neither of these people was authorized to accept service of process on behalf of Monumental. Second, Monumental states that Pennsylvania law requires that plaintiffs serving by mail on an out-of-state corporation must do so within 90 days of filing the complaint. Neither of these arguments is persuasive.

> FN1. Monumental supported its arguments with an affidavit from its General Counsel, H. Stacey Boyer.

**\*3** Although Plaintiffs did not provide any affidavits in support of their position that service was proper, the verification of Steven J. Fram indicates that the certified mail was addressed to the President and CEO of Monumental and was signed for Dan Brooks. (Fram V.S. Ex. B) There is no indication whether Brooks is an agent of Monumental, but I still find service proper under Pennsylvania law. Service was addressed to the President and CEO of Monumental; certainly Hagan qualifies as an executive officer under Pennsylvania law. Simply because mail sent to him must first pass through a mail clerk and his secretary does not render that service improper. *See Thomas v. Stone Container Corp.,* Civ. A. No. 89-1537, 1989 WL 69499, at *1 (E.D.Pa. June 21, 1989) (holding service sufficient when sent via certified mail and addressed to defendant corporation's office was even when mail was signed for by defendant's employee, whose position was secretary to vice president). Monumental cannot evade service by erecting barriers to its executive officers' receipt of their mail.

Defendants also argue that service was insufficient because Plaintiffs failed to serve process within 90 days of the filing of the complaint, as required by Rule 404 of the Pennsylvania Rules of Civil Procedure.[FN2] Monumental's argument is flawed because it renders meaningless the one hundred and twenty day time limit set out in Rule 4(m) of the Federal Rules of Civil Procedure. Rather, the appropriate way to harmonize Rule 4(m) with the clause in the Federal Rules allowing for service to be made on a corporation ?pursuant to the law of the state in which the district court is located? is to allow service to be made in the *manner* permitted by the relevant state law while allowing for service to be effectuated within the one hundred and twenty day time period allotted by the Federal Rules. This result is commanded by *Henderson v. United States,* 517 U.S. 654, 656, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996). The question presented in *Henderson* was whether the Federal Rule pertaining to time limits superseded the Admiralty Act, which instructed that actions brought under the Act be served ?forthwith.? *Henderson v. United States,* 517 U.S. at 656. The Court held that the Federal Rules applied because ?the 120-day provision operates not as an outer limit subject to *reduction,* but as an irreducible allowance.? *Id.* at 661. Accordingly, I reject Monumental's suggestion that service in this case was required to be made within 90 days rather than 120 days. Plaintiffs' complaint was filed on July 30, 2004 and service was completed on November 29, 2004, within the period allowed by the Federal Rules. *See* Pa. R. Civ. P. 403 (?Service is complete upon delivery of the mail.?) Therefore, Monumental was properly served under Pennsylvania law. [FN3]

> FN2. That Rule provides: ?Original process shall be served outside the Commonwealth within ninety days of the issuance of the writ or the filing of the complaint ...? Pa. R. Civ. P. 404.

> FN3. This finding obviates any need to examine whether the manner of service was proper under either Federal law or Maryland law.

### 3. Service on AEGON

Plaintiffs also properly served AEGON under Pennsylvania law. Neither side has submitted affidavits pertaining to service on AEGON, but the verification of service indicates that on November 26, 2004, Michael E. Trout of Premar Security signed for the certified mail and checked the box indicating that he was an agent of AEGON. (Fram V.S. Ex. B). The verification also indicates that the certified mail was addressed to Eric Goodman, President and Chief Investment Officer at AEGON, at AEGON's offices in Cedar Rapids, Iowa. As President and CIO, Mr. Goodman clearly falls within the list of corporate officers who may be served under Pennsylvania law. And, it is reasonable to believe that an agent hired by AEGON to handle the company's mail would transmit that mail to Mr. Goodman. Because the manner of service comports with Pennsylvania law and service on AEGON was also made within 120 days, it was proper.[FN4]

> FN4. This finding obviates any need to examine whether the manner of service was proper under either Federal law or Iowa law.

### IV. CONCLUSION

**\*4** Because the manner of service was proper under Pennsylvania law and Plaintiffs served both Monumental and AEGON within the time period permitted by the Federal Rules, Defendants' 12(b)(5) motion is denied. I am also denying Defendants' motion under 12(b)(6). An order follows.

### *ORDER*

AND NOW, this 14th day of January, 2005, upon consideration of Defendants Monumental and AEGON's Motion to Dismiss (Document No. 5), Plaintiffs' Response thereto (Document No. 8), Defendants' Reply thereon (Document No. 10), and for the foregoing reasons, it is hereby ORDERED that:
1. Defendants' Motion to Dismiss under Rule 12(b)(5) is DENIED.
2. Defendants' Motion to Dismiss under Rule 12(b)(6) is DENIED WITHOUT PREJUDICE to raise these issues at the appropriate time in a motion for summary judgment.

E.D.Pa.,2005.
Borah v. Monumental Life Ins. Co.
Not Reported in F.Supp.2d, 2005 WL 83261 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

? 2005 WL 3136077 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Brief in Opposition to the Motion for Summary Judgment of Defendants Barry Cohen and BCo Planning (Oct. 14, 2005) Original Image of this Document (PDF)

? 2005 WL 3134935 (Trial Pleading) Amended Answer to Complaint, Affirmative Defenses and Cross-Claims on behalf of Defendant Michael Kirwan (Oct. 4, 2005) Original Image of this Document (PDF)

? 2005 WL 2849964 (Trial Motion, Memorandum and Affidavit) Motion for Summary Judgment Pursuant to Fed. R.Civ.P. 56 of Defendants, Medical Society of New Jersey and Vincent Maressa (Sep. 30, 2005) Original Image of this Document (PDF)

? 2005 WL 2849963 (Trial Motion, Memorandum and Affidavit) Michael Kirwan's Memorandum of Law in Support of Motion for Summary Judgment (Sep. 29, 2005) Original Image of this Document (PDF)

? 2005 WL 2848523 (Trial Pleading) Amended Answer, Affirmative Defenses and Cross-Claims of the Medical Society of New Jersey and Vincent Maressa (Sep. 15, 2005) Original Image of this Document (PDF)

? 2005 WL 2683934 (Trial Pleading) Defendants, Donald S. Murphy and Dsm, Inc.s Amended Answer to Plaintiffs' Complaint Together with Affirmative Defenses, Cross-Claims against all Co-Defendants and Answer to Cross-Claims (Aug. 30, 2005) Original Image of this Document (PDF)

? 2:04cv03617 (Docket) (Jul. 30, 2004)

? 2004 WL 2697022 (Trial Pleading) Complaint and Jury Demand (2004) Original Image of this Document (PDF)

? 2004 WL 3568026 (Trial Motion, Memorandum and Affidavit) Defendants, Barry Cohen and Bco Planning's Motion for Summary Judgment (2004) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.

Slip Copy
Slip Copy, 2006 WL 3355185 (D.Del.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Epic Systems Corp. v. Acacia Research Corp.D.Del.,2006.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
EPIC SYSTEMS CORPORATION, Plaintiff,
v.
ACACIA RESEARCH CORPORATION and, Resource Scheduling Corporation, Defendants.
**No. CIVA 06-255 JJF.**

Nov. 16, 2006.

Nicholas J. Seay, James R. Cole, Anthony A. Tomaselli, and Kristin Graham Noel, of Quarles & Brady LLP, Madison, Wisconsin, Robert H. Richards, III, Jeffrey L. Moyer, and Anne Shea Gaza, of Richards, Layton & Finger, P.A., Wilmington, Delaware, for Plaintiff.
Jonathan T. Suder, Edward E. Casto, Jr., and Christie B. Lindsey, of Friedman, Suder & Cooke, Forth Worth, Texas, Kathleen M. Jennings, and Karen V. Sullivan, of Oberly, Jennings & Rhodunda, P.A., Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*

FARNAN, J.
*1 Pending before the Court is Defendants' Motion To Dismiss And, In The Alternative, Motion To Transfer Venue (D.I.7).[FN1] For the reasons discussed below, the Court will deny the Motion in part and grant the Motion in part.

> FN1. In a letter dated July 13, 2006, Defendants withdrew the request for a transfer to the Eastern District of Texas. (D.I.20).

I. BACKGROUND

Plaintiff Epic Systems Corporation (?Epic?) is a Wisconsin corporation with its principal place of business in Wisconsin. Defendants Acacia Research Corporation (?Acacia?) and Research Scheduling Corporation (?RSC?) are both Delaware corporations with their principal places of business in California. RSC is a wholly-owned subsidiary of Acacia Global Acquisition, which is a wholly-owned subsidiary of Acacia.

RSC acquired the rights to license and enforce U.S. Patent No. 4,937,743 entitled ?Method and System For Scheduling, Monitoring And Dynamically Managing Resources? (?the '743 patent?). This system utilizes a computer system to manage multiple resources in industries that rely on such functions in their business operations.

On March 23, 2006, Acacia Vice President Edward J. Treska sent a letter (?March 23 letter?) informing Plaintiff that Acacia believed Plaintiff's ?Cadence? product fell under the scope of the '743 patent and would require a license. The letter also suggested that other products might fall under the '743 Patent as well. The letter further informed Plaintiff that RSC was in the process of litigating infringement actions against several companies for violation of the '743 Patent, and that RSC and Acacia were contemplating adding additional parties to the action. The letter also invited the opportunity to negotiate a licence.

On April 19, 2006, Plaintiff Epic filed the instant action against Defendants Acacia and RSC seeking Declaratory Judgment that the '743 Patent is invalid and unenforceable and not infringed by Epic's products. (D.I.1).

II. PARTIES' CONTENTIONS

By their Motion, Defendants contend the Court should dismiss the Complaint in its entirety for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) and dismiss Plaintiff's claims against Defendant Acacia for lack of

subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Specifically, Defendants contend Plaintiff's Complaint fails to establish an ?actual controversy? because Plaintiff cannot show it had a reasonable apprehension of imminent suit by Defendants. Defendants further contend that Plaintiff could have no reasonable apprehension of imminent suit because Defendant Acacia has no legal interest in the '743 patent and thus, could not file a patent infringement suit against Plaintiff. In the alternative, Defendants contend the Court should decline to exercise jurisdiction in order to avoid discouraging licensing negotiations.

In response, Plaintiff contends that it had a reasonable apprehension of suit from the March 23 letter and that Defendants do not provide any evidence that Acacia does not have a legal interest in the patent at issue. Plaintiff further contends that the Court's jurisdiction should be exercised because this action presents the type of controversy the Declaratory Judgment Act was created to address.

## III. LEGAL STANDARD

**\*2** Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring his claim. Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the Court's subject matter jurisdiction. In reviewing a facial challenge under Rule 12(b)(1), the standards relevant to Rule 12(b)(6) apply. In this regard, the Court must accept all factual allegations in the Complaint as true, and the Court may only consider the complaint and documents referenced in or attached to the complaint. Gould Electronics Inc. v. U.S., 220 F.3d 169, 176 (3d Cir.2000). In reviewing a factual challenge to the Court's subject matter jurisdiction, the Court is not confined to the allegations of the complaint, and the presumption of truthfulness does not attach to the allegations in the complaint. Mortensen v. First Fed. Sav. and Loan, 549 F.2d 884, 891 (3d Cir.1977). Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction. Gotha v. United States, 115 F.3d 176, 179 (3d Cir.1997). Once the Court's subject matter jurisdiction over a complaint is challenged, the plaintiff bears the burden of proving that jurisdiction exists. Mortensen, 549 F.2d at 891.

## IV. DISCUSSION

### A. Whether Plaintiff Establishes An Actual Controversy For Purposes Of The Declaratory Judgment Act

Defendants contend Plaintiff has not established an ?actual controversy? because it did not have sufficient objectively reasonable apprehension of an imminent lawsuit. Specifically, Defendants contend that there was no threat of suit simply because it sent the March 23 letter intending to initiate negotiations to license the '743 patent. In response, Plaintiff contends that the March 23 letter contained threatening language which was sufficient to create reasonable apprehension of suit.

The Declaratory Judgment Act ?requires an actual controversy between the parties before a federal court may exercise jurisdiction.? 28 U.S.C. § 2201(a); EMC Corp. v. Norand Corp., 89 F.3d 807, 801 (Fed.Cir.2004). An actual controversy exists when there are both ?(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.? Gen-Probe, Inc. v. Vysis, Inc., 359 F.3d 1376, 1380 (Fed.Cir.2004) (quoting BP Chems. Ltd. v. Union Carbide Corp., 4 F.3d 975, 978 (Fed.Cir.1993)). When the patentee's conduct falls short of an explicit threat, a court must look to the ?totality of the circumstances? to determine whether the patentee's conduct gives rise to reasonable apprehension under the first prong of the test. Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 736 (Fed.Cir.1988) (quoting Goodyear Tire & Rubber Co. v. Releasomers, Inc., 824 F.2d 953, 955 (Fed.Cir.1987)).

**\*3** The parties do not dispute that Plaintiff was engaging in activity or intended to engage in activity that could constitute infringement. Thus, the Court will focus its inquiry on whether Plaintiff had reasonable apprehension of imminent suit by Defendants.

The Court concludes that it is a reasonable reading of the March 23 letter to find that the paragraph in which Defendants state ?we intend to add additional parties? to litigation pending in Texas involving the '743 patent constitutes an explicit threat of litigation. Further, considering the totality of the circumstances, the Court concludes that Plaintiff Epic has demonstrated reasonable apprehension of suit sufficient to establish an ?actual controversy.? Here, the March 23 letter was more than an offer to open licensing negotiations or a mere assertion of Defendants' bargaining position. The March 23 letter informed Plaintiff that Defendants intended to add parties to pending lawsuits in Texas against several companies for infringement of the '743 patent. Also in the March 23 letter,

Defendants proposed royalty rates for a license which ?will increase over time and as our litigation progresses.? Although courts have held that an offer of a license is insufficient to create reasonable apprehension, ?when the patentee takes steps that create a reasonable apprehension that he will seek redress through the courts, the alleged infringer ... can take the initiative and seek declaratory relief.? *EMC Corp.*, 89 F.3d at 811. The Court concludes Plaintiff could reasonably conclude from the March 23 letter that Defendants were ready and willing to bring an infringement suit directly against Plaintiff or add Plaintiff to the pending litigation in Texas. Thus, the Court concludes Plaintiff has established that an ?actual controversy? exists.

### B. *Whether The Court Should Exercise Jurisdiction Under The Declaratory Judgment Act*

Having determined that the Court has subject matter jurisdiction under the Declaratory Judgment Act, the Court must determine whether it is appropriate to exercise that jurisdiction. While the Act grants the Court jurisdiction, the Act allows district courts to decline jurisdiction. In exercising this discretion, courts must be mindful that the purpose of the Act is to allow alleged infringers relief from uncertainty and delay.

Defendants contend that the Court should decline its jurisdiction to avoid hindering future licensing negotiations. In response, Plaintiff contends that Defendants have not offered a sound reason for the Court not to exercise jurisdiction. Plaintiff also argues that the Act was intended to alleviate the type of insecurity created by Defendant Acacia's March 23 letter.

In the circumstances here, the Court concludes that exercising jurisdiction is appropriate. The Court agrees with Plaintiff that Defendants have not provided sufficient reasons to support the Court declining jurisdiction. Accordingly, the Court will deny Defendants' Motion To Dismiss to the extent it requests dismissal of Plaintiff's Complaint in its entirety (D.I.7).

### C. *Whether Acacia Should Be Dismissed From The Lawsuit.*

*4 Defendants contend that if jurisdiction is exercised, only RSC should be a Defendant and Acacia should be dismissed because Acacia had no standing to sue Plaintiff for patent infringement, and thus, Plaintiff could have no reasonable apprehension of a lawsuit with Acacia. In response, Plaintiff contends that Acacia should be a party to this lawsuit because Acacia has a legal interest in the '743 patent. Specifically, Plaintiff contends that statements in the March 23 letter such as ?we intend to add additional parties,? and ?Acacia, through its subsidiaries, licenses and enforces patents,? create a legal interest and infer that Acacia will bring the suit against Plaintiff or be involved in the litigation once it commenced.

The applicable federal law provides that only a patentee, assignee, or exclusive licensee has standing to bring a patent suit. *Rite-Hite Corp. v. Kelly Co.*, 56 F.3d 1538, 1551-52 (Fed.Cir.1995). To the Court's knowledge, Acacia does not fall within any of these categories, and therefore, the Court concludes Acacia does not have standing to sue for infringement of the '743 patent. Accordingly, the Court will grant Defendant's Motion To Dismiss to the extent it requests dismissal of claims against Defendant Acacia (D.I.7).

### V. CONCLUSION

In sum, the Court will deny Defendants' Motion to the extent it requests dismissal of Plaintiff's Complaint in its entirety; however, the Court will grant the Motion to the extent it requests dismissal of claims against Defendant Acacia Research Corporation.

An appropriate Order will be entered.

### *ORDER*

At Wilmington, this *17* day of November, 2006, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that:

1) Defendants' Motion To Dismiss And In The Alternative Motion To Transfer Venue (D.I.7) is *DENIED in part* and *GRANTED in part.*

2) Remaining parties, within twenty (20) days of the date of this Order, shall submit a Joint Proposed Scheduling Order for the Court's consideration. If the parties are unable to reach an agreement, they shall outline their disputes in the Joint Proposed Scheduling Order.

D.Del.,2006.
Epic Systems Corp. v. Acacia Research Corp.
Slip Copy, 2006 WL 3355185 (D.Del.)

Briefs and Other Related Documents (Back to top)

? 2006 WL 1814093 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of Defendants' Motion to Dismiss and in the Alternative Motion to Transfer Venue (May 31, 2006) Original Image of this Document (PDF)
? 2006 WL 1814092 (Trial Motion, Memorandum and Affidavit) Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss and in the Alternative Motion to Transfer Venue (May 23, 2006) Original Image of this Document (PDF)
? 2006 WL 1814091 (Trial Motion, Memorandum and Affidavit) Defendants' Opening Brief in Support of Defendants' Motion to Dismiss and in the Alternative Motion to Transfer Venue (May 9, 2006) Original Image of this Document (PDF)
? 2006 WL 1205318 (Trial Pleading) Complaint (Apr. 19, 2006) Original Image of this Document (PDF)
? 1:06cv00255 (Docket) (Apr. 19, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

In re Emerging Communications, Inc. Shareholders LitigationDel.Ch.,2004.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
In re EMERGING COMMUNICATIONS, INC. SHAREHOLDERS LITIGATION
**No. Civ.A. 16415.**

Submitted Aug. 30, 2003.
Decided May 3, 2004.
Revised June 4, 2004.

Thomas J. Allingham II, Leonard P. Stark, Rosemary S. Goodier, Douglas E. McCann, and James A. Whitney, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; for Greenlight Capital Qualified L.P., Greenlight Capital L.P. and Greenlight Capital Offshore, Ltd.
Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Shane T. Rowley, of Faruqi & Faruqi, LLP, New York, New York; for Brickell Partners and the Class, of counsel.
Thomas A. Beck, Raymond J. DiCamillo, Catherine G. Dearlove, and Kelly C. Ashby, of Richards, Layton & Finger, Wilmington, Delaware; P. Kevin Castel and Jonathan R. Donnellan, of Cahill Gordon & Reindel, New York, New York; for Emerging Defendants Communications, Inc., Jeffrey J. Prosser, Innovative Communication Corporation and Innovative Communication Company, LLC, of counsel.
David C. McBride and Bruce L. Silverstein, of Young Conaway y Stargatt & Taylor, Wilmington, Delaware; Attorneys for the Board Defendants; Kevin C. Logue, and Ryan K. Roth Gallo, of Paul, Hastings, Janofsky & Walker LLP, New York, New York; Attorneys for Defendants Richard N. Goodwin, John G. Vondras, Salvatore Muoio, Terrence A. Todman, Sir Shridath Ramphal; and Paul J. Ruskin, of the Law Offices of Paul J. Ruskin, Douglaston, New York; Attorney for Defendant John P. Raynor, of counsel.

OPINION

JACOBS, J.[FN*]

FN* Sitting by designation as Vice Chancellor under Del. Const., art. IV, § 13(2).

**\*1** Addressed in this Opinion are the merits of consolidated statutory appraisal and class actions for breach of fiduciary duty. These actions all arise out of the two-step ?going private? acquisition of the publicly owned shares of Emerging Communications, Inc. (?ECM?), by Innovative Communications Corporation, L.L.C. (?Innovative?), ECM's majority stockholder. The first step tender offer was commenced on August 18, 1998 by Innovative for 29% of ECM's outstanding shares at a price of $10.25 per share. The balance of ECM's publicly held shares were acquired in a second-step cash-out merger of ECM into an Innovative subsidiary, at the same price, on October 19, 1998.

At the time of this two-step transaction (the ?Privatization?), 52% of the outstanding shares of ECM, and 100% of the outstanding shares of Innovative, were owned by Innovative Communication Company, LLC (?ICC?). ICC, in turn, was wholly owned by ECM's Chairman and Chief Executive Officer, Jeffrey J. Prosser (?Prosser?). Thus, Prosser had voting control of both of the parties to the Privatization transaction.

In June 1998, shortly after the Privatization proposal was announced, a fiduciary duty class action was brought on behalf of the former public shareholders of ECM by Brickell Partners, an ECM shareholder. On February 10, 1999, four months after the Privatization was consummated, an appraisal action was filed by Greenlight Capital, L.P. and certain of its affiliates (collectively, ?Greenlight?). A settlement of the Brickell Partners class action was thereafter proposed and later withdrawn. Greenlight, which had objected to the proposed settlement, filed a separate fiduciary duty action on behalf of both its 750,300 ?appraisal shares? and 2,026,685 ECM minority shares to which Greenlight had been assigned the litigation rights. Thereafter, the Brickell fiduciary duty action and the Greenlight appraisal and fiduciary duty actions were consolidated, and were tried on the merits between September 17, 2001 and November 6, 2001. Post-trial briefing and the submission of other memoranda were completed on August 30, 2003.

This is the decision of the Court, after trial, on the merits of the consolidated fiduciary and appraisal actions.

## I. THE FACTS

Next recited are the material facts, many of which are undisputed. Where there are disputes, the facts are as found below. Although the recited facts set forth the basic storyline, they are not intended to be comprehensive. To avoid unduly diverting the reader from the essential plotline, other facts that are relevant to discrete issues are discussed elsewhere in this Opinion in the context where those issues are addressed.

### A. The Parties

#### 1. *The Plaintiffs*

The plaintiffs, as noted are Brickell Partners, which represents a class of persons who owned shares in ECM between May 29, 1998 and October 19, 1998; and Greenlight, which comprises three investment funds that focus on special situation value investments. At the time of the tender offer, Greenlight owned 750,300 shares of ECM, and it was also the assignee of the litigation rights (which Greenlight had previously acquired) to 2,026,685 ECM minority shares. Greenlight brings its appraisal action on behalf of the 750,300 shares that it owns outright. Greenlight brings its class action on behalf of those shares, and also on behalf of the 2,026,685 ECM shares as to which Greenlight holds the litigation rights.

#### 2. *The Defendants*

**\*2** There are two groups of defendants: (1) the ?ECM defendants,? which consist of ECM, ICC, and Innovative; and (2) the ?Board defendants,? who were ECM's directors at the time of the Privatization. In addition to Jeffrey Prosser, who was also ECM's Chairman and Chief Executive Officer, ECM's directors were Richard Goodwin; John Raynor; Sir Shridath Ramphal; Salvatore Muoio; John Vondras; and Terrence Todman. Each of the board defendants served as an ECM director at Prosser's request.

##### (a) *The ECM Defendants*

ECM, a Delaware corporation that was headquartered in the U.S.Virgin Islands (?USVI?), was formed in 1997 to receive the Virgin Islands operations of ECM's corporate predecessor, Atlantic Tele-Network, Inc. (?ATN?), in connection with a division of ATN's business. At the time of the October 1998 Privatization, ECM's principal business was the Virgin Islands Telephone Co. (?Vitelco?), which was the exclusive provider of local wired telephone services in the USVI. Vitelco represented the largest portion of ECM's business and accounted for approximately 88% of its revenues. ECM's other businesses included Vitelcom, an indirect subsidiary engaged in selling and leasing telecommunications equipment; and Vitelcom Cellular (?VitelCellular?), which provided cellular service in the USVI. ECM also owned SMB Holdings, which provided cellular service to the island of St. Maarten/St. Martin.

Innovative, a Virgin Islands corporation that was 100% owned by ICC, is a Delaware limited liability company with its principal place of business in the USVI. As earlier noted, at the time of the Privatization, Prosser owned the entire (100%) membership interest in ICC, which in turn owned 52% of ECM's common stock, and 100% of the stock of Innovative.

##### (b) *The Board Defendants*

The Board Defendants, and their respective backgrounds, are described at this point.

###### *Richard N. Goodwin*

Richard Goodwin, a member of the Massachusetts Bar, is a noted author of books on American history, government, and politics. In 1959, Mr. Goodwin served as a law clerk to United States Supreme Court Justice Felix Frankfurter, and during the 1960's, he served as Assistant Special Counsel to President John F. Kennedy. After President Kennedy's assassination, Goodwin served as Deputy Assistant Secretary of State for Inter-American Affairs and as Special Assistant to President Lyndon B. Johnson. In the late 1960's Mr. Goodwin served as campaign advisor to Senator Robert F. Kennedy. During the 1980's and part of the 1990's, Mr. Goodwin also served as a consultant to the

government of the USVI.

### Shridath S. Ramphal

Sir Shridath S. Ramphal (?Ramphal?), a native of Guyana, is a Barrister at Law who has held numerous prestigious government and academic positions. Between 1965 and 1993, Ramphal served successively (from 1965 to 1975) as Solicitor General of British Guyana, Assistant Attorney General of the West Indies, Attorney General of Guyana, and Guyana's Minister of Foreign Affairs of Justice. From 1975 to 1990, Ramphal served as Secretary General of the British Commonwealth, a group of 58 nations headquartered in London, England. Ramphal also served as Vice President of the United Nations General Assembly (from 1968 to 1973), Chairman of the United Nations Committee on Development Planning (from 1984 to 1987), Special Advisor to the United Nations Conference on Environment and Development (1992), Chairman of the West Indian Commission (1990 to 1992), and as President of the World Conservation Union (from 1990 to 1993). Finally, Ramphal served as chancellor of the University of Guyana from 1988 to 1992, and as chancellor of the University of Warwick in the United Kingdom and chancellor of the University of the West Indies, since 1989.

**\*3** Apart from these positions, Ramphal served as a director of, and a paid consultant to, ATN (ECM's corporate predecessor) in 1992, 1993, 1994, and 1995, during which years he was paid (respectively), $20,000, $140,000, $140,000, and $120,000.

### John G. Vondras

John G. Vondras (?Vondras?) is a professional engineer, with over 25 years of independent experience in the telecommunications industry. Vondras has served and continues to serve as a director (and as President Director) of PT ARIAWEST International, a joint venture company that operates a partnership with PT TELKOM, which provides wireless and land based telephone services in Indonesia. In 1986, Vondras spent two weeks in the USVI assisting Prosser on technical due diligence in Prosser's purchase of Vitelco. Vondras also served as a director of ATN.

### Salvatore Muoio

Salvatore Muoio (?Muoio?) is a principal and general partner of S. Muoio and Co., LLC, an investment advising firm, with significant experience in finance and the telecommunications sector. Mr. Muoio's background includes employment as a securities analyst and vice president at Lazard Fr?res & Co., from 1995 to 1996 in the telecommunications and media sector, and then for Gabelli & Co., Inc ., from 1985 to 1995, serving both as a generalist and in the communications sector. During his career, Mr. Muoio has been quoted in many well-regarded financial newspapers and periodicals.

### Terrence A. Todman

Terrence Todman, (?Todman?), a USVI native, is a former United States ambassador to Argentina, Denmark, Spain, Costa Rica, Guinea, and Chad, and has served as special advisor to the Governor of the USVI. Todman, who is now retired, serves on the boards of directors of several other companies, including Areolineas Argentinas and the Exxel Group.

### John P. Raynor

John P. Raynor, (?Raynor?), a practicing attorney, was a partner of an Omaha, Nebraska law firm, and served as Prosser's personal attorney as well as ECM's counsel. Raynor was also a business associate of Mr. Prosser, had been a director of ATN, and acted as Prosser's advisor in formulating the terms of the Privatization transaction.

### B. Background Leading To The Formation of ECM

ECM's corporate predecessor, Atlantic TeleNetwork, Inc. (?ATN?), was a company that Prosser and a partner, Cornelius Prior, formed in 1987 to acquire the Virgin Islands Telephone Corporation (?Vitelco?).

Vitelco, which was ATN's (and later ECM's) principal subsidiary, was (and still is) the exclusive provider of local wired telephone service in the USVI, where Vitelco operates a modern, fully digital telecommunications network.

Vitelco was an extremely valuable asset, for several reasons. At the time of the Privatization, Vitelco faced no competition in the foreseeable future, and was guaranteed an 11.5% rate of return on the rate base for local telephone service by the Virgin Islands Public Service Commission. Vitelco's business, which is essentially non-cyclical and not materially affected by recession or inflation, was enhanced by its membership in the Rural Telephone Finance Cooperative (?RTFC?), a non-profit lending cooperative that provided Vitelco with capital at below-market interest rates. Prosser and his entities had access to RTFC financing only because of their affiliation with Vitelco.

**\*4** Moreover, Vitelco had been essentially free from taxation. In May 1997, Vitelco was granted by the USVI Industrial Development Commission (?IDC?) a five year tax abatement from 90% of income taxes and 100% of gross receipts, property and excise taxes (running from October 1998 through October 2003). The tax abatement was granted to help Vitelco recover from uninsured damage caused by Hurricane Marilyn in 1995. The tax abatement lasted for almost the entire period from the time ATN acquired Vitelco, until the Privatization.

In January 1991, ATN acquired an 80% interest in a second telephone company: Guyana Telephone & Telegraph Company Limited (?GT & T?). Eleven months later, ATN completed an initial public offering of over 5 million shares of its common stock at $19 per share. As a result, Prosser and Prior together owned about 65% of ATN's stock.

By 1993, Prosser and Prior had a falling out. That led to a management deadlock, which effectively precluded Prosser from pursuing his acquisition strategy. With the co-CEOs at loggerheads and the ATN board deadlocked, Prosser and Prior sued each other in June 1995. In February 1996, Prior and Prosser entered into a global settlement of their disputes, in which they terminated all litigation and released all claims.

As part of the settlement, Prosser and Prior attempted to sell ATN, and engaged two investment banks-Prudential and PaineWebber-to assist in that endeavor. Both banks concluded that a buyer should be willing to pay $25 to $30 per share for ATN, which represented a 150% to 200% premium over ATN's market price. But, potential acquirors expressed interest only in acquiring ATN's Virgin Islands operations, primarily Vitelco.

Because ATN could not be sold as an entirety, and because selling only the USVI business would not resolve the management deadlock, Prosser and Prior decided to split ATN into two new companies (the ?Split Off?). One of those companies, to be controlled by Prosser, would consist of ATN's Virgin Islands Group. That company was ECM. The other company, which would be controlled by Prior, was New ATN, to which GT & T would be transferred. The Split Off was approved by ATN's board of directors and shareholders, and was consummated on December 30, 1997. Although ATN had no controlling stockholder before the Split Off (Prosser and Prior owned a large but not majority position), as a result of the Split Off Prosser ended up owning 52% of ECM's 10,959,131 shares, and ECM's public shareholders were relegated to the position of minority stockholders. [FN1]

> FN1. Knowing that he would control ECM and Vitelco after the Split Off, Prosser began acquiring telecommunication and other media companies. On December 30, 1997, the same date as the Split Off closed, ICC (wholly owned by Prosser) closed its acquisition of three Caribbean Cable Companies (BVI Cable TV; St. Croix Cable TV, Inc.; and St. Maarten Cable TV) and the Daily News. ICC closed on its agreement to purchase St. Thomas Cable (executed in September 1997) on April 3, 1998. The plaintiffs contend that these acquisitions were all corporate opportunities of ATN and ECM.

On December 31, 1997, ECM began trading as a public company on the American Stock Exchange. Shortly after Prosser obtained control of ECM, he appointed his long-time ATN directors, Raynor and Ramphal, to the ECM board. Prosser also appointed Messrs. Goodwin, Muoio and Vondras to the ECM board.

### C. The Proposed, But Later Aborted, Merger of Innovative Into ECM

ECM's life as a public company was short-only ten and one half months. That was not accidental: before the Split Off had been completed, Prosser indicated that he intended to merge Innovative into ECM, and he began exploring a combination of the two companies in January 1998. On January 20, 1998, ECM hired Prudential to advise it on the fairness of a potential merger of Innovative into ECM's subsidiary ATNCo (the ?Proposed Merger?). During the next month, Prosser formulated the terms of the Proposed Merger, assisted by Prudential, the law firm of Cahill, Gordon and Reindel, ECM's legal advisors (?Cahill Gordon?), and director John Raynor.

**\*5** On February 27, 1998, Prosser sent to each ECM director an outline of the terms of the Proposed Merger, a draft merger agreement, and proposed resolutions creating a special board committee that would consist of Messrs. Raynor, Goodwin, and Ramphal. At the March 9, 1998 meeting of the ECM board, Prosser formally presented the Proposed

Merger, whereby Innovative would merge into ATNCo (the wholly-owned ECM subsidiary that held Vitelco) in exchange for the issuance of $35 million of ATNCo convertible preferred stock to ICC (Innovative's parent). No privatization of ECM was contemplated as part of this transaction. At the March 9, 1998 board meeting, the ECM board also constituted a special committee, consisting of Messrs. Goodwin, Raynor, and Ramphal (the ?First Special Committee?), to consider Prosser's Proposed Merger. Those persons were appointed at the suggestion of Prosser.[FN2] At that time, Raynor, who was an ECM director and a Prosser business associate, was on retainer as ECM's attorney and had helped Prosser formulate the terms of the Proposed Merger.

> FN2. Trial. Tr. Vol. 10 (Prosser) 1785).

The law firm retained to serve as counsel to the First Special Committee was Cahill Gordon. The firm that was retained as the financial advisor to ECM and the First Special Committee in connection with the Proposed Merger was Prudential. From April 3, 1998 through May 20, 1998, Prudential engaged in discussions with ICC about the Proposed Merger terms.

Whether or not the First Special Committee actively considered the Proposed Merger is a heavily disputed issue. Goodwin testified that that Committee never met, that it had no financial or legal advisor, and that the Proposed Merger was ?dropped within the month .?[FN3] The other Committee members also testified that the First Special Committee never met and that it had no advisors.[FN4]

> FN3. Trial Tr. Vol. 4 (Goodwin) 829-35, 845-46, 853.

> FN4. *See* Trial Tr. Vol. 7 (Ramphal) 1423-1425; Raynor Dep. 118-119.

The record, however, shows that Prudential and Cahill Gordon were retained by, and performed work for, the First Special Committee.[FN5] The scenario in which the Proposed Merger supposedly ?languished? shortly after it first surfaced, is inconsistent with JX 218, which is Prudential's extensive documentary presentation of the Proposed Merger to the Special Committee. Joint exhibit 218 was sent to the Committee members on May 22, 1998 in preparation for the Committee's meeting scheduled for May 27, 1998. In that document Prudential valued ATN-the wholly owned ECM subsidiary into which Innovative would be merged-at $25 to $30 per share.[FN6] It is difficult to square Prudential having sent this document-which evidenced that firm had done significant work-to the First Special Committee as late as May 22, if in fact the Proposed Merger had languished or if the Special Committee had been disbanded after a week or two, as Goodwin testified.

> FN5. *See, e.g.,* JX35 (Prudential retainer letter); JX96 (draft fairness opinion); JX 265 (Prudential presentation to Cahill Gordon and First Committee); JX218 (Prudential Presentation to Special Committee containing its evaluation of the Proposed Merger); Trial Tr. Vol. 8 (Heying) (stating Prudential and Cahill Gordon were retained; Trial Tr. Vol. 10 (Prosser) 1796-98 (same).

> FN6. JX 218, Appendix, EC 020890-893. The Proposed Merger, if consummated, would have benefited ECM and its minority shareholders by combining all the media holdings Prosser had assembled (telephone, cellular and cable), using Vitelco's cash flow and capital, under the single corporate umbrella of ECM. Those benefits were not made available to ECM's minority stockholders in the Privatization. By definition, only Prosser received those benefits.

D. Prosser Abandons the Merger In Favor Of The Privatization

During the third week of May 1998, Prosser began having significant reservations about the Proposed Merger, because the low market interest in ECM's common stock had caused that stock to be undervalued.[FN7] On May 21, 1998, Prosser, together with Raynor, met with representatives of Prudential and Cahill Gordon to discuss the feasibility of Innovative acquiring all of the outstanding stock of ECM. By that point, Prosser had decided (in Raynor's words) to ?flip the transaction.?[FN8] Having concluded that the market was not recognizing ECM's intrinsic value, Prosser switched from being a seller of ECM stock to becoming a buyer of that stock. Although Prosser had placed a value of $13.25 per share on ECM for purposes of the Split Off that had occurred only 5 months before, as a buyer of that same stock he was now proposing to pay only $9.125 per share.

> FN7. Prosser Dep. June 7, 2000, at 67-69. On the first day ECM stock was traded, its high and low sales

prices were $8.25 and $7.875, respectively. During the second calendar quarter of 1997 (April 1-June 30), ECM shares traded at prices ranging from a high of $8.9375 to a low of $6.25 per share. On the last trading day before the public announcement of the Privatization, the reported closing price was $7.00 per share. JX 155 at SC4133. Prosser informed the ECM board that the ECM stock price had failed to reach the desired appreciation as a result of the small public float and the fact that the stock was not followed by Wall Street analysts. JX 155 at SC 4111.

> FN8. Raynor Dep. 173.

*6 Between May 22 and May 28, Prosser, Prudential and Cahill formulated the terms of a Privatization proposal to be presented to ECM's board. On May 28, Raynor, Prosser and Thomas Minnich, ECM's Chief Operating Officer, informed the RTFC that they had decided to abandon the Proposed Merger and to take ECM private. The next day, Prosser delivered to the ECM board a letter withdrawing the Proposed Merger and proposing instead that Innovative acquire all the ECM shares it did not already own. The proposed Privatization was structured as a first-step cash tender offer for ECM's publicly traded shares at $9.125 per share, to be followed by a second-step cash-out merger at the same price. [FN9]

> FN9. JX 150.

Prosser's May 29th letter was the first occasion that the ECM board and the First Special Committee (other than Raynor) learned of the abandonment of the Proposed Merger in favor of the Privatization. Those directors were never told of the roles played by Prudential, Cahill and Raynor-all supposedly retained to represent the interest of the ECM minority stockholders-in formulating the terms of the newly-substituted going private transaction.[FN10]

> FN10. The $9.125 per share merger price was arrived at by Prosser in consultation with Prudential, and no one else had a significant role in that decision. Prosser Dep. June 7, 2000 at 73-74. The First Special Committee members (other than Raynor) were not told of the ongoing plans to change the transaction until May 29, 1998. Goodwin Dep. August 11, 2000 at 48-52, 62.

On the same day that Prosser proposed the Privatization, he told ECM's board that he (Prosser) had retained ECM's former advisors, Prudential and Cahill Gordon, to represent Innovative as the buyer in that transaction. Prudential was an especially valuable advisor to ECM, because it understood ECM's business and properties and had been ECM's only advisor during its brief life as a stand-alone company. Thus, the advisors that initially were retained to work *for* the interests of ECM and its minority stockholders would now be working to serve the interests of Innovative, the party now bargaining *against* ECM. There is no evidence that the ECM board objected either to Prosser's co-opting these valuable advisors, or to the timing of the proposed Privatization.[FN11]

> FN11. At that time (May 1998), Prosser knew that ECM's stock price was artificially depressed, because the market was not viewing ECM as a U.S. telephone company, but, rather, as a developing nation/third world phone company. That perception, Prosser knew, was unfair, because ECM had all the characteristics of a U.S. telephone company-a stable government, dollar economy, English language, American courts and legal system-and none of the characteristics of a third world company. Trial Tr., Vol. 10 (Prosser) at 1728-29; 1801-02, 1807. Rather than educate the market or afford it time to understand ECM's true characteristics, Prosser exploited the market unfairness by proposing the Privatization at a price that reflected a ?premium? over ECM's then-current depressed market price level.

> E. The Formation Of The Second Special Committee And The Negotiation Of The Transaction Terms

At the May 29 ECM directors' meeting, the board formed another special committee (the ?Second Special Committee?) to review the fairness of the proposed Privatization. The directors selected to serve as members of this Second Special Committee were Messrs. Richard Goodwin, John Vondras, and Shridath Ramphal.[FN12]

> FN12. In their briefs the parties dispute whether Mr. Muoio had also been appointed to the Second Special Committee. Plaintiffs argue that he was, pointing to the minutes of the May 29 meeting (JX 97), which recite that Muoio was appointed. The defendants argue that those minutes were incorrect, and point to testimony that Muoio was never on the Committee. The materiality of this fact dispute is, to say the least, obscure. Because even the plaintiffs concede that Muoio ?did not serve? (Pl. Op. Trial Br. 27), the Court concludes that it is more probable than not that Muoio was never appointed.

There were several obstacles to the ability of these three directors to operate as a fully functioning Special Committee. Located on different continents and separated by a time difference of 14 hours, the three Committee members were never able to meet in person. Instead, they had to conduct their business by telephone and fax. Even teleconferences were difficult to arrange and as a result, the Second Special Committee never met collectively–even by telephone–to consider the $10.25 final negotiated offer whose approval it ultimately recommended.

Because one of the Second Special Committee members lived in Indonesia and the other lived in England, practicality dictated that Goodwin would be the Committee chair. In that capacity, Goodwin was designated to–and did–take the lead role in negotiating with Prosser and in selecting the Committee's legal and financial advisors. Mr. Goodwin interviewed William Schwitter of Paul, Hastings, Janofsky & Walker LLP (?Paul Hastings?), as a potential legal advisor to the Second Special Committee, and on June 5, 1998, the Committee retained the Paul Hastings firm as its legal counsel. Later, after meeting with representatives of J.P. Morgan and Houlihan Lokey Howard & Zukin (?Houlihan?) at his home in Massachusetts, Goodwin recommended that the Committee retain Houlihan as its financial advisor, and in mid-July, 1998, the Second Special Committee retained Houlihan in that capacity.<u>FN13</u>

> <u>FN13.</u> Plaintiffs challenge the independence of both Mr. Schwitter and Houlihan, pointing out that Schwitter had been recommended by Cahill Gordon, counsel for Innovative, and that Houlihan (as well as all other potential financial advisors) ?were first vetted by Prudential, which was now working solely for Prosser.? Moreover (plaintiffs assert), Houlihan was ultimately recommended by Mr. Goodwin, because Goodwin felt that Houlihan (unlike Morgan Stanley) would not ?[push] Prosser too hard,? which might cause Prosser to back off and result in a lower stock price. Morgan Stanley, on the other hand, was ?more aggressive? in pursuit of the retention, and was insisting on a fee arrangement that was linked to any increase above Prosser's initial $9.125 offer that Morgan could obtain.
>
> These arguments are strained at best. Although at one time Schwitter was an attorney at Cahill, at the time that Cahill recommended Schwitter (among other attorneys), he was a partner at a competitor firm and there is no evidence that Schwitter was beholden to Cahill or that he acted other than loyally as counsel to the Special Committee. Nor is there evidence that the retention of Houlihan prejudiced the Second Special Committee. The weakness was in the bargaining position of the Special Committee in relation to that of Prosser, who was not prepared to support or accept any alternative business transaction other than the Privatization. That is, the Committee's only options were to make a deal with Prosser on whatever terms he was willing to accept, or no deal at all (in which case the stock price might fall, to the minority stockholders' detriment). The defendants' response is that the Special Committee had ample bargaining power to negotiate a fair price, because it had the power to ?just say no,? *i.e.,* to veto the Privatization proposal, and that the Committee would approve the Privatization only if it was the best available transaction and represented fair value for the stock. Although the Court ultimately concludes that the Special Committee was ineffectual, it is not for the reason that Paul Hastings and Houlihan had been retained as the Second Special Committee's advisors.

*7 As part of its pre-financial analysis investigation of ECM, Houlihan conducted (among other things) a review of ECM's financial information. That information included financial projections for ECM, dated March 25, 1998 (the ?March projections?), that had been prepared by James Heying, ECM's then-Chief Financial Officer and Executive Vice President of Acquisitions.<u>FN14</u> What Houlihan was *not* provided, however, were financial projections dated June 22, 1998 (the ?June projections?) <u>FN15</u> that Prosser had caused Heying to prepare as part of Prosser's and ICC's application to the RTFC to finance the acquisition of ECM's minority shares.

> <u>FN14.</u> JX 13, 14.

> <u>FN15.</u> JX 38.

The June projections forecasted substantially higher growth than did the March projections. Based on the June projections, as modified by the RFTC, the RFTC concluded in July 1998 that ECM was worth (for loan approval purposes) approximately $28 per share.<u>FN16</u> Recognizing that the Privatization gave Prosser ?the opportunity to retain control at a price below the true market value of the company,? <u>FN17</u> the RTFC approved financing that would enable Prosser to offer up to $11.40 per share.<u>FN18</u> That suggests, and Prosser later confirmed, that he always planned (and gave himself sufficient elbow room) to increase his initial offer by some amount.<u>FN19</u> Moreover, the $60 million RTFC loan represented the amount Prosser had asked for, not the limit of what the RTFC would have allowed him to

borrow.[FN20]

> FN16. JX 167 at RTFC 698, 707, 720. The RTFC made certain downward modifications to the June projections so that its valuation would be on the conservative side. Using a 12% medium risk discount in its DCF analysis, the RTFC valued ECM at $27.84 per share. *Id.*

> FN17. JX 167 at RTFC 710; Reed Dep. 113-15.

> FN18. *See* JX 167 at RTFC 710. (?The initial offer price will be $9.25. The loan amount includes an additional $11.4 million to accommodate a $2.15 increase to the initial offer price.?)

> FN19. *See* Prosser June 8, 2000 Dep. 270-71 (?I am quite certain that we had requested enough room to go up so that we would have the ability to fund at a higher price obviously than nine and a quarter....?).

> FN20. Trial Tr. Vol. 10 (Prosser) 1813-14.

Although Prosser made the June projections available to his legal advisor (Cahill), his financial advisor (Prudential), and his lender (the RTFC), the June projections were never provided to the Second Special Committee, Houlihan, or the ECM board. Instead, Prosser directed Heying to send Houlihan the March projections, even though the June projections were available by that point. As a result, the Committee and its advisors believed-mistakenly-that the March projections were the most recent projections available.[FN21]

> FN21. Trial Tr. Vol. 7 (Vondras) 1351-52.

On August 4, 1998, the Committee met with Houlihan to discuss Houlihan's preliminary analysis, which had been furnished to the Committee members in the form of a draft presentation booklet. After explaining in detail his firm's assumptions and methodologies, Houlihan's representative informed the Committee that it was not prepared to opine that $9.125 was a price that would be fair to the minority stockholders. After further discussion, the Second Special Committee agreed that $9.125 would not provide adequate compensation for the ECM minority.

Before beginning its negotiations with Prosser, the Committee members discussed different strategies for obtaining the highest possible price for the minority shareholders. The Committee was not ready to reject Prosser's offer outright without at least attempting first to negotiate a higher price. One strategy the Committee discussed was to present Prosser with a ?final price? they believed was fair and acceptable. They concluded, however, that the approach best calculated to achieve the highest price was not to demand a specific price from Prosser, but, rather, to negotiate with Prosser for the highest price he would pay for the shares and then determine whether that price represented fair value for the minority stockholders.[FN22]

> FN22. There is evidence that sometime after the August 4[th] meeting, Houlihan told Goodwin that a one point increase above the original $9.125 offer, *i.e.,* an increase to $10.125, would enable Houlihan to furnish a fairness opinion. *See* JX 219, at SC 04099 (the so-called ?Goodwin Diary?), where in his entry for August 7, Goodwin recites that he told Prosser that Houlihan had concluded that the initial offer was too low, and that ?[a]fter much back and forth [Prosser] said that he could go up another point (*which was price Houlihan had told me privately would be acceptable.*)? Although Goodwin claimed at trial that Houlihan never told him that [Trial Tr. Vol. 5 (Goodwin) 911], Goodwin did not denigrate any other parts of what he wrote in the Goodwin Diary (*see, e.g., id.* at 915-18, 923). The defendants suggest no reason why this particular diary entry should be viewed as inaccurate when the other entries were not.

*8 Between August 5 and August 10, 1998, in a series of telephone conversations,[FN23] Messrs. Goodwin and Prosser negotiated the buyout price for ECM's publicly held shares. During the first conversation, which took place on August 7, Goodwin told Prosser that his initial offer of $9.125 was inadequate. According to an entry that Goodwin made in his ?diary?:

> FN23. Goodwin testified that in negotiating by telephone, rather than traveling to the Virgin Islands, he could much more ?maintain the necessary detachment and impassivity? than he could in Prosser's presence. Trial Tr. Vol. 4 (Goodwin) 771.

After much back and forth [Prosser] said that he could go up another point (which was price Houlihan had told me privately would be acceptable). If this failed [Prosser] was considering making a private tender which he calculated would give him around 90% of all the stock. If he could not get it at what he considered a fair price [he] might withdraw his offer and let the stock go to market level.[FN24]

    FN24. JX 219 at SC 04099.

Eventually, Prosser told Goodwin that he would consider the matter and call Goodwin back. Shortly thereafter, Prosser raised his offer by one eighth of a point, to $9.25 per share. Goodwin reported that offer to the Second Special Committee, which rejected it as inadequate. Goodwin then called Prosser and told Prosser that he would have to improve his offer. In a later negotiation, Prosser raised his offer to $10 per share. Again, Goodwin reported that offer to his fellow Committee members and to Houlihan. The Committee rejected that revised offer, and thereafter, Prosser raised his offer to $10.125 per share. The Second Special Committee rejected that offer as well.

In response, Prosser raised his offer to $10.25 per share, but told Goodwin that $10.25 was his final offer. Because the price had been going up in roughly quarter point increments, Goodwin countered by asking for $10.50 per share. Prosser rejected that request, pointing out that $10.25 was already ?straining the limits of [his] financing? for the transaction.[FN25] At that point, Goodwin made a judgment that the Committee ?had reached the limits of how far we could push ...,? [FN26] and informed the other Committee members-Ramphal and Vondras-of his conclusion. Ramphal and Vondras agreed to stop the negotiations at that point.[FN27]

    FN25. Trial Tr. Vol. 4 (Goodwin) 778; JX 142. The record shows that, in fact, Prosser's financing would have enabled him to increase his offer to $11.40 per share, and that the implied equity value of ECM was $305 million, or $28 per share. JX 167 at RFTC 698, 720; Reed Dep. 162-163; Prosser 6/7/00 Dep. 93-96. Goodwin testified that Prosser's representation about the limits of his financing, truthful or not, had no impact except to signal to him (Goodwin) that the negotiations had to end.

    FN26. Trial Tr. Vol. 4 (Goodwin) 779.

    FN27. The plaintiffs contend that the negotiations between Prosser and Goodwin were not arm's length, and that, in fact, the Special Committee's entire process was ?bankrupt.? To prove that point, the plaintiffs rely heavily upon the fact that Goodwin's regular practice was to send faxes to Special Committee members (or their counsel) through Prosser's secretary, Eling Joseph, and ask her to fax it to the others. Although Goodwin told Ms. Joseph that the Committee materials were confidential, this practice did create the potential of giving Prosser access to almost every document that circulated among the Special Committee, including Houlihan's financial analysis. Goodwin did not deny having routed his communications through Ms. Joseph, and defended that practice on the basis of convenience, not necessity. The defendants respond that there is no evidence that Prosser or his advisors saw these faxes. Prosser testified that Ms. Joseph never disclosed any of those materials to him, including Houlihan's valuation materials. The record discloses, however, that at least on one occasion the confidentiality of the faxed Committee materials was breached. Even if that had not occurred, this practice cannot help but undermine confidence in the integrity of the bargaining process. It is manifest that Goodwin's decision to route those materials through the secretary who shared the same office as Prosser-Goodwin's bargaining adversary-rather than route them through the office of the Committee's counsel, Mr. Schwitter, created a serious risk of compromising the Committee's process and its effectiveness in negotiating the highest available value.

Thereafter, Goodwin asked Houlihan if it could furnish a fairness opinion at $10.25 per share. Houlihan responded that it could, because that price was within the valuation ranges resulting from its market multiple analysis and its discounted cash flow (DCF) analysis.

The Committee having obtained what they believed was the highest available price, the question then became whether that price was fair. On August 12, 1998, Goodwin and Vondras had a telephonic meeting with Houlihan and Paul Hastings to review Prosser's $10.25 offer. Having updated its financial analysis, Houlihan concluded that the revised offer price of $10.25 was fair to ECM's public shareholders from a financial point of view. Goodwin and Vondras thereafter voted to recommend that the full ECM board approve the Privatization.[FN28]

    FN28. Ramphal did not attend the Committee's August 12 meeting, even by telephone. Shortly after the meeting, Goodwin contacted Ramphal and gave him a detailed account of what had occurred.

F. ECM's Directors and Shareholders Approve The Proposed Privatization

**\*9** A telephonic meeting of the ECM board to consider Prosser's revised offer to buy all of ECM's publicly held stock for $10.25 per share, was held on August 13, 1998, the following day. Present at that meeting were Mr. Schwitter and Houlihan representatives. Not attending were Messrs. Prosser (at the request of the Board) and Todman (due to a scheduling conflict). The Board members who had not served on the Special Committee had received copies of Houlihan's fairness analysis before the meeting.[FN29]

> [FN29]. Because the copies were sent after the Committee had acted on August 12, the non-Committee member directors had less than a day to review the Houlihan materials.

At the meeting, the Special Committee members described the process they had employed. Houlihan then explained its financial analysis and confirmed that in its opinion, the $10.25 per share price was fair to the minority stockholders from a financial point of view. After discussion, the board determined to approve the Privatization, but only if a majority of the shares held by the minority stockholders were tendered in the first-step tender offer. The meeting was then adjourned to August 17, 1998, at which time the board was told that Prosser would agree to this non-waivable minimum tender condition. The full board, acting upon the unanimous recommendation of the Second Special Committee, then voted to approve the Privatization.

On August 18, 1998, ECM publicly announced the execution of a definitive merger agreement that provided for the Tender Offer and Merger at $10.25 per share, and that the Tender Offer was subject to the minimum tender condition. The Tender Offer commenced on August 24, 1998. At the time of the Tender Offer, there were 10,959,131 outstanding ECM shares, of which 5,606,873 shares were owned by Prosser through ICC, and the remaining 5,352,258 were held by the public. As of September 25, 1998, 3,206,844 of those shares (*i.e.,* a majority of the minority shares) had been tendered. On October 19, 1998, a special meeting of ECM shareholders took place, at which the Merger was approved by a vote of 5,760,660 FOR, and 4,466 AGAINST, out of 10,959,131 shares entitled to vote. The Merger was consummated that same day.

These appraisal and fiduciary duty class actions followed.

## II. THE PARTIES' CONTENTIONS AND THE ISSUES PRESENTED

As earlier noted, the plaintiffs have brought and litigated two separate actions-a statutory appraisal action and a class action asserting claims that the Privatization was not entirely fair to ECM's minority shareholders. In a statutory appraisal action, the Court must determine the ?fair value? of the corporation whose stock is being appraised.[FN30] Plaintiff Greenlight claims that the statutory fair value of ECM at the time of the merger was $41.16 per share, plus the value of certain corporate opportunities that Prosser is claimed to have usurped (valued at $3.79 per share), for a total fair value of $44.95 per share.

> [FN30]. 8 *Del. C.* § 262(a).

In a class action seeking to invalidate a ?going private? acquisition of a corporation's minority stock by its majority stockholder, the standard under which this Court reviews the validity of the transaction and the liability of the fiduciaries charged with breach of duty, is entire fairness.[FN31] That standard of review has two aspects: fair dealing and fair price.[FN32] In this case, the plaintiffs claim that the Privatization was the product of unfair dealing that, in turn, resulted in an unfair transaction price. The transaction (it is claimed) resulted from violations of the defendants' fiduciary duties of loyalty and good faith, for which the defendants are liable and must respond in damages.

> [FN31]. *Emerald Partners v. Berlin,* 787 A.2d 85 (Del.2001).

> [FN32]. *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983).

**\*10** The plaintiffs' claims, both fiduciary and statutory, and the defenses to those claims, involve a plethora of contentions that are too numerous to catalogue in detail at this point without overburdening an unavoidably lengthy Opinion. The reason, in great part, is that the case was over-litigated and over-briefed, a state of affairs for which the Court (by allowing the parties to file briefs in excess of the page limit) is responsible. The post-trial briefs and other

submissions alone total almost 400 pages,[FN33] and the trial record, not surprisingly, is correspondingly voluminous. To save the reader from losing the forest in the trees, what follows is a ?broad brush? sketch of the parties' contentions. A more detailed picture of those contentions-and the specific issues which flow therefrom-is set forth in the sections of this Opinion that follow.

> FN33. The opening post-trial brief is 143 pages, the answering brief is 150 pages, and the reply brief is 72 pages.

In the fiduciary duty class action, the basic issues are whether the defendants dealt fairly with the ECM minority and whether the $10.25 per share transaction price was fair. Because the plaintiffs' class action damages claim is identical (dollar-wise) to their statutory appraisal claim, the fiduciary ?fair price? and statutory ?fair value,? contentions converge and are addressed in connection with the statutory appraisal claim. Accordingly, at this point the Court summarizes the ?fair dealing? contentions. Thereafter, it summarizes the fair price/fair value claims.

With respect to fair dealing, the threshold procedural issue is which side has the burden of proof. Because the defendants stood on both sides of the transaction, normally the burden would fall upon them. If, however, the defendants can satisfy the Court that the transaction was approved by a fully functioning independent committee of independent directors or by an informed majority of minority stockholders, the burden shifts to the plaintiff to prove that the transaction was unfair.[FN34] Here, the plaintiffs contend that the Second Special Committee was neither independent of Prosser nor fully functional, for which reason the burden of proving entire fairness falls upon the defendants. The defendants contend the opposite, and assert that the burden of proof must shift to the plaintiffs.

> FN34. *Weinberger v. UOP, Inc., supra; Kahn v. Lynch Communication Sys., Inc.,* 638 A.2d 1110, 1117 (Del.1994).

Turning first to the substantive fair dealing issues, the plaintiffs claim that the Privatization was not the result of fair dealing because: (1) the entire ECM board was ?unfairly stacked? in favor of (*i.e.,* beholden to) Prosser, (2) the timing of the transaction and Prosser's co-opting of ECM's advisors were unfair, (3) the Special Committee was neither independent nor properly functioning, and (4) the defendants violated, in various respects, their ?duty of candor? to the minority shareholders in both the tender offer disclosure document and in the proxy statement issued in connection with the second step merger.

Not surprisingly, the defendants vigorously resist these claims, and contend that in their dealings with ECM's minority stockholders they acted fairly in all respects. The defendants also raise three affirmative defenses: (1) Greenlight lacks standing to assert any claims based on its acquired ?litigation rights,? and (2) no former stockholders of ECM can recover the value of any shares that they tendered into the tender offer or voted in favor of the merger; and (3) even if the Privatization was not entirely fair, the defendants are exculpated from damages liability under Article Seventh of ECM's certificate of incorporation.

**\*11** The parties' briefs are largely devoted to the ?fair price? and appraisal issues, which in this case (as noted), are one and the same. Typical in litigation of this kind, the overriding question-what ECM was intrinsically worth on the merger date-involves a proverbial ?battle of the experts.? In this case, the valuation experts were University of Chicago Business School Professor Mark Zmijewski, the plaintiffs' expert who valued ECM at over $41 per share; and Daniel Bayston, a consultant at Duff and Phelps and the defendants' primary valuation expert,[FN35] who valued ECM at $10.38 per share.

> FN35. The defendants called two additional valuation experts: Princeton University Professor Burton Malkiel, who testified about issues relating to ECM's market value, and Gilbert Matthews, an investment banker and former managing partner of Bear Stearns & Co., who testified as the defendants' rebuttal witness.

These widely differing valuations of the same company result from quite different financial assumptions that each sponsoring side exhorts this Court to accept. To evaluate the parties' competing approaches requires the Court to resolve a multitude of DCF-related valuation issues, some of which are factual and others of which are conceptual.

The first set of issues involve which set of management projections is appropriate to use in a discounted cash flow (DCF) valuation of ECM-the March projections that were furnished to the Special Committee, or the June projections that were created closer in time to the merger date but were furnished only to Prosser, his advisors, and the RTFC, and not the Special Committee or its advisors. Professor Zmijewski used the June projections without modification. Mr.

Bayston, on the other hand, used the March projections and modified them in ways that the plaintiffs hotly dispute.

A second set of issues concerns the appropriate discount rate. In this regard, both Prof. Zmijewski and Mr. Bayston determined a discount rate using standard weighted average cost of capital (?WACC?) and Capital Asset Pricing Model (?CAPM?) formulas. Professor Zmijewski used the WACC formula without any modifications. Mr. Bayston modified the WACC formulas and inputs, by adding various ?small firm? and ?weather risk? premiums, substituting new costs of debt, and using a debt-to-value capital structure that (together with Bayston's other modifications) has also generated ardent disputes.

The third and fourth sets of issues center on the questions of what weight should be accorded to ECM's stock market price in determining its fair value; and whether the appraisal (or damages) award should include the value of certain businesses that plaintiffs claim were corporate opportunities of ECM.

The analysis that next follows addresses these fair value and fair price issues. In Part III of this Opinion the Court treats the valuation issues raised by the parties, and concludes that (1) the $10.25 merger price was not fair, and (2) ECM's fair value (and fair price) on the date of the merger was $38.05 per share. In Part IV, the Court turns to the fair dealing issues, and concludes that the burden of establishing fair dealing remains with the defendants, who failed to carry that burden. Finally, in Part V, the Court determines what fiduciary duties were violated and which defendants are monetarily liable as a consequence.

### III. THE FAIR PRICE AND FAIR VALUE OF ECM

*12 Although each side's experts valued ECM using both the comparable company and DCF approaches, in their briefs the parties focus almost exclusively upon DCF valuation issues. This Court views the parties' virtual non-treatment of the comparable company valuation as a tacit concession that that alternative valuation is a ?throwaway? of no material significance. Accordingly, this Opinion addresses only the valuation issues presented by the parties' competing DCF approaches.[FN36]

> FN36. The basic flaw in the comparable company approach is that ECM had no true comparables, as Mr. Bayston conceded. Trial Tr. Vol. 3 (Bayston) at 584-585. The DCF methodology, on the other hand, is more appropriate because ECM had available contemporaneous management forecasts, predictable earnings and cash flow.

Both sides agree, and our case law recognizes, that a DCF valuation is based upon three inputs: (a) the projections of free cash flow for a specified number of years, (b) the estimated terminal value of the firm at the end of the ?projection period,? and (c) the discount rate.[FN37] Although the parties raise a plethora of DCF-related issues, those disputes center around four pivotal questions: (1) which projections (March or June) provide the more appropriate free cash flow input to the DCF model; (2) what is the appropriate discount rate for ECM; (3) how much weight (if any) should the market value of ECM's stock be given in the valuation; and (4) should the value resulting from the DCF method be increased by the value of the businesses that are claimed to be corporate opportunities of ECM? The issues that fall within these four groupings are addressed in this Part of the Opinion.

> FN37. *Cede & Co. and Cinerama v. Technicolor, Inc.,* C.A. No. 7129, 2003 WL 23104613, (Del.Ch. Dec.31, 2003) (?*Cinerama?*) (citing *Taylor v. American Specialty Retailing Group, Inc.,* 2003 WL 21753752 at *3 (Del.Ch. July 25, 2003)).

### A. Which Set Of ECM's Projections-March Or June-Is More Reliable For Purposes Of A DCF Valuation On The Merger Date?

Critical to any DCF valuation are the projected revenues, expenses, reserves, and other charges of the firm being valued. On this threshold issue the parties divide, because at Prosser's direction, Heying prepared two sets of management projections, contemporaneously and in the normal course of business. The first set was prepared on March 25, 1998; the second, on June 22, 1998. Plaintiffs' expert, Prof. Zmijewski, used the June projections to derive his projected cash flow inputs, whereas defendants' expert, Duff & Phelps (Bayston) used the March projections, but modified them in significant respects. The issue is what set of projections is the more reliable for purposes of appraising ECM as of the merger date. For the reasons next discussed, the Court determines that the unmodified June projections are the more appropriate and reliable source of inputs for a DCF valuation of ECM.

*First,* as a general proposition (with which defendants' expert, Gilbert Matthews, agreed), ?an appraiser should rely on a company's most recent contemporaneous management forecasts unless there are compelling reasons to the contrary.? [FN38] Here, the facts compellingly point to reliance on the June projections, which, unlike the March projections, incorporated ECM's first quarter of actual results as a stand-alone company. The June projections also incorporated significant post-March events that were not included in the March projections, namely, the acquisition of St. Maarten Cellular, a corporate jet, and a headquarters building. All those events were ?facts on the ground? that would have to be considered in any valuation of ECM on the merger date. If only the March projections were used, those facts could not be considered.

> FN38. Trial Tr. Vol. 5 (Matthews) 1035.

**\*13** Prosser conceded that the June projections reflected management's interpretation of the first quarter results in the context of the future performance of ECM, and that they were not unreasonably aggressive.[FN39] Also telling is that the June projections were provided to Prosser's legal and financial advisors in the Privatization (Cahill and Prudential)-but not to the Second Special Committee or its advisors. At Prosser's direction, those projections were also provided to the RTFC, which used them to value ECM as collateral for the Privatization financing. If contemporaneous reliance upon the June projections by Prosser, his lender and his financial and legal advisors was appropriate, then logic and common sense dictate that reliance on those same projections by Prof. Zmijewski in performing his valuation was no less appropriate.

> FN39. Trial Tr. Vol. 10 (Prosser) 1020-1022. This testimony flatly conflicts with the defendants' contention that the St. Maarten Cellular forecast in the June projections was ?unreasonably aggressive.?

*Second,* the defendants' denigrations of Prof. Zmijewski's reliance on the June projections are unpersuasive. Defendants argue that the June projections are inappropriate for use in an appraisal because they incorporated two projected annual cost savings that (defendants say) are synergistic, *i.e.,* merger-related: $2.5 million in savings from the consolidation of ECM and ICC's operations, and $2 million in claimed ?going private? savings from the elimination of costs of ECM remaining a public company. Even if those arguments were valid, the proper treatment would be to adjust the June projections for those merger-related cost savings, rather than discard those projections altogether. But more fundamentally, the record shows that (i) the consolidation cost savings were not merger-dependent and (ii) the claimed going private cost savings are not supported by any credible evidence of record.

The cost savings attributed to the consolidation were properly includable in the June projections, because they were contemplated well before the going private merger and could have been achieved without it. Prosser had identified potential consolidation savings before the Privatization occurred. Because Prosser controlled both ECM and ICC, he had the power to accomplish those savings without a business combination, such as by intercompany contractual arrangements.[FN40] To put it differently, the value achieved by Prosser's existing pre-merger ability to effect those cost savings was an asset of ECM at the time of the Privatization merger. It therefore was a benefit in which all ECM stockholders, not just Prosser, were entitled to share.[FN41] That entitlement cannot be defeated by Prosser's unilateral decision not to achieve those savings except as part of a going private merger that would leave him as the sole owner of the enterprise.

> FN40. JX 41 at RTFC 1507; Raynor Dep. 156. Although Prosser claimed at trial that ECM had analyzed and discussed the potential of savings through intercompany agreements and determined that regulatory and union issues precluded it, that testimony is uncorroborated by any document, pre-trial testimony or any other testimony. Heying, who was ECM's Chief Financial Officer, testified that he never discussed the subject of intercompany agreements with Prosser. It is implausible that ECM's CFO and two of its paid litigation consultants (Bayston and Matthews) would be unaware of that analysis if it had actually been performed, or would be unaware of any discussions about that analysis had any such discussions been held.

> FN41. *Cede & Co. v. Technicolor, Inc.,* 684 A.2d 289 (Del.1996).

As for the ?going private? savings, the only evidence that those savings are reflected in the June projections is the self-interested testimony of Messrs. Prosser and Heying. No document of record identifies or itemizes those savings. Nowhere are those savings reflected or identified in the June projections or in Joint Exhibit 1, a document Heying prepared during this litigation to summarize the differences between the March and the June projections. Unlike the consolidation savings (which are explicitly identified in a separate line item on both the June projections and the

Heying memorandum), there is no separate line item for these alleged savings on either of these documents. That is significant, because at the time he prepared the June projections, Heying prepared a cover memorandum to reflect the most significant changes between the March and the June projections.[FN42] The purported going private savings-representing an alleged $2 million change-is conspicuously absent from Heying's memorandum.

> FN42. JX 168; Trial Tr. Vol. 8 (Heying) 1537-1539; Heying June 6, 2000 Dep. 183-84.

**\*14** The defendants claim that the going private savings include reductions in legal fees and professional fees paid to Deloitte Touche and investment relations companies, but defendants introduced no evidence of the magnitude of those fees, even though they possessed all the relevant data. The defendants could not even reach a consensus among themselves about the magnitude of those undocumented claimed savings. Heying testified at various times that it could be $2.2 to $2.5 million, or $2 million, or $1.8 to $2.2 million.[FN43] Bayston (whose source was Heying) testified that the savings were $2 to $2.5 million annually.[FN44] Matthews' report quantified those alleged savings exactly at $1,644,000 for 1999-a figure for which Matthews was unable to identify any source during his trial testimony.[FN45]

> FN43. Heying June 6, 2000 Dep. 196-97; Trial Tr. Vol. 8 (Heying) 1473-74, 1541.

> FN44. Trial Tr. Vol. 3 (Bayston) 536-537.

> FN45. Trial Tr. Vol. 6 (Matthews) 1211-14; JX 301, Ex. E.

It stands to reason that when a public company goes private, cost savings in some amount will often be achieved. But, in an appraisal proceeding, each party must bear the burden of establishing its own position.[FN46] It was the defendants' burden to establish both the existence and the amount of any cost savings from going private. In this case, the defendants nowhere documented the existence, or the amount, of such cost savings, and the testimony of their witnesses on that subject is hopelessly inconsistent. In these circumstances, the defendants have not carried their burden of persuading the Court that the June projections included a significant cost savings of $2.5 million attributable to eliminating ECM as a public company. Accordingly, those savings are not a valid basis for the defendants to disregard, or to denigrate an appraiser's reliance upon, the June projections for purposes of performing a DCF valuation of ECM.

> FN46. *M.G. Bancorporation, Inc. v. LeBeau*, 737 A.2d 513, 520 (Del.1999).

*Third,* the March projections are inappropriate for the additional reason that the defendants' expert, Mr. Bayston, initially relied on those projections, but then modified them by making large adjustments to critical inputs. The effect of those inputs was to depress the cash flows that management had contemporaneously projected. The defendants argue that Bayston's adjustments must also be made to the June projections if this Court finds those projections to be the appropriate starting point in a DCF valuation. The Court disagrees. It concludes that the June projections, without any modifications, are the most reliable source of inputs to project ECM's future net cash flows.

This Court has consistently expressed a preference for the most recently prepared management projections available as of the merger date. The Court has also been skeptical of *ex post* adjustments to such projections. As Chancellor Chandler observed in *Cede & Co. v. JRC Acquisition Corp.*:
[T]his Court prefers valuations based on management projections available as of the date of the merger and holds a healthy skepticism for post-merger adjustments to management projections or the creation of new projections entirely.[FN47]

> FN47. *Cede & Co. v. JRC Acquisition Corp.*, No. 18648, 2004 WL 286963, at \*2 (Del.Ch. Feb.10, 2004).

**\*15** The Chancellor echoed that observation in his most recent appraisal opinion in *Cinerama*:
Contemporary pre-merger management projections are particularly useful in the appraisal context because management projections, by definition, are not tainted by post-merger hindsight and are usually created by an impartial body. In stark contrast, *post hoc* litigation-driven forecasts have an ?untenably high? probability of containing ?hindsight bias and other cognitive distortions.? [FN48]

FN48. *Cinerama*, at *7 (quoting *Agranoff v. Miller, 791 A.2d 880, 892 (Del.Ch.2001)*).

When management projections are made in the ordinary course of business, they are generally deemed reliable. Experts who then vary from management forecasts should proffer legitimate reasons for such variance.[FN49]

> FN49. *Id.,* (internal citation omitted) (citing *Gray v. Cytokine Pharmasciences, Inc., 2002 WL 853549, at *8 (Del.Ch. Apr.25, 2002)*) (rejecting valuation because it inexplicably ignored and altered management forecasts in favor of litigation-driven projections) and *Kleinwort Benson Ltd. v. Silgan Corp., 1995 WL 376911, at *5 (Del.Ch. June 15, 1995)* (observing that variations from management projections merit ?close inspection? and may impeach the credibility of an expert witness). In the *Cinerama* opinion, the Chancellor concluded that the respondent company's expert's ?repeated discarding or modification of contemporaneous ... management forecasts ... cast serious doubt upon the integrity and reliability of his expert report? (*Cinerama, supra* at 6), and that ?management was in the best position to project the short-term prospects of the company, as they created projections *ex ante,* based upon information gleaned from their particular customers.? *Id.* at 8.

The question presented here is whether the defendants have offered ?legitimate reasons? for Bayston's modifications to the March projections. The Court concludes that they have not.

The primary modification [FN50] that Bayston made to the March (and, by inference, the June) projections was to increase projected capital expenditures (CapEx). Both the March and the June projections forecasted CapEx of approximately $9 million annually throughout the projection period. Prosser explained that these forecasted capital expenditures were lower than historical levels and were reasonable over the short term, because Vitelco had recently replaced and rebuilt its equipment, thereby reducing the need for short term capital expenditures.[FN51] Heying [FN52] and Matthews [FN53] agreed that the forecasted CapEx were management's best contemporaneous estimates.

> FN50. Bayston's other modifications were to eliminate the ?consolidation savings? and $2.5 million of ?going private savings? from the projected revenues. For the reasons already discussed, those modifications have been rejected.

> FN51. Trial Tr. Vol. 10 (Prosser) 1742-43.

> FN52. Trial Tr. Vol. 2 (Bayston) 326 (confirming that Heying told him that management's June CapEx forecasts were their best contemporaneous estimates).

> FN53. Trial Tr. Vol. 5 (Matthews) 1057-60 (no reason to change management CapEx forecast for 1998 through 2002).

Nonetheless, in his cash flow projection Bayston unilaterally increased forecasted CapEx by $3.7 million to $5.7 million per year, because (he claimed) managements ?typically? underestimate capital expenditures. Bayston could not cite any scholarly research confirming that view. Nor could he quantify the average amount of any such underestimations, and he never performed an analysis of whether ECM's management had regularly underestimated CapEx.[FN54] Bayston's CapEx adjustment decreased free cash flow for each of the forecast years by the amount of the adjusted increase, and for the terminal year decreased cash flow by almost 20 percent. The result was a *negative growth* in free cash flow for years 2005 to 2007, resulting in a consequential decrease in Bayston's overall valuation [FN55]

> FN54. Trial Tr. Vol. 3 (Bayston) 569-72.

> FN55. *Id.,* Vol. 2 (Bayston) 330-332; Trial Tr. Vol. 1 (Zmijewski) 162-63.

That adjustment amounts essentially to Bayston substituting his personal judgment of what CapEx should be for the non-litigation business judgment of ECM's management. Bayston's judgment rests solely upon his opinion that ?managements? in general underestimate CapEx. The defendants have nowhere demonstrated that that view is generally accepted within the financial valuation community or that *this* management habitually underestimated CapEx for ECM. Bayston's valuation approach evokes a reaction akin to that expressed by the Chancellor in

*Cinerama.* There, the petitioner's expert had rejected a management forecast on unsubstantiated grounds, and the Court observed: ?[The expert's] attempts to arrive at more ?realistic? results with a hindsight valuation that ... completely ignores the closest insiders' projections, and results in a strikingly [low] number. This is simply inexcusable.? [FN56]

> FN56. *Cinerama,* at *26. Nor is there merit to the defendants' criticism (articulated through Mr. Matthews) that in Prof. Zmijewski's terminal year (2002), depreciation exceeds CapEx, a state of affairs that cannot go on forever. Trial Tr. Vol. 5 (Matthews) 999-1001; Vol. 6 (Matthews) 1236-37. The flaw in this criticism is that Zmijewski projected cash flows only; he did not forecast the individual components of free cash flow, including CapEx or depreciation. Accordingly, there is no basis to conclude that Prof. Zmijewski forecasts perpetual divergent depreciation and CapEx. Trial Tr., Vol. 1 (Zmijewski) 120-123.

**\*16** For these reasons, the Court accepts Prof. Zmijewski's adoption of the June projections, and rejects Mr. Bayston's adoption of (and his modifications to) the March projections, as the basis for the cash flow inputs to the DCF valuation of ECM.

### B. What Is The Appropriate Discount Rate?

The second major group of issues concerns the appropriate rate for discounting the projected free cash flows. Both Prof. Zmijewski and Mr. Bayston determined their discount rate(s) using the Weighted Average Cost of Capital (?WACC?) and the Capital Asset Pricing Model (?CAPM?) formulas. Professor Zmijewski used the WACC formula, without adjustment, to calculate a discount rate of 8.8% during the 1998-2002 period when ECM's tax abatement would be in effect, and 8.5% thereafter, assuming that ECM's tax abatement would not be renewed. Mr. Bayston also used the WACC model, but modified the formula and the inputs to that formula by adding various premiums, substituting new debt costs, and using a different debt-to-equity weighting, to arrive at a discount rate of 11.5%.

To understand the significance of the disputes that arise under this heading, it is useful to explain how the discount rate is determined under the WACC model. Under WACC, the discount rate is calculated based upon the subject company's cost of capital. WACC is the sum of: (1) the percentage of the company's capital structure that is financed with equity, multiplied by the company's cost of equity capital, *plus* (2) the percentage of the company's capital structure that is financed with debt, multiplied by its after-tax cost of debt.[FN57]

> FN57. *See Cinerama, supra,* at *40; JX 352, p. 11. In formulaic terms, WACC has been expressed thusly (JX 298, at F-1):

WACC =    (Leveraged    +
          Cost of
          Equity x
          Equity % of
          Capital)
          (Cost of
          Long Term
          Debt x (1-tax
          rate) x Debt
          % of
          Capital).

One element of the WACC formula-the ?cost of equity capital?-is determined by the CAPM model. Under CAPM, the cost of equity capital is the risk-free rate of return plus the subject company's risk. The subject company's risk is determined by multiplying the equity risk premium for the market by the company's beta. ?Beta? is the measure of a given company's nondiversifiable risk relative to the market, specifically, the tendency of the returns on a company's security to correlate with swings in the broad market. A beta of 1, for example, means that the security's price will rise and fall with the market; a beta greater than 1 signifies that the security's price will be more volatile than the market; and a beta less than 1 indicates that it will be less volatile than the market.[FN58]

> FN58. *Cinerama, supra,* at 41 and n. 315.

The approximately 3% discrepancy between the two experts' discount rates (8.8% / 8.5% for Zmijewski vs. 11.5% for

Bayston) is attributable primarily to their different determinations of the (1) cost of debt, (2) capital structure, and (3) cost of equity. The issues generated by each of these input differences are now discussed.

*1. Cost of Debt*

Professor Zmijewski calculated the weighted average cost of long term debt for ECM at 6.3 %, which was ECM's actual observed cost of debt. He used that figure because of ECM's historical ability to borrow from the RTFC at below-market rates. Mr. Bayston, on the other hand, determined that ECM's weighted average cost of debt on the merger date was 6.59 %, but he assigned ECM a cost of long term debt of 8 %. Bayston's judgment was that ECM would not be able to borrow indefinitely from the RTFC at below-market rates and, therefore, ECM would have to borrow from another lender at rates closer to 8 %.[FN59] The issue is which of these two long-term debt cost figures is more reasonable. The evidence of record persuades this Court that the more reasonable long-term debt cost assumption is 6.3%.[FN60]

> FN59. Trial Tr. Vol. 2 (Bayston) 286.

> FN60. The reason for the discrepancy between the two experts' calculation of ECM's actual weighted cost of debt appears to be that Zmijewski's 6.3% cost figure was as of October 10, 1998 (JX 352 at 22), whereas Bayston's calculation was as of September 30, 1998 (JX 298 at J-1). Because Zmijewski's figure represented ECM's long term debt cost as of a time closer to the merger date than Bayston's, the Court adopts 6.3 % as the relevant actual cost of long term debt for ECM.

**\*17** The defendants admit that there is nothing of record which shows that on the merger date, ECM would not have been able to borrow from the RTFC at the weighted average cost of its existing debt.[FN61] As of the merger date, ECM had never borrowed at a rate even as high as 8%. Lending at below-market rates was the RTFC's mission, and as of the merger date management expected it could continue to borrow from the RTFC at favorable interest rates.[FN62] Management never told Mr. Bayston anything to the contrary,[FN63] and the defendants have cited nothing of record that supports Bayston's contrary assumption.

> FN61. Def's Consol. Post-Trial Br. at 110.

> FN62. *See* Reed Dep. 29-30; Trial Tr. Vol. 10 (Prosser) 1791; JX 209 at G331-32.

> FN63. Trial Tr. Vol. 3 (Bayston) 502.

For these reasons, the Court accepts Prof. Zmijewski's 6.3% cost of debt input, and rejects Mr. Bayston's 8% cost-of-debt assumption, the effect of which was to increase Bayston's calculated WACC from 10.9% to 11.16%.[FN64]

> FN64. Ex. H to Pls.' Op. Post-Trial Br.

*2. ECM's Debt/Equity Capital Structure*

Another important element of the WACC formula is the percentage of the capital structure represented by equity and by long term debt. This factor has proved to be problematic for both sides, and for the Court as well.

At first glance the difference between the experts on this variable appears trivial. Professor Zmijewski arrived at a 28.2% debt-to-enterprise value capital structure, whereas the debt-to-value capital structure used by Mr. Bayston was 30%. Mr. Bayston's 30% figure, however, was a ?target,? rather than the actual, percentage of ECM's debt to its total enterprise value as of the merger date. It is undisputed that on September 30, 1998 (shortly before the merger date), ECM's actual long term debt was $190.4 million. What is disputed is ECM's total enterprise value. Bayston calculated enterprise value by (i) multiplying ECM's total outstanding shares (10,959,131) by the merger price ($10.38 per share), thus deriving a value of $113.7 million represented by ?equity,? and then (ii) adding to that value the $190.4 million of long term debt, to arrive at a total enterprise value of $304.1 million. On that basis, Bayston calculated ECM's actual debt-to-value ratio at approximately 63%.

Bayston did not use the actual 63% debt-to-value ratio, however, because in his judgment ECM could not viably sustain such a highly-leveraged capital structure over the long term. Accordingly, Bayston used a 30% ?target? figure,

which assumed that management would reduce the debt level from 63% to 30%. [FN65]

> FN65. Trial. Tr. Vol. 3 (Bayston) 499-500.

Professor Zmijewski, unlike Mr. Bayston, based his 28.2% debt-to-value capital structure upon ECM's actual debt level, as opposed to a ?target? debt level. But, to arrive at his 28.2% figure, Prof. Zmijewski assumed an enterprise value of $41.16 per share,[FN66] which also was the ultimate fair value that he had determined for ECM.

> FN66. Professor Zmijewski's original debt-to-value ratio was 27.2%, based upon a value of $42.94 per share. JX 234 at 46. He later adjusted the ratio to 28.2%, based upon a fair value of $41.16. JX 235 at Ex. S-1.

The finance literature supports elements, but not the entirety, of each side's approach. One treatise instructs that ?the appropriate weights to use [to define the firm's capital structure in calculating the WACC] ... are the firm's *long run target weights stated in terms of market value.*? [FN67] Moreover:

> FN67. Bradford Cornell, *CORPORATE VALUATION Tools for Effective Appraisal and Decision Making,* 224 (McGraw-Hill 1993) (italics in original) (hereinafter ?Cornell?).

*18 One simple and popular procedure for estimating the target weights is to assume that they equal the company's current market value weights. Unfortunately, this assumption involves a circularity. In most cases, a company is being appraised because the market value of its securities is unknown, and, therefore, cannot be used to calculate the weights.... The circularity can be overcome, in the case of debt and preferred stock by directly establishing the value of these securities.... However, common stock is still a problem. The estimated value of the equity depends on the WACC, which, in turn, depends on the value of the equity.
In light of the circularity, an iterative procedure must be employed to solve simultaneously for the value of the equity and for the WACC. The iterative process begins with the selection of an initial estimate for the market value of the equity; the book value of the equity is a reasonable choice. Based on this initial estimate, the WACC is calculated ... Subtracting the value of the debt and preferred stock produces a revised estimate of the equity and a revised equity weight. This revised estimate is then used to calculate a new initial estimate of the equity weight.[FN68]

> FN68. Cornell, *supra* at 225.

The quoted excerpt does not support the entirety of either side's approach, however. Rather, the quoted treatise appears to support (in some circumstances) Bayston's use of a ?target? long term debt weight, but it also supports Zmijewski's employment of an iterative process to solve the circularity problem inherent in the WACC formula.[FN69] Even so, this Court must decide which (if any) of the two competing enterprise values it should accept in determining the percentage of the capital structure represented by debt and the percentage represented by equity.

> FN69. Trial Tr. Vol. 1 (Zmijewski) at 164-165; Zmijewski Dep. at 128-130.

The difficulty is both that Mr. Bayston's assumed $10.38 per share ?enterprise value? and Prof. Zmijewski's assumed $41.16 per share ?enterprise value? are identical to the ultimate ?fair value? that each expert determined for ECM. Those values exemplify the ultimate circularity inherent in WACC. In this case that circularity is of particular concern, because each expert's ultimate valuation is hotly disputed. Additionally, Mr. Bayston's 30% debt-to-value ?target? figure assumes that management would pay down approximately 50% of ECM's debt at some indeterminate future time. That assumption finds no support in the record. For these reasons, the Court is unable to adopt the ?enterprise value? assumed by either expert with any degree of confidence. Yet, the Court must still arrive independently at an enterprise value, and neither side has suggested a neutral or middle ground in their briefs.

Because the purpose of this calculation is to determine WACC based upon a reliable ?value of the equity,? the only sensible way (in the Court's view) to avoid the circularity in this case is to use an enterprise valuation of ECM that is not litigation-driven. On this record, the only such valuation is the $27.84 per share value, based on a 12% discount rate, that the RTFC determined and actually used for purposes of financing the Privatization.[FN70] Having no better or more reliable information, the Court adopts that value for purposes of determining the percentage of ECM's capital structure represented by long term debt and by equity on the merger date.

FN70. JX 167 at RTFC 698, 700, 707, 720. Prudential's estimate that ATNI could be sold for $25-30 per share in the Split Off, was for a company that included (but was larger than) ECM. Efforts to sell ATNI at that price were unavailing, because no purchaser was interested in acquiring ATNI in its entirety.

**\*19** As for the percentage represented by long term debt, the only data credibly anchored to the record is the RTFC determination of ECM (ATN)'s net-debt-to-value ratio at 38.8%. Because that ratio was conservatively determined and was calculated as of July 29, 1998, three months before the merger, [FN71] the actual debt-to-value percentage as of the merger date is unknown and can only be estimated. The Court concludes that a debt-to-value ratio of 38% would have been a reasonable estimate and input for purposes of determining a discount rate as of the merger date. From that conclusion it also follows that the percentage of ECM's capital structure represented by equity would have been 62% (*i.e.*, 100%-38%).

FN71. *Id.*

### 3. *Cost of Equity*

Both Prof. Zmijewski and Mr. Bayston used the CAPM formula to calculate ECM's cost of equity. Using that standard approach, Zmijewski derived a cost of equity of 10.4% (for the years when the tax abatement would be in effect), and 10.3% (when the current tax abatement expires). Bayston's initial cost of equity was somewhat lower-9.9%-but Bayston then increased it to 14% by adding ?premiums? totaling 4.1%.[FN72] More specifically, Bayston added a ?small stock premium? of 1.7% and a ?company-specific premium? of 2.4%, the latter consisting of a 1 to 1.5% ?super-small stock premium? and a .9 to 1.4% hurricane risk premium.? [FN73] Those ?premiums? account for most of the difference between these two experts' cost of equity inputs. Accordingly, the issue becomes whether either of these premiums is appropriate in these circumstances. The party seeking to add the premium (here, the defendants) has the burden to establish that they are appropriate.[FN74]

FN72. JX 298 at Ex. F-2; JX 352 at 31.

FN73. Trial Tr. Vol. 2 (Bayston) 261, 168; Def. Consol. Post-Trial. Br. 87.

FN74. *ONTI, Inc. v. Integra Bank,* 751 A.2d 904, 920 (Del.Ch.1999).

#### (a) *The 1.7% ?Small Firm/Small Stock? Premium*

Although plaintiffs contend that there is no basis in the finance literature or theory for adding a ?small firm/small stock? premium to the cost of equity, that is not entirely accurate. There is finance literature supporting the position that stocks of smaller companies are riskier than securities of large ones and, therefore, command a higher expected rate of return in the market. [FN75] Our case law also recognizes the propriety of a small firm/small stock premium in appropriate circumstances.[FN76] The issue, therefore, is not whether a small firm/small stock premium is permissible theoretically, but whether the defendants have shown that a premium of 1.7% is appropriate in this particular case. The Court concludes that the defendants have made that showing.

FN75. *See* treatises cited in *Onti, supra,* 751 A.2d 920 at n. 71; *see also,* Jay Fishman, et. al, *Guide to Business Valuation,* Vol. 1 at 502.15 (Practitioners Publishing Co., 13th ed., 2003).

FN76. *ONTI, supra; Cede & Co. v. JRC Acquisition,* C.A. No. 18648, 2004 WL 286963, at *8 (Del. Ch., Feb. 10, 2004).

Mr. Bayston computed a 1.7% small stock premium by a two step process. First, he determined qualitatively that such a premium was warranted by the size and business of ECM. Second, after reviewing data from the Ibbotson Associates publication, *Stocks, Bonds, Bills and Inflation 1998 Yearbook* (?Ibbotson?), Bayston quantified that premium by subtracting the 11% geometric mean return for large company stocks from the 12.7% mean return for small company stocks. [FN77]

FN77. JX 315; Trial Tr. Vol. 2 (Bayston) 263-264.

**\*20** Plaintiffs do not attack the amount of the premium. Rather, they argue that no small stock/small company premium should have been added at all. They contend that Bayston mechanically and non-qualitatively applied a premium solely because of ECM's size, even though ECM did not fit the typical profile of a ?small company .? Moreover, plaintiffs argue, recent research data show that contrary to the empirical assumption that implicitly underlies the small stock/small firm premium, small firms have in fact under performed large firms.

The answer to the plaintiffs' second argument is that although large-cap companies may have outperformed small-cap companies for discrete, short periods of time, over the last 10 (indeed, the last 75) years, the mean returns for small companies have exceeded the returns for large-cap companies.[FN78] The short answer to the plaintiffs' first argument is that although the favorable characteristics of ECM [FN79] are reasons not to apply the second (?supersmall firm?) premium that Bayston layered atop the 1.7% small stock/small company premium, those characteristics do not justify ignoring the incremental risk, not fully captured by beta, that typically accompanies a small sized firm.

> FN78. Trial Tr. Vol. 2 (Bayston) 395; JX 315.

> FN79. Plaintiffs point out that ECM's returns are not volatile, because its principal subsidiary is well-established, lacks competition, has protection against unforeseen events through regulatory relief, and has access to low-cost capital through the RTFC.

Accordingly, the Court accepts the 1.7% small stock/small firm premium that Mr. Bayston added to his 9.9% cost of equity, and arrives at a total cost of equity for ECM of 11.6%.

### (b) The 2.4% ?Supersmall Firm? And ?Hurricane Risk? Premium

Far more controversial, and less grounded in finance theory and legal precedent, is the additional 2.4% premium added by Bayston to account for what he determined was the incremental risk of ECM being both a ?supersmall? firm and also subject to unusually hazardous weather risk, specifically, hurricanes.

Bayston's justification for adding an incremental premium of 1%-1 .5% to ECM due to its ?supersmall? size occupies less than one page of defendants' 150 page brief. That justification boils down to an assertion that the 1.7% small firm premium reflected only Ibbotson's average premium for small firms, but that Ibbotson contains ?more particularized data which permits an assessment of the appropriate premium for a company, such as [ECM] ?which is much smaller ... than the average companies within the Ibbotson data.? ? [FN80] Other than to assert that that additional adjustment of the discount rate ?reflects the reality of investment returns in such micro-cap companies? [FN81] the defendants offer no analysis, discussion of specific data, reference to any finance text, or other rationale for their ?supersmall? firm premium.

> FN80. Def's Answering Post-Trial Br. at 87 (citing Trial Tr. Vol. 2 (Bayston) at 271).

> FN81. *Id.*

Defendants' support for an incremental premium that if accepted would further increase ECM's cost of capital, falls woefully short of the showing that is required. The defendants offer nothing to persuade the Court that ECM's risk profile fits what they contend is the ?reality? of investment returns for micro-cap companies. ECM may be small, but it is also a utility that was unusually protected from the hazards of the marketplace. ECM was well established, it had no competition, it was able to borrow at below-market rates, and it was cushioned by regulators from extraordinary hazards (for example, by tax abatements). Implicit in the defendants' position, but nowhere straightforwardly argued, is the assumption that these advantages, however extraordinary, were not enough to offset the added risk created by ECM's ?supersmall? size. It is the defendant's burden to support that assumption, and they have not done that.

**\*21** By adding a second incremental premium to ECM's cost of equity to account for the risk of size, Bayston appears to have performed a mechanical exercise, rather than make a nuanced, textured judgment. Accordingly, the Court determines that the defendants have not established a credible justification for their incremental ?supersmall? firm premium, and declines to add that premium to the cost-of-equity.

Apart from the ?supersmall firm? premium, Bayston also added a company-specific incremental premium for hurricane risk. The effect was to increase the cost of equity by 1-1.5%, to increase the discount rate by a range of .7%

to 1.05%, and to decrease enterprise value by $18 to $24 million (*i.e.*, by $1.64 to $2.19 per share). Bayston's justification for this incremental premium was that (1) as a result of Hurricane Hugo in 1989 and Hurricane Marilyn in 1995, Vitelco (ATN) suffered losses, not reimbursed by insurance or Universal Service Fund revenues, of approximately $80 million; and (2) ECM's management believed that hurricanes would pose a significant risk to ECM's business in the future, in that future storm losses would not be reimbursable by insurance because (management was informed) coverage would no longer be available.

This analysis is faulty on factual and conceptual grounds. First, it overstates the amount of unreimbursed hurricane damage. That amount, Mr. Heying testified, totaled about $55 million for the entire 70 years preceding the merger.[FN82] Second, defendants' claim that management knew as of the merger date that its hurricane insurance would not continue, relies entirely on Prosser's trial testimony,[FN83] which is not corroborated by any contemporaneous document and is inconsistent with ECM's SEC filings and RTFC loan documents, none of which indicate any impending loss of hurricane loss coverage.[FN84] Third, assuming that the risk of future storm losses should be accounted for in some way, the defendants have not supported their argument that the appropriate way to do that is by increasing the cost of equity. Defendants cite no finance literature supporting that approach, nor have they supported their argument empirically, such as (for example) by comparing ECM's company-specific weather-related risk (net of mitigation factors) to the ?average? or ?mean? weather-related risk for all companies, or even for all ?small? companies.

> FN82. Trial Tr. Vol. 8 (Heying) at 1513.

> FN83. *Id.,* Vol. 10 (Prosser) at 1758-59; Defs' Consol. Post-Trial Br. at 93

> FN84. *See* JX 155 at SC4189 (1997 10K); JX 165 at RTFC 2426 (covenanting to maintain storm insurance for two years).

The absence of theoretical and evidentiary support leaves this Court unpersuaded that the risk of unrecoverable hurricane damage loss is so embedded in ECM's business as to require a structural increase in ECM's cost of equity. Absent theoretical and empirical guidance, a more rational approach would be to factor that risk into ECM's cash flow projections such as (for example) by dividing the net hurricane-related loss by a statistically representative number of years to arrive at a loss deduction from projected cash flow for each forecast year. Unfortunately, neither side performed such a calculation.

**\*22** The only rational approach that is supported by the record is the plaintiffs' proposal that if the Court finds that the weather-related risk was not appropriately accounted for in Zmijewski's cash flow projections, the Court should reduce Zmijewski's enterprise value calculation by the dollar amount of the estimated effect of the hurricane risk, *i.e.,* by $18 to $24 million. That suggested approach supplies the frame of reference for the analysis that follows.

The plaintiffs' proposed approach to the weather risk issue raises two questions. The first is whether that risk has already been fully accounted for in Prof. Zmijewski's cash flow projections; if not, the second issue becomes what should be the amount of the resulting deduction from enterprise value. The record shows that the projections were based on historical results, and that they included the insurance premiums.[FN85] Because (as defense expert Gilbert Matthews conceded) it would not be appropriate to include the cost of insurance coverage in a forecast without taking into the account the benefit of the protection provided by that insurance,[FN86] the only loss that should be accounted for is the hurricane-related loss that was not reimbursed by insurance. Although the plaintiffs argue that that loss was implicitly included in Prof. Zmijewski's forecast, the Court has found no evidence to support that assertion. The Court is, therefore, unable to conclude that Professor Zmijewski factored those unreimbursed losses into his cash flow forecast.

> FN85. Trial Tr. Vol. 8 (Heying) at 1460-62.

> FN86. *Id.,* Vol. 6 (Matthews) at 1073.

Accordingly, it is appropriate (as plaintiffs concede) to deduct the dollar value effect of those losses from enterprise value. The question becomes: what amount should be deducted? The possibilities range from $18 to $24 million. Because the defendants overstated the magnitude of the unreimbursed losses caused by hurricane damage, the Court finds that an appropriately conservative deduction would be at the low end of the range, *i.e.,* $18 million or $1.64 per share.

To summarize, the Court determines that the correct cost of equity for ECM at the merger date was 11.6% (Bayston's initial 9.9% plus a 1.7% small firm/small stock premium). That cost of equity figure does not include a premium for hurricane damage risk. That risk shall be accounted for by deducting $18 million ($1.64 per share) from the enterprise value calculated (independent of that risk) with the DCF inputs as determined in this Opinion. The result will be to reduce the enterprise value by that $18 million ($1.64 per share) amount.

For the reasons previously discussed, the Court cannot accept in its entirety the DCF valuation of either side's expert. Although the Court accepts the plaintiffs' position that the projected cash flows and terminal value should be derived from the June projections, it has determined independently the disputed elements of the WACC and CAPM formulas from which the discount rate is computed. Based upon the Court's findings, the appropriate discount rate is determined to be 8.69%, and the fair value of ECM as of the merger date is determined to be $38.05 per share.[FN87]

> FN87. The $38.05 fair value represents the difference between the value of $39.69 per share and the $1.64 per share hurricane loss adjustment. The $39.69 per share value, as well as the 8.69% discount rate, were computed by all counsel at the request of the Court. (*See* letter dated March 17, 2004 from the Court to all counsel.) In its letter the Court asked counsel to compute the discount rate and the resulting fair value, based upon the DCF inputs determined in this Opinion. On April 2, 2004, Mr. Allingham responded to the Court on behalf of all counsel, setting forth the manner in which the $39.69 per share value was arrived at. (Letter dated Apr. 2, 2004 from Thomas J. Allingham, II, Esquire, to the Court). In that letter, counsel identified one additional variable that the Court would be required to determine: ECM's assumed growth rate. As disclosed in counsel's April 2, 2004 letter, the parties' different growth rate assumptions yielded a matrix of values ranging from $39.69 to $40.88 per share. Deciding to err on the side of conservatism, the Court selected the lowest value within that range–$39.69 per share–from which $1.64 per share was deducted to arrive at the ultimate adjudicated fair value for ECM of $38.05 per share.

### C. What Weight Should Be Accorded To ECM's Market Price As Evidence Of Fair Value?

**\*23** To support their claim that the fair value of ECM on the merger date was no more than $10.38 per share, the defendants urge that ?where, as here, the market for a publicly traded security is an active and efficient one, the market price [of ECM's common stock] is, at the least, important corroborative evidence of value ...? [FN88] For that argument, the defendants rely upon the expert testimony of Professor Burton Malkiel of Princeton University. Professor Malkiel opined that ECM's stock ?was trade[d] in an efficient market with enough volume and a low enough bid-asked spread, and that it reflected news without delay; and these ... indicators led [Prof. Malkiel] to conclude that ECM was traded in an efficient market and that the [$7.00 per share] market price of ECM common stock prior to the buyout ... was a reasonable reflection of its value.? [FN89] Intending no disrespect to Professor Malkiel, the Court is unable to accept his conclusion in this specific case. However sound Professor Malkiel's market price-based theory may be in other circumstances, that theory is inapplicable to these facts because its premise is not supported by either the trial record or Delaware law.

> FN88. Defs. Consol. Ans. Post-Trial Br. at 105.

> FN89. Trial Tr. Vol. 9 (Malkiel) at 1597-1598.

Delaware law recognizes that, although market price should be considered in an appraisal, the market price of shares is not always indicative of fair value. [FN90] Our appraisal cases so confirm.[FN91]

> FN90. *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 301 (Del.1996) (the ?market price of shares may not be representative of true value.?).

> FN91. *See, e.g., Harris v. Rapid-American Corp.*, C.A. No. 6462, 1992 WL 69614, at *1, *4. (Del.Ch. Apr.6, 1992) ($28 merger price, representing a 28% premium over unaffected trading price, was barely one-third of adjudicated fair value of $73.29); *In re Shell Oil Co.* ., C.A. No. 8080, 1990 WL 201390, at *14-15, *38 (Del.Ch. Dec.11, 1990), *aff'd,* 607 A.2d 1213 (Del.1992) (market price $44, adjudicated fair value $71.20);

Moreover, the record undermines any assertion that ECM's common stock was traded in an efficient market. Indeed, it was precisely because ECM's stock market price did not reflect ECM's underlying values that Prosser decided to abandon the proposed merger and instead acquire the ECM minority interest in the Privatization. Prosser himself told his fellow ECM directors that the ECM stock price had failed to reach the desired appreciation as a result of the small public float and the fact that the stock was not being followed by Wall Street analysts.[FN92] Moreover, because Prosser always owned the majority interest, the market price of ECM stock always reflected a minority discount. [FN93]

> FN92. *See* note 7, *supra.*

> FN93. Trial Tr. Vol. 1(Zmijewski) at 95-96; Finger Dep. (Jan. 11, 2000) at 143-144.

Professor Malkiel admitted that markets occasionally make errors, that the market could have been wrong about ECM, and that it is possible for a stock that trades even in an efficient market to be mispriced, especially in the short run.[FN94] Professor Malkiel also conceded that the market may be inefficient if material information is withheld from it.[FN95] In the case of ECM, while the stock was trading freely, (*i.e.,* before Prosser announced the Privatization), the market never had the benefit of any disclosed earnings or projections of future results, including the June Projections.[FN96]

> FN94. Trial Tr. Vol. 9 (Malkiel) at 1651-52, 1665-66, 1676-79. In this case, ECM stock traded publicly for only five months.

> FN95. *Id.* at 1633.

> FN96. Trial Tr. Vol. 1 (Zmijewski) at 93-94, 158-159.

For these reasons, the Court rejects the defendants' argument that the market price of ECM stock corroborates the $10.25 price as the fair or intrinsic value of ECM on the date of the merger. In this case, ECM's unaffected stock market price merits little or no weight.

### D. The Corporate Opportunity Claims

**\*24** The plaintiffs contend that to the value of ECM as determined by the DCF method, there should be added an additional $3.79 per share, representing the combined value of the Caribbean Cable Companies [FN97] and the Daily News. Those companies, which ICC (wholly owned by Prosser) acquired on December 30, 1997, are claimed to have been corporate opportunities of ECM that Prosser wrongfully usurped. The plaintiffs urge that Prosser had a fiduciary duty to make those opportunities available to ECM, and that consequently, ECM's minority shareholders were entitled to share in the value of those opportunities on the merger date.

> FN97. The Caribbean Cable Companies were BVI Cable TV, St. Croix Cable TV, Inc., St. Thomas-St. John Cable TV and St. Maarten Cable TV.

The Court cannot agree, because ECM did not come into existence until December 30, 1997, long after Prosser had had signed definitive purchase agreements on June 9, 1997 to acquire personally three of the Cable Companies, and an agreement to acquire the fourth Cable Company on September 8, 1997.[FN98] Because ECM did not exist, and therefore had no public shareholders at the time Prosser signed those agreements, Prosser was not a fiduciary, and could not have owed any fiduciary duties to ECM.[FN99]

> FN98. Pretrial Order, ¶ s 81, 95.

> FN99. *See Anadarko Pet. Corp. v. Panhandle East. Corp.,* 521 A.2d 624, 628 (Del.Ch.1987) (holding that a parent corporation owes no fiduciary duty to its wholly-owned subsidiary, and that no fiduciary duty arose until the subsidiary had outside stockholders).

If the Cable Companies and the Daily News were corporate opportunities, they were opportunities of ATN, which owned all the assets later allocated to Messrs. Prior and Prosser in the Split Off. In an Indemnity Agreement entered into among Prosser, Prior, and ATN as part of the Split Off, ATN and Prior relinquished any rights they had to such a

claim. In that Agreement, ATN and Prior covenanted ?not to bring any action suit or proceeding against Prosser or ECI with respect to any of the matters ... relating to the business, operations or management of [ATN] or any of its Subsidiaries prior to and including the Closing.? <u>FN100</u>

> FN100. JX 22 at ECI 0857, § 3.01(b). The Indemnity Agreement was one of the terms of the Split Off that was disclosed to, and approved by, ATN stockholders. JX 22.

In short, ECM had no corporate opportunity claim because ECM did not exist at the time the opportunities arose and were taken. If a corporate opportunity claim existed, it belonged to ATN, which relinquished that claim in connection with the Split Off. Accordingly, the corporate opportunity claims cannot form any part of ECM's fair value as of the merger date.

### E. The Fair Value Of ECM And The Unfairness Of The Merger Price

As a consequence of the foregoing determinations, the fair value of ECM on the merger date is found to be $416,996,000, or $38.05 per share.<u>FN101</u> Under *8 Del. C. § 262*, Greenlight, as the single appraisal claimant, is entitled to recover that per share amount, multiplied by the 750,300 shares for which it seeks appraisal, plus interest as determined in Part III F, *infra*, of this Opinion.

> FN101. The fair value of $416,996,000 ($38.05 per share) is equal to the discounted cash flow valuation of ECM that results from the DFC inputs determined in this Opinion ($434,996,000, or $39.69 per share) less $18 million ($1.64 per share), which represents the hurricane losses not reimbursed by insurance. *See* Apr. 2, 2004 Letter from Thomas J. Allingham, II, Esquire, to the Court, discussed in note 87, *supra*.

From that fair value finding it further follows that the $10.25 per share merger price was not a ?fair price? within the meaning of the Delaware fiduciary duty case law beginning with *Weinberger v. UOP, Inc.*<u>FN102</u> Although that, without more, is dispositive, the unfairness of the merger price rests upon more than that one bit of simple deductive logic. The overwhelming weight of the credible evidence of record also compels that conclusion.

> FN102. 457 A.2d 701 (Del.1983).

**\*25** The only competent evidence that the merger price was fair was the fairness opinion that Houlihan furnished to the Second Special Committee, and the testimony of Mr. Bayston in support of the fairness opinion rendered by his firm, Duff & Phelps. But whatever evidentiary force Houlihan's opinion might have had was totally undermined by the fact that (i) Houlihan never had the benefit of the June projections, and (ii) the defendants never called Houlihan, upon whose valuation the Special Committee and the board relied, to testify at trial in support of its valuation conclusion. The defendants have never explained their failure to do that. For these reasons, and because it was within the defendant's power to call Houlihan as a witness,<u>FN103</u> the only logical inference-and the inference this Court has drawn-is that Houlihan's testimony would have been unfavorable to the defendant's position.<u>FN104</u> The RTFC's approximately $28 per share valuation of ECM-which is credible because the RTFC relied on it in deciding to extend to Prosser a multimillion dollar loan to finance the Privatization-was almost thrice the magnitude of the $10.25 per share value that Houlihan was willing to pronounce as fair. And even Duff & Phelps, the defendants' trial valuation expert, was apparently unable to opine that $10.25 per share was fair: that firm valued ECM at not less than $10.38 per share.

> FN103. The defendants do not contend that Houlihan was unavailable to testify.

> FN104. *Demby v. State*, 744 A.2d 976, 978-979 (Del.2000) (citing *Wheatley v. State*, 465 A.2d 1110 (Del.1983)).

The several infirmities that led the Court to reject the Duff & Phelps valuation have been discussed and need not be repeated here. One additional infirmity merits discussion, however, and that is Mr. Bayston's use of impermissible post-merger data in arriving at some of his conclusions. In his deposition Mr. Bayston conceded that he had relied on post-merger evidence in preparing his projections, including his CapEx assumptions:
Q. So that in making your assessment about the best estimate of the costs of the company going forward, you examined and took into account the company's cost experience in the period between the appraisal date and the date of the preparation of your report?

A. That's correct.[FN105]

FN105. Bayston Dep. 286-87.

Q. Now, in formulating your more aggressive assumption for capital expenditures, did you take into account the company's capital expenditures experienced between the appraisal date and the date when you prepared your report? A. I believe we looked at that issue.[FN106]

FN106. *Id.* at 293.

Although at trial Bayston claimed that he misspoke on his deposition,[FN107] that recantation is not credible because if in fact Bayston misspoke, he did so repeatedly over the course of many deposition pages. Moreover, Bayston had extensive litigation-related contact with ECM's management,[FN108] which would have made it extremely difficult to avoid incorporating post-merger evidence in his valuation.

FN107. Trial Tr. Vol. 1 (Bayston) 209, Vol. 2 (Bayston) 320, 323, 329.

FN108. Trial. Tr. Vol. 2 (Bayston) 252-253, 328-329 (discussions about capital expenditures); 333 -334 (discussing extensive conversations with ECM management.)

Striving to portray Mr. Bayston's contacts with management as a strength, the defendants criticize Prof. Zmijewski for ?not even attempt[ing] to talk to [ECM] management in connection with his analysis.?[FN109] But Prof. Zmijewski cannot fairly be faulted for doing what litigation experts in the valuation area customarily do: conducting careful due diligence using the sworn testimony and contemporaneous discovery record. What Zmijewski did not do in valuing ECM was to rely upon unsworn, post-merger conversations with management. Nor did Prof. Zmijewski rely upon post-merger data to determine the inputs on which his DCF analysis depended.

FN109. Def. Consol. Ans. Post-trial Br. at 52.

F. Interest

**\*26** Once the fair value of the dissenting shareholders' shares is ascertained, our appraisal statute requires the Court to determine ?the fair rate of interest, if any? after considering ?all relevant factors.?[FN110] The interest may be simple or compound, and this Court has broad discretion to determine whether interest should be simple or compound, but the Court must explain its choice.[FN111] As the Chancellor recently stated in *Cede & Co. v. JRC Acquisition:*

FN110. 8 *Del. C.* § 262(h).

FN111. 8 *Del. C.* § 262(i); *M.G. Bancorporation, Inc. v. Le Beau,* 737 A.2d at 527. *Gonsalves v. Straight Arrow Publishers, Inc.,* 725 A.2d 442 (Table), 1999 WL 87280 at *4 (Del., Feb.25, 1999).

This Court's decision in *Gonsalves v. Straight Arrow Publishers, Inc.* is an accepted method for determining the rate of interest in appraisal actions. *Gonsalves* rests on the principle that an interest award should serve two purposes. First, it should disgorge the respondent of any benefit it received from the use of the petitioner's funds. Second, the interest award should compensate the petitioner for the loss of use of its money. The second purpose, however, is countenanced with the understanding that the election to ?reject the merger and to pursue appraisal does not shift to the corporation all responsibility for losses [the petitioner] may incur as a result of [its] inability to use the funds retained by the corporation? and that the petitioner can mitigate its losses and obtain perfect ?compensation for the loss of the use of their funds by borrowing the fair value of their shares.? *Gonsalves,* and several other decisions, have found that these twin purposes are served by awarding interest by weighing equally the respondent's actual costs of borrowing and based upon an objective prudent investor standard, the petitioner's opportunity cost.[FN112]

FN112. *Cede & Co. v. JRC Acquisition, Corp.,* No. 18648, 2004 WL 286963, at *12 (Del.Ch. Feb.10, 2004) (internal citations omitted).

Greenlight claims that it is entitled to an interest award of 22%, compounded daily, from the merger date. To further the compensatory purpose of the interest award, Greenlight argues, the Court should use Greenlight's actual rate of return on its invested capital-37%-for the period beginning October 1, 1998. Because 37% is what Greenlight claims it would have earned on its appraisal award had that award been paid on the merger date, only that rate would restore Greenlight to the financial position it would have had if the merger price were entirely fair. To further the restitutionary purpose of an interest award, Greenlight urges the Court to use the interest rate that ECM pays to short term, unsecured creditors (a category that includes Greenlight in this appraisal). Since the date of the merger, that rate has been 7%. Weighting both rates equally, Greenlight arrives at a rate of 22% which, Greenlight urges, should be compounded daily.

The defendants insist that Greenlight is entitled to simple interest at 5.24%, or at most, interest at that rate compounded no more frequently than monthly. Although the defendants agree that the ?restitutionary purpose of awarding interest is typically addressed by basing one half of the interest award on the corporation's cost of borrowing,? [FN113] they contend that as of September 30, 1998, ECM's weighted average interest rate on its $190.4 million of debt was 6.59%.

> FN113. Defs' Consol. Post-Trial Br. at 110. *See Gilbert v. M.P.M. Enters., Inc.,* 709 A.2d 663, 674 (Del.Ch., 1997); *aff'd,* 731 A.2d 790 (Del.1999) and *Chang's Holdings, S.A. v. Universal Chems. And Coatings, Inc.,* No. 16856, 1994 WL 681091, at *2 (Del. Ch. Nov. 22, 1994).

**\*27** As for the compensatory purpose of an interest award, the defendants claim that because this Court has historically applied an objective ?prudent investor? standard, (*viz.,* what a prudent investor would have achieved if it had invested the proceeds at the date of the merger) Greenlight's subjective claimed 37% return on its investments is irrelevant as a matter of law. In this case, the prudent investor rate, as determined by Mr. Bayston who relied on the mix of investments specified by Delaware case law, implied an interest rate of 5.54% as of the date of the Duff & Phelps report, and 3.88% as of the date of trial. Because both sides agree that borrowing costs and compensatory measures should be weighed equally, the appropriate rate of interest is 5.24% [ (6.59% + 3.88%) /2]. Finally, defendants argue, Greenlight cites no authority for its request that interest be compounded daily. Defendants urge that the interest award should be either simple interest or, if interest is compounded, the compounding should be no more frequent than monthly, consistent with the case law.[FN114]

> FN114. *See ONTI, Inc. v. Integra Bank,* 751 A.2d at 927-29 (interest compounded monthly); *Hintmann v. Frede Weber, Inc.,* 1998 WL 83052 (Del.Ch. Feb.17, 1998) (same); *Grimes v. Vitalink Communications Corp.,* No. 12334, 1997 WL 538676, at *13 (Del.Ch. Aug.28, 1997).

These colliding contentions generate four issues: (1) what was ECM's cost of borrowing, (2) what was Greenlight's opportunity cost, (3) based on those inputs, what is the appropriate rate of interest, and (4) should the form of the award be simple or compound interest, and if interest is compounded, over what interval? These issues are now addressed.

Although defendants argue that 6.59% was ECM's cost of borrowing, as Greenlight points out, that represents ECM's average, not its marginal, cost of short term unsecured debt, which was 7%.[FN115] According the Court finds that ECM's cost of borrowing was 7%.

> FN115. JX 235 at 26, Ex. 2B.

As for Greenlight's opportunity cost, *JRC Acquisition* and *Gonsalves* establish that that cost is to be determined on the basis of an objective ?prudent investor? standard, not Greenlight's subjective claimed 37% investment return. The defendants argue that the prudent investor rate of return was 5.54% as of the date Duff & Phelps submitted its report and 3.88% at the time of the trial. Greenlight does not propose any alternative ?prudent investor? rate of return. To err on the conservative side, the Court adopts 5.54% as the prudent investor rate of return.

The Delaware cases require that the interest rate be determined by weighting the cost of borrowing and the prudent investor rate of return equally. On that basis, the appropriate rate of interest on the appraisal award is determined to be 6.27%, running from the date of the Privatization merger.[FN116]

> FN116. Computed as follows: 7.00% + 5.54% / 2 = 6.27%.

The final issue relating to interest is whether the interest should be simple or compound and if compounded, over what interval. Greenlight cites no authority or evidence that daily compounding is appropriate in this case. But, Greenlight, which is in the business of investing money, has nonetheless satisfied the Court that it would have been able to earn interest on its appraisal award on a compound basis. Moreover, the Court finds, as did the Chancellor in *JRC Acquisition,* that ?the dual purpose of compensation and restitution may only be served by a compounding interval at least as frequent as one month.? <u>FN117</u>

> FN117. *JRC Acquisition, supra,* at \*15 (quoting *Grimes v. Vitalink Communications Corp., supra.,* 1997 WL 538676 at \*11). The defendants also concede that if interest is to be compounded, that the compounding be at one month intervals.

**\*28** Accordingly, interest on Greenlight's appraisal award shall be at the rate of 6.27%, compounded monthly, from the date of the merger to the date of judgment.

## IV. WAS THE TRANSACTION THE PRODUCT OF FAIR DEALING?

### A. Threshold Issues

An entire fairness analysis normally requires the Court to decide, in addition to whether the price paid in an interested merger was ?fair,? whether the merger was the product of ?fair dealing.? This case, however, raises three issues that must be confronted at the threshold. The first is whether this Court's determination that the merger price was not fair makes it unnecessary to engage in a ?fair dealing? analysis. The Court concludes that a fair dealing analysis is required. The second issue is whether the plaintiffs are barred from asserting their fiduciary duty claims. The Court finds that they are not. The third issue is which side has the burden of proof. The Court determines that the burden falls upon the defendants. What follows is the basis for the Court's rulings on these threshold issues.

### 1. *Is A Fair Dealing Analysis Required?*

In this case, this Court's determination of ECM's ?fair value? disposes of both Greenlight's appraisal action and the ?fair price? aspect of the plaintiffs' fiduciary duty claim. The determination that price is not fair raises a preliminary, threshold question of whether in this case any ?fair dealing? analysis need be undertaken at all. It is arguable that where (as here) the merger price is found to be unfair, it would be difficult, if not impossible, for the merger to be found ?entirely fair? even if the process leading up to the merger involved fair dealing.<u>FN118</u> That supposition, if correct, would lead to the result that where the merger price is found not to be fair, that finding establishes, *ipso facto,* the unfairness of the merger, thereby obviating the need for any analysis of the process oriented issues. The Supreme Court has not yet addressed that question, however.

> FN118. See *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1134, 1140 (Del.Ch.1994), *aff'd,* 663 A.2d 1156 (Del.1995) (?Plainly in a cash-out merger, price is a dominant concern, most especially where the buyer already has voting control of the enterprise, such as a parent-sub merger.?).

What the Supreme Court has decided is that where an interested merger is found to be unfair and the corporation's charter has a Section 102(b)(7) exculpatory provision, this Court must then proceed to ?identify the breach or breaches of fiduciary duty upon which liability [for damages] will be predicated in the *ratio decidendi* of its determination that entire fairness has not been established.? <u>FN119</u> That is, ?when entire fairness is the applicable standard of judicial review, a determination that the director defendants are exculpated from paying monetary damages can be made only *after the basis* for their liability has been decided.? <u>FN120</u>

> FN119. *Emerald Partners v. Berlin,* 787 A.2d at 94 (quoting *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1165 & n. 16 (Del.1995)).

> FN120. *Id.* (emphasis in original).

That mandate, I find, is applicable here. In this case the defendants have raised a § 102(b)(7) exculpatory defense. In determining that the merger price was not fair, this Court did not address whether the unfairness was the product of a breach of fiduciary duty or if so, the nature or character of that duty. Accordingly, a ?fair dealing? analysis is required

in this case, if only to enable the Court to determine the ?basis for the [defendants'] liability? for § 102(b)(7) exculpation purposes.

### 2. The ?No Standing? Affirmative Defense

**\*29** The defendants have interposed the affirmative defense that the plaintiffs lack standing to assert any fiduciary duty claims. That defense comes in two parts. First, the defendants concede that Greenlight has standing to assert fiduciary claims on behalf of the 750,300 ECM shares that it owns outright. The defendants argue, however, that Greenlight lacks standing to assert any claims on behalf of the former holders of 2,026,685 shares that sold to Greenlight their ?litigation rights? to assert the fiduciary claims associated with those shares.[FN121] Second, the defendants claim that no former shareholders of ECM can recover anything in respect of any shares that they tendered into the tender offer or voted in favor of the merger. Neither argument, in this Court's view, withstands scrutiny.

> FN121. The assignments of litigation rights to Greenlight are found in the record at JX9.

### (a) The Litigation Rights Validity Issue

The plaintiffs contend that Greenlight lacks standing to assert any claims based upon the assigned ?litigation rights,? because: (1) unliquidated fiduciary claims are not assignable as a matter of Delaware law and public policy, and (2) Greenlight purchased the litigation rights in violation of the parties' Confidentiality Stipulation in the appraisal action. Moreover (argue defendants), (3) if the assignments were invalidated, the litigation rights would not revert back to the assignors, i.e., to the plaintiff class, because by selling these claims those stockholders waived their right to assert their fiduciary claims and must therefore be excluded from the class.

Assuming without deciding that the defendants can be heard to challenge the validity of the assignments,[FN122] it is established Delaware law that choses in action that survive the death of the victim are validly assignable.[FN123] In this case, the choses in action are breach of fiduciary duty and fraud claims. Those claims survive to (or against) a personal representative under 10 Del. C. § 3701.[FN124] For purposes of determining which claims are assignable and which are not, Delaware law does not distinguish between claims that are liquidated and those that are unliquidated.

> FN122. There is authority holding that only a party to the assignment can contest its validity See Wagner v. United States, 573 F.2d 447 (7th Cir.1978); Gamble v. Stevenson, 305 S.C. 104, 406 S.E.2d 350, 353 (S.C.1991); 6A C.J.S. Assignments § 71 (1975).

> FN123. Industrial Trust Co. v. Stidham, 33 A.2d 159, 160-61 (Del.1942); Garford Motor Truck Co. v. Buckson, 143 A. 410, 411 (Del.Super.Ct.1927).

> FN124. Section 3701 provides:
> All causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive to and against the executors or administrators of the person to, or against whom, the cause of action accrued....[A]ll actions, so surviving, may be instituted or prosecuted by or against the executors or administrators of the person to or against whom the cause of action accrued.

Nor is there any basis for the defendants to argue that the assignments must be deemed invalid on public policy grounds because they are champertous. The short answer is that they are not champertous. Champerty requires ?an agreement between the owner of a claim and a volunteer that the latter may take the claim and collect it, dividing the proceeds with the owner, if they prevail; the champertor to carry on the suit at his own expense.?[FN125] Greenlight's purchase of the litigation rights was not champertous, because Greenlight has always been involved in the litigation. Greenlight was a shareholder when the Privatization was announced; Greenlight was a member of the shareholder class and always had the right-and standing-to pursue an individual fiduciary duty remedy simultaneously with its appraisal action. Champerty cannot be charged against one with an interest in the matter in controversy.[FN126]

> FN125. Gibson v. Gillespie, 152 A. 589, 593 (Del.Super.Ct.1928); see also Compaq Computer Corp. v. Horton, 631 A.2d 1, 5, n. 1 (Del.1993).

> FN126. Cede & Co. v. Technicolor, Inc., 542 A.2d 1182 (Del.1988).

**\*30** The defendants next urge that Greenlight should be denied standing to sue because it purchased the litigation rights in violation of Paragraph 2 of the Confidentiality Stipulation, which provides that:
Discovery Material shall be used solely for purposes of this litigation, and shall not be used for any other purpose, including, without limitation, any business or commercial purpose, *provided,* however, that Discovery Material may be used in connection with any litigation among the parties relating to the merger between [ECM] and [ICC] ... effective as of October 19, 1998.[FN127]

> FN127. D.I. 19 in Appraisal Action, Par. 2.

Specifically, the defendants contend that Greenlight ?used? confidential Discovery Material to purchase the litigation rights in violation of the quoted paragraph. Although Greenlight did possess confidential information, the defendants have not shown that Greenlight used that information in acquiring the litigation rights. Even if Greenlight did use Discovery Material, the defendants have not established that such use was prohibited by the Confidentiality Stipulation, which permitted Discovery Material to be used in both the Appraisal Action (?this litigation?) and in ?any litigation relating to the Merger? (*i.e.,* the fiduciary duty action challenging that Merger). Nor have the defendants shown that Greenlight disclosed confidential Discovery Material publicly in the marketplace, or otherwise failed to abide by the Confidentiality Stipulation terms.

Finally, the defendants have suffered no prejudice as a result of the assignment of the litigation rights, because those rights belonged to the members of the class. Absent an assignment, the defendants would have had to defend against those claims asserted on behalf of the class in any event. Thus, the defendants can hardly claim cognizable prejudice as a result of the assignment of those same claims to one member of the class that elected to sue individually.[FN128]

> FN128. Stated another way, if the Court granted defendants the relief they seek, the assignments would be void and the right to recover would revert to the class. A failed assignment of claims does not (as defendants assert without support), *constitute a waiver* of those claims. The defendants would still pay the same amount in damages; there would simply be a different name on the check. Not allowing the class member-assignors to recover would give the defendants a windfall for no valid factual or legal reason.

### (b) *The Waiver Issue*

The defendants next urge that members of the ECM shareholder class who tendered into the first step tender offer, or who voted for the Privatization merger, waived their right to challenge the fairness of that transaction. This argument is flawed, because it presupposes that the shareholders who tendered or voted made a fully informed decision based on full disclosure. As found elsewhere in this Opinion, that is not the case, because the defendants violated their duty of disclosure to the stockholders of ECM in several respects. On that basis alone the defendants' argument must be rejected. [FN129]

> FN129. *Bershad v. Curtiss-Wright Corp.,* 535 A.2d 840 (Del.1987)(acquiescence requires an informed act). For that same reason, the Court rejects the defendants' argument that the Class members who accepted the benefits of the merger must be deemed to have acquiesced in the merger. As Vice Chancellor Strine held in *Clements v. Rogers,* 790 A.2d 1222 (Del.Ch.2001), a plaintiff who accepts the merger consideration could not have acquiesced where she knew some, but not all of the material facts. The predicament in which Class of former ECM shareholders found themselves was indistinguishable from *Clements.*

### (c) *The Burden of Proof Issue*

The final threshold issue is which side has the burden of proof. Both sides agree that because the Privatization is a self-dealing transaction of which the majority stockholder stands on both sides, entire fairness is the standard of review *ab initio.*[FN130] The only question is whether the burden of proof, which normally falls upon the defendants, has shifted to the plaintiffs in this particular case.

> FN130. *Emerald Partners v. Berlin, supra,* 787 A.2d at 92, 97.

**\*31** The defendants argue that the burden of establishing that the merger was not entirely fair has shifted to the plaintiffs, because the merger was approved by both an informed independent committee of disinterested directors

and an informed majority of minority stockholders.[FN131] The short answer is that the merger was not approved by a committee of independent directors who were properly informed or independent of Prosser, nor was it approved by an informed vote of a majority of ECM's minority stockholders.

> FN131. _Kahn v. Lynch Communications Sys., Inc.,_ 638 A.2d 1110, 1117 (Del.1994).

In an entire fairness context, where the predicate for a burden-shifting argument is that the merger was negotiated by a special committee, the defendants must establish to the satisfaction of a carefully scrutinizing court, that the special committee was ?fully informed.?[FN132] As discussed more fully elsewhere in this Opinion, the Special Committee and a majority of ECM's minority shareholders voted to approve the merger, but their votes were not fully informed. A highly material fact was not disclosed either to the Special Committee or to the minority stockholders, namely, that the most recent projections-the June projections-had been provided to Prosser and his financial advisor (Prudential) and his lender (RTFC) but not to the Special Committee. Members of the Special Committee testified that they and Houlihan should have been provided with the June Projections.[FN133] Moreover, the June Projections were not disclosed in the proxy statement, and the proxy disclosures relating to that issue falsely and misleadingly suggested that the shareholders were being provided with all of the projections to which Prosser and his advisers had been privy. The portion of the proxy statement that contained the March projections (identified therein only as Company projections) stated:

> FN132. _Id._ at 1120.

> FN133. Trial Tr. Vol. 7 (Vondras) 1296, 1351-52; Vol. 4 (Goodwin) 751; Vol. 5 (Goodwin) 929-30. Mr. Vondras testified that the Special Committee ?was deprived of information that [he] would have considered important in [his] assessment of ... Prosser's offer? and that the Committee and Houlihan ?... should have had the most current data, and it would have used that in their analysis. Would it change the ... numbers? May or may not have. I don't know, but they should have had that data.? Trial Tr. Vol. 7 (Vondras) 1351-52.

Although the Company does not as a matter of course publicly disclose projections as to future revenues or earnings, because they were received by Mr. Prosser and the parent [ICC, LCC], the purchaser [ICC] is making these projections available to all stockholders.[FN134]

> FN134. JX 155 at SC4128.

As more fully discussed _infra,_ the proxy statement and the tender offer documents omitted to disclose other material facts as well. The material omission relating to the June Projections, however, is sufficient, in and of itself, to undermine the informed character of the Special Committee approval that is a predicate to shifting the burden of proof in an entire fairness case.

The defendants argue that the burden must shift, nonetheless, because the minimum tender condition, _i.e.,_ the condition that a majority of the minority shareholders tender into the offer, was the functional equivalent of a shareholder ratification of the transaction. But no Delaware case has held that burden-shifting can be accomplished by a tender of shares rather than by an actual vote. Nor should a tender be treated as the equivalent of an informed vote. Shareholders cannot be deemed to have ratified board action unless they are afforded the opportunity to express their approval of the precise conduct being challenged.[FN135] Stockholders have materially different interests at stake when tendering, as opposed to voting their shares. In considering whether to tender, stockholders must evaluate the risk of being left worse off, _i.e.,_ left vulnerable to being frozen out at an even lower price, if the other stockholders were to tender into an inadequate offer. As Vice Chancellor Strine incisively observed in _In re Pure Resources S'holders Litig:_

> FN135. _In re Santa Fe Pac. S'holders Litig.,_ 669 A.2d 59, 69 (Del.1995); _see also, In re Cencom Cable Income Partners, L.P.,_ No. 14634, 2000 WL 640676, at *5 (Del. Ch. May 5, 200) (?Ratification can effectively occur only where the specific transaction is clearly delineated to the investor whose approval is sought and that approval has been put to a vote.?).

**\*32** Indeed, many commentators would argue that the tender offer form is more coercive than a merger vote. In a merger vote, stockholders can vote no and still receive the transactional consideration if the merger prevails. In a tender offer, however, a nontendering shareholder faces an uncertain fate. That stockholder could be one of the few who holds out, leaving herself in an even more thinly traded stock with little hope of liquidity and subject to a § 253

merger at a lower price or at the same price or ... at a later (and, given the time value of money, a less valuable) time.[FN136]

> FN136. 808 A.2d 421, 442-43 (Del.Ch.2002), *appeal refused,* 812 A.2d 224 (Del.2002) (footnotes omitted).

Accordingly, the burden of proving fair dealing remains with the defendants.

The preliminary issues having been decided, the Court turns next to the substantive fair dealing questions.

### B. Fair Dealing Analyzed

A fair dealing analysis requires the Court to address ?issues of when the transaction was timed, how it was initiated, structured, negotiated, and disclosed to the board, and how director and shareholder approval was obtained.? [FN137]

> FN137. *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 937 (Del.1985).

#### 1. *Timing, Initiation and Structure*

Our courts have recognized that a freeze-out merger of the minority proposed by the majority stockholder is inherently coercive [FN138] Where, as here, the freeze-out merger is initiated by the majority stockholder, that fact, even though not dispositive, is evidence of unfair dealing.

> FN138. *See In re Pure Resources, Inc. S'holders Litig., supra,* 808 A.2d at 436; *Kahn v. Lynch Communication Systems, Inc., supra,* 638 A.2d at 1116.

Another circumstance that evidences the absence of fair dealing is where the transaction is timed in a manner that is financially disadvantageous to the stockholders and that enables the majority stockholder to gain correspondingly. [FN139] This case is the diametric opposite of *Jedwab v. MGM Grand Hotels, Inc.,* where this Court found that the timing of a merger was not unfair because there was no ?persuasive indication ... that from the minority's point of view this [was] a particularly poor time to liquidate their investment.? [FN140] Here, the evidence of unfair timing could not be more persuasive. Prosser's initial proposal was to merge Innovative into a wholly owned subsidiary of ECM. That would have benefited ECM stockholders and enabled them to remain as investors in a larger merged company. Because ECM's stock price was depressed, Prosser abandoned that proposal at the eleventh hour and ?flipped? the deal for his sole personal benefit to take advantage of the temporarily and artificially depressed stock price. That stock price then became the ?floor? for the equally depressed and unfair Privatization price, and benefited Prosser to the same extent that it disadvantaged the minority stockholders who were now being squeezed out of the enterprise.

> FN139. 509 A.2d 584 (Del.Ch.1986)

> FN140. *Id.* at 598.

In addition to, and apart, from the unfairness of its initiation and timing, the transaction was also unfairly structured, in that Prudential and Cahill, the firms that had been retained as advisors to ECM in the initially Proposed (but later abandoned) Merger, were co-opted by Prosser to serve as his advisors. That switch was unfair to ECM, because during ECM's entire existence, Prudential and Cahill had been its advisers and they possessed material nonpublic information about ECM's values, business and prospects. As such, Prudential and Cahill were in the best position to represent the interests of the ECM minority. Those same advisers were now switching sides to represent interests that were adverse to that same minority.

**\*33** At a minimum, ECM's board (including Prosser) or the Special Committee should have insisted that Prudential and Cahill remain as advisors to ECM, and that Prosser retain other financial and legal advisors. Failing that, the board-or at the very least the Special Committee-should have insisted that Prudential and Cahill recuse themselves from the negotiations. By doing neither, ECM was deprived of the advantage of knowledgeable advisors. That advantage was conferred upon ECM's controlling stockholder and to-be-adversary in the transaction-Prosser. There is no evidence that either the full board or the Special Committee ever considered that issue.

#### 2. *The Adequacy of the Minority Shareholders' Representation*

*(a) The Independence Of The Board And Of The Special Committee*

A critical aspect of any fair dealing analysis is the adequacy of the representation of the minority stockholders' interests. In this case, that issue is particularly critical, because a majority of the ECM board members were not independent of Prosser, making it necessary to appoint a Special Committee to negotiate on the minority stockholders' behalf. Unfortunately, a majority of the Special Committee members also lacked independence, and the one Committee member who arguably was independent did not function effectively as a champion of the minority's interests.

Besides Prosser, the ECM board had six members, all of whom Prosser had directly appointed: Raynor, Ramphal, Muoio, Goodwin, Vondras, and Todman. It is undisputed that Prosser, whose wholly-owned entity was the acquirer of ECM's minority interest, was conflicted. But, most of the remaining directors also had disabling conflicts because they were economically beholden to Prosser. Directors who ?through personal or other relationships are beholden to the controlling person[ ]? lack independence from that person.[FN141]

> FN141. *Aronson v. Lewis*, 473 A.2d 805, 815 (Del.1984); *see Beam v. Stewart*, --- A.2d ----, No. 501, 2003, Slip. Op. at 12 (Del. Mar. 31, 2004).

Raynor, who was Prosser's long time lawyer, was clearly conflicted. In 1996, 1997, and 1998, virtually one hundred percent of the legal fees that Raynor generated for his law firm were attributable to work he performed for Prosser and Prosser-owned entities. Before 1996, the percentage of total fees represented by work Raynor performed for Prosser was always greater than fifty percent. From 1987 through 1998, ATNI and its affiliates, and thereafter ECM and its affiliates, were the largest single client of Raynor's firm.[FN142] In 1998, the year of the Privatization, Raynor became ?of counsel? at his firm and was put on a retainer arrangement wherein ATNCo paid compensation of $25,000 per month to Raynor, and $5,000 per month to his firm, to cover Raynor's office rental cost. That amount represented all of Raynor's compensation for 1998.[FN143] Raynor also served as a Prosser nominee to the ATNI board, and as a director of Innovative, ECM, ATNCo and Vitelco. [FN144] As a highly paid consultant to and, later full-time employee of, Prosser and his companies, Raynor was clearly beholden to Prosser and, thus, not independent.[FN145]

> FN142. Raynor Dep.(June 12, 2001) at 25-28. In 1997, Raynor's law firm, Raynor, Rensch & Pfeiffer, was paid $479,000 for legal services provided to ECM and its predecessor. JX155 at SC4176. In 1996, the firm was paid $533,000 for its legal services. JX254 at G893.

> FN143. *Id.* at 30-32.

> FN144. *Id.* at 21, 29.

> FN145. See *In re Maxxam, Inc.*, 659 A.2d 760, 773-74 (Del.Ch.1995).

*34 If further evidence of non-independence were needed, in July 1998-during ECM's consideration of the Privatization proposal-Prosser agreed to pay Raynor $2.4 million over a five year period as compensation for his past services. There was no negotiation over that fee-Raynor requested $2.4 million and Prosser agreed to it. Nor was the $2.4 million compensation arrangement ever disclosed to the ECM board, Compensation Committee or the Special Committee, yet Raynor voted as an ECM director to approve the Privatization. [FN146] That disclosure omission was highly material. Goodwin testified that the $2.4 million payment arrangement should have been disclosed to the board.[FN147] For Raynor to have participated in the board's Privatization deliberations and vote as an ECM director without disclosing this contemporaneously negotiated compensation arrangement, was misleading to Raynor's fellow directors and a breach of his fiduciary duty owed to them and to ECM.

> FN146. JX 159; Raynor Dep. at 38-39, 61; Trial Tr. Vol. 10 (Prosser) 1834-36; Vol. 5 (Goodwin) 966; Vol. 7 (Vondras) 1732; Vol. 7 (Ramphal) 1444-45.

> FN147. Trial Tr. Vol. 5 (Goodwin) 966-67.

Ramphal was similarly beholden to Prosser. Ramphal was originally introduced to Prosser by his son-in-law, Sir

Ronald Sanders, who had a consulting arrangement with Prosser at that time. Like Sanders, Ramphal also fell into a lucrative consultancy with Prosser. In 1993 and 1994, Ramphal was paid consulting fees of $140,000 in both years, and in 1995 he was paid $120,000. On average, those amounts represented 22.5% of Ramphal's total income for that period.[FN148] Those amounts were in addition to the $30,000 directors' fee that Ramphal received annually.[FN149] Moreover, in 1998, Ramphal received $115,000 for his service on the ECM Board and special committees.[FN150]

> FN148. Trial Tr. Vol. 7 (Ramphal) 1386-87; Ramphal Dep. 33-34.

> FN149. Ramphal Dep. at 34.

> FN150. Trial Tr. Vol. 7 (Ramphal) 1390.

Given these undisputed facts, the defendants have not shown that Ramphal was independent of, *i.e.,* not beholden to, Prosser, and the Court affirmatively finds that he was not.[FN151] That finding is strengthened by the fact that the consulting arrangement of Ramphal's son-in-law, Sanders, with Prosser would be put at risk if Ramphal, as a Special Committee member, took a position overly adversarial to Prosser.[FN152] Finally, both Sanders and Ramphal were appointed as directors of Innovative after the Privatization had been completed.[FN153]

> FN151. *See Kahn v. Tremont Corp.,* 694 A.2d 422, 430 (Del.1997) (purportedly ?independent? director found beholden to majority stockholder where, three years previously, company had retained his consulting services for $10,000 per month and more than $325,000 in bonuses); *Kahn v. Dairy Mart Convenience Stores, Inc.,* No. 12489, 1996 WL 159628, at *6 (Del. Ch. Mar 29, 1996) (holding that consulting agreement may render independent director too beholden to management to remain independent).

> FN152. *See Harbor Fin. Partners v. Huizenga,* 751 A.2d 879, 889 (Del.Ch.1999) (a director has a disabling conflict where the director's decision could advance economic or career opportunities of a family member).

> FN153. Trial Tr. Vol. 7 (Ramphal) 1422; Ramphal Dep. 17, 35-36, 58.

Muoio was also a consultant to a Prosser entity and beholden to Prosser. As of mid-1997, Muoio was on an annual $200,000 retainer for providing banking/financial advisory services,[FN154] and he viewed Prosser as a source of additional future lucrative consulting fees. In March 1998, Muoio sought up to an additional $2 million for serving as financial adviser on a potential acquisition by ECM of CoreComm Inc. That effort was unsuccessful only because the acquisition ultimately never took place.[FN155]

> FN154. JX 144 at EC22472

> FN155. Muoio Dep. at 16-17.

Lastly, Goodwin, Vondras and Todman received annual directors' fees of $100,000, a generous amount given that ECM's board met only three or four times in 1998.[FN156] Goodwin and Vondras each also received $50,000 and $15,000 for their service on the Special Committee.[FN157] The $115,000 Vondras received in 1998 for serving on ECM's board and Special Committee represented approximately 10% of his income for that year.[FN158]

> FN156. Trial Tr. Vol. 7 (Ramphal) at 1390; Muoio Dep. 18.

> FN157. JX 140 at EC5950.

> FN158. Trial Tr. Vol. 7 (Vondras) 1288-89, 1376.

**\*35** Although the directors' fees received by Goodwin, Vondras and Todman would not, without more, necessarily constitute a disabling financial interest, [FN159] the record shows that all three of these directors-indeed, all the board defendants-expected to continue as directors of Prosser entities and benefit from the substantial compensation which accompanied that status. In fact, all of ECM's directors except Muoio were appointed to the Innovative board after the Privatization. That expectation, coupled with the fact that his director and committee fees represented a sizeable

portion of his income, was sufficient to vitiate Vondras' independence for purposes of considering objectively whether the Privatization was fair to the minority stockholders.

> FN159. *Grobow v. Perot*, 526 A.2d 914, 923, n. 12 (Del.Ch.1987), *aff'd*, 539 A.2d 180 (Del.1988).

The director defendants claim that they did not know they would be invited to join the Innovative board after the Privatization closed in October 1998. The evidence shows otherwise. During the negotiations over the Privatization, the ECM directors were told that they would continue on with the company ?in its new incarnation.? [FN160] The Merger Agreement generated by the board's counsel in connection with the Privatization disclosed that the board defendants would remain directors of the surviving corporation. The Special Committee, through its counsel, received drafts of that Merger Agreement as early as July 17, 1998, before they voted to approve the transaction. [FN161]

> FN160. Goodwin Dep. Oct. 19, 2001 at 5.

> FN161. JX155 at SC4236; SC4111.

In summary, the Court finds that a majority of the full board of ECM (Prosser, Raynor, Ramphal, Vondras, and Muoio) were beholden to Prosser and, thus, were not independent of him. The Court further finds that a majority of the Special Committee (Ramphal and Vondras) were beholden to, and therefore not independent of, Prosser, leaving Goodwin as the only arguably independent Committee member and Todman as the only arguably independent non-Committee director. As previously found, Goodwin, as Committee chair, did almost all of the Committee's work himself. Unfortunately, the work that Goodwin performed in that role, including his negotiations with Prosser, were fatally compromised and, consequently, inadequate to represent the interests of ECM's minority shareholders effectively. [FN162]

> FN162. As former Justice (then Vice Chancellor) Hartnett appropriately observed in *Lewis v. Fuqua*, 502 A.2d 962, 967 (Del.Ch.1985), in addressing the independence of a special litigation committee appointed to review a derivative action, ?[i]f a single member committee is to be used, the member should, like Caesar's wife, be above reproach.? Here, as in *Fuqua*, Goodwin's ?past and present associations raise a question of fact as to his independence? (502 A.2d at 967), which, given the burden of proof, would ordinarily be resolved against Goodwin's independence. The Court assumes, without deciding, however, that Goodwin was independent, but nonetheless concludes on other grounds that the Special Committee was not an effective representative of the minority stockholders' interests.

### (b) *The Committee's Ineffectiveness As The Minority's Representative*

There are several reasons why Mr. Goodwin's efforts as the Special Committee's chairman, and as its sole functioning member, were doomed to failure.

The first is that Prosser withheld the June projections, and knowledge of their existence, from the Committee and its advisors, Houlihan and Paul Hastings. As a consequence, Goodwin and Houlihan were deprived of information that was essential to an informed assessment of the fair value of ECM and of the gross inadequacy of merger price Prosser was offering. Thus disabled, Goodwin was not in a position to negotiate vigorously for a substantial increase in Prosser's opening offer ($9.125 per share) or, alternatively, to make a considered judgment to shut down the negotiations, thereby preventing the Privatization from going forward at all. That nondisclosure, without more, was enough to render the Special Committee ineffective as a bargaining agent for the minority stockholders.

**\*36** Second, Prosser misled Goodwin by falsely representing that $10.25 per share was already straining the limits of the financing available to him. In fact, Prosser's financing would have enabled him to increase his offer to $11.40 per share, and the record evidence indicates that the RTFC was willing to lend him more, based on its implied valuation of ECM as conservatively worth about $28 per share. [FN163] There is no evidence that Goodwin knew of Prosser's financing arrangements or the RTFC's valuation (for merger financing purposes) of ECM.

> FN163. *See* Reed Dep. Mar. 16, 2000 at 162-53, 171; Prosser Dep. June 7, 2000 at 93-96; JX 167 at RTFC 698, 720. That is not to suggest that the level at which the deal could be financed is a measure of ECM's fair value. Any such suggestion would be contrary to Delaware law and to the fair value determinations in this case. *See Smith v. Van Gorkom*, 488 A.2d 858, 890-891 (Del.1985) (holding that price at which a leveraged buy-out of a corporation was financially feasible was not determinative of the corporation's fair value). The

import of this nondisclosure is that it evidences Prosser's intent to deprive the Special Committee of any real utility as a bargaining agent for the ECM minority.

Third, and finally, Goodwin was careless, if not reckless, by routing all of his communications with the other Special Committee members through Eling Joseph, Prosser's secretary. The result was to give Prosser access to the Committee's confidential deliberations and strategy. That inexplicable method of channeling communications to Goodwin's fellow Committee members further confirms the severe information imbalance that existed between the two ?bargaining? sides. In fact, there was no effective bargaining, because Prosser held all the cards and misled Goodwin into believing that he (Goodwin) and the Committee's financial advisor (Houlihan), possessed all the information that was material to negotiating a fair price. Nothing could have been further from the truth.

### 3. The Adequacy of the Board And Shareholder Approvals

The fourth and final aspect of fair dealing concerns the adequacy of the board and shareholder approvals of the challenged transaction. In this case, those approvals were uninformed and, accordingly, of no legal consequence.

It is undisputed that the Privatization was approved by a unanimous vote of all ECM directors, with Prosser abstaining, at a board of directors' meeting held on August 17, 1998.[FN164] The board's approval was not informed, however, because the voting board members were ignorant of the existence of the June Projections and of the inadequacy of the Houlihan valuation that was based upon the March projections.

> FN164. JX 33.

Moreover, Raynor, who was conflicted, voted in favor of the Privatization but did not disclose to the other voting board members, the $2.4 million compensation payout arrangement that he had recently negotiated with Prosser. As previously found, that nondisclosure was material.

By not disclosing these facts, Prosser and Raynor violated the fiduciary duty of disclosure they owed to their fellow directors of ECM.[FN165]

> FN165. *Weinberger v. UOP, Inc.*, supra, 457 A.2d 701.

The approval of the transaction by a majority of the minority shareholders was also legally ineffective, because the misdisclosures and omissions in the disclosure documents sent to shareholders in connection with the Privatization rendered that vote uninformed. Those misdisclosures and omissions also violated the fiduciary duty of disclosure owed by ECM's majority stockholder and by the ECM directors who were responsible for the accuracy of those documents.[FN166] The plaintiffs claim several disclosure violations, but the Court need address only three of them.

> FN166. *Id., see also Lynch v. Vickers Energy Corp.*, 383 A.2d 278 (Del.1977).

*37 First, the Proxy Statement omitted to disclose to the minority shareholders the existence of the June projections and the fact that those projections had been furnished to Prudential and the RTFC, but were withheld from the Special Committee and its advisors. That omission was materially misleading, not only in its own right but also because the proxy statement contained affirmative representations that the public was being provided with the same projections to which Prosser was privy. The section of the proxy statement containing the March projections (identified there only as ?Company projections?) disclosed that ?[a]lthough the company does not as a matter of course publicly disclose projections as to future revenues or earnings, because they were received by Mr. Prosser and the parent [ICC, LLC], the purchaser [ICC] is making these projections available to all stockholders.? [FN167] Those misdisclosures were highly material because knowledge of the June projections would have enabled the shareholders to understand ECM's intrinsic worth and the extent of the market's undervaluation of their company.

> FN167. JX 155 at SC4128.

Second, the disclosure documents misled minority stockholders about the Special Committee's and the board's independence from Prosser. The Schedule 14D-9, which was disseminated in connection with the first-step tender offer, disclosed the members of the Special Committee and their compensation, but not their consulting relationships or retainer agreements with other Prosser entities.[FN168] Specifically, there was no disclosure of Raynor's or Ramphal's

long-standing financial relationships with Prosser, including Raynor's $2.4 million payout arrangement for past services and Ramphal's significant consulting arrangements or his conflict concerning the economic and career prospects of his son-in-law. Nor was there disclosure of Muoio's consulting fee arrangement that had resulted in payments to him of hundreds of thousands of dollars. Also, because of their role as negotiators on behalf of the minority stockholders, the prior consulting relationships of Ramphal should have been disclosed.[FN169] The disclosure documents misleadingly suggested that the Special Committee, and perhaps a majority of the entire board, were independent. In fact, that was not true.

> FN168. JX 251 at SC 4288-89; *see also* JX155 at SC4108-09.

> FN169. See *Clements v. Rogers,* 790 A.2d 1222, 1242-43 (Del.Ch.2001).

Third, that disclosure violation was compounded by the false disclosure that a majority of the board that approved the Privatization were members of the Special Committee.[FN170] In fact, only six of the board's seven members voted to approve the transaction,[FN171] and only three of those six were members of the Special Committee. Three is not a majority of seven. Also not disclosed was the related fact that ECM's and the Committee's original advisors who had been retained to represent the interests of all shareholders in the initially Proposed (but later abandoned) Merger, had been co-opted by Prosser and were now working against the minority stockholders whose interests that they were originally hired to further.

> FN170. JX251 at SC4295.

> FN171. JX33.

**\*38** In short, the disclosure documents were crafted to reassure the minority stockholders that their interests had been effectively represented by a Special Committee of directors who were independent of Prosser and his entities on the other side of the transaction. That impression was materially false and misleading and was sufficient, without more, to render the approving vote of the stockholders uninformed.[FN172]

> FN172. See *Clements v. Rogers,* 790 A.2d 1222, 1242-43 (Del.Ch.2001) (accuracy of disclosures concerning the independence and effectiveness of a special negotiating committee are of particular importance were the transaction is with a controlling stockholder).

For all these reasons, the Court finds that the Privatization transaction, and the $10.25 per share merger price that has been adjudicated as unfair, were the product of unfair dealing. Accordingly, the Court concludes that the Privatization was not entirely fair to the minority stockholders of ECM. Having so found, the Court must now assess the liability consequences of that determination.

### V. THE DEFENDANTS' FIDUCIARY DUTY BREACHES AND LIABILITY THEREFOR

Having concluded that the Privatization was not entirely fair, the Court must next determine the nature of the fiduciary duty violation-whether of care, loyalty, or good faith-that resulted in the unfair transaction.[FN173] Under *Emerald Partners v. Berlin,*[FN174] that is necessary to enable the Court to adjudicate which (if any) of the director defendants is liable for money damages, because ECM's § 102(b)(7) charter provision exculpates those directors found to have violated *solely* their duty of care from liability for money damages. Article Seventh of ECM's Certificate of Incorporation provides:

> FN173. That determination is required only for purposes of the fiduciary duty class action, not the appraisal. As the Court has found, the defendant that is solely liable in the appraisal proceeding is the surviving corporation in the merger, *i.e.,* Innovative. That entity is liable to Greenlight for $38.05, plus interest, for each ECM share for which appraisal was sought.

> FN174. 787 A.2d 85 (Del.2001).

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of

the law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit. [FN175]

> FN175. Pretrial Stipulation and Order, ¶ 164, at p.20.

By its terms, Article Seventh does not apply to fiduciaries other than directors. Thus, Article Seventh does not apply to Prosser in his capacity as ECM's controlling stockholder, or to ICC or Innovative, the entities that Prosser controlled and through which he effected the Privatization. Prosser, as majority stockholder, breached his duty of loyalty to Greenlight and the plaintiff shareholder class, by eliminating ECM's minority stockholders for an unfair price in an unfair transaction that afforded the minority no procedural protections. For that breach of duty Prosser is liable to Greenlight and the shareholder class. So also are the two Prosser-controlled entity defendants, Innovative and ICC, which were the mechanisms through which Prosser accomplished the Privatization. Those entities are liable for having aided and abetted Prosser's breach of fiduciary duty.[FN176]

> FN176. *Weinberger v. Rio Grande Industries, Inc.*, 519 A.2d 116 (Del.Ch.1986); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del.Ch.1984). One of the requirements for ?aiding and abetting? liability is the third party's ?knowing participation? in the directors' breach of fiduciary duty. In that case, Prosser's knowledge must be attributed to the entities that he controlled and used to effectuate his breaches of duty.

The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director.

**\*39** Prosser is liable in his capacity as a director for breach of his duty of loyalty, conduct that is not exculpated under Article Seventh. Prosser is also liable on the basis that he ?derived an improper personal benefit? from the Privatization transaction-which is another exception to the exculpatory coverage of Article Seventh.

Raynor also is liable for breaching his fiduciary duty of loyalty-conduct that is excluded from the exculpatory shield of Article Seventh. Raynor did not personally and directly benefit from the unfair transaction (as did Prosser), but Raynor actively assisted Prosser in carrying out the Privatization, and he acted to further Prosser's interests in that transaction, which were antithetical to the interests of ECM's minority stockholders.

Raynor acted in concert with Prosser, who was the source of Raynor's livelihood, to ?flip? the transaction from a merger of Innovative into ATNCo, to a going private merger of ECM into Innovative.[FN177] Raynor also assisted Prosser and Innovative in obtaining RTFC financing for the Privatization [FN178] at the time when Raynor was still serving on the First Special Committee, ostensibly to safeguard the interests of ECM's minority stockholders .[FN179] After the Second Special Committee was formed, Raynor attended a meeting with Prosser and two ECM officers and the RTFC to discuss issues relating to the structuring of the revised deal. [FN180] Finally, on July 20, 1998, Opus Capital Partners (?Opus?) sent a letter to Goodwin, complaining that the initial $9 .125 price was too low and should be around $30.[FN181] This letter was somehow ?leaked? to Cahill, Prudential, and Raynor,[FN182] and Raynor reported the contents of the Opus letter to the RTFC, editorializing that ?Opus-biggest [shareholder with] dissenting opinion on buy back bought in @$6 or $7/share [but] believes should be valued @ $30 per share.? [FN183]

> FN177. JX155 at SC4110; Raynor Dep. 171-173.

> FN178. JX184 at RTFC1474.

> FN179. Trial Tr. Vol. 10 (Prosser) at 1796-97.

> FN180. JX 187 at RTFC5145-46.

> FN181. JX 32.

> FN182. JX 280; JX 106; JX 186 at RTFC5135.

> FN183. JX 186 at RTFC5135; Reed Dep. 153.

Although Raynor did not benefit directly from the transactions, his loyalties ran solely to Prosser because Raynor's economic interests were tied solely to Prosser and he acted to further those economic interests. Accordingly, Raynor is liable to Greenlight and the shareholder class for breaching his fiduciary duty of loyalty and/or good faith.[FN184]

> FN184. The Court employs the ?and/or? phraseology because the Delaware Supreme Court has yet to articulate the precise differentiation between the duties of loyalty and of good faith. If a loyalty breach requires that the fiduciary have a self-dealing conflict of interest in the transaction itself, as at least one commentator has suggested, then only Prosser is liable on that basis. Raynor would be liable for violating his duty of good faith for consciously disregarding his duty to the minority stockholders. *See* Hillary A. Sale, *Delaware's Good Faith*, 89 Cornell L.Rev. 456 (2004). On the other hand, if a loyalty breach does not require a self-dealing conflict of interest or receipt of an improper benefit, then Raynor would be liable for breaching his duties of loyalty *and* good faith. *See Strassburger v. Earley*, 752 A.2d 557 (Del.Ch.2000) (director whose conduct in a transaction evidences loyalty solely to employer whose interests were adverse to the corporation held to have violated his duty of loyalty). The Court need not decide that definitional issue, because under either definition, Raynor's conduct amounted to a non-exculpated breach of fiduciary duty.

The Court also concludes, albeit with reluctance, that Muoio is similarly liable, even though Muoio's conduct was less egregious than that of Prosser and Raynor. Unlike Raynor, Muoio did nothing affirmatively to assist Prosser in breaching his fiduciary duties of loyalty and good faith. Like his fellow directors, Muoio was also not independent of Prosser.

Muoio is culpable because he voted to approve the transaction even though he knew, or at the very least had strong reasons to believe, that the $10.25 per share merger price was unfair. Muoio was in a unique position to know that. He was a principal and general partner of an investment advising firm, with significant experience in finance and the telecommunications sector. From 1995 to 1996, Muoio had been a securities analyst for, and a vice president of, Lazard Freres & Co. in the telecommunications and media sector. From 1985 to 1995, he was a securities analyst for Gabelli & Co., Inc., in the communications sector, and from 1993 to 1995, he was a portfolio manager for Gabelli Global Communications Fund, Inc.[FN185]

> FN185. Pretrial Stip. and Order, ¶'s 40-42.

*40 Hence, Muoio possessed a specialized financial expertise, and an ability to understand ECM's intrinsic value, that was unique to the ECM board members (other than, perhaps, Prosser). Informed by his specialized expertise and knowledge, Muoio conceded that the $10.25 price was ?at the low end of any kind of fair value you would put,?[FN186] and expressed to Goodwin his view that the Special Committee might be able to get up to $20 per share from Prosser.[FN187] In these circumstances, it was incumbent upon Muoio, as a fiduciary, to advocate that the board reject the $10.25 price that the Special Committee was recommending. As a fiduciary knowledgeable of ECM's intrinsic value, Muoio should also have gone on record as voting against the proposed transaction at the $10.25 per share merger price. Muoio did neither. Instead he joined the other directors in voting, without objection, to approve the transaction.

> FN186. Muoio Dep. at 175.

> FN187. Goodwin Dep. Sept. 6, 2001 at 47.

ECM's directors other than Prosser and Raynor could plausibly argue that they voted for the transaction in reliance on Houlihan's opinion that the merger term price was fair. In Muoio's case, however, that argument would be implausible. Muoio's expertise in this industry was equivalent, if not superior, to that of Houlihan, the Special Committee's financial advisor. That expertise gave Muoio far less reason to defer to Houlihan's valuation. Knowing (or at least having very strong reasons to suspect) that the price was unfair, why, then, would Muoio vote to approve this deal? The only explanation that makes sense is that Muoio, who was seeking future business opportunities from Prosser, decided that it would disserve his interests to oppose Prosser and become the minority's advocate.

Admittedly, divining the operations of a person's mind is an inherently elusive endeavor. Concededly, the possibility exists that Muoio's decision was driven not by his overriding loyalty to Prosser, but by a sincere belief that the $10.25 price was minimally fair, even if not the fairest or highest price attainable. But in this case that possibility is not sufficient to carry the day, because to establish a director's exculpation from liability under 8 Del. C. § 102(b)(7), the

burden falls upon the director to show that ?[his] failure to withstand an entire fairness analysis is *exclusively* attributable to a violation of the duty of care.? [FN188] Muoio has not carried that burden.

> FN188. *Emerald Partners v. Berlin,* 787 A.2d at 98 (italics added).

The credible evidence persuades the Court that Muoio's conduct is explainable in terms of only one of two possible mindsets. The first is that Muoio made a deliberate judgment that to further his personal business interests, it was of paramount importance for him to exhibit his primary loyalty to Prosser. The second was that Muoio, for whatever reason, ?consciously and intentionally disregarded? his responsibility to safeguard the minority stockholders from the risk, of which he had unique knowledge, that the transaction was unfair. [FN189] If motivated by either of those mindsets, Muoio's conduct would have amounted to a violation of his duty of loyalty and/or good faith. [FN190] Because Muoio has not established to the satisfaction of the Court, after careful scrutiny of the record, that his motivation was of a benign character, he is not exculpated from liability to Greenlight and the shareholder class.

> FN189. *See In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 289 (Del.Ch.2003).

> FN190. *See* note 184, *supra.*

**\*41** That leaves the four remaining directors-Goodwin, Ramphal, Todman, and Vondras-whose conduct, while also highly troublesome, is far more problematic from a liability standpoint than that of Prosser, Raynor, and Muoio. Like Raynor and Muoio, those directors (except possibly Goodwin) were not independent of Prosser, they all voted for the Privatization, and none had a personal conflicting financial interest in, or derived a personal benefit from, that transaction to the exclusion of the minority stockholders.

The conduct of these four directors differs from that of Raynor and Muoio, in that there is no evidence that any of those four affirmatively colluded with Prosser to effectuate the Privatization, or that they otherwise deliberately engaged in conduct disloyal to the minority stockholders' interests. Nor have the plaintiffs shown that any of those directors knew or had reason to believe, that the merger price was unfair.

This is not intended to suggest that these directors covered themselves in glory, or merit commendation, for the manner in which they discharged their responsibility as fiduciaries. But it is to say, and this Court after considerable reflection finds, that there is no persuasive evidence that the fiduciary violations of the ECM directors other than Prosser, Raynor, and Muoio implicated conduct more egregious than breaches of their duty of care.

A logical starting point in the analysis is first to consider the conduct of the members of the Second Special Committee: Goodwin, Ramphal and Vondras. Because Ramphal was located in London and Vondras in Indonesia, they never met in person with each other or with Goodwin, who became the Committee's sole working member. Put differently, all Committee initiatives and decisions were made initially by Goodwin, subject to concurrence by Ramphal and Vondras, who on all relevant issues willingly deferred to Goodwin and relied upon his recommendations, both as to the Committee's process and the transaction price.

Although Goodwin negotiated a merger price ($10.25 per share) that this Court has found to be unfair, there is no persuasive evidence that Goodwin knew or should have known that this was the case. Primarily, that is because critical information was withheld from Goodwin, from the other Committee members, from and their financial advisor, Houlihan. Based upon information that in material respects was incomplete, Houlihan opined that the negotiated price was fair, and there is no evidence that Goodwin, who had negotiated the price with Prosser, had reason to believe otherwise.

This is not to say that Goodwin carried out this process with the care that would be expected of someone of his distinguished background and accomplishments. No justification has been shown for Goodwin communicating with the other Committee members through Ms. Joseph, the secretary of the minority stockholders' negotiating adversary, Prosser. That misstep constituted a violation of Goodwin's duty of care and resulted in critical information being leaked to the other side. But, that fiduciary breach was of no actionable consequence, because Goodwin had all along been deprived of material information that both he and Houlihan needed to negotiate a fair price. Consequently, even if Goodwin had maintained adequate security arrangements, there is no basis to conclude that the result would have been any different.

**\*42** The plaintiffs insist, however, that Goodwin's fiduciary violations were of a character far more egregious than

duty of care violations. Plaintiffs urge that: (1) Goodwin (as well as Ramphal and Vondras) were financially not independent of Prosser and were motivated to do whatever was needed to remain in Prosser's good graces, (2) Goodwin willingly acceded to retaining the Special Committee's legal and financial advisors from among candidates that had been selected by Prosser or his advisors, (3) Goodwin's ?negotiations? with Prosser were nothing more than a scripted minuet wherein Goodwin, on behalf of the Committee, would bargain for a negligible price increase, (4) that bargaining, coupled with the gilt-edged credentials of all three Committee members, would create a credible record of ?arm's length? negotiations sufficient to survive entire fairness review. Goodwin's decision to route his communications through Ms. Joseph was, plaintiffs argue, further dramatic evidence that his true loyalties were to serve Prosser and his interests. This conduct, plaintiffs insist, violated Prosser's (and Ramphal's and Vondras's) fiduciary duties of loyalty and/or good faith-conduct that is not exculpated under Article Seventh.

It is correct (and this Court has found) that with the possible exception of Goodwin, none of the Committee members was independent of Prosser, that viewed with perfect hindsight the magnitude of the negotiated price increase was negligible, and that Goodwin permitted his communications with Ramphal and Vondras to be routed through Prosser's secretary. In quite different circumstances that might establish a violation of the duties of good faith and/or loyalty, especially since the burden of establishing exculpation falls upon the directors seeking exculpation. But here that procedural burden does not help the plaintiffs, because the evidence, viewed as a whole, fails to establish a *prima facie* case of bad faith or disloyalty that these directors would be called upon to negate or disprove.

More specifically, although Goodwin, Ramphal and Vondras, because of their relationship to Prosser, might have been motivated to aid Prosser in his scheme to force out ECM's minority at an unfair price, there is no evidence that they actually engaged in such improperly motivated conduct, or otherwise acted with disloyal intent. To be sure, Goodwin's conduct may fairly be described as having violated his duty of care. And, given the non-independence of Ramphal and Vondras, their wholesale abdications to Goodwin of their responsibility as Committee members to take an active and direct role in the process, also bespeaks a failure to observe the requisite due care.[FN191] But negligent or even gross negligent conduct, however misguided, does not automatically equate to disloyalty or bad faith. There is no evidence that Goodwin, Ramphal and Vondras intentionally conspired with Prosser to engage in a process that would create the illusion, but avoid the reality, of arm's length bargaining to obscure the true purpose of benefiting Prosser at the expense of the minority stockholders.

> FN191. *See Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 368 (Del.1993) (?[W]e have stated that a director's duty of care requires a director to take an active and direct role in the context of a sale of a company from beginning to end.?)

**\*43** Nor, in these circumstances, did those directors' conduct amount to a breach of their fiduciary duty to act in good faith. Although the Supreme Court has yet to define the precise conduct that would actionably violate that duty, this Court has recently held that directors can be found to have violated their duty of good faith if they *?consciously and intentionally disregard[ ] their responsibilities,* adopting a ?we don't care about the risks' attitude concerning a material corporate decision.? [FN192] Here, there is no evidence that Goodwin, Ramphal, or Vondras acted with conscious and intentional disregard of their responsibilities, or made decisions with knowledge that they lacked material information. Because the conduct of those director defendants was, solely and at most; a violation of their duty of care, they are exculpated from liability under Article Seventh.

> FN192. *In re Walt Disney,* 825 A.2d at 289 (italics in original). Elaborating on that formulation, the Chancellor observed that directors actionably violate their duty of good faith if they ?*knew* that they were making material decisions without adequate information and without adequate deliberation, and ... they simply did not care if the decisions caused the corporations and its stockholders to suffer injury or loss.? *Id.*

The foregoing analysis and conclusion are equally applicable to the seventh director, Todman. The circumstance that differentiates Todman from Goodwin, Ramphal and Vondras is that Todman played no role in the negotiation of the merger terms, his sole involvement being to cast his vote as a director in favor of the Privatization. Because (unlike Muoio) there is no evidence that Todman knew or had reason to suspect that the price was unfair, it may fairly be concluded that he voted for the transaction in reliance upon the pronouncements by Houlihan and the Special Committee that the merger price was fair. Accordingly, it serves no purpose for the Court to determine whether or not Todman's conduct amounted to a breach of his duty of care, because in either case the record evidence compels the finding that Todman committed no violation of his duty of loyalty or his duty of good faith. Accordingly, Todman is not liable, either because he has not been shown culpable in any respect, or because at most his conduct would have amounted to a breach of his duty of care, for which Todman would be exculpated under Article Seventh.

VI. CONCLUSION

For the reasons set forth above:

(1) In the appraisal action, Innovative, as the surviving corporation, is liable to Greenlight in the amount of $38.05 per share for each of the 750,300 shares that are subject to the appraisal, plus interest at the rate of 6.27%, compounded monthly, from the date of the merger to the date of the judgment.

(2) In the fiduciary duty action, defendants Innovative, ICC, Prosser, Raynor and Muoio are jointly and severally liable to the plaintiff class and to Greenlight (in its capacity as holder of litigation rights assigned by former ECM shareholders) in an amount equal to $27.80 per share.[FN193]

> [FN193.] $27.80 per share is equal to the difference between the fair value of ECM on the merger date ($38.05 per share) and the merger price paid to the ECM minority shareholders ($10.25 per share).

Counsel shall confer and submit an agreed form of Final Order and Judgment implementing the rulings made in this Opinion.

Del.Ch.,2004.
In re Emerging Communications, Inc. Shareholders Litigation
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6



Slip Copy
Slip Copy, 2006 WL 1431209 (D.Del.), Fed. Sec. L. Rep. P 93,877
**(Cite as: Slip Copy)**


Briefs and Other Related Documents
In re Veritas Software Corp. Securities LitigationD.Del.,2006.
United States District Court,D. Delaware.
In re VERITAS SOFTWARE CORP. SECURITIES LITIGATION
**No. 04-831-SLR.**


May 23, 2006.


Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, for Lead Plaintiffs, David J. Goldsmith, of Goodkind Blabaton Rudoff & Sucharow LLP, New York, New York; Andrew M. Schatz, and Barbara F. Wolf, of Schatz & Nobel, P.C., Hartford, Connecticut; Robert I. Harwood, and Jeffrey M. Norton, of Wechsler Harwood LLP, New York, New York, of counsel.
Peter J. Walsh, Jr., of Potter Anderson & Corroon LLP, Wilmington, Delaware, for Defendant, Nina F. Locker, and Peri Nielsen, of Wilson, Sonsini, Goodrich & Rosati, PC, Palo Alto, California, of counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

### I. INTRODUCTION

**\*1** Plaintiff Paul Kuck filed this securities class action against Veritas Software Corporation, Gary L. Bloom and Edwin J. Gillis on July 7, 2004 alleging they issued a materially misleading press release regarding expectations on revenue and earnings for the second quarter of 2004, in violation of the Securities Exchange Act of 1934, 15 U.SC. Chpt. §§ 78j(b) and 78t(a) (the ?Exchange Act?) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. (D.I.1) Several lawsuits were filed shortly thereafter and, on March 3, 2005, the court consolidated these lawsuits and appointed Tay Siew Choon and Mark Leonov as co-lead plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the ?Reform Act?). (D.I.44) On May 27, 2005, plaintiffs filed a consolidated amended class action complaint (?CAC?) against Veritas, Bloom, Gillis and John Brigden (collectively called ?defendants?). (D.I.52) In addition to the original forecast allegations, plaintiffs' CAC extends the putative class period back a year to claim that each of defendant Veritas' financial statements filed between April 23, 2003 and April 21, 2004 were false because defendants had recognized revenue improperly on sales transactions. (D.I.52)

Before the court is defendants' motion to dismiss the CAC pursuant to the heightened pleading requirements imposed by the Reform Act and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. (D.I.53) The court has jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

### II. BACKGROUND

Defendant Veritas is a Delaware corporation headquarted in Mountain View, California that provides storage management software for data protection, application availability and disaster recovery. (D.I. 52 at ¶ 7) Defendant Veritas describes itself as one of the ten largest software companies in the world. (*Id.*) Defendant Bloom joined defendant Veritas in 2000 and was, at all relevant times, the company's Chairman of the Board, President and Chief Executive Officer. (D.I. 52 at ¶ 8) Defendant Gillis has been the Chief Financial Officer since November 2002 and defendant Brigden has been the Senior Vice President, General Counsel and Secretary since November 2001. (D.I. 52 at ¶¶ 9, 10)

Plaintiffs bring this class action on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Veritas common stock during the period between April 23, 2003 and July 6, 2004, inclusive (the ?Class Period?). (D.I. 52 at ¶ 17) Lead plaintiffs Tay Siew Choon and Mark Leonov allege that they purchased shares of Veritas common stock during the Class Period at artificially high prices. (*Id.* at ¶ 7)

A. Public Announcements

On April 23, 2003, defendants issued a press release announcing, *inter alia,* Veritas' financial results for the first quarter of 2003 (the ?First Quarter 2003 Press Release?). (D.I. 52 at ¶ 24) The First Quarter 2003 Press Release stated that ?revenue for the quarter ended March 31, 2003 was $394 million, compared to revenue of $370 million for the same period a year ago. Generally accepted accounting principles (?GAAP?) net income for the quarter ended March 31, 2003 was $43 million, or $0.11 per share, diluted ... Non-GAAP diluted earnings per share for the quarter ended March 31, 2003 was $0.17.? (*Id.* at ¶ 24) The price of Veritas stock increased from a closing price of $20.28 on April 23, 2003 to $22.15 on April 24, 2003. (*Id.* at ¶ 24) On May 14, 2003, defendants filed with the SEC a Form 10-Q reporting Veritas' financial results for the first quarter of 2003. The 10-Q reported the financial results set forth in the First Quarter 2003 Press Release. (*Id.* at ¶ 25) The 10-Q was signed by defendant Gillis and defendants Bloom and Gillis signed certifications as to the truth of the representations. (*Id.*)

**\*2** On July 23, 2003, defendants issued a press release announcing, *inter alia,* Veritas' financial results for the second quarter of 2003 (the ?Second Quarter 2003 Press Release?). It stated that ?[r]evenue for the quarter ended June 30, 2003 was a record $413 million, compared to revenue of $365 million for the same period a year ago, representing 13% growth year over year.? (*Id.* at ¶ 26) GAAP net income was $49 million, or $0.11 per diluted share, compared to GAAP net income of $26 million, or $0.06 per diluted share, for the same period a year ago. Non-GAAP diluted earnings per share was $0.19, compared to $0.14 for the same period a year ago. (*Id.*) The price of Veritas stock increased from a closing price of $27.91 on July 23, 2003 to $30.20 on July 24, 2003. (*Id.*) On August 19, 2003, defendants filed with the SEC a Form 10-Q reporting Veritas' financial results for the second quarter of 2003 consistent with the Second Quarter 2003 Press Release. (*Id.* at ¶¶ 26-27) The second quarter 2003 10-Q was signed by defendant Gillis and defendants Bloom and Gillis signed certifications as to the truth of the representations.

On October 22, 2003, defendants issued a press release announcing, *inter alia,* Veritas' financial results for the third quarter of 2003 (the ?Third Quarter 2003 Press Release?). It stated that ?[r]evenue for the quarter ended September 30, 2003 was a record $451 million, compared to revenue of $366 million for the same period a year ago, representing 23% growth year over year.? (*Id.* at ¶ 28) GAAP net income was $77.6 million, or $0.18 per diluted share, compared to GAAP net income of $36.2 million, or $0.09 per diluted share, for the same period a year ago. (*Id.*) The price of Veritas stock closed at $33.94 on October 22, 2003 and $35.70 on October 23, 2003. On November 14, 2003, defendants filed with the SEC a Form 10-Q reporting Veritas' financial results for the third quarter of 2003 consistent with the Third Quarter Press Release. (*Id.* at ¶ 29) The Third Quarter 2003 10-Q was signed by defendant Gillis and defendants Bloom and Gillis signed certifications as to the truth of the representations. (*Id.*)

On January 28, 2004, defendants issued a press release announcing, *inter alia,* Veritas' results for the fourth quarter of 2003 and year-end 2003 (the ?Fourth Quarter and Annual 2003 Press Release?). (D.I. 52 at ¶ 30) It stated:
Veritas ... today announced financial results for the quarter ended December 31, 2003. Revenue for the quarter ended December 31, 2003 was a record $513 million, compared to revenue of $406 million for the same period a year ago, representing 26 percent growth year over year. Revenue for the year ended December 31, 2003 was $1.77 billion, compared to revenue of $1.51 billion for the same period a year ago, representing 18 percent growth year over year.

(*Id.* at ¶ 30) [FN1] Defendants disclosed that they expected first quarter 2004 earnings to decrease. (*Id.* at ¶ 30) The price of Veritas stock dropped from a closing price of $36.47 on January 28, 2004 to $32.24 on January 29, 2004, on substantially higher volume. (*Id.*)

> FN1. Defendant Bloom was quoted as saying:
> Our outstanding fourth quarter performance is a culmination of a record-breaking year. We attribute this success once again to our focused execution on our growth strategy of expanding our product portfolio, delivering these products on a broad range of hardware and software platforms to further our heterogeneous advantage, and extending our reach worldwide by investing in sales and service capacity around the globe. (*Id.* at ¶ 30)

**\*3** On March 15, 2004, defendants issued a press release (the ?March 15, 2004 Press Release?) announcing that its previously reported financial results had been overstated throughout 2003 as a result of management misconduct in earlier years and would be restated. (*Id.* at ¶ 32) The realization of the overstatements was a result of an internal investigation that ?identified certain accounting practices not in compliance with generally accepted accounting principles during 2002, 2001 and prior periods under the direction of former financial management.? (*Id.* at ¶ 32) The price of Veritas stock dropped from a closing price of $31.01 on March 12, 2004 to $29.14 on March 15, 2004 and $27.29 on March 16, 2004 on substantially higher volume. (*Id.*)

On April 21, 2004, defendants issued a press release announcing, *inter alia*, Veritas' financial results for the first quarter of 2004 (the ?First Quarter 2004 Press Release?), which stated:
Veritas ... today announced financial results for the quarter ended March 31, 2004. Revenue was $487 million, compared to revenue of $394 million for the same period a year ago, representing 24 percent growth year over year. GAAP net income for the quarter ended March 31, 2004 was $103 million, or $0.23 per diluted share, compared to GAAP net income of $42.5 million, or $0.10 per diluted share, for the same period a year ago.

(*Id.* at ¶ 34) [FN2] On April 21, 2004, during a conference call (the ?April 21, 2004 Conference Call?) with analysts and inventors, defendant Gillis stated that ?Veritas won 246 deals worth more than $100,000, averaging about $190,000, in the quarter.? (*Id.*) The price of Veritas stock increased from a closing price of $27.82 on April 21, 2004 to $29.42 on April 22, 2004 on substantially higher volume. (*Id.*)

> [FN2.] Defendant Bloom was quoted saying: ?Our strong first quarter financial results demonstrate the fundamental strength of our business strategy and the benefit of an improvement in IT spending.? (D.I. 52 at ¶ 34) Defendant Gillis was quoted saying: ?Building on the strength of a solid first quarter, we continue to view 2004 as an important growth year for Veritas and expect revenue for our second quarter to be in the range of $490 million to $505 million....? (*Id.*)

On May 5, 2004, at the Veritas Analyst Day in Las Vegas in conjunction with its annual users conference, Veritas announced to analysts its second quarter earnings guidance of $490 MM-$505 MM. (*Id.* at ¶ 36) On June 14, 2004, Veritas issued a press release announcing the filing of its delayed annual report on Form 10-K for the year ended December 31, 2003, and its delayed quarterly report on Form 10-Q for the quarter ended March 31, 2004 (the ?June 14, 2004 Press Release?). Defendants stated:
Veritas ... today announced that it has filed its Form 10-K for the year ended December 31, 2003, including restated financial statements for 2002 and 2001, the corresponding interim periods for 2002 and 2001 and the interim periods ended March, June and September 2003. The company has also filed its Form 10-Q for the quarter ended March 31, 2004. The company announced on March 15, 2004 that these filings would be delayed as a result of the restatement of its financial statements for 2002 and 2001 and the revision of its previously announced financial results for 2003. As a result of the restatement, the company has adjusted its financial results as follows:
*4 For the quarter ended March 31, 2004, the company reported revenue of $486 million, a decrease of $1 million from the previously announced $487 million. Net income for the quarter was $100 million, a decrease of $3 million from the previously announced $103 million.
For the year ended December 31, 2003, the company reported revenue of $1.747 billion, a decrease of $24 million from the previously announced $1.771 billion. Net income for 2003 was $347 million, an increase of $73 million from the previously reported $274 million. Excluding the effect of the Seagate tax settlement, which increased net income by $95 million, net income would have decreased by $22 million.
The company also confirmed its previous guidance for the quarter ending June 30, 2004. The company expects revenue to be in the range of $490 million to $505 million and GAAP earnings per share to be in the range of $0.21 to $0.23.

(*Id.* at ¶ 37)

On June 14, 2004, defendants filed with the SEC Veritas' Form 10-K Annual Report for 2003 (the ?2003 10-K?). (*Id.* at ¶ 38) The 2003 10-K reported the financial results set forth in the June 14, 2004 Press Release and also stated that adjustments to 2003 were made that were unrelated to errors in prior periods. ?The 2003 adjustments, which related primarily to the deferral of revenue associated with several multiple element arrangements, decreased user license fees and services revenue by $4.4 million and $0.7 million, respectively. The adjustments unrelated to errors in prior periods are expected to be recognized as revenue in 2004.? (*Id.* at ¶ 38) Defendants Bloom and Gillis signed the 2003 10-K and also signed certifications as to the truth of the representations. (*Id.*) On June 14, 2004, defendants also filed a Form 10-Q reporting Veritas' financial results for the first quarter of 2004 (the ?First Quarter 2004 10-Q?). (*Id.* at ¶ 39) It reported the financial results announced in the June 14, 2004 Press Release. (*Id.* at ¶ 39) The First Quarter 2004 10-K was signed by defendant Gillis and defendants Bloom and Gillis signed certifications as to the truth of the representations. (*Id.* at ¶ 39)

On July 6, 2004, three weeks after the company confirmed its second quarter 2004 expectations of revenue in the range of $490 million to $505 million and GAAP earnings per share in the range of $0.21 to $0.23, Veritas announced that the company's second quarter 2004 revenues would actually be ?in the range of $475 million to $485 million? and that its GAAP earnings per share would ?be in the range of $0.17 to $0.19.? (*Id.* at ¶ 44) On July 7, 2004, the

company's share price dropped 36% from $26.55 to $17.00 on heavy trading volume. (*Id.*)

## B. Confidential Witness Allegations

Plaintiffs reference five confidential witnesses (?CW?) in the CAC. CW # 1 was an inside sales manager for the southeast region and was so employed at Veritas during the Class Period until the end of the first quarter of 2004. (D.I. 52 at ¶ 23(a)) CW # 2 was part of sales management at Veritas during the Class Period through most of the second quarter of 2004. (*Id.* at ¶ 23(b)) CW # 3 worked in the legal department at Veritas throughout 2003 and had contract review responsibilities. (*Id.* at ¶ 23(c)) CW # 4 worked in the legal department at Veritas during the Class Period, had responsibilities related to the negotiation of licenses, and had regular interaction with the finance department throughout the Class Period until the end of the first quarter 2004. (*Id.* at ¶ 23(d)) CW # 5 was a sales staff administrator at Veritas during the Class Period until the end of 2003 and was involved with new contracts. (*Id.* at ¶ 23(e))

**\*5** The witnesses allege that the legal department was responsible for deciding when revenue could be recognized and reported. (D.I. 52 at ¶ 41(a)) According to these witnesses, defendant Brigden approved contracts knowing they would be included in revenue recognition despite the fact that they lacked essential terms such as price and signatures by the customers. (*Id.* at ¶ 41(b)) Furthermore, booking revenues on contracts that had not been signed, or lacked essential terms such as the price, was standard practice at least through 2003. (*Id.* at ¶ 41(b) CW # 5 stated that, during the Class Period at least through 2003, there was pressure from Veritas' management to report revenue sufficient to meet earnings estimates and, as a result, sales personnel would ?all the time? write up and process contracts without essential terms and customer signatures in order to meet revenue targets. (*Id.* at ¶ 41(c))

CW # 1 established that a key part of Veritas' financial condition deteriorated due to diminishing demands and sales. (*Id.* at 45) A key part of Veritas' strategy during the Class Period was to convince existing customers to purchase upgrades, renew their maintenance licenses and buy consulting services. (*Id.* at 45(a)) CW # 1 states that, to obtain new products to use as upgrades, Veritas was forced to buy small companies who had products that could be used as upgrades to Veritas' software products. (*Id.*) According to CW # 1, in 2003 and 2004, Veritas had seven major upgrades, but they sold poorly, resulting in sales that were only a small fraction of what Veritas had projected internally would sell. (*Id.* at 45(b)) Defendant Bloom's business model also depended on increased revenue from consulting services, which CW # 1 states never materialized. (*Id.* at 45(c)) According to CW # 2, Veritas was also unsuccessful in many of its attempts to renew existing business in 2003 and 2004, including efforts to renew contracts with its large company clients. (*Id.* at 45(d)) According to CW # 3, demand for new licenses also dropped in 2003 and did not recover during the Class Period. (*Id.* at 45(e)) At the end of the first quarter of 2004, ?practically none of the sales people had met their quotas for the quarter,? according to CW # 1. (*Id.*)

## C. Allegations Set Out In Complaint

Based upon the public announcements of record and the confidential witness information asserted, plaintiffs allege that, during the relevant time period of April 2003 through June 2004, defendants' representations regarding Veritas' revenue, net income and earnings per share were materially false and misleading because ?these financial results included revenue that had been recognized from purported contracts which had not been signed, and for which actual terms were not agreed at the time the revenue was recognized, in violation of GAAP.? (D.I. 52 at ¶¶ 31, 33, 35, 40, 43) In addition, plaintiffs allege that defendants' representations were materially false and misleading by attributing accounting errors to prior management ?when, in fact, current management were continuing to engage in accounting improprieties.? (*Id.* at ¶¶ 33, 40)

## III. STANDARD OF REVIEW

**\*6** In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiffs. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc .,* 140 F.3d 478, 483 (3d Cir.1998). ?A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint.? *Id.* Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiffs cannot demonstrate any set of facts that would entitle them to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

In order to state a claim under the Reform Act, plaintiffs must first plead the ?circumstances constituting the fraud or

mistake? with particularity. See *In re Advanta,* 180 F.3d 525, 531 (3d Cir.1999). Conclusory allegations are unacceptable under the Reform Act's heightened pleading requirements. See *In re Milestone Scientific Sec. Litig.,* 103 F.Supp.2d 425, 453 (D.N.J.2000). Plaintiffs must set forth ?with particularity all facts on which that belief is formed.? *In re Advanta,* 180 F.3d at 530. However, this rule has been relaxed in situations where the factual information is peculiarly within a defendant's knowledge or control. See *In re Burlington Coat Factory,* 114 F.3d 110, 1418 (3d Cir.1997). Indeed, in those situations, courts should apply the rule with ?some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants.? *In re Cendant Corp. Litig.,* 60 F.Supp.2d 354, 368-69 (D.N.J.1999) (internal quotations omitted).

## IV. DISCUSSION

It is clear that all of plaintiffs' claims stem from their assertion that defendants inflated Veritas' financial condition by including, as revenue, contracts that were not yet finalized; i.e., defendants are alleged to have improperly recognized revenue, thereby knowingly misrepresenting Veritas' current and forecast revenue, net income and earnings per share. Although defendants argue that plaintiffs have not adequately pled their allegations, the court finds that the allegations contained in the CAC are sufficient to pass muster under the Reform Act.

### A. Forecast Allegations

Opinions, predictions, and other forward-looking statements are not actionable unless the speaker does not genuinely and reasonably believe them when they are made. See *In re Donald J. Trump Sec. Litig.,* 7 F.3d 357, 368 (3d Cir.1993). The Reform Act provides a safe harbor for forward-looking statements which are identified as such and are accompanied by a meaningful cautionary statement detailing important factors which could result in actual results differing materially from those statements presented. See 15 U.S .C. § 78u-5(c)(1)(A). ?A statement is forward-looking if it is a ?statement containing a projection of revenues, income [ ], earnings [ ], per share, capital expenditures, dividends, capital structure, or other financial items,? ?a statement of the plans and objectives of management for future operations' or ?a statement of future economic performance.? ? *In re Party City Sec. Litig.,* 147 F.Supp.2d 282, 309 (D.N.J.2001). The proper inclusion of a cautionary statement in connection with a forward-looking statement renders the alleged omissions or misrepresentations immaterial as a matter of law. See *In re Donald J. Trump Casino,* 7 F.3d at 371.

**\*7** The safe harbor will not apply if the statement was made with the actual knowledge that it was false or misleading. See *In re Advanta,* 180 F.3d at 536. In other words, the safe harbor provision does not afford corporations a free pass to lie to investors. Further, a purposeful omission of existing facts or circumstances does not qualify as a forward-looking statement and is not protected by the safe harbor of the Reform Act. See *In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 930 (D.N.J.1998).

Consistent with Third Circuit case law, an opinion about future events is actionable if it lacks a reasonable basis when made. See *In re Burlington Coat Factory,* 114 F.3d at 1428. Here, plaintiffs have alleged that earnings forecasts were false or lacked a reasonable basis when made because they were related to improper revenue recognition. No manner of cautionary language can cure false statements knowingly made. Therefore, defendants' motion to dismiss is denied in this regard.

### B. Guidance for Second Quarter 2004

Plaintiffs allege that defendants knew, at the time guidance for the Second Quarter 2004 was issued, that the range of $490-$505 million was not achievable and the statements announcing the guidance were knowingly false and misleading because: (1) the guidance was premised upon a base of revenue that included revenue from contracts that had not been signed; (2) defendants knew that domestic direct enterprise transactions worth over $100,000 each were a critical measure for Veritas' business, those transactions had decreased from 286 for the quarter ended December 31, 2003 to 246 for the quarter ended March 31, 2004, and the projections were dependent upon closing more of such direct enterprise transactions than Veritas had closed in the prior quarter; (3) problems stemming from the restatement and accounting issues required ?significant time and attention from [the] executive team? and, therefore, was having an effect on sales; and (4) during the second quarter, customer buying patterns became more cautions leading to longer sales cycles and smaller deal sizes. (D.I. 52 at ¶ 43) As a result of the above alleged facts, plaintiffs claim that defendants knew Veritas would need over 246 direct enterprise transactions worth over $100,000 in the United States in the Second Quarter 2004 to achieve the forecast, and that the forecast goal was unattainable. <u>FN3</u> (*Id.* at ¶ 43(e))

FN3. Defendants only achieved 201 of these transactions during the Second Quarter 2004. (*Id.* at ¶ 43(3))

Plaintiffs have alleged with sufficient particularity that defendants knew that Veritas' earnings guidance for the Second Quarter of 2004 was unattainable and, therefore, the statements contained in the guidance were knowingly false and misleading. *See In re Aetna, Inc. Sec. Lit.*, 34 F.Supp.2d 935, 953 (E.D.Pa.1999) (allegations of fraud and widespread problems relating to Aetna's ?core business? when individual defendants were top executives ?provide strong circumstantial evidence that [defendants] ... had knowledge of undisclosed facts[.]?).

### C. Loss Causation

**\*8** Defendants argue that plaintiffs have failed to adequately plead loss causation because at no point did defendants disclose any alleged improper revenue collection and, therefore, plaintiffs cannot now show that the share price fell significantly after the ?truth? became known, as required by *Dura Pharmaceuticals, Inc. v. Broudo v.*, 544 U.S. 336 (2005). In order to establish or allege loss causation, the law requires only that a plaintiff establish that defendants' wrongful conduct was a substantial factor in the market change. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 187 (3d Cir.2000) The Third Circuit precedent instructs that loss causation is a fact intensive inquiry which is best resolved by the trier of fact. *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir.2000). Where a plaintiff alleges a fraud-on-the-market theory based upon a public dissemination of misleading material facts, as plaintiffs do here, the causal nexus between the misleading statement and a plaintiff purchasing or selling that security may be presumed. *See Basic v. Levinson*, 485 U.S. 224, 242-47 (1988).

The court finds that plaintiffs have adequately alleged that they purchased Veritas shares at an artificially inflated price and, when the truth became known (i.e., when the real revenue and earnings were announced), Veritas stock dropped to its true value. (D.I. 52 at ¶¶ 44, 52) *See Semerenko*, 223 F.3d at 185 (?Turning to the complaint at issue in this case, we are persuaded that the Class has alleged sufficient facts to show that the alleged misrepresentations proximately caused the claimed loss. The Class contends that it purchased shares of ABI common stock at a price that was inflated due to the alleged misrepresentations, and that it suffered a loss when the truth was made known and the price of ABI common stock returned to its true value.?). As discussed below, plaintiffs allege that the misrepresentations made about the higher revenue expectation resulted from improper revenue recognition. While the July 6, 2004 statement did not specifically disclose the improper revenue recognition, it did disclose that the guidance would be less than anticipated. Plaintiffs have asserted that, because defendants used improper revenue recognition, they knew that the original guidance was false and misleading and the real revenue and earnings would never be that high.

### D. Improper Revenue Recognition

Plaintiffs allege that defendants fraudulently recognized revenue by approving contracts that were incomplete, lacked essential terms and were unsigned by Veritas customers. (D.I. 52 at ¶ 41(b)-(c)) Defendants assert plaintiffs have not pled fraud with adequate specificity because no ?dates, transactions, customer names and amounts by which revenue was allegedly misstated? were disclosed.

The requirement for particularity in pleading fraud does not demand an exhaustive cataloging of facts, but only specificity sufficient to provide assurance that plaintiffs have investigated the alleged fraud and reasonably believe that a wrong has occurred. *Resource Ventures, Inc. v. Resources Management Int'l, Inc.*, 42 F.Supp.2d 423, 441 (D.Del.1999) (denying motion to dismiss where pleading described the act of fraud, but not specifics such as the date, place or time). Moreover, ?[t]he Third Circuit has cautioned that courts should ?apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants.? ? *In re Cendant Corp. Litig.*, 60 F.Supp.2d at 368-69 (quoting *Rolo v. City Inv. Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir.1998)).

**\*9** The court concludes that plaintiffs have adequately pled facts regarding improper revenue recognition. The complaint, based in part on former Veritas employees with personal knowledge of the wrongdoings, alleges a scheme by defendants to inflate the company's revenue numbers by including ?sales? from contracts that had not been signed by the customer or that were missing essential terms such as price. The complaint alleges that these fraudulent activities were ?standard practice? at the company, that they happened ?all the time,? and that incomplete or unsigned contracts were personally approved by defendant Brigden who, when confronted about this practice, stated, ?What's the difference? We already know what the numbers for the quarter are.? (D.I. 52 at ¶ 41(b)-(c)) Under the circumstances, the court finds the pleading is adequate to withstand a motion to dismiss.

### E. Facts Raising a Strong Inference of Fraudulent Intent

Defendants assert that plaintiffs did not adequately plead scienter with respect to all defendants. Allegations that defendants participated in the drafting, preparation, and/or approval of the public representations complained of adequately alleges scienter. *See Sheehan v. Little Switzerland, Inc., 136 F.Supp.2d 301, 313 (D.Del.2001)* (concluding that a complaint that generally alleged that defendants (1) filed and signed a company's Form 8K incorporating a merger agreement and (2) cosigned and sent a letter to shareholders advising them of a merger agreement, specifically alleged conduct giving rise to a strong inference that each of the defendants acted with the requisite state of mind). Plaintiffs allege that defendants Bloom and Gillis signed materially false statements filed with the SEC, reviewed and approved materially false and misleading Veritas press releases and made numerous materially false and misleading statements about Veritas that were incorporated into analyst reports and news letters. (D.I. 52 at ¶¶ 8, 9) Plaintiffs alleged that defendant Brigden ?had specific responsibility for ... determining whether, and how much, revenue could be properly recognized and included in the financial results issued during the Class Period and described [in the complaint].? (D.I. 52 at ¶ 10(b)) The court concludes that plaintiffs have adequately pled facts raising a strong inference of fraudulent intent.[FN4]

> FN4. The court need not reach the evidence of stock sales.

## V. CONCLUSION

For the reasons discussed above, defendants' motion to dismiss the consolidated amended class action complaint (D.I.53) is denied. An order consistent with this memorandum opinion shall issue.

## ORDER

At Wilmington this 23d day of May, 2006, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that defendants' motion to dismiss (D.I.53) is denied.

D.Del.,2006.
In re Veritas Software Corp. Securities Litigation
Slip Copy, 2006 WL 1431209 (D.Del.), Fed. Sec. L. Rep. P 93,877

Briefs and Other Related Documents (Back to top)

? 2005 WL 3666804 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Oct. 11, 2005) Original Image of this Document (PDF)
? 2005 WL 4035470 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Oct. 11, 2005)
? 2005 WL 2867939 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Oct. 7, 2005) Original Image of this Document (PDF)
? 2005 WL 2603653 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Sep. 7, 2005) Original Image of this Document (PDF)
? 2005 WL 4035468 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Sep. 7, 2005)
? 2005 WL 2385503 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Jul. 20, 2005) Original Image of this Document (PDF)
? 2005 WL 4035469 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Jul. 20, 2005)
? 2005 WL 4035467 (Trial Pleading) Consolidated Amended Class Action Complaint (May 27, 2005)
? 1:04cv00831 (Docket) (Jul. 7, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
In re IT Group Inc.D.Del.,2005.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
IT GROUP INC., et al., Debtor.
IT LITIGATION TRUST, Plaintiff,
v.
Daniel A. D'ANIELLO, Francis J. Harvey, James C. McGill, Richard W. Pogue, Philip B. Dolan, E. Martin Gibson,
Robert F. Pugliese, Charles W. Schmidt, James David Watkins, Anthony J. Deluca, Harry J. Soose, the Carlyle
Group, the Carlyle Group L.L.C., Carlyle Partners II, L.P., Carlyle SBC Partners, II, L.P., Carlyle International
Partners II, L.P., Carlyle International Partners III, L.P., C/S International Partners, Carlyle Investment Group, L.P.
Carlyle-IT International Partners, L.P., Carlyle-IT International Partners II, L.P., Carlyle-IT Partners L.P., and T.C.
Group, L.L.C., Defendants.
**No. 02-10118, Civ.A. 04-1268-KAJ.**

Nov. 15, 2005.

Jeffrey M. Schlerf, Thomas H. Kovach, Eric M. Sutty, the Bayard Firm, Wilmington, Delaware for Plaintiff, Richard
S. Wayne, Thomas P. Glass, John M. Levy, Strauss & Troy, Cincinnati, Ohio, Mark D. Collins, Marcos A. Ramos,
Richards, Layton & Finger, P.A., Wilmington, Delaware, Roger D. Anderson, Smith, Katzenstein & Furlow LLP,
Wilmington, Delaware, of counsel.
Ronald S. Gellert, Eckert, Seamans, Cherin & Mellott, LLC, Wilmington, Delaware for Defendants, Thomas L.
Patten, David A. Becker, Latham & Watkins, LLP, Washington, D.C., Paul J. Pogue?, Phillip B. Dolan (?Dolan?), E. Martin
Reston, Virginia, Charles A. De Monaco, Kimberly L. Haddox, Dickie McCamey & Chilcote, P.C., Pittsburgh,
Pennsylvania, Mark A. Willard, Paul D. Steinman, F. Timothy Grieco, Eckert, Seamans, Cherin & Mellot, LLC,
Pittsburgh, Pennsylvania, of counsel.

Jointly Administered

JORDAN, J.

MEMORANDUM OPINION

I. INTRODUCTION

**\*1** Before me are Motions to Dismiss for Lack of Subject Matter Jurisdiction (Docket Item [?D.I.?] 35) and for
Failure to State a Claim (D.I.37) filed by defendants Daniel A. D'Aniello (?D'Aniello?), Francis J. Harvey
(?Harvey?), James C. McGill (?McGill?), Richard W. Pogue (?Pogue?), Phillip B. Dolan (?Dolan?), E. Martin
Gibson (?Gibson?), Robert F. Pugliese (?Pugliese?), Charles W. Schmidt (?Schmidt?), James David Watkins
(?Watkins?), Anthony J. DeLuca (?DeLuca?), Harry J. Soose (?Soose?), and the following parties (collectively
referred to as the ?Carlyle Defendants?): The Carlyle Group, The Carlyle Group, L.L.C., Carlyle Partners II, L.P.,
Carlyle SBC Partners, II, L.P., Carlyle International Partners II, L.P., Carlyle International Partners III, L.P., C/S
International Partners, Carlyle Investment Group, L.P., Carlyle-IT International Partners, L.P., Carlyle-IT
International Partners II, L.P., Carlyle-IT Partners L.P., and T.C. Group, L.L.C.[FN1]

    FN1. All of the defendants are referred to collectively as the ?Defendants.?

The First Amended Complaint (D.I. 30, the ?Complaint?), filed by IT Litigation Trust (?Plaintiff?) alleges in Counts
I-V [FN2] that Defendants, as directors, officers, and controlling shareholders of the IT Group, Inc. (the ?IT Group? or
the ?Company?), breached their corporate fiduciary duties, that their acts constituted waste of corporate assets, and
that the Carlyle Defendants aided and abetted the other Defendants' breach of fiduciary duties. (D.I. 30 at ¶¶ 58-79.)
Plaintiff also alleges, in Counts VI-VIII, that payments made by the IT Group to certain Defendants are avoidable
preferences or fraudulent transfers under the Bankruptcy Code and Delaware state law. (Id. at ¶¶ 80-115 .) Finally,

Plaintiff alleges in Count IX that the directors unlawfully paid dividends to the Carlyle Defendants. (*Id.* at ¶¶ 116-18.)

> FN2. The Complaint sets forth nine theories of recovery, which are denominated as ?claims for relief? and, for convenience, are herein designated as ?Counts.? Count I alleges that the IT Group directors and officers breached their corporate fiduciary duties. Count II makes the same allegations against the directors and officers under the ?Trust Fund? doctrine, explained *infra* note 8. Count III alleges that the directors and officers wasted corporate assets. Count IV alleges that the Carlyle Defendants breached their corporate fiduciary duties. Count V alleges that the Carlyle Defendants aided and abetted the breaches committed by the directors and officers. Count VI seeks, under the Bankruptcy Code, to avoid certain preferential transfers. Count VII alleges that payments made to the Carlyle Defendants were constructively fraudulent transfers. Count VIII alleges that payments made to the Carlyle Defendants and certain individual defendants were actual fraudulent transfers. Count IX alleges that dividends were paid unlawfully to the Carlyle Defendants.

Defendants contend that the claims based exclusively on Delaware state law, Counts I-V and IX, do not fall within the subject matter jurisdiction of this court, either under the statute providing for original jurisdiction over bankruptcy cases, 28 U.S.C. § 1334, or under that providing for supplemental jurisdiction, 28 U.S.C. § 1367. Defendants also contend that Counts I-VI must be dismissed in their entirety, and that Counts VII and VIII must be dismissed in part, for failure to state a claim upon which relief can be granted. For the reasons that follow, I will deny Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, and I will grant in part and deny in part Defendants' Motion to Dismiss for Failure to State a Claim.

## II. BACKGROUND <u>FN3</u>

> FN3. The following background information is drawn from the parties' submissions and does not constitute findings of fact.

### A. *The Carlyle Defendants' Investment in the IT Group*

The IT Group was a Delaware corporation with its principal office in Monroeville, Pennsylvania, which provided services in ?consulting, engineering, construction, environmental remediation, and facilities and waste management.? (Complaint, D.I. 30 at ¶ 30.) These services ?included the identification of contaminants in soil, air, and water, as well as the subsequent design and execution of remedial solutions.? (*Id.*)

*2 The Carlyle Group is a private merchant bank headquartered in Washington D.C. that invested in the IT Group ?through a number of entities that it owns or controls.? (*Id.* at ¶ 14.) Specifically, in or around November 1996, the Carlyle Defendants collectively invested $45 million in the IT Group. (*Id.* at ¶ 31 .) That sum included investments by several Cayman Islands limited partnerships, i.e., Carlyle International Partners II, L.P., Carlyle International Partners III, L.P., C/S International Partners, Carlyle-IT International Partners, L.P., and Carlyle-IT International Partners II, L.P., made through their general partner, T.C. Group, L.L.C. (*Id.* at ¶¶ 18-20, ¶¶ 22-23, ¶ 31.) In return for the $45 million in investments, the Carlyle Defendants received 45,000 shares of 6% Cumulative Convertible Participating Preferred Stock and detachable warrants to purchase 1.25 million shares of the IT Group's common stock. (*Id.* at ¶ 31.)

?The Carlyle Defendants also received approximately 25% of the IT Group's voting power and obtained the right to elect a majority of IT Group's board of directors....? (*Id.*) The IT Group Proxy Statement <u>FN4</u> dated May 20, 1999 shows that, prior to 1999, the Carlyle Defendants elected five of the nine members of the IT Group's board. (D.I. 39, Ex. D at A-0024.) More particularly, from 1996 to 1999, the Carlyle Defendants filled five of nine IT Group board positions by electing defendants D'Aniello, Dolan, Gibson, Pugliese, and Watkins. (*Id.* at A-0025.) Those directors remained on the IT Group board through 2002. (Complaint, D.I. 30 at ¶ 3, ¶¶ 7-9, ¶ 11.)

> FN4. In reviewing a 12(b) motion to dismiss in a case such as this, the court may consider a company's SEC filings, as well as other public records. *See in re Delmarva Sec. Litig.,* 794 F.Supp. 1293, 1299 (D.Del.1992).

As of May 14, 1999, the IT Group increased the size of its board to eleven directors. (D.I. 39, Ex. D at A-0024.) The board nominated defendant Harvey to fill one of the two new board seats (*id.*), and he was promptly elected. (Complaint, D.I. 30 at ¶ 4.) He too remained on the board through 2002. (*Id.*) The Carlyle Defendants declined to exercise their right to elect the eleventh director, thus leaving the board with ten members, five of whom were elected by the Carlyle Defendants.<u>FN5</u> (D.I. 39, Ex. D at A-0024.)

FN5. In addition to the election rights associated with their investment, ?the Carlyle Defendants procured a consulting agreement ... pursuant to which they were paid $100,000.00 per year and $10,000.00 per month.? (Complaint, D.I. 30 at ¶ 31.)

Four of those ten directors had additional connections to the Carlyle Defendants. D'Aniello ?has been a Managing Director of The Carlyle Group since at least 1987? and was also the Managing Director of TCG Holdings, L.L.C. and a Managing Member of TC Group, L.L.C. (*Id.* at ¶ 3.) Dolan ?has been employed by The Carlyle Group since at least 1989.? (*Id.* at ¶ 7.) ?In 1998, Dolan became a Principal of The Carlyle Group, and in February 2001, he became a Managing Director of The Carlyle Group.? (*Id.*) Harvey, along with D'Aniello, served on the boards of directors of other companies that are owned or controlled by The Carlyle Group. (*Id.* at ¶¶ 3-4.) Finally, Watkins ?served as director of Duratek, Inc. of which the Carlyle Defendants are the majority shareholder.? (*Id.* at ¶ 11.)

**\*3** Plaintiff alleges that the Carlyle Defendants ?took control? of the IT Group in or around November 1996 (*id.* at ¶ 31), and that ?[a]t all relevant times, the Carlyle Defendants possessed and exercised control over the IT Group? (*id.* at ¶ 14).

### B. *The Roll-Up Strategy*

According to Plaintiff, ?[a]s of 1998, the IT Group had experienced consecutive fiscal years in which it had lost money.? (*Id.* at ¶ 42.) The Carlyle Defendants, ?through [their] control of the board of directors of the IT Group, adopted and implemented a purported ?Roll-Up Strategy? to grow the company by acquiring companies engaged in the same or similar lines of business .? (*Id.* at ¶ 32.) From 1998 to 2000, the IT Group ?acquired at least eleven companies? as part of this strategy. (*Id.*) In five of those acquisitions, the IT Group paid approximately $526 million and booked goodwill <u>FN6</u> of approximately $515.5 million. (*See id.* at ¶¶ 33-37.) In a sixth acquisition, the IT Group paid approximately $1 million, along with contingent consideration of up to $8 million, and booked goodwill of approximately $5.5 million. (*Id.* at ¶ 38.) ?By or about the end of 2000, the IT Group had booked aggregate [goodwill] of approximately $539 million, representing 41 percent of the IT Group's total assets.? (*Id.* at ¶ 39.) Plaintiff asserts that the goodwill booked in those transactions was ?of no value to the IT Group,? and that consequently, ?the value of the IT Group's assets was substantially less than the values reflected on its books.? (*Id.* at ¶ 41.)

FN6. ?Goodwill? is defined in the Complaint as the ?Cost in excess of net assets of the acquired businesses.? (Complaint, D.I. 30 at ¶ 39.)

### C. *The IT Group's Insolvency*

The Roll-Up acquisitions between 1998 and 2000 ?were funded largely by debt financing ... including approximately $500 million in secured loans and credit facilities ... and approximately $255 million in subordinated bond debt issued in 1999.? (*Id.* at ¶ 43.) This financing ?increased the Company's leverage, increased its interest payments, and strained [its] liquidity.? (*Id.* at ¶ 44.) To deal with this lack of liquidity, the IT Group obtained an additional $100 million term loan in March 2000. (*Id.* at ¶ 45.) Its ?average debt outstanding during 2000 was approximately $650 million.? (*Id.*)

?In March 1997, the Company reported approximately $360 million in revenues and total liabilities of approximately $172 million....? (*Id.* at ¶ 44.) ?[B]y December 2000, [it] reported approximately $1.4 billion in revenues, while total liabilities had ballooned to approximately $1 billion....? (*Id.*) ?For the period ended [sic] March 28, 1997, the IT Group had a tangible net worth of approximately $160 million. By the period end of December 2000, the IT Group had a tangible net worth of approximately negative $277 million.? (*Id.* at ¶ 46.) Plaintiff alleges that, ?[b]eginning as early as March 1998, the IT Group was insolvent or within the vicinity of insolvency.? (*Id.* at ¶ 47.)

**\*4** Finally, on January 16, 2002, the IT Group filed for bankruptcy protection. (*Id.* at ¶ 57.) ?Thereafter, the IT Group was liquidated.? (*Id.*)

### D. *Allegations Regarding the Board's Actions and Failures to Act*

Plaintiff alleges that, in addition to following the unwise Roll-Up Strategy, the IT Group directors and officers also ?failed to take prompt and prudent actions to preserve and maximize [the IT Group's] assets and to restructure its debts? (*id.* at ¶ 50), ?failed to retain financial asset divestiture consultants, financial consultants, turnaround and

restructuring consultants, or bankruptcy and legal counsel? (*id.* at ¶ 51), and ?failed to inform themselves of all material information available to them concerning financial restructuring? (*id.* at ¶ 52). According to Plaintiff, those failures ?caused or deepened [the IT Group's] insolvency, and sealed [its] financial doom.? (*Id.* at ¶ 55.) Because, Plaintiff says, the IT Group board was under the control of the Carlyle Defendants (*see id.* at ¶ 14, ¶ 31), those failures are also the Carlyle Defendants' failures (*see id.* at ¶ 1). In Counts I-IV, Plaintiff alleges that those failures amount to waste of corporate assets and to breaches of the Defendants' fiduciary duties to the IT Group and its creditors. (*Id.* at ¶¶ 58-75.) Count V alleges that the Carlyle Defendants also aided and abetted the other Defendants' breaches. (*Id.* at ¶¶ 76-79.)

Plaintiff further asserts that, while controlling the IT Group, the Carlyle Defendants were paid in excess of $850,000 from consulting agreements with the Company and in excess of $8.9 million in dividends from their preferred stock in the Company. (*Id.* at ¶ 1.) Plaintiff particularly describes dividend payments to the Carlyle Defendants of $1,362,254 in 1998 (*id.* at ¶ 99), $2,765,700 in 1999 (*id.* at ¶ 101), $2,765,700 in 2000 (*id.* at ¶ 102), and $2,074,275 in 2001 (*id.* at ¶ 103), all of which are alleged in Counts VII and VIII to be fraudulent transfers (*id.* at ¶¶ 97-115) and, in Count IX, to be unlawful payments of dividends (*id.* at ¶¶ 116-18). Plaintiff also lists other payments made to particular Defendants, including the Carlyle Defendants, within the year before the bankruptcy petition (*id.* at ¶¶ 82-88) and which are alleged, in Count VI, to be avoidable preferential transfers (*id.* at ¶¶ 80-96) and, in Count VIII, to be fraudulent transfers (*id.* at ¶¶ 109-115).

Plaintiff alleges, again in Counts I-IV, that those payments to insiders, made while the IT Group was insolvent or in the vicinity of insolvency, are additional instances of corporate waste and breach of fiduciary duties. (*Id.* at ¶ 61(g), ¶ 65(g), ¶ 69(f), ¶ 74(g).) Also, those payments and the increased debt burden were allegedly part of a strategy to ?artificially extend[ ] the life of the insolvent Company to obtain a return on the Carlyle Defendants' equity investment.? (*Id.* at ¶ 61(h), ¶ 65(h), ¶ 69(g), ¶ 74(h).) Count V alleges that the Carlyle Defendants aided and abetted those breaches as well. (*Id.* at ¶¶ 76-79.)

*5 The claims in this case were originally asserted by the Official Committee of Unsecured Creditors in the IT Group bankruptcy proceeding. (D.I. 36 at 1.) By stipulation of the parties and pursuant to the First Amended Joint Chapter 11 Plan for the IT Group, which was confirmed on April 5, 2004 (D.I. 52 at 6, D.I. 53 at A003-A062), the IT Litigation Trust was substituted as Plaintiff in this action.

### III. STANDARD OF REVIEW

A challenge to subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) requires a court to ask ?whether the complaint alleges facts on its face which, if taken as true, would be sufficient to invoke the district court's jurisdiction.? *FOCUS v. Allegheny County Court of Common Pleas,* 75 F.3d 834, 840 (3d Cir.1996).

Fed.R.Civ.P. 12(b)(6) requires a court to accept as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998). ?A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint.? *Id.* The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

A complaint must contain ?a short and plain statement of the claim showing that the pleader is entitled to relief.? Fed.R.Civ.P. 8(a). The Federal Rules ?do not require a claimant to set out in detail the facts upon which he bases his claim,? *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168 (1993), and ?a plaintiff will not be thrown out of court on a Rule 12(b)(6) motion for lack of detailed facts.? *Stanziale v. Nachtomi (In re Tower Air, Inc.),* 416 F.3d 229, 237 (3d Cir.2005). Still, a plaintiff must allege the supporting facts ?necessary to provide the defendant fair notice of the plaintiff's claim and the ?grounds upon which it rests.? ? *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)).

### IV. DISCUSSION

#### A. *The Motion Challenging Subject Matter Jurisdiction*

The federal district courts have subject matter jurisdiction over bankruptcy cases pursuant to 28 U.S.C. § 1334. That statute provides that ?the district courts shall have original and exclusive jurisdiction of all cases under title 11,? and ?original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases

under title 11.? § 1334(a), (b). ?Cases under title 11, proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as ?core? proceedings; whereas proceedings ?related to? a case under title 11 are referred to as ?non-core? proceedings.? *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 162 (3d Cir.2004). It is conceded that none of the state law claims in Counts I-V and IX qualify as core proceedings. The motion to dismiss for lack of subject matter jurisdiction thus centers on the question of whether these claims are non-core claims falling within the category of ?related to? jurisdiction.

*6 ?With ?related to? jurisdiction, Congress intended to grant bankruptcy courts comprehensive jurisdiction so that they could deal efficiently and expeditiously with matters connected with the bankruptcy estate.? *Id.* at 163-64 (internal citations omitted). Prior to the confirmation of a bankruptcy plan, a proceeding will fall under ?related to? jurisdiction if ?the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.? *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984). But the test must be formulated somewhat differently for proceedings that arise post-confirmation, because ?[a]t the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute.? *Resorts*, 372 F.3d at 165. After plan confirmation, a proceeding will be within the ?related to? jurisdiction if it has a ?close nexus to the bankruptcy plan.? *Id.* at 166. ?Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus.? *Id.* at 167.

Here, Defendants argue that, for two reasons, the state law claims do not have a close nexus to the confirmed IT Group plan. First, they say, because the IT Group estate no longer exists after plan confirmation, this lawsuit can have no effect on the estate. (D .I. 36 at 11.) Instead, any proceeds will be distributed by Plaintiff to the beneficiaries of the Litigation Trust. Second, Defendants argue that resolving the state law claims requires no construction, interpretation, or implementation of the plan. (*Id.* at 11-12.) Rather, the only connection to the bankruptcy ?is that a recovery by the Plaintiff might increase the assets of the Litigation Trust and its beneficiaries,? and that connection, on its own, is insufficient to support ?related to? jurisdiction. (*Id.* at 13 (citing *Resorts*, 372 F.3d at 170).) Thus, Defendants conclude, this court does not have subject matter jurisdiction over Counts I-V and IX.

The Defendants' reasoning, however, depends upon an overstatement of the Third Circuit's conclusions in *Resorts*. First, no one disputes that the IT Group estate no longer exists, but that fact alone is not determinative. Indeed, the ?close nexus? test was formulated to address jurisdiction over claims arising post-confirmation, recognizing that a literal interpretation of the *Pacor* test would end the court's jurisdiction when the plan was confirmed. *Id.* at 165-67. Thus, jurisdiction may be proper, even after confirmation of the bankruptcy plan.

Second, unlike the cause of action in *Resorts*, which arose nearly seven years after confirmation and was a malpractice claim by the litigation trust against its accountant, Plaintiff's cause of action in this case arose before the filing of the bankruptcy petition, and the losses claimed by Plaintiff on behalf of unsecured creditors are logically connected to the IT Group insolvency and subsequent bankruptcy. Furthermore, this cause of action was assigned to Plaintiff by Section 7.16 of the IT Group bankruptcy plan. (D.I. 53 at A034.) The assignment in a confirmed plan of a prepetition cause of action ?could well establish the ?close nexus to the bankruptcy plan or proceeding? which the Third Circuit requires.? *Michaels v. World Color Press, Inc. (In re LGI, Inc.)*, 322 B.R. 95, 102 (Bankr.D.N.J.2005). While resolving Plaintiff's state law claims may not require construction or interpretation of the plan, this proceeding ?plainly serves the plan through the implementation, consummation, and execution which typify many post-confirmation matters.? *Id.* Exhibit 1 of the confirmed plan includes within the listing of claims assigned to Plaintiff ?[a]ny claims for acts or omissions of [the IT Group's] ... present and former officers, directors, insiders and accountants.? (D.I. 53 at A052.) The present claims are within that category, and their pursuit was therefore contemplated by the plan itself.

*7 Thus, contrary to Defendants' position, the possible increase in Plaintiff's assets is not the only connection to the IT Group bankruptcy. Because this matter affects the implementation, consummation, and execution of the bankruptcy plan, there is a close nexus to the bankruptcy sufficient to satisfy the standard set in *Resorts*. 372 F.3d at 166-67. I therefore conclude that the state law claims in Counts I-V and IX are properly within the ?related to? jurisdiction granted under § 1334.[FN7]

> FN7. Because of that conclusion, I need not address the parties' arguments concerning supplemental jurisdiction under 28 U.S.C. § 1367.

### B. *The 12(b)(6) Motion to Dismiss*

1. *Counts I, II, and IV-Breach of Corporate Fiduciary Duty Claims Against the Directors, Officers, and Carlyle*

*Defendants*

As earlier noted, *supra* note 2, Plaintiff alleges in Count I that the IT Group directors and officers breached their duties of loyalty and due care to the Company and its creditors. In Count II, Plaintiff makes the same allegations against the directors and officers under the ?Trust Fund? doctrine,[FN8] based on the IT Group's alleged insolvency. In Count IV, Plaintiff alleges that the Carlyle Defendants breached duties of loyalty and due care that they owed because of their alleged control over the IT Group board. Defendants attack the sufficiency of the pleading of all of those counts. Since the allegations in Counts I, II, and IV are nearly identical, I treat them as a group in the following discussion, dealing first with the duty of loyalty claims and then with the duty of care claims. I conclude that the Complaint adequately states claims for breaches of the duty of loyalty by the directors and Carlyle Defendants, but that all other claims for breach of fiduciary duties must be dismissed.

> FN8. Under the Trust Fund doctrine, ?the directors [of an insolvent corporation] become trustees tasked with preserving capital for the benefit of creditors who are deemed to have an equity-like interest in the firm's assets.? *Prod. Res. Group, L.L.C. v. NCT Group, Inc .,* 863 A.2d 772, 791 (Del. Ch.2004).

a. *Duty of Loyalty*

Two of the ten separate breaches alleged in each of Counts I, II, and IV are identifiable as breaches of the duty of loyalty. First, the Defendants allegedly made ?transfers for the benefits [sic] of insiders.? (Complaint, D.I. 30 at ¶ 61(g), ¶ 65(g), ¶ 74(g).) Second, the Defendants ?artificially extend [ed] the life of the insolvent Company to obtain a return on the Carlyle Defendants' equity investment.? (*Id.* at ¶ 61(h), ¶ 65(h), ¶ 74(h).) These claims are apparently based on the payments made to Defendants, including the dividends paid to the Carlyle Defendants, while the IT Group was losing money and unable to service its debt. I will discuss in turn the claims against the directors, the officers, and the Carlyle Defendants.

i. *Directors*

Under Delaware law, a director's duty of loyalty ?imposes an affirmative obligation to protect and advance the interests of the corporation and mandates that [the director] absolutely refrain from any conduct that would harm the corporation.? *Belcom, Inc. v. Robb,* No. CIV.A.14663, 1998 WL 229527, at *3 (Del. Ch.1998) (citing *Guth v. Loft,* 5 A.2d 503, 510 (Del.1939)). While each director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made ?on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company,? *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984),[FN9] unless the plaintiff shows that the presumption does not apply. A plaintiff can avoid the presumption for a particular transaction by showing ?that a majority of a board that approved the transaction in dispute was interested and/or lacked independence.? *Orman v. Cullman,* 794 A.2d 5, 23 (Del. Ch.2002). A director is interested when appearing on both sides of a transaction or when deriving a personal benefit from a transaction that is not received by stockholders generally. *See Aronson,* 473 A.2d at 812; *Orman,* 794 A.2d at 23. ?Independence means that a director's decision is based on the corporate merits of the subject ... rather than extraneous considerations or influences.? *Aronson,* 473 A.2d at 816. A lack of independence arises when ?directors are ?beholden? to [the controlling person] or so under their influence that their discretion would be sterilized.? *Orman,* 794 A.2d at 24 (quoting *Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993)).

> FN9. While *Aronson* was a ?classic Delaware derivative case,? *Tower Air,* 416 F.3d at 236 n. 10, citing it, along with other derivative cases, for propositions of substantive Delaware law concerning the business judgment rule is proper. *Cf. id.* at 238 (citing *Aronson* for definition of the business judgment rule).

*8 Here, Plaintiff's claims are based on payments made to insiders, and the Complaint describes payments made both to the Carlyle Defendants and to individual defendants. The board allegedly made payments to the Carlyle Defendants pursuant to a consulting agreement and as dividends arising from the preferred stock. (*Id.* at ¶ 1, ¶¶ 99-103.) The directors were not interested in those payments because no director is alleged to have received a personal benefit. However, Plaintiff appears to allege that the directors lacked independence concerning those payments, because of the Carlyle Defendants' influence. To successfully avoid the business judgment rule presumption, Plaintiff will have to show that directors were ?beholden? to [the Carlyle Defendants] or so under their influence that their discretion would be sterilized.? *Orman,* 794 A.2d at 24. For the allegations to survive this Motion, Plaintiff must allege the supporting facts ?necessary to provide the [Defendants] fair notice of the [Plaintiff's] claim and the ?grounds upon which it rests.? ? *Tower Air,* 416 F.3d at 237 (quoting *Conley,* 355 U.S. at 47).

Four of the ten directors in place between 1999 and 2002, defendants D'Aniello, Dolan, Harvey, and Watkins, had other connections to the Carlyle Defendants, and two of those, D'Aniello and Dolan, were Managing Directors of The Carlyle Group. (*Id.* at ¶¶ 3-4, ¶ 7, ¶ 11.) Two other directors, defendants Gibson and Pugliese, were elected by the Carlyle Defendants. (D.I. 39, Ex. D at A-0025.) Thus, before 1999, five of nine directors were elected by the Carlyle Defendants. (*See id.*) After 1999, five of ten directors were elected by the Carlyle Defendants (*see id.*), and a sixth director, Harvey, allegedly had other connections to the Carlyle Defendants (Complaint, D.I. 30 at ¶ 4). These alleged connections would not be sufficient on their own to prove that these six directors lacked independence. *See Aronson,* 473 A.2d at 816 (?[I]t is not enough to charge that a director was nominated or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director.?) Nor do they show anything about the remaining director defendants, McGill, Pogue, Schmidt, and DeLuca.

Thus, the claim of a lack of independence is based largely on the allegations that the Carlyle Defendants ?took control? of the IT Group in or around November 1996 (Complaint, D.I. 30 at ¶ 31), and that ?[a]t all relevant times, the Carlyle Defendants possessed and exercised control over the IT Group? (*id.* at ¶ 14). Actual control of the IT Group's operations by the Carlyle Defendants, if proved, would support a conclusion that some or all of the directors lacked independence concerning payments made to the Carlyle Defendants. Thus, while I seriously doubt that the conclusory allegations of control in the Complaint would survive a 12(b)(6) motion in the Delaware Court of Chancery, they do put Defendants on notice that the claim here is based on the Carlyle Defendants' actual control of the IT Group and the lack of independence of the directors concerning payments to this controlling group. Given that the Third Circuit has emphasized the view that the Federal Rules of Civil Procedure do not require a plaintiff to plead detailed facts to make out a claim for breach of fiduciary duties under Delaware law, *Tower Air,* 416 F.3d at 236-39, I am bound to hold that the Plaintiff's allegations are sufficient in this case.[FN10]

FN10. A lengthy digression here will, I hope, be excused. The Third Circuit noted in *Tower Air,* 416 F.3d at 236-37 & n. 11, that when a state procedural rule conflicts with an on-point Federal Rule of Civil Procedure, a federal court should apply the Federal Rule. *See Hanna v. Plumer,* 380 U.S. 460 (1965) (applying the federal standard for service of process). That proposition is beyond dispute. However, the Delaware requirement that there be more than conclusory allegations to support fiduciary duty claims does not appear to me to be simply a matter of procedure. Rather, the pleading requirements shape the substance of fiduciary duty claims by enforcing the business judgment rule, which is fundamental to Delaware corporate law.

The business judgment rule reflects the understanding that the directors of a corporation are entrusted with that corporation's management, and that directors cannot guarantee the success of their decisions. Thus, ?in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith.? *Gagliardi v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1051 (Del. Ch.1996).

This rule is a matter of substantive corporate law. *See Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d 53, 64 (Del.1989) (?The [business judgment] rule operates as both a procedural guide for litigants and a substantive rule of law.?) First, it prevents the courts from second-guessing the decisions of directors and officers based on results of those decisions rather than on the care, loyalty, and good faith of the directors making the decision. Thus, the rule keeps courts from ?injecting themselves into a management role for which they were neither trained nor competent.? *Weiss v. Temporary Inv. Fund,* 692 F.2d 928, 941 (3d Cir.1982). Second, the business judgment rule protects ?against a threat of sub-optimal risk acceptance.? *Gagliardi,* 683 A.2d at 1052. As a policy matter, directors should not be overly risk averse. ?Shareholders' investment interests, across the full range of their diversifiable equity investments, will be maximized if corporate directors and managers honestly assess risk and reward and accept for the corporation the highest risk adjusted returns available that are above the firm's cost of capital.? *Id.* Imposing liability for corporate losses on directors and officers will tend to deter them from seeking this optimum level of risk.

To implement the business judgment rule, the substance of Delaware corporate law includes a presumption that, absent self-interest or lack of independence, ?the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company.? *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984). The plaintiff ?may prevent the application of the business judgment rule with well-pleaded facts establishing that the directors acted out of self-interest,? and ?in order to overcome the presumption of the business judgment rule [the plaintiff] must allege with particularity facts which establish that the contested decision was not a product of valid business judgment.? *In re General Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119, 1132 (D.Del.1988) (citing *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988); *Aronson,* 473 A.2d at 812); *see also Crescent/Mach I Partners L .P. v. Turner,* 846 A.2d 963, 984 (Del. Ch.2000) (?in order for plaintiffs' duty of care claims to survive a motion to dismiss, they must sufficiently plead facts which if true would take defendants' actions outside the protection afforded by the business judgment rule.?); *Ash v. McCall,* No. CIV.A.17132, 2000 WL 1370341, at *10

(Del. Ch. Sept. 15, 2000) (?[T]his Court has stated on several occasions that mere allegations that directors made a poor decision ... [do] not state a cause of action....?).

Having been taken to task once for citing derivative suit precedents in a direct action, *Tower Air,* 416 F.3d at 236 (?[T]he District Court (mistakenly) cited derivative suit pleading cases....?), I hasten to note that, as on that earlier occasion, I cite the foregoing cases not under some confusion that this is a derivative suit but for the specific point they make about the protections of the business judgment rule. Those protections are a substantive point of law that, I believe, stands largely independent both of the procedural distinction between direct and derivative actions, *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb,* 385 F.Supp.2d 449, 457 & n. 6 (D.Del.2004), and of the notice purpose inherent in procedural rules of pleading, *Stanziale v. Nachtomi,* No. CIV.A.01-403, 2004 WL 1812705, at *2 (D.Del. Aug. 6, 2004). In sum, though the Third Circuit apparently views the requirement for pleading facts in a context like this as a peculiarity of Delaware procedural law, *see Tower Air,* 416 F.3d at 236-37 (?Delaware courts consider Chancery Rule 8 specificity requirements as consonant with notice pleading, but such notice pleading bears scant resemblance to the federal species.?) (citation omitted), it appears to me to be instead an implementation of the substantive presumption of the business judgment rule. This is true even though the standard of pleading ?particularized? facts may be more stringent in a derivative action, governed by Rule 23.1, than in a direct action being challenged under Rule 12(b)(6). Cf. *Telxon Corp. v. Bogomolny,* 792 A.2d 964, 974 (Del. Ch.2001) (stating that the ?high burden of pleading with particularity facts supporting the reasonableness? of the alleged claims required to withstand a motion to dismiss under Rule 23.1 ?is somewhat lower? under Rule 12(b)(6)). My understanding is that, even in the latter circumstance, sufficient factual specificity must be included in the complaint to raise a rational inference that the duty in question has been breached. The Third Circuit may be correct that this approach bears ?scant resemblance? to simple notice pleading, but the difference is an entirely deliberate decision of substantive Delaware law, not a procedural peccadillo.

The *Tower Air* holding requires directors to face greater expense and risk in a federal court than they would in state court, because plaintiffs in a bankruptcy adversary proceeding can now more easily survive a Rule 12(b)(6) motion and therefore will have easier access to litigation and the opportunity to impose the burdens of litigation on corporate officials. This result is troubling for at least three reasons. First, and most fundamentally, if I am correct that we are dealing with substantive law here, the *Tower Air* approach creates a disparity between state and federal courts of the type condemned in *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938). The outcome of an application of Delaware corporate law ought not turn on whether one is appearing in the Delaware Court of Chancery or a federal district court.

Second, as a matter of public policy, it makes little sense to expand the risk of directors and officers simply because a corporation is insolvent. This case is brought as a direct rather than a derivative action solely because the IT Group became insolvent and its board was displaced by a bankruptcy trustee. As the Delaware Chancery Court has rightly noted, ?[i]t would be puzzling if, in insolvency, the equitable law of corporations expand[ed] the rights of firms to recover against their directors so to better protect creditors, who, unlike shareholders, typically have the opportunity to bargain and contract for additional protections to secure their positions.? *Prod. Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 794 (Del. Ch.2004).

Third, the approach dictated by the Third Circuit in *Tower Air* does not merely make particularized pleading unnecessary; it actively penalizes it and, instead, rewards obscurity. Calling the business judgment rule presumption an affirmative defense, the Court of Appeals stated, ?[g]enerally speaking, we will not rely on an affirmative defense ... to trigger dismissal of a complaint under Rule 12(b)(6).? *Tower Air,* 416 F.3d at 238. It went on to say, however, that where the plaintiff mentions an affirmative defense in the complaint, that defense can be a basis of dismissal. *Id.* Thus, plaintiffs are given a powerful and perverse incentive to ?dummy-up? about the obvious implications of the business judgment rule when drafting their complaints in the first instance. Any plaintiff unwise enough to actually allude to the rule ?must plead that he overcomes the presumption created by that rule.? *Id.* Since the standard to be applied is the notice pleading standard of Federal Rule of Civil Procedure 8, a pleading will not be insufficient for failure to include particularized facts. But it can be ?self-defeating? by giving such facts, if they offer ?an ostensibly legitimate business purpose for an allegedly egregious decision.? *Id.* at 239. In short, because the Third Circuit sees a problem not when facts are omitted but only when they are presented, *see id.* (?The problem ... is not the facts that are not pleaded, but the facts that are.?), the predictable and unfortunate result will be deliberately obtuse allegations. That is an outcome that truly bears scant resemblance to the operation of the business judgment rule in Delaware courts.

To conclude, the business judgment rule's presumption is a matter of substantive Delaware law. The *Tower Air* opinion requires me to apply a pleading standard far weaker than what I believe to be the Delaware requirement for pleading facts to overcome that presumption. I am uncomfortable changing the scope of Delaware fiduciary duty claims by weakening a substantive presumption, but, given the ruling in *Tower Air* and the lack of any Delaware authority directly stating that the *Tower Air* approach contravenes Delaware law, I must yield to the Third Circuit's interpretation.

*9 In Count VI, discussed below in Section IV.B.4, Plaintiff also describes payments made to individual directors. (Complaint, D.I. 30 at ¶¶ 81-87.) None of the fiduciary duty counts point specifically to those payments, which are only mentioned later in Count VI, and Plaintiff may not have intended them to form the basis for fiduciary duty claims. But even if Plaintiff intended to include them in the ?transfers to insiders? alleged in Counts I and II, the allegations concerning those payments are insufficient to meet even notice pleading requirements. Plaintiff alleges nothing other than the amounts and that the payments were made in satisfaction of antecedent debts and are avoidable preferences under Bankruptcy Code. (See id. at ¶¶ 81-87, ¶ 92.) No other information is given about the nature of the payments or the antecedent debts. Importantly for any fiduciary duty claims, the board is not alleged to have made any decision or acted in any way concerning those payments. And again, Plaintiff does not give notice in the Complaint that the payments to individual directors, mentioned only in Count VI, were intended to form the basis for claims in Counts I and II. Thus, even though particularized fact pleading is not required, the Complaint fails to give any satisfactory notice of a fiduciary duty claim based on those payments to individual directors.

Therefore, the Complaint states a claim against the directors for breach of their duty of loyalty in approving payments to the Carlyle Defendants and artificially extending the life of the Company to continue making those payments. Those two aspects of Counts I and II, as asserted against the directors, survive this Motion.

### ii. Officers

Counts I and II allege that the IT Group's officers breached their fiduciary duties, based on the same allegations that were made against the directors. Defendant Soose is the only officer named in the Complaint who was not also a director, but the Complaint alleges nothing about Soose other than his residence and position with the Company. (See Complaint, D.I. 30 at ¶ 13.) Soose is not alleged to have benefitted from any payments or to have been involved in the decisions to make payments. Therefore, the duty of loyalty claims in Counts I and II must be dismissed as to Soose.

The only other officer mentioned in the Complaint, DeLuca, was also a director during the alleged events. (See id. at ¶ 12.) Since no allegations are made against DeLuca based on his actions as an officer separate from those he supposedly took as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.1.a.i.

### iii. Carlyle Defendants

Under Delaware law, a shareholder will owe fiduciary duties to a corporation, including the duty of loyalty, ?only if [that shareholder] owns a majority interest in or exercises control over the business affairs of the corporation.? *Ivanhoe Partners v. Newmont Mining Corp. (In re Newmont Mining Corp. S'holders Litig.)*, 535 A.2d 1334, 1344 (Del.1987). A dominating shareholder may, therefore, be subject to a claim for breach of a duty of loyalty, if that shareholder stands on both sides of a transaction.

*10 Here, the issue is not whether the Carlyle Defendants were interested in the transactions that resulted in payments made to them. Obviously, they were; they derived a personal benefit that was not received by stockholders generally. *Aronson*, 473 A.2d at 812. The issue as to the Carlyle Defendants is whether they owed any fiduciary duties to the Company at all, i.e., whether they were controlling shareholders of the IT Group. As for the claims against the directors concerning the payments to the Carlyle Defendants, those claims depend on the allegations of actual control by the Carlyle Defendants over the IT Group directors. (See Complaint, D.I. 30 at ¶ 14, ¶ 31.) If Plaintiff can prove that the Carlyle Defendants exercised such control, then they owed fiduciary duties to the Company, and, as interested fiduciaries, may be liable on a duty of loyalty claim.

As discussed regarding the claims against the directors, *supra* Section IV.B.1.a.i, the allegations of control and self-interest put Defendants, including the Carlyle Defendants, on notice of Plaintiff's claim, satisfying the pleading standard set forth in *Tower Air*. The duty of loyalty claims set forth against the Carlyle Defendants in sections (g) and (h) of Count IV therefore survive the Motion to Dismiss for failure to state a claim.[FN11]

> FN11. Count IV actually alleges that the directors and officers breached various fiduciary duties, revealing that the allegations from Counts I and II were simply pasted into a count against the Carlyle Defendants. (See Complaint, D.I. 30 at ¶ 74.) However, the title indicates that Count IV is intended to make allegations against the Carlyle Defendants, and so I treat the Complaint as fairly making those allegations.

### b. Duty of Care

The remaining eight breaches alleged in Counts I, II, and IV are breaches of the duty of care. Plaintiff alleges that Defendants: first, ?fail[ed] to inform themselves of all material information readily available to them,? (Complaint, D.I. 30 at ¶ 61(a), ¶ 65(a), ¶ 74(a)); second, ?incurr[ed] Acquisitions for more than the fair value of such Acquisitions and increas[ed] the Company's debts through such Acquisitions,? (*id.* at ¶ 61(b), ¶ 65(b), ¶ 74(b)); third, ?deepen[ed] the Company's insolvency,? (*id.* at ¶ 61(c), ¶ 65(c), ¶ 74(c)); fourth, ?fail[ed] to preserve, maximize, and not dissipate the assets for the benefit of the Company and its creditors,? (*id.* at ¶ 61(d), ¶ 65(d), ¶ 74(d)); fifth, ?knowingly or recklessly ignor[ed] facts of, [sic] the Company's insolvency, that it was in the vicinity of insolvency, and was inadequately capitalized,? (*id.* at ¶ 61(e), ¶ 65(e), ¶ 74(e)); sixth, ?pursu [ed] a ?Roll-Up Strategy? long after they knew or should have known it was a failure,? (*id.* at ¶ 61(f), ¶ 65(f), ¶ 74(f)); seventh, ?fail[ed] to timely retain restructuring advisors in order to fully inform themselves of their duties and to take steps necessary and appropriate to maximize the value of the Company for its creditors,? (*id.* at ¶ 61(i), ¶ 65(i), ¶ 74(i)); and eighth, ?wast[ed] corporate assets,? (*id.* at ¶ 61(j), ¶ 65(j), ¶ 74(j)). Again, the claims against the directors, the officers, and the Carlyle Defendants are discussed in turn.

#### i. *Directors*

Directors must ?inform themselves ... of all material information available to them [and] ... must then act with requisite care in the discharge of their duties.? *Aronson*, 473 A.2d at 812. The duty of care claims [FN12] must be dismissed, however, because the IT Group's Certificate of Incorporation contains an exculpation provision that states:

> FN12. To the extent that these allegations relate to the payments to insiders or to the deliberate, artificial extension of the IT Group's life during insolvency to recoup the Carlyle Defendants' investments, they are really duty of loyalty claims and have already been discussed, Section IV.B.1.a. Read in the light most favorable to Plaintiff, the remaining duty of care claims allege, in parts (b)-(d), (f), and (j), poor decision-making concerning the Roll-Up acquisitions, and, in parts (a), (e), and (i), a failure to make informed decisions about the Roll-Up Strategy and the accompanying debt.

**\*11** A director of this Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such limitation of liability is prohibited by the Delaware General Corporation Law as the same exists or may hereafter be amended.
(D.I. 39 at A-0028.) This provision was adopted pursuant to § 102(b)(7) of Delaware's General Corporation Law, 8 *Del.Code* § 102(b)(7), which provides:
[T]he certificate of incorporation may ... contain ... (7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

The exculpatory provisions of § 102(b)(7) apply to claims brought by creditors of an insolvent corporation. *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 793-95 (Del. Ch.2004). Once the § 102(b)(7) provision is raised against duty of care claims, that is ?the end of the case.? *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del.2001).[FN13]

> FN13. The Third Circuit declined to address an exculpatory charter provision in *Tower Air*, because the provision was raised for the first time on appeal. 416 F.3d at 242. The Delaware Supreme Court held in reviewing a 12(b)(6) motion that, while a § 102(b)(7) clause provides an affirmative defense, ?proving the existence of a valid exculpatory provision ... entitles directors to dismissal of any claims ... against them that are based solely on alleged breaches of the board's duty of care.? *Malpiede v. Townson*, 780 A.2d 1075, 1095-96 n. 71 (Del.2001).

Thus, while the duty of loyalty claims are unaffected, the directors are protected by § 102(b)(7) against liability for breaching the duty of care. Counts I and II against the directors, to the extent that those counts allege breaches of the duty of care, must therefore be dismissed.

#### ii. *Officers*

Again, Counts I and II allege that the IT Group's officers breached their fiduciary duties, based on the same

allegations that were made against the directors. And again, the Complaint alleges nothing about defendant Soose other than his residence and position with the Company. (*See* Complaint, D.I. 30 at ¶ 13.) Because he is not alleged to have taken part in the decisions that form the basis of Plaintiff's complaint, the duty of care claims against Soose in Counts I and II must be dismissed. Therefore, these two counts are dismissed in their entirety as to Soose.

As discussed above, Section IV.B.1.a.ii, defendant DeLuca was a director and an officer. (*See id.* at ¶ 12.) Again, since no allegations are made against DeLuca based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above. Section IV.B.1.b.i.[FN14]

> [FN14.] Even if the Complaint alleged a breach of the duty of care by DeLuca in his capacity as officer, which it does not, such an allegation, like the duty of care allegations against the Carlyle Defendants, would fail to overcome the business judgment rule. *See infra* Section IV.B.1.b.iii.

### iii. *Carlyle Defendants*

In Count IV, Plaintiff alleges that the Carlyle Defendants have committed the same breaches of fiduciary duties as have the directors and officers, the duties of the Carlyle Defendants arising from control over the IT Group directors. As I noted in the discussion about the directors' alleged breaches, *supra* Section IV.B.1.b.i, these allegations against the Carlyle Defendants, read in the light most favorable to Plaintiff, concern poor decision-making about the Roll-Up acquisitions, and a failure to make informed decisions about the Roll-Up Strategy and the accompanying debt. Again, to the extent that these claims are made concerning the payments to insiders or concerning the deliberate, artificial extension of the IT Group's life during insolvency to recoup the Carlyle Defendants' investments, they are really duty of loyalty claims and have already been discussed, *supra* Section IV .B.1.a.iii. The remaining claims, therefore, center on the failed Roll-Up strategy.

**\*12** While the § 102(b)(7) charter provision protects only directors from duty of care claims, to the extent that Plaintiff is seeking to hold the Carlyle Defendants responsible for those alleged breaches, the Complaint fails to state a claim. Plaintiff is not required to plead detailed facts, but must still ?plead around the business judgment rule.? *Tower Air,* 416 F.3d at 238. Thus, even at the pleading stage, if facts alleged in a complaint show ?an ostensibly legitimate business purpose for an allegedly egregious decision,? then the complaint fails to state a claim for which relief can be granted. *Id.* at 239.

Here, Plaintiff alleges that the Roll-Up Strategy was implemented ?to grow the company by acquiring companies engaged in the same or similar lines of business.? (Complaint, D.I. 30 at ¶ 32.) Further, while the IT Group's debt increased during this time, the Roll-Up Strategy increased revenues from approximately $360 million in 1997 to approximately $1.4 billion in 2000. (*Id.* at ¶ 44.) While the strategy ?did not provide the Company with the desired benefits,? (*id.* at ¶ 48), the fact that the strategy was implemented to achieve benefits for the Company shows that it had a legitimate business purpose. Thus, the Complaint is ?self-defeating,? *see Tower Air,* 416 F.3d at 239 (?[A] complaint is self-defeating when it states an ostensibly legitimate business purpose for an allegedly egregious decision.?), to the extent that it claims that implementing the Roll-Up Strategy was a breach of the duty of care. Even if the strategy was unwise in retrospect, it is protected in this case by the presumptions of the business judgment rule.

Therefore, to the extent that Count IV alleges that the Carlyle Defendants breached their duty of care, it fails to state a claim and is dismissed.

### 2. *Count III-Waste of Corporate Assets*

In Count III, Plaintiff alleges that the directors and officers have wasted corporate assets through the same actions that are alleged to constitute breaches of their fiduciary duties. (Complaint, D.I. 30 at ¶ 69(a)-(h).) For a transaction to amount to waste, it must be ?so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.? *In re Walt Disney Co. Derivative Litig.,* 731 A.2d 342, 362 (Del. Ch.1998).

### a. *Directors*

Because Plaintiff's allegations of waste mirror those concerning breach of fiduciary duties, they concern two sets of transactions. The first set of transactions involves payments made to some of the Defendants, including the Carlyle

Defendants. Defendants argue that the pleadings are insufficient. As discussed above, *supra* Section IV.B.1.a.i, the Complaint sufficiently alleges that payments were made to the Carlyle Defendants in violation of the directors' duties of loyalty, and the Company is alleged to have received no consideration in return for those multimillion dollar payments. Thus, for claims of waste based on those payments, Defendants have not shown that Count III fails to state a claim.

**\*13** However, as discussed *supra* Section IV.B.1.a.i, the Complaint fails to state a claim for breach of fiduciary duty based on payments made to individual defendants. Since Count III provides no additional information, the Complaint similarly fails to state a claim for waste based on those payments.

The second set of transactions involves the Roll-Up acquisitions, for which the IT Group allegedly received inadequate consideration. While those acquisitions may appear unwise in retrospect, they do not raise a duty of loyalty question, and so, like the duty of care claims in Counts I and II, the § 102(b)(7) provision protects the directors from liability for those transactions. *See Green v. Phillips*, C.A. No. 14436, 1996 WL 342093, at \*6-\*7 (Del. Ch. June 19, 1996) (holding that a § 102(b)(7) provision protected directors from corporate waste claims based on transactions that did not ?bring the directors' loyalty and good faith into question?).

Therefore, the claims of corporate waste against the directors based on the payments to the Carlyle Defendants (Complaint, D.I. 30 at ¶ 69(f)-(g)) survive the Defendants' 12(b)(6) motion, while the other claims of corporate waste (*id.* at ¶ 69(a)-(e), (h)) must be dismissed.

### b. *Officers*

The allegations in Count III mirror those in Counts I and II. And just as Counts I and II make no allegations against defendant Soose, *see supra* Sections IV.B.1.a.ii, IV.B.1.b.ii, Count III likewise makes none, and that count against Soose will be dismissed as well.

Again, since no allegations are made against DeLuca based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.2.a.

### 3. *Count V-Aiding and Abetting Claim Against the Carlyle Defendants*

In Count V, Plaintiff alleges that the Carlyle Defendants aided and abetted the other Defendants' breaches of fiduciary duties. To succeed in this claim, Plaintiff must show: ?(1) the existence of a fiduciary relationship; (2) a breach of that relationship; and (3) knowing participation by the defendant in the fiduciary's breach.? *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 989 (Del. Ch.2000). While the parties agree that a fiduciary relationship existed between the IT Group directors and officers and the Company, Defendants argue that Plaintiff has failed to allege a breach or the knowing participation in that breach by the Carlyle Defendants. As with the duty of loyalty claims already discussed, Defendants' argument fails.

First, as discussed above, Section IV.B.1.a.i, Plaintiff has adequately alleged a breach of the duty of loyalty by the IT Group directors concerning the payments made to the Carlyle Defendants and artificially extending the life of the IT Group to keep those payments going. Second, again as earlier discussed, Section IV.B.1.a .iii, the allegations of the Carlyle Defendants' actual control of the IT Group board are sufficient to survive the 12(b)(6) motion, and knowing participation could be inferred from that alleged control. Thus, contrary to Defendants' argument, Plaintiff has alleged a breach and the knowing participation in the breach by the Carlyle Defendants, and so Count V adequately alleges that the Carlyle Defendants aided and abetted the directors' breach of their duty of loyalty. By contrast, the duty of care claims in Counts I and II cannot succeed, *see supra* Sections IV.B.1.b.i-ii, and so to the extent that Count V alleges aiding and abetting of those supposed breaches, it too must be dismissed.

### 4. *Count VI-Avoidance Claims Under 11 U.S.C. § 547*

**\*14** In Count VI, Plaintiff sets out payments made to Gibson, Pogue, Harvey, Pugliese, Schmidt, Watkins, and the Carlyle Defendants that the Plaintiff seeks to avoid as preferential transfers pursuant to 11 U.S.C. §§ 547(b), 550. The Complaint lists specific amounts transferred to the mentioned individual defendants and $2,076,000 transferred to the Carlyle Defendants. (D.I. 30 at ¶¶ 82-88.) The Complaint further alleges that the payments were made within one year of the bankruptcy petition date (*id.* at ¶ 81) to creditors (*id.* at ¶ 89) who are also insiders (*id.* at ¶ 90), that the payments were made on account of antecedent debt (*id.* at ¶ 92), were made while the IT Group was insolvent (*id.* at ¶

93), and enabled the listed Defendants to receive more than they would in the circumstances set forth in 11 U.S.C. § 547(b)(5) (*id.* at ¶ 94). Defendants argue that those allegations, which mostly mirror the statutory language in § 547(b), are insufficient and that Count VI must be dismissed.

Defendants base their argument on pleading requirements set out in *TWA, Inc. v. Marsh USA Inc. (In re TWA Inc.)*, 305 B.R. 228, 232 (Bankr.D.Del.2004), and *Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.)*, 288 B.R. 189, 192 (Bankr.D.Del.2003). Those cases instruct that, ?to survive a motion to dismiss,? a complaint must include: ?(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer.? *TWA*, 305 B.R. at 232; *Valley Media*, 288 B.R. at 192. Because such information is lacking in the present Complaint, in which the only specific information is the amounts transferred, Defendants conclude that the pleading is inadequate. Further, according to Defendants, the listing of the payment made to the Carlyle Defendants as a group rather than to each individual entity reduces to guesswork any effort to understand which payments were made to whom.

The pleading standard described in *TWA* and *Valley Media* has sometimes been viewed as inconsistent with the liberal pleading requirements of Federal Rule of Civil Procedure 8. *See Official Comm. of Unsecured Creditors of The IT Group v. Brandywine Apartments (In re The IT Group, Inc.)*, 313 B.R. 370, 373 (Bankr.D.Del.2004); *Neilson v. Southern (In re Webvan Group, Inc.)*, Adv. Proc. No. 03-54365, 2004 WL 483580, at *2 (Bankr.D.Del. Mar. 9, 2004). It has been rightly observed that, ?[w]hile plaintiffs should be encouraged to provide specific information in support of their claims whenever possible, to require them to do so in their initial pleading in all cases ... [is] inappropriate and unnecessarily harsh.? *IT Group*, 313 B.R. at 373. Even though the information listed in *TWA* will eventually need to be proved, ?it does not follow that it must be pleaded on pain of dismissal.? [FN15] *Id.* (quoting *Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs., Inc.)*, 290 B.R. 55, 65 (Bankr.S.D.N.Y.2003)).

> FN15. Notably, in *TWA*, the court gave the plaintiff leave to amend and agreed that the articulated standard might need to be relaxed in that case to allow the plaintiff to pursue details in discovery. 305 B.R. at 233-34.

**\*15** Here, Plaintiff has described specific amounts paid to specific Defendants in the Complaint (D.I. 30 at ¶¶ 82-88), providing more information than did the complaint discussed in *TWA, see* 305 B.R. at 232 (?Within 90 days prior to the Petition Date, Marsh received payments from Debtors of approximately two million dollars.?). Also, even though the Carlyle Defendants are grouped together as receiving a payment of $2,076,000 (D.I. 30 at ¶ 88), the information is sufficient to give the Defendants notice of the basis of the avoidance claim, given the relationship alleged between the Carlyle Defendants. That is all that Rule 8 requires. *Conley*, 355 U.S. at 47.

Accordingly, I decline to hold the Complaint to the pleading standard set forth in *TWA* and *Valley Media*. Count VI is sufficient to withstand the motion to dismiss.

### 5. *Counts VII and VIII-Fraudulent Transfer Claims*

In Count VII, Plaintiff alleges that the dividend payments made to the Carlyle Defendants were constructively fraudulent transfers that Plaintiff can recover pursuant to 11 U.S.C. §§ 544 and 548. In Count VIII, Plaintiff alleges that both the dividend payments in Count VII and the payments described in Count VI were actual fraudulent conveyances in violation of 11 U.S.C. § 544 and the Delaware Uniform Fraudulent Transfer Act. Defendants attack both the sufficiency of the pleadings and their timeliness.

First, Defendants argue that Count VII fails to give fair notice of the basis for alleging a violation of § 544. According to Defendants, the claim (1) lists payments made to the Carlyle Defendants as a group rather than individually; (2) fails to specify the relevant state law; (3) fails to specify an ?actual creditor? as required by § 544(b); and (4) fails to disclose how the IT Group received less than reasonably equivalent value or fair consideration for those payments.

Reading the Complaint in the light most favorable to Plaintiff, these arguments must fail. First, because the payments were dividends associated with the Carlyle Defendants' preferred stock, grouping the payments together does not force the Defendants to guess about which payments are described or who received them. Second, when read with the allegations in Count VIII, the relevant state law is identified as that of Delaware. Third, ?for purposes of Rule 12(b)(6), courts do not generally require a trustee to plead the existence of an unsecured creditor by name.? *Pardo v. Avanti Corporate Helath Sys., Inc. (In re APF Co.)*, 274 B.R. 634, 639 (Bankr.D.Del.2001). In any case. Plaintiff represents the interests of the unsecured creditors that are beneficiaries of the Litigation Trust. Finally, as discussed

above concerning the corporate waste claims, Plaintiff alleges that the IT Group received no consideration for those payments. Thus, Defendants are given fair notice of the basis of the § 544 claim in Count VII.

Next, Defendants argue that the § 548 claim of Count VII is untimely because it seeks to recover payments made more than one year prior to the bankruptcy petition date. The Bankruptcy Code allows the trustee to ?avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the [debtor's] petition.? 11 U.S.C. § 548(a)(1). The IT Group filed its petition on January 16, 2002, so any transfers made before January 16, 2001 are outside the scope of § 548. Therefore, the § 548 claim for the dividends paid from 1998 to 2000 must be dismissed (*see* Complaint, D.I. 30 at ¶¶ 99-102), while the claim for payments made on or after January 16, 2001 (*see id.* at ¶ 103) may continue.

**\*16** As to Count VIII, Defendants argue that the claims for fraudulent conveyances are untimely to the extent that they seek to recover transfers made before January 28, 2001. Delaware's Uniform Fraudulent Transfer Act provides that:
A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought ... within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant.

6 *Del.Code* § 1309(1). Since the Complaint was filed on January 28, 2005, Defendants argue that any claim for a payment made prior to January 28, 2001 is extinguished. But Plaintiff correctly points out that there is a factual issue concerning when the payments were or could reasonably have been discovered. Therefore, dismissal is inappropriate at the pleading stage.

Accordingly, Counts VII and VIII survive this 12(b)(6) motion, except for the § 548 claims under Count VII for payments made prior to January 16, 2001, which must be dismissed.

### 6. Count IX-Unlawful Payment of Dividends Claim

In Count IX, Plaintiff alleges that the directors violated § 174 of the Delaware General Corporation Law, 8 *Del.Code* § 174, by paying dividends to the Carlyle Defendants from 1998 to 2001 while the IT Group was insolvent. *See EBS Litig. LLC v. Barclays Global Investors, N.A.,* 304 F.3d 302, 305 (3d Cir.2002) (?[I]f the stock dividend occurred when [the company] was insolvent, or rendered [it] insolvent, it was illegal under Delaware law.?). Defendants argue that the pleadings insufficiently allege both the IT Group's insolvency during the time when the dividends were paid and the directors' knowledge of the insolvency. However, those arguments are not well-founded. The Complaint alleges that the IT Group was insolvent or in the vicinity of insolvency as early as March 1998. (D.I. 30 at ¶ 47.) Further, the booked goodwill associated with the Roll-Up acquisitions is alleged to have inflated the IT Group's assets. (*Id.* at ¶ 41.) Finally, Defendants are alleged to have artificially extended the life of the insolvent IT Group in order to keep making payments to the Carlyle Defendants (*id.* at ¶ 61, ¶ 65, ¶ 69, ¶ 74), which is relevant for both the allegations of insolvency and of the directors' knowledge. Again, Defendants have notice of the basis of Plaintiff's claims, and Count IX therefore survives the 12(b)(6) motion.

### V. CONCLUSION

Accordingly, I will deny the Motion to Dismiss for Lack of Subject Matter Jurisdiction. I will grant the Motion to Dismiss for Failure to State a Claim as to the following:
(1) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of care, waste of corporate assets for actions in violation of the duty of care, and aiding and abetting violations of the duty of care;
**\*17** (2) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of loyalty, waste of corporate assets, and aiding and abetting violations of the duty of loyalty based on the payments to individual defendants listed in Count VI;
(3) Counts I, II, and III to the extent that they are brought against Defendant Soose;
(4) Count VII to the extent that payments made prior to January 16, 2001 are sought to be recovered under 11 U.S.C. § 548.

I will deny the Motion to Dismiss for Failure to State a Claim in all other respects. An appropriate order will issue.

D.Del.,2005.
In re IT Group Inc.
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)

Briefs and Other Related Documents (Back to top)

? 2006 WL 1435863 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Renewed Motion of Defendants Carlyle International Partners II, L.P., Carlyle International Partners III, L.P., C/S International Partners, Carlyle-It International Partners, L.P., Carlyle-It International Partners II, L.P ., and Richard W. Pogue to Dismiss for Lack of Personal Jurisdiction (Apr. 10, 2006) Original Image of this Document (PDF)
? 2006 WL 1199858 (Trial Pleading) Answer and Affirmative Defenses of Defendants the Carlyle Group, Carlyle Partners II, L.P., Carlyle Sbc Partners II, L.P., Carlyle Investment Group, L.P., Carlyle-It Partners, L.P. and T.C. Group, LLC (Mar. 8, 2006) Original Image of this Document (PDF)
? 2006 WL 1199859 (Trial Pleading) Answer and Affirmative Defenses of Defendant D'Aniello (Mar. 8, 2006) Original Image of this Document (PDF)
? 2006 WL 1199860 (Trial Pleading) Answer and Affirmative Defenses of Defendant Dolan (Mar. 8, 2006) Original Image of this Document (PDF)
? 2006 WL 1199861 (Trial Pleading) Answer and Affirmative Defenses of Defendant Gibson (Mar. 8, 2006) Original Image of this Document (PDF)
? 2006 WL 1199862 (Trial Pleading) Answer and Affirmative Defenses of Defendant Harvey (Mar. 8, 2006) Original Image of this Document (PDF)
? 2006 WL 1199863 (Trial Pleading) Answer and Affirmative Defenses of Defendant McGill (Mar. 8, 2006) Original Image of this Document (PDF)
? 2006 WL 1199864 (Trial Pleading) Answer and Affirmative Defenses of Defendant Pugliese (Mar. 8, 2006) Original Image of this Document (PDF)
? 2006 WL 1199865 (Trial Pleading) Answer and Affirmative Defenses of Defendant Schmidt (Mar. 8, 2006) Original Image of this Document (PDF)
? 2006 WL 1199866 (Trial Pleading) Answer and Affirmative Defenses of Defendant Watkins (Mar. 8, 2006) Original Image of this Document (PDF)
? 2006 WL 1199857 (Trial Pleading) Answer and Affirmative Defenses of Defendant Anthony J. Deluca to the First Amended Complaint (Mar. 7, 2006) Original Image of this Document (PDF)
? 2006 WL 535685 (Trial Motion, Memorandum and Affidavit) Defendant Harry J. Soose. Jr.s Opposition to Plaintiffs Motion for Leave to File A Second Amended Complaint (Feb. 06, 2006)
? 2006 WL 535681 (Trial Motion, Memorandum and Affidavit) Plaintiffs Memorandum in Opposition to Defendants' Joint Motion for Reconsideration and Defendants' Petition for Certification of Issues of Law to the Supreme Court of Delaware (Jan. 10, 2006)
? 2006 WL 535682 (Trial Pleading) (Proposed) Second Amended Complaint with Jury Demand Endorsed Hereon (Jan. 10, 2006)
? 2006 WL 535684 (Trial Motion, Memorandum and Affidavit) Plaintiffs Motion for Leave to File a Second Amended Complaint (Jan. 10, 2006)
? 2005 WL 2603838 (Trial Motion, Memorandum and Affidavit) Reply Brief of Appellant State of New Jersey, Department of Environmental Protection (2005) Original Image of this Document (PDF)
? 1:04cv01268 (Docket) (Sep. 15, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8



Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Khanna v. McMinnDel.Ch.,2006.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
Dhruv KHANNA, Patrick Sams, and Sybil Meisel, derivatively and on behalf of all those similarly situated, Plaintiffs,
v.
Charles MCMINN, Daniel Lynch, Frank Marshall, Richard Shapero, Robert Hawk, Robert E. Knowling, Jr., Debra Dunn, Hellene Runtagh, Larry Irving, Charles Hoffman, L. Dale Crandall, Richard A. Jalkut, and Crosspoint Venture Partners, L.P., Defendants,
andCOVAD COMMUNICATIONS GROUP, INC., a Delaware corporation, Nominal Defendant.
**No. Civ.A. 20545-NC.**

Submitted Nov. 7, 2005.
Decided May 9, 2006.

<u>Stuart M. Grant</u>, <u>Jay W. Eisenhofer</u>, <u>Michael J. Barry</u>, and <u>Cynthia A. Calder</u>, of Grant & Eisenhofer, P.A., Wilmington, Delaware; <u>Mark C. Gardy</u>, and <u>Jill Abrams</u>, of Abbey Gardy LLP, New York, New York; and <u>Curtis V. Trinko</u>, of The Law Office of Curtis V. Trinko, LLP, New York, New York, for Plaintiffs.
<u>Alan J. Stone</u>, Natalie J. Haskins, and <u>Jason A. Cincilla</u>, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; <u>Douglas M. Schwab</u>, <u>Norman J. Blears</u>, <u>Robin E. Wechkin</u>, and <u>Kristi K. Hansen</u>, of Heller Ehrman White & McAuliffe LLP, Menlo Park, California, for Defendants Charles McMinn, Daniel Lynch, Frank Marshall, Rich Shapero, Robert Hawk, Robert E. Knowling, Jr., Debra Dunn, Hellene Runtagh, Larry Irving, Charles Hoffman, L. Dale Crandall, and Richard A. Jalkut.
<u>David C. McBride</u>, <u>Danielle Gibbs</u>, and <u>Adam W. Poff</u>, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; <u>Steven M. Schatz</u>, <u>Terry T. Johnson</u>, and <u>Clayton Basser-Wall</u>, of Wilson Sonsini Goodrich & Rosati, P.C., Palo Alto, California, for Defendant Crosspoint Venture Partners, L.P.
<u>Jesse A. Finkelstein</u>, Lisa Zwally Brown, and Candice Toll Aaron, of Richards, Layton & Finger, P.A., Wilmington, Delaware; <u>Paul H. Dawes</u>, <u>Darius Ogloza</u>, <u>Jacqueline D. Molnar</u>, and <u>David M. Friedman</u>, of Latham & Watkins LLP, Menlo Park, California, for Nominal Defendant Covad Communications Group, Inc.

MEMORANDUM OPINION AND ORDER

<u>NOBLE</u>, Vice Chancellor.
*1 Plaintiff Dhruv Khanna (?Khanna?) is a cofounder and shareholder of Nominal Defendant Covad Communications Group, Inc. (?Covad?) and served as its General Counsel and Executive Vice President from its formation in 1996 until June 2002 when he was removed from these positions amidst charges of sexual impropriety. On September 15, 2003, he brought this action, both derivatively and as a class action, to challenge acts and omissions of Covad's board while he was Covad's General Counsel and to contest certain omissions and misrepresentations which he alleges impaired the accuracy of Covad's proxy statements issued in advance of shareholders' meetings.<u>FN1</u> On August 3, 2004, Sybil Meisel and Patrick Sams, also Covad shareholders, joined him as representative plaintiffs with the filing of the Amended Derivative and Class Action Complaint (the ?Amended Complaint?).

> <u>FN1.</u> Khanna, on August 11, 2003, also filed an action, under <u>8 Del .C. § 220</u>, to compel Covad to grant him access to certain of its books and records. See <u>Khanna v. Covad Commc'n Group, Inc.,</u> 2004 WL 187274 (Del. Ch. Jan. 23, 2004). For convenience, exhibits produced at the <u>§ 220</u> trial are identified as ?JTX?, and the transcript of that trial is referred to as ?Trial Tr.?

The Individual Defendants are current and former directors of Covad. Also named as a defendant is Crosspoint Venture Partners, L.P. (?Crosspoint?), a venture capital firm closely connected to some of Covad's directors, a former investor in Covad, and the principal beneficiary of some of the actions which the Plaintiffs challenge. The Plaintiffs seek to impose liability on Crosspoint under principles of fiduciary duty for certain conduct when it was a large shareholder of Covad and under notions of aiding and abetting and *respondent superior*.

The Defendants, as one would expect, have moved to dismiss the Amended Complaint under <u>Court of Chancery Rule 23.1</u> because pre-suit demand upon the board was not excused and under <u>Court of Chancery Rule 12(b)(6)</u> for failure to state a claim upon which relief can be granted. Not so typically, the Defendants have also moved to dismiss because, they contend, (1) Khanna did, in fact, make demand upon Covad's board through a letter transmitted shortly after he was terminated and (2) Khanna is not qualified to act as a representative plaintiff in this action because of his former role as General Counsel of Covad and because of the mixed motives prompting the filing of this action-not only as a shareholder, but as a disgruntled former employee. In addition, the Defendants seek dismissal of Meisel and Sams as representative plaintiffs because they are alleged to have been ?tainted? by their association with Khanna. Finally, the parties quarrel over the confidential treatment to be given to certain of Khanna's allegations. This dispute requires resolution of opposing motions relating to maintaining the Amended Complaint under seal.

## I. FACTS <u>FN2</u>

> FN2. The ?facts? are drawn primarily from the ?well-pleaded? allegations of the Amended Complaint. Some ?facts? are taken from documents (or portions thereof) incorporated into the Amended Complaint. Finally, for the debates over disqualification and confidential treatment of portions of the record, the Court looks to a broader range of sources.

Covad, a service provider of broadband internet and network access using digital subscriber line (DSL) technology, is a Delaware corporation headquartered in San Jose, California. It filed for bankruptcy in August 2001 and departed from that jurisdiction in December 2001.

### A. *The Plaintiffs' Challenges-A Brief Overview*

In the Amended Complaint, the Plaintiffs seek redress for six matters (other than disclosure claims) allegedly resulting from breaches of fiduciary duties by various Covad Directors: (1) allowing the vesting of Defendant Charles McMinn's (?McMinn?) founders' shares in Covad even though he had not satisfied the requirements for vesting; (2) permitting McMinn and Defendant Rich Shapero (?Shapero?), with Crosspoint, to develop Certive, Inc. (?Certive?), a competitor of Covad; (3) Covad's subsequent investment in Certive; (4) Covad's acquisition of BlueStar Communications Group, Inc. (?BlueStar?), an act that rescued a failing investment of Crosspoint and was the principal cause of Covad's entry into bankruptcy; (5) the BlueStar earn-out settlement; and (6) Covad's investment in DishnetDSL (?Dishnet?), an entity with which McMinn was involved, and the payments Covad made to end that relationship. Crosspoint is alleged to be liable for the adverse consequences of some of those fiduciary failures either directly, as a controlling shareholder, or as an aider and abettor and under the doctrine of *respondeat superior.*

**\*2** Additionally, Khanna, in correspondence with Covad's Board, shortly after his termination, made numerous allegations of wrongdoing against members of Covad's Board. The Plaintiffs contest the sufficiency of Covad's proxy statements in 2002, 2003, and 2004 principally because, it is alleged, the charges Khanna made against Covad's Board were not fully disclosed to the shareholders who could have used the information in determining how to vote for directors standing for reelection to the Board.

### B. *Covad's Board of Directors*

When this action was filed, Covad's Board consisted of eight directors.

### 1. *Charles McMinn*

McMinn is a founder of Covad and Chairman of its Board of Directors. He has been on the Board-with the exception of an approximately one-year absence from November 1999 to late-October 2000-since October 1996. He was the company's Chief Executive Officer and President from October 1996 to July 1998.

McMinn is also a founder of Certive, which was incorporated in July 1999, and was Certive's Chief Executive Officer from November 1999 to October 2000. McMinn served as a director of BlueStar until Covad acquired it. He is also a member of Dishnet's board.

### 2. *Robert Hawk*

Hawk has been a member of Covad's Board since April 1998. Hawk is a ?Special Limited Partner? of Crosspoint.<u>FN3</u>

It is alleged that ?through Crosspoint and directly, Hawk has owned a substantial equity interest in BlueStar.? <u>FN4</u> Through Crosspoint, Hawk owned 12% of Diamond Lane (which paid $52 million to Covad for services rendered in 1998 and 1999) and a ?significant? stake in Efficient Technologies, both of which are Covad vendors. Additionally, Hawk is alleged to have ?joined the [Covad] board as a result of his friendship, connections and/or business affiliations with Defendants Shapero and/or McMinn.? <u>FN5</u>

> <u>FN3.</u> Amended Compl. at ¶ 12.

> <u>FN4.</u> *Id.*

> <u>FN5.</u> *Id.*

### 3. *Charles Hoffman*

Since June 2001, Hoffman has been a director, President, and Chief Executive Officer of Covad. It is alleged that he was recruited by McMinn and ?immediately forged a close relationship with defendant McMinn,? <u>FN6</u> whom he regards as his boss. Hoffman receives various benefits from Covad, including a $500,000 salary, a $375,000 annual bonus, a $100,000 signing bonus, term life insurance, and stock options. <u>FN7</u>

> <u>FN6.</u> *Id.* at ¶ 17.

> <u>FN7.</u> *Id.* at ¶ 138.

### 4. *Larry Irving*

Irving has served as a member of Covad's Board since April 2000. In the Amended Complaint, the Plaintiffs identify various instances in which Irving joined other Covad directors in making, what the Plaintiffs consider, egregious decisions. <u>FN8</u>

> <u>FN8.</u> These decisions include allowing Shapero to sit on the boards of Covad competitors, allowing Hawk to maintain his investment in BlueStar, granting Hoffman an overly generous compensation package, allowing McMinn to serve on the Covad and Dishnet boards while the two companies were in litigation, and retaliating against Khanna when he objected to the Board's improper conduct. *Id.* at ¶ 139.

### 5. *Richard A. Jalkut*

Jalkut was appointed to the Covad Board on July 18, 2002. He is the President and Chief Executive Officer of TelePacific, Inc., a Covad reseller.

### 6. *Daniel Lynch*

Lynch has been a member of the Covad Board since April 1997. Lynch is a member of the Board of Advisors of Certive, <u>FN9</u> appointed soon after Covad's investment in Certive. He is also a long-time friend of McMinn. The two own homes in the same neighborhood and neighboring wineries in St. Helena, Napa. <u>FN10</u>

> <u>FN9.</u> The Amended Complaint fails to develop sufficiently, for particularized pleading purposes, the nature of Certive's Board of Advisors. It may be that appointment to this position carried significant remunerative benefits, but the Plaintiffs' conclusory pleadings in this respect fail to set forth the detail necessary to satisfy <u>Court of Chancery Rule 23.1.</u>

> <u>FN10.</u> Amended Compl. at ¶ 9.

### 7. *L. Dale Crandall*

*3 Crandall was appointed to the Covad Board on June 20, 2002. He also sits on the board of BEA Systems (?BEA?),

a company that supplies Covad with software and related support.<u>FN11</u> Covad paid in excess of $2.2 million to BEA in 2004.

> <u>FN11.</u> Calder Decl., Ex. E, at 4. These facts are drawn from Covad's 2004 Proxy Statement. Although one may doubt whether this aspect of Covad's 2004 Proxy Statement was incorporated into the Amended Complaint, this information is not outcome-determinative.

### 8. Hellene Runtagh

Runtagh has been a member of the Covad Board of Directors since November 1999. ?She became a director with the consent and approval of the McMinn-Shapero director appointees. Defendant Runtagh derived the benefits of being and remaining on the Board of Directors of, and receiving compensation from, Covad by supporting and favoring the self-dealing of other directors in the BlueStar and Dishnet Transactions.? <u>FN12</u>

> <u>FN12.</u> Amended Compl. at ¶ 15.

### C. Former Covad Board Members

A brief review of the following former Covad directors is important to understanding, as the Plaintiffs tell the story, the ?incestuous? nature of Covad's Board, as well as the transactions challenged by the Plaintiffs.

### 1. Frank Marshall

Marshall served on Covad's Board from October 1997 to December 2002 and was Covad's interim chief executive officer from November 2000 until June 2001. He also serves on Certive's Board of Advisors. He has been a partner in Sequoia Capital (?Sequoia?), a venture capital firm, which invested with Crosspoint. He is a director of NetScreen Technologies, a Covad vendor that received $33,000 from Covad in 2001. Defendant Marshall is alleged to be a longtime friend of McMinn.

### 2. Rich Shapero

Shapero served on the Covad Board-as Crosspoint's designee-from July 1997 to May 2002 and on the Covad compensation committee.

Shapero is the Managing Partner, as well as a General Partner, of Crosspoint. Crosspoint had stakes in various entities associated with Covad, such as Certive, BlueStar, Diamond Lane, and Efficient Technologies, another Covad vendor. Shapero was also a member of the boards of BlueStar and NewEdge Networks (?NewEdge?).

### 3. Robert E. Knowling, Jr.

Knowling was Covad's Chief Executive Officer and a member of Covad's Board from July 1998 until November 1, 2000. He also served as Chairman of the Board from September 1999 until his departure from Covad in November 2000. Knowling is a former colleague of Hawk, with whom he worked at ?US West Communications, Inc. and/or its affiliates.? <u>FN13</u> Covad's stock price began its ?steep descent in the [s]pring of 2000? <u>FN14</u> on Knowling's watch.

> <u>FN13.</u> Amended Compl. at ¶ 13.

> <u>FN14.</u> Id.

### 4. Debra Dunn

Dunn served on the Covad Board from April 2000 to October 2000. She is a senior executive at Hewlett-Packard. Dunn was recruited to join the Covad Board through Knowling, who served on Hewlett-Packard's Board of Directors.

### D. Crosspoint and Other Relationships

Crosspoint is a ?venture capital firm that invests in early stage companies in two strategic areas: (a) Virtual Service Providers and E-Business Services; and (b) Broadband Infrastructure.? [FN15] Crosspoint had invested in Covad, Certive, BlueStar, and NewEdge and also ?owned a significant stake in Diamond Lane and Efficient Technologies, both of which were Covad vendors.? [FN16] In addition, Crosspoint ?co-invested in one or more companies alongside? Sequoia, with which Marshall is affiliated.[FN17] As noted, Shapero serves as Crosspoint's General and Managing Partner, and Hawk is a Special Limited Partner. Crosspoint ?cashed out? its investment in Covad in ?1999-2000.? [FN18]

> FN15. *Id.* at ¶ 18.

> FN16. *Id.* NewEdge is a ?provider of dedicated internet access for businesses and communications carriers....? *Id.* at ¶ 11. Diamond Lane is ?a Covad vendor who Covad paid $52 million for services rendered in 1998 and 1999.? *Id.*

> FN17. *Id.* at ¶ 18.

> FN18. *Id.*

### E. *The Plaintiffs' Challenges*

#### 1. *The Certive Claims* [FN19]

> FN19. Although referred to, for convenience, as the ?Certive Claims,? there are three separate aspects: (1) the vesting of McMinn's ?founders' shares? (Count I); (2) the usurpation by McMinn of Covad's business opportunity with respect to the activities of Certive (Count II); and (3) the decision of Covad's Board to invest in Certive (Count III).

*4 The Plaintiffs allege that the events surrounding Covad's investment in Certive reflect a pattern of self-dealing by McMinn and Crosspoint and that various supine Covad directors were rewarded with lucrative positions in exchange for their support.

Covad went public in January 1999. McMinn was no longer chief executive officer, but needed to remain a full-time employee of Covad until November 2000 for his founders' shares to vest fully. While employed at Covad, McMinn began looking for other investment opportunities. He wrote to Knowling, then-chief executive officer of Covad: ?The taking of board seats [with Crosspoint affiliates] and coming up with ideas that Crosspoint and I could invest in is what [C]rosspoint wanted me to do and what I thought we had agreed to with me helping them.? [FN20] He justified his involvement with other companies by contending that ?these would be deals that Covad would benefit from [and] that Covad may or may not want to invest in/partner with.? [FN21] Knowling, although concerned about the example that McMinn's behavior would set for other Covad employees, eventually acquiesced: ?You are the founder and exceptions can be made to make anything work.? [FN22] Thus, McMinn received his ?founders' shares? despite the fact that he did not remain with Covad on a full-time basis until November 2000. This special treatment was not reported to Covad's shareholders.

> FN20. *Id.* at ¶ 43.

> FN21. *Id.* at ¶ 44.

> FN22. *Id.* at ¶ 46.

One of the opportunities that McMinn was pursuing involved Certive, a privately-held provider of computerized data integration services. Certive's website, as of mid-2002, explained that Certive was ?developing a full-service e-business network to provide live support and systems to entrepreneurs over a broadband connection....? [FN23] McMinn was a founder of Certive, which was incorporated in July 1999 when McMinn was a full-time employee of Covad. Crosspoint and McMinn held substantial stakes in Certive. McMinn received 1,333,333 founders' shares of Certive and invested $1 million for an additional 666,667 Series A Preferred Shares. Crosspoint received 3 million

Series A Preferred shares for an investment of $4.5 million.

> FN23. *Id.* at ¶ 47.

Certive is alleged to have been in Covad's ?line of business.? <u>FN24</u> Covad was not offered the opportunity to invest in Certive's Series A Preferred round of financing.

> FN24. *Id.* at ¶ 153.

On September 22, 1999, the Covad Board blessed McMinn's involvement and investment in Certive *ex post*. This blessing came two months after McMinn had founded Certive and one month after McMinn and Crosspoint had invested in Certive's Series A Preferred shares. Covad's Board decided that ?the company would not be interested in pursuing an investment in [Certive] on the terms and conditions offered to McMinn and Crosspoint.? <u>FN25</u> At this meeting, the Covad Board also adopted a ?corporate opportunity policy? which forbade, without prior approval, a fiduciary of Covad to sit on the board of, or invest in, a company in competition with Covad.

> FN25. *Id.* at ¶ 55.

*5 Nineteen days later, however, Covad invested in Certive's Series B-1 Preferred round of financing. Covad paid $5 million for 1,111,111 Series B-1 Preferred shares (approximately $4.50 per share). Additionally, Covad signed a Shareholders' Rights Agreement that bound Covad to vote its shares in favor of Crosspoint and McMinn's designees on the Certive Board. Hawk, Lynch, Marshall, and Knowling participated in the Covad Board's deliberations and vote.

After Covad's investment in Certive, Lynch and Marshall were invited to serve on Certive's Board of Advisers. ?[Advisory board] positions are highly sought after and potentially lucrative as advisory board members in Silicon Valley companies are given stock options which during the 1990s became a source of great wealth for many people.? FN26

> FN26. *Id.* at ¶ 56.

### 2. *The BlueStar Transactions*

For convenience, Covad's involvement with BlueStar may be viewed as two separate, although closely related, transactions: (1) the BlueStar acquisition, and (2) the BlueStar earn-out settlement.

### a. *BlueStar Acquisition*

On June 16, 2000, Covad announced that it had entered into a merger agreement with BlueStar. BlueStar sold DSL services directly to retail customers. From mid-1999 on, Crosspoint owned more than 40% of BlueStar's outstanding shares. McMinn and Hawk ?owned a substantial number of preferred shares.? <u>FN27</u> Shapero and McMinn sat on the BlueStar board.

> FN27. *Id.* at ¶ 58.

?By mid-2000, BlueStar had incurred significant debt and liabilities and was losing millions of dollars every month. Its efforts to raise money through an initial public offering of stock were unsuccessful and it (and its major investor, Crosspoint) needed a bail-out.? <u>FN28</u> Shapero lobbied Knowling for Covad to acquire BlueStar, and Covad eventually succumbed. A fairness opinion prepared by BlueStar's financial advisor for the transaction reported, ?The management of [BlueStar] ... informed us that [BlueStar], as of June 14, 2000, expected to exhaust its liquidity in the near term and did not have a financing source for funding its anticipated operating and capital needs over the following 12 months .? <u>FN29</u> In addition to BlueStar's fiscal problems, senior Covad management opposed the transaction: ?BlueStar's entire business was built on a feet-on-the-street direct sales model already tried and rejected by Covad.? <u>FN30</u> The merger is alleged to have been ?fraught with self-dealing because of the interlocking and conflicting relationships between the Covad and BlueStar boards.? <u>FN31</u>

FN28. *Id.* at ¶ 61.

FN29. *Id.* at ¶ 63.

FN30. *Id.* at ¶ 69.

FN31. *Id.* at ¶ 71.

On September 22, 2000, Covad completed the BlueStar acquisition by issuing approximately 6.1 million shares of Covad common stock to BlueStar shareholders under an exchange ratio that enabled BlueStar preferred and common shareholders to receive an average price of $14 .23 per share of Bluestar. Additionally, BlueStar's stock options and warrants were converted into approximately 255,000 Covad shares at a fair value of $6.55 per share. The total consideration Covad paid was valued at, at least, $200 million.<sup>FN32</sup> Knowling, Marshall, Lynch, Dunn, and Runtagh approved the BlueStar acquisition.

FN32. *Id.* at ¶ 73.

**\*6** The acquisition immediately appeared to be a failure as, the day after the merger was announced, Covad's shares dropped 27%. On June 25, 2001, within a year after the merger, Covad announced it was shutting down the BlueStar network and laying off more than 400 employees.

b. *BlueStar Earn-Out Settlement*

In addition to the consideration paid at the time of the merger, BlueStar shareholders were entitled to receive up to 5,000,000 additional Covad common shares at the end of 2001 if BlueStar achieved certain revenue and EBITDA goals. ?Despite BlueStar's utterly dismal performance and failure to even approach, let alone reach, its EBITDA targets, in April 2001 Covad reached an agreement with BlueStar representatives, negotiated by Lynch, whereby BlueStar stockholders were given 3,250,000 of the 5,000,000 shares, in exchange for a release of all claims against [Covad]....? <sup>FN33</sup> Lynch negotiated this settlement without final BlueStar accounting results and even though the former BlueStar shareholders were not entitled to any payments until the end of 2001. At the same time that Lynch's negotiations were taking place, Marshall ?was sending emails to the Covad Board calling the BlueStar acquisition ?a very costly mistake, probably the worst mistake I have ever seen a company make.? ? <sup>FN34</sup> No corporate record was kept of the negotiations. The BlueStar earn-out settlement cost Covad $100 million, to the substantial benefit of Crosspoint, Shapero, McMinn, and Hawk (who collectively received almost half of the 3,250,000 shares from the earn-out settlement).<sup>FN35</sup> Covad reported that McMinn, Hawk, and Shapero did not participate in the meetings concerning the review and approval of the BlueStar earn-out settlement.<sup>FN36</sup> Marshall, Lynch, Runtagh, and Irving participated in the BlueStar earn-out settlement deliberations and vote.

FN33. *Id.* at ¶ 74.

FN34. *Id.*

FN35. *Id.* at ¶ 78.

FN36. *See* Amended Compl. at ¶ 80 (?In fact, [Covad] has publicly stated that McMinn, Hawk and Shapero did not participate in the meetings concerning the ?review and approval? of the [BlueStar earn-out settlement].?); *see also* Stone Aff., Ex. E at 121 (Covad's 10-K for fiscal year ending December 2000).

3. *The Dishnet Transaction*

McMinn sat on the Board of Directors of Dishnet and held options to purchase shares of that company. Dishnet is a privately held telecommunications company that provides DSL and dial-up access in India.

On February 15, 2001, Covad-through a wholly owned subsidiary-purchased 2,000,000 shares of Dishnet for $22,980,000. In addition to the subscription agreement, Dishnet entered into an agreement with Covad to license Covad's proprietary operational support system for use in India. The business relationship soon deteriorated.

In October 2001, Dishnet filed a proof of claim in Bankruptcy Court against Covad asserting damages in excess of $24 million. Covad attempted to exercise its $23 million put option in Dishnet. As a result of these actions, McMinn was simultaneously sitting on the boards of two companies engaged in a substantial legal dispute.

Covad and Dishnet resolved their dispute. Among the terms of the settlement were (1) the sale of Covad's investment in Dishnet for $3 million, (2) resolution of Dishnet's claims against Covad, and (3) the relinquishment of Covad's put option in Dishnet.

*F. Proxy Disclosures and Khanna's Letter to Covad's Board*

*7 The Plaintiffs allege that Khanna protested against the transactions discussed above on the grounds that they were compromised by self-dealing and otherwise lacked substantive business purpose. Covad's Board then ?vowed to remove Khanna so he would not be an obstacle to their self-dealing.? <u>FN37</u> Khanna was accused of sexual harassment, removed as General Counsel, and placed on administrative leave in June 2002.

   <u>FN37.</u> Amended Compl. at ¶ 110.

On June 10, 2002, Covad issued its 2002 Proxy Statement. The annual meeting of Covad shareholders was scheduled for July 25, 2002. On June 19, 2002, after he was relieved of his duties, Khanna (through his attorney) sent a letter to Covad's Board ?outlining among other things, the breaches of fiduciary duty alleged against the Board in [the Amended Complaint], including the Board's conduct in the Certive, BlueStar, and Dishnet transactions.? <u>FN38</u> Khanna contends that this was not a demand on the Board; ?[r]ather, it was a last-ditch attempt on his part to get the slim minority of directors who did not have direct interests in these transactions to do something to seek a remedy for the corporation.? <u>FN39</u>

   <u>FN38.</u> *Id.* at ¶ 122.

   <u>FN39.</u> *Id.* at ¶ 123. The letter, which may be considered as incorporated into the Amended Complaint, was part of the record in the § 220 action as JTX 123. *See, e.g.,* Amended Compl. at ¶ 3.

Although Khanna's charges were broadly directed at alleged fiduciary breaches by the Covad Board-breaches which, if as alleged, would have affected all public shareholders adversely-the response sought by Khanna was unique to him and provided no direct benefit to the other shareholders. Khanna attempted to extract the following terms:
1. Mr. Khanna shall be allowed to join the Covad Board of Directors, as Vice Chairman, with a not less than 15-year contract, ... he shall be responsible for overall conflict of interest compliance.
2. Mr. Khanna shall be given a role as Executive Vice President for Corporate Strategy reporting directly to the CEO, which shall include the following areas: Public Advocacy Strategy, including legal and related PR strategy, press release review, and second (second to the CEO) public spokesperson (without any impairment to the CFO's role as head of Investor Relations); Legal Strategy, including Litigation Initiation and Settlement Strategy; New and Existing Product Implementation Strategy; ILEC Restructuring Strategy; and related strategies.
3. He will retain the responsibility of being Covad's chief representative at trade associations....
4. He will remain on all pre-existing e-mail mailing lists and will join any applicable new ones.
5. He will be compensated at all times not less than a comparable officer that serves as both an officer and as a director. He shall not be terminated or investigated for any reason other than fraud or illegal conduct during the 15-year period.
6. Covad will make a statement to the legal department, corporate officers and members of the Board clearing Mr. Khanna of any and all violations of law and stating that he has been subjected to two separate investigations and has been cleared of any ethical or integrity violations as well....
*8 7. Mr. Khanna will have five individuals reporting to him on a solid line basis ..., and his administrative support person ..., plus a minimum of four individuals reporting to him on a dotted line basis.... <u>FN40</u>

   <u>FN40.</u> JTX 123.

On July 9, 2002, shortly after his letter to Covad's Board, Khanna sent a draft fiduciary duty complaint. His implicit threat: if the Board did not accede to his selfish wishes, a derivative and class action complaint would be brought,

purportedly for the benefit of all shareholders.

Covad's Board formed a committee, consisting of directors Runtagh and Crandall, to investigate Khanna's allegations; the committee was not initially given any power to act independently of the Covad Board. Additionally, Crandall was given the authority to act alone on behalf of the committee if his opinion differed from that of Runtagh. Although Khanna was not aware of it, at some point Jalkut became a member of the committee. On September 20, 2002, the Board gave the committee authority to determine whether or not to bring a suit based on Khanna's allegations of wrongdoing.

In October 2002, the committee concluded that the company should not pursue litigation based on the Certive matters.[FN41] The Amended Complaint charges that only disclosures Covad's Board made of Khanna's allegations and the subsequent investigations into those allegations were in its March 2003 10-K, its May 2003 10-Q, and its 2004 Proxy Statement.[FN42] Both of Covad's 2003 disclosures were essentially the same; its March 2003 10-K recited:

> [FN41.] *Id.* at ¶ 129. It is unclear from the Amended Complaint when the committee decided not to pursue claims based on the other transactions of which Khanna complained. It does allege that the committee ?informed Khanna that [it] believed his allegations were without merit? on December 26, 2002. *Id.* at ¶ 133.

> [FN42.] *Id.* at ¶¶ 204, 213. Paragraph 213 of the Amended Complaint contradicts Paragraph 204 by alleging that the disclosures were in the 2003 Proxy Statement. Additionally, Paragraph 133 of the Amended Complaint alleges that the ?only public disclosure? of Khanna's allegations and the investigation occurred in Covad's March 2003 10-K; however, the Amended Complaint explains in other paragraphs that disclosures were made at least in the May 2003 10-Q and the 2004 Proxy Statement. *See id.* at ¶¶ 204, 213.

In June 2002, Dhruv Khanna was relieved of his duties as our General Counsel and Secretary. Shortly thereafter, Mr. Khanna alleged that, over a period of years, certain current and former directors and officers had breached their fiduciary duties to the Company by engaging in or approving actions that constituted waste and self-dealing, that certain current and former directors and officers had provided false representations to our auditors and that he had been relieved of his duties in retaliation for his being a purported whistleblower and because of racial or national origin discrimination. He has threatened to file a shareholder derivative action against those current and former directors and officers, as well as a wrongful termination lawsuit. Mr. Khanna was placed on paid leave while his allegations were being investigated.

Our Board of Directors appointed a special investigative committee, which initially consisted of Mr. Crandall and Ms. Runtagh, to investigate the allegations made by Mr. Khanna. Mr. Jalkut was appointed to this committee shortly after he joined our Board of Directors. This committee retained an independent law firm to assist in its investigation. Based on this investigation, the committee concluded that Mr. Khanna's allegations were without merit and that it would not be in the best interest of the Company to commence litigation based on these allegations. The committee considered, among other things, that many of Mr. Khanna's allegations were not accurate, that certain allegations challenged business decisions lawfully made by management or the Board, that the transactions challenged by Mr. Khanna in which any director had an interest were approved by a majority of disinterested directors in accordance with Delaware law, that the challenged director and officer representations to the auditors were true and accurate, and that Mr. Khanna was not relieved of his duties as a result of retaliation for alleged whistleblowing or racial or national origin discrimination. Mr. Khanna has disputed the committee's work and the outcome of the investigation.

**\*9** After the committee's findings had been presented and analyzed, the Company concluded in January 2003 that it would not be appropriate to continue Mr. Khanna on paid leave status, and determined that there was no suitable role for him at the Company. Accordingly, he was terminated as an employee of the Company. While the Company believes the contentions of Mr. Khanna referred to above are without merit, and will be vigorously defended if brought, it is unable to predict the outcome of any potential lawsuit.[FN43]

> [FN43.] *Id.* at ¶ 133.

No other public disclosure was made of Khanna's termination and the charges he made in his letter to the Board.

## II. CONTENTIONS

### A. *Derivative Fiduciary Duty Claims*

Count I of the Amended Complaint alleges breaches of fiduciary duty against McMinn, Shapero, Marshall, Lynch, Hawk, and Knowling for allowing McMinn's founders' shares to vest. The Defendants respond that the Plaintiffs' claim is time-barred and that this decision is protected by the business judgment rule.

Count II of the Amended Complaint charges McMinn, Shapero, and Crosspoint with breaching their fiduciary duties by usurping a Covad corporate opportunity in founding, and investing in Series A Preferred shares of, Certive. The Defendants argue that this claim is time-barred, that it was properly rejected by a majority of disinterested and independent directors, and that the Plaintiffs have not properly alleged that pre-suit demand upon the Board would have been futile. Additionally, Crosspoint argues that this claim should be dismissed because the Plaintiffs do not sufficiently allege that Crosspoint owed fiduciary duties to Covad's shareholders.

Count III of the Amended Complaint alleges breaches of fiduciary duty by McMinn, Shapero, Hawk, Lynch, Marshall, and Knowling during Covad's acquisition of a substantial equity interest in Certive. The Plaintiffs assert that some of these directors were interested in the transaction and that the investment was detrimental to Covad's shareholders. The Plaintiffs contend that the investment constituted corporate waste. The Defendants respond that the Plaintiffs' claims surrounding the Certive investment are time-barred, that there was no breach of a duty of loyalty because the transaction was approved by a majority of disinterested and independent directors, that the Plaintiffs' claim for breach of fiduciary duty for failure to seek restitution for the Certive investment fails as a matter of law, and that pre-suit demand is not excused.

Count IV of the Amended Complaint asserts a claim against McMinn, Shapero, Hawk, Lynch, Marshall, Dunn, Knowling, Runtagh, and Irving for breaches of fiduciary duty with respect to the two BlueStar transactions (the acquisition and the earn-out settlement). The Defendants assert that this claim is time-barred and that the Plaintiffs have not shown that a majority of the directors who approved these transactions were interested or lacked independence.

Count V of the Amended Complaint alleges breaches of fiduciary duty by McMinn, Shapero, Hawk, Lynch, Marshall, Hoffman, Runtagh, and Irving for the Dishnet transaction. The Defendants contend that the Dishnet settlement was approved a majority of disinterested and independent directors.

*10 In addition, the Defendants assert that the Plaintiffs have failed to plead a proper claim for waste. Moreover, the Director Defendants have attempted to invoke the exculpatory provision adopted in Covad's Amended and Restated Certificate of Incorporation under 8 *Del.C.* § 102(b)(7), which would shield them from personal liability for money damages based on any breach of the duty of care.

Count VI of the Amended Complaint asserts a derivative claim against Crosspoint for aiding and abetting Covad's directors in breaching their fiduciary duties in the Certive and BlueStar transactions. Crosspoint argues that the Plaintiffs do not sufficiently plead an underlying breach of fiduciary duty (so there can be no secondary liability) and that the Plaintiffs failed to plead that Crosspoint knowingly participated in any breach of duty.

Count VII of the Amended Complaint seeks to set forth a claim against Crosspoint under the doctrine of *respondeat superior.* The Plaintiffs allege that Shapero and Hawk-acting as Crosspoint's agents-caused harm to Covad by orchestrating the Certive and BlueStar transactions. Crosspoint responds the Plaintiffs have failed to plead an underlying breach of fiduciary duty for the Certive and BlueStar transactions and that the Plaintiffs' *respondeat superior* claim fails as a matter of law.

### B. *Demand on the Board and Demand Futility*

The Defendants also contend that Khanna's letter to the Board was a demand on Covad's Board and the Plaintiffs have not set forth facts that show that the demand was wrongfully rejected. Furthermore, the Defendants contend that, even if Khanna did not make a demand on Covad's Board, the Plaintiffs have not set forth facts demonstrating that demand would have been futile and, thus, all derivative claims must be dismissed. The Plaintiffs respond that Khanna's letter to the Board was not a demand and that they have indeed pleaded facts showing that demand on Covad's Board would have been futile and, therefore, that demand should be excused.

### C. *Direct Claims for Breach of Fiduciary Duty with regard to Covad's 2002, 2003, and 2004 Proxy Statements* [FN44]

    FN44. The Plaintiffs do not allege that the board elections were contested.

Count VIII of the Amended Complaint is a direct claim against McMinn, Shapero, Hawk, Lynch, Marshall, Irving, Hoffman, and Runtagh for breaches of fiduciary duty resulting from material omissions in Covad's 2002 Proxy Statement. In 2002, McMinn, Hawk, and Hoffman were reelected to the Covad Board. The Plaintiffs allege that 2002 Proxy Statement did not disclose certain information-e.g., Khanna's June 19, 2002 letter to the Board, the Standstill Agreement,[FN45] the real reasons for Khanna's termination, that the BlueStar earn-out criteria had not been met, and that McMinn was working for Certive in 1999-and that these omissions were material to shareholders. The Defendants argue that the Plaintiffs' claim is barred by laches and that Covad satisfied its disclosure obligations.

> FN45. Covad and Khanna entered into the ?Standstill Agreement? which allowed for ?confidential settlement discussions? during the period of July 10, 2002 through July 23, 2002. *Id.* at ¶ 116. This period was subsequently extended through July 26, 2002. Under the Standstill Agreement, the parties agreed that ?[d]uring the Negotiating Period, neither party shall take any actions to advance, or that will have the effect of advancing, its litigation position, and they shall diligently and vigorously focus their attention on resolving the disputes among them.? *Id.*

Counts IX and X concern Covad's 2003 and 2004 Proxy Statements. In 2003, Lynch, Irving, and Jalkut were reelected to the Covad Board; and in 2004, Crandall and Runtagh were reelected. The Plaintiffs allege that certain information was either inadequately disclosed or entirely omitted-Khanna's June 19, 2002 letter, the real reasons for Khanna's termination from Covad, that the BlueStar earn-out criterion had not been met, and which transactions and directors Khanna was challenging-and that these omissions were material to shareholders. Again, the Defendants argue that the Plaintiffs' claims are barred by laches and that Covad satisfied its disclosure requirements.

### D. *Motion to Disqualify Plaintiffs*

**\*11** Covad contends that Khanna must be disqualified as a representative plaintiff because (1) Khanna's ethical duties, as Covad's former General Counsel, prevent him from pursuing this litigation; (2) he is barred from pursuing litigation against his former client on matters with which he had a ?substantial relationship?; (3) he participated, or at least acquiesced, in the challenged transactions; and (4) he has a personal agenda against the Defendants separate from Covad shareholders. Khanna denies all of these allegations. Additionally, Covad contends that Sams and Meisel must be disqualified because they have been ?tainted? by exposure to Khanna's privileged information and because they are not the ?driving force? behind this litigation.

### E. *Motions to Strike Portions of the Amended Complaint-Motions to Seal/Unseal the Record*

Covad contends that Paragraphs 52, 54, 55, and 57 of the Amended Complaint should be stricken because they disclose privileged information in violation of Khanna's attorney-client duties. Khanna argues that these paragraphs should not be stricken because the information is public information gained from the § 220 proceeding and, with regard to paragraph 52, because Covad waived any privilege it may have had by introducing its facts as evidence at the § 220 trial.

Comparable arguments regarding privilege are made in the competing motions to seal and unseal the record.[FN46] In addition to the challenges presented above, Covad argues that Paragraphs 43, 44, and 74 of the Amended Complaint should remain sealed because they contain confidential and sensitive information.

> FN46. Plaintiffs have moved to unseal the record, in addition to Covad's motion for continued sealing of portions of the record.

### III. DEMAND FUTILITY

The Plaintiffs seek to assert multiple derivative claims on behalf of Covad. The Court must first inquire as to whether demand was made on Covad's Board. If it was not, the Court must then determine whether demand is excused.

### A. *Legal Standard for Demand Futility*

?A shareholder's right to bring a derivative action does not arise until he has made a demand on the board of directors to institute such an action directly, such demand has been wrongfully refused, or until the shareholder has demonstrated, with particularity, the reasons why pre-suit demand would be futile.? [FN47] This requirement, found in

Court of Chancery Rule 23 .1,<u>FN48</u> arises from the fundamental principle that the board of directors manages the business and affairs of a corporation, including decisions of whether to bring suit on behalf of the corporation.<u>FN49</u> In order to bring a derivative claim, a plaintiff ?must overcome the powerful presumptions of the business judgment rule....? <u>FN50</u> Indeed, ?[t]he key principle upon which this area of our jurisprudence is based is that the directors are entitled to a *presumption* that they were faithful to their fiduciary duties.? <u>FN51</u> ?By its very nature the derivative suit impinges on the managerial freedom of directors.? <u>FN52</u> As a consequence, <u>Court of Chancery Rule 23.1</u> imposes on a plaintiff a pleading burden that is ?more onerous? than the burden a plaintiff must satisfy when confronted with a motion to dismiss under <u>Court of Chancery Rule 12(b)(6)</u>.<u>FN53</u>

> FN47. *Ash v. McCall,* 2000 WL 1370341, at *6 (Del. Ch. Sept. 15, 2000).

> FN48. Ct. Ch. R. 23.1 (?The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.?).

> FN49. *See* 8 *Del.C.* § 141; *see also* White v. Panic, 793 A .2d 356, 363 (Del. Ch.2000), *aff'd,* 783 A.2d 543 (Del.2001).

> FN50. *Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993). This Court has previously explained that
> [t]he purpose for the demand requirement and concomitant heightened pleading standard is to ?effectively distinguish between strike suits motivated by the hope of creating settlement leverage through the prospect of expensive and time-consuming litigation discovery and suits reflecting a reasonable apprehension of actionable director malfeasance that the sitting board cannot be expected to objectively pursue on the corporation's behalf.?
> *White,* 793 A.2d at 364 (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 9-2(b)(3)(i), at 554 (1998)); *see also* Beam v. Stewart, 845 A.2d 1040, 1050 (Del.2004).

> FN51. *Beam,* 845 A.2d at 1050 (citing Aronson v. Lewis, 473 A .2d 805, 812 (Del.1984), *overruled on other grounds,* Brehm v. Eisner, 746 A.2d 244, 254 (Del.2000)).

> FN52. *Aronson,* 473 A.2d at 811. ?The hurdle of proving demand futility also serves an important policy function of promoting internal resolution, as opposed to litigation, of corporate disputes and grants the corporation a degree of control over any litigation brought for its benefit.? *Rattner v. Bidzos,* 2003 WL 22284323, at *7 (Del. Ch. Sep. 30, 2003) (citations omitted).

> FN53. *Levine v. Smith,* 591 A.2d 194, 207 (Del.1991), *overruled on other grounds,* Brehm, 746 A.2d at 254.

**\*12** As this Court has previously explained, depending on the circumstances, inquiry into whether demand is excused proceeds under either *Aronson v. Lewis* <u>FN54</u> or *Rales v. Blasband.*<u>FN55</u>

> FN54. 473 A.2d 805 (Del.1984).

> FN55. 634 A.2d 927 (Del.1993).

Under the two-pronged *Aronson* test, demand will be excused if the derivative complaint pleads particularized facts creating a reasonable doubt that ?(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.? As the Supreme Court stated in *Rales* ..., however, there are three circumstances in which the *Aronson* standard will not be applied: ?(1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where ... the decision being challenged was made by the board of a different corporation.? In those situations, demand is excused only where ?particularized factual allegations ... create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.? <u>FN56</u>

FN56. *In re Bally's Grand Deriv. Litig.,* 1997 WL 305803, at *3 (Del. Ch. June 4, 1997) (footnotes omitted). See also the Court's discussion at Part III(C)(2), *infra,* addressing analysis of ?substantial threat[s] of personal liability? for directors applicable under *Rales* in certain circumstances.

In other words, if the pleadings present particularized ?facts sufficient to create a reasonable doubt that ... a majority of the directors are disinterested and independent,? [FN57] then demand will be excused under either the test in *Rales* or the first prong of *Aronson.*

> FN57. *White,* 793 A.2d at 364. The burden of demonstrating demand futility lies with the Plaintiffs. *See Aronson,* 473 A.2d at 812.

Disinterested ?means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.? ?Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.? [FN58]

> FN58. *In re J.P. Morgan Chase & Co.,* 2005 WL 1076069, at *8 (Del. Ch. Apr. 29, 2005) (quoting *Aronson,* 473 A.2d at 812, 816), *aff'd,* 2006 WL 585606 (Del. Mar. 8, 2006); *see also Beam,* 845 A.2d at 1049; *Rales,* 634 A.2d at 936.

If, however, the Court's ?review of the complaint reveals that it does not allege with particularity facts from which the court could reasonably conclude? that at least half ?of the directors in office when the complaint was filed were disabled from impartially considering a demand,? then the plaintiff's derivative claim will be dismissed-unless the second prong of *Aronson* applies and is satisfied.[FN59]

> FN59. *Highland Legacy Ltd. v. Singer,* 2006 WL 741939, at *1 (Del. Ch. Mar. 17, 2006); *see also Beneville v. York,* 769 A.2d 80, 86 (Del. Ch.2000) (describing analysis where half of board compromised).

?At the motion to dismiss stage of the litigation, ?[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences.? ? [FN60] The Court ?need not blindly accept as true all allegations, nor must [it] draw all inferences from them in plaintiffs' favor unless they are reasonable inferences.? [FN61] Pleading with particularity is essential for a plaintiff to satisfy the requirements of demand excusal. Indeed, such ?pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a).? [FN62] The Court must, however, ?accept as true all well-pled allegations of fact in the complaint, and all reasonable inferences from non-conclusory allegations contained in the complaint must be drawn in favor of the plaintiff.? [FN63]

> FN60. *White v. Panic,* 783 A.2d 543, 549 (Del.2001) (citations omitted); *see also Kahn v. Roberts,* 1994 WL 70118, at *5 (Del. Ch. Feb. 28, 1994) (?Conclusory allegations of domination and control, without particularized facts showing that an individual person or entity interested in the transaction controlled the board's vote on the transaction, are insufficient to excuse pre-suit demand.?).

> FN61. *White,* 783 A.2d at 549 (citation omitted).

> FN62. *Brehm,* 746 A.2d at 254 (?What the pleader must set forth are particularized factual statements that are essential to the claim. Such facts are sometimes referred to as ?ultimate facts,? ?principal facts' or ?elemental facts.? ? (citations omitted)).

> FN63. *Rattner,* 2003 WL 22284323, at *7 (citing *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988), *overruled on other grounds, Brehm,* 746 A.2d at 254).

### B. Khanna's Letter Was Not a Demand to Covad's Board

**\*13** Before proceeding to demand futility analysis, the Court must first ascertain whether Khanna's letter of June 19, 2002, constituted a demand on the Covad Board. By making demand on a board of directors, a plaintiff concedes the

disinterestedness and independence of that board.[FN64] It is then left to the board to determine whether to pursue litigation. A plaintiff's only recourse, in that circumstance, would be to demonstrate that demand was wrongfully rejected, but, as with any board decision, rejection of shareholder demand is afforded the presumptions of the business judgment rule.[FN65]

> FN64. *See, e.g., Scattered Corp. v. Chicago Stock Exchange, Inc.,* 701 A.2d 70, 73 (Del.1997) (quoting *Levine,* 591 A.2d at 197-98).

> FN65. *Id.*

In determining whether Khanna's June 19, 2002, letter to the Board was a demand, the Court cannot look for ?magic words? establishing that a communication is a demand for purposes of Court of Chancery Rule 23.1.[FN66]

> FN66. *See Yaw v. Talley,* 1994 WL 89019, at *7 (Del. Ch. Mar. 2 1994) (?There is no all-inclusive legal formula defining what types of communications will constitute a demand. That determination is essentially fact-driven.?).

To constitute a demand, a communication must specifically state: (i) the identity of the alleged wrongdoers, (ii) the wrongdoing they allegedly perpetrated and the resultant injury to the corporation, and (iii) the legal action the shareholder wants the board to take on the corporation's behalf. Those elements are consistent with and derive from the policies underlying the demand requirement.[FN67]

> FN67. *Id.*

The burden of demonstrating that a communication was a demand lies with the party alleging that the communication should be viewed as such.[FN68]

> FN68. *See id.* (?Policy considerations require that the burden lie with the party asserting that a demand was made, and that ambiguous communications be construed against a finding of a demand.?).

In this instance, the Defendants contend that the June 19, 2002, letter from Khanna's attorney [FN69] constituted a demand. The letter clearly meets the first two requirements of a demand: it identified the alleged wrongdoers and the harm they caused Covad. The issue, then, is whether the letter identified ?the legal action the shareholder wants the board to take on the corporation's behalf.? [FN70] Covad argues that the letter can be ?fairly construed [to give] rise to the inference that Khanna was demanding the Board take legal action on the corporation's behalf? [FN71] and cites, in particular, to various requests (or, in the Defendants' view, demands) made by Khanna in the letter, such as his reinstatement as General Counsel and his appointment to Covad's Board.[FN72]

> FN69. JTX 123.

> FN70. *Yaw,* 1994 WL 89019, at *7 (emphasis added).

> FN71. Reply Mem. in Supp. of Covad Commc'ns Group, Inc.'s Mot. to Dismiss Am. Deriv. & Class Action Compl. (?Covad Reply Br. to Dismiss?) at 3.

> FN72. JTX 123, at 11-12.

Though it is not a question free from doubt, the Court rejects Defendants' argument for the following reasons. First, the Defendants bear the burden of establishing that demand was, in fact, made, and any ambiguity must be construed against a finding of demand. Second, the remedial actions sought by Khanna related to his removal as Covad's General Counsel and his future employment status at Covad. The relief would have been for his personal benefit; it would have accomplished little (or nothing) for the shareholders. The transactions challenged in this litigation are related, at most, tangentially to his termination dispute. In other words, the remedies Khanna sought in the letter addressed directly his claimed wrongful suspension and likely termination, and the letter cannot fairly be read as an attempt to seek a remedy for the challenged transactions for the good of Covad or its shareholders.[FN73]

FN73. This question is complicated by transmission of a draft complaint. *See* Amended Compl. at ¶ 123; JTX 124. Although the transmission of a draft complaint, along with other communications, has been previously held not to constitute demand, *see Yaw,* 1994 WL 89019, at \*6-\*8, the aggregate here draws near the threshold of demand status.

\*14 Covad points out language in the letter-for example, the threat to ?light a legal fuse? [FN74] that could be read as an expansive threat to seek a remedy for every wrong alleged in the letter and that the remedies Khanna sought, while inadequate to ?make whole? the shareholders at large, nonetheless were the remedies Khanna chose. A far more plausible reading of the letter, however, is that the remedies Khanna sought were, as the letter's opening sentence provides, ?relat[ed] to his removal from the position of General Counsel of Covad.? [FN75] Ambiguity of this sort must be resolved in favor of Khanna (*i.e.,* the party not seeking to show that the letter was a demand). Therefore, the Court concludes that Khanna's June 19, 2002, letter did not constitute demand upon the Covad Board.[FN76]

FN74. JTX 123 at 12.

FN75. *Id.* at 1.

FN76. Covad also argues that the letter constituted demand because ?[t]he Board did exactly what it was required to do upon receiving a pre-lawsuit demand? and notes that ?Khanna was an active and willing participant in the investigation.? Covad Reply Br. to Dismiss, at 4. Although this may be true, the Board's interpretation of what the letter represented does not control the Court's determination of whether it was a demand.

### C. *Plaintiffs' Failure to Allege with Particularity that the Covad Board was Interested or Lacked Independence*

The Court now turns to the question of whether at least half of the Covad Board was either interested or lacked independence when this action was filed. [FN77] The Court's demand-futility analysis here is somewhat complicated by the relatively long time-span during which the challenged transactions took place and by turnover in the membership of Covad's Board. A majority of Covad's Board changed after the events surrounding Counts II and III and, probably, Count I. Additionally, the Plaintiffs bring Count I (the vesting of McMinn's founders' shares) on the theory that it was result of board inaction-*i.e.,* that no business decision was made. The parties agree, therefore, that demand-futility with respect to the Certive Claims must be analyzed under *Rales.* [FN78] A majority of the Covad board has *not* changed, however, since the events surrounding Counts IV and V (*i.e.,* the ?BlueStar Claims? and the ?Dishnet Claims,? respectively); therefore, the Court employs the two-prong standard of *Aronson* with respect to these claims.

FN77. *See, e.g., Brehm,* 746 A.2d at 257; *see also Highland Legacy Ltd.,* 2006 WL 741939, at \*4; *In re Nat'l Auto Credit, Inc. S'holders Litig.,* 2003 WL 139768, at \*8 (Del. Ch. Jan. 10, 2003); *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 WL 31888343, at \*10 (Del. Ch. Dec. 18, 2002); *In re Bally's Grand,* 1997 WL 305803, at \*3. *Cf.* Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery, § 9-2[b], at 9-75 to -76, 9-78 (2005), (considering which ?Board?-at the time of suit or the time of the transaction-must be evaluated under *Aronson* ).

FN78. *See Rales,* 634 A.2d at 934. With respect to Count I, the Amended Complaint fails to allege the date of the vesting of the disputed Covad shares; *Rales,* in one form or another, will control. *See, e.g.,* Pls.' Ans. Br. in Opp'n to Covad Commc'ns Group, Inc.'s Mot. to Dismiss Am. Deriv. & Class Action Compl. (?Pls.' Ans. Br. to Covad's Mot. to Dismiss?) at 30; Covad Reply Br. to Dismiss at 9; Pls.' Ans. Br. in Opp'n to Dir. Defs. Mot. to Dismiss Am. Deriv. & Class Action Compl. (?Pls.' Ans. Br. to Dirs.' Mot. to Dismiss?) at 31. *But cf. In re Bally's Grand,* 1997 WL 305803, at \*3-\*4 (declining to examine demand futility because complaint failed to identify directors on board at filing).

?Demand futility [will] be determined solely from the well-pled allegations of the Complaint.? [FN79] This analysis is fact-intensive and proceeds director-by-director and transaction-by-transaction.[FN80] The Covad Board, at the time of filing of this action, consisted of eight directors: Irving, Jalkut, Lynch, Crandall, Runtagh, Hawk, Hoffman, and McMinn.[FN81] If the Court concludes that the Plaintiffs failed in their efforts to allege that at least four of the directors were not disinterested and independent for demand purposes, then the Court's analysis with respect to *Rales* and the first-prong of *Aronson* is at an end.

FN79. *In re Cooper Co., Inc.,* 2000 WL 1664167, at *5 (Del. Ch. Oct. 31, 2000).

FN80. *See, e.g., Beam,* 845 A.2d at 1051 (explaining that review occurs on a ?case-by-case basis?).

FN81. As explained below, consideration of Jalkut does not prejudice the Plaintiffs. *See* Part III(C)(5), *infra.*

As a preliminary matter, the Court notes that the Amended Complaint repeatedly sets forth certain generalized, conclusory allegations. In the interest of efficiency, the Court examines these now. Demand-futility jurisprudence often recites that certain allegations cannot ?without more,? or ?standing alone,? satisfy the particularized pleading requirements of Court of Chancery Rule 23.1. These conclusory allegations add no, or only *de minimis,* substance to the Court's demand-futility inquiry; they are to be distinguished from substantive allegations that are, by themselves, insufficient but, when viewed *in toto,* may push the analysis over the threshold of ?reasonable doubt? and thereby excuse demand.

*15 First, the Plaintiffs repeatedly allege that the Covad Board is McMinn (and/or Shapero) ?dominated,? or some variant thereof.[FN82] Indeed, the Plaintiffs' theory as to why demand is excused appears, at times, to hinge largely on this characterization. The Plaintiffs have not, however, alleged that McMinn is a controlling shareholder, and, even if he were, ?[t]here must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person.? [FN83] Whether McMinn (or any other director) ?dominates? the Covad Board is a question that must be resolved director-by-director, based on particularized allegations of fact. ?Independence is a fact-specific determination made in the context of a particular case. The court must make that determination by answering the inquiries: independent from whom and independent for what purpose?? [FN84] Conclusory, across-the-board allegations of a lack of independence will not prevail; allegations of this type are akin to the ?shorthand shibboleth? which this Court has long-rejected. [FN85]

FN82. *See, e.g.,* Amended Compl. at ¶¶ 32, 40, 138.

FN83. *Aronson,* 473 A.2d at 815; *see also Beam,* 845 A.2d at 1050.

FN84. *Beam,* 845 A.2d at 1049-50; *see also Highland Legacy, Ltd .,* 2006 WL 741939, at *5 (?There must be some alleged nexus between the domination and the resulting personal benefit to the controlling party.? (citing *Aronson,* 473 A.2d at 816)).

FN85. *See, e.g., Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *7; *see also* Wolfe & Pittenger, *supra* note 77, § 9-2[b], at 9-57, 9-69 to -72.

Second, the Amended Complaint repeatedly alleges that McMinn (or another director) ?recruited? certain individuals to be Covad directors, that those individuals took their seats at McMinn's (or others') ?behest,? and that those individuals became directors with the other directors' ?consent and approval.? [FN86] Again, conclusory allegations of this nature do not advance the Court's inquiry; they will not ?sterilize? a director's judgment with respect to demand.[FN87] ?The proper focus is the care, skill and diligence used by the directors in making the challenged decision rather than upon the way in which the directors obtained their seats in the boardroom.? [FN88] ?Directors must be nominated and elected to the board in one fashion or another,? [FN89] and to hold otherwise would unnecessarily subject the independence of many corporate directors to doubt. Conclusory allegations of this type do not cast suspicion on the independence of directors without additional facts demonstrating reason to view the nomination process askance. As a consequence, such allegations, ?without more,? are of little assistance in view of the requirement for particularity-and the ?piling-on? of more and similar conclusory allegations will not sum to a reasonable doubt.

FN86. *See, e.g.,* Amended Compl. at ¶¶ 15-17.

FN87. *See Aronson,* 473 A.2d at 816. *See also White,* 793 A.2d at 366; *Benerofe v. Cha,* 1996 WL 535405, at *7 (Del. Ch. Sept. 12, 1996); *cf. In re W. Nat'l Corp. S'holders Litig.,* 2000 WL 710192, at *15 (Del. Ch. May 22, 2000) (applying summary judgment standard).

FN88. *Emerald Partners v. Berlin,* 1993 WL 545409, at *4 (Del. Ch. Dec. 23, 1993).

FN89. *In re W. Nat'l Corp.,* 2000 WL 710192, at *15.

Third, the Amended Complaint sets forth the repeated incantation that the directors' lack of independence is demonstrated by their ?pattern? of votes and ?acquiescence? in permitting McMinn and others to benefit from self-dealing transactions.[FN90] The complaint fails either to explain, in most instances, how the directors' alleged acquiescence benefited them (other than possibly as addressed in the next paragraph) [FN91] or to set forth particularized facts showing a pattern of votes (in addition to the few challenged transactions) from which the Court could draw a reasonable inference.[FN92]

FN90. *See* Amended Compl. at ¶¶ 14-16, 139.

FN91. *Cf. In re eBay, Inc. S'holders Litig.,* 2004 WL 253521, at *4-*5 (Del. Ch.2004).

FN92. *See, e.g., Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *7, *9; *Beam v. Stewart,* 833 A.2d 961, 981 (Del. Ch.2003), *aff'd,* 845 A.2d 1040 (Del.2004). *Cf. Brehm,* 746 A.2d at 257 n. 34.
Although there may be instances in which a director's voting history would be sufficient to negate a director's presumed independence, routine consensus cannot suffice to demonstrate disloyalty on the part of a director. To conclude otherwise would simply encourage staged disagreements and nonunanimous decisions for the sake of nonunanimous decisions in the boardroom.

**\*16** Fourth, the Amended Complaint alleges, repeatedly, that the directors ?derived the benefit of being and remaining on the Board of Directors of, and receiving compensation from, Covad....? [FN93] The Plaintiffs then conclusorily allege that the price of these ?benefits? was the directors' support for the ?self-dealing? occurring at Covad.[FN94] As with the allegations described above, the mere fact that a director receives compensation for her service as a board member adds little or nothing to demand-futility analysis, ?without more? [FN95]—*i.e.,* unless the pleadings demonstrate, for example, that the status or compensation was somehow ?material? to the director or otherwise outside the norm.

FN93. *See* Amended Compl. at ¶¶ 14-17.

FN94. *See id.*

FN95. *See, e.g., Grobow,* 539 A.2d at 188; *cf. Highland Legacy Ltd.,* 2006 WL 741939, at *5; *White,* 793 A.2d at 366 (addressing allegations involving normal fees and compensation).

Finally, the Amended Complaint sets forth numerous allegations of various social and business ties among members of the Covad Board.[FN96] With the exception of Lynch, however, as discussed in some detail below, the Plaintiffs' allegations amount to no more than the equivalent of a simple assertion that demand should be excused due to ?structural bias.? As explained in *Beam v. Stewart,*[FN97] ?to render a director unable to consider demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence.? [FN98] The Court's analysis in *Beam* was primarily directed at social relationships, but it also may inform the evaluation of allegations of business relationships, as well: ?Whether they arise before board membership or later as a result of collegial relationships among the board of directors, such affinities-standing alone-will not render pre-suit demand futile.? [FN99] Although not all allegations of past or present social or business relationships may be lumped in the category of allegations that provide no grist for the mill of demand-futility inquiry, the heightened strength of relationship required to find that a director's ?discretion would be sterilized? renders allegations concerning most ordinary relationships of limited value, at most.[FN100]

FN96. *See* Amended Compl. at ¶¶ 13-14.

FN97. 845 A.2d 1040 (Del.2004).

FN98. *Id.* at 1051.

FN99. *Id.; see also Jacobs v. Yang*, 2004 WL 1728521, at *5-*6, *7 (Del. Ch. Aug. 2, 2004), *aff'd*, 867 A.2d 902 (Del.2005) (Table) (citing *Orman v. Cullman*, 794 A.2d 5, 27 n. 33 (Del. Ch.2002) (?The naked assertion of previous business relationships is not enough to overcome the presumption of a director's independence.?)); *Cal. Pub. Employees' Ret. Sys.*, 2002 WL 31888343, at *9.

FN100. *See, e.g., Beam*, 845 A.2d at 1050-52; *see also* Michael P. Dooley & E. Norman Veasey, *The Role of the Board in Derivative Litigation: Delaware Law and the Current ALI Proposals Compared*, 44 Bus. Law. 503, 534-35 (1989).

Having examined the repeated, conclusory allegations that comprise too much of the Amended Complaint, the Court now begins a director-by-director (and, as necessary, transaction-by-transaction) inquiry into the specific, substantive allegations of the Amended Complaint relevant to demand excusal.FN101

FN101. It should be noted that, in several instances during the course of analysis, the Court identifies facts that the Plaintiffs did not plead in their attempt to obtain demand excusal. This is not intended to set forth a requirement that each of the absent facts be pleaded in order that demand be excused; on the contrary, the Court's intent is only to point out facts that, if alleged, could significantly increase the likelihood of a finding of interestedness or lack of independence.

### 1. *Crandall*

The Amended Complaint, on its face, fails to create a reasonable doubt as to the disinterestedness or independence of Crandall. Crandall was only appointed to the Covad Board on June 20, 2002, after the challenged transactions took place.FN102 While this does not, alone, make demonstration of potential interest or lack of independence impossible, it does make the Plaintiffs' burden more difficult. Indeed, the Amended Complaint may be read to concede Crandall's disinterestedness and independence. The complaint does not list Crandall as among the seven members of the Covad Board who are alleged either to be interested or lack independence.FN103

FN102. Amended Compl. at ¶ 19. Nowhere in the Amended Complaint is Crandall alleged to have been interested in any of the transactions in question.

FN103. *See* Amended Compl. at ¶¶ 137, 140; *see also* Ct. Ch. R. 23.1 (requiring that complaint ?allege with particularity ... the reasons ... for not making [demand]?).

*17 The Plaintiffs, in their answering brief, however, assert for the first time that Crandall's independence is compromised by his ties to BEA Systems, a Covad vendor.FN104 The Plaintiffs explain that Crandall is a member of the board of directors of BEA Systems, a supplier of software and related support that received in excess of $2.2 million in revenue from Covad in 2004. The Plaintiffs make no mention of BEA Systems in the Amended Complaint;FN105 nevertheless, they now ask the Court to consider this information on the grounds that it is contained in Covad's 2004 Proxy, which is referenced in their brief with respect to the Plaintiffs' proxy disclosure claims.FN106 Although the Court is skeptical that this constitutes a proper means of asserting by way of a *well-pleaded complaint* particularized facts within the meaning of Court of Chancery Rule 23.1,FN107 the parties may refer to the substance of certain documents if those documents are ?integral to plaintiffs' claims and incorporated in the complaint.?FN108 Here, the proxy statement was ?integral? to the disclosure claims, not to assertions regarding Crandall's independence. To evaluate fully the Plaintiffs' claims, the Court will consider Crandall's ties to BEA Systems in analyzing his independence, as well.

FN104. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 34.

FN105. *See* Amended Compl. at ¶ 19.

FN106. *See* Calder Decl., Ex. E (Covad's 2004 Proxy Statement).

FN107. A plaintiff for whom demand will be excused should be capable of demonstrating demand futility by

recourse solely to the particularized facts alleged in the complaint. *Cf. Kaplan v. Peat, Marwick, Mitchell & Co., 540 A.2d 726, 727-28 (Del.1988)* (?When deciding a motion to dismiss for failure to make a demand under Chancery Rule 23.1 the record before the court must be restricted to the allegations of the complaint.?).

FN108. *Saito v. McCall,* 2004 WL 3029876, at *1 n. 9 (Del. Ch. Dec. 20, 2004). *Cf. In re Gen. Motors (Hughes) S'holder Litig.,* 2006 WL 722198, at *3 (Del. Mar. 20, 2006) (describing extent to which a court may consider matters outside complaint on motion to dismiss under Rule 12(b)(6)).

Ultimately, the inquiry into independence turns in this instance on whether Covad's business relationship with BEA Systems was material to BEA or to Crandall himself as a director of BEA.[FN109] The 2004 Proxy merely reports that Crandall is a member of the BEA Systems board of directors and the amounts Covad paid for the firm's products and services. These facts, standing alone, are insufficient to cast reasonable doubt on Crandall's independence for demand purposes.[FN110] The Court cannot discern whether the revenue from Covad is material to either BEA Systems or to Crandall because of his relationship with BEA Systems.[FN111] Neither the terms of BEA Systems' relationship with Covad (*e.g.*, whether the companies have entered into a long-term contract), nor particularized facts supporting the Plaintiffs' conclusory statement in their brief that BEA Systems' business with Covad could be ?taken away?[FN112] by McMinn and others, are provided.[FN113] Moreover, no allegation has been made that Crandall's responsibilities to BEA Systems include managing the firm's relationship with Covad; nor could the Court conclude that Crandall has a financial interest in BEA, other than possibly an unspecified director's salary, which might influence his decisions.[FN114] Put simply, even considering Crandall's ties to BEA Systems, the Plaintiffs have not alleged particularized facts sufficient to demonstrate that Crandall independent discretion would be compromised.[FN115]

FN109. *See, e.g., Jacobs,* 2004 WL 1728521, at *6.

FN110. *See id; see also Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *9.

FN111. *See Jacobs,* 2004 WL 1728521, at *6.

FN112. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 34.

FN113. These statements are too conclusory to demonstrate that particular interested Covad directors ?have the authority or ability to cause [Covad] to terminate its relationships with the companies.? *Jacobs,* 2004 WL 1728521, at *6.

FN114. *See id.*

FN115. *See id.* (?[T]he existence of contractual relationships with companies that directors are affiliated with potentially makes the board's decision more difficult, ?but it does not sterilize the board's ability to decide.? ? (citation omitted)).

### 2. Runtagh

Similarly, the Plaintiffs fail to create a reasonable doubt as to Runtagh's disinterestedness and independence. The Plaintiffs' principal claim is that Runtagh lacks independence because ?[s]he became a director with the consent and approval of the McMinn-Shapero director appointees?[FN116] and ?derived the benefits of being and remaining on the Board of Directors of, and receiving compensation from, Covad by supporting and favoring the self-dealing of other directors in the BlueStar and Dishnet transactions.?[FN117] As explained above, these bare allegations are insufficient to negate Runtagh's presumed independence.

FN116. Amended Compl. at ¶ 15.

FN117. *Id.* Similarly, the Court rejects the Plaintiffs' conclusory allegation that Runtagh ?acquiesced knowingly in ... McMinn's breach of duty.? *Id.* at ¶¶ 93, 139. *See Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *9 (?Our cases have determined that personal friendships, without more; outside business relationships, without more; *and approving of or acquiescing in the challenged transactions, without more,*

are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment.?) (emphasis added)).

**\*18** Interestingly, the Plaintiffs also allege that Runtagh has a ?disabling interest? that was ?acknowledged? by the Covad Board in its resolution creating the special committee to investigate the claims made by Khanna in his June 19, 2002 letter to the Covad Board .[FN118] The Plaintiffs quote the resolution, which provides: ?Mr. Crandall shall have the authority to act alone in the event that, in his sole judgment, an alleged material conflict of interest arises with respect to Ms. Runtagh.? [FN119] This short statement, however, cannot be construed as an admission by the Board, cannot satisfy demand-futility's pleading with particularity requirement, and does not permit a *reasonable* inference of interestedness or lack of independence.[FN120]

> FN118. Amended Compl. at ¶¶ 125, 137. The Plaintiffs allege that ?Defendant Runtagh ... has a disabling interest, which was acknowledged by defendants in their resolutions constituting the Committee.? *Id.* at ¶ 137.

> FN119. *Id.* at ¶ 125.

> FN120. *See White*, 783 A.2d at 549 (The Court ?need not blindly accept as true all allegations, nor must [it] draw all inferences from them in plaintiffs' favor unless they are reasonable inferences .? (citation omitted)).

Because Count I of the Amended Complaint (the vesting of McMinn's founders' shares) may be analyzed under *Rales* for having resulted from board inaction, one additional issue must be considered with respect to Runtagh's capacity to consider demand: whether she faces a ?substantial likelihood? of personal liability resulting from the vesting of McMinn's shares.[FN121] As the Court in *David B. Shaev Profit Sharing Account v. Armstrong*,[FN122] explained: ?Most notably in *In re Caremark Int'l Inc. Derivative Litigation*, and then in other cases ... this court has taken cognisance of allegations that the directors failed to act when they otherwise should have done so.? [FN123] When analyzing demand futility under *Rales* where no board action was taken,[FN124] the Court looks not only to whether directors are disinterested and independent for demand purposes, but also to whether directors ?face a substantial likelihood of personal liability, because doubt has been created as to whether their actions were products of a legitimate business judgment.? [FN125] A ?mere threat of personal liability,? however, is insufficient in this context.[FN126]

> FN121. As discussed below, the Court considers whether a director considering demand faces a ?substantial threat? of personal liability arising from the alleged wrongful acts-with a finding of a ?substantial threat? resulting in reasonable doubt as to the capacity of that director to consider demand. *See, e.g., David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006); *Guttman*, 823 A.2d at 501. This analysis would perhaps apply equally, for example, in analyzing the disinterestedness of current directors who participated in the alleged wrongful conduct, *see Rales*, 634 A.2d at 936, even though a majority of board has ?flipped.? The confusion, here, lies in the fact that the Court cannot determine from the Amended Complaint whether Runtagh was a member of the Covad Board at the time the vesting challenged in Count I occurred-and, therefore, is unable to determine with confidence whether the *Rales* analysis proceeds under the first or second *Aronson* exception. *See Rales*, 634 A.2d at 934. As a consequence, the Court's analysis addresses both scenarios. The Court need not address these considerations for Board members other than Runtagh, however, because, with respect to Counts II and III, it is clear that a majority of the current Board members both did not participate in the underlying acts and have been determined otherwise to be disinterested and independent.

> FN122. *Shaev*, 2006 WL 391931 (Del. Ch. Feb. 13, 2006).

> FN123. *Id.* at *4 (citing *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch.1996)).

> FN124. *Compare supra* note 121.

> FN125. *Id.* (citing *Guttman*, 823 A.2d at 501).

> FN126. *See Rales*, 634 A.2d at 936 (?[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors ....? (quoting *Aronson*, 473 A .2d at 815)).

The Plaintiffs allege that a breach of duty occurred because, ?under his Restricted Stock Purchase Agreement, McMinn needed to remain a full-time employee of Covad until November 2000 to fully vest in his founders' shares of [Covad]. If he did not maintain full-employment with the Company until all of his shares were vested, Covad had the right under the Restricted Stock Purchase Agreement to repurchase his unvested shares for mere pennies.? [FN127] McMinn, however, determined that he wished to pursue other opportunities (namely, the formation of Certive), and informed Knowling by email, on May 3, 1999, that he would be pursuing investment opportunities with Crosspoint. [FN128] The Amended Complaint further provides that, although McMinn ?offered to leave Covad's employ altogether, but only if he could ?accelerate the vesting of the remaining 31% of [his] unvested Covad stock,? ? an ?exception? was made for his benefit.[FN129] ?[U]nbeknownst to Covad's public shareholders, [McMinn] continued vesting his founders' shares, drew a full-time salary from Covad, and served as its Chairman of the Board....? [FN130] The complaint additionally alleges that Shapero, as General and Managing Partner of Crosspoint, was aware of McMinn's activities, and that it was ?highly likely? that Hawk, as a Special Limited Partner of Crosspoint, knew, as well .[FN131] McMinn resigned as a Covad director on November 1, 1999, and did not rejoin the board until late October 2000.

> FN127. Amended Compl. at ¶ 42.
>
> FN128. *Id.* at ¶ 43.
>
> FN129. *Id.* at ¶ 45.
>
> FN130. *Id.*
>
> FN131. *Id.* at ¶ 48.

**\*19** The Amended Complaint does not allege when McMinn's shares fully vested. It is this difficulty that potentially necessitates analysis of Runtagh's liability with respect to this claim. It perhaps can be said that two potential alternative conclusions may be reasonably inferred from the Plaintiffs' allegations: (1) that McMinn's shares were deemed vested when he resigned on November 1, 1999, or (2) that the exception for McMinn permitted his shares to vest fully as of November 2000. The Amended Complaint provides only that Runtagh joined the Covad board in ?November 1999.? [FN132] If it is the former, then it is unreasonable to conclude that Runtagh faced a ?substantial likelihood? of personal liability for a vesting of shares that occurred, at most, only on her first day as director. In the event it is the latter, however, it is theoretically possible that Runtagh could face personal liability for the vesting such that she would be unable to consider demand with respect to this claim. In that case, analysis of Runtagh's potential liability under *Caremark* would be necessary.

> FN132. *Id.* at ¶ 15. A third inference that may be drawn is that the vesting ended with the meeting of the Covad board on September 22, 1999, at which the board ?blessed? McMinn's founding of Certive, but also adopted a corporate opportunity policy ?expressly requir[ing] the prior approval of the Board before a fiduciary of Covad could take a corporate opportunity for himself.? *Id.* at ¶ 54.

Notwithstanding the above, the Court concludes that this potential aspect of the Plaintiffs' vesting claim, however, is without merit for several reasons. The dilemma presented by the multiple alternative scenarios points to the foremost reason why the Court need not develop this analysis: the absence of alleged facts permitting the Court to determine whether vesting occurred throughout the relevant period fails to satisfy the particularity requirements of Court of Chancery Rule 23.1.[FN133]

> FN133. Indeed, the imprecise allegation that Runtagh joined that Covad board in ?November 1999? only compounds the Court's difficulties. Also, the question of whether the Plaintiffs' claims are time-barred has been vigorously debated; that defense would further diminish the prospect of liability for Runtagh (who also is not named by the Plaintiffs as a defendant liable with respect to Count I). *See Rales,* 634 A.2d at 936 (stating that a ?mere threat of personal liability? is insufficient). Finally, the Plaintiffs have not argued that Runtagh is exposed to personal liability as the result of the vesting of McMinn's shares.

### 3. *Irving*

In setting forth their reasons for why Irving lacks independence, the Plaintiffs make conclusory allegations regarding

Irving's voting history, that he became a director ?with the consent and approval of the McMinn-Shapero nominees,? and that he receives compensation as a Covad director.[FN134] Again, bare allegations of this nature are insufficient, separately or cumulatively, to negate Irving's independence.

>    FN134. Amended Compl. at ¶¶ 16, 139.

First, the Plaintiffs allege that Irving ?put[ ] the interests of the McMinn cronies ahead of Covad's....? This conclusory allegation, however, is essentially a repetition of the Plaintiffs' ?acquiescence? arguments, which the Court has already rejected for being insufficient to assist in meeting the particularized pleading requirements.[FN135] Second, the Plaintiffs' refrain that a particular director was appointed to the Covad Board ?with the consent and approval of the McMinn-Shapero nominees? fails, without more. Finally, the Plaintiffs have failed to allege particularized facts demonstrating that the fees Irving receives as a director would somehow interfere with the exercise of his judgment; indeed, they have failed to enumerate even what these fees are. As a consequence, Irving's disinterestedness and independence are not subject to reasonable doubt on the basis of the facts plead.

>    FN135. *See also Cal. Pub. Employees' Ret. Sys.*, 2002 WL 31888343, at *9.

### 4. Lynch

The Plaintiffs have failed to satisfy their burden to present sufficient particularized facts to create a reasonable doubt as to the presumed disinterestedness and independence of Lynch. The Amended Complaint alleges that Lynch is a ?long-time friend of McMinn.? [FN136] Indeed, the Plaintiffs' allegations provide that their friendship is ?so close? that they own both homes in the same neighborhood and ?neighboring wineries.? Certainly, according to these allegations, Lynch and McMinn are not strangers-indeed, they maybe fairly close-but allegations of this nature do not allow a reasonable inference that the exercise of a director's discretion and judgment is impaired. As alluded to above, ?to render a director unable to consider demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence.? [FN137] This is true regardless of whether such ties arose as a consequence of the directors' board membership or whether they were pre-existing. [FN138] ?Mere allegations that [the directors in question] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes.? [FN139] In the context of pre-suit demand, ?friendship must be accompanied by substantially more in the nature of *serious* allegations? supporting a reasonable doubt as to independence.[FN140] In other words, considering ?the risks that directors would take by protecting their social acquaintances in the face of allegations that those friends engaged in misconduct,? [FN141] the Plaintiffs have failed to create a reasonable doubt that Lynch ?would be more willing to risk his ... reputation than risk the relationship with the interested director.? [FN142]

>    FN136. Amended Compl. at ¶ 9.

>    FN137. *Beam,* 845 A.2d at 1051; *see also Odyssey Partners, L.P. v. Fleming Cos., Inc.,* 735 A.2d 386, 409 (Del. Ch.1999) (?That [directors] were neighbors or former neighbors is of no moment.?).

>    FN138. *See Beam,* 845 A.2d at 1051.

>    FN139. *Id.* at 1051-52.

>    FN140. *Id.* at 1052 (emphasis added); *see also id.* at 1050-51 (describing other instances in which reasonable doubt might arise).

>    FN141. *Id.* at 1052.

>    FN142. *Id.*

**\*20** Similarly, ?the naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence.? [FN143] In their Amended Complaint, the Plaintiffs again repeat their well-worn allegation that Lynch ?derived the benefits of being and remaining on the Board ... of, and receiving compensation from, Covad

...;? <u>FN144</u> the Court has already explained its reasons for giving little weight to such allegations. The Amended Complaint, however, also asserts in this instance that Lynch has ?derived? these ?benefits? as a consequence of certain unspecified ?business dealings? with Covad directors.<u>FN145</u> As discussed above, the sweeping absence of particularity, here, precludes a reasonable inference that Lynch's business dealings or relationships compromised his presumed independence.

> FN143. *Orman*. 794 A.2d at 27; *see also Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 980-81 (Del. Ch.2000).

> FN144. Amended Compl. at ¶ 9.

> FN145. *Id.*

Finally, the Plaintiffs allege that Lynch was rewarded for his support with membership on Certive's ?Advisory Board,? <u>FN146</u> and that fact demonstrates both his interestedness with respect to the Certive Claims, as well his lack of independence generally.<u>FN147</u> Though the question may be close, the Plaintiffs' argument, however, ultimately fails for lack of support with sufficiently particularized allegations. The Amended Complaint does not inform the Court what membership on the Certive ?Advisory Board? actually entails. Although the Court cannot conclude with certainty from the face of the pleadings, it does not appear to refer to Certive's board of directors. <u>FN148</u> Moreover, although the Plaintiffs contend that the position is prestigious and lucrative,<u>FN149</u> the only allegation offered to support this assertion is that Certive's website describes the Advisory Board by stating that ?many companies use Advisory Boards as window dressing[,] Certive believes they should be much more....? <u>FN150</u> Perhaps a certain level of prestige (at least from Certive's perspective) can be inferred from this statement, but that alone does not prove its materiality to Lynch.

> FN146. *Id.* at ¶ 56.

> FN147. *Id.* at ¶¶ 137, 138, 140.

> FN148. *See id.* at ¶ 56. The Amended Complaint quotes the Certive website as explaining: ?[The Certive Advisory] Board meets quarterly and *provides insight that we actively use to run the business.* [Advisory] Board meetings are lively and protracted-one and a half days. And, everyone attends.? *Id.* (emphasis added). These allegations appear to refer to a group of experienced, outside advisors who generally advise those actually managing the company's affairs. This demonstrates the Court's difficulty (and the need for compliance with the requirement of particularized pleading): the Court can only hazard a guess, based on the allegations-and, therefore, no inference doubting Lynch's presumed independence and disinterestedness can flow from this allegation.

> FN149. *Id.* (?These positions are highly sought after and potentially lucrative as advisory board members in Silicon Valley companies are given stock options which during the 1990s became a source of great wealth for many people.?).

> FN150. *Id.*

[I]n the absence of self-dealing, it is not enough to establish the interest of a director by alleging that he received *any* benefit not equally shared by the stockholders. Such benefit must be alleged to be *material* to that director. Materiality means that the alleged benefit was significant enough ?*in the context of the director's economic circumstances,* as to have made it improbable that the director could perform her fiduciary duties to the ... shareholders without being influenced by her overriding personal interest.? <u>FN151</u>

> FN151. *Orman,* 794 A.2d at 23 (footnotes omitted) (emphasis in original).

The allegations provided by the Plaintiffs clearly fail to meet the above-articulated standard: they set forth no particularized allegations of compensation actually received by Lynch in return for his Advisory Board service or as to whether such compensation would be material to a director in Lynch's position. Indeed, the Plaintiffs allege only that Certive ?grant[ed] stock interests in Certive *and/or* provide[d] *some form* of compensation? to Lynch for his

service on the Advisory Board.[FN152] These allegations fail to satisfy the materiality test described above, much less set forth particularized facts sufficient to conclude that Lynch was ? ?beholden to [McMinn or Crosspoint] or so under their influence that [his] discretion would be sterilized.? [FN153]

> FN152. Amended Compl. at ¶ 56; *see also id.* at ¶¶ 137-38.

> FN153. *Rales,* 634 A.2d at 936. Additionally, the Plaintiffs do not plead when Lynch received his appointment. The Plaintiffs offer no *particularized* facts demonstrating the necessary linkage between Lynch's appointment to the Certive Advisory Board and his relationship to McMinn. Perhaps the Court should infer this from the facts, but the Plaintiffs have also alleged that ?Lynch is a private investor in a number of start-up companies in the Internet area.? Amended Compl. at ¶ 33. Indeed, it is the relatively ?incestuous? nature of Silicon Valley's business culture that appears to be at the heart of the Plaintiffs' suit; however, on the other hand, ?cozy? business relationships of this nature are perhaps an almost inevitable by-product of a highly-sophisticated growth industry reliant almost entirely on innovation and a narrow field of experienced entrepreneurial talent.

### 5. *Jalkut*

**\*21** The Plaintiffs dispute inclusion of Jalkut in the Court's demand futility analysis because they allege that his appointment to the Covad Board occurred in violation of the Standstill Agreement between Covad and Khanna,[FN154] which provided that the parties would ?refrain from taking any action that could advance their respective positions.? [FN155] Essentially, the Plaintiffs argue that Covad advanced its position in litigation by appointing Jalkut because it gave ?the McMinn-tainted Board one more vote in their camp.? [FN156] This argument begs the question, however, as the inquiry during demand futility analysis, in this context, is independence. Jalkut can only be viewed as a ?vote in the McMinn camp? if he is not independent and if he is not independent, then McMinn and his confederates gain no benefit from his presence. Thus, for demand futility purposes, it is appropriate to consider Jalkut because the inquiry into whether Covad advanced its litigation position by packing the Board (in violation of the Standstill Agreement) and inquiry into Jalkut's independence are substantially the same.

> FN154. *See* Amended Compl. at ¶¶ 136, 138.

> FN155. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 33 n. 13.

> FN156. *Id.*

Moreover, because the Court concludes that Jalkut is disinterested and independent, the Court's decision to include or to exclude Jalkut from its demand futility analysis results in no detriment to the Plaintiffs. Exclusion of Jalkut from the Board members considered lowers the total number of directors on the Board for demand futility purposes to seven-therefore, since the Court has already concluded that four are disinterested and independent, analysis under the first prong of *Aronson* is at an end. On the other hand, if Jalkut is included in the Court's analysis, then the total number of directors is raised to eight, with five disinterested and independent directors required to preclude demand excusal under *Aronson'* s first prong. Jalkut, then, is that fifth director.

Assuming that Jalkut is to be included, the Court turns to analysis of his disinterestedness and independence. The Plaintiffs allege that, in addition to his seat on the Covad Board, Jalkut serves as chief executive officer of TelePacific, a Covad reseller (*i.e.,* a Covad retailer). Specifically, the Plaintiffs allege that ?[a]s the CEO of a customer of Covad, Jalkut lacks the independence to fairly and impartially judge the actions of his fellow Board members.? [FN157] As with Crandall, the Plaintiffs point to information available in the 2004 Proxy Statement (but not explicitly mentioned in the Amended Complaint) to support their claim. Indeed, the allegations in the Amended Complaint, standing alone, are exceedingly conclusory.

> FN157. Amended Compl. at ¶¶ 20, 138 (?Jalkut lacks independence from the McMinn-dominated Board because he is the CEO and president of one of Covad's customers, TelePacific.?).

Assuming that the 2004 Proxy Statement may be considered for these purposes,[FN158] the Plaintiffs still fail to allege facts sufficient to create a reasonable doubt as to Jalkut's independence. Specifically, the Plaintiffs explain that Covad ?recognized in excess of $1.3 million and $1.8 million in revenues from TelePacific [in 2002 and 2001],

respectively.? FN159 The Plaintiffs contend that this ?obviously? resulted in ?many millions more in revenue? for TelePacific, on the theory that services that services purchased from Covad by TelePacifc were then sold to TelePacific customers at a mark-up.FN160 Without particularized allegations of fact, however, there is nothing ?obvious? about this argument. Without knowledge of the mark-up, one wonders if ?many millions more? is even plausible. Moreover, although gross revenues are not unimportant, the critical information would be profits, something the Plaintiffs have not provided.

> FN158. This may not be a good assumption. *Compare Hughes*, 2006 WL 722198, at *3 (holding that court may consider documents referred to in complaint ?in some instances and for carefully limited purposes?). *See also supra* text accompanying note 108.

> FN159. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 33-34.

> FN160. *Id.*

**\*22** Moreover, there are no particularized facts alleged adequately linking the business relationship between TelePacific and Covad with the claimed lack of independence of Jalkut. The Plaintiffs argue that TelePacific, as a customer of Covad, would not want to jeopardize the current pricing structure offered to TelePacific (as an increase in price has the potential to adversely affect TelePacific's profits). Arguments of this nature (*i.e.,* that a customer wants to avoid offending its supplier) must be considered with care. First, the Plaintiffs' contention assumes that the market for TelePacific's product is highly elastic and that, as a consequence, increases in cost will be absorbed by TelePacific, instead of passed on to the firm's customers. Although it may be reasonable to assume that some percentage of cost increases will be absorbed by a retailer, the amount (and therefore its materiality) may vary widely across firms and industries. The Plaintiffs argue that ?Jalkut clearly does not want TelePacific to have to pay more for [Covad's] services,? FN161 which, though certainly a reasonable observation, is insufficient to lead to the broader inference that Jalkut's judgment has been sterilized as to the best interests of Covad shareholders.FN162 Moreover, the Plaintiffs' allegations are insufficiently particularized to displace the notion that, in this context, if Covad unilaterally raised its prices relative to the market, TelePacific would purchase from another, lower-priced seller.

> FN161. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 33-34.

> FN162. *Cf. Jacobs*, 2004 WL 1728521, at *5-*6.

Additionally, as with Crandall and BEA Systems, the Plaintiffs make no allegations as to the terms of TelePacific's business dealings with Covad; nor do the Plaintiffs allege facts permitting the Court to infer, in this context, that TelePacific's relationship with Covad is material. Although the Plaintiffs have asserted that Covad received certain revenue from TelePacific in 2001 and 2002, this tells the Court little about the materiality of this relationship to TelePacific. As a consequence, without more, the Plaintiffs have failed to create a reasonable doubt as to the presumed disinterestedness and independence of Jalkut.

In summary, the Court concludes that Khanna's June 19, 2002 letter to the Covad Board was not a demand letter, and, thus, there is no need to inquire into whether demand was wrongfully rejected. Additionally, although the Covad Board had ?cozy? business and social relationships, the Plaintiffs have failed to plead particularized allegations that would cast a reasonable doubt on the disinterestedness and independence of at least half of the Covad Board. FN163 Consequently, the Plaintiffs have failed to show that demand was excused under the first prong of *Aronson* or under *Rales.*FN164

> FN163. The Court notes that the factual paucity described above may have resulted from difficulties in accessing certain information. Indeed, even after using the ?tools at hand? to develop particularized facts (*e.g.,* public filings and § 220), certain information may be restricted due to the fact that it is held by entities with no public disclosure obligations. Although the burdens presented by such obstacles have been recognized, *see Brehm*, 746 A.2d at 268 (Hartnett, J., concurring) (?Plaintiffs must not be held to a too-high standard of pleading because they face an almost impossible burden when they must plead facts with particularity and the facts are not public knowledge.?), the pleading standard under which the Court examines allegations for requisite particularity remains unaltered, even for plaintiffs who employed the ?tools at hand.?

FN164. Accordingly, the Certive Claims (Counts I through III) must be dismissed.

IV. BUSINESS JUDGMENT

As discussed above, because the two prongs of the test for demand futility under *Aronson* ?are disjunctive,? the challenged transactions subject to analysis under *Aronson* must be examined under the test's second-prong, in addition to the first prong's ?disinterestedness? and ?independence? analysis. FN165 As a consequence, the BlueStar Transactions and the Dishnet Settlement each require inquiry into whether reasonable doubt is created that these challenged transactions were ?otherwise the product of a valid exercise of business judgment.? FN166

FN165. *See, e.g., In re J.P. Morgan & Co.,* 2005 WL 1076069, at *8.

FN166. *See Aronson,* 473 A.2d at 814. Analysis under the second prong of *Aronson* is not required for the Certive Claims, because a majority of the board has changed since the events giving rise to Counts II and III and because Count I does not challenge a business decision. *See Rales,* 634 A.2d at 934.

A. *Legal Standard*

**\*23** In order to satisfy the second prong of *Aronson,* the Plaintiffs must plead ?particularized facts creating a reasonable doubt that the decisions of the [board] were protected by the business judgment rule.? FN167 ?[A]bsent particularized allegations to the contrary, the directors are presumed to have acted on an informed basis and in the honest belief that their decisions were in furtherance of the best interests of the corporation and its shareholders.? FN168 It is not an easy task to allege that a decision falls outside the realm of the business judgment rule because ?[t]his Court will not second-guess the judgment of a board of directors if it bases its decision on a rational business purpose.? FN169 Thus, ?[t]he burden is on the party challenging the decision to establish facts rebutting the presumption.? FN170 In conducting its analysis, the Court must examine the ?substantive nature of the challenged transactions and the board's approval thereof.? FN171

FN167. *Brehm,* 746 A.2d at 258.

FN168. *Highland Legacy Ltd.,* 2006 WL 741939, at *7; *see also Levine,* 591 A.2d at 206 (?[P]laintiff ... must plead particularized facts creating a reasonable doubt as to the ?soundness' of the challenged transaction sufficient to rebut the presumption that the business judgment rule attaches to the transaction.?); *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984) (?A court does not assume that the transaction was a wrong to the corporation requiring corrective measures by the board.?), *overruled on other grounds, Brehm,* 746 A.2d at 254.

FN169. *Kahn v. Roberts,* 1995 WL 745056, at *4 (Del. Ch. Dec. 6, 1995), *aff'd,* 679 A.2d 460 (Del.1996).

FN170. *Aronson,* 473 A.2d at 812.

FN171. *Id.* at 814.

A plaintiff seeking to demonstrate demand futility under the second prong of *Aronson* ?must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision.? FN172 The Court's inquiry in this context is ?predicated upon concepts of gross negligence.? FN173 ?The plaintiff faces a substantial burden, as the second prong of the *Aronson* test is ?directed to extreme cases in which despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review.? ? FN174 Although the second prong of *Aronson* may potentially be satisfied by recourse to multiple theories,FN175 establishing that a board's decision falls outside the scope of the business judgment rule frequently requires a showing of facts tantamount to corporate waste.FN176 As a consequence, a plaintiff will bear a difficult, but not insurmountable, burden in pleading particularized facts demonstrating demand futility under this prong of *Aronson.*FN177

FN172. *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del. Ch.2003); *see also In re J.P. Morgan Chase & Co.*, 2005 WL 1076069, at *11. *Cf. Levine*, 591 A.2d at 206 (although addressing only whether directors were adequately informed, identifying self-interest, entrenchment, waste, and acting in such an uninformed manner as to constitute gross negligence as topics of analysis in this context).

FN173. *Aronson*, 473 A.2d at 812; *see also Brehm*, 746 A.2d at 259 (?Pre-suit demand will be excused in a derivative suit only if the Court ... conclude[s] that the particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decisionmaking process, *measured by concepts of gross negligence*, included consideration of all material information reasonably available.? (emphasis in original)).

FN174. *Greenwald v. Batterson*, 1999 WL 596276, at *7 (Del. Ch. July 26, 1999) (quoting *Kahn v. Tremont Corp.*, 1994 WL 162613, at *6 (Del. Ch. Apr. 22, 1994)); *see also Highland Legacy Ltd.*, 2006 WL 741939, at *7.

FN175. *See, e.g., Levine*, 591 A.2d at 206; *see also* Wolfe & Pittenger, *supra* note 77, § 9-2[b], at 9-76 n. 303 (describing analysis under second prong of *Aronson* generally as looking to substantive due care and to procedural due care).

FN176. *See Tremont Corp.*, 1994 WL 162613, at *6 (?The test for this second stage is thus necessarily high, similar to the legal test for waste.?).

FN177. *See, e.g., Brehm*, 746 A.2d at 263 (describing waste as ? ?an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration? ? (quoting *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch.1993)); *Grobow*, 539 A.2d at 189 (holding that waste depends on ?whether ?what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid? ? (quoting *Saxe v. Brady*, 184 A.2d 602, 610 (Del. Ch.1962)); *see also Green v. Phillips*, 1996 WL 342093 (Del. Ch. June 19, 1996) (?That extreme test is rarely satisfied, because if a reasonable person could conclude the board's action made business sense, the inquiry ends and the complaint will be dismissed.?).

### B. *The BlueStar Transactions*

The BlueStar acquisition was approved by the Covad Board on June 15, 2000, and announced on June 16, 2000. The Amended Complaint sets forth that, on September 22, 2000, the transaction was completed with Covad's issuance of approximately 6.1 million shares of Covad common stock to BlueStar stockholders ?according to an exchange ratio by which BlueStar stockholders received an average market price of $14.23 in exchange for all outstanding preferred and common stock.? [FN178] The Amended Complaint explains that this resulted in a price to Covad of ?at least $200 million? for BlueStar.[FN179] The complaint further states that the day after the merger was announced, Covad's shares dropped 27%, constituting $1 billion of market value.[FN180]

FN178. Amended Compl. at ¶ 73. Outstanding BlueStar stock options and warrants were converted into options to purchase approximately 225,000 shares of Covad common stock at a ?fair value? of $6.55 per share. *Id.*

FN179. *Id.*

FN180. *Id.* at ¶ 70. It is uncertain whether the drop in share price can be attributed solely to the BlueStar transaction, since the Amended Complaint ambiguously explains that, ?at the same time [Covad] announced the merger,? the company also announced that ?it had reduced both the number of end-user lines it expected to be in service on June 30, 2000 and its 2000 line growth expectations primarily because of the channel conflict with BlueStar.? *Id.*

**\*24** The Plaintiffs identify numerous grounds on which they contend that the BlueStar acquisition was not a valid exercise of the Covad Board's business judgment. They principally argue that the Board's approval process was procedurally deficient, that the Board failed to inform itself adequately and to act in good faith, and that the transaction constituted corporate waste.

The Amended Complaint alleges that no special committee of disinterested directors was formed to consider the transaction.[FN181] The mere allegation of a failure to form a committee is insufficient, however, to satisfy *Aronson's* second prong.[FN182] This fact, however, is not without value, given the material interests in the transaction of at least one-quarter (*i.e.*, Shapero and Hawk) of the Covad Board.[FN183] Moreover, the Plaintiffs allege that the acquisition was initiated by the repeated lobbying of Covad's then-chief executive officer and board member, Knowling. The Amended Complaint provides that ?Shapero lobbied Knowling through lengthy emails on the weekend of May 20-21, 2000 to have Covad acquire BlueStar and NewEdge. After Shapero's full-court press, Knowling decided on May 21, 2000-without any due diligence-that Covad should acquire BlueStar.? [FN184] The Amended Complaint further alleges that the reason for the ?hasty process? was that it ?served BlueStar's interests (and, therefore, Shapero/Crosspoint's interests) in that BlueStar was in a precarious financial condition and had it continued as a stand-alone company, it would have been unable to mask its serious problems any longer.? [FN185] Indeed, the Amended Complaint alleges that the fairness opinion rendered by Donaldson, Lufkin & Jenrette (?DLJ?) to BlueStar with respect to the merger stated that DLJ had been informed by the ?management of the Company? that ?the Company, as of June 14, 2000, expected to exhaust its liquidity in the near term and did not have a financing source for funding its anticipated operating and capital needs over the following 12 months.? [FN186]

FN181. *See* Amended Compl. at ¶ 65.

FN182. The parties' briefs contain significant debate over which directors participated in the review and approval of the challenged transactions and the effect of those directors' participation on the Court's analysis. The Covad Board at the time of the BlueStar acquisition was comprised of Dunn, Hawk, Irving, Knowling, Lynch, Marshall, Runtagh, and Shapero. The Amended Complaint, however, does not allege which directors participated in the review and approval of the BlueStar acquisition. Although Paragraph 80 of the complaint provides that, with respect to the BlueStar earn-out settlement, ?under normal Covad practice, self-interested directors would have left any Board meeting when matters pertaining to their self-interest are discussed and voted upon,? the Court is unable to draw any conclusions from this fact as to approval of the BlueStar acquisition under the standard governing motions to dismiss.
At the time of the BlueStar earn-out settlement, McMinn, Shapero, Hawk, Irving, Lynch, Marshall, and Runtagh were members of the Covad Board. Paragraph 80 does explicitly allege that McMinn, Hawk, and Shapero did not participate in board meetings for ?review and approval? of the settlement.

FN183. The Amended Complaint provides that ?at least as early as mid-1999, Shapero, through Crosspoint, owned approximately 46% of BlueStar's outstanding shares, and both McMinn and Hawk owned a substantial number of preferred shares.? *Id.* at ¶ 59. Paragraph 72 of the Amended Complaint provides: ?Each of Messrs. McMinn, Hawk and Shapero and/or Crosspoint were significant shareholders of BlueStar.? Crosspoint, for which Shapero serves as General and Managing Partner, is alleged to have owned approximately 30 million shares, representing approximately 41.9% of all issued and outstanding BlueStar shares. *See id.* ?Hawk, a Special Limited Partner of Crosspoint, was also a significant shareholder of BlueStar stock.? *Id.* McMinn is alleged to have been the beneficial owner of approximately 656,942 shares of BlueStar common stock, *see id.*; however, it should be noted that McMinn had resigned from the Covad Board on November 1, 1999, prior to the BlueStar acquisition's approval. McMinn rejoined the Board in late October 2000, and was a member at the time of the BlueStar earn-out settlement.

FN184. Amended Compl. at ¶ 62. Shapero sat on the board of NewEdge Networks, a ?provider of dedicated internet access for businesses and communications carriers.? A reasonable doubt has also been shown as to Knowling's independence at the time of the acquisition. At that time, Knowling was Covad's chief executive officer, as well as a member of its Board, and ?received a generous compensation package when hired?: $1.5 million signing bonus, $400,000 salary, other bonuses, and stock options. *Id.* at ¶ 97. Additionally, Covad granted Knowling severance benefits ?worth $1.5 million? and forgave a $500,000 loan to him when he resigned in November 2000 (months after the BlueStar acquisition). *Id.* Most significantly, Shapero served as a member of Covad's compensation committee at this time. *Id.* at ¶¶ 11, 72.

FN185. *Id.* at ¶ 62.

FN186. *Id.* at ¶ 63.

The Amended Complaint sets forth that ?[a]lmost uniformly, Covad management objected to the transaction.? [FN187]

Indeed, the Amended Complaint alleges that Knowling ?was the sole Covad officer to support? the BlueStar acquisition. [FN188] The complaint also describes a due diligence report prepared by Covad's engineering director, ?which stated that the acquisition would be virtually useless because of the overlap in the companies' networks.? [FN189] The complaint alleges that the Board ?ignored? management's due diligence findings, which were presented to the Board and which ?expressed serious concern? that ?Covad already had overlapping physical assets to provide DSL coverage in 70% of BlueStar service territory....? [FN190] The Plaintiffs charge that the Covad directors did not ?evaluate? the due diligence reports ?prepared by ... [the director of engineering] and others that pointed out many of the key acute problems of BlueStar....? [FN191]

> FN187. *Id.* at ¶ 64. The complaint particularly cites Khanna, Chuck Haas, Vice President and co-founder of Covad, and Ron Marquardt, Covad's engineering director, as having ?expressed their objections to the deal.?

> FN188. *Id.* at ¶ 72.

> FN189. *Id.* at ¶ 64. The Plaintiffs, in their answering brief, also charge, *inter alia,* that the directors approved the transaction after only a ?35 minute telephone conversation? with five board members present. Pls.' Ans. Br. to Dirs.' Mot. to Dismiss at 40. This information, however, is not among the allegations of the Amended Complaint.

> FN190. Amended Compl. at ¶ 68.

> FN191. *Id.* at ¶ 65. The Plaintiffs' answering brief also provides that ?no independent appraisal of BlueStar was sought much less obtained....? This allegation does not appear in the Amended Complaint. Pls.' Ans. Br. to Dirs.' Mot. to Dismiss at 40.

**\*25** Finally, the Plaintiffs argue that Covad's investment banker (Bear Stearns), which provided a fairness opinion for the transaction, ?had a conflict of interest with respect to the merger, and the Board was aware of the conflict.? [FN192] The Amended Complaint recites that ?Bear Stearns Corporate Lending, Inc ., an affiliate of Bear Stearns, provided BlueStar with a $40 million financing commitment to fund BlueStar's continuing operations until the effective date of the merger.? [FN193] The complaint states that, as a result of this bridge loan, it was in the interest of Bear Stearns ?to render a favorable opinion ... and ensure the closing of the transaction,? and that, ?even though all the signs at the outset indicated that the transaction would spell financial disaster for Covad,? Bear Stearns was conflicted from ?urging (and therefore failed to urge) Covad to cancel the deal.? [FN194] As the Amended Complaint explains, ?if Covad did not close the transaction, Bear Stearns would be left with the unpaid bridge loan....? [FN195]

> FN192. Amended Compl. at ¶ 66. The Amended Complaint describes the fairness opinion as ?perfunctory.? *Id.* This perhaps adds context, but little substance, to the Court's inquiry. Moreover, the absence of an independent opinion on which the board relied would not, of itself, demonstrate gross negligence satisfying *Aronson'* s second prong. In this instance, however, the Amended Complaint alleges, for example, that Covad's management's opinion was ?[a]lmost uniformly? hostile to the transaction.

> FN193. *Id.* The Amended Complaint also provides that Bear Stearns was conflicted because it had an ?ongoing interest in earning fees from this and other Covad transactions.? *Id.* First, this is insufficiently particularized. Second, the mere fact that an investment bank will receive typical fees for its services does not render its advice conflicted.

> FN194. *Id.*

> FN195. *Id. Compare Crescent/Mach 1 Partners, L.P.,* 846 A.2d at 984-85. The Court notes that the Amended Complaint does not specify when the bridge loan was extended to BlueStar. The chronology, however, may have substantial impact on the analysis. If the bridge loan was made prior to rendering the fairness opinion, then this fact certainly adds substance to the Court's ?reasonable doubt? analysis. On the other hand, if the loan was not negotiated or extended until *after* Bear Stearns rendered its fairness opinion (or until after the Covad Board's vote to approve), then the existence of the bridge loan would be substantially less significant to the Court's analysis. Issues of continuing reliance on Bear Stearns' advice might arise, but these would perhaps be distinct from reliance on the fairness opinion, itself.

The Court is commanded to make all reasonable inferences in favor of the Plaintiffs from particularized allegations. In this instance, the inference clearly intended by the Plaintiffs' from Paragraph 66 of the Amended Complaint is that loaned funds were at risk-not merely fees for making the loan-because the loan was extended before the opinion was delivered. Similarly, Paragraph 141 states that the Board obtained a ?highly-conflicted Bear Stearns [sic] opinion in connection with the First BlueStar Transaction.? The Plaintiffs' briefs support the Court's inference and make even more clear the light in which the Plaintiffs intended the allegations to be read. *See, e.g.,* Pls.' Ans. Br. to Covad's Mot. to Dismiss at 36-37 (?The Amended Complaint ... is replete with facts *known to the Board at the time it approved the transaction* which unequivocally show the gross negligence of Runtagh and Lynch.... The only financial opinion before the Board was that of Bear Stearns.... That opinion was hopelessly conflicted (and the Covad Board knew it) because a subsidiary of Bear Stearns had a $40 million bridge loan outstanding to BlueStar and would not see a dime of that money returned to it unless Covad acquired BlueStar.?); *id.* at 12 (?[The Covad Board] accepted the fairness opinion of Covad's investment banker, Bear Stearns, despite the fact that Bear Stearns *had* a glaring conflict of interest with respect to the merger. Bear Stearns Corporate Lending, Inc .... *had given* BlueStar a $40 million financing commitment to fund BlueStar's continuing operations, and would have had no hope of recouping a dime of that money without the merger.? (citing Amended Compl. at ¶ 66 (emphasis added))); Pls.' Ans. Br. to Dirs.' Mot. to Dismiss at 10 (?[The Covad board] accepted a favorable ?preliminary? opinion from an investment banker that the Covad Board *knew* had an enormous conflict that prevented it from evaluating the BlueStar acquisition in an objective manner.? (citing Amended Compl. at ¶¶ 65, 66) (emphasis in original)). The Court recognizes that this is perhaps an example of particularly artful drafting, as well. Indeed, at the hearing on these motions, the Defendants pointed to documents produced in § 220 action that may resolve this issue; however, the Court may not consider them in the present analysis.

On a motion to dismiss, the Court is required to accept as true all well-pleaded allegations and to draw all reasonable inferences from such allegations in favor of the Plaintiffs. The Court acknowledges that the above facts, if true, create a reasonable doubt that the transaction was the product of a valid exercise of business judgment. The Plaintiffs have argued that, in acting to approve the merger, the directors committed violations of their duties of good faith and due care. Demand will be excused, for example, where the Court ?conclude[s] that the particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decisionmaking process, *measured by concepts of gross negligence,* included consideration of all material information reasonably available.? [FN196] It is possible that demand may also be excused where the Court may reasonably doubt that directors have complied in good faith with the requirement they fulfill their fiduciary duties.[FN197] This Court has previously addressed the possibility that

FN196. *Brehm,* 746 A.2d at 259 (emphasis in original).

FN197. *Cf. Guttman v. Huang,* 823 A.2d 492, 506 (Del. Ch.2003); *IHS,* 2004 WL 1949290, at *9 n. 36.

disinterested, independent directors ?knew that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss.? If they did indeed act in such a way, they have acted in a manner that cannot be said to be the product of sound business judgment and so cannot be protected by the presumption of the business judgment rule.[FN198]

FN198. *Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. (?IHS?) v. Elkins,* 2004 WL 1949290, at *10 (Del. Ch. Aug. 24, 2004) (addressing motion to dismiss under Court of Chancery Rule 12(b)(6)) (quoting *In re Walt Disney Co.,* 825 A.2d at 289).

In other words, if they behaved in such a manner, then they ? ?consciously and intentionally disregarded their responsibilities,? and ... therefore, could be in violation of their fiduciary duties to the corporation.? [FN199]

FN199. *IHS,* 2004 WL 1949290, at *9 (quoting *In re Walt Disney Co.,* 825 A.2d at 289) (emphasis in original).

The Plaintiffs have pleaded particularized facts alleging, *inter alia,* that the Covad Board had members with significant, material interests in the transaction, ignored a management that objected to the acquisition ?[a]lmost uniformly,? failed to ?evaluate? management due diligence findings that expressed ?serious concerns? about the transaction, and knew of significant conflicts held by the investment banker rendering the fairness opinion on which

the Board relied.[FN200] As a consequence, the Court concludes that the allegations contained in the Amended Complaint create a reasonable doubt as to whether approval of the BlueStar transaction was the product of a valid exercise of business judgment by the Covad Board.[FN201] Therefore, demand is excused as to the BlueStar acquisition of Count IV.[FN202]

FN200. The Court acknowledges that, after an opportunity for discovery, it may become clear that the bridge loan was negotiated, and funded, only after Bear Stearns had rendered its opinion. *See, e.g., In re New Valley Corp.,* 2001 WL 50212, at *6 n. 17 (Del. Ch. Jan. 11, 2001) (remarking that affidavit might give reason to doubt allegations, but was nevertheless improper to consider on motion to dismiss); *Mizel v. Connelly,* 1999 WL 550369, at *5 n. 5 (Del. Ch. July 22, 1999) (same).

FN201. The Director Defendants contend that their compliance with the ?safe harbor? provisions of 8 *Del.C.* § 144(a) conclusively rebuts the Plaintiffs' contentions; however, compliance with § 144(a) does not guarantee the benefit of the presumption of the business judgment rule that entire fairness review will not apply. *See, e.g., Benihana of Tokyo, Inc. v. Benihana, Inc.,* 891 A.2d 150, 185 (Del. Ch.2005); *In re Cox Commc'ns S'holders Litig.,* 879 A.2d 604, 614-15 (Del. Ch.2005); *Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *13. As the Court in *Benihana* explained:

Satisfying the requirements of § 144 only means that the [challenged transaction] is not void or voidable *solely* because of the conflict of interest. ?While non-compliance with §§ 144(a)(1), (2)'s disclosure requirement by definition triggers fairness review rather than business judgment rule review, the satisfaction of §§ 144(a)(1) or (a)(2) alone does not always have the opposite effect of invoking business judgment rule review.... Rather, satisfaction of §§ 144(a)(1) or (a)(2) simply protects against invalidation of the transaction ?solely? because it is an interested one. As such, § 144 is best seen as establishing a floor for board conduct but not a ceiling.? Thus, equitable common law rules requiring the application of the entire fairness standard on grounds other than a director's interest still apply.

891 A.2d at 185. Moreover, the Director Defendants' purported compliance may not be a matter amendable to resolution on the basis of the pleadings. *See supra* note 182.

The Director Defendants also argue that, since Covad's Amended and Restated Certificate of Incorporation exempts directors from liability for breaches of the duty of care pursuant to 8 *Del.C.* § 102(b)(7), all claims against the Director Defendants involving duty of cares must be dismissed. However, ?when a duty of care breach is not the *exclusive* claim, a court may not dismiss based upon an exculpatory provision.? *Alidina v. Internet.com Corp.,* 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002) (citing *Emerald Partners v. Berlin,* 787 A.2d 85, 91 (Del.2001); *see also Malpiede v. Townson,* 780 A.2d 1075 (Del.2001).

Additionally, charter provisions adopted under § 102(b)(7) merely work to exculpate liability, but do not erase the underlying breach of fiduciary duty. As a consequence, a tension potentially exists between the effect of § 102(b)(7) provisions on analysis under *Rales* and under the second-prong of *Aronson.* For instance, the pertinent question under *Rales,* in this context, is whether a director faces a ?substantial likelihood? of personal liability, which, if it exists, would then be deemed as compromising the director's capacity to consider demand. *See, e.g., Guttman,* 823 A.2d at 501. If a mere breach of a duty of care is the exclusive well-pleaded claim, however, then, in the presence of a § 102(b)(7) provision, the question posed by *Rales,* above, will likely be answered in the negative. *See id.* With respect to analysis under *Aronson'* s second prong, however, courts are instructed to ask whether the ?challenged transaction was otherwise the product of a valid exercise of business judgment?-*i.e.,* the pertinent question, in this context, is whether an underlying breach has occurred and not whether a substantial threat of liability exists, regardless of breach. The crucial factor, however, would seem to be questions of the potential for personal liability which affect capacity to consider demand. *See id.* (?When ... there are allegations that a majority of the board that must consider a demand acted wrongfully, the *Rales* test sensibly addresses concerns similar to the second prong of *Aronson.* To wit, if the directors face a ?substantial likelihood? of personal liability, their ability to consider a demand impartially is compromised under *Rales,* excusing demand.?); *see also Aronson,* 473 A.2d at 815 (?[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.?).

FN202. With respect to the Defendants' motion under Court of Chancery Rule 12(b)(6), the Court's conclusion here that demand is excused under the more demanding standard of *Aronson'* s second-prong necessarily moots analysis under Rule 12(b)(6).

The Defendants contend that the challenge to the BlueStar acquisition is barred by laches (or the ?borrowed? three-year statute of limitations) because the Original Complaint was filed more than three years after the Covad Board's approval of the transaction. *See* Mem. in Supp. of Dirs.' Mot. to Dismiss Am. Deriv. & Class

Action Compl. (?Dirs.' Op. Br. to Dismiss?) at 26-27 (citing *Kahn v. Seaboard Corp.*, 625 A.2d 269, 271 (Del. Ch.1993); *In re Marvel Entm't Group, Inc.*, 273 B.R. 58, 73-74 (D.Del.2002)). *But see* Pls.' Ans. Br. to Dirs.' Mot. to Dismiss, at 21 (citing *Kaufman v. Albin*, 447 A.2d 761 (Del. Ch.1982); *Dofflemyer v. W.F. Hall Printing Co.*, 558 F.Supp. 372 (D.Del.1983)). The motion to dismiss, with respect to the Defendants' affirmative defense of laches, is reviewed under Court of Chancery Rule 12(b)(6). Because the Court is unable to discern with reasonable certainty from the complaint that laches applies, the Court cannot grant the Defendants' motion on this ground at this time. *See, e.g.,* Amended Compl. at ¶ 144; Reply in Supp. of Dirs.' Mot. to Dismiss Am. Deriv. & Class Action Compl. (?Dirs.' Reply Br. to Dismiss?) at 9 (alluding to ?requirement? that BlueStar shareholders ?approve the transaction by tendering their shares on September 22, 2000?).

**\*26** The Court, furthermore, will not conduct business judgment analysis examining the BlueStar earn-out settlement separately. The two aspects of the BlueStar investment, proximate in time, as well as presenting issues of fact and law not easily bifurcated, are best tackled by treating them as one for demand excusal purposes. Thus, demand is also excused with respect to claims the Plaintiffs asserted in Count IV involving the BlueStar earn-out settlement. [FN203]

> FN203. Although the acquisition appears disastrous with the benefit of hindsight, the Court cannot permit the *ex post* results of a decision to cloud analysis of a board's *ex ante* judgment. *See, e.g., White*, 783 A.2d at 554; *Ash*, 2000 WL 1370341, at \*8; *Greenwald*, 1999 WL 596276, at \*7 (citing *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 361-62 (Del. Ch.1998), *aff'd in part and rev'd in part, sub nom. Brehm*, 746 A.2d 244; *Litt v. Wycoff*, 2003 WL 1794724, at \*10 (Del. Ch. Mar. 28, 2003); William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of Van Gorkom and its Progeny as a Standard of Review Problem*, 96 Nw. U.L.Rev. 449, 454-55 (2002).
>
> BlueStar's performance has been characterized as ?dismal,? but the Court notes the possibility that the ultimate failure of the deal may have had much to do with exogenous market forces affecting all of the telecommunications industry during this time. The failure to anticipate and avoid these reversals of fortune may perhaps not have been the result of, for example, bad faith, but rather aggressive and overly-optimistic business strategies that, in times of better economic fortune, are lauded as demonstrative off entrepreneurial skill and wisdom.

### C. The Dishnet Settlement [FN204]

> FN204. Although the Plaintiffs cast aspersions on Covad's decision to invest in Dishnet, they have not pursued any attack with particularized allegations.

Again, the Plaintiffs challenge the Covad Board's alleged failure to employ certain procedural devices (*e.g.,* a special committee) in approving the Dishnet Settlement.[FN205] As above, such allegations do not establish a *per se* rebuttal of the business judgment rule, as the Plaintiffs suggest. The Plaintiffs make only a conclusory allegation that the agreement was entered into ?without the benefit of the necessary financial and legal analysis....? [FN206] This clearly fails to meet the requirement that the Plaintiffs plead particularized facts. Although the Plaintiffs' briefs rely heavily, and expand, upon this ?fact,? the Court must look to the Amended Complaint to determine whether the Plaintiffs have satisfied their pleading burden-and they have not.[FN207]

> FN205. Amended Compl. at ¶ 141. At the time of the Dishnet settlement, McMinn, Shapero, Lynch, Marshall, Hawk, Hoffman, Irving, and Runtagh comprised the Covad Board. The Amended Complaint does not allege which directors participated in review and approval of the settlement. Although Paragraph 93 of the complaint addresses McMinn's ?course and conduct in connection with the failed Dishnet investment? and provides that ?the other Covad directors at the time-including Shapero, Lynch, Marshall, Hawk, Hoffman, Irving and Runtagh-acquiesced knowingly in, and as a group supported,? McMinn's conduct, the Court cannot draw any conclusions with regard to director participation on the basis of the pleadings under the standard governing motions to dismiss.

> FN206. *Id.* at ¶ 92. The Plaintiffs also make the highly conclusory allegation that, with respect to Dishnet, ?the other Covad directors at the time,? excluding McMinn, ?acquiesced knowingly in, and as a group supported, McMinn's breach of duty. *Id.* at ¶ 93.

> FN207. Although the Plaintiffs point out that McMinn was director of both Dishnet and Covad at this time,

the Plaintiffs do not allege that McMinn participated in the meeting or voted to approve the settlement. The Amended Complaint essentially sets forth only the terms of the settlement. *See, e.g., id.* at ¶¶ 89, 92. This is significant in light of Paragraph 80 of the Amended Complaint, which, in addressing the Board's consideration of the BlueStar earn-out settlement, provides that ?under normal Covad practice, self-interested directors would have left any Board meeting when matters pertaining to their self-interest are discussed and voted upon....?

The Plaintiffs' allegations regarding the Dishnet settlement appear principally, if not exclusively, directed toward corporate waste. The allegations of the Amended Complaint do not amount to waste because it cannot be said that the benefits received by Covad from the settlement are ?so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid.?[FN208] It is not, however, outside the realm of business reasonableness to conclude that Covad was better off settling with Dishnet and putting the Dishnet ordeal behind it than to engage in a drawn-out battle with the risk of losing.[FN209] There are certainly instances in which settling claims-even though of questionable merit-is the prudent course of conduct. Based on the facts alleged, the Plaintiffs have failed to plead that the Covad Board's decision to enter into the Dishnet settlement was beyond the business judgment rule.[FN210]

> FN208. *See* note 177, *supra.*

> FN209. If, as the Plaintiffs allege, the key principal of Dishnet ?had a highly mixed reputation in Asia,? *id.* at ¶ 88, it may not have been outside the realm of business judgment to determine that an immediate disentanglement from Dishnet was worth the cost.

> FN210. The Director Defendants' opening brief contends that this action should be dismissed on the grounds that the Plaintiffs have failed to state a claim under Court of Chancery Rule 12(b)(6). *See* Dirs.' Op. Br. to Dismiss at 1, 3. In support of their argument, the Director Defendants contend that their approvals of the transactions are protected under the business judgment rule. *See* Dirs.' Op. Br. to Dismiss at 34-35. In their answering brief to the Director Defendants, the Plaintiffs raised certain arguments questioning applicability of the protections of the business judgment rule. *See* Pls.' Ans. Br. Dirs.' Mot. to Dismiss at 30, 43-46. As the Plaintiffs chose only to address these arguments to the Director Defendants' briefing with respect to Rule 12(b)(6), in this context, the Court neither addresses them with respect to demand excusal nor expresses a view as to their potential applicability in light of dismissal of the various claims under Rule 23.1. *Compare* Pls.' Ans. Br. to Covad's Mot. to Dismiss 40-43.

## V. AIDING AND ABETTING CLAIMS

The Plaintiffs assert claims in Count VI of the Amended Complaint against Crosspoint for aiding and abetting poorly behaving fiduciaries with respect to the Certive and BlueStar transactions. The Court has already determined that the Plaintiffs' claims regarding Certive must be dismissed for failure to make demand upon the Board. The Court now addresses the Plaintiffs' aiding and abetting claim with respect to the BlueStar transactions.

A third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party ?knowingly participates? in the breach. To survive a motion to dismiss, the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: ?(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants,? and (4) damages proximately caused by the breach.[FN211]

> FN211. *Malpiede,* 780 A.2d at 1096 (quoting *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del. Ch.1984) (?It is well settled that a third party who knowingly participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship.?), *aff'd,* 575 A.2d 1131 (Del.1990)); *Penn Mart Realty Co. v. Becker,* 298 A.2d 349, 351 (Del. Ch.1972)); *see also Laventhol, Krekstein, Horwath and Horwath v. Tuckman,* 372 A.2d 168, 170-71 (Del.1976) (?[P]ersons who knowingly join a fiduciary in an enterprise which constitutes a breach of his fiduciary duty of trust are jointly and severally liable for any injury which results.?).

\*27 The Court notes first the distinction between the party who stands in a fiduciary relationship (described by the first and second elements of the test) and the non-fiduciary defendant (described by the test's third element) against whom the aiding and abetting claim is brought.[FN212] Of course, the Covad Board at the time of the BlueStar

acquisition owed fiduciary duties to Covad and its shareholders, thereby satisfying the first element of an aiding and abetting claim. Moreover, the Court has already determined that the Plaintiffs' claims with respect to the BlueStar transactions survive the motion to dismiss; thus, the second element of the test is satisfied here, as well. Similarly, the Amended Complaint sufficiently alleges that, in the event a breach of fiduciary duty is proved, damages were proximately caused.[FN213] As to the requirement that there be ?knowing participation? in the breach by the non-fiduciary defendant (*i.e.*, Crosspoint), ?[a] claim of knowing participation need not be pled with particularity. However, there must be factual allegations in the complaint from which knowing participation can be reasonably inferred.?[FN214] Shapero's status as a Covad director and General and Managing Partner of Crosspoint is sufficient to impute knowledge of Shapero's conduct with respect to the BlueStar acquisition to Crosspoint, for purposes of this motion to dismiss.[FN215] The allegations of the Amended Complaint support the reasonable inference that Shapero, and therefore Crosspoint, knew of BlueStar's gloomy business prospects at the same time he was touting the potential acquisition.[FN216] Moreover, the allegations permit the reasonable inference that Shapero-by his statements and influence over, at least, Knowling-initiated, induced, and contributed to the underlying breach of Covad's Board.[FN217] The Amended Complaint sets forth that ?Shapero lobbied Knowling through lengthy emails on the weekend of May 20-21, 2000, to have Covad acquire BlueStar and NewEdge.?[FN218] Additionally, the Complaint alleges:

> FN212. *See, e.g., In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *24 (Del. Ch. May 4, 2005), *aff'd*, 2006 WL 722198 (Del. Mar. 20, 2006).

> FN213. *See also Hughes*, 2005 WL 1089021, at *23 (requiring that ?damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary? (quoting *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 386 (Del. Ch.1999)).

> FN214. *Hughes*, 2005 WL 1089021, at *24 (quoting *In re Shoe-Town, Inc. S'holders Litig.*, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990)). Crosspoint's motion to dismiss the Plaintiffs' aiding and abetting claim is reviewed under Court of Chancery Rule 12(b)(6).

> FN215. *See, e.g., Carlson v. Hallinan*, 2006 WL 771722, at *20-*21 (Del. Ch. Mar. 21, 2006) (imputing majority shareholder's knowledge to nonfiduciary defendant-entities for which shareholder serves as director and officer) (citing *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 n. 22 (Del. Ch.2003), *aff'd*, 847 A.2d 1121 (Del.2004) (Table)).

> FN216. *See* Amended Compl. at ¶¶ 58, 59, 62, 63.

> FN217. Because Shapero serves as General and Managing Partner of Crosspoint, his acts permit the Plaintiffs to charge Crosspoint with ?participation? in the context of the third element of the aiding and abetting claim. Indeed, the emails sent by Shapero to Knowling were from Shapero's Crosspoint email account and are signed ?Rich Shapero, Managing Partner, Crosspoint Venture Partners.? Calder Decl., Ex. Q.

> FN218. Amended Compl. at ¶ 62.

According to Covad's amended Form S-4/A, filed with the Securities and Exchange Commission on August 30, 2000, BlueStar's directors, which included defendants McMinn and Shapero, suggested that the CEOs of BlueStar and Covad meet initially to discuss a possible business combination. In fact, the documents produced in the § 220 action clearly show that Shapero, a member of Covad's compensation committee, repeatedly and directly lobbied (and ultimately persuaded) Knowling, the CEO whose compensation was determined by Shapero and his other committee members, that Covad should acquire BlueStar. [FN219]

> FN219. *Id.* at ¶ 72. The Amended Complaint additionally provides:
> Each of Messrs, McMinn, Hawk and Shapero and/or Crosspoint were significant stockholder of BlueStar. Specifically, McMinn was the beneficial owner of approximately 656,942 shares of BlueStar common stock. Shapero's venture capital firm, Crosspoint, owned approximately 30 million shares of BlueStar stock, which represented approximately 41.9% of all of BlueStar's issued and outstanding common stock. Hawk, a Special Limited Partner of Crosspoint, was also a significant shareholder of BlueStar stock. BlueStar's CEO, Robert Dupuis, had previously worked for Crosspoint and thus had ties to Shapero and Hawk.
> *Id.* It should be noted that McMinn was not a member of Covad's Board at the time of the acquisition, having

resigned on November 1, 1999, and rejoining only in ?late October 2000.? *Id.* at ¶ 8.

Crosspoint contends that documents produced as a consequence of the § 220 action, and on which the Plaintiffs in part rely,[FN220] fail to demonstrate that Shapero acted improperly.[FN221] Specifically, Crosspoint argues that document LWDK 0002013 shows that Shapero's statements were not improper, but merely constituted permitted ?expression? of Shapero's views.[FN222] The Court need not resolve the question of the characterization of the disputed emails, however, since a reasonable inference to draw from the allegations in the Amended Complaint is that Shapero's power to infect the decisions of Knowling and the Board, and the process by which this was accomplished, were premised not solely on his salesmanship (as reflected in this limited email chain), but, *inter alia,* on his power over Knowling's compensation as a member of Covad's compensation committee. Thus, the Court concludes that, based on the allegations before it, the Plaintiffs' claim against Crosspoint for aiding and abetting, with respect to the BlueStar transactions, cannot be dismissed.[FN223]

> FN220. *See* Pls.' Ans. Br. in Opp'n to Def. Crosspoint Venture Partners, L.P.'s Mot. to Dismiss Am. Deriv. & Class Action Compl. (?Pls.' Ans. Br. to Crosspoint's Mot. to Dismiss?) at 33 (citing Calder Decl., Exs. Q (LWDK0002013-2015), R (LDWK0002987-2988); *see also* Amended Compl. at ¶ 72 (stating that ?the documents produced in the § 220 action clearly show? Shapero's involvement).

> FN221. Reply Br. in Further Supp. of Def. Crosspoint Venture Partners, L.P.'s Mot. to Dismiss Pls.' Am. Deriv. & Class Action Compl. (?Crosspoint's Reply Br. to Dismiss?) at 26.

> FN222. *See id.* at 25-26. Crosspoint states that ?[a]n interested director's expression of his views does not taint the decision of the disinterested directors.? *Id.* (citing *In re Ply Gem Indus. Inc. S'holders Litig.,* 2001 WL 755133 (Del. Ch. June 26, 2001); *Lewis v. Leaseway Transp. Corp.,* 1990 WL 67383 (Del. Ch. May 16, 1990)). Shapero, however, is alleged to have moved well beyond merely ?expressing his views.? Moreover, the inference can be drawn that he was well aware of BlueStar's dismal circumstances and prospects.

> FN223. The Plaintiffs asserted fiduciary duty claims against Crosspoint arising out of the Certive matters because, at that time, Crosspoint controlled a significant, even if less than half, portion of Covad's outstanding stock. Those claims were dismissed for failure to make demand on the Board. By the time of the BlueStar Transaction, Crosspoint had eliminated (or substantially reduced) its holdings in Covad and, thus, no longer owed (if it ever did) fiduciary duties to Covad.
> Additionally, in the context of the motion to dismiss, the Court cannot conclude that, *inter alia,* that the transaction was the product of arms-length negotiations sufficient to preclude aiding and abetting liability. *Compare Hughes,* 2005 WL 1089021, at \*26-\*28.

## VI. *RESPONDEAT SUPERIOR* CLAIM

**\*28** In Count VII of the Amended Complaint, the Plaintiffs also assert claims against Crosspoint under the doctrine of *respondeat superior.* The Court concludes that these claims must be dismissed in their entirety. The Plaintiffs have not cited any authority demonstrating that such claims are permissible, in this context. *?Respondeat superior* imposes liability upon a principal for the torts of his agent committed within the scope of their agency relationship.?[FN224] As has already been described above, Crosspoint stands as a *non-fiduciary* defendant in this litigation vis-?-vis Covad and its shareholders with respect to the BlueStar matters.[FN225] Indeed, this is a critical element of the Plaintiffs' aiding and abetting claim against Crosspoint. To permit recovery, in this circumstance, under the common law tort law doctrine of *respondeat superior* ?would work an unprecedented, revolutionary change in our law, and would give investors in a corporation reason for second thoughts about seeking representation on the corporation's board of directors.?[FN226] As a consequence, the Court determines that the Plaintiffs' claim for *respondeat superior* is insufficient as a matter of law, under these circumstances, and, therefore, must be dismissed.

> FN224. *Arnold v. Soc'y for Sav. Bancorp, Inc.,* 1995 WL 376919, at \*8 (Del. Ch. June 15, 1995) (citing *Fields v. Synthetic Ropes, Inc.,* 215 A.2d 427, 432 (Del.1965)). Count VI also briefly mentions the ?Certive Transaction.? *See* Amended Compl. at ¶ 181.
> To the extent that the Plaintiffs may seek to plead an aiding and abetting claim against Crosspoint for matters arising out of events described by Counts I through III-which have been dismissed for failure to make demand on the Board, as described above-the Plaintiffs may not assert a claim for aiding and abetting, since the underlying claims may not be pursued.

FN225. *Cf. Emerson Radio Corp. v. Int'l Jensen Inc.*, 1996 WL 483086, at *20 (Del. Ch. Aug. 20, 1996) (?As a stockholder, [defendant third-party entity] could attain fiduciary status only if it were a majority shareholder or it actually controlled the affairs of [defendant corporation].?).

FN226. *Emerson Radio Corp.*, 1996 WL 483086, at *20 n. 18 (analogizing plaintiffs' claims in that case to claims brought under theory employed by the Plaintiffs in this litigation). *Cf. USAirways Group, Inc. v. British Airways PLC*, 989 F.Supp. 482, 494 (S.D.N.Y.1997) (denying recovery under this theory of tort law since it would ?undermine? and ?circumvent[ ] clear limitations imposed by Delaware corporate law?).

## VII. PROXY STATEMENT DISCLOSURES

The Plaintiffs also assert direct claims against McMinn, Shapero, Hawk, Lynch, Marshall, Irving, Hoffman, Runtagh, Crandall, and Jalkut for material omissions from Covad's Proxy Statements from 2002, 2003, and 2004. The Plaintiffs allege that Covad shareholders might not have elected the directors who were up for election during those years had the omitted information been disclosed. Specifically, the Plaintiffs allege that the following material information should have been disclosed:

1. Khanna's June 19, 2002 letter to the Covad Board. (2002, 2003, & 2004)
2. The Standstill Agreement with Khanna. (2002)
3. ?The real reasons for and circumstances relating to the removal of Khanna as General Counsel and his intention, expressed to them, of taking legal action, if necessary, to seek redress for the harm defendants had caused Covad.? (2002, 2003, and 2004)
4. The earn-out criterion for the BlueStar transaction had not been met, and Shapero, McMinn, and Hawk derived a great benefit from the settlement. (2002, 2003, and 2004)
5. ?[D]efendant McMinn, during the time period of February to November 1999 when he purported to be working for Covad full-time, was actually working for himself and Crosspoint to find new investment vehicles.? (2002)
6. Generalized information with respect to Khanna's allegations-specifically, which transactions and which directors challenged. (2003 & 2004)

In 2002, McMinn, Hawk, and Hoffman were slated for election and were re-elected. In 2003, Jalkut, Irving, and Lynch were slated for election and were re-elected. In 2004, Crandall and Runtagh were slated for election and were re-elected. Each of these elections was apparently uncontested.

### A. *Legal Standards*

#### 1. *Motion to Dismiss*

**\*29** The standards governing this Court's analysis of motions to dismiss under Rule 12(b)(6) have recently been reiterated:

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are ?well-pleaded? if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the ?plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.? [FN227]

FN227. *Hughes*, 2006 WL 722198, at *3 (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-7 (Del.2002)).

Although the Court must ?accept as true all of the well-pleaded allegations of fact and draw reasonable inferences in the plaintiff's favor,? [FN228] it is ?not ... required to accept as true conclusory allegations ?without specific supporting factual allegations.? ? [FN229] Instead, the Court must ?accept only those ?reasonable inferences that logically flow from the face of the complaint? and ?is not required to accept every strained interpretation of the allegations proposed by the plaintiff.? ? [FN230] It should also be noted that the standard governing motions under Court of Chancery Rule 12(b)(6) is ?less stringent? than the standard employed in demand futility analysis under Court of Chancery Rule 23.1.[FN231]

FN228. *Id.* (citing *Malpiede*, 780 A.2d at 1082).

FN229. *Id.* (citing *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 65-66 (Del.1995)); *see also Solomon v. Pathe Commc'ns Corp.,* 672 A.2d 35, 38 (Del.1996).

FN230. *Hughes,* 2006 WL 722198, at *3 (quoting *Malpiede,* 780 A.2d at 1082).

FN231. *Malpiede,* 780 A.2d at 1082-83 (citations omitted); *see also Rabkin v. Philip A. Hunt Chem. Corp.,* 498 A.2d 1099, 1104 (Del.1985).

### 2. *Fiduciary Duty with Respect to Disclosure*

Delaware common law of fiduciary duty requires that directors disclose fully and with complete candor all material facts in soliciting proxies from shareholders.[FN232] Although it has been held that this duty is ?best discharged through a broad rather than a restrictive approach to disclosure,? [FN233] only material facts must be disclosed. ?An omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote.? [FN234]

FN232. *Arnold v. Soc'y for Sav. Bancorp, Inc.,* 650 A.2d 1270, 1277 (Del.1994); *see also Malpiede,* 780 A.2d at 1086 (explaining that ?duty of disclosure? does not exist as an independent fiduciary duty).

FN233. *Zirn v. VLI Corp.,* 621 A.2d 773, 779 (Del.1993); *see also Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 144 (Del.1997) (declining to adopt ?bright line? test for disclosure violations, even though it might be ?better practice? for directors ?to be more candid and forthcoming in their communications to stockholders when presenting a slate for election to the board?).

FN234. *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)) (?Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the ?total mix? of information made available.?). In order to be material, however, it need not be demonstrated that disclosure of a fact would have changed the shareholder's vote.

In order to allege adequately a violation of disclosure requirements, a plaintiff must plead ?some basis for a court to infer that the alleged violations were material. For example, a pleader must allege that facts are missing from the proxy statement, identify those facts, state why they meet the materiality standard and how the omission caused injury.? [FN235] The test for whether an omitted fact is material is context-specific, and, therefore, determinations of materiality will not frequently be appropriate on a motion to dismiss.[FN236] Nevertheless, this Court may resolve such questions at the motion to dismiss stage if it is satisfied with reasonable certainty that no set of facts could be proved that would permit the plaintiffs to obtain relief under the allegations made.[FN237] Even though the Court's analysis in this context is not overly stringent, ?it is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleading not be merely conclusory.? [FN238]

FN235. *Loudon,* 700 A.2d at 141; *see also M & B Weiss Family Ltd. P'ship of 1996 v. Davie,* C.A. No. 20303, slip op. at 5, Chandler, Ch. (Bench Ruling Del. Ch. Apr. 12, 2005). *Cf. Orman,* 794 A.2d at 31 (?In order for a plaintiff to state properly a claim for breach of a disclosure duty by omission, he must ?plead facts identifying (1) material, (2) reasonably available, (3) information that (4) was omitted from the proxy materials.? ? (quoting *O'Reilly v. Transworld Healthcare, Inc.,* 745 A.2d 902, 926 (Del.1999)); *accord Wolf v. Assaf,* 1998 WL 326662, at *1 (Del. Ch. June 16, 1998).

FN236. *See, e.g., Alessi v. Beracha,* 849 A.2d 939, 949 n. 68 (Del. Ch.2004).

FN237. *Seagraves v. Urstadt Property Co., Inc.,* 1989 WL 137918, at *5 (Del. Ch. Nov. 13, 1989); *see also In re Encore Computer Corp. S'holders Litig.,* 2000 WL 823373, at *8-*9 (Del. Ch. June 16, 2000); *In re JCC Holding Co., Inc.,* 843 A.2d 713, 720 (Del.2003); *Orman,* 794 A.2d at 32.

FN238. *Loudon,* 700 A.2d at 140.

### 3. *Self-flagellation*

A long-standing principle of disclosure jurisprudence provides that a board need not engage in ?self-flagellation.? [FN239] Notwithstanding the requirement that directors disclose fully all material facts in the solicitation of proxies from shareholders, a board of directors is not required to ?confess to wrongdoing prior to any adjudication of guilt,? [FN240] nor must it ?draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter.? [FN241]

> FN239. *See, e.g., Stroud v. Grace,* 606 A.2d 75, 84 n. 1 (Del.1992).

> FN240. *Loudon,* 700 A.2d at 145.

> FN241. *Stroud,* 606 A.2d at 84 n. 1. *Compare Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC,* 2006 WL 846121, at *10 (Del. Ch. Mar. 28, 2006).

### 4. Laches

**\*30** ?The essential elements of laches are: (1) the plaintiff must have knowledge of the claim and (2) there must be prejudice to the defendant arising from an unreasonable delay by the plaintiff in bringing the claim.? [FN242] Essentially,

> FN242. *U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.,* 864 A.2d 930, 951 (Del Ch.2004), *vacated on other grounds,* 875 A.2d 632 (Del.2005) (Table).

[l]aches is defined as an unreasonable delay by a party, without any specific reference to duration, in the enforcement of a right. An unreasonable delay can range from as long as several years to as little as one month. The temporal aspect of the delay is less critical than the reasons for it, because in some circumstances even a long delay might be excused. [FN243]

> FN243. *Steele v. Ratledge,* 2002 WL 31260990, at *3 (Del. Ch. Sept. 20, 2002) (footnotes omitted).

Determination of what constitutes ?unreasonable delay? is most often necessarily a factual and context-specific inquiry and, therefore, not generally appropriate for resolution on a motion to dismiss. If, however, the pleadings make reasonably certain that laches is applicable and there can be no facts reasonably supporting a contrary inference, then no insurmountable procedural hurdle exists to prevent the Court from resolving the issue on a motion to dismiss claim. [FN244]

> FN244. *See Bay NewFoundland Co., LTD. v. Wilson & Co., Inc.,* 28 A.2d 157 (Del. Ch.1942), *aff'd,* 37 A.2d 59 (Del.1944); *cf. Steele,* 2002 WL 31260990, at *3 (applying doctrine of laches on summary judgment when ?undisputed material facts? established applicability). Although this Court is frequently reluctant to apply laches on a motion to dismiss, *see, e.g., Goldman v. Pogo.com, Inc .,* 2002 WL 1358760, at *2 n. 16 (Del. Ch. June 14, 2002), there is no *per se* bar to its application when it is clearly appropriate.

### 5. Incorporation and Consideration of Matters Outside the Complaint

?The complaint generally defines the universe of facts that the [Court] may consider in ruling on a ... motion to dismiss. When the [Court] considers matters outside of the complaint, a motion to dismiss is usually converted into a motion for summary judgment and the parties are permitted to expand the record.? [FN245] The Court may, however, ?in some instances and for carefully limited purposes,? consider documents referred to in the complaint in order to rule on a motion to dismiss. [FN246] Additionally, the Court may take judicial notice ?of matters that are not subject to reasonable dispute.? [FN247] As a consequence, the Court will consider the challenged Covad proxy statements, as well as other documents incorporated into the Amended Complaint, in its analysis of the motion to dismiss.

> FN245. *Hughes,* 2006 WL 722198, at *3 (citations omitted); *see also* Ct. Ch. R. 12(b).

> FN246. *See Hughes,* 2006 WL 722198, at *3 (citing *In re Santa Fe Pac. Corp.,* 669 A.2d at 69).

<u>FN247.</u> *See id.* (citing <u>Del. R. Evid. 201(b)</u>).

B. *Analysis*

The Plaintiffs have identified information they allege was omitted from Covad Proxy Statements and have explained it was material because its omission permitted the re-election of particular directors who would perhaps not have been re-elected otherwise. The Plaintiffs ask the Court to grant equitable relief by overturning the 2002, 2003, and 2004 elections. ?The courts of this state ?have long held that inequitable conduct by directors that interferes with a fair voting process may be set aside in equity.? ? <u>FN248</u> Therefore, ?voiding results of directorial elections and ordering a new election is an appropriate remedy when an election occurs using materially false and misleading proxy materials.? <u>FN249</u>

> <u>FN248.</u> *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11, 15 (Del. Ch.2002) (quoting <u>Linton v. Everett, 1997 WL 441189, at *9 (Del. Ch. July 31, 1997)</u>).
>
> <u>FN249.</u> <u>*Shamrock Holdings of Cal., Inc. v. Iger*, 2005 WL 1377490, at *5 n. 37 (Del. Ch. June 6, 2005)</u>. The Court notes that the Amended Complaint does not specifically request that the Court order a new election.

Below, the Court addresses first the application of laches to the Plaintiffs' 2002 Proxy disclosure claims. The Court then turns to each of the Plaintiffs' remaining 2003 and 2004 Proxy disclosure claims and addresses them *seriatim.*

1. *Analysis of Plaintiffs' 2002 Proxy Claims Under Laches Doctrine* <u>FN250</u>

> <u>FN250.</u> This action was filed on September 15, 2003, well before Covad's issuance of the 2004 Proxy Statement on April 30, 2004, and the 2004 Covad Board meeting on June 10, 2004.
> It should also be noted that the Plaintiffs did not file their Amended Complaint asserting claims for omissions in the 2004 Proxy until August 3, 2004. Whether the Plaintiffs' 2004 Proxy claims should be dismissed because they were not sooner filed is a question the Court need not decide here, given its analysis below.
> The 2002 Proxy Statement is JTX 16; the 2003 Proxy Statement is JTX 24; and the 2004 Proxy Statement appears at Calder Decl., Ex. E.

**\*31** As stated above, laches does not, in the mill run of cases, present a proper basis on which the Court may dismiss a plaintiff's claims, since determination of what constitutes ?unreasonable delay? is frequently a factual and context-specific inquiry. Notwithstanding the Court's general reluctance to employ laches at the motion to dismiss stage, the Court will, however, dismiss claims when ?unreasonable delay? may be found from the face of the pleadings and it is reasonably certain that no set of facts can be proved which would otherwise preclude such a finding.

In the present litigation, the chronology relevant to laches analysis is undisputed. The Plaintiffs seek now to overturn the 2002 election for directors. The directors elected in 2002 have since completed their three-year terms of office. This fact alone makes equitable relief with respect to the 2002 Proxy claim impossible.

Moreover, the Court is troubled by Khanna's delay of more than a year after the 2002 board elections in filing his Original Complaint challenging the adequacy of 2002 Proxy Statement. The Draft Complaint presented to the Covad board by Khanna on July 9, 2002 (as well as his letter to the board of June 19, 2002) demonstrates that he was aware of the facts underlying his disclosure claims before the 2002 board meeting, at the latest (and probably much earlier). Indeed, Khanna served as General Counsel of Covad when the transactions he now challenges (and which underlie the bulk of his disclosure claims) took place. Very few shareholders would stand in a better position to know the relevant facts than a corporation's General Counsel.<u>FN251</u>

> <u>FN251.</u> The Plaintiffs also argue that an issue of fact as to Khanna's delay in filing this action is created by a letter from Covad's outside counsel to Khanna's counsel, dated February 13, 2003, Pls.' Ans. Br. to Covad's Mot. to Dismiss at 46-47. JTX 62. The Court notes, first, that the February 13, 2003 letter was actually in response to a letter from Khanna's counsel sent two days earlier, on February 11, *see* JTX 63, and not an email from Khanna, dated November 13, 2002, *see* JTX 33. Moreover, although the February 13 letter does provide that Khanna's disclosure objections would be ?refer[ed] ... to the Company, which is being advised

by separate counsel on its disclosure obligations,? the Court does not view this as potentially mitigating Khanna's already by then extensive delay in seeking the wide-ranging equitable relief he now requests.

Although this Court may overturn a board election, a plaintiff seeking such relief must present her claims with reasonable alacrity if useful equitable relief is to be granted.[FN252] Moreover, finality and predictability with respect to a corporation's governing structure clearly are not of insignificant benefit to the corporate enterprise.[FN253] Khanna, with his knowledge of the facts he now asserts were improperly omitted, could have acted at the time of the 2002 election. Similarly, he could have filed an action for equitable relief promptly following the 2002 election. The Plaintiffs have offered the Court no persuasive explanation for his delay of more than one year.

> FN252. The policy considerations animating this view in the context of challenges to board elections also apply in the context of challenges to mergers, although perhaps with more severe consequences for the dilatory plaintiff. *Cf. In re J.P. Morgan Chase & Co.,* 2005 WL 1076069, at *12 (holding that failure to file TRO in merger context resulted in ?equitable [being] relief is no longer practicable,? since the ? ?eggs' ha[d] been irretrievably ?scrambled? and there [was] no possibility of effective equitable relief?); *see also Arnold,* 678 A.2d at 537. *But see Loudon,* 700 A.2d at 138 (in context of board election, stating that ?[a] timely complaint, properly pleaded and supported by proof sufficient to invoke preliminary equitable relief, could result in an *early* injunction or the imposition of corrective disclosures *before* the complained-of corporate activity had been consummated? (emphasis added)).

> FN253. *Compare Bay Newfoundland Co. v. Wilson & Co.,* 37 A.2d 59, 62 (Del.1944) (addressing certainty interests in the distinct, but analogous context of corporate act approval).

The Court concludes that, in light of equitable principles guiding the exercise of its jurisdiction, it would be inequitable to award the Plaintiffs the relief they seek with respect to their 2002 Proxy disclosure claims. Khanna served as Covad's General Counsel during the period the challenged transactions were approved; however, Khanna filed suit only after his termination, thus generating concern that his actions were motivated by his employment dispute.[FN254] Khanna's role at Covad provided him with knowledge and a platform from which the problems could have been addressed. Khanna now seeks to employ that knowledge against the corporation, and its directors, well after the fact.[FN255] Moreover, the addition of Sams and Meisel, as plaintiffs, fails to ameliorate the Court's concerns.[FN256] The Court cannot permit the Plaintiffs in this instance to have stood effectively idle until more than a year after the 2002 annual meeting to bring their challenge before this Court. Fundamentally, this is not an instance in which the grant of equitable relief would comport with its general notions of equity, and, as a consequence, the Plaintiffs' claims with respect to the 2002 Proxy Statement must be dismissed under the doctrine of laches.[FN257]

> FN254. The Court acknowledges the Plaintiffs' allegations that Khanna objected to the transactions and that he was investigated internally for sexual harassment as a result of his objections, *but see* Pls.' Ans. Br. to Covad's Mot. to Dismiss at 42 n. 14 (explaining that Khanna's objections with respect to Dishnet-and presumably the other transactions, as well-were business advice only, and not legal advice); however, the Court does not view Khanna's termination as isolated from Khanna's filing litigation against the defendants soon thereafter-*i.e.,* the timing of events is not mere coincidence. Indeed, given the Court's treatment of Khanna's June 19 letter to the Covad Board as made in the employment context (which is a treatment that the Plaintiffs necessarily desire), the Court will not now view the present litigation as unrelated (*i.e.,* not to gain advantage in what may perhaps be viewed as a substitute for convoluted employment litigation).

> FN255. This does not diminish, however, the Court's ruling, below, that certain information is not subject to attorney-client privilege.

> FN256. The Court holds Sams and Meisel, as co-plaintiffs with Khanna, charged with the behavior of Khanna that took place prior to their appearance in this action.

> FN257. The Court also notes that prior decisions have held claims for equitable relief moot when the challenged directors' terms have expired. *See Loudon,* 700 A.2d at 138; *see also M & B Weiss Family Ltd. P'ship of 1996,* C.A. No. 20303, slip op. at 5. This applies to Hawk, and it also likely applies to the claims against McMinn and Hoffman. Because McMinn and Hoffman were re-elected on expiration of their terms in 2005, however, the Court declines to rely on this principle.

*2. Analysis of Plaintiffs' Individual Proxy Disclosure Claims*

*a. Disclosure Claim # 1: Khanna's June 19, 2002 Letter to the Covad Board (2002, 2003, and 2004 Proxy Statements)*

**\*32** The Plaintiffs first claim that the failure to disclose Khanna's June 19, 2002 letter to the Covad Board constituted a material omission from Covad's 2002 Proxy Statement.<u>FN258</u> Based on the foregoing analysis, this claim must be dismissed.

> <u>FN258.</u> Amended Compl. at ¶ 194.

The claims presented in the Amended Complaint with respect to the 2003 and 2004 Proxy Statements do not specifically identify the letter as a material omission.<u>FN259</u> Nevertheless, assuming *arguendo* that the Amended Complaint does set forth such claims, they would be dismissed as well.

> <u>FN259.</u> *Compare id.* at ¶ 194, *with* ¶¶ 204, 213. Indeed, as explained above, failure to identify the omitted facts which form the basis of a plaintiff's claim is, in itself, cause to dismiss. *See Loudon, 700 A.2d at 140.*

First, any such claims involving the 2003 and 2004 Proxy Statements fail principally because, as explained above, Khanna's June 19, 2002 letter must be viewed primarily as part of an on-going employment dispute between Covad and Khanna. Therefore, the letter is a document that the Company is not required to disclose, standing alone. This Court has already ruled in the Plaintiffs' favor on this issue, deeming the letter not to have been a demand on the Covad Board, but the Plaintiffs must endure the consequences along with the benefits of this conclusion. Moreover, the Plaintiffs' claims with respect to the letter fail because disclosing the letter (and its characterization of the challenged transactions) would amount to a requirement that the Covad Board disclose and adopt Khanna's pejorative characterization of the challenged conduct. This would amount to ?self-flagellation.?

*b. Disclosure Claim # 2: Standstill Agreement (2002 Proxy Statement)*

As explained above, this claim must be dismissed because it is a challenge to the 2002 Proxy Statement. The Court also briefly notes, however, that the Plaintiffs have failed to satisfy the materiality standard necessary to survive the motion to dismiss this claim, as well. On June 10, 2002, the Proxy Statement was issued. On June 19, 2002, Khanna sent the Covad Board his letter. The directors were elected on July 25, 2002. Thus, with regard to the 2002 disclosure of the Standstill Agreement, the question becomes whether this was material before July 25, 2002. The Court concludes that it was not. Since the Standstill Agreement related solely to Khanna's employment claims, it was not relevant to shareholders, at least in the way that the Amended Complaint alleges.<u>FN260</u>

> <u>FN260.</u> As discussed above, Khanna's June 19, 2002 letter-read it in the light most favorable to the Plaintiffs-relates to Khanna's employment dispute. The corporate governance allegations are subordinate to the employment demands. Similarly, the Standstill Agreement relates to Khanna's employment claims. The Amended Complaint does not allege that this understanding changed while the Standstill Agreement was in effect between July 10, 2002 and July 26, 2002. Obviously, at some point the posture of Khanna's claims against Covad purportedly changed from being centered on his termination to seeking redress for shareholders in general. When the nature of these claims changed is unclear from the Amended Complaint. However, it is clear that it was after July 25, 2002.
> Moreover, the Amended Complaint alleges that the omissions from Covad's 2002 Proxy Statement led to the election of McMinn, Hawk, and Hoffman and that the omitted facts would have been material to this decision. It is not at all clear how disclosure of the Standstill Agreement would have been material to the decision of whether to reelect these directors.

*c. Disclosure Claim # 3: ?Real Reasons? for Khanna's Termination as General Counsel of Covad (2002, 2003, & 2004 Proxy Statements)*

As with the above discussion of the June 19, 2002 letter, the Plaintiffs' third disclosure claim (that the ?real reasons? behind Khanna's termination should have been disclosed) would constitute admissions of wrongdoing, which the Defendants contest, before a final adjudication on the merits. This constitutes a request that the Board engage in classic ?self-flagellation,? and, therefore, this claim is dismissed as well.<u>FN261</u> Moreover, the Plaintiffs' challenges to the 2002 Proxy must also be dismissed with respect to this claim for the reasons stated above.<u>FN262</u>

FN261. The Court also views the additional disclosures the Plaintiffs seek here to be not material to shareholders' decisions of whether to elect particular directors, especially since they relate to an employment dispute. Moreover, the only directors whom the Plaintiffs allege tried to ?intimidate? Khanna (McMinn and Hoffman) were re-elected in 2002.

FN262. With respect to their 2002 Proxy claim, the Plaintiffs additionally assert that the Defendants failed to ?disclose ... [Khanna's] intention, expressed to them, of taking legal action, if necessary, to seek redress for the harm defendants had caused Covad.? Amended Compl. at ¶ 196. This claim is set forth in the same paragraph as the alleged omission of the ?real reasons? for Khanna's termination. Khanna's purported ?intentions,? as a shareholder or even as a former General Counsel, cannot be said to be a material fact that a board must disclose in its proxy statement in this context.

d. *Disclosure Claim # 4: Failure to Satisfy the BlueStar Earn-Out Criteria (2002, 2003, & 2004 Proxy Statements)*

**\*33** The Plaintiffs also allege that the failure of BlueStar to meet the earn-out criteria set forth in the BlueStar Acquisition constituted a material omission from all three challenged Covad Proxy Statements. Specifically, the Plaintiffs allege: ?Defendants also did not disclose that the earn-out criteria for the BlueStar transaction had not been met, but that they decided to pay out the 3,250,000 shares. Defendants Crosspoint, Shapero, McMinn, and Hawk derived great benefit by, between them, receiving almost 50% of the 3,250,000 shares issued by Covad in this transaction.? [FN263]

FN263. *Id.* at ¶¶ 197, 206, 215.

At the outset, the Court notes that the 2002 Proxy disclosure claims must be dismissed for the reasons set forth above. The Court, therefore, addresses only the Plaintiffs' claims with respect to the 2003 and 2004 Proxies. With respect to these two proxy statements, the Amended Complaint fails to set forth allegations sufficient to survive the Defendants' motion to dismiss. The materiality of any disclosure must be analyzed within the scope of the pleadings. Thus, the fact that BlueStar failed to meet its earning targets must be considered in light of its materiality to shareholders' decision to elect particular directors (*i.e.*, in the context in which the Plaintiffs bring their disclosure claims). Viewed in this light, BlueStar's earning disclosure cannot be viewed as material.[FN264]

FN264. The BlueStar acquisition and earn-out settlement had occurred more than two years before the 2003 proxies were solicited. Shareholder approval was not required for the BlueStar earn-out settlement. If approval had been required, then disclosure of this information would likely have been material to that decision.

The only potential argument as to why disclosure would be material to shareholders, in the context of the board elections, is that the directors' approval of the earn-out payment may have been relevant in deciding whether or not to elect a particular director. This rationale alone, however, is not sufficient to mandate disclosure. A large quantity of information may exist regarding any director that *could* be useful to shareholders in making a decision whether or not to elect a particular director. Yet, the question is not merely whether a disclosure might be helpful in deciding to elect a director, but, instead, whether the information reaches the necessary threshold of materiality.[FN265] The business decision of a board to settle certain disputed claims is not, standing alone, within the class of information that is the proper subject of disclosure when shareholder action is not requested with respect to that action but, instead, in the context of a director election. [FN266] Because the BlueStar earn-out settlement was just one of many decisions that Covad's directors made, and given the passage of time following the earn-out settlement, the Court concludes that disclosure of BlueStar's financial data measured against Covad's earn-out obligations to former BlueStar shareholders in the 2003 and 2004 Proxy Statements was not material to the Covad shareholders in this context. Disclosure would not have significantly altered the total mix of information available to shareholders in deciding how to cast their votes in the 2003 and 2004 elections for disinterested directors. [FN267]

FN265. A proxy statement need not disclose the details of all transactions in which uninterested directors slated for re-election participated. Certainly, broad disclosure is preferred, *see, e.g., Zirn,* 621 A.2d at 779, but the Plaintiffs' expectations are too expansive in this context.
The Amended Complaint does not identify the lack of detail about Lynch's role in negotiating the BlueStar transaction as an improper omission from the 2003 Proxy Statement. *See* Amended Compl. at ¶¶ 197, 206, 215.

FN266. *Cf. Loudon,* 700 A.2d at 145. (?The details of a corporation's inner workings and its day-to-day functioning are not the proper subject of disclosure.?).

FN267. The Court takes a dim view of the 2002 Proxy Statement's vague (if at all extant) references to the interests of McMinn and Hawk in the BlueStar earn-out settlement. Had the Plaintiffs' 2002 Proxy claims not been dismissed in their entirety, the Court may have found the disclosure shortcomings in this context material for purposes of the motion to dismiss.

**\*34** Moreover, Covad had already disclosed facts relevant to the BlueStar acquisition and settlement in its 2002 Proxy Statement, and Covad's 2003 10-K describes BlueStar's subsequent liquidation. Indeed, the disclosures of the 2002 Proxy approach, if not fulfill, disclosure of the information the Plaintiffs contend was improperly omitted. Although the Proxy Statement does not explicitly set forth that the criteria were not met, it does make clear that (1) the full amount BlueStar stockholders were originally to receive under the earn-out provisions was not paid, (2) settlement occurred before the full earn-out period had passed, and (3) the settlement was agreed-to ?in exchange for a release of all claims against [Covad].? [FN268]

FN268. According to the 2002 Proxy Statement:
In connection with our acquisition of BlueStar, we agreed to place approximately 800,000 shares of our common stock in a third-party escrow account. Up to 5,000,000 additional common shares of our common stock were to be issued if BlueStar achieved certain specified levels of revenues and earnings before interest, taxes, depreciation and amortization in 2001. However, in April 2001, we reached an agreement with the BlueStar stockholders' representative to resolve this matter, as well as the matters that caused 800,000 of the Company's common shares to be held in escrow as of December 31, 2000, by providing the BlueStar stockholders with 3,250,000 of the 5,000,000 shares, in exchange for a release of all claims against the Company. BlueStar's former stockholders received the additional shares of the Company's common stock during 2001. The 800,000 common shares held in escrow were ultimately returned to the Company under this agreement.

Were the Court to conclude that the failure to meet the earn-out criteria was material to the shareholders' decision and did not constitute self-flagellation-*e.g.,* if the proxy had been sent to solicit shareholder approval of the settlement-then the prior disclosures of material information would be insufficient to grant a motion to dismiss.[FN269] The Plaintiffs' claim presents a distinct set of issues, however. In the context of a director election, the Court, in this instance, must ask questions similar to those considered in both *Loudon v. Archer-Daniels-Midland Co.*[FN270] and *Wolf v. Assaf.* [FN271] Where can it be said that a bright-line rule should apply requiring disclosure of mere facts concerning a past action of the board that would otherwise appear to have bearing on a director's election no greater (unless the conclusion is made that the conduct was ?wrongful?) than any other facts regarding the numerous business decisions with which the director has been involved? Such a rule would seem to invite overwhelming disclosure of a broad range of information in the context of director elections (*e.g.,* information surrounding *all* transactions which the director has voted to approve) in order to avoid potential future litigation. Although broad disclosure is encouraged, it is also possible for such disclosure to become so extreme as to render proxies confusing and not particularly useful to shareholders in casting an informed vote.[FN272]

FN269. *Compare Wolf,* 1998 WL 326662, at *3 (?Including the description of the federal class action in the 10-K and attaching it to the proxy statement creates a substantial likelihood that the reasonable shareholder would have been on notice to review and would have been likely to review its contents.?), *with ODS Techs., L.P. v. Marshall,* 832 A.2d 1254, 1261-62 (Del. Ch.2003) (granting preliminary injunction since omissions of purpose and effect underlying proposed amendments ?cross the line? to become ?affirmatively misleading,? and rejecting argument that reference to 10-K mailed with proxy to attachment sent to shareholders in unrelated distribution years earlier was sufficient as it would create ?a ?super? shareholder standard and create almost limitless opportunities for deception of the ?reasonable? shareholder?). *Cf. Bren v. Capital Realty Group Senior Housing, Inc.,* 2004 WL 370214, at *9 (Del. Ch. Feb. 27, 2004) (although denying summary judgment and motion to dismiss, stating: ?All material facts to the action must be disclosed. This does not require, however, that all material information that was previously disclosed be disclosed again with the specific correspondence requesting action.? (citations omitted)).

FN270. 700 A.2d 135 (Del.1997).

FN271. 1998 WL 326662 (Del. Ch. June 16, 1998).

FN272. Cf. *Brown v. Perrette*, 1999 WL 342340, at *8 (Del. Ch. May 14, 1999) (noting that ?disclosure of a single unadorned fact can quickly snowball into wide-ranging disclosure of facts and opinions that otherwise would never come before the shareholders? (citing *Wolf*, 1998 WL 326662, at *4)).

The Plaintiffs might respond that BlueStar's shareholders were so undeserving of the earn-out payment, and Covad's decision to make any earn-out payment were so egregious, that disclosure of BlueStar's earnings would have been material to Covad shareholders, because it would have alerted them that Covad's directors were not pursuing Covad's best interest. This argument, however, accepts Khanna's pejorative description of the BlueStar earn-out settlement, which the Covad Board was not required to disclose because it would constitute the legal characterization of facts (and not a statement of facts). Disclosure of the failure of BlueStar to meet the earn-out criteria would be material to shareholders in this context only if approval of the settlement by the directors up for re-election had been wrongful.[FN273] Thus, the Plaintiffs seek a disclosure ?which by inference would convey? a breach of fiduciary duty. [FN274] Disclosure of the single, unadorned fact of the failure to meet the earn-out criteria, standing alone in the proxy to elect directors-especially in 2003 and 2004, two and three years after the settlement-would likely invite, if not require, the Board to explain its reasons why the settlement was warranted. The Court, then, views this as sufficiently analogous to other plaintiffs' prior ?attempt[s] to ?skirt? the ?self-flagellation? rule,? which would ultimately place the Court on a ?well greased slippery slope? and on which the Court declines to tread.[FN275]

FN273. Cf. *Loudon*, 700 A.2d at 145.

FN274. See *Wolf*, 1998 WL 326662, at *4.

FN275. *Id.*; accord *Loudon*, 700 A.2d at 145. But cf. *Brown*, 1999 WL 342340, at *7 (discussing, in context of Court's analysis of disclosures with respect to a transaction approval, potential drawbacks of application of self-flagellation rule).
Finally, the Court views as pertinent to the Court's discussion in *Wolf* of the plaintiffs' arguments that the omission in that action was ?material to [the director's] character, competence, or fitness for office? is instructive:
Delaware law does not, however, require a proxy statement to impugn a director's character or draw negative inferences from his past business practices. It only requires a summary of his credentials and his qualifications to serve on the board as well as a description of any conflicts of interest. Nothing in our law requires a masochistic litany of management minutiae. If we required companies to include a detailed, subjective assessment of a director's character and past performance in proxy statements before an election, I do not see how this Court could avoid a flood of second-guessing, hindsighted shareholders seeking to contest admittedly subjective conclusions. This form of subjective titillation has never been required as spice for the ?total mix.?
1998 WL 326662, at *5. The Plaintiffs' claims with respect to the 2002 Proxy Statement have been dismissed for the reasons described above. Moreover, the Plaintiffs do not challenge the summary of credentials and qualifications or of any conflicts of interest with respect to the 2003 or 2004 Proxies.

*e. Disclosure Claim # 5: McMinn's Status at Covad While Creating Certive (2002 Proxy Statement)*

**\*35** The Plaintiffs' fifth disclosure claim alleges that the 2002 Proxy ?did not disclose that defendant McMinn, during the time period of February to November 1999 when he purported to be working for Covad full-time, was actually working for himself and Crosspoint to find new investment vehicles.? [FN276] A requirement that the board make this type of disclosure would implicate considerations similar to those discussed, above, with respect to the Plaintiffs' fourth disclosure claim. Moreover, it would require that Covad adopt Khanna's interpretation of McMinn's employment status, as well as his conformity or non-conformity with the conditions on his compensation. As such, the claim must be dismissed. Additionally, this claim constitutes a challenge to the 2002 Proxy Statement, and therefore must be dismissed for the reasons set forth above.

FN276. Amended Compl. at ¶ 198.

*f. Disclosure Claim # 6: Disclosure of Challenged Directors, Officers, and Transactions (2003 & 2004 Proxy Statements)*

The Plaintiffs also make generalized claims with respect to the 2003 and 2004 Proxy Statements.[FN277] They variously allege that the directors failed to disclose ?anything about Khanna's allegations regarding the Certive, Bluestar or Dishnet transactions;? ?[t]he substance of Khanna's allegations;? or ?the information showing the pattern and practice of self-dealing and other malfeasance by the directors....? [FN278] The only omissions they point to with any reasonable specificity is that ?Defendants did not identify which directors and officers or which transactions were the subject of Khanna's allegations.? [FN279]

> FN277. *Id.* at ¶¶ 204, 213.

> FN278. *Id.* at ¶¶ 204, 205, 213, 214.

> FN279. *Id.* at ¶¶ 204, 213.

As explained above, ?it is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleading not be merely conclusory.? [FN280] Certainly, the threshold is relatively low in order for a claim to be considered well-pleaded on a motion to dismiss under Court of Chancery Rule 12(b)(6). Nevertheless, in order to state a claim for material omission from a proxy statement, a plaintiff must, *inter alia*, identify the facts that were improperly omitted.[FN281] The Plaintiffs claim here could be fairly read to challenge non-disclosure of all facts asserted in the Plaintiffs' Amended Complaint (or Khanna's June 19, 2002 letter to the Covad board or his July 9, 2002 Draft Complaint). The Court will not attempt, however, to parse a broadly generalized claim for non-disclosure for the benefit of the Plaintiffs-it is their responsibility to identify in a reasonable manner the facts which they allege were improperly omitted.

> FN280. *Loudon,* 700 A.2d at 140.

> FN281. *See id.* at 141; *id.* at 144 (upholding trial court's ruling that complaint ?failed to ?identify any specific fact that should have been disclosed.? ?); *see also M & B Weiss Family Ltd. P'ship of 1996,* C.A. No. 20303, slip op. at 5.

As a consequence, the Court understands the Plaintiffs to be asserting a claim for failure to identify the directors, officers, and transactions that were the subject of Khanna's allegations.[FN282] At the outset, the Court notes that, once Khanna had filed his Original Complaint on September 15, 2003, after the 2003 election, the subsequent 2004 Proxy discloses both the initiation of the lawsuit and lists the former and current directors named as defendants. [FN283] Though the 2004 Proxy Statement does not specifically identify the Certive, Bluestar, and Dishnet transactions as being the subject of his suit, it does describe in sufficient detail the history of Covad's dealings with Khanna, the steps it took in investigating his claims, the result of that investigation, and the general claims he now asserts.[FN284] Indeed, a requirement that the proxy statement disclose details (and conclusions that could be drawn from those details) to the degree the Plaintiffs apparently wish would most likely cross into self-flagellation. Therefore, the Court concludes that the Plaintiffs have failed to state a claim with respect to the 2004 Proxy Statement.

> FN282. Although the Amended Complaint is not clear, it does provide in the first sentence of the relevant paragraphs that ?defendants did not disclose anything about Khanna's allegations regarding the Certive, BlueStar or Dishnet transactions.? *See* Amended Compl. at ¶¶ 204, 213. The Court, therefore, understands the Plaintiffs to be claiming that these listed transactions should have been disclosed as having been the ?subject of Khanna's allegations.? *See id.*

> FN283. *See* 2004 Proxy Statement at 6-7.

> FN284. Neither Crandall nor Runtagh, the directors slated for re-election in 2004, was interested in any of the challenged transactions, and the Court does not view disclosure of these particular transactions as being the ?subject of Khanna's allegations? as material to these directors' re-election. Covad's disclosure puts any shareholder who is concerned by Khanna's allegations on notice that the Covad Board is ?too cozy? and that the shareholder should either vote no as to Covad's slate of directors or seek the nomination of fresh candidates.

**\*36** With respect to the 2003 Proxy Statement, no lawsuit had been filed during most important period (*i.e.,* before the

2003 election).<u>FN285</u> Although the Plaintiffs seek to characterize this information (*i.e.*, the directors, officers, and transaction that were the subject of Khanna's allegations) as ?facts,? information of this sort is not normally the subject of proper disclosure claims. The Court, instead, views the Plaintiffs' claim in this context as analogous to prior instances in which this Court has held that proxy statements need not set forth the ?opinions of stockholders? who have merely voiced opposition to a transaction, even if they are ?large holders of ... stock.? <u>FN286</u>

> FN285. Though Khanna had filed his § 220 demand on Covad on June 10, 2003 (and a related § 220 action in this Court on August 11, 2003, *see Khanna*, 2004 WL 187274), the date relevant to the present analysis is that on which he filed the present litigation.

> FN286. *In re Triton Group Ltd. S'holders Litig.*, 1991 WL 36471, at *9 (Del. Ch. Feb. 22, 1991), *aff'd sub nom. Glinert v. Lord*, 604 A.2d 417 (Del.1991) (Table); *see also Seibert v. Harper & Row, Publishers, Inc.*, 1984 WL 21874, at *6 (Del. Ch. Dec. 5, 1984). Khanna is the largest, or one of the largest, individual shareholders of Covad.

The Plaintiffs' contention that Khanna's opinions, as a former General Counsel of Covad, carry more weight and therefore merit different treatment is unpersuasive.<u>FN287</u> That Khanna's allegations came forth only contemporaneously with a contentious employment dispute, after Khanna had failed to take affirmative action when the transactions occurred, makes the Court less willing to draw a distinction for these Plaintiffs.

> FN287. *See* Pls.' Ans. Br. to Dirs.' Mot. to Dismiss at 27.

Moreover, in response to Khanna's letter, Covad appointed a special committee to investigate whether there was any substance to his claims. An independent law firm was then retained by the committee to aid its investigation. <u>FN288</u> The committee, comprised of Crandall, Runtagh, and Jalkut, <u>FN289</u> directors whom the Court has already determined are disinterested and independent, informed Khanna of its conclusion that the allegations had no merit on December 26, 2002.<u>FN290</u> Khanna's allegations, the investigation, and the investigation's conclusions were disclosed in Covad's March 2003 10-K. <u>FN291</u> In view of Covad's actions, then, to require more would constitute self-flagellation. Because the Court finds that the Plaintiffs' 2003 Proxy disclosure claim does not, in this instance, properly state a claim for omitted material facts, it must also be dismissed.

> FN288. Amended Compl. at ¶ 133 (quoting Covad's March 2003 10-K).

> FN289. The Amended Complaint provides that the Covad Board determined, on July 18, 2002, that Crandall and Runtagh ?had the authority to add? Jalkut to the investigation committee. *Id.* at ¶ 126. It also alleges that Jalkut's appointment ?most likely? occurred ?after Khanna's September 2002 meetings with counsel for the Committee,? but before February 19, 2003, when Khanna was informed of Jalkut's appointment. *Id.* at ¶ 130.

> FN290. Amended Compl. at ¶ 133.

> FN291. *Id.* at ¶¶ 133. The Amended Complaint also provides that similar disclosures were made in Covad's May 2003 10-Q. *Id.* at ¶ 204.

## VIII. MOTIONS TO CONTINUE TO SEAL/UNSEAL THE RECORD AND TO STRIKE PORTIONS OF THE AMENDED COMPLAINT

The Court now turns to motions addressing whether certain allegations should be given confidential treatment.

### A. Motion to Strike Portions of the Amended Complaint

#### 1. Whether the Amended Complaint Contains Privileged Information

Covad maintains that Paragraphs 52, 54, 55, and 57 of the Amended Complaint contain privileged information. Rule 502 of the Delaware's Rules of Evidence defines the attorney-client privilege:
A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client ...

between the client or the client's representative and the client's lawyer or the lawyer's representative.... <u>FN292</u>

> FN292. <u>Del. R. Evid. 502(b)(1)</u>. Although Khanna's professional obligations may be defined by California, the parties have pointed to no material difference between the lawyer conduct rules of California and Delaware.

In order for the communication to be confidential, the communication must not have been ?intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication .? <u>FN293</u> Although the identity of one's attorney is usually not privileged,<u>FN294</u> the subject matter of the communications is privileged.

> FN293. <u>Del. R. Evid. 502(a)(2)</u>.

> FN294. <i>See, e.g., <u>Gotham Partners v. Hallwood Realty,</u> 1999 WL 252377, at *1 (Del. Ch. Mar. 31, 1999)</i> (?Neither the status nor identity of an attorney whose communications are privileged are privileged facts.?).

**\*37** In the case at hand, the Amended Complaint, at times, reveals the subject matter of communications between Covad and Wilson Sonsini Goodrich & Rosati, P.C. (?Wilson Sonsini?), the law firm representing it-namely that the Certive transaction was a possible corporate opportunity for Covad. It is fair to read Paragraphs 52 <u>FN295</u> and 54 <u>FN296</u> as revealing confidential information-specifically, the general subject matter of Covad's communications with its inside- and outside-counsel.

> FN295. Amended Compl. at ¶ 52 (?Khanna voiced his opposition to the [Certive] deal, and raised with defendant Knowling and [Wilson Sonsini] the issue of Certive being a possible corporate opportunity for Covad.?). This paragraph discusses both the opinions of Khanna, Covad's inside-counsel, of the Certive transaction and the subject matter of Covad's conversations with Wilson Sonsini, its outside-counsel.

> FN296. <i>Id.</i> at ¶ 54 (?[T]he Board adopted (with the counsel of the conflicted Wilson Sonsini firm) a corporate opportunity policy which expressly required the prior approval of the Board before a fiduciary of Covad could take a corporate opportunity for himself....?). This reveals that Wilson Sonsini worked with Covad on its corporate opportunity policy, which, of course, reveals the subject matter of Wilson Sonsini's representation of Covad. Furthermore, if the information alleged in the Amended Complaint was gained from Khanna's attendance at the board meeting as General Counsel, then the information may be privileged for this reason as well.

Although paragraphs 52 and 54 reveal the subject matter of Wilson Sonsini's representation of Covad, it is less clear why paragraphs 55 and 57 are privileged. Paragraph 55 states that ?[the Board] even disregarded the very obvious conflict of counsel to Covad, Wilson Sonsini, serving as counsel for Certive during the period when McMinn was founding Certive while on Covad's payroll as a full-time employee and representing Certive in the very transaction by which Covad acquired its Certive shares.? <u>FN297</u> Paragraph 55 then goes on the describe Wilson Sonsini's interest in Certive.<u>FN298</u> Neither of these statements is privileged. Moreover, the fact of Wilson Sonsini's representation of Covad during the Certive transaction is not privileged because the identity of one's attorney does not constitute privileged information.<u>FN299</u>

> FN297. <i>Id.</i> at ¶ 55.

> FN298. The Court notes that Wilson Sonsini's interest in Certive is not privileged because it does not reveal any confidential information that Covad provided to (or advice received from) Wilson Sonsini. Instead, Paragraph 55 merely discusses Wilson Sonsini's independent ownership interest in Certive. Covad holds no privilege with regard to this information.

> FN299. <i>See supra</i> note 294 and accompanying text.

Paragraph 57 states that ?while at Covad and on Covad's time, and using Covad's outside counsel, Wilson Sonsini, [McMinn] developed and pursued the Certive business opportunity....? <u>FN300</u> As with Paragraph 55, Paragraph 57

only reveals the identity of Covad's outside counsel and, therefore, is not privileged.

> FN300. Amended Compl. at ¶ 57.

> *2. Whether the Privilege was Waived with Regard to the Information in the Amended Complaint*

Because the Court has determined that Paragraphs 52 and 54 contain privileged information, it must now consider whether the attorney-client privilege, with respect these Paragraphs, has been waived by Covad.
The doctrine of waiver is expressly codified by Rule 510 of the Delaware Uniform Rules of Evidence which provides that ?[a] person upon whom these rules confer a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter.? FN301

> FN301. *The Cove on Herring Creek Homeowners' Ass'n, Inc. v. Riggs,* 2001 WL 1720194, at *2 (Del. Ch. Dec. 28, 2001).

The Court first considers Khanna's argument that Covad waived its privilege by disclosing information to him when he was wearing his ?Vice President hat,? as opposed to his ?General Counsel hat.? Khanna cites authority, including *United States v. Vehicular Parking, Ltd.,*FN302 for the proposition that ?legal advice that is merely incidental to business advice may not be protected.? FN303 In *Vehicular Parking,* the court, ruling on the defendants' claims of privilege, held that ?the communications in question indicate [that the defendants' attorney] was advising on matters of business. Privilege is not accorded to such communications.? FN304 Privilege as to the communications at issue in that case, however, was not a close call. The court had no difficulty separating the roles of attorney and businessman. As the court explained, ?[The set of communications in question] is more than attorney-talk. It is big-as well as basic-business diction.? FN305

> FN302. 52 F.Supp. 751 (D.Del.1943).

> FN303. Pls.' Ans. Br. in Opp'n to Covad Commc'ns Group, Inc.'s Mot. to Disqualify Pls. & Mot. to Strike Portions of Am. Deriv. & Class Action Compl. (?Pls.' Ans. Br. to Mot. to Disqualify?) at 22.

> FN304. 52 F.Supp. at 753.

> FN305. *Id.; see also* Del. R. Evid. 502(a)(2) (describing ?confidential information? as ?disclosure made in the furtherance of the rendition of professional *legal* services? (emphasis added)).

**\*38** It is significantly more difficult, however, to relate the understanding that ?business diction? occurring between an attorney and her client is not privileged to the case at hand. Khanna provides no specific evidence-other that stating that he was a Vice President at Covad-to buttress his assertion that the information Covad deems privileged was obtained outside his legal capacity. Instead, the Plaintiffs cite authority that would place the burden on Covad to demonstrate that the information it wishes to protect was given in Khanna's legal capacity.FN306 The Court of Appeals in *In re Sealed Case,*FN307 ruling on a corporation's claim that certain communications were privileged and could not be testified to by its former general counsel, explained that it was ?mindful ... that [the general counsel] was a Company vice president, and had certain responsibilities outside the lawyer's sphere. The Company can shelter [the General Counsel's] advice only upon a clear showing that [the General Counsel] gave it in a professional legal capacity.? FN308 The Court of Appeals also explained, however, that ?advice does not spring from lawyers' heads as Athena did from the brow of Zeus,? FN309 and, since some nonlegal background is necessary for lawyers to give legal advice, the mere mention of nonlegal information does not negate the attorney-client privilege.FN310

> FN306. *See, e.g., In re Sealed Case,* 737 F.2d 94, 99 (D.C.Cir.1984) (?The Company can shelter [in-house counsel's] advice only upon a clear showing that [in-house counsel] gave it in a professional legal capacity.?).

> FN307. 737 F.2d 94 (D.C.Cir.1984).

FN308. *Id.* at 99; *see also id.* (?It remains the claimant's burden, however, to present to the court sufficient facts to establish the privilege; the claimant must demonstrate with reasonable certainty that the lawyer's communication rested in significant and inseparable part on the client's confidential disclosure.? (citations omitted)).

FN309. *Id.*

FN310. *Id.*

*In re Sealed Case* was written in the context of the attorney and client, on the same side of litigation, trying to protect privilege. It was *not* written in the context of the attorney trying to break the attorney-client privilege. In other words, *In re Sealed Case* deals with an attorney and client attempting to deploy the attorney-client privilege as a shield, not an attorney trying to break the privilege and use the information as a sword. Given the importance this Court places on the attorney-client privilege and an attorney's ethical duties to his former client,[FN311] in the situation where an attorney is seeking to use potentially privileged information as a sword against a former client, the inquiry has been framed as:

FN311. *See, e.g., Continental Ins. Co. v. Rutledge & Co., Inc.,* 1999 WL 66528, at *1 (Del. Ch. Jan. 26, 1999) (?The importance of the attorney-client privilege is central to the American model of adversarial litigation.?).

whether it can reasonably be said that in the course of the former representation the attorney might have acquired information related to the subject of this subsequent representation. [The Court] will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.[FN312]

FN312. *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 268-69 (S.D.N.Y.1953). This Court has previously followed portions of *T.C. Theatre Corp.*-namely its ?substantial relationship? test. *See Ercklentz v. Inverness Mgmt. Corp.,* 1984 WL 8251 (Del. Ch. Oct. 18, 1984).

In the present litigation, because Khanna served as General Counsel of Covad, it can reasonably be inferred that Khanna received information regarding the Certive transaction in his legal capacity. Furthermore, Khanna's response on learning information regarding the transaction was of a legal nature, [FN313] which leads one to infer that the information was provided to him in the context of seeking legal advice. Finally, the fact that, as Khanna claims, he was ?told to leave the meeting when the Board was ready to *discuss* and vote on the Board's ratification of the McMinn and Crosspoint investments in Certive? [FN314] leads one to believe that his *business* opinion was not valued (even for discussion purposes) and, thus, it is unlikely that he would have originally been given the information to provide a business opinion. For these reasons, the Court finds Khanna's argument, that the information in Paragraphs 52 and 54 of the Amended Complaint is not privileged because he was wearing his ?Vice President hat? when he learned the information, to be unpersuasive.

FN313. *See* Amended Compl. at ¶ 52 (noting that Khanna voiced his opposition to the deal as a possible corporate opportunity and objected to Shapero sitting on the board of a competitor).

FN314. *Id.* at ¶ 53 (emphasis added).

**\*39** The only issue remaining, with regard to whether Paragraphs 52 and 54 are privileged, is whether Covad waived its privilege through disclosure during the § 220 trial.[FN315] The Court addresses Paragraph 52, first.

FN315. *See supra* note 301, and accompanying text.

This Court has previously held that the attorney-client privilege does not apply ?when the party holding the privilege waives the privilege in one of two basic ways: (1) the party injects the communications into the litigation, or (2) the party injects an issue into the litigation, the truthful resolution of which requires an examination of the confidential communications.? [FN316] Additionally, the ?attorney-client privilege may be waived by the public disclosure of information that was formerly confidential.? [FN317] A fair reading of Joint Exhibit 119 from the § 220 trial, which is a letter from Khanna's counsel to an attorney for a subcommittee of Covad's Board, demonstrates that Covad waived

privilege with respect to Paragraph 52. Covad used Joint Exhibit 119 at the § 220 trial. Perhaps Covad's intent was to introduce only letter itself and not the subsequent chronology (authored by Khanna) attached to the letter. Permitting Covad to introduce the document as evidence at the § 220 hearing, and then allowing Covad to shield an integral and incorporated attachment to that document (and clearly referenced in the document itself),[FN318] would defeat the purpose of the ?inject into litigation? exception to attorney-client privilege.[FN319] Joint Exhibit 119 clearly references, on multiple occasions, the attachment; and the letter can be viewed as a summary of that attachment. Since the attachment was so integral to the letter, the introduction, by Covad, of part of Joint Exhibit 119 into litigation waives the attorney-client privilege as to the entire document. Thus, the Court concludes that Paragraph 52 does not contain any currently privileged information because privilege was waived.

FN316. *Baxter Int'l, Inc. v. Rhone-Poulenc Rorer, Inc.,* 2004 WL 2158051, at *3 (Sept. 17, 2004).

FN317. *Texaco, Inc. v. Phoenix Steel Corp.,* 264 A.2d 523, 525 (Del. Ch.1970).

FN318. JTX 119 (Letter from Grellas to Poss, at 1 (9/10/2002) (?We have attached a detailed chronology prepared by Mr. Khanna....?)).

FN319. According to *Baxter Int'l:* ?The [inject into litigation] exception is based on the principles of waiver and of fairness, so that the party holding the privilege cannot use it as both a sword and a shield.? 2004 WL 2158051, at *3.

Waiver issues with regard to Paragraph 54 are relatively easy to resolve. The information alleged to be privileged (*i.e.,* Wilson Sonsini's involvement in shaping Covad's Corporate Opportunity Policy) can be inferred from documents produced by Covad in the § 220 production. Specifically, document LWDK 0003485 contains the policy, and document LWDK 0003473 lists the attendees at the board meeting at which the policy was adopted. This list includes a Wilson Sonsini attorney, acting as secretary. These two facts, made available through the § 220 production, lead to the inference that the Covad Board adopted its Corporate Opportunity Policy with the advice of a Wilson Sonsini attorney, who was present at the meeting.

In conclusion, the information in Paragraphs 55 and 57 of the Amended Complaint is not protected by the attorney-client privilege. Covad placed the information contained in Paragraph 52 into litigation and, thus, waived attorney-client privilege with regard to the pertinent documents. Finally, the information contained in Paragraph 54 can be deciphered from the documents produced in the § 220 production. For these reasons, the Court denies Covad's motion to strike Paragraphs 52, 54, 55, and 57 from the Amended Complaint.

### B. *Motions to Seal/Unseal the Amended Complaint*

**\*40** Much of the briefing with regard to sealing and unsealing overlaps the Court's analysis, above, concerning the motion to strike portions of the Amended Complaint. Specifically, Covad argues that the Amended Complaint should remain sealed because Paragraphs 52, 54, 55, and 57 contain privileged information and Paragraphs 43, 44, and 74 contain trade secrets and unnecessarily embarrass Covad executives and board members.

The sealing of Court records is addressed in Court of Chancery Rule 5(g), which states:
(1) Except as otherwise provided in this Rule ... all pleadings and other papers ... filed with the Register in Chancery shall become a part of the public record of the proceedings before this Court.
(2) Documents shall not be filed under seal unless and except to the extent that the person seeking such filing under seal shall have first obtained, for good cause shown, an order of this Court specifying those documents ... which should be filed under seal; provided, however, the Court ... may determine whether good cause exists for the filing of such documents under seal. [FN320]

FN320. Ct. Ch. R. 5(g)(1)-(2); *see also Romero v. Dowdell,* C .A. No. 1398-N, slip op. (Del. Ch. Apr. 28, 2006).

For the reasons discussed above, the challenged portions of the Amended Complaint do not contain currently privileged information. It necessarily follows that the record should not be sealed on this basis. Additionally, this Court is unable to determine what are the ?trade secrets? revealed by Paragraphs 43, 44, and 74. Although these

Paragraphs perhaps reveal some internal matters at Covad, they are relevant to the Plaintiffs' case and simply are not sufficiently sensitive to counteract the strong policy reasons as to why the record is presumed to be public unless good cause is shown as to why it should be otherwise. Additionally, although perhaps Marshall's admission of a mistake is embarrassing, this information, disclosed in Paragraph 74, is relevant to the Plaintiffs' claim in that a member of Covad's board thought the BlueStar transaction was a disaster and yet Covad, as alleged, unnecessarily made a performance-based earn-out payment to BlueStar's former shareholders. While perhaps embarrassing, it is nonetheless relevant. An unfortunate consequence of litigation is that information sometimes surfaces that parties would prefer to keep in the dark.[FN321] Sealing any complaint that contains mildly embarrassing information would defeat the presumption, set forth in Rule 5(g), that a record is public unless good cause is shown as to why it should be sealed.

> FN321. *See Romero*, C.A. No. 1398-N, slip op. at 5-7.

Therefore, the Court denies Covad's Motion for the Continued Sealing and Resealing of Documents and grants the Plaintiffs' Cross-Motion to Unseal the Record.

### IX. DISQUALIFICATION OF THE PLAINTIFFS

The remaining issue for the Court to address is Covad's motion to disqualify Khanna, Sams, and Meisel as derivate and class plaintiffs in this action. This motion presents two questions: first, whether Khanna may continue as a representative plaintiff in the litigation; and second, if the Court finds Khanna not a proper representative plaintiff, whether Sams and Meisel may nevertheless continue as plaintiffs. The Court addresses these issues in turn, below.[FN322]

> FN322. The Court, in considering whether each of the Plaintiffs may bring this case, is not restricted solely to the face of the Amended Complaint and documents incorporated into it. When necessary, the Court may, in this context, look to affidavits submitted by the parties, as well as documents and testimony submitted as part of the related, earlier § 220 action. *But cf. Canadian Commercial Workers Indus. Pension Plan v. Alden,* 2006 WL 456786, at *8-*9 (Del. Ch. Feb. 22, 2006) (applying summary judgment standard in that instance).

**\*41** Khanna served as Covad's General Counsel for approximately six years, until mid-2002 when he was relieved of his duties. The parties adopted an overtly hostile posture soon thereafter.[FN323] During his time at Covad, Khanna served as a senior executive with supervisory responsibilities over Covad's legal department, in addition to the matters on which he worked directly. Khanna was Covad's General Counsel during the relevant periods for all of the challenged transactions.[FN324]

> FN323. *See, e.g.,* JTX 123 (June 19, 2002 letter to Covad Board from Khanna's counsel).

> FN324. The Dishnet Subscription Agreement was dated February 15, 2001, and the Dishnet Settlement was entered into by Covad in February 2002. *See* Amended Compl. at ¶¶ 86, 92. Khanna was told of the charges of sexual impropriety against him on May 9, 2002, *see* JTX 106; JTX 123 at 8, and suspended from his position the following month.

Plaintiffs seeking to maintain derivative claims must satisfy the adequacy requirements implicit in Court of Chancery Rule 23.1.[FN325] ?[A] derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her diligence, wisdom and integrity.?[FN326] In a challenge to a particular plaintiff's adequacy, however, the burden rests with the defendant.[FN327] ?The defendant must show a substantial likelihood that the derivative action is not being maintained for the benefit of the shareholders.?[FN328]

> FN325. *See, e.g., Youngman v. Tahmoush,* 457 A.2d 376, 379 (Del. Ch.1983). The analysis of the Plaintiffs' capacity to serve as derivative plaintiffs will, in this instance, be the same as the analysis of the propriety of their service as class representatives. *See, e.g., In re Fuqua Indus. S'holder Litig.,* 752 A.2d 126, 129 n. 2 (Del. Ch.1999) ( ?[A]nalysis of adequacy requirements is generally the same under Rules 23 and 23.1 as cases decided under Rule 23(a)(4), *i.e.,* the adequacy requirement of Rule 23, may be used in analyzing the adequacy requirements of Rule 23.1.? (citations omitted)).

> FN326. *In re Fuqua Indus.,* 752 A.2d at 129 (citing *Katz v. Plant Indus., Inc.,* 1981 WL 15148, at *1 (Del.

Ch. Oct. 27, 1981)).

FN327. *See Emerald Partners v. Berlin,* 564 A.2d 670, 674 (Del. Ch.1989).

FN328. *Id.; see also Canadian Commercial Workers Indus. Pension Plan,* 2006 WL 456786, at *8.

A number of factors may be considered in determining whether a plaintiff is deemed ?adequate? for these purposes:
(1) economic antagonisms between the representative and the class;
(2) the remedy sought by plaintiff in the derivative litigation;
(3) indications that the named plaintiff was not the driving force behind the litigation;
(4) plaintiff's unfamiliarity with the litigation;
(5) other litigation pending between plaintiff and defendants;
(6) the relative magnitude of plaintiff's personal interests as compared to her interest in the derivative action itself;
(7) plaintiff's vindictiveness toward defendants; and
(8) the degree of support plaintiff was receiving from the shareholders she purported to represent.[FN329]

FN329. *In re Fuqua Indus.,* 752 A.2d at 130.

This list, however, is not exhaustive.[FN330] ?Typically, the elements are intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1....? [FN331] It is possible that the inadequacy of a plaintiff may be concluded from a ?strong showing of only one factor [; however,] that factor must involve some conflict of interest between the derivative plaintiff and the class.? [FN332]

FN330. *See Katz,* 1981 WL 15148, at *2 (explaining that the factors are ?[a]mong the elements which the courts have evaluated?).

FN331. *Id.,* at *2 (quoting *Davis v. Comed, Inc.,* 619 F.2d 588, 593-94 (6th Cir.1980); *see also In re Fuqua Indus.,* 752 A.2d at 130 n. 5.

FN332. *In re Fuqua Indus.,* 752 A.2d at 130; *see also Canadian Commercial Workers Indus. Pension Plan,* 2006 WL 456786, at *8 (explaining that ?economic? conflicts are often the primary consideration); *Youngman,* 457 A.2d at 379 (noting exception that ?fact that the plaintiff may have interests which go beyond the interests of the class, but are at least co-extensives with the class interest, will not defeat his serving as a representative of the class?). The Court in *Youngman* also explained that ?purely hypothetical, potential or remote conflicts of interests never disable the individual plaintiff.? *Id.* (citation omitted).

The Court finds Khanna an inadequate representative plaintiff, one who must therefore be disqualified, for two principal reasons.[FN333] First, *Ercklentz v. Inverness Management Corp.*[FN334] effectively controls disposition of this issue. In *Ercklentz,* the Court granted the defendants' motions to disqualify the plaintiff's law firm, which had formerly represented the defendant corporation, and the plaintiff, who had formerly served as general counsel (and director) of the defendant corporation. In granting the motion to disqualify the plaintiff, the Court ruled that ?the ethical considerations which bar an attorney from acting as counsel against his former client also preclude him from acting as a class or derivative plaintiff against his former client.? [FN335] The Court determined that, because the general counsel's former representation of his corporate employer involved issues that were ?substantially related? to the claims he sought to assert derivatively, the plaintiff would be disqualified.[FN336] The parties agree that this is the standard to be applied.[FN337]

FN333. The Court's analysis addresses only the issue of whether Khanna may serve a representative plaintiff, which implicates considerations distinct from affording an attorney the opportunity to vindicate rights *personal to him. See, e.g., Doe v. A Corp.,* 709 F.2d 1043 (5th Cir.1983) (disqualifying former in-house attorney as representative plaintiff in suit against former corporate employer, but permitting him to continue suit asserting personal cause of action).

FN334. 1984 WL 8251 (Del. Ch. Oct. 18, 1984).

FN335. *Id.* at *4 (citing *Richardson v. Hamilton Int'l Corp.,* 469 F.2d 1382 (3d Cir.1972); *Doe,* 709 F.2d 1043).

FN336. *See Ercklentz,* 1984 WL 8251, at *4–*5; *see also* Delaware Lawyers' Rules of Professional Conduct (?D.L.R.P.C.?) 1.6, 1.9. *Cf. Richardson,* 469 F.2d 1382; *Doe v. A Corp.,* 330 F.Supp. 1352 (S.D.N.Y.1971), *aff'd sub nom., Hall v. A Corp.,* 453 F.2d 1375 (2d Cir1972).

FN337. *See* Pls.' Ans. Br. to Mot. to Disqualify at 15; Mem. in Supp. of Covad Commc'ns Group, Inc.'s Mot. to Disqualify Pls. (?Covad's Op. Br. to Disqualify?) at 8.

*42 To determine whether matters are ?substantially related? for purposes of a conflict of interest with a former client the Court must evaluate: the nature and scope of the prior representation at issue; the nature and scope of the present lawsuit against the former client; and whether during the course of the previous representation the client may have disclosed confidential information that could be used against the former client in the current lawsuit. Matters may be substantially related if they involve the same transaction or legal dispute or there is substantial risk that confidential information obtained in the former representation could materially advance the client's position in the current matter. The former client is not required to reveal specific details of the information shared with the attorney, rather the Court may determine whether information regularly shared in that type of representation creates an unavoidable conflict with the current case. FN338

FN338. *Hendry v. Hendry,* 2005 WL 3359078, at *4 (Del. Ch. Dec. 1, 2005) (citing *Sanchez-Caza v. Estate of Whetstone,* 2004 WL 2087922, at *3 (Del.Super.Sept. 16, 2004))); D.L.R.P.C. 1.9 cmt. 3.
In the parties' briefs, much is made of the effect of language from *T.C. Theatre Corp.,* which is quoted by the Court in *Ercklentz:* ?In cases of this sort the Court must ask whether it can reasonably be said that in the course of the former representation the attorney *might* have acquired information related to the subject of his subsequent representation.? *Ercklentz,* 1984 WL 8251, at *2 (quoting *T.C. Theatre Corp.,* 113 F.Supp. at 269 (emphasis added)). In *Ercklentz,* the Court noted that this test set forth a strict standard that, although followed by the Third Circuit, *see Richardson,* 469 F.2d at 1385, had been modified by the Second Circuit, which instead required that the ?issues involved in the two representations have been ?identical? or ?essentially the same? ? in order to find that a substantial relationship existed. *Ercklentz,* 1984 WL 8251, at *2. Ultimately, the Court concluded that it need not decide which standard to apply, since the defendants had met the higher burden of demonstrating that the two representations were essentially the same. *See id.* at *4; *see also* ABA Formal Op. 99-415 (Sept. 8, 1999) (?Representation Adverse to Organization by Former In-House Lawyer?) (describing, in Part A(2), tests for ?same or substantially related matters,? and indicating approval of Second Circuit formulation).
The standard articulated in Comment 3 of D.L.R.P.C. 1.9, adopted in response to revisions of the ABA's Model Rules of Professional Conduct following the report of the ABA's Ethics 2000 Commission, appears to craft a middle approach between the two previously competing tests described above. *See also* E. Norman Veasey, *Ethics 2000: Thoughts and Comments on Key Issues of Professional Responsibility in the Twenty-First Century,* 5 Del. L.Rev. 1, 13 (2002).

Specifically, Comment 3 to D.L.R.P.C. 1.9 provides that ?[a] conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.? Additionally, ?[i]n the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation.? FN339 These principles govern the Court's analysis of whether Khanna's prior representation of Covad as its General Counsel is substantially related to the matters at issue in the present litigation.

FN339. D.L.R.P.C. 1.9 cmt. 3.

The Plaintiffs' principal argument as to why Khanna should not be disqualified is that the information he received regarding the challenged transactions was in his capacity as an officer and shareholder of Covad, and not as Covad's General Counsel. FN340 The Plaintiffs contend that Khanna's duties as General Counsel were primarily related to telecommunications regulatory work and that Covad's board members actively sought to ?keep Khanna ?out of the loop? ? with respect to the challenged transactions. FN341 The Plaintiffs add that Khanna ?was wholly preoccupied with hotly contested telecommunications regulatory matters and related litigation? and that, even if the board had not

kept him ? ?out of the loop,? the reality is that he likely still would not have even had time to participate in the transactions as counsel.? FN342

> FN340. *See* Pls.' Ans Br at 16 (citing Amended Compl. at ¶¶ 108-11).

> FN341. Pls.' Ans. Br. to Mot. to Disqualify at 16, 22.

> FN342. *Id.* at 16 n. 3.

These arguments are not persuasive, however, in light of Khanna's status as Covad's senior in-house counsel. In his testimony at the § 220 trial, Khanna claimed that he ?owned? corporate governance issues for Covad and that he would have had a ?role to play? in such areas.FN343 Indeed, Khanna's Original Complaint sets forth that, as General Counsel, he was ?charged with the role of reviewing all conflict of interest matters for Covad.FN344 Khanna's June 19, 2002 letter to the Covad Board states that, with respect to the BlueStar acquisition: ?Mr. Khanna had seriously objected, both on pure legal grounds (concerning the Clayton Act violations) and on legal/business grounds (waste and self-dealing).? FN345

> FN343. Trial Tr. 121, 136-37.

> FN344. *See* Original Compl. at ¶ 40.

> FN345. JTX 123.

**\*43** Khanna's contention that board members did not solicit his advice does not dampen the Court's concerns as to the source of his information and the circumstances under which he obtained it. The Court finds that a ?substantial risk? exists that an attorney in Khanna's position would, in the ordinary course, have learned confidential information relating to the challenged transactions. This concern is supported by the fact that Khanna, acting as board secretary, signed the minutes of the June 15, 2000 Covad board meeting at which the BlueStar acquisition was approved.FN346 The Plaintiffs argue that Khanna was ordinarily excluded from board meetings when transactions of this nature were approved; however, the Plaintiffs cite only to board minutes regarding the Certive transaction.FN347 Although it is the Defendants' burden to demonstrate that disqualification should occur, the Court concludes that this burden has been satisfied with respect to demonstrating a ?substantial risk? that Khanna learned confidential information relating to the present litigation.FN348 Moreover, document LDWK 0002012, an email from Knowling to several Covad employees, including Khanna, dated May 21, 2000, more than two weeks before the Board's vote, states, ?Here is the game plan. I've asked Bear Stearns to move forward with BlueStar ASAP with an objective to come to terms on a deal this week. Tim, *Drhuv*, Davenport and Lach *are the handlers on this transaction.?* FN349 It is unreasonable for Khanna now to argue that he was not involved with the BlueStar acquisition (claiming to have been fully engaged in regulatory matters or otherwise kept in the dark by the Covad Board about what was a major transaction, even though he served as Covad's General Counsel).

> FN346. *See* JTX 117.

> FN347. Moreover, even assuming, *arguendo,* that Khanna was excluded during the portions of the meeting discussing the BlueStar transaction, this would not diminish the substantial risk (indeed, likelihood) that Khanna learned confidential information either before his temporary absence or after rejoining the Board's meeting.

> FN348. The Plaintiffs also argue that, unlike in *Ercllentz,* Khanna was not a member of the board and did not approve of the challenged transactions. That, however, is not a requirement for disqualification.

> FN349. Calder Decl., Ex. R. (emphasis added).

In this instance, the issue of adequacy as a representative plaintiff, however, is not confined exclusively to Khanna's ethical responsibilities as Covad's former General Counsel. Indeed, the Court need not embrace here a *per se* rule of disqualification applicable to former in-house lawyers as representative plaintiffs.FN350 Additional factors support, under these circumstances, the Court's decision that, with respect to Khanna, a substantial likelihood exists that the

representative action is ?not being maintained for the benefit of the shareholders.? Specifically, Khanna's employment dispute with Covad has impaired Khanna's capacity to vindicate shareholders' best interests. The June 19, 2002 letter to the Covad Board, demonstrates a self-interested motivation that is not consistent with the continued pursuit of a derivative and class action by this plaintiff-a plaintiff on whom the Covad shareholders would be relying. The June 19, 2002 letter makes clear that Khanna's initial motive in threatening to bring the action was to provide leverage in his attempt to regain (and enhance) his position at Covad after his suspension as General Counsel. The letter lays out numerous requirements to be imposed on the Covad Board, including that Khanna be appointed to the Covad Board ?with a not less than 15-year contract[, subject only to a vote of the general shareholders based on the classified Board seat],? ?be given a role as Executive Vice President for Corporate Strategy,? ?be compensated at all times not less than a comparable officer that serves as both an officer and as a director,? and be permitted to name five individuals who would report directly to him. None of these requirements inures directly to the benefit of the shareholders, if at all-instead, the benefit is directed almost exclusively, if not solely, to Khanna. The letter continues on to threaten that

> FN350. The Court recognizes that, in a derivative suit, relief is not sought from the company; this distinction was afforded no substance in *Ercklentz. See* 1984 WL 8251, at *4-*5.

**\*44** Mr. Khanna is more than prepared to act to defend himself, and his reputation for tenacity in this regard well precedes him. But he does not desire to light a legal fuse unless his is given no choice. The choice, then, belongs to the company and its Board. We can only hope that it is wisely made.

The Court acknowledges that mere selfish motives [FN351] and past bad behavior [FN352] do not necessarily disqualify an individual from serving as a derivative plaintiff. The posture of these parties, however, demonstrates ample history of bad will creating a substantial likelihood that Khanna will not maintain and prosecute the action according to the best interests of the shareholders.[FN353]

> FN351. *See Youngman,* 457 A.2d at 382. (?Though the plaintiff may well have in part a selfish motive in bringing this action, which is not unusual, he will be permitted to continue to act on behalf of [the class].?)

> FN352. *See Emerald Partners,* 564 A.2d at 674-75. The Court notes that, in support of Khanna's argument that his actions during the initial stages of this dispute should be overlooked by the Court, Khanna has purported to waive any employment claims he may have had against Covad. Trial Tr. at 47. Khanna refers the Court to *Emerald Partners,* where this Court permitted a plaintiff who had engaged in ?greenmail? in the past to continue as a derivative plaintiff because ?Emerald further asserts that it no longer seeks to ?make a quick buck? from the situation. In support of this contention, Emerald has presented evidence that it rejected offers of ?greenmail? payments.... I am not persuaded, therefore that Emerald is maintaining this suit solely in its own interest, or that it will be unable to fairly and adequately represent the interests of ... other shareholders.? 564 A.2d at 674-75. However, concerns about ?greenmail? are far different from the concerns surrounding Khanna. The concern with a derivative plaintiff engaging in greenmail is that the plaintiff will sell out too quickly, will not pursue corporate governance reform involving the nominal defendant, or will seek personal financial reward at the expense of the corporate enterprise to the detriment of shareholders in general. These concerns are not unfounded. However, in the greenmail situation, the prospective plaintiff's goal is economic in nature and, once a greenmail offer has been rejected, the concerns discussed *supra* are not applicable. In the case at hand, Khanna's objectives are more qualitative in nature. One can reasonably infer that many of Khanna's issues with Covad's Board are personal in nature and, therefore, the fact that Khanna has offered to forego these claims carries less weight than in a less personal situation, such as one involving greenmail.

> FN353. The Plaintiffs also point to the Court's ruling in the § 220 action that Khanna's § 220 demand was brought under a ?proper purpose.? The Court's ruling in that context, however, involved different standards and policies than those considered in the Court's analysis of Khanna's adequacy as a representative plaintiff.

In concluding that Khanna must be disqualified as a representative plaintiff, the Court relies primarily on Khanna's position as Covad's former General Counsel and the ethical quagmire that follows. This result is significantly supported, however, by the cloud hanging over the litigation created by the tangential and acrimonious employment dispute between Khanna and his former employer. Although the existence of a substantial relationship between Khanna's prior representation of Covad and the matters presently at issue is likely sufficient grounds to deem Khanna inadequate as a representative plaintiff under *Ercklentz,*[FN354] the Court ultimately concludes that, as a consequence of these two ?intertwined and interrelated? considerations described above, Khanna must be disqualified as a representative plaintiff in this action.[FN355]

FN354. This conclusion may be viewed as equivalent to the ?strong showing? of one factor, demonstrating a conflict of interest, necessary to disqualify a plaintiff as an adequate representative. *See In re Fuqua Indus., 752 A.2d at 130.*

FN355. The Defendants have asked that the Court enter an injunction preventing Khanna from further participating in this litigation and from aiding any other persons in bringing their claims, in this context. No evidence has yet been presented to the Court requiring entry of injunctive relief-indeed, the Court's disqualification of Khanna relies in substantial part on the presumption that a danger exists that confidences will be revealed where a ?substantial relationship? has been found. The Court presumes that Khanna will conform his behavior with his ethical obligations as a member of the bar; however, the Court may revisit this issue, if necessary.

Covad asserts two grounds for the disqualification of Sams and Meisel, in addition to Khanna: (1) that they are not the ?driving force? behind the litigation and (2) that they have been improperly tainted by Khanna. Covad, as movant, must satisfy its burden of demonstrating inadequacy with respect to Sams and Meisel, in addition to Khanna. The evidence before the Court does not, as yet, constitute a sufficient showing of cause to conclude in this context either that the remaining Plaintiffs are not the ?driving force? behind the litigation,[FN356] or that the same potential taint surrounding Khanna extends to Sams and Meisel.[FN357] Moreover, the Court is not satisfied that the evidence before it merits the disqualification of Sams and Meisel when these factors are viewed together. Counsel for the Plaintiffs have represented to the Court that ?there has been no disclosure of privileged information by Khanna to the other plaintiffs or to any of plaintiffs' counsel.? [FN358] It is within the Court's discretion, then, to rely on their representations as officers of the Court.[FN359] The Court may, however, reconsider disqualification of Sams and Meisel at a later date, should it become necessary.[FN360]

FN356. Although whether a plaintiff is the ?driving force? behind litigation is among the factors to be considered in determining adequacy for purposes of Court of Chancery Rule 23.1, *see, e.g., Youngman,* 457 A.2d at 379-80, Covad has yet to present persuasive evidence pointing to more than the potential that Sams and Meisel may not be sufficiently interested and involved to continue with this action. *See, e.g.,* Trial Tr. 54. This potential is insufficient. *Compare Nolen v. Shaw-Walker Co.,* 449 F.2d 506, 508-10 (6th Cir.1971) (finding strong showing of evidence that plaintiff was a front for person in actual control of litigation, who also had ties to corporations with which court concluded that litigation was intended to force nominal defendant to merge), *with In re Fuqua Indus.,* 752 A.2d at 130-36 (denying motion to disqualify, and, although addressing motion to disqualify focusing on one factor and thereby necessitating ?strong showing,? suggesting that ?driving force? factor, in order to impact analysis, requires satisfaction of a fairly demanding burden by defendants).
Covad's ?driving force? arguments would have significant impact were the Court to conclude that Sams and Meisel's ability to maintain this action relied solely or in large part on information received from Khanna that was privileged or confidential-this, of course, would implicate considerations addressed with respect to Covad's second basis for arguing that Sams and Meisel should be disqualified, as well. Indeed, Covad contends that Sams and Meisel are not among the contemplated parties having proper access to documents produced as a consequence of the earlier § 220 trial under the Confidentiality Agreement resulting from that action. Covad states that ?the Confidentiality Agreement provides that the Discovery Material produced in that action may be made available to ... parties *to that litigation,* i.e., the Section 220 Action.... It provides that additional parties that are joined *in that litigation* may sign the Confidentiality Agreement and thereby receive access to the Discovery Material.... However, plaintiffs Sams and Meisel *were not parties to the Section 220 Action,* and therefore they were *not* eligible to receive the Discovery Material produced in that action.? Covad Commc'ns Group, Inc.'s Reply to Pls.' Ans. Br. to Covad Commc'ns Group, Inc.'s Mot. to Disqualify Pls. (?Covad's Reply Br. to Disqualify?) at 25-26 (emphasis in original). The Court, however, rejects this argument. The present litigation was initially filed during the pendency of the prior § 220 action, and the Court does not view this as a fair reading of the parties' intent. Given that the Amended Complaint contains no improperly divulged privileged or confidential information and that Sams and Meisel have access to the § 220 action documents, the Court finds Covad's ?driving force? arguments unpersuasive on the record before it.

FN357. The Court recognizes the potential for abuse in this context. Khanna's disqualification ultimately results from the Court's consideration of more than one factor. The Court is not, however, persuaded that the case law cited by Covad creates a *presumption* that Khanna's presence has improperly tainted Sams and Meisel, in this context. Meisel has separate counsel. The record is unclear whether Sams is similarly

represented by separate counsel. Moreover, much of Covad's argument is premised on its contention that the Amended Complaint contained, and therefore evidenced the improper sharing of, privileged and confidential information; this, however, was rejected by the Court, above.

FN358. Pls.' Ans. Br. to Mot. to Disqualify at 27-28; *see also* Toll Aff., Ex. C at 3; Amended Compl. at ¶ 3 n. 1.

FN359. *See IMC Global, Inc. v. Moffett,* 1998 WL 842312, at *3 (Del. Ch. Nov. 12, 1998) (?Where, as officers of the Court, attorneys can represent the full extent of information flow between them to the Court it is within the Court's discretion to rely on those representations where there is seemingly no danger of intrusion on the fairness of the adjudication process.?).

FN360. *See, e.g., Canadian Commercial Workers Indus. Pension Plan,* 2006 WL 456786, at *10. The issue of whether Sams is, and has been, represented by separate counsel may, for example, present a matter for the Court's further consideration with respect to his adequacy as plaintiff when the record on this point is clarified.

### X. CONCLUSION

For the reasons stated above, the Defendants' motions to dismiss are granted as to Counts I, II, III, V, VII, VIII, IX, and X of the Amended Complaint; the motions are, however, denied as to Counts IV and VI.FN361 Khanna is dismissed as a representative plaintiff. In addition, Covad's motion to continue to seal the record is denied and the Plaintiffs' cross-motion to unseal the record is granted. Finally, Covad's motion to strike is denied.

FN361. Crosspoint's motion to dismiss is, however, granted as to the Certive Claims asserted in Count VI.

**\*45** IT IS SO ORDERED.

Del.Ch.,2006.
Khanna v. McMinn
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 9



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 792179 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Lord v. BridgesE.D.Pa.,1998.Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Edward LORD and Helen Lord,
v.
LIVING BRIDGES, et al.
**No. CIV.A. 97-6355.**

Nov. 10, 1998.

*MEMORANDUM ORDER*

WALDMAN.
*1 Presently before the court is the motion of Michelle Iatesta Towers to dismiss for failure to effect timely service of process.

The uncontradicted facts are, in pertinent part, as follow.

This action was originally filed on December 20, 1996 in the United States District Court for the District of New Jersey. Plaintiffs attempted to serve defendant Towers by handing process to someone in charge at the offices of defendant Living Bridges in Pennsylvania. Ms. Towers was an employee of Living Bridges at the time of the events described in the complaint but not when service was attempted. Thus, she was not properly served pursuant to Fed.R.Civ.P. 4, New Jersey law or Pennsylvania law. By memorandum and order of September 19, 1997, Judge Lifland quashed service of process as to Ms. Towers and transferred this action to this court pursuant to 28 U.S.C. § 1406(a).

Plaintiffs did not attempt to serve Ms. Towers until May 29, 1998, more than eight months after Judge Lifland's order. She was served on that date at her home in Ardmore, Pennsylvania. The summons with which she was served was issued by the Clerk of the Court for the District of New Jersey, was dated January 24, 1997 and makes no reference to transfer of the case to this court.

Defendant Towers has resided at the same address in Ardmore since 1995, long before this action was filed. There is no suggestion that Ms. Towers made any attempt to evade service of process.

The form of service with which plaintiff was served aside, Fed.R.Civ.P. 4(m) requires plaintiffs to serve defendants with process within 120 days of the date they file their complaints. A motion to quash service of process or to dismiss a complaint for failure properly to effect service tolls the 120-day period. See *Bruley v. Lincoln Property Co., N.C., Inc.,* 140 F.R.D. 452, 455 (D.Colo.1991). Nevertheless, even if plaintiffs had the benefit of an entirely new 120-day period within which to effect service on Ms. Towers running from the date of the order quashing service, the attempt to serve process on May 29, 1998 was considerably more than 120 days later.

Plaintiffs have not opposed this motion or made any showing of good cause for their failure timely to effect service upon Ms. Towers. Dismissal of this action without prejudice as to Ms. Towers is therefore appropriate. See *Petrucelli v. Bohringer and Ratzinger, GMBH,* 46 F.3d 1298, 1305 (3d Cir.1995); *Suegart v. United States Customs Svc.,* 180 F.R.D. 276, 278-79 (E.D.Pa.1998).

ACCORDINGLY, this day of November, 1998, upon consideration of defendants' Motion to Dismiss Pursuant to Rule 4 of the Federal Rules of Civil Procedure (Doc. # 9), and in the absence of any response by plaintiffs thereto, IT IS HEREBY ORDERED that said Motion is GRANTED, and this action is DISMISSED without prejudice as to Ms. Towers.

E.D.Pa.,1998.

Lord v. Bridges
Not Reported in F.Supp.2d, 1998 WL 792179 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

? 2:97cv06355 (Docket) (Oct. 14, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2802913 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

Briefs and Other Related Documents
Shamrock Holdings, Inc. v. ArensonD.Del.,2006.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
SHAMROCK HOLDINGS, Shamrock Capital Advisors, Eugene Krieger, George Buchler, and Bruce Stein,
Plaintiffs,
v.
Avie ARENSON, Laurel Equity Group LLC, Selk LLC, A. Arenson Holdings Ltd., D.A. Gardens Ltd., and J12ALH
Associates, Defendants.
Laurel Equity Group LLC, Selk LLC, A. Arenson Holdings Ltd., D.A. Gardens Ltd., and J12ALH Associates,
Counterclaim Plaintiffs and Third Party Plaintiffs,
v.
Shamrock Holdings, Shamrock Capital Advisors, Eugene Krieger, George Buchler, and Bruce Stein, Counterclaim
Defendants,
andALH Holdings LLC, Third Party Defendant.
**Nos. CIV.04-1339-SLR, CIV.06-62-SLR.**

Sept. 29, 2006.

**Background:** Following sale of a Delaware limited liability company, controlling equity holder and certain board members filed declaratory judgment action against minority equity holders. After removal and consolidation with minority equity holders' action against plaintiffs, which converted minority equity holders' claims into counterclaims, plaintiffs filed motion for judgment on the pleadings as to certain counts as well as a motion to dismiss defendants' counterclaims.

**Holdings:** The District Court, Sue L. Robinson, Chief Judge, held that:

(1) exculpation provisions of limited liability company's operating and consulting agreements did not give rise to independent grounds for contractual liability should consultant's or limited liability company's fiduciaries act with bad faith or in a grossly negligent manner;

(2) minority equity holders could bring a direct action against controlling equity holder and certain board members for their participation in the sale of limited liability company's operating units; and

(3) minority equity holders were not required to plead around the business judgment rule in order to avoid dismissal of breach of duty claims for failure to state a claim.

Motion for judgment on the pleadings granted in part and denied in part; motion to dismiss counterclaims denied.

[1] Federal Courts 170B ⟜32

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction, Determination and Waiver
                170Bk32 k. Pleading. Most Cited Cases
Challenge to subject matter jurisdiction is facial where sufficiency of claims turns on whether the claims are direct or derivative. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

[2] Federal Courts 170B ⟜32

<u>170B</u> Federal Courts
    <u>170BI</u> Jurisdiction and Powers in General
        <u>170BI(A)</u> In General
            <u>170Bk29</u> Objections to Jurisdiction, Determination and Waiver
                <u>170Bk32</u> k. Pleading. <u>Most Cited Cases</u>
Dismissal for a facial challenge to jurisdiction is proper only when the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or is wholly insubstantial and frivolous. <u>Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.</u>

**[3] Limited Liability Companies 241E ⟶43**

<u>241E</u> Limited Liability Companies
    <u>241Ek40</u> Officers and Agents
        <u>241Ek43</u> k. Individual Liabilities of Officers and Agents. <u>Most Cited Cases</u>
Exculpation provisions of Delaware limited liability company's operating and consulting agreements did not give rise to independent grounds for contractual liability should consultant's or limited liability company's fiduciaries act with bad faith or in a grossly negligent manner; those provisions merely discussed under what circumstances consultant and the other fiduciaries would be protected from liability.

**[4] Limited Liability Companies 241E ⟶48**

<u>241E</u> Limited Liability Companies
    <u>241Ek44</u> Actions
        <u>241Ek48</u> k. Derivative Suits. <u>Most Cited Cases</u>

**Limited Liability Companies 241E ⟶49**

<u>241E</u> Limited Liability Companies
    <u>241Ek49</u> k. Conversion, Merger, and Dissolution. <u>Most Cited Cases</u>
Under Delaware law, minority equity holders could bring a direct action against controlling equity holder and certain board members for their participation in the sale of limited liability company's operating units; since limited liability company was effectively dissolved, there was no limited liability company to which a recovery could be paid.

**[5] Corporations 101 ⟶310(1)**

<u>101</u> Corporations
    <u>101X</u> Officers and Agents
        <u>101X(C)</u> Rights, Duties, and Liabilities as to Corporation and Its Members
            <u>101k310</u> Management of Corporate Affairs in General
                <u>101k310(1)</u> k. In General. <u>Most Cited Cases</u>
In Delaware, the business judgment rule is a presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company.

**[6] Federal Civil Procedure 170A ⟶1752.1**

<u>170A</u> Federal Civil Procedure
    <u>170AXI</u> Dismissal
        <u>170AXI(B)</u> Involuntary Dismissal
            <u>170AXI(B)2</u> Grounds in General
                <u>170Ak1752</u> Affirmative Defenses, Raising by Motion to Dismiss
                    <u>170Ak1752.1</u> k. In General. <u>Most Cited Cases</u>
A complaint may be dismissed for failure to state a claim where an affirmative defense appears on its face. <u>Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.</u>

**[7] Limited Liability Companies 241E ⟶45**

<u>241E</u> Limited Liability Companies

241Ek44 Actions
    241Ek45 k. In General. Most Cited Cases
Minority equity holders of Delaware limited liability company, which asserted breach of duty claims against controlling equity holder, were not required to plead around the business judgment rule in order to avoid dismissal for failure to state a claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[8] Limited Liability Companies 241E ☞45**

241E Limited Liability Companies
    241Ek44 Actions
        241Ek45 k. In General. Most Cited Cases
Federal notice pleading standards did not require minority equity holders of limited liability company to allege precisely what actions were taken by consultant's agents, who served on company's board, in order to state claim against consultant for knowingly aiding the agents in breaching their fiduciary duties as board members. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[9] Limited Liability Companies 241E ☞45**

241E Limited Liability Companies
    241Ek44 Actions
        241Ek45 k. In General. Most Cited Cases
Breach of duty claims brought by minority equity holders of Delaware limited liability company against controlling equity holder and certain board members would not be dismissed at pleading stage on ground that damages pled were totally speculative; because it was not clear that company had lost all of its value ?long before? the alleged breaches of duty, minority equity holders were not yet required to plead damages with particularity. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

S. Mark Hurd, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Counsel for Plaintiffs, Counterclaim Defendants, and Third Party Defendant.
Sean J. Bellew, David A. Felice, Cozen O'Connor, Wilmington, DE, Counsel for Defendants, Counterclaim Plaintiffs, and Third Party Plaintiffs.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

### I. INTRODUCTION

**\*1** The present litigation arises out of the sale of a Delaware limited liability company known as ALH Holdings (?ALH?). Shamrock Holdings (?Shamrock?), Shamrock Capital Advisors (?SCA?), Eugene Krieger (?Krieger?), George Buchler (?Buchler?), and Bruce Stein (?Stein?) (collectively, ?plaintiffs?), filed the present action, which seeks declaratory judgment on eight different issues,[FN1] in Delaware Chancery Court on October 5, 2004. (D.I. 72 at 5) At the request of defendants Avie Arenson (?Arenson?), Laurel Equity Group LLC (?Laurel?), SELK LLC (?SELK?), A. Arenson Holdings Ltd. (?Arenson Holdings?), D.A. Gardens Ltd. (?D.A. Gardens?), and J12ALH Associates (?J12?) (collectively, ?defendants?), it was removed to the United States District Court for the District of Delaware on the grounds of diversity jurisdiction, 28 U.S.C. § 1332. (Id.) Plaintiffs' motion to remand to Chancery Court was denied by this court. (D.I. 33) Plaintiffs later amended their complaint. (D.I. 37)

Meanwhile, defendants, minus Arenson, filed an action against plaintiffs in a United States District Court in North Carolina. (D.I. 72 at 5) That action was subsequently transferred to this court, was consolidated with plaintiffs' action, and became defendants' counterclaim against plaintiffs[FN2] and third party complaint against ALH.[FN3] (Id. at 6) Defendants made several motions to dismiss (D.I. 40, 43, 46), all of which the court denied (D.I. 78). Presently before the court are plaintiffs' motion for judgment on the pleadings as to counts I, II, III, and VIII of their complaint,[FN4] as well as their motion to dismiss defendants' counterclaims and third party complaint; ALH has joined plaintiffs in their motion to dismiss.[FN5] (D.I. 71)

### II. BACKGROUND

Shamrock, a California corporation, is the majority member of ALH, holding a Class A interest in the company. (D.I.

37 at ¶¶ 2, 7) SCA is a Delaware corporation that provided consulting services to ALH. (D.I. 20 at ¶ 13) Krieger is an employee of Shamrock, as well as a Class A representative on ALH's Supervisory Board. (D.I. 37 at ¶ 8) Buchler, another Shamrock employee, served as the second Class A representative on ALH's board. (*Id.*) Stein is also a Shamrock employee, and was one of the Class D representatives on ALH's board. (*Id.*) Krieger, Buchler, and Stein have also performed substantial services for SCA. (*Id.*) ALH is a Delaware LLC that suffered financial troubles and was subsequently sold in pieces over the objections of its Class B members, leading to the instant litigation.

Defendant Arenson served as the Class B representative on ALH's Supervisory Board but did not personally hold equity in ALH. (*Id.* at ¶ 10) Arenson, however, does own, control, and act as an agent for two companies, Arenson Holdings and D.A. Gardens, which are Class B equity holders in ALH. (*Id.* at ¶ 11; D.I. 67[A] at ¶ 11) He is not a party to the counterclaim, nor to the third party complaint. SELK is a Delaware limited liability company which holds Class B membership in ALH. (D.I. 37 at ¶ 52; D.I. 67[A] at ¶ 52) J12 is a New York general partnership and is also a Class B member of ALH. (D.I. 37 at ¶¶ 58-60; D.I. 67[A] at ¶¶ 58-60) Arenson Holdings, a Class B member of ALH, is owned by defendant Arenson. (D.I. 37 at ¶ 11; D.I. 67[A] at ¶ 11) D.A. Gardens, another Class B equity holder in ALH, is likewise owned by Arenson. (*Id.*) Laurel, the final Class B member of ALH, is a Delaware LLC. (D.I. 37 at ¶ 57; D.I. 67[A] at ¶ 57)

*2 ALH was created on June 3, 1998. (D.I. 37 at ¶ 19) On or about June 12, 1998, the Class B members funded their investments in the company. (*Id.* at ¶ 20) ALH became the sole shareholder of American Landmark Homes Corporation (?ALH Corp.?) and Atlantic Builders, Inc. (?ABI?), Delaware corporations with home-building operations in Florida. (*Id.* at ¶ 21) ALH's Operating Agreement was initially signed by ALH's members as of June 12, 1998 and was amended as of March 15, 1999. (*Id.* at ¶ 22) On or around December 9, 1998, the members of ALH's Supervisory Board decided to form a subsidiary to act as the parent company of all of ALH's operating subsidiaries. That corporate subsidiary, ALH II, Inc. (?ALH II?), was organized on December 9, 1998 under the laws of Delaware. (*Id.* at ¶ 25)

In January 2000, ALH II took out a loan of $27.5 million which was used to fund the acquisition of a North Carolina home-building operation called Mulvaney Homes, Inc. (?MHI?). (*Id.* at ¶ 27) ALH became the guarantor of ALH II's obligation to Wachovia Bank, the lender. ALH's Supervisory Board unanimously approved all of the steps related to the purchase of MHI. (*Id.* at ¶ 28)

On March 15, 1999, ALH amended its Operating Agreement, with Arenson signing the amendment on behalf of Arenson Holdings and D.A. Gardens and committing the two companies to contribute approximately $469,000 in capital to ALH. (*Id.* at ¶ 29) This infusion of capital allowed ALH Tennessee Acquisition, Inc. (?ALH Tennessee?), a wholly-owned subsidiary of ALH II, to purchase Bowden Building Corporation (?BBC?) in Tennessee. (*Id.* at ¶ 30)

On April 6, 2000, some of the ALH investors, including Shamrock and Arenson Holdings, loaned ALH $2 million with which to ?finance certain operations? of ALH II. (*Id.* at ¶ 32) Among the ALH II subsidiaries guaranteeing this loan were ABI, ALH Acquisition Corp. (ABI's parent company), and ALH Tennessee (the parent company of BBC). (*Id.* at ¶ 33) The members of ALH's Supervisory Board unanimously approved these loans to ALH II. (*Id.* at ¶ 34) By the end of that year, ALH II was in default on several loans and was undergoing serious financial difficulties. (*Id.* at ¶ 35)

Pursuant to ALH's Operating Agreement, Lion LLC (?Lion?) had been appointed as ALH's Initial Manager. (*Id.* at 36) In July 2001, after disputes over Lion's performance, Lion settled with ALH (again, with the unanimous approval of the Supervisory Board). (*Id.* at ¶¶ 38, 41) The terms of the settlement permitted the Class A members to appoint three of the five members of ALH's Supervisory Board and hire SCA to provide consulting services for ALH, simultaneously weakening Lion's influence over the company and increasing Shamrock's. (*Id.* at ¶ 39) SCA's Consulting Agreement with ALH indemnified it from all liability except that resulting primarily from actions or omissions done in bad faith or due to gross negligence or willful misconduct. (*Id.* at ¶ 77)

*3 In March of 2002, all five board members of ALH agreed to hire Jolson Merchant Partners (?JMP?) to provide ?financial advisory and investment banking services? in connection with the possible sale of ALH. (*Id.* at ¶ 44) On May 7, 2002, with the Supervisory Board's unanimous approval, some of the ALH investors (including Shamrock and D.A. Gardens) loaned another $4.4 million to ALH II. (*Id.* at ¶ 46) That July, the Class B members began expressing an interest in buying all of ALH's Class A shares, though an agreement to do so was never finalized. (*Id.* at ¶ 49)

At a June 26, 2003 meeting of the Supervisory Board, a majority of representatives (with Arenson opposing and the fifth representative, Shalom Lamm, abstaining) voted to sell ABI. (*Id.* at ¶ 105) All five class representatives

subsequently gave their consent for ALH members' 2000 and 2002 loans to ALH II to be repaid from proceeds realized by the sale of ABI. (*Id.* at ¶ 48) On March 24, 2004, over the objections of Arenson and Lamm, a majority of the board also decided to sell BBC. (*Id.* at ¶ 122) Finally, on December 15, 2004, the same majority voted to sell the last of ALH's home-building operations, MHI.[FN6] (*Id.* at ¶ 129) After repeated threats by defendants to sue them for selling ALH in pieces against the Class B members' wishes, plaintiffs filed the present action for declaratory judgment. (*Id.* at ¶ 6)

### III. STANDARD OF REVIEW

#### A. Motion for Judgment on the Pleadings

When deciding a <u>Rule 12(c)</u> motion for judgment on the pleadings, a district court must view the facts and inferences to be drawn from the pleadings in the light most favorable to the non-moving party. <u>Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 220 (3d Cir.2001)</u>; <u>Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 406 (3d Cir.1993)</u>. The motion can be granted only if no relief could be afforded under any set of facts that could be provided. <u>Turbe v. Gov't of the Virgin Islands, 938 F.2d 427, 428 (3d Cir.1991)</u>; *see also* <u>Southmark Prime Plus, L.P. v. Falzone, 776 F.Supp. 888, 891 (D.Del.1991)</u>; <u>Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Ctr., 536 F.Supp. 1065, 1072 (E.D.Pa.1982)</u> (?If a complaint contains even the most basic of allegations that, when read with great liberality, could justify plaintiff's claim for relief, motions for judgment on the pleadings should be denied.?). However, the court need not adopt conclusory allegations or statements of law. <u>In re General Motors Class E Stock Buyout Sec. Litig., 694 F.Supp. 1119, 1125 (D.Del.1988)</u>. Judgment on the pleadings will only be granted if it is clearly established that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. <u>Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 290 (3d Cir.1988)</u>.

#### B. Motion to Dismiss-Lack of Subject Matter Jurisdiction

[1] Once subject matter jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. See <u>Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 69 (3d Cir.2000)</u>. Under <u>Fed.R.Civ.P. 12(b)(1)</u>, the court's jurisdiction may be challenged either facially (based on the legal sufficiency of the claim) or factually (based on the sufficiency of jurisdictional fact). *See* 2 James W. Moore, Moore's Federal Practice § 12.30[4] (3d ed.1997). In the case at bar, where the sufficiency of counts I-VII of the counterclaim turns on whether defendants' claims are truly direct or derivative, plaintiffs' challenge to subject matter jurisdiction is facial. *See, e.g.,* <u>In re Franklin Mut. Funds Fee Litigation, 388 F.Supp.2d 451, 462 (D.N.J.2005)</u> (?Because the Court finds that plaintiffs' alleged injuries are derivative, these Counts are dismissed as improperly pleaded.?).

*4 [2] Under a facial challenge to jurisdiction, the court must accept as true the allegations contained in the complaint. *See* 2 Moore § 12.30[4]. Dismissal for a facial challenge to jurisdiction is ?proper only when the claim ?clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous.? ? <u>Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1408-09 (3d Cir.1991)</u> (quoting <u>Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)</u>).

#### C. Motion to Dismiss-Failure to State a Claim

?The standards for determining a motion to dismiss a counter-claim are the same as for determining a motion to dismiss a complaint.? <u>Milton Roy Co. v. Bausch & Lomb, Inc., 418 F.Supp. 975, 978 (D.Del.1976)</u>. In analyzing a motion to dismiss pursuant to <u>Rule 12(b)(6)</u>, the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *See* <u>Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir.1998)</u>. ?A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint.? *Id.* Claims may be dismissed pursuant to a <u>Rule 12(b)(6)</u> motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. *See* <u>Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)</u>. The moving party has the burden of persuasion. *See* <u>Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.1991)</u>.

### IV. DISCUSSION

#### A. Motion for Judgment on the Pleadings

Plaintiffs have moved for judgment on the pleadings with respect to counts I, II, III, and VIII of their complaint, which request a declaratory judgment that, respectively, plaintiffs did not violate their fiduciary duties; they violated neither ALH's Operating Agreement nor Consulting Agreement; and they did not violate defendant Arenson's rights as the Class B representative on ALH's Supervisory Board. (D.I. 71, 72) For the following reasons, plaintiffs' motion for judgment on the pleadings is granted in part and denied in part.

### 1. Count I-Breach of Fiduciary Duties

Plaintiffs aver that various ?admissions? of facts made by defendants in their answer contradict the allegations in defendants' counterclaim complaint to such an extent that they preclude a finding on any of the counterclaim charges of breach of fiduciary duty. (D.I. 72 at 2-3) Defendants contend that these ?admissions? are either irrelevant to the matters at bar, mischaracterizations by plaintiffs, or material facts that are still in dispute (D.I. 82 at 12-13), such as whether Shamrock received a disproportionate benefit from the sale of ALH's operations (*id.* at 23-24) and whether or not it was actually **necessary** to liquidate ALH in order to pay off lenders, or if Shamrock merely supported it for self-interested reasons (*id.* at 32).

*5 At this early stage of the proceedings, the court cannot conclude that defendants' pleadings do not ?contain[ ] even the most basic of allegations that, when read with great liberality, could justify [their] claim for relief,? *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Ctr.,* 536 F.Supp. 1065, 1072 (E.D.Pa.1982), nor that there are no material facts left in dispute. Therefore, plaintiffs' motion for judgment on the pleadings is denied as to count I of their complaint.

### 2. Counts II and III-Breach of ALH's Operating and Consulting Agreements

Plaintiffs likewise seek judgment on the pleadings regarding their alleged breach of ALH's Operating Agreement, ALH's Consulting Agreement with SCA, and any implied contractual covenant of good faith and fair dealing, on the grounds that defendants have not identified any provisions of these contracts that plaintiffs have violated. (D.I. 72 at 37) Defendants claim that they have pointed to specific provisions in these contracts, namely § 6.2(f) of the Operating Agreement and Schedule A of the Consulting Agreement. (D.I. 82 at 35)

Section 6.2(f) states that fiduciaries are not protected from liability for acts or omissions that are done in bad faith or with gross negligence (*see* D.I. 67[C] at ¶ 142), while defendants' counterclaim is premised on allegations that Shamrock, Krieger, Buchler, and Stein acted in bad faith and with gross negligence (D.I. 82 at 35). Schedule A similarly states that ALH will not be liable for actions or omissions of SCA which were done in bad faith or through gross negligence or willful misconduct. (*See* D.I. 67[C] at ¶ 155) These two provisions merely discuss under what circumstances SCA and the other fiduciaries will be protected from liability; defendants appear to assert that they constitute contractual obligations in and of themselves, which can be violated by any action done in bad faith or with gross negligence.

[3] Plaintiffs' entitlement to judgment on the pleadings for counts II and III rests on whether § 6.2(f) and Schedule A are actionable contractual obligations or whether defendants are required to identify other, independent parts of the agreements that the fiduciaries have allegedly breached. The court agrees with the latter proposition. Defendants quote a Delaware Chancery Court decision for the statement that ?LLC members' rights begin with and typically end with the Operating Agreement? (D.I. 82 at 35, quoting *Walker v. Resource Dev., LLC,* 791 A.2d 799, 813 (Del.Ch.2000)), but they cite no case law supporting their claim that the exculpation provisions of § 6.2(f) and Schedule A give rise to independent grounds for contractual liability should SCA or ALH's fiduciaries act with bad faith or in a grossly negligent manner.

Defendants cannot allege any set of facts which would entitle them to relief under § 6.2(f) and Schedule A of the Operating and Consulting Agreements, respectively. Consequently, the court grants plaintiffs' motion for judgment on the pleadings with respect to counts II and III of their complaint.

### 3. Count VIII-Violation of Arenson's Rights

*6 Plaintiffs seek a declaratory judgment that they did not violate defendant Arenson's rights as a Class B representative by preventing him from having meaningful participation in the Supervisory Board's decision-making process. (D.I. 37) This court recently denied defendant Arenson's motion to dismiss (D.I. 46) solely because ?[his] role in the Supervisory Board decision-making process is a factual issue currently being addressed in discovery.? (D.I. 77 at 10) With regard to plaintiffs' request for declaratory judgment in count VIII of the complaint, the court opined:

The amended complaint contains no allegations that defendant Arenson as an individual either has a cause of action against plaintiffs or that plaintiffs have a cause of action against defendant Arenson. Defendant Arenson was not a member of ALH. Defendant Arenson served only on the Supervisory Board as the class B representative. Any harm caused by depriving the class B representative of his rights to participate in the Supervisory Board will be suffered by the class B members, not by defendant Arenson as the class B representative.

.... Plaintiffs present no law to support the position that a financial interest in a company is enough to require a party to defend a declaratory judgment action.

(*Id.* at 9) Plaintiffs have failed to meet their burden for a judgment on the pleadings as to count VIII of their complaint; it, therefore, is denied.

### B. Motion to Dismiss-Lack of Subject Matter Jurisdiction

[4] Plaintiffs have moved to dismiss counts I-VII of defendants' counterclaim (the ?direct claims?) because, they argue, defendants may only bring such claims derivatively, on behalf of ALH.[FN7] (D.I. 72 at 39-40) The Delaware Supreme Court has stated that, in determining whether a shareholder suit is direct or derivative,
a court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1039 (Del.2004). Plaintiffs claim that defendants cannot show that any of their alleged injuries arise independently from injuries to ALH. (D.I. 72 at 39-40)

Defendants concur that *Tooley* is normally the proper test to use for such an analysis, but argue that it is not applicable to the case at bar. According to defendants, the unjust enrichment exception[FN8] survives the Court's holding in *Tooley.* (D.I. 82 at 39) Therefore, they aver, their claims should be treated as direct because Shamrock, the majority member of ALH and one of the counterclaim defendants, will unjustly benefit from any derivative action recovery. (*Id.* at 40) Likewise, defendants contend, a derivative action is neither necessary nor practical because ? ?superimposing derivative pleading requirements upon [the] claims [will] needlessly delay[ ] ultimate substantive resolution and serve[ ] no useful or meaningful public policy purpose.? ? (*Id.* at 40-41, quoting *Cencom,* 2000 WL 130629, at *3)

*7 Much like the partnership in *Cencom,* ALH has effectively been dissolved. In a recent decision, the Delaware Supreme Court held that allegations that a majority shareholder supported a transaction which ?wrongfully reduced the cash-value and the voting power of the ... minority interest, and increased correspondingly the value and voting power of the controller's majority interest? was ?not exclusively derivative and [could] be brought by the (former) minority shareholders directly.? *Gentile v. Rossette,* 906 A.2d 91, 92 (Del.2006). According to the Court,
[t]he harm to the minority shareholder plaintiffs resulted from a breach of a fiduciary duty owed to them by the controlling shareholder, namely, not to cause the corporation to effect a transaction that would benefit the fiduciary at the expense of the minority stockholders.... Because SinglePoint no longer exists, ... there is no corporate entity to which a recovery ... could be paid.... The only parties to whom that recovery could be paid are the plaintiffs. Hence, although under *Tooley* the claim could be brought derivatively or directly, as a practical matter, the only claim available after [the company] was liquidated is a direct action by the plaintiffs.

*Id.* (footnote omitted).

The reasoning employed in *Gentile* is applicable to the facts at bar and, under Delaware law, defendants may bring a direct action against plaintiffs for their participation in the sale of ALH's operating units; consequently, plaintiffs' motion to dismiss counts I-VII of the counterclaim as improperly pleaded is denied.[FN9]

### C. Motion to Dismiss-Failure to State a Claim

#### 1. Breach of Fiduciary Duties (Counts I, II, VI, VII, VIII, IX, XIII, and XIV of the Counterclaim)

Defendants allege that Shamrock, as the majority member of ALH (and the employer of three of the five Supervisory Board representatives), exercised dominion and control over ALH and, consequently, owed fiduciary duties to ALH and the minority members, including defendants. (D.I. 67[C] at ¶¶ 178-79) According to defendants, Shamrock subsequently breached these duties and injured both defendants and ALH by mishandling the sale of ALH and failing

to maximize the sale's value; stifling competitive bids for the company by selling its operating units ?piecemeal at ?fire sale? prices?; pursuing the sale of said operating units against ALH's best interests; and ?continually failing and refusing? to act in the best interests of ALH's minority members. (*Id.* at ¶ 181) Counts I and VIII of defendants' counterclaim maintain that Shamrock's conduct was in bad faith, grossly negligent, self-dealing, and constituted a conscious indifference to the consequences defendants would suffer, as well as reckless indifference to and wanton disregard of defendants' rights. (*Id.* at ¶ 182)

Defendants likewise claim, in counts II and IX, that Krieger, Buchler, and Stein owed fiduciary duties to ALH and its minority members and that they breached those duties by mishandling the sale of ALH; selling the operations piecemeal at fire sale prices; ?failing to actively solicit offers for ALH and failing to work with Class B members?; hiring professionals to work for ALH who also had loyalty to Shamrock; and ?continually failing and refusing? to act in ALH's best interest. (*Id.* at ¶ 187) Defendants believe that these actions were grossly negligent and in bad faith and that, as a result, defendants lost the value of their investment in ALH. (*Id.* at ¶¶ 188-89) Counts VI, VII, XIII, and XIV make similar claims of gross negligence and self-dealing resulting from these breaches of fiduciary duties and plaintiffs' alleged breaches of the Operating and Consulting Agreements. (*Id.* at ¶¶ 216-23, 225-33)

**\*8** [5] Accepting the material allegations of the counterclaim as true and viewing all facts and inferences in a light most favorable to defendants, the court finds that defendants have pled sufficient information to support their breach of duty claims. In spite of this, plaintiffs aver that the allegations in counts I, II, VI, VII, VIII, IX, XIII, and XIV of the counterclaim reflect nothing more than a difference in business judgment and that plaintiffs, therefore, are protected from liability by the business judgment rule.[FN10] (D.I. 72 at 30)

[6][7] According to the Third Circuit, ?Generally speaking, we will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6). A complaint may be dismissed under Rule 12(b)(6) where an affirmative defense appears on its face, however.? *Stanziale v. Nachtomi* (*In re Tower Air*), 416 F.3d 229, 238 (3d Cir.2005) (emphasis added). Defendants argue that they are not required to plead around the business judgment rule in response to a motion to dismiss because they did not ?make any allegations about the business judgment rule? in their complaint. (D.I. 82 at 15) Plaintiffs contend that defendants have implicitly raised the business judgment rule by repeatedly describing the minority shareholders' behavior with terms such as ?well-reasoned? in a preemptive attempt to combat a possible affirmative defense.[FN11] (*See, e.g.,* D.I. 67[C] at ¶¶ 2, 56)

The cases plaintiffs cite in support of their argument [FN12] are fact-intensive and fail to state a bright line rule permitting courts to dismiss claims under Rule 12(b)(6) based on unanswered affirmative defenses which are raised only implicitly on the face of the complaint. The court declines to infer such an ability and holds that defendants are not required to plead around the business judgment rule at this stage in the proceedings. Plaintiffs' Rule 12(b)(6) motion to dismiss is denied with respect to counts I, II, VI, VII, VIII, IX, XIII, and XIV of the counterclaim.

### 2. Breach of the Operating and Consulting Agreements (Counts III, V, X, and XII)

Having already granted plaintiffs' motion for judgment on the pleadings regarding their alleged breaches of the Operating and Consulting Agreements, *see supra* § IV.A.2, plaintiffs' motion to dismiss counts III, V, X, and XII of the counterclaim is moot.

### 3. Aiding and Abetting (Counts IV and XI)

Counts IV and XI of the counterclaim allege that SCA, a consultant for ALH with ties to Shamrock, Krieger, Buchler, and Stein, knowingly aided the four of them in breaching their fiduciary duties. (D.I. 67[C] at ¶ 204) In Delaware, [a] third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party ?knowingly participates? in the breach. To survive a motion to dismiss, the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: ?(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach.?

**\*9** *Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del.2001) (omission in original) (citations omitted). Plaintiffs aver that, because defendants can show neither that the fiduciaries breached any duties nor that SCA knowingly participated in any such breaches, counts IV and XI fail to state a claim upon which relief can be granted.[FN13] (D.I. 72 at 37-38) The court has already held that defendants' breach of duty claims are sufficiently well-pled to survive a

motion to dismiss; therefore, the viability of defendants' aiding and abetting claims rests on whether defendants have made a sufficient showing of knowing participation by SCA.

Defendants quote *In re General Motors (Hughes) Shareholder Litigation*, No. Civ. A. 20269, 2005 WL 1089021 (Del.Ch. May 4, 2005), for the proposition that ? ?[a] claim of knowing participation need not be pled with particularity. However, there must be factual allegations in the complaint from which knowing participation can be reasonably inferred.? ? (D.I. 82 at 36, quoting *General Motors*, 2005 WL 1089021, at *24 (internal citations omitted)) Although defendants fail to quote it, the *General Motors* court continued:
If such facts are not pled, then in order to infer knowing participation, the plaintiff must have alleged that the fiduciary breached its duty in an ?inherently wrongful manner.? This has also been stated as requiring the plaintiff to allege that the act taken by the fiduciary was *per se* illegal. Conclusory statements of knowing participation will not suffice. *General Motors*, 2005 WL 1089021, at *24 (footnotes omitted). Defendants have not alleged that plaintiffs' conduct was ?inherently wrongful? or ?*per se* illegal.? As a result, defendants' aiding and abetting claims turns on whether knowing participation by SCA can reasonably be inferred from the facts alleged in the counterclaim.

[8] Plaintiffs argue that defendants have not ?identif[ied] any participatory act by SCA.? (D.I. 72 at 38) According to defendants, the fact that ?Krieger, Buchler, and Stein performed substantial services for SCA? and that the counterclaim repeatedly alleges ?that Krieger, Buchler, and Stein committed wrongful acts that facilitated their liquidation of ALH? makes it ?reasonable to infer that these actions were taken, in part, in their capacity as agents for SCA.? (D.I. 82 at 36) Moreover, defendants contend that, ?at this pre-discovery point in the litigation,? federal notice pleading standards do not require them to ?allege[ ] precisely what actions were taken by Krieger, Buchler and Stein in their capacity as agents for SCA.? (*Id.* at 36-37)

When a claim is challenged under Rule 12(b)(6), the court may grant the motion to dismiss only if the non-moving party ?cannot demonstrate any set of facts that would entitle him to relief.? *See Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Viewing the facts and inferences in a light most favorable to defendants, the court finds that plaintiffs, who have the burden of persuasion, *see Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991), are unable to establish that none of the facts alleged in the counterclaim would entitle defendants to a judgment in their favor. Consequently, plaintiffs' motion for failure to state a claim of aiding and abetting is denied.

#### 4. Speculative Damages

**\*10** [9] In addition to challenging the individual counts of defendants' counterclaim, plaintiffs move for dismissal because defendants have pled damages that are totally speculative; consequently, they argue, there is no reason to continue litigating the counterclaim without a viable claim for damages. (D.I. 72 at 38-39) Defendants maintain that they have suffered actual damages due to the near-total devaluation of their equity interests in ALH. (D.I. 82 at 37-38) Plaintiffs disagree, stating that, ?according to [defendants'] own allegations, their investment had lost its value long before any of the acts on which they purport to sue.? (D.I. 84 at 17) Plaintiffs fail to see the causal link between the allegations made in the counterclaim and the amount of damages defendants are seeking, and question why defendants chose not to request the difference between ALH's value immediately before and immediately after plaintiffs' alleged breaches of duty. (D.I. 72 at 38) In addition, plaintiffs believe that defendants' allegations are based on assumptions that ?are not susceptible to proof,? which would require the court to make similar speculative assumptions in order to award damages. (*Id.*)

The events on which defendants' claims are based occurred over a long period of time, during which numerous financial transactions took place. Because it is not clear that ALH had lost all of its value ?long before? plaintiffs' alleged breaches of duty and defendants are not yet required to plead damages with particularity,[FN14] plaintiffs have not adequately supported their motion for dismissal on the grounds of speculative damages; such motion, therefore, is denied.

#### V. CONCLUSION

For the reasons stated above, plaintiffs' motion for judgment on the pleadings is granted in part (as to counts II and III of the complaint) and denied in part (with respect to counts I and VIII of the complaint). Plaintiffs' motion to dismiss defendants' counterclaim and third party complaint is denied. An appropriate order shall issue.

#### ORDER

At Wilmington this 29th day of September, 2006, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Plaintiffs' motion for judgment on the pleadings (D.I. 71) is granted in part and denied in part.

2. Plaintiffs' motion to dismiss defendants' counterclaim (D.I. 71) is denied.

FN1. In their complaint, plaintiffs request that the court enter an order:
A. declaring that they have not breached any fiduciary duty to defendants [count I];
B. declaring that they have not breached any obligations to defendants, or violated any rights of defendants under [ALH's] Operating Agreement [count II];
C. declaring that (1) in rendering services pursuant to [ALH's] Consulting Agreement [with SCA], they did not commit bad faith, gross negligence or willful misconduct, and (2) they are protected from any liability to defendants by the Consulting Agreement [count III];
D. declaring that they relied in good faith on [consultants] and ALH's outside counsel [count IV];
E. declaring that they are entitled to indemnification, including advancement of legal fees and other expenses [count V];
F. declaring that SELK's claims against them have been released ..., or, in the alternative, that SELK's equity interest is reduced or eliminated ... [counts VI and VII]; [and]
G. declaring that plaintiffs have not violated [Avie] Arenson's rights as Class B Representative [of ALH] [count VIII] ....
(D.I. 37 at 49-50)

FN2. Because defendants' answer and counterclaim complaint are combined in the same document and contain overlapping paragraph numbers, ?D.I. 67[A]? will be used to refer to defendants' answer and ?D.I. 67[C]? to refer to their counterclaim complaint.

FN3. Defendants allege:
I. that Shamrock, as majority shareholder of ALH, breached its fiduciary duties to ALH's minority members;
II. that Krieger, Buchler, and Stein, as Shamrock employees who were also the Class A and D representatives on ALH's Supervisory Board, breached their fiduciary duties to ALH's minority shareholders;
III. that Shamrock, Krieger, Buchler, and Stein (collectively, ?the fiduciaries?) violated ALH's Operating Agreement when they breached their fiduciary duties;
IV. that SCA, a consultant of ALH, aided and abetted the fiduciaries in their breaches of duty;
V. that, in doing so, SCA breached its Consulting Agreement with ALH;
VI. that the fiduciaries breached their fiduciary duties through gross negligence; and
VII. that the fiduciaries breached their fiduciary duties with acts of self-dealing.
(D.I. 67[C] at ¶¶ 126-76) Defendants have framed these seven counts as a direct action against plaintiffs; counts VIII through XIV of their counterclaim complaint allege the same series of violations as counts I to VII but couch them as derivative claims. (*Id.* at ¶¶ 177-233)

FN4. Plaintiffs contend that a judgment in their favor on these counts ?would moot Counts VI and VII and render Count V (indemnification) ready for summary disposition.? (D.I. 72 at 6)

FN5. For simplicity's sake, the term ?plaintiffs? will hereinafter include the original plaintiffs (who are also the counterclaim defendants) and the third party defendant, ALH; ?defendants? will refer to the defendants in the original action, the counterclaim plaintiffs, and the third party plaintiffs.

FN6. According to defendants, ?[a]lthough it still exists, ALH no longer has any operations and is winding up its affairs. ALH's business is completed, [and] the liquidation sale is over ....? (D.I. 67[C] at ¶ 117 (citing D.I. 51 at 34))

FN7. Plaintiffs do not challenge defendants' standing to assert counts VIII-XIV (the ?derivative claims?).

FN8. The Court of Chancery has held that ? ?the potential inclusion of culpable parties in the class due relief may affect the distinction between the derivative and direct claims.? ? *In re Cencom Cable Income Partners,* C.A. No. 14634, 2000 WL 130629, at *5 (Del.Ch. Jan. 27, 2000).

FN9. The court, therefore, will include defendants' direct claims, counts I-VII of the counterclaim, in its Rule 12(b)(6) analysis.

FN10. ?In Delaware, the business judgment rule is a presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company.? _Stanziale v. Nachtomi (In re Tower Air, Inc.),_ 416 F.3d 229, 238 (3d Cir.2005) (citing _Aronson v. Lewis,_ 473 A.2d 805, 812 (Del.1984)).

FN11. The court will not explore plaintiffs' meritless claim that defendants' denial (D.I. 67[A] at ¶ 3) of plaintiffs' assertion that ?[a]ll of plaintiffs' actions in connection with ALH were taken in good faith, in the reasonable exercise of plaintiffs' business judgment? (D.I. 37 at ¶ 3) was enough to require defendants to plead around the business judgment rule. (_See_ D.I. 84 at 5)

FN12. _ALA, Inc. v. CCAIR, Inc.,_ 29 F.3d 855, 859-61 (3d Cir.1994) (including a letter attached to the complaint in the court's analysis of whether an affirmative defense was raised on the face of the complaint); _Davis v. Grusemeyer,_ 996 F.2d 617, 624-25 (3d Cir.1993) (finding that a letter predating many of plaintiff's claims for fraudulent concealment in a RICO prosecution against him served to notify him of operative facts on the face of the criminal complaint), _abrogated on other grounds, Rolo v. City Investing Co. Liquidating Trust,_ 155 F.3d 644 (3d Cir.1998).

FN13. Plaintiffs do not challenge the existence of a fiduciary relationship or damages proximately caused by a breach of such relationship.

FN14. With regard to damages, Fed.R.Civ.P. 8 requires only that pleadings contain ?a demand for judgment for the relief the pleader seeks.? Fed.R.Civ.P. 8(a)(3).

D.Del.,2006.
Shamrock Holdings, Inc. v. Arenson
--- F.Supp.2d ----, 2006 WL 2802913 (D.Del.)

Briefs and Other Related Documents (Back to top)

? 2006 WL 1435873 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Plaintiff and Counterclaim Defendants' Motion for Judgment on the Pleadings and Dismisal of the Counterclaims (Apr. 28, 2006) Original Image of this Document (PDF)
? 2006 WL 1388583 (Trial Motion, Memorandum and Affidavit) Counterclaim Plaintiffs' Answering Brief in Opposition to Counterclaim Defendants' Motion for Judgment on the Pleadings and Dismissal of the Counterclaims (Apr. 7, 2006) Original Image of this Document (PDF)
? 2006 WL 1199885 (Trial Pleading) Reply to Counterclaims (Mar. 1, 2006) Original Image of this Document (PDF)
? 2006 WL 1199886 (Trial Pleading) Answer to Third-Party Complaint (Mar. 1, 2006) Original Image of this Document (PDF)
? 1:06cv00062 (Docket) (Jan. 31, 2006)
? 2005 WL 2867998 (Trial Motion, Memorandum and Affidavit) Defendant Abraham Arenson'S Reply Brief in Support of his Motion to Dismiss the Amended Complaint (Sep. 12, 2005) Original Image of this Document (PDF)
? 2005 WL 2868000 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of their Motion to Dismiss under Federal Rules of Civil Procedure 12(B)(2) and (7) (Sep. 12, 2005) Original Image of this Document (PDF)
? 2005 WL 2868001 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of their Motion to Dismiss, or in the Alternative for Stay of Proceedings (Sep. 12, 2005) Original Image of this Document (PDF)
? 2005 WL 2385513 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, or in the Alternative, for Stay of Proceedings (Aug. 8, 2005) Original Image of this Document (PDF)
? 2005 WL 2385514 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss First Amended Complaint for Declaratory Relief (Aug. 8, 2005) Original Image of this Document (PDF)
? 2005 WL 2385646 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendant Arenson'S Motion to Dismiss (Aug. 8, 2005) Original Image of this Document (PDF)
? 1:04cv01339 (Docket) (Oct. 6, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 11

Westlaw.

--- A.2d ----
--- A.2d ----, 2006 WL 3169168 (Del.Supr.)
**(Cite as: --- A.2d ----)**

Briefs and Other Related Documents
Stone ex rel. AmSouth Bancorporation v. RitterDel.Supr.,2006.Only the Westlaw citation is currently available.
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW
REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.
Supreme Court of Delaware.
William STONE and Sandra Stone, derivatively on Behalf of Nominal Defendant AmSOUTH
BANCORPORATION, Plaintiffs Below, Appellants,
v.
C. Dowd RITTER, Ronald L. Kuehn, Jr., Claude B. Nielsen, James R. Malone, Earnest W. Davenport, Jr., Martha R.
Ingram, Charles D. McCrary, Cleophus Thomas, Jr., Rodney C. Gilbert, Victoria B. Jackson, J. Harold Chandler,
James E. Dalton, Elmer B. Harris, Benjamin F. Payton, and John N. Palmer, Defendants Below, Appellees,
andAmSouth Bancorporation, Nominal Defendant Below, Appellee.
**No. 93, 2006.**

Submitted: Oct. 5, 2006.
Decided: Nov. 6, 2006.

**Background:** Shareholders brought derivative action on behalf of corporation against 15 present and former
directors, alleging that they had failed to ensure that a reasonable federal Bank Secrecy Act compliance and reporting
system existed. The Court of Chancery, New Castle County, 2006 WL 302558, dismissed the complaint for failure to
satisfy pre-suit demand requirements. Shareholders appealed.

**Holdings:** The Supreme Court, Holland, J., held that:

(1) a failure to act in good faith is not conduct that results, ipso facto, in the direct imposition of corporate fiduciary
liability;

(2) necessary conditions predicate for director oversight liability are utterly failing to implement any reporting or
information system or controls, or consciously failing to monitor or oversee operations of such a system; and

(3) report issued by independent consultant refuted shareholders' allegations, and thus there was no basis for oversight
claim.

Affirmed.

**[1] Corporations 101 ⟶206(1)**

101 Corporations
 101IX Members and Stockholders
  101IX(C) Suing or Defending on Behalf of Corporation
   101k206 Refusal of Corporation, Officers, or Stockholders to Act
    101k206(1) k. In General. Most Cited Cases
By its very nature a derivative action impinges on the managerial freedom of directors.

**[2] Corporations 101 ⟶206(2)**

101 Corporations
 101IX Members and Stockholders
  101IX(C) Suing or Defending on Behalf of Corporation

101k206 Refusal of Corporation, Officers, or Stockholders to Act
    101k206(2) k. Necessity of Demanding Action. <u>Most Cited Cases</u>

**Corporations 101 &#9756;206(4)**

<u>101</u> Corporations
    <u>101IX</u> Members and Stockholders
        <u>101IX(C)</u> Suing or Defending on Behalf of Corporation
            <u>101k206</u> Refusal of Corporation, Officers, or Stockholders to Act
                <u>101k206(4)</u> k. Excuse for Failure to Demand. <u>Most Cited Cases</u>
Right of a stockholder to prosecute a derivative suit is limited to situations where either the stockholder has demanded the directors pursue a corporate claim and the directors have wrongfully refused to do so, or where demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation.

**[3] Corporations 101 &#9756;211(5)**

<u>101</u> Corporations
    <u>101IX</u> Members and Stockholders
        <u>101IX(C)</u> Suing or Defending on Behalf of Corporation
            <u>101k211</u> Pleading
                <u>101k211(5)</u> k. Excuse for Failure to Allege Demand. <u>Most Cited Cases</u>
Allegations in a shareholder derivative action of demand futility must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by general rules of pleading. <u>Chancery Court Rules 8(a)</u>, <u>23.1</u>.

**[4] Corporations 101 &#9756;206(4)**

<u>101</u> Corporations
    <u>101IX</u> Members and Stockholders
        <u>101IX(C)</u> Suing or Defending on Behalf of Corporation
            <u>101k206</u> Refusal of Corporation, Officers, or Stockholders to Act
                <u>101k206(4)</u> k. Excuse for Failure to Demand. <u>Most Cited Cases</u>
To excuse demand in the absence of a business decision, a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.

**[5] Corporations 101 &#9756;174**

<u>101</u> Corporations
    <u>101IX</u> Members and Stockholders
        <u>101IX(A)</u> Rights and Liabilities as to Corporation
            <u>101k174</u> k. Nature of Relation. <u>Most Cited Cases</u>

**Corporations 101 &#9756;310(1)**

<u>101</u> Corporations
    <u>101X</u> Officers and Agents
        <u>101X(C)</u> Rights, Duties, and Liabilities as to Corporation and Its Members
            <u>101k310</u> Management of Corporate Affairs in General
                <u>101k310(1)</u> k. In General. <u>Most Cited Cases</u>
A failure to act in good faith is not conduct that results, ipso facto, in the direct imposition of corporate fiduciary liability.

**[6] Corporations 101 &#9756;174**

<u>101</u> Corporations
    <u>101IX</u> Members and Stockholders

101IX(A) Rights and Liabilities as to Corporation
    101k174 k. Nature of Relation. <u>Most Cited Cases</u>

**Corporations 101 &copy;&#x2192;310(1)**

<u>101</u> Corporations
    <u>101X</u> Officers and Agents
        <u>101X(C)</u> Rights, Duties, and Liabilities as to Corporation and Its Members
            <u>101k310</u> Management of Corporate Affairs in General
                <u>101k310(1)</u> k. In General. <u>Most Cited Cases</u>
Failure to act in good faith may result in corporate fiduciary liability because the requirement to act in good faith is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty.

**[7] Corporations 101 &copy;&#x2192;314(.5)**

<u>101</u> Corporations
    <u>101X</u> Officers and Agents
        <u>101X(C)</u> Rights, Duties, and Liabilities as to Corporation and Its Members
            <u>101k314</u> Individual Profits or Benefits from Corporate Business
                <u>101k314(.5)</u> k. In General. <u>Most Cited Cases</u>
Because a showing of bad faith conduct is essential to establish director oversight liability, the fiduciary duty violated by that conduct is the duty of loyalty.

**[8] Corporations 101 &copy;&#x2192;174**

<u>101</u> Corporations
    <u>101IX</u> Members and Stockholders
        <u>101IX(A)</u> Rights and Liabilities as to Corporation
            <u>101k174</u> k. Nature of Relation. <u>Most Cited Cases</u>

**Corporations 101 &copy;&#x2192;310(1)**

<u>101</u> Corporations
    <u>101X</u> Officers and Agents
        <u>101X(C)</u> Rights, Duties, and Liabilities as to Corporation and Its Members
            <u>101k310</u> Management of Corporate Affairs in General
                <u>101k310(1)</u> k. In General. <u>Most Cited Cases</u>

**Corporations 101 &copy;&#x2192;314(.5)**

<u>101</u> Corporations
    <u>101X</u> Officers and Agents
        <u>101X(C)</u> Rights, Duties, and Liabilities as to Corporation and Its Members
            <u>101k314</u> Individual Profits or Benefits from Corporate Business
                <u>101k314(.5)</u> k. In General. <u>Most Cited Cases</u>
Although good faith may be described colloquially as part of a ?triad? of corporate fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty.

**[9] Corporations 101 &copy;&#x2192;174**

<u>101</u> Corporations
    <u>101IX</u> Members and Stockholders
        <u>101IX(A)</u> Rights and Liabilities as to Corporation
            <u>101k174</u> k. Nature of Relation. <u>Most Cited Cases</u>

**Corporations 101 &copy;&#x2192;310(1)**

101 Corporations
  101X Officers and Agents
    101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
      101k310 Management of Corporate Affairs in General
        101k310(1) k. In General. Most Cited Cases

**Corporations 101 ⬤➾314(.5)**

101 Corporations
  101X Officers and Agents
    101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
      101k314 Individual Profits or Benefits from Corporate Business
        101k314(.5) k. In General. Most Cited Cases
Only the duties of care and loyalty, where violated, may directly result in corporate fiduciary liability, whereas a failure to act in good faith may do so, but indirectly.

**[10] Corporations 101 ⬤➾174**

101 Corporations
  101IX Members and Stockholders
    101IX(A) Rights and Liabilities as to Corporation
      101k174 k. Nature of Relation. Most Cited Cases

**Corporations 101 ⬤➾310(1)**

101 Corporations
  101X Officers and Agents
    101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
      101k310 Management of Corporate Affairs in General
        101k310(1) k. In General. Most Cited Cases

**Corporations 101 ⬤➾314(.5)**

101 Corporations
  101X Officers and Agents
    101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
      101k314 Individual Profits or Benefits from Corporate Business
        101k314(.5) k. In General. Most Cited Cases
Corporate fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest; it also encompasses cases where the fiduciary fails to act in good faith.

**[11] Corporations 101 ⬤➾310(1)**

101 Corporations
  101X Officers and Agents
    101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
      101k310 Management of Corporate Affairs in General
        101k310(1) k. In General. Most Cited Cases

**Corporations 101 ⬤➾314(.5)**

101 Corporations
  101X Officers and Agents
    101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
      101k314 Individual Profits or Benefits from Corporate Business
        101k314(.5) k. In General. Most Cited Cases
A director can not act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest.

**[12] Corporations 101 ⟵⟶310(1)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k310 Management of Corporate Affairs in General
                101k310(1) k. In General. Most Cited Cases
Necessary conditions predicate for director oversight liability are: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.

**[13] Corporations 101 ⟵⟶310(1)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k310 Management of Corporate Affairs in General
                101k310(1) k. In General. Most Cited Cases
Imposition of oversight liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.

**[14] Corporations 101 ⟵⟶310(1)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k310 Management of Corporate Affairs in General
                101k310(1) k. In General. Most Cited Cases
Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

**[15] Appeal and Error 30 ⟵⟶893(2)**

30 Appeal and Error
    30XVI Review
        30XVI(F) Trial De Novo
            30k892 Trial De Novo
                30k893 Cases Triable in Appellate Court
                    30k893(2) k. Equitable Proceedings. Most Cited Cases
Supreme Court reviews de novo a Court of Chancery's decision to dismiss a derivative suit for failure to satisfy pre-suit demand requirements. Chancery Court Rule 23.1.

**[16] Corporations 101 ⟵⟶310(1)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k310 Management of Corporate Affairs in General
                101k310(1) k. In General. Most Cited Cases
Report issued by independent consultant refuted shareholders' assertion in derivative action that directors never took the necessary steps to ensure that a reasonable federal Bank Secrecy Act compliance and reporting system existed, and thus there was no basis for oversight claim seeking to hold directors personally liable for failures of corporation's employees to file required suspicious activity reports (SARs); report reflected that the board of directors received and approved relevant policies and procedures, delegated to certain employees and departments the responsibility for filing SARs and monitoring compliance, and exercised oversight by relying on periodic reports from them. 31 U.S.C.A. § 5318 et seq.

[17] Corporations 101 ☞310(1)

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k310 Management of Corporate Affairs in General
            101k310(1) k. In General. Most Cited Cases
In the absence of red flags, good faith in the context of director oversight must be measured by the directors' actions to assure a reasonable information and reporting system exists and not by second-guessing after the occurrence of employee conduct that results in an unintended adverse outcome.

Court Below-Court of Chancery of the State of Delaware, in and for New Castle County, C.A. No. 1570-N.
Upon appeal from the Court of Chancery. **AFFIRMED.**

Brian D. Long (argued) and Seth D. Rigrodsky, of Rigrodsky & Long, P.A., Wilmington, DE, for appellants.
Jesse A. Finkelstein, Raymond J. DiCamillo, and Lisa Zwally Brown, of Richards, Layton & Finger, Wilmington, DE, David B. Tulchin (argued), L. Wiesel, and Jacob F.M. Oslick, of Sullivan & Cromwell, L.L.P., New York City, for appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices (constituting the Court en Banc).
HOLLAND, Justice:
*1 This is an appeal from a final judgment of the Court of Chancery dismissing a derivative complaint against fifteen present and former directors of AmSouth Bancorporation (?AmSouth?), a Delaware corporation. The plaintiffs-appellants, William and Sandra Stone, are AmSouth shareholders and filed their derivative complaint without making a pre-suit demand on AmSouth's board of directors (the ?Board?). The Court of Chancery held that the plaintiffs had failed to adequately plead that such a demand would have been futile. The Court, therefore, dismissed the derivative complaint under Court of Chancery Rule 23.1.

The Court of Chancery characterized the allegations in the derivative complaint as a ?classic *Caremark* claim,? a claim that derives its name from *In re Caremark Int'l Deriv. Litig.*[FN1] In *Caremark*, the Court of Chancery recognized that: ?[g]enerally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation ... only a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists-will establish the lack of good faith that is a necessary condition to liability.?[FN2]

In this appeal, the plaintiffs acknowledge that the directors neither ?knew [n]or should have known? that violations of law were occurring,? *i.e.,* that there were no ?red flags? before the directors. Nevertheless, the plaintiffs argue that the Court of Chancery erred by dismissing the derivative complaint which alleged that ?the defendants had utterly failed to implement any sort of statutorily required monitoring, reporting or information controls that would have enabled them to learn of problems requiring their attention.? The defendants argue that the plaintiffs' assertions are contradicted by the derivative complaint itself and by the documents incorporated therein by reference.

Consistent with our opinion in *In re Walt Disney Co. Deriv. Litig.,* we hold that *Caremark* articulates the necessary conditions for assessing director oversight liability.[FN3] We also conclude that the *Caremark* standard was properly applied to evaluate the derivative complaint in this case. Accordingly, the judgment of the Court of Chancery must be affirmed.

*Facts*

This derivative action is brought on AmSouth's behalf by William and Sandra Stone, who allege that they owned AmSouth common stock ?at all relevant times.? The nominal defendant, AmSouth, is a Delaware corporation with its principal executive offices in Birmingham, Alabama. During the relevant period, AmSouth's wholly-owned subsidiary, AmSouth Bank, operated about 600 commercial banking branches in six states throughout the southeastern United States and employed more than 11,600 people.

In 2004, AmSouth and AmSouth Bank paid $40 million in fines and $10 million in civil penalties to resolve government and regulatory investigations pertaining principally to the failure by bank employees to file ?Suspicious

Activity Reports? (?SARs?), as required by the federal Bank Secrecy Act (?BSA?) <u>FN4</u> and various anti-money-laundering (?AML?) regulations.<u>FN5</u> Those investigations were conducted by the United States Attorney's Office for the Southern District of Mississippi (?USAO?), the Federal Reserve, FinCEN and the Alabama Banking Department. No fines or penalties were imposed on AmSouth's directors, and no other regulatory action was taken against them.

\*2 The government investigations arose originally from an unlawful ?Ponzi? scheme operated by Louis D. Hamric, II and Victor G. Nance. In August 2000, Hamric, then a licensed attorney, and Nance, then a registered investment advisor with Mutual of New York, contacted an AmSouth branch bank in Tennessee to arrange for custodial trust accounts to be created for ?investors? in a ?business venture.? That venture (Hamric and Nance represented) involved the construction of medical clinics overseas. In reality, Nance had convinced more than forty of his clients to invest in promissory notes bearing high rates of return, by misrepresenting the nature and the risk of that investment. Relying on similar misrepresentations by Hamric and Nance, the AmSouth branch employees in Tennessee agreed to provide custodial accounts for the investors and to distribute monthly interest payments to each account upon receipt of a check from Hamric and instructions from Nance.

The Hamric-Nance scheme was discovered in March 2002, when the investors did not receive their monthly interest payments. Thereafter, Hamric and Nance became the subject of several civil actions brought by the defrauded investors in Tennessee and Mississippi (and in which AmSouth also was named as a defendant), and also the subject of a federal grand jury investigation in the Southern District of Mississippi. Hamric and Nance were indicted on federal money-laundering charges, and both pled guilty.

The authorities examined AmSouth's compliance with its reporting and other obligations under the BSA. On November 17, 2003, the USAO advised AmSouth that it was the subject of a criminal investigation. On October 12, 2004, AmSouth and the USAO entered into a Deferred Prosecution Agreement (?DPA?) in which AmSouth agreed: first, to the filing by USAO of a one-count Information in the United States District Court for the Southern District of Mississippi, charging AmSouth with failing to file SARs; and second, to pay a $40 million fine. In conjunction with the DPA, the USAO issued a ?Statement of Facts,? which noted that although in 2000 ?at least one? AmSouth employee suspected that Hamric was involved in a possibly illegal scheme, AmSouth failed to file SARs in a timely manner. In neither the Statement of Facts nor anywhere else did the USAO ascribe any blame to the Board or to any individual director.

On October 12, 2004, the Federal Reserve and the Alabama Banking Department concurrently issued a Cease and Desist Order against AmSouth, requiring it, for the first time, to improve its BSA/AML program. That Cease and Desist Order required AmSouth to (among other things) engage an independent consultant ?to conduct a comprehensive review of the Bank's AML Compliance program and make recommendations, as appropriate, for new policies and procedures to be implemented by the Bank.? KPMG Forensic Services (?KPMG?) performed the role of independent consultant and issued its report on December 10, 2004 (the ?KPMG Report?).

\*3 Also on October 12, 2004, FinCEN and the Federal Reserve jointly assessed a $10 million civil penalty against AmSouth for operating an inadequate anti-money-laundering program and for failing to file SARs. In connection with that assessment, FinCEN issued a written Assessment of Civil Money Penalty (the ?Assessment?), which included detailed ?determinations? regarding AmSouth's BSA compliance procedures. FinCEN found that ?AmSouth violated the suspicious activity reporting requirements of the Bank Secrecy Act,? and that ?[s]ince April 24, 2002, AmSouth has been in violation of the anti-money-laundering program requirements of the Bank Secrecy Act.? Among FinCEN's specific determinations were its conclusions that ?AmSouth's [AML compliance] program lacked adequate board and management oversight,? and that ?reporting to management for the purposes of monitoring and oversight of compliance activities was materially deficient.? AmSouth neither admitted nor denied FinCEN's determinations in this or any other forum.

*Demand Futility and Director Independence*

[1][2][3] It is a fundamental principle of the Delaware General Corporation Law that ?[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors....? <u>FN6</u> Thus, ?by its very nature [a] derivative action impinges on the managerial freedom of directors.? <u>FN7</u> Therefore, the right of a stockholder to prosecute a derivative suit is limited to situations where either the stockholder has demanded the directors pursue a corporate claim and the directors have wrongfully refused to do so, or where demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such

litigation.[FN8] Court of Chancery Rule 23.1, accordingly, requires that the complaint in a derivative action ?allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors [or] the reasons for the plaintiff's failure to obtain the action or for not making the effort.? [FN9]

[4] In this appeal, the plaintiffs concede that ?[t]he standards for determining demand futility in the absence of a business decision? are set forth in *Rales v. Blasband.*[FN10] To excuse demand under *Rales,* ?a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.? [FN11] The plaintiffs attempt to satisfy the *Rales* test in this proceeding by asserting that the incumbent defendant directors ?face a substantial likelihood of liability? that renders them ?personally interested in the outcome of the decision on whether to pursue the claims asserted in the complaint,? and are therefore not disinterested or independent.[FN12]

**\*4** Critical to this demand excused argument is the fact that the directors' potential personal liability depends upon whether or not their conduct can be exculpated by the section 102(b)(7) provision contained in the AmSouth certificate of incorporation.[FN13] Such a provision can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty.[FN14] The standard for assessing a director's potential personal liability for failing to act in good faith in discharging his or her oversight responsibilities has evolved beginning with our decision in *Graham v. Allis-Chalmers Manufacturing Company,*[FN15] through the Court of Chancery's *Caremark* decision to our most recent decision in *Disney.*[FN16] A brief discussion of that evolution will help illuminate the standard that we adopt in this case.

### Graham and Caremark

*Graham* was a derivative action brought against the directors of Allis-Chalmers for failure to prevent violations of federal anti-trust laws by Allis-Chalmers employees. There was no claim that the Allis-Chalmers directors knew of the employees' conduct that resulted in the corporation's liability. Rather, the plaintiffs claimed that the Allis-Chalmers directors *should have known* of the illegal conduct by the corporation's employees. In *Graham,* this Court held that ?*absent cause for suspicion* there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists.? [FN17]

In *Caremark,* the Court of Chancery reassessed the applicability of our holding in *Graham* when called upon to approve a settlement of a derivative lawsuit brought against the directors of Caremark International, Inc. The plaintiffs claimed that the Caremark directors should have known that certain officers and employees of Caremark were involved in violations of the federal Anti-Referral Payments Law. That law prohibits health care providers from paying any form of remuneration to induce the referral of Medicare or Medicaid patients. The plaintiffs claimed that the *Caremark* directors breached their fiduciary duty for having ?allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance.? [FN18]

In evaluating whether to approve the proposed settlement agreement in *Caremark,* the Court of Chancery narrowly construed our holding in *Graham* ?as standing for the proposition that, absent grounds to suspect deception, neither corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf.? [FN19] The *Caremark* Court opined it would be a ?mistake? to interpret this Court's decision in *Graham* to mean that:
**\*5** corporate boards may satisfy their obligation to be reasonably informed concerning the corporation, without assuring themselves that information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.[FN20]

To the contrary, the *Caremark* Court stated, ?it is important that the board exercise a good faith judgment that the corporation's information and reporting system is in concept and design adequate to assure the board that appropriate information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility.? [FN21] The *Caremark* Court recognized, however, that ?the duty to act in good faith to be informed cannot be thought to require directors to possess detailed information about all aspects of the operation of the

enterprise.? [FN22] The Court of Chancery then formulated the following standard for assessing the liability of directors where the directors are unaware of employee misconduct that results in the corporation being held liable:

Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, as in *Graham* or in this case, ... only a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists-will establish the lack of good faith that is a necessary condition to liability. [FN23]

### Caremark Standard Approved

As evidenced by the language quoted above, the *Caremark* standard for so-called ?oversight? liability draws heavily upon the concept of director failure to act in good faith. That is consistent with the definition(s) of bad faith recently approved by this Court in its recent *Disney*[FN24] decision, where we held that a failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence). [FN25] In *Disney*, we identified the following examples of conduct that would establish a failure to act in good faith:

A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.[FN26]

**\*6** The third of these examples describes, and is fully consistent with, the lack of good faith conduct that the *Caremark* court held was a ?necessary condition? for director oversight liability, i.e., ?a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists....? [FN27] Indeed, our opinion in *Disney* cited *Caremark* with approval for that proposition.[FN28] Accordingly, the Court of Chancery applied the correct standard in assessing whether demand was excused in this case where failure to exercise oversight was the basis or theory of the plaintiffs' claim for relief.

[5][6][7] It is important, in this context, to clarify a doctrinal issue that is critical to understanding fiduciary liability under *Caremark* as we construe that case. The phraseology used in *Caremark* and that we employ here-describing the lack of good faith as a ?necessary condition to liability?-is deliberate. The purpose of that formulation is to communicate that a failure to act in good faith is not conduct that results, *ipso facto*, in the direct imposition of fiduciary liability.[FN29] The failure to act in good faith may result in liability because the requirement to act in good faith ?is a subsidiary element[,]? i.e., a condition, ?of the fundamental duty of loyalty.? [FN30] It follows that because a showing of bad faith conduct, in the sense described in *Disney* and *Caremark*, is essential to establish director oversight liability, the fiduciary duty violated by that conduct is the duty of loyalty.

[8][9][10][11] This view of a failure to act in good faith results in two additional doctrinal consequences. First, although good faith may be described colloquially as part of a ?triad? of fiduciary duties that includes the duties of care and loyalty,[FN31] the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty. Only the latter two duties, where violated, may directly result in liability, whereas a failure to act in good faith may do so, but indirectly. The second doctrinal consequence is that the fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith. As the Court of Chancery aptly put it in *Guttman*, ?[a] director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest.? [FN32]

[12][13][14] We hold that *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.[FN33] Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities,[FN34] they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.[FN35]

*Chancery Court Decision*

*7 [15] The plaintiffs contend that demand is excused under Rule 23.1 because AmSouth's directors breached their oversight duty and, as a result, face a ?substantial likelihood of liability? as a result of their ?utter failure? to act in good faith to put into place policies and procedures to ensure compliance with BSA and AML obligations. The Court of Chancery found that the plaintiffs did not plead the existence of ?red flags?-?facts showing that the board ever was aware that AmSouth's internal controls were inadequate, that these inadequacies would result in illegal activity, and that the board chose to do nothing about problems it allegedly knew existed.? In dismissing the derivative complaint in this action, the Court of Chancery concluded:

This case is not about a board's failure to carefully consider a material corporate decision that was presented to the board. This is a case where information was not reaching the board because of ineffective internal controls.... With the benefit of hindsight, it is beyond question that AmSouth's internal controls with respect to the Bank Secrecy Act and anti-money laundering regulations compliance were inadequate. Neither party disputes that the lack of internal controls resulted in a huge fine-$50 million, alleged to be the largest ever of its kind. The fact of those losses, however, is not alone enough for a court to conclude that a majority of the corporation's board of directors is disqualified from considering demand that AmSouth bring suit against those responsible.FN36

This Court reviews *de novo* a Court of Chancery's decision to dismiss a derivative suit under Rule 23.1.FN37

*Reasonable Reporting System Existed*

The KPMG Report evaluated the various components of AmSouth's longstanding BSA/AML compliance program. The KPMG Report reflects that AmSouth's Board dedicated considerable resources to the BSA/AML compliance program and put into place numerous procedures and systems to attempt to ensure compliance. According to KPMG, the program's various components exhibited between a low and high degree of compliance with applicable laws and regulations.

The KPMG Report describes the numerous AmSouth employees, departments and committees established by the Board to oversee AmSouth's compliance with the BSA and to report violations to management and the Board:

**BSA Officer.** Since 1998, AmSouth has had a ?BSA Officer? ?responsible for all BSA/AML-related matters including employee training, general communications, CTR reporting and SAR reporting,? and ?presenting AML policy and program changes to the Board of Directors, the managers at the various lines of business, and participants in the annual training of security and audit personnel[;]?

**BSA/AML Compliance Department.** AmSouth has had for years a BSA/AML Compliance Department, headed by the BSA Officer and comprised of nineteen professionals, including a BSA/AML Compliance Manager and a Compliance Reporting Manager;

**\*8 Corporate Security Department.** AmSouth's Corporate Security Department has been at all relevant times responsible for the detection and reporting of suspicious activity as it relates to fraudulent activity, and William Burch, the head of Corporate Security, has been with AmSouth since 1998 and served in the U.S. Secret Service from 1969 to 1998; and

**Suspicious Activity Oversight Committee.** Since 2001, the ?Suspicious Activity Oversight Committee? and its predecessor, the ?AML Committee,? have actively overseen AmSouth's AML compliance program. The Suspicious Activity Oversight Committee's mission has for years been to ?oversee the policy, procedure, and process issues affecting the Corporate Security and BSA/AML Compliance Programs, to ensure that an effective program exists at AmSouth to deter, detect, and report money laundering, suspicious activity and other fraudulent activity.?

The KPMG Report reflects that the directors not only discharged their oversight responsibility to establish an information and reporting system, but also proved that the system was designed to permit the directors to periodically monitor AmSouth's compliance with BSA and AML regulations. For example, as KPMG noted in 2004, AmSouth's designated BSA Officer ?has made annual high-level presentations to the Board of Directors in each of the last five years.? Further, the Board's Audit and Community Responsibility Committee (the ?Audit Committee?) oversaw AmSouth's BSA/AML compliance program on a quarterly basis. The KPMG Report states that ?the BSA Officer presents BSA/AML training to the Board of Directors annually,? and the ?Corporate Security training is also presented to the Board of Directors.?

The KPMG Report shows that AmSouth's Board at various times enacted written policies and procedures designed to ensure compliance with the BSA and AML regulations. For example, the Board adopted an amended bank-wide ?BSA/AML Policy? on July 17, 2003-four months before AmSouth became aware that it was the target of a government investigation. That policy was produced to plaintiffs in response to their demand to inspect AmSouth's

books and records pursuant to section 220 [FN38] and is included in plaintiffs' appendix. Among other things, the July 17, 2003, BSA/AML Policy directs all AmSouth employees to immediately report suspicious transactions or activity to the BSA/AML Compliance Department or Corporate Security.

### Complaint Properly Dismissed

[16] In this case, the adequacy of the plaintiffs' assertion that demand is excused depends on whether the complaint alleges facts sufficient to show that the defendant *directors* are potentially personally liable for the failure of non-director bank *employees* to file SARs. Delaware courts have recognized that ?[m]ost of the decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention.? [FN39] Consequently, a claim that directors are subject to personal liability for employee failures is ?possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.? [FN40]

*9 For the plaintiffs' derivative complaint to withstand a motion to dismiss, ?only a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists-will establish the lack of good faith that is a necessary condition to liability.? [FN41] As the *Caremark* decision noted:
Such a test of liability-lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight-is quite high. But, a demanding test of liability in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to *good faith performance of duty* by such directors.[FN42]

The KPMG Report-which the plaintiffs explicitly incorporated by reference into their derivative complaint-refutes the assertion that the directors ?never took the necessary steps ... to ensure that a reasonable BSA compliance and reporting system existed.? KPMG's findings reflect that the Board received and approved relevant policies and procedures, delegated to certain employees and departments the responsibility for filing SARs and monitoring compliance, and exercised oversight by relying on periodic reports from them. Although there ultimately may have been failures by employees to report deficiencies to the Board, there is no basis for an oversight claim seeking to hold the directors personally liable for such failures by the employees.

[17] With the benefit of hindsight, the plaintiffs' complaint seeks to equate a bad outcome with bad faith. The lacuna in the plaintiffs' argument is a failure to recognize that the directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both, as occurred in *Graham, Caremark* and this very case. In the absence of red flags, good faith in the context of oversight must be measured by the directors' actions ?to assure a reasonable information and reporting system exists? and not by second-guessing after the occurrence of employee conduct that results in an unintended adverse outcome.[FN43] Accordingly, we hold that the Court of Chancery properly applied *Caremark* and dismissed the plaintiffs' derivative complaint for failure to excuse demand by alleging particularized facts that created reason to doubt whether the directors had acted in good faith in exercising their oversight responsibilities.

### Conclusion

The judgment of the Court of Chancery is affirmed.

FN1. *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del.Ch.1996).

FN2. *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d at 971; *see also David B. Shaev Profit Sharing Acct. v. Armstrong,* 2006 WL 391931, at *5 (Del.Ch.); *Guttman v. Huang,* 823 A.2d 492, 506 (Del.Ch.2003).

FN3. *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27 (Del.2006).

FN4. 31 U.S.C. § 5318 (2006) *et seq.* The Bank Secrecy Act and the regulations promulgated thereunder require banks to file with the Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury known as ?FinCEN,? a written ?Suspicious Activity Report? (known as a ?SAR?) whenever, *inter alia,* a banking transaction involves at least $5,000 ?and the bank knows, suspects, or has reason to suspect? that, among other possibilities, the ?transaction involves funds derived from illegal activities or is intended or

conducted in order to hide or disguise funds or assets derived from illegal activities....? 31 U.S.C. § 5318(g) (2006); 31 C.F.R. § 103.18(a)(2) (2006).

FN5. *See, e.g.,* 31 C.F.R. § 103.18(a)(2) (2006).

FN6. Del.Code Ann. tit. 8, § 141(a) (2006). *See Rales v. Blasband,* 634 A.2d 927, 932 (Del.1993).

FN7. *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984).

FN8. *Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000).

FN9. Ch. Ct. R. 23.1. Allegations of demand futility under Rule 23.1 ?must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a).? *Brehm v. Eisner,* 746 A.2d at 254.

FN10. *Rales v. Blasband,* 634 A.2d 927 (Del.1993).

FN11. *Id.* at 934.

FN12. The fifteen defendants include eight current and seven former directors. The complaint concedes that seven of the eight current directors are outside directors who have never been employed by AmSouth. One board member, C. Dowd Ritter, the Chairman, is an officer or employee of AmSouth.

FN13. Del.Code Ann. tit. 8, § 102(b)(7) (2006).

FN14. *Id.*; *see In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27 (Del.2006).

FN15. *Graham v. Allis-Chalmers Mfg. Co.,* 188 A.2d 125 (Del.1963).

FN16. *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27 (Del.2006).

FN17. *Graham v. Allis-Chalmers Mfg. Co.,* 188 A.2d at 130 (emphasis added).

FN18. *In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d 959, 967 (Del.Ch.1996).

FN19. *Id.* at 969.

FN20. *Id.* at 970.

FN21. *Id.*

FN22. *Id.* at 971.

FN23. *In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d at 971.

FN24. *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27 (Del.2006).

FN25. *Id.* at 66.

FN26. *Id.* at 67.

FN27. *In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d 959, 971 (Del.Ch.1996).

FN28. *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d at 67 n. 111.

FN29. That issue, whether a violation of the duty to act in good faith is a basis for the direct imposition of liability, was expressly left open in *Disney.* 906 A.2d at 67 n. 112. We address that issue here.

FN30. *Guttman v. Huang,* 823 A.2d 492, 506 n. 34 (Del.Ch.2003).

FN31. *See Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del.1993).

FN32. *Guttman v. Huang,* 823 A.2d 492, 506 n. 34 (Del.Ch.2003).

FN33. *Id.* at 506.

FN34. *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 67 (Del.2006).

FN35. *See Guttman v. Huang,* 823 A.2d at 506.

FN36. *Stone v. Ritter,* C.A. No. 1570-N, 2006 WL 302558, at *2 (Del.Ch.2006) (Letter Opinion).

FN37. *Beam ex rel. Martha Stewart Living Omnimedia Inc. v. Stewart,* 845 A.2d 1040, 1048 (Del.2004).

FN38. Del.Code Ann. tit. 8, § 220 (2006).

FN39. *In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d at 968.

FN40. *Id.* at 967.

FN41. *Id.* at 971.

FN42. *Id.* (emphasis in original).

FN43. *Id.* at 967-68, 971.
Del.Supr.,2006.
Stone ex rel. AmSouth Bancorporation v. Ritter
--- A.2d ----, 2006 WL 3169168 (Del.Supr.)

Briefs and Other Related Documents (Back to top)

? 2006 WL 3300384 (Appellate Brief) Appellants' Reply Brief (Jun. 6, 2006)
? 2006 WL 3300382 (Appellate Brief) Appellees' Answering Brief (May 22, 2006)
? 2006 WL 3300383 (Appellate Brief) Appellants' Opening Brief (Apr. 7, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12



Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1313859 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Street Search Partners, L.P. v. Ricon Intern., L.L.C.Del.Super.,2006.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware,New Castle County.
STREET SEARCH PARTNERS, L.P., a New Jersey limited partnership, Plaintiff,
v.
RICON INTERNATIONAL, L.L.C., a Missouri limited liability company, and Enviro Board Corporation, a
Delaware corporation, Defendants.
**C.A. No. 04C-09-191-PLA.**

Submitted: May 2, 2006.
Decided: May 12, 2006.

Upon A & R Investment Associates' Motion for Reargument **DENIED**.
Defendant Enviro Board Corporation's Motion to Dismiss **GRANTED**.

Jeffrey Podesta, for Street Search Partners, pro se.
Tanya Pino Jefferis, Esquire, Wilmington, Delaware, Attorney for A & R Investment Associates, L.P., Raymond Nisivoccia and Albert Passanante.
Joseph J. Bodnar, Esquire, Wilmington, Delaware, Attorney for Enviro Board Corporation.
ABLEMAN, J.
**\*1** I have considered A & R Investment Associates' (?A & R?) LP Motion for Reargument. Because the Court did not misapprehend the law or the facts in its previous decision, the Motion is DENIED. Furthermore, because a corporate entity may not appear without counsel in Delaware courts, and Plaintiff Street Search has failed to have substitute counsel enter an appearance after its original counsel withdrew, Defendant's Motion to Dismiss is GRANTED.

*Facts*

Plaintiff Street Search Partners LP (?Street Search? or ?Plaintiff?) loaned $250,000 to Defendant Ricon International, LLC (?Ricon?) with instructions for Ricon to re-loan the money to Enviro Board Corporation (?Enviro Board?). Enviro Board failed to repay the loan to Ricon, and, as a result, Ricon subsequently did not repay its related loan with Street Search.

Street Search filed its complaint against both Ricon and Enviro Board on September 22, 2004, alleging a variety of claims against each. Ricon has never entered an appearance, leaving Enviro Board the only defendant at bar. This Court dismissed all of Street Search's claims against Enviro Board, with the exception of an unjust enrichment claim, holding that no privity exists between Enviro Board and Street Search, and that Street Search was not an intended third party beneficiary of the loan contract between Enviro Board and Ricon. [FN1]

FN1. *Street Search Partners, LP v. Ricon Int'l,* 2005 WL 1953094 (Del.Super.).

Street Search then encountered financial difficulties, resulting in the withdrawal of its attorneys for Street Search's failure to satisfy outstanding legal invoices. This Court gave Street Search thirty days to engage substitute counsel and file a notice of substitution of counsel. The day before the deadline, the Court's assistant received a telephone call from an attorney (presumably A & R's counsel) requesting a short extension of the deadline, which was granted. Two days later, A & R filed a Motion to Intervene as assignees-in-interest for the purpose of pursuing Street Search's claims against the defendants. Attached to the motion was a contract indicating that Street Search, ?for good and valuable consideration,? had transferred all interest in its claims against Enviro Board and Ricon to A & R. Enviro Board filed a response, opposing A & R's intervention as ?champertous.?

The Court ruled from the Bench, denying the motion as champertous. Enviro Board then filed a Motion to Dismiss the action on the grounds that Street Search failed to comply with the Court order requiring substitution of counsel within

thirty days, is unrepresented to date, and no other party exists to prosecute the action in Street Search's stead. The Court dismissed the action from the Bench as no one appeared as counsel for Street Search. This is the Court's decision on A & R's Motion for Reargument, and its reasons for granting Enviro Board's Motion to Dismiss.

*Law*

The standard for a Motion for Reargument pursuant to <u>Superior Court Civil Rule 59(e)</u> is that the court ?misapprehended the law or facts? in its previous decision, such that the outcome would have been different if the court had been fully and correctly informed.[FN2] Such motion should not be used to merely ?rehash the arguments already decided by the court.? [FN3] Nor will the Court consider new arguments that could have previously been raised. [FN4] The Court may dismiss an action pursuant to Rule 41(b) for failure of the plaintiff to prosecute or comply with any order of the Court.

> FN2. *Steadfast Ins. Co. v. Eon Labs Mfg., Inc.,* 1999 WL 743982 (Del.Super.)

> FN3. *Cunningham v. Horvath,* 2004 WL 2191035 (Del.Super.).

> FN4. *Plummer v. Sherman,* 2004 WL 63414 (Del.Super.).

*Discussion*

A. *The Motion to Intervene*

**\*2** A & R moved to intervene in this action as a matter of right, and now argues that the Court's denial of this request is an incorrect application of the law. Rule 24 permits third parties to intervene in litigation that directly affects a real interest held by that party. In order for the Court to grant such a motion, the applicant must show that it holds an interest that shares a common question of law or fact with the main action, that the interest will be directly and immediately affected by the litigation, and that either the applicant's interest is not identical to that of a present party, or the representation provided by existing parties at bar is inadequate to protect the applicant's interests. Where the applicant's interest is identical to that of one of the litigating parties, the applicant must make a compelling showing that representation is inadequate.[FN5]

> FN5. *Cheswold Aggregates, LLC v. Town of Cheswold,* 1999 WL 743302, at \*2 (Del.Super.).

In this case, A & R has petitioned to intervene, but has no right of its own to be joined in the action. Instead, A & R is attempting to assert Plaintiff's interest and step into Plaintiff's shoes, without actually becoming the party-in-interest. Rule 24 does not contemplate such a situation, but instead is intended to permit an interested party, who is not otherwise a party to the litigation, to join in a suit in order to protect its own rights.[FN6] Because intervention permits the Court to effect what is essentially a joinder of interested parties,[FN7] if the Court allowed A & R to intervene in this action, Street Search would remain the plaintiff party in interest asserting its claims, while A & R would be joined as an intervening interested party, also asserting Street Search's claims.

> FN6. *See Bramble Transp., Inc. v. Sam Senter Sales, Inc.,* 294 A.2d 97 (Del.Super.)

> FN7. *See White v. Metzer,* 159 A.2d 788 (Del.Super.Ct.1960).

This result would not only be absurd, but also pointless. Even if A & R were permitted to intervene, the Court is still required to dismiss the action due to Street Search's failure to retain substitute counsel during the allotted time, resulting in Street Search's inability to maintain this claim. Dismissal is thus required because Delaware law does not permit legally distinct, artificial entities to be unrepresented by counsel in court.[FN8] Although A & R has tenaciously defended its position that this Court should permit intervention, the case must nevertheless still be dismissed for Plaintiff's failure to obtain counsel and prosecute its claim. As an intervenor, A & R would not have the right to prosecute Street Search's claims for it, but could only represent its own interests in the litigation between Street Search and the defendants. If Street Search does not prosecute its claim, A & R, as intervenor, could not maintain the suit in Street Search's stead because A & R has no claim of its own against Defendants.

FN8. *Poore v. Fox Hollow Enters.* 1994 WL 150872 (Del.Super.) (LLC provides limited liability such that member may not appear for the entity in court without proper legal representation); *Arbor Place LP v. Encore Opportunity Fund LLC,* 2002 WL 205681,) (holding that the law treats LLC and LP treated the same because Delaware's LLC Act was modeled on Delaware's LP Act).

Because the end result is the same whether the Court grants or denies the motion, the Court cannot fathom why Street Search has pursued its argument in the dogged manner it has. The Court can only speculate that A & R may have confused intervention and substitution, or that it knows that the Assignment did not effectively transfer all rights in the litigation that would enable A & R to become the actual party in interest. The Court suspects the latter over the former. Indeed, the Court must agree that the attempted assignment of interest fails to transfer Street Search's interest in its claims against Defendant. Still, as will be detailed below, even if the Court treats the Motion to Intervene as a Motion to Substitute, A & R's attempt to maintain this litigation fails.

### B. *The Assignment*

*3 Although A & R noticed and argued its motion as a Motion to Intervene, the substance of the motion may be evaluated as a motion to substitute parties. Attached to A & R's Motion to Intervene is an Assignment of Claims that purports to transfer Street Search's interest in its claims against Ricon and EnviroBoard ?in connection with a Settlement? reached in New Jersey.[FN9] In addition, affidavits have been submitted to the Court indicating that Plaintiff Street Search is unable to continue this litigation due to financial hardship. This motion may therefore be considered substantively as a Motion to Substitute, since the apparent intent is to permit A & R to step into Plaintiff's shoes so as to continue the litigation that Street Search cannot. As is illustrated below, however, even under a substitution analysis A & R cannot salvage this litigation.

FN9. It is the Court's understanding that this litigation was initiated by A & R against Street Search in New Jersey prior to the filing of this action. The Court finds it remarkable that A & R's counsel would attempt to appear on behalf of Street Search during the hearing on the Motion to Dismiss, when the two are adversaries in New Jersey.

Rule 25 permits the substitution of parties where one party transfers its interest during the pendency of the action. The Court has the discretion to allow substitution, dependent on whether there has been a proper transfer of interest in the litigation to an assignee.[FN10] The question thus becomes whether the interest in this litigation has been properly assigned.

FN10. *Manubay v. Autumnwood Assocs., LP.* 1997 WL 383020 (Del. Ch .) (declining to permit a substitution where no transfer of interest had occurred); *see also Schock Bros. v. Raskin,* 1991 WL 166076 (Del.Super.) (noting that Rule 25 ?does not require that anything be done after an interest has been transferred. The action may be continued by or against the original party, and the judgment will be binding on his successor in interest even though he is not named.?).

Enviro Board argues that the assignment is invalid because unjust enrichment is an equitable claim personal to Street Search, and therefore cannot be assigned. Generally, a chose in action, or the right to bring an action, is transferable if it is the type of claim that would survive the hypothetical death of the assignor and pass to his or her personal representative.[FN11] At common law, survivable actions are those that primarily affect property and property rights, while nonsurvivable actions are those in which the injury is personal, or specific to the person.[FN12] That common law rule was expanded by statute in Delaware under 10 *Del. C.* § 3701, which provides that ?all causes of action, except actions for defamation, malicious prosecution, or upon penal statutes shall survive ...? Enviro Board's argument seems to imply that equitable claims are, by nature, personal. Although many equitable claims are personal, and therefore untransferable, claims for breach of fiduciary obligations and resultant unjust enrichment have been held to survive.[FN13] A claim for unjust enrichment due to director misconduct likewise is survivable, and therefore, assignable.

FN11. *Industrial Trust Co. v. Stidham,* 33 A.2d 159, 160-61 (Del.1942); *Garford Motor Truck Co. v. Buckson,* 143 A. 410, 411 (Del.Super.Ct.1927).

FN12. *Hollett v. Wilmington Trust Co.,* 172 A. 763 (Del.Super.Ct.1934); 1 Am.Jur.2d *Abatement, Survival, and Revival* § 51 (2005).

FN13. *In re Emerging Commc'ns, Inc. S'holders Litig.,* 2004 WL 1305745 (Del. Ch.); *Puma v. Marriott,* 294 F.Supp. 1116 (D.Del.1969).

Enviro Board also contends that the assignment is invalid because it is champertous. Champerty is ?an agreement between the owner of a claim and a volunteer that the latter may take the claim and collect it, dividing the proceeds with the owner, if they prevail; the champertor to carry on the suit at his own expense.? [FN14] The doctrine of champerty prohibits such agreements only in the case of ?strangers? to the action-those who have no legal interest in the subject matter of the dispute, or those who have no relation to either of the parties to the dispute.[FN15] An agreement is not champertous where the assignee has some legal or equitable interest in the subject matter of the litigation independent from the terms of the assignment. [FN16]

FN14. *Gibson v. Gillespie,* 152 A. 589, 593 (Del.Super.Ct.1928).

FN15. *Bayard v. McLane,* 3 Del. (3 Harr.) 139, 208 (1840).

FN16. *Drake v. Nw. Natural Gas Co.,* 165 A.2d 452 (Del. Ch.1960).

*4 A & R contends that the assignment is not champertous because A & R is not a stranger to the litigation at bar. The interest A & R claims is a distant one. A & R is an investor in Street Search Advisors, LLC, which manages Plaintiff. A & R therefore maintains that it has an interest in the recovery of funds that may include investment principle it provided. This interest is sufficient, according to A & R, because no case law requires a direct interest to avoid champerty.

A & R's contention that no case law requires a direct interest, that *any* interest is sufficient, is inapt. The law clearly requires a *legal* interest in the litigation to avoid champerty.[FN17] In this case, A & R's interest as the investor in Plaintiff's management company does not evidence a legal interest in the loan or contract at issue here. Likewise, A & R's concern regarding recovering money due it by Street Search as a result of litigation in New Jersey does not provide it with a legal interest in the subject matter of this suit.

FN17. *Id.* (holding that Delaware courts do not find assignments champterous where the assignee had a ?*legal or equitable interest* in the subject matter [at bar]? other than the assignment at issue) (emphasis added). Even this low threshold cannot be met here because A & R has *no* interest whatsoever in the loan or contract at issue in *this* case.

The Court does note that A & R's position that its interest as an investor in Street Search's management company (and therefore, presumably also Street Search, secondarily) is belied by the litigation in New Jersey. It is clear to this Court that neither an investor, once removed, nor an adversarial party to the plaintiff in an action, may claim an interest in legal proceedings with which it otherwise has no connection.

A & R also maintains that the assignment is not champertous because any proceeds from the litigation will not be shared. Rather, A & R argues, the assignment provides that A & R will retain the entire amount of any judgment recovered against Defendants. During oral argument, however, counsel for A & R disclosed that Plaintiff and A & R have been involved in litigation in New Jersey, and have reached a settlement agreement in that action, for an undisclosed sum. According to counsel, any proceeds from this action would be applied against the debt Street Search incurred with A & R under the settlement agreement. The assignment contract supports this claim, indicating that A & R will ?pursue the Claims in connection with a Settlement [Agreement] ...? Thus, although A & R would retain the full amount of any proceeds from this litigation, Street Search will enjoy a decrease in, or satisfaction of, the debt it owes to A & R. The result of this arrangement is effectively a division of any received proceeds.

Alternately, if the Court were to accept A & R's claims that the assignment does not effectuate a division of the proceeds under the settlement agreement, the assignment would be unenforceable for lack of consideration. Every contract, to be enforceable, must contain good and valid consideration. [FN18] Consideration generally consists of a benefit to a promisor, or detriment to a promisee.[FN19] Delaware's transactional perspective on consideration permits a court to inquire into, and find, consideration for an agreement anywhere in the transaction, regardless of whether it was labeled or spelled out in the contract.[FN20]

FN18. *Corletto v. Morgan,* 89 A. 738 (Del.Super.Ct.1914).

FN19. *First Mortgage Co. v. Fed. Leasing Corp., 456 A.2d 794* (Del.1982).

FN20. *Equitable Trust Co. v. Gallagher,* 99 A.2d 49 (Del. Ch.1953).

**\*5** The Court, in enforcing contracts, does have an interest in ensuring that consideration exists,[FN21] even though, strictly speaking, the adequacy of the consideration is not generally a question for judicial determination.[FN22] A & R's Assignment of Claims indicates that it was executed ?in connection with a Settlement ...? and that the agreement was made ?for good and valuable consideration.? Thus, the consideration for the assignment appears to be the cancellation of debt accrued under the settlement agreement in the litigation between Street Search and A & R in New Jersey with funds to be obtained from this action. The Court is unsure whether the assignment was an asset bargained for in the settlement agreement, or otherwise, because counsel for A & R never provided the settlement agreement, in draft or other form, despite repeated requests from the Court.

FN21. *Thai Tantalum Inc. v. Fansteel Inc., 1992 WL 172678 (Del. Ch.)* (inquiring into the transaction where the contract indicated the consideration for the sale was $1.00 and ?other good and valuable consideration,? and finding that the ?other valuable consideration appears to be the cancellation of a $400,000 debt ...?).

FN22. *Affiliated Enters., Inc. v. Waller, 5 A.2d 257 (Del.1939).*

If, indeed, the assignment was executed in consideration of A & R's action to recoup monies owed A & R by Street Search, and thereby cancel Street Search's debt to A & R, the assignment is champertous. If that is not the case, the assignment is unenforceable by this Court for lack of consideration. Either way, the Court cannot permit a substitution of A & R for Street Search because A & R is not the real party-in-interest in this case.

*Conclusions*

The Court did not misapprehend the facts or the law when it denied A & R's Motion to Intervene. A & R is not properly an intervenor because its interests in the litigation stems from an assignment of interest and A & R's interest, if any, is the same as Plaintiffs. A & R cannot be properly substituted for Plaintiff because A & R does not have a valid assignment of interest. Accordingly, A & R's Motion for Reargument is DENIED.

Furthermore, since corporate entities must be represented by counsel in order to appear before the Court and prosecute a claim, and Street Search has never caused substitute counsel to enter an appearance, Enviro Board's Motion to Dismiss must be GRANTED.

IT IS SO ORDERED.

Del.Super.,2006.
Street Search Partners, L.P. v. Ricon Intern., L.L.C.
Not Reported in A.2d, 2006 WL 1313859 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December, 2006, a copy of Compendium of Cases

Cited in Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss was caused to be

served in the manner indicated upon the following:

**VIA HAND DELIVERY**
Adam W. Poff, Esquire
William D. Johnston, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

**VIA FEDERAL EXPRESS**
J. Allen Maines, Esquire
John G. Parker, Esquire
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, GA  30308

Linda Richenderfer (#4138)
Bifferato, Gentilotti, Biden & Balick
1308 Delaware Avenue
P.O. Box 2165
Wilmington, DE 19899-2165