## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AD HOC COMMITTEE OF EQUITY HOLDERS OF TECTONIC NETWORK, INC.<br><br>　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>AROL WOLFORD, SHERWIN KRUG, CHARLES McROBERTS, JOHN McROBERTS, CHARLES PECCHIO, JR., LAURA ROGERS and THEO VANDERBOOM<br><br>　　　　　　　　Defendants. | Civil Action No. 06-665 (***) |

## COMPENDIUM OF UNREPORTED CASES CITED IN DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
William D. Johnston (No. 2123)
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6672

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
J. Allen Maines, Georgia Bar No. 466575
John G. Parker, Georgia Bar No. 562425
Albert M. Myers, Georgia Bar No. 002711
Michael D. Grider, Georgia Bar No. 310473
600 Peachtree Street, Suite 2400
Atlanta, GA 30308
Telephone: (404) 815-2400
Facsimile: (404) 815-2424

*Attorneys for Defendants*

December 22, 2006

<u>CASE</u>                                                                                                      <u>TAB</u>

<u>IT Group Inc. v. IT Litigation Trust,</u>
    No. 02-10118, Civ. A. 04-1268-KAJ,
    2005 WL 3050611 (D. Del. Nov. 15, 2005) ........................................................................1

<u>Khanna v. McMinn,</u>
    No. Civ. A. 20545-NC, 2006 WL 1388744
    (Del. Ch. May 9, 2006) ......................................................................................................2

<u>Seaford Funding Limited Partnership v. M & M Assoc. II, L.P.,</u>
    C.A. No. 1578 S, 1995 Del. Ch. LEXIS 51 (Del. Ch. Apr. 26, 1995)................................3

<u>Shamrock Holdings, Inc. v. Arenson,</u>
    No. CIV. 04-1339-SLR, 2006 WL 2802913
    (D. Del. Sept. 29, 2006) .....................................................................................................4

<u>Stone v. Ritter,</u>
    No. 93, 2006, 2006 Del. LEXIS 597 (Del. Nov. 6, 2006) ..................................................5

# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**

Briefs and Other Related Documents
In re IT Group Inc.D.Del.,2005.Only the Westlaw
citation is currently available.
United States District Court,D. Delaware.
IT GROUP INC., et al., Debtor.
IT LITIGATION TRUST, Plaintiff,
v.
Daniel A. D'ANIELLO, Francis J. Harvey, James C.
McGill, Richard W. Pogue, Philip B. Dolan, E.
Martin Gibson, Robert F. Pugliese, Charles W.
Schmidt, James David Watkins, Anthony J. Deluca,
Harry J. Soose, the Carlyle Group, the Carlyle Group
L.L.C., Carlyle Partners II, L.P., Carlyle SBC
Partners, II, L.P., Carlyle International Partners II,
L.P., Carlyle International Partners III, L.P., C/S
International Partners, Carlyle Investment Group,
L.P. Carlyle-IT International Partners, L.P., Carlyle-
IT International Partners II, L.P., Carlyle-IT Partners
L.P., and T.C. Group, L.L.C., Defendants.
**No. 02-10118, Civ.A. 04-1268-KAJ.**

Nov. 15, 2005.

Jeffrey M. Schlerf, Thomas H. Kovach, Eric M.
Sutty, the Bayard Firm, Wilmington, Delaware for
Plaintiff, Richard S. Wayne, Thomas P. Glass, John
M. Levy, Strauss & Troy, Cincinnati, Ohio, Mark D.
Collins, Marcos A. Ramos, Richards, Layton &
Finger, P.A., Wilmington, Delaware, Roger D.
Anderson, Smith, Katzenstein & Furlow LLP,
Wilmington, Delaware, of counsel.
Ronald S. Gellert, Eckert, Seamans, Cherin &
Mellott, LLC, Wilmington, Delaware for Defendants,
Thomas L. Patten, David A. Becker, Latham &
Watkins, LLP, Washington, D.C., Laurie B. Smilan,
Latham & Watkins, LLP, Reston, Virginia, Charles
A. De Monaco, Kimberly L. Haddox, Dickie
McCamey & Chilcote, P.C., Pittsburgh,
Pennsylvania, Mark A. Willard, Paul D. Steinman, F.
Timothy Grieco, Eckert, Seamans, Cherin & Mellot,
LLC, Pittsburgh, Pennsylvania, of counsel.

Jointly Administered
JORDAN, J.

MEMORANDUM OPINION

I. INTRODUCTION

*1 Before me are Motions to Dismiss for Lack of
Subject Matter Jurisdiction (Docket Item ["D.I."] 35)
and for Failure to State a Claim (D.I.37) filed by
defendants Daniel A. D'Aniello ("D'Aniello"),
Francis J. Harvey ("Harvey"), James C. McGill
("McGill"), Richard W. Pogue ("Pogue"), Phillip B.
Dolan ("Dolan"), E. Martin Gibson ("Gibson"),
Robert F. Pugliese ("Pugliese"), Charles W. Schmidt
("Schmidt"), James David Watkins ("Watkins"),
Anthony J. DeLuca ("DeLuca"), Harry J. Soose
("Soose"), and the following parties (collectively
referred to as the "Carlyle Defendants"): The Carlyle
Group, The Carlyle Group, L.L.C., Carlyle Partners
II, L.P., Carlyle SBC Partners, II, L.P., Carlyle
International Partners II, L.P., Carlyle International
Partners III, L.P., C/S International Partners, Carlyle
Investment Group, L.P., Carlyle-IT International
Partners, L.P., Carlyle-IT International Partners II,
L.P., Carlyle-IT Partners L.P., and T.C. Group,
L.L.C.[FN1]

FN1. All of the defendants are referred to
collectively as the "Defendants."

The First Amended Complaint (D.I. 30, the
"Complaint"), filed by IT Litigation Trust
("Plaintiff") alleges in Counts I-V [FN2] that
Defendants, as directors, officers, and controlling
shareholders of the IT Group, Inc. (the "IT Group" or
the "Company"), breached their corporate fiduciary
duties, that their acts constituted waste of corporate
assets, and that the Carlyle Defendants aided and
abetted the other Defendants' breach of fiduciary
duties. (D.I. 30 at ¶¶ 58-79.) Plaintiff also alleges,
in Counts VI-VIII, that payments made by the IT
Group to certain Defendants are avoidable
preferences or fraudulent transfers under the
Bankruptcy Code and Delaware state law. (Id. at ¶¶
80-115 .) Finally, Plaintiff alleges in Count IX that
the directors unlawfully paid dividends to the Carlyle
Defendants. (Id. at ¶¶ 116-18.)

FN2. The Complaint sets forth nine theories
of recovery, which are denominated as
"claims for relief" and, for convenience, are
herein designated as "Counts." Count I
alleges that the IT Group directors and
officers breached their corporate fiduciary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

duties. Count II makes the same allegations against the directors and officers under the "Trust Fund" doctrine, explained *infra* note 8. Count III alleges that the directors and officers wasted corporate assets. Count IV alleges that the Carlyle Defendants breached their corporate fiduciary duties. Count V alleges that the Carlyle Defendants aided and abetted the breaches committed by the directors and officers. Count VI seeks, under the Bankruptcy Code, to avoid certain preferential transfers. Count VII alleges that payments made to the Carlyle Defendants were constructively fraudulent transfers. Count VIII alleges that payments made to the Carlyle Defendants and certain individual defendants were actual fraudulent transfers. Count IX alleges that dividends were paid unlawfully to the Carlyle Defendants.

Defendants contend that the claims based exclusively on Delaware state law, Counts I-V and IX, do not fall within the subject matter jurisdiction of this court, either under the statute providing for original jurisdiction over bankruptcy cases, 28 U.S.C. § 1334, or under that providing for supplemental jurisdiction, 28 U.S.C. § 1367. Defendants also contend that Counts I-VI and IX must be dismissed in their entirety, and that Counts VII and VIII must be dismissed in part, for failure to state a claim upon which relief can be granted. For the reasons that follow, I will deny Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, and I will grant in part and deny in part Defendants' Motion to Dismiss for Failure to State a Claim.

## II. BACKGROUND [FN3]

FN3. The following background information is drawn from the parties' submissions and does not constitute findings of fact.

### A. *The Carlyle Defendants' Investment in the IT Group*

The IT Group was a Delaware corporation with its principal office in Monroeville, Pennsylvania, which provided services in "consulting, engineering, construction, environmental remediation, and facilities and waste management." (Complaint, D.I. 30 at ¶ 30.) These services "included the identification of contaminants in soil, air, and water,

as well as the subsequent design and execution of remedial solutions." (*Id.*)

**\*2** The Carlyle Group is a private merchant bank headquartered in Washington D.C. that invested in the IT Group "through a number of entities that it owns or controls." (*Id.* at ¶ 14.) Specifically, in or around November 1996, the Carlyle Defendants collectively invested $45 million in the IT Group. (*Id.* at ¶ 31 .) That sum included investments by several Cayman Islands limited partnerships, i.e., Carlyle International Partners II, L.P., Carlyle International Partners III, L.P., C/S International Partners, Carlyle-IT International Partners, L.P., and Carlyle-IT International Partners II, L.P., made through their general partner, T.C. Group, L.L.C. (*Id.* at ¶¶ 18-20, ¶¶ 22-23, ¶ 31.) In return for the $45 million in investments, the Carlyle Defendants received 45,000 shares of 6% Cumulative Convertible Participating Preferred Stock and detachable warrants to purchase 1.25 million shares of the IT Group's common stock. (*Id.* at ¶ 31.)

"The Carlyle Defendants also received approximately 25% of the IT Group's voting power and obtained the right to elect a majority of IT Group's board of directors...." (*Id.*) The IT Group Proxy Statement [FN4] dated May 20, 1999 shows that, prior to 1999, the Carlyle Defendants elected five of the nine members of the IT Group's board. (D.I. 39, Ex. D at A-0024.) More particularly, from 1996 to 1999, the Carlyle Defendants filled five of nine IT Group board positions by electing defendants D'Aniello, Dolan, Gibson, Pugliese, and Watkins. (*Id.* at A-0025.) Those directors remained on the IT Group board through 2002. (Complaint, D.I. 30 at ¶ 3, ¶¶ 7-9, ¶ 11.)

FN4. In reviewing a 12(b) motion to dismiss in a case such as this, the court may consider a company's SEC filings, as well as other public records. *See in re Delmarva Sec. Litig.,* 794 F.Supp. 1293, 1299 (D.Del.1992).

As of May 14, 1999, the IT Group increased the size of its board to eleven directors. (D.I. 39, Ex. D at A-0024.) The board nominated defendant Harvey to fill one of the two new board seats (*id.*), and he was promptly elected. (Complaint, D.I. 30 at ¶ 4.) He too remained on the board through 2002. (*Id.*) The Carlyle Defendants declined to exercise their right to elect the eleventh director, thus leaving the board with ten members, five of whom were elected by the

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Carlyle Defendants.[FN5] (D.I. 39, Ex. D at A-0024.)

> FN5. In addition to the election rights associated with their investment, "the Carlyle Defendants procured a consulting agreement ... pursuant to which they were paid $100,000.00 per year and $10,000.00 per month." (Complaint, D.I. 30 at ¶ 31.)

Four of those ten directors had additional connections to the Carlyle Defendants. D'Aniello "has been a Managing Director of The Carlyle Group since at least 1987" and was also the Managing Director of TCG Holdings, L.L.C. and a Managing Member of TC Group, L.L.C. (*Id.* at ¶ 3.) Dolan "has been employed by The Carlyle Group since at least 1989." (*Id.* at ¶ 7.) "In 1998, Dolan became a Principal of The Carlyle Group, and in February 2001, he became a Managing Director of The Carlyle Group." (*Id.*) Harvey, along with D'Aniello, served on the boards of directors of other companies that are owned or controlled by The Carlyle Group. (*Id.* at ¶¶ 3-4.) Finally, Watkins "served as director of Duratek, Inc. of which the Carlyle Defendants are the majority shareholder." (*Id.* at ¶ 11.)

*3 Plaintiff alleges that the Carlyle Defendants "took control" of the IT Group in or around November 1996 (*id.* at ¶ 31), and that "[a]t all relevant times, the Carlyle Defendants possessed and exercised control over the IT Group" (*id.* at ¶ 14).

### B. *The Roll-Up Strategy*

According to Plaintiff, "[a]s of 1998, the IT Group had experienced consecutive fiscal years in which it had lost money." (*Id.* at ¶ 42.) The Carlyle Defendants, "through [their] control of the board of directors of the IT Group, adopted and implemented a purported 'Roll-Up Strategy' to grow the company by acquiring companies engaged in the same or similar lines of business ." (*Id.* at ¶ 32.) From 1998 to 2000, the IT Group "acquired at least eleven companies" as part of this strategy. (*Id.*) In five of those acquisitions, the IT Group paid approximately $526 million and booked goodwill [FN6] of approximately $515.5 million. (*See id.* at ¶¶ 33-37.) In a sixth acquisition, the IT Group paid approximately $1 million, along with contingent consideration of up to $8 million, and booked goodwill of approximately $5.5 million. (*Id.* at ¶ 38.) "By or about the end of 2000, the IT Group had booked aggregate [goodwill] of approximately $539

million, representing 41 percent of the IT Group's total assets." (*Id.* at ¶ 39.) Plaintiff asserts that the goodwill booked in those transactions was "of no value to the IT Group," and that consequently, "the value of the IT Group's assets was substantially less than the values reflected on its books." (*Id.* at ¶ 41.)

> FN6. "Goodwill" is defined in the Complaint as the "Cost in excess of net assets of the acquired businesses." (Complaint, D.I. 30 at ¶ 39.)

### C. *The IT Group's Insolvency*

The Roll-Up acquisitions between 1998 and 2000 "were funded largely by debt financing ... including approximately $500 million in secured loans and credit facilities ... and approximately $255 million in subordinated bond debt issued in 1999." (*Id.* at ¶ 43.) This financing "increased the Company's leverage, increased its interest payments, and strained [its] liquidity." (*Id.* at ¶ 44.) To deal with this lack of liquidity, the IT Group obtained an additional $100 million term loan in March 2000. (*Id.* at ¶ 45.) Its "average debt outstanding during 2000 was approximately $650 million." (*Id.*)

"In March 1997, the Company reported approximately $360 million in revenues and total liabilities of approximately $172 million...." (*Id.* at ¶ 44.) "[B]y December 2000, [it] reported approximately $1.4 billion in revenues, while total liabilities had ballooned to approximately $1 billion...." (*Id.*) "For the period ended [sic] March 28, 1997, the IT Group had a tangible net worth of approximately $160 million. By the period end of December 2000, the IT Group had a tangible net worth of approximately negative $277 million." (*Id.* at ¶ 46.) Plaintiff alleges that, "[b]eginning as early as March 1998, the IT Group was insolvent or within the vicinity of insolvency." (*Id.* at ¶ 47.)

*4 Finally, on January 16, 2002, the IT Group filed for bankruptcy protection. (*Id.* at ¶ 57.) "Thereafter, the IT Group was liquidated." (*Id.*)

### D. *Allegations Regarding the Board's Actions and Failures to Act*

Plaintiff alleges that, in addition to following the unwise Roll-Up Strategy, the IT Group directors and officers also "failed to take prompt and prudent actions to preserve and maximize [the IT Group's]

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)

(Cite as: Not Reported in F.Supp.2d)

assets and to restructure its debts" (*id.* at ¶ 50), "failed to retain financial asset divestiture consultants, financial consultants, turnaround and restructuring consultants, or bankruptcy and legal counsel" (*id.* at ¶ 51), and "failed to inform themselves of all material information available to them concerning financial restructuring" (*id.* at ¶ 52). According to Plaintiff, those failures "caused or deepened [the IT Group's] insolvency, and sealed [its] financial doom." (*Id.* at ¶ 55.) Because, Plaintiff says, the IT Group board was under the control of the Carlyle Defendants (*see id.* at ¶ 14, ¶ 31), those failures are also the Carlyle Defendants' failures (*see id.* at ¶ 1). In Counts I-IV, Plaintiff alleges that those failures amount to waste of corporate assets and to breaches of the Defendants' fiduciary duties to the IT Group and its creditors. (*Id.* at ¶ ¶ 58-75.) Count V alleges that the Carlyle Defendants also aided and abetted the other Defendants' breaches. (*Id.* at ¶ ¶ 76-79.)

Plaintiff further asserts that, while controlling the IT Group, the Carlyle Defendants were paid in excess of $850,000 from consulting agreements with the Company and in excess of $8.9 million in dividends from their preferred stock in the Company. (*Id.* at ¶ 1.) Plaintiff particularly describes dividend payments to the Carlyle Defendants of $1,362,254 in 1998 (*id.* at ¶ 99), $2,765,700 in 1999 (*id.* at ¶ 101), $2,765,700 in 2000 (*id.* at ¶ 102), and $2,074,275 in 2001 (*id.* at ¶ 103), all of which are alleged in Counts VII and VIII to be fraudulent transfers (*id.* at ¶ ¶ 97-115) and, in Count IX, to be unlawful payments of dividends (*id.* at ¶ ¶ 116-18). Plaintiff also lists other payments made to particular Defendants, including the Carlyle Defendants, within the year before the bankruptcy petition (*id.* at ¶ ¶ 82-88) and which are alleged, in Count VI, to be avoidable preferential transfers (*id.* at ¶ ¶ 80-96) and, in Count VIII, to be fraudulent transfers (*id.* at ¶ ¶ 109-115).

Plaintiff alleges, again in Counts I-IV, that those payments to insiders, made while the IT Group was insolvent or in the vicinity of insolvency, are additional instances of corporate waste and breach of fiduciary duties. (*Id.* at ¶ 61(g), ¶ 65(g), ¶ 69(f), ¶ 74(g).) Also, those payments and the increased debt burden were allegedly part of a strategy to "artificially extend[ ] the life of the insolvent Company to obtain a return on the Carlyle Defendants' equity investment." (*Id.* at ¶ 61(h), ¶ 65(h), ¶ 69(g), ¶ 74(h).) Count V alleges that the Carlyle Defendants aided and abetted those breaches as well. (*Id.* at ¶ ¶ 76-79.)

*5 The claims in this case were originally asserted by the Official Committee of Unsecured Creditors in the IT Group bankruptcy proceeding. (D.I. 36 at 1.) By stipulation of the parties and pursuant to the First Amended Joint Chapter 11 Plan for the IT Group, which was confirmed on April 5, 2004 (D.I. 52 at 6, D.I. 53 at A003-A062), the IT Litigation Trust was substituted as Plaintiff in this action.

### III. STANDARD OF REVIEW

A challenge to subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) requires a court to ask "whether the complaint alleges facts on its face which, if taken as true, would be sufficient to invoke the district court's jurisdiction." *FOCUS v. Allegheny County Court of Common Pleas,* 75 F.3d 834, 840 (3d Cir.1996).

Fed.R.Civ.P. 12(b)(6) requires a court to accept as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). The Federal Rules "do not require a claimant to set out in detail the facts upon which he bases his claim," *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168 (1993), and "a plaintiff will not be thrown out of court on a Rule 12(b)(6) motion for lack of detailed facts." *Stanziale v. Nachtomi (In re Tower Air, Inc.),* 416 F.3d 229, 237 (3d Cir.2005). Still, a plaintiff must allege the supporting facts "necessary to provide the defendant fair notice of the plaintiff's claim and the 'grounds upon which it rests.' " *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)).

### IV. DISCUSSION

*A. The Motion Challenging Subject Matter Jurisdiction*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

The federal district courts have subject matter jurisdiction over bankruptcy cases pursuant to 28 U.S.C. § 1334. That statute provides that "the district courts shall have original and exclusive jurisdiction of all cases under title 11," and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." § 1334(a), (b). "Cases under title 11, proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as 'core' proceedings; whereas proceedings 'related to' a case under title 11 are referred to as 'non-core' proceedings." *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.),* 372 F.3d 154, 162 (3d Cir.2004). It is conceded that none of the state law claims in Counts I-V and IX qualify as core proceedings. The motion to dismiss for lack of subject matter jurisdiction thus centers on the question of whether these claims are non-core claims falling within the category of "related to" jurisdiction.

*6 "With 'related to' jurisdiction, Congress intended to grant bankruptcy courts comprehensive jurisdiction so that they could deal efficiently and expeditiously with matters connected with the bankruptcy estate." *Id.* at 163-64 (internal citations omitted). Prior to the confirmation of a bankruptcy plan, a proceeding will fall under "related to" jurisdiction if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984). But the test must be formulated somewhat differently for proceedings that arise post-confirmation, because "[a]t the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute." *Resorts,* 372 F.3d at 165. After plan confirmation, a proceeding will be within the "related to" jurisdiction if it has a "close nexus to the bankruptcy plan." *Id.* at 166. "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id.* at 167.

Here, Defendants argue that, for two reasons, the state law claims do not have a close nexus to the confirmed IT Group plan. First, they say, because the IT Group estate no longer exists after plan confirmation, this lawsuit can have no effect on the estate. (D .I. 36 at 11.) Instead, any proceeds will be distributed by Plaintiff to the beneficiaries of the Litigation Trust. Second, Defendants argue that

resolving the state law claims requires no construction, interpretation, or implementation of the plan. (*Id.* at 11-12.) Rather, the only connection to the bankruptcy "is that a recovery by the Plaintiff might increase the assets of the Litigation Trust and its beneficiaries," and that connection, on its own, is insufficient to support "related to" jurisdiction. (*Id.* at 13 (citing *Resorts,* 372 F.3d at 170).) Thus, Defendants conclude, this court does not have subject matter jurisdiction over Counts I-V and IX.

The Defendants' reasoning, however, depends upon an overstatement of the Third Circuit's conclusions in *Resorts.* First, no one disputes that the IT Group estate no longer exists, but that fact alone is not determinative. Indeed, the "close nexus" test was formulated to address jurisdiction over claims arising post-confirmation, recognizing that a literal interpretation of the *Pacor* test would end the court's jurisdiction when the plan was confirmed. *Id.* at 165-67. Thus, jurisdiction may be proper, even after confirmation of the bankruptcy plan.

Second, unlike the cause of action in *Resorts,* which arose nearly seven years after confirmation and was a malpractice claim by the litigation trust against its accountant, Plaintiff's cause of action in this case arose before the filing of the bankruptcy petition, and the losses claimed by Plaintiff on behalf of unsecured creditors are logically connected to the IT Group insolvency and subsequent bankruptcy. Furthermore, this cause of action was assigned to Plaintiff by Section 7.16 of the IT Group bankruptcy plan. (D.I. 53 at A034.) The assignment in a confirmed plan of a prepetition cause of action "could well establish the 'close nexus to the bankruptcy plan or proceeding' which the Third Circuit requires." *Michaels v. World Color Press, Inc. (In re LGI, Inc.),* 322 B.R. 95, 102 (Bankr.D.N.J.2005). While resolving Plaintiff's state law claims may not require construction or interpretation of the plan, this proceeding "plainly serves the plan through the implementation, consummation, and execution which typify many post-confirmation matters." *Id.* Exhibit 1 of the confirmed plan includes within the listing of claims assigned to Plaintiff "[a]ny claims for acts or omissions of [the IT Group's] ... present and former officers, directors, insiders and accountants." (D.I. 53 at A052.) The present claims are within that category, and their pursuit was therefore contemplated by the plan itself.

*7 Thus, contrary to Defendants' position, the possible increase in Plaintiff's assets is not the only connection to the IT Group bankruptcy. Because this

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

matter affects the implementation, consummation, and execution of the bankruptcy plan, there is a close nexus to the bankruptcy sufficient to satisfy the standard set in *Resorts.* 372 F.3d at 166-67. I therefore conclude that the state law claims in Counts I-V and IX are properly within the "related to" jurisdiction granted under § 1334.[FN7]

> FN7. Because of that conclusion, I need not address the parties' arguments concerning supplemental jurisdiction under 28 U.S.C. § 1367.

### B. *The 12(b)(6) Motion to Dismiss*

#### 1. *Counts I, II, and IV-Breach of Corporate Fiduciary Duty Claims Against the Directors, Officers, and Carlyle Defendants*

As earlier noted, *supra* note 2, Plaintiff alleges in Count I that the IT Group directors and officers breached their duties of loyalty and due care to the Company and its creditors. In Count II, Plaintiff makes the same allegations against the directors and officers under the "Trust Fund" doctrine,[FN8] based on the IT Group's alleged insolvency. In Count IV, Plaintiff alleges that the Carlyle Defendants breached duties of loyalty and due care that they owed because of their alleged control over the IT Group board. Defendants attack the sufficiency of the pleading of all of those counts. Since the allegations in Counts I, II, and IV are nearly identical, I treat them as a group in the following discussion, dealing first with the duty of loyalty claims and then with the duty of care claims. I conclude that the Complaint adequately states claims for breaches of the duty of loyalty by the directors and Carlyle Defendants, but that all other claims for breach of fiduciary duties must be dismissed.

> FN8. Under the Trust Fund doctrine, "the directors [of an insolvent corporation] become trustees tasked with preserving capital for the benefit of creditors who are deemed to have an equity-like interest in the firm's assets." *Prod. Res. Group, L.L.C. v. NCT Group, Inc .,* 863 A.2d 772, 791 (Del. Ch.2004).

#### a. *Duty of Loyalty*

Two of the ten separate breaches alleged in each of

Counts I, II, and IV are identifiable as breaches of the duty of loyalty. First, the Defendants allegedly made "transfers for the benefits [sic] of insiders." (Complaint, D.I. 30 at ¶ 61(g), ¶ 65(g), ¶ 74(g).) Second, the Defendants "artificially extend [ed] the life of the insolvent Company to obtain a return on the Carlyle Defendants' equity investment." (*Id.* at ¶ 61(h), ¶ 65(h), ¶ 74(h).) These claims are apparently based on the payments made to Defendants, including the dividends paid to the Carlyle Defendants, while the IT Group was losing money and unable to service its debt. I will discuss in turn the claims against the directors, the officers, and the Carlyle Defendants.

#### i. *Directors*

Under Delaware law, a director's duty of loyalty "imposes an affirmative obligation to protect and advance the interests of the corporation and mandates that [the director] absolutely refrain from any conduct that would harm the corporation." *Belcom, Inc. v. Robb,* No. CIV.A.14663, 1998 WL 229527, at *3 (Del. Ch.1998) (citing *Guth v. Loft,* 5 A.2d 503, 510 (Del.1939)). While each director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made "on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company," *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984),[FN9] unless the plaintiff shows that the presumption does not apply. A plaintiff can avoid the presumption for a particular transaction by showing "that a majority of a board that approved the transaction in dispute was interested and/or lacked independence." *Orman v. Cullman,* 794 A.2d 5, 23 (Del. Ch.2002). A director is interested when appearing on both sides of a transaction or when deriving a personal benefit from a transaction that is not received by stockholders generally. See *Aronson,* 473 A.2d at 812; *Orman,* 794 A.2d at 23. "Independence means that a director's decision is based on the corporate merits of the subject ... rather than extraneous considerations or influences." *Aronson,* 473 A.2d at 816. A lack of independence arises when "directors are 'beholden' to [the controlling person] or so under their influence that their discretion would be sterilized." *Orman,* 794 A.2d at 24 (quoting *Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993)).

> FN9. While *Aronson* was a "classic Delaware derivative case," *Tower Air,* 416

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

F.3d at 236 n. 10, citing it, along with other derivative cases, for propositions of substantive Delaware law concerning the business judgment rule is proper. *Cf. id.* at 238 (citing *Aronson* for definition of the business judgment rule).

*8 Here, Plaintiff's claims are based on payments made to insiders, and the Complaint describes payments made both to the Carlyle Defendants and to individual defendants. The board allegedly made payments to the Carlyle Defendants pursuant to a consulting agreement and as dividends arising from the preferred stock. (*Id.* at ¶ 1, ¶ ¶ 99-103.) The directors were not interested in those payments because no director is alleged to have received a personal benefit. However, Plaintiff appears to allege that the directors lacked independence concerning those payments, because of the Carlyle Defendants' influence. To successfully avoid the business judgment rule presumption, Plaintiff will have to show that directors were "beholden to [the Carlyle Defendants] or so under their influence that their discretion would be sterilized." *Orman,* 794 A.2d at 24. For the allegations to survive this Motion, Plaintiff must allege the supporting facts "necessary to provide the [Defendants] fair notice of the [Plaintiff's] claim and the 'grounds upon which it rests.' " *Tower Air,* 416 F.3d at 237 (quoting *Conley,* 355 U.S. at 47).

Four of the ten directors in place between 1999 and 2002, defendants D'Aniello, Dolan, Harvey, and Watkins, had other connections to the Carlyle Defendants, and two of those, D'Aniello and Dolan, were Managing Directors of The Carlyle Group. (*Id.* at ¶ ¶ 3-4, ¶ 7, ¶ 11.) Two other directors, defendants Gibson and Pugliese, were elected by the Carlyle Defendants. (D.I. 39, Ex. D at A-0025.) Thus, before 1999, five of nine directors were elected by the Carlyle Defendants. (*See id.*) After 1999, five of ten directors were elected by the Carlyle Defendants (*see id.*), and a sixth director, Harvey, allegedly had other connections to the Carlyle Defendants (Complaint, D.I. 30 at ¶ 4). These alleged connections would not be sufficient on their own to prove that these six directors lacked independence. *See Aronson,* 473 A.2d at 816 ("[I]t is not enough to charge that a director was nominated or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director.") Nor do they show anything about the remaining director defendants, McGill, Pogue, Schmidt, and DeLuca.

Thus, the claim of a lack of independence is based largely on the allegations that the Carlyle Defendants "took control" of the IT Group in or around November 1996 (Complaint, D.I. 30 at ¶ 31), and that "[a]t all relevant times, the Carlyle Defendants possessed and exercised control over the IT Group" (*id.* at ¶ 14). Actual control of the IT Group's operations by the Carlyle Defendants, if proved, would support a conclusion that some or all of the directors lacked independence concerning payments made to the Carlyle Defendants. Thus, while I seriously doubt that the conclusory allegations of control in the Complaint would survive a 12(b)(6) motion in the Delaware Court of Chancery, they do put Defendants on notice that the claim here is based on the Carlyle Defendants' actual control of the IT Group and the lack of independence of the directors concerning payments to this controlling group. Given that the Third Circuit has emphasized the view that the Federal Rules of Civil Procedure do not require a plaintiff to plead detailed facts to make out a claim for breach of fiduciary duties under Delaware law, *Tower Air,* 416 F.3d at 236-39, I am bound to hold that the Plaintiff's allegations are sufficient in this case.[FN10]

FN10. A lengthy digression here will, I hope, be excused. The Third Circuit noted in *Tower Air,* 416 F.3d at 236-37 & n. 11, that when a state procedural rule conflicts with an on-point Federal Rule of Civil Procedure, a federal court should apply the Federal Rule. *See Hanna v. Plumer,* 380 U.S. 460 (1965) (applying the federal standard for service of process). That proposition is beyond dispute. However, the Delaware requirement that there be more than conclusory allegations to support fiduciary duty claims does not appear to me to be simply a matter of procedure. Rather, the pleading requirements shape the substance of fiduciary duty claims by enforcing the business judgment rule, which is fundamental to Delaware corporate law.
The business judgment rule reflects the understanding that the directors of a corporation are entrusted with that corporation's management, and that directors cannot guarantee the success of their decisions. Thus, "in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

an officer made or that directors authorized in good faith." *Gagliardi v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1051 (Del. Ch.1996). This rule is a matter of substantive corporate law. *See Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d 53, 64 (Del.1989) ("The [business judgment] rule operates as both a procedural guide for litigants and a substantive rule of law.") First, it prevents the courts from second-guessing the decisions of directors and officers based on results of those decisions rather than on the care, loyalty, and good faith of the directors making the decision. Thus, the rule keeps courts from "injecting themselves into a management role for which they were neither trained nor competent." *Weiss v. Temporary Inv. Fund,* 692 F.2d 928, 941 (3d Cir.1982). Second, the business judgment rule protects "against a threat of sub-optimal risk acceptance." *Gagliardi,* 683 A.2d at 1052. As a policy matter, directors should not be overly risk averse. "Shareholders' investment interests, across the full range of their diversifiable equity investments, will be maximized if corporate directors and managers honestly assess risk and reward and accept for the corporation the highest risk adjusted returns available that are above the firm's cost of capital." *Id.* Imposing liability for corporate losses on directors and officers will tend to deter them from seeking this optimum level of risk.

To implement the business judgment rule, the substance of Delaware corporate law includes a presumption that, absent self-interest or lack of independence, "the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company." *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984). The plaintiff "may prevent the application of the business judgment rule with well-pleaded facts establishing that the directors acted out of self-interest," and "in order to overcome the presumption of the business judgment rule [the plaintiff] must allege with particularity facts which establish that the contested decision was not a product of valid business judgment." *In re General Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119, 1132 (D.Del.1988) (citing *Grobow v. Perot,* 539 A.2d 180, 187

(Del.1988); *Aronson,* 473 A.2d at 812); *see also Crescent/Mach I Partners L .P. v. Turner,* 846 A.2d 963, 984 (Del. Ch.2000) ("in order for plaintiffs' duty of care claims to survive a motion to dismiss, they must sufficiently plead facts which if true would take defendants' actions outside the protection afforded by the business judgment rule."); *Ash v. McCall,* No. CIV.A.17132, 2000 WL 1370341, at *10 (Del. Ch. Sept. 15, 2000) ("[T]his Court has stated on several occasions that mere allegations that directors made a poor decision ... [do] not state a cause of action....").

Having been taken to task once for citing derivative suit precedents in a direct action, *Tower Air,* 416 F.3d at 236 ("[T]he District Court (mistakenly) cited derivative suit pleading cases...."), I hasten to note that, as on that earlier occasion, I cite the foregoing cases not under some confusion that this is a derivative suit but for the specific point they make about the protections of the business judgment rule. Those protections are a substantive point of law that, I believe, stands largely independent both of the procedural distinction between direct and derivative actions, *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb,* 385 F.Supp.2d 449, 457 & n. 6 (D.Del.2004), and of the notice purpose inherent in procedural rules of pleading, *Stanziale v. Nachtomi,* No. CIV.A.01-403, 2004 WL 1812705, at *2 (D.Del. Aug. 6, 2004). In sum, though the Third Circuit apparently views the requirement for pleading facts in a context like this as a peculiarity of Delaware procedural law, *see Tower Air,* 416 F.3d at 236-37 ("Delaware courts consider Chancery Rule 8 specificity requirements as consonant with notice pleading, but such notice pleading bears scant resemblance to the federal species.") (citation omitted), it appears to me to be instead an implementation of the substantive presumption of the business judgment rule. This is true even though the standard of pleading "particularized" facts may be more stringent in a derivative action, governed by Rule 23.1, than in a direct action being challenged under Rule 12(b)(6). *Cf. Telxon Corp. v. Bogomolny,* 792 A.2d 964, 974 (Del. Ch.2001) (stating that the "high burden of pleading with particularity facts

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

supporting the reasonableness" of the alleged claims required to withstand a motion to dismiss under Rule 23.1 "is somewhat lower" under Rule 12(b)(6). My understanding is that, even in the latter circumstance, sufficient factual specificity must be included in the complaint to raise a rational inference that the duty in question has been breached. The Third Circuit may be correct that this approach bears "scant resemblance" to simple notice pleading, but the difference is an entirely deliberate decision of substantive Delaware law, not a procedural peccadillo.

The *Tower Air* holding requires directors to face greater expense and risk in a federal court than they would in state court, because plaintiffs in a bankruptcy adversary proceeding can now more easily survive a Rule 12(b)(6) motion and therefore will have easier access to litigation and the opportunity to impose the burdens of litigation on corporate officials. This result is troubling for at least three reasons. First, and most fundamentally, if I am correct that we are dealing with substantive law here, the *Tower Air* approach creates a disparity between state and federal courts of the type condemned in *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938). The outcome of an application of Delaware corporate law ought not turn on whether one is appearing in the Delaware Court of Chancery or a federal district court.

Second, as a matter of public policy, it makes little sense to expand the risk of directors and officers simply because a corporation is insolvent. This case is brought as a direct rather than a derivative action solely because the IT Group became insolvent and its board was displaced by a bankruptcy trustee. As the Delaware Chancery Court has rightly noted, "[i]t would be puzzling if, in insolvency, the equitable law of corporations expand[ed] the rights of firms to recover against their directors so to better protect creditors, who, unlike shareholders, typically have the opportunity to bargain and contract for additional protections to secure their positions." *Prod. Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 794 (Del. Ch.2004).

Third, the approach dictated by the Third Circuit in *Tower Air* does not merely make particularized pleading unnecessary; it actively penalizes it and, instead, rewards obscurity. Calling the business judgment rule presumption an affirmative defense, the Court of Appeals stated, "[g]enerally speaking, we will not rely on an affirmative defense ... to trigger dismissal of a complaint under Rule 12(b)(6)." *Tower Air,* 416 F.3d at 238. It went on to say, however, that where the plaintiff mentions an affirmative defense in the complaint, that defense can be a basis of dismissal. *Id.* Thus, plaintiffs are given a powerful and perverse incentive to "dummy-up" about the obvious implications of the business judgment rule when drafting their complaints in the first instance. Any plaintiff unwise enough to actually allude to the rule "must plead that he overcomes the presumption created by that rule." *Id.* Since the standard to be applied is the notice pleading standard of Federal Rule of Civil Procedure 8, a pleading will not be insufficient for failure to include particularized facts. But it can be "self-defeating" by giving such facts, if they offer "an ostensibly legitimate business purpose for an allegedly egregious decision." *Id.* at 239. In short, because the Third Circuit sees a problem not when facts are omitted but only when they are presented, *see id.* ("The problem ... is not the facts that are not pleaded, but the facts that are."), the predictable and unfortunate result will be deliberately obtuse allegations. That is an outcome that truly bears scant resemblance to the operation of the business judgment rule in Delaware courts.

To conclude, the business judgment rule's presumption is a matter of substantive Delaware law. The *Tower Air* opinion requires me to apply a pleading standard far weaker than what I believe to be the Delaware requirement for pleading facts to overcome that presumption. I am uncomfortable changing the scope of Delaware fiduciary duty claims by weakening a substantive presumption, but, given the ruling in *Tower Air* and the lack of any Delaware authority directly stating that the *Tower Air* approach contravenes Delaware law, I must yield to the Third Circuit's interpretation.

*9 In Count VI, discussed below in Section IV.B.4, Plaintiff also describes payments made to individual

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

directors. (Complaint, D.I. 30 at ¶¶ 81-87.) None of the fiduciary duty counts point specifically to those payments, which are only mentioned later in Count VI, and Plaintiff may not have intended them to form the basis for fiduciary duty claims. But even if Plaintiff intended to include them in the "transfers to insiders" alleged in Counts I and II, the allegations concerning those payments are insufficient to meet even notice pleading requirements. Plaintiff alleges nothing other than the amounts and that the payments were made in satisfaction of antecedent debts and are avoidable preferences under Bankruptcy Code. (See id. at ¶¶ 81-87, ¶ 92.) No other information is given about the nature of the payments or the antecedent debts. Importantly for any fiduciary duty claims, the board is not alleged to have made any decision or acted in any way concerning those payments. And again, Plaintiff does not give notice in the Complaint that the payments to individual directors, mentioned only in Count VI, were intended to form the basis for claims in Counts I and II. Thus, even though particularized fact pleading is not required, the Complaint fails to give any satisfactory notice of a fiduciary duty claim based on those payments to individual directors.

Therefore, the Complaint states a claim against the directors for breach of their duty of loyalty in approving payments to the Carlyle Defendants and artificially extending the life of the Company to continue making those payments. Those two aspects of Counts I and II, as asserted against the directors, survive this Motion.

### ii. Officers

Counts I and II allege that the IT Group's officers breached their fiduciary duties, based on the same allegations that were made against the directors. Defendant Soose is the only officer named in the Complaint who was not also a director, but the Complaint alleges nothing about Soose other than his residence and position with the Company. (See Complaint, D.I. 30 at ¶ 13.) Soose is not alleged to have benefitted from any payments or to have been involved in the decisions to make payments. Therefore, the duty of loyalty claims in Counts I and II must be dismissed as to Soose.

The only other officer mentioned in the Complaint, DeLuca, was also a director during the alleged events. (See id. at ¶ 12.) Since no allegations are made against DeLuca based on his actions as an officer separate from those he supposedly took as a

director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.1.a.i.

### iii. Carlyle Defendants

Under Delaware law, a shareholder will owe fiduciary duties to a corporation, including the duty of loyalty, "only if [that shareholder] owns a majority interest in or exercises control over the business affairs of the corporation." *Ivanhoe Partners v. Newmont Mining Corp. (In re Newmont Mining Corp. S'holders Litig.), 535 A.2d 1334, 1344 (Del.1987).* A dominating shareholder may, therefore, be subject to a claim for breach of a duty of loyalty, if that shareholder stands on both sides of a transaction.

**\*10** Here, the issue is not whether the Carlyle Defendants were interested in the transactions that resulted in payments made to them. Obviously, they were; they derived a personal benefit that was not received by stockholders generally. *Aronson, 473 A.2d at 812.* The issue as to the Carlyle Defendants is whether they owed any fiduciary duties to the Company at all, i.e., whether they were controlling shareholders of the IT Group. As for the claims against the directors concerning the payments to the Carlyle Defendants, those claims depend on the allegations of actual control by the Carlyle Defendants over the IT Group directors. (See Complaint, D.I. 30 at ¶ 14, ¶ 31.) If Plaintiff can prove that the Carlyle Defendants exercised such control, then they owed fiduciary duties to the Company, and, as interested fiduciaries, may be liable on a duty of loyalty claim.

As discussed regarding the claims against the directors, *supra* Section IV.B.1.a.i, the allegations of control and self-interest put Defendants, including the Carlyle Defendants, on notice of Plaintiff's claim, satisfying the pleading standard set forth in *Tower Air.* The duty of loyalty claims set forth against the Carlyle Defendants in sections (g) and (h) of Count IV therefore survive the Motion to Dismiss for failure to state a claim.[FN11]

> FN11. Count IV actually alleges that the directors and officers breached various fiduciary duties, revealing that the allegations from Counts I and II were simply pasted into a count against the Carlyle

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Defendants. (*See* Complaint, D.I. 30 at ¶ 74.) However, the title indicates that Count IV is intended to make allegations against the Carlyle Defendants, and so I treat those allegations as fairly making those allegations.

### b. *Duty of Care*

The remaining eight breaches alleged in Counts I, II, and IV are breaches of the duty of care. Plaintiff alleges that Defendants: first, "fail[ed] to inform themselves of all material information readily available to them," (Complaint, D.I. 30 at ¶ 61(a), ¶ 65(a), ¶ 74(a)); second, "incurr[ed] Acquisitions for more than the fair value of such Acquisitions and increas[ed] the Company's debts through such Acquisitions," (*id.* at ¶ 61(b), ¶ 65(b), ¶ 74(b)); third, "deepen[ed] the Company's insolvency," (*id.* at ¶ 61(c), ¶ 65(c), ¶ 74(c)); fourth, "fail[ed] to preserve, maximize, and not dissipate the assets for the benefit of the Company and its creditors," (*id.* at ¶ 61(d), ¶ 65(d), ¶ 74(d)); fifth, "knowingly or recklessly ignor[ed] facts of, [sic] the Company's insolvency, that it was in the vicinity of insolvency, and was inadequately capitalized," (*id.* at ¶ 61(e), ¶ 65(e), ¶ 74(e)); sixth, "pursu [ed] a 'Roll-Up Strategy' long after they knew or should have known it was a failure," (*id.* at ¶ 61(f), ¶ 65(f), ¶ 74(f)); seventh, "fail[ed] to timely retain restructuring advisors in order to fully inform themselves of their duties and to take steps necessary and appropriate to maximize the value of the Company for its creditors," (*id.* at ¶ 61(i), ¶ 65(i), ¶ 74(i)); and eighth, "wast[ed] corporate assets," (*id.* at ¶ 61(j), ¶ 65(j), ¶ 74(j)). Again, the claims against the directors, the officers, and the Carlyle Defendants are discussed in turn.

### i. *Directors*

Directors must "inform themselves ... of all material information available to them [and] ... must then act with requisite care in the discharge of their duties." *Aronson,* 473 A.2d at 812. The duty of care claims [FN12] must be dismissed, however, because the IT Group's Certificate of Incorporation contains an exculpation provision that states:

> FN12. To the extent that these allegations relate to the payments to insiders or to the deliberate, artificial extension of the IT Group's life during insolvency to recoup the

Carlyle Defendants' investments, they are really duty of loyalty claims and have already been discussed, Section IV.B.1.a. Read in the light most favorable to Plaintiff, the remaining duty of care claims allege, in parts (b)-(d), (f), and (j), poor decision-making concerning the Roll-Up acquisitions, and, in parts (a), (e), and (i), a failure to make informed decisions about the Roll-Up Strategy and the accompanying debt.

**\*11** A director of this Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such limitation of liability is prohibited by the Delaware General Corporation Law as the same exists or may hereafter be amended.

(D.I. 39 at A-0028.) This provision was adopted pursuant to § 102(b)(7) of Delaware's General Corporation Law, 8 *Del.Code* § 102(b)(7), which provides:

> [T]he certificate of incorporation may ... contain ... (7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

The exculpatory provisions of § 102(b)(7) apply to claims brought by creditors of an insolvent corporation. *Prod. Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 793-95 (Del. Ch.2004). Once the § 102(b)(7) provision is raised against duty of care claims, that is "the end of the case." *Malpiede v. Townson,* 780 A.2d 1075, 1095 (Del.2001).[FN13]

> FN13. The Third Circuit declined to address an exculpatory charter provision in *Tower Air,* because the provision was raised for the first time on appeal. 416 F.3d at 242. The Delaware Supreme Court held in reviewing a 12(b)(6) motion that, while a § 102(b)(7) clause provides an affirmative defense, "proving the existence of a valid exculpatory provision ... entitles directors to dismissal of any claims ... against them that are based

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

solely on alleged breaches of the board's duty of care." *Malpiede v. Townson,* 780 A.2d 1075, 1095-96 n. 71 (Del.2001).

Thus, while the duty of loyalty claims are unaffected, the directors are protected by § 102(b)(7) against liability for breaching the duty of care. Counts I and II against the directors, to the extent that those counts allege breaches of the duty of care, must therefore be dismissed.

### ii. *Officers*

Again, Counts I and II allege that the IT Group's officers breached their fiduciary duties, based on the same allegations that were made against the directors. And again, the Complaint alleges nothing about defendant Soose other than his residence and position with the Company. (*See* Complaint, D.I. 30 at ¶ 13.) Because he is not alleged to have taken part in the decisions that form the basis of Plaintiff's complaint, the duty of care claims against Soose in Counts I and II must be dismissed. Therefore, these two counts are dismissed in their entirety as to Soose.

As discussed above, Section IV.B.1.a.ii, defendant DeLuca was a director and an officer. (*See id.* at ¶ 12.) Again, since no allegations are made against DeLuca based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above. Section IV.B.1.b.i.[FN14]

> FN14. Even if the Complaint alleged a breach of the duty of care by DeLuca in his capacity as officer, which it does not, such an allegation, like the duty of care allegations against the Carlyle Defendants, would fail to overcome the business judgment rule. *See infra* Section IV.B.1.b.iii.

### iii. *Carlyle Defendants*

In Count IV, Plaintiff alleges that the Carlyle Defendants have committed the same breaches of fiduciary duties as have the directors and officers, the duties of the Carlyle Defendants arising from control over the IT Group directors. As I noted in the discussion about the directors' alleged breaches, *supra* Section IV.B.1.b.i, these allegations against the Carlyle Defendants, read in the light most favorable to Plaintiff, concern poor decision-making about the

Roll-Up acquisitions, and a failure to make informed decisions about the Roll-Up Strategy and the accompanying debt. Again, to the extent that these claims are made concerning the payments to insiders or concerning the deliberate, artificial extension of the IT Group's life during insolvency to recoup the Carlyle Defendants' investments, they are really duty of loyalty claims and have already been discussed, *supra* Section IV .B.1.a.iii. The remaining claims, therefore, center on the failed Roll-Up strategy.

*12 While the § 102(b)(7) charter provision protects only directors from duty of care claims, to the extent that Plaintiff is seeking to hold the Carlyle Defendants responsible for those alleged breaches, the Complaint fails to state a claim. Plaintiff is not required to plead detailed facts, but must still "plead around the business judgment rule." *Tower Air,* 416 F.3d at 238. Thus, even at the pleading stage, if facts alleged in a complaint show "an ostensibly legitimate business purpose for an allegedly egregious decision," then the complaint fails to state a claim for which relief can be granted. *Id.* at 239.

Here, Plaintiff alleges that the Roll-Up Strategy was implemented "to grow the company by acquiring companies engaged in the same or similar lines of business." (Complaint, D.I. 30 at ¶ 32.) Further, while the IT Group's debt increased during this time, the Roll-Up Strategy increased revenues from approximately $360 million in 1997 to approximately $1.4 billion in 2000. (*Id.* at ¶ 44.) While the strategy "did not provide the Company with the desired benefits," (*id.* at ¶ 48), the fact that the strategy was implemented to achieve benefits for the Company shows that it had a legitimate business purpose. Thus, the Complaint is "self-defeating," *see Tower Air,* 416 F.3d at 239 ("[A] complaint is self-defeating when it states an ostensibly legitimate business purpose for an allegedly egregious decision."), to the extent that it claims that implementing the Roll-Up Strategy was a breach of the duty of care. Even if the strategy was unwise in retrospect, it is protected in this case by the presumptions of the business judgment rule.

Therefore, to the extent that Count IV alleges that the Carlyle Defendants breached their duty of care, it fails to state a claim and is dismissed.

### 2. *Count III-Waste of Corporate Assets*

In Count III, Plaintiff alleges that the directors and officers have wasted corporate assets through the same actions that are alleged to constitute breaches of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

their fiduciary duties. (Complaint, D.I. 30 at ¶ 69(a)-(h).) For a transaction to amount to waste, it must be "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *In re Walt Disney Co. Derivative Litig.,* 731 A.2d 342, 362 (Del. Ch.1998).

### a. Directors

Because Plaintiff's allegations of waste mirror those concerning breach of fiduciary duties, they concern two sets of transactions. The first set of transactions involves payments made to some of the Defendants, including the Carlyle Defendants. Defendants argue that the pleadings are insufficient. As discussed above, *supra* Section IV.B.1.a.i, the Complaint sufficiently alleges that payments were made to the Carlyle Defendants in violation of the directors' duties of loyalty, and the Company is alleged to have received no consideration in return for those multimillion dollar payments. Thus, for claims of waste based on those payments, Defendants have not shown that Count III fails to state a claim.

\*13 However, as discussed *supra* Section IV.B.1.a.i, the Complaint fails to state a claim for breach of fiduciary duty based on payments made to individual defendants. Since Count III provides no additional information, the Complaint similarly fails to state a claim for waste based on those payments.

The second set of transactions involves the Roll-Up acquisitions, for which the IT Group allegedly received inadequate consideration. While those acquisitions may appear unwise in retrospect, they do not raise a duty of loyalty question, and so, like the duty of care claims in Counts I and II, the § 102(b)(7) provision protects the directors from liability for those transactions. *See Green v. Phillips,* C.A. No. 14436, 1996 WL 342093, at \*6-\*7 (Del. Ch. June 19, 1996) (holding that a § 102(b)(7) provision protected directors from corporate waste claims based on transactions that did not "bring the directors' loyalty and good faith into question").

Therefore, the claims of corporate waste against the directors based on the payments to the Carlyle Defendants (Complaint, D.I. 30 at ¶ 69(f)-(g)) survive the Defendants' 12(b)(6) motion, while the other claims of corporate waste (*id.* at ¶ 69(a)-(e), (h)) must be dismissed.

### b. Officers

The allegations in Count III mirror those in Counts I and II. And just as Counts I and II make no allegations against defendant Soose, *see supra* Sections IV.B.1.a.ii, IV.B.1.b.ii, Count III likewise makes none, and that count against Soose will be dismissed as well.

Again, since no allegations are made against DeLuca based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.2.a.

### 3. Count V-Aiding and Abetting Claim Against the Carlyle Defendants

In Count V, Plaintiff alleges that the Carlyle Defendants aided and abetted the other Defendants' breaches of fiduciary duties. To succeed in this claim, Plaintiff must show: "(1) the existence of a fiduciary relationship; (2) a breach of that relationship; and (3) knowing participation by the defendant in the fiduciary's breach." *Crescent/Mach I Partners, L.P. v. Turner,* 846 A.2d 963, 989 (Del. Ch.2000). While the parties agree that a fiduciary relationship existed between the IT Group directors and officers and the Company, Defendants argue that Plaintiff has failed to allege a breach or the knowing participation in that breach by the Carlyle Defendants. As with the duty of loyalty claims already discussed, Defendants' argument fails.

First, as discussed above, Section IV.B.1.a.i, Plaintiff has adequately alleged a breach of the duty of loyalty by the IT Group directors concerning the payments made to the Carlyle Defendants and artificially extending the life of the IT Group to keep those payments going. Second, again as earlier discussed, Section IV.B.1.a .iii, the allegations of the Carlyle Defendants' actual control of the IT Group board are sufficient to survive the 12(b)(6) motion, and knowing participation could be inferred from that alleged control. Thus, contrary to Defendants' argument, Plaintiff has alleged a breach and the knowing participation in the breach by the Carlyle Defendants, and so Count V adequately alleges that the Carlyle Defendants aided and abetted the directors' breach of their duty of loyalty. By contrast, the duty of care claims in Counts I and II cannot succeed, *see supra* Sections IV.B.1.b.i-ii, and so to the extent that Count V alleges aiding and abetting of

Not Reported in F.Supp.2d                                                                 Page 14
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

those supposed breaches, it too must be dismissed.

### 4. *Count VI-Avoidance Claims Under 11 U.S.C. § 547*

*14 In Count VI, Plaintiff sets out payments made to Gibson, Pogue, Harvey, Pugliese, Schmidt, Watkins, and the Carlyle Defendants that the Plaintiff seeks to avoid as preferential transfers pursuant to 11 U.S.C. § 547(b), 550. The Complaint lists specific amounts transferred to the mentioned individual Defendants and $2,076,000 transferred to the Carlyle Defendants. (D.I. 30 at ¶¶ 82-88.) The Complaint further alleges that the payments were made within one year of the bankruptcy petition date (*id.* at ¶ 81) to creditors (*id.* at ¶ 89) who are also insiders (*id.* at ¶ 90), that the payments were made on account of antecedent debt (*id.* at ¶ 92), were made while the IT Group was insolvent (*id.* at ¶ 93), and enabled the listed Defendants to receive more than they would in the circumstances set forth in 11 U.S.C. § 547(b)(5) (*id.* at ¶ 94). Defendants argue that those allegations, which mostly mirror the statutory language in § 547(b), are insufficient and that Count VI must be dismissed.

Defendants base their argument on pleading requirements set out in *TWA, Inc. v. Marsh USA Inc. (In re TWA Inc.),* 305 B.R. 228, 232 (Bankr.D.Del.2004), and *Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.),* 288 B.R. 189, 192 (Bankr.D.Del.2003). Those cases instruct that, "to survive a motion to dismiss," a complaint must include: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer." *TWA,* 305 B.R. at 232; *Valley Media,* 288 B.R. at 192. Because such information is lacking in the present Complaint, in which the only specific information is the amounts transferred, Defendants conclude that the pleading is inadequate. Further, according to Defendants, the listing of the payment made to the Carlyle Defendants as a group rather than to each individual entity reduces to guesswork any effort to understand which payments were made to whom.

The pleading standard described in *TWA* and *Valley Media* has sometimes been viewed as inconsistent with the liberal pleading requirements of Federal Rule of Civil Procedure 8. *See Official Comm. of Unsecured Creditors of The IT Group v. Brandywine Apartments (In re The IT Group, Inc.),* 313 B.R. 370,

373 (Bankr.D.Del.2004); *Neilson v. Southern (In re Webvan Group, Inc.),* Adv. Proc. No. 03-54365, 2004 WL 483580, at *2 (Bankr.D.Del. Mar. 9, 2004). It has been rightly observed that, "[w]hile plaintiffs should be encouraged to provide specific information in support of their claims whenever possible, to require them to do so in their initial pleading in all cases ... [is] inappropriate and unnecessarily harsh." *IT Group,* 313 B.R. at 373. Even though the information listed in *TWA* will eventually need to be proved, "it does not follow that it must be pleaded on pain of dismissal." [FN15] *Id.* (quoting *Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs., Inc.),* 290 B.R. 55, 65 (Bankr.S.D.N.Y.2003)).

> FN15. Notably, in *TWA,* the court gave the plaintiff leave to amend and agreed that the articulated standard might need to be relaxed in that case to allow the plaintiff to pursue details in discovery. 305 B.R. at 233-34.

*15 Here, Plaintiff has described specific amounts paid to specific Defendants in the Complaint (D.I. 30 at ¶¶ 82-88), providing more information than did the complaint discussed in *TWA, see* 305 B.R. at 232 ("Within 90 days prior to the Petition Date, Marsh received payments from Debtors of approximately two million dollars."). Also, even though the Carlyle Defendants are grouped together as receiving a payment of $2,076,000 (D.I. 30 at ¶ 88), the information is sufficient to give the Defendants notice of the basis of the avoidance claim, given the relationship alleged between the Carlyle Defendants. That is all that Rule 8 requires. *Conley,* 355 U.S. at 47.

Accordingly, I decline to hold the Complaint to the pleading standard set forth in *TWA* and *Valley Media.* Count VI is sufficient to withstand the motion to dismiss.

### 5. *Counts VII and VIII-Fraudulent Transfer Claims*

In Count VII, Plaintiff alleges that the dividend payments made to the Carlyle Defendants were constructively fraudulent transfers that Plaintiff can recover pursuant to 11 U.S.C. §§ 544 and 548. In Count VIII, Plaintiff alleges that both the dividend payments in Count VII and the payments described in Count VI were actual fraudulent conveyances in violation of 11 U.S.C. § 544 and the Delaware Uniform Fraudulent Transfer Act. Defendants attack

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

both the sufficiency of the pleadings and their timeliness.

First, Defendants argue that Count VII fails to give fair notice of the basis for alleging a violation of § 544. According to Defendants, the claim (1) lists payments made to the Carlyle Defendants as a group rather than individually; (2) fails to specify the relevant state law; (3) fails to specify an "actual creditor" as required by § 544(b); and (4) fails to disclose how the IT Group received less than reasonably equivalent value or fair consideration for those payments.

Reading the Complaint in the light most favorable to Plaintiff, these arguments must fail. First, because the payments were dividends associated with the Carlyle Defendants' preferred stock, grouping the payments together does not force the Defendants to guess about which payments are described or who received them. Second, when read with the allegations in Count VIII, the relevant state law is identified as that of Delaware. Third, "for purposes of Rule 12(b)(6), courts do not generally require a trustee to plead the existence of an unsecured creditor by name." *Pardo v. Avanti Corporate Helath Sys., Inc. (In re APF Co.)*, 274 B.R. 634, 639 (Bankr.D.Del.2001). In any case. Plaintiff represents the interests of the unsecured creditors that are beneficiaries of the Litigation Trust. Finally, as discussed above concerning the corporate waste claims, Plaintiff alleges that the IT Group received no consideration for those payments. Thus, Defendants are given fair notice of the basis of the § 544 claim in Count VII.

Next, Defendants argue that the § 548 claim of Count VII is untimely because it seeks to recover payments made more than one year prior to the bankruptcy petition date. The Bankruptcy Code allows the trustee to "avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the [debtor's] petition." 11 U.S.C. § 548(a)(1). The IT Group filed its petition on January 16, 2002, so any transfers made before January 16, 2001 are outside the scope of § 548. Therefore, the § 548 claim for the dividends paid from 1998 to 2000 must be dismissed (*see* Complaint, D.I. 30 at ¶¶ 99-102), while the claim for payments made on or after January 16, 2001 (*see id.* at ¶ 103) may continue.

*16 As to Count VIII, Defendants argue that the claims for fraudulent conveyances are untimely to the extent that they seek to recover transfers made before January 28, 2001. Delaware's Uniform Fraudulent Transfer Act provides that:
A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought ... within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant.

6 Del.Code § 1309(1). Since the Complaint was filed on January 28, 2005, Defendants argue that any claim for a payment made prior to January 28, 2001 is extinguished. But Plaintiff correctly points out that there is a factual issue concerning when the payments were or could reasonably have been discovered. Therefore, dismissal is inappropriate at the pleading stage.

Accordingly, Counts VII and VIII survive this 12(b)(6) motion, except for the § 548 claims under Count VII for payments made prior to January 16, 2001, which must be dismissed.

### 6. Count IX-Unlawful Payment of Dividends Claim

In Count IX, Plaintiff alleges that the directors violated § 174 of the Delaware General Corporation Law, 8 Del.Code § 174, by paying dividends to the Carlyle Defendants from 1998 to 2001 while the IT Group was insolvent. See *EBS Litig. LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 305 (3d Cir.2002) ("[I]f the stock dividend occurred when [the company] was insolvent, or rendered [it] insolvent, it was illegal under Delaware law."). Defendants argue that the pleadings insufficiently allege both the IT Group's insolvency during the time when the dividends were paid and the directors' knowledge of the insolvency. However, those arguments are not well-founded. The Complaint alleges that the IT Group was insolvent or in the vicinity of insolvency as early as March 1998. (D.I. 30 at ¶ 47.) Further, the booked goodwill associated with the Roll-Up acquisitions is alleged to have inflated the IT Group's assets. (*Id.* at ¶ 41.) Finally, Defendants are alleged to have artificially extended the life of the insolvent IT Group in order to keep making payments to the Carlyle Defendants (*id.* at ¶ 61, ¶ 65, ¶ 69, ¶ 74), which is relevant for both the allegations of insolvency and of the directors' knowledge. Again, Defendants have notice of the basis of Plaintiff's claims, and Count IX therefore survives the 12(b)(6) motion.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

V. CONCLUSION

Accordingly, I will deny the Motion to Dismiss for Lack of Subject Matter Jurisdiction. I will grant the Motion to Dismiss for Failure to State a Claim as to the following:
(1) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of care, waste of corporate assets for actions in violation of the duty of care, and aiding and abetting violations of the duty of care;
*17 (2) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of loyalty, waste of corporate assets, and aiding and abetting violations of the duty of loyalty based on the payments to individual defendants listed in Count VI;
(3) Counts I, II, and III to the extent that they are brought against Defendant Soose;
(4) Count VII to the extent that payments made prior to January 16, 2001 are sought to be recovered under 11 U.S.C. § 548.

I will deny the Motion to Dismiss for Failure to State a Claim in all other respects. An appropriate order will issue.

D.Del.,2005.
In re IT Group Inc.
Not Reported in F.Supp.2d, 2005 WL 3050611 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1435863 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Renewed Motion of Defendants Carlyle International Partners II, L.P., Carlyle International Partners III, L.P., C/S International Partners, Carlyle-It International Partners, L.P., Carlyle-It International Partners II, L.P ., and Richard W. Pogue to Dismiss for Lack of Personal Jurisdiction (Apr. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 1199858 (Trial Pleading) Answer and Affirmative Defenses of Defendants the Carlyle Group, Carlyle Partners II, L.P., Carlyle Sbc Partners II, L.P., Carlyle Investment Group, L.P., Carlyle-It Partners, L.P. and T.C. Group, LLC (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 1199859 (Trial Pleading) Answer and Affirmative Defenses of Defendant D'Aniello (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 1199860 (Trial Pleading) Answer and Affirmative Defenses of Defendant Dolan (Mar. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 1199861 (Trial Pleading) Answer and Affirmative Defenses of Defendant Gibson (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 1199862 (Trial Pleading) Answer and Affirmative Defenses of Defendant Harvey (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 1199863 (Trial Pleading) Answer and Affirmative Defenses of Defendant McGill (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 1199864 (Trial Pleading) Answer and Affirmative Defenses of Defendant Pugliese (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 1199865 (Trial Pleading) Answer and Affirmative Defenses of Defendant Schmidt (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 1199866 (Trial Pleading) Answer and Affirmative Defenses of Defendant Watkins (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 1199857 (Trial Pleading) Answer and Affirmative Defenses of Defendant Anthony J. Deluca to the First Amended Complaint (Mar. 7, 2006) Original Image of this Document (PDF)
• 2006 WL 535685 (Trial Motion, Memorandum and Affidavit) Defendant Harry J. Soose. Jr.s Opposition to Plaintiff's Motion for Leave to File A Second Amended Complaint (Feb. 06, 2006)
• 2006 WL 535681 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Opposition to Defendants' Joint Motion for Reconsideration and Defendants' Petition for Certification of Issues of Law to the Supreme Court of Delaware (Jan. 10, 2006)
• 2006 WL 535682 (Trial Pleading) (Proposed) Second Amended Complaint with Jury Demand Endorsed Hereon (Jan. 10, 2006)
• 2006 WL 535684 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion for Leave to File a Second Amended Complaint (Jan. 10, 2006)
• 2005 WL 2603838 (Trial Motion, Memorandum and Affidavit) Reply Brief of Appellant State of New Jersey, Department of Environmental Protection (2005) Original Image of this Document (PDF)
• 1:04cv01268 (Docket) (Sep. 15, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Westlaw.

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

C

Khanna v. McMinnDel.Ch.,2006.Only the Westlaw
citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Dhruv KHANNA, derivatively and on behalf of all those similarly
situated, Plaintiffs,
v.
Charles MCMINN, Daniel Lynch, Frank Marshall,
Richard Shapero, Robert Hawk, Robert E. Knowling,
Jr., Debra Dunn, Hellene Runtagh, Larry Irving,
Charles Hoffman, L. Dale Crandall, Richard A.
Jalkut, and Crosspoint Venture Partners, L.P.,
Defendants,
andCOVAD COMMUNICATIONS GROUP, INC., a
Delaware corporation, Nominal Defendant.
No. Civ.A. 20545-NC.

Submitted Nov. 7, 2005.
Decided May 9, 2006.

Stuart M. Grant, Jay W. Eisenhofer, Michael J.
Barry, and Cynthia A. Calder, of Grant & Eisenhofer,
P.A., Wilmington, Delaware; Mark C. Gardy, and Jill
Abrams, of Abbey Gardy LLP, New York, New
York; and Curtis V. Trinko, of The Law Office of
Curtis V. Trinko, LLP, New York, New York, for
Plaintiffs.
Alan J. Stone, Natalie J. Haskins, and Jason A.
Cincilla, of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware; Douglas M. Schwab,
Norman J. Blears, Robin E. Wechkin, and Kristi K.
Hansen, of Heller Ehrman White & McAuliffe LLP,
Menlo Park, California, for Defendants Charles
McMinn, Daniel Lynch, Frank Marshall, Rich
Shapero, Robert Hawk, Robert E. Knowling, Jr.,
Debra Dunn, Hellene Runtagh, Larry Irving, Charles
Hoffman, L. Dale Crandall, and Richard A. Jalkut.
David C. McBride, Danielle Gibbs, and Adam W.
Poff, of Young Conaway Stargatt & Taylor, LLP,
Wilmington, Delaware; Steven M. Schatz, Terry T.
Johnson, and Clayton Basser-Wall, of Wilson Sonsini
Goodrich & Rosati, P.C., Palo Alto, California, for
Defendant Crosspoint Venture Partners, L.P.
Jesse A. Finkelstein, Lisa Zwally Brown, and
Candice Toll Aaron, of Richards, Layton & Finger,
P.A., Wilmington, Delaware; Paul H. Dawes, Darius
Ogloza, Jacqueline D. Molnar, and David M.

Friedman, of Latham & Watkins LLP, Menlo Park,
California, for Nominal Defendant Covad
Communications Group, Inc.

MEMORANDUM OPINION AND ORDER
NOBLE, Vice Chancellor.
*1 Plaintiff Dhruv Khanna ("Khanna") is a cofounder
and shareholder of Nominal Defendant Covad
Communications Group, Inc. ("Covad") and served
as its General Counsel and Executive Vice President
from its formation in 1996 until June 2002 when he
was removed from these positions amidst charges of
sexual impropriety. On September 15, 2003, he
brought this action, both derivatively and as a class
action, to challenge acts and omissions of Covad's
board while he was Covad's General Counsel and to
contest certain omissions and misrepresentations
which he alleges impaired the accuracy of Covad's
proxy statements issued in advance of shareholders'
meetings.[FN1] On August 3, 2004, Sybil Meisel and
Patrick Sams, also Covad shareholders, joined him as
representative plaintiffs with the filing of the
Amended Derivative and Class Action Complaint
(the "Amended Complaint").

> FN1. Khanna, on August 11, 2003, also filed
> an action, under 8 Del .C. § 220, to compel
> Covad to grant him access to certain of its
> books and records. See Khanna v. Covad
> Commc'n Group, Inc., 2004 WL 187274
> (Del. Ch. Jan. 23, 2004). For convenience,
> exhibits produced at the § 220 trial are
> identified as "JTX," and the transcript of
> that trial is referred to as "Trial Tr."

The Individual Defendants are current and former
directors of Covad. Also named as a defendant is
Crosspoint Venture Partners, L.P. ("Crosspoint"), a
venture capital firm closely connected to some of
Covad's directors, a former investor in Covad, and
the principal beneficiary of some of the actions which
the Plaintiffs challenge. The Plaintiffs seek to impose
liability on Crosspoint under principles of fiduciary
duty for certain conduct when it was a large
shareholder of Covad and under notions of aiding and
abetting and respondent superior.

The Defendants, as one would expect, have moved to
dismiss the Amended Complaint under Court of
Chancery Rule 23.1 because pre-suit demand upon

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

the board was not excused and under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Not so typically, the Defendants have also moved to dismiss because, they contend, (1) Khanna did, in fact, make demand upon Covad's board through a letter transmitted shortly after he was terminated and (2) Khanna is not qualified to act as a representative plaintiff in this action because of his former role as General Counsel of Covad and because of the mixed motives prompting the filing of this action-not only as a shareholder, but as a disgruntled former employee. In addition, the Defendants seek dismissal of Meisel and Sams as representative plaintiffs because they are alleged to have been "tainted" by their association with Khanna. Finally, the parties quarrel over the confidential treatment to be given to certain of Khanna's allegations. This dispute requires resolution of opposing motions relating to maintaining the Amended Complaint under seal.

## I. FACTS [FN2]

> FN2. The "facts" are drawn primarily from the "well-pleaded" allegations of the Amended Complaint. Some "facts" are taken from documents (or portions thereof) incorporated into the Amended Complaint. Finally, for the debates over disqualification and confidential treatment of portions of the record, the Court looks to a broader range of sources.

Covad, a service provider of broadband internet and network access using digital subscriber line (DSL) technology, is a Delaware corporation headquartered in San Jose, California. It filed for bankruptcy in August 2001 and departed from that jurisdiction in December 2001.

### A. The Plaintiffs' Challenges-A Brief Overview

In the Amended Complaint, the Plaintiffs seek redress for six matters (other than disclosure claims) allegedly resulting from breaches of fiduciary duties by various Covad Directors: (1) allowing the vesting of Defendant Charles McMinn's ("McMinn") founders' shares in Covad even though he had not satisfied the requirements for vesting; (2) permitting McMinn and Defendant Rich Shapero ("Shapero"), with Crosspoint, to develop Certive, Inc. ("Certive"), a competitor of Covad; (3) Covad's subsequent

investment in Certive; (4) Covad's acquisition of BlueStar Communications Group, Inc. ("BlueStar"), an act that rescued a failing investment of Crosspoint and was the principal cause of Covad's entry into bankruptcy; (5) the BlueStar earn-out settlement; and (6) Covad's investment in DishnetDSL ("Dishnet"), an entity with which McMinn was involved, and the payments Covad made to end that relationship. Crosspoint is alleged to be liable for the adverse consequences of some of those fiduciary failures either directly, as a controlling shareholder, or as an aider and abettor and under the doctrine of *respondeat superior.*

*2 Additionally, Khanna, in correspondence with Covad's Board, shortly after his termination, made numerous allegations of wrongdoing against members of Covad's Board. The Plaintiffs contest the sufficiency of Covad's proxy statements in 2002, 2003, and 2004 principally because, it is alleged, the charges Khanna made against Covad's Board were not fully disclosed to the shareholders who could have used the information in determining how to vote for directors standing for reelection to the Board.

### B. Covad's Board of Directors

When this action was filed, Covad's Board consisted of eight directors.

#### 1. Charles McMinn

McMinn is a founder of Covad and Chairman of its Board of Directors. He has been on the Board-with the exception of an approximately one-year absence from November 1999 to late-October 2000-since October 1996. He was the company's Chief Executive Officer and President from October 1996 to July 1998.

McMinn is also a founder of Certive, which was incorporated in July 1999, and was Certive's Chief Executive Officer from November 1999 to October 2000. McMinn served as a director of BlueStar until Covad acquired it. He is also a member of Dishnet's board.

#### 2. Robert Hawk

Hawk has been a member of Covad's Board since April 1998. Hawk is a "Special Limited Partner" of Crosspoint.[FN3] It is alleged that "through Crosspoint

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 3

and directly, Hawk has owned a substantial equity interest in BlueStar." [FN4] Through Crosspoint, Hawk owned 12% of Diamond Lane (which paid $52 million to Covad for services rendered in 1998 and 1999) and a "significant" stake in Efficient Technologies, both of which are Covad vendors. Additionally, Hawk is alleged to have "joined the [Covad] board as a result of his friendship, connections and/or business affiliations with Defendants Shapero and/or McMinn." [FN5]

FN3. Amended Compl. at ¶ 12.

FN4. Id.

FN5. Id.

### 3. Charles Hoffman

Since June 2001, Hoffman has been a director, President, and Chief Executive Officer of Covad. It is alleged that he was recruited by McMinn and "immediately forged a close relationship with defendant McMinn," [FN6] whom he regards as his boss. Hoffman receives various benefits from Covad, including a $500,000 salary, a $375,000 annual bonus, a $100,000 signing bonus, term life insurance, and stock options.[FN7]

FN6. Id. at ¶ 17.

FN7. Id. at ¶ 138.

### 4. Larry Irving

Irving has served as a member of Covad's Board since April 2000. In the Amended Complaint, the Plaintiffs identify various instances in which Irving joined other Covad directors in making, what the Plaintiffs consider, egregious decisions.[FN8]

FN8. These decisions include allowing Shapero to sit on the boards of Covad competitors, allowing Hawk to maintain his investment in BlueStar, granting Hoffman an overly generous compensation package, allowing McMinn to serve on the Covad and Dishnet boards while the two companies were in litigation, and retaliating against Khanna when he objected to the Board's improper conduct. Id. at ¶ 139.

### 5. Richard A. Jalkut

Jalkut was appointed to the Covad Board on July 18, 2002. He is the President and Chief Executive Officer of TelePacific, Inc., a Covad reseller.

### 6. Daniel Lynch

Lynch has been a member of the Covad Board since April 1997. Lynch is a member of the Board of Advisors of Certive,[FN9] appointed soon after Covad's investment in Certive. He is also a long-time friend of McMinn. The two own homes in the same neighborhood and neighboring wineries in St. Helena, Napa. [FN10]

FN9. The Amended Complaint fails to develop sufficiently, for particularized pleading purposes, the nature of Certive's Board of Advisors. It may be that appointment to this position carried significant remunerative benefits, but the Plaintiffs' conclusory pleadings in this respect fail to set forth the detail necessary to satisfy Court of Chancery Rule 23.1.

FN10. Amended Compl. at ¶ 9.

### 7. L. Dale Crandall

*3 Crandall was appointed to the Covad Board on June 20, 2002. He also sits on the board of BEA Systems ("BEA"), a company that supplies Covad with software and related support.[FN11] Covad paid in excess of $2.2 million to BEA in 2004.

FN11. Calder Decl., Ex. E, at 4. These facts are drawn from Covad's 2004 Proxy Statement. Although one may doubt whether this aspect of Covad's 2004 Proxy Statement was incorporated into the Amended Complaint, this information is not outcome-determinative.

### 8. Hellene Runtagh

Runtagh has been a member of the Covad Board of Directors since November 1999. "She became a director with the consent and approval of the McMinn-Shapero director appointees. Defendant Runtagh derived the benefits of being and remaining on the Board of Directors of, and receiving

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

compensation from, Covad by supporting and favoring the self-dealing of other directors in the BlueStar and Dishnet Transactions." [FN12]

> FN12. Amended Compl. at ¶ 15.

### C. Former Covad Board Members

A brief review of the following former Covad directors is important to understanding, as the Plaintiffs tell the story, the "incestuous" nature of Covad's Board, as well as the transactions challenged by the Plaintiffs.

### 1. Frank Marshall

Marshall served on Covad's Board from October 1997 to December 2002 and was Covad's interim chief executive officer from November 2000 until June 2001. He also serves on Certive's Board of Advisors. He has been a partner in Sequoia Capital ("Sequoia"), a venture capital firm, which invested with Crosspoint. He is a director of NetScreen Technologies, a Covad vendor that received $33,000 from Covad in 2001. Defendant Marshall is alleged to be a longtime friend of McMinn.

### 2. Rich Shapero

Shapero served on the Covad Board-as Crosspoint's designee-from July 1997 to May 2002 and on the Covad compensation committee.

Shapero is the Managing Partner, as well as a General Partner, of Crosspoint. Crosspoint had stakes in various entities associated with Covad, such as Certive, BlueStar, Diamond Lane, and Efficient Technologies, another Covad vendor. Shapero was also a member of the boards of BlueStar and NewEdge Networks ("NewEdge").

### 3. Robert E. Knowling, Jr.

Knowling was Covad's Chief Executive Officer and a member of Covad's Board from July 1998 until November 1, 2000. He also served as Chairman of the Board from September 1999 until his departure from Covad in November 2000. Knowling is a former colleague of Hawk, with whom he worked at "US West Communications, Inc. and/or its affiliates." [FN13] Covad's stock price began its "steep descent in

the [s]pring of 2000" [FN14] on Knowling's watch.

> FN13. Amended Compl. at ¶ 13.

> FN14. Id.

### 4. Debra Dunn

Dunn served on the Covad Board from April 2000 to October 2000. She is a senior executive at Hewlett-Packard. Dunn was recruited to join the Covad Board through Knowling, who served on Hewlett-Packard's Board of Directors.

### D. Crosspoint and Other Relationships

Crosspoint is a "venture capital firm that invests in early stage companies in two strategic areas: (a) Virtual Service Providers and E-Business Services; and (b) Broadband Infrastructure." [FN15] Crosspoint had invested in Covad, Certive, BlueStar, and NewEdge and also "owned a significant stake in Diamond Lane and Efficient Technologies, both of which were Covad vendors." [FN16] In addition, Crosspoint "co-invested in one or more companies alongside" Sequoia, with which Marshall is affiliated. [FN17] As noted, Shapero serves as Crosspoint's General and Managing Partner, and Hawk is a Special Limited Partner. Crosspoint "cashed out" its investment in Covad in "1999-2000." [FN18]

> FN15. Id. at ¶ 18.

> FN16. Id. NewEdge is a "provider of dedicated internet access for businesses and communications carriers...." Id. at ¶ 11. Diamond Lane is "a Covad vendor who Covad paid $52 million for services rendered in 1998 and 1999." Id.

> FN17. Id. at ¶ 18.

> FN18. Id.

### E. The Plaintiffs' Challenges

### 1. The Certive Claims [FN19]

> FN19. Although referred to, for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 5
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

convenience, as the "Certive Claims," there are three separate aspects: (1) the vesting of McMinn's "founders' shares" (Count I); (2) the usurpation by McMinn of Covad's business opportunity with respect to the activities of Certive (Count II); and (3) the decision of Covad's Board to invest in Certive (Count III).

*4 The Plaintiffs allege that the events surrounding Covad's investment in Certive reflect a pattern of self-dealing by McMinn and Crosspoint and that various supine Covad directors were rewarded with lucrative positions in exchange for their support.

Covad went public in January 1999. McMinn was no longer chief executive officer, but needed to remain a full-time employee of Covad until November 2000 for his founders' shares to vest fully. While employed at Covad, McMinn began looking for other investment opportunities. He wrote to Knowling, then-chief executive officer of Covad: "The taking of board seats [with Crosspoint affiliates] and coming up with ideas that Crosspoint and I could invest in is what [C]rosspoint wanted me to do and what I thought we had agreed to with me helping them." [FN20] He justified his involvement with other companies by contending that "these would be deals that Covad would benefit from [and] that Covad may or may not want to invest in/partner with." [FN21] Knowling, although concerned about the example that McMinn's behavior would set for other Covad employees, eventually acquiesced: "You are the founder and exceptions can be made to make anything work." [FN22] Thus, McMinn received his "founders' shares" despite the fact that he did not remain with Covad on a full-time basis until November 2000. This special treatment was not reported to Covad's shareholders.

FN20. *Id.* at ¶ 43.

FN21. *Id.* at ¶ 44.

FN22. *Id.* at ¶ 46.

One of the opportunities that McMinn was pursuing involved Certive, a privately-held provider of computerized data integration services. Certive's website, as of mid-2002, explained that Certive was "developing a full-service e-business network to provide live support and systems to entrepreneurs over a broadband connection...." [FN23] McMinn was a founder of Certive, which was incorporated in July 1999 when McMinn was a full-time employee of

Covad. Crosspoint and McMinn held substantial stakes in Certive. McMinn received 1,333,333 founders' shares of Certive and invested $1 million for an additional 666,667 Series A Preferred Shares. Crosspoint received 3 million Series A Preferred shares for an investment of $4.5 million.

FN23. *Id.* at ¶ 47.

Certive is alleged to have been in Covad's "line of business." [FN24] Covad was not offered the opportunity to invest in Certive's Series A Preferred round of financing.

FN24. *Id.* at ¶ 153.

On September 22, 1999, the Covad Board blessed McMinn's involvement and investment in Certive *ex post.* This blessing came two months after McMinn had founded Certive and one month after McMinn and Crosspoint had invested in Certive's Series A Preferred shares. Covad's Board decided that "the company would not be interested in pursuing an investment in [Certive] on the terms and conditions offered to McMinn and Crosspoint." [FN25] At this meeting, the Covad Board also adopted a "corporate opportunity policy" which forbade, without prior approval, a fiduciary of Covad to sit on the board of, or invest in, a company in competition with Covad.

FN25. *Id.* at ¶ 55.

*5 Nineteen days later, however, Covad invested in Certive's Series B-1 Preferred round of financing. Covad paid $5 million for 1,111,111 Series B-1 Preferred shares (approximately $4.50 per share). Additionally, Covad signed a Shareholders' Rights Agreement that bound Covad to vote its shares in favor of Crosspoint and McMinn's designees on the Certive Board. Hawk, Lynch, Marshall, and Knowling participated in the Covad Board's deliberations and vote.

After Covad's investment in Certive, Lynch and Marshall were invited to serve on Certive's Board of Advisers. "[Advisory board] positions are highly sought after and potentially lucrative as advisory board members in Silicon Valley companies are given stock options which during the 1990s became a source of great wealth for many people." [FN26]

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 6

FN26. *Id.* at ¶ 56.

### 2. *The BlueStar Transactions*

For convenience, Covad's involvement with BlueStar may be viewed as two separate, although closely related, transactions: (1) the BlueStar acquisition, and (2) the BlueStar earn-out settlement.

#### a. *BlueStar Acquisition*

On June 16, 2000, Covad announced that it had entered into a merger agreement with BlueStar. BlueStar sold DSL services directly to retail customers. From mid-1999 on, Crosspoint owned more than 40% of BlueStar's outstanding shares. McMinn and Hawk "owned a substantial number of preferred shares." [FN27] Shapero and McMinn sat on the BlueStar board.

FN27. *Id.* at ¶ 58.

"By mid-2000, BlueStar had incurred significant debt and liabilities and was losing millions of dollars every month. Its efforts to raise money through an initial public offering of stock were unsuccessful and it (and its major investor, Crosspoint) needed a bail-out." [FN28] Shapero lobbied Knowling for Covad to acquire BlueStar, and Covad eventually succumbed. A fairness opinion prepared by BlueStar's financial advisor for the transaction reported, "The management of [BlueStar] ... informed us that [BlueStar], as of June 14, 2000, expected to exhaust its liquidity in the near term and did not have a financing source for funding its anticipated operating and capital needs over the following 12 months ." [FN29] In addition to BlueStar's fiscal problems, senior Covad management opposed the transaction: "BlueStar's entire business was built on a feet-on-the-street direct sales model already tried and rejected by Covad." [FN30] The merger is alleged to have been "fraught with self-dealing because of the interlocking and conflicting relationships between the Covad and BlueStar boards." [FN31]

FN28. *Id.* at ¶ 61.

FN29. *Id.* at ¶ 63.

FN30. *Id.* at ¶ 69.

FN31. *Id.* at ¶ 71.

On September 22, 2000, Covad completed the BlueStar acquisition by issuing approximately 6.1 million shares of Covad common stock to BlueStar shareholders under an exchange ratio that enabled BlueStar preferred and common shareholders to receive an average price of $14 .23 per share of Bluestar. Additionally, BlueStar's stock options and warrants were converted into approximately 255,000 Covad shares at a fair value of $6.55 per share. The total consideration Covad paid was valued at, at least, $200 million.[FN32] Knowling, Marshall, Lynch, Dunn, and Runtagh approved the BlueStar acquisition.

FN32. *Id.* at ¶ 73.

*6 The acquisition immediately appeared to be a failure as, the day after the merger was announced, Covad's shares dropped 27%. On June 25, 2001, within a year after the merger, Covad announced it was shutting down the BlueStar network and laying off more than 400 employees.

#### b. *BlueStar Earn-Out Settlement*

In addition to the consideration paid at the time of the merger, BlueStar shareholders were entitled to receive up to 5,000,000 additional Covad common shares at the end of 2001 if BlueStar achieved certain revenue and EBITDA goals. "Despite BlueStar's utterly dismal performance and failure to even approach, let alone reach, its EBITDA targets, in April 2001 Covad reached an agreement with BlueStar representatives, negotiated by Lynch, whereby BlueStar stockholders were given 3,250,000 of the 5,000,000 shares, in exchange for a release of all claims against [Covad]...." [FN33] Lynch negotiated this settlement without final BlueStar accounting results and even though the former BlueStar shareholders were not entitled to any payments until the end of 2001. At the same time that Lynch's negotiations were taking place, Marshall "was sending emails to the Covad Board calling the BlueStar acquisition 'a very costly mistake, probably the worst mistake I have ever seen a company make.' ' " [FN34] No corporate record was kept of the negotiations. The BlueStar earn-out settlement cost Covad $100 million, to the substantial benefit of Crosspoint, Shapero, McMinn, and Hawk (who collectively received almost half of the 3,250,000 shares from the earn-out settlement).[FN35] Covad reported that McMinn, Hawk, and Shapero did not participate in the meetings concerning the review and

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

approval of the BlueStar earn-out settlement.[FN36] Marshall, Lynch, Runtagh, and Irving participated in the BlueStar earn-out settlement deliberations and vote.

FN33. *Id.* at ¶ 74.

FN34. *Id.*

FN35. *Id.* at ¶ 78.

FN36. *See* Amended Compl. at ¶ 80 ("In fact, [Covad] has publicly stated that McMinn, Hawk and Shapero did not participate in the meetings concerning the 'review and approval' of the [BlueStar earn-out settlement]."); *see also* Stone Aff., Ex. E at 121 (Covad's 10-K for fiscal year ending December 2000).

### 3. *The Dishnet Transaction*

McMinn sat on the Board of Directors of Dishnet and held options to purchase shares of that company. Dishnet is a privately held telecommunications company that provides DSL and dial-up access in India.

On February 15, 2001, Covad-through a wholly owned subsidiary-purchased 2,000,000 shares of Dishnet for $22,980,000. In addition to the subscription agreement, Dishnet entered into an agreement with Covad to license Covad's proprietary operational support system for use in India. The business relationship soon deteriorated.

In October 2001, Dishnet filed a proof of claim in Bankruptcy Court against Covad asserting damages in excess of $24 million. Covad attempted to exercise its $23 million put option in Dishnet. As a result of these actions, McMinn was simultaneously sitting on the boards of two companies engaged in a substantial legal dispute.

Covad and Dishnet resolved their dispute. Among the terms of the settlement were (1) the sale of Covad's investment in Dishnet for $3 million, (2) resolution of Dishnet's claims against Covad, and (3) the relinquishment of Covad's put option in Dishnet.

### F. *Proxy Disclosures and Khanna's Letter to Covad's Board*

\*7 The Plaintiffs allege that Khanna protested against the transactions discussed above on the grounds that they were compromised by self-dealing and otherwise lacked substantive business purpose. Covad's Board then "vowed to remove Khanna so he would not be an obstacle to their self-dealing." [FN37] Khanna was accused of sexual harassment, removed as General Counsel, and placed on administrative leave in June 2002.

FN37. Amended Compl. at ¶ 110.

On June 10, 2002, Covad issued its 2002 Proxy Statement. The annual meeting of Covad shareholders was scheduled for July 25, 2002. On June 19, 2002, after he was relieved of his duties, Khanna (through his attorney) sent a letter to Covad's Board "outlining among other things, the breaches of fiduciary duty alleged against the Board in [the Amended Complaint], including the Board's conduct in the Certive, BlueStar, and Dishnet transactions." [FN38] Khanna contends that this was not a demand on the Board; "[r]ather, it was a last-ditch attempt on his part to get the slim minority of directors who did not have direct interests in these transactions to do something to seek a remedy for the corporation." [FN39]

FN38. *Id.* at ¶ 122.

FN39. *Id.* at ¶ 123. The letter, which may be considered as incorporated into the Amended Complaint, was part of the record in the § 220 action as JTX 123. *See, e.g.,* Amended Compl. at ¶ 3.

Although Khanna's charges were broadly directed at alleged fiduciary breaches by the Covad Board-breaches which, if as alleged, would have affected all public shareholders adversely-the response sought by Khanna was unique to him and provided no direct benefit to the other shareholders. Khanna attempted to extract the following terms:
1. Mr. Khanna shall be allowed to join the Covad Board of Directors, as Vice Chairman, with a not less than 15-year contract, ... he shall be responsible for overall conflict of interest compliance.
2. Mr. Khanna shall be given a role as Executive Vice President for Corporate Strategy reporting directly to the CEO, which shall include the following areas: Public Advocacy Strategy, including legal and related PR strategy, press release review, and second (second to the CEO) public spokesperson (without any impairment to the CFO's role as head of

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Investor Relations); Legal Strategy, including Litigation Initiation and Settlement Strategy; New and Existing Product Implementation Strategy; ILEC Restructuring Strategy; and related strategies.

3. He will retain the responsibility of being Covad's chief representative at trade associations....

4. He will remain on all pre-existing e-mail mailing lists and will join any applicable new ones.

5. He will be compensated at all times not less than a comparable officer that serves as both an officer and as a director. He shall not be terminated or investigated for any reason other than fraud or illegal conduct during the 15-year period.

6. Covad will make a statement to the legal department, corporate officers and members of the Board clearing Mr. Khanna of any and all violations of law and stating that he has been subjected to two separate investigations and has been cleared of any ethical or integrity violations as well....

*8 7. Mr. Khanna will have five individuals reporting to him on a solid line basis ..., and his administrative support person ..., plus a minimum of four individuals reporting to him on a dotted line basis.... [FN40]

FN40. JTX 123.

On July 9, 2002, shortly after his letter to Covad's Board, Khanna sent a draft fiduciary duty complaint. His implicit threat: if the Board did not accede to his selfish wishes, a derivative and class action complaint would be brought, purportedly for the benefit of all shareholders.

Covad's Board formed a committee, consisting of directors Runtagh and Crandall, to investigate Khanna's allegations; the committee was not initially given any power to act independently of the Covad Board. Additionally, Crandall was given the authority to act alone on behalf of the committee if his opinion differed from that of Runtagh. Although Khanna was not aware of it, at some point Jalkut became a member of the committee. On September 20, 2002, the Board gave the committee authority to determine whether or not to bring a suit based on Khanna's allegations of wrongdoing.

In October 2002, the committee concluded that the company should not pursue litigation based on the Certive matters. [FN41] The Amended Complaint charges that only disclosures Covad's Board made of Khanna's allegations and the subsequent investigations into those allegations were in its March

2003 10-K, its May 2003 10-Q, and its 2004 Proxy Statement. [FN42] Both of Covad's 2003 disclosures were essentially the same; its March 2003 10-K recited:

FN41. *Id.* at ¶ 129. It is unclear from the Amended Complaint when the committee decided not to pursue claims based on the other transactions of which Khanna complained. It does allege that the committee "informed Khanna that [it] believed his allegations were without merit" on December 26, 2002. *Id.* at ¶ 133.

FN42. *Id.* at ¶¶ 204, 213. Paragraph 213 of the Amended Complaint contradicts Paragraph 204 by alleging that the disclosures were in the 2003 Proxy Statement. Additionally, Paragraph 133 of the Amended Complaint alleges that the "only public disclosure" of Khanna's allegations and the investigation occurred in Covad's March 2003 10-K; however, the Amended Complaint explains in other paragraphs that disclosures were made at least in the May 2003 10-Q and the 2004 Proxy Statement. *See id.* at ¶¶ 204, 213.

In June 2002, Dhruv Khanna was relieved of his duties as our General Counsel and Secretary. Shortly thereafter, Mr. Khanna alleged that, over a period of years, certain current and former directors and officers had breached their fiduciary duties to the Company by engaging in or approving actions that constituted waste and self-dealing, that certain current and former directors and officers had provided false representations to our auditors and that he had been relieved of his duties in retaliation for his being a purported whistleblower and because of racial or national origin discrimination. He has threatened to file a shareholder derivative action against those current and former directors and officers, as well as a wrongful termination lawsuit. Mr. Khanna was placed on paid leave while his allegations were being investigated.

Our Board of Directors appointed a special investigative committee, which initially consisted of Mr. Crandall and Ms. Runtagh, to investigate the allegations made by Mr. Khanna. Mr. Jalkut was appointed to this committee shortly after he joined our Board of Directors. This committee retained an independent law firm to assist in its investigation. Based on this investigation, the committee concluded that Mr. Khanna's allegations were without merit and that it would not be in the best interest of the

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Company to commence litigation based on these allegations. The committee considered, among other things, that many of Mr. Khanna's allegations were not accurate, that certain allegations challenged business decisions lawfully made by management or the Board, that the transactions challenged by Mr. Khanna in which any director had an interest were approved by a majority of disinterested directors in accordance with Delaware law, that the challenged director and officer representations to the auditors were true and accurate, and that Mr. Khanna was not relieved of his duties as a result of retaliation for alleged whistleblowing or racial or national origin discrimination. Mr. Khanna has disputed the committee's work and the outcome of the investigation.

*9 After the committee's findings had been presented and analyzed, the Company concluded in January 2003 that it would not be appropriate to continue Mr. Khanna on paid leave status, and determined that there was no suitable role for him at the Company. Accordingly, he was terminated as an employee of the Company. While the Company believes the contentions of Mr. Khanna referred to above are without merit, and will be vigorously defended if brought, it is unable to predict the outcome of any potential lawsuit.[FN43]

FN43. *Id.* at ¶ 133.

No other public disclosure was made of Khanna's termination and the charges he made in his letter to the Board.

## II. CONTENTIONS

### A. *Derivative Fiduciary Duty Claims*

Count I of the Amended Complaint alleges breaches of fiduciary duty against McMinn, Shapero, Marshall, Lynch, Hawk, and Knowling for allowing McMinn's founders' shares to vest. The Defendants respond that the Plaintiffs' claim is time-barred and that this decision is protected by the business judgment rule.

Count II of the Amended Complaint charges McMinn, Shapero, and Crosspoint with breaching their fiduciary duties by usurping a Covad corporate opportunity in founding, and investing in Series A Preferred shares of, Certive. The Defendants argue

that this claim is time-barred, that it was properly rejected by a majority of disinterested and independent directors, and that the Plaintiffs have not properly alleged that pre-suit demand upon the Board would have been futile. Additionally, Crosspoint argues that this claim should be dismissed because the Plaintiffs do not sufficiently allege that Crosspoint owed fiduciary duties to Covad's shareholders.

Count III of the Amended Complaint alleges breaches of fiduciary duty by McMinn, Shapero, Hawk, Lynch, Marshall, and Knowling during Covad's acquisition of a substantial equity interest in Certive. The Plaintiffs assert that some of these directors were interested in the transaction and that the investment was detrimental to Covad's shareholders. The Plaintiffs contend that the investment constituted corporate waste. The Defendants respond that the Plaintiffs' claims surrounding the Certive investment are time-barred, that there was no breach of a duty of loyalty because the transaction was approved by a majority of disinterested and independent directors, that the Plaintiffs' claim for breach of fiduciary duty for failure to seek restitution for the Certive investment fails as a matter of law, and that pre-suit demand is not excused.

Count IV of the Amended Complaint asserts a claim against McMinn, Shapero, Hawk, Lynch, Marshall, Dunn, Knowling, Runtagh, and Irving for breaches of fiduciary duty with respect to the two BlueStar transactions (the acquisition and the earn-out settlement). The Defendants assert that this claim is time-barred and that the Plaintiffs have not shown that a majority of the directors who approved these transactions were interested or lacked independence.

Count V of the Amended Complaint alleges breaches of fiduciary duty by McMinn, Shapero, Hawk, Lynch, Marshall, Hoffman, Runtagh, and Irving for the Dishnet transaction. The Defendants contend that the Dishnet settlement was approved a majority of disinterested and independent directors.

*10 In addition, the Defendants assert that the Plaintiffs have failed to plead a proper claim for waste. Moreover, the Director Defendants have attempted to invoke the exculpatory provision adopted in Covad's Amended and Restated Certificate of Incorporation under 8 *Del.C.* § 102(b)(7), which would shield them from personal liability for money damages based on any breach of the duty of care.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Count VI of the Amended Complaint asserts a derivative claim against Crosspoint for aiding and abetting Covad's directors in breaching their fiduciary duties in the Certive and BlueStar transactions. Crosspoint argues that the Plaintiffs do not sufficiently plead an underlying breach of fiduciary duty (so there can be no secondary liability) and that the Plaintiffs failed to plead that Crosspoint knowingly participated in any breach of duty.

Count VII of the Amended Complaint seeks to set forth a claim against Crosspoint under the doctrine of *respondeat superior.* The Plaintiffs allege that Shapero and Hawk-acting as Crosspoint's agents-caused harm to Covad by orchestrating the Certive and BlueStar transactions. Crosspoint responds the Plaintiffs have failed to plead an underlying breach of fiduciary duty for the Certive and BlueStar transactions and that the Plaintiffs' *respondeat superior* claim fails as a matter of law.

### B. *Demand on the Board and Demand Futility*

The Defendants also contend that Khanna's letter to the Board was a demand on Covad's Board and the Plaintiffs have not set forth facts that show that the demand was wrongfully rejected. Furthermore, the Defendants contend that, even if Khanna did not make a demand on Covad's Board, the Plaintiffs have not set forth facts demonstrating that demand would have been futile and, thus, all derivative claims must be dismissed. The Plaintiffs respond that Khanna's letter to the Board was not a demand and that they have indeed pleaded facts showing that demand on Covad's Board would have been futile and, therefore, that demand should be excused.

### C. *Direct Claims for Breach of Fiduciary Duty with regard to Covad's 2002, 2003, and 2004 Proxy Statements* [FN44]

> FN44. The Plaintiffs do not allege that the board elections were contested.

Count VIII of the Amended Complaint is a direct claim against McMinn, Shapero, Hawk, Lynch, Marshall, Irving, Hoffman, and Runtagh for breaches of fiduciary duty resulting from material omissions in Covad's 2002 Proxy Statement. In 2002, McMinn, Hawk, and Hoffman were reelected to the Covad Board. The Plaintiffs allege that 2002 Proxy

Statement did not disclose certain information-*e.g.*, Khanna's June 19, 2002 letter to the Board, the Standstill Agreement,[FN45] the real reasons for Khanna's termination, that the BlueStar earn-out criteria had not been met, and that McMinn was working for Certive in 1999-and that these omissions were material to shareholders. The Defendants argue that the Plaintiffs' claim is barred by laches and that Covad satisfied its disclosure obligations.

> FN45. Covad and Khanna entered into the "Standstill Agreement" which allowed for "confidential settlement discussions" during the period of July 10, 2002 through July 23, 2002. *Id.* at ¶ 116. This period was subsequently extended through July 26, 2002. Under the Standstill Agreement, the parties agreed that "[d]uring the Negotiating Period, neither party shall take any actions to advance, or that will have the effect of advancing, its litigation position, and they shall diligently and vigorously focus their attention on resolving the disputes among them." *Id.*

Counts IX and X concern Covad's 2003 and 2004 Proxy Statements. In 2003, Lynch, Irving, and Jalkut were reelected to the Covad Board; and in 2004, Crandall and Runtagh were reelected. The Plaintiffs allege that certain information was either inadequately disclosed or entirely omitted-Khanna's June 19, 2002 letter, the real reasons for Khanna's termination from Covad, that the BlueStar earn-out criterion had not been met, and which transactions and directors Khanna was challenging-and that these omissions were material to shareholders. Again, the Defendants argue that the Plaintiffs' claims are barred by laches and that Covad satisfied its disclosure requirements.

### D. *Motion to Disqualify Plaintiffs*

\*11 Covad contends that Khanna must be disqualified as a representative plaintiff because (1) Khanna's ethical duties, as Covad's former General Counsel, prevent him from pursuing this litigation; (2) he is barred from pursuing litigation against his former client on matters with which he had a "substantial relationship"; (3) he participated, or at least acquiesced, in the challenged transactions; and (4) he has a personal agenda against the Defendants separate from Covad shareholders. Khanna denies all of these allegations. Additionally, Covad contends

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 11
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

that Sams and Meisel must be disqualified because they have been "tainted" by exposure to Khanna's privileged information and because they are not the "driving force" behind this litigation.

### E. *Motions to Strike Portions of the Amended Complaint-Motions to Seal/Unseal the Record*

Covad contends that Paragraphs 52, 54, 55, and 57 of the Amended Complaint should be stricken because they disclose privileged information in violation of Khanna's attorney-client duties. Khanna argues that these paragraphs should not be stricken because the information is public information gained from the § 220 proceeding and, with regard to paragraph 52, because Covad waived any privilege it may have had by introducing its facts as evidence at the § 220 trial.

Comparable arguments regarding privilege are made in the competing motions to seal and unseal the record.[FN46] In addition to the challenges presented above, Covad argues that Paragraphs 43, 44, and 74 of the Amended Complaint should remain sealed because they contain confidential and sensitive information.

FN46. Plaintiffs have moved to unseal the record, in addition to Covad's motion for continued sealing of portions of the record.

### III. DEMAND FUTILITY

The Plaintiffs seek to assert multiple derivative claims on behalf of Covad. The Court must first inquire as to whether demand was made on Covad's Board. If it was not, the Court must then determine whether demand is excused.

### A. *Legal Standard for Demand Futility*

"A shareholder's right to bring a derivative action does not arise until he has made a demand on the board of directors to institute such an action directly, such demand has been wrongfully refused, or until the shareholder has demonstrated, with particularity, the reasons why pre-suit demand would be futile."[FN47] This requirement, found in Court of Chancery Rule 23 .1,[FN48] arises from the fundamental principle that the board of directors manages the business and affairs of a corporation, including decisions of whether to bring suit on behalf of the corporation.[FN49] In order to bring a derivative claim, a plaintiff "must

overcome the powerful presumptions of the business judgment rule...."[FN50] Indeed, "[t]he key principle upon which this area of our jurisprudence is based is that the directors are entitled to a *presumption* that they were faithful to their fiduciary duties."[FN51] "By its very nature the derivative suit impinges on the managerial freedom of directors."[FN52] As a consequence, Court of Chancery Rule 23.1 imposes on a plaintiff a pleading burden that is "more onerous" than the burden a plaintiff must satisfy when confronted with a motion to dismiss under Court of Chancery Rule 12(b)(6).[FN53]

FN47. *Ash v. McCall,* 2000 WL 1370341, at *6 (Del. Ch. Sept. 15, 2000).

FN48. Ct. Ch. R. 23.1 ("The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.").

FN49. *See* 8 *Del.C.* § 141; *see also White v. Panic,* 793 A .2d 356, 363 (Del. Ch.2000), *aff'd,* 783 A.2d 543 (Del.2001).

FN50. *Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993). This Court has previously explained that
[t]he purpose for the demand requirement and concomitant heightened pleading standard is to "effectively distinguish between strike suits motivated by the hope of creating settlement leverage through the prospect of expensive and time-consuming litigation discovery and suits reflecting a reasonable apprehension of actionable director malfeasance that the sitting board cannot be expected to objectively pursue on the corporation's behalf."
*White,* 793 A.2d at 364 (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 9-2(b)(3)(i), at 554 (1998)); *see also Beam v. Stewart,* 845 A.2d 1040, 1050 (Del.2004).

FN51. *Beam,* 845 A.2d at 1050 (citing *Aronson v. Lewis,* 473 A .2d 805, 812 (Del.1984), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244, 254 (Del.2000)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN52. *Aronson,* 473 A.2d at 811. "The hurdle of proving demand futility also serves an important policy function of promoting internal resolution, as opposed to litigation, of corporate disputes and grants the corporation a degree of control over any litigation brought for its benefit." *Rattner v. Bidzos,* 2003 WL 22284323, at *7 (Del. Ch. Sep. 30, 2003) (citations omitted).

FN53. *Levine v. Smith,* 591 A.2d 194, 207 (Del.1991), *overruled on other grounds, Brehm,* 746 A.2d at 254.

*12 As this Court has previously explained, depending on the circumstances, inquiry into whether demand is excused proceeds under either *Aronson v. Lewis* [FN54] or *Rales v. Blasband.* [FN55]

FN54. 473 A.2d 805 (Del.1984).

FN55. 634 A.2d 927 (Del.1993).

Under the two-pronged *Aronson* test, demand will be excused if the derivative complaint pleads particularized facts creating a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." As the Supreme Court stated in *Rales* ..., however, there are three circumstances in which the *Aronson* standard will not be applied: "(1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where ... the decision being challenged was made by the board of a different corporation." In those situations, demand is excused only where "particularized factual allegations ... create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." [FN56]

FN56. *In re Bally's Grand Deriv. Litig.,* 1997 WL 305803, at *3 (Del. Ch. June 4, 1997) (footnotes omitted). See also the Court's discussion at Part III(C)(2), *infra,* addressing analysis of "substantial threat[s] of personal liability" for directors applicable under *Rales* in certain circumstances.

In other words, if the pleadings present particularized "facts sufficient to create a reasonable doubt that ... a majority of the directors are disinterested and independent," [FN57] then demand will be excused under either the test in *Rales* or the first prong of *Aronson.*

FN57. *White,* 793 A.2d at 364. The burden of demonstrating demand futility lies with the Plaintiffs. *See Aronson,* 473 A.2d at 812.

Disinterested "means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." [FN58]

FN58. *In re J.P. Morgan Chase & Co.,* 2005 WL 1076069, at *8 (Del. Ch. Apr. 29, 2005) (quoting *Aronson,* 473 A.2d at 812, 816), *aff'd,* 2006 WL 585606 (Del. Mar. 8, 2006); *see also Beam,* 845 A.2d at 1049; *Rales,* 634 A.2d at 936.

If, however, the Court's "review of the complaint reveals that it does not allege with particularity facts from which the court could reasonably conclude" that at least half "of the directors in office when the complaint was filed were disabled from impartially considering a demand," then the plaintiff's derivative claim will be dismissed-unless the second prong of *Aronson* applies and is satisfied.[FN59]

FN59. *Highland Legacy Ltd. v. Singer,* 2006 WL 741939, at *1 (Del. Ch. Mar. 17, 2006); *see also Beneville v. York,* 769 A.2d 80, 86 (Del. Ch.2000) (describing analysis where half of board compromised).

"At the motion to dismiss stage of the litigation, '[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences.' " ' [FN60] The Court "need not accept as true all allegations, nor must [it] draw all inferences from them in plaintiffs' favor unless they

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

are reasonable inferences."[FN61] Pleading with particularity is essential for a plaintiff to satisfy the requirements of demand excusal. Indeed, such "pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)."[FN62] The Court must, however, "accept as true all well-pled allegations of fact in the complaint, and all reasonable inferences from non-conclusory allegations contained in the complaint must be drawn in favor of the plaintiff."[FN63]

FN60. *White v. Panic,* 783 A.2d 543, 549 (Del.2001) (citations omitted); *see also Kahn v. Roberts,* 1994 WL 70118, at *5 (Del. Ch. Feb. 28, 1994) ("Conclusory allegations of domination and control, without particularized facts showing that an individual person or entity interested in the transaction controlled the board's vote on the transaction, are insufficient to excuse pre-suit demand.").

FN61. *White,* 783 A.2d at 549 (citation omitted).

FN62. *Brehm,* 746 A.2d at 254 ("What the pleader must set forth are particularized factual statements that are essential to the claim. Such facts are sometimes referred to as 'ultimate facts,' 'principal facts' or 'elemental facts.' " (citations omitted)).

FN63. *Rattner,* 2003 WL 22284323, at *7 (citing *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988), *overruled on other grounds, Brehm,* 746 A.2d at 254).

## B. *Khanna's Letter Was Not a Demand to Covad's Board*

*13 Before proceeding to demand futility analysis, the Court must first ascertain whether Khanna's letter of June 19, 2002, constituted a demand on the Covad Board. By making demand on a board of directors, a plaintiff concedes the disinterestedness and independence of that board.[FN64] It is then left to the board to determine whether to pursue litigation. A plaintiff's only recourse, in that circumstance, would be to demonstrate that demand was wrongfully rejected, but, as with any board decision, rejection of shareholder demand is afforded the presumptions of the business judgment rule.[FN65]

FN64. *See, e.g., Scattered Corp. v. Chicago Stock Exchange, Inc.,* 701 A.2d 70, 73 (Del.1997) (quoting *Levine,* 591 A.2d at 197-98).

FN65. *Id.*

In determining whether Khanna's June 19, 2002, letter to the Board was a demand, the Court cannot look for "magic words" establishing that a communication is a demand for purposes of Court of Chancery Rule 23.1.[FN66]

FN66. *See Yaw v. Talley,* 1994 WL 89019, at *7 (Del. Ch. Mar. 2 1994) ("There is no all-inclusive legal formula defining what types of communications will constitute a demand. That determination is essentially fact-driven.").

To constitute a demand, a communication must specifically state: (i) the identity of the alleged wrongdoers, (ii) the wrongdoing they allegedly perpetrated and the resultant injury to the corporation, and (iii) the legal action the shareholder wants the board to take on the corporation's behalf. Those elements are consistent with and derive from the policies underlying the demand requirement.[FN67]

FN67. *Id.*

The burden of demonstrating that a communication was a demand lies with the party alleging that the communication should be viewed as such.[FN68]

FN68. *See id.* ("Policy considerations require that the burden lie with the party asserting that a demand was made, and that ambiguous communications be construed against a finding of a demand.").

In this instance, the Defendants contend that the June 19, 2002, letter from Khanna's attorney[FN69] constituted a demand. The letter clearly meets the first two requirements of a demand: it identified the alleged wrongdoers and the harm they caused Covad. The issue, then, is whether the letter identified "the legal action the shareholder wants the board to take on the corporation's behalf."[FN70] Covad argues that the letter can be "fairly construed [to give] rise to the inference that Khanna was demanding the Board take

Not Reported in A.2d                                                                    Page 14
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

legal action on the corporation's behalf" [FN71] and cites, in particular, to various requests (or, in the Defendants' view, demands) made by Khanna in the letter, such as his reinstatement as General Counsel and his appointment to Covad's Board.[FN72]

> FN69. JTX 123.

> FN70. *Yaw,* 1994 WL 89019, at *7 (emphasis added).

> FN71. Reply Mem. in Supp. of Covad Commc'ns Group, Inc.'s Mot. to Dismiss Am. Deriv. & Class Action Compl. ("Covad Reply Br. to Dismiss") at 3.

> FN72. JTX 123, at 11-12.

Though it is not a question free from doubt, the Court rejects Defendants' argument for the following reasons. First, the Defendants bear the burden of establishing that demand was, in fact, made, and any ambiguity must be construed against a finding of demand. Second, the remedial actions sought by Khanna related to his removal as Covad's General Counsel and his future employment status at Covad. The relief would have been for his personal benefit; it would have accomplished little (or nothing) for the shareholders. The transactions challenged in this litigation are related, at most, tangentially to his termination dispute. In other words, the remedies Khanna sought in the letter addressed directly his claimed wrongful suspension and likely termination, and the letter cannot fairly be read as an attempt to seek a remedy for the challenged transactions for the good of Covad or its shareholders.[FN73]

> FN73. This question is complicated by transmission of a draft complaint. *See* Amended Compl. at ¶ 123; JTX 124. Although the transmission of a draft complaint, along with other communications, has been previously held not to constitute demand, *see Yaw,* 1994 WL 89019, at *6-*8, the aggregate here draws near the threshold of demand status.

*14 Covad points out language in the letter-for example, the threat to "light a legal fuse" [FN74]-that could be read as an expansive threat to seek a remedy for every wrong alleged in the letter and that the remedies Khanna sought, while inadequate to "make whole" the shareholders at large, nonetheless were

the remedies Khanna chose. A far more plausible reading of the letter, however, is that the remedies Khanna sought were, as the letter's opening sentence provides, "relat[ed] to his removal from the position of General Counsel of Covad." [FN75] Ambiguity of this sort must be resolved in favor of Khanna (*i.e.,* the party not seeking to show that the letter was a demand). Therefore, the Court concludes that Khanna's June 19, 2002, letter did not constitute demand upon the Covad Board.[FN76]

> FN74. JTX 123 at 12.

> FN75. *Id.* at 1.

> FN76. Covad also argues that the letter constituted demand because "[t]he Board did exactly what it was required to do upon receiving a pre-lawsuit demand" and notes that "Khanna was an active and willing participant in the investigation." Covad Reply Br. to Dismiss, at 4. Although this may be true, the Board's interpretation of what the letter represented does not control the Court's determination of whether it was a demand.

### C. *Plaintiffs' Failure to Allege with Particularity that the Covad Board was Interested or Lacked Independence*

The Court now turns to the question of whether at least half of the Covad Board was either interested or lacked independence when this action was filed. [FN77] The Court's demand-futility analysis here is somewhat complicated by the relatively long time-span during which the challenged transactions took place and by turnover in the membership of Covad's Board. A majority of Covad's Board changed after the events surrounding Counts II and III and, probably, Count I. Additionally, the Plaintiffs bring Count I (the vesting of McMinn's founders' shares) on the theory that it was result of board inaction-*i.e.,* that no business decision was made. The parties agree, therefore, that demand-futility with respect to the Certive Claims must be analyzed under *Rales.* [FN78] A majority of the Covad board has *not* changed, however, since the events surrounding Counts IV and V (*i.e.,* the "BlueStar Claims" and the "Dishnet Claims," respectively); therefore, the Court employs the two-prong standard of *Aronson* with respect to these claims.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN77. *See, e.g., Brehm,* 746 A.2d at 257; *see also Highland Legacy Ltd.,* 2006 WL 741939, at *4; *In re Nat'l Auto Credit, Inc. S'holders Litig.,* 2003 WL 139768, at *8 (Del. Ch. Jan. 10, 2003); *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 WL 31888343, at *10 (Del. Ch. Dec. 18, 2002); *In re Bally's Grand,* 1997 WL 305803, at *3. *Cf.* Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery, § 9-2[b], at 9-75 to -76, 9-78 (2005), (considering which "Board"-at the time of suit or the time of the transaction-must be evaluated under *Aronson* ).

FN78. *See Rales,* 634 A.2d at 934. With respect to Count I, the Amended Complaint fails to allege the date of the vesting of the disputed Covad shares: *Rales,* in one form or another, will control. *See, e.g.,* Pls.' Ans. Br. in Opp'n to Covad Commc'ns Group, Inc.'s Mot. to Dismiss Am. Deriv. & Class Action Compl. ("Pls.' Ans. Br. to Covad's Mot. to Dismiss") at 30; Covad Reply Br. to Dismiss at 9; Pls.' Ans. Br. in Opp'n to Dir. Defs. Mot. to Dismiss Am. Deriv. & Class Action Compl. ("Pls.' Ans. Br. to Dirs.' Mot. to Dismiss") at 31. *But cf. In re Bally's Grand,* 1997 WL 305803, at *3-*4 (declining to examine demand futility because complaint failed to identify directors on board at filing).

"Demand futility [will] be determined solely from the well-pled allegations of the Complaint." [FN79] This analysis is fact-intensive and proceeds director-by-director and transaction-by-transaction.[FN80] The Covad Board, at the time of filing of this action, consisted of eight directors: Irving, Jalkut, Lynch, Crandall, Runtagh, Hawk, Hoffman, and McMinn.[FN81] If the Court concludes that the Plaintiffs failed in their efforts to allege that at least four of the directors were not disinterested and independent for demand purposes, then the Court's analysis with respect to *Rales* and the first-prong of *Aronson* is at an end.

FN79. *In re Cooper Co., Inc.,* 2000 WL 1664167, at *5 (Del. Ch. Oct. 31, 2000).

FN80. *See, e.g., Beam,* 845 A.2d at 1051 (explaining that review occurs on a "case-by-case basis").

FN81. As explained below, consideration of Jalkut does not prejudice the Plaintiffs. *See* Part III(C)(5), *infra.*

As a preliminary matter, the Court notes that the Amended Complaint repeatedly sets forth certain generalized, conclusory allegations. In the interest of efficiency, the Court examines these now. Demand-futility jurisprudence often recites that certain allegations cannot "without more," or "standing alone," satisfy the particularized pleading requirements of Court of Chancery Rule 23.1. These conclusory allegations add no, or only *de minimis,* substance to the Court's demand-futility inquiry; they are to be distinguished from substantive allegations that are, by themselves, insufficient but, when viewed *in toto,* may push the analysis over the threshold of "reasonable doubt" and thereby excuse demand.

**\*15** First, the Plaintiffs repeatedly allege that the Covad Board is McMinn (and/or Shapero) "dominated," or some variant thereof.[FN82] Indeed, the Plaintiffs' theory as to why demand is excused appears, at times, to hinge largely on this characterization. The Plaintiffs have not, however, alleged that McMinn is a controlling shareholder, and, even if he were, "[t]here must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person." [FN83] Whether McMinn (or any other director) "dominates" the Covad Board is a question that must be resolved director-by-director, based on particularized allegations of fact. "Independence is a fact-specific determination made in the context of a particular case. The court must make that determination by answering the inquiries: independent from whom and independent for what purpose?" [FN84] Conclusory, across-the-board allegations of a lack of independence will not prevail; allegations of this type are akin to the "shorthand shibboleth" which this Court has long-rejected. [FN85]

FN82. *See, e.g.,* Amended Compl. at ¶¶ 32, 40, 138.

FN83. *Aronson,* 473 A.2d at 815; *see also Beam,* 845 A.2d at 1050.

FN84. *Beam,* 845 A.2d at 1049-50; *see also Highland Legacy, Ltd.,* 2006 WL 741939, at *5 ("There must be some alleged nexus

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

between the domination and the resulting personal benefit to the controlling party." (citing *Aronson*, 473 A.2d at 816)).

FN85. *See, e.g., Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *7; *see also* Wolfe & Pittenger, *supra* note 77, § 9-2[b], at 9-57, 9-69 to -72.

Second, the Amended Complaint repeatedly alleges that McMinn (or another director) "recruited" certain individuals to be Covad directors, that those individuals took their seats at McMinn's (or others') "behest," and that those individuals became directors with the other directors' "consent and approval." [FN86] Again, conclusory allegations of this nature do not advance the Court's inquiry; they will not "sterilize" a director's judgment with respect to demand.[FN87] "The proper focus is the care, skill and diligence used by the directors in making the challenged decision rather than upon the way in which the directors obtained their seats in the boardroom." [FN88] "Directors must be nominated and elected to the board in one fashion or another," [FN89] and to hold otherwise would unnecessarily subject the independence of many corporate directors to doubt. Conclusory allegations of this type do not cast suspicion on the independence of directors without additional facts demonstrating reason to view the nomination process askance. As a consequence, such allegations, "without more," are of little assistance in view of the requirement for particularity-and the "piling-on" of more and similar conclusory allegations will not sum to a reasonable doubt.

FN86. *See, e.g.,* Amended Compl. at ¶¶ 15-17.

FN87. *See Aronson,* 473 A.2d at 816. *See also White,* 793 A.2d at 366; *Benerofe v. Cha,* 1996 WL 535405, at *7 (Del. Ch. Sept. 12, 1996); *cf. In re W. Nat'l Corp. S'holders Litig.,* 2000 WL 710192, at *15 (Del. Ch. May 22, 2000) (applying summary judgment standard).

FN88. *Emerald Partners v. Berlin,* 1993 WL 545409, at *4 (Del. Ch. Dec. 23, 1993).

FN89. *In re W. Nat'l Corp.,* 2000 WL 710192, at *15.

Third, the Amended Complaint sets forth the repeated incantation that the directors' lack of

independence is demonstrated by their "pattern" of votes and "acquiescence" in permitting McMinn and others to benefit from self-dealing transactions.[FN90] The complaint fails either to explain, in most instances, how the directors' alleged acquiescence benefitted them (other than possibly as addressed in the next paragraph) [FN91] or to set forth particularized facts showing a pattern of votes (in addition to the few challenged transactions) from which the Court could draw a reasonable inference.[FN92]

FN90. *See* Amended Compl. at ¶¶ 14-16, 139.

FN91. *Cf. In re eBay, Inc. S'holders Litig.,* 2004 WL 253521, at *4-*5 (Del. Ch.2004).

FN92. *See, e.g., Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *7, *9; *Beam v. Stewart,* 833 A.2d 961, 981 (Del. Ch.2003), *aff'd,* 845 A.2d 1040 (Del.2004). *Cf. Brehm,* 746 A.2d at 257 n. 34.
Although there may be instances in which a director's voting history would be sufficient to negate a director's presumed independence, routine consensus cannot suffice to demonstrate disloyalty on the part of a director. To conclude otherwise would simply encourage staged disagreements and nonunanimous decisions for the sake of nonunanimous decisions in the boardroom.

*16 Fourth, the Amended Complaint alleges, repeatedly, that the directors "derived the benefit of being and remaining on the Board of Directors of, and receiving compensation from, Covad...." [FN93] The Plaintiffs then conclusorily allege that the price of these "benefits" was the directors' support for the "self-dealing" occurring at Covad.[FN94] As with the allegations described above, the mere fact that a director receives compensation for her service as a board member adds little or nothing to demand-futility analysis, "without more" [FN95]-i.e., unless the pleadings demonstrate, for example, that the status or compensation was somehow "material" to the director or otherwise outside the norm.

FN93. *See* Amended Compl. at ¶¶ 14-17.

FN94. *See id.*

FN95. *See, e.g., Grobow,* 539 A.2d at 188; *cf. Highland Legacy Ltd.,* 2006 WL 741939,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

at *5; _White_, 793 A.2d at 366 (addressing allegations involving normal fees and compensation).

Finally, the Amended Complaint sets forth numerous allegations of various social and business ties among members of the Covad Board.[FN96] With the exception of Lynch, however, as discussed in some detail below, the Plaintiffs' allegations amount to no more than the equivalent of a simple assertion that demand should be excused due to "structural bias." As explained in _Beam v. Stewart_,[FN97] "to render a director unable to consider demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." [FN98] The Court's analysis in _Beam_ was primarily directed at social relationships, but it also may inform the evaluation of allegations of business relationships, as well: "Whether they arise before board membership or later as a result of collegial relationships among the board of directors, such affinities-standing alone-will not render pre-suit demand futile." [FN99] Although not all allegations of past or present social or business relationships may be lumped in the category of allegations that provide no grist for the mill of demand-futility inquiry, the heightened strength of relationship required to find that a director's "discretion would be sterilized" renders allegations concerning most ordinary relationships of limited value, at most.[FN100]

FN96. _See_ Amended Compl. at ¶ ¶ 13-14.

FN97. 845 A.2d 1040 (Del.2004).

FN98. _Id._ at 1051.

FN99. _Id.; see also Jacobs v. Yang_, 2004 WL 1728521, at *5-*6, *7 (Del. Ch. Aug. 2, 2004), _aff'd_, 867 A.2d 902 (Del.2005) (Table) (citing _Orman v. Cullman_, 794 A.2d 5, 27 n. 33 (Del. Ch.2002) ("The naked assertion of previous business relationships is not enough to overcome the presumption of a director's independence.")); _Cal. Pub. Employees' Ret. Sys._, 2002 WL 31888343, at *9.

FN100. _See, e.g., Beam_, 845 A.2d at 1050-52; _see also_ Michael P. Dooley & E. Norman Veasey, _The Role of the Board in Derivative Litigation: Delaware Law and the Current ALI Proposals Compared_, 44 Bus. Law. 503, 534-35 (1989).

Having examined the repeated, conclusory allegations that comprise too much of the Amended Complaint, the Court now begins a director-by-director (and, as necessary, transaction-by-transaction) inquiry into the specific, substantive allegations of the Amended Complaint relevant to demand excusal.[FN101]

FN101. It should be noted that, in several instances during the course of analysis, the Court identifies facts that the Plaintiffs did not plead in their attempt to obtain demand excusal. This is not intended to set forth a requirement that each of the absent facts be pleaded in order that demand be excused; on the contrary, the Court's intent is only to point out facts that, if alleged, could significantly increase the likelihood of a finding of interestedness or lack of independence.

1. _Crandall_

The Amended Complaint, on its face, fails to create a reasonable doubt as to the disinterestedness or independence of Crandall. Crandall was only appointed to the Covad Board on June 20, 2002, after the challenged transactions took place.[FN102] While this does not, alone, make demonstration of potential interest or lack of independence impossible, it does make the Plaintiffs' burden more difficult. Indeed, the Amended Complaint may be read to concede Crandall's disinterestedness and independence. The complaint does not list Crandall as among the seven members of the Covad Board who are alleged either to be interested or lack independence.[FN103]

FN102. Amended Compl. at ¶ 19. Nowhere in the Amended Complaint is Crandall alleged to have been interested in any of the transactions in question.

FN103. _See_ Amended Compl. at ¶ ¶ 137, 140; _see also_ Ct. Ch. R. 23.1 (requiring that complaint "allege with particularity ... the reasons ... for not making [demand]").

*17 The Plaintiffs, in their answering brief, however, assert for the first time that Crandall's independence is compromised by his ties to BEA Systems, a Covad

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

(Cite as: Not Reported in A.2d)

vendor.[FN104] The Plaintiffs explain that Crandall is a member of the board of directors of BEA Systems, a supplier of software and related support that received in excess of $2.2 million in revenue from Covad in 2004. The Plaintiffs make no mention of BEA Systems in the Amended Complaint;[FN105] nevertheless, they now ask the Court to consider this information on the grounds that it is contained in Covad's 2004 Proxy, which is referenced in their brief with respect to the Plaintiffs' proxy disclosure claims.[FN106] Although the Court is skeptical that this constitutes a proper means of asserting by way of a *well-pleaded complaint* particularized facts within the meaning of Court of Chancery Rule 23.1,[FN107] the parties may refer to the substance of certain documents if those documents are "integral to plaintiffs' claims and incorporated in the complaint."[FN108] Here, the proxy statement was "integral" to the disclosure claims, not to assertions regarding Crandall's independence. To evaluate fully the Plaintiffs' claims, the Court will consider Crandall's ties to BEA Systems in analyzing his independence, as well.

FN104. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 34.

FN105. *See* Amended Compl. at ¶ 19.

FN106. *See* Calder Decl., Ex. E (Covad's 2004 Proxy Statement).

FN107. A plaintiff for whom demand will be excused should be capable of demonstrating demand futility by reference solely to the particularized facts alleged in the complaint. *Cf. Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d 726, 727-28 (Del.1988) ("When deciding a motion to dismiss for failure to make a demand under Chancery Rule 23.1 the record before the court must be restricted to the allegations of the complaint.").

FN108. *Saito v. McCall,* 2004 WL 3029876, at *1 n. 9 (Del. Ch. Dec. 20, 2004). *Cf. In re Gen. Motors (Hughes) S'holder Litig.,* 2006 WL 722198, at *3 (Del. Mar. 20, 2006) (describing extent to which a court may consider matters outside complaint on motion to dismiss under Rule 12(b)(6)).

Ultimately, the inquiry into independence turns in this instance on whether Covad's business

relationship with BEA Systems was material to BEA or to Crandall himself as a director of BEA.[FN109] The 2004 Proxy merely reports that Crandall is a member of the BEA Systems board of directors and the amounts Covad paid for the firm's products and services. These facts, standing alone, are insufficient to cast reasonable doubt on Crandall's independence for demand purposes.[FN110] The Court cannot discern whether the revenue from Covad is material to either BEA Systems or to Crandall because of his relationship with BEA Systems.[FN111] Neither the terms of BEA Systems' relationship with Covad (*e.g.,* whether the companies have entered into a long-term contract), nor particularized facts supporting the Plaintiffs' conclusory statement in their brief that BEA Systems' business with Covad could be "taken away" by McMinn and others, are provided.[FN113] Moreover, no allegation has been made that Crandall's responsibilities to BEA Systems include managing the firm's relationship with Covad; nor could the Court conclude that Crandall has a financial interest in BEA, other than possibly an unspecified director's salary, which might influence his decisions.[FN114] Put simply, even considering Crandall's ties to BEA Systems, the Plaintiffs have not alleged particularized facts sufficient to demonstrate that Crandall independent discretion would be compromised.[FN115]

FN109. *See, e.g., Jacobs,* 2004 WL 1728521, at *6.

FN110. *See id; see also Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *9.

FN111. *See Jacobs,* 2004 WL 1728521, at *6.

FN112. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 34.

FN113. These statements are too conclusory to demonstrate that particular interested Covad directors "have the authority or ability to cause [Covad] to terminate its relationships with the companies." *Jacobs,* 2004 WL 1728521, at *6.

FN114. *See id.*

FN115. *See id.* ("[T]he existence of contractual relationships with companies that directors are affiliated with potentially

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

makes the board's decision more difficult, 'but it does not sterilize the board's ability to decide.' ' (citation omitted)).

### 2. *Runtagh*

Similarly, the Plaintiffs fail to create a reasonable doubt as to Runtagh's disinterestedness and independence. The Plaintiffs' principal claim is that Runtagh lacks independence because "[s]he became a director with the consent and approval of the McMinn-Shapero director appointees" [FN116] and "derived the benefits of being and remaining on the Board of Directors of, and receiving compensation from, Covad by supporting and favoring the self-dealing of other directors in the BlueStar and Dishnet transactions." [FN117] As explained above, these bare allegations are insufficient to negate Runtagh's presumed independence.

FN116. Amended Compl. at ¶ 15.

FN117. *Id.* Similarly, the Court rejects the Plaintiffs' conclusory allegation that Runtagh "acquiesced knowingly in ... McMinn's breach of duty." *Id.* at ¶ ¶ 93, 139. *See Cal. Pub. Employees' Ret. Sys., 2002 WL 31888343, at *9* ("Our cases have determined that personal friendships, without more; outside business relationships, without more; *and approving of or acquiescing in the challenged transactions, without more,* are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment.") (emphasis added)).

*18 Interestingly, the Plaintiffs also allege that Runtagh has a "disabling interest" that was "acknowledged" by the Covad Board in its resolution creating the special committee to investigate the claims made by Khanna in his June 19, 2002 letter to the Covad Board.[FN118] The Plaintiffs quote the resolution, which provides: "Mr. Crandall shall have the authority to act alone in the event that, in his sole judgment, an alleged material conflict of interest arises with respect to Ms. Runtagh." [FN119] This short statement, however, cannot be construed as an admission that the Board, cannot satisfy demand-futility's pleading with particularity requirement, and does not permit a *reasonable* inference of interestedness or lack of independence.[FN120]

FN118. Amended Compl. at ¶ ¶ 125, 137. The Plaintiffs allege that "Defendant Runtagh ... has a disabling interest, which was acknowledged by defendants in their resolutions constituting the Committee." *Id.* at ¶ 137.

FN119. *Id.* at ¶ 125.

FN120. *See White,* 783 A.2d at 549 (The Court "need not blindly accept as true all allegations, nor must [it] draw all inferences from them in plaintiffs' favor unless they are reasonable inferences ." (citation omitted)).

Because Count I of the Amended Complaint (the vesting of McMinn's founders' shares) may be analyzed under *Rales* for having resulted from board inaction, one additional issue must be considered with respect to Runtagh's capacity to consider demand: whether she faces a "substantial likelihood" of personal liability resulting from the vesting of McMinn's shares.[FN121] As the Court in *David B. Shaev Profit Sharing Account v. Armstrong,*[FN122] explained: "Most notably in *In re Caremark Int'l Inc. Derivative Litigation,* and then in other cases ... this court has taken cognisance of allegations that the directors failed to act when they otherwise should have done so." [FN123] When analyzing demand futility under *Rales* where no board action was taken,[FN124] the Court looks not only to whether directors are disinterested and independent for demand purposes, but also to whether directors "face a substantial likelihood of personal liability, because doubt has been created as to whether their actions were products of a legitimate business judgment." [FN125] A "mere threat of personal liability," however, is insufficient in this context.[FN126]

FN121. As discussed below, the Court considers whether a director considering demand faces a "substantial threat" of personal liability arising from the alleged wrongful acts-with a finding of a "substantial threat" resulting in reasonable doubt as to the capacity of that director to consider demand. *See, e.g., David B. Shaev Profit Sharing Account v. Armstrong,* 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006); *Guttman,* 823 A.2d at 501. This analysis would perhaps apply equally, for example, in analyzing the disinterestedness of current directors who participated in the alleged wrongful conduct, *see Rales,* 634 A.2d at

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

936, even though a majority of board has "flipped." The confusion, here, lies in the fact that the Court cannot determine from the Amended Complaint whether Runtagh was a member of the Covad Board at the time the vesting challenged in Count I occurred-and, therefore, is unable to determine with confidence whether the *Rales* analysis proceeds under the first or second *Aronson* exception. *See Rales,* 634 A.2d at 934. As a consequence, the Court's analysis addresses both scenarios. The Court need not address these considerations for Board members other than Runtagh, however, because, with respect to Counts II and III, it is clear that a majority of the current Board members both did not participate in the underlying acts and have been determined otherwise to be disinterested and independent.

FN122. *Shaev,* 2006 WL 391931 (Del. Ch. Feb. 13, 2006).

FN123. *Id.* at *4 (citing *In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d 959 (Del. Ch.1996)).

FN124. *Compare supra* note 121.

FN125. *Id.* (citing *Guttman,* 823 A.2d at 501).

FN126. *See Rales,* 634 A.2d at 936 ("[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors ...." (quoting *Aronson,* 473 A .2d at 815)).

The Plaintiffs allege that a breach of duty occurred because, "under his Restricted Stock Purchase Agreement, McMinn needed to remain a full-time employee of Covad until November 2000 to fully vest in his founders' shares of [Covad]. If he did not maintain full-employment with the Company until all of his shares were vested, Covad had the right under the Restricted Stock Purchase Agreement to repurchase his unvested shares for mere pennies." [FN127] McMinn, however, determined that he wished to pursue other opportunities (namely, the formation of Certive), and informed Knowling by email, on May 3, 1999, that he would be pursuing investment opportunities with Crosspoint. [FN128] The Amended

Complaint further provides that, although McMinn "offered to leave Covad's employ altogether, but only if he could 'accelerate the vesting of the remaining 31% of [his] unvested Covad stock,' " an "exception" was made for his benefit. [FN129] "[U]nbeknownst to Covad's public shareholders, [McMinn] continued vesting his founders' shares, drew a full-time salary from Covad, and served as its Chairman of the Board...." [FN130] The complaint additionally alleges that Shapero, as General and Managing Partner of Crosspoint, was aware of McMinn's activities, and that it was "highly likely" that Hawk, as a Special Limited Partner of Crosspoint, knew, as well. [FN131] McMinn resigned as a Covad director on November 1, 1999, and did not rejoin the board until late October 2000.

FN127. Amended Compl. at ¶ 42.

FN128. *Id.* at ¶ 43.

FN129. *Id.* at ¶ 45.

FN130. *Id.*

FN131. *Id.* at ¶ 48.

*19 The Amended Complaint does not allege when McMinn's shares fully vested. It is this difficulty that potentially necessitates analysis of Runtagh's liability with respect to this claim. It perhaps can be said that two potential alternative conclusions may be reasonably inferred from the Plaintiffs' allegations: (1) that McMinn's shares were deemed vested when he resigned on November 1, 1999, or (2) that the exception for McMinn permitted his shares to vest fully as of November 2000. The Amended Complaint provides only that Runtagh joined the Covad board in "November 1999." [FN132] If it is the former, then it is unreasonable to conclude that Runtagh faced a "substantial likelihood" of personal liability for a vesting of shares that occurred, at most, only on her first day as director. In the event it is the latter, however, it is theoretically possible that Runtagh could face personal liability for the vesting such that she would be unable to consider demand with respect to this claim. In that case, analysis of Runtagh's potential liability under *Caremark* would be necessary.

FN132. *Id.* at ¶ 15. A third inference that may be drawn is that the vesting ended with the meeting of the Covad board on

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

September 22, 1999, at which the board "blessed" McMinn's founding of Certive, but also adopted a corporate opportunity policy "expressly requir[ing] the prior approval of the Board before a fiduciary of Covad could take a corporate opportunity for himself." *Id.* at ¶ 54.

Notwithstanding the above, the Court concludes that this potential aspect the Plaintiffs' vesting claim, however, is without merit for several reasons. The dilemma presented by the multiple alternative scenarios points to the foremost reason why the Court need not develop this analysis: the absence of alleged facts permitting the Court to determine whether vesting occurred throughout the relevant period fails to satisfy the particularity requirements of <u>Court of Chancery Rule 23.1.</u>[FN133]

> FN133. Indeed, the imprecise allegation that Runtagh joined that Covad board in "November 1999" only compounds the Court's difficulties. Also, the question of whether the Plaintiffs' claims are time-barred has been vigorously debated; that defense would further diminish the prospect of liability for Runtagh (who also is not named by the Plaintiffs as a defendant liable with respect to Count I). *See <u>Rales, 634 A.2d at 936</u>* (stating that a "mere threat of personal liability" is insufficient). Finally, the Plaintiffs have not argued that Runtagh is exposed to personal liability as the result of the vesting of McMinn's shares.

### 3. Irving

In setting forth their reasons for why Irving lacks independence, the Plaintiffs make conclusory allegations regarding Irving's voting history, that he became a director "with the consent and approval of the McMinn-Shapero nominees," and that he receives compensation as a Covad director.[FN134] Again, bare allegations of this nature are insufficient, separately or cumulatively, to negate Irving's independence.

> FN134. Amended Compl. at ¶¶ 16, 139.

First, the Plaintiffs allege that Irving "put[ ] the interests of the McMinn cronies ahead of Covad's...." This conclusory allegation, however, is essentially a repetition of the Plaintiffs' "acquiescence" arguments, which the Court has already rejected for being

insufficient to assist in meeting the particularized pleading requirements.[FN135] Second, the Plaintiffs' refrain that a particular director was appointed to the Covad Board "with the consent and approval of the McMinn-Shapero nominees" fails, without more. Finally, the Plaintiffs have failed to allege particularized facts demonstrating that the fees Irving receives as a director would somehow interfere with the exercise of his judgment; indeed, they have failed to enumerate even what these fees are. As a consequence, Irving's disinterestedness and independence are not subject to reasonable doubt on the basis of the facts plead.

> FN135. *See also <u>Cal. Pub. Employees' Ret. Sys., 2002 WL 31888343, at *9.</u>*

### 4. Lynch

The Plaintiffs have failed to satisfy their burden to present sufficient particularized facts to create a reasonable doubt as to the presumed disinterestedness and independence of Lynch. The Amended Complaint alleges that Lynch is a "long-time friend of McMinn." [FN136] Indeed, the Plaintiffs' allegations provide that their friendship is "so close" that they own both homes in the same neighborhood and "neighboring wineries." Certainly, according to these allegations, Lynch and McMinn are not strangers-indeed, they maybe fairly close-but allegations of this nature do not allow a reasonable inference that the exercise of a director's discretion and judgment is impaired. As alluded to above, "to render a director unable to consider demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." [FN137] This is true regardless of whether such ties arose as a consequence of the directors' board membership or whether they were pre-existing. [FN138] "Mere allegations that [the directors in question] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes." [FN139] In the context of pre-suit demand, "friendship must be accompanied by substantially more in the nature of *serious* allegations" supporting a reasonable doubt as to independence.[FN140] In other words, considering "the risks that directors would take by protecting their social acquaintances in the face of allegations that those friends engaged in misconduct," [FN141] the Plaintiffs have failed to create a reasonable doubt that Lynch "would be more

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 22

willing to risk his ... reputation than risk the relationship with the interested director." [FN142]

> FN136. Amended Compl. at ¶ 9.
>
> FN137. *Beam*, 845 A.2d at 1051; *see also Odyssey Partners, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 409 (Del. Ch.1999) ("That [directors] were neighbors or former neighbors is of no moment.").
>
> FN138. *See Beam*, 845 A.2d at 1051.
>
> FN139. *Id.* at 1051-52.
>
> FN140. *Id.* at 1052 (emphasis added); *see also id.* at 1050-51 (describing other instances in which reasonable doubt might arise).
>
> FN141. *Id.* at 1052.
>
> FN142. *Id.*

*20 Similarly, "the naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence." [FN143] In their Amended Complaint, the Plaintiffs again repeat their well-worn allegation that Lynch "derived the benefits of being and remaining on the Board ... of, and receiving compensation from, Covad ...;"[FN144] the Court has already explained its reasons for giving little weight to such allegations. The Amended Complaint, however, also asserts in this instance that Lynch has "derived" these "benefits" as a consequence of certain unspecified "business dealings" with Covad directors.[FN145] As discussed above, the sweeping absence of particularity, here, precludes a reasonable inference that Lynch's business dealings or relationships compromised his presumed independence.

> FN143. *Orman*, 794 A.2d at 27; *see also Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 980-81 (Del. Ch.2000).
>
> FN144. Amended Compl. at ¶ 9.
>
> FN145. *Id.*

Finally, the Plaintiffs allege that Lynch was rewarded for his support with membership on Certive's "Advisory Board," [FN146] and that fact demonstrates both his interestedness with respect to the Certive Claims, as well his lack of independence generally.[FN147] Though the question may be close, the Plaintiffs' argument, however, ultimately fails for lack of support with sufficiently particularized allegations. The Amended Complaint does not inform the Court what membership on the Certive "Advisory Board" actually entails. Although the Court cannot conclude with certainty from the face of the pleadings, it does not appear to refer to Certive's board of directors. [FN148] Moreover, although the Plaintiffs contend that the position is prestigious and lucrative,[FN149] the only allegation offered to support this assertion is that Certive's website describes the Advisory Board by stating that "many companies use Advisory Boards as window dressing[,] Certive believes they should be much more...." [FN150] Perhaps a certain level of prestige (at least from Certive's perspective) can be inferred from this statement, but that alone does not prove its materiality to Lynch.

> FN146. *Id.* at ¶ 56.
>
> FN147. *Id.* at ¶¶ 137, 138, 140.
>
> FN148. *See id.* at ¶ 56. The Amended Complaint quotes the Certive website as explaining: "[The Certive Advisory] Board meets quarterly and *provides insight that we actively use to run the business.* [Advisory] Board meetings are lively and protracted-one and a half days. And, everyone attends." *Id.* (emphasis added). These allegations appear to refer to a group of experienced, outside advisors who generally advise those actually managing the company's affairs. This demonstrates the Court's difficulty (and the need for compliance with the requirement of particularized pleading): the Court can only hazard a guess, based on the allegations-and, therefore, no inference doubting Lynch's presumed independence and disinterestedness can flow from this allegation.
>
> FN149. *Id.* ("These positions are highly sought after and potentially lucrative as advisory board members in Silicon Valley companies are given stock options which during the 1990s became a source of great wealth for many people.").
>
> FN150. *Id.*

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

[I]n the absence of self-dealing, it is not enough to establish the interest of a director by alleging that he received *any* benefit not equally shared by the stockholders. Such benefit must be alleged to be *material* to that director. Materiality means that the alleged benefit was significant enough *"in the context of the director's economic circumstances,* as to have made it improbable that the director could perform her fiduciary duties to the ... shareholders without being influenced by her overriding personal interest." [FN151]

FN151. *Orman,* 794 A.2d at 23 (footnotes omitted) (emphasis in original).

The allegations provided by the Plaintiffs clearly fail to meet the above-articulated standard: they set forth no particularized allegations of compensation actually received by Lynch in return for his Advisory Board service or as to whether such compensation would be material to a director in Lynch's position. Indeed, the Plaintiffs allege only that Certive "grant[ed] stock interests in Certive *and/or* provide[d] *some form* of compensation" to Lynch for his service on the Advisory Board. [FN152] These allegations fail to satisfy the materiality test described above, much less set forth particularized facts sufficient for the Court to conclude that Lynch was " 'beholden to [McMinn or Crosspoint] or so under their influence that [his] discretion would be sterilized." [FN153]

FN152. Amended Compl. at ¶ 56; *see also id.* at ¶¶ 137-38.

FN153. *Rales,* 634 A.2d at 936. Additionally, the Plaintiffs do not plead when Lynch received his appointment. The Plaintiffs offer no *particularized* facts demonstrating the necessary linkage between Lynch's appointment to the Certive Advisory Board and his relationship to McMinn. Perhaps the Court should infer this from the facts, but the Plaintiffs have also alleged that "Lynch is a private investor in a number of start-up companies in the Internet area." Amended Compl. at ¶ 33. Indeed, it is the relatively "incestuous" nature of Silicon Valley's business culture that appears to be at the heart of the Plaintiffs' suit; however, on the other hand, "cozy" business relationships of this nature are perhaps an almost inevitable by-product of a

highly-sophisticated growth industry reliant almost entirely on innovation and a narrow field of experienced entrepreneurial talent.

### 5. Jalkut

**\*21** The Plaintiffs dispute inclusion of Jalkut in the Court's demand futility analysis because they allege that his appointment to the Covad Board occurred in violation of the Standstill Agreement between Covad and Khanna, [FN154] which provided that the parties would "refrain from taking any action that could advance their respective positions." [FN155] Essentially, the Plaintiffs argue that Covad advanced its position in litigation by appointing Jalkut because it gave "the McMinn-tainted Board one more vote in their camp." [FN156] This argument begs the question, however, as the inquiry during demand futility analysis, in this context, is independence. Jalkut can only be viewed as a "vote in the McMinn camp" if he is not independent-and if he is not independent, then McMinn and his confederates gain no benefit from his presence. Thus, for demand futility purposes, it is appropriate to consider Jalkut because the inquiry into whether Covad advanced its litigation position by packing the Board (in violation of the Standstill Agreement) and inquiry into Jalkut's independence are substantially the same.

FN154. *See* Amended Compl. at ¶¶ 136, 138.

FN155. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 33 n. 13.

FN156. *Id.*

Moreover, because the Court concludes that Jalkut is disinterested and independent, the Court's decision to include or to exclude Jalkut from its demand futility analysis results in no detriment to the Plaintiffs. Exclusion of Jalkut from the Board members considered lowers the total number of directors on the Board for demand futility purposes to seven-therefore, since the Court has already concluded that four are disinterested and independent, analysis under the first prong of *Aronson* is at an end. On the other hand, if Jalkut is included in the Court's analysis, then the total number of directors is raised to eight, with five disinterested and independent directors required to preclude demand excusal under *Aronson'* s first prong. Jalkut, then, is that fifth director.

Assuming that Jalkut is to be included, the Court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

turns to analysis of his disinterestedness and independence. The Plaintiffs allege that, in addition to his seat on the Covad Board, Jalkut serves as chief executive officer of TelePacific, a Covad reseller (*i.e.*, a Covad retailer). Specifically, the Plaintiffs allege that "[a]s the CEO of a customer of Covad, Jalkut lacks the independence to fairly and impartially judge the actions of his fellow Board members." [FN157] As with Crandall, the Plaintiffs point to information available in the 2004 Proxy Statement (but not explicitly mentioned in the Amended Complaint) to support their claim. Indeed, the allegations in the Amended Complaint, standing alone, are exceedingly conclusory.

> FN157. Amended Compl. at ¶ ¶ 20, 138 ("Jalkut lacks independence from the McMinn-dominated Board because he is the CEO and president of one of Covad's customers, TelePacific.").

Assuming that the 2004 Proxy Statement may be considered for these purposes, [FN158] the Plaintiffs still fail to allege facts sufficient to create a reasonable doubt as to Jalkut's independence. Specifically, the Plaintiffs explain that Covad "recognized in excess of $1.3 million and $1.8 million in revenues from TelePacific [in 2002 and 2001], respectively." [FN159] The Plaintiffs contend that this "obviously" resulted in "many millions more in revenue" for TelePacific, on the theory that services purchased from Covad by TelePacifc were then sold to TelePacific customers at a mark-up. [FN160] Without particularized allegations of fact, however, there is nothing "obvious" about this argument. Without knowledge of the mark-up, one wonders if "many millions more" is even plausible. Moreover, although gross revenues are not unimportant, the critical information would be profits, something the Plaintiffs have not provided.

> FN158. This may not be a good assumption. *Compare Hughes, 2006 WL 722198, at *3* (holding that court may consider documents referred to in complaint "in some instances and for carefully limited purposes"). *See also supra* text accompanying note 108.

> FN159. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 33-34.

> FN160. *Id.*

*22 Moreover, there are no particularized facts

alleged adequately linking the business relationship between TelePacific and Covad with the claimed lack of independence of Jalkut. The Plaintiffs argue that TelePacific, as a customer of Covad, would not want to jeopardize the current pricing structure offered to TelePacific (as an increase in price has the potential to adversely affect TelePacific's profits). Arguments of this nature (*i.e.*, that a customer wants to avoid offending its supplier) must be considered with care. First, the Plaintiffs' contention assumes that the market for TelePacific's product is highly elastic and that, as a consequence, increases in cost will be absorbed by TelePacific, instead of passed on to the firm's customers. Although it may be reasonable to assume that some percentage of cost increases will be absorbed by a retailer, the amount (and therefore its materiality) may vary widely across firms and industries. The Plaintiffs argue that "Jalkut clearly does not want TelePacific to have to pay more for [Covad's] services," [FN161] which, though certainly a reasonable observation, is insufficient to lead to the broader inference that Jalkut's judgment has been sterilized as to the best interests of Covad shareholders. [FN162] Moreover, the Plaintiffs' allegations are insufficiently particularized to displace the notion that, in this context, if Covad unilaterally raised its prices relative to the market, TelePacific would purchase from another, lower-priced seller.

> FN161. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 33-34.

> FN162. *Cf. Jacobs, 2004 WL 1728521, at *5-*6.*

Additionally, as with Crandall and BEA Systems, the Plaintiffs make no allegations as to the terms of TelePacific's business dealings with Covad; nor do the Plaintiffs allege facts permitting the Court to infer, in this context, that TelePacific's relationship with Covad is material. Although the Plaintiffs have asserted that Covad received certain revenue from TelePacific in 2001 and 2002, this tells the Court little about the materiality of this relationship to TelePacific. As a consequence, without more, the Plaintiffs have failed to create a reasonable doubt as to the presumed disinterestedness and independence of Jalkut.

In summary, the Court concludes that Khanna's June 19, 2002 letter to the Covad Board was not a demand

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

letter, and, thus, there is no need to inquire into whether demand was wrongfully rejected. Additionally, although the Covad Board had "cozy" business and social relationships, the Plaintiffs have failed to plead particularized allegations that would cast a reasonable doubt on the disinterestedness and independence of at least half of the Covad Board. [FN163] Consequently, the Plaintiffs have failed to show that demand was excused under the first prong of *Aronson* or under *Rales*. [FN164]

> FN163. The Court notes that the factual paucity described above may have resulted from difficulties in accessing certain information. Indeed, even after using the "tools at hand" to develop particularized facts (*e.g.*, public filings and § 220), certain information may be restricted due to the fact that it is held by entities with no public disclosure obligations. Although the burdens presented by such obstacles have been recognized, *see Brehm, 746 A.2d at 268* (Hartnett, J., concurring) ("Plaintiffs must not be held to a too-high standard of pleading because they face an almost impossible burden when they must plead facts with particularity and the facts are not public knowledge."), the pleading standard under which the Court examines allegations for requisite particularity remains unaltered, even for plaintiffs who employed the "tools at hand."

> FN164. Accordingly, the Certive Claims (Counts I through III) must be dismissed.

## IV. BUSINESS JUDGMENT

As discussed above, because the two prongs of the test for demand futility under *Aronson* "are disjunctive," the challenged transactions subject to analysis under *Aronson* must be examined under the test's second-prong, in addition to the first prong's "disinterestedness" and "independence" analysis. [FN165] As a consequence, the BlueStar Transactions and the Dishnet Settlement each require inquiry into whether reasonable doubt is created that these challenged transactions were "otherwise the product of a valid exercise of business judgment." [FN166]

> FN165. *See, e.g., In re J.P. Morgan & Co., 2005 WL 1076069, at *8.*

> FN166. *See Aronson, 473 A.2d at 814.* Analysis under the second prong of *Aronson* is not required for the Certive Claims, because a majority of the board has changed since the events giving rise to Counts II and III and because Count I does not challenge a business decision. *See Rales, 634 A.2d at 934.*

### A. Legal Standard

**\*23** In order to satisfy the second prong of *Aronson,* the Plaintiffs must plead "particularized facts creating a reasonable doubt that the decisions of the [board] were protected by the business judgment rule." [FN167] "[A]bsent particularized allegations to the contrary, the directors are presumed to have acted on an informed basis and in the honest belief that their decisions were in furtherance of the best interests of the corporation and its shareholders." [FN168] It is not an easy task to allege that a decision falls outside the realm of the business judgment rule because "[t]his Court will not second-guess the judgment of a board of directors if it bases its decision on a rational business purpose." [FN169] Thus, "[t]he burden is on the party challenging the decision to establish facts rebutting the presumption." [FN170] In conducting its analysis, the Court must examine the "substantive nature of the challenged transactions and the board's approval thereof." [FN171]

> FN167. *Brehm, 746 A.2d at 258.*

> FN168. *Highland Legacy Ltd., 2006 WL 741939, at *7; see also Levine, 591 A.2d at 206* ("[P]laintiff ... must plead particularized facts creating a reasonable doubt as to the 'soundness' of the challenged transaction sufficient to rebut the presumption that the business judgment rule attaches to the transaction."); *Pogostin v. Rice, 480 A.2d 619, 624 (Del.1984)* ("A court does not assume that the transaction was a wrong to the corporation requiring corrective measures by the board."), *overruled on other grounds, Brehm, 746 A.2d at 254.*

> FN169. *Kahn v. Roberts, 1995 WL 745056, at *4 (Del. Ch. Dec. 6, 1995), aff'd, 679 A.2d 460 (Del.1996).*

> FN170. *Aronson, 473 A.2d at 812.*

> FN171. *Id. at 814.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

A plaintiff seeking to demonstrate demand futility under the second prong of *Aronson* "must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." [FN172] The Court's inquiry in this context is "predicated upon concepts of gross negligence." [FN173] "The plaintiff faces a substantial burden, as the second prong of the *Aronson* test is 'directed to extreme cases in which despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review." ' [FN174] Although the second prong of *Aronson* may potentially be satisfied by recourse to multiple theories,[FN175] establishing that a board's decision falls outside the scope of the business judgment rule frequently requires a showing of facts tantamount to corporate waste.[FN176] As a consequence, a plaintiff will bear a difficult, but not insurmountable, burden in pleading particularized facts demonstrating demand futility under this prong of *Aronson*.[FN177]

FN172. *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del. Ch.2003); *see also In re J.P. Morgan Chase & Co.*, 2005 WL 1076069, at *11. Cf. *Levine*, 591 A.2d at 206 (although addressing only whether directors were adequately informed, identifying self-interest, entrenchment, waste, and acting in such an uninformed manner as to constitute gross negligence as topics of analysis in this context).

FN173. *Aronson*, 473 A.2d at 812; *see also Brehm*, 746 A.2d at 259 ("Pre-suit demand will be excused in a derivative suit only if the Court ... conclude[s] that the particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decisionmaking process, *measured by concepts of gross negligence,* included consideration of all material information reasonably available." (emphasis in original)).

FN174. *Greenwald v. Batterson*, 1999 WL 596276, at *7 (Del. Ch. July 26, 1999) (quoting *Kahn v. Tremont Corp.*, 1994 WL 162613, at *6 (Del. Ch. Apr. 22, 1994)); *see also Highland Legacy Ltd.*, 2006 WL 741939, at *7.

FN175. *See, e.g., Levine*, 591 A.2d at 206; *see also* Wolfe & Pittenger, *supra* note 77, § 9-2[b], at 9-76 n. 303 (describing analysis under second prong of *Aronson* generally as looking to substantive due care and to procedural due care).

FN176. *See Tremont Corp.*, 1994 WL 162613, at *6 ("The test for this second stage is thus necessarily high, similar to the legal test for waste.").

FN177. *See, e.g., Brehm*, 746 A.2d at 263 (describing waste as " 'an exchange that is so one sided that no business person of ordinary, sound business judgment could conclude that the corporation has received adequate consideration" ' (quoting *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch.1993)); *Grobow*, 539 A.2d at 189 (holding that waste depends on "whether 'what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid" ' (quoting *Saxe v. Brady*, 184 A.2d 602, 610 (Del. Ch.1962)); *see also Green v. Phillips*, 1996 WL 342093 (Del. Ch. June 19, 1996) ("That extreme test is rarely satisfied, because if a reasonable person could conclude the board's action made business sense, the inquiry ends and the complaint will be dismissed.").

### B. The BlueStar Transactions

The BlueStar acquisition was approved by the Covad Board on June 15, 2000, and announced on June 16, 2000. The Amended Complaint sets forth that, on September 22, 2000, the transaction was completed with Covad's issuance of approximately 6.1 million shares of Covad common stock to BlueStar stockholders "according to an exchange ratio by which BlueStar stockholders received an average market price of $14.23 in exchange for all outstanding preferred and common stock." [FN178] The Amended Complaint explains that this resulted in a price to Covad of "at least $200 million" for BlueStar.[FN179] The complaint further states that the day after the merger was announced, Covad's shares dropped 27%, constituting $1 billion of market value.[FN180]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 27
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN178. Amended Compl. at ¶ 73. Outstanding BlueStar stock options and warrants were converted into options to purchase approximately 225,000 shares of Covad common stock at a "fair value" of $6.55 per share. *Id.*

FN179. *Id.*

FN180. *Id.* at ¶ 70. It is uncertain whether the drop in share price can be attributed solely to the BlueStar transaction, since the Amended Complaint ambiguously explains that, "at the same time [Covad] announced the merger," the company also announced that "it had reduced both the number of end-user lines it expected to be in service on June 30, 2000 and its 2000 line growth expectations primarily because of the channel conflict with BlueStar." *Id.*

*24 The Plaintiffs identify numerous grounds on which they contend that the BlueStar acquisition was not a valid exercise of the Covad Board's business judgment. They principally argue that the Board's approval process was procedurally deficient, that the Board failed to inform itself adequately and to act in good faith, and that the transaction constituted corporate waste.

The Amended Complaint alleges that no special committee of disinterested directors was formed to consider the transaction.[FN181] The mere allegation of a failure to form a committee is insufficient, however, to satisfy *Aronson'* s second prong.[FN182] This fact, however, is not without value, given the material interests in the transaction of at least one-quarter (*i.e* ., Shapero and Hawk) of the Covad Board.[FN183] Moreover, the Plaintiffs allege that the acquisition was initiated by the repeated lobbying of Covad's then-chief executive officer and board member, Knowling. The Amended Complaint provides that "Shapero lobbied Knowling through lengthy emails on the weekend of May 20-21, 2000 to have Covad acquire BlueStar and NewEdge. After Shapero's full-court press, Knowling decided on May 21, 2000-without any due diligence-that Covad should acquire BlueStar." [FN184] The Amended Complaint further alleges that the reason for the "hasty process" was that it "served BlueStar's interests (and, therefore, Shapero/Crosspoint's interests) in that BlueStar was in a precarious financial condition and had it continued as a stand-alone company, it would have been unable to mask its serious problems any longer." [FN185] Indeed, the Amended Complaint

alleges that the fairness opinion rendered by Donaldson, Lufkin & Jenrette ("DLJ") to BlueStar with respect to the merger stated that DLJ had been informed by the "management of the Company" that "the Company, as of June 14, 2000, expected to exhaust its liquidity in the near term and did not have a financing source for funding its anticipated operating and capital needs over the following 12 months." [FN186]

FN181. *See* Amended Compl. at ¶ 65.

FN182. The parties' briefs contain significant debate over which directors participated in the review and approval of the challenged transactions and the effect of those directors' participation on the Court's analysis. The Covad Board at the time of the BlueStar acquisition was comprised of Dunn, Hawk, Irving, Knowling, Lynch, Marshall, Runtagh, and Shapero. The Amended Complaint, however, does not allege which directors participated in the review and approval of the BlueStar acquisition. Although Paragraph 80 of the complaint provides that, with respect to the BlueStar earn-out settlement, "under normal Covad practice, self-interested directors would have left any Board meeting when matters pertaining to their self-interest are discussed and voted upon," the Court is unable to draw any conclusions from this fact as to approval of the BlueStar acquisition under the standard governing motions to dismiss.
At the time of the BlueStar earn-out settlement, McMinn, Shapero, Hawk, Irving, Lynch, Marshall, and Runtagh were members of the Covad Board. Paragraph 80 does explicitly allege that McMinn, Hawk, and Shapero did not participate in board meetings for "review and approval" of the settlement.

FN183. The Amended Complaint provides that "at least as early as mid-1999, Shapero, through Crosspoint, owned approximately 46% of BlueStar's outstanding shares, and both McMinn and Hawk owned a substantial number of preferred shares." *Id.* at ¶ 59. Paragraph 72 of the Amended Complaint provides: "Each of Messrs. McMinn, Hawk and Shapero and/or Crosspoint were significant shareholders of BlueStar."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Crosspoint, for which Shapero serves as General and Managing Partner, is alleged to have owned approximately 30 million shares, representing approximately 41.9% of all issued and outstanding BlueStar shares. *See id.* "Hawk, a Special Limited Partner of Crosspoint, was also a significant shareholder of BlueStar stock." *Id.* McMinn is alleged to have been the beneficial owner of approximately 656,942 shares of BlueStar common stock, *see id.;* however, it should be noted that McMinn had resigned from the Covad Board on November 1, 1999, prior to the BlueStar acquisition's approval. McMinn rejoined the Board in late October 2000, and was a member at the time of the BlueStar earn-out settlement.

FN184. Amended Compl. at ¶ 62. Shapero sat on the board of NewEdge Networks, a "provider of dedicated internet access for businesses and communications carriers." A reasonable doubt has also been shown as to Knowling's independence at the time of the acquisition. At that time, Knowling was Covad's chief executive officer, as well as a member of its Board, and "received a generous compensation package when hired": $1.5 million signing bonus, $400,000 salary, other bonuses, and stock options. *Id.* at ¶ 97. Additionally, Covad granted Knowling severance benefits "worth $1.5 million" and forgave a $500,000 loan to him when he resigned in November 2000 (months after the BlueStar acquisition). *Id.* Most significantly, Shapero served as a member of Covad's compensation committee at this time. *Id.* at ¶¶ 11, 72.

FN185. *Id.* at ¶ 62.

FN186. *Id.* at ¶ 63.

The Amended Complaint sets forth that "[a]lmost uniformly, Covad management objected to the transaction." FN187 Indeed, the Amended Complaint alleges that Knowling "was the sole Covad officer to support" the BlueStar acquisition. FN188 The complaint also describes a due diligence report prepared by Covad's engineering director, "which stated that the acquisition would be virtually useless because of the overlap in the companies' networks." FN189 The complaint alleges that the Board "ignored" management's due diligence findings, which were presented to the Board and which "expressed serious

concern" that "Covad already had overlapping physical assets to provide DSL coverage in 70% of BlueStar service territory...." FN190 The Plaintiffs charge that the Covad directors did not "evaluate" the due diligence reports "prepared by ... [the director of engineering] and others that pointed out many of the key acute problems of BlueStar...." FN191

FN187. *Id.* at ¶ 64. The complaint particularly cites Khanna, Chuck Haas, Vice President and co-founder of Covad, and Ron Marquardt, Covad's engineering director, as having "expressed their objections to the deal."

FN188. *Id.* at ¶ 72.

FN189. *Id.* at ¶ 64. The Plaintiffs, in their answering brief, also charge, *inter alia,* that the directors approved the transaction after only a "35 minute telephone conversation" with five board members present. Pls.' Ans. Br. to Dirs.' Mot. to Dismiss at 40. This information, however, is not among the allegations of the Amended Complaint.

FN190. Amended Compl. at ¶ 68.

FN191. *Id.* at ¶ 65. The Plaintiffs' answering brief also provides that "no independent appraisal of BlueStar was sought much less obtained...." This allegation does not appear in the Amended Complaint. Pls.' Ans. Br. to Dirs.' Mot. to Dismiss at 40.

*25 Finally, the Plaintiffs argue that Covad's investment banker (Bear Stearns), which provided a fairness opinion for the transaction, "had a conflict of interest with respect to the merger, and the Board was aware of the conflict." FN192 The Amended Complaint recites that "Bear Stearns Corporate Lending, Inc ., an affiliate of Bear Stearns, provided BlueStar with a $40 million financing commitment to fund BlueStar's continuing operations until the effective date of the merger." FN193 The complaint states that, as a result of this bridge loan, it was in the interest of Bear Stearns "to render a favorable opinion ... and ensure the closing of the transaction," and that, "even though all the signs at the outset indicated that the transaction would spell financial disaster for Covad," Bear Stearns was conflicted from "urging (and therefore failed to urge) Covad to cancel the deal." FN194 As the Amended Complaint explains, "if Covad did not

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

close the transaction, Bear Stearns would be left with the unpaid bridge loan...." [FN195]

> FN192. Amended Compl. at ¶ 66. The Amended Complaint describes the fairness opinion as "perfunctory." *Id.* This perhaps adds context, but little substance, to the Court's inquiry. Moreover, the absence of an independent opinion on which the board relied would not, of itself, demonstrate gross negligence satisfying *Aronson'* s second prong. In this instance, however, the Amended Complaint alleges, for example, that Covad's management's opinion was "[a]lmost uniformly" hostile to the transaction.

> FN193. *Id.* The Amended Complaint also provides that Bear Stearns was conflicted because it had an "ongoing interest in earning fees from this and other Covad transactions." *Id.* First, this is insufficiently particularized. Second, the mere fact that an investment bank will receive typical fees for its services does not render its advice conflicted.

> FN194. *Id.*

> FN195. *Id.* Compare *Crescent/Mach 1 Partners, L.P.,* 846 A.2d at 984-85. The Court notes that the Amended Complaint does not specify when the bridge loan was extended to BlueStar. The chronology, however, may have substantial impact on the analysis. If the bridge loan was made prior to rendering the fairness opinion, then this fact certainly adds substance to the Court's "reasonable doubt" analysis. On the other band, if the loan was not negotiated or extended until *after* Bear Stearns rendered its fairness opinion (or until after the Covad Board's vote to approve), then the existence of the bridge loan would be substantially less significant to the Court's analysis. Issues of continuing reliance on Bear Stearns' advice might arise, but these would perhaps be distinct from reliance on the fairness opinion, itself.

The Court is commanded to make all reasonable inferences in favor of the Plaintiffs from particularized allegations. In this instance, the inference clearly intended by the Plaintiffs' from Paragraph 66 of the Amended Complaint is that loaned funds were at risk-not merely fees for making the loan-because the loan was extended before the opinion was delivered. Similarly, Paragraph 141 states that the Board obtained a "highly-conflicted Bear Sterns [sic] opinion in connection with the First BlueStar Transaction." The Plaintiffs' briefs support the Court's inference and make even more clear the light in which the Plaintiffs intended the allegations to be read. *See, e.g.,* Pls.' Ans. Br. to Covad's Mot. to Dismiss at 36-37 ("The Amended Complaint ... is replete with facts *known to the Board at the time it approved the transaction* which unequivocally show the gross negligence of Runtagh and Lynch.... The only financial opinion before the Board was that of Bear Stearns.... That opinion was hopelessly conflicted (and the Covad Board knew it) because a subsidiary of Bear Stearns had a $40 million bridge loan outstanding to BlueStar and would not see a dime of that money returned to it unless Covad acquired BlueStar."); *id.* at 12 ("[The Covad Board] accepted the fairness opinion of Covad's investment banker, Bear Stearns, despite the fact that Bear Stearns *had* a glaring conflict of interest with respect to the merger. Bear Stearns Corporate Lending, Inc .... *had given* BlueStar a $40 million financing commitment to fund BlueStar's continuing operations, and would have had no hope of recouping a dime of that money without the merger." (citing Amended Compl. at ¶ 66 (emphasis added))); Pls.' Ans. Br. to Dirs.' Mot. to Dismiss at 10 ("[The Covad board] accepted a favorable 'preliminary' opinion from an investment banker that the Covad Board *knew* had an enormous conflict that prevented it from evaluating the BlueStar acquisition in an objective manner." (citing Amended Compl. at ¶ ¶ 65, 66) (emphasis in original)). The Court recognizes that this is perhaps an example of particularly artful drafting, as well. Indeed, at the hearing on these motions, the Defendants pointed to documents produced in § 220 action that may resolve this issue; however, the Court may not consider them in the present analysis.

On a motion to dismiss, the Court is required to accept as true all well-pleaded allegations and to draw all reasonable inferences from such allegations

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 30

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

in favor of the Plaintiffs. The Court acknowledges that the above facts, if true, create a reasonable doubt that the transaction was the product of a valid exercise of business judgment. The Plaintiffs have argued that, in acting to approve the merger, the directors committed violations of their duties of good faith and due care. Demand will be excused, for example, where the Court "conclude[s] that the particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decisionmaking process, *measured by concepts of gross negligence,* included consideration of all material information reasonably available."[FN196] It is possible that demand may also be excused where the Court may reasonably doubt that directors have complied in good faith with the requirement they fulfill their fiduciary duties.[FN197] This Court has previously addressed the possibility that

> FN196. *Brehm,* 746 A.2d at 259 (emphasis in original).

> FN197. Cf. *Guttman v. Huang,* 823 A.2d 492, 506 (Del. Ch.2003); *IHS,* 2004 WL 1949290, at \*9 n. 36.

disinterested, independent directors "knew that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." If they did indeed act in such a way, they have acted in a manner that cannot be said to be the product of sound business judgment and so cannot be protected by the presumption of the business judgment rule.[FN198]

> FN198. *Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. ("IHS") v. Elkins,* 2004 WL 1949290, at \*10 (Del. Ch. Aug. 24, 2004) (addressing motion to dismiss under Court of Chancery Rule 12(b)(6)) (quoting *In re Walt Disney Co.,* 825 A.2d at 289).

In other words, if they behaved in such a manner, then they " 'consciously and intentionally disregarded their responsibilities,' and ... therefore, could be in violation of their fiduciary duties to the corporation."[FN199]

> FN199. *IHS,* 2004 WL 1949290, at \*9

(quoting *In re Walt Disney Co.,* 825 A.2d at 289) (emphasis in original).

The Plaintiffs have pleaded particularized facts alleging, *inter alia,* that the Covad Board had members with significant, material interests in the transaction, ignored a management that objected to the acquisition "[a]lmost uniformly," failed to "evaluate" management due diligence findings that expressed "serious concerns" about the transaction, and knew of significant conflicts held by the investment banker rendering the fairness opinion on which the Board relied.[FN200] As a consequence, the Court concludes that the allegations contained in the Amended Complaint create a reasonable doubt as to whether approval of the BlueStar transaction was the product of a valid exercise of business judgment by the Covad Board.[FN201] Therefore, demand is excused as to the BlueStar acquisition of Count IV.[FN202]

> FN200. The Court acknowledges that, after an opportunity for discovery, it may become clear that the bridge loan was negotiated, and funded, only after Bear Stearns had rendered its opinion. *See, e.g., In re New Valley Corp.,* 2001 WL 50212, at \*6 n. 17 (Del. Ch. Jan. 11, 2001) (remarking that affidavit might give reason to doubt allegations, but was nevertheless improper to consider on motion to dismiss); *Mizel v. Connelly,* 1999 WL 550369, at \*5 n. 5 (Del. Ch. July 22, 1999) (same).

> FN201. The Director Defendants contend that their compliance with the "safe harbor" provisions of *8 Del.C. § 144(a)* conclusively rebuts the Plaintiffs' contentions; however, compliance with § 144(a) does not guarantee the benefit of the presumption of the business judgment rule that entire fairness review will not apply. *See, e.g., Benihana of Tokyo, Inc. v. Benihana, Inc.,* 891 A.2d 150, 185 (Del. Ch.2005); *In re Cox Commc'ns S'holders Litig.,* 879 A.2d 604, 614-15 (Del.Ch.2005); *Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at \*13. As the Court in *Benihana* explained:
> Satisfying the requirements of § 144 only means that the [challenged transaction] is not void or voidable *solely* because of the conflict of interest. 'While non-compliance with § § 144(a)(1), (2)'s disclosure requirement by definition triggers fairness

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

review rather than business judgment rule review, the satisfaction of § § 144(a)(1) or (a)(2) alone does not always have the opposite effect of invoking business judgment rule review.... Rather, satisfaction of § § 144(a)(1) or (a)(2) simply protects against invalidation of the transaction 'solely' because it is an interested one. As such, § 144 is best seen as establishing a floor for board conduct but not a ceiling." Thus, equitable common law rules requiring the application of the entire fairness standard on grounds other than a director's interest still apply.

891 A.2d at 185. Moreover, the Director Defendants' purported compliance may not be a matter amendable to resolution on the basis of the pleadings. See supra note 182.

The Director Defendants also argue that, since Covad's Amended and Restated Certificate of Incorporation exempts directors from liability for breaches of the duty of care pursuant to 8 Del.C. § 102(b)(7), all claims against the Director Defendants involving duty of cares must be dismissed. However, "when a duty of care breach is not the exclusive claim, a court may not dismiss based upon an exculpatory provision." Alidina v. Internet.com Corp., 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002) (citing Emerald Partners v. Berlin, 787 A.2d 85, 91 (Del.2001); see also Malpiede v. Townson, 780 A.2d 1075 (Del.2001).

Additionally, charter provisions adopted under § 102(b)(7) merely work to exculpate liability, but do not erase the underlying breach of fiduciary duty. As a consequence, a tension potentially exists between the effect of § 102(b)(7) provisions on analysis under Rales and under the second-prong of Aronson. For instance, the pertinent question under Rales, in this context, is whether a director faces a "substantial likelihood" of personal liability, which, if it exists, would then be deemed as compromising the director's capacity to consider demand. See, e.g., Guttman, 823 A.2d at 501. If a mere breach of a duty of care is the exclusive well-pleaded claim, however, then, in the presence of a § 102(b)(7) provision, the question posed by Rales, above, will likely be answered in the negative. See id. With respect to analysis under Aronson's second prong, however, courts are instructed to ask

whether the "challenged transaction was otherwise the product of a valid exercise of business judgment"-i.e., the pertinent question, in this context, is whether an underlying breach has occurred and not whether a substantial threat of liability exists, regardless of breach. The crucial factor, however, would seem to be questions of the potential for personal liability which affect capacity to consider demand. See id. ("When ... there are allegations that a majority of the board that must consider a demand acted wrongfully, the Rales test sensibly addresses concerns similar to the second prong of Aronson. To wit, if the directors face a 'substantial likelihood' of personal liability, their ability to consider a demand impartially is compromised under Rales, excusing demand."); see also Aronson, 473 A.2d at 815 ("[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.").

FN202. With respect to the Defendants' motion under Court of Chancery Rule 12(b)(6), the Court's conclusion here that demand is excused under the more demanding standard of Aronson' s second-prong necessarily moots analysis under Rule 12(b)(6). The Defendants contend that the challenge to the BlueStar acquisition is barred by laches (or the "borrowed" three-year statute of limitations) because the Original Complaint was filed more than three years after the Covad Board's approval of the transaction. See Mem. in Supp. of Dirs.' Mot. to Dismiss Am. Deriv. & Class Action Compl. ("Dirs.' Op. Br. to Dismiss") at 26-27 (citing Kahn v. Seaboard Corp., 625 A.2d 269, 271 (Del. Ch.1993); In re Marvel Entm't Group, Inc., 273 B.R. 58, 73-74 (D.Del.2002)). But see Pls.' Ans. Br. to Dirs.' Mot. to Dismiss, at 21 (citing Kaufman v. Albin, 447 A.2d 761 (Del. Ch.1982); Dofflemyer v. W.F. Hall Printing Co., 558 F.Supp. 372 (D.Del.1983)). The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

motion to dismiss, with respect to the Defendants' affirmative defense of laches, is reviewed under <u>Court of Chancery Rule 12(b)(6)</u>. Because the Court is unable to discern with reasonable certainty from the complaint that laches applies, the Court cannot grant the Defendants' motion on this ground at this time. *See, e.g.,* Amended Compl. at ¶ 144; Reply in Supp. of Dirs.' Mot. to Dismiss Am. Deriv. & Class Action Compl. ("Dirs.' Reply Br. to Dismiss") at 9 (alluding to "requirement" that BlueStar shareholders "approve the transaction by tendering their shares on September 22, 2000").

**\*26** The Court, furthermore, will not conduct business judgment analysis examining the BlueStar earn-out settlement separately. The two aspects of the BlueStar investment, proximate in time, as well as presenting issues of fact and law not easily bifurcated, are best tackled by treating them as one for demand excusal purposes. Thus, demand is also excused with respect to claims the Plaintiffs asserted in Count IV involving the BlueStar earn-out settlement. [FN203]

FN203. Although the acquisition appears disastrous with the benefit of hindsight, the Court cannot permit the *ex post* results of a decision to cloud analysis of a board's *ex ante* judgment. *See, e.g., White,* 783 A.2d at 554; *Ash,* 2000 WL 1370341, at \*8; *Greenwald,* 1999 WL 596276, at \*7 (citing *In re Walt Disney Co. Deriv. Litig.,* 731 A.2d 342, 361-62 (Del. Ch.1998), *aff'd in part and rev'd in part, sub nom. Brehm,* 746 A.2d 244; *Litt v. Wycoff,* 2003 WL 1794724, at \*10 (Del. Ch. Mar. 28, 2003)); William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of Van Gorkom and its Progeny as a Standard of Review Problem,* 96 Nw. U.L.Rev. 449, 454-55 (2002). BlueStar's performance has been characterized as "dismal," but the Court notes the possibility that the ultimate failure of the deal may have had much to do with exogenous market forces affecting all of the telecommunications industry during this time. The failure to anticipate and avoid these reversals of fortune may perhaps not have been the result of, for example, bad

faith, but rather aggressive and overly-optimistic business strategies that, in times of better economic fortune, are lauded as demonstrative off entrepreneurial skill and wisdom.

### C. *The Dishnet Settlement* [FN204]

FN204. Although the Plaintiffs cast aspersions on Covad's decision to invest in Dishnet, they have not pursued any attack with particularized allegations.

Again, the Plaintiffs challenge the Covad Board's alleged failure to employ certain procedural devices (*e.g.,* a special committee) in approving the Dishnet Settlement.[FN205] As above, such allegations do not establish a *per se* rebuttal of the business judgment rule, as the Plaintiffs suggest. The Plaintiffs make only a conclusory allegation that the agreement was entered into "without the benefit of the necessary financial and legal analysis...." [FN206] This clearly fails to meet the requirement that the Plaintiffs plead particularized facts. Although the Plaintiffs' briefs rely heavily, and expand, upon this "fact," the Court must look to the Amended Complaint to determine whether the Plaintiffs have satisfied their pleading burden-and they have not.[FN207]

FN205. Amended Compl. at ¶ 141. At the time of the Dishnet settlement, McMinn, Shapero, Lynch, Marshall, Hawk, Hoffman, Irving, and Runtagh comprised the Covad Board. The Amended Complaint does not allege which directors participated in review and approval of the settlement. Although Paragraph 93 of the complaint addresses McMinn's "course and conduct in connection with the failed Dishnet investment" and provides that "the other Covad directors at the time-including Shapero, Lynch, Marshall, Hawk, Hoffman, Irving and Runtagh-acquiesced knowingly in, and as a group supported," McMinn's conduct, the Court cannot draw any conclusions with regard to director participation on the basis of the pleadings under the standard governing motions to dismiss.

FN206. *Id.* at ¶ 92. The Plaintiffs also make the highly conclusory allegation that, with respect to Dishnet, "the other Covad

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

directors at the time," excluding McMinn, "acquiesced knowingly in, and as a group supported, McMinn's breach of duty. *Id.* at ¶ 93.

FN207. Although the Plaintiffs point out that McMinn was director of both Dishnet and Covad at this time, the Plaintiffs do not allege that McMinn participated in the meeting or voted to approve the settlement. The Amended Complaint essentially sets forth only the terms of the settlement. *See, e.g., id.* at ¶¶ 89, 92. This is significant in light of Paragraph 80 of the Amended Complaint, which, in addressing the Board's consideration of the BlueStar earn-out settlement, provides that "under normal Covad practice, self-interested directors would have left any Board meeting when matters pertaining to their self-interest are discussed and voted upon...."

The Plaintiffs' allegations regarding the Dishnet settlement appear principally, if not exclusively, directed toward corporate waste. The allegations of the Amended Complaint do not amount to waste because it cannot be said that the benefits received by Covad from the settlement were "so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid." [FN208] It is not, however, outside the realm of business reasonableness to conclude that Covad was better off settling with Dishnet and putting the Dishnet ordeal behind it than to engage in a drawn-out battle with the risk of losing. [FN209] There are certainly instances in which settling claims-even though of questionable merit-is the prudent course of conduct. Based on the facts alleged, the Plaintiffs have failed to plead that the Covad Board's decision to enter into the Dishnet settlement was beyond the business judgment rule. [FN210]

FN208. *See* note 177, *supra.*

FN209. If, as the Plaintiffs allege, the key principal of Dishnet "had a highly mixed reputation in Asia," *id.* at ¶ 88, it may not have been outside the realm of business judgment to determine that an immediate disentanglement from Dishnet was worth the cost.

FN210. The Director Defendants' opening brief contends that this action should be

dismissed on the grounds that the Plaintiffs have failed to state a claim under Court of Chancery Rule 12(b)(6). *See* Dirs.' Op. Br. to Dismiss at 1, 3. In support of their argument, the Director Defendants contend that their approvals of the transactions are protected under the business judgment rule. *See* Dirs.' Op. Br. to Dismiss at 34-35. In their answering brief to the Director Defendants, the Plaintiffs raised certain arguments questioning applicability of the protections of the business judgment rule. *See* Pls.' Ans. Br. Dirs.' Mot. to Dismiss at 30, 43-46. As the Plaintiffs chose only to address these arguments to the Director Defendants' briefing with respect to Rule 12(b)(6), in this context, the Court neither addresses them with respect to demand excusal nor expresses a view as to their potential applicability in light of dismissal of the various claims under Rule 23.1. *Compare* Pls.' Ans. Br. to Covad's Mot. to Dismiss 40-43.

## V. AIDING AND ABETTING CLAIMS

The Plaintiffs assert claims in Count VI of the Amended Complaint against Crosspoint for aiding and abetting poorly behaving fiduciaries with respect to the Certive and BlueStar transactions. The Court has already determined that the Plaintiffs' claims regarding Certive must be dismissed for failure to make demand upon the Board. The Court now addresses the Plaintiffs' aiding and abetting claim with respect to the BlueStar transactions.

A third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party "knowingly participates" in the breach. To survive a motion to dismiss, the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants," and (4) damages proximately caused by the breach. [FN211]

FN211. *Malpiede,* 780 A.2d at 1096 (quoting *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del. Ch.1984) ("It is well settled that a third party who knowingly participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship."), *aff'd,* 575 A.2d 1131

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 34

(Del.1990)); _Penn Mart Realty Co. v. Becker,_ 298 A.2d 349, 351 (Del. Ch.1972)); _see also Laventhol, Krekstein, Horwath and Horwath v. Tuckman,_ 372 A.2d 168, 170-71 (Del.1976) ("[P]ersons who knowingly join a fiduciary in an enterprise which constitutes a breach of his fiduciary duty of trust are jointly and severally liable for any injury which results.").

**\*27** The Court notes first the distinction between the party who stands in a fiduciary relationship (described by the first and second elements of the test) and the non-fiduciary defendant (described by the test's third element) against whom the aiding and abetting claim is brought.[FN212] Of course, the Covad Board at the time of the BlueStar acquisition owed fiduciary duties to Covad and its shareholders, thereby satisfying the first element of an aiding and abetting claim. Moreover, the Court has already determined that the Plaintiffs' claims with respect to the BlueStar transactions survive the motion to dismiss; thus, the second element of the test is satisfied here, as well. Similarly, the Amended Complaint sufficiently alleges that, in the event a breach of fiduciary duty is proved, damages were proximately caused.[FN213] As to the requirement that there be "knowing participation" in the breach by the non-fiduciary defendant (_i.e.,_ Crosspoint), "[a] claim of knowing participation need not be pled with particularity. However, there must be factual allegations in the complaint from which knowing participation can be reasonably inferred." [FN214] Shapero's status as a Covad director and General and Managing Partner of Crosspoint is sufficient to impute knowledge of Shapero's conduct with respect to the BlueStar acquisition to Crosspoint, for purposes of this motion to dismiss.[FN215] The allegations of the Amended Complaint support the reasonable inference that Shapero, and therefore Crosspoint, knew of BlueStar's gloomy business prospects at the same time he was touting the potential acquisition.[FN216] Moreover, the allegations permit the reasonable inference that Shapero-by his statements and influence over, at least, Knowling-initiated, induced, and contributed to the underlying breach of Covad's Board.[FN217] The Amended Complaint sets forth that "Shapero lobbied Knowling through lengthy emails on the weekend of May 20-21, 2000, to have Covad acquire BlueStar and NewEdge." [FN218] Additionally, the Complaint alleges:

> FN212. _See, e.g., In re Gen. Motors (Hughes) S'holder Litig.,_ 2005 WL 1089021,

at \*24 (Del. Ch. May 4, 2005), _aff'd,_ 2006 WL 722198 (Del. Mar. 20, 2006).

FN213. _See also Hughes,_ 2005 WL 1089021, at \*23 (requiring that "damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary" (quoting _Jackson Nat'l Life Ins. Co. v. Kennedy,_ 741 A.2d 377, 386 (Del. Ch.1999)).

FN214. _Hughes,_ 2005 WL 1089021, at \*24 (quoting _In re Shoe-Town, Inc. S'holders Litig.,_ 1990 WL 13475, at \*8 (Del. Ch. Feb. 12, 1990). Crosspoint's motion to dismiss the Plaintiffs' aiding and abetting claim is reviewed under Court of Chancery Rule 12(b)(6).

FN215. _See, e.g., Carlson v. Hallinan,_ 2006 WL 771722, at \*20-\*21 (Del. Ch. Mar. 21, 2006) (imputing majority shareholder's knowledge to nonfiduciary defendant-entities for which shareholder serves as director and officer) (citing _In re HealthSouth Corp. S'holders Litig.,_ 845 A.2d 1096, 1108 n. 22 (Del. Ch.2003), _aff'd,_ 847 A.2d 1121 (Del.2004) (Table)).

FN216. _See_ Amended Compl. at ¶¶ 58, 59, 62, 63.

FN217. Because Shapero serves as General and Managing Partner of Crosspoint, his acts permit the Plaintiffs to charge Crosspoint with "participation" in the context of the third element of the aiding and abetting claim. Indeed, the emails sent by Shapero to Knowling were from Shapero's Crosspoint email account and are signed "Rich Shapero, Managing Partner, Crosspoint Venture Partners." Calder Decl., Ex. Q.

FN218. Amended Compl. at ¶ 62.

According to Covad's amended Form S-4/A, filed with the Securities and Exchange Commission on August 30, 2000, BlueStar's directors, which included defendants McMinn and Shapero, suggested that the CEOs of BlueStar and Covad meet initially to discuss a possible business combination. In fact, the documents produced in the § 220 action clearly show that Shapero, a member of Covad's compensation committee, repeatedly and directly lobbied (and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

ultimately persuaded) Knowling, the CEO whose compensation was determined by Shapero and his other committee members, that Covad should acquire BlueStar. [FN219]

> FN219. *Id.* at ¶ 72. The Amended Complaint additionally provides:
> Each of Messrs. McMinn, Hawk and Shapero and/or Crosspoint were significant stockholder of BlueStar. Specifically, McMinn was the beneficial owner of approximately 656,942 shares of BlueStar common stock. Shapero's venture capital firm, Crosspoint, owned approximately 30 million shares of BlueStar stock, which represented approximately 41.9% of all of BlueStar's issued and outstanding common stock. Hawk, a Special Limited Partner of Crosspoint, was also a significant shareholder of BlueStar stock. BlueStar's CEO, Robert Dupuis, had previously worked for Crosspoint and thus had ties to Shapero and Hawk.
> *Id.* It should be noted that McMinn was not a member of Covad's Board at the time of the acquisition, having resigned on November 1, 1999, and rejoining only in "late October 2000." *Id.* at ¶ 8.

Crosspoint contends that documents produced as a consequence of the § 220 action, and on which the Plaintiffs in part rely,[FN220] fail to demonstrate that Shapero acted improperly.[FN221] Specifically, Crosspoint argues that document LWDK 0002013 shows that Shapero's statements were not improper, but merely constituted permitted "expression" of Shapero's views. [FN222] The Court need not resolve the question of the characterization of the disputed emails, however, since a reasonable inference to draw from the allegations in the Amended Complaint is that Shapero's power to infect the decisions of Knowling and the Board, and the process by which this was accomplished, were premised not solely on his salesmanship (as reflected in this limited email chain), but, *inter alia,* on his power over Knowling's compensation as a member of Covad's compensation committee. Thus, the Court concludes that, based on the allegations before it, the Plaintiffs' claim against Crosspoint for aiding and abetting, with respect to the BlueStar transactions, cannot be dismissed.[FN223]

> FN220. *See* Pls.' Ans. Br. in Opp'n to Def. Crosspoint Venture Partners, L.P.'s Mot. to

Dismiss Am. Deriv. & Class Action Compl. ("Pls.' Ans. Br. to Crosspoint's Mot. to Dismiss") at 33 (citing Calder Decl., Exs. Q (LWDK0002013-2015), R (LDWK0002987-2988); *see also* Amended Compl. at ¶ 72 (stating that "the documents produced in the § 220 action clearly show" Shapero's involvement).

> FN221. Reply Br. in Further Supp. of Def. Crosspoint Venture Partners, L.P.'s Mot. to Dismiss Pls.' Am. Deriv. & Class Action Compl. ("Crosspoint's Reply Br. to Dismiss") at 26.

> FN222. *See id.* at 25-26. Crosspoint states that "[a]n interested director's expression of his views does not taint the decision of the disinterested directors." *Id.* (citing *In re Ply Gem Indus. Inc. S'holders Litig.,* 2001 WL 755133 (Del. Ch. June 26, 2001); *Lewis v. Leaseway Transp. Corp.,* 1990 WL 67383 (Del. Ch. May 16, 1990)). Shapero, however, is alleged to have moved well beyond merely "expressing his views." Moreover, the inference can be drawn that he was well aware of BlueStar's dismal circumstances and prospects.

> FN223. The Plaintiffs asserted fiduciary duty claims against Crosspoint arising out of the Certive matters because, at that time, Crosspoint controlled a significant, even if less than half, portion of Covad's outstanding stock. Those claims were dismissed for failure to make demand on the Board. By the time of the BlueStar Transaction, Crosspoint had eliminated (or substantially reduced) its holdings in Covad and, thus, no longer owed (if it ever did) fiduciary duties to Covad.
> Additionally, in the context of the motion to dismiss, the Court cannot conclude that, *inter alia,* that the transaction was the product of arms-length negotiations sufficient to preclude aiding and abetting liability. *Compare Hughes,* 2005 WL 1089021, at *26-*28.

## VI. *RESPONDEAT SUPERIOR* CLAIM

*28 In Count VII of the Amended Complaint, the Plaintiffs also assert claims against Crosspoint under the doctrine of *respondeat superior.* The Court concludes that these claims must be dismissed in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

their entirety. The Plaintiffs have not cited any authority demonstrating that such claims are permissible, in this context. *"Respondeat superior* imposes liability upon a principal for the torts of his agent committed within the scope of their agency relationship." [FN224] As has already been described above, Crosspoint stands as a *non-fiduciary* defendant in this litigation vis-à-vis Covad and its shareholders with respect to the BlueStar matters.[FN225] Indeed, this is a critical element of the Plaintiffs' aiding and abetting claim against Crosspoint. To permit recovery, in this circumstance, under the common law tort law doctrine of *respondeat superior* "would work an unprecedented, revolutionary change in our law, and would give investors in a corporation reason for second thoughts about seeking representation on the corporation's board of directors." [FN226] As a consequence, the Court determines that the Plaintiffs' claim for *respondeat superior* is insufficient as a matter of law, under these circumstances, and, therefore, must be dismissed.

FN224. *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 1995 WL 376919, at *8 (Del. Ch. June 15, 1995) (citing *Fields v. Synthetic Ropes, Inc.*, 215 A.2d 427, 432 (Del.1965)). Count VI also briefly mentions the "Certive Transaction." *See* Amended Compl. at ¶ 181.
To the extent that the Plaintiffs may seek to plead an aiding and abetting claim against Crosspoint for matters arising out of events described by Counts I through III-which have been dismissed for failure to make demand on the Board, as described above-the Plaintiffs may not assert a claim for aiding and abetting, since the underlying claims may not be pursued.

FN225. *Cf. Emerson Radio Corp. v. Int'l Jensen Inc.*, 1996 WL 483086, at *20 (Del. Ch. Aug. 20, 1996) ("As a stockholder, [defendant third-party entity] could attain fiduciary status only if it were a majority shareholder or it actually controlled the affairs of [defendant corporation].").

FN226. *Emerson Radio Corp.*, 1996 WL 483086, at *20 n. 18 (analogizing plaintiffs' claims in that case to claims brought under theory employed by the Plaintiffs in this litigation). *Cf. USAirways Group, Inc. v. British Airways PLC*, 989 F.Supp. 482, 494

(S.D.N.Y.1997) (denying recovery under this theory of tort law since it would "undermine" and "circumvent[ ] clear limitations imposed by Delaware corporate law").

## VII. PROXY STATEMENT DISCLOSURES

The Plaintiffs also assert direct claims against McMinn, Shapero, Hawk, Lynch, Marshall, Irving, Hoffman, Runtagh, Crandall, and Jalkut for material omissions from Covad's Proxy Statements from 2002, 2003, and 2004. The Plaintiffs allege that Covad shareholders might not have elected the directors who were up for election during those years had the omitted information been disclosed. Specifically, the Plaintiffs allege that the following material information should have been disclosed:
1. Khanna's June 19, 2002 letter to the Covad Board. (2002, 2003, & 2004)
2. The Standstill Agreement with Khanna. (2002)
3. "The real reasons for and circumstances relating to the removal of Khanna as General Counsel and his intention, expressed to them, of taking legal action, if necessary, to seek redress for the harm defendants had caused Covad." (2002, 2003, and 2004)
4. The earn-out criterion for the BlueStar transaction had not been met, and Shapero, McMinn, and Hawk derived a great benefit from the settlement. (2002, 2003, and 2004)
5. "[D]efendant McMinn, during the time period of February to November 1999 when he purported to be working for Covad full-time, was actually working for himself and Crosspoint to find new investment vehicles." (2002)
6. Generalized information with respect to Khanna's allegations-specifically, which transactions and which directors challenged. (2003 & 2004)

In 2002, McMinn, Hawk, and Hoffman were slated for election and were re-elected. In 2003, Jalkut, Irving, and Lynch were slated for election and were re-elected. In 2004, Crandall and Runtagh were slated for election and were re-elected. Each of these elections was apparently uncontested.

### A. *Legal Standards*

#### 1. *Motion to Dismiss*

**\*29** The standards governing this Court's analysis of motions to dismiss under Rule 12(b)(6) have recently been reiterated:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof." [FN227]

> FN227. *Hughes,* 2006 WL 722198, at *3 (quoting *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896-7 (Del.2002)).

Although the Court must "accept as true all of the well-pleaded allegations of fact and draw reasonable inferences in the plaintiff's favor," [FN228] it is "not ... required to accept as true conclusory allegations 'without specific supporting factual allegations.' " [FN229] Instead, the Court must "accept only those 'reasonable inferences that logically flow from the face of the complaint' and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.' " [FN230] It should also be noted that the standard governing motions under Court of Chancery Rule 12(b)(6) is "less stringent" than the standard employed in demand futility analysis under Court of Chancery Rule 23.1.[FN231]

> FN228. *Id.* (citing *Malpiede,* 780 A.2d at 1082).

> FN229. *Id.* (citing *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 65-66 (Del.1995)); *see also Solomon v. Pathe Commc'ns Corp.,* 672 A.2d 35, 38 (Del.1996).

> FN230. *Hughes,* 2006 WL 722198, at *3 (quoting *Malpeide,* 780 A.2d at 1082).

> FN231. *Malpiede,* 780 A.2d at 1082-83 (citations omitted); *see also Rabkin v. Philip A. Hunt Chem. Corp.,* 498 A.2d 1099, 1104 (Del.1985).

2. *Fiduciary Duty with Respect to Disclosure*

Delaware common law of fiduciary duty requires that directors disclose fully and with complete candor all material facts in soliciting proxies from shareholders.[FN232] Although it has been held that this duty is "best discharged through a broad rather than a

restrictive approach to disclosure," [FN233] only material facts must be disclosed. "An omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote." [FN234]

> FN232. *Arnold v. Soc'y for Sav. Bancorp, Inc.,* 650 A.2d 1270, 1277 (Del.1994); *see also Malpiede,* 780 A.2d at 1086 (explaining that "duty of disclosure" does not exist as an independent fiduciary duty).

> FN233. *Zirn v. VLI Corp.,* 621 A.2d 773, 779 (Del.1993); *see also Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 144 (Del.1997) (declining to adopt "bright line" test for disclosure violations, even though it might be "better practice" for directors "to be more candid and forthcoming in their communications to stockholders when presenting a slate for election to the board").

> FN234. *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)) ("Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."). In order to be material, however, it need not be demonstrated that disclosure of a fact would have changed the shareholder's vote.

In order to allege adequately a violation of disclosure requirements, a plaintiff must plead "some basis for a court to infer that the alleged violations were material. For example, a pleader must allege that facts are missing from the proxy statement, identify those facts, state why they meet the materiality standard and how the omission caused injury." [FN235] The test for whether an omitted fact is material is context-specific, and, therefore, determinations of materiality will not frequently be appropriate on a motion to dismiss.[FN236] Nevertheless, this Court may resolve such questions at the motion to dismiss stage if it is satisfied with reasonable certainty that no set of facts could be proved that would permit the plaintiffs to obtain relief under the allegations made.[FN237] Even though the Court's analysis in this context is not overly stringent, "it is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleading not be merely

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 38

conclusory." [FN238]

FN235. _Loudon, 700 A.2d at 141; see also M & B Weiss Family Ltd. P'ship of 1996 v. Davie,_ C.A. No. 20303, slip op. at 5, Chandler, Ch. (Bench Ruling Del. Ch. Apr. 12, 2005). _Cf. Orman, 794 A.2d at 31_ ("In order for a plaintiff to state properly a claim for breach of a disclosure duty by omission, he must 'plead facts identifying (1) material, (2) reasonably available, (3) information that (4) was omitted from the proxy materials." ' (quoting _O'Reilly v. Transworld Healthcare, Inc., 745 A.2d 902, 926 (Del. Ch.1999);_ _accord Wolf v. Assaf, 1998 WL 326662, at_ *1 (Del. Ch. June 16, 1998).

FN236. _See, e.g., Alessi v. Beracha, 849 A.2d 939, 949 n. 68 (Del. Ch.2004)._

FN237. _Seagraves v. Urstadt Property Co., Inc., 1989 WL 137918, at_ *5 (Del. Ch. Nov. 13, 1989); _see also In re Encore Computer Corp. S'holders Litig., 2000 WL 823373, at_ *8-*9 (Del. Ch. June 16, 2000); _In re JCC Holding Co., Inc., 843 A.2d 713, 720 (Del. Ch.2003); Orman, 794 A.2d at 32._

FN238. _Loudon, 700 A.2d at 140._

### 3. Self-flagellation

A long-standing principle of disclosure jurisprudence provides that a board need not engage in "self-flagellation." [FN239] Notwithstanding the requirement that directors disclose fully all material facts in the solicitation of proxies from shareholders, a board of directors is not required to "confess to wrongdoing prior to any adjudication of guilt," [FN240] nor must it "draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter." [FN241]

FN239. _See, e.g., Stroud v. Grace, 606 A.2d 75, 84 n. 1 (Del.1992)._

FN240. _Loudon, 700 A.2d at 145._

FN241. _Stroud, 606 A.2d at 84 n. 1. Compare Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC, 2006 WL 846121, at_ *10 (Del. Ch. Mar. 28, 2006).

### 4. Laches

*30 "The essential elements of laches are: (1) the plaintiff must have knowledge of the claim and (2) there must be prejudice to the defendant arising from an unreasonable delay by the plaintiff in bringing the claim." [FN242] Essentially,

FN242. _U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C., 864 A.2d 930, 951 (Del Ch.2004), vacated on other grounds, 875 A.2d 632 (Del.2005)_ (Table).

[l]aches is defined as an unreasonable delay by a party, without any specific reference to duration, in the enforcement of a right. An unreasonable delay can range from as long as several years to as little as one month. The temporal aspect of the delay is less critical than the reasons for it, because in some circumstances even a long delay might be excused. [FN243]

FN243. _Steele v. Ratledge, 2002 WL 31260990, at_ *3 (Del. Ch. Sept. 20, 2002) (footnotes omitted).

Determination of what constitutes "unreasonable delay" is most often necessarily a factual and context-specific inquiry and, therefore, not generally appropriate for resolution on a motion to dismiss. If, however, the pleadings make reasonably certain that laches is applicable and there can be no facts reasonably supporting a contrary inference, then no insurmountable procedural hurdle exists to prevent the Court from resolving the issue on a motion to dismiss claim. [FN244]

FN244. _See Bay NewFoundland Co., LTD. v. Wilson & Co., Inc., 28 A.2d 157 (Del. Ch.1942), aff'd, 37 A.2d 59 (Del.1944); cf. Steele, 2002 WL 31260990, at_ *3 (applying doctrine of laches on summary judgment when "undisputed material facts" established applicability). Although this Court is frequently reluctant to apply laches on a motion to dismiss, _see, e.g., Goldman v. Pogo.com, Inc ., 2002 WL 1358760, at_ *2 n. 16 (Del. Ch. June 14, 2002), there is no _per se_ bar to its application when it is clearly appropriate.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

**(Cite as: Not Reported in A.2d)**

Page 39

### 5. *Incorporation and Consideration of Matters Outside the Complaint*

"The complaint generally defines the universe of facts that the [Court] may consider in ruling on a ... motion to dismiss. When the [Court] considers matters outside of the complaint, a motion to dismiss is usually converted into a motion for summary judgment and the parties are permitted to expand the record." [FN245] The Court may, however, "in some instances and for carefully limited purposes," consider documents referred to in the complaint in order to rule on a motion to dismiss. [FN246] Additionally, the Court may take judicial notice "of matters that are not subject to reasonable dispute." [FN247] As a consequence, the Court will consider the challenged Covad proxy statements, as well as other documents incorporated into the Amended Complaint, in its analysis of the motion to dismiss.

> FN245. *Hughes,* 2006 WL 722198, at *3 (citations omitted); *see also* Ct. Ch. R. 12(b).

> FN246. *See Hughes,* 2006 WL 722198, at *3 (citing *In re Santa Fe Pac. Corp.,* 669 A.2d at 69).

> FN247. *See id.* (citing Del. R. Evid. 201(b)).

### B. *Analysis*

The Plaintiffs have identified information they allege was omitted from Covad Proxy Statements and have explained it was material because its omission permitted the re-election of particular directors who would perhaps not have been re-elected otherwise. The Plaintiffs ask the Court to grant equitable relief by overturning the 2002, 2003, and 2004 elections. "The courts of this state 'have long held that inequitable conduct by directors that interferes with a fair voting process may be set aside in equity.'" [FN248] Therefore, "voiding results of directorial elections and ordering a new election is an appropriate remedy when an election occurs using materially false and misleading proxy materials." [FN249]

> FN248. *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.,* 824 A.2d 11, 15 (Del. Ch.2002) (quoting *Linton v. Everett,* 1997 WL 441189, at *9 (Del. Ch. July 31, 1997)).

> FN249. *Shamrock Holdings of Cal., Inc. v. Iger,* 2005 WL 1377490, at *5 n. 37 (Del. Ch. June 6, 2005). The Court notes that the Amended Complaint does not specifically request that the Court order a new election.

Below, the Court addresses first the application of laches to the Plaintiffs' 2002 Proxy disclosure claims. The Court then turns to each of the Plaintiffs' remaining 2003 and 2004 Proxy disclosure claims and addresses them *seriatim.*

### 1. *Analysis of Plaintiffs' 2002 Proxy Claims Under Laches Doctrine* [FN250]

> FN250. This action was filed on September 15, 2003, well before Covad's issuance of the 2004 Proxy Statement on April 30, 2004, and the 2004 Covad Board meeting on June 10, 2004.
> It should also be noted that the Plaintiffs did not file their Amended Complaint asserting claims for omissions in the 2004 Proxy until August 3, 2004. Whether the Plaintiffs' 2004 Proxy claims should be dismissed because they were not sooner filed is a question the Court need not decide here, given its analysis below.
> The 2002 Proxy Statement is JTX 16; the 2003 Proxy Statement is JTX 24; and the 2004 Proxy Statement appears at Calder Decl., Ex. E.

*31 As stated above, laches does not, in the mill run of cases, present a proper basis on which the Court may dismiss a plaintiff's claims, since determination of what constitutes "unreasonable delay" is frequently a factual and context-specific inquiry. Notwithstanding the Court's general reluctance to employ laches at the motion to dismiss stage, the Court will, however, dismiss claims when "unreasonable delay" may be found from the face of the pleadings and it is reasonably certain that no set of facts can be proved which would otherwise preclude such a finding.

In the present litigation, the chronology relevant to laches analysis is undisputed. The Plaintiffs seek now to overturn the 2002 election for directors. The directors elected in 2002 have since completed their three-year terms of office. This fact alone makes equitable relief with respect to the 2002 Proxy claim

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

impossible.

Moreover, the Court is troubled by Khanna's delay of more than a year after the 2002 board elections in filing his Original Complaint challenging the adequacy of 2002 Proxy Statement. The Draft Complaint presented to the Covad board by Khanna on July 9, 2002 (as well as his letter to the board of June 19, 2002) demonstrates that he was aware of the facts underlying his disclosure claims before the 2002 board meeting, at the latest (and probably much earlier). Indeed, Khanna served as General Counsel of Covad when the transactions he now challenges (and which underlie the bulk of his disclosure claims) took place. Very few shareholders would stand in a better position to know the relevant facts than a corporation's General Counsel.[FN251]

> FN251. The Plaintiffs also argue that an issue of fact as to Khanna's delay in filing this action is created by a letter from Covad's outside counsel to Khanna's counsel, dated February 13, 2003, Pls.' Ans. Br. to Covad's Mot. to Dismiss at 46-47. JTX 62. The Court notes, first, that the February 13, 2003 letter was actually in response to a letter from Khanna's counsel sent two days earlier, on February 11, *see* JTX 63, and not an email from Khanna, dated November 13, 2002, *see* JTX 33. Moreover, although the February 13 letter does provide that Khanna's disclosure objections would be "refer[ed] ... to the Company, which is being advised by separate counsel on its disclosure obligations," the Court does not view this as potentially mitigating Khanna's already by then extensive delay in seeking the wide-ranging equitable relief he now requests.

Although this Court may overturn a board election, a plaintiff seeking such relief must present her claims with reasonable alacrity if useful equitable relief is to be granted.[FN252] Moreover, finality and predictability with respect to a corporation's governing structure clearly are not of insignificant benefit to the corporate enterprise.[FN253] Khanna, with his knowledge of the facts he now asserts were improperly omitted, could have acted at the time of the 2002 election. Similarly, he could have filed an action for equitable relief promptly following the 2002 election. The Plaintiffs have offered the Court no persuasive explanation for his delay of more than one year.

> FN252. The policy considerations animating this view in the context of challenges to board elections also apply in the context of challenges to mergers, although perhaps with more severe consequences for the dilatory plaintiff. Cf. *In re J.P. Morgan Chase & Co.,* 2005 WL 1076069, at *12 (holding that failure to file TRO in merger context resulted in "equitable [being] relief is no longer practicable," since the " 'eggs' ha[d] been irretrievably 'scrambled' and there [was] no possibility of effective equitable relief"); *see also Arnold,* 678 A.2d at 537. *But see Loudon,* 700 A.2d at 138 (in context of board election, stating that "[a] timely complaint, properly pleaded and supported by proof sufficient to invoke preliminary equitable relief, could result in an early injunction or the imposition of corrective disclosures *before* the complained-of corporate activity had been consummated" (emphasis added)).

> FN253. *Compare Bay Newfoundland Co. v. Wilson & Co.,* 37 A.2d 59, 62 (Del.1944) (addressing certainty interests in the distinct, but analogous context of corporate act approval).

The Court concludes that, in light of equitable principles guiding the exercise of its jurisdiction, it would be inequitable to award the Plaintiffs the relief they seek with respect to their 2002 Proxy disclosure claims. Khanna served as Covad's General Counsel during the period the challenged transactions were approved; however, Khanna filed suit only after his termination, thus generating concern that his actions were motivated by his employment dispute.[FN254] Khanna's role at Covad provided him with knowledge and a platform from which the problems could have been addressed. Khanna now seeks to employ that knowledge against the corporation, and its directors, well after the fact.[FN255] Moreover, the addition of Sams and Meisel, as plaintiffs, fails to ameliorate the Court's concerns.[FN256] The Court cannot permit the Plaintiffs in this instance to have stood effectively idle until more than a year after the 2002 annual meeting to bring their challenge before this Court. Fundamentally, this is not an instance in which the grant of equitable relief would comport with its general notions of equity, and, as a consequence, the Plaintiffs' claims with respect to the 2002 Proxy Statement must be dismissed under the doctrine of

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

laches.[FN257]

*Proxy Statements)*

FN254. The Court acknowledges the Plaintiffs' allegations that Khanna objected to the transactions and that he was investigated internally for sexual harassment as a result of his objections, *but see* Pls.' Ans. Br. to Covad's Mot. to Dismiss at 42 n. 14 (explaining that Khanna's objections with respect to Dishnet-and presumably the other transactions, as well-were business advice only, and not legal advice); however, the Court does not view Khanna's termination as isolated from Khanna's filing litigation against the defendants soon thereafter-*i.e.,* the timing of events is not mere coincidence. Indeed, given the Court's treatment of Khanna's June 19 letter to the Covad Board as made in the employment context (which is a treatment that the Plaintiffs necessarily desire), the Court will not now view the present litigation as unrelated (*i.e.,* not to gain advantage in what may perhaps be viewed as a substitute for convoluted employment litigation).

FN255. This does not diminish, however, the Court's ruling, below, that certain information is not subject to attorney-client privilege.

FN256. The Court holds Sams and Meisel, as co-plaintiffs with Khanna, charged with the behavior of Khanna that took place prior to their appearance in this action.

FN257. The Court also notes that prior decisions have held claims for equitable relief moot when the challenged directors' terms have expired. *See Loudon,* 700 A.2d at 138; *see also M & B Weiss Family Ltd. P'ship of 1996,* C.A. No. 20303, slip op. at 5. This applies to Hawk, and it also likely applies to the claims against McMinn and Hoffman. Because McMinn and Hoffman were re-elected on expiration of their terms in 2005, however, the Court declines to rely on this principle.

2. *Analysis of Plaintiffs' Individual Proxy Disclosure Claims*

a. *Disclosure Claim # 1: Khanna's June 19, 2002 Letter to the Covad Board (2002, 2003, and 2004*

*32 The Plaintiffs first claim that the failure to disclose Khanna's June 19, 2002 letter to the Covad Board constituted a material omission from Covad's 2002 Proxy Statement.[FN258] Based on the foregoing analysis, this claim must be dismissed.

FN258. Amended Compl. at ¶ 194.

The claims presented in the Amended Complaint with respect to the 2003 and 2004 Proxy Statements do not specifically identify the letter as a material omission.[FN259] Nevertheless, assuming *arguendo* that the Amended Complaint does set forth such claims, they would be dismissed as well.

FN259. *Compare id.* at ¶ 194, *with* ¶¶ 204, 213. Indeed, as explained above, failure to identify the omitted facts which form the basis of a plaintiff's claim is, in itself, cause to dismiss. *See Loudon,* 700 A.2d at 140.

First, any such claims involving the 2003 and 2004 Proxy Statements fail principally because, as explained above, Khanna's June 19, 2002 letter must be viewed primarily as part of an on-going employment dispute between Covad and Khanna. Therefore, the letter is a document that the Company is not required to disclose, standing alone. This Court has already ruled in the Plaintiffs' favor on this issue, deeming the letter not to have been a demand on the Covad Board, but the Plaintiffs must endure the consequences along with the benefits of this conclusion. Moreover, the Plaintiffs' claims with respect to the letter fail because disclosing the letter (and its characterization of the challenged transactions) would amount to a requirement that the Covad Board disclose and adopt Khanna's pejorative characterization of the challenged conduct. This would amount to "self-flagellation."

b. *Disclosure Claim # 2: Standstill Agreement (2002 Proxy Statement)*

As explained above, this claim must be dismissed because it is a challenge to the 2002 Proxy Statement. The Court also briefly notes, however, that the Plaintiffs have failed to satisfy the materiality standard necessary to survive the motion to dismiss this claim, as well. On June 10, 2002, the Proxy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                Page 42
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Statement was issued. On June 19, 2002, Khanna sent the Covad Board his letter. The directors were elected on July 25, 2002. Thus, with regard to the 2002 disclosure of the Standstill Agreement, the question becomes whether this was material before July 25, 2002. The Court concludes that it was not. Since the Standstill Agreement related solely to Khanna's employment claims, it was not relevant to shareholders, at least in the way that the Amended Complaint alleges.[FN260]

> FN260. As discussed above, Khanna's June 19, 2002 letter-read it in the light most favorable to the Plaintiffs-relates to Khanna's employment dispute. The corporate governance allegations are subordinate to the employment demands. Similarly, the Standstill Agreement relates to Khanna's employment claims. The Amended Complaint does not allege that this understanding changed while the Standstill Agreement was in effect between July 10, 2002 and July 26, 2002. Obviously, at some point the posture of Khanna's claims against Covad purportedly changed from being centered on his termination to seeking redress for shareholders in general. When the nature of these claims changed is unclear from the Amended Complaint. However, it is clear that it was after July 25, 2002.

Moreover, the Amended Complaint alleges that the omissions from Covad's 2002 Proxy Statement led to the election of McMinn, Hawk, and Hoffman and that the omitted facts would have been material to this decision. It is not at all clear how disclosure of the Standstill Agreement would have been material to the decision of whether to reelect these directors.

### c. *Disclosure Claim # 3: "Real Reasons" for Khanna's Termination as General Counsel of Covad (2002, 2003, & 2004 Proxy Statements)*

As with the above discussion of the June 19, 2002 letter, the Plaintiffs' third disclosure claim (that the "real reasons" behind Khanna's termination should have been disclosed) would constitute admissions of wrongdoing, which the Defendants contest, before a final adjudication on the merits. This constitutes a request that the Board engage in classic "self-flagellation," and, therefore, this claim is dismissed as well.[FN261] Moreover, the Plaintiffs' challenges to the 2002 Proxy must also be dismissed with respect

to this claim for the reasons stated above.[FN262]

> FN261. The Court also views the additional disclosures the Plaintiffs seek here to be not material to shareholders' decisions of whether to elect particular directors, especially since they relate to an employment dispute. Moreover, the only directors whom the Plaintiffs allege tried to "intimidate" Khanna (McMinn and Hoffman) were re-elected in 2002.

> FN262. With respect to their 2002 Proxy claim, the Plaintiffs additionally assert that the Defendants failed to "disclose ... [Khanna's] intention, expressed to them, of taking legal action, if necessary, to seek redress for the harm defendants had caused Covad." Amended Compl. at ¶ 196. This claim is set forth in the same paragraph as the alleged omission of the "real reasons" for Khanna's termination. Khanna's purported "intentions," as a shareholder or even as a former General Counsel, cannot be said to be a material fact that a board must disclose in its proxy statement in this context.

### d. *Disclosure Claim # 4: Failure to Satisfy the BlueStar Earn-Out Criteria (2002, 2003, & 2004 Proxy Statements)*

*33 The Plaintiffs also allege that the failure of BlueStar to meet the earn-out criteria set forth in the BlueStar Acquisition constituted a material omission from all three challenged Covad Proxy Statements. Specifically, the Plaintiffs allege: "Defendants also did not disclose that the earn-out criteria for the BlueStar transaction had not been met, but that they decided to pay out the 3,250,000 shares. Defendants Crosspoint, Shapero, McMinn, and Hawk derived great benefit by, between them, receiving almost 50% of the 3,250,000 shares issued by Covad in this transaction."[FN263]

> FN263. *Id.* at ¶¶ 197, 206, 215.

At the outset, the Court notes that the 2002 Proxy disclosure claims must be dismissed for the reasons set forth above. The Court, therefore, addresses only the Plaintiffs' claims with respect to the 2003 and 2004 Proxies. With respect to these two proxy statements, the Amended Complaint fails to set forth

allegations sufficient to survive the Defendants' motion to dismiss. The materiality of any disclosure must be analyzed within the scope of the pleadings. Thus, the fact that BlueStar failed to meet its earning targets must be considered in light of its materiality to shareholders' decision to elect particular directors (*i.e.*, in the context in which the Plaintiffs bring their disclosure claims). Viewed in this light, BlueStar's earning disclosure cannot be viewed as material.[FN264]

> FN264. The BlueStar acquisition and earn-out settlement had occurred more than two years before the 2003 proxies were solicited. Shareholder approval was not required for the BlueStar earn-out settlement. If approval had been required, then disclosure of this information would likely have been material to that decision.

The only potential argument as to why disclosure would be material to shareholders, in the context of the board elections, is that the directors' approval of the earn-out payment may have been relevant in deciding whether or not to elect a particular director. This rationale alone, however, is not sufficient to mandate disclosure. A large quantity of information may exist regarding any director that *could* be useful to shareholders in making a decision whether or not to elect a particular director. Yet, the question is not merely whether a disclosure might be helpful in deciding to elect a director, but, instead, whether the information reaches the necessary threshold of materiality.[FN265] The business decision of a board to settle certain disputed claims is not, standing alone, within the class of information that is the proper subject of disclosure when shareholder action is not requested with respect to that action but, instead, in the context of a director election. [FN266] Because the BlueStar earn-out settlement was just one of many decisions that Covad's directors made, and given the passage of time following the earn-out settlement, the Court concludes that disclosure of BlueStar's financial data measured against Covad's earn-out obligations to former BlueStar shareholders in the 2003 and 2004 Proxy Statements was not material to the Covad shareholders in this context. Disclosure would not have significantly altered the total mix of information available to shareholders in deciding how to cast their votes in the 2003 and 2004 elections for disinterested directors. [FN267]

> FN265. A proxy statement need not disclose the details of all transactions in which

uninterested directors slated for re-election participated. Certainly, broad disclosure is preferred, *see, e.g., Zirn,* 621 A.2d at 779, but the Plaintiffs' expectations are too expansive in this context.

The Amended Complaint does not identify the lack of detail about Lynch's role in negotiating the BlueStar transaction as an improper omission from the 2003 Proxy Statement. *See* Amended Compl. at ¶¶ 197, 206, 215.

> FN266. *Cf. Loudon,* 700 A.2d at 145. ("The details of a corporation's inner workings and its day-to-day functioning are not the proper subject of disclosure.").

> FN267. The Court takes a dim view of the 2002 Proxy Statement's vague (if at all extant) references to the interests of McMinn and Hawk in the BlueStar earn-out settlement. Had the Plaintiffs' 2002 Proxy claims not been dismissed in their entirety, the Court may have found the disclosure shortcomings in this context material for purposes of the motion to dismiss.

*34 Moreover, Covad had already disclosed facts relevant to the BlueStar acquisition and settlement in its 2002 Proxy Statement, and Covad's 2003 10-K describes BlueStar's subsequent liquidation. Indeed, the disclosures of the 2002 Proxy approach, if not fulfill, disclosure of the information the Plaintiffs contend was improperly omitted. Although the Proxy Statement does not explicitly set forth that the criteria were not met, it does make clear that (1) the full amount BlueStar stockholders were originally to receive under the earn-out provisions was not paid, (2) settlement occurred before the full earn-out period had passed, and (3) the settlement was agreed-to "in exchange for a release of all claims against [Covad]."[FN268]

> FN268. According to the 2002 Proxy Statement:
> In connection with our acquisition of BlueStar, we agreed to place approximately 800,000 shares of our common stock in a third-party escrow account. Up to 5,000,000 additional common shares of our common stock were to be issued if BlueStar achieved certain specified levels of revenues and earnings before interest, taxes, depreciation and amortization in 2001. However, in April

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

(Cite as: Not Reported in A.2d)

Page 44

2001, we reached an agreement with the BlueStar stockholders' representative to resolve this matter, as well as the matters that caused 800,000 of the Company's common shares to be held in escrow as of December 31, 2000, by providing the BlueStar stockholders with 3,250,000 of the 5,000,000 shares, in exchange for a release of all claims against the Company. BlueStar's former stockholders received the additional shares of the Company's common stock during 2001. The 800,000 common shares held in escrow were ultimately returned to the Company under this agreement.

Were the Court to conclude that the failure to meet the earn-out criteria was material to the shareholders' decision and did not constitute self-flagellation-e.g., if the proxy had been sent to solicit shareholder approval of the settlement-then the prior disclosures of material information would be insufficient to grant a motion to dismiss.[FN269] The Plaintiffs' claim presents a distinct set of issues, however. In the context of a director election, the Court, in this instance, must ask questions similar to those considered in both *Loudon v. Archer-Daniels-Midland Co.*[FN270] and *Wolf v. Assaf*.[FN271] Where can it be said that a bright-line rule should apply requiring disclosure of mere facts concerning a past action of the board that would otherwise appear to have bearing on a director's election no greater (unless the conclusion is made that the conduct was "wrongful") than any other facts regarding the numerous business decisions with which the director has been involved? Such a rule would seem to invite overwhelming disclosure of a broad range of information in the context of director elections (*e.g.*, information surrounding *all* transactions which the director has voted to approve) in order to avoid potential future litigation. Although broad disclosure is encouraged, it is also possible for such disclosure to become so extreme as to render proxies confusing and not particularly useful to shareholders in casting an informed vote.[FN272]

FN269. Compare *Wolf, 1998 WL 326662*, at *3 ("Including the description of the federal class action in the 10-K and attaching it to the proxy statement creates a substantial likelihood that the reasonable shareholder would have been on notice to review and would have been likely to review its contents."), with *ODS Techs., L.P. v.*

*Marshall, 832 A.2d 1254, 1261-62 (Del. Ch.2003)* (granting preliminary injunction since omissions of purpose and effect underlying proposed amendments "cross the line" to become "affirmatively misleading," and rejecting argument that reference to 10-K mailed with proxy to attachment sent to shareholders in unrelated distribution years earlier was sufficient as it would create "a 'super' shareholder standard and create almost limitless opportunities for deception of the 'reasonable' shareholder"). Cf. *Bren v. Capital Realty Group Senior Housing, Inc., 2004 WL 370214, at *9 (Del. Ch. Feb. 27, 2004)* (although denying summary judgment and motion to dismiss, stating: "All material facts to the action must be disclosed. This does not require, however, that all material information that was previously disclosed be disclosed again with the specific correspondence requesting action." (citations omitted)).

FN270. *700 A.2d 135 (Del.1997)*.

FN271. *1998 WL 326662 (Del. Ch. June 16, 1998)*.

FN272. Cf. *Brown v. Perrette, 1999 WL 342340, at *8 (Del. Ch. May 14, 1999)* (noting that "disclosure of a single unadorned fact can quickly snowball into wide-ranging disclosure of facts and opinions that otherwise would never come before the shareholders" (citing *Wolf, 1998 WL 326662, at *4)*).

The Plaintiffs might respond that BlueStar's shareholders were so undeserving of the earn-out payment, and Covad's decision to make any earn-out payment were so egregious, that disclosure of BlueStar's earnings would have been material to Covad shareholders, because it would have alerted them that Covad's directors were not pursuing Covad's best interest. This argument, however, accepts Khanna's pejorative description of the BlueStar earn-out settlement, which the Covad Board was not required to disclose because it would constitute the legal characterization of facts (and not a statement of facts). Disclosure of the failure of BlueStar to meet the earn-out criteria would be material to shareholders in this context only if approval of the settlement by the directors up for re-election had been wrongful.[FN273] Thus, the Plaintiffs seek a disclosure "which by inference would convey"

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

a breach of fiduciary duty. [FN274] Disclosure of the single, unadorned fact of the failure to meet the earn-out criteria, standing alone in the proxy to elect directors-especially in 2003 and 2004, two and three years after the settlement-would likely invite, if not require, the Board to explain its reasons why the settlement was warranted. The Court, then, views this as sufficiently analogous to other plaintiffs' prior "attempt[s] to 'skirt' the 'self-flagellation' rule," which would ultimately place the Court on a "well greased slippery slope" and on which the Court declines to tread. [FN275]

FN273. *Cf. Loudon,* 700 A.2d at 145.

FN274. *See Wolf,* 1998 WL 326662, at *4.

FN275. *Id.; accord Loudon,* 700 A.2d at 145. *But cf. Brown,* 1999 WL 342340, at *7 (discussing, in context of Court's analysis of disclosures with respect to a transaction approval, potential drawbacks of application of self-flagellation rule).

Finally, the Court views as pertinent to the Court's discussion in *Wolf* of the plaintiff's arguments that the omission in that action was "material to [the director's] character, competence, or fitness for office" is instructive:

Delaware law does not, however, require a proxy statement to impugn a director's character or draw negative inferences from his past business practices. It only requires a summary of his credentials and his qualifications to serve on the board as well as a description of any conflicts of interest. Nothing in our law requires a masochistic litany of management minutiae. If we required companies to include a detailed, subjective assessment of a director's character and past performance in proxy statements before an election, I do not see how this Court could avoid a flood of second-guessing, hindsighted shareholders seeking to contest admittedly subjective conclusions. This form of subjective titillation has never been required as spice for the "total mix."

1998 WL 326662, at *5. The Plaintiffs' claims with respect to the 2002 Proxy Statement have been dismissed for the reasons described above. Moreover, the Plaintiffs do not challenge the summary of credentials and qualifications or of any

conflicts of interest with respect to the 2003 or 2004 Proxies.

*e. Disclosure Claim # 5: McMinn's Status at Covad While Creating Certive (2002 Proxy Statement)*

**\*35** The Plaintiffs' fifth disclosure claim alleges that the 2002 Proxy "did not disclose that defendant McMinn, during the time period of February to November 1999 when he purported to be working for Covad full-time, was actually working for himself and Crosspoint to find new investment vehicles." [FN276] A requirement that the board make this type of disclosure would implicate considerations similar to those discussed, above, with respect to the Plaintiffs' fourth disclosure claim. Moreover, it would require that Covad adopt Khanna's interpretation of McMinn's employment status, as well as his conformity or non-conformity with the conditions on his compensation. As such, the claim must be dismissed. Additionally, this claim constitutes a challenge to the 2002 Proxy Statement, and therefore must be dismissed for the reasons set forth above.

FN276. Amended Compl. at ¶ 198.

*f. Disclosure Claim # 6: Disclosure of Challenged Directors, Officers, and Transactions (2003 & 2004 Proxy Statements)*

The Plaintiffs also make generalized claims with respect to the 2003 and 2004 Proxy Statements. [FN277] They variously allege that the directors failed to disclose "anything about Khanna's allegations regarding the Certive, Bluestar or Dishnet transactions;" "[t]he substance of Khanna's allegations;" or "the information showing the pattern and practice of self-dealing and other malfeasance by the directors...." [FN278] The only omissions they point to with any reasonable specificity is that "Defendants did not identify which directors and officers or which transactions were the subject of Khanna's allegations." [FN279]

FN277. *Id.* at ¶¶ 204, 213.

FN278. *Id.* at ¶¶ 204, 205, 213, 214.

FN279. *Id.* at ¶¶ 204, 213.

As explained above, "it is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleading not be merely conclusory." [FN280]

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Certainly, the threshold is relatively low in order for a claim to be considered well-pleaded on a motion to dismiss under Court of Chancery Rule 12(b)(6). Nevertheless, in order to state a claim for material omission from a proxy statement, a plaintiff must, *inter alia*, identify the facts that were improperly omitted.[FN281] The Plaintiffs claim here could be fairly read to challenge non-disclosure of all facts asserted in the Plaintiffs' Amended Complaint (or Khanna's June 19, 2002 letter to the Covad board or his July 9, 2002 Draft Complaint). The Court will not attempt, however, to parse a broadly generalized claim for non-disclosure for the benefit of the Plaintiffs-it is their responsibility to identify in a reasonable manner the facts which they allege were improperly omitted.

FN280. *Loudon*, 700 A.2d at 140.

FN281. *See id.* at 141; *id.* at 144 (upholding trial court's ruling that complaint "failed to 'identify any specific fact that should have been disclosed.' "); *see also M & B Weiss Family Ltd. P'ship of 1996*, C.A. No. 20303, slip op. at 5.

As a consequence, the Court understands the Plaintiffs to be asserting a claim for failure to identify the directors, officers, and transactions that were the subject of Khanna's allegations.[FN282] At the outset, the Court notes that, once Khanna had filed his Original Complaint on September 15, 2003, after the 2003 election, the subsequent 2004 Proxy discloses both the initiation of the lawsuit and lists the former and current directors named as defendants. [FN283] Though the 2004 Proxy Statement does not specifically identify the Certive, Bluestar, and Dishnet transactions as being the subject of his suit, it does describe in sufficient detail the history of Covad's dealings with Khanna, the steps it took in investigating his claims, the result of that investigation, and the general claims he now asserts.[FN284] Indeed, a requirement that the proxy statement disclose details (and conclusions that could be drawn from those details) to the degree the Plaintiffs apparently wish would most likely cross into self-flagellation. Therefore, the Court concludes that the Plaintiffs have failed to state a claim with respect to the 2004 Proxy Statement.

FN282. Although the Amended Complaint is not clear, it does provide in the first sentence of the relevant paragraphs that "defendants did not disclose anything about Khanna's allegations regarding the Certive, BlueStar or Dishnet transactions." *See* Amended Compl. at ¶ ¶ 204, 213. The Court, therefore, understands the Plaintiffs to be claiming that these listed transactions should have been disclosed as having been the "subject of Khanna's allegations." *See id.*

FN283. *See* 2004 Proxy Statement at 6-7.

FN284. Neither Crandall nor Runtagh, the directors slated for re-election in 2004, was interested in any of the challenged transactions, and the Court does not view disclosure of these particular transactions as being the "subject of Khanna's allegations" as material to these directors' re-election. Covad's disclosure puts any shareholder who is concerned by Khanna's allegations on notice that the Covad Board is "too cozy" and that the shareholder should either vote no as to Covad's slate of directors or seek the nomination of fresh candidates.

*36 With respect to the 2003 Proxy Statement, no lawsuit had been filed during most important period (*i.e.*, before the 2003 election).[FN285] Although the Plaintiffs seek to characterize this information (*i.e.*, the directors, officers, and transaction that were the subject of Khanna's allegations) as "facts," information of this sort is not normally the subject of proper disclosure claims. The Court, instead, views the Plaintiffs' claim in this context as analogous to prior instances in which this Court has held that proxy statements need not set forth the "opinions of stockholders" who have merely voiced opposition to a transaction, even if they are "large holders of ... stock." [FN286]

FN285. Though Khanna had filed his § 220 demand on Covad on June 10, 2003 (and a related § 220 action in this Court on August 11, 2003, *see Khanna*, 2004 WL 187274), the date relevant to the present analysis is that on which he filed the present litigation.

FN286. *In re Triton Group Ltd. S'holders Litig.*, 1991 WL 36471, at *9 (Del. Ch. Feb. 22, 1991), *aff'd sub nom. Glinert v. Lord*, 604 A.2d 417 (Del.1991) (Table); *see also Seibert v. Harper & Row, Publishers, Inc.*, 1984 WL 21874, at *6 (Del. Ch. Dec. 5, 1984). Khanna is the largest, or one of the largest, individual shareholders of Covad.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

The Plaintiffs' contention that Khanna's opinions, as a former General Counsel of Covad, carry more weight and therefore merit different treatment is unpersuasive.[FN287] That Khanna's allegations came forth only contemporaneously with a contentious employment dispute, after Khanna had failed to take affirmative action when the transactions occurred, makes the Court less willing to draw a distinction for these Plaintiffs.

FN287. *See* Pls.' Ans. Br. to Dirs.' Mot. to Dismiss at 27.

Moreover, in response to Khanna's letter, Covad appointed a special committee to investigate whether there was any substance to his claims. An independent law firm was then retained by the committee to aid its investigation. [FN288] The committee, comprised of Crandall, Runtagh, and Jalkut, [FN289] directors whom the Court has already determined are disinterested and independent, informed Khanna of its conclusion that the allegations had no merit on December 26, 2002.[FN290] Khanna's allegations, the investigation, and the investigation's conclusions were disclosed in Covad's March 2003 10-K. [FN291] In view of Covad's actions, then, to require more would constitute self-flagellation. Because the Court finds that the Plaintiffs' 2003 Proxy disclosure claim does not, in this instance, properly state a claim for omitted material facts, it must also be dismissed.

FN288. Amended Compl. at ¶ 133 (quoting Covad's March 2003 10-K).

FN289. The Amended Complaint provides that the Covad Board determined, on July 18, 2002, that Crandall and Runtagh "had the authority to add" Jalkut to the investigation committee. *Id.* at ¶ 126. It also alleges that Jalkut's appointment "most likely" occurred "after Khanna's September 2002 meetings with counsel for the Committee," but before February 19, 2003, when Khanna was informed of Jalkut's appointment. *Id.* at ¶ 130.

FN290. Amended Compl. at ¶ 133.

FN291. *Id.* at ¶ ¶ 133. The Amended Complaint also provides that similar disclosures were made in Covad's May 2003

10-Q. *Id.* at ¶ 204.

VIII. MOTIONS TO CONTINUE TO SEAL/UNSEAL THE RECORD AND TO STRIKE PORTIONS OF THE AMENDED COMPLAINT

The Court now turns to motions addressing whether certain allegations should be given confidential treatment.

A. *Motion to Strike Portions of the Amended Complaint*

1. *Whether the Amended Complaint Contains Privileged Information*

Covad maintains that Paragraphs 52, 54, 55, and 57 of the Amended Complaint contain privileged information. Rule 502 of the Delaware's Rules of Evidence defines the attorney-client privilege:

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client ... between the client or the client's representative and the client's lawyer or the lawyer's representative.... [FN292]

FN292. Del. R. Evid. 502(b)(1). Although Khanna's professional obligations may be defined by California, the parties have pointed to no material difference between the lawyer conduct rules of California and Delaware.

In order for the communication to be confidential, the communication must not have been "intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication ." [FN293] Although the identity of one's attorney is usually not privileged,[FN294] the subject matter of the communications is privileged.

FN293. Del. R. Evid. 502(a)(2).

FN294. *See, e.g., Gotham Partners v. Hallwood Realty,* 1999 WL 252377, at *1 (Del. Ch. Mar. 31, 1999)* ("Neither the status

© 2006 Thomson/West. No Claim to Orig. U.S. Gov't. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 48

nor identity of an attorney whose communications are privileged are privileged facts.").

*37 In the case at hand, the Amended Complaint, at times, reveals the subject matter of communications between Covad and Wilson Sonsini Goodrich & Rosati, P.C. ("Wilson Sonsini"), the law firm representing it-namely that the Certive transaction was a possible corporate opportunity for Covad. It is fair to read Paragraphs 52 [FN295] and 54 [FN296] as revealing confidential information-specifically, the general subject matter of Covad's communications with its inside- and outside-counsel.

FN295. Amended Compl. at ¶ 52 ("Khanna voiced his opposition to the [Certive] deal, and raised with defendant Knowling and [Wilson Sonsini] the issue of Certive being a possible corporate opportunity for Covad."). This paragraph discusses both the opinions of Khanna, Covad's inside-counsel, of the Certive transaction and the subject matter of Covad's conversations with Wilson Sonsini, its outside-counsel.

FN296. *Id.* at ¶ 54 ("[T]he Board adopted (with the counsel of the conflicted Wilson Sonsini firm) a corporate opportunity policy which expressly required the prior approval of the Board before a fiduciary of Covad could take a corporate opportunity for himself...."). This reveals that Wilson Sonsini worked with Covad on its corporate opportunity policy, which, of course, reveals the subject matter of Wilson Sonsini's representation of Covad. Furthermore, if the information alleged in the Amended Complaint was gained from Khanna's attendance at the board meeting as General Counsel, then the information may be privileged for this reason as well.

Although paragraphs 52 and 54 reveal the subject matter of Wilson Sonsini's representation of Covad, it is less clear why paragraphs 55 and 57 are privileged. Paragraph 55 states that "[the Board] even disregarded the very obvious conflict of counsel to Covad, Wilson Sonsini, serving as counsel for Certive during the period when McMinn was founding Certive while on Covad's payroll as a full-time employee and representing Certive in the very transaction by which Covad acquired its Certive shares." [FN297] Paragraph 55 then goes on the describe

Wilson Sonsini's interest in Certive.[FN298] Neither of these statements is privileged. Moreover, the fact of Wilson Sonsini's representation of Covad during the Certive transaction is not privileged because the identity of one's attorney does not constitute privileged information.[FN299]

FN297. *Id.* at ¶ 55.

FN298. The Court notes that Wilson Sonsini's interest in Certive is not privileged because it does not reveal any confidential information that Covad provided to (or advice received from) Wilson Sonsini. Instead, Paragraph 55 merely discusses Wilson Sonsini's independent ownership interest in Certive. Covad holds no privilege with regard to this information.

FN299. *See supra* note 294 and accompanying text.

Paragraph 57 states that "while at Covad and on Covad's time, and using Covad's outside counsel, Wilson Sonsini, [McMinn] developed and pursued the Certive business opportunity...." [FN300] As with Paragraph 55, Paragraph 57 only reveals the identity of Covad's outside counsel and, therefore, is not privileged.

FN300. Amended Compl. at ¶ 57.

2. *Whether the Privilege was Waived with Regard to the Information in the Amended Complaint*

Because the Court has determined that Paragraphs 52 and 54 contain privileged information, it must now consider whether the attorney-client privilege, with respect these Paragraphs, has been waived by Covad. The doctrine of waiver is expressly codified by Rule 510 of the Delaware Uniform Rules of Evidence which provides that "[a] person upon whom these rules confer a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter." [FN301]

FN301. *The Cove on Herring Creek Homeowners' Ass'n, Inc. v. Riggs,* 2001 WL 1720194, at *2 (Del. Ch. Dec. 28, 2001).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 49

The Court first considers Khanna's argument that Covad waived its privilege by disclosing information to him when he was wearing his "Vice President hat," as opposed to his "General Counsel hat." Khanna cites authority, including *United States v. Vehicular Parking, Ltd.*,[FN302] for the proposition that "legal advice that is merely incidental to business advice may not be protected."[FN303] In *Vehicular Parking*, the court, ruling on the defendants' claims of privilege, held that "the communications in question indicate [that the defendants' attorney] was advising on matters of business. Privilege is not accorded to such communications."[FN304] Privilege as to the communications at issue in that case, however, was not a close call. The court had no difficulty separating the roles of attorney and businessman. As the court explained, "[The set of communications in question] is more than attorney-talk. It is big-as well as basic-business diction."[FN305]

FN302. 52 F.Supp. 751 (D.Del.1943).

FN303. Pls.' Ans. Br. in Opp'n to Covad Commc'ns Group, Inc.'s Mot. to Disqualify Pls. & Mot. to Strike Portions of Am. Deriv. & Class Action Compl. ("Pls.' Ans. Br. to Mot. to Disqualify") at 22.

FN304. 52 F.Supp. at 753.

FN305. *Id.; see also* Del. R. Evid. 502(a)(2) (describing "confidential information" as "disclosure made in the furtherance of the rendition of professional *legal* services" (emphasis added)).

*38 It is significantly more difficult, however, to relate the understanding that "business diction" occurring between an attorney and her client is not privileged to the case at hand. Khanna provides no specific evidence-other that stating that he was a Vice President at Covad-to buttress his assertion that the information Covad deems privileged was obtained outside his legal capacity. Instead, the Plaintiffs cite authority that would place the burden on Covad to demonstrate that the information it wishes to protect was given in Khanna's legal capacity.[FN306] The Court of Appeals in *In re Sealed Case*,[FN307] ruling on a corporation's claim that certain communications were privileged and could not be testified to by its former general counsel, explained that it was "mindful ... that [the general counsel] was a Company vice president, and had certain responsibilities outside the

lawyer's sphere. The Company can shelter [the General Counsel's] advice only upon a clear showing that [the General Counsel] gave it in a professional legal capacity."[FN308] The Court of Appeals also explained, however, that "advice does not spring from lawyers' heads as Athena did from the brow of Zeus,"[FN309] and, since some nonlegal background is necessary for lawyers to give legal advice, the mere mention of nonlegal information does not negate the attorney-client privilege.[FN310]

FN306. *See, e.g., In re Sealed Case, 737 F.2d 94, 99 (D.C.Cir.1984)* ("The Company can shelter [in-house counsel's] advice only upon a clear showing that [in-house counsel] gave it in a professional legal capacity.").

FN307. 737 F.2d 94 (D.C.Cir.1984).

FN308. *Id. at 99; see also id.* ("It remains the claimant's burden, however, to present to the court sufficient facts to establish the privilege; the claimant must demonstrate with reasonable certainty that the lawyer's communication rested in significant and inseparable part on the client's confidential disclosure." (citations omitted)).

FN309. *Id.*

FN310. *Id.*

*In re Sealed Case* was written in the context of the attorney and client, on the same side of litigation, trying to protect privilege. It was *not* written in the context of the attorney trying to break the attorney-client privilege. In other words, *In re Sealed Case* deals with an attorney and client attempting to deploy the attorney-client privilege as a shield, not an attorney trying to break the privilege and use the information as a sword. Given the importance this Court places on the attorney-client privilege and an attorney's ethical duties to his former client,[FN311] in the situation where an attorney is seeking to use potentially privileged information as a sword against a former client, the inquiry has been framed as:

FN311. *See, e.g., Continental Ins. Co. v. Rutledge & Co., Inc.*, 1999 WL 66528, at *1 (Del. Ch. Jan. 26, 1999) ("The importance of the attorney-client privilege is central to the American model of adversarial litigation.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

whether it can reasonably be said that in the course of the former representation the attorney might have acquired information related to the subject of this subsequent representation. [The Court] will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.[FN312]

> FN312. *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 268-69 (S.D.N.Y.1953). This Court has previously followed portions of *T.C. Theatre Corp.*-namely its "substantial relationship" test. *See Ercklentz v. Inverness Mgmt. Corp.,* 1984 WL 8251 (Del. Ch. Oct. 18, 1984).

In the present litigation, because Khanna served as General Counsel of Covad, it can reasonably be inferred that Khanna received information regarding the Certive transaction in his legal capacity. Furthermore, Khanna's response on learning information regarding the transaction was of a legal nature, [FN313] which leads one to infer that the information was provided to him in the context of seeking legal advice. Finally, the fact that, as Khanna claims, he was "told to leave the meeting when the Board was ready to *discuss* and vote on the Board's ratification of the McMinn and Crosspoint investments in Certive" [FN314] leads one to believe that his *business* opinion was not valued (even for discussion purposes) and, thus, it is unlikely that he would have originally been given the information to provide a business opinion. For these reasons, the Court finds Khanna's argument, that the information in Paragraphs 52 and 54 of the Amended Complaint is not privileged because he was wearing his "Vice President hat" when he learned the information, to be unpersuasive.

> FN313. *See* Amended Compl. at ¶ 52 (noting that Khanna voiced his opposition to the deal as a possible corporate opportunity and objected to Shapero sitting on the board of a competitor).

> FN314. *Id.* at ¶ 53 (emphasis added).

*39 The only issue remaining, with regard to whether Paragraphs 52 and 54 are privileged, is whether Covad waived its privilege through disclosure during the § 220 trial.[FN315] The Court addresses Paragraph 52, first.

> FN315. *See supra* note 301, and accompanying text.

This Court has previously held that the attorney-client privilege does not apply "when the party holding the privilege waives the privilege in one of two basic ways: (1) the party injects the communications into the litigation, or (2) the party injects an issue into the litigation, the truthful resolution of which requires an examination of the confidential communications." [FN316] Additionally, the "attorney-client privilege may be waived by the public disclosure of information that was formerly confidential." [FN317] A fair reading of Joint Exhibit 119 from the § 220 trial, which is a letter from Khanna's counsel to an attorney for a subcommittee of Covad's Board, demonstrates that Covad waived privilege with respect to Paragraph 52. Covad used Joint Exhibit 119 at the § 220 trial. Perhaps Covad's intent was to introduce only letter itself and not the subsequent chronology (authored by Khanna) attached to the letter. Permitting Covad to introduce the document as evidence at the § 220 hearing, and then allowing Covad to shield an integral and incorporated attachment to that document (and clearly referenced in the document itself),[FN318] would defeat the purpose of the "inject into litigation" exception to attorney-client privilege.[FN319] Joint Exhibit 119 clearly references, on multiple occasions, the attachment; and the letter can be viewed as a summary of that attachment. Since the attachment was so integral to the letter, the introduction, by Covad, of part of Joint Exhibit 119 into litigation waives the attorney-client privilege as to the entire document. Thus, the Court concludes that Paragraph 52 does not contain any currently privileged information because privilege was waived.

> FN316. *Baxter Int'l, Inc. v. Rhone-Poulenc Rorer, Inc.,* 2004 WL 2158051, at *3 (Sept. 17, 2004).

> FN317. *Texaco, Inc. v. Phoenix Steel Corp.,* 264 A.2d 523, 525 (Del. Ch.1970).

> FN318. JTX 119 (Letter from Grellas to Poss, at 1 (9/10/2002) ("We have attached a detailed chronology prepared by Mr. Khanna....")).

> FN319. According to *Baxter Int'l:* "The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

(Cite as: Not Reported in A.2d)

[inject into litigation] exception is based on the principles of waiver and of fairness, so that the party holding the privilege cannot use it as both a sword and a shield." 2004 WL 2158051, at *3.

Waiver issues with regard to Paragraph 54 are relatively easy to resolve. The information alleged to be privileged (*i.e.,* Wilson Sonsini's involvement in shaping Covad's Corporate Opportunity Policy) can be inferred from documents produced by Covad in the § 220 production. Specifically, document LWDK 0003485 contains the policy, and document LWDK 0003473 lists the attendees at the board meeting at which the policy was adopted. This list includes a Wilson Sonsini attorney, acting as secretary. These two facts, made available through the § 220 production, lead to the inference that the Covad Board adopted its Corporate Opportunity Policy with the advice of a Wilson Sonsini attorney, who was present at the meeting.

In conclusion, the information in Paragraphs 55 and 57 of the Amended Complaint is not protected by the attorney-client privilege. Covad placed the information contained in Paragraph 52 into litigation and, thus, waived attorney-client privilege with regard to the pertinent documents. Finally, the information contained in Paragraph 54 can be deciphered from the documents produced in the § 220 production. For these reasons, the Court denies Covad's motion to strike Paragraphs 52, 54, 55, and 57 from the Amended Complaint.

### B. *Motions to Seal/Unseal the Amended Complaint*

*40 Much of the briefing with regard to sealing and unsealing overlaps the Court's analysis, above, concerning the motion to strike portions of the Amended Complaint. Specifically, Covad argues that the Amended Complaint should remain sealed because Paragraphs 52, 54, 55, and 57 contain privileged information and Paragraphs 43, 44, and 74 contain trade secrets and unnecessarily embarrass Covad executives and board members.

The sealing of Court records is addressed in Court of Chancery Rule 5(g), which states:
(1) Except as otherwise provided in this Rule ... all pleadings and other papers ... filed with the Register in Chancery shall become a part of the public record of the proceedings before this Court.

(2) Documents shall not be filed under seal unless and except to the extent that the person seeking such filing under seal shall have first obtained, for good cause shown, an order of this Court specifying those documents ... which should be filed under seal; provided, however, the Court ... may determine whether good cause exists for the filing of such documents under seal. FN320

FN320. Ct. Ch. R. 5(g)(1)-(2); *see also Romero v. Dowdell,* C.A. No. 1398-N, slip op. (Del. Ch. Apr. 28, 2006).

For the reasons discussed above, the challenged portions of the Amended Complaint do not contain currently privileged information. It necessarily follows that the record should not be sealed on this basis. Additionally, this Court is unable to determine what are the "trade secrets" revealed by Paragraphs 43, 44, and 74. Although these Paragraphs perhaps reveal some internal matters at Covad, they are relevant to the Plaintiffs' case and simply are not sufficiently sensitive to counteract the strong policy reasons as to why the record is presumed to be public unless good cause is shown as to why it should be otherwise. Additionally, although perhaps Marshall's admission of a mistake is embarrassing, this information, disclosed in Paragraph 74, is relevant to the Plaintiffs' claim in that a member of Covad's board thought the BlueStar transaction was a disaster and yet Covad, as alleged, unnecessarily made a performance-based earn-out payment to BlueStar's former shareholders. While perhaps embarrassing, it is nonetheless relevant. An unfortunate consequence of litigation is that information sometimes surfaces that parties would prefer to keep in the dark.FN321 Sealing any complaint that contains mildly embarrassing information would defeat the presumption, set forth in Rule 5(g), that a record is public unless good cause is shown as to why it should be sealed.

FN321. *See Romero,* C.A. No. 1398-N, slip op. at 5-7.

Therefore, the Court denies Covad's Motion for the Continued Sealing and Resealing of Documents and grants the Plaintiffs' Cross-Motion to Unseal the Record.

### IX. DISQUALIFICATION OF THE PLAINTIFFS

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

The remaining issue for the Court to address is Covad's motion to disqualify Khanna, Sams, and Meisel as derivate and class plaintiffs in this action. This motion presents two questions: first, whether Khanna may continue as a representative plaintiff in the litigation; and second, if the Court finds Khanna not a proper representative plaintiff, whether Sams and Meisel may nevertheless continue as plaintiffs. The Court addresses these issues in turn, below.[FN322]

> FN322. The Court, in considering whether each of the Plaintiffs may bring this case, is not restricted solely to the face of the Amended Complaint and documents incorporated into it. When necessary, the Court may, in this context, look to affidavits submitted by the parties, as well as documents and testimony submitted as part of the related, earlier § 220 action. *But cf. Canadian Commercial Workers Indus. Pension Plan v. Alden,* 2006 WL 456786, at *8-*9 (Del. Ch. Feb. 22, 2006) (applying summary judgment standard in that instance).

*41 Khanna served as Covad's General Counsel for approximately six years, until mid-2002 when he was relieved of his duties. The parties adopted an overtly hostile posture soon thereafter.[FN323] During his time at Covad, Khanna served as a senior executive with supervisory responsibilities over Covad's legal department, in addition to the matters on which he worked directly. Khanna was Covad's General Counsel during the relevant periods for all of the challenged transactions.[FN324]

> FN323. *See, e.g.,* JTX 123 (June 19, 2002 letter to Covad Board from Khanna's counsel).

> FN324. The Dishnet Subscription Agreement was dated February 15, 2001, and the Dishnet Settlement was entered into by Covad in February 2002. *See* Amended Compl. at ¶¶ 86, 92. Khanna was told of the charges of sexual impropriety against him on May 9, 2002, *see* JTX 106; JTX 123 at 8, and suspended from his position the following month.

Plaintiffs seeking to maintain derivative claims must satisfy the adequacy requirements implicit in Court of Chancery Rule 23.1.[FN325] "[A] derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her diligence, wisdom and integrity."[FN326] In a challenge to a particular plaintiff's adequacy, however, the burden rests with the defendant.[FN327] "The defendant must show a substantial likelihood that the derivative action is not being maintained for the benefit of the shareholders."[FN328]

> FN325. *See, e.g., Youngman v. Tahmoush,* 457 A.2d 376, 379 (Del. Ch.1983). The analysis of the Plaintiffs' capacity to serve as derivative plaintiffs will, in this instance, be the same as the analysis of the propriety of their service as class representatives. *See, e.g., In re Fuqua Indus. S'holder Litig.,* 752 A.2d 126, 129 n. 2 (Del. Ch.1999) ( "[A]nalysis of adequacy requirements is generally the same under Rules 23 and 23.1 as cases decided under Rule 23(a)(4), *i.e.,* the adequacy requirement of Rule 23, may be used in analyzing the adequacy requirements of Rule 23.1." (citations omitted)).

> FN326. *In re Fuqua Indus.,* 752 A.2d at 129 (citing *Katz v. Plant Indus., Inc.,* 1981 WL 15148, at *1 (Del. Ch. Oct. 27, 1981)).

> FN327. *See Emerald Partners v. Berlin,* 564 A.2d 670, 674 (Del. Ch.1989).

> FN328. *Id.; see also Canadian Commercial Workers Indus. Pension Plan,* 2006 WL 456786, at *8.

A number of factors may be considered in determining whether a plaintiff is deemed "adequate" for these purposes:
(1) economic antagonisms between the representative and the class;
(2) the remedy sought by plaintiff in the derivative litigation;
(3) indications that the named plaintiff was not the driving force behind the litigation;
(4) plaintiff's unfamiliarity with the litigation;
(5) other litigation pending between plaintiff and defendants;
(6) the relative magnitude of plaintiff's personal interests as compared to her interest in the derivative action itself;
(7) plaintiff's vindictiveness toward defendants; and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

(8) the degree of support plaintiff was receiving from the shareholders she purported to represent.[FN329]

> FN329. *In re Fuqua Indus.,* 752 A.2d at 130.

This list, however, is not exhaustive.[FN330] "Typically, the elements are intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1...." [FN331] It is possible that the inadequacy of a plaintiff may be concluded from a "strong showing of only one factor [; however,] that factor must involve some conflict of interest between the derivative plaintiff and the class." [FN332]

> FN330. *See Katz,* 1981 WL 15148, at *2 (explaining that the factors are "[a]mong the elements which the courts have evaluated").

> FN331. *Id.,* at *2 (quoting *Davis v. Comed, Inc.,* 619 F.2d 588, 593-94 (6th Cir.1980); *see also In re Fuqua Indus.,* 752 A.2d at 130 n. 5.

> FN332. *In re Fuqua Indus.,* 752 A.2d at 130; *see also Canadian Commercial Workers Indus. Pension Plan,* 2006 WL 456786, at *8 (explaining that "economic" conflicts are often the primary consideration); *Youngman,* 457 A.2d at 379 (noting exception that "fact that the plaintiff may have interests which go beyond the interests of the class, but are at least co-extensives with the class interest, will not defeat his serving as a representative of the class"). The Court in *Youngman* also explained that "purely hypothetical, potential or remote conflicts of interests never disable the individual plaintiff." *Id.* (citation omitted).

The Court finds Khanna an inadequate representative plaintiff, one who must therefore be disqualified, for two principal reasons.[FN333] First, *Ercklentz v. Inverness Management Corp.*[FN334] effectively controls disposition of this issue. In *Ercklentz,* the Court granted the defendants' motions to disqualify the plaintiff's law firm, which had formerly represented the defendant corporation, and the plaintiff, who had formerly served as general counsel (and director) of the defendant corporation. In granting the motion to disqualify the plaintiff, the Court ruled that "the ethical considerations which bar

an attorney from acting as counsel against his former client also preclude him from acting as a class or derivative plaintiff against his former client." [FN335] The Court determined that, because the general counsel's former representation of his corporate employer involved issues that were "substantially related" to the claims he sought to assert derivatively, the plaintiff would be disqualified.[FN336] The parties agree that this is the standard to be applied.[FN337]

> FN333. The Court's analysis addresses only the issue of whether Khanna may serve a representative plaintiff, which implicates considerations distinct from affording an attorney the opportunity to vindicate rights *personal to him. See, e.g., Doe v. A Corp.,* 709 F.2d 1043 (5th Cir.1983) (disqualifying former in-house attorney as representative plaintiff in suit against former corporate employer, but permitting him to continue suit asserting personal cause of action).

> FN334. 1984 WL 8251 (Del. Ch. Oct. 18, 1984).

> FN335. *Id.* at *4 (citing *Richardson v. Hamilton Int'l Corp.,* 469 F.2d 1382 (3d Cir.1972); *Doe,* 709 F.2d 1043).

> FN336. *See Ercklentz,* 1984 WL 8251, at *4-*5; *see also* Delaware Lawyers' Rules of Professional Conduct ("D.L.R.P.C.") 1.6, 1.9. *Cf. Richardson,* 469 F.2d 1382; *Doe v. A Corp.,* 330 F.Supp. 1352 (S.D.N.Y.1971), *aff'd sub nom. Hall v. A Corp.,* 453 F.2d 1375 (2d Cir1972).

> FN337. *See* Pls.' Ans. Br. to Mot. to Disqualify at 15; Mem. in Supp. of Covad Commc'ns Group, Inc.'s Mot. to Disqualify Pls. ("Covad's Op. Br. to Disqualify") at 8.

**\*42** To determine whether matters are "substantially related" for purposes of a conflict of interest with a former client the Court must evaluate: the nature and scope of the prior representation at issue; the nature and scope of the present lawsuit against the former client; and whether during the course of the previous representation the client may have disclosed confidential information that could be used against the former client in the current lawsuit. Matters may be substantially related if they involve the same transaction or legal dispute or there is substantial risk that confidential information obtained in the former

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 54
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

representation could materially advance the client's position in the current matter. The former client is not required to reveal specific details of the information shared with the attorney, rather the Court may determine whether information regularly shared in that type of representation creates an unavoidable conflict with the current case. [FN338]

FN338. *Hendry v. Hendry,* 2005 WL 3359078, at *4 (Del. Ch. Dec. 1, 2005) (citing *Sanchez-Caza v. Estate of Whetstone,* 2004 WL 2087922, at *3 (Del.Super.Sept. 16, 2004))); D.L.R.P.C. 1.9 cmt. 3.
In the parties' briefs, much is made of the effect of language from *T.C. Theatre Corp.,* which is quoted by the Court in *Ercklentz:* "In cases of this sort the Court must ask whether it can reasonably be said that in the course of the former representation the attorney *might* have acquired information related to the subject of his subsequent representation." *Ercklentz,* 1984 WL 8251, at *2 (quoting *T.C. Theatre Corp.,* 113 F.Supp. at 269 (emphasis added)). In *Ercklentz,* the Court noted that this test set forth a strict standard that, although followed by the Third Circuit, *see Richardson,* 469 F.2d at 1385, had been modified by the Second Circuit, which instead required that the "issues involved in the two representations have been 'identical' or 'essentially the same' " in order to find that a substantial relationship existed. *Ercklentz,* 1984 WL 8251, at *2. Ultimately, the Court concluded that it need not decide which standard to apply, since the defendants had met the higher burden of demonstrating that the two representations were essentially the same. *See id.* at *4; *see also* ABA Formal Op. 99-415 (Sept. 8, 1999) ("Representation Adverse to Organization by Former In-House Lawyer") (describing, in Part A(2), tests for "same or substantially related matters," and indicating approval of Second Circuit formulation).
The standard articulated in Comment 3 of D.L.R.P.C. 1.9, adopted in response to revisions of the ABA's Model Rules of Professional Conduct following the report of the ABA's Ethics 2000 Commission, appears to craft a middle approach between the two previously competing tests described above. *See also* E. Norman Veasey, *Ethics 2000: Thoughts and*

*Comments on Key Issues of Professional Responsibility in the Twenty-First Century,* 5 Del. L.Rev. 1, 13 (2002).

Specifically, Comment 3 to D.L.R.P.C. 1.9 provides that "[a] conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services." Additionally, "[i]n the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation." [FN339] These principles govern the Court's analysis of whether Khanna's prior representation of Covad as its General Counsel is substantially related to the matters at issue in the present litigation.

FN339. D.L.R.P.C. 1.9 cmt. 3.

The Plaintiffs' principal argument as to why Khanna should not be disqualified is that the information he received regarding the challenged transactions was in his capacity as an officer and shareholder of Covad, and not as Covad's General Counsel.[FN340] The Plaintiffs contend that Khanna's duties as General Counsel were primarily related to telecommunications regulatory work and that Covad's board members actively sought to "keep Khanna 'out of the loop' " with respect to the challenged transactions.[FN341] The Plaintiffs add that Khanna "was wholly preoccupied with hotly contested telecommunications regulatory matters and related litigation" and that, even if the board had not kept him " 'out of the loop,' the reality is that he likely still would not have even had time to participate in the transactions as counsel." [FN342]

FN340. *See* Pls.' Ans Br at 16 (citing Amended Compl. at ¶ ¶ 108-11).

FN341. Pls.' Ans. Br. to Mot. to Disqualify at 16, 22.

FN342. *Id.* at 16 n. 3.

These arguments are not persuasive, however, in light of Khanna's status as Covad's senior in-house counsel. In his testimony at the § 220 trial, Khanna

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

claimed that he "owned" corporate governance issues for Covad and that he would have had a "role to play" in such areas.[FN343] Indeed, Khanna's Original Complaint sets forth that, as General Counsel, he was "charged with the role of reviewing all conflict of interest matters for Covad.[FN344] Khanna's June 19, 2002 letter to the Covad Board states that, with respect to the BlueStar acquisition: "Mr. Khanna had seriously objected, both on pure legal grounds (concerning the Clayton Act violations) and on legal/business grounds (waste and self-dealing)."[FN345]

FN343. Trial Tr. 121, 136-37.

FN344. *See* Original Compl. at ¶ 40.

FN345. JTX 123.

*43 Khanna's contention that board members did not solicit his advice does not dampen the Court's concerns as to the source of his information and the circumstances under which he obtained it. The Court finds that a "substantial risk" exists that an attorney in Khanna's position would, in the ordinary course, have learned confidential information relating to the challenged transactions. This concern is supported by the fact that Khanna, acting as board secretary, signed the minutes of the June 15, 2000 Covad board meeting at which the BlueStar acquisition was approved.[FN346] The Plaintiffs argue that Khanna was ordinarily excluded from board meetings when transactions of this nature were approved; however, the Plaintiffs cite only to board minutes regarding the Certive transaction.[FN347] Although it is the Defendants' burden to demonstrate that disqualification should occur, the Court concludes that this burden has been satisfied with respect to demonstrating a "substantial risk" that Khanna learned confidential information relating to the present litigation.[FN348] Moreover, document LDWK 0002012, an email from Knowling to several Covad employees, including Khanna, dated May 21, 2000, more than two weeks before the Board's vote, states, "Here is the game plan. I've asked Bear Stearns to move forward with BlueStar ASAP with an objective to come to terms on a deal this week. Tim, *Drhuv,* Davenport and Lach *are the handlers on this transaction.* "[FN349] It is unreasonable for Khanna now to argue that he was not involved with the BlueStar acquisition (claiming to have been fully engaged in regulatory matters or otherwise kept in the dark by the Covad Board about what was a major transaction, even though he served as Covad's General Counsel).

FN346. *See* JTX 117.

FN347. Moreover, even assuming, *arguendo,* that Khanna was excluded during the portions of the meeting discussing the BlueStar transaction, this would not diminish the substantial risk (indeed, likelihood) that Khanna learned confidential information either before his temporary absence or after rejoining the Board's meeting.

FN348. The Plaintiffs also argue that, unlike in *Ercllentz,* Khanna was not a member of the board and did not approve of the challenged transactions. That, however, is not a requirement for disqualification.

FN349. Calder Decl., Ex. R. (emphasis added).

In this instance, the issue of adequacy as a representative plaintiff, however, is not confined exclusively to Khanna's ethical responsibilities as Covad's former General Counsel. Indeed, the Court need not embrace here a *per se* rule of disqualification applicable to former in-house lawyers as representative plaintiffs.[FN350] Additional factors support, under these circumstances, the Court's decision that, with respect to Khanna, a substantial likelihood exists that the representative action is "not being maintained for the benefit of the shareholders." Specifically, Khanna's employment dispute with Covad has impaired Khanna's capacity to vindicate shareholders' best interests. The June 19, 2002 letter to the Covad Board, demonstrates a self-interested motivation that is not consistent with the continued pursuit of a derivative and class action by this plaintiff-a plaintiff on whom the Covad shareholders would be relying. The June 19, 2002 letter makes clear that Khanna's initial motive in threatening to bring the action was to provide leverage in his attempt to regain (and enhance) his position at Covad after his suspension as General Counsel. The letter lays out numerous requirements to be imposed on the Covad Board, including that Khanna be appointed to the Covad Board "with a not less than 15-year contract[, subject only to a vote of the general shareholders based on the classified Board seat]," "be given a role as Executive Vice President for Corporate Strategy," "be compensated at all times not less than a comparable officer that serves as both an officer and as a director," and be

Not Reported in A.2d                                                                    Page 56
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

permitted to name five individuals who would report directly to him. None of these requirements inures directly to the benefit of the shareholders, if at all—instead, the benefit is directed almost exclusively, if not solely, to Khanna. The letter continues on to threaten that

> FN350. The Court recognizes that, in a derivative suit, relief is not sought from the company; this distinction was afforded no substance in *Ercklentz. See* 1984 WL 8251, at *4-*5.

*44 Mr. Khanna is more than prepared to act to defend himself, and his reputation for tenacity in this regard well precedes him. But he does not desire to light a legal fuse unless his is given no choice. The choice, then, belongs to the company and its Board. We can only hope that it is wisely made.

The Court acknowledges that mere selfish motives [FN351] and past bad behavior [FN352] do not necessarily disqualify an individual from serving as a derivative plaintiff. The posture of these parties, however, demonstrates ample history of bad will creating a substantial likelihood that Khanna will not maintain and prosecute the action according to the best interests of the shareholders.[FN353]

> FN351. See *Youngman,* 457 A.2d at 382. ("Though the plaintiff may well have in part a selfish motive in bringing this action, which is not unusual, he will be permitted to continue to act on behalf of [the class].")

> FN352. See *Emerald Partners,* 564 A.2d at 674-75. The Court notes that, in support of Khanna's argument that his actions during the initial stages of this dispute should be overlooked by the Court, Khanna has purported to waive any employment claims he may have had against Covad. Trial Tr. at 47. Khanna refers the Court to *Emerald Partners,* where this Court permitted a plaintiff who had engaged in "greenmail" in the past to continue as a derivative plaintiff because "Emerald further asserts that it no longer seeks to 'make a quick buck' from the situation. In support of this contention, Emerald has presented evidence that it rejected offers of 'greenmail' payments.... I am not persuaded, therefore that Emerald is maintaining this suit solely in its own interest, or that it will be unable to fairly and

adequately represent the interests of ... other shareholders." 564 A.2d at 674-75. However, concerns about "greenmail" are far different from the concerns surrounding Khanna. The concern with a derivative plaintiff engaging in greenmail is that the plaintiff will sell out too quickly, will not pursue corporate governance reform involving the nominal defendant, or will seek personal financial reward at the expense of the corporate enterprise to the detriment of shareholders in general. These concerns are not unfounded. However, in the greenmail situation, the prospective plaintiff's goal is economic in nature and, once a greenmail offer has been rejected, the concerns discussed *supra* are not applicable. In the case at hand, Khanna's objectives are more qualitative in nature. One can reasonably infer that many of Khanna's issues with Covad's Board are personal in nature and, therefore, the fact that Khanna has offered to forego these claims carries less weight than in a less personal situation, such as one involving greenmail.

> FN353. The Plaintiffs also point to the Court's ruling in the § 220 action that Khanna's § 220 demand was brought under a "proper purpose." The Court's ruling in that context, however, involved different standards and policies than those considered in the Court's analysis of Khanna's adequacy as a representative plaintiff.

In concluding that Khanna must be disqualified as a representative plaintiff, the Court relies primarily on Khanna's position as Covad's former General Counsel and the ethical quagmire that follows. This result is significantly supported, however, by the cloud hanging over the litigation created by the tangential and acrimonious employment dispute between Khanna and his former employer. Although the existence of a substantial relationship between Khanna's prior representation of Covad and the matters presently at issue is likely sufficient grounds to deem Khanna inadequate as a representative plaintiff under *Ercklentz,*[FN354] the Court ultimately concludes that, as a consequence of these two "intertwined and interrelated" considerations described above, Khanna must be disqualified as a representative plaintiff in this action.[FN355]

> FN354. This conclusion may be viewed as

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

equivalent to the "strong showing" of one factor, demonstrating a conflict of interest, necessary to disqualify a plaintiff as an adequate representative. *See In re Fuqua Indus., 752 A.2d at 130.*

FN355. The Defendants have asked that the Court enter an injunction preventing Khanna from further participating in this litigation and from aiding any other persons in bringing their claims, in this context. No evidence has yet been presented to the Court requiring entry of injunctive relief-indeed, the Court's disqualification of Khanna relies in substantial part on the presumption that a danger exists that confidences will be revealed where a "substantial relationship" has been found. The Court presumes that Khanna will conform his behavior with his ethical obligations as a member of the bar; however, the Court may revisit this issue, if necessary.

Covad asserts two grounds for the disqualification of Sams and Meisel, in addition to Khanna: (1) that they are not the "driving force" behind the litigation and (2) that they have been improperly tainted by Khanna. Covad, as movant, must satisfy its burden of demonstrating inadequacy with respect to Sams and Meisel, in addition to Khanna. The evidence before the Court does not, as yet, constitute a sufficient showing of conflict to conclude in this context either that the remaining Plaintiffs are not the "driving force" behind the litigation,[FN356] or that the same potential taint surrounding Khanna extends to Sams and Meisel.[FN357] Moreover, the Court is not satisfied that the evidence before it merits the disqualification of Sams and Meisel when these factors are viewed together. Counsel for the Plaintiffs have represented to the Court that "there has been no disclosure of privileged information by Khanna to the other plaintiffs or to any of plaintiffs' counsel." [FN358] It is within the Court's discretion, then, to rely on their representations as officers of the Court.[FN359] The Court may, however, reconsider disqualification of Sams and Meisel at a later date, should it become necessary.[FN360]

FN356. Although whether a plaintiff is the "driving force" behind litigation is among the factors to be considered in determining adequacy for purposes of Court of Chancery Rule 23.1, *see, e.g., Youngman, 457 A.2d at 379-80,* Covad has yet to present persuasive

evidence pointing to more than the potential that Sams and Meisel may not be sufficiently interested and involved to continue with this action. *See, e.g.,* Trial Tr. 54. This potential is insufficient. *Compare Nolen v. Shaw-Walker Co., 449 F.2d 506, 508-10 (6th Cir.1971)* (finding strong showing of evidence that plaintiff was a front for person in actual control of litigation, who also had ties to corporations with which court concluded that litigation was intended to force nominal defendant to merge), *with In re Fuqua Indus., 752 A.2d at 130-36* (denying motion to disqualify, and, although addressing motion to disqualify focusing on one factor and thereby necessitating "strong showing," suggesting that "driving force" factor, in order to impact analysis, requires satisfaction of a fairly demanding burden by defendants).

Covad's "driving force" arguments would have significant impact were the Court to conclude that Sams and Meisel's ability to maintain this action relied solely or in large part on information received from Khanna that was privileged or confidential-this, of course, would implicate considerations addressed with respect to Covad's second basis for arguing that Sams and Meisel should be disqualified, as well. Indeed, Covad contends that Sams and Meisel are not among the contemplated parties having proper access to documents produced as a consequence of the earlier § 220 trial under the Confidentiality Agreement resulting from that action. Covad states that "the Confidentiality Agreement provides that the Discovery Material produced in that action may be made available to ... parties *to that litigation,* i.e., the Section 220 Action.... It provides that additional parties that are joined *in that litigation* may sign the Confidentiality Agreement and thereby receive access to the Discovery Material.... However, plaintiffs Sams and Meisel *were not parties to the Section 220 Action,* and therefore they were *not* eligible to receive the Discovery Material produced in that action." Covad Commc'ns Group, Inc.'s Reply to Pls.' Ans. Br. to Covad Commc'ns Group, Inc.'s Mot. to Disqualify Pls. ("Covad's Reply Br. to Disqualify") at 25-26 (emphasis in original). The Court, however, rejects this argument. The present litigation was initially filed during the pendency of the

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)
(Cite as: Not Reported in A.2d)

prior § 220 action, and the Court does not view this as a fair reading of the parties' intent. Given that the Amended Complaint contains no improperly divulged privileged or confidential information and that Sams and Meisel have access to the § 220 action documents, the Court finds Covad's "driving force" arguments unpersuasive on the record before it.

FN357. The Court recognizes the potential for abuse in this context. Khanna's disqualification ultimately results from the Court's consideration of more than one factor. The Court is not, however, persuaded that the case law cited by Covad creates a *presumption* that Khanna's presence has improperly tainted Sams and Meisel, in this context. Meisel has separate counsel. The record is unclear whether Sams is similarly represented by separate counsel. Moreover, much of Covad's argument is premised on its contention that the Amended Complaint contained, and therefore evidenced the improper sharing of, privileged and confidential information; this, however, was rejected by the Court, above.

FN358. Pls.' Ans. Br. to Mot. to Disqualify at 27-28; *see also* Toll Aff., Ex. C at 3; Amended Compl. at ¶ 3 n. 1.

FN359. *See IMC Global, Inc. v. Moffett, 1998 WL 842312, at *3 (Del. Ch. Nov. 12, 1998)* ("Where, as officers of the Court, attorneys can represent the full extent of information flow between them to the Court it is within the Court's discretion to rely on those representations where there is seemingly no danger of intrusion on the fairness of the adjudication process.").

FN360. *See, e.g., Canadian Commercial Workers Indus. Pension Plan, 2006 WL 456786, at *10.* The issue of whether Sams is, and has been, represented by separate counsel may, for example, present a matter for the Court's further consideration with respect to his adequacy as plaintiff when the record on this point is clarified.

## X. CONCLUSION

For the reasons stated above, the Defendants' motions to dismiss are granted as to Counts I, II, III, V, VII,

VIII, IX, and X of the Amended Complaint; the motions are, however, denied as to Counts IV and VI.[FN361] Khanna is dismissed as a representative plaintiff. In addition, Covad's motion to continue to seal the record is denied and the Plaintiffs' cross-motion to unseal the record is granted. Finally, Covad's motion to strike is denied.

FN361. Crosspoint's motion to dismiss is, however, granted as to the Certive Claims asserted in Count VI.

*45 IT IS SO ORDERED.

Del.Ch.,2006.
Khanna v. McMinn
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

LEXSEE 1995 DEL. CH. LEXIS 51

**SEAFORD FUNDING LIMITED PARTNERSHIP, a Delaware limited partnership, BARRY M. KOTLER, M.D., P.A. RETIREMENT PLAN, LOSS & MILLER, P.A. MONEY PURCHASE PENSION PLAN VOLUNTARY ACCOUNT, F.B.O., BRIAN B. LOSS, PHILIP HOROWITZ, M.D., P.A. PROFIT SHARING PLAN, PHILIP HOROWITZ, M.D., P.A. PENSION ACCOUNT, HOWARD C. BROWN DEFINED BENEFIT KEOGH PLAN, PAUL A. CECA, JR., M.D., P.A. PROFIT SHARING PLAN, DAVID B. NIBOUAR, D.D.S., P.A. PROFIT SHARING PLAN, and CARL P. MULVENERY, M.D., P.A., PENSION FUND, DOMINIC M. GIOFFRE, D.D.S., P.A. PENSION AND PROFIT SHARING PLANS and WILLIAM R. FOSTER, SR., Plaintiffs, v. M & M ASSOCIATES II, L.P., a Pennsylvania Limited Partnership, and THOMAS R. MULLEN, M.D., Defendants.**

**C.A. No. 1598-S**

**COURT OF CHANCERY OF DELAWARE, SUSSEX**

**1995 Del. Ch. LEXIS 51**

**January 30, 1995, Submitted**
**April 26, 1995, Decided**

**NOTICE:** [*1]   THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** As Amended.

**DISPOSITION:**

Defendants' Motion to Dismiss is granted in part and denied in part.

**COUNSEL:**

Richard E. Berl, Jr., of BERL & JONES, P.A., Georgetown, Delaware. Attorney for Plaintiffs.

Michael I. Kotler, of SCHWARTZ, GOLD, COHEN ZAKARIN & KOTLER, P.A., Boca Raton, Florida. Of Counsel.

Craig B. Smith, David A. Jenkins and Michele C. Gott of SMITH, KATZENSTEIN & FURLOW, Wilmington Delaware. Attorneys for Defendants.

**JUDGES:** MYRON T. STEELE, Vice-Chancellor

**OPINION BY:** MYRON T. STEELE

**OPINION:**

*MEMORANDUM OPINION*

STEELE, Vice-Chancellor

This is a derivative suit brought by the limited partners of Seaford Funding Limited Partnership ("Seaford Funding") against Thomas R. Mullen, M.D. ("Mullen"), the general partner of Seaford Funding and M & M Associates II, L.P. ("M & M Associates"). Plaintiffs allege: (1) Defendants defaulted on a Promissory Note, Mortgage and Security Agreement; and, (2) Mullen breached his fiduciary duty to the limited partners of Seaford Funding.

Defendants have moved to dismiss this action claiming the Plaintiffs lack standing. After the parties completed briefing [*2] on Defendants' Motion to Dismiss, Plaintiffs filed an amended complaint and a Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss. This is the decision on Defendants' Motion to Dismiss after briefing and oral argument.

**I. BACKGROUND**

At this stage, the Court will consider all well-plead facts as true. Seaford Funding is a Delaware limited partnership created by Mullen for the purpose of financing M & M Associates' acquisition of real property and the construction and operation of a bowling center, res-

taurant and lounge near Seaford, Delaware (the "Property"). Mullen is the general partner of Seaford Funding. Mullen also created and serves as the general partner of M & M Associates, a Pennsylvania limited partnership. M & M Associates purchased the Property on December 27, 1985.

Mullen created Nanticoke Partners, Inc. ("Nanticoke Partners"), a Delaware corporation, to operate the business entities at the Property. Nanticoke Partners has an equipment and restaurant equipment lease with M & M Associates. Mullen personally guaranteed the Nanticoke Partners rental payments to M & M Associates.

Mullen created two other companies to provide services to the Property. [*3] P.T. Management Company provides maintenance services for the Property. M & M Management, Inc. supervises the lease of the Property's businesses and manages, operates, and maintains the Property.

Seaford Funding and M & M Associates entered into a Loan Agreement ("Loan") dated December 1, 1986. Pursuant to the Loan, Seaford Funding agreed to loan M & M Associates up to $ 900,000 in return for a promissory note M & M Associates executed on December 1, 1986 (the "Note"). A Mortgage and Security Agreement covering the Property and certain personal property of M & M secured payment of the Note. To date, Seaford Funding has advanced approximately $ 500,000 of the $ 900,000.

M & M Associates has not paid the Note installments for five years. As early as April 30, 1987, M & M Associates owed Seaford Funding $ 480,796. In June 1988, the limited partners of Seaford Funding requested Mullen take action against M & M Associates. Mullen did nothing.

On March 12, 1992, some of the Seaford Funding limited partners wrote Mullen demanding the partnership take action against M & M Associates because it had made no payments since approximately April of 1987. Mullen did nothing.

The Plaintiffs filed [*4] this action pursuant to 6 Del. C. § 17-1001 to enforce M & M Associates' and Mullen's obligations. Plaintiffs seek the remaining principle balance of § 480,796 plus interest due under the Note from M & M Associates. (Am. Compl. Count I.) Plaintiffs also seek foreclosure on the mortgage and execution on and sale of the personal property securing the Note and the appointment of a receiver to take possession of the mortgaged property. (Am. Compl. Count II - IV.)

Plaintiffs allege Mullen breached his fiduciary duties to Seaford Funding by failing to take action against M & M Associates for nonpayment of the Note installments,

despite the limited partners' demands. (Am. Compl. Count V.) Plaintiffs further allege Mullen breached his fiduciary duties to the limited partners by failing to create and maintain escrow accounts in accordance with the Loan. Id. Finally, Plaintiffs allege Mullen breached his fiduciary duty to the limited partners by creating and managing P.T. Management Company and M & M Management to the detriment of Seaford Funding and for failing to account for money collected by these other entities. Id. Plaintiffs' seek compensatory and punitive damages.

## II. CONTENTIONS [*5] OF THE PARTIES

Defendants assert Plaintiffs do not have standing to maintain this derivative action. Defendants argue Plaintiffs have failed to allege facts creating a reasonable doubt Mullen acted with due care or upon a good faith belief in rejecting the demand. Defendants also argue Plaintiffs did not make demand on Mullen concerning the escrow account and did not allege why demand would be futile.

Plaintiffs argue they have plead particularized facts creating reasonable doubt Mullen's refusal was a product of the valid exercise of his business judgment. Specifically, Plaintiffs argue Mullen had numerous conflicts of interest which tainted his judgment.

## III. LEGAL STANDARD FOR A MOTION TO DISMISS

On a motion to dismiss for failure to state a claim upon which relief can be granted, the Court considers only those matters referred to in the pleadings. *Hart Holding v. Drexel Burnham Lambert,* Del. Ch., 593 A.2d 535, 538 (1991). The Court will consider all well-plead facts to be true and draw all inferences in the light most favorable to the nonmoving party. *Grobow v. Perot,* Del. Supr., 539 A.2d 180, 187 n.6 (1988). Conclusory allegations will not be accepted [*6] as true. *Id.* A complaint will not be dismissed unless it appears to a reasonable degree of certainty the plaintiff would not be entitled to relief under any set of facts which could be proved in support of his claim. *Rabkin v. Philip A. Hunt Chem. Corp.,* Del. Supr., 498 A.2d 1099, 1104 (1985); *In re USACAFES, L.P. Litig.,* Del. Ch., 600 A.2d 43, 47 (1991).

## IV. THE STATUTORY REQUIREMENTS FOR A DERIVATIVE CLAIM

Before limited partners may bring a derivative claim in Chancery Court, Delaware law requires the plaintiffs to make a demand on the general partner to bring the action or explain why they made no demand. 17 Del. C. § 17-1001 n1; *Litman v. Prudential-Bache Properties, Inc.,* Del. Ch., 611 A.2d 12, 17 (1992) *("Litman I").* For this reason, limited partners in a derivative complaint

must allege with particularity the effort, if any, made to secure the action desired from the general partner and the reasons the effort failed or why they chose not to make the effort. 6 Del. C. § 17-1003 n2; see Ch. Ct. R. 23.1 n3.

> n1 6 Del. C. § 17-1001 states:
>
> A limited partner may bring an action in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

[*7]

> n2 6 Del. C. § 17-1003 states:
>
> In a derivative action, the complaint shall set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by a general partner or the reasons for not making the effort.

> n3 Chancery Court Rule 23.1 states, in pertinent part:
>
> The complaint shall also allege with particularity he efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

## V. ALL PLAINTIFFS MADE DEMAND

Plaintiffs argue only Plaintiff "Barry M. Kotler, M.D., P.A. Retirement Plan" made presuit demand on Mullen by letter dated March 12, 1992. The language of the demand letter sent by Mr. Kotler to Mullen does not

support their argument. The demand letter states: "The undersigned represents Barry M. Kotler retirement plan, a limited partner in Seaford Funding Limited Partnership **as well as other limited partners of the limited partnership**." (Compl. Ex. A (emphasis [*8] added)). The demand letter also states: "I have been authorized by my clients to undertake whatever steps are necessary to protect their legal interests." Id. (emphasis added). These statements, combined with the fact counsel filed suit purportedly on behalf of the limited partners, forces me to conclude counsel presented the pre-suit demand letter on behalf of all of the Plaintiffs. Therefore, I will analyze whether Mullen wrongfully refused demand for all Plaintiffs.

## VI. WHETHER CORPORATE DEMAND REFUSED REQUIREMENTS ARE USED IN THE LIMITED PARTNERSHIP CONTEXT

Plaintiffs argue the Court should not use the standards and principles created in the corporate context when analyzing whether they have met the "demand refused" requirements. This Court has already ruled corporate standards apply to limited partnerships in the "demand excused" analysis. *Litman v. Prudential-Bache Properties, Inc.,* Del. Ch., C.A. No. 12137, Chandler, V.C. (Jan. 4, 1993) Mem. Op. at 4-5 *("Litman II")*. Vice Chancellor Chandler reasoned general partners have control over derivative suits and sometimes general partners must exercise their judgment whether to pursue litigation the interest [*9] of the partnership once the general partner receives a demand letter. Id. at 5. At times, plaintiffs may find demand on the general partner to be futile. Id. at 5-6. Therefore, demand futility issues in the partnership context are the same as in the corporate context. Id. at 6.

The statutory test for derivative actions in the partnership context is nearly identical to corporation case law. Sections 17-1001 and 17-1003 do not specifically articulate when a general partner must take action. Nor does the statutory scheme address the consequences of making a demand for action to a general partner with a clear conflict of interest amounting to self-dealing. After receiving a demand, a general partner must exercise business judgment whether to pursue the course of action demanded by the plaintiff. In some situations, plaintiff may find a general partner wrongfully refused to take action. Demand refused issues appear similar in the limited partnership and corporate contexts. Therefore, any analysis of whether plaintiffs have met "demand refused" requirements must at least begin with *Aronson v. Lewis,* Del. Supr., 473 A.2d 805 (1984), and its progeny.

## VII. CASE LAW DEMAND REFUSED [*10] REQUIREMENTS

The general partner has the responsibility to decide whether to bring a law suit on behalf of the partnership. *Zapata Corp. v. Maldonado,* Del. Supr., 430 A.2d 779, 782 (1981). When limited partners make demand and the general partner refuses to pursue the action after informed consideration and in good faith the business judgment rule comes into play. *Levine v. Smith,* Del. Supr. 591 A.2d 194, 200 (1991), *Aronson,* 473 A.2d at 813. The plaintiffs' power to maintain the derivative action is terminated by the refusal. Id. Therefore, the business judgment rule is of paramount significance in a derivative action. *Aronson,* 473 A.2d at 812.

General partners may not claim the protection of the business judgment rule when appearing on both sides of the transaction or when deriving a personal benefit in the sense of self-dealing. Id. at 812. Furthermore, general partners may not use the business judgment rule as a shield if they are not informed of material information reasonably available to them before making a business decision. Id.

Therefore, reviewing a general partners' refusal of demand under the business judgment rule creates [*11] three issues for the Court: (1) whether the general partner acted independently and not self interestedly; (2) whether the general partner reasonably investigated the basis for the proposed litigation; and (3) whether the general partner refused to act in good faith. *See Spiegel v. Buntrock,* Del. Supr., 571 A.2d 767, 777 (1990). n4

n4 *Spiegel* also states: "By electing to make a demand, a shareholder plaintiff tacitly concedes the independence of a majority of the board to respond. Therefore, when a board refuses a demand, the only issues to be examined are the good faith and reasonableness of its investigation." *Spiegel,* 571 A.2d at 777. However, as discussed below, common sense demands the concession principle not apply to this case.

## VIII. WHETHER PLAINTIFF'S CONCEDED MULLEN'S DISINTERESTEDNESS

Defendants argue Plaintiffs conceded Mullen's independence by making pre-suit demand. It is not disputed the Delaware Supreme Court has ruled, in the corporate context, a shareholder [*12] electing to make demand concedes the independence of a majority of the board to respond. *Rales v. Blasband,* Del. Supr., 634 A.2d 927, 935 n.12 (1993); *Spiegel,* 571 A.2d at 777. The rationale underlying *Rales* does not apply to the facts of this case.

*Aronson* explicitly explains the rationale for the demand requirement:

By its very nature the derivative action impinges on the managerial freedom of directors. Hence, the demand requirement of Chancery Rule 23.1 exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits. Thus, by promoting this form of alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations.

*Aronson,* 473 A.2d at 812 (footnote omitted). The demand rules assume the existence of an effective dispute resolution mechanism shareholders concede should be in the hands of a talented, independent and effective board of managers elected to decide corporate policy. Presumably submitting the [*13] dispute first to the board, reasoned persons acting in an environment constituting a more practical alternative than the Courts, promotes judicial efficiency. *Spiegel* requires a further leap of faith -- that logic as well as judicial economy support the conclusion that submission of the demand for action to the board requires one to conclude the decision making authority is capable of acting independently and without self-interest. At least one would conclude no facts could be put forward to suggest otherwise or the complainants would have sued and pleaded demand futility. In the corporate context, the demand rule is intended to act as a gatekeeper to both encourage extra judicial intracorporate solutions to internal problems and to bar meritless claims of self-interested decision making. How well this rule functions to encourage resort to the board is a question beyond our responsibility to answer. In all events in the limited partnership context, the doctrine fails to promote judicial efficiency at least when there is a single general partner.

Here the plaintiffs took the most efficient course of action available to them. Mullen is the general partner of two limited partnerships. [*14] The sole purpose of one of the limited partnerships is to lend money to the other. Mullen and his wife personally guaranteed the loan with their personal property. Mullen is also in charge of other business entities which manage and maintain the property serving as security for the loan. It is patently obvious the pleadings allege the limited partners were acutely aware Mullen did not attempt to collect the debt owed Seaford Funding because of his interests in the debtor limited partnership and the other business organizations at the time they demanded action. The limited partners, understanding Mullen's self-interested conflict, simply

requested Mullen do what he personally obligated himself to do in a way that made sense from a practical point of view. Basically they asked the one individual empowered to act to do so in the obvious best interest of the limited partnership he controlled. This gave Mullen an opportunity to do the right thing under uncontrovertible circumstances. A rule punishing plaintiffs using intrapartnership remedies to avoid litigation flatly and illogically conflicts with any rational view of the concept of judicial efficiency. Parties attempting to avoid rushing [*15] to the courthouse should be rewarded, not penalized. A court of equity ought not blindly apply a corporate rule which is premised upon a reasoned vote of a majority of individuals constituting a board of directors, to a one person general partner enveloped in a self-spun web of conflicting interests. There are no Delaware cases extending the innovative corporate concession rule to limited partnerships. I will not do so on these facts.

Therefore, I find Plaintiffs' pre-suit demand should not constitute a concession that Mullen acted independently in the face of facts uncontrovertedly establishing otherwise.

## IX. WHETHER MULLEN WRONGFULLY REFUSED DEMAND

Turning to the analysis of Plaintiffs' Amended Complaint, clearly Plaintiffs have plead with particularity facts demonstrating Mullen's self-dealing and personal interest. Mullen created Seaford Funding for the sole purpose of lending money to M & M Associates for the acquisition of land. (Am. Compl. PP 17, 18.) Mullen personally controls Seaford Funding and M & M Associates. (Am. Compl. P 34.) Mullen also created two other business organizations to maintain and operate the businesses on M & M Associates' property. (Am. Compl. [*16] PP 24-27.) M & M Associates have not paid installments as they have become due and Mullen has not explained why he has not collected the outstanding debt or made a distribution to the limited partners. (Am. Comp. PP 28, 30.) The allegations, if proved true, form a reasonable doubt whether Mullen exercised valid business judgment by refusing to take action as demanded by the limited partners. See, e.g., USACafes, 600 A.2d 43 (1991). Therefore, I find Plaintiffs have standing to proceed with the derivative action.

## X. PLAINTIFFS' WAIVED THEIR BREACH OF FIDUCIARY DUTY CLAIM BASED ON MULLEN'S FAILURE TO OPEN ESCROW ACCOUNTS

Defendants argue Plaintiffs' waived their claim Mullen did not establish escrow accounts in accordance with the Loan agreement because they did not present the escrow account claim when they made demand. Failure to present matters to the general partner when making

demand results in a waiver of the claims not presented. See Grimes v. Donald, Del. Ch., C.A. No. 13358, Allen, C. (Jan. 11, 1995) Mem. Op. at 15. It is undisputed Plaintiffs made demand on the general partner but did not raise the escrow account claim. Therefore, I find Plaintiffs have [*17] waived this claim. The Plaintiffs may remedy this failure by presenting the claim to the general partner for his consideration. See id.

## XI. WHETHER PLAINTIFFS KNEW ABOUT CONFLICT OF INTEREST

Defendants argue Plaintiffs are precluded from complaining about Mullen's alleged conflict of interest because they knew Mullen to be general partner of both Seaford Funding and M & M Associates before Plaintiffs became limited partners of Seaford Funding. A conflict of interest disclosed in a prospectus or partnership agreement and a plaintiff's acceptance of the terms of the prospectus or Partnership Agreement precludes the plaintiff bringing a derivative claim based on the facts disclosed in these documents. Litman II, supra, at 10 n.4; see Boxer v. Husky Oil Co., Del. Ch., C.A. No. 6261, Hartnett, V.C. (June 28, 1983) Mem. Op. at 15. If Plaintiffs knew of Mullen's conflicts of interest as disclosed in the Partnership Agreement or the prospectus, this initial acquiescence would preclude Plaintiffs from asserting a breach from these same facts. Proof of these facts suggest plaintiff limited partners understood and invited the risks from which they now suffer. However, [*18] Defendants can point to no specific allegations of the complaint supporting their claim "plaintiffs were aware of Dr. Mullen's dual status when they became limited partners of Seaford Funding." (Defendants' Reply Brief at 2 n. 1.) Therefore, dismissal of the complaint is not warranted on this basis at this stage of the proceedings.

## XII. CONCLUSION

All Plaintiffs made demand on Mullen by letter dated March 12, 1992. Plaintiffs do not concede Mullen is not self-interested by making demand. Plaintiffs have plead facts leading to the inference, if proved true, that Mullen straddled the transaction between Seaford Funding and M & M Associates and his self-dealing interfered with his judgment to refuse to collect the loan. It is unclear from the current state of the record whether the partnership agreement or the prospectus disclosed Mullen's two roles as general partner of both Seaford Funding and M & M Associates. Therefore, Defendants' Motion to Dismiss is denied as to the breach of fiduciary duty claims regarding the collection of the loan.

Plaintiffs waived their claim Mullen did not establish escrow accounts by not presenting the claim to the general partner when Plaintiffs [*19] made demand. Defendants' Motion to Dismiss is granted as to the breach of fiduciary duty claim regarding the establish-

1995 Del. Ch. LEXIS 51, *

ment of escrow accounts. Plaintiffs may cure this mistake by presenting the claim to the general partner if they so choose.

Defendants' Motion to Dismiss is *granted in part* and *denied in part.*

**IT IS SO ORDERED.**

Myron T. Steele

Vice-Chancellor

# EXHIBIT 4

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2802913 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Page 1

**H**

Briefs and Other Related Documents
Shamrock      Holdings,      Inc.      v.
ArensonD.Del.,2006.Only the Westlaw citation is
currently available.
        United States District Court,D. Delaware.
        SHAMROCK HOLDINGS, Shamrock Capital
        Advisors, Eugene Krieger, George Buchler, and
                Bruce Stein, Plaintiffs,
                        v.
        Avie ARENSON, Laurel Equity Group LLC, Selk
        LLC, A. Arenson Holdings Ltd., D.A. Gardens Ltd.,
        and J12ALH Associates, Defendants.
        Laurel Equity Group LLC, Selk LLC, A. Arenson
        Holdings Ltd., D.A. Gardens Ltd., and J12ALH
        Associates, Counterclaim Plaintiffs and Third Party
                        Plaintiffs,
                        v.
        Shamrock Holdings, Shamrock Capital Advisors,
        Eugene Krieger, George Buchler, and Bruce Stein,
                Counterclaim Defendants,
        andALH Holdings LLC, Third Party Defendant.
        **Nos. CIV.04-1339-SLR, CIV.06-62-SLR.**

                Sept. 29, 2006.

**Background:** Following sale of a Delaware limited
liability company, controlling equity holder and
certain board members filed declaratory judgment
action against minority equity holders. After removal
and consolidation with minority equity holders'
action as plaintiffs, which converted minority
equity holders' claims into counterclaims, plaintiffs
filed motion for judgment on the pleadings as to
certain counts as well as a motion to dismiss
defendants' counterclaims.

**Holdings:** The District Court, Sue L. Robinson,
Chief Judge, held that:

(1) exculpation provisions of limited liability
company's operating and consulting agreements did
not give rise to independent grounds for contractual
liability should consultant's or limited liability
company's fiduciaries act with bad faith or in a
grossly negligent manner;

(2) minority equity holders could bring a direct action
against controlling equity holder and certain board
members for their participation in the sale of limited

liability company's operating units; and

(3) minority equity holders were not required to plead
around the business judgment rule in order to avoid
dismissal of breach of duty claims for failure to state
a claim.

Motion for judgment on the pleadings granted in part
and denied in part; motion to dismiss counterclaims
denied.

**[1] Federal Courts 170B ⬡32**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29    Objections    to    Jurisdiction,
Determination and Waiver
                170Bk32 k. Pleading. Most Cited Cases
Challenge to subject matter jurisdiction is facial
where sufficiency of claims turns on whether the
claims are direct or derivative. Fed.Rules
Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[2] Federal Courts 170B ⬡32**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29    Objections    to    Jurisdiction,
Determination and Waiver
                170Bk32 k. Pleading. Most Cited Cases
Dismissal for a facial challenge to jurisdiction is
proper only when the claim clearly appears to be
immaterial and made solely for the purpose of
obtaining jurisdiction or is wholly insubstantial and
frivolous. Fed.Rules Civ.Proc.Rule 12(b)(1), 28
U.S.C.A.

**[3] Limited Liability Companies 241E ⬡43**

241E Limited Liability Companies
    241Ek40 Officers and Agents
        241Ek43 k. Individual Liabilities of Officers
and Agents. Most Cited Cases
Exculpation provisions of Delaware limited liability
company's operating and consulting agreements did
not give rise to independent grounds for contractual
liability should consultant's or limited liability

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2802913 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Page 2

company's fiduciaries act with bad faith or in a grossly negligent manner; those provisions merely discussed under what circumstances consultant and the other fiduciaries would be protected from liability.

**[4] Limited Liability Companies 241E ☞48**

241E Limited Liability Companies
   241Ek44 Actions
      241Ek48 k. Derivative Suits. Most Cited Cases

**Limited Liability Companies 241E ☞49**

241E Limited Liability Companies
   241Ek49 k. Conversion, Merger, and Dissolution. Most Cited Cases
Under Delaware law, minority equity holders could bring a direct action against controlling equity holder and certain board members for their participation in the sale of limited liability company's operating units; since limited liability company was effectively dissolved, there was no limited liability company to which a recovery could be paid.

**[5] Corporations 101 ☞310(1)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k310 Management of Corporate Affairs in General
            101k310(1) k. In General. Most Cited Cases
In Delaware, the business judgment rule is a presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company.

**[6] Federal Civil Procedure 170A ☞1752.1**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)2 Grounds in General
            170Ak1752 Affirmative Defenses, Raising by Motion to Dismiss
               170Ak1752.1 k. In General. Most Cited Cases
A complaint may be dismissed for failure to state a claim where an affirmative defense appears on its face. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[7] Limited Liability Companies 241E ☞45**

241E Limited Liability Companies
   241Ek44 Actions
      241Ek45 k. In General. Most Cited Cases
Minority equity holders of Delaware limited liability company, which asserted breach of duty claims against controlling equity holder, were not required to plead around the business judgment rule in order to avoid dismissal for failure to state a claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[8] Limited Liability Companies 241E ☞45**

241E Limited Liability Companies
   241Ek44 Actions
      241Ek45 k. In General. Most Cited Cases
Federal notice pleading standards did not require minority equity holders of limited liability company to allege precisely what actions were taken by consultant's agents, who served on company's board, in order to state claim against consultant for knowingly aiding the agents in breaching their fiduciary duties as board members. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[9] Limited Liability Companies 241E ☞45**

241E Limited Liability Companies
   241Ek44 Actions
      241Ek45 k. In General. Most Cited Cases
Breach of duty claims brought by minority equity holders of Delaware limited liability company against controlling equity holder and certain board members would not be dismissed at pleading stage on ground that damages pled were totally speculative; because it was not clear that company had lost all of its value "long before" the alleged breaches of duty, minority equity holders were not yet required to plead damages with particularity. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

S. Mark Hurd, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Counsel for Plaintiffs, Counterclaim Defendants, and Third Party Defendant.
Sean J. Bellew, David A. Felice, Cozen O'Connor, Wilmington, DE, Counsel for Defendants, Counterclaim Plaintiffs, and Third Party Plaintiffs.

**MEMORANDUM OPINION**

SUE L. ROBINSON, Chief Judge.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2802913 (D.Del.)
(Cite as: --- F.Supp.2d ----)

## I. INTRODUCTION

*1 The present litigation arises out of the sale of a Delaware limited liability company known as ALH Holdings ("ALH"). Shamrock Holdings ("Shamrock"), Shamrock Capital Advisors ("SCA"), Eugene Krieger ("Krieger"), George Buchler ("Buchler"), and Bruce Stein ("Stein") (collectively, "plaintiffs"), filed the present action, which seeks declaratory judgment on eight different issues,[FN1] in Delaware Chancery Court on October 5, 2004. (D.I. 72 at 5) At the request of defendants Avie Arenson ("Arenson"), Laurel Equity Group LLC ("Laurel"), SELK LLC ("SELK"), A. Arenson Holdings Ltd. ("Arenson Holdings"), D.A. Gardens Ltd. ("D.A. Gardens"), and J12ALH Associates ("J12") (collectively, "defendants"), it was removed to the United States District Court for the District of Delaware on the grounds of diversity jurisdiction, 28 U.S.C. § 1332. (Id.) Plaintiffs' motion to remand to Chancery Court was denied by this court. (D.I. 33) Plaintiffs later amended their complaint. (D.I. 37)

Meanwhile, defendants, minus Arenson, filed an action against plaintiffs in a United States District Court in North Carolina. (D.I. 72 at 5) That action was subsequently transferred to this court, was consolidated with plaintiffs' action, became defendants' counterclaim against plaintiffs[FN2] and third party complaint against ALH.[FN3] (Id. at 6) Defendants made several motions to dismiss (D.I. 40, 43, 46), all of which the court denied (D.I. 78). Presently before the court are plaintiffs' motion for judgment on the pleadings as to counts I, II, III, and VIII of their complaint,[FN4] as well as their motion to dismiss defendants' counterclaims and third party complaint; ALH has joined plaintiffs in their motion to dismiss.[FN5] (D.I. 71)

## II. BACKGROUND

Shamrock, a California corporation, is the majority member of ALH, holding a Class A interest in the company. (D.I. 37 at ¶ ¶ 2, 7) SCA is a Delaware corporation that provided consulting services to ALH. (D.I. 20 at ¶ 13) Krieger is an employee of Shamrock, as well as a Class A representative on ALH's Supervisory Board. (D.I. 37 at ¶ 8) Buchler, another Shamrock employee, served as the second Class A representative on ALH's board. (Id.) Stein is also a Shamrock employee, and was one of the Class D representatives on ALH's board. (Id.) Krieger, Buchler, and Stein have also performed substantial services for SCA. (Id.) ALH is a Delaware LLC that

suffered financial troubles and was subsequently sold in pieces over the objections of its Class B members, leading to the instant litigation.

Defendant Arenson served as the Class B representative on ALH's Supervisory Board but did not personally hold equity in ALH. (Id. at ¶ 10) Arenson, however, does own, control, and act as an agent for two companies, Arenson Holdings and D.A. Gardens, which are Class B equity holders in ALH. (Id. at ¶ 11; D.I. 67[A] at ¶ 11) He is not a party to the counterclaim, nor to the third party complaint. SELK is a Delaware limited liability company which holds Class B membership in ALH. (D.I. 37 at ¶ 52; D.I. 67[A] at ¶ 52) J12 is a New York general partnership and is also a Class B member of ALH. (D.I. 37 at ¶ ¶ 58-60; D.I. 67[A] at ¶ ¶ 58-60) Arenson Holdings, a Class B member of ALH, is owned by defendant Arenson. (D.I. 37 at ¶ 11; D.I. 67[A] at ¶ 11) D.A. Gardens, another Class B equity holder in ALH, is likewise owned by Arenson. (Id.) Laurel, the final Class B member of ALH, is a Delaware LLC. (D.I. 37 at ¶ 57; D.I. 67[A] at ¶ 57)

*2 ALH was created on June 3, 1998. (D.I. 37 at ¶ 19) On or about June 12, 1998, the Class B members funded their investments in the company. (Id. at ¶ 20) ALH became the sole shareholder of American Landmark Homes Corporation ("ALH Corp.") and Atlantic Builders, Inc. ("ABI"), Delaware corporations with home-building operations in Florida. (Id. at ¶ 21) ALH's Operating Agreement was initially signed by ALH's members as of June 12, 1998 and was amended as of March 15, 1999. (Id. at ¶ 22) On or around December 9, 1998, the members of ALH's Supervisory Board decided to form a subsidiary to act as the parent company of all of ALH's operating subsidiaries. That corporate subsidiary, ALH II, Inc. ("ALH II"), was organized on December 9, 1998 under the laws of Delaware. (Id. at ¶ 25)

In January 2000, ALH II took out a loan of $27.5 million which was used to fund the acquisition of a North Carolina home-building operation called Mulvaney Homes, Inc. ("MHI"). (Id. at ¶ 27) ALH became the guarantor of ALH II's obligation to Wachovia Bank, the lender. ALH's Supervisory Board unanimously approved all of the steps related to the purchase of MHI. (Id. at ¶ 28)

On March 15, 1999, ALH amended its Operating Agreement, with Arenson signing the amendment on behalf of Arenson Holdings and D.A. Gardens and committing the two companies to contribute

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

. --- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2802913 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Page 4

approximately $469,000 in capital to ALH. (*Id.* at ¶ 29) This infusion of capital allowed ALH Tennessee Acquisition, Inc. ("ALH Tennessee"), a wholly-owned subsidiary of ALH II, to purchase Bowden Building Corporation ("BBC") in Tennessee. (*Id.* at ¶ 30)

On April 6, 2000, some of the ALH investors, including Shamrock and Arenson Holdings, loaned ALH $2 million with which to "finance certain operations" of ALH II. (*Id.* at ¶ 32) Among the ALH II subsidiaries guaranteeing this loan were ABI, ALH Acquisition Corp. (ABI's parent company), and ALH Tennessee (the parent company of BBC). (*Id.* at ¶ 33) The members of ALH's Supervisory Board unanimously approved these loans to ALH II. (*Id.* at ¶ 34) By the end of that year, ALH II was in default on several loans and was undergoing serious financial difficulties. (*Id.* at ¶ 35)

Pursuant to ALH's Operating Agreement, Lion LLC ("Lion") had been appointed as ALH's Initial Manager. (*Id.* at 36) In July 2001, after disputes over Lion's performance, Lion settled with ALH (again, with the unanimous approval of the Supervisory Board). (*Id.* at ¶¶ 38, 41) The terms of the settlement permitted the Class A members to appoint three of the five members of ALH's Supervisory Board and hire SCA to provide consulting services for ALH, simultaneously weakening Lion's influence over the company and increasing Shamrock's. (*Id.* at ¶ 39) SCA's Consulting Agreement with ALH indemnified it from all liability except that resulting primarily from actions or omissions done in bad faith or due to gross negligence or willful misconduct. (*Id.* at ¶ 77)

*3 In March of 2002, all five board members of ALH agreed to hire Jolson Merchant Partners ("JMP") to provide "financial advisory and investment banking services" in connection with the possible sale of ALH. (*Id.* at ¶ 44) On May 7, 2002, with the Supervisory Board's unanimous approval, some of the ALH investors (including Shamrock and D.A. Gardens) loaned another $4.4 million to ALH II. (*Id.* at ¶ 46) That July, the Class B members began expressing an interest in buying all of ALH's Class A shares, though an agreement to do so was never finalized. (*Id.* at ¶ 49)

At a June 26, 2003 meeting of the Supervisory Board, a majority of representatives (with Arenson opposing and the fifth representative, Shalom Lamm, abstaining) voted to sell ABI. (*Id.* at ¶ 105) All five class representatives subsequently gave their consent for ALH members' 2000 and 2002 loans to ALH II to

be repaid from proceeds realized by the sale of ABI. (*Id.* at ¶ 48) On March 24, 2004, over the objections of Arenson and Lamm, a majority of the board also decided to sell BBC. (*Id.* at ¶ 122) Finally, on December 15, 2004, the same majority voted to sell the last of ALH's home-building operations, MHI.[FN6] (*Id.* at ¶ 129) After repeated threats by defendants to sue them for selling ALH in pieces against the Class B members' wishes, plaintiffs filed the present action for declaratory judgment. (*Id.* at ¶ 6)

### III. STANDARD OF REVIEW

#### A. Motion for Judgment on the Pleadings

When deciding a Rule 12(c) motion for judgment on the pleadings, a district court must view the facts and inferences to be drawn from the pleadings in the light most favorable to the non-moving party. *Green v. Fund Asset Mgmt., L.P.,* 245 F.3d 214, 220 (3d Cir.2001); *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,* 11 F.3d 399, 406 (3d Cir.1993). The motion can be granted only if no relief could be afforded under any set of facts that could be provided. *Turbe v. Gov't of the Virgin Islands,* 938 F.2d 427, 428 (3d Cir.1991); *see also Southmark Prime Plus, L.P. v. Falzone,* 776 F.Supp. 888, 891 (D.Del.1991); *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Ctr.,* 536 F.Supp. 1065, 1072 (E.D.Pa.1982) ("If a complaint contains even the most basic of allegations that, when read with great liberality, could justify plaintiff's claim for relief, motions for judgment on the pleadings should be denied."). However, the court need not adopt conclusory allegations or statements of law. *In re General Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119, 1125 (D.Del.1988). Judgment on the pleadings will only be granted if it is clearly established that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. *Jablonski v. Pan Am. World Airways, Inc.,* 863 F.2d 289, 290 (3d Cir.1988).

#### B. Motion to Dismiss-Lack of Subject Matter Jurisdiction

[1] Once subject matter jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. *See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.,* 227 F.3d 62, 69 (3d Cir.2000). Under Fed.R.Civ.P. 12(b)(1),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2802913 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Page 5

the court's jurisdiction may be challenged either facially (based on the legal sufficiency of the claim) or factually (based on the sufficiency of jurisdictional fact). *See* 2 James W. Moore, Moore's Federal Practice § 12.30[4] (3d ed.1997). In the case at bar, where the sufficiency of counts I-VII of the counterclaim turns on whether defendants' claims are truly direct or derivative, plaintiffs' challenge to subject matter jurisdiction is facial. *See, e.g., In re Franklin Mut. Funds Fee Litigation,* 388 F.Supp.2d 451, 462 (D.N.J.2005) ("Because the Court finds that plaintiffs' alleged injuries are derivative, these Counts are dismissed as improperly pleaded.").

*4 [2] Under a facial challenge to jurisdiction, the court must accept as true the allegations contained in the complaint. *See* 2 Moore § 12.30[4]. Dismissal for a facial challenge to jurisdiction is 'proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous.' " *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1408-09 (3d Cir.1991) (quoting *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)).

### C. Motion to Dismiss-Failure to State a Claim

"The standards for determining a motion to dismiss a counter-claim are the same as for determining a motion to dismiss a complaint." *Milton Roy Co. v. Bausch & Lomb, Inc.,* 418 F.Supp. 975, 978 (D.Del.1976). In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *See* Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. *See* Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The moving party has the burden of persuasion. *See* Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.1991).

### IV. DISCUSSION

### A. Motion for Judgment on the Pleadings

Plaintiffs have moved for judgment on the pleadings with respect to counts I, II, III, and VIII of their complaint, which request a declaratory judgment that, respectively, plaintiffs did not violate their fiduciary duties; they violated neither ALH's Operating Agreement nor Consulting Agreement; and they did not violate defendant Arenson's rights as the Class B representative on ALH's Supervisory Board. (D.I. 71, 72) For the following reasons, plaintiffs' motion for judgment on the pleadings is granted in part and denied in part.

### 1. Count I-Breach of Fiduciary Duties

Plaintiffs aver that various "admissions" of facts made by defendants in their answer contradict the allegations in defendants' counterclaim complaint to such an extent that they preclude a finding on any of the counterclaim charges of breach of fiduciary duty. (D.I. 72 at 2-3) Defendants contend that these "admissions" are either irrelevant to the matters at bar, mischaracterizations by plaintiffs, or material facts that are still in dispute (D.I. 82 at 12-13), such as whether Shamrock received a disproportionate benefit from the sale of ALH's operations (*id.* at 23-24) and whether or not it was actually **necessary** to liquidate ALH in order to pay off lenders, or if Shamrock merely supported it for self-interested reasons (*id.* at 32).

*5 At this early stage of the proceedings, the court cannot conclude that defendants' pleadings do not "contain[ ] even the most basic of allegations that, when read with great liberality, could justify [their] claim for relief," *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Ctr.,* 536 F.Supp. 1065, 1072 (E.D.Pa.1982), nor that there are no material facts left in dispute. Therefore, plaintiffs' motion for judgment on the pleadings is denied as to count I of their complaint.

### 2. Counts II and III-Breach of ALH's Operating and Consulting Agreements

Plaintiffs likewise seek judgment on the pleadings regarding their alleged breach of ALH's Operating Agreement, ALH's Consulting Agreement with SCA, and any implied contractual covenant of good faith and fair dealing, on the grounds that defendants have not identified any specific provisions of these contracts that plaintiffs have violated. (D.I. 72 at 37)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2802913 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Defendants claim that they have pointed to specific provisions in these contracts, namely § 6.2(f) of the Operating Agreement and Schedule A of the Consulting Agreement. (D.I. 82 at 35)

Section 6.2(f) states that fiduciaries are not protected from liability for acts or omissions that are done in bad faith or with gross negligence (*see* D.I. 67[C] at ¶ 142), while defendants' counterclaim is premised on allegations that Shamrock, Krieger, Buchler, and Stein acted in bad faith and with gross negligence (D.I. 82 at 35). Schedule A similarly states that ALH will not be liable for actions or omissions of SCA which were done in bad faith or through gross negligence or willful misconduct. (*See* D.I. 67[C] at ¶ 155) These two provisions merely discuss under what circumstances SCA and the other fiduciaries will be protected from liability; defendants appear to assert that they constitute contractual obligations in and of themselves, which can be violated by any action done in bad faith or with gross negligence.

[3] Plaintiffs' entitlement to judgment on the pleadings for counts II and III rests on whether § 6.2(f) and Schedule A are actionable contractual obligations or whether defendants are required to identify other, independent parts of the agreements that the fiduciaries have allegedly breached. The court agrees with the latter proposition. Defendants quote a Delaware Chancery Court decision for the statement that "LLC members' rights begin with and typically end with the Operating Agreement" (D.I. 82 at 35, quoting *Walker v. Resource Dev., LLC,* 791 A.2d 799, 813 (Del.Ch.2000)), but they cite no case law supporting their claim that the exculpation provisions of § 6.2(f) and Schedule A give rise to independent grounds for contractual liability should SCA or ALH's fiduciaries act with bad faith or in a grossly negligent manner.

Defendants cannot allege any set of facts which would entitle them to relief under § 6.2(f) and Schedule A of the Operating and Consulting Agreements, respectively. Consequently, the court grants plaintiffs' motion for judgment on the pleadings with respect to counts II and III of their complaint.

### 3. Count VIII-Violation of Arenson's Rights

*6 Plaintiffs seek a declaratory judgment that they did not violate defendant Arenson's rights as a Class B representative by preventing him from having meaningful participation in the Supervisory Board's decision-making process. (D.I. 37) This court recently denied defendant Arenson's motion to dismiss (D.I. 46) solely because "[his] role in the Supervisory Board decision-making process is a factual issue currently being addressed in discovery." (D.I. 77 at 10) With regard to plaintiffs' request for declaratory judgment in count VIII of the complaint, the court opined:

The amended complaint contains no allegations that defendant Arenson as an individual either has a cause of action against plaintiffs or that plaintiffs have a cause of action against defendant Arenson. Defendant Arenson was not a member of ALH. Defendant Arenson served only on the Supervisory Board as the class B representative. Any harm caused by depriving the class B representative of his rights to participate in the Supervisory Board will be suffered by the class B members, not by defendant Arenson as the class B representative.

.... Plaintiffs present no law to support the position that a financial interest in a company is enough to require a party to defend a declaratory judgment action.

(*Id.* at 9) Plaintiffs have failed to meet their burden for a judgment on the pleadings as to count VIII of their complaint; it, therefore, is denied.

### B. Motion to Dismiss-Lack of Subject Matter Jurisdiction

[4] Plaintiffs have moved to dismiss counts I-VII of defendants' counterclaim (the "direct claims") because, they argue, defendants may only bring such claims derivatively, on behalf of ALH.[FN7] (D.I. 72 at 39-40) The Delaware Supreme Court has stated that, in determining whether a shareholder suit is direct or derivative,

a court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1039 (Del.2004). Plaintiffs claim that defendants cannot show that any of their alleged injuries arise independently from injuries to ALH. (D.I. 72 at 39-40)

Defendants concur that *Tooley* is normally the proper test to use for such an analysis, but argue that it is not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2802913 (D.Del.)
(Cite as: --- F.Supp.2d ----)

applicable to the case at bar. According to defendants, the unjust enrichment exception[FN8] survives the Court's holding in *Tooley*. (D.I. 82 at 39) Therefore, they aver, their claims should be treated as direct because Shamrock, the majority member of ALH and one of the counterclaim defendants, will unjustly benefit from any derivative action recovery. (*Id.* at 40) Likewise, defendants contend, a derivative action is neither necessary nor practical because " 'superimposing derivative pleading requirements upon [the] claims [will] needlessly delay[ ] ultimate substantive resolution and serve[ ] no useful or meaningful public policy purpose.' " (*Id.* at 40-41, quoting *Cencom,* 2000 WL 130629, at *3)

*7 Much like the partnership in *Cencom,* ALH has effectively been dissolved. In a recent decision, the Delaware Supreme Court held that allegations that a majority shareholder supported a transaction which "wrongfully reduced the cash-value and the voting power of the ... minority interest, and increased correspondingly the value and voting power of the controller's majority interest" was "not exclusively derivative and [could] be brought by the (former) minority shareholders directly." *Gentile v. Rossette,* 906 A.2d 91, 92 (Del.2006). According to the Court, [t]he harm to the minority shareholder plaintiffs resulted from a breach of a fiduciary duty owed to them by the controlling shareholder, namely, not to cause the corporation to effect a transaction that would benefit the fiduciary at the expense of the minority stockholders.... Because SinglePoint no longer exists, ... there is no corporate entity to which a recovery ... could be paid.... The only parties to whom that recovery could be paid are the plaintiffs. Hence, although under *Tooley* the claim could be brought derivatively or directly, as a practical matter, the only claim available after [the company] was liquidated is a direct action by the plaintiffs.

*Id.* (footnote omitted).

The reasoning employed in *Gentile* is applicable to the facts at bar and, under Delaware law, defendants may bring a direct action against plaintiffs for their participation in the sale of ALH's operating units; consequently, plaintiffs' motion to dismiss counts I-VII of the counterclaim as improperly pleaded is denied.[FN9]

### C. Motion to Dismiss-Failure to State a Claim

### 1. Breach of Fiduciary Duties (Counts I, II, VI, VII, VIII, IX, XIII, and XIV of the Counterclaim)

Defendants allege that Shamrock, as the majority member of ALH (and the employer of three of the five Supervisory Board representatives), exercised dominion and control over ALH and, consequently, owed fiduciary duties to ALH and the minority members, including defendants. (D.I. 67[C] at ¶ ¶ 178-79) According to defendants, Shamrock subsequently breached these duties and injured both defendants and ALH by mishandling the sale of ALH and failing to maximize the sale's value; stifling competitive bids for the company by selling its operating units "piecemeal at 'fire sale' prices"; pursuing the sale of said operating units against ALH's best interests; and "continually failing and refusing" to act in the best interests of ALH's minority members. (*Id.* at ¶ 181) Counts I and VIII of defendants' counterclaim maintain that Shamrock's conduct was in bad faith, grossly negligent, self-dealing, and constituted a conscious indifference to the consequences defendants would suffer, as well as reckless indifference to and wanton disregard of defendants' rights. (*Id.* at ¶ 182)

Defendants likewise claim, in counts II and IX, that Krieger, Buchler, and Stein owed fiduciary duties to ALH and its minority members and that they breached those duties by mishandling the sale of ALH; selling the operations piecemeal at fire sale prices; "failing to actively solicit offers for ALH and failing to work with Class B members"; hiring professionals to work for Shamrock who also had loyalty to Shamrock; and "continually failing and refusing" to act in ALH's best interest. (*Id.* at ¶ 187) Defendants believe that these actions were grossly negligent and in bad faith and that, as a result, defendants lost the value of their investment in ALH. (*Id.* at ¶ ¶ 188-89) Counts VI, VII, XIII, and XIV make similar claims of gross negligence and self-dealing resulting from these breaches of fiduciary duties and plaintiffs' alleged breaches of the Operating and Consulting Agreements. (*Id.* at ¶ ¶ 216-23, 225-33)

*8 [5] Accepting the material allegations of the counterclaim as true and viewing all facts and inferences in a light most favorable to defendants, the court finds that defendants have pled sufficient information to support their breach of duty claims. In spite of this, plaintiffs aver that the allegations in counts I, II, VI, VII, VIII, IX, XIII, and XIV of the counterclaim reflect nothing more than a difference in business judgment and that plaintiffs, therefore, are protected from liability by the business judgment

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2802913 (D.Del.)
(Cite as: --- F.Supp.2d ----)

rule.[FN10] (D.I. 72 at 30)

[6][7] According to the Third Circuit, "Generally speaking, we will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6). A complaint may be dismissed under Rule 12(b)(6) where an affirmative defense appears on its face, however." *Stanziale v. Nachtomi (In re Tower Air)*, 416 F.3d 229, 238 (3d Cir.2005) (emphasis added). Defendants argue that they are not required to plead around the business judgment rule in response to a motion to dismiss because they did not "make any allegations about the business judgment rule" in their complaint. (D.I. 82 at 15) Plaintiffs contend that defendants have implicitly raised the business judgment rule by repeatedly describing the minority shareholders' behavior with terms such as "well-reasoned" in a preemptive attempt to combat a possible affirmative defense.[FN11] (See, e.g., D.I. 67[C] at ¶¶ 2, 56)

The cases plaintiffs cite in support of their argument [FN12] are fact-intensive and fail to state a bright line rule permitting courts to dismiss claims under Rule 12(b)(6) based on unanswered affirmative defenses which are raised only implicitly on the face of the complaint. The court declines to infer such an ability and holds that defendants are not required to plead around the business judgment rule at this stage in the proceedings. Plaintiffs' Rule 12(b)(6) motion to dismiss is denied with respect to counts I, II, VI, VII, VIII, IX, XIII, and XIV of the counterclaim.

### 2. Breach of the Operating and Consulting Agreements (Counts III, V, X, and XII)

Having already granted plaintiffs' motion for judgment on the pleadings regarding their alleged breaches of the Operating and Consulting Agreements, see supra § IV.A.2, plaintiffs' motion to dismiss counts III, V, X, and XII of the counterclaim is moot.

### 3. Aiding and Abetting (Counts IV and XI)

Counts IV and XI of the counterclaim allege that SCA, a consultant for ALH with ties to Shamrock, Krieger, Buchler, and Stein, knowingly aided the four of them in breaching their fiduciary duties. (D.I. 67[C] at ¶ 204) In Delaware,
[a] third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the

stockholders if the third party "knowingly participates" in the breach. To survive a motion to dismiss, the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."

*9 *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del.2001) (omission in original) (citations omitted). Plaintiffs aver that, because defendants can show neither that the fiduciaries breached any duties nor that SCA knowingly participated in any such breaches, counts IV and XI fail to state a claim upon which relief can be granted.[FN12] (D.I. 72 at 37-38) The court has already held that defendants' breach of duty claims are sufficiently well-pled to survive a motion to dismiss; therefore, the viability of defendants' aiding and abetting claims rests on whether defendants have made a sufficient showing of knowing participation by SCA.

Defendants quote *In re General Motors (Hughes) Shareholder Litigation*, No. Civ. A. 20269, 2005 WL 1089021 (Del.Ch. May 4, 2005), for the proposition that " '[a] claim of knowing participation need not be pled with particularity. However, there must be factual allegations in the complaint from which knowing participation can be reasonably inferred.' " (D.I. 82 at 36, quoting *General Motors*, 2005 WL 1089021, at *24 (internal citations omitted)) Although defendants fail to quote it, the *General Motors* court continued:
If such facts are not pled, then in order to infer knowing participation, the plaintiff must have alleged that the fiduciary breached its duty in an "inherently wrongful manner." This has also been stated as requiring the plaintiff to allege that the act taken by the fiduciary was *per se* illegal. Conclusory statements of knowing participation will not suffice. *General Motors*, 2005 WL 1089021, at *24 (footnotes omitted). Defendants have not alleged that plaintiffs' conduct was "inherently wrongful" or "*per se* illegal." As a result, defendants' aiding and abetting claims turns on whether knowing participation by SCA can reasonably be inferred from the facts alleged in the counterclaim.

[8] Plaintiffs argue that defendants have not "identif[ied] any participatory act by SCA." (D.I. 72 at 38) According to defendants, the fact that "Krieger, Buchler, and Stein performed substantial services for SCA" and that the counterclaim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2802913 (D.Del.)
(Cite as: --- F.Supp.2d ----)

repeatedly alleges "that Krieger, Buchler, and Stein committed wrongful acts that facilitated their liquidation of ALH" makes it "reasonable to infer that these actions were taken, in part, in their capacity as agents for SCA." (D.I. 82 at 36) Moreover, defendants contend that, "at this pre-discovery point in the litigation," federal notice pleading standards do not require them to "allege[ ] precisely what actions were taken by Krieger, Buchler and Stein in their capacity as agents for SCA." (*Id.* at 36-37)

When a claim is challenged under Rule 12(b)(6), the court may grant the motion to dismiss only if the non-moving party "cannot demonstrate any set of facts that would entitle him to relief." *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Viewing the facts and inferences in a light most favorable to defendants, the court finds that plaintiffs, who have the burden of persuasion, *see Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991), are unable to establish that none of the facts alleged in the counterclaim would entitle defendants to a judgment in their favor. Consequently, plaintiffs' motion for failure to state a claim of aiding and abetting is denied.

#### 4. Speculative Damages

**\*10** [9] In addition to challenging the individual counts of defendants' counterclaim, plaintiffs move for dismissal because defendants have pled damages that are totally speculative; consequently, they argue, there is no reason to continue litigating the counterclaim without a viable claim for damages. (D.I. 72 at 38-39) Defendants maintain that they have suffered actual damages due to the near-total devaluation of their equity interests in ALH. (D.I. 82 at 37-38) Plaintiffs disagree, stating that, "according to [defendants'] own allegations, their investment had lost its value long before any of the acts on which they purport to sue." (D.I. 84 at 17) Plaintiffs fail to see the causal link between the allegations made in the counterclaim and the amount of damages defendants are seeking, and question why defendants chose not to request the difference between ALH's value immediately before and immediately after plaintiffs' alleged breaches of duty. (D.I. 72 at 38) In addition, plaintiffs believe that defendants' allegations are based on assumptions that "are not susceptible to proof," which would require the court to make similar speculative assumptions in order to award damages. (*Id.*)

The events on which defendants' claims are based

occurred over a long period of time, during which numerous financial transactions took place. Because it is not clear that ALH had lost all of its value "long before" plaintiffs' alleged breaches of duty and defendants are not yet required to plead damages with particularity,[FN14] plaintiffs have not adequately supported their motion for dismissal on the grounds of speculative damages; such motion, therefore, is denied.

### V. CONCLUSION

For the reasons stated above, plaintiffs' motion for judgment on the pleadings is granted in part (as to counts II and III of the complaint) and denied in part (with respect to counts I and VIII of the complaint). Plaintiffs' motion to dismiss defendants' counterclaim and third party complaint is denied. An appropriate order shall issue.

### ORDER

At Wilmington this 29th day of September, 2006, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Plaintiffs' motion for judgment on the pleadings (D.I. 71) is granted in part and denied in part.

2. Plaintiffs' motion to dismiss defendants' counterclaim (D.I. 71) is denied.

> FN1. In their complaint, plaintiffs request that the court enter an order:
> A. declaring that they have not breached any fiduciary duty to defendants [count I];
> B. declaring that they have not breached any obligations to defendants, or violated any rights of defendants under [ALH's] Operating Agreement [count II];
> C. declaring that (1) in rendering services pursuant to [ALH's] Consulting Agreement [with SCA], they did not commit bad faith, gross negligence or willful misconduct, and (2) they are protected from any liability to defendants by the Consulting Agreement [count III];
> D. declaring that they relied in good faith on [consultants] and ALH's outside counsel [count IV];

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

E. declaring that they are entitled to indemnification, including advancement of legal fees and other expenses [count V];

F. declaring that SELK's claims against them have been released ..., or, in the alternative, that SELK's equity interest is reduced or eliminated ... [counts VI and VII]; [and]

G. declaring that plaintiffs have not violated [Avie] Arenson's rights as Class B Representative [of ALH] [count VIII] ....

(D.I. 37 at 49-50)

FN2. Because defendants' answer and counterclaim complaint are combined in the same document and contain overlapping paragraph numbers, "D.I. 67[A]" will be used to refer to defendants' answer and "D.I. 67[C]" to refer to their counterclaim complaint.

FN3. Defendants allege:

I. that Shamrock, as majority shareholder of ALH, breached its fiduciary duties to ALH's minority members;

II. that Krieger, Buchler, and Stein, as Shamrock employees who were also the Class A and D representatives on ALH's Supervisory Board, breached their fiduciary duties to ALH's minority shareholders;

III. that Shamrock, Krieger, Buchler, and Stein (collectively, "the fiduciaries") violated ALH's Operating Agreement when they breached their fiduciary duties;

IV. that SCA, a consultant of ALH, aided and abetted the fiduciaries in their breaches of duty;

V. that, in doing so, SCA breached its Consulting Agreement with ALH;

VI. that the fiduciaries breached their fiduciary duties through gross negligence; and

VII. that the fiduciaries breached their fiduciary duties with acts of self-dealing.

(D.I. 67[C] at ¶¶ 126-76) Defendants have framed these seven counts as a direct action against plaintiffs; counts VIII through XIV of their counterclaim complaint allege the same series of violations as counts I to VII but couch them as derivative claims. (*Id.* at ¶¶ 177-233)

FN4. Plaintiffs contend that a judgment in their favor on these counts "would moot Counts VI and VII and render Count V

(indemnification) ready for summary disposition." (D.I. 72 at 6)

FN5. For simplicity's sake, the term "plaintiffs" will hereinafter include the original plaintiffs (who are also the counterclaim defendants) and the third party defendant, ALH; "defendants" will refer to the defendants in the original action, the counterclaim plaintiffs, and the third party plaintiffs.

FN6. According to defendants, "[a]lthough it still exists, ALH no longer has any operations and is winding up its affairs. ALH's business is completed, [and] the liquidation sale is over ...." (D.I. 67[C] at ¶ 117 (citing D.I. 51 at 34))

FN7. Plaintiffs do not challenge defendants' standing to assert counts VIII-XIV (the "derivative claims").

FN8. The Court of Chancery has held that " 'the potential inclusion of culpable parties in the class due relief may affect the distinction between the derivative and direct claims.' " *In re Cencom Cable Income Partners, C.A. No. 14634, 2000 WL 130629, at *5 (Del.Ch. Jan. 27, 2000)*.

FN9. The court, therefore, will include defendants' direct claims, counts I-VII of the counterclaim, in its Rule 12(b)(6) analysis.

FN10. "In Delaware, the business judgment rule is a presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company." *Stanziale v. Nachtomi (In re Tower Air, Inc.), 416 F.3d 229, 238 (3d Cir.2005)* (citing *Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984))*.

FN11. The court will not explore plaintiffs' meritless claim that defendants' denial (D.I. 67[A] at ¶ 3) of plaintiffs' assertion that "[a]ll of plaintiffs' actions in connection with ALH were taken in good faith, in the reasonable exercise of plaintiffs' business judgment" (D.I. 37 at ¶ 3) was enough to require defendants to plead around the business judgment rule. (*See* D.I. 84 at 5)

FN12. *ALA, Inc. v. CCAIR, Inc., 29 F.3d*

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2802913 (D.Del.)
(Cite as: --- F.Supp.2d ----)

855, 859-61 (3d Cir.1994) (including a letter attached to the complaint in the court's analysis of whether an affirmative defense was raised on the face of the complaint); *Davis v. Grusemeyer*, 996 F.2d 617, 624-25 (3d Cir.1993) (finding that a letter predating many of plaintiff's claims for fraudulent concealment in a RICO prosecution against him served to notify him of operative facts on the face of the criminal complaint), *abrogated on other grounds, Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644 (3d Cir.1998).

FN13. Plaintiffs do not challenge the existence of a fiduciary relationship or damages proximately caused by a breach of such relationship.

FN14. With regard to damages, Fed.R.Civ.P. 8 requires only that pleadings contain "a demand for judgment for the relief the pleader seeks." Fed.R.Civ.P. 8(a)(3).

D.Del.,2006.
Shamrock Holdings, Inc. v. Arenson
--- F.Supp.2d ----, 2006 WL 2802913 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1435873 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Plaintiff and Counterclaim Defendants' Motion for Judgment on the Pleadings and Dismisal of the Counterclaims (Apr. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 1388583 (Trial Motion, Memorandum and Affidavit) Counterclaim Plaintiffs' Answering Brief in Opposition to Counterclaim Defendants' Motion for Judgment on the Pleadings and Dismissal of the Counterclaims (Apr. 7, 2006) Original Image of this Document (PDF)
• 2006 WL 1199885 (Trial Pleading) Reply to Counterclaims (Mar. 1, 2006) Original Image of this Document (PDF)
• 2006 WL 1199886 (Trial Pleading) Answer to Third-Party Complaint (Mar. 1, 2006) Original Image of this Document (PDF)
• 1:06cv00062 (Docket) (Jan. 31, 2006)
• 2005 WL 2867998 (Trial Motion, Memorandum and Affidavit) Defendant Abraham Arenson'S Reply Brief in Support of his Motion to Dismiss the Amended Complaint (Sep. 12, 2005) Original Image of this Document (PDF)
• 2005 WL 2868000 (Trial Motion, Memorandum

and Affidavit) Defendants' Reply Brief in Support of their Motion to Dismiss under Federal Rules of Civil Procedure 12(B)(2) and (7) (Sep. 12, 2005) Original Image of this Document (PDF)
• 2005 WL 2868001 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of their Motion to Dismiss, or in the Alternative for Stay of Proceedings (Sep. 12, 2005) Original Image of this Document (PDF)
• 2005 WL 2385513 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, or in the Alternative, for Stay of Proceedings (Aug. 8, 2005) Original Image of this Document (PDF)
• 2005 WL 2385514 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss First Amended Complaint for Declaratory Relief (Aug. 8, 2005) Original Image of this Document (PDF)
• 2005 WL 2385646 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendant Arenson'S Motion to Dismiss (Aug. 8, 2005) Original Image of this Document (PDF)
• 1:04cv01339 (Docket) (Oct. 6, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

LEXSEE



Positive
As of: Dec 22, 2006

WILLIAM STONE AND SANDRA STONE, derivatively on behalf of Nominal De-
fendant AmSOUTH BANCORPORATION, Plaintiffs Below, Appellants, v. C.
DOWD RITTER, RONALD L. KUEHN, JR., CLAUDE B. NIELSEN, JAMES R.
MALONE, EARNEST W. DAVENPORT, JR., MARTHA R. INGRAM, CHARLES
D. McCRARY, CLEOPHUS THOMAS, JR., RODNEY C. GILBERT, VICTORIA
B. JACKSON, J. HAROLD CHANDLER, JAMES E. DALTON, ELMER B.
HARRIS, BENJAMIN F. PAYTON, and JOHN N. PALMER, Defendants Below,
Appellees, and AmSOUTH BANCORPORATION, Nominal Defendant Below, Ap-
pellee.

No. 93, 2006

SUPREME COURT OF DELAWARE

2006 Del. LEXIS 597

October 5, 2006, Submitted
November 6, 2006, Decided

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**PRIOR HISTORY:** Court Below -- Court of Chancery
of the State of Delaware, in and for New Castle County.
C.A. No. 1570-N.

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff shareholders
appealed a judgment of the Court of Chancery of the
State of Delaware, in and for New Castle County, which
granted defendant current and former corporate directors'
motion to dismiss the shareholders' derivative action
alleging a violation of the directors' duty of good faith
regarding banking law violations. The chancery court
dismissed the derivative complaint under Del. Ch. Ct. R.
23.1.

**OVERVIEW:** The bank and corporation paid fines and
civil penalties for the bank's failure to file Suspicious

Activity Reports in violation of the Bank Secrecy Act, 31
U.S.C.S. § 5318(g), in relation to a money laundering
scheme. The shareholders alleged that the directors failed
to implement any statutorily required monitoring, report-
ing, or information controls that would have enabled
them to learn of the problems. On a appeal, the court
found that the chancery court applied the correct stan-
dard. A necessary condition for director oversight liabil-
ity was a sustained or systematic failure of the board of
directors to exercise oversight. A consultant's report re-
flected that the directors not only discharged their over-
sight responsibility to establish an information and re-
porting system but also proved that the system was de-
signed to permit the directors to periodically monitor the
bank's compliance with regulations. Although there were
ultimately failures by employees to report deficiencies,
there was no basis for an oversight claim seeking to hold
the directors personally liable for such failures by the
employees.

**OUTCOME:** The court affirmed the judgment.

**CORE TERMS:** oversight, reporting, derivative, board
of directors, failure to act, fiduciary, Bank Secrecy Act,
necessary condition, fiduciary duty, regulations, system-
atic, excused, utter, duty of loyalty, assessing, derivative

action, duty to act, suspicious, investors, training, fine, personal liability, loyalty, Chancery Rule, ensure compliance, anti-money-laundering, oversight-such, stockholder, monitoring, doctrinal

## LexisNexis(R) Headnotes

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > General Overview*
[HN1] Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, only a sustained or systematic failure of the board to exercise oversight, such as an utter failure to attempt to assure a reasonable information and reporting system exists, will establish the lack of good faith that is a necessary condition to liability.

*Banking Law > Bank Activities > Bank Accounts > Deposit Accounts > General Overview*
*Banking Law > Federal Acts > Bank Secrecy Act*
[HN2] The Bank Secrecy Act, 31 U.S.C.S. § 5318 et seq., and the regulations promulgated thereunder require banks to file with the Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury known as "FinCEN," a written "Suspicious Activity Report" (known as a SAR) whenever, inter alia, a banking transaction involves at least $5,000 and the bank knows, suspects, or has reason to suspect that, among other possibilities, the transaction involves funds derived from illegal activities or is intended or conducted in order to hide or disguise funds or assets derived from illegal activities. 31 U.S.C.S. § 5318(g); 31 C.F.R. § 103.18(a)(2) (2006).

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > Procedures*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*

*Civil Procedure > Class Actions > Derivative Actions > Demand Futility*
*Civil Procedure > Class Actions > Derivative Actions > Demand Requirement*
[HN3] It is a fundamental principle of the Delaware General Corporation Law that the business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors. Del. Code Ann. tit. 8, § 141(a) (2006). Thus, by its very nature, a derivative action impinges on the managerial freedom of directors. Therefore, the right of a stockholder to prosecute a derivative suit is limited to situations where either the stockholder has demanded the directors pursue a corporate claim and the directors have wrongfully refused to do so, or where demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation. Del. Ch. Ct. R. 23.1, accordingly, requires that the complaint in a derivative action allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or the reasons for the plaintiff's failure to obtain the action or for not making the effort.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > Procedures*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Class Actions > Derivative Actions > Demand Futility*
[HN4] Allegations of demand futility under Del. Ch. Ct. R. 23.1 must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Del. Ch. Ct. R. 8(a).

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > Procedures*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Class Actions > Derivative Actions > Demand Futility*
[HN5] To excuse demand under Rales, a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a rea-

sonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
[HN6] Absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
[HN7] The duty to act in good faith to be informed cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Care*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
[HN8] A failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence). A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Loyalty*

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > General Overview*
[HN9] The phraseology used in Caremark describing the lack of good faith as a necessary condition to liability is deliberate. The purpose of that formulation is to communicate that a failure to act in good faith is not conduct that results, ipso facto, in the direct imposition of fiduciary liability. The failure to act in good faith may result in liability because the requirement to act in good faith is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty. It follows that because a showing of bad faith conduct is essential to establish director oversight liability, the fiduciary duty violated by that conduct is the duty of loyalty.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Care*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Loyalty*
[HN10] The view of a failure to act in good faith results in two additional doctrinal consequences. First, although good faith may be described colloquially as part of a triad of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty. Only the latter two duties, where violated, may directly result in liability, whereas a failure to act in good faith may do so, but indirectly. The second doctrinal consequence is that the fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith. A director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > General Overview*

[HN11] Caremark articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > General Overview*
*Civil Procedure > Class Actions > Derivative Actions > General Overview*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN12] An appellate court reviews de novo a court of chancery's decision to dismiss a derivative suit under Del. Ch. Ct. R. 23.1.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > Procedures*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Civil Procedure > Class Actions > Derivative Actions > General Overview*
[HN13] For plaintiffs' derivative complaint to withstand a motion to dismiss, only a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists--will establish the lack of good faith that is a necessary condition to liability. Such a test of liability, a lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight, is quite high. But, a demanding test of liability in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board

decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to good faith performance of duty by such directors.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith*
[HN14] In the absence of red flags, good faith in the context of oversight must be measured by the directors' actions to assure a reasonable information and reporting system exists and not by second-guessing after the occurrence of employee conduct that results in an unintended adverse outcome.

**COUNSEL:** Brian D. Long, Esquire (argued) and Seth D. Rigrodsky, Esquire, of Rigrodsky & Long, P.A., Wilmington, Delaware, for appellants.

Jesse A. Finkelstein, Esquire, Raymond J. DiCamillo, Esquire, and Lisa Zwally Brown, Esquire, of Richards, Layton & Finger, Wilmington, Delaware, David B. Tulchin, Esquire (argued), L. Wiesel, Esquire, and Jacob F. M. Oslick, Esquire, of Sullivan & Cromwell LLP, New York, New York, for appellees.

**JUDGES:** Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices (constituting the Court en Banc).

**OPINION BY:** HOLLAND

**OPINION: HOLLAND,** Justice:

This is an appeal from a final judgment of the Court of Chancery dismissing a derivative complaint against fifteen present and former directors of AmSouth Bancorporation ("AmSouth"), a Delaware corporation. [*2] The plaintiffs-appellants, William and Sandra Stone, are AmSouth shareholders and filed their derivative complaint without making a pre-suit demand on AmSouth's board of directors (the "Board"). The Court of Chancery held that the plaintiffs had failed to adequately plead that such a demand would have been futile. The Court, therefore, dismissed the derivative complaint under Court of Chancery Rule 23.1.

The Court of Chancery characterized the allegations in the derivative complaint as a "classic *Caremark* claim," a claim that derives its name from *In re Caremark Int'l Deriv. Litig.* n1 In *Caremark*, the Court of Chancery recognized that: [HN1] "[g]enerally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation . . . only a sustained or systematic

failure of the board to exercise oversight--such as an utter failure to attempt to assure a reasonable information and reporting system exists--will establish the lack of good faith that is a necessary condition to liability." n2

n1 *In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959 (Del. Ch. 1996).*

[*3]

n2 *In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d at 971; see also David B. Shaev Profit Sharing Acct. v. Armstrong, 2006 Del. Ch. LEXIS 33, 2006 WL 391931, at *5 (Del. Ch.); Guttman v. Huang, 823 A.2d 492, 506 (Del. Ch. 2003).*

In this appeal, the plaintiffs acknowledge that the directors neither "knew [n]or should have known that violations of law were occurring," *i.e.*, that there were no "red flags" before the directors. Nevertheless, the plaintiffs argue that the Court of Chancery erred by dismissing the derivative complaint which alleged that "the defendants had utterly failed to implement any sort of statutorily required monitoring, reporting or information controls that would have enabled them to learn of problems requiring their attention." The defendants argue that the plaintiffs' assertions are contradicted by the derivative complaint itself and by the documents incorporated therein by reference.

Consistent with our opinion in *In re Walt Disney Co. Deriv Litig*, we hold that *Caremark* articulates the necessary conditions for assessing director [*4] oversight liability. n3 We also conclude that the *Caremark* standard was properly applied to evaluate the derivative complaint in this case. Accordingly, the judgment of the Court of Chancery must be affirmed.

n3 *In re Walt Disney Co. Deriv. Litig., 906 A.2d 27 (Del. 2006).*

**Facts**

This derivative action is brought on AmSouth's behalf by William and Sandra Stone, who allege that they owned AmSouth common stock "at all relevant times." The nominal defendant, AmSouth, is a Delaware corporation with its principal executive offices in Birmingham, Alabama. During the relevant period, AmSouth's wholly-owned subsidiary, AmSouth Bank, operated about 600 commercial banking branches in six states throughout the southeastern United States and employed more than 11,600 people.

In 2004, AmSouth and Amsouth Bank paid $40 million in fines and $10 million in civil penalties to resolve government and regulatory

investigations pertaining principally to the failure by bank employees to file "Suspicious [*5] Activity Reports" ("SARs"), as required by the federal Bank Secrecy Act ("BSA") n4 and various anti-money-laundering ("AML") regulations. n5 Those investigations were conducted by the United States Attorney's Office for the Southern District of Mississippi ("USAO"), the Federal Reserve, FinCEN and the Alabama Banking Department. No fines or penalties were imposed on AmSouth's directors, and no other regulatory action was taken against them.

n4 *31 U.S.C. 5318 (2006) et seq.* [HN2] The Bank Secrecy Act and the regulations promulgated thereunder require banks to file with the Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury known as "FinCEN," a written "Suspicious Activity Report" (known as a "SAR") whenever, *inter alia*, a banking transaction involves at least $5,000 "and the bank knows, suspects, or has reason to suspect" that, among other possibilities, the "transaction involves funds derived from illegal activities or is intended or conducted in order to hide or disguise funds or assets derived from illegal activities. . . ." *31 U.S.C. 5318(g) (2006); 31 C.F.R. 103.18(a)(2) (2006).*

[*6]

n5 *See, e.g., 31 C.F.R. 103.18(a)(2) (2006).*

The government investigations arose originally from an unlawful "Ponzi" scheme operated by Louis D. Hamric, II and Victor G. Nance. In August 2000, Hamric, then a licensed attorney, and Nance, then a registered investment advisor with Mutual of New York, contacted an AmSouth branch bank in Tennessee to arrange for custodial trust accounts to be created for "investors" in a "business venture." That venture (Hamric and Nance represented) involved the construction of medical clinics overseas. In reality, Nance had convinced more than forty of his clients to invest in promissory notes bearing high rates of return, by misrepresenting the nature and the risk of that investment. Relying on similar misrepre-

sentations by Hamric and Nance, the AmSouth branch employees in Tennessee agreed to provide custodial accounts for the investors and to distribute monthly interest payments to each account upon receipt of a check from Hamric and instructions from Nance.

The Hamric-Nance scheme was discovered in March 2002, when the investors [*7] did not receive their monthly interest payments. Thereafter, Hamric and Nance became the subject of several civil actions brought by the defrauded investors in Tennessee and Mississippi (and in which AmSouth also was named as a defendant), and also the subject of a federal grand jury investigation in the Southern District of Mississippi. Hamric and Nance were indicted on federal money-laundering charges, and both pled guilty.

The authorities examined AmSouth's compliance with its reporting and other obligations under the BSA. On November 17, 2003, the USAO advised AmSouth that it was the subject of a criminal investigation. On October 12, 2004, AmSouth and the USAO entered into a Deferred Prosecution Agreement ("DPA") in which AmSouth agreed: first, to the filing by USAO of a one-count Information in the United States District Court for the Southern District of Mississippi, charging AmSouth with failing to file SARs; and second, to pay a $40 million fine. In conjunction with the DPA, the USAO issued a "Statement of Facts," which noted that although in 2000 "at least one" AmSouth employee suspected that Hamric was involved in a possibly illegal scheme, AmSouth failed to file SARs in [*8] a timely manner. In neither the Statement of Facts nor anywhere else did the USAO ascribe any blame to the Board or to any individual director.

On October 12, 2004, the Federal Reserve and the Alabama Banking Department concurrently issued a Cease and Desist Order against AmSouth, requiring it, for the first time, to improve its BSA/AML program. That Cease and Desist Order required AmSouth to (among other things) engage an independent consultant "to conduct a comprehensive review of the Bank's AML Compliance program and make recommendations, as appropriate, for new policies and procedures to be implemented by the Bank." KPMG Forensic Services ("KPMG") performed the role of independent consultant and issued its report on December 10, 2004 (the "KPMG Report").

Also on October 12, 2004, FinCEN and the Federal Reserve jointly assessed a $10 million civil penalty against AmSouth for operating an inadequate anti-money-laundering program and for failing to file SARs. In connection with that assessment, FinCEN issued a written Assessment of Civil Money Penalty (the "Assessment"), which included detailed "determinations"

regarding AmSouth's BSA compliance procedures. FinCEN found that "AmSouth [*9] violated the suspicious activity reporting requirements of the Bank Secrecy Act," and that "[s]ince April 24, 2002, AmSouth has been in violation of the anti-money-laundering program requirements of the Bank Secrecy Act." Among FinCEN's specific determinations were its conclusions that "AmSouth's [AML compliance] program lacked adequate board and management oversight," and that "reporting to management for the purposes of monitoring and oversight of compliance activities was materially deficient." AmSouth neither admitted nor denied FinCEN's determinations in this or any other forum.

### Demand Futility and Director Independence

[HN3] It is a fundamental principle of the Delaware General Corporation Law that "[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors . . . ." n6 Thus, "by its very nature [a] derivative action impinges on the managerial freedom of directors." n7 Therefore, the right of a stockholder to prosecute a derivative suit is limited to situations where either the stockholder has demanded the directors pursue a corporate claim and the directors have wrongfully refused [*10] to do so, or where demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation. n8 Court of Chancery Rule 23.1, accordingly, requires that the complaint in a derivative action "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors [or] the reasons for the plaintiff's failure to obtain the action or for not making the effort." n9

---

n6 Del. Code Ann. tit. 8, 141(a) (2006). *See Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

n7 *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984).

n8 *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

n9 Ch. Ct. R. 23.1. [HN4] Allegations of demand futility under Rule 23.1 "must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)." *Brehm v. Eisner*, 746 A.2d at 254.

[*11]

In this appeal, the plaintiffs concede that "[t]he standards for determining demand futility in the absence of a business decision" are set forth in *Rales v. Blasband*. n10 [HN5] To excuse demand under *Rales*, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." n11 The plaintiffs attempt to satisfy the *Rales* test in this proceeding by asserting that the incumbent defendant directors "face a substantial likelihood of liability" that renders them "personally interested in the outcome of the decision on whether to pursue the claims asserted in the complaint," and are therefore not disinterested or independent. n12

n10 *Rales v. Blasband*, 634 A.2d 927 (Del. 1993).

n11 *Id.* at 934.

n12 The fifteen defendants include eight current and seven former directors. The complaint concedes that seven of the eight current directors are outside directors who have never been employed by AmSouth. One board member, C. Dowd Ritter, the Chairman, is an officer or employee of AmSouth.

[*12]

Critical to this demand excused argument is the fact that the directors' potential personal liability depends upon whether or not their conduct can be exculpated by the section 102(b)(7) provision contained in the AmSouth certificate of incorporation. n13 Such a provision can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty. n14 The standard for assessing a director's potential personal liability for failing to act in good faith in discharging his or her oversight responsibilities has evolved beginning with our decision in *Graham v. Allis-Chalmers Manufacturing Company*, n15 through the Court of Chancery's *Caremark* decision to our most recent decision in *Disney*. n16 A brief discussion of that evolution will help illuminate the standard that we adopt in this case.

n13 *Del. Code Ann. tit. 8, 102(b)(7)* (2006).

n14 *Id.*; see *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2006).

n15 *Graham v. Allis-Chalmers Mfg. Co.*, 41 Del. Ch. 78, 188 A.2d 125 (Del. 1963).

n16 *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2006).

[*13]

### Graham and Caremark

*Graham* was a derivative action brought against the directors of Allis-Chalmers for failure to prevent violations of federal anti-trust laws by Allis-Chalmers employees. There was no claim that the Allis-Chalmers directors knew of the employees' conduct that resulted in the corporation's liability. Rather, the plaintiffs claimed that the Allis-Chalmers directors *should have known* of the illegal conduct by the corporation's employees. In *Graham*, this Court held that " [HN6] *absent cause for suspicion* there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists." n17

n17 *Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d at 130 (emphasis added).

In *Caremark*, the Court of Chancery reassessed the applicability of our holding in *Graham* when called upon to approve a settlement of a derivative lawsuit brought against the directors of Caremark International, [*14] Inc. The plaintiffs claimed that the Caremark directors should have known that certain officers and employees of Caremark were involved in violations of the federal Anti-Referral Payments Law. That law prohibits health care providers from paying any form of remuneration to induce the referral of Medicare or Medicaid patients. The plaintiffs claimed that the *Caremark* directors breached their fiduciary duty for having "allowed a situation to develop and continue which exposed the corporation to

enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance." n18

n18 *In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959, 967 (Del. Ch. 1996).*

In evaluating whether to approve the proposed settlement agreement in *Caremark*, the Court of Chancery narrowly construed our holding in *Graham* "as standing for the proposition that, absent grounds to suspect deception, neither corporate boards nor senior officers can be charged with wrongdoing [*15] simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf." n19 The *Caremark* Court opined it would be a "mistake" to interpret this Court's decision in *Graham* to mean that:

> corporate boards may satisfy their obligation to be reasonably informed concerning the corporation, without assuring themselves that information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance. n20

n19 *Id.* at 969.

n20 *Id.* at 970.

To the contrary, the *Caremark* Court stated, "it is important that the board exercise a good faith judgment that the corporation's information and reporting system is in concept and design adequate to assure the [*16] board that appropriate information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility." n21 The *Caremark* Court recognized, however, that [HN7] "the duty to act

in good faith to be informed cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise." n22 The Court of Chancery then formulated the following standard for assessing the liability of directors where the directors are unaware of employee misconduct that results in the corporation being held liable:

> Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, as in *Graham* or in this case, . . . only a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists-will establish the lack of good faith that is a necessary condition to liability. n23

n21 *Id.*

n22 *Id.* at 971.
[*17]

n23 *In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d at 971.*

**Caremark Standard Approved**

As evidenced by the language quoted above, the *Caremark* standard for so-called "oversight" liability draws heavily upon the concept of director failure to act in good faith. That is consistent with the definition(s) of bad faith recently approved by this Court in its recent *Disney* n24 decision, where we held that [HN8] a failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence). n25 In *Disney*, we identified the following examples of conduct that would establish a failure to act in good faith:

> A failure to act in good faith may be shown, for instance, where the fiduciary

intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known [*18] duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient. n26

n24 *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2006).

n25 *Id.* at 66.

n26 *Id.* at 67.

The third of these examples describes, and is fully consistent with, the lack of good faith conduct that the *Caremark* court held was a "necessary condition" for director oversight liability, i.e., "a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists . . . ." n27

Indeed, our opinion in *Disney* cited *Caremark* with approval for that proposition. n28 Accordingly, the Court of Chancery applied the correct standard in assessing whether demand was excused in this case where failure to exercise oversight was the basis or theory of the plaintiffs' [*19] claim for relief.

n27 *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996).

n28 *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d at 67 n.111.

It is important, in this context, to clarify a doctrinal issue that is critical to understanding fiduciary liability under *Caremark* as we construe that case. [HN9] The phraseology used in *Caremark* and that we employ here--describing the lack of good faith as a "necessary condition to liability"--is deliberate. The purpose of that formulation is to communicate that a failure to act in good

faith is not conduct that results, *ipso facto*, in the direct imposition of fiduciary liability. n29 The failure to act in good faith may result in liability because the requirement to act in good faith "is a subsidiary element[,]" i.e., a condition, "of the fundamental duty of loyalty." n30 It follows that because a showing of bad faith conduct, in the sense described in *Disney* and *Caremark*, is essential [*20] to establish director oversight liability, the fiduciary duty violated by that conduct is the duty of loyalty.

n29 That issue, whether a violation of the duty to act in good faith is a basis for the direct imposition of liability, was expressly left open in *Disney*, 906 A.2d at 67 n.112. We address that issue here.

n30 *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003).

[HN10] This view of a failure to act in good faith results in two additional doctrinal consequences. First, although good faith may be described colloquially as part of a "triad" of fiduciary duties that includes the duties of care and loyalty, n31 the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty. Only the latter two duties, where violated, may directly result in liability, whereas a failure to act in good faith may do so, but indirectly. The second doctrinal consequence is that the fiduciary duty of [*21] loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith. As the Court of Chancery aptly put it in *Guttman*, "[a] director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest." n32

n31 *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

n32 *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003).

We hold that [HN11] *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously

failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability [*22] requires a showing that the directors knew that they were not discharging their fiduciary obligations. n33 Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, n34 they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith. n35

n33 *Id.* at 506.

n34 *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

n35 *See Guttman v. Huang*, 823 A.2d at 506.

### Chancery Court Decision

The plaintiffs contend that demand is excused under Rule 23.1 because AmSouth's directors breached their oversight duty and, as a result, face a "substantial likelihood of liability" as a result of their "utter failure" to act in good faith to put into place policies and procedures to ensure compliance with BSA and AML obligations. The Court of Chancery found that the plaintiffs did not plead the existence of "red flags" -- "facts showing [*23] that the board ever was aware that AmSouth's internal controls were inadequate, that these inadequacies would result in illegal activity, and that the board chose to do nothing about problems it allegedly knew existed." In dismissing the derivative complaint in this action, the Court of Chancery concluded:

> This case is not about a board's failure to carefully consider a material corporate decision that was presented to the board. This is a case where information was not reaching the board because of ineffective internal controls. . . . With the benefit of hindsight, it is beyond question that AmSouth's internal controls with respect to the Bank Secrecy Act and anti-money laundering regulations compliance were inadequate. Neither party disputes that the lack of internal controls resulted in a huge fine--$50 million, alleged to be the largest ever of its kind. The fact of those losses, however, is not alone enough for a court to conclude that a majority of the corporation's board of directors is disqualified from considering demand that

AmSouth bring suit against those responsible. n36

[HN12] This Court reviews *de novo* a Court of Chancery's decision to dismiss a derivative suit [*24] under Rule 23.1. n37

n36 *Stone v. Ritter*, 2006 Del. Ch. LEXIS 20, C.A. No. 1570-N (Del. Ch. 2006) (Letter Opinion).

n37 *Beam ex rel. Martha Stewart Living Omnimedia Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004).

### Reasonable Reporting System Existed

The KPMG Report evaluated the various components of AmSouth's longstanding BSA/AML compliance program. The KPMG Report reflects that AmSouth's Board dedicated considerable resources to the BSA/AML compliance program and put into place numerous procedures and systems to attempt to ensure compliance. According to KPMG, the program's various components exhibited between a low and high degree of compliance with applicable laws and regulations.

The KPMG Report describes the numerous AmSouth employees, departments and committees established by the Board to oversee AmSouth's compliance with the BSA and to report violations to management and the Board:

> **BSA Officer.** Since 1998, AmSouth has had a "BSA Officer" "responsible for all BSA/AML-related [*25] matters including employee training, general communications, CTR reporting and SAR reporting," and "presenting AML policy and program changes to the Board of Directors, the managers at the various lines of business, and participants in the annual training of security and audit personnel[;]"

> **BSA/AML Compliance Department.** AmSouth has had for years a BSA/AML Compliance Department, headed by the BSA Officer and comprised of nineteen professionals, including a BSA/AML

Compliance Manager and a Compliance Reporting Manager;

**Corporate Security Department**. AmSouth's Corporate Security Department has been at all relevant times responsible for the detection and reporting of suspicious activity as it relates to fraudulent activity, and William Burch, the head of Corporate Security, has been with AmSouth since 1998 and served in the U.S. Secret Service from 1969 to 1998; and

**Suspicious Activity Oversight Committee**. Since 2001, the "Suspicious Activity Oversight Committee" and its predecessor, the "AML Committee," have actively overseen AmSouth's BSA/AML compliance program. The Suspicious Activity Oversight Committee's mission has for years been to "oversee the [*26] policy, procedure, and process issues affecting the Corporate Security and BSA/AML Compliance Programs, to ensure that an effective program exists at AmSouth to deter, detect, and report money laundering, suspicious activity and other fraudulent activity."

The KPMG Report reflects that the directors not only discharged their oversight responsibility to establish an information and reporting system, but also proved that the system was designed to permit the directors to periodically monitor AmSouth's compliance with BSA and AML regulations. For example, as KPMG noted in 2004, AmSouth's designated BSA Officer "has made annual high-level presentations the Board of Directors in each of the last five years." Further, the Board's Audit and Community Responsibility Committee (the "Audit Committee") oversaw AmSouth's BSA/AML compliance program on a quarterly basis. The KPMG Report states that "the BSA Officer presents BSA/AML training to the Board of Directors annually," and the "Corporate Security training is also presented to the Board of Directors."

The KPMG Report shows that AmSouth's Board at various times enacted written policies and procedures designed to ensure compliance with [*27] the BSA and AML regulations. For example, the Board adopted an amended bank-wide "BSA/AML Policy" on July 17, 2003--four months before AmSouth became aware that it was the target of a government investigation. That policy was produced to plaintiffs in response to their demand to inspect AmSouth's books and records pursuant to section 220 n38 and is included in plaintiffs' appendix. Among other things, the July 17, 2003, BSA/AML Policy directs all AmSouth employees to immediately report suspicious transactions or activity to the BSA/AML Compliance Department or Corporate Security.

n38 Del. Code Ann. tit. 8, 220 (2006).

**Complaint Properly Dismissed**

In this case, the adequacy of the plaintiffs' assertion that demand is excused depends on whether the complaint alleges facts sufficient to show that the defendant *directors* are potentially personally liable for the failure of non-director bank *employees* to file SARs. Delaware courts have recognized that "[m]ost of the decisions [*28] that a corporation, acting through its human agents, makes are, of course, not the subject of director attention." n39 Consequently, a claim that directors are subject to personal liability for employee failures is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." n40

n39 *In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d at 968.

n40 *Id.* at 967.

[HN13] For the plaintiffs' derivative complaint to withstand a motion to dismiss, "only a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists--will establish the lack of good faith that is a necessary condition to liability." n41 As the *Caremark* decision noted:

Such a test of liability--lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight--is quite high. But, a demanding test of liability [*29] in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to *good faith performance of duty* by such directors. n42

n41 *Id.* at 971.

n42 *Id.* (emphasis in original).

The KPMG Report--which the plaintiffs explicitly incorporated by reference into their derivative complaint--refutes the assertion that the directors "never took the necessary steps . . . to ensure that a reasonable BSA compliance and reporting system existed." KPMG's findings reflect that the Board received and approved relevant policies and procedures, delegated to certain employees and departments the responsibility for filing SARs and monitoring compliance, and exercised oversight by relying on periodic reports from them. Although there ultimately may have been failures by employees to report deficiencies to the Board, there is no basis for [*30] an oversight claim seeking to hold the directors personally liable for such failures by the employees.

With the benefit of hindsight, the plaintiffs' complaint seeks to equate a bad outcome with bad faith. The lacuna in the plaintiffs' argument is a failure to recognize that the directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both, as occurred in *Graham*, *Caremark* and this very case. [HN14] In the absence of red flags, good faith in the context of oversight must be measured by the directors' actions "to assure a reasonable information and reporting system exists" and not by second-guessing after the occurrence of employee conduct that results in an unintended adverse outcome. n43 Accordingly, we hold that the Court of Chancery properly applied *Caremark* and dismissed the plaintiffs' derivative complaint for failure to excuse demand by alleging particularized facts that created reason to doubt whether the directors had acted in good faith in exercising their oversight responsibilities.

n43 *Id.* at 967-68, 971.

[*31]

### Conclusion

The judgment of the Court of Chancery is affirmed.

## CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on December 22, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Ian Connor Bifferato
> Linda Richenderfer
> Joseph K. Koury
> Bifferato, Gentilotti, Biden & Balick
> 1308 Delaware Ave.
> Wilmington, DE 19806

I further certify that on December 22, 2006, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY FEDERAL EXPRESS**

Thomas J. Flemming
Herbert C. Ross, Jr.
Olshan, Grundman, Frome,
Rosenzweig, & Wolosky LLP
65 East 55th Street
New York, NY 10022

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
William D. Johnston (No. 2123)
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
(302) 571-6600
apoff@ycst.com

DB02:5681902.1

065840.1001