# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AD HOC COMMITTEE OF EQUITY HOLDERS OF TECTONIC  NETWORK, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 06-665-GMS-MPT |
| | : | |
| AROL WOLFORD; SHERWIN KRUG; CHARLES MCROBERTS; JOHN MCROBERTS; CHARLES PECCHIO, JR.; LAURA ROGERS; and THEO VANDERBOOM, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM ORDER

## I.    INTRODUCTION

On October 27, 2006, the Ad Hoc Committee of Equity Holders of Tectonic

Network, Inc. ("Ad Hoc Committee" or "the Committee") filed this action alleging its

members suffered economic harm as the result of the purportedly improper conduct of

certain former officers and directors of Tectonic Network, Inc. ("Tectonic Network").[1]

The conduct complained of occurred prior to Tectonic Network filing for protection

under the Bankruptcy Code in 2005.  The Complaint sets forth claims of:  (1) fraud

against Wolford and Krug; (2) breaches of fiduciary duties against Wolford; (3)

---

[1] D.I. 1 (the "Complaint").  The individual defendants are:  Arol Wolford ("Wolford"), Sherwin Krug ("Krug"), Charles McRoberts ("Charles McRoberts"), John McRoberts ("John McRoberts"), Charles Pecchio, Jr. ("Pecchio"), Laura Rogers ("Rogers"), and Theo VanderBoom ("VanderBoom") (collectively, "defendants").  *Id.*  Defendants Charles McRoberts, John McRoberts, Pecchio, Rogers, and VanderBoom were members of the board of directors of Tectonic and are collectively referred to as the "director-defendants."  *Id.*, ¶ 11.

breaches of fiduciary duties against Krug; and (4) breaches of fiduciary duties against the director-defendants.

Currently before the court is defendants' motion to dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[2] Defendants contend this matter must be dismissed for at least three reasons: (1) lack of subject matter jurisdiction under 28 U.S.C. § 1332; (2) the Committee's lack of standing to bring the asserted claims; and (3) failure to state a claim upon which relief may be granted and failure to plead fraud with particularity as required by Fed. R. Civ. P. 9(b).[3]

## II.    BACKGROUND

In 1990, Tectonic Network incorporated in Delaware with its principal place of business located in Georgia.[4]  Until February 2005, Tectonic Network had two primary operating subsidiaries:  Tectonic Solutions, Inc. ("Tectonic Solutions") and GO Software, Inc. ("GO Software").  Go Software developed, marketed, and sold software and services for processing credit card, debit card, or check transactions.[5]  Tectonic Solutions was incorporated in Delaware in or about the second half of 2003 with its principal place of business in Georgia.  Tectonic Solutions is, and has been since its incorporation, a wholly-owned subsidiary of Tectonic Network.[6]  Tectonic Solutions

---

[2] Pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and Local Rule 73.1, the parties consented to the jurisdiction of United States Magistrate Judge Mary Pat Thynge to exercise civil jurisdiction over and rule upon defendants' motion to dismiss.  *See* D.I. 55.

[3] D.I. 13 (Motion to Dismiss); D.I. 14 (Opening Brief in Support of Motion to Dismiss).  Defendants' motion originally asserted insufficiency of service of process under Fed. R. Civ. P. 12(b)(2).  Defendants subsequently withdrew that part of their motion.  *See* D.I. 53.  The court, therefore, will not address the parties' arguments on that topic and denies defendants' motion as moot on that issue.

[4] D.I. 1, ¶ 12.  Tectonic Network was formerly known as Return On Investment Corporation ("ROI") and, earlier, Net/Tech International, Inc.  *Id.*, ¶ 13.

[5] *Id.*, ¶ 20.

[6] *Id.*, ¶ 14.

2

provided "custom software solutions to help building product manufacturers and distributors improve the way they organize, display and distribute their product information."[7]

In late 2003 and early 2004, Tectonic Network acquired three businesses which provided information and advertising for the construction industry: BBN Acquisition, Inc. ("BBN"); Construction Yellow Pages LLC ("CYP"); and SpecSource.com, Inc. ("SpecSource").[8] Each of those businesses were combined into Tectonic Solutions.[9]

On November 18, 2003, Tectonic Network and BBN consummated a merger whereby BBN was merged with and into Tectonic Solutions pursuant to an agreement and plan of merger dated October 29, 2003. At the time of the agreement, Wolford was the principal and controlling shareholder of BBN and his daughter was a member of the BBN board of directors. As consideration for the merger, Tectonic Network conveyed 750,000 shares of its common stock to the BBN shareholders for all BBN stock. Wolford received 311,671 of the 750,000 shares for his 41.6% ownership interest in BBN.[10]

On November 26, 2003, Tectonic Network purchased the operating assets of CYP pursuant to an asset purchase agreement dated as of October 29, 2003. As consideration for the purchase, Tectonic Network conveyed  750,000 shares of common stock to the members of CYP and assumed certain CYP liabilities. Wolford was the majority equity owner-member of CYP and received 435,000 of the 750,000

---

[7] D.I. 16, Ex. F at 4 (ROI Form 10-KSB for fiscal year ended June 30, 2004).
[8] D.I. 1, ¶ 21-22.
[9] *Id.*, ¶ 22. Wolford had a controlling interest in each of the three businesses. *Id.*
[10] *Id.*, ¶ 22 A.

shares for his 58% interest in CYP.[11]

On January 2, 2004, Tectonic Network purchased substantially all of the operating assets of SpecSource, pursuant to an asset purchase agreement dated October 29, 2003 (the "SpecSource Agreement"), in return for a non-interest bearing note in the amount of $533,000 payable to SpecSource and 1,450,000 shares of Tectonic Network common stock. Wolford was the majority shareholder of SpecSource and his daughter was a SpecSource employee. Wolford was entitled to receive approximately 980,000 shares of the Tectonic Network common stock upon the dissolution of SpecSource and 67.6% of any and all payments on the note.[12] In connection with the SpecSource transaction, Tectonic Network entered into a non-compete agreement with SpecSource's only other shareholder, John White ("White"). In exchange for White entering into the non-compete agreement, Tectonic Network gave White a $360,000 non-interest bearing note.[13]

During the first three quarters of 2004, Wolford urged the development of a Virtual Model Business ("VMB") whereby Tectonic Network would offer the service of converting two-dimensional building construction plans into three-dimensional models to expedite building construction by eliminating the additional time necessary to analyze

---

[11] *Id.*, ¶ 22 B. When acquired by Tectonic Network, CYP was in the business of publishing general print directories, entitled the "Construction Yellow Pages," which were distributed in four regions of the United States. The Construction Yellow Pages listed the addresses and telephone numbers of construction contractors, manufacturers of construction equipment, and manufacturers and distributors of building construction products (who purchased advertising space in the directories), and were intended for distribution to all purchasers of construction products. *Id.*, ¶ 78-79.

[12] *Id.*, ¶ 22 C. The Tectonic Network common stock used as consideration for the three transactions was then valued at $1.82 per share. *Id.*, ¶ 22 A, B, C.

[13] *Id.*, ¶ 23. When Tectonic Network acquired SpecSource, the business of SpecSource was selling advertising space to manufacturers of building construction products on its online directory or reference database of manufacturers of construction products and their local distributors. *Id.*, ¶ 36.

4

two-dimensional plans and envision them in a three-dimensional framework.[14]  Wolford

informed Tectonic Network's Board of Directors (the "Board") that VMB would be the

foundation of an overall strategy to move Tectonic Network into the construction

information business, and that VMB would be highly profitable.[15]  When Wolford first

urged the development of VMB, Tectonic Network did not have the funds, staff, or

management time to develop the business.  Consequently, Wolford turned over

development of the project to an outside contractor, RCMS.  RCMS was a competitor

with Tectonic Network for the targeted customers of VMB, but RCMS did not enter into

a non-compete agreement before being retained.  Wolford's nephew was employed by

RCMS.  Tectonic Network paid more than $500,000 to RCMS for the project.[16]

GO Software was the largest generator of revenue for Tectonic Network and the

only profitable business among those it owned.  For the year ending June 30, 2004, GO

Software was responsible for $8,917,666 of the total revenues of $10,586,034 of

Tectonic Network and its subsidiaries on a consolidated basis.[17]  In the summer of

2004, Wolford began a campaign to convince the Board that Tectonic Network should

sell GO Software in order to generate funds to support the recently-acquired BBN, CYP,

and SpecSource businesses, as well as, VMB.  To finance those businesses, the Board

approved procuring substantial loans to Tectonic Network, including loans given in

return for secured convertible notes issued by Tectonic Network in August and

November 2004, on the basis that GO Software would be sold to repay those loans.[18]

---

[14] *Id.*, ¶ 63.
[15] *Id.*, ¶ 64.
[16] *Id.*, ¶ 72-76.
[17] *Id.*, ¶ 83-84.
[18] *Id.*, ¶ 85.

5

On December 6, 2004, Tectonic Network entered into an asset purchase agreement with VeriFone, Inc. ("VeriFone") by which VeriFone purchased substantially all of GO Software's assets. The sale closed on February 28, 2005, with VeriFone paying $13 million in cash at closing and having the obligation to pay GO Software up to an additional $2 million contingent upon future events.[19]

In early January 2005, Tectonic Network gave two notes to a lender in exchange for a loan of $5.5 million, of which $2,300,000 was to pay the secured convertible notes procured in August and November 2004 and $1,500,000 was used to pay other loans it procured in 2004 to finance the three acquired businesses and VMB.[20]

The Board deemed the sale of GO Software to be a change of control of Tectonic Network. That change in control triggered certain obligations on the part of Tectonic Network under the terms of its employment agreement with Pecchio; the note given by Tectonic Network to SpecSource; and the note given by Tectonic Network to White, obligating the company to pay $360,000 in monthly installments to Pecchio; to pay the $533,000 note to SpecSource; and to pay the $360,000 note to White.[21]

Following the sale of GO Software, Tectonic Network's financial situation worsened.[22] For the year ending June 2005, Tectonic Network had gross revenues of approximately $1.22 million and made payments within the prior year to insiders

---

[19] *Id.*, ¶ 87.

[20] *Id.*, ¶ 88.

[21] *Id.*, ¶ 91. As noted above, Wolford was entitled to 67.6% of the payment of the SpecSource note due to his former ownership interest in that company. Following the sale of GO Software's assets, Tectonic Network paid SpecSource $473,124 on the $533,000 note. *Id.*, ¶ 97. Wolford's employment contract with Tectonic Network also contained a change in control provision that triggered an obligation for the company to pay Wolford twenty-four consecutive monthly installments totaling $360,000. Wolford waived his right to receive payment at that time. *Id.*, ¶ 93.

[22] *Id.*, ¶ 96.

6

exceeding $1.572 million, including salary, bonuses, and note payments.[23]

On October 3, 2005, Tectonic Network and Tectonic Solutions filed voluntary

petitions in the United States Bankruptcy Court for the Northern District of Georgia

("Bankruptcy Court") under Chapter 11 of the Bankruptcy Code. By the First Amended

Joint Plan of Reorganization ("Reorganization Plan" or "the Plan") approved in a July

11, 2006 order of the Bankruptcy Court, Tectonic Network, as reorganized, continues to

operate.[24] Pursuant to the Reorganization Plan, all issued and outstanding shares of

Tectonic Network stock were cancelled and 100,000 shares of common stock of

Tectonic Network were issued. Wolford owns all of those shares.[25]

On April 12, 2006, the Bankruptcy Court approved a stipulation and consent

order ("Stipulation and Consent Order" or "the Order") by which, *inter alia*, "the

automatic stay of 11 U.S.C. Section 362 shall be terminated to permit the members of

the Committee as shareholders of Network to pursue the Claims . . . against the

Debtors' directors and officers in a forum outside of the within chapter 11

proceedings."[26]

## III.    DISCUSSION

### A.    Subject Matter Jurisdiction

The Complaint avers that this court has subject matter jurisdiction over this

---

[23] *Id.*, ¶ 103.

[24] *Id.*, ¶ 15.

[25] *Id.*, ¶ 16. Before filing for bankruptcy protection, Tectonic Network was a publicly traded company. On the date of the bankruptcy petition, there were 13,867,054 outstanding shares of common stock, of which 6,276,533 shares (approximately 45%) were then owned by Wolford, John McRoberts, Charles McRoberts, and Pecchio. *Id.*, ¶ 13.

[26] D.I. 16, Ex. C at 3 ("Stipulation and Consent Order (a) Resolving Certain Motions by the Ad Hoc Committee . . . , (b) Lifting the Automatic Stay to Permit Members of the Ad Hoc Committee of Equity Holders the Right to Pursue Claims Against the Debtors' Officers and Directors and (c) Authorizing the Debtors to Abandon Such Claims").

action by virtue of 28 U.S.C. § 1332. Defendants contend that there is not complete

diversity between the members of the Committee and defendants and, therefore, the

suit must be dismissed for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P.

12(b)(1).[27]  The Committee disputes that contention.  Alternatively, the Committee

argues that, regardless whether there is complete diversity in this matter, the court has

subject matter jurisdiction under 28 U.S.C. § 1334.[28]  Finally, the Committee suggests

that if the court determines that there is not complete diversity and that jurisdiction is

not found under § 1334, then it should be permitted to move to delete the defendant

which destroyed diversity to preserve this court's jurisdiction under 28 U.S.C. § 1332.

The Committee argues such deletion is proper because that defendant is not an

indispensable party under Fed. R. Civ. P. 19.[29]

### 1.    28 U.S.C. § 1332

The only basis for this court's jurisdiction alleged in the Complaint is pursuant to

28 U.S.C. § 1332.[30]  That statute recites, in relevant part, "[t]he district courts shall have

original jurisdiction of all civil actions where the matter in controversy exceeds the sum

or value of $75,000, exclusive of interest and costs, and is between (1) citizens of

different States . . . ."  "Federal courts do not have jurisdiction on the ground of diversity

of citizenship unless that diversity exists between all the plaintiffs, on the one hand, and

---

[27] Fed. R. Civ. P. 12 (b)(1) ("Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter . . .").

[28] D.I. 17 at 14.

[29] *Id.* at 3.

[30] D.I. 1, ¶ 17 ("This Court has jurisdiction over this action by virtue of 28 U.S.C. § 1332 as this action is between citizens of different States and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.  None of the members of the Ad Hoc Committee is a citizen of the same state of which any of the Defendants is a citizen.").

all the defendants, on the other, at the time suit is instituted."[31]

Defendants may challenge subject matter jurisdiction through a Rule 12(b)(1) motions to dismiss in two ways: a facial challenge to the complaint and a factual challenge to the complaint.[32]  By asserting a facial challenge, defendants contend that even if the facts alleged in the complaint are true, they are insufficient to establish the court's jurisdiction.[33]  In considering a facial challenge the court "'must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'"[34]  In asserting a factual challenge to the court's subject matter jurisdiction, however, the defendant "contends that the allegations in the complaint establishing jurisdiction are not sufficiently supported by the facts.  When considering a factual challenge, a court can consider evidence outside of the pleadings."[35]

Because defendants are asserting a factual challenge to the court's subject

---

[31] *Osthaus v. Button*, 70 F.2d 392, 394 (3d Cir. 1934); *Transamerica Corp. v. Reliance Ins. Co. of Illinois*, 884 F. Supp. 133, 137 (D. Del.,1995) ("It is axiomatic that there must be complete diversity of citizenship between plaintiffs and all defendants.  Thus, if any one defendant is a citizen of the same state as any one plaintiff, diversity of citizenship is destroyed and § 1332 provides no basis for federal court jurisdiction.") (citation omitted).

[32] *Ketterson v. Wolf*, No. Civ.A. 99-689-JJF, 2001 WL 940909, at *3  (D. Del. Aug. 14, 2001) (citing *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir.2000)).

[33] *Id.*; *see also IT Litigation Trust v. D'Aniello*, No. 02-10118, Civ.A. 04-1268-KAJ, 2005 WL 3050611, at *5 (D. Del. Nov. 15, 2005) ("A challenge to subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) requires a court to ask 'whether the complaint alleges facts on its face which, if taken as true, would be sufficient to invoke the district court's jurisdiction.'") (quoting *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 840 (3d Cir.1996)).

[34] *Ketterson*, 2001 WL 940909, at *3 (quoting *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)).

[35] *Id.*; *see also Epic Sys. Corp. v. Acacia Research Corp.*, No Civ. A. 06-255, 2006 WL 3355185, at *2 (D. Del. Nov. 16, 2006) ("In reviewing a factual challenge to the Court's subject matter jurisdiction, the Court is not confined to the allegations of the complaint, and the presumption of truthfulness does not attach to the allegations in the complaint.  Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction.") (citing *Mortensen v. First Fed. Sav. and Loan*, 549 F.2d 884, 891 (3d Cir. 1977); *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997)); *Adkins v. Rumsfeld*, 450 F. Supp. 2d 440, 445 (D. Del. 2006) (same).

matter jurisdiction, the court may consider evidence outside of the pleadings. With regard to the state citizenship of the individual defendants, the Complaint alleges that Wolford, Krug, Charles McRoberts, Pecchio, Rogers, and VanderBoom are citizens of the State of Georgia[36] and that John McRoberts is a citizen of the State of Alabama.[37]

The Complaint states that the Ad Hoc Committee "is an unincorporated association consisting of a group of public shareholders which owned approximately fifty percent (50%) of all non-insider owned stock of Tectonic . . . ."[38] "Although corporations suing in diversity long have been 'deemed' citizens, unincorporated associations remain mere collections of individuals. When the 'persons composing such association' sue in their collective name, they are the parties whose citizenship determines the diversity jurisdiction of a federal court."[39] The Complaint avers that "[n]one of the members of the Ad Hoc Committee is a citizen of the same state of which any of the Defendants is a citizen" but it does not give the name or state citizenship of any individual member of the committee.[40] Defendants note that the Committee filed a verified statement in Tectonic Network's bankruptcy proceeding listing the names and addresses of the Committee's members. That list includes four members of the Committee who reside in the State of Florida.[41] The Committee does not dispute the

---

[36] D.I. 1, ¶¶ 3, 5, 7, 9, 10, 11.

[37] *Id.*, ¶ 8.

[38] *Id.*, ¶ 1.

[39] *Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 461 (1980) (quoting *Great Southern Fire Proof Hotel Co. v. Jones,* 177 U.S. 449, 456 (1900) (citation omitted); *see also Transamerica Corp. v. Reliance Ins. Co. of Illinois,* 884 F. Supp. 133, 137 (D. Del. 1995) ("[A]n unincorporated association has no separate legal identity and its citizenship, for purposes of diversity jurisdiction, is the citizenship of each of its members.") (citing *Carden v. Arkoma Assocs.,* 494 U.S. 185 (1990)).

[40] *See* D.I. 1, ¶ 17.

[41] *See* D.I. 16, Ex. E at 2-4 (Verified Statement of Olshan Grundman Frome Rosenzweig & Wolosky LLP and Cohen Pollock Merlin Axelrod & Small, P.C. Pursuant to Fed. R. Bankr. P. 2019) (listing Committee members Bridge Ventures Inc., Sharon Will, Don Will, and Albert Saphier as having addresses

accuracy of that list, nor does it argue that the addresses listed therein are inconsistent with the citizenship of those individuals for purposes of diversity jurisdiction.

Defendants maintain that John McRoberts is a citizen of the State of Florida and that such residence means that there is not complete diversity between all plaintiffs and all defendants and, consequently, this court lacks subject matter jurisdiction. Defendant John McRoberts filed a declaration with defendants' opening brief avering that he has been a resident of Florida since June 2004.[42] Because the Complaint was filed on October 27, 2006, John McRoberts' citizenship in Florida as of that date, if found to be accurate, would destroy this court's § 1332 diversity jurisdiction.

In opposing defendants' subject matter jurisdiction argument, the Committee contends that at the time the lawsuit was filed, publicly available information showed that John McRoberts was a citizen of Alabama.[43] According to Tectonic Network's Amendment No. 1 to Form SB-2/A, filed with the United States Securities and Exchange Commission on June 28, 2005, John McRoberts was then the President and Chief Executive Officer of Meadowbrook Healthcare, Inc, Managing Member of CannonGate Partners LLC, and a director of Foresite LLC.[44] The website of Meadowbrook Healthcare Inc. shows its corporate office in Birmingham, Alabama and identifies John W. McRoberts as President and CEO.[45] Through an Internet search, the address for CannonGate Partners was shown to be in Birmingham, Alabama.[46] The

---

in the State of Florida).

[42] D.I. 16, Ex. J ("John McRoberts deposes and says: 1. I am a defendant in this action. 2. Since June 2004, my residence has been . . . Panama City Beach, FL 32413. I declare under penalty of perjury that the foregoing is true and correct. s/John McRoberts.").

[43] D.I. 17 at 12.

[44] D.I. 19, Ex. 3 at 46.

[45] *Id.*, Ex. 4.

[46] *Id.*, Ex. 5

website for ForeSite Towers, LLC also shows its address as Birmingham, Alabama.[47]  A search of an online directory for John McRoberts in Birmingham, Alabama showed an address in Birmingham, Alabama.[48]  Finally, the Statement of Financial Affairs of Tectonic Network, Inc., filed in the Bankruptcy Court on October 26, 2005, shows the same street address for John McRoberts.  That address is the one alleged in paragraph 8 of the Complaint.

The Committee argues that even if John McRoberts has been a *resident* of Florida since June 2004, the citizenship for diversity purposes is the individual's domicile and that an individual can only have a single domicile.[49]  It argues that defendants have not meant their jurisdictional burden of proof and requests discovery and a hearing on this issue.[50]

"Citizenship is synonymous with domicile, and 'the domicile of an individual is his true, fixed and permanent home and place of habitation. It is the place to which, whenever he is absent, he has the intention of returning.'"[51]  "In determining an individual's domicile, a court considers several factors, including 'declarations, exercise of political rights, payment of personal taxes, house of residence, and place of business.'"[52]  "Other factors to be considered may include location of brokerage and bank accounts, location of spouse and family, membership in unions and other

---

[47] *Id.*, Ex. 6.

[48] *Id.*, Ex. 7.

[49] D.I. 17 at 12.

[50] *Id.* at 14.

[51] *McCann v. Newman Irrevocable Trust*,  458 F.3d 281, 286 (3d Cir. 2006) (quoting *Vlandis v. Kline*, 412 U.S. 441, 454 (1973)).

[52] *Id.* (quoting *Krasnov v. Dinan*, 465 F.2d 1298, 1301 (3d Cir. 1972)).

organizations, and driver's license and vehicle registration."[53]

To clarify the facts supporting his citizenship for diversity purposes, rather than merely averring his state of residence, John McRoberts filed an additional declaration with defendants' reply brief. In that declaration, he states that "I am considered a resident of Florida for federal and state income taxation purposes. I am registered to vote in Florida, and am subject to jury duty in Florida. I pay property taxes in Florida. In addition, my car is registered in Florida."[54]

"A district court's determination regarding domicile or citizenship is a mixed question of fact and law, but primarily one of fact . . . ."[55] "The party asserting diversity jurisdiction bears the burden of proof. . . . by proving diversity of citizenship by a preponderance of the evidence."[56] "Whether the party asserting a change of domicile is asserting or contesting federal subject matter jurisdiction, the appropriate standard of proof is the preponderance of the evidence."[57]

> If a defendant contests any of the jurisdictional allegations as pled by the plaintiff, the court must permit the plaintiff to respond with rebuttal evidence in support of jurisdiction, and the court then decides the jurisdictional issue by weighing the evidence. If there is a dispute of material fact, the court must conduct a plenary hearing on the contested issues prior to determining jurisdiction.[58]

Here, there is clearly a question of fact as each side has presented evidence which support their competing averments as to John McRoberts' citizenship. Although

---

[53] *Id.* (citing 13B Wright, Miller & Kane, *Federal Practice and Procedure* § 3612 (3d ed.2005)).
[54] D.I. 47 (Reply Declaration of John McRoberts) (This declaration was also signed by John McRoberts "under penalty of perjury that the foregoing is true and correct.").
[55] *McCann*, 458 F.3d at 286.
[56] *Id.* (citations omitted).
[57] *Id.* at 289.
[58] *Id.* at 290 (citation omitted).

his declarations list several factors weighing in favor of a determination of Florida citizenship, defendants take somewhat contradictory positions on the evidence relied upon by the Committee to show Alabama citizenship. On the one hand, defendants seek to have the Court accept the addresses listed in certain filings in the Bankruptcy Court as establishing the citizenship for diversity purposes of those individuals who constitute the Ad Hoc Committee. On the other hand, defendants ask the court to disregard a Bankruptcy Court filing listing an Alabama address for John McRoberts for that purpose and, instead accept the statements of his declarations as establishing that he is a citizen of Florida. In this case, the Committee has requested jurisdictional discovery and were the court to have determined that it did not have jurisdiction under 28 U.S.C. § 1334, below, it would permit discovery on the issue and likely conduct a plenary hearing on the issue. As discussed below, however, the court has jurisdiction under that section and such discovery is unnecessary.[59]

### 2.    28 U.S.C. § 1334

The Committee argues that even if there is no subject matter jurisdiction under 28 U.S.C. § 1332, the court has jurisdiction over this action pursuant to 28 U.S.C. § 1334 because, although it is a "non-core" proceeding, it is "related to" a case under title 11 of the United States Code.

> That statute provides that "the district courts shall have original and exclusive jurisdiction of all cases under title 11," and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." § 1334(a), (b). "Cases under title 11, proceedings arising under title 11, and proceedings arising in a

---

[59] For the same reason, it is unnecessary for the court to address the Committee's request that it be permitted to delete John McRoberts (based on its argument that he is not a Rule 19 indispensable party) in order to preserve § 1332 jurisdiction.

case under title 11 are referred to as 'core' proceedings; whereas proceedings 'related to' a case under title 11 are referred to as 'non-core' proceedings.[60]

After plan confirmation, a proceeding will be within the "related to" jurisdiction if it has a "close nexus to the bankruptcy plan." "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus."[61]

In *IT Litigation*, the court stated that:

Plaintiff's cause of action in this case arose before the filing of the bankruptcy petition, and the losses claimed by Plaintiff on behalf of unsecured creditors are logically connected to the IT Group insolvency and subsequent bankruptcy. Furthermore, this cause of action was assigned to Plaintiff [in] . . . the IT Group bankruptcy plan. The assignment in a confirmed plan of a prepetition cause of action "could well establish the 'close nexus to the bankruptcy plan or proceeding' which the Third Circuit requires."[62]

In light of those facts, the court found that "[b]ecause this matter affects the implementation, consummation, and execution of the bankruptcy plan, there is a close nexus to the bankruptcy sufficient to satisfy the standard set in *Resorts*."[63]

Defendants contend that "jurisdiction must be established on the face of the complaint, and the Complaint here is silent as to any such jurisdictional basis" and that silence distinguishes this case from *IT Litigation*.[64] Next, defendants argue that:

deeming this action one that arises under the Bankruptcy Code is completely at variance with the theory alleged in the Complaint itself, viz. that the claims are state law fraud and fiduciary claims against directors

---

[60] *IT Litigation Trust v. D'Aniello*, No. 02-10118, Civ.A. 04-1268-KAJ, 2005 WL 3050611, at *5 (D. Del. Nov. 15, 2005) (quoting *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 162 (3d Cir.2004)).

[61] *Id.* at *6 (quoting *In re Resorts*, 372 F.3d at 166, 167) (internal citation omitted).

[62] *Id.* (quoting *Michaels v. World Color Press, Inc. (In re LGI, Inc.)*, 322 B.R. 95, 102 (Bankr. D.N.J. 2005)).

[63] *Id.* at *7 (citing *In re Resorts*, 372 F.3d at 166-67).

[64] D.I. 31 at 3.

and officers of the company–and it is completely at variance with the Bankruptcy Court's own determination that the Claims should go forward, if at all, 'in a forum <u>outside of the within chapter 11 proceedings.</u>[65]

With respect to defendants' first argument, Fed. R. Civ. P. 15(a) states that "[t]he court should freely give leave [to amend] when justice so requires." The United States Supreme Court has stated that "this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."[66] While leave to grant or deny amendment is discretionary,

> In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be "freely given."[67]

Any deficiency from the Complaint's lack of stating that this court has subject matter jurisdiction under § 1334 may be remedied by permitting such amendment. The court finds no reason to deny that amendment.

The court also disagrees with defendants' second argument, that finding § 1334 jurisdiction is inappropriate in light of the Complaint's asserted state law claims. Similar state law claims were asserted by the plaintiff in *IT Litigation* and jurisdiction was found under § 1334.[68] Finally, the court disagrees with defendants' contention that such jurisdiction "is completely at variance with the Bankruptcy Court's own determination

---

[65] *Id.* at 3-4 (emphasis in original).
[66] *Foman v. Davis*, 371 U.S. 178, 182 (1962) (citation omitted).
[67] *Id.*
[68] *See IT Litigation*, 2005 WL 3050611, at *1 n.2 (listing, *inter alia*, state law claims for breach of fiduciary duty).

16

that the Claims should go forward, if at all, 'in a forum <u>outside of the within chapter 11</u>
<u>proceedings.</u>'"[69]  This court is a proper forum outside the chapter 11 proceedings where
"related to" claims having a close nexus to the bankruptcy plan may be heard.[70]

Here, the Committee's claims challenge defendants' actions prior to Tectonic
Network's bankruptcy.  The challenged actions purportedly led to the insolvency and
bankruptcy of Tectonic Network.  Necessarily, therefore, the claims are logically
connected to the insolvency and bankruptcy of that company.  Those claims clearly
arose prior to the bankruptcy petition as the Stipulation and Consent Order notes.[71]

That Order permits the Committee to pursue the claims asserted here, stating
"the automatic stay . . . shall be terminated to permit the members of the Committee as
shareholders of Network to pursue the Claims . . . against the Debtors' directors and
officers in a forum outside of the within chapter 11 proceedings."[72]  The Stipulation and
Consent Order is also incorporated by reference in the Reorganization Plan.[73]

Consequently, as was determined in the *IT Litigation* matter, the court finds that
this matter "affects the implementation, consummation, and execution of the bankruptcy
plan" and, therefore, "there is a close nexus to the bankruptcy sufficient" to establish
"related to" jurisdiction under § 1334.  Defendants motion to dismiss' for lack of subject

---

[69] D.I. 31 at 4 (emphasis in original).

[70] *See IT Litigation*, 2005 WL 3050611, at *6.

[71] D.I. 16, Ex. C at 2 (defining those "Claims" are "all claims against the Debtors' directors and officers, including but not limited to claims for fraud, breach of fiduciary duty and breach of the duty of care and loyalty *which were assertable prior to the filing of these chapter 11 cases* . . . .") (emphasis added).

[72] *Id.*, Ex. C at 3, ¶ 3.

[73] D.I. 19, Ex. 2 at 2, ¶ 1.1(b) (defining "Ad Hoc Committee Stipulation" as "that certain Stipulation and Consent Order by and between the Debtors and the Ad Hoc Committee of Equity holders entered on the docket in the Bankruptcy case on April 13, 2006"); *id.*, Ex. 2 at 24, ¶ 8.4 (releasing certain parties "subject to the terms of the Ad Hoc Committee Stipulation which shall be incorporated herein and in the event of any conflict with the Plan control").

matter jurisdiction is, therefore, denied.

###### B.    The Committee's Standing to Assert the Claims

Defendants argue that, even if the court determines it has subject matter

jurisdiction, the Complaint must nevertheless be dismissed.  Defendants maintain that

the Committee's claims are derivative claims that must be dismissed.  First, they argue

that all derivative claims were abandoned in the Bankruptcy proceeding and, therefore,

the Committee has no standing to assert those claims.[74]  Next, defendants contend that

the Committee has no standing to assert the claims because it does not satisfy the

contemporaneous ownership rule applicable to derivative claims and otherwise failed to

satisfy the procedural requirements of Fed. R. Civ. P. 23.1 for bringing such claims.[75]

Finally, defendants maintain that even if the court determines that the claims are direct,

they must nevertheless be dismissed.  According to defendants, because the

Committee was never a shareholder, it does not have standing to bring direct claims.

Also, such claims are only appropriately asserted as class claims and the Committee

has not complied with the requirements of Fed. R. Civ. P. 23.[76]

The Committee argues that "[d]efendants have mischaracterized this action.

This is a direct, rather than a derivative, action . . . ."[77]  As such, it argues that there was

no need to comply with the procedural requirements of a shareholders' derivative action

and that failure can not warrant dismissal.[78]  It also counters that the bankruptcy

---

[74] D.I. 14 at 11.

[75] *Id.*

[76] D.I. 31 at 8.

[77] D.I. 17 at 1.

[78] *Id.* at 4 ("By stipulation and order of the Bankruptcy Court, Plaintiff was authorized to bring this action in the right of Tectonic Network, but for the benefit of Plaintiff's members.  The order transferred all claims of Tectonic Network against its officers and directors, except those for preferential transfers, to

documents make it clear that the claims asserted were not abandoned in the bankruptcy proceedings.[79]

The court finds defendants' abandonment argument without merit. They contend that the Committee has no standing to assert the claims alleged here because "[i]n the bankruptcy proceedings, Tectonic expressly and irrevocably abandoned any derivative claims it might have had against its officers and directors."[80]  In support of that contention, they cite the following language of the Stipulation and Consent Order: "Upon entry of this Order . . . the Claims shall be deemed to be abandoned."[81]  The Order also recites that the Estate and the Debtors declined to prosecute the Claims and "do not oppose the lifting of the automatic stay to permit the prosecution of [the Claims] by the members of the Committee, either individually or by class action."[82]  By that Order, "the automatic stay . . . [was] terminated to permit the members of the Committee as shareholders of Network to pursue the Claims . . . in a forum outside of the within chapter 11 proceedings."[83]  "Neither the Plan nor any order of this or any other court, including a confirmation order of the Plan, may approve any releases of the Claims . . . ."[84]

The Reorganization Plan does release claims against certain parties. "Released Parties" are defined as "all officers of each of the Debtors as of the Petition Date, all

---

Plaintiff. In fact, the order provides that in the event Plaintiff, in its sole discretion, requests formal assignment from Tectonic Network of its claims, such must be given upon demand by Plaintiff. Therefore, as Tectonic's Network's claims have been transferred to Plaintiff by order of the Bankruptcy court, there is no need to comply with any of the procedural formalities of a shareholders' derivative action.").

[79] *Id.* at 18.
[80] D.I. 14 at 11.
[81] *Id.* (citing D.I. 16, Ex. C at 3, ¶ 4).
[82] D.I. 16, Ex. C at 2.
[83] *Id.*, Ex. C at 3, ¶ 3.
[84] *Id.*, Ex. C at 4, ¶ 9.

members of the boards of directors of each of the Debtors as of the Petition Date

. . . ."[85] The "Release by Debtors of Certain Parties" of claims against the "Released

Parties," however, is "subject to the terms of the Ad Hoc Committee Stipulation which

shall be incorporated herein and in the event of any conflict with the Plan control . . . .[86]

Both the Stipulation and Consent Order and the Reorganization Plan, therefore, make

clear that the provision that "[u]pon entry of this Order . . . the Claims shall be deemed

to be abandoned," does not operate to preclude the Committee from pursuing the

Claims.

With regard to whether the asserted claims are derivative, defendants cite

paragraph 8 of the Stipulation and Consent Order which purportedly "made clear that

any claims thus abandoned to members of the Ad Hoc Committee were 'derivative'."[87]

Paragraph 8 of that order does not, however, make "clear" that the Claims are

"derivative." In its entirety, that paragraph reads:

> This court shall retain jurisdiction to take any future action necessary to
> effectuate any action which permits the Committee to pursue the Claims,
> including without limitation supplementing or amending this order to
> effectuate such relief in favor of the Committee's *derivative right* to pursue
> the Claims.[88]

That language does not characterize the *Claims* as "derivative," rather it describes the

"derivative *right*" of the members of the Committee to pursue the "Claims." Indeed, the

Claims are not characterized at all; they are merely identified as those to which the

automatic stay was lifted (and that the Committee might pursue them), and those to

---

[85] D.I. 19, Ex. 2 at 10, § 1.1(aaaa).

[86] *Id.*, Ex. 2 at 24, § 8.4.

[87] D.I. 31 at 6.

[88] D.I. 16, Ex. C, ¶ 8 (emphasis added).

20

which the stay was not lifted (the Preference Claims).[89]

The Committee argues that the claims are direct. It contends that, as a result of the Stipulation and Consent Order, it acquired Tectonic Network's claims against its former officers and directors and that it stands in the same shoes as the plaintiff trust in *IT Litigation Trust*.[90] The court agrees with the Committee's claims in this action are direct claims.

The *IT Litigation Trust* case arose following the bankruptcy of IT Group Inc. ("IT Group"). Plaintiff IT Litigation Trust asserted a claim for, *inter alia*, breaches of fiduciary duty against certain former directors and officers of IT Group. Those claims were "originally asserted by the Official Committee of Unsecured Creditors in the IT Group bankruptcy proceeding. By stipulation of the parties and pursuant to the First Amended Joint Chapter 11 Plan for the IT Group, which was [later confirmed], the IT Litigation Trust was substituted as Plaintiff in this action."[91] There, the "case is brought as a direct rather than a derivative action solely because the IT Group became insolvent and its board was displaced by a bankruptcy trustee."[92]

Similarly, the Committee originally moved for appointment as an official committee of equity holders (the "Equity Committee Motion") and to investigate the

---

[89] D.I. 16, Ex. C at 2 (The "Claims" are defined as "all claims against the Debtors' directors and officers, including but not limited to claims for fraud, breach of fiduciary duty and breach of the duty of care and loyalty . . . and claims for fraudulent conveyances . . . . For the purposes of this Stipulation and Consent order, the Claims do not include the cause of action the Estate has or may have against the Debtors' directors and officers for preferential transfers pursuant to either Bankruptcy Code § 547 or any applicable state law authorizing the recovery of such preferential transfers (the 'Preference Claims').").

[90] No. 02-10118, Civ. A. 04-1268-KAJ, 2005 WL 3050611 (D. Del. Nov. 15, 2005)

[91] *IT Litigation*, 2005 WL 3050611, at *5 (citations omitted); *id.* at *6 ("[W]ithin the listing of claims assigned to Plaintiff [were] '[a]ny claims for acts or omissions of [the IT Group's] . . . present and former officers, directors, insiders and accountants.'" (third and fourth alterations in original).

[92] *Id.* at *8 n.10; *id.* (explaining that the court's "citing derivative suit precedents in a direct action . . . [was not the result of] some confusion that this is a derivative suit").

21

Claims, to which the Debtors (Tectonic Network and Tectonic Solutions) objected.[93] The Debtors filed a Joint Plan of Reorganization which provided for the release of all claims against officers and directors, including the Claims, to which the Committee objected.[94]  The Estate and the Debtors did not oppose lifting the automatic stay to permit the Committee to pursue the Claims.[95]  Therefore, the Debtors, the Estate, and the Committee agreed, *inter alia*, that:  the Equity Committee Motion would be withdrawn[96] and that the automatic stay would be lifted to permit the Committee to pursue "the Claims . . . against the Debtors' directors and officers in a forum outside of the within chapter 11 proceedings."[97]  As a result, the Committee acquired Tectonic Network's claims against its "directors and officers, including . . . claims for fraud, breach of fiduciary duty and breach of the duty of care and loyalty which were assertable prior to the filing of these chapter 11 cases . . . ."[98]  As in *IT Litigation*, the claims asserted in this action are not derivative claims and are not subject to the procedural requirements of Fed. R. Civ. P. 23.1.[99]

---

[93] D.I. 16, Ex. C at 1-2

[94] *Id.*, Ex. C at 2.

[95] *Id.*, Ex. C at 2.

[96] *Id.*, Ex. C at 3, ¶ 2.

[97] *Id.*, Ex. C at 3, ¶ 3.

[98] *Id.*, Ex. C at 2.

[99] *See, e.g., Continuing Creditors' Committee of Star Telecommunications Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 456-57 (D. Del. 2004) ("This case is unusual in that it alleges corporate misfeasance and malfeasance of a type most frequently challenged in derivative suits, but, because of the bankruptcy context in which it arises, the case is brought by the Plaintiff directly, without the Plaintiff having first had to make a demand on the Company's Board of Directors for some corrective action.  In a context like this, the Delaware Court of Chancery has said, '[b]ecause the filing of this action was approved by the Bankruptcy Court, there is no motion to dismiss for failure to comply with Court of Chancery Rule 23.1's demand requirement.  Thus, the Plaintiff's allegations are not subject to the more exacting standard imposed by Court of Chancery Rule 23.1 for derivative actions.'" (quoting *Official Comm. of Unsecured Creditors of Integrated Health Servs. v. Elkins*, C.A. No. 20228-NC, 2004 WL 1949290, at *2 n.2 (Del. Ch. Aug. 24, 2004) (footnotes omitted)); *Id.* at 457 n.5 ("The Star Creditors' Liquidating Trust is the successor in interest to Star and has assigned its claims and rights of action to the Plaintiff.  Thus, the Plaintiff has been enabled to bring this action directly and not derivatively.") (footnote omitted).

Defendants also argue that if the court determines, as it has, that the claims are not derivative, they still must be dismissed. They contend that because the Ad Hoc Committee never held shares of Tectonic Network in its own name it has no standing to sue for injury either on behalf of the company or in the capacity of a shareholder.[100] The court has already determined that as a result of the Stipulation and Consent Order, the Committee has standing to pursue the claims asserted in this action. Were the Committee to be prohibited from pursuing these claims on the basis that it had never owned shares in the company, plaintiffs such as the IT Litigation Trust (which never owned shares of IT Group in its own name) would never be able to bring similar claims. This would be at odds with the clear intent of Bankruptcy Court orders establishing litigation trusts or committees of former shareholders for the express purpose of enabling those entities to pursue certain claims. Therefore, the court rejects defendants' argument that the Committee's lack of ownership of Tectonic Network shares requires dismissal of the claims.

Defendants also quote the language of the Stipulation and Consent Order that any "recoveries" go to "similarly situated members of the class,"[101] and contend that the language of the Stipulation and Consent Order indicates that "the claims, to the extent direct, are class claims. If so, then Defendants hereby move to dismiss on the basis that plaintiff has not pleaded any of the requirements of Fed. R. Civ. P. 23 . . . ."[102] Here, however, the Committee does not purport assert this matter as a class action and the Stipulation and Consent Order does not so require.

---

[100] D.I. 31 at 8.
[101] *Id.* (citing D.I. 16, Ex. C, ¶ 5) (emphasis in original).
[102] *Id.*

Defendants indirectly make an additional standing contention based on the Stipulation and Consent Order, albeit as part of the argument that the claims are derivative, that the Committee is not the proper plaintiff to have brought this action. They maintain that the Order permits "'the <u>members</u> of the Committee as shareholders of [Tectonic] to pursue the Claims . . . .'"[103] That language is said to show that the Claims "survived only as claims that could have been brought by <u>members</u> of the Ad Hoc Committee—i.e., <u>shareholders</u>."[104] While the Stipulation and Consent Order is correctly quoted by defendants, read as a whole, it is clear that the Committee is authorized to pursue the Claims in its own name.

The Order states that the automatic stay "shall be terminated to permit the members of the Committee as shareholder of [Tectonic Network] to pursue the Claims . . . ."[105] It refers to "costs incurred by *the Committee <u>or</u> its members in their pursuit of the Claims*"[106] and recoveries from the claims benefitting "*the Committee <u>or</u> its members* subject to any applicable law requiring *the Committee* to share any recovery with similarly situated *members of the class*."[107] This alternative language concerning costs and recoveries demonstrates that the parties to the Order contemplated the Committee bringing the Claims in its own name, as does subsequent language therein written both in the alternative and specific as to the Committee. To preserve the Committee's ability to pursue the Claims, it recites that:

In the event circumstances arise in this or any future proceeding or action

---

[103] *Id.* at 6 (quoting D.I. 16, Ex. C at 3, ¶ 3) (emphasis in original).
[104] *Id.* at 6 (emphasis in original).
[105] D.I. 16, Ex. C at 3, ¶ 3.
[106] *Id.*, Ex. C at 3, ¶ 5 (emphasis added).
[107] *Id.*, Ex. C at 3-4, ¶ 5 (emphasis added)

24

which, in the sole discretion of *the Committee and/or its members*
pursuing the Claims, require the Estate or the Debtors to execute any
further documents or the Court to enter any further orders to formally
assign, deliver or abandon the Claims to *the Committee and/or its
members*, the Estate and the Debtors shall execute such documents, and
fully cooperate with *the Committee* to effectuate such release.[108]

Additionally, the Bankruptcy Court "shall retain jurisdiction to take any future

action necessary to effectuate any action which permits *the Committee* to pursue the

Claims, including without limitation supplementing or amending this order to effectuate

such relief in favor of *the Committee's* derivative right to pursue the Claims."[109]  Finally,

"[n]either the Plan nor any order of this or any other court, including a confirmation

order of the Plan, may approve any releases of the Claims, which Claims are hereby

preserved for the benefit of *the Committee*."[110]

In light of the above language, the court finds that the Stipulation and Consent

Order permits the Committee to bring the instant action in its own name and does not

require that the action be brought as a class action.  Defendants' motion to dismiss

based on the Committee's lack of standing and/or failure to comply with certain

procedural of the Federal Rules is denied.

## C.     Failure to State a Claim Upon which Relief May be Granted and Failure to Plead Fraud With Particularity

Defendants contend that the Complaint must be dismissed for failure to state a

claim upon which relief may be granted and failure to plead fraud with particularity.  The

Committee, naturally, disputes those contentions.

Defendants argue that "[a]llegations of breach of fiduciary duty must be analyzed

---

[108] *Id.*, Ex. C at 4, ¶ 7 (emphasis added).
[109] *Id.*, Ex. C at 4, ¶ 8 (emphasis added).
[110] *Id.*, Ex. C at 4, ¶ 9 (emphasis added).

to determine whether plaintiff rebuts the business judgment rule presumption that disinterested directors who honestly and reasonably believe they are benefitting the corporation may not be second-guessed by shareholders."[111]  Defendants maintain that the allegations of the Complaint fail to rebut the business judgment rule presumption and must be dismissed.

The Committee points out that, in support of their contentions, defendants cite Delaware state court decisions for the pleading standards for claims officers' and directors' breaches of fiduciary duties under substantive Delaware state law such as *Aronson v. Lewis*.[112]  The Third Circuit's *In re Tower Air, Inc.*[113] decision (not cited in defendants' opening brief), however, made abundantly clear that in pleading directors' and officers' breaches of fiduciary duty, the notice pleading standard of Fed. R. Civ. P. 8 applies, rather than the more specific factual pleading required by Delaware state courts under Delaware Court of Chancery Rule 8.  Federal Rule of Civil Procedure 8(a) simply requires a complaint to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  The Third Circuit noted that Delaware Chancery's Rule 8[114] mirrors Fed. R. Civ. P. 8.  "The problem is that Delaware courts interpret Chancery Rule 8 to require pleading facts with specificity.  That is *not* the federal notice pleading standard."[115]  "'[A] plaintiff need only make out a claim upon

---

[111] D.I. 14 at 22.  The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)

[112] 473 A.2d 805 (Del. 1984).

[113] 416 F.3d 299, 236 (3d Cir. 2005).

[114] *Id.* at 236 n.9 ("Del. Ch. Ct. R. 8 ('A pleading which sets forth a claims for relief . . . shall contain . . . a short and plaint statement of the claims showing that the pleader is entitled to relief . . . .').").

[115] *Id.* at 236 (emphasis added).

which relief can be granted. If more facts are necessary to resolve or clarify the disputed issues, the parties may avail themselves of the civil discovery mechanisms under the Federal Rules.'"[116]  "[T]he Federal Rules of Civil Procedure 'do not require a claimant to set out in detail the facts upon which he bases his claim.'"[117]  The "supporting facts should be alleged, but only those necessary to provide the defendant fair notice of the plaintiff's claim and the 'grounds upon which it rests.'"[118]  "[A] plaintiff will not be thrown out of court on a Rule 12(b)(6) motion for lack of detailed facts. To say that a plaintiff's claim appears factually weak is not to say that he states no claim."[119]  "Generally speaking, [the court] will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6)."[120]

Defendants respond that, even under *Tower Air*, the Committee must still plead around the business judgment rule because "*Tower Air* stands for the proposition that a complaint that expressly *or implicitly* invokes the 'business judgment rule' must plead around' that rule, in order to survive a motion to dismiss."[121]  The court disagrees with defendants' characterization of that proposition. After stating that the business judgment rule generally will not trigger dismissal under Rule 12(b)(6), the *Tower Air* court stated that "[a] complaint may be dismissed under Rule 12(b)(6) where an

---

[116] *Id.* at 237 (quoting *Alston v. Parker*, 363 F.3d 229, 233 n.6 (3d Cir. 1996)); *see also id.* at 137 ("The District court erred by assuming that Delaware's notice pleading cases are interchangeable with federal notice pleading cases. *They are not.* By requiring [plaintiff] to allege specific facts, the District Court erroneously preempted discovery on certain claims by imposing a heightened pleading standard not required by Federal Rule of Civil Procedure 8.") (footnote omitted) (emphasis added).

[117] *Id.* at 137 (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993)).

[118] *Id.* at 137 (quoting *Conley v. Gibson*, 335 U.S. 41, 47 (1957)).

[119] *Id.* at 137-38.

[120] *Id.* at 138.

[121] D.I. 17 at 21 (citing *In re Tower Air*, 416 F.3d at 238) (emphasis added).

unanswered affirmative defense *appears on its face*, however."[122]   The *Tower Air* complaint "declare[d] that the business judgment rule does not vitiate any of his claims."[123]   Because that defense appeared on the face of the complaint, "[plaintiff] must plead that he overcomes the presumption created by that rule . . . ."[124]

Defendants do not, and can not contend that the business judgment rule appears on the face of the Complaint.   Instead, they argue that the Complaint implicitly invokes the business judgment rule by describing "<u>each</u> of the transactions which underlie the breach of fiduciary duty claims as being 'decisions that no <u>reasonable person could possibly authorize in good faith</u> . . . .'"[125]   A similar argument was recently rejected by this court in *Shamrock Holdings, Inc. v. Arenson*.[126]

In *Shamrock*, it was argued that the business judgment rule was implicitly raised "by repeatedly describing the minority shareholders' behavior with terms such as 'well-reasoned' in a preemptive attempt to combat a possible affirmative defense."[127]   The Court acknowledged the teaching of *Tower Air* that affirmative defenses, such as the business judgment rule, generally will not trigger dismissal of a complaint, but that a complaint may be dismissed based on that defense if it appears on the face of the complaint.[128]   The court rejected the argument that dismissal is appropriate where the business judgment rule is implicitly raised.   The court stated that it did not find "a bright

---

[122] *In re Tower Air*, 416 F.3d at 238 (citing *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (emphasis added).

[123] *Id.* at 238.

[124] *Id.*   The court also noted that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task." *Id.*

[125] D.I. 31 at 9-10 (citing D.I. 1 at 29, ¶ 127) (emphasis in original).

[126] 456 F. Supp. 2d 599 (D. Del. 2006).

[127] *Id.* at 609.

[128] *Id.* (citing *Tower Air*, 416 F.3d at 238).

line rule permitting courts to dismiss claims under Rule 12(b)(6) based on unanswered affirmative defenses which are raised *only implicitly* on the face of the complaint."[129] Defendants have not cited any case that supports the proposition that implicitly raising the business judgment rule as the basis for dismissal. As in *Shamrock*, this "court declines to infer such ability and holds that defendants are not required to plead around the business judgment rule at this stage in the proceedings."[130] Consequently, the Committee's Complaint need only satisfy the notice requirement of Fed. R. Civ. P. 8 to survive defendants' 12(b)(6) motion to dismiss.

The bulk of defendants' argument that the Committee fails to state a claim upon which relief may be granted is based on their contention that the Committee must plead around the business judgment rule, which the court has determined is not the case here. Defendants make a passing attempt at arguing that the Complaint fails the notice pleading requirement of Rule 8. They contend that "[i]n all events, plaintiff's claims are subject to dismissal for failure of even the most basic notice pleading standards."[131] In support of that contention, they cite *Tower Air*, *Continuing Creditors' Committee of Star Telecommunications v. Edgecomb*,[132] and *Malpiede v. Townson*.[133] Those cases are of no help to defendants. In *Tower Air*, the Third Circuit had determined that the plaintiff had to plead around the business judgment rule before analyzing the allegations in the complaint.[134] Here, the court has determined that plaintiff is not required to plead

---

[129] *Id.* (emphasis added).
[130] *Id.*
[131] D.I. 31 at 11.
[132] 385 F. supp. 2d 449 (D. Del. 2004).
[133] 780 A.2d 1075 (Del. 2001).
[134] *In re Tower Air*, 416 F.3d at 238.

29

around the business judgment rule. *Star Telecommunications* was decided prior to *Tower Air*. There is no mention of Fed. R. Civ. P. 8 in that case and the court apparently looked to Delaware state court opinions to determine whether the claims were properly plead; the application of which the *Tower Air* court subsequently held was inappropriate. For the same reason, defendants' reliance on *Malpiede* is misplaced as that court, necessarily, was not examining the allegations under Fed. R. Civ. P. 8.

        1.    Duty of Loyalty[135]

The duty of loyalty requires that "the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[136] The Committee argues that "[a] breach of the duty of loyalty is pleaded if the alleged facts, accepted as true, show that the board was either interested in the transaction or lacked the independence to objectively consider whether the transaction was in the best interest of the corporation and its shareholders."[137] With respect to the requirement that a fiduciary not be interested in a transaction, that fiduciary "can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the

---

[135] The Committee argues that the Complaint also states a claim for breach of the duty of good faith. The Delaware Supreme Court has stated, however, that the duty of a fiduciary to act in good faith is not a separate duty on which liability may be based. *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006) ("The failure to act in good faith may result in liability because the requirement to act in good faith is a subsidiary element[,] i.e., a condition, of the fundamental duty of loyalty. . . . [A]lthough good faith may be described colloquially as part of a 'triad' of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty. Only the latter two duties, where violated, may directly result in liability, whereas a failure to act in good faith may do so, but indirectly.") (footnotes and internal quotation marks omitted) (first alteration in original); *see also Orman v. Cullman*, 794 A.2d 5, 14 n.3 (Del. Ch. 2002) ("Because the duty to act in 'good faith' is merely a subset of a director's duty of loyalty, my consideration of [plaintiff's] duty of loyalty allegations necessarily includes a consideration of whether the facts pled suggest the defendants did not act in good faith with regard to their duty of loyalty to the Company.").

[136] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[137] D.I. 17 at 22 (citing *Orman*, 794 A.2d at 22).

sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."[138] A fiduciary's lack of independence "can be shown when a plaintiff pleads facts that establish 'that the directors are beholden to [the controlling person] or so under their influence that their discretion would be sterilized.'"[139]

Here, the Complaint alleges facts, which if proved, would support a conclusion that some or all of the defendants lacked independence or were interested in the challenged transactions.

The Complaint alleges that, with respect to the acquisitions of BBN, CYP, and SpecSource, Wolford was a majority (or controlling) shareholder of each of those businesses and, as such, appeared on both sides of those transactions and, therefore, lacked disinterest.[140] As a result of the BBN and CYP transactions, Wolford received Tectonic Network stock in return for his interest in those companies.[141] Through the SpecSource transaction, Wolford was entitled to receive "approximately 980,000 shares of the common stock of Tectonic Network upon the dissolution of SpecSource and 67.6 % of any and all payments on [a $533,000] note" as consideration for his ownership interest in that company.[142]

With respect to Krug, the Complaint alleges that he lacked independence as he was beholden to and controlled by Wolford. Wolford allegedly controlled Krug because Wolford hired Krug as Chief Financial Officer of Tectonic Network and Krug reported to

---

[138] *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) (quoting *Aronson*, 473 A.2d at 812).
[139] *Id.* at 24.
[140] D.I. 1, ¶ 22.
[141] *Id.*, ¶¶ 22(a)-22(b).
[142] *Id.*, ¶ 22(c).

31

Wolford who acted as Krug's supervisor.[143]  Krug was also purportedly beholden to

Wolford who "effectively determined Krug's compensation, including stock options and

bonuses given to him."[144]

The interest of John McRoberts, Charles McRoberts, and Pecchio is also

alleged.  Under an agreement entered in 2000, those directors were "entitled to the

receipt of over three million seven hundred fifty thousand (3,750,000) shares of

common stock of Tectonic Network, held in escrow, upon Tectonic Network reaching

certain financial results."[145]  As of the dates of the consideration and authorization of the

BBN, CYP, and SpecSource acquisitions, Tectonic Network had never achieved those

results.[146]  As part of the acquisition of those businesses, Wolford devised a "scheme"

whereby "all of the escrowed shares would be released from escrow, most of them

(approximately 2.85 million shares) would then be used as consideration or partial

consideration given to the [owners of the acquired businesses], and nearly all of the

balance of the shares would be given immediately" to those three directors.[147]  Charles

McRoberts was to receive 309,383 shares, John McRoberts 187,846 shares, and

Pecchio 253,131 shares.[148]  As a result of their purported interest, i.e., the anticipated

receipt of Tectonic Network stock, those directors "approved the scheme proposed by

Wolford and the acquisitions of the three businesses, which were integral to the

scheme."[149]

---

[143] *Id.*, ¶ 29.
[144] *Id.*, ¶ 29.
[145] *Id.*, ¶ 31.
[146] *Id.*, ¶ 31.
[147] *Id.*, ¶ 32.
[148] *Id.*, ¶ 32.
[149] *Id.*, ¶ 33.

The lack of independence of Charles McRoberts, VanderBoom and Rogers is also alleged. Wolford purportedly exerted control over Charles McRoberts as Wolford was his close friend and supervisor for many years and he reported to Wolford.[150] VanderBoom is alleged to have been under the control of Wolford because VanderBoom was a Chief Financial Officer in another company in which Wolford was the Chief Executive Officer to whom VanderBoom reported.[151] Rogers' lack of independence was due to her wish "to become the President of Tectonic Network and [she] required Wolford's good will and support to secure that position."[152]

These allegations are sufficient, under Rule 8, to put provide defendants fair notice of the Committee's claims and the grounds upon which those claims rest.[153] Defendants motion to dismiss the Committee's duty of loyalty claims is denied.[154]

### 2.    Duty of Care

Defendants argue that the Committee's duty of care claims must be dismissed

---

[150] *Id.*, ¶ 123.

[151] *Id.*

[152] *Id.*

[153] *See, e.g., IT Litigation*, 2005 WL 3050611, at *8 (In footnote 10 of the *IT Litigation* opinion, then-district court Judge Jordan, set forth an in depth and scholarly examination of the business judgment rule and the pleading standards set forth in the decision of the Third Circuit in *In re Tower Air, Inc.*, 416 F.3d 229 (3d Cir. 2005). There, the court stated that "the claim of lack of independence is based largely on the allegations that the Carlyle Defendants 'took control' of the IT Group in or around November 1996, and that '[a]t all relevant times, the Carlyle Defendants possessed and exercised control over the IT Group.' Actual control of the IT Group's operations by the Carlyle Defendants, if proved, would support a conclusion that some or all of the directors lacked independence concerning payments made to the Carlyle Defendants. Thus, *while I seriously doubt that the conclusory allegations of control in the Complaint would survive a 12(b)(6) motion in the Delaware Court of Chancery*, they do put Defendants on notice that the claim here is based on the Carlyle Defendants' actual control of the IT Group and the lack of independence of the directors concerning payments to this controlling group. Given that the Third Circuit has emphasized the view that the Federal Rules of Civil Procedure do not require a plaintiff to plead detailed facts to make out a claim for breach of fiduciary duties under Delaware law, I am bound to hold that Plaintiff's allegations are sufficient in this case.") (emphasis added) (citations omitted).

[154] Having determined that the Complaint states a claim for breaches of the duty of loyalty, the court need not examine the parties' separate arguments concerning the subsidiary element of that duty, i.e., the requirement that the defendants act with good faith.

because Tectonic Network's certificate of incorporation contains an exculpation

provision eliminating liability for breaches of the duty of care. Delaware's General

Corporation Law permits a corporation to eliminate its directors from monetary liability

for breaches of the duty of care.

> [T]he certificate of incorporation may . . . contain . . . (7) A provision
> eliminating or limiting the personal liability of a director to the corporation
> or its stockholders for monetary damages for breach of fiduciary duty as a
> director, provided that such provision shall not eliminate or limit the liability
> of a director: (i) For any breach of the director's duty of loyalty to the
> corporation or its stockholders; (ii) for acts or omissions not in good faith
> or which involve intentional misconduct or a knowing violation of the law;
> (iii) under § 174 of this title; or (iv) for any transaction from which the
> director derived an improper benefit.[155]

Tectonic Network adopted such a provision eliminating liability "to the corporation

or any of its stockholders for monetary damages for breach of fiduciary duty as a

director" tracking the language of § 102(b)(7) and stating that it is "the intention of the

foregoing provision to eliminate the liability of the corporation's directors to the

corporation or its stockholders to the fullest extent permitted by Section 102(b)(7)

. . . ."[156]

Defendants do not point to any deficiencies in the Complaint's allegations

concerning purported breaches of the duty of care. The only ground upon which the

motion to dismiss on this issue is based on the existence of Tectonic Network's

exculpation provision. Defendants cite *IT Litigation*, where the court dismissed duty of

care claims based on a § 102(b)(7) exculpation provision, as support for dismissal of

---

[155] 8 *Del. C.* § 102(b)(7); *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006) (A section 102(b)(7) "provision can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty.").

[156] D.I. 32, Ex. A, ¶ 8.

those claims here.  In *IT Litigation*, the court stated that "[t]he Third Circuit declined to address an exculpatory charter provision because the provision was raised for the first time on appeal"[157] and held that "while the duty of loyalty claims are unaffected, the [IT Group] directors are protected by § 102(b)(7) against liability for breaching the duty of care."[158]

Although the *Tower Air* court declined to address the defendants' § 102(b)(7) argument, it stated both the fact that the argument was first raised on appeal *and* that such provision appeared to be in the nature of an affirmative defense as its reasons:

> We decline to address it today because we generally decline to address arguments for the first time on appeal, *and because* the protection of an exculpatory charter provision appears to be in the nature of an affirmative defense.  As we have said, affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6).[159]

Delaware state courts characterize a § 102(b)(7) charter provision as in the nature of an affirmative defense.[160]  At least two federal courts have cited *Tower Air* in denying motions to dismiss duty of care claims based on exculpation provisions.[161]  Because a

---

[157] *IT Litigation*, 2005 WL 3050611, at *11 n.13.

[158] *Id.*, at *11.

[159] *In re Tower Air*, 416 F. 3d at 242 (citation and internal quotation marks omitted) (emphasis added).

[160] *See, e.g., Emerald Partners v. Berlin*, 726 A.2d 1215, 1223 (Del. 1999) ("[T]he shield from liability provided by a certificate of incorporation provision adopted pursuant to 8 *Del. C.* § 102(b)(7) is in the nature of an affirmative defense.") (footnote omitted); *In re Walt Disney Co. Derivative Litigation*, 907 A.2d 693, 752 (Del. Ch. 2005) ("An exculpation provision such as that authorized by § 102(b)(7) is in the nature of an affirmative defense.") (citing *Emerald Partners v. Berlin*, 787 A.2d 85, 91-92 (Del. 2001)).

[161] *See, e.g., In re The Brown Schools*, 368 B.R. 394, 401 (Bankr. D. Del. 2007) (denying a motion to dismiss based on a § 102(b)(7) exculpatory clause because "[t]he exculpation clause is an affirmative defense and the determination of the viability of that defense is not proper at this stage") (citing *Tower Air*, 416 F.3d at 238, 242) *In re TASER Int'l Shareholder Derivative Litig.*, No. CV-05-123-PHX-SRB, 2006 WL 687033, at *19 (D. Ariz. Mar. 17, 2006) (The court declined to consider an exculpatory charter provision in the context of defendants' motion to dismiss because "the liability shield provided by a certificate of incorporation . . . is 'in the nature of an affirmative defense.'"  Generally 'affirmative defenses . . . will not form the basis for dismissal under Rule 12(b)(6).'") (quoting *Emerald Partners*, 726 A.2d at 1223 & *In re Tower Air*, 416 F.3d at 242); *see also Fleet Nat. Bank v. Boyle*, No. Civ.A. 04CV1277LDD, 2005 WL 2455673, at *15 (E.D. Pa. Sept. 12, 2005) (noting, in response defendants' § 102(b)(7) argument, that

section 102(b)(7) provision is in the nature of an affirmative defense and following the statement of the Third Circuit that such defenses will generally not form the basis of a Rule 12(b)(6) dismissal, defendants' motion to dismiss the duty of care claims is denied.

### 3. Fraud

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

> "Rule 9(b) requires a plaintiff to plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage."[162]

"Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements."[163] Even with the stringent requirements of Rule 9(b), however, "courts should be sensitive to the fact that application of the Rule prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud."[164] As a result "the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control."[165] The court must bear in mind, however,

---

"because . . . affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6) we consider the other grounds on which Plaintiff's claim[s] fail") (internal quotation marks omitted).

[162] *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (quoting *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 284 (3d Cir. 1992)) (alteration in original).

[163] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

[164] *Id.* (internal quotation marks omitted).

[165] *Id.*

that even with a relaxed application of Rule 9, "boilerplate and conclusory allegations will not suffice.  Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible."[166]

.       According to defendants, the allegations of the fraud claim are that "Wolford and/or Krug made misrepresentations to induce Tectonic to acquire and invest further in BBN, CYP, and [SpecSource]; to invest in VBM; to sell GO Software; and to approve various payments."[167]  In their opening brief, defendants argue the allegations in support of the fraud claim fail to meet the heightened pleading standard because the allegations are "hopelessly vague" and fail to establish the "who what, when, where, and how" of any fraud, as required by Rule 9(b).[168]  In support, defendants point to the assertion that Wolford and Krug "falsely represented . . . that these businesses would be greatly profitable and viable" and that "[t]he financials are positive and the risks manageable,"[169] as being "so vague and general that, by their terms, they could not reasonably have been relied upon."[170]  Moreover, the Complaint purportedly makes no effort to provide specific information as to what makes those statements false and

---

[166] *Id.*

[167] D.I. 14 at 26.  In its opposition brief, the Committee does not dispute this characterization of the fraud alleged in the first claim for relief.

[168] *Id..*  In their reply brief, defendants argue, for the first time, that the second through fourth claims for relief (delineated "breach of fiduciary duty") should also be dismissed for failing to plead with particularity with regard to those counts.  "The claims for breach of fiduciary duties are all based on a theory that the alleged breaches would not have occurred but for fraud allegedly committed by certain defendants and the Director Defendants' failure to discover that fraud.  As such, the gravamen of these claims is fraud, and Rule 9(b) requires that they be pled with particularity."  D.I. 31 at 14 (citing *Toner v. Allstate Ins. Co.*, 821 F. Supp. 276, 283-85 (D. Del. 1993)).  Because defendants failed to raise this argument in their opening brief, thereby giving the Committee the opportunity to respond in its opposition brief, the court will not considered defendants' heightened pleading arguments with regard to Claims for Relief 2-4.  *See* D. Del. LR 7.1.3(c)(2) ("The party filing the opening brief *shall not* reserve material for the reply brief which should have been included in a full and fair opening brief." (emphasis added)).

[169] D.I. 1, ¶¶ 24-25.

[170] D.I. 14 at 26.

merely concludes that "the acquired businesses were riddled with fraudulent and unethical business practices, unprofitable, and in need of large infusions of cash in order to continue operating."[171]  Consequently, defendants contend that the fraud claim must be dismissed for failure to meet the Rule 9(b) pleading standards.

The Complaint specifically calls out particular paragraphs as supporting the allegations of fraud.[172]  The Complaint generally alleges that "[p]rior to Tectonic Network's acquisitions of [BBN, CYP, and SpecSource], Defendants Wolford *and Krug* falsely represented to Tectonic Network's Board of Directors and shareholders that these businesses would be greatly profitable and were viable,"[173] and that "Tectonic Network purchased these businesses based upon false or misleading financial information provided by Wolford *and Krug* who knew the information to be false when provided."[174]  It is only alleged, however, that "[i]n a presentation made to . . . [the] Board . . . on October 22, 2003, *Wolford represented*, as to the three businesses, that '[t]he financials are positive and the risks manageable.'"[175]  There are no allegations as to what information Krug gave to the Board that induced them to acquire the three businesses.  The court also agrees with defendants that these general statements, directed at the acquisition of all three businesses is vague and does not explain what

---

[171] D.I. 1, ¶ 26.

[172] *Id.*, ¶106 ("At the times when Defendants Wolford and Krug made the representations set forth in paragraphs 24 though 26, 29, 39, 40, 42 through 45, 47, 51 through 56, 62, 64 through 66, 68, 69, 82, and 86 herein, those Defendants knew those representations to be false or made them with reckless disregard for their truth or falsity, and intended that Tectonic Network's Board of Directors rely on the representations.").

[173] *Id.*, ¶ 24 (emphasis added).

[174] *Id.*, ¶ 26 (emphasis added).  The Complaint also alleges that "Wolford controlled . . . Krug . . . . Krug was beholden to Wolford, and, thereby, Wolford controlled the quality and quantity of the financial information that Krug furnished to the Board . . . about Tectonic Network, Tectonic Solutions, and the three acquired businesses, both before and after Tectonic Network's acquisition of them."  *Id.*, ¶ 29.

[175] *Id.*, ¶ 25 (emphasis added).

false and misleading information was presented to the Board.  With regard to the acquisition of SpecSource, however, more specific allegations are made.

The Complaint alleges that "[t]he financial statements for SpecSource as of September 30, 2003 and for the period then ended materially overstated SpecSource's revenues for that period."[176]  When those "financial statements were made part of a schedule to the SpecSource Agreement, Wolford knew that they materially overstated the revenue . . . ."[177]  "In a presentation made to . . . [the] Board . . . on October 22, 2003, Wolford" materially overstated the average daily number of searches performed on the SpecSource website's reference database.[178]  This knowing overstatement by Wolford was material because "the basis of SpecSource's service agreements with its customers was that the website would generate hits and searches on the website which advertised the products of SpecSource's customers."[179]  Prior to the acquisition, Wolford also falsely represented to Tectonic Network that SpecSource's reference database (which was its primary asset and the basis for the amount of consideration to be paid by Tectonic Network in the acquisition) was complete and accurate.[180]

In paragraph 3.16 of the SpecSource Agreement, Wolford represented that SpecSource "has not received any notice or has no knowledge to the effect that any current Customer . . . may terminate or materially alter its business relations with the company either as a result of the transaction contemplated by this Agreement or

---

[176] *Id.*, ¶ 39.
[177] *Id.*, ¶ 40.
[178] *Id.*, ¶ 43.
[179] *Id.*, ¶ 44.
[180] *Id.*, ¶ 45-47.

otherwise."[181]  In paragraph 3.18 of that agreement, Wolford represented that "[n]o

representation, warranty or covenant made by [SpecSource] or [Wolford . . .] in this

Agreement (including the schedules hereto) contains any untrue statement of a material

fact or omits to state a material fact required to be stated herein or necessary to make

the statements contained herein not misleading."[182]  It is alleged that Wolford breached

paragraph 3.16's representations and warranty because he knew of:

> the falsity of the representations made by SpecSource to its customers,
> concerning the completeness and accuracy of . . . SpecSource's
> reference database and the number of hits and searches on the database
> and that such misrepresentations would ultimately cause a material
> number of its customers to cancel their contracts, demand and receive
> refunds, or receive free advertising, thereby terminating or materially
> altering their relationship to the SpecSource business.[183]

Wolford is alleged to have breached the representation and warranty of paragraph 3.18

because his:

> failure to disclose in that paragraph his knowledge of the falsity of the
> representations made by SpecSource to its customers, concerning the
> completeness and accuracy of the SpecSource's reference database and
> the number of hits and searches on the database, "omit[ted] to state a
> material fact required to be stated herein or necessary to make the
> statements contained herein not misleading."[184]

Following the acquisition of the three businesses, Wolford and Krug purportedly

made additional false representations to the Board concerning those businesses.

"Shortly following the first quarter of 2004, . . . . Wolford and Krug falsely represented to

[the] . . . Board . . . that, during that first quarter Tectonic Solutions achieved over

---

[181] *Id.*, ¶ 51.
[182] *Id.*, ¶ 52 (alterations in original).
[183] *Id.*, ¶ 53.
[184] *Id.*, ¶ 54 (alteration in original).

$500,000 in advertising revenue from the three acquired businesses"[185]  Although the

Complaint alleges that the first revenues were "falsely represented," that dollar figure

does not appear to be incorrect as the allegation continues by stating that:

> Tectonic Solutions would have to refund much of *those advertising
> revenues* or give free advertising to customers because (i) SpecSource
> had materially inflated and thereby materially misrepresented the hits and
> searches on its reference database, (ii) the reference data base was
> materially incomplete and inaccurate, and (iii) Tectonic Solutions decided
> not to publish and distribute the number of editions of directories carrying
> customer advertisements that Tectonic Solutions or CYP had contracted
> with its customers to publish and distribute.[186]

"Following Tectonic Network's acquisitions of the three businesses, . . . Wolford

and Krug continued to represent falsely to [the] . . . Board . . . that these business[es]

were growing and held out huge promise for future profitability."[187]

"In early 2005, . . . a former employee of Tectonic Solutions and a putative

Sarbanes Oxley Act 'whistleblower', flied a complaint alleging that the data used as part

of the sales and budgeting efforts at Tectonic Solutions were fraudulent or materially

overstated."[188]  The Board assigned Wolford to investigate the complaint after which, on

March 24, 2005, Tectonic Network filed Form 8-K with the SEC stating "[n]o evidence of

any material adverse conditions has been found in connection with the employee's

allegations, but if any is, the Company shall take prompt and appropriate action in

---

[185] *Id.*, ¶ 55.
[186] *Id.*.  The Complaint alleges that during 2004 and early 2005, Tectonic Solutions "Became
aware of the longstanding fraudulent business practices of the SpecSource business . . . halted those
practices, advised the customers of the misstatements about the numbers of hits and searches, and
attempted to retain the customers by offering and giving them either refunds or free advertising for an
additional year period." *Id.*, ¶ 58.  Advertising revenue for the first calendar quarter of 2005 dropped to
$100,000 from the alleged $560,000 advertising revenue in the first calendar quarter of 2004. *Id.*, ¶ 59.
[187] *Id.*, ¶ 56.
[188] *Id.*, ¶ 60.

response."[189]  Wolford signed that filing and "knew the falsity of this statement when it was made."[190]

With respect to VMB, "[i]n the first three calendar quarters of 2004, Wolford urged the development" of that business.[191]  With no reasonable basis,

> Wolford assured the Board . . . that (a) this model business would be the foundation of an overall strategy to move Tectonic Network into the construction information business, and (b) that the [VMB] would be hugely profitable, generating revenues of approximately $30,000 to $40,000 per project with a thirty percent profit margin.[192]

"In order to procure authorization for funding this project[,] . . . Wolford fabricated results for this project and included them in presentations to the Board and in financial statements for Tectonic Network."[193]  In August 2004, Wolford falsely represented to the Board that:

> Tectonic Network had acquired six (6) new contracts 'in only one month' of sales during the third calendar quarter of 2004 to develop [VMB] for the customers, each of these contracts had been completed, and revenue for these contracts was included in Tectonic Networks' financial statements for the quarter ended September 30, 2004 in order to create the false appearance that there was demand for Tectonic Solutions' Virtual Model products or services, when there was none, and that the business would be a huge financial success when it was in a highly speculative, developmental stage.[194]

In June 2004, Wolford and Krug presented to the Board a budget and forecast for the period July 1, 2004 through December 31, 2004 in which they projected $2.4

---

[189] *Id.*, ¶¶ 61-62.
[190] *Id.*, ¶ 62.
[191] *Id.*, ¶ 63.
[192] *Id.*, ¶ 64.
[193] *Id.*, ¶ 65.
[194] *Id.*, ¶ 66.  "There were no contracts; the work had not been completed; whatever work that was done was for businesses or organizations that Wolford controlled or influenced, principally non-profit organizations in which he was a director; no invoices for the work were paid; and the projected revenue [for VMB] had no basis in fact."  *Id.*, ¶ 70.

million in revenue from developing VMB, which projections were not based on any facts or reasonable assumptions.[195]

"Wolford and Krug intended that the board . . . rely upon those representations and projections in order to secure their agreement to (a) the sale of GO Software, (b) Tectonic Network's procuring financing during the period August 2004 to January 2005 to fund Tectonic Solutions' speculative and failing businesses, and (c) Tectonic Network's investment of substantial funds in the new [VMB]. The board . . . agreed to all of the foregoing in reliance on the representations and projections."[196]

When acquired, CYP sold advertising to businesses in the construction field and published regional general print directories for distribution to purchasers of construction products.[197] After acquiring CYP, Tectonic Network conducted market research as the type of directories that would be profitable based on customer preferences, determining that advertisers preferred vertical directories aimed at a specific segment of the construction industry.[198] "Wolford ordered that, in addition to the vertical market directories, Tectonic Network publish and distribute in the first half of 2005 a general, national directory similar to the general regional directories CYP had distributed previously."[199] Wolford's insistence on the publication of the national directory was purportedly "to conceal the falsity of his representations to . . . [the] Board . . . that CYP's operating assets should be purchased because CYP's business of distributing general directories to all purchasers of construction products (rather than to a segment

---

[195] *Id.*, ¶¶ 68-69.
[196] *Id.*, ¶ 71.
[197] *Id.*, ¶ 78-79.
[198] *Id.*, ¶ 80.
[199] *Id.*, ¶ 81.

of such purchasers) was viable with a profitable future for Tectonic Network."[200]  As a

result significant funds were wasted "in order to further hide the fraudulent

representations made by him about the business of CYP to Tectonic Network to cause

its acquisition."[201]

With respect to the sale of GO Software, the Complaint alleges that "[b]eginning

in or about the Summer of 2004, Wolford commenced a campaign aimed at convincing

the Board . . . that Tectonic Network should sell its GO Software business to generate

funds for the supposedly up and coming [VMB] and to support the three businesses

acquired at the end of 2003 and early 2004 . . . ."[202]

> In addition to his misrepresentations about the [VMB] alleged in
> paragraphs 64 through 66, 68, and 69 herein, Wolford continued to
> represent falsely to the Board . . . , without any reasonable basis, that the
> SpecSource business was viable and would generate enormous profits in
> the future and hid from the Board . . . the material incompleteness of and
> inaccuracies in the SpecSource reference database, the material[]
> inflation of the numbers of hits and searches on the website, and the
> materially negative impact that revelation of those misrepresentations to
> the customers had and would have on the SpecSource business.[203]

The Complaint alleges that the Board "relied on the aforesaid representations in

approving the acquisitions of the businesses of BBN, SpecSource, and CYP, investing

substantial sums in those businesses after the acquisition and in the worthless Virtual

Model business, approving the sale of the GO Software business, and approving

Tectonic Network's payments to insiders."[204]  The Complaint alleges that, other than

Wolford, the members of the Board "did not know the falsity of the representations

---

[200] *Id.*, ¶ 82
[201] *Id.*, ¶ 82.
[202] *Id.*, ¶ 85.
[203] *Id.*, ¶ 86
[204] *Id.*, ¶ 107.

when those members relied on the representations"[205] and, "[a]s a result of the false representations and fraud of Defendants Wolford and Krug, Tectonic Network and Plaintiff have all suffered damages . . . ."[206]

The court finds that, with respect to Wolford, the allegations of fraud with concerning the acquisition of SpecSource meet the particularity requirements of Rule 9. No allegations are made with respect to specific misrepresentation by Krug as to that transaction. Also, the allegations of fraud as to both Wolford and Krug concerning the acquisitions of BBN and CYP are nothing more than "boilerplate and conclusory allegations" which fail to meet Rule 9's requirements. Relatedly, the court finds the allegations concerning the publication of the national directory by CYP (all directed at Wolford) do not meet the requirements of Rule 9. The Complaint merely alleges that Wolford ordered publication of a costly national directory (similar to the regional directories published by CYP prior to its acquisition) in addition to ordering the vertical directories determined to be preferred by advertisers. As the court has already determined that the Complaint inadequately alleges fraud in the acquisition of CYP, allegations that the publication of the national directory was to "further hide the fraudulent representations" causing Tectonic Network to acquire CYP are merely conclusory.

With regard to the alleged misrepresentations by Wolford and Krug after the acquisition of the three businesses, the Complaint is deficient for Rule 9 purposes. It states that Wolfson and Krug "falsely represented" to the Board that Tectonic Solutions

---

[205] *Id.*, ¶ 108.
[206] *Id.*, ¶ 109.

45

had achieved certain advertising revenue in the first quarter of 2004.  That figure
appears to be accurate, even though it is alleged that customer refunds and/or free
advertising may have been offered in the future.  Allegations that Wolford's and Krug's
representations that the businesses "were growing and held out huge promise for future
profitability" were fraudulent are merely conclusory.  The allegation that Wolford
knowingly made a false statement in signing March 24, 2005 Form 8-K addressing the
Sarbanes Oxley Act "whistleblower" complaint is also insufficient.  Prior to that filing, the
Complaint alleges that during 2004 and early 2005, Tectonic Solutions "Became aware
of the longstanding fraudulent business practices of the SpecSource business . . . [and]
halted those practices . . . ."[207]

With respect to the funding of VMB, the allegations that Wolford urged the
development of that business and assured the Board of certain profit margins;[208] and
the allegations that in June 2004 Wolford and Krug made certain revenue projections[209]
are insufficient to state a claim for fraud.  However, there is an additional allegation that,
in order to procure authorization for the funding of VMB, Wolford falsely represented in
August 2004 that six new contracts had been acquired in one month; that those
contracts had been completed; and revenues for those contracts was included in
Tectonic Networks' financial statement.[210]  Such allegation, and the Board's reliance
thereon, states a claim of fraud with sufficient particularity as to Wolford.

Finally, the Complaint alleges that in the summer of 2004 Wolford began to

---

[207] *Id.*, ¶ 58.
[208] *Id.*, ¶¶ 63-64.
[209] *Id.*, ¶ 68-69.
[210] *Id.*, ¶ 66.

convince the Board to sell GO Software, Tectonic Network's only profitable business unit, to fund the three acquired businesses and VMB.[211]  Wolford's alleged fraud in connection with the sale of GO Software is based on his false representations concerning VMB and his continued representations concerning the viability and growth prospects of SpecSource.[212]  Having determined that the Complaint states a claim of fraud against Wolford with respect to the SpecSource acquisition and the funding of VMB, the allegations concerning the sale of GO Software also sufficiently state a claim for fraud against Wolford.

## IV.    CONCLUSION

At Wilmington, this 21st day of May, 2008:

For the reasons stated above:

IT IS ORDERED and ADJUDGED that defendants' motion for to dismiss (D.I. 13) is granted in part and denied in part.

1.    Defendants' motion to dismiss for lack of subject matter jurisdiction is **DENIED** with leave for plaintiff to amend to allege jurisdiction under 28 U.S.C. § 1334.

2.    Defendants' motion to dismiss for insufficiency of service of process is **DENIED as moot**.

3.    Defendants' motion to dismiss the first claim for relief (fraud) against Krug is **GRANTED**.

4.    Defendants' motion to dismiss the first claim of relief (fraud) against

---

[211] *Id.*, ¶ 85.
[212] *Id.*, ¶ 86.

47

Wolford is **GRANTED** with respect to the allegations concerning the acquisitions of BBN and CYP and **GRANTED** with respect to the post acquisition allegations concerning the publication of the national directory by CYP.  The remainder of defendants' motion to dismiss the first claim of relief (fraud) against Wolford is **DENIED**.

5.    Defendants' motion to dismiss is **DENIED** in all other respects.

_____
UNITED STATES MAGISTRATE JUDGE