# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AD HOC COMMITTEE OF EQUITY HOLDERS OF TECTONIC NETWORK, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 06-665- GMS-MPT |
| | : | |
| AROL WOLFORD; SHERWIN KRUG; CHARLES MCROBERTS; JOHN MCROBERTS; CHARLES PECCHIO, JR. ; LAURA ROGERS; and THEO VANDERBOOM, | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO STRIKE PORTIONS OF DEFENDANTS' ANSWER AND TO DISMISS THE THIRTY-SIXTH DEFENSE

William D. Johnston (Bar No. 2123)
Adam W. Poff (Bar No. 3990)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6642

J. Allen Maines, Esq. (Georgia Bar No. 466575)
John G. Parker, Esq. (Georgia Bar No. 562425)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
600 Peachtree Street, N.E.
Suite 2400
Atlanta, GA 30308-2222
(404) 815-2400

*Attorneys for Defendants*

## TABLE OF CONTENTS

**PAGE NO.**

NATURE AND STAGE OF PROCEEDINGS/ BACKGROUND ................................................1

SUMMARY OF ARGUMENT .............................................................................................8

ARGUMENT ....................................................................................................................9

POINT 1:  UNDER FREEDMAN AND WILL, PLAINTIFF CANNOT FAIRLY AND
ADEQUATELY PROTECT THE INTERESTS OF ANY PURPORTED GROUP OF
SHAREHOLDERS ............................................................................................................9

    A.  Freedman and Will Lack the Qualities Required of an Adequate Class
    Representative Holders ............................................................................................9

    B.  Neither Plaintiff, nor Freedman nor Will, Are Members of the Class They
    Seek to Represent...................................................................................................10

POINT 2:  PLAINTIFF'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE
SET-OFF IS A DEFENSE, AND NOT A COUNTERCLAIM .....................................................14

CONCLUSION................................................................................................................18

# TABLE OF AUTHORITIES

## CASES

**PAGE NO.**

Adams v. Amplidyne, Inc.,
    No. 99-4468, 2000 U.S. Dist. LEXIS 21383 (D.N.J. Oct. 24, 2000) ..................................1

Adams v. Amplidyne, Inc.,
    No. 99-4468 (March 24, 2000) ...................................................................................6

Amswiss International Corp. v. Heublein, Inc.,
    69 F.R.D. 663 (N.D. Ga. 1975).................................................................................10

Ash v. Brunswick Corp.,
    405 F. Supp. 234 (D. Del. 1975)...............................................................................10

Blumenthal v. Great American Mortgage Investors,
    74 F.R.D. 508 (N.D. Ga. 1976)...................................................................................9

Conley v. Gibson,
    355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1857)........................................................17

Friedlander v. Nims,
    755 F.2d 810 (11th Cir. 1985) ..................................................................................17

General Telegraph Co. v. Falcon,
    457 U.S. 147 (1982)..................................................................................................10

Herrmann v. Atlantic Richfield Co.,
    72 F.R.D. 182 (W.D. Pa. 1976) .................................................................................15

Hishon v. King & Spalding,
    467 U.S. 69 (1984).....................................................................................................18

Jobin v. Arnot (In re M & L Bus. Machine Co.),
    178 B.R. 270 (Bnkr. D. Colo. 1995)..........................................................................14

Kehr Packages, Inc. v. Fidelcor, Inc.,
    926 F.2d 1406 (3d Cir. 1991)....................................................................................17

Kornick v. Talley,
    86 F.R.D. 715 (N.D. Ga. 1980)..................................................................................10

Plekowski v. Ralston Purina Co.,
    68 F.R.D. 443 (M.D. Ga. 1975)...................................................................................9

Reiter v. Cooper
        507 U.S. 258 (1993).................................................................................................15

Rendon v. Valleycrest Prods.,
        294 F.3d 1279 (11th Cir. 2002) ...........................................................................18

Rutledge v. Electric Hose & Rubber Co.,
        511 F.2d 668 (9th Cir. 1975) ................................................................................9

SEC v. Amplidyne, Inc.,
        No. 03-Civ-2425 (D.N.J. May 22, 2003).................................................................5

S.E.C. v. Physicians Guardian Unit Investment Trust,
        72 F. Supp. 2d 1342 (M.D. Fla. 1999).................................................................17

Shaw v. Digital Equip. Corp.,
        82 F.3d 1194 (1st Cir. 1996)................................................................................17

Sticka v. Oregon State Lottery Commission (In re Moore),
        323 B.R. 752 (Bnkr. D. Or. 2005) .......................................................................14

Styler v. Jean Bob, Inc.,
        154 B.R. 581 (D. Utah 1993)...............................................................................14

Thompson v. T.F.I. Cos.,
        64 F.R.D. 140 (N.D. Ill. 1974)..............................................................................9

Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,
        140 F.3d 478 (3d Cir. 1998)................................................................................17

Weisman v. Darneille,
        78 F.R.D. 669 (S.D.N.Y. 1978) ...........................................................................10

## STATUTES

Fed.R.Civ.P. 23(a)(4)..........................................................................................................9


## MISCELLANEOUS

Harris Clarke & Co., at 3, 5, 6, 6-7, 7, 22, 27, 30, 31
(Securities and Exchange Comm'n Oct. 15, 1965) ............................................................4

NATURE AND STAGE OF PROCEEDINGS/ BACKGROUND

Plaintiff Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. ("Plaintiff")

holds itself out as an unincorporated association, but it is in reality the cloak used by two former

Tectonic Network insiders, Harris Freedman and Sharon Will. Plaintiff has moved to strike

references about Freedman and Will consisting of quotes from a matter of public record. These

exact references were the subject of a motion to strike in another lawsuit against Freedman and

Will for securities fraud, Adams v. Amplidyne, Inc., No. 99-4468, 2000 U.S. Dist. LEXIS 21383

(D.N.J. Oct. 24, 2000). The United States District Court for the District of New Jersey denied

that motion and refused to strike the very allegations that Plaintiff now, once more, seeks to

strike.

As stated in Defendants' Answer, "the Complaint in this action is procedurally flawed

and inconsistent, sometimes seemingly asserting derivative claims, sometimes purporting to

assert the types of claims one would find in a class action (but without obtaining class

certification), and sometimes appearing to assert direct actions. Each of these gives rise to

numerous different defenses and arguments as to why the Complaint is procedurally and

substantively defective." (Answer, p. 16.) Although Defendants believe this suit is fatally

flawed under any scenario, it is not possible to focus on specific defenses until the Court

determines the type of action it seeks to bring. What is clear is that Freedman and Will are the

driving forces behind this action. Through the Plaintiff, they seek to represent a "group of public

shareholders which owned approximately fifty percent (50%) of all non-insider owned stock of

Tectonic Network Inc. ("Tectonic Network")."

1

Whether either of them is fit to serve in any type of representative fiduciary role is central to this action. Depending on whether this action is denominated as a class or derivative action, a direct action, or one by an unincorporated association, as a preliminary matter this court must pass on the adequacy of Freedman and Will and determine that they will fairly protect the interests of others, acting as fiduciaries.

Plaintiff's motion seeks to strike references to Freedman and Will purportedly because these references consist "solely of impertinent, immaterial and scandalous allegations." Plaintiff's Brief in Support of its Motion to Strike Portions of Defendants' Answer and to Dismiss the Thirty-Sixth Defense ("Plaintiff's Brief"), p.1. The references, however, are pertinent under the law. As stated in Defendants' Answer (the portion that Plaintiff seeks to strike):

> Defendants do not believe Plaintiff or these individuals are suitable representatives or that they will fairly and adequately represent the interests of those on whose behalf they purport to act.

Answer ¶ 1.

Both Freedman and Will have a long history of alleged securities fraud, stock price manipulation, illegal trading, and misconduct involving public companies. The SEC investigated Freedman, who was a stockbroker. The Commission found he violated the Securities Act and the Exchange Act, and **barred him from the industry**:

> [D]uring the period May 1962 through January 1963 registrant, Freedman … willfully violated and aided and abetted willful violations of the … Securities Act and the Exchange Act and the respective Rules thereunder, in the offer and sale of the common stock of Alaska International Corporation (Alaska) otherwise than on a national securities exchange and directly and indirectly employed devices, schemes and artifices to defraud and engaged in a course of business which would and did operate as a fraud and deceit upon purchasers and prospective purchasers of securities.

\* \* \*

Freedman [through his company]… made untrue statements of material facts and omitted to state material facts to purchasers of the common stock of Alaska….

\* \* \*

The representations made … included, among other things, that the Alaska stock would increase in price, that it could double or might triple in price or that it would increase three or four times within a period of three months; that Alaska was a hot stock which at one time had been as high as $6, $8, or $10 a share with a good possibility of or words suggesting the likelihood that Alaska stock would return to its former price; that a $500 investment in the said stock could increase to $5,000; and that **as a result of inside information which registrant had**, the stock would advance to $4 or $5 a share within six months…. One customer was told Alaska was sifting for gold and some of the company's operations were profitable.

\* \* \*

There was no reasonable basis for the representations made regarding Alaska's price appreciation, its purported merger, its successful business operations or its earnings. Such statements were either outright false or so artfully stated as to leave customers with the rosy expectations of gain without disclosing any known or reasonable ascertainable adverse information about Alaska.

\* \* \*

The hearing examiner finds that Freedman, Clare, and Summers [his colleagues] willfully violated and aided and abetted registrant in willfully violating Section 17(a) of the Securities Act and Sections 10(b) and 15(c)(1) of the Exchange Act and Rules 10b-5 and 15cl-2 thereunder.

\* \* \*

The hearing examiner finds it is in the public interest to revoke registrant's [Freedman's company] registration as a broker-dealer.

\* \* \*

3

> The hearing examiner concludes it is in the public interest to bar
> Freedman, Clare and Summers from being associated with a broker
> or dealer.

<div align="center">* * *</div>

> **[A] firm in which Freedman owns all of the stock should not be
> permitted to deal with the public.**

Harris Clarke & Co., at 3, 5, 6, 6-7, 7, 22, 27, 30, 31 (Securities and Exchange
Comm'n Oct. 15, 1965) (emphasis added).  (See attached Exhibit "A.")

Further,

> [I]n 1967 Harris Freedman pleaded **guilty** to **criminal** charges that
> he conspired to violate the anti-fraud provisions of the Securities
> Act of 1933, as amended (the "Securities Act"), and that he
> directly violated the anti-fraud provisions of the Securities Act by
> intentionally misleading investors.

Elite Pharmaceuticals, Inc., Preliminary Proxy Solicitation Material -- Contested
Solicitation (Schedule 14A) (Aug. 20, 2002) (emphasis added).  (See attached
Exhibit "B.")

Both Freedman and Will have been associated with companies indicted by the New York

State Attorney General for stock manipulation:  Netsmart Technologies, Inc. and Big City

Bagels, Inc.  See Adams v. Amplidyne, Inc., No. 99-4468 (March 24, 2000) (Complaint,

attached hereto as Exhibit "D").  Additionally, both individuals served as officers of Hemispherx

Biopharma, Inc. (HEB).  HEB garnered criticism from market analysts when it falsely

represented that it had made a presentation on HIV test findings at a conference sponsored by

Search for the Cure.  Id.  Freedman also served as a Vice President of MusicSource USA, which

was delisted by NASDAQ.  Id.  MusicSource USA was implicated in a case involving brokers

taking bribes from a stock promoter.  See Floyd Norris, Of Brokers and Bribes:  A Federal Case,

N.Y. Times, Sep. 5, 1996, available at

<div align="center">4</div>

http://query.nytimes.com/gst/fullpage.html?res=9504E1DD1F38F936A3575AC0A960958260.

(See attached Exhibit "C.")

In 2003, the U.S. Securities and Exchange Commission initiated a suit against Amplidyne, Inc., a public company in which both Freedman and Will served as officers performing virtually the same services as they performed for Tectonic, e.g., investor relations. SEC v. Amplidyne, Inc., No. 03-Civ-2425 (D.N.J. May 22, 2003). Amplidyne was permanently enjoined from violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)(5) of the same, and an officer paid a $50,000 civil fine.

The shareholders of Amplidyne, Inc. sued Freedman and Will, as its officers. They alleged that:

> During the Class Period, [Freedman and Will] carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Amplidyne's securities; and (iii) cause plaintiffs and other members of the Class to purchase Amplidyne's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.
>
> Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Amplidyne's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-S. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

<div align="center">* * *</div>

> By generating interest in the Company's products and future,
> defendants would be able to sell their holdings in a follow-on
> offering by the Company of shares sold by selling security holders.
> The S-3 filed with the SEC by the Company discloses that the
> selling security holders include Bridge Ventures Inc., selling
> 150,000 shares, and Saggi Capital Corp., selling 100.000 shares.
> This is more than 10% of all stock being sold by "selling security
> holders." ...[D]efendants Freedman and Will own or control
> BridgeVentures, Inc. and Saggi Capital Corp. and will personally
> profit from a successful follow on offering.  By generating interest
> in the Company's products and future, thereby inflating the
> Company's stock price, defendants Freedom [sic] and Will would
> enhance the value of the Amplidyne stock and stock options they
> held directly and indirectly.

<p style="text-align:center">* * *</p>

> Discovery may reveal that Freedman and Will sold shares during
> the Class period.

Adams v. Amplidyne, Inc., No. 99-4468 (Mar. 24, 2000) (Complaint).  (See attached
Exhibit "D.")

Freedman and Will have also artfully created a pattern of entering into consulting

agreements with companies, amassing large amounts of stock via warrants or options, using their

insider status to manipulate the value of that stock, and using illegal means to bend the targeted

companies into their will.  At least one company, Elite Pharmaceuticals ("Elite"), took notice of

that practice and terminated their consulting agreements:

> The consulting services performed by the entities affiliated with
> Harris Freedman and Sharon Will were discontinued in December
> 2001 and June 2002, respectively, by the Company because of
> unprofessional, and ineffective assistance and poor performance,
> and a belief by the Company that Mr. Freedman and Ms. Will were
> more concerned about the performance of the Company's stock
> than the growth and development of the company's business.

Elite Pharmaceuticals, Consent Revocation Statement (Schedule 14A), at 5 (Sep. 16, 2002).  (See
attached Exhibit "E.")

<p style="text-align:center">6</p>

After their termination from Elite, faced with the prospect of their warrants expiring,

"Freedman and Will pressured the Company [Elite] to extend the warrants immediately, and

made statements to the effect that the Company's stock price would be greatly depressed by

unspecified actions that the Freedman Group [Freedman and Will] would take if the warrants

were not extended." Id. at 11. When Elite declined to extend the warrants, Harris and Freedman

commenced a consent solicitation to replace three board members with themselves and

Freedman's brother, Michael. Id. Shortly after, Elite sued Freedman and Will for insider

trading, and other charges related to the consent solicitation:

> On August 27, 2002 in connection with the Consent Solicitation,
> the Company commenced an action in the United States District
> Court for the District of New Jersey (the "Action") against (i) the
> individual members of the Freedman Group, (ii) additional
> individuals whose identities, we contended, the Freedman Group
> was required to disclose but who were not listed in any of the
> Freedman Group's SEC filings and (iii) other unnamed defendants
> who were acting in concert with the disclosed and undisclosed
> members of the Freedman Group (collectively, the "Defendants").
> The complaint sought injunctive relief against the Defendants on
> the basis that the Defendants violated the federal securities laws
> and the rules promulgated by the SEC there under by, among other
> things, filing a Schedule 13D more than ten days after the
> Defendants formed a "group" for purposes of Section 13(d) of the
> Securities Exchange Act of 1934 (the "Exchange Act"), by failing
> to disclose all persons acting in concert with the Freedman Group
> and by acquiring additional shares of our stock during a period that
> is prohibited by the Act.

Elite Pharmaceuticals, Quarterly Report (Form 10Q), at 20 (Feb. 13, 2003).[1]  (See attached

Exhibit "F.")

---

[1] Ultimately, Freedman and Will failed in their attempt to replace the directors because of a lack
of the necessary votes. Id. at 21.  Despite this failure, they issued proxy statements nominating
their choices for directors and contesting the election at the annual meeting. Id. at 21.  They
withdrew the proxy upon entering into a settlement agreement with Elite Pharmaceuticals
(continued...)

The pattern continued with Intermix Media, Inc. (formerly eUniverse, Inc.).  Will entered into a consulting agreement with Intermix through her company Saggi Capital.  See Intermix Media, Inc., Quarterly Report (Form 10Q), at 16 (Aug. 15, 2005).  (See attached Exhibit "G.")  In return, both Bridge Ventures [Freedman's Company] and Saggi Capital received warrants to purchase Intermix stock.  Id.  Again, a dispute arose over the warrants.  Id.  In this instance, Freedman and Will turned to another tactic:  litigation.  Ultimately, Bridge Ventures and Saggi Capital entered into a settlement agreement with Intermix resolving the dispute, but later once again attempted to intimidate management during subsequent arbitration involving securities and common law fraud in connection with the settlement agreement.  Id.

<div align="center">SUMMARY OF ARGUMENT</div>

1.      Under Freedman and Will, plaintiff cannot fairly and adequately protect the interests of any purported group of shareholders because Freedman and Will lack the qualities required of an adequate class representative.

2.      Neither plaintiff, nor Friedman nor Will, are members of the class they seek to represent.

3.      Plaintiff's motion to dismiss should be denied because set-off is a defense, and not a counterclaim.

---

(...continued)

whereby they agreed to support the nominees for director supplied by Elite, and Elite agreed to issue new warrants in exchange for the expired ones.  Nevertheless, it appears that Freedman and Will have repeated their pattern within the same company.  After new directors took over Elite in 2007, Freedman, Will and Will's sister, appear to have secured consulting agreements and warrants yet again.

ARGUMENT

POINT I

UNDER FREEDMAN AND WILL, PLAINTIFF CANNOT FAIRLY
AND ADEQUATELY PROTECT THE INTERESTS OF ANY
PURPORTED GROUP OF SHAREHOLDERS

A fundamental prerequisite to a class action, or any representative action, is the

requirement that "the representative parties will fairly and adequately protect the interest of the

class." Fed.R.Civ.P. 23(a)(4). The plaintiff's burden under this requirement is a heavy one.

Plekowski v. Ralston Purina Co., 68 F.R.D. 443, 452 (M.D. Ga. 1975). In Thompson v. T.F.I.

Cos., 64 F.R.D. 140, 148 (N.D. Ill. 1974), the court pointed out that:

> The adequacy requirement must be "strictly construed and stringently applied
> since many absent class members will be bound by the judgment."

Similarly, in Blumenthal v. Great American Mortgage Investors, 74 F.R.D. 508, 513 (N.D. Ga.

1976), this court noted that:

> Adequacy of representation is a critical factor in determining class maintainability
> because of the potential binding effect of such judgment on absent class members by
> virtue of the doctrine of res judicata.

And in Rutledge v. Electric Hose & Rubber Co., 511 F.2d 668, 673 (9th Cir. 1975), the court

observed:

> "[A] court must now carefully scrutinize the adequacy of representation in all
> class actions."

Neither Freedman nor Will can satisfy the adequacy requirement.

A.    Freedman and Will Lack the Qualities Required of an Adequate Class
      Representative

Because a judgment in a class action binds absent class members, it is critical that the

individual who represents their interests have those qualities that insure that he will (1) at all

stages, act in the interests of the class he represents, and not be guided by his own personal

interests, and (2) testify truthfully, so that absent class members are not harmed by testimony that may not be regarded as credible by the factfinder. See, e.g., Amswiss Int'l Corp. v. Heublein, Inc., 69 F.R.D. 663, 671 (N.D. Ga. 1975); Kornick v. Talley, 86 F.R.D. 715 (N.D. Ga. 1980). The same rationale is true for those individuals who seek to represent, and therefore bind, members of a purported unincorporated association.

The prior conduct of a representative is highly relevant to the determination of whether that person possesses the requisite "honesty, conscientiousness, and other affirmative personal qualities." Weisman v. Darneille, 78 F.R.D. 669, 671 (S.D.N.Y. 1978), quoting from Ash v. Brunswick Corp., 405 F. Supp. 234 (D. Del. 1975). The Weisman decision succinctly states the standard a class representative must meet: "As a fiduciary for the class, [the named plaintiff] would be required to adhere to the highest standards of honesty and integrity." 78 F.R.D. at 671. Freedman's and Will's conduct in this and other litigation demonstrates a lack of the requisite "honesty, conscientiousness and other affirmative personal qualities" required of a class representative.

B.    Neither Plaintiff, nor Freedman nor Will, Are Members of The Class They Seek to Represent

The United States Supreme Court has "repeatedly held that 'a class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.'" General Tel. Co. v. Falcon, 457 U.S. 147, 156 (1982).

Plaintiff unincorporated association does not and has never owned any stock in Tectonic Network. It nevertheless seeks to represent a number of "public shareholders which owned approximately fifty percent (50%) of all non-insider owned stock of" Tectonic Network. (Cmplt., ¶ 1) Plaintiff was not misled, was not defrauded, and was never owed duties of any

nature.  Certainly it was not owed any fiduciary duties by any of the Defendants.  Moreover, it

<u>cannot</u> carry its burden of showing that it owned stock in Tectonic at the time of an alleged

breach of fiduciary duty by any of the Defendants, or that it owned stock in Tectonic at the time

the complaint was filed.  Both are <u>absolute pre-requisites</u> to recovery by any former Tectonic

shareholder.

On the other hand, each member of Plaintiff's purported constituency is alleged to have,

at one time or another, owned Tectonic stock.  (Cmplt., ¶ 1)  The Complaint neglects to set forth

the dates on which any of them might have owned stock (a fundamental requirement of the

Private Securities Litigation Reform Act).  None of them are alleged to have owned stock:

- at the time of any of the acquisitions mentioned in the complaint
- at the time of any alleged breach of fiduciary duty by any Defendant
- at the time of any alleged fraud
- at the time the complaint was filed.

None of them are alleged to have been told exactly the same things, by exactly the same people,

at exactly the same time, or to have been defrauded personally, or to have purchased stock in

reliance on anything said or done by any of these Defendants, or even to have sustained any

damages as a result of Defendants' actions.  Importantly, none of them are alleged to have

purchased stock from Tectonic, the Defendants, or in the open market.  Many members of

Plaintiff's constituency appear to be related to either Freedman or Will, and therefore probably

acquired their stock directly from them, which stock had been given to Freedman and Will as

compensation by Tectonic in exchange for performing investor relations services.  It is

undisputed from the face of this Complaint, however, that, unlike those it seeks to represent,

Plaintiff unincorporated association was not a Tectonic shareholder at *any* time.  <u>Plaintiff is not a</u>

<u>member of the class it purports to represent</u>.

Neither Harris nor Will is a member of the group of people they purport to represent in this lawsuit. Contrary to the description of that class in the Complaint, ***both of them were insiders retained by Tectonic*** as consultants, and to assist with respect to raising money from investors. (See the Affidavit of Arol Wolford, attached as "H," ¶¶ 3-4.) **In other words, they were paid money and received stock and options to induce investors (other members of the purported class or unincorporated association) to purchase Tectonic stock.** Just as in the case of Amplidyne, Inc.—the case in which they were accused of illegal misconduct and securities fraud—both of them were insiders. The language Plaintiff seeks to strike from Defendants' Answer in this case quotes from the Consolidated Amended Class Action Complaint filed in the Amplidyne securities litigation, which is a matter of public record. Will and Freedman, just as they did with Amplidyne, were in charge of Tectonic's investor relations, and investor communications. The *Amplidyne* Complaint alleged that Freedman was Amplidyne's "investor relations spokesperson for the Company, and ... the ... individual with knowledge about the company and authority to speak on behalf of the Company." (See attached Exhibit "D.") This is exactly what he and Will did for Tectonic. In fact, upon information and belief, a number of other members of the Plaintiff obtained their stock from either Freedman or Will, or entities or individuals they controlled, or which were in league with them.

Freedman and Will received $5,000 per month pursuant to consulting agreements between their companies and Tectonic. Exhibit "H," ¶¶ 3-4. From 2002 to 2006, both Freedman and Will received upwards of $190,000 for their services. Each provided "management consulting," which encompassed several roles. Id. at ¶ 5. Will provided investor relations services, and she is listed as the Investor Relations Contact on several of Tectonic's press releases. Id. As part of that role, she regularly assisted in soliciting investments. See id.

Freedman also assisted in this effort. See id. Because of their role as investment relations consultants, they regularly received confidential financial and operational information about Tectonic. See id. Both individuals communicated heavily with the CEO and CFO of Tectonic, and sometimes attended Board Meetings. Id.

It is simply incongruent to suggest that individuals with such access to information, and such influence over the financing of the company, stand on the same footing as shareholders whose only access to information about Tectonic was through public filings and statements. **While other members of the purported unincorporated association were reading press releases about Tectonic, Will was writing them.**

Freedman's and Will's unsuitability to serve in any type of representative capacity is further apparent because they solicited the purchase of Tectonic stock **by members of the purported association**, including Stephen Dart, who is listed as a member of the association under the Stephen M. Dart Family Trust. (See Ad Hoc Committee Membership List, attached hereto as Exhibit "I.") Not only does this demonstrate strikingly the distinction in insider-status between Freedman and Will and the other members, it also underscores that they are unfit as representatives for the group. Stephen Dart, and other members who may have bought the stock through Freedman and Will, or their associates, may have a claim against them for issues related to the purchase. Thus, it is impossible for Freedman and Will to represent the interests of the other members, because they have an inherent conflict of interest.

Freedman and Will are not members of the group they purport to represent. To the contrary, they most likely are adverse to it. Plaintiffs Freedman and Will are not part of the class, do not possess the same interest, and have not suffered the same alleged injury. The law

precludes either of them, or any entity controlled by them, from serving in a representative capacity.

<div align="center">POINT 2</div>

<div align="center">PLAINTIFF'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE SET-OFF IS<br>A DEFENSE, AND NOT A COUNTERCLAIM</div>

Plaintiff's motion to strike Defendants' affirmative defense of set-off "against the Plaintiff and/or its individual members" (Answer, p. 24) is entirely dependent on Plaintiff's argument that this Court first is required to re-cast this set-off defense as a counterclaim. In other words, Plaintiff sets up a "straw dog" by asking the court to disregard the fact that Defendants only plead set-off defensively, and do not seek affirmative relief. Plaintiff contorts the defense of set-off, recasting it as a counterclaim in order to weaken resistance to collateral attack. Then, Plaintiff seeks to prematurely dispute the allegations rather than accept them as true, as they must on a motion to dismiss. Plaintiff repeatedly makes assumptions and draws inferences not in Defendants' favor, as the law requires, but in its own favor. Plaintiff simply reinvents the Answer to its own advantage.

It is well-settled, however, that set-off may be pled as a defense. E.g., Sticka v. Oregon State Lottery Comm'n (In re Moore), 323 B.R. 752, 757 (Bnkr. D. Or. 2005); Jobin v. Arnot (In re M & L Bus. Mach. Co.), 178 B.R. 270, 272 (Bnkr. D. Colo. 1995) ("Setoff and recoupment can be raised as either an affirmative defense or a counterclaim."); Styler v. Jean Bob, Inc., 154 B.R. 581, 586 (D. Utah 1993) ("a defendant may [choose to] . . . use . . . set-off defensively, rather than as the basis of a counterclaim seeking affirmative relief, and it may properly do so.").

The cases cited by Plaintiff to buttress its bald assertion that setoff and recoupment are counterclaims fail to support that proposition, and are distinguishable and wholly inapplicable to

<div align="center">14</div>

the facts of this case.  In <u>Reiter v. Cooper</u>, the Supreme Court examined a case where bankrupt carrier Carolina's trustee brought suit against a shipper with which it had contracted.  507 U.S. 258 (1993).  The shipper had paid rates less than the published tariff rate.  <u>Id.</u> at 262.  The trustee sought to recover the difference in the rates paid and the tariff rates.  <u>Id.</u>  The shipper defended using the "unreasonable rate" defense, asserting its right under ICA § 10705(b)(3) to recover the difference between the tariff rate and what a reasonable rate should have been, thus setting off any recovery by the trustee.  <u>Id.</u>  In deciding whether the defense could properly be raised, the Court noted that 10705(b)(3) granted a **cause of action**, and not a defense.  <u>Id.</u> at 263.  Because "a defendant having a cause of action against a plaintiff may—indeed, often must—assert that cause of action as a counterclaim," the Court chose to view the defense as a counterclaim.  <u>Id.</u>

Plaintiff's reliance on <u>Reiter v. Cooper</u> is misplaced for several reasons.  First, the Court did **not** hold that all recoupment defenses are counterclaims.  Rather, their finding was limited to the unreasonable rate defense.  <u>See id.</u> at 265 ("[A]n unreasonable-rate claim is technically a counterclaim rather than a defense.").  The Court even noted that it may "not be clear whether set-offs and recoupments should be viewed as defenses or counterclaims."  <u>Id.</u> (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1275, pp. 459-460 (2d ed. 1990)).  Second, the Court based its decision primarily on the fact that the attempted defense actually arose from a **statutorily created cause of action**.  Defendant's setoff defense here does not derive from statute; rather it is a long-standing defense stemming from common law.

The Plaintiff also mischaracterizes <u>Herrmann v. Atlantic Richfield Co.</u>, 72 F.R.D. 182 (W.D. Pa. 1976).  In that case, the defendant moved for leave to file two types of counterclaims: some that sought affirmative judgments and some that were "in the nature of set-offs, employed defensively to reduce the amount of an opposing party's recovery rather than as the basis for any

affirmative relief." Id. at 185. With respect to the second category, the court decided not to treat them as permissive counterclaims. See id. ("[W]hile the Court is inclined to characterize these counterclaims as permissive ... they fall within the 'defensive set-off' exception to Rule 13(b).")." Thus, the case does not stand for the sweeping proposition that "setoff is a permissive counterclaim."

Recasting the defense of set-off as a counterclaim would make no sense. Defendants, as individuals, have no counterclaims against the Plaintiff as a purported unincorporated association. There is no procedural device that permits counterclaiming against third-parties other than a Plaintiff, which third-parties in this case are members of the purported association, should such an entity be proven to exist.[2]

If, as urged by Plaintiff, Defendants' thirty-sixth defense really is a counterclaim, then Plaintiff would be in default for failure to file an answer. Should the court label Defendants' thirty-sixth affirmative defense as a counterclaim, but not enter a default against Plaintiff, the Plaintiff should be compelled to file a response to it. If the Plaintiff at that time elects to file a motion to dismiss, then that motion should proceed with briefing in the ordinary course governed by the standards that apply to such motions, including that the allegations would be assumed to

---

[2] Plaintiff claims to be an unincorporated association, whose members apparently have nothing in common other than the fact that they formerly owned stock in Tectonic. Defendants fiercely contest the existence of an unincorporated association. Former stock ownership does not retroactively result in the existence of an unincorporated association. Members of an unincorporated association join at the beginning, and not retroactively, subject to a contract of association and the association's by-laws. Obviously no such contract exists here. There are no by-laws. This association has no name. It has no purpose. Its members pay no dues, elect no officers, and file no registrations. It has no assets. It pays no taxes. It owns no stock in Tectonic. It never did. Simply calling a group of people an unincorporated association does not magically create one, and does not enable one to circumvent the protections and requirements serving as conditions precedent to class actions, derivative suits, and direct actions.

be true and Defendants would be given every benefit of the doubt. If this court were to insist that

Defendants seek affirmative relief, instead of simply pleading set-off defensively, the standards

applicable to a motion to dismiss such a counterclaim were enunciated by the Plaintiff itself in its

brief opposing Defendants' motion to dismiss the Complaint in this case.

On a Rule 12(b)(6), Fed.R.Civ.P., motion:

> The court must accept as true all material allegations of the
> complaint and it must construe the complaint in favor of the
> plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage
> Resorts, Inc.*, 140 F. 3d 478, 483 (3d Cir. 1998). "A complaint
> should be dismissed only if, after accepting as true all of the facts
> alleged in the complaint, and drawing all inferences in the
> plaintiff's favor no relief could be granted under any set of facts
> consistent with the allegations in the complaint." *Id.* Claims may
> be dismissed pursuant to a Rule 12(b)(6) motion only if the
> plaintiff cannot demonstrate any set of facts that would entitle him
> to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99,
> 2 L. Ed. 2d 80 (1857). The moving party has the burden of
> persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d
> 1406, 1409 (3d Cir. 1991)."

"[W]hen considering the question of whether or not a pleading of fraud is alleged with

adequate particularity in a securities law context, [courts] must not read Rule 9(b) ... to abrogate

the notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure."[3] In other

words, a claimant is not required to allege evidence that could only be known by the opposing

party at this preliminary stage of litigation, which has yet to see any discovery whatsoever.[4]

---

[3] *S.E.C. v. Physicians Guardian Unit Inv. Trust*, 72 F. Supp. 2d 1342, 1352 (M.D. Fla. 1999)
(citing *Friedlander v. Nims*, 755 F.2d 810 (11th Cir. 1985)).

[4] *See, e.g., Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996) ("[I]n determining
the adequacy of the complaint under [Rule 9(b)], we cannot hold plaintiffs to a standard that
would effectively require them, pre-discovery, to plead evidence.") (emphasis added).

Thus, before a complaint can be dismissed under Rule 12(b)(6), it must be "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."[5] On a motion to dismiss, a court must accept all the factual allegations in the complaint as true and, in the light most favorable to the plaintiff, draw all reasonable inferences from those allegations. Defendants are not required to recite in their Complaint the sorts of factual nuances that can only come after a reasonable opportunity for discovery.

## CONCLUSION

The order entered by the bankruptcy court abandoning the claims asserted by Plaintiff expressly contemplated that any such claims would be brought as a class action for the benefit of all members of the class. It did not authorize, and could not authorize, claims to be brought by an alleged unincorporated association. Plaintiff itself cited to the order in its opposition to Defendants' motion to dismiss: "'recoveries from the Claims shall inure solely to the benefit of the Committee or its members subject to any applicable law requiring the committee to share any recoveries with similarly situated **members of the class**." (¶ 5) (emphasis added). Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, p. 19. In order to avoid the heightened pleading requirements of the Private Securities Litigation Reform Act, however, and the rigors of class certification, this action was not brought as a class action, but instead was brought in the name of a purported unincorporated association that itself sustained no injury, never owned any Tectonic stock, and never was owed any fiduciary duties.[6] However this action proceeds, the

---

[5] *Rendon v. Valleycrest Prods.,* 294 F.3d 1279, 1282 (11th Cir. 2002) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)).

[6] No attempt has been made to comply with the conditions precedent to bringing a derivative action, even though the fiduciary duties allegedly breached by former directors were owed to the

(continued...)

adequacy of purported representatives is a relevant issue to be considered by this court, and clearly will be the subject of discovery. If witnesses can testify about the matter, it should not be stricken.

It would be reversible error to grant Plaintiff's motion to dismiss Defendants' Thirty-Sixth Defense of set-off and recoupment. The Plaintiff cannot show any harm by leaving this defense in the case, especially at this stage.

For the foregoing reasons, Defendants respectfully submit Plaintiffs' motion should be denied.

---

(...continued)

corporation. This suit seeks to recover damages purportedly sustained by each of several different shareholders of Tectonic. No attempt has been made to assert these claims as direct actions by the shareholders individually, which would require each shareholder showing a special injury different from that sustained by shareholders generally, and showing causation, and reliance on purported misrepresentations by one or more of the Defendants. Certainly the unincorporated association as an entity cannot show reliance, or for that matter damages, since it never owned any stock.

Dated:   July 28, 2008

Respectfully submitted,

  /s/ Adam W. Poff
William D. Johnston (Bar No. 2123)
Adam W. Poff (Bar No. 3990)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 571-6642

J. Allen Maines, Esq. (Georgia Bar No. 466575)
John G. Parker, Esq. (Georgia Bar No. 562425)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
600 Peachtree Street, N.E.
Suite 2400
Atlanta, GA  30308-2222
(404) 815-2400

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2008, I electronically filed the foregoing DEFENDANTS'

RESPONSE TO PLAINTIFFS' MOTION TO STRIKE PORTIONS OF DEFENDANTS' ANSWER AND

TO DISMISS THE THIRTY-SIXTH DEFENSE with the Clerk of Court using the CM/ECF system,

which will automatically send e-mail notification of such filing to the following attorneys of

record:

Linda Richenderfer, Esq.                     Herbert C. Ross, Jr., Esq.
BIFFERATO GENTILOTTI LLC                      OLSHAN GRUNDMAN FROME ROSENZWEIG
800 N. King Street, Plaza Level                  & WOLOSKY LLP
Wilmington, Delaware  19801                   Park Avenue Tower
                                              65 East 55th Street
                                              New York, New York  10022


                        /s/ Adam W. Poff
                        Adam W. Poff (No. 3990)
                        YOUNG CONAWAY STARGATT & TAYLOR, LLP
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        Wilmington, DE  19801
                        Telephone:  (302) 571-6642

065840.1001

EXHIBIT A

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

| In the Matters of | |
|---|---|
| HARRIS CLARE & CO., INC. | (8-10474) |
| HARRIS CLARE & CO. | (8-11753) |
| TOWNE HARRIS & CO., INC. | (8-10377) |
| BRUCE SHAPIRO | (8-10474) |
| MARTIN CLARE MELVIN WINSLOW ROBERT SUMMERS | (8-11753) |
| HARRIS FREEDMAN | (8-10377) |

F I L E :

OCT 1 5 1965

SECURITIES & EXCHANGE COMMISSION

INITIAL DECISION

Washington, D. C.
October 15, 1965

Irving Schiller
Hearing Examiner

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

| In the Matters of | | |
|---|---|---|
| HARRIS CLARE & CO., INC. | (8-10474) | : |
| HARRIS CLARE & CO. | (8-11753) | : |
| TOWNE HARRIS & CO., INC. | (8-10377) | : INITIAL DECISION |
| BRUCE SHAPIRO | (8-10474) | : |
| MARTIN CLARE | | : |
| MELVIN WINSLOW | (8-11753) | : |
| ROBERT SUMMERS | | : |
| HARRIS FREEDMAN | (8-10377) | : |

BEFORE:        Irving schiller, Hearing Examiner

APPEARANCES:   Joseph C. Daley, Joel Leifer, Roberta Karmel and
               Gerald H. Goldsholle, Esqs., for the Division of
               Trading and Markets.

               Bernard Coven and Edward J. Gedalecia, Esqs.,
               for Harris Clare & Co., Inc., Harris Clare & Co.,
               Towne Harris & Co., Inc., Harris Freedman and
               Martin Clare.

               Robert Summers, pro se.

- 2 -

1/

These are proceedings  pursuant to Section 15(b) and 15A

of the Securities Exchange Act of 1934 (Exchange Act) to determine

whether Harris Clare & Co., Inc. (registrant) willfully violated

Section 17(a) of the Securities Act of 1933 (Securities Act) and

Sections 10(b) and 15(c)(1) of the Exchange Act and Rules 10b-5 and

15cl-2 thereunder and whether Martin Clare, Melvin Winslow (Winslow),

Robert Summers (Summers), Bruce Shapiro (Shapiro) and Harris

Freedman (Freedman), singly and in concert, willfully violated and

aided and abetted in willful violation of the above-mentioned

Sections of the Securities Act and the Exchange Act and whether

remedial action is appropriate in the public interest pursuant to
2/
Section 15(b) and 15A of the Exchange Act.

---

1/   These proceedings were consolidated with proceedings simultaneously
     ordered by the Commission in the matter of Christopher & Co., Inc.,
     et al (File No. 8-9380) and J. E. Marken & Co., Inc., et al (File
     No. 8-1057) as to common questions of law and fact.  An initial
     decision will be filed in each of the above-named proceedings.

2/   Section 15(b) of the Exchange Act as applicable here, provides that
     the Commission shall censure, suspend for a period not exceeding
     12 months or revoke the registration of a broker-dealer if it finds
     that it is in the public interest and that such broker or dealer or
     any person associated with such broker-dealer has willfully violated
     any provisions of that Act or of the Securities Act of 1933 or any
     rule thereunder.

     Section 15A(1)(2) of the Exchange Act provides for suspension for a
     maximum of 12 months or the expulsion from a registered securities
     association of any member, or for suspension for a maximum period of
     12 months or barring any person from being associated with a member
     thereof if the Commission finds that such member or person has vio-
     lated any provision of the Exchange Act or rule or regulation there-
     under or has willfully violated any provision of the Securities Act
     of 1933, as amended, or any rule or regulation thereunder.

- 3 -

The order for proceedings alleges in essence that during the period May 1962 through January 1963 registrant, Freedman, Clare, Winslow, Summers and Shapiro, singly and in concert, willfully violated and aided and abetted willful violations of the above-mentioned Sections of the Securities Act and the Exchange Act and the respective Rules thereunder, in the offer and sale of the common stock of Alaska International Corporation (Alaska) otherwise than on a national securities exchange and directly and indirectly employed devices, schemes and artifices to defraud and engaged in a course of business which would and did operate as a fraud and deceit upon purchasers and prospective purchasers of securities.

After appropriate notice, hearings were held before the undersigned hearing examiner.  Proposed findings of fact and conclusions of law and briefs in support thereof were filed by the Division of Trading and Markets and by registrant, Harris Clare & Co., Towne Harris, Freedman and Clare. [3]

---

[3]  Winslow and Shapiro failed to file answers as directed by the order for proceedings and failed to appear at the hearings held thereon. Under the Commission's Rules of Practice, 17 CFR 201.6(e) and 7(e) the two named individuals were deemed to be in default.  On July 27, 1965 the Commission rendered its Findings and Opinion and found that Winslow and Shapiro, while associated with registrant, willfully violated and aided and abetted in willful violations of certain provisions of the Securities Act of 1933 and the Exchange Act and Rules thereunder, as set forth in the order for proceedings in connection with the offer and sale of the common stock of Alaska and entered an order barring both individuals from being associated with a broker or dealer.

- 4 -

The following findings and conclusions are based on the record, the documents and exhibits therein and the hearing examiner's observation of the various witnesses.

Registrant was originally registered as a broker-dealer pursuant to Section 15(b) of the Exchange Act on March 11, 1962 under the name of Harris Stevens & Co., Inc. By appropriate amendment filed May 14, 1962 registrant reflected a change in its corporate name to Harris Clare, Inc. Clare & Co., a partnership located at the same address as registrant, was registered as a broker-dealer pursuant to Section 15(b) of the Exchange Act in December 1963. Towne Harris was originally registered as a broker-dealer pursuant to Section 15(b) of the Exchange Act under the name of Thompson Securities, Inc. By appropriate amendment filed February 1964 Thompson Securities, Inc. reflected a change in its corporate name to Towne Harris. Clare & Co. and Towne Harris are members of the National Association of Securities Dealers, Inc. (NASD), a national securities association registered pursuant to Section 15A of the Exchange Act.

Freedman was president and director and owner of 10% or more of the equity securities of registrant from March 1962 until April 1963 and was, and is, a director and owner of 10% or more of the equity securities of Towne. Clare was, and is, a general partner of Clare & Co. and since May 1962 has been employed by registrant as a registered representative. Summers was employed by registrant in July 1962 as a registered representative and in April 1963 became vice president, secretary, a director, and owner of 10% or more of the

- 5 -

equity securities of registrant.  Since December 1963 Summers has been a general partner of Clare & Co.

Fraudulent Sale of Alaska Stock

The order for proceedings alleges, among other things, that during the period May 1962 through January 1963 registrant, Freedman, Clare, Winslow, Summers and Shapiro, singly and in concert, made untrue statements of material facts and omitted to state material facts to purchasers of the common stock of Alaska and engaged in acts, practices and a course of business which operated as a fraud and deceit upon purchasers and prospective purchasers of the said securities in willful violation of the anti-fraud provisions of the Securities Act and the Exchange Act. [4/]

Eighteen investor witnesses testified as to the representations concerning Alaska made to them by the above-named persons.  In addition, three former employees of registrant testified as to the information they received at registrant's office for dissemination to potential investors and as to the manner in which the firm conducted its business.  One of such employees was hired as a research assistant

_____

[4/]  The anti-fraud provisions referred to are Sections 17(a) of the Securities Act and Sections 10(b) and 15(c)(1) of the Exchange Act and Rules thereunder.  The composite effect of these provisions, as applicable here, is to make unlawful the use of the mails or inter-state facilities in connection with the offer and sale of any security by means of a device to defraud, an untrue and misleading statement of a material fact, or any act, practice, or course of business which operates or would operate as a fraud or deceit upon a customer or by means of any other manipulative or fraudulent device.

- 6 -

and registered representative; the second, a part-time salesman, and the third, a receptionist and typist.  The latter also purchased stock of Alaska (in her father's name) on the representations made to her by Winslow and Freedman.  The representations made to the investor witnesses included, among other things, that the Alaska stock would increase in price, that it could double or might triple in price or that it would increase three or four times within a period of three months; that Alaska was a hot stock which at one time had been as high as $6, $8 or $10 a share with a good possibility of or words suggesting the likelihood that Alaska stock would return to its former price; that a $500 investment in the said stock could increase to $5,000; and that as a result of inside information which registrant had, the stock would advance to $4 or $5 a share within six months.  Three of registrant's salesmen told customers that by purchasing Alaska stock they could recoup prior losses sustained in earlier securities transactions.  Four of the salesmen told their customers that Alaska was close to or would possibly merge or that another company would purchase Alaska's properties or that Alaska was taking over companies whose names were being kept secret.  Sixteen of the witnesses who testified stated they were informed that Alaska was either a mining company or an oil company or both; that it was engaged in drilling for oil; that it had found what it had expected and as a result would make money; that on property adjacent to that owned by Alaska in Australia oil was discovered; or that Alaska had rich mineral deposits such as uranium and nickel or that it was mining substances needed in atomic research.  One customer

- 7 -

was told Alaska was sifting for gold and some of the company's opera-
tions were profitable.  Two of such customers were advised that Alaska
was making money and operating on a profit and one of the customers
was told that the company had a million dollars in its treasury;
another was informed that as a result of substances found Alaska's
earnings would increase.  None of the respondents testified at the
hearing and the record contains no denial by them of the investor's
testimony concerning the foregoing representations. [5/]

There was no reasonable basis for the representations made
regarding Alaska's price appreciation, its purported merger, its
successful business operations or its earnings.  Such statements were
either outright false or so artfully stated as to leave customers with
the rosy expectations of gain without disclosing any known or reasonably
ascertainable adverse information concerning Alaska.  To test the
validity of these conclusions we shall first examine the knowledge
registrant had concerning Alaska and measure such knowledge against the
then existing facts concerning Alaska's financial position and the
results of its operations.

Registrant determined to sell Alaska stock in July 1962.  At
that time the firm was looking for a low-priced situation that had
growth potential which could be sold to customers as a speculation.

---

[5/]  It should be noted that although the Commission has already barred
Winslow and Shapiro from being associated with a broker or dealer
the hearing examiner has considered evidence concerning their
representations to investors while they were employed by registrant.

- 8 -

Freedman, who was president, made the determination to sell Alaska
after conferring with Clare and Winslow.  Freedman's knowledge of
Alaska's business was obtained from the material he received from
Alaska consisting of reprints of newspaper articles relating to
Alaska's granite and gold properties, a report to stockholders dated
September 1, 1961 containing a financial statement at July 31, 1961
and an interim report to stockholders dated June 1962 which had no
financial information.  From these sources Freedman believed that
Alaska had the largest granite quarry in New Mexico, had a lease or
an option to lease gold properties in Arizona, some mineral properties
and property in Australia.  Winslow, who was registrant's vice presi-
dent, understood Alaska had property in Australia, that it was engaged
in mining, exploring for oil and that it had some properties in the
Southwest.  Freedman was impressed by the fact that the balance sheet
for the fiscal year ended July 31, 1961 showed that Alaska's assets
exceeded its liabilities and it was not insolvent.  In determining to
sell Alaska stock all of them gave great weight to the fact that at one
time Alaska sold as high as $7 a share and in July of 1962 was selling
below $1, and that approximately 25 or 30 brokers appeared to be
expressing an active interest in the said stock.  There was also evi-
dence that, in the spring of 1962, Clare visited one of Alaska's
properties in Arizona and was told by Alaska's president that a pilot
gold mining project had been conducted at the property and that
samples of gold had been filed with the Bureau of Land Management.
Clare was also told at that time that the property had possibilities as

- 9 -

real estate development if a partner could be found to furnish financial help since Alaska did not have money itself to develop the property. During such visit Clare neither requested nor obtained financial statements or information. Alaska's then president testified that Alaska's books and records were available at all times to anyone who cared to examine them and that Clare made no request to look at Alaska's books nor did Clare make any effort during said visit to obtain any information concerning Alaska's total operations.

It is clear from the record the July 31, 1961 balance sheet was the only financial information concerning Alaska which registrant and its representatives had during the period it sold that company's stock. The balance sheet was prepared by a firm of certified public accountants. In a letter accompanying the balance sheet the firm stated that it was unable to render an opinion because, among other things, it was unable to examine original records relating to acquisitions of mineral and oil properties prior to April 21, 1961 and because the company had "revalued oil and gas properties, mineral holdings, stocks in other companies and mining equipment based on appraisals made by geologists, engineers, management and others." Under the liabilities and stockholders' equity portion of the balance sheet the surplus item reflected that Alaska had revalued its assets upward by $2,339,223 and that it had an earned surplus deficit of $2,455,025. Though, as noted above, registrant commenced selling Alaska stock in July 1962 it was not until September 20, 1962 that it

= 10 =

requested Alaska to furnish current financial information and admitted in the letter that the 1961 financial statement which it had was "too generalized to be of any significant value." Registrant also requested detailed additional information as to "the varied properties included in the assets" stating that the "projections of the proper- ties" accompanying the financial statement were "all optimistic." Information was requested as to "the extent to which the individual properties materialized." Alaska acknowledged receipt of the letter but stated that the information requested was not available and would not be until the 1962 financial statements became available. A second request was made for similar information to which no reply was received. Notwithstanding the failure to secure current financial and other information concerning Alaska's operations registrant continued to sell Alaska stock.

The information registrant had concerning Alaska was totally insufficient and inadequate as a basis for making the type of repre- sentations which the investors testified were told to them nor for purposes of recommending such stock to investors. Alaska was incorpor- ated in 1957 and during the period registrant sold its stock it was a diversified holding company engaged in the exploration and development of mineral and mining properties and owned or had an interest in developed and undeveloped real estate. The record discloses that on May 5, 1959 Cataract Mining Corp. was merged into Alaska and as of that date Alaska's books and records reflect that it had tax losses carried

: 11 :

forward as follows:

| Fiscal Period Ended | Loss | Fiscal Period Ended | Loss |
|---|---|---|---|
| 2/28/56 | $ 37,276 | 2/28/58 | $1,013,869 |
| | | 2/28/59 | 140,276 |
| 2/28/57 | 147,914 | 5/5/59(Date of Merger) | 7,282 |

Alaska's operations after the merger continued to be unsuccessful.
For the fiscal year ended July 31, 1959 Alaska had a loss carry for-
ward of $161,106 and for the period ended July 31, 1960 such loss
amounted to $273,797. By the latter part of 1960 Alaska was in a very
weak financial position and unable to meet its obligations. During the
summer and fall of 1960 the old management negotiated to sell control
of the company and on or about April 1, 1961 such sale was effected.
The group which acquired control made some loans to Alaska in light
of its dire need for cash and embarked on a program of acquiring
leases and other property by issuing its own 3-cent par value common
stock which it arbitrarily valued at $1 per share. As at July 31,
1961 Alaska had issued and outstanding 6,234,058 shares of its common
stock and by July 31, 1962 there were 8,806,288 such shares outstanding.

It is clear from the evidence that from at least 1959 Alaska
had no operating profits but sustained losses. For the fiscal year
ended July 31, 1960 Alaska had a total income of $10,702 and a loss of
$273,797. As at the same period it had an accumulated loss of
$1,781,522. For the fiscal year ended July 31, 1961 Alaska's total in-
come amounted to $32,459, which was composed of income from the sale of
oil and gas amounting to $20,079 and a refund of prior charges amount-
ing to $12,380. For the same period Alaska expenses amounted to

* 12 *

$1,013,855 and included a write-off of the cost of exploration and development on expired leases amounting to $107,133, the cost of expired mineral leases and permits amounting to $760,788 and the cost of operations on abandoned leases amounting to $14,748. The total loss for the fiscal year ended July 31, 1961 amounted to $981,395. As at the same period Alaska's total accumulated loss amounted to $2,762,917.

Alaska's operations during the following fiscal year continued their unfavorable trend and neither the existing projects nor the properties acquired during the said year resulted in any operating profit. [6/] In fact, Alaska's accumulated loss substantially increased.

---

[6/]    Alaska's chief executive officer responsible for the company's operations for the period August 1, 1961 through July 31, 1962 testified that the company set up its operations as projects, all of which incurred expenses far exceeding any income which any project may have had and each of which resulted in an operating loss. Many of the leases were dropped as commercially unfeasible or abandoned as worthless. Alaska's "prime project" was the R-Gold Project located outside Phoenix, Arizona. During 1961 and early 1962 Alaska conducted a pilot gold mining operation. In the fall of 1962 Alaska learned its properties had been "salted." No gold had ever been produced commercially. Alaska's loss on this operation was approximately $60,000. Its next largest project was called the Beryllium Project. The ore mined in this beryllium operation failed to meet the requirements of Alaska's purchaser. Moreover, Alaska needed milling facilities which it was unable to obtain and it was unable to erect its own facilities since it lacked adequate financial means. At any rate it is clear that after May 1962 there was no possibility of commercial production of beryllium by Alaska and the project was dropped with a $25,000 loss. The third largest project related to an oil and gas concession in Queensland, Australia in which Alaska owned a 10% stock interest. Alaska had no money to meet its requirements or pay rentals. No drilling was ever conducted on this project, no oil was ever discovered and no income ever received from operations. (Cont'd next page.)

- 13 -

For the fiscal year ended July 31, 1962 Alaska's gross income amounted
to $3,427.  For the same period its expenses amounted to $239,065 and
included a write-off of the abandoned mineral leases amounting to
$88,500, the cost of exploration and development on abandoned leases
amounting to $67,713 and the cost of expired oil and gas leases
$71,100.  The total loss for the fiscal year ended July 31, 1962
amounted to $418,489.  In addition, Alaska sustained long-term capital
losses amounting to $202,714 and short-term capital losses amounting

---

Similarly, other projects either had no income or very little
income and all of them necessitated expenditures for development
or other operations and each of them resulted in losses by
Alaska for the year ended July 31, 1962.  Alaska's books reflect
that the following projects, which constituted its major opera-
tions, were either abandoned or determined to be worthless and
written off as losses.

| Name of Project | Loss |
|---|---|
| Big Bug Placer - | $ 36,641 |
| No commercial operation - abandoned | |
| Frenchman's Gulch - | 21,529 |
| Investment abandoned as worthless | |
| Plaza Hospital Center and Heritage Home - | 2,666 |
| Research and exploration on both proper- | |
| ties which were abandoned | |
| Equitable Development - | 90,342 |
| Management determined that its investment | |
| was worthless | |
| Centennial Beryllium - | 91,982 |
| Project abandoned December 1961 | |
| Cinco Petroleum | 134,156 |
| Write-off of investment | |
| National Growth Corporation | |
| Loss on investment - | 159,259 |
| Loss in value of securities - | 191,109 |
| Two oil and gas leases in Alaska and | |
| research of oil property in Ohio - | .18,446 |
| Banner Oil Corp. - | 7,000 |
| Determined by management to be worthless | |
| Partridge Canadian, Ltd. - | -26,291. |
| Determination by management that stock | |
| was worthless | |

- 14 -

to $6,899.  As at July 31, 1962 Alaska's accumulated loss amounted to
$3,131,291.

It is obvious that prior to and during the time registrant
was selling Alaska's stock the company was continually losing money.
However, none of the investor witnesses who testified were so informed.
Thus, twelve of the investor witnesses testified they were never told
anything concerning Alaska's losses for the years 1961 and 1962.  Five
of the investor witnesses testified they were informed that Alaska was
making money or it was operating at a profit or that it would make
money or that it had some profitable operation or that its earnings
would increase.  The representations made to investors by registrant's
principals and salesmen with respect to the nature of Alaska's business
were either inaccurate or wholly insufficient.  None of the investors
were told that Alaska was a diversified holding company engaged in
exploration and development of mineral and mining properties both in
this country and abroad and that it owned developed and undeveloped
real estate.  Thus, three of the investor witnesses were told that
Alaska was engaged only in a mining operation and one of such witnesses
was told that such operation was used in connection with atomic research.
One of the investor witnesses was told that Alaska had rich mineral
deposits including uranium and nickel and another was told that Alaska
was doing special research and that it had found "something" which
should result in earnings.  Two investor witnesses were told that
Alaska was engaged in mining and in oil, three investor witnesses were

- 15 -

told Alaska was engaged in mining gold and one of such witnesses was told that Alaska was seeking oil as well.  One of registrant's employees who testified he was engaged as a part-time researcher and salesman testified he was informed that Alaska had granite quarries, gold deposits and property in Australia adjacent to property in which oil was discovered.  Finally, one investor was told that Alaska was a land holding company.  None of the representations concerning Alaska's business were completely accurate nor did they fully inform potential investors the type of company in which they were being asked to invest. The statements relating to profitable operations or earnings were utterly false.

At the time registrant undertook to sell Alaska stock to investors it satisfied itself that Alaska was in business but apparently had no knowledge of that company's total operations nor of the results thereof nor did it know Alaska's financial condition.  Moreover, it made no effort to obtain adequate information as to Alaska's current financial condition or whether it was earning or losing money notwith- standing the fact that the financial statement it had reflected an accumulated loss of $2,762,917.  That fact alone should have raised a red flag and put registrant on notice that further investigation was warranted.  At least some effort should have been made to determine whether Alaska's hugh losses were still continuing.. Failure to make an effort to obtain adequate information essential to an intelligent evaluation of the securities registrant was offering and selling such

- 16 -

stock to investors by unwarranted representations calculated to deceive prospective investors into believing their investment would be profitable constitutes a reckless indifference as to whether such representations are true or false and registrant is chargeable as if it had knowledge of the falsity. Irwin v. United States 338 F. 2d. 770 (C.A.9, 1964). Three months after registrant started selling Alaska stock it admitted in a letter to the company that the financial statement it had was too generalized to be of any significant value. Moreover, it sought information as to whether any of the properties which Alaska had ever materialized. The record is barren of any explanation for the failure to obtain such information prior to determining to sell such securities. As previously noted, none of registrant's principals or salesmen testified at the hearing nor did registrant offer proof to rebut the testimony by the investor witnesses as to the representations made to them. The hearing examiner credits the testimony of such witnesses.

The Commission has consistently held and the Courts have stated that unfounded predictions as to future levels or price increases unsupported by any reasonable basis of fact are a "hallmark of fraud." Mac Robbins & Co., Inc., Exchange Act Release No. 6846, July 11, 1962, p.15, affirmed sub nom Berko v. Securities and Exchange Commission 316 F. 2d. 137 (C.A.2, 1963); Alexander Reid & Co., Inc., 40 S.E.C. 986 (February 8, 1962). The hearing examiner finds that, in light of Alaska's substantial losses both prior to the date registrant undertook to sell such stock and mounting continually during the period such

- 17 -

stock was being sold, there was no reasonable basis for the predic-
tions of price increase or that an investor's prior losses could be
recouped by an investment in Alaska.  The hearing examiner further
finds that the representations as to earnings or profits or that
Alaska had a million dollars in its treasury were completely false.
The evidence in the record shows that during the period registrant
was selling Alaska stock there was no merger pending nor was there
any concrete basis for believing that a merger was imminent.  Though
much was made of Alaska's gold mining operations the evidence shows
that the company never produced gold commercially and in fact no gold
mining operations were being carried on after May 1962.  Any
representations relating to such matters the hearing examiner finds
were unwarranted.  The hearing examiner also finds that the registrant
omitted to state material facts concerning Alaska's losses as well as
its inability to obtain current financial or other information, facts
which registrant knew or should have known.

Registrant contended throughout the hearing the investors
either knew when they purchased Alaska stock that it was a speculation
or that they were so informed by the salesman.  The element of specula-
tion is inherent in stock investments, but the investor is entitled to
have the opportunity to evaluate the risk of loss, as against the hope
of lucrative return, from true statements of the financial status of
the corporate enterprise in which he is acquiring an interest. [7]

7/ S.E.C. v. F. S. John & Co., 207 Fed Supp 566 (1962).

- 18 -

Moreover, the Commission has held that the fact that customers may have been seeking speculative securities does not detract from the fraudulent nature of the representations made to them. [8/]

The hearing examiner concludes that in the offer and sale of Alaska stock registrant willfully violated Section 17(a) of the Securities Act and Section 10(b) and 15(c)(1) of the Exchange Act and Rules 10b-5 and 15c1-2 thereunder. [9/]

## Findings as to Freedman, Clare and Summers

The representations made to investors referred to above included those made by Freedman, Clare and Summers. Freedman informed investors that Alaska stock could go to $1 in three to six months or that it would increase three or four times in approximately three months or that the stock was good for a short-term gain and better for long-term and pointed out to one investor that the stock had been as high as $10 a share. Freedman also told the employee whom the firm hired as a part-time salesman that potential investors are to be informed that within a period of four months the stock should move up to $1 or $1.25. Clare informed potential investors that Alaska should double in a matter of weeks or that it should rise to $1 a share in a period of six months. Clare also informed one investor that the price of the

---

[8/] *Wright, Myers & Bessell, Inc.*, Securities Exchange Act Release No. 7415, p.4 (September 8, 1964).

[9/] The evidence shows and there is no dispute that the mails were used in connection with the offer and sale of Alaska stock.

- 19 -

stock had at one time been as high as $7 a share and informed such
investor that when the stock went to $1 he would pull the investor out
of the investment.  Clare also informed the aforementioned part-time
employee that he should inform his customers that the stock would
increase.  Summers told investors that the stock has been as high as
$4 and $5 a share and would rise again within a period of three months,
that he was close to the president of Alaska and that he knew there
would be a real movement in the stock soon.  Summers represented to one
investor that he would guarantee to double his investment by the end of
the year and represented that a $500 investment would rise to about
$5000.  He informed another investor that he had inside information,
that the issue would advance and would go to $4 or $5 and told still
another investor that the people behind Alaska were going to move the
stock and that the reason the stock was selling below $1 was that it
was due to their desire to keep the price of the stock down and they
did not want to make public the value of the assets.

In addition, all three of the above-named individuals told
one or more of their customers that by purchasing Alaska stock they
could recover losses sustained in prior securities transactions.  Each
of the three individuals represented to one or more of their customers
that Alaska either had or would have profitable operations.  Thus,
Freedman represented to at least one of his customers that the company
had millions of dollars in its treasury, that it was making money,
that Alaska's expenses were down and it was showing a profit.  He
informed another customer that the company was earning considerable

- 20 -

money.  Clare informed one customer that Alaska was making money and was operating at a profit.  Summers represented to one customer that Alaska was doing research, that it had found what they expected and as a result would make money and that Alaska would eventually go on an Exchange.  This latter representation was a complete fabrication.

None of the three individuals mentioned above informed any of their customers that Alaska had never had any profits but in fact had sustained substantial losses.  The failure to disclose that Alaska had sustained substantial losses constituted an omission to state a material fact which each of them knew or should have known. There is no evidence in the record that, prior to undertaking the offer and sale of Alaska stock, any of them made any individual effort to secure current financial or other information regarding Alaska's operations.  Although they were all aware of the fact that in September 1962 registrant sought current financial information as well as the status of the various projects that Alaska was involved in and that in fact no current financial or other information was ever received none of them made any effort to halt the sales of such stock.

The hearing examiner finds that, on the basis of the facts concerning Alaska's financial condition and the results of its operations set forth above, there was no reasonable basis for the representations made to investor witnesses by Freedman, Clare and Summers and that each one of them omitted to state material facts concerning Alaska's financial condition and operations which they either

- 21 -

knew or should have known. Moreover, it is evident that none of them disclosed to customers their inability to obtain current information as to Alaska's operations or financial condition. The investor witnesses testified that each of the persons named above in describing Alaska's business represented that Alaska was either engaged in exploration for oil or minerals or both or was mining for gold or that it was only a land holding company. These statements were half-truths and each of the persons named above omitted to furnish investors with an accurate description of Alaska's diversified operations. In fact, one investor witness testified that he was told nothing concerning the business of Alaska except that Alaska was the type of company in which he could double his money by the end of the year. Freedman told one customer that Alaska was engaged in special research, that something had been found as a result of which the company was earning considerable money. Clare told one customer that Alaska was only a mining company.

None of the above-named individuals saw fit to testify in the instant proceeding or controvert any of the statements made by the investor witnesses who testified regarding the representations made to them by each of the above-named persons. It is well settled that, in a noncriminal case, the failure of a party to testify in explanation of suspicious facts and circumstances peculiarly within his knowledge fairly warrants the inference that his testimony, if produced, would

- 22 -

10/
have been adverse.

The Commission has frequently emphasized that inherent in the relationship of every broker-dealer with his customer is the implied vital representation that the customer will be dealt with fairly and honestly. 11/

In the instant case it is evident and the hearing examiner finds that neither Freedman, Clare nor Summers dealt fairly with their customers and in fact made fraudulent representations to them to induce them to purchase the security by promising them quick profits.

The hearing examiner finds that Freedman, Clare and Summers willfully violated and aided and abetted registrant in willfully violating Section 17(a) of the Securities Act and Sections 10(b) and 15(c)(1) of the Exchange Act and Rules 10b-5 and 15c1-2 thereunder.

Other Matters

Respondents in their brief contend that the hearing examiner erred in refusing respondent's request to direct the Division of Trading and Markets to turn over for inspection all papers in the Division's possession (other than work product). Such request was made at a time when a government witness was on the witness stand who

---

10/  2 Wigmore Evidence (1940), S.E.C. Section 289; Mammoth Oil Company v. U. S. 275, U.S. 13, 52-3 (1927) Cf. N. Sims Organ & Co., Inc. v. Securities and Exchange Commission 293 F. 2d. 78, 80-81 (C.A. 3, 1961) Cert. denied 82 S Ct. 440.

11/  Pinsker & Co., Inc., 40 S.E.C. 285 (1960).

- 23 -

stated that he recalled seeing a four-page brochure relating to Alaska which contained "figures" and a reprint of a newspaper article. After attempting to have the witness further identify the documents, the hearing examiner recessed the hearing and directed the Division to search its files to determine whether it had the documents which the witness testified as having seen in registrant's office.  The Division stated on the record it did not have the material mentioned by the witness.  Counsel for the respondents further requested the Division to produce all papers in their possession, financial state-ments, brochures and prospectuses of Alaska obtained by process or otherwise, not their work products.  With respect to material taken from respondents the Division stated and respondents did not refute that all such material had been returned to respondents.  The hearing examiner ruled that any material such as brochures, prospectuses or financial statements relating to Alaska which were in the public files of the Commission would be made available to respondents.  The hearing examiner, in addition, directed the Division to turn over to the respondents any material which the witness then on the stand was able to identify.  The hearing examiner, however, denied the broad request for all the documents in the Division's possession.

The hearing examiner has reviewed respondent's claim of error and is of the view that his prior ruling was proper.  In essence, respondent's request was tantamount to asking the hearing examiner to direct the Division to turn over all of the files which the Commission had accumulated during the course of its private investigation and make

- 24 -

such material available to the respondents so that respondents could determine whether any such material could be of help to it in the cross-examination of the witness then on the stand or otherwise assist its case. In support of its contention respondents cite Brady v. State of Maryland, 373 U.S. 83 (1963), U. S. v. Shindler, 24 F.R.D. 142 (U.S.D.C., SDNY 1959); U. S. v. Iozia 13 F.R.D. 335 (DCSD NY). None of these cases support respondent's contention. In the Iozia case, the Court held that even the Federal Rules of Criminal Procedure do not authorize a rummaging through the files of the prosecution at will and that to entitle a defendant to production and inspection of documents there must be a showing of good cause. The Court went on to state that good cause requires a showing of four standards including that the documents are evidentiary and relevant and that the application be made in good faith and not intended as a general fishing expedition. In the instant case, respondents failed to demonstrate the existence of any of the standards for good cause laid down by the Court. On the other hand it was obvious that respondents were attempting a fishing expedition in the hope of finding some material which could be of some use to them. In fairness to the respondents the hearing examiner directed the staff to search its files and turn over to the respondents all material which could be identified by the witness on the stand together with all material obtained from the respondents. In denying the request for the production of all of the Commission's private files the hearing examiner was obviously weighing respondent's request against countervailing considerations of protecting confidential sources of information and the method, manner and circumstances of the Commission's acquisition of

- 25 -

the materials.  It should be noted that unlike the Iozia case the respondents never made any effort to identify the documents it sought.

In the Shindler case, the Court stated that the defendents had shown good cause for inspection under the standards laid down in the Iozia case.  The Brady case is not pertinent to the instant proceeding since in that case the Government sought to repress a confession and the Supreme Court held that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment.

The Commission has held that information or documents obtained by the staff in the course of any private examination or investigation are deemed confidential unless disclosure or production is authorized by the Commission as not being contrary to the public interest.  Where a request was made for a copy of a transcript of a witness taken in a private investigation the Commission ruled that such a request was in the nature of a "fishing expedition" and that a sufficient showing had not been made of a particularized need "which outweighed the policy against intrusion into confidential files." (Memorandum Opinion re Linder Bilotti & Co., Inc. (File No. 8-9570) April 2, 1964, citing General Aeromation, Inc., 40 S.E.C. 21 (1961); See also Alexander Reid & Co., Inc., 40 S.E.C. 986 (1962).  In the instant case there was no showing by the respondents upon which a determination could be made to overcome the policy against intrusion into the Commission's confidential files.

- 26 -

Public Interest

The sole remaining question is what, if any, remedial action
is appropriate in the public interest. During the period July 1962
through January 1963 registrant sold in excess of 140,000 shares to
approximately 125 investors. Each of the investor witnesses who
testified was contacted by telephone and the pattern of selling was
similar in nearly all instances, namely, the lure of quick profits.
In addition to the representations heretofore mentioned most of the
customers were told Alaska stock had at one time been selling as high
as 7 to 10 dollars a share with the obvious intent of implanting in
the minds of the investors, nearly all of whom the hearing examiner
believes were naive and unsophisticated, practically an assurance that
the price of the stock would rise shortly. Registrant attempted to
demonstrate at the hearing that the investors had previously purchased
securities thereby seeking to infer that they were sophisticated
investors and knowledgeable about securities. The hearing examiner
rejects such a patently absurd contention. One or two purchases of
securities by persons completely untutored in securities analysis or
evaluation is hardly a basis for making them sophisticated investors
with an understanding of the vagaries of the stock market or the value
of a specific security, particularly of a speculative security such as
Alaska. When superimposed on such lack of understanding are the artful
nuances and implications by salesmen in presenting an unwarranted
optimistic picture so as to whet the appetite for a quick profit
without disclosing or distorting essential information the hearing

- 27 -

examiner concludes that such a course of conduct can best be characterized as "boiler room" procedures involving as they usually do a concerted high pressure effort, by telephone, to sell a large volume of a speculative or promotioned security without concern for the suitability of such securities in the light of the customers' needs or objectives. [12/]  Seven of the investor witnesses testified they were never informed of the inherent risks involved in the purchase of Alaska's stock.  Ten of the investor witnesses testified they were never asked what their investment aims or objectives were or indeed if they had any and there is no evidence that such information was in fact obtained from the other investors who testified.  Nine of the investor witnesses testified they put faith and reliance on the statements made to them by registrant's representatives.

A course of conduct by a broker-dealer wherein false and misleading statements are made to investors and reasonably ascertainable adverse material information is not disclosed, clearly evinces a complete disregard of the customer's best interests and constitutes a violation of the fiduciary obligations to persons who had been induced to place their trust and confidence in such broker-dealer.  The hearing examiner concludes that such a course of conduct amounted to a scheme to defraud which operated as a fraud and deceit on the public in violation of the anti-fraud provisions of the Securities Acts.  The hearing examiner finds it is in the public interest to revoke registrant's registration as a broker-dealer.

---

12/  Mac Robbins & Co., Inc., supra.

- 28 -

We have previously found that Freedman, Clare and Summers
have willfully violated and aided and abetted registrant's violation
of the Securities Acts.  By representing that Alaska's stock would
rise and making other unwarranted representations concerning the
company's business and operations each of them implied that adequate
financial and other information supported the extravagant claims made.
None of them sustained the burden of going forward with evidence to
establish they had some reasonable basis for their representations.
The selling methods employed by each of them is the anthithesis of
fair dealing with customers.  In addition, Freedman who was president
bore an additional responsibility to supervise so as to prevent the
type of selling practices engaged in by the other salesmen.  Not only
did he fail in such supervision but himself engaged in the same type
of misleading statements and concealment of material information.  Both
Clare and Freedman, the record discloses, importuned other salesmen
to sell Alaska stock.  For example, one of the persons hired as a part-
time salesman testified that both Freedman and Clare at informal
meetings of the sales force told salesmen "Get out there and do
something.  We've got a business to run here.  We've got to make money."
"Get out and sell Alaska."  The same employee further testified that
Clare asked him to listen while he (Clare) spoke to a potential
investor so the employee could learn the techniques of selling.  In
a conversation which thereupon followed Clare informed a potential
investor that he expected Alaska to rise to about $1.25 in a three or
four-month period.  There is nothing in the record indicating that

- 29 -

either Clare or Friedman ever stressed to salesmen the necessity of
informing customers of the inherent risks involved in the purchase of
a speculative security such as Alaska. Nor is there evidence that any
of them told customers of Alaska's substantial accumulated loss or that
no current information concerning Alaska was available. The sales
techniques used by each of them fell far short of dealing fairly with
customers.

In the light of the record in the instant case the hearing
examiner finds that Freedman, Clare and Summers made false and mislead-
ing statements to customers regarding Alaska, failed to disclose
essential information known to or reasonably ascertainable by them and
in general each of them have demonstrated a lack of understanding of
their legal and ethical obligation to deal fairly with customers. In
their relationship with customers, trust and confidence had been devel-
oped between each of them and their customers so that customers relied
on the advice furnished and each of them had a duty to act in the
customers' best interests. The record demonstrates and the hearing
examiner finds that Freedman, Clare and Summers failed to so act. More-
over, Freedman, Clare and Summers are associated with firms which are
members of the NASD. Article III, section 2, of the Rules of Fair
Practice of that organization provides that -

> "In recommending to a customer the purchase.....
> of any security, a member shall have reasonable grounds
> for believing that the recommendation is suitable for
> such customer on the basis of the facts, if any, dis-
> closed by such customer as to his other security holdings
> and as to his financial situation and needs."

As noted above, neither Freedman, Clare nor Summers made any effort to

- 30 -

determine whether Alaska was suitable for such customer nor did they
ascertain the customer's financial situation or his needs.

The hearing examiner concludes it is in the public interest
to bar Freedman, Clare and Summers from being associated with a broker
or dealer.

The hearing examiner is required to determine what, if any,
remedial action is appropriate in the public interest as to Clare & Co.
and Towne. Clare and Summers are the sole partners of Clare & Co.
Clare and Summers were found to have willfully violated and aided and
abetted registrant's violation of the anti-fraud provisions of the
Securities acts and each of them were found to have failed to discharge
their fiduciary obligation to treat customers fairly. The hearing
examiner concluded that each of them be barred from association with a
broker or dealer. Under the circumstances a firm composed of two such
persons should not be permitted to deal with the public. The hearing
examiner finds that pursuant to Section 15(b) of the Exchange Act, as
amended, it is in the public interest to revoke the registration of
Clare & Co. as a broker or dealer and pursuant to Section 15A(b) of
the Exchange Act it is the public interest to expel Clare & Co. from
membership in the NASD.

In light of the findings that Freedman willfully violated and
aided and abetted registrant's violation of the anti-fraud provisions
of the Securities Acts, that he failed to discharge his fiduciary obli-
gation to treat customers fairly and that he failed reasonably to

- 31 -

supervise persons subject to his supervision with a view to preventing violations of such statutes it was concluded that he be barred from association with a broker or dealer.  Under the circumstances a firm in which Freedman owns all of the stock should not be permitted to deal with the public.  The hearing examiner finds that pursuant to Section 15(b) of the Exchange Act, as amended, it is in the public interest to revoke the registration of Towne as a broker or dealer and pursuant to Section 15A(b) of the Exchange Act it is in the public interest to expel Towne from membership in the NASD.

Irving Schiller
Hearing Examiner

Washington, D. C.
October 15, 1965

EXHIBIT B

PREC14C 1 aug20-02sch14a.htm

PRELIMINARY COPY - SUBJECT TO COMPLETION - DATED AUGUST [__], 2002

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

SCHEDULE 14A INFORMATION

Consent Revocation Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934
(Amendment No. )

Filed by the Registrant [X]

Filed by a party other than the Registrant [  ]

Check the appropriate box:

[X] Preliminary Consent Revocation Statement

[  ] Confidential for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

[  ] Definitive Proxy Statement

[  ] Definitive Additional Materials

[  ] Soliciting Material Pursuant to Section 240.14a-11(c) or Section 240.14a-12

ELITE PHARMACEUTICALS, INC.
(Name of Registrant as Specified In Its Charter)

N/A

(Name of Person(s) Filing Proxy Statement if other than Registrant)

Payment Filing Fee (Check the appropriate box):

[X]       No fee required.

[  ]      Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

(1) Title of each class of securities to which transaction applies:

N/A

(2) Aggregate number of securities to which transaction applies:

N/A

(3) Per unit price or other underlying value of transaction computed
pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee
is calculated and state how it was determined):

N/A

(4) Proposed maximum aggregate value of transaction:

N/A

(5) Total fee paid:

N/A

[  ] Fee paid previously with preliminary materials.

[  ] Check box if any part of the fee is offset as provided by Exchange Act
Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid
previously. Identify the previous filing by registration statement number, or
the Form or Schedule and the date of its filing:

(1) Amount Previously Paid:

N/A

(2) Form, Schedule or Registration Statement No.:

N/A

(3) Filing Party:

N/A

(4) Date Filed:

N/A


[ELITE PHARMACEUTICALS LETTERHEAD]


Dear Stockholder:

The Board of Directors of Elite Pharmaceuticals is writing to you today to inform you that Harris Freedman, Bridge Ventures, Inc., Bridge Ventures, Inc. Employee Pension Plan, SMACS Holding Corp., Sharon Will, Saggi Capital Corp., Saggi Capital Corp. Money Purchase Plan, Saggi Capital Corp. Profit Sharing Plan, and Michael H. Freedman (all of them affiliated with Harris Freedman and/or Sharon Will, together referred to in this letter as the "Freedman Group") are seeking to gain control of your Company by removing three of the current members of your Board of Directors, without cause, all of whom are independent directors and replacing them with their own hand-picked nominees. The Freedman Group refers to itself as the "Elite Value Committee"; however, the Freedman Group is not affiliated with the Company other than through its members' ownership of some of the Company's securities. We believe that the motives and objectives of the Freedman Group are questionable and self-serving and are not in the best interests of the Company and its other stockholders.

Your current Board of Directors and management are committed to enhancing stockholder value for all stockholders. We continue to implement the Company's strategic plan and have been taking steps to continue to improve the Company's performance.

For all of the reasons discussed in the materials included with this letter, we strongly urge you to REJECT the solicitation made by the Freedman Group and NOT sign any WHITE consent card they send you. Each member of the Board of Directors who is a stockholder of the Company is rejecting the Freedman Group's proposals.

In order to REJECT the Freedman Group's proposals the Board unanimously recommends that you sign, date and mail the enclosed BLUE Consent Revocation Card today. Even if you have previously signed the Freedman Group's WHITE consent card, you have every right to REVOKE YOUR CONSENT by voting the BLUE Consent Revocation Card.

In order to be sure that you are revoking a prior consent, you must either mark the "Revoke Consent" boxes on the BLUE Consent Revocation Card or sign the BLUE Consent Revocation Card without marking any boxes. If you do not mark any box for any one or more of the proposals on the BLUE Consent Revocation Card and you sign and return the Card, you will be deemed to have revoked any previously signed consent to any proposal you did not mark.

Thank you for your continued interest and support.

Very truly yours,

Atul M. Mehta, Ph.D

President and Chief Executive Officer for
The Board of Directors


CONSENT REVOCATION STATEMENT
BY THE BOARD OF DIRECTORS OF ELITE
PHARMACEUTICALS, INC. IN OPPOSITION TO THE
SOLICITATION OF CONSENTS BY HARRIS FREEDMAN,
BRIDGE VENTURES, INC., BRIDGE VENTURES, INC. EMPLOYEE PENSION PLAN,
SMACS HOLDING CORP., SHARON WILL, SAGGI CAPITAL CORP., SAGGI CAPITAL CORP.
MONEY PURCHASE PLAN, SAGGI CAPITAL CORP. PROFIT SHARING PLAN
AND MICHAEL H. FREEDMAN

This Consent Revocation Statement and the accompanying BLUE Consent Revocation Card are being furnished by the Board of Directors of Elite Pharmaceuticals, Inc., a Delaware corporation ("Elite", the "Company", "we" or

"us"), to the holders of the outstanding shares of Elite's common stock in opposition to the solicitation by Harris Freedman ("Freedman"), Bridge Ventures, Inc., Bridge Ventures, Inc. Employee Pension Plan, SMACS Holding Corp., Sharon Will ("Will"), Saggi Capital Corp., Saggi Capital Corp. Money Purchase Plan, Saggi Capital Corp. Profit Sharing Plan and Michael H. Freedman ("M. Freedman" and, with Freedman, Will and each of the other entities in the foregoing list, the "Freedman Group").

The Freedman Group is soliciting consents in favor of two separate proposals (collectively, the "Freedman Group's Proposals"), which are designed to effect the replacement of three of your four duly elected directors (and all of the independent directors of the Company) with their slate of under-qualified nominees. We are asking you to oppose the Freedman Group's Proposals because:

o       The Freedman Group is self-interested.

o       Your Board believes that Elite is at a critical juncture and that any change in our management could substantially jeopardize our future growth and success.

o       The Freedman Group has not communicated any specific business plan.

o       The Freedman Group has no relevant past business experience in our industry or our core businesses.

o       We believe that the Company's current Board, whom you elected, and management are in the best position to evaluate the strategic alternatives available to Elite and to decide on the courses of action that are in the best interests of all of the Company's stockholders.

o       The Freedman Group does not have the necessary integrity to lead the Company.

We unanimously oppose the consent solicitation by the Freedman Group and urge you NOT TO SIGN the WHITE consent card that they sent to you.

Even if you previously signed and returned the WHITE consent card, you have every right to revoke your consent. We urge you to sign, date and mail the enclosed BLUE Consent Revocation Card today in the postage-paid envelope provided. Your prompt action is very important.

In order to be sure that you are revoking a prior consent, you must either mark the "Revoke Consent" boxes on the BLUE Consent Revocation Card or sign the BLUE Consent Revocation Card without marking any boxes. If you do not mark any box for any one or more of the proposals on the BLUE Consent Revocation Card and you sign and return the Card, you will be deemed to have revoked any previously signed consent to any proposal you did not mark.

If any of your shares are held in the name of a bank, broker or other nominee, please contact the person responsible for your account today and direct him or her to vote the BLUE Consent Revocation Card immediately.

This Consent Revocation Statement and the enclosed BLUE Consent Revocation Card are first being mailed to stockholders beginning on or about August [__], 2002.

If you have any questions or need assistance in voting your shares, please contact the firm assisting the Company in this solicitation of consent revocations:

[_____]

QUESTIONS AND ANSWERS ABOUT THIS REQUEST
FOR CONSENT REVOCATION

Q:      WHO IS MAKING THE REQUEST FOR REVOCATION?

A:              This Request is being made by your duly elected Board of
                Directors, including all of the independent directors.

Q:      WHAT ARE WE ASKING YOU TO DO?

A:              We are asking you to oppose the solicitation made by Harris Freedman,
                Bridge Ventures, Inc., Bridge Ventures, Inc. Employee Pension Plan,
                SMACS Holding Corp., Sharon Will, Saggi Capital Corp.,
                Saggi Capital Corp. Money Purchase Plan, Saggi Capital Corp.
                Profit Sharing Plan, and Michael H. Freedman, all of whom are affiliated
                with Harris Freedman and/or Sharon Will.
                They are seeking to gain control of your Board by
                replacing three of your four duly elected directors (and all of the independent directors
                with their slate of under-qualified hand-picked nominees.
                To oppose them, you can withhold your consent from their

proposals, or, if you have already given your consent, you can revoke it.

The Members of the Board of Directors who are stockholders of the
Company have advised the Company that they intend to reject the Freedman Group's proposals.

Q:     WHY ARE WE ASKING YOU TO REVOKE YOUR CONSENT?

A:     We are asking you to oppose the Freedman Group's Proposals because we
believe that your current Board and management are in the best
position to operate Elite's business and to evaluate its strategic alternatives.
We are committed to enhancing stockholder value for all
of Elite's stockholders.  While current management has developed
and executed a strategic plan to improve the Company's
performance, the Freedman Group has self-interested motives for its
consent solicitation and has no specific plans for improving stockholder
value.  The Freedman Group has expressly stated that it will extend the term
of some of the Company's warrants, which extension will directly benefit it.
In addition, the Freedman Group only speaks in broad generalities that are not
applicable to Elite's business.

Q:     WHO ARE THE FREEDMAN GROUP'S NOMINEES?

A:     The Freedman Group's nominees are Harris Freedman, Sharon Will
and Michael H. Freedman (the son of Harris Freedman), none of whom
are currently affiliated with Elite and none of whom has had any relevant
experience in Elite's core businesses.  Companies affiliated with
Harris Freedman and Sharon Will had performed consulting services
for the Company in the past.  The consulting services were
discontinued for poor performance reasons.

The one current Elite director who the Freedman Group is not
seeking to replace, Dr. Atul M. Mehta, has not consented to serving on a Board comprised
of the Freedman Group's nominees.  The Company's future success is substantially
dependent on Dr. Mehta's remaining an officer and director of the Company.

Q:     WHO CAN WITHHOLD OR REVOKE THEIR CONSENT?

A:     If you already sent in a WHITE consent card, you can send in a BLUE
Consent Revocation Card to revoke your consent to one or more of
the Freedman Group's Proposals. If you owned Elite shares on August 5, 2002,
you have the right to send in a BLUE Consent Revocation Card.

Q:     HOW MANY SHARES MUST BE VOTED IN FAVOR OF THE FREEDMAN GROUP'S PROPOSALS TO IMPLEMENT THEM?

A:     The Freedman Group must receive consents from stockholders who hold
a majority of Elite's outstanding shares for their Proposals to be adopted.
As of August 5, 2002, Elite had 9,728,116 shares of common stock
outstanding.  Each share is entitled to one vote. Therefore, the affirmative
vote of at least 4,864,059 shares is necessary to effect the Freedman Group's
Proposals.  Abstentions, failures to vote and broker non-votes will have the
same effect as a "no" vote.

Q:     WHAT SHOULD YOU DO TO REVOKE YOUR CONSENT?

A:     Sign, date and return the enclosed BLUE Consent Card Revocation
TODAY to [_____] in the postage paid envelope provided.

Q:     WHO DO YOU CALL IF YOU HAVE QUESTIONS ABOUT THE CONSENT REVOCATION?

         A:     Please call [_____] at [_____].


                    OUR REASONS FOR OPPOSING THE FREEDMAN GROUP'S PROPOSALS
                       AND RECOMMENDING THAT YOU OPPOSE THEM TOO

The Freedman Group's Proposals are designed to enable the Freedman Group to
take control of your Elite Board.  We believe that the Freedman Group's consent
solicitation is a self-interested attempt to extend the expiration of Elite's
Class A Warrants held by the Freedman Group, and to take control of Elite
without presenting any specific plan for increasing stockholder value.

Elite's Board of Directors  strongly believes that the arguments set forth
by the Freedman Group are seriously flawed and  misinformed.  The Members of the
Board of Directors who are  stockholders of the Company have advised the Company
that they intend to reject the Freedman Group's proposals.

The Board of Directors of the Company unanimously believes  that the
Freedman Group's Proposals are not in the best interests of the Company's
stockholders and urges stockholders to reject them.  YOUR BOARD OF DIRECTORS
REQUESTS THAT YOU SIGN,  DATE AND RETURN THE ENCLOSED  BLUE CONSENT REVOCATION

CARD, WHETHER OR NOT YOU HAVE PREVIOUSLY SIGNED AND RETURNED THE WHITE CONSENT CARD SOLICITED BY THE FREEDMAN GROUP.

Your Board of Directors is, and has always been, committed to increasing stockholder value for all stockholders. We have implemented several long-term, strategic initiatives to enhance stockholder value. See "THE COMPANY". For example, we:

o    expanded our product portfolio to include over 15 branded and generic oral drug delivery products, some which are being developed with our partners.

o    focused greater attention and resources on branded delivery products.

o    consulted with a nationally recognized investment bank that is assisting the Company in identifying potential strategic transactions.

o    interviewed individuals to assist the Company with business development opportunities to augment the assistance provided on a regular basis by the Members of the Board of Directors in this area.

As your duly elected Board of Directors, it is our duty to identify for you our deep and serious concerns about the Freedman Group. We will describe these concerns in greater detail later in this document; however, we have highlighted a number of these below:

o    One of the stated principal purposes of the Freedman Group for soliciting the consents is to extend the expiration date of Class A Warrants held by the Freedman Group, which extension will benefit the Freedman Group at the expense of the other stockholders and will require the Company to incur expenses of over $1 million.

o    Harris Freedman, Sharon Will and Michael H. Freedman have no relevant experience in Elite's core businesses.

o    Harris Freedman has previously violated the Federal securities laws in his dealings with other public companies.

o    The Freedman Group has no real plans. Their solicitation materials speak in broad terms and hypothetical, conceptual strategies. The Freedman Group claims to know how to improve Elite's performance, but they have not offered anything other than rhetoric and generalities.

In addition, the Freedman Group's Proposals could end up costing you money for the following reasons:

The extension of the Class A Warrants as desired by the Freedman Group would require the Company to incur expense in excess of $1 million.

The Freedman Group wants to hire at direct expense to the Company a Chief Financial Officer and a Chief Operating Officer of the Company, yet they articulate no rationale for those hires other than public companies should have those officers. In fact, the Company already has a Chief Financial Officer (Mark I. Gittelman, who serves in that capacity on a part-time basis) and a director of operations, both of whom fully meet all of the Company's needs with regard to finances and operations given the Company's current level of operations. The Company's auditors have never commented to the Company's management that the Company's finance personnel are not capable of meeting all of the Company's accounting and control needs. In the event that the Company concludes that it requires a full time chief financial officer or other operations personnel, it will seek those additional personnel to its management team. In addition to relying on its existing personnel, the Company relies on the members of its Board of Directors for strategic and operational assistance. The members of the Board of Directors frequently participate in the negotiation of transactions on the Company's behalf.

If the Freedman Group is successful, their solicitation materials indicate that they will seek to have the Company reimburse them for their solicitation expenses, which their materials estimate will be $[____].

THE COMPANY

Business Strategy

    In an effort to increase value to the Company and its stockholders, we are now focusing on the development of branded delivery products (which require new drug applications ("NDA")). Our initial strategy was primarily to develop generic drug delivery products (which require abbreviated new drug applications ("ANDA")). The reasons for implementing this refined strategy are as follows:

o    the period of exclusivity for branded products is 3 years versus 6 months for generic drugs.

- o    branded development allows us to enter into collaborations with other pharmaceutical companies.

- o    branded development presents an opportunity to license products to drug companies earlier, which could result in cash flow before the eventual filing with the Food and Drug Administration ("FDA") and approval of products.

- o    the competition in the generic drug industry continues to increase.

- o    increased litigation with large branded drug marketers is delaying the release of some generic drug products.

We intend to license the marketing rights of our generic products to larger generic companies for sales, distribution and marketing, while retaining manufacturing rights and royalties and/or profit sharing for those products. We plan to license our branded products at an early stage, while retaining the manufacturing rights. This strategy will allow us to pursue NDA filings, which requires larger resources. We intend to continue to collaborate in the development of five products with our current partners. We also plan to seek additional collaborations to develop more products and have had discussions with a number of potential parties in this area.

Our revised business strategy enables us to reduce our risk by

- o    diversifying our product portfolio to include both branded and generic products in various therapeutic categories.

- o    building collaborations and establishing licensing agreements with companies with greater resources.

In addition to retargeting our goals and reviewing how our resources are expended, we have taken the following steps to better position the Company for success:

- o    we initiated a relationship with a nationally recognized investment banking firm, RBC Dain Rauscher Wessels, with regard to possible strategic transactions, well before the Freedman Group initiated its consent solicitation.

- o    we are interviewing candidates to join the Company's management as the head of business development.

- o    we are in the initial stages of negotiating the acquisition of a pharmaceutical plant, that would entail the manufacture by Elite of several existing products with established cash flow. The negotiations for this acquisition are in the initial stages and there can be no assurance that the Company will be able to reach acceptable terms to complete this acquisition.

Collaborations

Our joint development and operating agreement with Elan Pharmaceuticals consists of developing three pain and neurology products using the drug delivery technologies and expertise of both companies. Our first product has successfully completed Phase I study and the second product is anticipated to enter Phase I testing this year. The third product formulation development also began in the past quarter.

In June 2001, we established two separate development and licensing agreements with a U.S pharmaceutical company to develop two products in exchange for development fees, certain payments, royalties, and manufacturing rights.

Intellectual Property

To date, we have been issued three patents in the United States in connection with a controlled-release formulation of nifedipine, controlled released nifedipine formulations and for pulsed-released delivery systems for methylphenidate. The patent for pulsed-released delivery systems for methylphenidate was assigned to Celgene Corporation and was subsequently licensed to Novartis. We have filed two more patent applications and the Company intends to file additional patent applications in the future; however, there can be no assurance that any of these or any future patents will be granted.

Financial Performance

Our revenues for the year ended March 31, 2002 were $1.2 million, compared to $0.1 million for the fiscal year ended March 31, 2001. Our cash position of approximately $6.5 million continues to be strong. Our net cash used in operating activities in fiscal year 2002 was approximately $1.5 million. We believe that our existing cash-on-hand will provide us with sufficient resources to allow us to implement our business strategy, although no assurances can be given that we will have sufficient resources to complete our business plan

without needing additional capital. Our audited financial statements for the fiscal year ended March 31, 2002 are included in our Annual Report on Form 10-K which is available without charge to each person solicited, upon the written request of any such person. Such request should be directed to Mark I. Gittelman, Elite Pharmaceuticals, Inc., 165 Ludlow Avenue, Northvale, New Jersey 07647.

The Outlook for Elite

Our policy has been to refrain from making public announcements of preliminary results or contemplated agreements. The strategy has also been to avoid large cash transactions that entail sacrifices in Elite's long-term interests.

With our broad technology pipeline, expanded research and development activities, FDA and DEA registered facility, and alliances with large pharmaceutical companies, we believe the Company is strategically positioned for accelerated growth. In preparation for this growth, we have expanded our staff to allow for greater resources to be devoted to research and development activities.

Elite's Development of Products

We have expanded our product portfolio to include over 15 branded and generic oral drug delivery products, some of which are being developed with our partners. These products are:

o        Two products in the pain and central nervous system categories are being developed in our joint venture with Elan. These products are intended to compete in a market that exceeds $2 billion.

o        Two products in the allergy/decongestant category are being developed for a US pharmaceutical company. These products will also compete in a market of over $2 billion.

o        Additional products are being developed solely by Elite for treatment of the following conditions: cardiovascular, arthritis, diabetes, infection and central nervous system disorders. There can be no assurances that any of the Company's products will receive approval from the FDA or other governmental authorities.

Among the products in our current proprietary pipeline, several have completed Phase I bioavailability studies, some of which are being scaled up for pivotal studies. Others are in the formulation development phase.

THE FREEDMAN GROUP

The Freedman Group's Self-Interested Agenda

On July 14, 1998 and September 20, 1999, the Company issued Class A Warrants covering 250,000 shares of common stock in the aggregate to Bridge Ventures, Inc. ("Bridge"), an entity controlled by Harris Freedman, and on December 17, 1998 and September 20, 1999, the Company issued Class A Warrants covering 100,000 shares of common stock in the aggregate to Saggi Capital Corp. ("Saggi"), an entity controlled by Sharon Will. The exercise price of the Class A Warrants issued to each of Bridge and Saggi is $6.00 per share. The warrants were issued in connection with consulting services performed for the Company by Bridge and Saggi, entities controlled by Harris Freedman and Sharon Will, respectively. The Class A Warrants issued to Bridge and Saggi expire on November 30, 2002.

On December 31, 2001 in the case of Bridge and June 30, 2002 in the case of Saggi, the Company concluded that the consulting services being provided were not satisfactory and elected to discontinue the consulting arrangements.

Beginning in or about June 2002, Harris Freedman and Sharon Will, on behalf of Bridge and Saggi, began urging Dr. Atul M. Mehta, Elite's President and Chairman of the Board, to extend the term of the Class A Warrants, which were due to expire in November 2002. Freedman and Will pressured the Company to extend the warrants immediately, and implied unspecified consequences to the Company if the warrants were not extended. At no time during these discussions did Freedman or Will mention any of the matters expressed by the Freedman Group as justification for its consent solicitation.

Elite investigated whether extending the term of the warrants would have any adverse effect on the Company. The Company's independent accountants advised the Company that it would be required to incur an expense of $1.4 million if the expiration of the warrants were extended. The Company solicited a second opinion from KPMG, which advised that the charge would be approximately $1.1 million. The Board of Directors considered the information received from its accountants and other advisors and concluded on July 18, 2002 that it was not in the best interests of the Company or its stockholders to extend the expiration date of

the Class A Warrants.

While the Board considered Freedman and Wills' request to extend the term
of the warrants, they began exerting greater pressure on the Company. On the day
of the July 18 Board meeting, Freedman filed a Schedule 13-D with the SEC,
stating that as a result of the Company's "recent performance" he intended to do
certain unspecified things to "enhance shareholder value". Freedman sent copies
of the filing to the Board of Directors by fax prior to the meeting.

Dr. Mehta and the other Elite directors received several phone calls and
faxes prior to the beginning of the July 18 meeting from persons known to have a
close relationship with Freedman and Will, demanding extension of the Class A
Warrants. Notwithstanding the pressure from Freedman and Will, the Board
unanimously voted against extension. The Board took into consideration the
following factors:

o       The stockholders had no expectation when they acquired the Class A
        Warrants that they would be extended.

o       The Class A Warrants are registered, and they were in the money for many
        months. As such, the holders had adequate time to exercise or trade out
        of their position.

o       The Company would incur an accounting charge of over $1,000,000. The
        Board believed that the charge would have a negative impact on the trading
        value of the Company's stock.

o       The extension would benefit the warrantholders at the expense of other
        stockholders.

o       The extension of the Class A Warrants would not guarantee that the issue
        of the expiration date would not arise again when a new expiration date approached.

o       the Board believed that the Company had no obligation to extend the term
        of the warrants and that the extension might be inconsistent with the fiduciary
        duties of the Board of Directors.

o       The possible capital inflow that may arise from the exercise of the Class A
        Warrant is not guaranteed and would almost certainly be at the end of the
        extended term, if at all. Further, the Company had (and has) adequate
        cash to meet its current and anticipated needs and believes that it could raise
        additional capital from the capital markets if the need arises.

On July 24, 2002, Elite filed a Current Report on Form 8-K confirming that
it was not extending the expiration date of the Class A Warrants.

The Board has scheduled the Company's annual meeting of stockholders for
October 31, 2002. The Company has no plans to postpone that meeting, nor has the
Company in the past postponed its annual meeting of stockholders. The Company
believes that the Freedman Group elected to pursue the consent solicitation
because the expiration date of the Class A Warrants might pass before the
Freedman Group gained control of the Board and extended the expiration date. In
addition, the Freedman Group claims that its consent solicitation might be the
last opportunity to change the composition of Elite's Board. Again, the Company
questions the Freedman Group's logic because the Board must stand for election
every year.

The Freedman Group's Nominees

The Freedman Group's nominees for the Board are Harris Freedman, Sharon
Will and Michael H. Freedman. Their lack of knowledge about Elite's core
businesses is apparent.

According to information provided by the Freedman Group, Harris Freedman is
a business consultant, but the Freedman Group did not disclose the businesses or
industries to which he has consulted.

According to information provided by the Freedman Group, Sharon Will is
involved in investor relations services, but the Freedman Group did not disclose
the businesses or industries to which she provides services or how those
services qualify her to be a director of the Company.

According to information provided by the Freedman Group, Michael H.
Freedman is a corporate lawyer with no relevant industry experience and is the
son of Harris Freedman.

The information provided by the Freedman Group makes no reference to any of
Harris Freedman, Sharon Will or Michael H. Freedman having served on a board of
directors nor having any experience in developing, manufacturing or marketing
pharmaceutical products.

By contrast to the Freedman Group's nominees, your existing Board of Directors has significant experience both in the pharmaceutical industry and in the investment community. Its members also enjoy spotless reputations in the industry, which is critical for a business dealing with the FDA and the capital markets. Our current board members actively participate in the strategic management of the Company. A loss of the board members will mean losing valuable pharmaceutical industry experience and hands-on involvement. In addition, the one current Elite director who the Freedman Group is not seeking to replace, Dr. Atul M. Mehta, has not consented to serving on a Board comprised of the Freedman Group's nominees. The Company is highly dependent on Dr. Mehta's research and formulation abilities as well as his ability to develop products attractive to the market. Elite's success depends a great deal on Dr. Mehta's ability to interact with the Board.

The Freedman Group Does Not Understand Elite or Its Business

The Freedman Group criticizes the Company for not filing any Treatment IND, ANDA or NDA with the FDA since 1997. That criticism reveals their unfamiliarity with the pharmaceutical industry. Some of the products the Company is developing do not require investigative new drug applications before initiating Phase I studies. Moreover, the lack of filings bears no relationship to the development of new products, and the Company intends to file directly or through partners/licensees/collaborators the necessary application for its products.

The Freedman Group's solicitation materials also cite Elite's failure to enter into any new license or joint venture agreements as a justification for replacing three of the members of the Board of Directors. The Company completed two such transactions in the past two years and is currently evaluating other possible ones. We have acted conservatively in entering into any new joint venture or licensing agreements, to maximize the value to the Company and its stockholders of the products that are under development. Moving too quickly to enter into those agreements could compromise the Company's ability to recover its research and development costs or to make a profit on those products.

While it is easy for the Freedman Group to criticize that which it does not know or understand, the cost of acting without the requisite knowledge can be severe. Without having management that is familiar with FDA requirements, has sound knowledge of the pharmaceutical industry and possess solid reputations in the industry, the Company will be at a significant competitive disadvantage.

The Freedman Group Has No Real Plans For The Company

The Freedman Group is asking you to support their slate of nominees for the Board of Directors without having offered you a comprehensive, industry-specific business plan. They are asking for your support without telling you how they plan to increase stockholder value. Their attempt at a business plan appears to call for hiring two new executives, retaining an investment banker and extending the term of the Class A Warrants. Nowhere do they explain how they would operate the Company differently or improve the Company's performance. It is possible that they are not providing any of this detail because they have not yet undertaken this analysis, or because they cannot undertake the analysis since they do not know or understand our industry or our Company.

Our business strategies include tangible, ongoing changes and initiatives that have been explained to stockholders over the last year and are beginning to bear positive results. You can see the successful results of our business plan by the performance of the Company. Our strategic, industry-specific business plan has begun to yield positive results, while the Freedman Group has yet to show you any real plan at all.

Elite's Stock and Warrant Price

One of the accusations made by the Freedman Group is that the current Board of Directors has caused the decline in the stock price of Elite. The price of Elite stock has declined over the past months along with the vast majority of publicly traded stocks over that period. The bio-tech industry has been particularly hard hit. Yet, Elite has outperformed the Nasdaq Biotech index, both on a two-year and year-to-date basis. While the Freedman Group has criticized the performance of the Company's stock price, the Company has done better than other companies with which the Freedman Group is associated.

The Freedman Group also draws attention to the fact that the price of the Class A Warrants has declined, making the inference that this decline is also due to mismanagement of the Company. At the time the Class A Warrants were issued, they had an expiration date of November 30, 2002. This has not changed. Under the Black-Scholes option pricing model, the fair market value of a warrant declines as its expiration date approaches. The warrants will have no value upon their expiration.

What the Freedman Group Didn't Tell You

According to information obtained by the Company,

o       in 1967 Harris Freedman pleaded guilty to criminal charges that he conspired to violate the anti-fraud provisions of the Securities Act of 1933, as amended (the "Securities Act"), and that he directly violated the anti-fraud provisions of the Securities Act by intentionally misleading investors.

o       the Securities and Exchange Commission barred Harris Freedman from associating with a registered broker-dealer for willfully violating the anti-fraud provisions of the Securities Act and the Securities Exchange Act of 1934, as amended, and revoked the registration of a brokerage firm of which Mr. Freedman was president as a result of its finding that Mr. Freedman intentionally misled invest.

o       Finally, in 1999, Harris Freedman and Ms. Will, who is a member of Mr. Freedman's group, were named as defendants in a lawsuit filed in the United States District Court of New Jersey agreeing, among other things, that Mr. Freedman and Ms. Will manipulated the trading price of a public company for their own benefit.

<div align="center">
THE ROUTE THE FREEDMAN GROUP CHOSE TO ATTEMPT TO TAKE<br>
CONTROL OF YOUR BOARD OF DIRECTORS WILL NOT RESULT<br>
IN THE PAYMENT TO YOU OF ANY CONTROL PREMIUM
</div>

People who seek control of a company usually either make a proposal to the board of directors to buy the company, or, if the board refuses their proposal, they commence a tender offer for the outstanding shares. In either case, a person trying to obtain control of a company this way usually offers a control or sales premium to the stockholders, that is, they pay more than market value for the shares. That excess price is called a control premium.

In contrast, control premiums generally are not paid when a change in management has occurred as a result of a consent solicitation. By starting a consent solicitation to replace Elite's Board of Directors, the Freedman Group has chosen to attempt to gain control of the Company using a method that, although legal, does not include the payment of a control premium (or anything at all) to stockholders.

Each of the Freedman Group's Proposals is designed to enable it to take control of the Board that YOU elected and which contains the independent directors by replacing a majority of the Board with their own underqualified hand-picked nominees. We believe that their consent solicitation is an attempt to pressure you without giving you the opportunity to consider all of Elite's strategic alternatives. We believe that this undue pressure created by the Freedman Group is not in the Company's or your best interests. The Freedman Group's Proposals are:

    (1) Removal of three present members of the Elite Board without cause, Donald S. Pearson, Harmon Aronson and Eric L. Sichel and any person or persons elected to the Elite Board to fill any vacancy arising since the last annual meeting of stockholders or any newly created directorships; and

    (2) Election of the Freedman Group's slate, Harris Freedman, Sharon Will and Michael H. Freedman, to the Board of Directors to fill the newly created vacancies on the Board, and to serve until their respective successors are duly elected and qualify.

For the reasons discussed above, we have determined that the Freedman Group's Proposals are not in the best interests of you or Elite. The above discussion of reasons and factors considered by us is not intended to be exhaustive, but does reflect the material information and factors we considered in our review and analysis of the Freedman Group's Proposals. In view of the variety of factors and the amount of information considered, we did not find it practicable to provide specific assessments of, quantify or otherwise assign any relative weights to, the specific factors considered in determining to recommend that you reject the Freedman Group's Proposals. Our determination was made after we considered all the factors taken as a whole. In addition, some of the members of our Board of Directors may have given differing weights to different factors. Throughout our deliberations regarding the Freedman Group's Proposals, we received advice from James, McElroy & Diehl, P.A. and Lowenstein Sandler PC in connection with the Freedman Group's Proposals and related matters.

WE UNANIMOUSLY OPPOSE THE FREEDMAN GROUP'S CONSENT SOLICITATION AND URGE YOU NOT TO SIGN THE WHITE CONSENT CARD THAT THEY SENT TO YOU.

Even if you previously signed and returned the WHITE consent card, you have every right to change your vote. We urge you to sign, date and mail the enclosed BLUE Consent Revocation Card in the postage-paid envelope provided. Your prompt action is very important. Please return the BLUE Consent Revocation Card today.

If any of your shares are held in the name of a bank, broker or other nominee, please contact the person responsible for your account today and direct him or her to vote the BLUE Consent Revocation Card immediately.

If you have any questions about giving your revocation of consent or require assistance, please call [_____], the firm assisting the Company in this request for revocations, at:

[_____]

OUTSTANDING ELITE SECURITIES

As of August 5, 2002, there were 9,728,116 shares of Elite common stock outstanding.

THE CONSENT PROCEDURE

Under Section 228 of the General Corporation Law of the State of Delaware ("DGCL"), unless otherwise provided in the certificate of incorporation, any action which may be taken at an annual or special meeting of stockholders of a corporation may be taken without a meeting if consents in writing, setting forth the action so taken, are signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and such consents are duly delivered to the corporation.

Thus, the unrevoked consent of the holders of not less than a majority of the shares of common stock outstanding and entitled to vote on the Record Date (as defined below) must be obtained within the time limits specified to adopt each of the Freedman Group's Proposals. Each share of common stock is entitled to one vote per share. Since consents are required from the holders of record of a majority of the outstanding shares of common stock in order for each of the Freedman Group's Proposals to be adopted, an abstention from voting on the Freedman Group's WHITE Consent Card or a broker non-vote will have the practical effect of a vote against such proposals.

In order to be effective, consents with respect to the Freedman Group's Proposals must be delivered within 60 days of the earliest dated consent with respect to the Freedman Group's Proposals delivered to the Company in the manner required by Delaware law. On August 5, 2002, a consent with respect to 2,000 shares of common stock executed by Harris Freedman and dated August 5, 2002 was delivered to the Company. Accordingly, the record date (the "Record Date") for stockholders entitled to consent is August 5, 2002 and assuming no earlier dated consents are delivered to the Company, the consents will not be effective unless the requisite number of unrevoked consents are delivered to the Company on or before October 4, 2002. As of the Record Date, there were 9,728,116 shares of common stock issued and outstanding.

YOU HAVE THE RIGHT TO REVOKE ANY CONSENT YOU MAY HAVE PREVIOUSLY GIVEN TO THE FREEDMAN GROUP. TO DO SO, YOU NEED ONLY SIGN, DATE AND RETURN IN THE ENCLOSED POSTAGE-PAID ENVELOPE THE BLUE CONSENT REVOCATION CARD WHICH ACCOMPANIES THIS REVOCATION STATEMENT. IF YOU DO NOT INDICATE A SPECIFIC VOTE ON THE BLUE CONSENT REVOCATION CARD WITH RESPECT TO ANY FREEDMAN GROUP PROPOSAL, THE CARD WILL BE USED IN ACCORDANCE WITH THE BOARD RECOMMENDATION TO REVOKE ANY CONSENT WITH RESPECT TO SUCH PROPOSAL.

IF YOU ARE AGAINST THE FREEDMAN GROUP'S PROPOSALS AND HAVE NOT SIGNED A FREEDMAN GROUP CONSENT, YOU MAY SHOW YOUR OPPOSITION TO THE PROPOSALS BY SIGNING, DATING AND RETURNING THE ENCLOSED BLUE CONSENT REVOCATION CARD. THIS WILL BETTER ENABLE THE COMPANY TO KEEP TRACK OF HOW MANY STOCKHOLDERS OPPOSE THE FREEDMAN GROUP'S PROPOSALS.

The Company has retained [_____] to assist in communicating with stockholders in connection with the Freedman Group's solicitation and to assist in our efforts to obtain consent revocations. If you have any questions about how to complete or submit your BLUE consent revocation card or any other questions, [_____] will be pleased to assist you. You may call [_____] at [_____]; Banks and Brokers call [_____].

STOCKHOLDERS ARE URGED TO DELIVER ALL BLUE CONSENT
REVOCATIONS CARDS TO:
[_____]

The Company requests that if you deliver your BLUE Consent Revocation Card to the Company instead of [_____], that you also deliver a photocopy to [_____], so that [_____] will be aware of all revocations.

If any shares of common stock that you owned on the Record Date were held for you in an account with a stock brokerage firm, bank nominee or other similar "street name" holder, you are not entitled to vote such shares directly, but rather must give instructions to the stock brokerage firm, bank nominee or other "street name" holder to grant or revoke consent for the shares of common stock

held in your name. Accordingly, you should contact the person responsible for your account and direct him or her to execute the enclosed BLUE Consent Revocation Card on your behalf.

You are urged to confirm in writing your instructions to the persons responsible for your account and provide a copy of those instructions to the Company so that the Company will be aware of your instructions and ensure that your instructions are followed.

<div align="center">

INFORMATION ABOUT US,
THE PEOPLE ASKING YOU
TO REVOKE YOUR CONSENT

</div>

The table below sets forth the names and ages (as of August 20, 2002) of each of Elite's directors, and the other positions and offices presently held by each of the directors within the Company, the period during which each such person has served on the Board of Directors of the Company, and the principal occupations and employment of each such person during the past five years. In each instance in which dates are not provided in connection with a director's business experience, such director has held the position indicated for at least the past five years.

<div align="center">

DIRECTORS AND EXECUTIVE OFFICERS

</div>

The current directors and the executive officers of the Company are:

| Name | Age | Position |
|------|-----|----------|
| Dr. Atul M. Mehta | 53 | President, Chief Executive Officer and Director |
| Donald S. Pearson | 66 | Director |
| Harmon Aronson | 59 | Director |
| Eric L. Sichel | 43 | Director |
| Mark I. Gittelman | 42 | Chief Financial Officer, Secretary and Treasurer |

There are no arrangements between any director or executive officer and any other person, pursuant to which the director or officer is to be selected as such. There is no family relationship between the directors, executive officers, or persons nominated or chosen by the Company to become directors or executive officers.

Atul M. Mehta, Ph.D., the founder of Elite Laboratories, Inc. ("ELI"), has been a director of ELI since its inception in 1990 and a director of the Company since 1997. He has been employed as the President of ELI since 1990 and President of the Company since 1997. Prior to that, he was Vice President at Nortec Development Associates, a company specializing in the development of food, pharmaceutical and chemical specialty products, from 1984 to 1989. From 1981 to 1984, he was associated with Ayerst Laboratories, a division of American Home Products Corporation in the solids formulation section as Group Leader. His responsibilities included development of formulations of ethical drugs for conventional and controlled-release dosage forms for both USA and international markets. He received his B.S. degree in Pharmacy with honors from Shivaii University, Kolhapur, India, and a BS, MS, and a Doctorate of Philosophy in Pharmaceutics from the University of Maryland in 1981. Other than ELI, no company with which Dr. Mehta was affiliated in the past was a parent, subsidiary or other affiliate of the Company.

Donald S. Pearson, a director since 1999, has been employed since 1997 as the President of Pearson & Associates, Inc., a company that provides consulting services to the pharmaceutical industry. Prior to starting Pearson & Associates, Mr. Pearson served for five years as the Director of Licensing at Elan Pharmaceuticals, and prior to that he was employed by Warner-Lambert for thirty years in various marketing, business development and licensing capacities. Mr. Pearson holds a B.S. in Chemistry from the University of Arkansas and studied steroid chemistry at St. John's University. He has served on the informal advisory board of ELI for several years; other than ELI, no company with which Dr. Pearson was affiliated in the past was a parent, subsidiary or other affiliate of the Company.

Harmon Aronson, Ph.D., a director since 1999, has been employed since 1997 as the President of Aronson Kaufman Associates, Inc., a New Jersey-based consulting firm that provides manufacturing, FDA regulatory and compliance services to the pharmaceutical and biotechnology companies. Its clients include United States and international firms manufacturing bulk drugs and finished pharmaceutical dosage products who are seeking FDA approval for their products for the US Market. Prior to 1997, Dr. Aronson was employed by Biocraft Laboratories, a leading generic drug manufacturer, most recently in the position of Vice President of Quality Management; prior to that he held the position of Vice President of Non-Antibiotic Operations, where he was responsible for the manufacturing of all the firm's non-antibiotic products. Dr. Aronson holds a Ph.D. in Physics from the University of Chicago. Other than ELI, no company with which Dr. Aronson was affiliated in the past was a parent, subsidiary or other affiliate of the Company.

Eric L. Sichel, M.D., a director since August 2, 2001, is President of Sichel Medical Ventures, Inc., Englewood, NJ, which company provides biotechnology company assessments and investment banking services. Dr. Sichel has been the owner and President of Sichel Medical Ventures, Inc. since 1997. From 1995 through 1996, Dr. Sichel was a senior analyst in the biotechnology field for Alex, Brown & Sons, Inc. of New York, NY. Prior to that, Dr. Sichel was affiliated with Sandoz Pharmaceuticals Corp. of East Hanover, NJ, in various capacities, including associate director of transplantation/immunology. Dr. Sichel is licensed to practice medicine by the State of New York.

Mark I. Gittelman, CPA is the President of Gittelman & Co., P.C., an accounting firm in Clifton, NJ. Prior to forming Gittelman & Co., P.C. in 1984, he worked as a certified public accountant with the international accounting firm of KPMG Peat Marwick, LLP. Mr. Gittelman holds a B.S. in accounting from New York University and a Masters of Science in Taxation from Farleigh Dickinson University. He is a Certified Public Accountant licensed in New Jersey and New York, and is a member of the American Institute of Certified Public Accountants ("AICPA"), the Securities and Exchange Practice Section of the AICPA, and the New Jersey State and New York States Societies of CPAs. Other than ELI, no company with which Mr. Gittelman was affiliated in the past was a parent, subsidiary or other affiliate of the Company.

Each director holds office (subject to the Company's By-Laws) until the next annual meeting of stockholders and until such director's successor has been elected and qualified. All executive officers of the Company are serving until the next annual meeting of directors and until their successors have been duly elected and qualified. There are no family relationships between any of the directors and executive officers of the Company.

SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

To the knowledge of the Company, there was no person who, at any time during the fiscal year ended March 31, 2002, was a director, officer, beneficial owner of more than 10% of any class of equity securities of the Company registered pursuant to Section 12 of the Securities Exchange Act of 1934, who failed to file on a timely basis the reports required by Section 16(a) of the Securities Exchange Act of 1934 during the most recent fiscal year.

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The Company is a party to an agreement whereby fees are paid to Gittelman & Co., P.C., a company wholly owned by Mark Gittelman, the Company's Chief Financial Officer, Secretary and Treasurer, in consideration for services rendered by Mr. Gittelman in his capacity as Chief Financial Officer and Treasurer. For the fiscal years ended March 31, 2002 and 2001, the fees paid to that company were $91,260 and $82,639, respectively.

COMMITTEES

The Company has an Audit Committee of the Board of Directors. The Company has no other standing committees of the Board of Directors.

AUDIT COMMITTEE

The Company's Board of Directors has adopted a written charter for the Audit Committee, a copy of which was included as an appendix to the Company's proxy statement sent to stockholders in connection with the annual meeting of stockholders held October 11, 2001.

The Company deems the members of its Audit Committee to be independent as independence is defined in Section 121(A) of the American Stock Exchange Listing Standards.

AUDIT COMMITTEE REPORT

The Audit Committee reviewed and discussed the audited financial statements with management. The Audit Committee discussed with the independent auditors of the Company the matters required to be discussed by SAS 61 (Codification of Statements on Auditing Standards, AU 380), as modified or supplemented. The Audit Committee received the written disclosures and the letter from the independent accountants required by Independence Standards Board Standard No. 1 (Independence Standards Board Standard No. 1, Independence Discussions with Audit Committees), as modified or supplemented. The Audit Committee discussed with the independent accountant the independent accountant's independence. Based upon the foregoing review and discussions, the Audit Committee recommended to the Board of Directors of the Company that the audited financial statements of the Company be included in the Company's Annual Report on Form 10-K for the last fiscal year ended March 31, 2002 as filed with the Securities and Exchange Commission.

The foregoing report of the Audit Committee is made by members of the Audit Committee of the Company: Donald S. Pearson, Harmon Aronson and Eric L. Sichel.

BOARD MEETINGS

The Board of Directors of the Company had three meetings held during the fiscal year ended March 31, 2002. No incumbent director attended fewer than 75% of the aggregate of the meetings of the Board and its Audit Committee during that year.

COMPENSATION OF DIRECTORS

Each non-affiliated director receives $2,000 as compensation for each meeting of the Board of Directors attended.

EXECUTIVE COMPENSATION

The following table provides information on the compensation of Dr. Atul M. Mehta, the chief executive officer of the Company for the last three fiscal years. No other executive officer of the Company received salary and bonus exceeding $100,000 during those periods.

Summary Compensation Table

| | | Annual Compensation | | | Long Term Compensation | | | |
|---|---|---|---|---|---|---|---|---|
| (a)<br>Name and<br>principal<br>position | (b)<br>Fiscal<br>Year | (c)<br>Salary | (d)<br>Bonus | (e)<br>Other<br>Annual<br>Compen-<br>sation | (f)<br>Restricted<br>stock<br>awards | (g)<br>Securities<br>Underlying<br>options | (h)<br>LTIP<br>payouts | (i)<br>All other<br>compen-<br>sation |
| Atul M. | 2001-02 | $272,855 | $30,000 | $83,896 | -- | 50,000 | -- | -- |
| Mehta | 2000-01 | $248,050 | $45,000 | $3,040 | -- | 425,000(1)(2) | -- | -- |
| President | 1999-00 | $227,030 | $25,000 | $3,040 | -- | 500,000 | -- | -- |
| and Chief | | | | | | | | |
| Executive Officer | | | | | | | | |

(1) On December 15, 2000, Dr. Mehta surrendered options for 425,000 shares of the Company's common stock (exercisable at $7.00 per share) and in return received options for 425,000 shares of the Company's common stock exercisable on January 2, 2001 and expiring January 1, 2006. The exercise price is 110% of the opening price of the Company's common stock on January 2, 2001 adjusted upward to the nearest half dollar of $7.00. On January 2, 2001, the stock of the Company opened at $6.25 per share, therefore the exercise price for the stock subject to these options is $7.00 per share.

(2) By action on February 21, 2002, the Board corrected a clerical error in options for 425,000 shares of common stock of the Company previously granted to Dr. Mehta. This correction did not result in any additional shares being subject to options held by Dr. Mehta, any change in the exercise price or a change in any other material terms.

The Company's fiscal year begins April 1 and ends March 31. The information is provided for each fiscal year beginning April 1.

Other Annual Compensation represents use of a company car and premiums paid by the Company for life insurance on Dr. Mehta's life for the benefit of his wife paid by the Company.

Reported below in this report is the purchase by the Company of options from Dr. Mehta. The purchase price for those options of $80,896 is included above in "Other Annual Compensation."

Option Grants in Last Fiscal Year

During the fiscal year ended March 31, 2002, the Board of the Company authorized issuance to Dr. Mehta of options to acquire 50,000 shares of the common stock of the Company, vesting over a period of five years at the rate of 10,000 shares per year beginning February 21, 2003, exercisable at a price equal to 110% of the closing price of the stock on February 21, 2002 ($8.25 per share).

By action on January 25, 2001, the Board purchased options held by Dr. Mehta for 20,214 shares of the Class A common stock of the Company at a price of $4.00 per share. The options carried an exercise price of $2.00 per share. The then current market price for the stock was in excess of $7.50. Dr. Mehta had intended to exercise the option for these shares and then sell the shares. The purchase price for the option arrived at by the Board took into account the amount which would be necessary to purchase the options and cover taxes payable by Dr. Mehta on the transaction.

Option/SAR Grants Table in Last Fiscal Year

| (a)<br>Name | (b)<br>Number of<br>Securities<br>Underlying Options<br>Granted | (c)<br>% Grant Represents<br>of Options<br>to Employees | (d)<br>Exercise or<br>Base Price<br>($/sh) | (e)<br>Expiration date |
|---|---|---|---|---|
| Atul M. Mehta | 50,000 | 2.8% | $8.25 | 2-20-07 |

Options for 500,000 shares which were granted to Dr. Mehta during the fiscal year ended March 31, 2000 vest at the rate of 100,000 shares per year on each December 31 beginning December 31, 2001. The options expire on the earlier of (a) one year after Dr. Mehta ceases to be employed by the Company or to serve as an officer or director of the Company or (b) March 31, 2010. Notwithstanding, the options shall become fully vested and exercisable if Dr. Mehta's employment agreement or his position as an officer and director is terminated by the Company for any reason or if it expires as a result of the Company giving notice of nonrenewal. If the board of directors of the Company votes to approve the acquisition of more than 50% of the stock of the Company by any person or entity, the Company may require Dr. Mehta to exercise or sell the options. In addition to the above stated options, by board action on September 22, 2000, Dr. Mehta was granted a preemptive right to acquire shares of the Company in a sufficient number to maintain his percentage ownership of the shares outstanding. Under this preemptive right, upon issuance by the Company of shares of common stock for any reason, or of securities convertible into common stock upon demand, Dr. Mehta shall be permitted to purchase shares of common stock of the Company sufficient to maintain the greater of his percentage ownership of outstanding common stock of the Company determined on an absolute basis and upon a fully diluted basis as existed prior to the stock issuance. The price which Dr. Mehta shall pay for such stock shall be the lower of (x) the then current market price (discounted 15% if the shares are not registered) or (y) the price to be paid by the party in the transaction triggering the preemptive right. The right shall be exercised and the price shall be paid within 120 days of the issuance of the stock triggering the preemptive right.

Aggregate Option Exercises in Last Fiscal Year and Fiscal Year End Option Value Table

| a<br>Name | b<br>Shares Acquired<br>on Exercise | c<br>Value<br>Realized | d<br>No. of Securities Underlying<br>Unexercised Options<br>at FY-End<br>Exercisable/<br>Unexercisable | e<br>Value of Unexercised<br>In-the-Money Options<br>at FY-End<br>Exercisable/<br>Unexercisable |
|---|---|---|---|---|
| Dr. Atul M. Mehta | None | $0 | 1,025,000/450,000 | $975,000/0 |

These options and the shares underlying them are unregistered, and their market value is unknown and incalculable. However, the registered common stock of the Company was trading for $3.95 per share as of the close of business on August 15, 2002. It is on this hypothetical value that the figures in column (e) are calculated. These figures may have no relation to the actual value of the unexercised options.

EMPLOYMENT AGREEMENT

The only employment agreement which the Company has with an executive officer is the Amended and Restated Employment Agreement entered into [_____], 2002 between the Company and Dr. Atul M. Mehta (the "Agreement"). The Agreement provides:

o       that the Company will employ Dr. Mehta for a period of five years ending December 31, 2005 (unless sooner terminated pursuant to provisions of the Agreement). At the end of the five years, the Agreement will be automatically renewed for an additional five year term with an annual salary to be agreed to, unless either party gives written notice of nonrenewal by December 31, 2004. The Agreement is automatically extended for periods of one year after December 31, 2010 unless either party gives notice of nonrenewal at least one year prior to the date of expiration.

o       for an annual salary of $242,000, which amount is to be increased by the board of directors not less than 10% annually beginning January 1, 2001.

o       that Dr. Mehta will receive 5% of the net profit of the Company each fiscal year.

o       for an annual bonus in an amount determined by the Board.

o       that Dr. Mehta will receive options to purchase Elite common stock at a price

of $10.00 per share in a total amount of 500,000 shares, exercisable in increments of 100,000 shares annually beginning December 31, 2000. The options shall be exercisable from the date of vesting until one year after Dr. Mehta ceases to be employed by the Company or to serve as an officer and director of the Company or March 31, 2010, whichever is earlier.

o     that the options are exercisable by Dr. Mehta if the Agreement or Dr. Mehta's position as an officer and director is terminated by the Company for any reason or if the Agreement is not renewed by the Company.

o     that the Agreement will terminate upon (a) Dr. Mehta's death, (b) election of either party if Dr. Mehta is unable to perform his duties on account of disability for a total period of 120 days or more during any consecutive period of twelve months, (c) by the Company upon "severe cause" and (d) by Dr. Mehta upon the occurrence of certain events.

o     that if the Agreement is terminated due to Dr. Mehta's death, his surviving spouse, or his estate if his spouse does not survive, shall receive Dr. Mehta's salary, incentive commissions, benefits and any deferred compensation accrued through the last day of the third calendar month following the month in which termination occurred; in addition, one-half of his salary would be paid for an additional period of three years.

o     that if the Agreement is terminated by the Company because of Dr. Mehta's disability or upon "severe cause", Dr. Mehta will receive his salary, incentive commissions, benefits and any deferred compensation through the last day of the calendar month in which the termination occurs.

o     that if the Agreement is terminated by Dr. Mehta upon the occurrence of one of the events specified, including a "change in control" as defined, Dr. Mehta will receive all accrued salary, incentive commissions, benefits and any deferred compensation through the later of May 22, 2006 or the third anniversary of such termination.

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS

Shown in the table below is any person (including any "group") known to the Company to be the beneficial owner of more than five percent (5%) of any class of the Company's voting securities as of August 16, 2002.

| Title of Class | Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Common | Dr. Atul M. Mehta, Director/Officer<br>165 Ludlow Avenue<br>Northvale New Jersey 07647 | 2,962,701(1)<br>Direct and<br>Indirect | 26.4% |
| Common | Jerome Belson<br>495 Broadway<br>New York, NY 10012 | 928,00(2)<br>Direct and<br>Indirect | 9.2% |
| Common | John de Neufville and Mely Rahn, Trustees<br>Margaret de Neufville Revocable Trusts<br>197 Meister Avenue<br>North Branch, NJ  08876 | 766,100(3)<br>Direct and<br>Indirect | 7.6% |
| Common | Bakul and Dilip Mehta<br>P. O. Box 438<br>Muscat, Sultanate of Oman | 630,000<br>Direct | 6.5% |
| Common | Bridge Ventures, Inc.<br>1241 Gulf of Mexico Drive<br>Longboat Key, FL 24228 | 859,470(4)<br>Direct and<br>Indirect | 8.6% |
|  | SMACS Holding Corp.<br>1241 Gulf of Mexico Drive<br>Longboat Key, FL 24228 |  |  |
|  | Bridge Ventures, Inc. Employee<br>  Pension Plan<br>1241 Gulf of Mexico Drive<br>Longboat Key, FL 24228 |  |  |
|  | Saggi Capital Corp.<br>9 Prospect Hill Road Ext.<br>Pine Plains, NY 12567 |  |  |
|  | Saggi Capital Corp. Money Purchase Plan<br>9 Prospect Hill Road Ext.<br>Pine Plains, NY 12567 |  |  |
|  | Saggi Capital Corp. Profit Sharing Plan<br>9 Prospect Hill Road Ext.<br>Pine Plains, NY 12567 |  |  |

Harris Freedman
1241 Gulf of Mexico Drive
Longboat Key, FL 24228

Sharon Will
9 Prospect Hill Road Ext.
Pine Plains, NY 12567

Michael H. Freedman
200 East 89th Street, Suite 17A
New York, NY 10128

(1)     Includes (i) 6,300 shares held by Dr. and Mrs. Mehta as custodians for
Amar Mehta; (ii) 6,300 shares held by Dr. and Mrs. Mehta as custodians for Anand
Mehta; (iii) 200,000 shares held by Mehta Partners, LP; and (iv) options to
purchase 1,475,000 shares of common stock held by Dr. Mehta (including options
for 400,000 shares which do not begin vesting until December 31, 2002 and then
vest 100,000 shares on that date and 100,000 shares annually thereafter for
three years and options for 50,000 shares which begin vesting on December 31,
2002 and then vest 10,000 shares on that date and 10,000 shares annually
thereafter for four years).

(2)     Includes (i) 35,000 shares held by Maxine Belson, wife of Jerome
Belson; (ii) 50,000 shares by the Jerome Belson Foundation; and (iii) 28,000
shares owned by the Grandchildren of Jerome Belson; and (iv) warrants for
256,000 shares.

(3)     Represents (i) 331,000 shares held in trust for the benefit of John P.
de Neufville; (ii) 410,000 shares held in trust for David T. de Neufville; and
(iii) options personally held by John P. de Neufville to purchase 25,000 shares.

(4)     Based on information contained in a Schedule 13D, as amended, filed by
the foregoing persons on August 13, 2002 who have formed a group within the
meaning of Section 13(d) of the Securities Exchange Act of 1934. Consists of (a)
2,000 shares of common stock owned by Harris Freedman, (b) 369,970 shares of
common stock owned by Bridge Ventures, Inc. (including 85,250 shares of common
stock issuable upon exercise of warrants owned by Bridge Ventures, Inc.), (c)
121,000 shares of common stock owned by SMACS Holding Corp. (including 75,000
shares of common stock issuable upon exercise of warrants owned by SMACS Holding
Corp.), (d) 102,200 shares of common stock owned by Bridge Ventures, Inc.
Employee Pension Plan (including 10,000 shares of common stock issuable upon
exercise of warrants owned by Bridge Ventures, Inc. Employee Pension Plan), (e)
7,500 shares of common stock owned by Sharon Will, (f) 217,500 shares of common
stock owned by Saggi Capital Corp. (including 110,000 shares of common stock
issuable upon exercise of warrants owned by Saggi Capital Corp.), (g) 7,450
shares of common stock owned by Saggi Capital Corp. Money Purchase Plan, (h)
8,350 shares of common stock owned by Saggi Capital Corp. Profit Sharing Plan,
and (i) 23,500 shares of common stock owned by Michael H. Freedman (including
5,000 shares of common stock issuable upon exercise of warrants owned by Michael
H. Freedman).

The Company is informed and believes that as of August 16, 2002, Cede & Co.
held 6,544,413 shares of the Company's common stock and 1,200,120 Class A
Warrants for shares of the common stock of the Company as nominee for Depository
Trust Company, 55 Water Street, New York, New York 10004. It is the Compan's
understanding that Cede & Co. and Depository Trust Company both disclaim any
beneficial ownership therein and that such shares are held for the account of
numerous other persons, no one of whom is believed to beneficially own five
percent or more of the common stock of the Company.

SECURITY OWNERSHIP OF MANAGEMENT

Shown below, as of August 15, 2002, are the shares of the Company beneficially owned by all directors, by the
executive officers and by the directors and executive officers of the Company as a group.

| Title of Class | Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Common | Dr. Atul M. Mehta, Director/Officer<br>165 Ludlow Avenue<br>Northvale NJ 07647 | 2,962,700(1)<br>Direct and Indirect | 26.4% |
| Common | Donald S. Pearson, Director<br>1305 Peabody Avenue<br>Memphis, TN 38104 | 78,750(2)<br>Direct | 0.8% |
| Common | Harmon Aronson, Director<br>26 Monterey Drive<br>Wayne, NJ 07470 | 60,000(3)<br>Direct | 0.6% |
| Common | Eric L. Sichel, Director | 30,000(4) | 0.3% |

|        |                                                                 |                        |       |
|--------|-----------------------------------------------------------------|------------------------|-------|
|        | 411 Highview Road<br>Englewood, NJ  07631                       | Direct                 |       |
| Common | Mark I. Gittelman, Chief Financial Officer,<br>Treasurer and Secretary<br>300 Colfax Avenue<br>Clifton, NJ  07013 | 10,000(5)<br>Direct    | 0.1%  |
| Common | Officers and Directors as a Group                               | 3,141,450<br>Direct and<br>Indirect | 27.7% |

(1)    Includes (i) 6,300 shares held by Dr. and Mrs.  Mehta as custodians for Amar Mehta; (ii) 6,300 shares held by Dr. and Mrs. Mehta as custodians for Anand Mehta;  (iii)  200,000  shares held by Mehta Partners,  LP; and  (iv) options to purchase  1,475,000 shares of common stock held by Dr. Mehta (including  options for 400,000  shares which do not begin vesting until  December 31, 2002 and then vest 100,000  shares on that date and 100,000  shares  annually  thereafter  for three years and options for 50,000 shares which do begin vesting until  December 31, 2002 and then vest  10,000  shares on that date and 10,000  shares  annually thereafter for four years).

(2)    Includes  options to purchase 60,000 shares.  Options for 40,000 shares are vested.  The  remaining  options vest in increments of 10,000 shares each on September 1, 2002 and January 2, 2003.

(3)    Comprised of options to purchase  60,000  shares.  Options for 40,000 shares are vested.  The  remaining  options vest in  increments of 10,000 shares each on September 1, 2002 and January 2, 2003.

(4)    Comprised of options to purchase  30,000  shares.  Options for 10,000 shares are vested. Options for the remaining shares vest in increments of 10,000 each on August 2, 2003 and August 2, 2004.

(5)    Comprised of options to purchase 10,000 shares.

Information  on the stock  ownership  of these  persons was provided to the Company by the persons.

COMPARATIVE SHAREHOLDER RETURN

The graph  which follows  compares  the yearly percentage  change in the Company's  cumulative  total  stockholder  return on its  common  stock with the cumulative total stockholder return of (1) all United States companies traded on the American Stock Exchange (where the Company's common stock is now traded) and (2) 51 companies  traded on the American Stock Exchange which carry the Standard Industrial  Classification  (SIC)  code 283  (Pharmaceuticals).  The  graph  was prepared  by the Center for  Research in Security  Prices at the  University of Chicago Graduate School of Business, Chicago, IL.

The stock of the Company was traded on the NASDAQ over-the-counter bulletin board from July 23, 1998 until February 24, 2000. The stock of the Company began trading on the American  Stock Exchange on February 24, 2000. The period covered by the  comparison  begins  September 1998 because no trading data was available for the period from July 23, 1998 through August 31, 1998. The Company's  fiscal year ends on March 31.

## Comparison of Five-Year Cumulative Total Returns

### Performance Graph for
### Elite Pharmaceuticals, Inc.

#### Produced on 05/29/2002 including data to 03/28/2002

$3,000

$2,000



### Legend

| Symbol | CRSP Total Returns Index for: | 09/1998 | 03/1999 | 03/2000 | 03/2001 | 03/2002 |
|---|---|---|---|---|---|---|
| | Elite Pharmaceuticals, Inc. | 100.0 | 158.4 | 1780.0 | 880.0 | 1238.4 |
| | AMEX Stock Market (US Companies) | 100.0 | 117.5 | 166.6 | 132.9 | 135.0 |
| | AMEX Stocks (SIC 2830 - 2839 US Companies) Drugs | 100.0 | 136.2 | 267.8 | 156.3 | 110.1 |

**Notes:**

A. The lines represent monthly index levels derived from compounded daily returns that include all dividends.
B. The indexes are reweighted daily, using the market capitalization on the previous trading day.
C. If the monthly interval, based on the fiscal year-end, is not a trading day, the preceding trading day is used.
D. The index level for all series was set to $100.0 on 09/30/1998.
E. Data for Elite Pharmaceuticals, Inc. from 09/1996 to 01/2000 was provided by the client.

Prepared by CRSP (www.crsp.uchicago.edu), Center for Research in Security Prices, Graduate School of Business, The University of Chicago. Used with permission. All rights reserved.          ©Copyright 2002

RELATIONSHIP WITH INDEPENDENT PUBLIC ACCOUNTANTS

The Board of Directors selects the independent public accounting firm for the Company each year at its annual meeting following the annual meeting of stockholders. Therefore, no accounting firm is being recommended to or selected in connection with this revocation solicitation. Miller Ellin & Company, New York, New York, is the independent public accounting firm for the Company.

AUDIT FEES

The aggregate fees billed for professional services rendered by Miller Ellin & Company, the principal accountants of the Company for the most recent fiscal year ended March 31, 2002, for the audit of the Company's annual financial statements for the most recent fiscal year ended March 31, 2002 and the reviews of the financial statements included in the Company's Forms 10-Q filed during that fiscal year were $38,523.75.

ALL OTHER FEES

No fees were billed for services rendered to the Company by Miller Ellin & Company for the most recent fiscal year ended March 31, 2002 other than those services specified in the immediately preceding section.

PRINCIPAL OFFICE.

The Company's principal offices are located at 165 Ludlow Avenue, Northvale, New Jersey 07647, and its telephone number is (201) 750-2646.

SOLICITATION OF CONSENT REVOCATIONS

Consent revocations may be solicited by mail, telephone, facsimile transmission or other electronic media and in person. Solicitation of consent revocations may be made by directors, officers and regular employees of Elite for which they will receive no additional compensation.

[_____] will receive a fee of $[_____] for its services to Elite in connection with the solicitation of the consent revocations, plus reimbursement for reasonable out-of-pocket expenses. Elite has also agreed to indemnify [_____] for certain liabilities in connection with this solicitation. Approximately [__] persons will be employed by [_____] to solicit stockholders.

Banks, brokers, custodians, nominees and fiduciaries will be requested to forward solicitation material to beneficial owners of shares of Elite common stock. Elite will reimburse banks, brokers, custodians, nominees and fiduciaries for their reasonable expenses for sending solicitation material to the beneficial owners.

The entire cost of soliciting the consent revocations, including, without limitation, costs, if any, relating to advertising, printing, fees of attorneys, financial advisors, proxy solicitors, accountants, public relations, transportation, litigation and related expenses and filing fees, will be borne by Elite. Elite estimates that total expenditures relating to the Elite Board's solicitation of the consent revocations will be approximately $[_____]. Such costs do not include the amount normally expended for a solicitation for an uncontested election of directors or costs represented by salaries and wages of regular employees and officers. The portion of such costs allocable solely to the solicitation of consent revocations to the Freedman Group's Proposals is not readily determinable. To date, approximately $[_____] has been paid by Elite in connection with its solicitation of revocations of consents.

## ABSENCE OF APPRAISAL RIGHTS

Under Delaware law, you do not have appraisal rights in connection with our solicitation of consent revocations.

## PARTICIPANTS IN THE SOLICITATION

Under applicable regulations of the SEC, each member of the Elite Board and each executive officer of Elite may be deemed to be a "participant" in Elite's solicitation of revocations of consent. In the event each of these persons is deemed a "participant", and without acknowledging that any such person is a "participant", we furnish the following information. Except as set forth below, the principal business addresses of each director and executive officer are 165 Ludlow Avenue, Northvale, New Jersey 07647. The principal occupation of each director and executive officer is set forth in this Revocation Statement under the sections entitled "Information About Us, The People Asking You To Revoke Your Consent" and "Directors and Executive Officers", respectively. Information about the present ownership by directors and executive officers and any of their respective "associates" of Elite common stock is set forth under the section entitled "Security Ownership of Management." Information about transactions by each director and executive officer in Elite's common stock during the past two years can be found in such director's or executive officer's filings under Section 16 of the Securities Exchange Act of 1934, as amended, during that period. Information about related party transactions involving directors and executive officers can be found under the sections entitled "Certain Relationships and Related Transactions" and "Employment Agreement". Except as otherwise set forth in this Revocation Statement, none of the directors or executive officers or any of their respective "associates" has any arrangement or understanding with any person with respect to future employment or future transactions with Elite.

## STOCKHOLDER PROPOSALS

As reported in our proxy statement for last year's Annual Meeting of Stockholders, stockholder proposals must have been received by the Company in writing no later than May 15, 2002 in order for such proposal to be eligible for inclusion in the Company's proxy statement and form of proxy for the 2002 Annual Meeting.

## WHERE YOU CAN FIND MORE INFORMATION

The Company files reports, proxy statements and other information with the SEC under the Securities Exchange Act of 1934, as amended. The SEC maintains an Internet world wide web site that provides access, without charge, to reports, proxy statements and other information about issuers, like Elite, who file electronically with the SEC. The address of that site is http://www.sec.gov.

You also may obtain copies of these materials by mail from the Public Reference Section of the Securities and Exchange Commission, 450 Fifth Street,

N.W., Room 1024, Washington, D.C. 20549, at prescribed rates. These materials are also available from the SEC in person at any one of its public reference rooms. Please call the SEC at 1-800-SEC-0330 for further information on its public reference rooms. You may read and copy this information at the following locations of the SEC:

| Public Reference Room | Northeast Regional Office | Chicago Regional Office |
|---|---|---|
| 450 Fifth Street, N.W. | The Woolworth Building | 175 W. Jackson Boulevard |
| Room 1024 | 233 Broadway | Suite 900 |
| Washington, D.C. 20549 | New York, New York 10279 | Chicago, Illinois 60604 |

You can also obtain, without charge, reports, proxy statements and other information, including without limitation, any information we may incorporate by reference herein, about the Company, by contacting: Elite Pharmaceuticals, Inc., 165 Ludlow Avenue, Northvale, New Jersey 07647, Attn: Corporate Secretary, telephone: (201) 750-2646, facsimile: [_____], or on the Company's Internet world wide web site: http://www.elitepharma.com.

CAUTION ABOUT FORWARD LOOKING STATEMENTS

This Consent Revocation Statement contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, that are based on the beliefs of the Company's management and Board of Directors, as well as assumptions made by and information currently available to the Company's management and Board of Directors. Such statements reflect the current views of the Company or the Board of Directors with respect to future events based on currently available information and are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such forward-looking statements.

Factors that could cause actual results to differ materially from the Company's expectations include, but are not limited to, the following: the ability of the Company to execute and manage the Company's growth strategy, the results of the Company's investment spending, the ability to develop new products, the ability to obtain governmental approval of its products, improved financial results, the entrance of new competitors into the marketplace, the ability to attract and retain key customers, the ability to positively modify its revenue mix, variations in quarterly results and the sufficiency of the Company's working capital, and other factors which are described from time to time in the Company's public filings with the Securities and Exchange Commission, news releases and other communications. Also, when Elite uses the words "believes," "expects," "anticipates," "estimates," "plans," "intends," "objectives," "goals," "aims," "projects" or similar words or expressions, Elite is making forward-looking statements. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. The Company does not undertake any obligation to release publicly any revisions to these forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

August [__], 2002                    By Order of the Board of Directors

                                     Mark I. Gittelman, Secretary

IMPORTANT

1. If your shares are registered in your name, please sign, date and mail the enclosed BLUE Consent Revocation Card to [_____] in the postage-paid envelope provided.

2. If you have previously signed and returned a WHITE consent card to the Freedman Group, you have every right to change your vote. Only your latest dated card will count. You may revoke any WHITE consent card already sent to the Freedman Group by signing, dating and mailing the enclosed BLUE Consent Revocation Card in the postage-paid envelope provided.

3. In order to be sure that you are revoking a prior consent, you must either mark the "Revoke Consent" boxes on the BLUE Consent Revocation Card or sign the BLUE Consent Revocation Card without marking any boxes. If you do not mark any box for any one or more of the Freedman Group's Proposals on the BLUE Consent Revocation Card and you sign and return the Card, you will be deemed to have revoked any previously signed consent to any proposal you did not mark. If the BLUE Consent Revocation Card is signed and returned, any previously executed consent will be revoked unless the "Do Not Revoke Consent" box is marked.

4. If your shares are held in the name of a brokerage firm, bank nominee or other institution, only it can sign a BLUE Consent Revocation Card with respect to your shares and only after receiving your specific instructions. To ensure that your revocation is completed, you should contact the person responsible for your account and give instructions for a BLUE Consent Revocation Card to be signed representing your shares.

5. After signing the enclosed BLUE Consent Revocation Card, do not sign or return the WHITE consent card. Do not even use the Freedman Group's consent card to indicate your opposition to the Freedman Group's Proposals.

If you have any questions above giving your revocation of consent or require assistance, please call:

[_____]

ELITE PHARMACEUTICALS, INC.

THIS REVOCATION OF CONSENT IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS OF ELITE PHARMACEUTICALS, INC. ("ELITE") IN OPPOSITION TO THE CONSENT SOLICITATION BY HARRIS FREEDMAN, BRIDGE VENTURES, INC., BRIDGE VENTURES, INC. EMPLOYEE PENSION PLAN, SMACS HOLDING CORP., SHARON WILL, SAGGI CAPITAL CORP., SAGGI CAPITAL CORP. MONEY PURCHASE PLAN, SAGGI CAPITAL CORP. PROFIT SHARING PLAN AND MICHAEL H. FREEDMAN (THE "FREEDMAN GROUP").

The undersigned, a holder of shares of common stock, par value $0.01 per share, of Elite, is acting with respect to all the shares of common stock of Elite held by the undersigned, and hereby revokes any and all consents that the undersigned may have given in respect of the following proposals submitted by the Freedman Group:

[X] PLEASE MARK YOUR VOTE AS IN THIS EXAMPLE.

THE BOARD OF DIRECTORS OF ELITE UNANIMOUSLY RECOMMENDS THAT YOU VOTE "REVOKE CONSENT" ON EACH PROPOSAL SET FORTH BELOW. Please sign, date and mail this consent revocation card today.

1. Removal of three present members of the Elite Board without cause, Donald S. Pearson, Harmon Aronson and Eric L. Sichel and any other person or persons elected to the Elite Board to fill any vacancy arising since the last annual meeting of stockholders or any newly created directorships.

[_] REVOKE CONSENT [_] DO NOT REVOKE CONSENT

INSTRUCTIONS: To revoke consent or withhold revocation of consent to the removal of all the persons named in the above proposal, check the appropriate box. If you wish to revoke the consent to the removal of certain of the persons named above, but not all of them, check the "Revoke Consent" box and write the name of each such person as to whom you do not wish to revoke consent (i.e., the persons you want removed) in the following space:_____
_____ .

2. Election of the Freedman Group's slate, Harris Freedman, Sharon Will and Michael H. Freedman, to the Board of Directors to fill the newly created vacancies on the Board, and to serve until their respective successors are duly elected and qualify.

[_] REVOKE CONSENT [_] DO NOT REVOKE CONSENT

INSTRUCTIONS: To revoke consent or withhold revocation of consent to the election of all the persons named in the above proposal, check the appropriate box. If you wish to revoke the consent to the election of certain of the persons named above, but not all of them, check the "Revoke Consent" box and write the name of each such person as to whom you do not wish to revoke consent (i.e., the persons you want elected) in the following space:_____
_____ .

IF NO DIRECTION IS MADE WITH RESPECT TO ONE OR MORE OF THE FOREGOING PROPOSALS, OR IF YOU MARK THE "REVOKE CONSENT" BOX WITH RESPECT TO ONE OR MORE OF THE FOREGOING PROPOSALS, THIS REVOCATION OF CONSENT WILL REVOKE ALL PREVIOUSLY EXECUTED CONSENTS WITH RESPECT TO SUCH PROPOSALS.

IF YOU DO NOT MARK ANY BOX FOR ANY ONE OR MORE OF THE FOREGOING PROPOSALS AND YOU SIGN AND RETURN THIS CARD, YOU WILL BE DEEMED TO HAVE REVOKED ANY PREVIOUSLY SIGNED CONSENT TO ANY PROPOSAL YOU DID NOT MARK. IF THE BLUE CONSENT REVOCATION CARD IS SIGNED AND RETURNED, ANY PREVIOUSLY EXECUTED CONSENT WILL BE REVOKED UNLESS THE "DO NOT REVOKE CONSENT" BOX IS MARKED.

Dated: _____, 2002

Signature

Signature, if held jointly

Title of Authority

Please sign exactly as your name appears hereon. If shares are held
jointly, each stockholder should sign. When signing as attorney, executor,
administrator, trustee, guardian, corporate officer, etc., give full title as
such. Please sign, date and mail this Consent Revocation Card promptly in the
enclosed postage-paid envelope.

If you have any questions or need assistance, please contact
[_____], which is assisting Elite in this solicitation of
consent revocations:
                        [_____]

EXHIBIT C



HOME PAGE | MY TIMES | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS            Log in · Register Now

**The New York Times**
Thursday, July 24, 2008

# Business

Ameriprise Financial

WORLD | U.S. | N.Y. / REGION | BUSINESS | TECHNOLOGY | SCIENCE | HEALTH | SPORTS | OPINION | ARTS | STYLE | TRAVEL | JOBS | REAL ESTATE | AUTOS

Totally Unlimited Calling Plan available for $79.99/Month, plus taxes and surcharges. Nationwide calling available within nationwide coverage area reaching more than 250 million people. Coverage not available in all areas. See website for details.   $79 99/MONTH   CLICK TO >>GET IT NOW<<   Virgin mobile   You Rule.
DETAILS »

## Of Brokers and Bribes: a Federal Case

By FLOYD NORRIS
Published: September 5, 1996

E-MAIL

PRINT

SINGLE-PAGE

SAVE

SHARE

In late 1993, the stock of Malvy Technology went crazy in the Nasdaq small-capitalization market, rising from pennies a share to a peak of $6.56. Unfortunately, those who bought were destined to suffer.

Today, the company, now renamed Metal Recovery Technologies, trades on the over-the-counter Bulletin Board, having been delisted from Nasdaq in 1995. And after a 1-for-20 reverse split, also in 1995, the stock trades for about 82 cents. In other words, the share that went for $6.56 is now worth about 4 cents, for a 99 percent decline in less than three years.

Those who bought the stock may be inclined to dismiss the investment as an unfortunate speculation, but yesterday Federal prosecutors provided another explanation: at least some brokers who steered their clients into the stock were bribed to do so. The person paying them was a stock promoter hired by Malvy.

Charges filed in Federal District Court in Fort Lauderdale, Fla., accused five brokers for small firms of committing fraud by taking bribes from a stock promoter named Harcourt Wiltshire, who had previously pleaded guilty to paying such bribes. Three of the brokers were cited for taking bribes to sell Malvy stock at prices ranging from $2.28 to $4.94 a share. Altogether, the brokers were accused of taking bribes to sell seven different stocks.

Rick Murad, the assistant United States attorney prosecuting the case, said the five brokers had agreed to plead guilty and cooperate in the investigation.

Officials of Metal Recovery, which is based in Houston, could not be reached for comment. The number listed for the company is no longer in service.

The brokers who were charged with wire fraud and securities fraud were Simon D. Baier, who worked for Joseph Roberts & Company and for Euro-Atlantic Securities in Chicago; David W. D'Andrea, who worked for Barron Chase Securities in Boca Raton, Fla.; Nicholas J. Giandomenico, who worked for Greenway Capital, Meyers Pollock Robbins, Thomas James Associates and Barron Chase, in Florida and Boston; Richard D. Henderson, who worked for Cohig & Associates in Chicago, and Joseph Miceli Jr., who worked for Barron Chase in Boca Raton.

None of the brokerage firms were accused of complicity in the practice, in which, according to the charges, the brokers were paid about 20 percent of what their customers paid for the stock, on top of the normal commissions they were paid by their firms. The payments were contingent on clients not selling the stock without permission from the promoter.

These were the six other companies involved, according to the charges:

*Madison Sports and Entertainment Group of Fort Lauderdale. The brokers were said to have sold investors shares at prices between $3.16 and $6.68. It closed yesterday at



IT'S EASY WITH END-TO-END iSCSI SOLUTIONS FROM HP

» Start simplifying your storage

**MOST POPULAR**

E-MAILED | BLOGGED | SEARCHED

1. What's Lurking in Your Countertop?
2. Timothy Egan: The Oil Man Cometh
3. Skin Deep: It's Botox for You, Dear Bridesmaids
4. Maureen Dowd: Is 'The One' Cocky or Commander in Chief?
5. Slow Food Savors Its Big Moment
6. Going Down the Road: A State That Never Was in Wyoming
7. The Return of a Lost Jersey Tomato
8. Recipes for Health: Pasta With Cherry Tomatoes and Arugula
9. Op-Ed Contributor: Paying Doctors to Ignore Patients
10. Stand Back, Mister Softee: There's a New Swirl in Town

Go to Complete List »



**The New York Times**    **TRAVEL**
nytimes.com/travel

**A lost world made by women**
Also in Travel:
What are your airline miles worth?
Valencia Street, San Francisco
Readers' picks: Toronto

RELATED ADS                    what are related ads?

» NPR Driveway Moments
» Listen Live Radio

$2.09 a share.

*U.S. Exploration of Independence, Kan. It now trades for $2.97 a share, in contrast to the $1.37 to $7.09 paid by customers.

*Entertainment and Gaming International of Pompano Beach, Fla., now known as Whitestone Industries. Investors paid $2.125 to $2.50 for shares now worth about 13 cents.

*Musicsource U.S.A. of Newport Beach, Calif. Investors paid 44 cents to $3.38 for shares now each worth 25 cents.

*Linium Technology of Miami, now called Value Holdings. Holders paid 51 cents to $1.51 for shares now worth a tenth of a penny each.

*Wavetech of Tucson, Ariz. Holders paid $1.03 for shares worth 72 cents.

While the charges say the companies had retained the promoters, they do not specifically contend that the companies were aware of the techniques that would be used to sell their shares.

One thing most of the companies involved in these cases have in common is that they were listed on the Bulletin Board or the Pink Sheets, places for companies that cannot even be listed on Nasdaq's small capitalization list. While there are good companies on the Bulletin Board, it is also a place where many dubious ones are found.

Performance Nutrition
Dismisses Chairman

Another Bulletin Board company was in the news yesterday, expressing shock at learning that its chairman and chief executive was a convicted felon.

1 | 2   NEXT PAGE >

» Northwest Public Radio
» NPR Radio
» Online Radio

Ads by Google                what's this?

**Proactiv - Official Site**
Revolutionary Acne Skincare System. Just $19.95
& 2 Free Gifts!
www.Proactiv.com

INSIDE NYTIMES.COM

MOVIES »

How Many Heroes Does It Take to Tire a Genre?

TRAVEL »

Frugal Traveler: The Grand Tour in Gdansk

OPINION »

## Obama and the Surge
In a Bloggingheads video, a discussion on whether Senator Barack Obama's position on the troop surge will hurt him politically.

FASHION & STYLE »

Everything's Fine! My T-Shirt Says So.

OPINION »

Letters: A Nation of Debtors

HOME & GARDEN »

A Spare Stage for the Spectacle of Life

Home   World   U.S.   N.Y./Region   Business   Technology   Science   Health   Sports   Opinion   Arts   Style   Travel   Jobs   Real Estate   Autos   Back to Top
Copyright 2008 The New York Times Company   Privacy Policy   Search   Corrections   RSS   First Look   Contact Us   Work for Us   Media Kit   Site Map

EXHIBIT D

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RICHARD ADAMS, HARRY GIBSON, | ) |
| GILBERT D. KAYE, MICHAEL MUSA, | ) |
| DONALD PRICE, and MICHAEL DENNIS | ) |
| STEINER, et al., Individually and On | ) |
| Behalf of Themselves and All Others | ) |
| Similarly Situated, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) CIVIL ACTION NO.: |
| vs. | ) 99-4468 (MLC) |
| | ) |
| AMPLIDYNE, INC., DEVANDAR | ) JURY TRIAL DEMANDED |
| S. BAINS, HARRIS FREEDMAN, and | ) |
| SHARON WILL, | ) |
| | ) |
| Defendants. | ) |

## CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT

Plaintiffs, by their undersigned attorneys. on behalf of themselves and the Class they seek to represent, for their Consolidated and Amended Class Action Complaint, make the following allegations against defendants based upon the investigation conducted by and under the supervision of plaintiffs' counsel, which included reviewing and analyzing information relating to the relevant time period obtained from numerous public and proprietary sources, including, among other things, SEC filings, publicly available press releases, published interviews, news articles and other media reports (including those disseminated in print and by electronic media), in order to obtain the information necessary to plead plaintiffs' claims with particularity. The investigation of plaintiffs' counsel also included interviewing or consulting with numerous individuals with relevant information, including several former employees of Amplidyne, Inc. ("Amplidyne" or the "Company") who are knowledgeable about the Company's business and operations.

Except as alleged herein, the underlying information relating to defendants' misconduct and the particulars thereof are not available to plaintiffs and the public and lie within the possession and control of defendants and other Amplidyne insiders, thus preventing plaintiffs from further detailing defendants' misconduct at this time. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

This is a federal securities class action on behalf of all purchasers of the common stock and warrants of Amplidyne between September 9, 1999, and September 17, 1999, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). In summary, Amplidyne was in extremely precarious financial straits. In a scheme to drive up Amplidyne's stock price so as to enable defendants to redeem the Company's warrants and enable the individual defendants to sell their stock to unsuspecting members of the public, and thereby reap a huge. albeit illicit, financial gain, defendants disseminated materially false and misleading statements concerning, among other things, the uniqueness of the Company's technology, and its efficacy, the functionality of its products. the availability of such products, and the true novelty or revolutionary character of the Company's products. On September 13, 1999, the market was shocked to discover that the statements which caused Amplidyne's stock to rocket by over 500 percent were false and materially misleading, and omitted to state material facts necessary to make the Company's statements not materially false and misleading. Despite defendants' continued attempts to inflate the stock price by continuing to misstate the Company's technology, and products after adverse reports, the stock continued to fall reaching a low at $4.75 per share.

## JURISDICTION AND VENUE

The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 139 1(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, defendants' chief executive offices and principal place of business are located within this District.

In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

### A. Plaintiffs

### (i) Lead Plaintiffs

The Lead Plaintiffs in this action are the persons and entities appointed as Lead Plaintiffs by this Court in this consolidated action. The Lead Plaintiffs are: Richard Adams, Harry Gibson, Gilbert D. Kaye, Michael Musa, Donald Price, and Michael Dennis Steiner.

The Lead Plaintiffs purchased Amplidyne common stock during the Class Period, as stated on the Certifications of the Lead Plaintiffs previously submitted to this Court and incorporated by reference. The Lead Plaintiffs suffered damages as a result of their transactions in Amplidyne Securities.

### (ii) Additional Plaintiffs

Numerous persons joined this suit after the initial complaints were filed and are listed on Attachment A hereto.

### B. Defendants

Defendant Amplidyne. Inc., is a Delaware Corporation. with its principal executive offices located in Raritan, New Jersey. According to the Company's press releases, Amplidyne to design, manufacture and sell ultra linear power amplifiers and related subsystems to the purports worldwide wireless telecommunications market. These single and multi-carrier linear power amplifiers, which are purportedly a key component in cellular base stations, increase the power of radio frequency and microwave signals with low distortion. The Company further claims that its products are marketed to the cellular, wireless local loop and PCS segments of the wireless telecommunications industry.

The following defendants are collectively referred to herein as the "Individual

Defendants":

Defendant Devendar S. Bains ("Bains"), at all times relevant to the allegations alleged herein, served as Amplidyne's Chief Executive Officer, President, Principal Accounting Officer, Treasurer, and Board Member.

Defendant Harris Freedman ("Freedman") has served as Amplidyne's Vice President of Strategic Alliances since July 1996. Although Bains and Freedman have disclaimed that Freedman is an officer of the Company, Freedman continues to operate as an investor relations spokesperson for the Company, and Freedman and the Company continue to hold Freedman out to the public as an individual with knowledge about the Company and authority to speak on behalf of the Company. It has been reported that defendant Freedman has been associated with at least two companies against which the New York State Attorney General issued indictments for stock manipulation. According to reports. defendant Freedman, either directly or indirectly, controlled substantial amounts of Netsmart Technologies. Inc. (NASDAQ: NTST) and Big City Bagels. Inc. (NASDAQ: BIGC) stock before their respective 1996 initial public offerings - companies identified in the Attorney General's indictment. Defendant Freedman also served as a Vice President of MusicSource USA, Inc. (OTC: MUSS) which was delisted by NASDAQ in April 1999. Freedman is associated with or controls SMACS, which also was involved with Netsmart Technologies, Inc., as well as Sequential Information Systems. Inc.. a widely held penny stock company that, as one reporter has described it, "has vanished from the public view." Freedman is also a Vice President of Hemisphenx Biopharma, Inc. (AMEX: HEB), which has drawn criticism from market analysts for making false statements, including, most recently, asserting that HEB had provided grants to the University of California at Irvine (Frederic Y. NI. Wan, Vice Chancellor for Research at UCI, has stated that "UCI has received no grant or contract support from Hemispherix Biopharma") and that HEB had presented HIV test findings at a conference in February 2000 sponsored by Search for a Cure, a Boston-based non-profit organization. Search for a Cure has demanded that HEB correct its statement, as "Hemispherix did not make a presentation at the conference." Freedman is also associated with and/or controls Saggi Capital Corp., which has registered to sell 100,000 Amplidyne shares, and Bridge Ventures, Inc., which has registered to sell 150,000 Amplidyne shares. Because Bains and Freedman assert that Freedman is no longer an officer of Amplidyne, Freedman may have sold additional shares of Amplidyne stock in the open market without filing a disclosure form. Freedman continues to handle Investor Relations for the Company.

Defendant Sharon Will ("Will") has served as Amplidyne's Vice President of Corporate Communications and Investor Relations since July 1996. Although Bains and Will have disclaimed that Will is an officer of the Company, Will continues to operate as the investor relations spokesperson for the Company, and Will and the Company continue to hold Will out to the public as an individual with knowledge about the Company and authority to speak on behalf of the Company. It has been reported that defendant Will has been associated with at least two companies against which the New York State Attorney General issued indictments for stock manipulation. According to reports, defendant Will, either directly or indirectly, controlled substantial amounts of Netsmart Technologies, Inc. and Big City Bagels. Inc. stock before their respective 1996 initial public offerings. Will is also associated with HEB which has drawn criticism and engaged in activities as described in subparagraph 10 b above. Will is also associated with and/or controls Saggi Capital Corp., which has registered to sell 100,000 Amplidyne shares. Because Bains and Will assert that Will is no longer an officer of Amplidyne,

Will may have sold additional shares of Amplidyne stock in the open market without filing a disclosure form. Will continues to handle Investor Relations for the Company.

Because of the Individual Defendants positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company. were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business. operations, products, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing and or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ National Market System (the "NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants misrepresentations and omissions during the Class Period violated these specific requirements and obligations. Under rules and regulations promulgated by the SEC under the Exchange Act, including Item 303 of Regulation S-K. Defendants also had a duty to report. among other things, all trends and uncertainties that were reasonably likely to affect Amplidyne's net sales, revenues, or income. Defendants' wrongdoing during the Class Period, as alleged herein, also violated this specific requirement and obligation.

The Individual Defendants participated in the drafting, preparation, and or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of. or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their executive and managerial positions with Amplidyne, the Individual Defendants had access to the adverse undisclosed information about Amplidyne's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that

these adverse facts rendered the positive representations made by or about Amplidyne and its business issued or adopted by the Company to be materially false and misleading.

The Individual Defendants, because of their positions of control and authority as officers and directors of the Company, were able to and did control the content of the various press releases and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

All defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Amplidyne common stock and warrants by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Amplidyne's business prospects and potential for growth, new product quality, capabilities and capacities, and the intrinsic value of Amplidyne common stock and warrants; and (ii) caused plaintiffs and other members of the Class to purchase Amplidyne common stock and warrants at artificially inflated prices.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased Amplidyne common stock and warrants between September 9, 1999, and September 17, 1999, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company. at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Amplidyne common shares were actively traded on the NASDAQ Exchange. As of May 14, 1999 there were approximately 5.74 million shares of Amplidyne common stock issued and outstanding as well as numerous warrants. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Amplidyne or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants? wrongful conduct in violation of federal law that is complained of herein.

Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

whether the federal securities laws were violated by defendants' acts as alleged herein;

whether statements made by defendants to the investing public during the Class Period misrepresented material facts about Amplidyne's products, their capabilities and the future outlook for the Company; and

the extent the members of the Class have sustained damages and the proper measure of damages.

A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## Background

### The Company

Amplidyne was incorporated on or about December 14, 1995, and from its inception to date has lost over $12 million. Included in its losses is almost all of the $6.78 million raised as a result of the Company's January 21. 1997 initial public offering of common stock and warrants. In fact, according to the Company s former Chief Engineer, William Suter, who resigned from the Company 10 months after the initial public offering, "[t]hey got quite a bit of money in the IPO and just frittered it away.

As evidence of the Company's dire financial straits, recently the following has occurred:

The Company has sold approximately S 1.5 million worth of its stock at below market prices:

In April of 1999, the Company sold 900,000 shares in a private placement at $1.125, <u>a 57 percent discount to the prevailing market price from which the Company netted just $915,746</u>.

In June of 1999, it sold $500,000 of preferred stock (which carried rights to dividends and a liquidation preference and was convertible into common shares) at a 15 percent discount to their average closing price for the five days prior to conversion netting the Company just $465,000.

In July of 1999, Amplidyne moved out of its 21,000 square foot headquarters in Somerset, New Jersey, to an 11,400 square foot site in Raritan, New Jersey lowering its monthly rent from approximately $14,000 to approximately $6,000.

Amplidyne's officers have deferred their salaries and have been paid in stock. For example, Bains employment contract provides for a cash salary of $162,000 annually. However, of the $324,000 Bains was to collect for 1998 and 1999, more than 70% or $238,000 was received in the form of Company stock in exchange for forgiveness of accrued salary obligations:

on or before June 30, 1998 the Company issued 40,000 shares of stock to Bains in exchange for forgiveness of $50,000 of accrued salary;

on or before December 31, 1998 the Company issued 104,000 shares to Bains exchange for forgiveness of $ 117,000 of accrued salary. The Company also issued stock to two other employees in exchange for forgiveness of salary accrued but not paid;

on or before March 31, 1999 the Company issued 9,490 shares to Bains in exchange for forgiveness of approximately $24,000 of accrued salary. The Company again issued additional amounts of stock to two other employees in exchange for forgiveness of salary accrued but not paid;

on or before June 30, 19991, the Company issued 15,400 shares to Bains in exchange for forgiveness of approximately $27,000 of accrued salary. The exchange for Company again issued additional amounts of stock two other employees in forgiveness and salary accrued but not paid; and

on or before September 30, 1999 the Company issued approximately 33,000 shares to Bains in exchange for forgiveness of approximately $20,000 of accrued salary. The Company again issued additional amounts of stock to two other employees in exchange for forgiveness of salary accrued but not paid.

More than 94% of the Company's revenues were derived from three customers in 1998 and the Company experienced "reductions, delays and cancellations in orders from [its] new and existing customers, particularly in the Korean marketplace." A much needed and touted order in January 1999 for $5.4 million of amplifiers stopped shipping before even 20% of the order had been shipped, allegedly because the customer changed product specifications. Shipping on this order never resumed in 1999.

The Company repeatedly failed to pay vendors. Several former employees reported that the Company received dunning calls and letters. The Company has been sued by vendors for failing to pay for items purchased and services rendered.

Several former employees stated that their pay checks had bounced and that premiums for medical insurance were not being paid in a timely manner by the Company.

In Amplidyne's financial report to the SEC, for the period ended June 30, 1999, filed on Form 10-Q and dated August 13, 1999 (the "June 1999 10-Q"), the Company reported a net loss of $785,289 for the six months ended June 30, 1999, compared to a loss of $684,009 for the same period in the prior year. In the June 1999 10-Q, Amplidyne reported that its revenues and gross profits shrank to $423,000 and a loss of $2,900, from $503,000 and a profit of $127,000,

respectively, in the same period the prior year. As a further sign of financial weakness, the Company's receivables grew to $5 15,000 on June 30, 1999, from $441,000 on December31, 1998, and inventories totaled $801,000 up from $559,000 during the same period. The net loss for the second quarter nearly doubled to $485,000.

Prior to the Class Period, Amplidyne also suffered financially because the Company experienced a significant amount of product returns. According to former Amplidyne employees who were privy to information and discussions about the relevant facts, over 750o of Amplidyne's feed forward amplifiers, the Company's core product, were returned by customers due to defects that plagued the product. For example, Korea Telecom, Amplidyne's largest customer, returned all thirty amplifiers that it had purchased from the Company because of problems that Korean Telecom was experiencing with its use of the products.

In fact, the Company had been under such continuous financial pressure that, in December 1998, it signed a Letter of Intent to be acquired by Microwave Power Devices, Inc. of Hauppauge, New York, for $7.2 million in stock, or approximately $1.50 per share. On January 21, 1999, however, this proposed merger was canceled without explanation.

At the time the Company filed its June 1999 10-Q, Amplidyne's stock traded below $2.00 per share. This low share price, which was then almost 60 percent below the $5.00 offering price, made it highly unlikely that, the Company would be able to redeem its warrants and reap a huge financial benefit. The Company has over 1.6 million warrants outstanding. Each warrant entitles the holder to purchase one share for $6.00 during the four-year period ending January 21, 2001, subject to the Company's right of redemption which can only be exercised if the average closing price equaled or exceeded $9.00 per share for any twenty consecutive trading days. Should this occur, the Company can redeem the warrants at a price of $0.01 per warrant, at any time with not less than thirty days' prior written notice.

In addition, the Company had distributed large amounts of stock and warrants to purchase stock to employees and third parties in lieu of paying obligations in cash. These persons and entities, including Bains, his wife and his brother, could only reap a financial benefits if the Company's stock price rose.

Thus, defendants needed to reinvigorate the Company's stock price in order to both reap monetary reward and infuse the Company with desperately needed cash. To further this goal. the Company purportedly created a division dedicated to wireless Internet activity.

Defendants began their attempt to increase the Company's stock price in May 1999 when the Company issued a press release to "Business Editors/High Tech Writers" touting that Amplidyne has established a "Wireless Internet Division." The purported "new" division would be headed by defendant Bains. assisted by two board members that had been with the Company for over a year. Moreover, one of these Board members, Charles Ritchie, did work for AT&T/Lucent but was employed on the sales and marketing side of the business. The other Board member, Mannish Detroja, is self-employed and runs two companies -- Keystone Laminates, Inc., a plastics company, and Current Circuits, Inc. Bains is quoted in the Company's press release as

saying: "This is a very exciting phase in the development of the company and it products as related to the high speed Wireless Internet Access."

The creation of a purported division within Amplidyne indeed would be something "new." Former employees have reported that of the approximately 40 employees, most worked in manufacturing, the Bains Family handled the sales and accounting aspects of the business and the May 20, shipped to approximately five engineers were employed to tune amplifiers before they were customers. The Company had no research and development department or division.

Despite the defendants' efforts, the press release was only picked up by 1999 edition of <u>Wireless Today</u>, which reported:

Amplidyne Inc. [AMPD], a company with expertise in both digital signal processing and RF technology, today announced the establishment of a division which will provide "total solutions" for delivering high-speed wireless Internet access connectivity.

Despite the purported creation of the Company's new wireless division, the following facts indicate that the Company was still experiencing serious financial difficulties immediately prior to the Class Period. For example:

according to a former Amplidyne employee, the Company constantly received calls from the Company's suppliers, including, among others. P&O Machine Shop in Bridgewater. New Jersey, and California Eastern Labs, complaining that they had not been paid for their services;

according to former Amplidyne employees, defendants experienced difficulties in paying the Company's employees their salaries and benefits. Several Amplidyne employees had their pay checks bounce and medical coverage cut without their knowledge. Although defendant Bains had taken money out of Amplidyne's employees' paychecks for medical coverage, he apparently failed to pay the medical coverage bill; and

compared to the success that Amplidyne's competitors were enjoying in the wireless telecommunications market, the market was not receptive to the Company's products. For example, Powerwave and Digital Microwave, competitors in the amplifier field, realized revenues in the second fiscal quarter of 1999 of $68.5 and $66.0 million, respectively, as compared to Amplidyne's revenues of $423,000.

Thus, it was against the desperate financial condition of the Company that defendants embarked on a scheme to artificially inflate the price of the Company's stock, eventually by over 500 percent in two days (Amplidyne common stock rose from $3. 13 per share on September 9, 1999, to a high of $16.75 on September 10, 1999). by issuing a materially false and misleading press release, which among other things, mischaracterized the uniqueness of the Company's technology, its efficacy, its cost competitiveness and other characteristics about its products. This press release, published by the Company on September 9, 1999, inflated the price of the Company's common stock well above the levels necessary to position the Company to redeem its warrants, and thereby reap a huge, albeit illicit, financial gain. However, before the Company could capitalize on the artificial inflation in the price of its stock which defendants' materially

false and misleading press release had created, investors learned of the defendants' misstatements and omissions, and the price of Amplidyne shares dropped precipitously, reaching a low of $4.75 per share in intra-day trading on September 17, 1999.

**Materially False And Misleading**

**Statements Made During The Class Period**

On September 9, 1999, the beginning of the Class Period, the Company issued a press release, published on Business Wire, in which it announced that it had introduced "new" and revolutionary products which purportedly would provide high speed wireless Internet access many times faster than conventional services. The press release highlighted the uniqueness of the Company's new products by stating, in part, the following:

Amplidyne, Inc., a manufacturer of wireless amplifiers and data communication equipment, has just announced a **new set of products**, to offer high speed wireless Internet access. The Amplidyne equipment will be compatible to IEEE802.11 standards. [Emphasis added.]

Additionally, the press release focused investor attention on the fact that the Company's new products purportedly would allow customers to connect their entire computer network to the Internet wirelessly, at a range of up to fifty (50) miles and at very low rates. In this regard, the press release stated, in part, the following:

Finally, the press release quoted defendant Bains, who attempted to create the impression that the Company had itself

**patented technology.** I personally am very excited to be a part of this **new technology** as we envision a world able to communicate through wireless connectivity for the new millennium. Exciting new products with higher speeds are being developed and will be available in due course from our new division." [Emphasis added.]

To ensure that investors would take note, the press release used the magic words "high speed" and "wireless Internet access" more than five times in a half-page press release. Investors seeking more information were instructed to contact "Sharon Will, Investor Relations, AMPLIDYNE, INC."

Defendants' representations that (i) the Company had just introduced a "new set of products," (ii) the products had "been developed in a relatively short span," (iii) the "new technology" enabled defendants to "line of sight links up to 50 miles," (iv) the Company was now "able to offer subscribers Internet access with speeds up to 2,000 Kbps," (v) "all computers on that network" would have continuous high speed wireless Internet access," and (vi) at a "fraction of the cost of having wired Internet service" are materially false and misleading for the following reasons, among others:

Contrary to defendants' representations, the Company's technology was not "new" or revolutionary, but in fact, had been available in the market for quite some time. For example:

Amplidyne's purported new product was so substantially similar to a product developed by one of its competitors, YDI, Inc. ("YDI"), that Amplidyne's September 9 press release plagiarized a description of its "new" found technology directly from a YDI press release that had been published approximately ten months earlier. As had Amplidyne's Press Release, the YDI press release which introduced its wireless Internet product, stated, among other things, the following:

Using equipment in the license free 2.4 GHz band, **YDI** is able to offer subscribers Internet access with speeds up to 2,000 Kbps (2 Mbps), much faster than a 28.8 Kbps dial-up telephone connection! Also, this high speed connection will be available automatically 24 hours a day -- no dialing or user intervention is necessary.

This will enable all computers on that network to have continuous high-speed wireless Internet access at a faction of the cost of having wired Internet Service.

In June 1997, Proxim, a leader in the wireless local area networking (LAN) industry, announced its plans to deliver a high-performance frequency hopping wireless LAN based <u>on the IEEE 802.11 standard.</u> Thus, contrary to defendants' representations that the Company's recently discovered technology was new, in reality, the Company's purported "new" product was based on existing technology, developed and marketed by other companies, that had been introduced to the wireless Internet market more than two years earlier.

Another one of Amplidyne's competitors, Adaptive Broadband ("Adaptive"), announced, on the same day that Amplidyne issued its September 9 press release, that it had "successfully demonstrated wireless transmissions involving simultaneous point-to-multipoint voice and data traffic using Internet Protocol."

Contrary to defendants' representations, the engineers and consultants from Amplidyne's "newly created division" did not develop any new technology or products. Rather the press release was derived from YDI's announcement of YDI's products. Indeed, defendant Bains has admitted that he was intimately aware of YDI's proprietary technology because Amplidyne had previously attempted to acquire YDI.

According to former Amplidyne employees with personal knowledge of the relevant facts, contrary to defendants representation that the "new" products had been "created in a relatively short span" by Amplidyne's "newly created division," in reality, defendants could not, and did not, possess the requisite resources or capabilities to create such a technologically advanced Internet product in such a short period of time, if at all, because:

Wireless Internet service is extraordinarily complex. It is not something a company can stumble upon but takes years of effort and millions of dollars to develop. Amplidyne's precarious financial state precluded defendants from spending the requisite amount of money to develop such a complex and technologically advanced product. Despite defendants' lack of knowledge

and expertise with the wireless Internet industry, defendants purportedly were somehow able to develop the Company's "new" and revolutionary technology by spending merely S 135.702 on research and development ("R&D") for the entire second quarter. Indeed the Company's R&D costs for the entire nine months ending September 1999 were a mere 5392,000. The Company reported that R&D costs were at similar levels for 1999 as 1998 and that the "trend should continue as reoccurring orders are received from customers utilizing the existing technology." Indeed the marginally elevated R&D costs reported for the first quarter of 1999 were associated solely with work on the "NMT-450 multi carrier amplifiers" which have nothing to do with wireless Internet access. Moreover, a former employee reported that Amplidyne's "R&D" costs were in fact the salaries paid to the Company's engineers who work on amplifiers. In contrast, Powerwave, one of the Company's competitors, spent $6.4 million on R&D for the quarter ending June 1999 in its attempt to develop similar technology.

The Company's products were primarily in the 1.9 Giga-hertz range. It is not technically feasible to use such products to amplify signals in the 2.4 Giga-hertz range because the components within the amplifiers are frequency dependent. To change the frequency the amplifier works with requires re-tuning the amplifier. The process of re-tuning involves changing the circuits and semi-conductors which control the process and which are built to operate with a specific frequency.

The Company's engineers did not have the technical expertise to create the type of product Amplidyne asserted it had developed. Such engineers would need to be highly skilled and have special knowledge in digital signal processing, networking, Internet protocols, antenna design, computer, electrical and microwave engineering as well as system design. Former employees and persons with knowledge believe that such highly skilled technical engineers do not work at or for Amplidyne. Every former employee has stated that during the time of his or her employment, the Company did not have and was not working on the technology related to wireless Internet connections. Such technology was foreign to the engineers at the Company, including Bains, and it was not discussed with any of the engineers as a possibility that the Company was even working towards. Moreover, because of the Company's precarious financial position, the Company did not have the funds to hire such individuals or retain their services on a consulting basis.

The Company did not have the right tools or equipment necessary to develop such technology. The Company does not possess any sophisticated printed circuit board design tools or the software necessary to develop chip masks. Morever, because of the Company's precarious financial position, it did not have the funds necessary to purchase such equipment.

The Company did not possess the adequate equipment that was needed to assemble the product. As described above, in July 1999 the Company moved out of its 21,000 square foot headquarters to a much smaller 11,400 foot site.

Contrary to defendants' representations that its products would provide "subscribers Internet access with speeds up to 2,000 Kbps" over a distance of "50 miles" and that "all computers" on a subscribers network would have "continuous high speed wireless Internet access," the products

and technology the Company purported to have did not have the capabilities the Company claimed existed. For example:

In order for a signal to be carried over 50 miles without degrading to the point it is no longer useable, the signal's power must be very high, typically in the kilowatt range. Using an omnidirectional antenna to service multiple subscribers would require an extremely high signal strength just to cover a much smaller area -- more like 5 miles than the 50 miles Amplidyne claims. Even using a directional antenna, the signal strength needs to be very strong because the directional antenna's signals are degraded whenever they encounter a barrier in the line of sight between the transmitting and receiving antennae. It is unlikely that any Company would design or produce products using this amount of power as the FCC limits the unlicenced band users to 50 milowatts. Former employees with knowledge of the Company's products and capabilities do not believe that the Company has products with these capacities nor that the Company had the ability to develop such products.

Even the products Amplidyne claims it has for wireless Internet access are not "high speed" nor do they cover the area that the press release stated they would. The technical specifications say that the greatest distance the product can achieve is 20 miles when transmitting a smaller amount of data than the 2 Mbps touted in the press release. If more data is transmitted, at or above the amount of touted in the press release, the farthest distance achievable is 5 miles using an extremely narrowly focused directional antenna. When the Company's omnidirectional antenna is used, the distance falls to 5 miles, sending less data than touted in the press release, to as little as 1 .86 miles when sending data at or above the levels touted in the press release.

Notably, other companies that claim to have products for wireless Internet access have not claimed a maximum distance beyond 25 miles and further qualify that distance as "maximum performance" requiring an unobstructed line of sight, specific antennae and "good" links.

Amplidyne's claim that all computers on a subscriber's network would have "continuous high-speed wireless Internet access" ignores the technological requirements of the Internet protocols and the parameters of bandwidth. Each computer connecting to the Internet must transmit its data through a router. whether that router is provider by the end user as part of a network or whether it is provided by an Internet service provider such as America Online. The router functions as a base bandwidth processor. The bandwidth cannot be expanded. If several users are attempting to transmit data at the same time, the router will not be able to feed the data into the "backbone" of the Internet because the bandwidth, essentially the pipeline to the backbone, can only carry so much data. By attaching more computers to a router, access to the Internet is actually slowed.

Contrary to defendants' representations, Amplidyne's "new" technology was neither marketably feasible nor economical.

Demographics suggest that very few homes would likely be within the "line of sight" necessary to carry a 2.4 GHz signal required by the Amplidyne system. As such, the "line-of sight" connection between the rooftop and local network, as required by Amplidyne's system, would have limited applicability and would not likely positively impact sales.

Companies and Internet Service Providers that actually do provide equipment for wireless Internet access do not provide it "at a fraction of the cost of having wired Internet Service." Installation is typically at least S 1,000.00 and the subscriber must also pay for the equipment (ranging from $895 to $3,500 depending on the subscriber's needs and location) as well as monthly fees that can range from several hundred to thousands of dollars depending upon connection speeds the subscriber seeks and the amount of data transmitted.

According to a person who had an interest in the Company and spoke with Bains who has personal knowledge of the relevant facts, the Company had never beta-tested its new products and therefore lacked a good faith basis upon which to claim that its new products had a fifty mile range or any of the other capabilities ascribed to them by Bains and the Company. Mr. Bains told this person that the Company had only tested pre-beta equipment in its lab and the Company had not operated any equipment over a 50-mile distance. Bains declined to allow this person to test the Company's alleged products. In fact, at the time the Company issued the September 9, 1999 press release, the Company had new products in operation, it had <u>no</u> systems in the field, it had never tested its equipment at such long ranges and the Company only had tested pre-beta equipment in its 11,400 square foot laboratory.

Because the Company never beta- or field-tested its "new" products, the Company lacked a reasonable basis to claim that its system would provide Internet access for "all" users of a network, when in fact, the Company did not know how many system users such a system would support at any given distance.

Because the Company had neither beta- nor field-tested its systems, the Company lacked a reasonable basis upon which to claim that its products provided Amplidyne clients' significant cost savings over wired Internet service systems. In fact, the Company could not price its products until it knew what the true costs were related to the development and manufacture of its product, and when interviewed, defendant Bains subsequently admitted that the Company <u>could not</u> comment on paces.

Based on the fact that the product had <u>not</u> been beta tested, and that <u>no</u> operational systems were being field-tested, it was materially false and misleading to create the impression that these products would be available for sale in the short term (i.e. 60-90 days), when in fact, the Company did not know when these products would be available for market, or what the pricing of these products would be.

Another telling sign that the Company had not developed any revolutionary new technology was the glaring failure of Bains to seek any patent protection. Defendants failed to patent the Company's revolutionary new wireless Internet technology, despite the fact that Bains went to great lengths to patent his amplifier technology. which was not revolutionary, and insisted employees sign non-disclosure and non-compete agreements before they could work with his amplifiers.

The Company stood idly by as its stock increased over 500 percent in two days, never once taking the responsible action of correcting its previously issued press release so as to correct the misperceptions which defendants knowingly, or recklessly, caused and then disregarded. Instead,

defendants continued to assert the Company had unique, ground breaking products. For example, defendant Bains fueled the stock frenzy by claiming, on September 13, 1999, that the price of Amplidyne stock was still "too low," based on the Company's purportedly unique products and technology.

Defendants' unequivocal false and misleading statements concerning the Company's "new" and revolutionary technology had the effect defendants intended. Indeed, in reaction to defendants' announcement, the price of Amplidyne's common stock rose from approximately $3.00 per share, to a high of S 10. 13 per share in trading of 17.3 million shares, approximately 600 times its three-month daily average on September 9, 1999. According to Bloomberg news service, the substantial rise in Amplidyne stock was due, among other things, to the market's perception that the Company's new products would "enable all computers on a network to have continuous high-speed wireless Internet access at a fraction of the cost of wired Internet service on the current lines."

The reaction to Amplidyne's press release was dramatic. Bloomberg News reported that, during the trading day of September 9, 1999. the Company's stock "rose 5 3/4, or nearly tripled, to 8 7/8 and traded as high as 9 23/32. The maker of power amplifiers for wireless and satellite telecommunications said it introduced a set of products to offer high-speed wireless Internet access."

Bloomberg News in an article entitled "Amplidyne Shares Rise as High-Speed Internet Access Introduced" also reported on September 9, 1999:

Amplidyne Inc. shares more than tripled after the make of power amplifiers for wireless and satellite telecommunications introduced a set of products to offer high-speed wireless Internet access.

The Company will be able to able to offer subscribers Internet access with speeds up to 2,000 kilobits per second, much faster than a 56 Kbps dial-up telephone connection.

An Amplidyne Access Point Device, located at the subscribers' home or office, would connect to a wired local area network. This will enable all computers on that network to have continuous high-speed wireless Internet access at a fraction of the cost of wired Internet service on the current lines.

Bloomberg reported in its "final" edition for September 9, 1999 that the Company's stock "rose 7, or 2240o, to 10 1/8" after the Company "said it introduced a set of products to offer high-speed wireless Internet access."

The stock's movement attracted the attention of reporters at The Street.Com. In an article published there, Amplidyne's technology was again described:

When installed at a subscriber's home or office, Amplidyne's terminals connect wirelessly to local networks and the Internet. Amplidyne says its transmission speeds approach 2 megabytes per second, which is competitive with the increasingly popular cable modems.

Defendant Freedman is also attributed in this article with stating Amplidyne will ship commercial units late this year (1999).

The trading frenzy in Amplidyne's stock continued the following day as the news of Amplidyne's alleged new products moved through the market. During the day of September 10, 1999 the Company's stock traded as high as 16 34 per share -- nearly 5 times it opening price before the Company's deceptive press release. Remarkably, a company with a "float" of a little over 2.8 million shares[1] traded over 38 million shares over the course of only two single trading-days.

### The Financial Press and Stock Analysts

### <u>Begin To Challenge the Defendants' Statements</u>

On September 13, 1999, the market was shocked to discover that the statements which caused Amplidyne's stock to rocket by astronomical percentage increases were false and materially misleading, and omitted to state material facts necessary to make the Company's statements not materially false and misleading. On this day, <u>Bloomberg</u> published a news report which began by summarizing the prior days' events, stating, in part, the following:

<u>The Raritan, New Jersey, company surged as much as 13 5/8 to 16 3/4, a record,</u>

<u>Thursday and Friday as 38.2 million shares traded.</u> The stock fell 2 5i'16 to 9 15/16 in early trading today)[2]

After summarizing Amplidyne's spectacular price action over the past few days, the <u>Bloomberg</u> report attacked the veracity of the Company's September 9, 1999 press release, in substantial part, as follow's:

**Young Design Inc., a competitor in Falls Church, Virginia announced a similar product almost a year ago.**

**"If you look at the press release, they're not describing anything that hasn't been out there on the market for at least a year," said Rob Fitzgerald. chief executive of YDI, a private company.**

<u>Last Oct. 1 9. YDI announced a high-speed wireless Internet access system that, like .Amplidyne's, offers Internet access at speeds up to 2,000 kilobits per second.</u>

**Amplidyne's press release uses language similar to YDI's.**

<u>"This will enable all computers on that network to have continuous high-speed wireless Internet access at a fraction of the cost of having wired Internet service,</u> said both releases.

**Bains said the similarity to YDI's release was probably a coincidence, he said**

he was familiar with the company and had even tried to buy it...

**Bains said Amplidyne's high-speed wireless Internet access system was developed by a staff engineers and consultants over the past nine months at a cost of more than Si million.**

[However] [a]ccording to Amplidyne filings with the Securities and Exchange Commission, spending for research and development declined 5 percent to 8135,702 in the second quarter. The company spent 8811,612 on research and development for 1998 and the first half of 1999 combined, the filings show.

After last week's price surge, Amplidyne's 5.8 million shares outstanding were worth 871 million. That's about 10 times more than its shareholders would have received when it agreed to be acquired late last year. [Emphasis added.]

Even in light of these revelations, defendants continued to mislead the market. Bains implied that the Company had a product line ready to be sold and again emphasized that the share price was undervalued:

Bains, who owned 3.24 million shares as of March 31, said the stock's price is still "too low." Amplidyne first sold shares to the public at S5 each in January 1999.

"We have probably the world's best product," he said.

Amplidyne said its high-speed access device provides Internet service that's 36 times faster than a 56k telephone dial-up modem. Users must place special antennas on their rooftops that would be connected to Amplidyne's equipment.

Bains said the company isn't ready to show the new product to potential customers. "It's probably not the right thing to do," he said. "We have to make sure everything is right before we demonstrate it."

He said the product line, to be manufactured in Asia, won't be rolled out for 60 to 90 days. He declined to discuss pricing.

Bains said Amplidyne's high-speed wireless Internet access system was developed by staff engineers and consultants over the past nine months at a cost of more than $1 million.

On September 14, 1999, the defendants continued their misrepresentations so to inflate the Company's stock price. On September 14, 1999, Bains appeared on CNBC's program "Squawk Box" to discuss the Company and its business. During that interview, Bains made several false and misleading statements, and failed to correct statements he knew were incorrect, including the following:

MARK HAINES - CNBC SQUAWK BOX ANCHOR: Investors have been screaming for shares of data amplifier Amplidyne (AMPD). The Stock took off last week. Jumped 400 percent from 83 to as high as 516. Lost some steam yesterday. Closed down 3 at 59. The move came after the company debuted new wireless equipment that provides Internet access 35 times faster than the more common 56k modem. That lets Internet service providers offer faster and cheaper 24-hour service without dial-up or user intervention. So, what does all this mean for the company? Here to answer that is Dave Bains. He's chairman and CEO at Amplidyne.

DAVID FABER: Sir, you know, your stock took off in part because of this new equipment. I guess, that you announced, but there's been some questions about just how new the equipment is and also whether it's really ready to go. You said it's in beta testing. I believe. Can you clarify, please, what exactly is going on? Is it new? And are your ready to actually sell it?

BAINS: Yea. **The equipment is new. And we are ready to sell**

**it.** We feel that with this type of equipment, we need the time to get it rolling into the marketplace. **We will be signing up ISPs in the next 60 to 90 days. And after that we will be able to roll out the service.**

FABER: Do you have any equipment though in the field at this time? And what has the beta test been involved with? Because my understanding is it has to operate over, what 50 miles? Is that correct?

**BAINS: The service is** able to get to 50 miles by using the (INAUDIBLE) technology. **So we** are able to project these numbers based on our experience and our testing.

FABER: **So you're projecting them, but don't know whether it works in the field at this point?**

BAINS: No, **it does work in the field.**

FABER: **Do you know that?**

BAINS: **I know that, yes.**

FABER: **Because you have tried it there?**

BAINS: **Yes.**

FABER: **Over the 50 miles.**

BAINS: **Over the 50 miles, yes.**

DAVID SIMON: Mr. Bains I have a question for you. As recently as December '98, you entered into a merger agreement with Microwave Power Design whereby you were willing to sell your whole company for $7.2 million. Now your company has a market value of somewhat closer to 550 to $60 million. That merger transaction fell apart. because Microwave decided not to go forward. What's changed in the last eight months that you think your company is still undervalued at S50 million where somebody walked at $7 million?

BAINS: I think once we started looking into the wireless Internet market, we decided to pursue this very' aggressively. We see -- we say that the key element is time to market. And that is why, I think, that we are where we are now.

The Company issued an additional press release on September 15, 1999 again touting its "new" technology and implying that the technology was greatly sought after by customers:

Amplidyne, Inc. has received many inquiries regarding its new set of products relating to high speed Internet Access that it had previously disclosed on September 9th, 1999.

The Company's new products are compatible to the existing IEE

802.11 standards. The Company believes that its products will offer a solution to ISP's requiring high speed Internet access, at a fraction of the cost of having wired Internet service.

This press release directs investors seeking more information to contact "Sharon Will, Ii₁vestor Relations, AMPLIDYNE, INC."

Defendants' continued representations, reported in <u>Bloomberg</u> report on CNBC, and through additional press releases or public statements, concerning the purported abilities of the product, including, among other things, that the "new" technology will enable <u>all</u> computers on that network to have continuous high-speed wireless Internet access at a fraction of the cost of having wired Internet service, were materially false and misleading for the reasons set forth in paragraph 40 above.

In addition, the defendants' representations were materially false and misleading for the following reasons:

Defendant Bains' representation that the Company spent the past "nine months" developing new technology at a cost of $1 million is completely contradicted by the Company's own SEC filings. Amplidyne's June 1999 10-Q indicates that the Company spent only $267,000 on R&D for the first half of 1999 and Amplidyne's September 1999 10-Q show's that the Company spent just another $125,000 for R&D for the following three months. This number is less than half of the "one million dollars" Bains claims the Company spent.[3] Furthermore, although defendants credit their new R&D division for developing the "new" technology, because the division had only been in existence for three months, since May 1999, at the time of the September <u>Bloomberg</u> story, it would have been impossible for defendants to have worked on the project for nine months or to have spent more than the $125,000 the Company reported to the SEC.

On or about November 2, 1999, Freedman told a shareholder, who called seeking information on the products, that no time frame had been set or a location determined to unveil the new products Bains touted as ready to sell in September 1999. Upon further questioning, Freedman told this person there were still "kinks" in the equipment to be worked out.

On or about November 2, Tochi Bains, the brother of defendant Bains and the Vice President in charge of Sales and Marketing for the Company, as well as a Director of the Company since 1991, told a shareholder who called inquiring about the Company's alleged products for wireless Internet Access that "1 know nothing and do not have any dealings with this equipment.

On or about December 7, 1999, Amplidyne announced it had "signed a letter of intent to sell high-speed Internet access products to Ingressnet LLC, a New Jersey service provider." An employee of Ingressnet with knowledge of the facts stated that the only materials Amplidyne is providing to Ingressnet is a "basic amplifier." A basic amplifier standing alone does not facilitate Internet connections.

In connection with a recent offering of warrants and an offering of another 2 million shares of stock by certain "selling security holders," Amplidyne made certain filings with the SEC. In both Form S-3/A (relating to the warrants and filed January 3, 2000) and Form S-3 (relating to the offering of stock by selling security holders and filed February 8, 2000) the Company describes its business as:

Currently we compete primarily with non-captive suppliers of power amplification products. We believe that our success will be based primarily upon servicing, pricing, reputation, and our ability to meet product delivery schedules.

Neither document discusses wireless Internet access technology as part of the Company's current offerings, even though 5 months earlier defendants stated the products were field-tested and ready to ship in 60-90 days. Indeed, both documents confirm that there were 112 products field tested or ready for sale in September 1999 as they state "we are currently developing new' products for high speed Internet access."

Any negative reaction to these revelations uncovered in the Bloomberg article were offset by defendants' continued false and misleading statements. On September 13, 1999, Amplidyne's shares receded to a low of $8.93 per share. The following day, September 14, 1999, Amplidyne's stock opened down and fell as low' as $6.59 per share. As the Company's additional announcements offset the truth disclosed by market analysts, the Company's stock moved slightly up and down until the market had the opportunity to digest the facts uncovered by financial analysts and settled in the $4-5 per share range on September 17, 1999.

## Undisclosed Adverse Information

During the Class Period, the price of Amplidyne common stock fell, in total, $12.00, from a high of $16.75 reached on September 10, 1999, to a low of $4.75 on September 17, 1999. As a result of the dramatic decline in the value of the Company's stock, and consequently its warrants, plaintiff and the other members of the Class have been damaged.

The market for Amplidyne's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Amplidyne's common stock traded at artificially inflated prices during the Class Period. The artificial inflation continued until the time the market learned that the spectacular claims made by defendants in the September 9, 1999 press release were materially false and misleading, and that, in fact, the Company was not introducing "new" and revolutionary technology, but was rather re-introducing a pre-existing technology which had many undisclosed limitations and which had already failed in the marketplace due to its high price, among other things. Plaintiff and other members of the Class purchased or otherwise acquired Amplidyne common stock and warrants relying upon the integrity of the market price of Amplidyne's securities and market information relating to Amplidyne, and have been damaged thereby.

During the Class Period, defendants materially misled the investing public, thereby inflating the price of Amplidyne's common stock and warrants, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company. its business and operations, including, inter alia:

That, despite defendants claims to the contrary, the Company s technology was not "new" or revolutionary, but in fact. had been available in the market for quite some time. In fact, the product being offered by the Company was so substantially similar to other products being offered by other companies, specifically '(DI, that Amplidyne plagiarized a description of its "new" products directly from YDI's October 19, 1998 press release announcing the introduction of substantially similar technology;

According to former Amplidyne employees with personal knowledge of the relevant facts, contrary to defendants representation that the "new" products had been "created in a relatively short span," in reality, defendants could not, and did not, possess the requisite resources or capabilities to create such a technologically advanced product in such a short period of time, if at all;

Contrary to defendants' representations, the equipment was not developed by a staff of engineers and consultants from Amplidyne's "newly created division at a cost of $1 million." Rather the products were based on technology available to the Company through dealings with '(DI. which, as detailed above, had developed the same technology a year earlier. Indeed, defendant Bains has admitted that he was intimately aware of YDI's proprietary technology because Amplidyne had tried to acquire YDI earlier. In fact, according to former Amplidyne employees. the Company's engineers lacked the necessary background to successfully develop the purported newly discovered technology;

That, the Company had never beta-tested or field-tested its new products and therefore lacked a good faith basis upon which to claim that its new products had a fifty mile range. In fact, at the time the Company issued its now infamous September 9, 1999 press release the Company had no new products in operation. it had systems in the field, it had never tested its equipment at such

long ranges and the Company only had tested pre-beta equipment in its 11,400 square foot laboratory;

That, also, since the Company never beta- or field-tested its "new" products, the Company lacked a reasonable basis to claim that its system would provide Internet access for "all" users of a network, when in fact, the Company did not know how many system users its system would support at any given distance;

That, since the Company had neither beta- nor field-tested its systems, the Company lacked a reasonable basis upon which to claim that its products provided Amplidyne clients' significant cost savings over conventional cable modems and satellite systems. In fact, the Company could not price its products until it knew what the true costs related to the development and manufacture of its product, and when interviewed, defendant Bains subsequently admitted that the Company could not comment on prices; and

That, based on the fact that the product had not been beta tested, and that pp operational systems were being field-tested, it was materially false and misleading to create the impression that these products would be available, in the short term (i.e. 60-90 days). when in fact, the Company did not know when these products would be available for market, or what the pricing of these products would be.

At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Amplidyne's products and consequently its business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Amplidyne and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## SCIENTER ALLEGATIONS

As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Amplidyne, their control over. and. or receipt and/or modification of Amplidyne's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Amplidyne, participated in the fraudulent scheme alleged herein. For example:

When Bains said, "The introduction of these new products from our newly created division, in a relatively short span, is an excellent achievement for Amplidyne," he knew the statement was false because Amplidyne's "new" division had not created the alleged products.

When Bains said Amplidyne's high-speed wireless Internet access system was developed by staff engineers and consultants over nine months at a cost of more than $1 million, Bains knew this was false in that Amplidyne had spent less than half of this amount on R&D and that money went to engineers' salaries working on a plain vanilla feed forward amplifier not high speed wireless Internet access technology, and Amplidyne's "staff engineers and consultants" had nothing to do with the alleged products.

When Bains said, "the equipment is new. And we are ready to sell it," he knew that the alleged products were merely a copy of the '(DI system which had been in the market for over a year, and that Amplidyne was not ready to sell one piece of their alleged product in September 1999.

When Bains said the alleged product worked in the field and that it had been tested in the field and tested over a distance of 50 miles, Bains knew Amplidyne had never field-tested the equipment, let alone over 50 miles.

When the defendants published the statement that Amplidyne's alleged products would enable "all computers in the network to have continuous high-speed wireless Internet access at a fraction of the cost of having wired Internet service," they were reckless in that they knew or should have known that the Company had not tested the alleged product nor priced the alleged product and could not say whether it would work, how it would work or how much it would cost.

Because of their position and access to information, defendants had actual knowledge that their statements were materially false and misleading.

Defendants would profit from their actions in several ways if their scheme was at all successful:

If the Company's stock price closed at or above $9 per share for any twenty consecutive trading days, the Company would be entitled to redeem its warrants and reap a huge financial benefit.

By inflating the Company's stock price, Bains would be able to substantially improve his and Amplidyne's financial net worth and obtain additional financing which the Company desperately needed as well as protect and enhance his executive positions and the compensation and prestige he obtained thereby.

By inflating the price of Amplidyne common stock, defendants would be able to utilize Amplidyne stock as currency to acquire other companies which had proprietary technology and to allay investor concerns about the Company's operating condition and business prospects.

By generating interest in the Company's products and future, defendants were able to offer warrants and generate additional financing for the Company.

By generating interest in the Company's products and future, defendants would be able to sell their holdings in a follow-on offering by the Company of shares sold by selling security holders. The S-3 filed with the SEC by the Company discloses that the selling security holders include BridgeVentures Inc., selling 150,000 shares, and Saggi Capital Corp., selling 100,000 shares. This is more than 10% of all stock being sold by "selling security holders." As discussed at paragraph 10 above, defendants Freedman and Will own or control BridgeVentures, Inc. and Saggi Capital Corp. and will personally profit from a successful follow on offering.

By generating interest in the Company's products and future, thereby inflating the Company's stock price, defendants Freedom and Will would enhance the value of the Amplidyne stock and stock options they held directly and indirectly.

Discovery may reveal that Freedman and Will sold shares during the Class period. As the defendants assert that Freedman and Will are no longer officers of Amplidyne, they may also assert that they are no longer required to disclose their trading activity in the Company's stock.

### Applicability Of Presumption Of Reliance:

### Fraud-On-The-Market Doctrine

At all relevant times, the market for Amplidyne's stock was an efficient market for the following reasons, among others:

Amplidyne's stock met the requirements for listing, and was listed and actively traded on the NASDAQ National Exchange. a highly efficient and automated market;

As a regulated issuer, Amplidyne filed periodic public reports with the SEC and the NASDAQ National Exchange; and

Amplidyne regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

As a result of the foregoing, the market for Amplidyne's stock promptly digested current information regarding Amplidyne from all publicly available sources and reflected such information in Amplidyne's stock price. Under these circumstances, all purchasers of Amplidyne's common stock during the Class Period suffered similar injury through their purchase of Amplidyne's common stock at artificially inflated prices and a presumption of reliance applies

### NO SAFE HARBOR

The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when

made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Amplidyne who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of

### The Exchange Act Against And Rule 10b-5

### Promulgated Thereunder Against All Defendants

Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

During the Class Period, Amplidyne and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Amplidyne's securities; and (iii) cause plaintiffs and other members of the Class to purchase Amplidyne's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Amplidyne's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-S. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

In addition to the duties of full disclosure imposed on defendants as a result of making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

Amplidyne and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Amplidyne as specified herein. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Amplidyne's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Amplidyne and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Amplidyne's common stock during the Class Period.

The Individual Defendants primary liability, and controlling persons liability, arises from the following facts: (i) the Individual Defendants were high-level executives and directors at the Company during the Class Period or held out to the public to be such; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior officers and directors of the Company were privy to and participated in the creation, development and reporting of the Company's internal plans, projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with the other members of the Company in management positions and were advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Amplidyne's products and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's products and consequently its likely potential business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Amplidyne's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Amplidyne's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants

during the Class Period, plaintiffs and the other members of the Class acquired Amplidyne securities during the Class Period at artificially high prices and were damaged thereby.

At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the Class and the marketplace known of the true condition and business prospects of Amplidyne, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Amplidyne securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

By virtue of the foregoing. defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-S promulgated thereunder.

As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of

### The Exchan2e Act A2ainst the Individual Defendants

Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

The Individual Defendants acted as controlling persons of Amplidyne within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the product development problems, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.

In particular, Bains had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the statements and particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

In particular. Freedman and Wills had direct involvement and control over the false and misleading press releases issued by the Company and were changed by the Company with the

role of handling public relations and investor communications and are presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein and exercised the same.

As set forth above, Amplidyne and the Individual Defendants each violated Section 10(b) and Rule 10b-S by their acts and omissions as alleged in this Complaint. By virtue of their positions as a controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

Determining that this action is a proper class action, certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

Dated: March 24, 2000

**MILBERG WEISS BERSHAD**

**HYNES & LERACH, LLP**

Anita Kartalopolous (AK- 6216) (member in good

standing of the New Jersey Bar)

Bruce D. Bernstein, Esq.

One Pennsylvania Plaza - 49th Floor

New York, NY 10119-0165

(212) 594-5300

**BARRACK RODOS & BACINE**

Samuel R. Simon, Esq.

14 Kings Highway West

Haddonfield, N.J. 08033

(215)963-0600

**BARRACK RODOS & BACINE**

Leonard Barrack, Esq.

3300 Two Commerce Square

2001 Market Street

Philadelphia, PA 19103

(215)963-0600

**BERNSTEIN LIEBHARD & LIFSHITZ LLP**

Robert J. Berg, Esq.

2050 Center Avenue, Suite 200

Fort Lee, NJ. 07024

**BERNSTEIN LIEBHARD & LIFSHITZ LLP**

Mel E. Lifshitz, Esq.

10 East 40th Street, 22nd Floor

New York. N.Y. 10016

*Plaintiffs Lead Counsel*

**BERGER & MONTAGUE, P.C.**

Sherrie E. Savett, Esq.

Jill E. Sterbakov, Esq.

1622 Locust Street

Philadelphia. PA 19103

**BERMAN DEVALERIO & PEASE, LLP**

Norman Berman, Esq.

One Liberty Square

Boston, Mass. 02109

**BULL & LIFSHITZ, LLP**

Peter D. Bull, Esq.

Joshua M. Litshtz, Esq.

246 West 38th Street

New York, N.Y. 10018

**DONOVAN MILLER. LLC**

Michael D. Donovan, Esq.

1608 Walnut Street, Suite 1400

Philadelphia, PA 19103

**FINKELSTEIN & KRINSK**

Jeffrey R. Krinsk, Esq.

501 West Broadway, Suite 1250

San Diego, Cal. 92101

**FITZSIMMONS, RINGLE & JACOBS, P.C.**

Andrew R. Jacobs, Esq.

50 Park Place, 4th Floor

Newark, New Jersey 07102

**HOFFMAIN & EDELSON**

Marc H. Edelson, Esq.

45 W. Court Street

Doylestown, Pa. 18901

**KALIKMAN & MASNIK**

Peter L. Masnik, Esq.

30 Washington Avenue

Haddonfield, NJ 08033

**KANTROWITZ & GOLDHAMER**

Gary S. Graifman, Esq.

111 Chestnut Ridge Road

Montvale, NJ 07645

**LAW OFFICES OF JAMES V. BASHIAN**

James V. Bashian, Esq.

500 Fifth Avenue

New York, NY 10110

**LAW OFFICES OF LEO W. DESMOND**

Leo W. Desmond, Esq.

2 Lethington Road

Palm Beach Gardens, Florida 33418

**LAW OFFICES OF CURTIS V. TRINKO, LLP**

Curtis V. Trinko, Esq.

16 West 46th Street, 7th Floor

New York, N.Y. 10036

**LAW OFFICES OF ALFRED G. YATES JR**

Alfred G. Yates, Jr.

519 Allegheny Building

429 Forbes Avenue

Pittsburgh, Pa 15219

**LEVY & LEVY, P.C.**

Stephen G. Levy, Esq.

245 Park Avenue, 39th Floor

New York, N.Y. 10167

**SIROTA & SIROTA LLP**

Saul Roffe, Esq.

110 Wall Street, 21st Floor

New York, N.Y. 10005

**STULL, STULL & BRODY**

Michael D. Braun, Esq.

10940 Wilshire Blv., Suite 2300

Los Angeles, Cal. 90024

**TRUJILLO RODRIGUEZ & RICHARDS, LLC**

Lisa J. Rodriguez, Esq.

Ira Neil Richards, Esq.

3 Kings Highway East

Haddonfield, N.J. 08033

**WEINSTEIN KITCHENOFF SCARLATO &**

**GOLDMAN, LTD.**

Mark S. Goldman, Esq.

1608 Walnut Street, Suite 1400

Philadelphia, Pa. 19103

**WEISS & YOURMAN**

Kevin J. Yourman, Esq.

inserMatthew J. Zevin, Esq.

10940 Wilshire Boulevard. 24th Floor

Los Angeles. Cal. 90024

**WOLF HALDENSTEIN ADLER**

**FREEMAN & HERZ LLP**

Fred Taylor Isquith, Esq.

Gregory S. Nespole, Esq.

270 Madison Avenue

New York, N.Y. 10016

**Counsel for Plaintiffs**


Amplidyne Plaintiffs

Raul Abang Profit Sharing Trust

Alan Abbott

N. Abdelfattah

Charles Accetturo

Anna Acosta

D. Adams

Richard & Eloise Adams

Reynold J. Addario

Paul Adelman

Yusuf H. Aden

Thompson Adermi

Shawn Adolph

Bhoo P. Agarwal

Festus Agholor

Dr. Eugene Agugua

Peter Ahig

Fariduddin Ahmed

John Ahn

Martha Ahr

George Aiken

Narayan Akkar

Albarta Partnership

Omar Albatati

John William Albert

Omar Aldawud

Edward Aleuy

Amber Alex

Hilal Algamdi

Wisam Au

Augustine Alifo

Mohammed Alk.halifa

Frank Allen

Joyce Allen

Michael Larry Allen

Ronald Allen

Anne Allender

Nora F. Alley

Frank Allgaier

Sami Al-Mahmoud

Bennett Alpert

Lode Alteri

Jesse Alvarado

Lawrence Ambrosio

American Druid Corp.

T. Amlong

Yaa Cynthia AmpaduBoateng

Grant Anderson

Mary Andrews

Jeff Angel

Scott D. & Jodi M. Angelini

David A. Angell

Edwin Angeli

Thomas & Leslie Angone

Wenoy Antonowsky

Derek Araje

Yazdani Ardeshir

Ragner Arestad

Carlos Arguello

Amber Arkush-Nicodemus

Carlos Arnado

Eric Arnett

Ray Arnold

Michael J. Arthur

Braham Arva

Frodrick Ashford

David Ashworth

Samuel Aslanian

Syed Ateequlla

Amir Ativa

Lap Au

Bernard Augustine

Mario Aurelio

Leroy Austin

Don Avant

Rhen Avner

Lloyd Avram

Leslie N. Avers

Robert W. Avers. Sr.

Shaun Ayvazi

Gholamreza & Jaleh Babaaii

Robert J. Babbini

Bahman Bader

C. Backley Om Bahl

Denise Bacardi

Roland Bacon

Kamran Balakhanei

Vidhya Balakrishnan

J. Baldoomas

Utz Baldwin

George Baldyga

Aaron Barber

Ronald Barbera

Robert Barcus

Sanford Barcus

**W.T.** Barnett

Kenneth Barr

Patrick Barrett

Willis Joey Barrington

Mary Ann Barron

Mani Bashyam

Ronald Bathaw

Joel Battiste

Stephen Baughman

Jgnacio Bautista

Percival M. Bautista

Marlene Bayer

Mike Beaulieu

Barry D. Beavers

Kent A. Beavins

M. Bedgood

Ademe Bekele

Augusto Belen

Larry Bellard

Ruth C. Belier

Rosa Beliocco

Steve Belozeroff

Debbie B. Belton

Eiise Bender

Branden Benelli

Robert C. Benelii

Brad Benjamin

Tom Bennett

Claudia Berdugo

Jafar Berenji

Ron Bergenske

Steven Berger

Servillano A. Bemardo

Stephen D. Berry

Stephen Betti

Daisy Bhagowalia

L. Bhalia

Mark Bialkoski

Jintang Bian

Eugene Bik

Mary J. Bishop

Ronald Thomas Bishop

Claude Bissonette

Billie J. Bair

Janice Blankenship

Horace Bledsoe

Winston Block

Debra S. & Roger A. Blomgren

Barbara Blumfield

A. Bohlin

Raul Bolggiani

Avedis Boornazian

Dolores & John Borges

Frank Bosco

George A. Bottoni. Jr.

Ange Boursiquot

A. Bouthillier

Bruce Allan Boyd III

William & Beulah Boyd

Virginia Boyett

Christopher Boyle

Donald Boyle

Larrv Bovtee

Darren Brachman

Jeffrey Bradin

James A. & Vicki A. Bradley

Alice Bradshaw

Mark Brakke

B. Brase

Steve Brasslett

Robert A. Brazell, Jr.

Nancy Brecher

Michael Brenner

Charles F. Brenon, Jr.

Thomas Brezinski

Grady Brewer

Steve Brickley

Todd Brindley

Patrick Bristot

Tina Ling Bnttain

Rosa I. Broche

Russell Brose

Betty Brotherton

Charles Brown

David W. & Patricia A. Brown

Homer Wesley Brown

John Brown

P. Brown

Ray Brown

Robert Brown

Susan Brown

William Brown

Donna Broyard

Martha Brugler

Dean Brumbaugh

Richard Buck

Carl J. Buckley

Dorothy Buckilin

Hung K. Bui

Ngoc xn Bui

Thomas Bunk

Andres Bunnan

Alice & Francis Burbank

Jonathan Burchel

Kay R. Burgess

Pam Burke

Paul & Jane Burke

Deidre Burkholder

Harold Burkholder

Lani A. Burns

JoAnne Burrage

Jacqueline R. Burt

Harry Bushaw

Dan Bussone

William Patrick Butler

Roy Byerly

Mark Byers

Julius Caballero

Libbie Caballero

Mario Caccamo

Sean Cadogen

Jimmy Cain

Machduit Caisford

Guy Calabro

Jack Caldwell

Brian Callahan

Emmett Callahan

Margaret Callahan

Sean Callahan

Joseph Cammiso

Gary W. Camp

Debra Campbell

Jan & Caroline Campbell

Karen Campbell

Kenneth M. Campbell

Heinz Campe

Audry Campsall

Elton Cannady

Jayson Cannon

Jeanie Cannon

Tony Cannon

Mary Cantrall &

Wesley Capes

Frederick Cappo

Marshall Capps

Paul P. Capra

Marguerite Carini

Julie Calm

E. Carr

M. Carr

Linda D. Carannante

Rolanda D. Carey

Gerald Carlson

J. Clayton Carson

Bernard Carrol

William Carter

Charles Caruana

Joseph Lee Caruso

John Cash

A. Chait

James B. Chambers

Sonata Chan

Ramesh Chand

G. Chandok

Gerald P. Chapman

John Charba

Carol A. Charlantini

Darnell Charlton

Rodney Chatman

Manash Chaudhun

Albert Cheong

Richard Chemy

Barbara Dom

Charlotte H. Chesterman

Joseph Chiarovano

Anthony Chieffo

T. Chien

George Childress

Robyn Chiminiello

Essetta Chin

Wendrell Ching

Frank Chirico

Jerzy Chodorowski

Sheung Choi

Cyril Chorath

C. Chou

Mohammad Choudhry

Hubert Chow

Pete Chow

Y. Choy

Elaine Christie

John Christopoulos

P. Chrzanowski

Sean Inyeod Chu

Charles Cioling

Donna A. Cinelli

Alexxi Cmi

Gary Wayne Cisneros

John Clark

Paulette Y. Clark

Luisto Claudio

Russell Keith Clay

Thomas Cleary

Richard Cleveland

Gwendolyn H. Cline

William E. Cline

Willie Clopton

Jonathan Cloud

Brendan Coen

Gene & Naomi Cohen

Mary F. Coley

Daniel J. Collins

George Conn

Sharon Conner

V. Consalazio

Robert J. Conway

Stephen Conway

Karolyn Cooks

C. Copeland

Jack Coppedge

S. Coon

Leroy Coote

Abel Coronado

Alexander Corpuz

Brian Costa

Nofrio & Yolanda Costa

Andrew Costello

Mark L. Cottle

Andrea Courtney

Philip C. Cox

Marie Coyle

Hugo F. Coz

Don Crawford

Rosemary Craycroft

Louis Cretella

Billy Ray Crittenden

Bobby L. Cross

Jesus E. Cruz

L. Cruz

Robert F. Cullinane

Robert Cygan

Leon Czarniak

Alexander Czech

Ricardo Daclison

Abbas & Donna Daliei

Angelo Daluisio

Alex Damalas

Anthony Dambrosio

Olga Damo

Robert Danelson

Kimberly Daniels

Keith Darity

Pamela Davies

Frederick Davis

Hai Davis

Laura G. Davis

Tony L. & Cathy B. Davis

Souren M. Davoudi

Vazgen Davoudi

Paul Dawson

Giovanni Debari

Robert Decker

Eleazer Deguzman

John Delancey

Maria DeMarco

Kathryn DeMichael

Judith Demmert

Franeois Demond

Roy Demry

Mathilde Dennisson

Stephen Densmore

Richard Denzler

William P. Devine

N. DeVito

Clint Dewitt

Glenn 0. Dewitt

Charlene Dham

Daljits Dhanjal

Dickieson Trust

Tamara M. Didreckson

Mark J. Diedrick

Walter & Marilyn Dietze

Juliet M. DiFlavis & Patricia A. Macanany

Luigi Digrolamo

Wallace R. Dill

Eric Dimar

David Dinh

Jasmine Dinh

Ron Dipolo

David Dirst

Matthew E. Dittmar

Khosrow Djafarzadeh

Duong Do

Louis Donadio

David Donofrio

Frank D'Onfrio

George Donovan

Thomas Donovan

Elizabeth Doran

Adrian Dorman

Michael D. Dose

Jeffrey Dougherty

Patricia Douglas

Harold Doumeng

Ricky Lee Downey

Ricky Lee Downey, Sr.

Ilse Drews

Dan Driscoll

Lowell Dryzer

Mihail Dtomazos

Lori Dubbell

Cecil Eston Dubberly

Milford Dube

Theresa Dube

Janice Duley

James G. Duncan

Michael P. Dupuis

Redgie Keith Durham

Charles Early

Melissa Eastman

Donald R. Ebaugh

Duane E. Eberhardt

Irwin Eberhart, II

Barry Edwards

Dave Edwards

Michael Edwards

Marcu Eibschutz

Laurel Eiler

Renee Elawar

John Ellis

Margit Ellis

Joan Ellman

Mahmoud Elsherif

Eduardo Raposo Encarnacao

Georgette English

C. David & Norma J. Enman

Gary L. Epperhart

Rufino C. Escano

Hesctor Escobar

Edward Esposito

Yun Estes

Reginald Evans

Brian W. Everett

Elbert & Virginia Everett

Anthony Ewherido

Sirous Ezzatian

Ena Ezzeldine

Kevin Ezell

Joseph M. Fabiano

Bobby Faerman

John Fairlie

James Falbo

Afsar Fallah-Tafti

Gustavo A. FanFassian

M. Fanous

Corrina & Andrew Famster

James Farrington

Marcia Fasano

E. Fatemi

Julius Faulk

Maura Fay

S. Fecser

Alan Fedden

George M. Feher

Mansour Feiz

Harry Richard Ferguson

R. Fernandez

Diane M. Ferrari

Francis Ferraro

Steve Ferrin

J. Ferry

John Festino

John Fmnney

Dana Fiola

Thomas W. Fiscus

Karen Fisher

Richard Fitch

Janice C. Florendine

Nora Fluellen

George Fogarty

Michael Foley

Frederick J. Foote

Stephen P. Forcier

Kirk Foroozani

Prentice Forrester

M. Fortunato

Mary J. Foster

Michael L. Foster

Ted Foster

Mark S. Fowler

Mary Jackson Frame

Frank Franco

R. Fraser

Jonathan Alan Frassetti

Gunther Fraulob

Gail Frazier

Mary Frazier

George H. Frick

Edward Friedland

Jerome Friedman

Paul Friedman

Bruce Frischhertz

Kathleen Fritz

Steven Frye

Julie Fry

Gary Furcy

Terence J. Furey

Meredith Fussell

Syed & Naseeb S. Fuzail

Ragab Gadalla

Paul Gagnon

Steve Gagnon

Machduldt Gaisford

Herbert Gamble

Margaret S. Gano

Steve Gao

Madeline Garcia

Yvonne Garcia

Johann Gardarsson

Gail Garner

Charles Garrett

Charles Garris

James Garris

Ron G. Garris

Gas & More Enterprise Elena Fon

Raymond Gaspari

Paul Gaudard

W.J. Gaughan

Edward Gay

Archibald Gayares

Edward V. Gaynor

Siew Gean

James Gee

Victor Gee

Phillis Geist

Lisa Geller

Genevision (Dwayne Shealey)

Weimin Geng

Chris Genge

Jill Genzler

James I. Gibb

Harry Gibson

James Giffin

Arthur Gifford

Shirley Gilbert

Andrew Gill

Dennis Gill

Allen Gillum

Joseph Gimelli

Alec Ginas

James Ginnas

Phyllis J. Girten

Rieki Glass

John Z. Glatzer

Morton Glazer

Mark A. Glickman

Charles Goad

Rajiv Goel

Betty Goins

Robert Goldstein

Bonnie J. Good

James E. Good

Bill Gordon

David Gordon

Pamela Gordon

Robert M. Gordon

Gerry Gorman

Kenneth G. Gorski

William Gosling

Joey Goss

Jack Gotcher

Joseph Grabowski

Pamela Graf

James Graham

Carl Grant

Dale & Sharon Grate

Allan L. Graupman

Mark D. Graves

Thomas Gray

Christopher Grbhardt

Billy Green

Mark J. Green

Geoffrey Greenwall

Loraine W. Greenwalt

Thomas Gregg

John Grett

Zane Grey

Zane A. Grey, Sr.

Joseph Grider

James Allen Griffin

Thomas F. Griffin

Brent Grogan

Roger Grohmann

Theresa Grutzeck

Joann Guadagno

Vincent & Jeanette Gubitose

Rose Guglielmo

Lydia Guffey

Joyce Gugler

Daniel Gulledge

James Gunn

Thoedore Guralnik

Hasan Guzeldere

Madeleine Gween

Duc Ha

Mary Habbas

Gemard Haber

Ronny Hagar

Jorge Hahn

William G. Haick

Sandra Haight

Steven W. Haines

Edna Hale

Iris Hales

Kenneth R. Haley

Guy Halliday

Raymond Halliday

Michael Hamelin

W.C. Hankins

Ronald Hanlev

John T. Hanna

Barry Harder

Gregory L. Hargis

Douglas J. Harmer

Monty E. Harrell

Earl Harris

Helen & Richard Harris

Lloyd Harris

Wendy Harris

Sandra Harrison

Andrea Hartman

Michael Harville

Gil J. Harwood

Kay G. Hassett

Charles Hawkins

Michael Hayes

Charlie Hayes

Michael Haytaian

Christopher Healy

Laurence O. Heath

Lana Hebert

Randolph Hebert

Meribeth Hedrick

Jung Kim Hee

Robert C. Heikowsky II

James Heim

David J. Helme

Kaisha Hemingway

Elizabeth Hemmerlein

Andrew Henderson

Gerald Henke

Mavis Y. Hennessy

Willi & Cora L. Henny

Marie Heppler

Waseng Her

Stanley E. Hermensky

Ted Hemendez

George E. Hertzke

Tom Hibbard

Anthony Hicks

Rob Hiekel

Mike Highsmith

Edwin Hilarid

Bob Hill

Jim Hill

Robert & Nanette Hill

Rory R. Hiller

Lynda M. Hilliard

Andrew Hinda

Brad Hines

Michael R. Hinson

Arthur Hippler

Sara Jerry Hirschberg

Joan Hitchen

Mark Hoagland

Ana Hobbs

Richard Hockenberry

Lucien Hodelin

Don Hoehner

Barbara Von Hofgarden

Katherine Hogg

Douglas Holdsworth

Walter Hollenberger

Steve Homatas

John Honeyager

Ying Hong

Yufeng Hong

Karen Horn

Daniel Homig

Delores Hotz

Thomas M. & Bridgette L. Houghton

Bill Howell

Arthur Hcyte

Steve Hrobuchak

Robert Huaco

Wayne Hubbell

Dawn Hulse

Kerry & Larry Humphries

Hsin-Lin Hung

Arif Hussain

Fayya Hussain

David L. Hustad

John E. Hutchins, II

Dennis Hutton

David Huynh

Hai Huynh

Thomas Hyde

Chima Ibekwe

Abdussemed Ibrahim

Marianita Iglesia

Emil Imbro

Wanda mnnes

Robert Joviero

Darryl Irion

Martha Isbell

Mohamed 0. Ishmael

Karl Itzkowitz

James F. Ivan

Edware Iyadi

Steve Jackler

William Jacobs

Robert Jacobson

Marcus Jacoby

Paul Jacques

Ali Jafri

Manoj Jam

James M. Jamieson

Suk Young iang

Raymond Janisch

Bernard Janowski

Sarah Janssen

Frank Jaros

Karen Jassy

Cris Javier

Rolando Javier

Rhiu Jebb

W'aleed Jenani

Henry C. Jenkins, Jr.

Karyn Jenner

Harold Jensen

Jeffrey J. Jetter

Sam Jiang

Dan Jiminez

Wayne Jinske

David Johnson

Donna Johnson

Erika Johnson

F. Steven Johnson

Jeanne Johnson

Jimmy J. Johnson

Millard Johnson

Raymond C. Johnson

Robert Johnson

Joanne Johnston

David Jokisch

Eric A. Jonas

Chris Jones

Derrick Jones

Donna Jones

Jo Jones

Reynald Joven

Boyd Judd

Robert Julien

John Kaessinger

Shari Kaestner

Russell S. Kagehiro

Fadi Kaji

Sotiria Kalaitzoglou

Christopher & Kristina Kalili

Scott Kalis

Mohammad Kamali

Bernard Kaminsky

Steve Kanis

Jean A. Kannarko

Ahmet Barns Karacasu

Armen Karakhanian

Alexander Karwowski

Robert J. Kaser

Joshua Kash

Mary Rosanne Katske

Roger Kaufman

Kamnaz Kavoosi

Karl M. Kawano

Gilbert Kaye

Tim Kazurinsky

Thomas P. Keams

Ahworn Keef

Barbara Kelly

Esther Chen Kelly

Kerry Kelly

Tony Kenny

Joe Kenworthv

Valerie Keogh

Brad Kessler

David Kessler

Karl Kessler

Stephen B. Ketner

Esa Ketola

Kerim Kfuri

Amir Khan

Imdad U. Khan

Muhammad Khan

Hooshang Khazai

Henry Kim

Kyoung S. Kim

Sherry Kim

Yung Joo Kim

Thomas Kingman

Rodney Kirk

Darnell E. Kirkland

Scott & Nanci Kirkland

Lyle Kirtisine

Mary Kislan

Richard Kissinger

Armenak Kizirian

Mila S. Kleinbergs

Gerard Kling

Virginia & Luis Kluge

**Donald & Gladys** Klune

Michael Knish

Urban Knoll

Evanne Knorr

Mei-Ying Ko

Jeffrey Koble

Bruce Kochheiser

Edward Kocsos

Al Koehler

Mary Fung Koehler

Robert Koenig

Purshotam Kohli

Michael Kuhn

Jim Kolmeier

Constantine Konstas

Maura Kostelec

Vincent & Shirley Koster

George T. Kostoulas

James M. Kozlowski

Michael Krall

Marsha Kramer

Steven Kramer

Edward Kriemer Fund

Cynthia Krueger

Mary Elizabeth Kulyski

Tom T. Kumagai

Jenghis Kung

Dominick Kurtvan

Charles Laabs

Richard Lacey

Robert L. Lagreca

Joseph Laibinis

Frank Laiosa

Fergus Lam

Hubert Lam

Muk Wai Lam

Christine Lambrechts

John Lambros

Ann Lane

Fred Lane

William Langley

Albert La Plant

Larsa Migliorati Large

Violet Lasanen

Paul Latronicia

Steven & Georgia Latson

Willie Laundrie

Gary LaValley

Martin Lavor

Dean Law

Dimeji Lawal

Ronald Lawrence

Dennis Le

Hanh Kim Le

Hoang Minh Le

Salyna Le

Armand Le Blanc

Ronald Leclair

Marcella W. Ledford

Jacques J. Leduc

Bernard Lee

Bill Lee

Darryl Lee

Frances Lee

Justina Lee

Peter C. Lee

Sangy'up S. Lee

Shawn Lee

Thomas Lee

Wanda Lee

Yen Chih Lee

Young Lee

Andrew M. Leibowitz

Cynthia J. LeMay

Timothy L emley

James Douglas Lemoine

James J. Lemon

Norman Lenox

Ralph Leo

Louis Leon

David B. Leonard

Arunee Lertnakom

Mark Lesko

Wong Let

Paul K. Letsch

Si Sing Leung

Lynne Leventon

Marcia J. Levesque

Ira Levine

Stanley Levine

Robert Hugh Levittan

Janet Levy

Ron Lewandowski

Eric Lewis

Clarence & Patricia Leyes

Richard L'Heureux

Pei Li

Xiang Li

Charles Liang

Robert Liang

Kenneth R. Liber

Leon & Nancy Lieberman

Walter Lieck

Kenneth Lien

Louis Liles

Herb Lilly

Kok K. Lim

Suwat Limkrailassiri

John Shen Lin

Edward Linden

Jeffrey A. Linden

Hsiu-Feng Ling

Clayton Lingelbach, Sr.

Janice & Lonnie Lipoglav

Yousuf Lisanuddin

Gary M. Liss

Arlene Liu

Feng Liu

Yu-Hsuan Liu

Helmut Loeffler

Howard Loesch

Dennis Loftus

Mickey Loi

Wilton Lombard

Fitzgerald Long

Dominic Longobucco

Ron Longtin

Mike Looney

Steven Lopez

Jerome S. Lorence

Jack E. Loringer

Jerry Lousteau

Ozzie Loverme

Richard Loverne

Donald Ray & Karen Lee Loving

Leon Lowery

Shao Yue Lu

Nancy Lucca

Huyen Luckie

James Lukatch

Bruce Lundy

Tan Luong

Joseph Lupicki

James Luu

Connie Ly

Khiem Ly

Pamel D. Lyles

Don Lynch

Sharon Lynden

Andriy Ly3sikov

Maksim Lyubarskiy

Beaudine Ma

Chu F. Ma

Sunny Ma

Roselyn R. Macaraeg

Debbie Macy

Au Maday

Sudhir Madisetty

Rachel Maeroff

Janet Magenheim

Charles Maggs

James R. Magliulo

Jeffrey P. Maguire

Frances M. Mahan

Shawn Robert Mahan

Ashok Mahauir

Timothy M. Maher

Kishore H. Makhija

Isaac & Lois Mallah

Randi Mallory

Carolann & Harold M. Mamzellis

Hui Kin Man

Jane Mandell

Can Manderschaid

Charles Manella

Joe Mangiameli

Bobbi Mangiamelli

Lorraine Mankiewicz

Michael Mannarino

Robert Lee Manning

William & Georgia Manos

June Mantas

Mike Manteck

Alisa & Victor Mantoni

Joe Manzella

Lin Guo Mao

Ann C. Mapes

Ruth Margolis

Robert Marino

Peter P. Markatos

Markos Markou

Sandria Marks

Victoria Marone

Aviel S. Marrache

Darrel Martin

John Martin

Timothy S. Martin

Domenick Martino

Thomas Martovitz

Bharat Maru

Megan Marzolf

Masoud Mashouf

Saqib Masroor

Donald W. Mathena

Daniel K. Mathers

Louis Mathis

Dennis L. Mathson

Jamie Matlin

Lynne Matthews

Casper C. Mauceri

Richard Maughan

Alton May

Linda May

Steven A. Mayer

Ben J. Mavfield

Donald Mayley

Scott Mazur

Samuel Mbuthia

Shawn McAuley

Harold W. McBain

Andrew McBath

Zita McCall

Hyland McCarthy

Jeremiah McCarthy

Robert J. McCarthy

David McCartney

Tom & Nancy McClair

Virginia McClure

Michael John McCormack

Patrick & Judy McCormick

Ned McDaniel

Milton McDonald

Bernie McGinley

Mark McGinley

Todd McGown

Jason McGuire

Jeff McHugh

James McIntosh

John A. McIntyre

Diana L. McKeand

Howard McKee

Joseph McKeluey

Joseph Michael McKelvey

James McKeon

Doug McLaney

Stevie McLaunin

Hannon McLeod

Michael McLeon

Sandra C. McMahon

Terry McMahon

Gary Lee McMasters

George R. McMeen

William S. McNair

Malissa Meadows

James N. Medlin

Robert Meeks

Anwan Meherally

Diuyajit Meht

Paul Melchiurre

Joseph Mellon

H.L. Melnyk

Efie Mendoza

John Menna

Anita L. Meredith

Robert Merker

Mario Merolle

David J. Merritt

Costa Michalakis

Richard Michalec

Dma Michalik

John Michalik

Victor Michel

Barry Michelson

Grace Migliorati

Amelia Miguel

Robert E. Milani

Sherly Milani-nia

Elizabeth Milano

Albert Millay

Albert K. Millay

Carol Miller

Darrell M. Miller

Helen Miller

Justin Miller

Michael Miller

Mike Miller

Millie Miiler

Richard Miller

Ed Milstein

Mary Kay & William A. Misenheimer

Anita Mital

Beverly Mitchell

Michael Mitchell

Robert Francis Mitchell

Nabeel Mitry

Jack & Mirta Moadel

Anthony Moberly

Rodney Mock

Kurt A. Moeschl

Mehrdad Mogaddam

Moe Moghadam

M. Mohtashemi

Michael Moir

Dale Mombert

Harry Momdjian

Mark Monaldi

Vincent Mong

Warren Monroe

Jon Monschein

Miguel Montalvo

George Monte

Luis Monteiro

Mooney

Carl Moore

Gary Moore

Gloria Moore

Robert B. Moore

Brian Moran

Steven Moran

Sergio Moreno

Steven S. Moretto

Frank Morgan

Richard Morris

Phyliss Mosby

Baruch Moscovici

Beniamin Moscovici

Robert Motta

Praveen Moturu

Alex Movasseghi

Richard G. Moxley, III

Jacqalean Moyer

Wayne Muhr

Diane Mulrooney

Mark Mundy

Venkat Krishna C. Murali

Christopher Muray

Larry Muri

Joe Muro

Martha Murphy

Patrick Murphy

Mark Murray

Michael Musa

Miyanjibuai Musabui

Vladimir Musaelyan

Angelo Muscolo

Mustakeem Muslim

Paul Musselwhite

Joseph N. Muzio

John Edward Mylton

Anna Names

Koichiro Nara

Ronaldo Navarro

Russell Joseph Nealey

Steven Gary Nees

Peter & Peter Jr. Negro

Dennis Nemcek

Scott Nemcheck

Miguel Nemesio

Keet Nerhan

Abrahm & Marion Nessin

Latchman Netram

Alfred & Donna Neumann

Bernard Newton

Chau Minh Ngo

Greg Ngo

PhuNgo

Chau (Joe) Nguyen

Do-Nhu Nguyen

Minh Nguyen

Nhan Van Nguyen

Phiyen Nguyen & Trac Van Lam

Robin Nguyen

Than Nguyen

Tn Nguyen

Lorenzo Nicolas

Lorenzo G. Nicolas

Robert Nichols

Michael Harding Nicholson

Ninety-Eight Vested (Mollary, M.)

Fumin Niu

Roland E. Noel

Sandra Nogalo

Raymond A. Nohra

Gerry Nolan

Peter G. Noragang

Rebeca Nordqvist

Steve & Irene Norris

Allene Norton

Charles Norton

Henry Novak

Joseph Nozicka

Dorothy M. Nuss

David O'Brien

William T. O'Connor

Anthony O'Donnell

Timothy O'Donnell

Bryan Oesterreicher

Steven L. Ogles

Christine Oh

Bert Okino

Richard Olds

Enrique Olivas

Richard Olsen

Robert C. Olson

James Onstad

Chukwudi Onwuka

Deborah Orlando

Robert Omdoft

Danio Ortiz

Bright Otaluka

Anita Otter

Gregory A. Oullette

Gregory Qutlette

C. Norman Owensby

Ali Ozer

Fred Pabian

Warren Paboojian

Louis Pabon

Phyllis Paccelli

J.H. Packer

Stanley Pacocha

Jeff Padgett

Stephen C. Pagano

Jeffrey L. Paiva

Stephen & Joann Pakech

Charles Palladino

Francis M. Palma

Donald Palmer

Michael Panek

Debborah S. Paolasso

Paul Paolasso

Helen Pappas

Jacquelyn Paquette

Robert Paradine

Francisci Paranada

Amorsolo Paraso

Daniel D. Parcel

Jason C. Parent

Margaret Parent

Dennis Paresa

Sunesh Panikh

Edward R. Parise

Katherine Parkenson

Dennis E. Parker

Ronald D. Panris

Avantika Patel

J. Patel

Manhar Patel

Piyush B. Patel

Suresh R. Patel

Uday Patel

Kermit J. Patrick

Donald Patterson

Kenneth Patterson

Mary Patterson

Mary Patterson & Don Mullally

Charles Payne

William Pearson

Richard Peck

John Peebles

Lewie Peek

Charles Peele

Annelie Pelaez

Harry E. Pelella

Pietno Pelella

Judith Pelletier

Richard A. Pellicen, Jr.

Rocco Pelosi

John Peltas

Charles Pence

William Scott Pence

Pescha Penso

Maria Elisa T.

Ernest Pentek

David Perez

Charles E. Perry

Thomas Pesta

Walter Petersen

William F. Petruzel

Tracy Pham

Thai Phan

Peter E. Phillips

Shelby L. Phillips

Shelby L. Phillips (Cust. Cherise)

Kihang Phuog

Mike Picciallo

R.L. Piccinmnni

Pamela C. Pickens

Helen Picozzi

Gary G. Pierce

Donald Pillai

Joseph Pinchock

Larry Pincus

John Ping

Jaime Pinto

Victor Pirouzan

Darvoush Pishdadian

Edvard Pitka

Vlado Pitka

Salvatore Pizzo

Mike Planzo

Kenneth Plassmeyer

Wayne Plestina

Pentecostes

George Plevniak

William L. Plummer

Conny Plunk

Harry Polydor

Wendy Pons

Gary Porteneir

Warren & Patsy Portenier

Lance Porter

Nathaniel Porter

Harold Portzer

David F. Postoll

Patricia E. Potempa

Charles Potter

William Poulos

James E. Powell

Leacadia Powell

Richard Powell

Bernadette J. Power

Phillip J. Prejean

Jackie Presley

Atansaio & Colomba Prestigiacomo

Gerhardt Preuss

E. Prevost

Donald Price

Lucille G. Price

Russell Morgan Price

Jim Proia

Vishnu & Gopi Punwaw

Rajendra Qandi

Jamal Qandil

Feng Qiu

Ping Qiu

Manuel J. Quinteino

Doan Quach

William & Marie Quint

Adrian F. Raab

Daniel Raabe

Alimohammad Rabii

Nair Radhamani

Shaheed Rafeek

Denzel Ragland

Seth Rajendran

Karthik Raju

Thiagara Ramachandran

Aparna Ramani

Carole M. Ramberg

Danyel Ramelow

Gunadi Ramli

Dan Ramm

Frank Ramm

Joseph Ramos

Susan Randall

Kenneth Rank

Susan Rapp

Desmond Raymond

Jimmy Rayos

Hamid Razzaghi

Emilio Redondo

Christopher Reese

Barry Rehurek

Randy A. Reid

Richard W. Reid

Thomas L. Reister

Douglas Reneau

Stela Requena

Robert Rettig

Ana Lissa Reyes

Jeffrey Reynolds

Rosemary Reynolds

Abbas Rezvi

Douglas B. Rhodes

Kevin Ricci

Kevin W. Rice

Ron Richard

Greg Richards

Helen Richards

Patrick Rimroth

Adeniz Rivera

Joseph Rizzo

Gary Roberts

Fletcher Robertson

Jerry Robison

Jonathan Robison

Jack Rockhold

Kim Rodgers

Martin Rodgers

William Rogers

Jack Rockhold

Grant Rodges

Daniel Rodriguez

Felix Rodriguez

Hector Rodriguez

Tony Rodriguez

Rudolfo Rojo

Joseph D. Romani

Billy Romania

Steven Romano

Imelda Romero

Maio Romualdo

Harold J. Rookey

Patricia Ann Rose

Thomas Rosebeny

Jay & Carole Rosenblatt

Jordan Rosenblum

Thomas Rosenfeldt

Nilsa Rosier

Todd Rossbach

John Rossi, Jr.

John & Carolyn Rossi

Richard Rosso

Debbie Roth

Frederick J. Roth

Michael Roth

Harold Rowden

Arlene Rowland

Barbara J. Roy

Loydene Roylance

Kathleen Rubin

Stewart Rubin

Brian Rubino

Jerry L. Ruff

Larry Ruffino

James Ruggiero

Beatrice Ruiz

Rosemarie C. Ruskaup

Johnny Russell

Lorraine Russo

Thomas Rvll

James Saai

Laila & Farid Sadik

John Saito

Gary Sakakihara

Rana Sakkab

Robert & Marilyn Salas

Thomas Salatto

Judith E. Saleeby

Alfred Salyer

Peter Sambogna

Robert Samson

Jana Sanders

Bruce Sandstrom

Linda Sanicola

Maria Santorello

Francisco L. Santos

Louis Sardinas

Genevieve Sartell

Mark Sasson

David B. Saunders

Roy Savoie

Karen A. Scalise

Tracy Schaderberg

Anthony Schiau

Tim Schilling

John Schlink

Kevin Schlosser

Robert J. Schmela

William Schmidt

Thomas Jansey Schrom

Karen Anne Schmucker

James Schupp

Thomas Sciarrmno

Linda Scoggin

Donna L. Scott

Richard Scott

Jared Michael Sealy

Jody Alien Seckinger

Wayne C. Secord

Faouzi Sefrioui

Rami Segal

Phillip Seguin

Charles Seipp

Paykan Sejafari

Lenny Semeraro

Dharminder Sethi

Bruce Seto

Kwok J. Seto

Geoffrey Severed & Jennifer Ibrahim

Paykan Seyed-Jafari

Jeffrey B. Shafer

R. Shafizadeh

Mukesh H. Shah

Naresh Kumar R. Shah

Mydeer Shaikh

Refael Shalom

Row Shan

Akbar Sharifi

Virai Shaw

Dwayne Shealey

Helen Ann Shearmn

Peter C. Sheehan

Bennie Shellnut

Thomas Sheppard

Leslie Shetler

Ishan Shiekh

Patricia Shields

Chin Shih

Terry Shipman

Hamid Shirvani

Anthony Shouse

David M. & Donita A. Shrock

Barbara Shulas

Charles M. Shumaker

Richard F. Shuman

Ama Shusser

George Michael Siciliani

Arif Siddiqui

George Raymond

Meili Sikora

David A. Silveira

Mark Silvernail

Randy Simmon

Debra Simmons

Jackie Simms

Pavman Simoni

Jason Sims

Harpreet Singh

Paul Singh

Saranjit Singh

Harold & Sharon Sipe

Wayne M. & Phyllis J. Sipes

Mohamed Sirag

Allan Sjoholm

Raymond Skates

Kern & Michael Skiles

David E. Skillin

Bruce Slattery

Robert Smarzinski

Fred W. Smith

Siebold. Sr.

George Leon Smith

Janis Smith

Joseph E. Smith

Mary L. Smith

Sheldon Smith

Stephen Smith

Steven L. Smith

Terry A. Smith

Wayne Smith

William Smith

Edward Snodgrass

Steven Snow

Alvaro Sousa

Robert Douglas Soutter

Donald A. Spadola

Romano Spagnolo

Jim Speca

Sal Spedale

Annette Speght

Tim Spiry

Michael Spivak

Jacqueline P. Spong

Jacqueline P. Spong Carmella M.

Edward Spopak

Cornelius Spronsen

Marian Van Spronsen

Billie Spurling

David Squire

Roy Squire

Chopitak Srihiranrat

Terry Lee Stager

Valerie Z. Stanley

Richard Stead

Joseph Steams

David Steele

Leon M. Steffey

Dorsey Stegall

Dewayne E. Stegner

Michael Dennis Steiner

Larry Stenger

Warren Stephens

Robert W. Stern

Catrina Stevers

Ann Stewart

ArthurG. Stewart, II

& Bellanger

David W. Stewart

Karen Stewart

Lisa Stewart

William Stewart

Michael St. John

Marilyn Stokes

Debra Stonebraker

Andrew Stonebreaker

Peter V.S. Storey

Therese Stout

Larry R. Strait

Claude A. Stramonine

Lorene & Vito Strano

Carl Strum

Toni C. Strutz

Robert Stuart

John Stubbings

Joseph Stumbo

Leslie F. Summerfield

Mark Summers

Cliff Sun

Miao-Kun Sun

Bernard J. Sussman

Noriaky Suzuki

G. Sweany

John Swick

Thomas Swift

Shirley Swindell

Wilbert Sy

Stephen Szmuriga

Kevin Ta

Abdoihossien Tabrizi

Calvin M. Taiiey

John R. Tanselle

Art Tantasook

Pauli Taylorboyd

William Teague

Bettye Teasley

Michael Tebrugge

Ehmer & Arlene Telge

Howard T. Tepp

Stacey T. Tepp

Robert L. Terrell

Mark G. Tessier

Brenda Tetrick

Rashmi Thakrar

Emanuel Theodore

Anna Mae Thimons

John G. Thomas

Kent Leonard Thomas

Richard Thomas

Ted C. Thomas

Richard C. Thompson

Fred Thysell

Lorrie Tillotson

Jagadeswara Rao Tipiemeni

David Todd

Sean A. Toguchi

Allan H.T. Toh

Michael Tolleson

Peter Toma

Stuart Tomlinson

Ming Tong

John Tonne

Sharon L. Tonti

Varter Toroussian

Irma Torres

Jesse Torres

Lanny Toups

Marshall Towe

Vinh T. Tra

Paul Tracev

John M. Tran

Lang Thi Tran

Thanh Tran

Michael Truong

Christopher Trapani

John Truschke

Art Tsuchiva

Arthur Tsuchiya

Jason Tucker

Thomas Tucker

Bruce Turner

Russell Turner

Anthony Tutrone

Robert Tuttle

Howard Tward

Danny Twitty

Janet L. Tyler

Robert Tyler

Rusi Udwadia

Sukyoung Um

Johnny Ung

Men Ung

David M. Upshaw

Eugene H. Upton

Ron Utter

Alexander Vago

Vaid

Joseph L. Valade

Joseph Valente

Luciano Valente

Jim Valentine

Helen Van

Todd Van

Ronald & Patricia

Lee VanderStroom

Stephen Vargosko

Doris Vascik

Georgie Vaughn

Rosemary Vaughn

Richard Veilleux

Jimmie R. Venable

Capt. Francis Venhorst

Gene Vereen

Henr & Arliss Verleve

Rocco Verrastro

Mel Verti

Vilay Viengkhou

John Villahermosa

Tiburcio Villaruz

Gladys Vincent

Flurelio Vindigmi

Lois Vining

Chi Vo

Michael B. Volz

Bob Von Moss

Robert Voselone

Thai Vu

J.D. & Patricia Wacaster

Steve Wade

Joseph K. Wagner

K.A. Wagner

Bilad Wahid

Wendy Walczak

Joe Walden

Jerry Walker

Timothy J. Walker

VanGulick

Woodrow Walker

Frank Walls

Miriam Wallwin

Dvane Walters

Rocardo Walters

Sherrie & Gary Walters

Rosemary Wanamaker

Annie Wang

Gordon Wang

Guo Quing Wang

Jing Wang

John Wang

Kal Wangden

Willis Wareham

Harry E. Washburn

Leslie Washko

Leslie A. Washko

John Wasilausky

Sandra Waszelewski

Ernest Watari

Brenda Waters

Gary Watkins

Jerry S. Watkins

William J. Watson

Edward Wawerski

William Web

Bruce Weeks

Sandra Weeks

Marti Weifenbach

Rafer Weigel

Jeff Weir

Carl Weiss

Daniel Weiss

Dan W. Wells

Carson West

Eddie West

Rosemary Weston

Elaine Whalen

Gerard Whatton

Fran Whisnant

Robert C. Whitaker

Charles E. & Eddie White

David White

Gerome White

John J. White

Donna L. Whittemore

Lalith Wickremasinghe

Kirk Wickstrom

Richard Wieniski

Benjamin Arthur Williams

Jimmy Williams

Ryan Earl Williamson

Tim Williamson

Joel Willoughby

Donald Wlson

Michael F. Wilson

R.B. Wilson

Tom Wilson

William Wilson

John M. Wise

Jose Witongco

Brigitte Wolter

Tony Wong

Barbara Wood

Marilyn Woodson

Gordon Woolf

James D. Woomer

Thomas Wright

Kelvin Wu

Yu Wu

Frederic A. Wyle

Y to the X Incorporated

Alice Yang

Seung Yang

John Yardimian

Eli Yecheskel

David Yokoyama

Sung Yoo

Wes Young

Nathan Youngman

Diane G. Youra

David Yousefnejad

Hatim H. Yousif

Lisanuddin Yousuf

W'innie Yu

Gensheng Yuan

Wenjie Yuan

David Zakudto

Riziq Zanayed

Frank Zanzucchi

Juan A. Zaragoza

Donald Zatek

Karl & Rose Marie Zeller

Steven Zerang

Shu Zhang

Yongzhi Zhang

Bingwen Zhao

Baosheng Zhou

Kelly Zidik

Keith Zimmerman

Lawrence B. Zimmerman

Anatoly Zingman

David Zinkowich

John Zirkelbach

John Zolandz

EXHIBIT E

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGj1WyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+tWIDAQAB
MIC-Info: RSA-MD5,RSA,
 QoNipjU9clsDEbJVD2+wGOLW2QLT8OBgXJmHVzbUW8fbMJ+9zRt5Qn3yoThs1GQ3
 My9ujc1vcGn0FPE1xnzzTw==

<SEC-DOCUMENT>0001133884-02-001003.txt : 20020916
<SEC-HEADER>0001133884-02-001003.hdr.sgml : 20020916
<ACCEPTANCE-DATETIME>20020916130335
ACCESSION NUMBER:         0001133884-02-001003
CONFORMED SUBMISSION TYPE:    DEFC14A
PUBLIC DOCUMENT COUNT:        1
FILED AS OF DATE:             20020916

SUBJECT COMPANY:

        COMPANY DATA:
                COMPANY CONFORMED NAME:          ELITE PHARMACEUTICALS INC /DE/
                CENTRAL INDEX KEY:               0001053369
                STANDARD INDUSTRIAL CLASSIFICATION:  PHARMACEUTICAL PREPARATIONS [2834]
                IRS NUMBER:                      223542636
                STATE OF INCORPORATION:          DE
                FISCAL YEAR END:                 0331

        FILING VALUES:
                FORM TYPE:                       DEFC14A
                SEC ACT:                         1934 Act
                SEC FILE NUMBER:                 001-15697
                FILM NUMBER:                     02764603

        BUSINESS ADDRESS:
                STREET 1:                        165 LUDLOW AVENUE
                CITY:                            NORTHVALE
                STATE:                           NJ
                ZIP:                             07647
                BUSINESS PHONE:                  2017502646

        MAIL ADDRESS:
                STREET 1:                        165 LUDLOW AVENUE
                CITY:                            NORTHVALE
                STATE:                           NJ
                ZIP:                             07647

FILED BY:

        COMPANY DATA:
                COMPANY CONFORMED NAME:          ELITE PHARMACEUTICALS INC /DE/
                CENTRAL INDEX KEY:               0001053369
                STANDARD INDUSTRIAL CLASSIFICATION:  PHARMACEUTICAL PREPARATIONS [2834]
                IRS NUMBER:                      223542636
                STATE OF INCORPORATION:          DE
                FISCAL YEAR END:                 0331

        FILING VALUES:
                FORM TYPE:                       DEFC14A

        BUSINESS ADDRESS:
                STREET 1:                        165 LUDLOW AVENUE
                CITY:                            NORTHVALE
                STATE:                           NJ
                ZIP:                             07647
                BUSINESS PHONE:                  2017502646

        MAIL ADDRESS:
                STREET 1:                        165 LUDLOW AVENUE
                CITY:                            NORTHVALE
                STATE:                           NJ
                ZIP:                             07647
</SEC-HEADER>
<DOCUMENT>
<TYPE>DEFC14A
<SEQUENCE>1
<FILENAME>gdefc14a-26462.txt
<DESCRIPTION>DEFC14A
<TEXT>
<PAGE>

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

SCHEDULE 14A INFORMATION

Consent Revocation Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934

Filed by the Registrant [X]

Filed by a party other than the Registrant [ ]

Check the appropriate box:

[ ] Preliminary Consent Revocation Statement

[ ] Confidential for Use of the Commission Only (as permitted by Rule
    14a-6(e)(2))

[X] Definitive Consent Revocation Statement

[ ] Definitive Additional Materials

[ ] Soliciting Material Pursuant to ss.240.14a-11(c) or ss.240.14a-12

ELITE PHARMACEUTICALS, INC.
(Name of Registrant as Specified In Its Charter)

N/A

(Name of Person(s) Filing Proxy Statement if other than Registrant)

Payment Filing Fee (Check the appropriate box):

[X] No fee required.

[ ] Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

    (1) Title of each class of securities to which transaction applies:

                    N/A

    (2) Aggregate number of securities to which transaction applies:

                    N/A

    (3) Per unit price or other underlying value of transaction computed
pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee
is calculated and state how it was determined):

                    N/A

    (4) Proposed maximum aggregate value of transaction:

                    N/A

    (5) Total fee paid:

                    N/A

[ ] Fee paid previously with preliminary materials.

[ ] Check box if any part of the fee is offset as provided by Exchange Act Rule
0-11(a)(2) and identify the filing for which the offsetting fee was paid
previously. Identify the previous filing by registration statement number, or
the Form or Schedule and the date of its filing:

        (1) Amount Previously Paid:

                    N/A

        (2) Form, Schedule or Registration Statement No.:

                    N/A

        (3) Filing Party:

                    N/A

        (4) Date Filed:

                    N/A

<PAGE>

[ELITE PHARMACEUTICALS LETTERHEAD]

Dear Fellow Stockholder:

As your Board of Directors reported to you in my letter of August 29, 2002, Harris Freedman, Bridge Ventures, Inc., Bridge Ventures, Inc. Employee Pension Plan, SMACS Holding Corp., Sharon Will, Saggi Capital Corp., Saggi Capital Corp. Money Purchase Plan, Saggi Capital Corp. Profit Sharing Plan, and Michael H. Freedman (all of them affiliated with Harris Freedman and/or Sharon Will, together referred to in this letter as the "Freedman Group") are seeking to gain control of your Company by removing three of the current members of your Board of Directors, without cause, all of whom are independent directors, and replacing them with their own hand-picked nominees - themselves. The Freedman Group refers to itself as the "Elite Value Committee"; however, the Freedman Group is not affiliated with the Company other than through its members' ownership of some of the Company's securities. We believe that the motives and objectives of the Freedman Group are questionable and self-serving and are not in the best interests of the Company and its other stockholders.

Your current Board of Directors and management are committed to enhancing stockholder value for all stockholders. We continue to implement the Company's strategic plan and have been taking steps to continue to improve the Company's performance.

For all of the reasons discussed in the materials included with this letter, we strongly urge you to REJECT the solicitation made by the Freedman Group and NOT sign any WHITE consent card they send you. Each member of the Board of Directors who is a stockholder of the Company is rejecting the Freedman Group's proposals.

In order to REJECT the Freedman Group's proposals, the Board unanimously recommends that you sign, date and mail the enclosed BLUE Consent Revocation Card today. Even if you have previously signed the Freedman Group's WHITE consent card, you have every right to REVOKE YOUR CONSENT by voting the BLUE Consent Revocation Card.

In order to be sure that you are revoking a prior consent, you must either mark the "Revoke Consent" boxes on the BLUE Consent Revocation Card or sign the BLUE Consent Revocation Card without marking any boxes. If you do not mark any box for any one or more of the proposals on the BLUE Consent Revocation Card and you sign and return the Card, you will be deemed to have revoked any previously signed consent to any proposal you did not mark.

Also enclosed for your information is a copy of our Annual Report on Form 10-K for the fiscal year ended March 31, 2002.

Thank you for your continued interest and support in your company.

Very truly yours,

Atul M. Mehta, Ph.D

President and Chief Executive Officer for
The Board of Directors

<PAGE>

CONSENT REVOCATION STATEMENT
BY THE BOARD OF DIRECTORS OF ELITE
PHARMACEUTICALS, INC. IN OPPOSITION TO THE
SOLICITATION OF CONSENTS BY HARRIS FREEDMAN,
BRIDGE VENTURES, INC., BRIDGE VENTURES, INC. EMPLOYEE PENSION PLAN,
SMACS HOLDING CORP., SHARON WILL, SAGGI CAPITAL CORP., SAGGI CAPITAL CORP.
MONEY PURCHASE PLAN, SAGGI CAPITAL CORP. PROFIT SHARING PLAN
AND MICHAEL H. FREEDMAN

This Consent Revocation Statement and the accompanying BLUE Consent Revocation Card are being furnished by the Board of Directors of Elite Pharmaceuticals, Inc., a Delaware corporation ("Elite", the "Company", "we" or "us"), to the holders of the outstanding shares of Elite's common stock in opposition to the solicitation by Harris Freedman ("Freedman"), Bridge Ventures, Inc., Bridge Ventures, Inc. Employee Pension Plan, SMACS Holding Corp., Sharon Will ("Will"), Saggi Capital Corp., Saggi Capital Corp. Money Purchase Plan, Saggi Capital Corp. Profit Sharing Plan and Michael H. Freedman ("Michael Freedman" and, with Freedman, Will and each of the other entities in the foregoing list, the "Freedman Group").

The Freedman Group is soliciting consents in favor of two separate proposals (collectively, the "Freedman Group's Proposals"), which are designed to effect the replacement of three of your four duly elected directors (and all of the independent directors of the Company) with their slate of nominees. We are asking you to oppose the Freedman Group's Proposals because we believe that:

o      the Freedman Group is self-interested.

o      Elite is at a critical juncture and any change in our management could substantially jeopardize our future growth and success.

o      the Freedman Group did not communicate any strategic plan for improving the performance or prospects of your company in its few proposals for change.

o      the Freedman Group has no relevant past business experience in the pharmaceutical industry or our core business of developing oral controlled release pharmaceutical products.

o      the Company's current Board, whom you elected, and management are in the best position to evaluate the strategic alternatives available to Elite and to decide on the courses of action that are in the best interests of all of the Company's stockholders.

o      the Freedman Group does not have the necessary integrity to lead the Company based on publicly available information obtained by Elite.

We unanimously oppose the consent solicitation by the Freedman Group and urge you NOT TO SIGN the WHITE consent card that they sent to you.

Even if you previously signed and returned the WHITE consent card, you have every right to revoke your consent. We urge you to sign, date and mail the enclosed BLUE Consent Revocation Card today in the postage-paid envelope provided. Your prompt action is very important.

In order to be sure that you are revoking a prior consent, you must either mark the "Revoke Consent" boxes on the BLUE Consent Revocation Card or sign the BLUE Consent Revocation Card without marking any boxes. If you do not mark any box for any one or more of the proposals on the BLUE Consent Revocation Card and you sign and return the Card, you will be deemed to have revoked any previously signed consent to any proposal you did not mark.

If your shares are registered in your name, please sign, date and mail the enclosed BLUE Consent Revocation Card to Georgeson Shareholder Communications Inc. in the postage-prepaid envelope provided today. If your shares are held in the name of a brokerage firm, bank nominee or other institution, only it can sign a BLUE Consent

-2-

<PAGE>

Revocation Card with respect to your shares and only after receiving your specific instructions. Accordingly, please sign, date and mail the enclosed BLUE Consent Revocation Card in the postage-paid envelope provided. To ensure that your revocation is completed, you should also contact the person responsible for your account and give instructions for a BLUE Consent Revocation Card to be issued representing your shares.

This Consent Revocation Statement and the enclosed BLUE Consent Revocation Card are first being mailed to stockholders beginning on or about September 16, 2002.

If you have any questions or need assistance in voting your shares, please contact the firm assisting the Company in this solicitation of consent revocations:

<div align="center">

Georgeson Shareholder Communications Inc.
17 State Street
New York, New York 10004
Stockholders call toll free: 866-297-1267
Banks & Brokers call: 212-440-9800
Fax number: 212-440-9009

</div>

-3-

<PAGE>

<div align="center">

QUESTIONS AND ANSWERS ABOUT THIS REQUEST
FOR CONSENT REVOCATION

</div>

Q:    WHO IS MAKING THE REQUEST FOR REVOCATION?

A:    This Request is being made by your duly elected Board of Directors, including all of the independent directors.

Q:    WHAT ARE WE ASKING YOU TO DO?

A:    We are asking you to oppose the solicitation made by Harris Freedman, Bridge Ventures, Inc., Bridge Ventures, Inc.

Employee Pension Plan, SMACS Holding Corp., Sharon Will, Saggi Capital Corp., Saggi Capital Corp. Money Purchase Plan, Saggi Capital Corp. Profit Sharing Plan, and Michael H. Freedman, all of whom are affiliated with Harris Freedman and/or Sharon Will. They are seeking to gain control of your Board by replacing three of your four duly elected directors (and all of the independent directors) with their slate of hand-picked nominees - themselves. To oppose them, you can withhold your consent from their proposals, or, if you have already given your consent, you can revoke it.

The Members of the Board of Directors who are stockholders of the Company have advised the Company that they intend to reject the Freedman Group's proposals.

Q:     WHY ARE WE ASKING YOU TO REVOKE YOUR CONSENT?

A:         We are asking you to oppose the Freedman Group's Proposals because we believe that the collective knowledge and experience of your current Board and management put us in the best position to operate Elite's business and to evaluate its strategic alternatives. We are committed to enhancing stockholder value for all of Elite's stockholders.

We believe that the Freedman Group, is attempting to take control of your Company in order to cause the Company to extend the term of the Company's Class A Warrants that expire on November 30, 2002. The Freedman Group has expressly stated in its solicitation materials that it will extend the term of the warrants, which will expire on November 30, 2002. We have estimated, after speaking with our accountants, that the Company will incur more than $1,000,000 of compensation expense in fiscal year 2003 if the term of the warrants were extended. According to the Freedman Group's Schedule 13D/A filed with the SEC on August 26, 2002, the Freedman Group collectively holds 185,250 of the warrants which will expire on November 30, 2002, or more than 11% of the warrants that will expire on that date, in addition to 574,220 shares of our common stock (5.9% of the total outstanding shares of stock on August 5, 2002). The Freedman Group seeks to justify the extension by claiming that the Company would obtain additional capital when the warrants are exercised. However, the exercise price of the warrants exceeds the trading price of our common stock, making the exercise of the warrants unlikely. In addition the Company believes it has adequate cash to meet its current and anticipated needs. We believe that if additional capital is needed that the Company could raise it from the capital markets without incurring the more than $1 million expense.

In addition, while current management has developed and executed a strategic plan to advance the Company towards success, the Freedman Group has expressed no strategic plan for improving stockholder value or improving the Company's performance.

-4-

<PAGE>

Instead, it makes general statements about the need to hire a CFO and COO, to retain an investment bank, to enter into more license and joint venture arrangements and to extend the term of the warrants. These proposals are general and unrelated to the Company's core business of developing oral controlled release pharmaceutical products. We believe that they do not provide any relevant suggestions for improving Elite's performance because none of their proposals addresses the Company's operations or products or manner in which the Company is operated.

Moreover, we do not believe that the Freedman Group has the integrity to serve on our board of directors. Harris Freedman was barred by the SEC from associating with a registered broker-dealer because of securities fraud, and in 1967, Harris Freedman pleaded guilty to criminal securities fraud.

Q:     WHO ARE THE FREEDMAN GROUP'S NOMINEES?

A:         The Freedman Group's nominees are Harris Freedman, Sharon Will and Michael H. Freedman (the son of Harris Freedman), none of whom are currently affiliated with Elite and none of whom to our knowledge has had any relevant experience in Elite's core

business of developing oral controlled release pharmaceutical products. While companies affiliated with Harris Freedman and Sharon Will performed consulting services for the Company in the past, those services related to marketing and management consulting in the case of Harris Freedman and investor relations in the case of Sharon Will. Neither Mr. Freedman nor Ms. Will has been involved in any way with the actual operations of the Company. We believe that as a small company in the pharmaceutical industry we need a board of directors who have broad pharmaceutical industry experience and who are well regarded in that industry in order to demonstrate the Company's expertise and to have access to strategic partners and customers.

The consulting services performed by the entities affiliated with Harris Freedman and Sharon Will were discontinued in December 2001 and June 2002, respectively, by the Company because of unprofessional, and ineffective assistance and poor performance, and a belief by the Company that Mr. Freedman and Ms. Will were more concerned about the performance of the Company's stock than the growth and development of the Company's business.

The Company retained the entities affiliated with Harris Freedman and Sharon Will to provide the respective consulting services at a time when the Company was first beginning its operations. Harris Freedman was the controlling stockholder of the public shell into which the Company merged and Sharon Will was his business partner. They were eager to help the Company with its growth. Even though these entities did not have experience with pharmaceutical companies, we did not believe that the experience was a pre-requisite, provided the services were performed in a professional, effective manner.

In addition, the Freedman Group's materials do not indicate that any of the Freedman Group's nominees has served on the board of directors of any public company.

The one current Elite director who the Freedman Group is not seeking to replace, Dr. Atul M. Mehta, has not consented to serving on a Board comprised of the Freedman Group's nominees. The Company's future success is substantially dependent on Dr. Mehta's remaining an officer and director of the Company. As discussed below under "Employment Agreement", Dr. Mehta will have the right to terminate his employment if the consent solicitation is successful. At this time, Dr. Mehta has not yet decided whether he will continue with the Company if the Freedman Group is successful in its consent solicitation.

-5-

<PAGE>

Q:    WHO CAN WITHHOLD OR REVOKE THEIR CONSENT?

A:    If you already sent in a WHITE consent card, you can send in a BLUE Consent Revocation Card to revoke your consent to one or more of the Freedman Group's Proposals. If you owned Elite shares on August 5, 2002, you have the right to send in a BLUE Consent Revocation Card.

Q:    HOW MANY SHARES MUST BE VOTED IN FAVOR OF THE FREEDMAN GROUP'S PROPOSALS TO IMPLEMENT THEM?

A:    The Freedman Group must receive consents from stockholders who hold a majority of Elite's outstanding shares for their Proposals to be adopted. As of August 5, 2002, Elite had 9,728,116 shares of common stock outstanding. Each share is entitled to one vote. Therefore, the affirmative vote of at least 4,864,059 shares is necessary to effect the Freedman Group's Proposals. Abstentions, failures to vote and broker non-votes will have the same effect as a "no" vote.

Q:    WHAT SHOULD YOU DO TO REVOKE YOUR CONSENT?

A:    If your shares are registered in your name, please sign, date and mail the enclosed BLUE Consent Revocation Card to Georgeson Shareholder Communications Inc. in the postage-prepaid envelope provided today. If your shares are held in the name of a brokerage firm, bank nominee or other institution, only it can sign a BLUE Consent Revocation Card with respect to your shares and only after receiving your specific instructions. Accordingly, please sign, date and mail

the enclosed BLUE Consent Revocation Card in the postage-paid
envelope provided. To ensure that your revocation is
completed, you should also contact the person responsible for
your account and give instructions for a BLUE Consent
Revocation Card to be issued representing your shares.

Q:    WHO DO YOU CALL IF YOU HAVE QUESTIONS ABOUT THE CONSENT REVOCATION?

A:            Please call Georgeson Shareholder Communications Inc., toll
              free at 866-297-1267; Banks & Brokers please call:
              212-440-9800. You may also fax Georgeson at 212-440-9009.

-6-

<PAGE>

### OUR REASONS FOR OPPOSING THE FREEDMAN GROUP'S PROPOSALS
### AND RECOMMENDING THAT YOU OPPOSE THEM TOO

The Freedman Group's Proposals are designed to enable the Freedman Group to take
control of your Elite Board. We believe that the Freedman Group's consent
solicitation is a self-interested attempt to extend the expiration of Elite's
Class A Warrants that expire on November 30, 2002 and to take control of Elite
without presenting any strategic plan for increasing stockholder value or
improving Elite's performance. According to the Freedman Group's solicitation
materials, the Freedman Group holds 185,250 of the warrants which will expire on
November 30, 2002.

Elite's Board of Directors strongly believes that the arguments set forth by the
Freedman Group are seriously flawed and misinformed. The Members of the Board of
Directors who are stockholders of the Company have advised the Company that they
intend to reject the Freedman Group's proposals.

The Board of Directors of the Company unanimously believes that the Freedman
Group's Proposals are not in the best interests of the Company's stockholders
and urges stockholders to reject them. YOUR BOARD OF DIRECTORS REQUESTS THAT YOU
SIGN, DATE AND RETURN THE ENCLOSED BLUE CONSENT REVOCATION CARD, WHETHER OR NOT
YOU HAVE PREVIOUSLY SIGNED AND RETURNED THE WHITE CONSENT CARD SOLICITED BY THE
FREEDMAN GROUP.

Your Board of Directors is, and has always been, committed to increasing
stockholder value for all stockholders. We have implemented several long-term,
strategic initiatives to enhance stockholder value. See "THE COMPANY". For
example, we:

o       expanded our product portfolio to include over 15 branded and generic
        oral drug delivery products, some of which are being developed with our
        partners.

o       focused greater attention and resources on branded delivery products.

o       interviewed individuals to assist the Company with business development
        opportunities to augment the assistance provided on a regular basis by
        the Members of the Board of Directors in this area.

As your duly elected Board of Directors, it is our duty to identify for you our
deep and serious concerns about the Freedman Group. We will describe these
concerns in greater detail later in this document; however, we have highlighted
a number of these below:

o       One of the stated principal purposes of the Freedman Group for
        soliciting the consents is to extend the expiration date of Elite's
        Class A Warrants that expire on November 30, 2002. According to the
        Freedman Group's solicitation materials, the Freedman Group holds
        185,250 of the warrants which will expire on November 30, 2002. We
        estimate, after speaking with our accountants, that the Company would
        be required to incur a compensation expense of more than $1 million in
        fiscal year 2003 if the warrants were extended as proposed by the
        Freedman Group without any benefit to the Company from the extension.
        The Freedman Group seeks to justify the extension by claiming that the
        Company would obtain additional capital when the warrants are
        exercised. However, the exercise price of the warrants exceeds the
        trading price of our common stock, making the exercise of the warrants
        unlikely. In addition the Company believes it has adequate cash to meet
        its current and anticipated needs. We believe that if additional
        capital is needed that the Company could raise it from the capital
        markets without incurring the more than $1 million expense.

o       To our knowledge, Harris Freedman, Sharon Will and Michael H. Freedman
        have no relevant experience in Elite's core businesses of developing
        oral controlled release pharmaceutical products or in negotiating the
        terms of licenses or collaborations in the pharmaceutical industry. The
        Freedman Group's solicitation materials make no reference to any of

their nominees having any experience in the pharmaceutical industry.

-7-

<PAGE>

o       Harris Freedman has previously violated the Federal securities laws in
        his dealings with other public companies.

o       The Freedman Group has no strategic plan for improving stockholder
        value or improving the Company's performance. Instead, it makes general
        statements about the need to hire a CFO and COO, to retain an
        investment bank, to enter into more license and joint venture
        arrangements and to extend the term of the warrants. These proposals
        are general and unrelated to the Company's core business of developing
        oral controlled release pharmaceutical products and we believe do not
        provide any specific business or operations suggestions for improving
        Elite's performance because none of their proposals addresses the
        Company's operations or manner in which the Company is operated.

In addition, the Freedman Group's Proposals could end up costing you money for
the following reasons:

The extension of the term of the Class A Warrants as desired by the Freedman
Group would require the Company to incur compensation expense in excess of $1
million in fiscal year 2003.

The Freedman Group wants to hire at direct expense to the Company a full-time
Chief Financial Officer and a Chief Operating Officer of the Company, yet they
articulate no rationale for those hires other than public companies should have
those officers. In fact, the Company already has a Chief Financial Officer (Mark
I. Gittelman, who serves in that capacity on a part-time basis) and a director
of operations, both of whom fully meet all of the Company's needs with regard to
finances and operations given the Company's current level of operations. The
Company's auditors have never commented to the Company's management that the
Company's finance personnel are not capable of meeting all of the Company's
accounting and control needs. In the event that the Company concludes that it
requires a full time chief financial officer or other operations personnel, it
will seek to add those additional personnel to its management team. In addition
to relying on its existing personnel, the Company relies on the members of its
Board of Directors for strategic and operational assistance. The members of the
Board of Directors frequently participate in the negotiation of transactions on
the Company's behalf and bring with them many years of experience in licensing
and marketing pharmaceutical products, FDA regulatory and compliance experience,
and investment banking experience for bio-tech companies. According to the
Freedman Group's filings, the Freedman Group's nominees for director do not have
any similar experience.

If the Freedman Group is successful, their solicitation materials indicate that
they will seek to have the Company reimburse them for their solicitation
expenses, which their materials estimate will be $100,000.

The Company's chief executive officer, Dr. Atul M. Mehta, has a change in
control provision in his employment agreement with the Company as discussed
under the heading "Employment Agreement". The Board believed it was important to
enter into this arrangement to provide security for Dr. Mehta so that he could
focus on the various strategic initiatives to improve the Company's
profitability and enhance stockholder value. Pursuant to the change in control
arrangement, if the Freedman Group is successful in its solicitation, a "change
in control" of the Company will have occurred, and Dr. Mehta will be entitled to
terminate his employment and to receive "all accrued salary, incentive
commissions, benefits, and any deferred compensation and all salary and
commissions payable under Paragraph 4(b) through a period ending upon the later
of (i) May 22, 2006 or (ii) the third anniversary of such termination." The
salary portion of these payments will be due to Dr. Mehta in a lump sum.
Paragraph 4(b) entitles Dr. Mehta to a bonus each year of 5% of the Company's
net profit.

THE COMPANY

Business Strategy

In an effort to increase value to the Company and its stockholders, we are now
focusing on the development of branded delivery products (which require new drug
applications ("NDA")). Our initial strategy was primarily to develop generic
drug delivery products (which require abbreviated new drug applications
("ANDA")). The reasons for implementing this refined strategy are as follows:

o       the period of exclusivity for branded products is 3 years versus 6
        months for generic drugs.

-8-

<PAGE>

o     branded development allows us to enter into collaborations with other pharmaceutical companies thereby allowing us to share the cost of the development of new products with our partners and to share the burden of providing resources with our partners in order to better bring the products to market.

o     branded development presents an opportunity to license products to drug companies earlier, which could result in cash flow before the eventual filing with the Food and Drug Administration ("FDA") and approval of products.

o     the competition in the generic drug industry continues to increase.

o     increased litigation with large branded drug marketers is delaying the release of some generic drug products.

We intend to license the marketing rights of our generic products to larger generic companies for sales, distribution and marketing, while retaining manufacturing rights and royalties and/or profit sharing for those products. We plan to license our branded products at an early stage, while retaining the manufacturing rights. This strategy will allow us to pursue NDA filings, which requires larger resources. We intend to continue to collaborate in the development of five products with our current partners. We also plan to seek additional collaborations to develop more products and have had discussions with a number of potential parties in this area.

Our revised business strategy enables us to reduce our risk by

o     diversifying our product portfolio to include both branded and generic products in various therapeutic categories.

o     building collaborations and establishing licensing agreements with companies with greater resources thereby allowing us to share costs of development and to improve cash-flow.

In addition to retargeting our goals and reviewing how our resources are expended, we have taken the following steps to better position the Company for success:

o     we are interviewing candidates to join the Company's management as the head of business development.

o     we are in the initial stages of negotiating the acquisition of a pharmaceutical plant, that would entail the manufacture by Elite of several existing products with established cash flow. The negotiations for this acquisition are in the initial stages and there can be no assurance that the Company will be able to reach acceptable terms to complete this acquisition.

Collaborations

Our joint development and operating agreement with Elan Pharmaceuticals consists of developing three pain and neurology products using the drug delivery technologies and expertise of both companies. Our first product has successfully completed Phase I study and the second product is anticipated to enter Phase I testing this year. The third product formulation development also began in the past quarter. We have received revenue from the products being developed with Elan and believe that additional revenue will be realized from this collaboration.

Intellectual Property

To date, we have been issued three patents in the United States in connection with a controlled-release formulation of nifedipine, controlled released nifedipine formulations and for pulsed-released delivery systems for methylphenidate, the compound sold under the Ritalin(C) brand. The patents for nifedipine demonstrate our ability to

-9-

<PAGE>

develop patentable products in the $1 billion control release market and have helped improve our credibility in this area. The methylphenidate patent demonstrated our ability to develop a pulse release formulation for a major product. The patent for pulsed-released delivery systems for methylphenidate was assigned to Celgene Corporation and was subsequently licensed to Novartis. We received a development fee from Celgene in connection with this patent and obtained a license to use this patent for applications other than methylphenidate and continue to develop other applications based on this

technology. As with our patents for nifedipine, this technology further demonstrates our ability to develop marketable products and has helped us in beginning discussions with other potential strategic partners.

We have filed two more patent applications and the Company intends to file additional patent applications in the future; however, there can be no assurance that any of these or any future patents will be granted. Controlled drug delivery of a pharmaceutical compound offers a safer and more effective means of administering drugs through releasing a drug into the bloodstream or delivering it to a certain site in the body at predetermined rates or predetermined times. Its goal is to provide more effective drug therapy while reducing or eliminating many of the side effects associated with conventional drug therapy and/or to reduce the frequency of administration.

Financial Performance

Our revenues for the year ended March 31, 2002 were $1.2 million, compared to $0.1 million for the fiscal year ended March 31, 2001. The increase in revenue resulted primarily from product development fees from collaborations with a US pharmaceutical company to develop two products as well as from the development of products for our joint venture with Elan. Our cash position of approximately $6.5 million continues to be strong. Our net cash used in operating activities in the fiscal year ended March 31, 2002 was approximately $1.5 million. We believe that our existing cash-on-hand will provide us with sufficient resources to allow us to implement our business strategy, although no assurances can be given that we will have sufficient resources to complete our business plan without needing additional capital. Our audited financial statements for the fiscal year ended March 31, 2002 are included in our Annual Report on Form 10-K which is available without charge to each person solicited, upon the written request of any such person. Such request should be directed to Mark I. Gittelman, Elite Pharmaceuticals, Inc., 165 Ludlow Avenue, Northvale, New Jersey 07647.

The Outlook for Elite

Our policy has been to refrain from making public announcements of preliminary results or contemplated agreements. The strategy has also been to avoid large cash transactions that entail sacrifices in Elite's long-term interests.

With our broad technology pipeline, expanded research and development activities, FDA and DEA registered facility, and alliances with large pharmaceutical companies, we believe the Company is strategically positioned for accelerated growth. In preparation for this growth, we have expanded our staff to allow for greater resources to be devoted to research and development activities.

-10-

<PAGE>

THE FREEDMAN GROUP

The Freedman Group's Self-Interested Agenda

On July 14, 1998 and September 20, 1999, the Company issued Class A Warrants covering 250,000 shares of common stock in the aggregate to Bridge Ventures, Inc. ("Bridge"), an entity controlled by Harris Freedman, and on December 17, 1998 and September 20, 1999, the Company issued Class A Warrants covering 100,000 shares of common stock in the aggregate to Saggi Capital Corp. ("Saggi"), an entity controlled by Sharon Will. The exercise price of the Class A Warrants issued to each of Bridge and Saggi was $6.00 per share. The warrants were issued in connection with consulting services performed for the Company by Bridge and Saggi, entities controlled by Harris Freedman and Sharon Will, respectively. The Class A Warrants issued to Bridge and Saggi expire on November 30, 2002.

Beginning in or about June 2002, Harris Freedman and Sharon Will, on behalf of Bridge and Saggi, began urging Dr. Atul M. Mehta, Elite's President and Chairman of the Board, to extend the term of the Class A Warrants, which were due to expire in November 2002. Freedman and Will pressured the Company to extend the warrants immediately, and made statements to the effect that the Company's stock price would be greatly depressed by unspecified actions that the Freedman Group would take if the warrants were not extended. However, the Company was not certain what actions the Freedman Group intended to take.

Elite investigated whether extending the term of the warrants would have any adverse effect on the Company. The Company's independent accountants, Miller, Ellin & Co., LLP, reviewed with the Company the calculation of the more than $1 million compensation expense which would be incurred in fiscal year 2003 if the expiration of the warrants were extended as requested by the Freedman Group. The Company solicited a second opinion from KPMG, which concurred that the charge would be more than $1 million. The Board also consulted with its counsel, James, McElroy & Diehl, P.A., about the Freedman Group's demand and the Company's

obligation, if any, to extend the term of the warrants. The Board of Directors considered the information received from its accountants and other advisors and concluded on July 18, 2002 that it was not in the best interests of the Company or its stockholders to extend the expiration date of the Class A Warrants.

While the Board considered Freedman and Wills' request to extend the term of the warrants, they began exerting greater pressure on the Company. On the day of the July 18 Board meeting, Freedman filed a Schedule 13-D with the SEC, stating that as a result of the Company's "recent performance" he intended to take unspecified actions to "enhance shareholder value". Freedman sent copies of the filing to the Board of Directors by fax prior to the meeting.

The Board took into consideration the following factors after speaking with its accountants and attorneys:

o     The warrantholders had no expectation when they acquired the Class A Warrants that they would be extended.

o     The Class A Warrants are registered, and they were in the money for many months. As such, the holders had adequate time to exercise or trade out of their position.

o     The Company would incur compensation expense of more than $1,000,000 in fiscal year 2003. The Board believed that the added expense would have a negative impact on the trading value of the Company's stock, thereby harming the other stockholders.

o     The extension would benefit the warrantholders by increasing the value of the warrants without any guaranty that the warrants would ever be exercised.

o     The extension of the Class A Warrants would not guarantee that the issue of the expiration date would not arise again when a new expiration date approached.

                                    -11-
<PAGE>

o     the Board believed that the Company had no obligation to extend the term of the warrants and that the extension might be inconsistent with the fiduciary duties of the Board of Directors.

o     The possible capital inflow that may arise from the exercise of the Class A Warrant is not guaranteed and would almost certainly be at the end of the extended term, if at all. Further, the Company had (and has) adequate cash to meet its current and anticipated needs and believes that it could raise additional capital from the capital markets if the need arises.

On July 24, 2002, Elite filed a Current Report on Form 8-K confirming that it was not extending the expiration date of the Class A Warrants.

The Board scheduled the Company's annual meeting of stockholders for October 31, 2002. The Company had no plans to postpone that meeting prior to the Freedman Group's solicitation, nor has the Company in the past postponed its annual meeting of stockholders. Because of the timing of the Freedman Group's solicitation, the Company may need to postpone its 2002 annual meeting in order to avoid confusion. The Company believes that distributing proxy materials for the annual meeting and soliciting votes for the Company's slate of directors while the consent solicitation is continuing would unnecessarily confuse stockholders. The Company believes that the Freedman Group elected to pursue the consent solicitation because the expiration date of the Class A Warrants might pass before the Freedman Group gained control of the Board and extended the expiration date. In addition, the Freedman Group claims that its consent solicitation might be the last opportunity to change the composition of Elite's Board. Again, the Company questions the Freedman Group's logic because the Board must stand for election every year.

The Freedman Group's Nominees

The Freedman Group's nominees for the Board are Harris Freedman, Sharon Will and Michael H. Freedman. Their lack of knowledge about Elite's core businesses is apparent.

According to information provided by the Freedman Group, Harris Freedman is a business consultant, but the Freedman Group did not disclose the businesses or industries to which he has consulted.

According to information provided by the Freedman Group, Sharon Will is involved in investor relations services, but the Freedman Group did not disclose the businesses or industries to which she provides services or how those services qualify her to be a director of the Company.

According to information provided by the Freedman Group, Michael H. Freedman is a corporate lawyer with no relevant industry experience and is the son of Harris Freedman.

The information provided by the Freedman Group makes no reference to any of Harris Freedman, Sharon Will or Michael H. Freedman having served on a board of directors of a public company nor having any experience in developing, licensing, manufacturing or marketing pharmaceutical products or obtaining FDA approval with regard to any of such products.

By contrast to the Freedman Group's nominees, your existing Board of Directors has significant experience both in the pharmaceutical industry and in the investment community. Our current board members actively participate in the strategic management of the Company. A loss of the board members will mean losing valuable pharmaceutical industry experience and hands-on involvement. In addition, the one current Elite director who the Freedman Group is not seeking to replace, Dr. Atul M. Mehta, has not consented to serving on a Board comprised of the Freedman Group's nominees. The Company is highly dependent on Dr. Mehta's research and formulation abilities as well as his ability to develop products attractive to the market. Elite's success depends a great deal on Dr. Mehta's ability to interact with the Board. At this time, Dr. Mehta has not yet decided whether he will continue with the Company if the Freedman Group is successful in its consent solicitation. Pursuant to his employment agreement, if the Freedman Group is successful in its solicitation, a "change in control" of the Company will have occurred, and Dr. Mehta will be entitled to terminate his employment. See "Employment Agreement".

-12-

<PAGE>

The Freedman Group Does Not Understand Elite or Its Business

The Freedman Group criticizes the Company for not filing any Treatment IND, ANDA or NDA with the FDA since 1997. That criticism reveals their unfamiliarity with the pharmaceutical industry. Some of the products the Company is developing do not require investigative new drug applications before initiating Phase I studies. Moreover, the lack of filings bears no relationship to the development of new products, and the Company intends to file directly or through partners/licensees/collaborators the necessary applications for its products.

While it is easy for the Freedman Group to criticize that which it does not know or understand, the cost of acting without the requisite knowledge can be severe. We believe that without having management and a Board that is familiar with FDA requirements, has sound knowledge of the pharmaceutical industry and possess solid reputations in the industry, the Company will be at a significant competitive disadvantage.

The Freedman Group Has No Real Plans For The Company

The Freedman Group is asking you to support their slate of nominees for the Board of Directors without having offered you a comprehensive, industry-specific business plan. They are asking for your support without telling you how they plan to increase stockholder value. Their attempt at a business plan appears to call for hiring two new executives, retaining an investment banker and extending the term of the Class A Warrants. Nowhere do they explain how they would operate the Company differently or improve the Company's performance or develop new or different products. It is possible that they are not providing any of this detail because they have not yet undertaken this analysis, or because they cannot undertake the analysis since they do not know or understand our industry or our Company.

Our business strategies include tangible, ongoing changes and initiatives that have been explained to stockholders over the last year and are beginning to bear positive results. You can see the successful results of our business plan by the performance of the Company. We believe that evidence of our improved performance can be seen from:

o     the increase in our revenues by $1.1 million from the fiscal year ended March 31, 2001 to the fiscal year ended March 31, 2002. The increase resulted primarily from product development fees and our joint venture with Elan.

o     two new patents have been granted to the Company which improved our visibility within our industry and our reputation. We also filed two additional patent applications.

o     our product portfolio has expanded from 9 to 15 products.

We believe that our strategic, industry-specific business plan has begun to yield positive results, while the Freedman Group has yet to show you any real plan at all.

Elite's Stock and Warrant Price

One of the accusations made by the Freedman Group is that the current Board of Directors has caused the decline in the stock price of Elite. The price of Elite stock has declined over the past months along with the vast majority of publicly traded stocks over that period. The bio-tech industry has been particularly hard hit. Yet, Elite has performed better than the Nasdaq Composite Index and the Nasdaq Biotech Index and roughly equivalent to the Amex Biotech Index. For comparison purposes, in the past two years, the Nasdaq Composite Index declined by nearly 70%, the Nasdaq Biotech Index has declined by more than 64%, and the Amex Biotech Index has declined by approximately 55% while the Company's stock price also declined by only approximately 55% in this period. We believe that a comparison of the performance of our stock to these indices for the past 2 years gives a fair comparison because the Company has only been listed on the American Stock Exchange since February 2000.

-13-

<PAGE>

The Freedman Group also draws attention to the fact that the price of the Class A Warrants has declined, making the inference that this decline is also due to mismanagement of the Company. At the time the Class A Warrants at issue in this solicitation were issued, they had an expiration date of November 30, 2002. This has not changed. Under the Black-Scholes option pricing model, the fair market value of a warrant declines as its expiration date approaches. The warrants will have no value upon their expiration.

What the Freedman Group Didn't Tell You

According to publicly available information obtained by the Company,

o    in 1967 Harris Freedman pleaded guilty to criminal charges that he conspired to violate the anti-fraud provisions of the Securities Act of 1933, as amended (the "Securities Act"), and that he directly violated the anti-fraud provisions of the Securities Act by intentionally misleading investors.

o    the Securities and Exchange Commission barred Harris Freedman from associating with a registered broker-dealer for willfully violating the anti-fraud provisions of the Securities Act and the Securities Exchange Act of 1934, as amended, and revoked the registration of a brokerage firm of which Mr. Freedman was president as a result of its finding that Mr. Freedman intentionally misled investors.

o    Finally, in 1999, Harris Freedman and Ms. Will, who is a member of Mr. Freedman's group, were named as defendants in a lawsuit filed in the United States District Court for the District of New Jersey alleging, among other things, that Mr. Freedman and Ms. Will manipulated the trading price of a public company for their own benefit. This lawsuit was settled with the payment to the plaintiffs of $750,000 and the issuance to the plaintiffs of 324,486 shares of Amplidyne Inc. stock. The publicly announced terms of the settlement do not indicate which defendants paid the settlement amounts and do not contain admissions of any wrong-doing.

THE ROUTE THE FREEDMAN GROUP CHOSE TO ATTEMPT TO TAKE
CONTROL OF YOUR BOARD OF DIRECTORS WILL NOT RESULT
IN THE PAYMENT TO YOU OF ANY CONTROL PREMIUM

People who seek control of a company usually either make a proposal to the board of directors to buy the company, or, if the board refuses their proposal, they commence a tender offer for the outstanding shares. In either case, a person trying to obtain control of a company this way usually offers a control or sales premium to the stockholders, that is, they pay more than market value for the shares. That excess price is called a control premium.

In contrast, control premiums generally are not paid when a change in management has occurred as a result of a consent solicitation. By starting a consent solicitation to replace Elite's Board of Directors, the Freedman Group has chosen to attempt to gain control of the Company using a method that, although legal, does not include the payment of a control premium (or anything at all) to stockholders.

Each of the Freedman Group's Proposals is designed to enable it to take control of the Board that YOU elected and which contains the independent directors by replacing a majority of the Board with their own hand-picked nominees - themselves. We believe that their consent solicitation is an attempt to pressure you without giving you the opportunity to consider all of Elite's strategic alternatives. We believe that this undue pressure created by the Freedman Group is not in the Company's or your best interests. The Freedman Group's Proposals

are:

(1) Removal of three present members of the Elite Board without cause, Donald S. Pearson, Harmon Aronson and Eric L. Sichel and any person or persons elected to the Elite Board to fill any vacancy arising since the last annual meeting of stockholders or any newly created directorships; and

-14-

<PAGE>

(2) Election of the Freedman Group's slate, Harris Freedman, Sharon Will and Michael H. Freedman, to the Board of Directors to fill the newly created vacancies on the Board, and to serve until their respective successors are duly elected and qualify.

For the reasons discussed above, we have determined that the Freedman Group's Proposals are not in the best interests of you or Elite. The above discussion of reasons and factors considered by us is not intended to be exhaustive, but does reflect the material information and factors we considered in our review and analysis of the Freedman Group's Proposals. In view of the variety of factors and the amount of information considered, we did not find it practicable to provide specific assessments of, quantify or otherwise assign any relative weights to, the specific factors considered in determining to recommend that you reject the Freedman Group's Proposals. Our determination was made after we considered all the factors taken as a whole. In addition, some of the members of our Board of Directors may have given differing weights to different factors. Throughout our deliberations regarding the Freedman Group's Proposals, we received advice from our counsel James, McElroy & Diehl, P.A. in connection with the Freedman Group's Proposals and the obligation of the Company, if any, to extend the term of the warrants and related matters, and from James, McElroy and Diehl, P.A. and Lowenstein Sandler PC with regard to the Freedman Group's solicitation and the Company's consent revocation solicitation. We also discussed with our accountants Miller, Ellin & Co. LLP about the potential accounting consequences to the Company of extending the term of the warrants.

WE UNANIMOUSLY OPPOSE THE FREEDMAN GROUP'S CONSENT SOLICITATION AND URGE YOU NOT TO SIGN THE WHITE CONSENT CARD THAT THEY SENT TO YOU.

Even if you previously signed and returned the WHITE consent card, you have every right to change your vote. We urge you to sign, date and mail the enclosed BLUE Consent Revocation Card in the postage-paid envelope provided. Your prompt action is very important. Please return the BLUE Consent Revocation Card today.

If your shares are registered in your name, please sign, date and mail the enclosed BLUE Consent Revocation Card to Georgeson Shareholder Communications Inc. in the postage-prepaid envelope provided today. If your shares are held in the name of a brokerage firm, bank nominee or other institution, only it can sign a BLUE Consent Revocation Card with respect to your shares and only after receiving your specific instructions. Accordingly, please sign, date and mail the enclosed BLUE Consent Revocation Card in the postage-paid envelope provided. To ensure that your revocation is completed, you should also contact the person responsible for your account and give instructions for a BLUE Consent Revocation Card to be issued representing your shares.

If you have any questions about giving your revocation of consent or require assistance, please call Georgeson, the firm assisting the Company in this request for revocations, at:

Georgeson Shareholder Communications Inc.
17 State Street
New York, New York 10004
Stockholders call toll free: 866-297-1267
Banks & Brokers call: 212-440-9800
Fax number: 212-440-9009

-15-

<PAGE>

PENDING LITIGATION

On August 27, 2002, we commenced an action in the United States District Court for the District of New Jersey (the "Action") against (i) the individual members of the Freedman Group, (ii) additional individuals whose identities, we contend, the Freedman Group was required to disclose but who were not listed in any of the Freedman Group's SEC filings and (iii) other unnamed defendants who are acting in concert with the disclosed and undisclosed members of the Freedman Group (collectively, the "Defendants"). The complaint seeks injunctive relief against the Defendants on the basis that the Defendants violated the federal securities laws and the rules promulgated by the SEC thereunder by, among other things, filing a Schedule 13D more than ten days after the Defendants formed a "group" for purposes of Section 13(d) of the Securities Exchange Act of 1934

(the "Act"), by failing to disclose all persons acting in concert with the Freedman Group and by acquiring additional shares of our stock during a period that is prohibited by the Act .

We also allege that the Defendants violated Section 14(a) of the Act by filing a false and misleading proxy solicitation which failed to identify all the participants of the Freedman Group's solicitation. The complaint also alleges that the Defendants are violating the SEC's proxy rules in conducting their consent solicitation by representing to Elite stockholders the outcome of the consent solicitation process. Elite contends that the Freedman Group has violated these stockholder-protection provisions of the federal securities laws in order to advance its efforts to take control of the Company.

On August 27, 2002, we applied to the Court for a temporary restraining order barring Defendants from any further contacts with Elite's stockholders, barring Defendants from any further violation of the federal securities laws, and compelling corrective disclosures to remedy the Section 13(d) and Section 14(a) violations. Our application is still pending.

### OUTSTANDING ELITE STOCK

As of August 5, 2002, there were 9,728,116 shares of Elite common stock outstanding.

### THE CONSENT PROCEDURE

Under Section 228 of the General Corporation Law of the State of Delaware ("DGCL"), unless otherwise provided in the certificate of incorporation, any action which may be taken at an annual or special meeting of stockholders of a corporation may be taken without a meeting if consents in writing, setting forth the action so taken, are signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and such consents are duly delivered to the corporation.

Thus, the unrevoked consent of the holders of not less than a majority of the shares of common stock outstanding and entitled to vote on the Record Date (as defined below) must be obtained within the time limits specified to adopt each of the Freedman Group's Proposals. Each share of common stock is entitled to one vote per share. Since consents are required from the holders of record of a majority of the outstanding shares of common stock in order for each of the Freedman Group's Proposals to be adopted, an abstention from voting on the Freedman Group's WHITE Consent Card or a broker non-vote will have the practical effect of a vote against such proposals.

In order to be effective, consents with respect to the Freedman Group's Proposals must be delivered within 60 days of the earliest dated consent with respect to the Freedman Group's Proposals delivered to the Company in the manner required by Delaware law. On August 5, 2002, a consent with respect to 2,000 shares of common stock executed by Harris Freedman and dated August 5, 2002 was delivered to the Company. Accordingly, the record date (the "Record Date") for stockholders entitled to consent is August 5, 2002 and assuming no earlier dated consents are delivered to the Company, the consents will not be effective unless the requisite number of unrevoked consents are delivered to the Company on or before October 4, 2002. As of the Record Date, there were 9,728,116 shares of common stock issued and outstanding.

-16-

<PAGE>

YOU HAVE THE RIGHT TO REVOKE ANY CONSENT YOU MAY HAVE PREVIOUSLY GIVEN TO THE FREEDMAN GROUP. TO DO SO, YOU NEED ONLY SIGN, DATE AND RETURN IN THE ENCLOSED POSTAGE-PAID ENVELOPE THE BLUE CONSENT REVOCATION CARD WHICH ACCOMPANIES THIS REVOCATION STATEMENT. IF YOU DO NOT INDICATE A SPECIFIC VOTE ON THE BLUE CONSENT REVOCATION CARD WITH RESPECT TO ANY FREEDMAN GROUP PROPOSAL, THE CARD WILL BE USED IN ACCORDANCE WITH THE BOARD RECOMMENDATION TO REVOKE ANY CONSENT WITH RESPECT TO SUCH PROPOSAL.

IF YOU ARE AGAINST THE FREEDMAN GROUP'S PROPOSALS AND HAVE NOT SIGNED A FREEDMAN GROUP CONSENT, YOU MAY SHOW YOUR OPPOSITION TO THE PROPOSALS BY SIGNING, DATING AND RETURNING THE ENCLOSED BLUE CONSENT REVOCATION CARD. THIS WILL BETTER ENABLE THE COMPANY TO KEEP TRACK OF HOW MANY STOCKHOLDERS OPPOSE THE FREEDMAN GROUP'S PROPOSALS.

The Company has retained Georgeson Shareholder Communications, Inc. to assist in communicating with stockholders in connection with the Freedman Group's solicitation and to assist in our efforts to obtain consent revocations. If you have any questions about how to complete or submit your BLUE consent revocation card or any other questions, Georgeson will be pleased to assist you. Stockholders may call Georgeson toll free at 866-297-1267 and Banks & Brokers may call Georgeson at 212-440-9800.

The Company has retained IVS Associates, Inc. ("IVS") to serve as inspector in
the event that the Freedman Group delivers consents to the Company. In such
event, IVS will tabulate the number of consents obtained by the Freedman Group
and the number of revocations obtained by the Company at a cost of approximately
$8,500, which will be borne by the Company.

The Company will issue a press release announcing the results of the
solicitation promptly following the end of the solicitation period.

<div align="center">

STOCKHOLDERS ARE URGED TO DELIVER ALL BLUE CONSENT
REVOCATIONS CARDS TO:

Georgeson Shareholder Communications Inc.
17 State Street
New York, New York 10004
Stockholders call toll free: 866-297-1267
Banks & Brokers call: 212-440-9800
Fax number: 212-440-9009

</div>

The Company requests that if you deliver your BLUE Consent Revocation Card to
the Company instead of Georgeson, that you also deliver a photocopy to
Georgeson, so that Georgeson will be aware of all revocations.

If your shares are registered in your name, please sign, date and mail the
enclosed BLUE Consent Revocation Card to Georgeson Shareholder Communications
Inc. in the postage-prepaid envelope provided today. If your shares are held in
the name of a brokerage firm, bank nominee or other institution, only it can
sign a BLUE Consent Revocation Card with respect to your shares and only after
receiving your specific instructions. Accordingly, please sign, date and mail
the enclosed BLUE Consent Revocation Card in the postage-paid envelope provided.
To ensure that your revocation is completed, you should also contact the person
responsible for your account and give instructions for a BLUE Consent Revocation
Card to be issued representing your shares.

You are urged to confirm in writing your instructions to the persons responsible
for your account and provide a copy of those instructions to the Company so that
the Company will be aware of your instructions and ensure that your instructions
are followed.

<div align="center">-17-</div>

<PAGE>

<div align="center">

INFORMATION ABOUT US,
THE PEOPLE ASKING YOU
TO REVOKE YOUR CONSENT

</div>

The table below sets forth the names and ages (as of September 3, 2002) of each
of Elite's directors, and the other positions and offices presently held by each
of the directors within the Company, the period during which each such person
has served on the Board of Directors of the Company, and the principal
occupations and employment of each such person during the past five years. In
each instance in which dates are not provided in connection with a director's
business experience, such director has held the position indicated for at least
the past five years.

<div align="center">DIRECTORS AND EXECUTIVE OFFICERS</div>

The current directors and the executive officers of the Company are:

```
<TABLE>
<CAPTION>
    Name                    Age        Position
    ----                    ---        --------
<S>                         <C>        <C>
Dr. Atul M. Mehta           53         President, Chief Executive Officer and Director
Donald S. Pearson           66         Director
Harmon Aronson              59         Director
Eric L. Sichel              43         Director
Mark I. Gittelman           42         Chief Financial Officer, Secretary and Treasurer
</TABLE>
```

There are no arrangements between any director or executive officer and any
other person, pursuant to which the director or officer is to be selected as
such. There is no family relationship between the directors, executive officers,
or persons nominated or chosen by the Company to become directors or executive
officers.

Atul M. Mehta, Ph.D., the founder of Elite Laboratories, Inc. ("ELI"), has been
a director of ELI since its inception in 1990 and a director of the Company
since 1997. He has been employed as the President of ELI since 1990 and
President of the Company since 1997. Prior to that, he was Vice President at

Nortec Development Associates, a company specializing in the development of food, pharmaceutical and chemical specialty products, from 1984 to 1989. From 1981 to 1984, he was associated with Ayerst Laboratories, a division of American Home Products Corporation in the solids formulation section as Group Leader. His responsibilities included development of formulations of ethical drugs for conventional and controlled-release dosage forms for both USA and international markets. He received his B.S. degree in Pharmacy with honors from Shivaii University, Kolhapur, India, and a BS, MS, and a Doctorate of Philosophy in Pharmaceutics from the University of Maryland in 1981. Dr. Mehta is also a director of Elite Research, Ltd., the joint venture between Elite and Elan Corporation. Other than ELI and Elite Research, Ltd., no company with which Dr. Mehta was affiliated in the past was a parent, subsidiary or other affiliate of the Company.

Donald S. Pearson, a director since 1999, has been employed since 1997 as the President of Pearson & Associates, Inc., a company that provides consulting services to the pharmaceutical industry. Prior to starting Pearson & Associates, Mr. Pearson served for five years as the Director of Licensing at Elan Pharmaceuticals, and prior to that he was employed by Warner-Lambert for thirty years in various marketing, business development and licensing capacities. Mr. Pearson holds a B.S. in Chemistry from the University of Arkansas and studied steroid chemistry at St. John's University. He has served on the informal advisory board of ELI for several years; other than ELI, no company with which Dr. Pearson was affiliated in the past was a parent, subsidiary or other affiliate of the Company.

Harmon Aronson, Ph.D., a director since 1999, has been employed since 1997 as the President of Aronson Kaufman Associates, Inc., a New Jersey-based consulting firm that provides manufacturing, FDA regulatory and compliance services to the pharmaceutical and biotechnology companies. Its clients include United States and international firms manufacturing bulk drugs and finished pharmaceutical dosage products who are seeking FDA approval for their products for the US Market. Prior to 1997, Dr. Aronson was employed by Biocraft Laboratories, a leading generic drug manufacturer, most recently in the position of Vice President of Quality Management; prior to that he held the position of Vice President of Non-Antibiotic Operations, where he was responsible for the manufacturing of all the firm's non-antibiotic products. Dr. Aronson holds a Ph.D. in Physics from the University of Chicago. Mr.

-18-

<PAGE>

Aronson is also a director of Elite Research, Ltd., the joint venture between Elite and Elan Corporation. Other than ELI and Elite Research Ltd., no company with which Dr. Aronson was affiliated in the past was a parent, subsidiary or other affiliate of the Company.

Eric L. Sichel, M.D., a director since August 2, 2001, is President of Sichel Medical Ventures, Inc., Englewood, NJ, which company provides biotechnology company assessments and investment banking services. Dr. Sichel has been the owner and President of Sichel Medical Ventures, Inc. since 1997. From 1995 through 1996, Dr. Sichel was a senior analyst in the biotechnology field for Alex, Brown & Sons, Inc. of New York, NY. Prior to that, Dr. Sichel was affiliated with Sandoz Pharmaceuticals Corp. of East Hanover, NJ, in various capacities, including associate director of transplantation/immunology. Dr. Sichel is licensed to practice medicine by the State of New York.

Mark I. Gittelman, CPA, the Chief Financial Officer, Secretary and Treasurer of the Company, is the President of Gittelman & Co., P.C., an accounting firm in Clifton, NJ. Prior to forming Gittelman & Co., P.C. in 1984, he worked as a certified public accountant with the international accounting firm of KPMG Peat Marwick, LLP. Mr. Gittelman holds a B.S. in accounting from New York University and a Masters of Science in Taxation from Farleigh Dickinson University. He is a Certified Public Accountant licensed in New Jersey and New York, and is a member of the American Institute of Certified Public Accountants ("AICPA"), and the New Jersey State Securities and Exchange Practice Section of the AICPA, and the New Jersey State and New York States Societies of CPAs. Other than ELI, no company with which Mr. Gittelman was affiliated in the past was a parent, subsidiary or other affiliate of the Company.

Each director holds office (subject to the Company's By-Laws) until the next annual meeting of stockholders and until such director's successor has been elected and qualified. All executive officers of the Company are serving until the next annual meeting of directors and until their successors have been duly elected and qualified. There are no family relationships between any of the directors and executive officers of the Company.

SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

To the knowledge of the Company, there was no person who, at any time during the fiscal year ended March 31, 2002, was a director, officer, beneficial owner of more than 10% of any class of equity securities of the Company registered

pursuant to Section 12 of the Securities Exchange Act of 1934, who failed to file on a timely basis the reports required by Section 16(a) of the Securities Exchange Act of 1934 during the most recent fiscal year.

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The Company is a party to an agreement whereby fees are paid to Gittelman & Co., P.C., a company wholly owned by Mark Gittelman, the Company's Chief Financial Officer, Secretary and Treasurer, in consideration for services rendered by Mr. Gittelman in his capacity as Chief Financial Officer and Treasurer. For the fiscal years ended March 31, 2002 and 2001, the fees paid to that company were $91,260 and $82,639, respectively.

COMMITTEES

The Company has an Audit Committee of the Board of Directors. The Company has no other standing committees of the Board of Directors.

AUDIT COMMITTEE

The Audit Committee had one meeting during the fiscal year ended March 31, 2002. The Company's Board of Directors has adopted a written charter for the Audit Committee, a copy of which was included as an appendix to the Company's proxy statement sent to stockholders in connection with the annual meeting of stockholders held October 11, 2001.

The Company deems the members of its Audit Committee to be independent as independence is defined in Section 121(A) of the American Stock Exchange Listing Standards.

                                   -19-
<PAGE>

AUDIT COMMITTEE REPORT

The Audit Committee reviewed and discussed the audited financial statements with management. The Audit Committee discussed with the independent auditors of the Company the matters required to be discussed by SAS 61 (Codification of Statements on Auditing Standards, AU 380), as modified or supplemented. The Audit Committee received the written disclosures and the letter from the independent accountants required by Independence Standards Board Standard No. 1 (Independence Standards Board Standard No. 1, Independence Discussions with Audit Committees), as modified or supplemented. The Audit Committee discussed with the independent accountant the independent accountant's independence. Based upon the foregoing review and discussions, the Audit Committee recommended to the Board of Directors of the Company that the audited financial statements of the Company be included in the Company's Annual Report on Form 10-K for the last fiscal year ended March 31, 2002 as filed with the Securities and Exchange Commission.

The foregoing report of the Audit Committee is made by members of the Audit Committee of the Company: Donald S. Pearson, Harmon Aronson and Eric L. Sichel.

BOARD MEETINGS

The Board of Directors of the Company had three meetings held during the fiscal year ended March 31, 2002. No incumbent director attended fewer than 75% of the aggregate of the meetings of the Board and its Audit Committee during that year.

COMPENSATION OF DIRECTORS

Each non-affiliated director receives $2,000 as compensation for each meeting of the Board of Directors attended.

EXECUTIVE COMPENSATION

The following table provides information on the compensation of Dr. Atul M. Mehta, the chief executive officer of the Company for the last three fiscal years. No other executive officer of the Company received salary and bonus exceeding $100,000 during those periods.

Summary Compensation Table

<TABLE>
<CAPTION>

| (a) Name and principal position | (b) Fiscal Year | (c) Salary | (d) Bonus | (e) Other Annual Compen- | (f) Restricted stock awards | (g) Securities Underlying options | (h) LTIP payouts | (i) All other compen- sation |
|---|---|---|---|---|---|---|---|---|

eation

| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
|---|---|---|---|---|---|---|---|---|
| Atul M. | 2001-02 | $272,855 | $30,000 | $83,896 | -- | 50,000 | -- | -- |
| Mehta | 2000-01 | $248,050 | $45,000 | $3,040 | -- | 425,000(1)(2) | -- | -- |
| President | 1999-00 | $227,030 | $25,000 | $3,040 | -- | 500,000 | -- | -- |
| and Chief |
| Executive Officer |
| </TABLE> |

(1) On December 15, 2000, Dr. Mehta surrendered options for 425,000 shares of the Company's common stock (exercisable at $7.00 per share) and in return received options for 425,000 shares of the Company's common stock exercisable on January 2, 2001 and expiring January 1, 2006. The exercise price is 110% of the opening price of the Company's common stock on January 2, 2001 adjusted upward to the nearest half dollar or $7.00. On January 2, 2001, the stock of the Company opened at $6.25 per share, therefore the exercise price for the stock subject to these options is $7.00 per share.

-20-

<PAGE>

(2) By action on February 21, 2002, the Board corrected a clerical error in options for 425,000 shares of common stock of the Company previously granted to Dr. Mehta. This correction did not result in any additional shares being subject to options held by Dr. Mehta, any change in the exercise price or a change in any other material terms.

The Company's fiscal year begins April 1 and ends March 31. The information is provided for each fiscal year beginning April 1.

Other Annual Compensation represents use of a company car and premiums paid by the Company for life insurance on Dr. Mehta's life for the benefit of his wife paid by the Company.

Reported below in this report is the purchase by the Company of options from Dr. Mehta. The purchase price for those options of $80,896 is included above in "Other Annual Compensation."

Option Grants in Last Fiscal Year

During the fiscal year ended March 31, 2002, the Board of the Company authorized issuance to Dr. Mehta of options to acquire 50,000 shares of the common stock of the Company, vesting over a period of five years at the rate of 10,000 shares per year beginning February 21, 2003, exercisable at a price equal to 110% of the closing price of the Company's common stock on February 21, 2002 ($8.25 per share).

By action on January 25, 2001, the Board purchased options held by Dr. Mehta for 20,214 shares of common stock of the Company at a price of $4.00 per share. The options carried an exercise price of $2.00 per share. The then current market price for the stock was in excess of $7.50. Dr. Mehta had intended to exercise the option for these shares and then sell the shares. The purchase price for the option arrived at by the Board took into account the amount which would be necessary to purchase the options and cover taxes payable by Dr. Mehta on the transaction.

Option/SAR Grants Table in Last Fiscal Year

<TABLE>
<CAPTION>

| (a) | (b) | (c) | (d) | (e) |
|---|---|---|---|---|
| Name | Number of Securities Underlying Options Granted | % of Total Options Granted to Employees in Fiscal Year | Exercise or Base Price ($/sh) | Expiration date |
| <S> | <C> | <C> | <C> | <C> |
| Atul M. Mehta | 50,000 | 2.8% | $8.25 | 2-20-07 |
| </TABLE> |

Options for 500,000 shares which were granted to Dr. Mehta during the fiscal year ended March 31, 2000 vest at the rate of 100,000 shares per year on each December 31 beginning December 31, 2001. The options expire on the earlier of (a) one year after Dr. Mehta ceases to be employed by the Company or to serve as an officer or director of the Company or (b) March 31, 2010. Notwithstanding, the options shall become fully vested and exercisable if Dr. Mehta's employment agreement or his position as an officer and director is terminated by the Company for any reason or if it expires as a result of the Company giving notice of nonrenewal. If the board of directors of the Company votes to approve the acquisition of more than 50% of the stock of the Company by any person or entity, the Company may require Dr. Mehta to exercise or sell the options. In addition to the above stated options, by board action on September 22, 2000, Dr.

Mehta was granted a preemptive right to acquire shares of the Company in a sufficient number to maintain his percentage ownership of the shares outstanding. Under this preemptive right, upon issuance by the Company of shares of common stock for any reason, or of securities convertible into common stock upon demand, Dr. Mehta shall be permitted to purchase shares of common stock of the Company sufficient to maintain the greater of his percentage ownership of outstanding common stock of the Company determined on an absolute basis and upon a fully diluted basis as existed prior to the stock issuance. The price which Dr. Mehta shall pay for such stock shall be the lower of (x) the then current market price (discounted 15% if the shares are not registered) or (y) the price to be paid by the party in the transaction triggering the preemptive right. The right shall be exercised and the price shall be paid within 120 days of the issuance of the stock triggering the preemptive right.

-21-

<PAGE>

Aggregate Option Exercises in Last Fiscal Year and Fiscal Year End Option Value Table

<TABLE>
<CAPTION>

| a | b | c | d | e |
|---|---|---|---|---|
| | | | No. of Securities Underlying Unexercised Options at FY-End | Value of Unexercised In-the-Money Options at FY-End |
| Name | Shares Acquired on Exercise | Value Realized | Exercisable/ Unexercisable | Exercisable/ Unexercisable |
| ---- | ----------- | -------- | -------------- | -------------- |
| <S> | <C> | <C> | <C> | <C> |
| Dr. Atul M. Mehta | None | $0 | 1,025,000/450,000 | $975,000/0 |

</TABLE>

These options and the shares underlying them are unregistered, and their market value is unknown and incalculable. However, the registered common stock of the Company was trading for $3.36 per share as of the close of business on August 30, 2002. It is on this hypothetical value that the figures in column (e) are calculated. These figures may have no relation to the actual value of the unexercised options.

EMPLOYMENT AGREEMENT

The only employment agreement which the Company has with an executive officer is the Amended and Restated Employment Agreement entered into March 31, 2000 and amended on July 18, 2002, between the Company and Dr. Atul M. Mehta (the "Agreement"). The Agreement provides:

o       that the Company will employ Dr. Mehta for a period of five years ending December 31, 2005 (unless sooner terminated pursuant to provisions of the Agreement). At the end of the five years, the Agreement will be automatically renewed for an additional five year term with an annual salary to be agreed to, unless either party gives written notice of nonrenewal by December 31, 2004. The Agreement is automatically extended for periods of one year after December 31, 2010 unless either party gives notice of nonrenewal at least one year prior to the date of expiration.

o       for an annual salary of $242,000, which amount is to be increased by the board of directors not less than 10% annually beginning January 1, 2001.

o       that Dr. Mehta will receive 5% of the net profit of the Company each fiscal year.

o       for an annual bonus in an amount determined by the Board.

o       that Dr. Mehta will receive options to purchase Elite common stock at a price of $10.00 per share in a total amount of 500,000 shares, exercisable in increments of 100,000 shares annually beginning December 31, 2000. The options shall be exercisable from the date of vesting until one year after Dr. Mehta ceases to be employed by the Company or to serve as an officer and director of the Company or March 31, 2010, whichever is earlier.

o       that the options are exercisable by Dr. Mehta if the Agreement or Dr. Mehta's position as an officer and director is terminated by the Company for any reason or if the Agreement is not renewed by the Company.

o       that the Agreement will terminate upon (a) Dr. Mehta's death, (b)

election of either party if Dr. Mehta is unable to perform his duties on account of disability for a total period of 120 days or more during any consecutive period of twelve months, (c) by the Company upon "severe cause" and (d) by Dr. Mehta upon the occurrence of certain events.

o  that if the Agreement is terminated due to Dr. Mehta's death, his surviving spouse, or his estate if his spouse does not survive, shall receive Dr. Mehta's salary, incentive commissions, benefits and any deferred compensation accrued through the last day of the third calendar month following the month in

-22-

<PAGE>

which termination occurred; in addition, one-half of his salary would be paid for an additional period of three years.

o  that if the Agreement is terminated by the Company because of Dr. Mehta's disability or upon "severe cause", Dr. Mehta will receive his salary, incentive commissions, benefits and any deferred compensation through the last day of the calendar month in which the termination occurs.

o  that if the Agreement is terminated by Dr. Mehta upon the occurrence of one of the events specified, including a "change in control" as defined, Dr. Mehta will receive all accrued salary, incentive commissions, benefits and any deferred compensation through the later of May 22, 2006 or the third anniversary of such termination. If the Freedman Group is successful in its solicitation, a change-in-control as defined in Dr. Mehta's employment agreement will have occurred and Dr. Mehta will have the right to terminate his employment with the Company and to receive "all accrued salary, incentive commissions, benefits, and any deferred compensation and all salary and commissions payable under Paragraph 4(b) through a period ending upon the later of (i) May 22, 2006 or (ii) the third anniversary of such termination." The salary portion of these payments will be due to Dr. Mehta in a lump sum. Paragraph 4(b) entitles Dr. Mehta to a bonus each year of 5% of the Company's net profit.

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS

Shown in the table below is any person (including any "group") known to the Company to be the beneficial owner of more than five percent (5%) of any class of the Company's voting securities as of August 5, 2002.

<TABLE>
<CAPTION>

| Title of Class | Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Common | Dr. Atul M. Mehta, Director/Officer 165 Ludlow Avenue Northvale New Jersey 07647 | 2,962,701(1) Direct and Indirect | 26.4% |
| Common | Jerome Belson 495 Broadway New York, NY 10012 | 928,000(2) Direct and Indirect | 9.2% |
| Common | John de Neufville and Mely Rahn, Trustees Margaret de Neufville Revocable Trusts 197 Meister Avenue North Branch, NJ  08876 | 766,100(3) Direct and Indirect | 7.6% |
| Common | Bakul and Dilip Mehta P. O. Box 438 Muscat, Sultanate of Oman | 630,000 Direct | 6.5% |
| Common | Bridge Ventures, Inc. 1241 Gulf of Mexico Drive Longboat Key, FL 24228 | 859,470(4) Direct and Indirect | 8.6% |
|  | SMACS Holding Corp. 1241 Gulf of Mexico Drive Longboat Key, FL 24228 |  |  |
|  | Bridge Ventures, Inc. Employee Pension Plan 1241 Gulf of Mexico Drive Longboat Key, FL 24228 |  |  |

-23-

&lt;PAGE&gt;

Saggi Capital Corp.
9 Prospect Hill Road Ext.
Pine Plains, NY 12567

Saggi Capital Corp. Money Purchase Plan
9 Prospect Hill Road Ext.
Pine Plains, NY 12567

Saggi Capital Corp. Profit Sharing Plan
9 Prospect Hill Road Ext.
Pine Plains, NY 12567

Harris Freedman
1241 Gulf of Mexico Drive
Longboat Key, FL 24228

Sharon Will
9 Prospect Hill Road Ext.
Pine Plains, NY 12567

Michael H. Freedman
200 East 89th Street, Suite 17A
New York, NY 10128

&lt;/TABLE&gt;

(1) Includes (i) 6,300 shares held by the Amar Mehta Trust; (ii) 6,300 shares
held by Dr. and Mrs. Mehta as custodians for Anand Mehta; (iii) 200,000 shares
held by Mehta Partners, LP; and (iv) options to purchase 1,475,000 shares of
common stock held by Dr. Mehta (including options for 400,000 shares which do
not begin vesting until December 31, 2002 and then vest 100,000 shares on that
date and 100,000 shares annually thereafter for three years and options for
50,000 shares which begin vesting on December 31, 2002 and then vest 10,000
shares on that date and 10,000 shares annually thereafter for four years).

(2) Includes (i) 35,000 shares held by Maxine Belson, wife of Jerome Belson;
(ii) 50,000 shares by the Jerome Belson Foundation; and (iii) 28,000 shares
owned by the Grandchildren of Jerome Belson; and (iv) warrants for 256,000
shares.

(3) Represents (i) 331,000 shares held in trust for the benefit of John P. de
Neufville; (ii) 410,000 shares held in trust for David T. de Neufville; and
(iii) options personally held by John P. de Neufville to purchase 25,000 shares.

(4) Based on information contained in a Schedule 13D, as amended, filed by the
foregoing persons on August 26, 2002 who have formed a group within the meaning
of Section 13(d) of the Securities Exchange Act of 1934. Consists of (a) 2,000
shares of common stock owned by Harris Freedman, (b) 369,970 shares of common
stock owned by Bridge Ventures, Inc. (including 95,250 shares of common stock
issuable upon exercise of warrants owned by Bridge Ventures, Inc.), (c) 121,000
shares of common stock owned by SMACS Holding Corp. (including 75,000 shares of
common stock issuable upon exercise of warrants owned by SMACS Holding Corp.),
(d) 102,200 shares of common stock owned by Bridge Ventures, Inc. Employee
Pension Plan (including 10,000 shares of common stock issuable upon exercise of
warrants owned by Bridge Ventures, Inc. Employee Pension Plan), (e) 7,500 shares
of common stock owned by Sharon Will, (f) 217,500 shares of common stock owned
by Saggi Capital Corp. (including 110,000 shares of common stock issuable upon
exercise of warrants owned by Saggi Capital Corp.), (g) 7,450 shares of common
stock owned by Saggi Capital Corp. Money Purchase Plan, (h) 8,350 shares of
common stock owned by Saggi Capital Corp. Profit Sharing Plan, and (i) 23,500
shares of common stock owned by Michael H. Freedman (including 5,000 shares of
common stock issuable upon exercise of warrants owned by Michael H. Freedman).

-24-

&lt;PAGE&gt;

The Company is informed and believes that as of August 30, 2002, Cede &amp; Co. held
6,544,413 shares of the Company's common stock and 1,200,120 Class A Warrants
for shares of the common stock of the Company as nominee for Depository Trust
Company, 55 Water Street, New York, New York 10004. It is the Company's
understanding that Cede &amp; Co. and Depository Trust Company both disclaim any
beneficial ownership therein and that such shares are held for the account of
numerous other persons, no one of whom is known to beneficially own five
percent or more of the common stock of the Company.

SECURITY OWNERSHIP OF MANAGEMENT

Shown below, as of August 5, 2002, are the shares of the Company beneficially

owned by all directors, by the executive officers and by the directors and
executive officers of the Company as a group.

| Title of Class | Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Common | Dr. Atul M. Mehta, Director/Officer 165 Ludlow Avenue Northvale NJ 07647 | 2,962,700(1) Direct and Indirect | 26.4% |
| Common | Donald S. Pearson, Director 1305 Peabody Avenue Memphis, TN 38104 | 78,750(2) Direct | 0.8% |
| Common | Harmon Aronson, Director 26 Monterey Drive Wayne, NJ 07470 | 60,000(3) Direct | 0.6% |
| Common | Eric L. Sichel, Director 411 Highview Road Englewood, NJ 07631 | 30,000(4) Direct | 0.3% |
| Common | Mark I. Gittelman, Chief Financial Officer, Treasurer and Secretary 300 Colfax Avenue Clifton, NJ 07013 | 10,000(5) Direct | 0.1% |
| Common | Officers and Directors as a Group | 3,141,450 Direct and Indirect | 27.7% |

(1) Includes (i) 6,300 shares held by the Amar Mehta Trust; (ii) 6,300 shares
held by Dr. and Mrs. Mehta as custodians for Anand Mehta; (iii) 200,000 shares
held by Mehta Partners, LP; and (iv) options to purchase 1,475,000 shares of
common stock held by Dr. Mehta (including options for 400,000 shares which do
not begin vesting until December 31, 2002 and then vest 100,000 shares on that
date and 100,000 shares annually thereafter for three years and options for
50,000 shares which do begin vesting until December 31, 2002 and then vest
10,000 shares on that date and 10,000 shares annually thereafter for four
years).

(2) Includes options to purchase 60,000 shares. Options for 40,000 shares are
vested. The remaining options vest in increments of 10,000 shares each on
September 1, 2002 and January 2, 2003.

(3) Comprised of options to purchase 60,000 shares. Options for 40,000 shares
are vested. The remaining options vest in increments of 10,000 shares each on
September 1, 2002 and January 2, 2003.

(4) Comprised of options to purchase 30,000 shares. Options for 10,000 shares
are vested. Options for the remaining shares vest in increments of 10,000 shares each
on August 2, 2003 and August 2, 2004.

-25-

<PAGE>

(5)      Comprised of options to purchase 10,000 shares.

         Information on the stock ownership of these persons was provided to the
Company by the persons.

                          COMPARATIVE STOCKHOLDER RETURN

The graph which follows compares the yearly percentage change in the Company's
cumulative total stockholder return on its common stock with the cumulative
total stockholder return of (1) all United States companies traded on the
American Stock Exchange (where the Company's common stock is now traded) and (2)
51 companies traded on the American Stock Exchange which carry the Standard
Industrial Classification (SIC) code 283 (Pharmaceuticals). The graph was
prepared by the Center for Research in Security Prices at the University of
Chicago Graduate School of Business, Chicago, IL.

The stock of the Company was traded on the NASDAQ over-the-counter bulletin
board from July 23, 1998 until February 24, 2000. The stock of the Company began
trading on the American Stock Exchange on February 24, 2000. The period covered
by the comparison begins September 1998 because no trading data was available
for the period from July 23, 1998 through August 31, 1998. The Company's fiscal

year ends on March 31.

-26-

<PAGE>

Comparison of Five-Year Cumulative Total Returns
Performance Graph for
Elite Pharmaceuticals, Inc.

Produced on 05/29/2002 including data to 03/28/2002

[THE FOLLOWING DATA APPEARED AS A LINE CHART IN THE PRINTED MATERIAL]

|            | Elite Pharmaceuticals, Inc. | AMEX Stock Market (US Companies) | AMEX Stocks (SIC 2830-2839 US Companies) Drugs |
|------------|---------|---------|---------|
| 09/03/1998 | 100.0   | 100.0   | 100.0   |
| 03/31/1999 | 158.4   | 117.5   | 136.2   |
| 03/31/2000 | 1780.0  | 166.6   | 267.8   |
| 03/30/2001 | 880.0   | 132.9   | 156.3   |
| 03/28/2002 | 1238.4  | 135.0   | 110.1   |

- --------------------------------------------------------------------------
                            Legend

<TABLE>
<CAPTION>

| Symbol | CRSP Total Returns Index for: | 09/1998 | 03/1999 | 03/2000 | 03/2001 | 03/2002 |
|--------|-------------------------------|---------|---------|---------|---------|---------|
| <S>    | <C>                           | <C>     | <C>     | <C>     | <C>     | <C>     |
| [Box]  | Elite Pharmaceuticals, Inc.   | 100.0   | 158.4   | 1780.0  | 880.0   | 1238.4  |
| [Star] | AMEX Stock Market (US Companies) | 100.0 | 117.5  | 166.6   | 132.9   | 135.0   |
| [Triangle] | AMEX Stocks (SIC 2830-2839 US Companies) Drugs | 100.0 | 136.2 | 267.8 | 156.3 | 110.1 |

</TABLE>

Notes:

A.  The lines represent monthly index levels derived from compounded daily
    returns that include all dividends.
B.  The indexes are reweighted daily, using the market capitalization on the
    previous trading day.
C.  If the monthly interval, based on the fiscal year-end, is not a trading
    day, the preceding trading day is used.
D.  The index level for all series was set to $100.0 on 09/30/1998.
E.  Data for Elite Pharmaceuticals, Inc. from 09/1996 to 01/2000 was provided
    by the client.
- --------------------------------------------------------------------------
Prepared by CRSP (www.crsp.uchicago.edu), Center for Research in Security
Prices, Graduate School of Business, The University of Chicago. Used with
permission.
All rights reserved.
11442/81204067                                     (C) Copyright 2002

-27-

<PAGE>

RELATIONSHIP WITH INDEPENDENT PUBLIC ACCOUNTANTS

The Board of Directors selects the independent public accounting firm for the
Company each year at its annual meeting following the annual meeting of
stockholders. Therefore, no accounting firm is being recommended to or selected
in connection with this consent revocation solicitation. Miller, Ellin & Co.,
LLP New York, New York, is the independent public accounting firm for the
Company.

AUDIT FEES

The aggregate fees billed for professional services rendered by Miller, Ellin &
Co., LLP, the principal accountants of the Company for the most recent fiscal
year ended March 31, 2002, for the audit of the Company's annual financial
statements for the most recent fiscal year ended March 31, 2002 and the reviews
of the financial statements included in the Company's Forms 10-Q filed during
that fiscal year were approximately $43,000.

ALL OTHER FEES

No fees were billed for services rendered to the Company by Miller, Ellin & Co.,
LLP for the most recent fiscal year ended March 31, 2002 other than those
services specified in the immediately preceding section.

PRINCIPAL OFFICE.

The Company's principal offices are located at 165 Ludlow Avenue, Northvale, New
Jersey 07647, and its telephone number is (201) 750-2646.

### SOLICITATION OF CONSENT REVOCATIONS

Consent revocations may be solicited by mail, telephone, facsimile transmission
or other electronic media and in person. We will not solicit revocations via the
Internet, such as Internet chat rooms and/or posting on websites. Solicitation
of consent revocations may be made by directors, officers and regular employees
of Elite for which they will receive no additional compensation.

Georgeson will receive a fee of $30,000 for its services to Elite in connection
with the solicitation of the consent revocations and will receive an additional
fee of $20,000 if we are successful in opposing the Freedman Group's
solicitation, plus reimbursement for reasonable out-of-pocket expenses. Elite
has also agreed to indemnify Georgeson for certain liabilities in connection
with this solicitation. Approximately 35 persons will be employed by Georgeson
to solicit stockholders.

Banks, brokers, custodians, nominees and fiduciaries will be requested to
forward solicitation material to beneficial owners of shares of Elite common
stock. Elite will reimburse banks, brokers, custodians, nominees and fiduciaries
for their reasonable expenses for sending solicitation material to the
beneficial owners.

The entire cost of soliciting the consent revocations, including, without
limitation, costs, if any, relating to advertising, printing, fees of attorneys,
financial advisors, proxy solicitors, accountants, public relations,
transportation, litigation and related expenses and filing fees, will be borne
by Elite. Elite estimates that total expenditures relating to the Elite Board's
solicitation of the consent revocations will be approximately $200,000. Such
costs do not include the amount normally expended for a solicitation for an
uncontested election of directors or costs represented by salaries and wages of
regular employees and officers. The portion of such costs allocable solely to
the solicitation of consent revocations to the Freedman Group's Proposals is not
readily determinable. To date, approximately $100,000 has been paid by Elite in
connection with its solicitation of revocations of consents.

-28-

<PAGE>

### ABSENCE OF APPRAISAL RIGHTS

Under Delaware law, you do not have appraisal rights in connection with our
solicitation of consent revocations.

### PARTICIPANTS IN THE SOLICITATION

Under applicable regulations of the SEC, each member of the Elite Board and each
executive officer of Elite may be deemed to be a "participant" in Elite's
solicitation of revocations of consent. In the event each of these persons is
deemed a "participant", and without acknowledging that any such person is a
"participant", we furnish the following information. The name of each director
and executive officer is listed under the Section entitled "Directors and
Executive Officers". Except as set forth below, the principal business addresses
of each director and executive officer are 165 Ludlow Avenue, Northvale, New
Jersey 07647. The principal occupation of each director and executive officer is
set forth in this Revocation Statement under the sections entitled "Information
About Us, The People Asking You To Revoke Your Consent" and "Directors and
Executive Officers", respectively. Information about the present ownership by
directors and executive officers and any of their respective "associates" of
Elite common stock is set forth under the section entitled "Security Ownership
of Management." Information about transactions by each director and executive
officer in Elite's common stock during the past two years can be found in such
director's or executive officer's filings under Section 16 of the Securities
Exchange Act of 1934, as amended, during that period. Information about related
party transactions involving directors and executive officers can be found under
the sections entitled "Certain Relationships and Related Transactions" and
"Employment Agreement". Except as otherwise set forth in this Revocation
Statement, none of the directors or executive officers or any of their
respective "associates" has any arrangement or understanding with any person
with respect to future employment or future transactions with Elite.

### STOCKHOLDER PROPOSALS

As reported in our proxy statement for last year's Annual Meeting of
Stockholders, stockholder proposals must have been received by the Company in
writing no later than May 15, 2002 in order for such proposal to be eligible for
inclusion in the Company's proxy statement and form of proxy for the 2002 Annual

Meeting.

-29-

<PAGE>

## WHERE YOU CAN FIND MORE INFORMATION

The Company files reports, proxy statements and other information with the SEC under the Securities Exchange Act of 1934, as amended. The SEC maintains an Internet world wide web site that provides access, without charge, to reports, proxy statements and other information about issuers, like Elite, who file electronically with the SEC. The address of that site is http://www.sec.gov.

You also may obtain copies of these materials by mail from the Public Reference Section of the Securities and Exchange Commission, 450 Fifth Street, N.W., Room 1024, Washington, D.C. 20549, at prescribed rates. These materials are also available from the SEC in person at any one of its public reference rooms. Please call the SEC at 1-800-SEC-0330 for further information on its public reference rooms. You may read and copy this information at the following locations of the SEC:

                    Public Reference Room
                    450 Fifth Street, N.W.
                    Washington, D.C. 20549

You can also obtain, without charge, reports, proxy statements and other information, including without limitation, any information we may incorporate by reference herein, about the Company, by contacting: Elite Pharmaceuticals, Inc., 165 Ludlow Avenue, Northvale, New Jersey 07647, Attn: Corporate Secretary, telephone: (201) 750-2646, facsimile: (201) 750-2755.

## CAUTION ABOUT FORWARD LOOKING STATEMENTS

This Consent Revocation Statement contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, that are based on the beliefs of the Company's management and Board of Directors, as well as assumptions made by and information currently available to the Company's management and Board of Directors. Such statements reflect the current views of the Company or the Board of Directors with respect to future events based on currently available information and are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such forward-looking statements.

Factors that could cause actual results to differ materially from the Company's expectations include, but are not limited to, the following: the ability of the Company to execute and manage the Company's growth strategy, the results of the Company's investment spending, the ability to develop new products, the ability to obtain governmental approval of its products, improved financial results, the entrance of new competitors into the marketplace, the ability to attract and retain key customers, the ability to positively modify its revenue mix, variations in quarterly results and the sufficiency of the Company's working capital, and other factors which are described from time to time in the Company's public filings with the Securities and Exchange Commission, news releases and other communications. Also, when Elite uses the words "believes," "expects," "anticipates," "estimates," "plans," "intends," "objectives," "goals," "aims," "projects" or similar words or expressions, Elite is making forward-looking statements. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. The Company does not undertake any obligation to release publicly any revisions to these forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

September 16, 2002          By Order of the Board of Directors

                            Mark I. Gittelman, Secretary

-30-

<PAGE>

## IMPORTANT

1. If your shares are registered in your name, please sign, date and mail the enclosed BLUE Consent Revocation Card to Georgeson in the postage-paid envelope provided.

2. If you have previously signed and returned a WHITE consent card to the Freedman Group, you have every right to change your vote. Only your latest dated card will count. You may revoke any WHITE consent card already sent to the Freedman Group by signing, dating and mailing the enclosed BLUE Consent Revocation Card in the postage-paid envelope provided.

3. In order to be sure that you are revoking a prior consent, you must either mark the "Revoke Consent" boxes on the BLUE Consent Revocation Card or sign the BLUE Consent Revocation Card without marking any boxes. If you do not mark any box for any one or more of the Freedman Group's Proposals on the BLUE Consent Revocation Card and you sign and return the Card, you will be deemed to have revoked any previously signed consent to any proposal you did not mark. If the BLUE Consent Revocation Card is signed and returned, any previously executed consent will be revoked unless the "Do Not Revoke Consent" box is marked.

4. If your shares are held in the name of a brokerage firm, bank nominee or other institution, only it can sign a BLUE Consent Revocation Card with respect to your shares and only after receiving your specific instructions. To ensure that your revocation is completed, you should contact the person responsible for your account and give instructions for a BLUE Consent Revocation Card to be signed representing your shares.

5. After signing the enclosed BLUE Consent Revocation Card, do not sign or return the WHITE consent card. Do not even use the Freedman Group's consent card to indicate your opposition to the Freedman Group's Proposals.

If you have any questions above giving your revocation of consent or require assistance, please call:

<div align="center">
Georgeson Shareholder Communications Inc.<br>
Stockholders call toll free: 866-297-1267<br>
Banks & Brokers call: 212-440-9800<br>
Fax number: 212-440-9009
</div>

                                -31-
<PAGE>

<div align="center">
PLEASE SIGN, DATE AND MAIL<br>
YOUR BLUE CONSENT REVOCATION CARD TODAY

(SEE REVERSE SIDE FOR INSTRUCTIONS)

PLEASE DETACH CONSENT CARD HERE
</div>

[X]      PLEASE MARK YOUR VOTES AS IN THIS EXAMPLE

THE BOARD OF DIRECTORS OF ELITE UNANIMOUSLY RECOMMENDS THAT YOU VOTE "REVOKE CONSENT" ON EACH PROPOSAL SET FORTH BELOW. Please sign, date and mail this consent revocation card today.

1. Removal of three present members of the Elite Board without cause, Donald S. Pearson, Harmon Aronson and Eric L. Sichel and any other person or persons elected to the Elite Board to fill any vacancy arising since the last annual meeting of stockholders or any newly created directorships.

REVOKE CONSENT
DO NOT REVOKE CONSENT

INSTRUCTIONS: To revoke consent or withhold revocation of consent to the removal of all the persons named in the above proposal, check the appropriate box. If you wish to revoke the consent to the removal of certain of the persons named above, but not all of them, check the "Revoke Consent" box and write the name of each such person as to whom you do not wish to revoke consent (i.e., the persons you want removed) in the following space:

2. Election of the Freedman Group's slate, Harris Freedman, Sharon Will and Michael H. Freedman, to the Board of Directors to fill the newly created vacancies on the Board, and to serve until their successors are duly elected and qualify.

REVOKE CONSENT
DO NOT REVOKE CONSENT

INSTRUCTIONS: To revoke consent or withhold revocation of consent to the election of all the persons named in the above proposal, check the appropriate box. If you wish to revoke the consent to the election of certain of the persons named above, but not all of them, check the "Revoke Consent" box and write the name of each such person as to whom you do not wish to revoke consent (i.e., the persons you want elected) in the following space:

IF YOU DO NOT MARK ANY BOX FOR ANY ONE OR MORE OF THE FOREGOING PROPOSALS AND YOU SIGN AND RETURN THIS CARD, YOU WILL BE DEEMED TO HAVE REVOKED ANY PREVIOUSLY SIGNED CONSENT TO ANY PROPOSAL YOU DID NOT MARK. IF THE BLUE CONSENT REVOCATION CARD IS SIGNED AND RETURNED, ANY PREVIOUSLY EXECUTED CONSENT WILL BE REVOKED UNLESS THE "DO NOT REVOKE CONSENT" BOX IS MARKED.
Dated: _____ ,2002

```
         --------------------------------------------------------
Signature

- --------------------------------------------------------
Signature if held jointly

         --------------------------------------------------------
Title of Authority
```

                              -32-
<PAGE>

Please sign exactly as your name appears hereon. If shares are held jointly,
each stockholder should sign. When signing as attorney, executor, administrator,
trustee, guardian, corporate officer, etc., give full title as such. Please
sign, date and mail this Consent Revocation Card promptly in the enclosed
postage-paid envelope.

INSTRUCTIONS

1. If your shares are registered in your name, please sign, date and mail the
enclosed BLUE Consent Revocation Card to Georgeson Shareholder in the
postage-paid envelope provided.

2. If you have previously signed and returned a WHITE consent card to the
Freedman Group, you have every right to change your vote. Only your latest dated
card will count. You may revoke any WHITE consent card already sent to the
Freedman Group by signing, dating and mailing the enclosed BLUE Consent
Revocation Card in the postage-paid envelope provided.

3. In order to be sure that you are revoking a prior consent, you must either
mark the "Revoke Consent" boxes on the BLUE Consent Revocation Card or sign the
BLUE Consent Revocation Card without marking any boxes. If you do not mark any
box for any one or more of the Freedman Group's Proposals on the BLUE Consent
Revocation Card and you sign and return the Card, you will be deemed to have
revoked any previously signed consent to any proposal you did not mark. If the
BLUE Consent Revocation Card is signed and returned, any previously executed
consent will be revoked unless the "Do Not Revoke Consent" box is marked.

4. If your shares are held in the name of a brokerage firm, bank nominee or
other institution, only it can sign a BLUE Consent Revocation Card with respect
to your shares and only after receiving your specific instructions. Accordingly,
please sign, date and mail the enclosed BLUE Consent Revocation Card in the
postage-paid envelope provided. To ensure that your revocation is completed, you
should also contact the person responsible for your account and give
instructions for a BLUE Consent Revocation Card to be issued representing your
shares.

5. After signing the enclosed BLUE Consent Revocation Card, do not sign or
return the WHITE consent card. Do not even use the Freedman Group's consent card
to indicate your opposition to the Freedman Group's Proposals. If you have any
questions about revoking your consent or require assistance, please call:

Georgeson Shareholder Communications Inc.
17 State Street
New York, NY 10004 Call Toll-Free: 1-866-297-1267
Banks and Brokerage firms call collect: 212-440-9800

                    PLEASE DETACH CONSENT CARD HERE

                       ELITE PHARMACEUTICALS, INC.

THIS REVOCATION OF CONSENT IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS OF
ELITE PHARMACEUTICALS, INC. ("ELITE") IN OPPOSITION TO THE CONSENT SOLICITATION
BY HARRIS FREEDMAN, BRIDGE VENTURES, INC., BRIDGE VENTURES, INC. EMPLOYEE
PENSION PLAN, SMACS HOLDING CORP., SHARON WILL, SAGGI CAPITAL CORP., SAGGI
CAPITAL CORP. MONEY PURCHASE PLAN, SAGGI CAPITAL CORP. PROFIT SHARING PLAN AND
MICHAEL H. FREEDMAN (THE "FREEDMAN GROUP").

IF NO DIRECTION IS MADE WITH RESPECT TO ONE OR MORE OF THE FOREGOING PROPOSALS,
OR IF YOU MARK THE "REVOKE CONSENT" BOX WITH RESPECT TO ONE OR MORE OF THE

                              -33-
<PAGE>

FOREGOING PROPOSALS, THIS REVOCATION OF CONSENT WILL REVOKE ALL PREVIOUSLY
EXECUTED CONSENTS WITH RESPECT TO SUCH PROPOSALS.

The undersigned, a holder of shares of common stock, par value $0.01 per share,

of Elite, is acting with respect to all the shares of common stock of Elite held
by the undersigned, and hereby revokes any and all consents that the undersigned
may have given in respect of the following proposals submitted by the Freedman
Group as indicated on the reverse side hereof.

-34-

```
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

EXHIBIT F

```
<DOCUMENT>
<TYPE>10-Q
<SEQUENCE>1
<FILENAME>elite10qfeb03.txt
<DESCRIPTION>FORM 10-Q FOR QUARTER ENDED DECEMBER 31, 2002
<TEXT>
```

U.S. SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
FORM 10-Q

[ X ]   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
        EXCHANGE ACT OF 1934

For the quarterly period ended                December 31, 2002
                                    --------------------------------------------

or

[   ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
        EXCHANGE ACT OF 1934

For the transition period ended                 to

Commission File Number: 333-45241
--------------------------------------------------------------------------------

ELITE PHARMACEUTICALS, INC.
--------------------------------------------------------------------------------
(Exact name of registrant as specified in its charter)

Delaware                                        22-3542636
---------------------------------------         --------------------------------
(State or other jurisdiction of                 (I.R.S. Employer Identification No.)
incorporation or organization)

165 Ludlow Avenue, Northvale, New Jersey            07647
---------------------------------------         --------------------------------
(Address of principal executive offices)        (Zip Code)


(201)750-2646
--------------------------------------------------------------------------------
(Registrant's telephone number, including area code)

(Former name, former address and former fiscal year,
if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934
during the preceding 12 months (or for such shorter period that the registrant
was required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days.
                                                    Yes [x] No [ ]

APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY
PROCEEDINGS DURING THE PRECEDING FIVE YEARS:

Indicate by check mark whether the registrant has filed all documents and
reports required to be filed by Sections 12, 13 or 15 (d) of the Securities
Exchange Act of 1934 subsequent to the distribution of securities under a plan
confirmed by a court.
                                                    Yes [ ] No [ ]

Indicate by check mark whether the registrant is an accelerated filer (as
defined in Rule 12b-2 of the exchange Act).
                                                    Yes [ ] No [x]

APPLICABLE ONLY TO CORPORATE ISSUERS:

Indicate the number of shares outstanding of the common stock, $.01 par value,
as of January 31, 2003: 10,544,426.

```
<PAGE>
```

ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES


INDEX

```
<TABLE>
```
                                                          Page No.
<S>                                                       <C>
PART I - FINANCIAL INFORMATION

ITEM 1.  FINANCIAL STATEMENTS

      Consolidated Balance Sheets as of December 31, 2002 (unaudited) and
      March 31, 2002 ............................................. 1 - 2

      Consolidated Statements of Operations for the three and nine months
      ended December 31, 2002 and December 31, 2001 (unaudited) ... 3

      Consolidated Statements of Changes in Stockholders' Equity for the
      nine months ended December 31, 2002 and December 31, 2001 (unaudited) ... 4

      Consolidated Statements of Cash Flows for the nine months
      ended December 31, 2002 and December 31, 2001 (unaudited) ... 5

      Notes to Form 10-Q ......................................... 6 - 13

ITEM 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF
      FINANCIAL CONDITION AND RESULTS OF OPERATIONS ............. 14 - 19

ITEM 3.  QUANTITATIVE AND QUALITATIVE DISCLOSURES
      ABOUT MARKET RISK ......................................... 20

ITEM 4.  CONTROLS AND PROCEDURES ................................... 20

PART II  OTHER INFORMATION ........................................ 20 - 22

      Item 1 Legal Proceedings
      Item 2 Changes in Securities and Use of Proceeds
      Item 3 Defaults Upon Senior Securities
      Item 4 Submission of Matters to a Vote of Security-Holders
      Item 5 Other Information
      Item 6 Exhibits and Reports on Form 8-K

SIGNATURES ........................................................ 23 - 27

EXHIBITS

&lt;/TABLE&gt;

&lt;PAGE&gt;

ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

ASSETS

&lt;TABLE&gt;

|  | December 31, 2002 | March 31, 2002 |
|---|---|---|
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; |
|  | (Unaudited) | (Audited) |
| CURRENT ASSETS: |  |  |
| Cash and cash equivalents | $ 4,498,510 | $ 6,852,434 |
| Short-term investments | --- | 100,000 |
| Accounts receivable | --- | 39,988 |
| Restricted cash | 115,848 | 213,664 |
| Due from Joint Venture | --- | 525,259 |
| Prepaid expenses and other current assets | 51,323 | 106,082 |
| Total current assets | 4,665,681 | 7,837,427 |
| PROPERTY AND EQUIPMENT, net of accumulated depreciation and amortization | 4,338,826 | 3,865,771 |
| INTANGIBLE ASSETS - net of accumulated amortization | 75,432 | 54,669 |
| OTHER ASSETS: |  |  |
| Deposit on Equipment | --- | 123,396 |
| Investment in Joint Venture | --- | 63,381 |
| Amount receivable from sale of state tax losses | --- | 66,077 |
| Restricted cash - Debt Service Reserve | 300,000 | 300,000 |
| Restricted cash - Note payable | 250,000 | 250,000 |
| EDA bond offering costs, net of accumulated amortization of $43,751 and $34,076, respectively | 154,102 | 163,777 |
| Total other assets | 704,102 | 966,631 |
| Total assets | $ 9,784,041 | $ 12,724,498 |

&lt;/TABLE&gt;

The accompanying notes are an integral part of
the consolidated financial statements.

-1-

<PAGE>

ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

LIABILITIES AND STOCKHOLDERS' EQUITY

<TABLE>

|  | December 31, 2002 (Unaudited) | March 31, 2002 (Audited) |
|---|---|---|
| <S> | <C> | <C> |
| CURRENT LIABILITIES: | | |
| Current portion - Note payable | $ 75,000 | $ 75,000 |
| Current portion of EDA bonds | 140,000 | 130,000 |
| Accounts payable and accrued expenses | 112,093 | 141,712 |
| Due to Joint Venture | --- | 435,754 |
| Total current liabilities | 327,093 | 782,466 |
| | | |
| LONG TERM LIABILITIES: | | |
| Dividends payable - Preferred Series A | --- | 853,148 |
| Note payable - net of current portion | 243,750 | 300,000 |
| EDA bonds - net of current portion | 2,495,000 | 2,635,000 |
| Total long-term liabilities | 2,738,750 | 3,788,148 |
| Total liabilities | 3,065,843 | 4,570,614 |
| | | |
| COMMITMENTS AND CONTINGENCIES | | |
| | | |
| STOCKHOLDERS' EQUITY: | | |
| Preferred stock at liquidating value of $1,000 per share - $1.00 par value; 20,000 shares authorized; Series A convertible exchangeable preferred stock; 12,015 issued and outstanding at March 31, 2002 | --- | 12,015,000 |
| Preferred stock - $1.00 par value; 7,250,000 shares authorized; Series B convertible preferred stock; 4,806,000 shares designated, 200,000 shares issued and outstanding at March 31, 2002 | --- | 200,000 |
| Common stock - $.01 par value; Authorized - 25,000,000 shares Issued and outstanding - 10,544,426 and 9,710,840 shares, Respectively | 105,444 | 97,108 |
| Additional paid-in capital | 34,298,282 | 19,469,464 |
| Accumulated deficit | (27,415,673) | (23,627,688) |
| | 6,988,053 | 8,153,884 |
| Cost of 82,600 shares of common stock held by the Company at December 31, 2002 | (269,855) | --- |
| Total stockholders' equity | 6,718,198 | 8,153,884 |
| Total liabilities and stockholder's equity | $ 9,784,041 | $ 12,724,498 |

</TABLE>

The accompanying notes are an integral part of the consolidated financial statements.

-2-

<PAGE>

ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

<TABLE>

|  | THREE MONTHS ENDED DECEMBER 31, | | NINE MONTHS ENDED DECEMBER 31, | |
|---|---|---|---|---|
|  | 2002 (Unaudited) | 2001 (Unaudited) | 2002 (Unaudited) | 2001 (Unaudited) |
| <S> | <C> | <C> | <C> | <C> |
| REVENUES: | | | | |
| Research and Development | $ 150,000 | $ 228,000 | $ 365,000 | $ 478,000 |
| Product Formulation Revenues | --- | 245,597 | 187,810 | 455,108 |
| Testing Fees | 2,500 | --- | 2,500 | 3,450 |
| Total revenues | 152,500 | 473,597 | 555,310 | 936,558 |

| OPERATING EXPENSES: | | | | |
|---|---|---|---|---|
| Research and development | 567,864 | 431,239 | 1,461,345 | 1,061,305 |
| General and administrative | 450,024 | 214,456 | 1,297,046 | 519,752 |
| Depreciation and amortization | 78,210 | 70,848 | 234,630 | 212,544 |
| | 1,096,098 | 716,543 | 2,993,021 | 1,793,601 |
| LOSS FROM OPERATIONS | (943,598) | (242,946) | (2,437,711) | (857,043) |
| OTHER INCOME (EXPENSES): | | | | |
| Interest income | 18,616 | 39,867 | 81,334 | 215,902 |
| Interest expense | (55,896) | (53,572) | (172,281) | (164,591) |
| Equity in loss of Joint Venture | --- | (221,202) | (186,379) | (389,021) |
| Charge relating to exchange of warrants | (242,338) | --- | (242,338) | --- |
| | (279,618) | (234,907) | (519,664) | (337,710) |
| LOSS BEFORE (BENEFIT FROM) INCOME TAXES | (1,223,216) | (477,853) | (2,957,375) | (1,194,753) |
| (BENEFIT FROM) INCOME TAXES | (71,614) | (137,643) | (71,214) | (135,388) |
| NET LOSS | $ (1,151,602) | $ (340,210) | $ (2,886,161) | $ (1,059,365) |
| BASIC AND DILUTED LOSS PER COMMON SHARE | $ (.11) | $ (.03) | $ (.29) | $ (.11) |
| WEIGHTED AVERAGE NUMBER OF COMMON SHARES OUTSTANDING | 10,286,917 | 9,631,634 | 9,914,722 | 9,528,362 |

</TABLE>

The accompanying notes are an integral part of the consolidated
financial statements.

-3-

<PAGE>

ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY
(Unaudited)

<TABLE>

| | SERIES A PREFERRED STOCK | | SERIES B PREFERRED STOCK | | COMMON STOCK | | ADDITIONAL PAID-IN CAPITAL | TREASURY STOCK | ACCUMULATED DEFICIT | STOCKHOLDERS' EQUITY |
|---|---|---|---|---|---|---|---|---|---|---|
| | SHARES | AMOUNT | EQUITY | SHARES | SHARES | AMOUNT | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| BALANCE AT MARCH 31, 2001 | 12,015 | $12,015,000 | - | $ | 9,376,389 | $ 93,764 | $18,071,503 | $ - | $(21,000,013) | $ 9,180,254 |
| Issuance of Shares through exercise of warrants | - | - | - | - | 224,429 | 2,244 | 1,116,744 | - | - | 1,118,988 |
| Issuance of shares and warrants through exercise of placement agent warrants | - | - | - | - | 15,522 | 155 | 57,524 | - | - | 57,679 |
| Issuance of shares and warrants through exercise of options | - | - | - | - | 20,000 | 200 | 37,939 | - | - | 38,139 |
| Issuance of Series B convertible exchangeable Preferred Stock | - | - | 200,000 | 200,000 | - | - | - | - | - | 200,000 |
| Dividends declared - Preferred A | - | - | - | - | - | - | - | - | (853,148) | (853,148) |
| Net loss for nine months ended December 30, 2001 | - | - | - | - | - | - | - | - | (1,059,365) | (1,059,365) |
| BALANCE AT DECEMBER 30, 2001 | 12,015 | $12,015,000 | 200,000 | $200,000 | 9,636,370 | $ 96,363 | 19,283,709 | $ - | (22,912,526) | $ 8,682,546 |
| BALANCE AT MARCH 31, 2002 | 12,015 | $12,015,000 | 200,000 | $200,000 | 9,710,840 | $ 97,108 | 19,469,464 | $ - | $(23,627,688) | $ 8,153,884 |

<TABLE>

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Issuance of shares through exercise of warrants | - | - | - | - | 2,606 | 26 | 13,004 | - | - | 13,030 |
| Issuance of shares and warrants through exercise of placement agent warrants | - | - | - | - | 14,670 | 147 | 52,666 | - | - | 52,813 |
| Issuance of Series B convertible exchangeable Preferred Stock | - | - | 559,000 | 559,000 | - | - | - | - | - | 559,000 |
| Dividends-declared -Preferred B | - | - | - | - | - | - | - | - | (14,000) | (14,000) |
| Dividends-declared -Preferred A | - | - | - | - | - | - | - | - | (887,826) | (887,826) |
| Dividends-issued -Preferred A and B | 1,741 | 1,740,973 | 14,000 | 14,000 | - | - | - | - | - | 1,754,973 |
| Conversion of Series B and A Convertible exchangeable Preferred stock into common stock | (13,756) | (13,755,973) | (773,000) | (773,000) | 836,310 | 8,163 | 14,520,810 | - | - | - |
| Purchase of Treasury Stock | - | - | - | - | - | - | - | (269,855) | - | (269,855) |
| Charge relating to exchange of warrants | - | - | - | - | - | - | 242,338 | - | - | 242,338 |
| Net loss for nine months ended December 31,2002 | - | - | - | - | - | - | - | - | (2,886,161) | (2,886,161) |
| BALANCE AT DECEMBER 31,2002 | --- $ | - | - $ | - | 10,544,426 | $105,444 | $34,298,282 | $(269,855) | $(27,415,673) $ | 6,718,198 |

</TABLE>

The accompanying notes are an integral part of the consolidated financial statements.

-4-

<PAGE>


ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

<TABLE>

| | NINE MONTHS ENDED DECEMBER 30, | |
|---|---|---|
| | 2002 | 2001 |
| | (Unaudited) | (Unaudited) |
| | <C> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net loss | $ (2,886,161) | $ (1,059,365) |
| Adjustments to reconcile net loss to cash used in operating activities: | | |
| Depreciation and Amortization | 234,630 | 212,544 |
| Equity in loss of Joint Venture | 186,379 | 389,021 |
| Deferred income | --- | 100,000 |
| Charge relating to exchange of warrants | 242,338 | --- |
| Changes in assets and liabilities: | | |
| Contract revenue receivable | 39,988 | 13,314 |
| Prepaid expenses and other current assets | 54,759 | 31,392 |
| Amount receivable from Joint Venture | 525,259 | (298,378) |
| Accounts payable, accrued expenses and other current liabilities | (29,619) | (116,849) |
| Amount payable to Joint Venture | --- | (95) |
| NET CASH (USED IN) OPERATING ACTIVITIES | (1,632,427) | (728,416) |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Maturity of short-term investment | 100,000 | --- |
| Purchase of property and equipment | (570,810) | (69,763) |
| Purchase of patent | (24,318) | --- |
| Receivable from sale of New Jersey Tax Losses | 66,077 | 80,055 |
| Restricted cash | 97,816 | 70,417 |
| NET CASH (USED IN) PROVIDED BY INVESTING ACTIVITIES | (331,235) | 80,709 |

```
CASH FLOWS FROM FINANCING ACTIVITIES:
    Proceeds from issuance of common stock and warrants                65,843        1,214,805
    Principal bank note payments                                      (56,250)           ---
    Principal repayments of NJEDA Bonds                              (130,000)       (120,000)
    Purchase of Treasury Stock                                       (269,855)           ---
                                                                  --------------   --------------
NET CASH (USED IN) PROVIDED BY FINANCING ACTIVITIES                 (390,262)       1,094,805
                                                                  --------------   --------------

NET CHANGE IN CASH AND CASH EQUIVALENTS                           (2,353,924)        447,098

CASH AND CASH EQUIVALENTS - beginning of period                    6,852,434       7,296,702
                                                                  --------------   --------------
CASH AND CASH EQUIVALENTS - end of period               $          4,498,510   $   7,743,800
                                                                  ==============   ==============

SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:
    Cash paid for interest                              $            172,881   $     111,794
    Cash paid (received) for income taxes                           (71,214)         2,255

SUPPLEMENTAL SCHEDULE NON-CASH TRANSACTIONS
    Issuance of Preferred Stock Series B (including stock dividend payable of
      $14,000 and subscription receivable of $67,000)  $            573,000   $     200,000
    Conversion of Preferred Stock Series B to Common Stock             (521)           ---
    Conversion of Preferred Stock to Additional Paid In Capital  (14,520,810)           ---
    Reduction of Amounts Due to Joint Venture                      (622,133)       (125,447)
    Reduction in (Addition to) Investment in Joint Venture           61,381         (74,553)
    Dividends accrued on Preferred Stock - Series A                 899,923         853,146
    Conversion of Series A to Common Stock                           (7,642)           ---
    Transfer of Deposit on Equipment                                123,396            ---
```

</TABLE>

The accompanying notes are an integral part of the consolidated
financial statements.

-5-

<PAGE>

ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
NINE MONTHS ENDED DECEMBER 31, 2002 AND 2001
(UNAUDITED)

NOTE 1    -    BASIS OF PRESENTATION
               --------------------

The information in this Form 10-Q includes the results of
operations of Elite Pharmaceuticals, Inc. ("the Company") and
its wholly-owned subsidiary, Elite Laboratories, Inc. ("Elite
Labs"), for the three and nine months ended December 31, 2002
and 2001. On September 30, 2002, the "Company" acquired from
Elan Corporation, plc and Elan International Services, Ltd.
(together, "Elan") Elan's 19.9% interest in Elite Research Ltd.
("ERL"), a joint venture formed between the Company and Elan
where the Company's interest originally was 80.1%. Proforma
results of operations are presented as part of Note 4. As of
December 31, 2002, the balance sheets of all entities are
consolidated and all significant intercompany accounts are
eliminated upon consolidation. The accompanying unaudited
consolidated financial statements have been prepared pursuant to
rules and regulations of the Securities and Exchange Commission.
Accordingly, they do not include all of the information and
footnotes required by accounting principles generally accepted
in the United States of America for complete financial
statements. In the opinion of management, all adjustments
(consisting of normal recurring accruals) considered necessary
for a fair presentation of financial positions, results and
operations and cash flows for the periods presented have been
included. The financial results for the interim periods are not
necessarily indicative of the results to be expected for the
full year or future interim periods.

On December 31, 2002 the Company entered into an agreement of
merger whereby ERL (a Bermuda Corporation) was merged into a new
Delaware Corporation, Elite Research, Inc. ("ERI"), a wholly
owned subsidiary of the Company. As a result of the merger, ERI
became the owner of all of the assets and liabilities of ERL.
The merger was accounted for as a tax free reorganization.

The accounting policies utilized in the preparation of this Form
10-Q are the same as those set forth in the Company's annual
report on Form 10K for the fiscal year ended March 31, 2002 and
should be read in conjunction with the disclosures presented
therein.

The Company does not anticipate being profitable for fiscal year
2003, therefore a current provision for income tax was not
established for the nine months ended December 31, 2002. Only
the minimum corporation tax liability required for state
purposes is reflected.

NOTE 2    -    RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS
                 --------------------------------------------

In December 2002, the Financial Accounting Standards Board
issued Statement No. 148, Accounting for Stock-Based
Compensation - Transition and Disclosure, (SFAS No. 148) which
amends SFAS No. 123, Accounting for Stock-Based Compensation to
provide alternative methods of transition for a voluntary change
to the fair value based method of accounting for stock-based
employee compensation. This Statement does not permit the use of
the original SFAS No. 123 prospective method of transition for
changes to the fair value based method made in fiscal years
beginning after December 15, 2003. The Company has elected to
apply the recognition provisions of SFAS No. 148 prospectively
to all employee awards granted, modified or settled after April
1, 2002. The effects of applying the prospective method of
transition allowed under SFAS No. 148 has not yet been
determined.

                              -6-

<PAGE>

                ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES
                 NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
                 NINE MONTHS ENDED DECEMBER 31, 2002 AND 2001
                              (UNAUDITED)

NOTE 3    -    BOND FINANCING OFFERING
                 -----------------------

On September 2, 1999, the Company completed the issuance of
tax-exempt bonds by the New Jersey Economic Development
Authority. The aggregate principal proceeds of the fifteen-year
term bonds were $3,000,000. Interest on the bonds accrues at
7.75% per annum. The proceeds, net of offering costs of $60,000,
are being used by the Company to refinance the land and building
it currently owns, and for the purchase of certain manufacturing
equipment and related building improvements.

Offering costs in connection with the bond issuance totaled
$197,860, including the $60,000 mentioned above which were paid
from bond proceeds. Offering costs included underwriter fees
equal to $90,000 (three percent (3%) of the par amount of the
bonds).

The bonds are collateralized by a first lien on the building,
which includes property and equipment. Several restricted cash
accounts are maintained in connection with the issuance of these
bonds. These restricted accounts include accounts restricted for
payments of bond principal and interest, for the refinancing of
the land and building the Company currently owns, for the
purchase of certain manufacturing equipment and related building
improvements as well as for the maintenance of a $300,000 Debt
Service Reserve. All restricted amounts other than the $300,000
Debt Service Reserve are expected to be expended within twelve
months and are therefore categorized as current assets.

NOTE 4    -    JOINT VENTURE ACTIVITIES
                 ------------------------

In October 2000, the Company and Elite Labs entered into a joint
development and operating agreement with Elan Corporation, plc,
and Elan International Services, Ltd. (together "Elan") to
develop products using drug delivery technologies and expertise
of both companies. This joint venture, Elite Research, Ltd.
("ERL") a Bermuda corporation, was initially owned 80.1% by the
Company and 19.9% by Elan. ERL was to fund its research through
capital contributions from its partners based on the partners'
respective ownership percentage. ERL subcontracted research and
development efforts to Elite Labs, Elan and others. It was
anticipated that Elite Labs would provide most of the
formulation and development work. Elite Labs has commenced work
for three products. For the nine months ended December 31, 2002
and 2001, Elite Labs charged $187,810 and $455,108,
respectively, to ERL which is reflected in product formulation
revenues. For the three months ending December 31, 2002 and
2001, Elite Labs charged $0 and $245,597, respectively, to ERL
which is reflected in product formulation fees.

While the Company initially owned 80.1% of the outstanding
capital stock (100% of the outstanding common stock) of ERL
until September 30, 2002, Elan and its subsidiaries retained
significant minority investor rights that were considered
"participating rights" as defined in the Emerging Issues Task
Force Consensus No. 96-16. Accordingly, the Company did not
consolidate the financial statements of ERL until September 30,
2002 but instead accounted for its investment in ERL under the
equity method of accounting until the Joint Venture was
terminated, effective September 30, 2002.

For the nine months ended December 31, 2002 and 2001, ERL recognized net losses of $232,742 and $485,669, respectively. The net losses included $187,810 and $455,108 due to Elite Labs for services rendered to ERL for the nine months ended December 31, 2002 and 2001, respectively. The Company recognized 80.1% of ERL's losses, or $186,379 and $389,021, respectively, for the nine months ended December 31, 2002 and 2001. For the three months ended December 31, 2002 and 2001, Elite's share of ERL's losses amounted to $60 and $221,202, respectively. To date, ERL has not recognized any revenue.

In December 2000, ERL approved one product for development at its first organizational meeting. In March 2001, the management committee of ERL met to finalize its budget and business plan and to complete a preliminary formulation of the drug product. As of December 31, 2002, ERL completed in-vivo (pilot clinical trial) on the first product and began formulation and development of two additional products.

<center>-7-</center>

<PAGE>

<center>ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
NINE MONTHS ENDED DECEMBER 31, 2002 AND 2001
(UNAUDITED)</center>

NOTE 4    –    JOINT VENTURE ACTIVITIES (Continued)
                -----------------------

As of December 31, 2001, the Company owed ERL $328,306, representing its 80.1% of unfunded contributions to ERL to cover ERL's expenses through December 31, 2001.

On September 30, 2002, the Company consummated a termination agreement (the "Termination Agreement") with Elan to acquire all of Elan's interest in ERL. As a result of the Termination Agreement, the joint venture terminated and the Company now owns 100 percent of ERL's capital stock.

Under the Termination Agreement, among other things, the Company acquired all proprietary, development and commercial rights for the worldwide markets for the products developed by ERL. In exchange for the assignment, ERL agreed to pay Elan a royalty on certain revenues that may be realized from the once-a-day Oxycodone product that has been developed by ERL. In the future, the Company will be solely responsible to fund ERL's product development, which it will do from internal resources or through loans or investment by third parties.

The Company did not pay, nor did Elan receive any cash consideration under the Termination Agreement. Furthermore, the Company has the exclusive rights to the proprietary, development and commercial rights for the worldwide markets for two other products developed by ERL. The Company will not have to pay Elan royalties on revenues that may be realized from these products.

The Company accounted for this acquisition by consolidating ERL as a wholly owned subsidiary as of September 30, 2002. As more specifically described in Note 6, EIS converted 773,000 shares of Elite Labs Series B Preferred Stock, according to their terms, into 52,089 shares of the Company's common stock. This resulted in an increase in common stock of $521 and an increase in additional paid in capital of $772,479. As a result, the Series B Preferred Stock was eliminated.

As further disclosed in Note 6, the acquisition resulted in the conversion of 13,756 shares of Elite Labs Series A Preferred Stock into 764,224 shares of Elite Pharmaceuticals common stock in accordance with their terms. The Company accounted for this conversion by increasing common stock in the amount of $7,642 and a corresponding increase in additional paid in capital of $13,748,332. As a result, the Series A Preferred Stock was eliminated.

As a result of the Termination Agreement, ERL became a wholly owned subsidiary of the Company as of September 30, 2002. Elan retained certain securities of Elite it had obtained in connection with the joint venture and transferred other such securities to a third-party. See Note 6.

The following are unaudited pro-forma consolidated results of operations for the three and nine months ended December 31, 2002 and 2001, assuming the acquisition was completed on April 1, 2001.

<TABLE>

| | THREE MONTHS ENDED DECEMBER 31, | | NINE MONTHS ENDED DECEMBER 31, | |
|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 |
| | ---- | ---- | ---- | ---- |

| <S> | (Unaudited)<br><C> | (Unaudited)<br><C> | (Unaudited)<br><C> | (Unaudited)<br><C> |
|---|---|---|---|---|
| Revenue | $ 152,500 | $ 228,000 | $ 367,500 | $ 481,450 |
| Net (loss) available to common<br>Shareholders | $(1,151,602) | $(395,166) | $(2,932,524) | $(1,156,013) |
| Net (loss) available to common<br>shareholders per share -<br>basic and diluted | $ (.11) | $ (.04) | $ (.29) | $ (.12) |

</TABLE>

-8-

<PAGE>

ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
NINE MONTHS ENDED DECEMBER 31, 2002 AND 2001
(UNAUDITED)

NOTE 4    -    JOINT VENTURE ACTIVITIES (Continued)
               -------------------------

Unaudited pro-forma data may not be indicative of the results
that would have been obtained had these events actually occurred
at the beginning of the periods presented, nor does it intend to
be a projection of future results.

NOTE 5    -    COMMITMENTS AND CONTINGENCIES
               -----------------------------

As described in the Company's annual report on Form 10-K, on
August 1, 1998, Elite Labs entered into a consulting agreement
with a company for the purpose of providing management,
marketing and financial consulting services for an unspecified
term. Terms of the agreement provide for a nonrefundable monthly
fee of $2,000. This compensation will be applied against amounts
due pursuant to a business referral agreement entered into on
April 8, 1997.

Terms of the business referral agreement provide, among other
things, for payments by Elite Labs based upon a formula, as
defined, for an unspecified term. On November 14, 2000, Elite
Labs amended the referral agreement to provide certain
consulting services for the period of November 1, 2000 through
October 31, 2003. Elite Labs previously advanced $20,000 under
the April 8, 1997 agreement in addition to a payment of $50,000
made during the year ended March 31, 2001. The agreement calls
for 25 monthly installments of $3,200 beginning on December 1,
2001.

For the nine months ended December 31, 2002 and 2001, consulting
expense under this agreement amounted to $28,800 and $3,200,
respectively, and for the three months ended December 31, 2002
and 2001, consulting expense under this agreement was $9,600 and
$3,200, respectively.

Referral Agreement

As described in the Company's annual report on Form 10-K, on
January 29, 2002, the Company entered into a Referral Agreement
with an individual (Referring Party) whereby Elite Labs will pay
the Referring Party a fee based upon payments received by Elite
Labs from sales of products, development fees, licensing fees
and royalties generated as a direct result of the Referring
Party identifying customers for Elite Labs. These amounts shall
be reduced by the cost of goods sold directly incurred in the
manufacturing or development of products as well as any direct
expenses associated with these efforts. Elite Labs will pay
Referring Party a referral fee each year equal to:

| Percentage of<br>Referral<br>Base | From | To |
|---|---|---|
| 5% | $          0 | $ 1,000,000 |
| 4% | 1,000,000 | 2,000,000 |
| 3% | 2,000,000 | 3,000,000 |
| 2% | 3,000,000 | 4,000,000 |
| 1% | 4,000,000 | 5,000,000 |

-9-

<PAGE>

ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
NINE MONTHS ENDED DECEMBER 31, 2002 AND 2001
(UNAUDITED)

NOTE 5    -    COMMITMENTS AND CONTINGENCIES (Continued)

Collaborative Agreements

As described in the Company's annual report on Form 10-K, on
June 27, 2001, Elite Labs entered into two separate and distinct
development and license agreements with another pharmaceutical
company ("partner"). Elite Labs will develop two drug compounds
for the partner in exchange for certain payments and royalties.
Elite Labs also reserves the right to manufacture the compounds.
Elite Labs received $250,000 and $300,000, respectively, on
these two agreements. These amounts have been earned as of March
31, 2002. Elite Labs is currently proceeding with development
and formulation for both products as specified in the
development agreements. During the nine months ended December
31, 2002 Elite Labs earned revenues of $85,000 for additional
development and formulation for both products.

On September 13, 2002, Elite Labs, entered into a manufacturing
agreement with Ethypharm S.A. ("Ethypharm"). Under the terms of
this agreement, Elite Labs has initiated the manufacturing of a
new prescription drug product for Ethypharm. Elite Labs received
an upfront manufacturing fee for the first phase of the
technology transfer and billed an additional amount upon the
completion of the first phase of manufacturing. Elite Labs is
entitled to receive additional fees in advance for the final
phase of the manufacturing. In addition, upon FDA approval and
if requested by Ethypharm, Elite Labs will manufacture
commercial batches of the product on terms to be agreed upon.

As of December 31, 2002, Elite Labs billed and earned revenues
of $280,000 under this agreement, in accordance with the
substantive milestone method of revenue recognition. Under this
method, the milestone payments are considered to be payments
received for the accomplishment of a discrete, substantive
earnings event. Accordingly, the non-refundable milestone
payments are recognized in full when the milestone is achieved.

Contingency

Elite Labs is the plaintiff in a civil action brought in the
Superior Court of New Jersey on November 20, 2000 against three
parties to recover damages in an unspecified amount based on the
alleged failure of the defendants to perform properly and
complete certain pharmaceutical tests and studies for which
Elite Labs paid approximately $950,000.

The defendants brought a counterclaim of approximately $418,800
allegedly due for services rendered to Elite Labs by the
defendants. Elite Labs will vigorously contest the counterclaim.

The action and counterclaim are proceeding in pretrial discovery
under a Case Management Order entered by the court. If such
action or counterclaim is in favor of the defendants, the
recovery, if any, is not expected to have a material effect on
the Company's financial condition or results of operations.
Legal counsel is unable to predict the outcome of these actions.
Accordingly, no provision for liability, if any, has been
provided in the accompanying consolidated financial statements.

-10-

<PAGE>

ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
NINE MONTHS ENDED DECEMBER 31, 2002 AND 2001
(UNAUDITED)

NOTE 6    -    STOCKHOLDERS' EQUITY

Treasury Stock Transactions

At a special meeting of the Company's Board of Directors held on
June 27, 2002, the Board authorized the Company to purchase up
to 100,000 shares of its common stock in the open market no
later than December 31, 2002. As of December 31, 2002, the
Company had purchased 82,600 shares of common stock for total
consideration of $269,855.

Joint Venture Subscription Offering

--------------------------------------

On October 16, 2000, Elite entered into an agreement (the "Joint Venture Agreement") with Elan International Services, Ltd. ("EIS") and Elan Corporation, plc. (together with EIS, "Elan"), under which the parties formed a joint venture, Elite Research, Ltd. ("ERL"). Under the terms of the Joint Venture Agreement, 409,165 shares of the Company common stock and 12,015 shares of a newly created Elite Labs Series A Convertible Exchangeable Preferred Stock ("Series A Preferred Stock") were issued to EIS for consideration of $5,000,000 and $12,015,000, respectively. Proceeds from the sale of the Series A Preferred Stock were used to fund Elite Lab's 80.1% share of ERL.

ERL was initially capitalized with $15,000,000 which included the issuance of 6,000 Voting Common shares, of par value $1.00 per share and 6,000 Non-Voting convertible preferred shares, of par value $1.00 per share. All of the voting shares were held by Elite Labs, with the Non-Voting convertible preferred shares held by both Elite Labs and Elan, being split 3,612 shares and 2,388 shares, respectively.

The Preferred shares were convertible at the option of the holders on a one-for-one basis into common shares of ERL at any time after two years from the date of issuance of the preferred stock. The Preferred shares were Non-Voting, did not bear a dividend and had a liquidation preference equal to their original issue price.

The Series A Preferred Stock accrued a dividend of 7% per annum, compounded annually and payable in shares of Series A Preferred Stock. Dividends accrued and compounded annually beginning on October 16, 2001. As of December 31, 2002, Elite Labs had accrued dividends of $1,740,973 on the Series A Preferred Stock.

On October 17, 2000, the Company authorized 7,250,000 shares of newly created Elite Labs Series B Preferred Stock of which 4,806,000 was designated for issuance to EIS for a total consideration of $4,806,000. These shares were issuable from time to time upon demand by Elite Labs to fund Elite Lab's 80.1% portion of capital contributions to ERL and for funding of the research and development activities for ERL.

The Series B Preferred Stock accrued a dividend of 7% per annum of the original issue price, compounded on each succeeding twelve month anniversary of the first issuance and payable solely by the issuance of additional shares of Series B Preferred Stock, at a price per share equal to the original issue price. Dividends were accrued and compounded commencing one year after issuance. As of December 31, 2002, Elite Labs had accrued dividends of $14,000 on the Series B Preferred Stock.

During the nine months ended December 31, 2002, Elite Labs made capital contributions to ERL in the amount of $573,000. These contributions were financed by the proceeds from the issuance to EIS of 573,000 shares of Series B Preferred Stock of Elite Labs. These contributions were in addition to a capital contribution in the amount of $200,000 made by Elite Labs to ERL in fiscal year ended March 31, 2002.

In additional to the issuance of shares as described above, on October 17, 2000 the Company issued EIS 100,000 warrants to purchase the Company's common stock at an exercise price of $18 per share. The warrants are exercisable at any time on or before October 17, 2005.

-11-

<PAGE>

ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
NINE MONTHS ENDED DECEMBER 31, 2002 AND 2001
(UNAUDITED)

NOTE 6  -  STOCKHOLDERS' EQUITY
             ------------------

Joint Venture Subscription Offering (Continued)
--------------------------------------

Subject to a Termination Agreement between the Company and Elan dated September 30, 2002, the Company acquired Elan's 19.9% interest in ERL, and Elan transferred its warrants and its 12,015 shares of Elite Labs Series A Preferred Stock to a third party along with accrued dividends of 1,741 shares. On November 6, 2002, under a transfer and assignment among the Company, Elan and a third party purchaser, all 13,756 shares of Series A Preferred Stock have been converted, according to their terms, into 764,221 shares of the Company's common stock using the $18 per share price. Elan retained 409,165 shares of Elite common stock and 773,000 shares of Elite Labs Series B Preferred Stock the latter of which was converted into 52,089 shares of Elite common stock. Both of the Series A and Series B preferred stock

were converted to Elite Common stock in accordance with their
terms. The warrants remain unexercised at December 31, 2002.

For the period of one year after the issuance of the above
common stock, EIS and the third party purchaser have the right
to require registration under the Securities Act of 1933, as
amended ("the Securities Act") of all or part of these
securities. All registration expenses will be borne by the
requesting party. EIS and the third party purchaser also have
the right to piggyback registration if at any time the Company
proposes to register shares of its common stock under the
Securities Act.

Warrants and Options
--------------------

At December 31, 2002, Elite had outstanding approximately
2,266,850 options with exercise prices ranging from $2.00 to
$10.00. At December 31, 2002, Elite had outstanding
approximately 2,561,103 warrants with exercise prices ranging
from $2.00 to $18.00.

During the quarter ended December 31, 2002, the Company issued
210,000 options to purchase common stock to an employee and to
members of the Board of the Directors. The options have exercise
prices of $5.00 per share and vest over three years. The options
expire 10 years from the date of their issuance.

Class A Warrant Exchange Offer
------------------------------

On October 23, 2002, the Company entered into a Settlement
Agreement with various parties in order to end a Consent
Solicitation and various litigation initiated by the Company.
The Agreement provided, among other things, an agreement to
commence an exchange offer (the "Exchange Offer") to which
holders of the Company's Class A Warrants which expired on
November 30, 2002 (the "Old Warrants") will have the opportunity
to exchange those warrants for new warrants (The "New Warrants")
upon payment to the Company of $.10 per share of common stock
issuable upon the exercise of the old warrants.

The New Warrants will be exercisable for the same number of
shares of common stock as the Old Warrants, have an exercise
price of $5.00 per share, will expire on November 30, 2005 and
will not be transferable except pursuant to operation of law.

The Exchange Offer must be registered under applicable federal
and state securities laws and will only be made pursuant to an
effective registration statement meeting applicable legal
requirements. A registration statement was filed with the
Securities and Exchange Commission on December 6, 2002, with
respect to the Exchange Offer, but has not yet been declared
effective by the SEC.

During the quarter ending December 31, 2002, the Company has
taken a charge of $242,338 relating to the exchange offer, which
represents the fair value of the new warrants, net of
anticipated proceeds, assuming all Class A Warrants will be
exchanged.

-12-

<PAGE>

ELITE PHARMACEUTICALS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
NINE MONTHS ENDED DECEMBER 31, 2002 AND 2001
(UNAUDITED)

NOTE 7    -    SUBSEQUENT EVENTS
               ---------------

Treasury Stock Transactions
---------------------------

As of January 31, 2003, the Company had purchased an additional
17,400 shares of its common stock pursuant to its stock
re-purchase program for total consideration of $36,986.

Change of Stock Designations
----------------------------

On January 28, 2003, the Board of Directors and stockholders of
Elite Labs authorized an amendment to the certificate of
incorporation for Elite Labs which changed the stock
designations eliminating the authorization of Series A and
Series B preferred stock and Class B common stock. The Board
further authorized a reverse split of 20,000 to 1 reducing the
number of shares of Class A voting common stock having a par
value of $.01 from 20,000,000 to 1,000.

Accordingly, this amendment's effect is to eliminate Class B common stock and Series A preferred stock and Series B preferred stock previously authorized by Elite Labs. No shares of any such class of stock are currently outstanding.

This amendment also reduces the number of Class A common voting shares having a par value of $.01 per share issued and outstanding from Elite Labs to the Company from 20,000,000 to 200 resulting from the reverse split.

-13-

<PAGE>

ELITE PHARMACEUTICALS, INC.

PART I. ITEM 2

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
CONDITION AND RESULTS OF OPERATIONS

NINE MONTH PERIOD ENDED DECEMBER 31, 2002 COMPARED TO
THE NINE MONTH PERIOD ENDED DECEMBER 31, 2001

The following discussion and analysis should be read in conjunction with the Consolidated Financial Statements, the related Notes to Consolidated Financial Statements and Management's Discussion and Analysis of Financial Condition and Results of Operations included in the Company's Annual Report on Form 10-K for the fiscal year ended March 31, 2002 (the "10-K") and the Unaudited Consolidated Financial Statements and related Notes to Consolidated Financial Statements included in Item 1 of Part I of this Quarterly Report on Form 10-Q.

The Company has included in this Quarterly Report certain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 concerning the Company's business, operations and financial condition. "Forward-looking statements" consist of all non-historical information, and the analysis of historical information, including the references in this Quarterly Report to future revenue growth, future expense growth, future credit growth, EBITDA, future profitability, anticipated cash resources, anticipated capital expenditures, capital requirements, and the Company's plans for future periods. In addition, the words "could", "expects", "anticipates", "objective", "plan", "may affect", "may depend", "believes", "estimates", "projects" and similar words and phrases are also intended to identify such forward-looking statements.

Actual results could differ materially from those projected in the Company's forward-looking statements due to numerous known and unknown risks and uncertainties, including, among other things, unanticipated technological difficulties, the volatile and competitive environment for drug delivery products, changes in domestic and foreign economic, market and regulatory conditions, the inherent uncertainty of financial estimates and projections, the difficulties of integrating businesses which were previously operated as stand-alone units, the creditworthiness of the Company's customers, the uncertainties involved in certain legal proceedings, instabilities arising from terrorist actions and responses thereto, and other considerations described as "Risk Factors" in other filings by the Company's with the SEC including the Form 10-K. Such factors may also cause substantial volatility in the market price of the Company's common stock. All such forward-looking statements are current only as of the date on which such statements were made. The Company does not undertake any obligation to publicly update any forward-looking statement to reflect events or circumstances after the date on which any such statement is made or to reflect the occurrence of unanticipated events.

Critical Accounting Policies and Estimates
------------------------------------------

Management's discussion addresses the Company's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of financial statements and the reported amounts of revenues and expenses during the reporting period. On an ongoing basis, management evaluates its estimates and judgment, including those related to bad debts, intangible assets, income taxes, workers compensation, and contingencies and litigation. Management bases its estimates and judgments on historical experience and on various other factors that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions.

-14-

<PAGE>

ELITE PHARMACEUTICALS, INC.

PART I. ITEM 2

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
CONDITION AND RESULTS OF OPERATIONS

NINE MONTH PERIOD ENDED DECEMBER 31, 2002 COMPARED TO
THE NINE MONTH PERIOD ENDED DECEMBER 30, 2001

Management believes the following critical accounting policies, among others, affect its more significant judgments and estimates used in the preparation of its consolidated financial statements. The Company's most critical accounting policies include the recognition of revenue upon completion of certain phases of projects under research and development contracts. The Company also assesses a need for an allowance to reduce its deferred tax assets to the amount that it believes is more likely than not to be realized. The Company assesses the recoverability of long-lived assets and intangible assets whenever events or changes in circumstances indicate that the carrying value of the asset may not be recoverable. The Company assesses its exposure to current commitments and contingencies. It should be noted that actual results may differ from these estimates under different assumptions or conditions.

During the third quarter of fiscal year 2003, the Company elected to prospectively recognize the fair value of stock options granted to employees and members of the Board of Directors, effective as of the beginning of the fiscal year. The prospective method allowed by the Financial Accounting Standards Board does not materially effect the Company's results of operations for the three-month and nine-month periods ended December 31, 2002. The fair value of stock options granted to employees and member of the Board of Directors at the end of the current quarter is expected to significantly effect the results of operations of future periods, as these awards vest.

Overview

The Company is involved in the development of drug delivery products. It is engaged in developing over fifteen oral controlled release pharmaceutical products which are at varying stages of the development and testing process. In addition, Elite Labs has also conducted several research and development projects on behalf of several large pharmaceutical companies although these activities have generated only limited revenue for Elite Labs to date.

The Company operates out of its manufacturing facility in Northvale, N.J. which is both Federal Drug Administration ("FDA") and Drug Enforcement Agency ("DEA") registered and will allow the Company to manufacture pharmaceutical products in batches in sizes sufficient to file for FDA approval.

In October 2000, Elite Labs entered into a joint development and operating agreement with Elan Corporation, plc, and Elan International Services, Ltd. (together "Elan") to develop products using drug delivery technologies and expertise of both companies. This joint venture, Elite Research, Ltd. ("ERL"), a Bermuda corporation, was initially owned 80.1% by the Company and 19.9% by Elan. ERL funded its research through capital contributions from its partners based on the partners' respective ownership percentage. ERL subcontracted research and development efforts to Elite Labs, Elan and others. The in-vivo (pilot bioavailability) was completed on the first product formulated by Elite Labs. Elite Labs had begun to develop formulation for the two additional products.

On September 30, 2002, the Company consummated a termination agreement with Elan to acquire all of Elan's interest in ERL. As a result of the agreement, the joint venture terminated and the Company now owns 100 percent of ERL. Accordingly, ERL became a wholly owned subsidiary of the Company as of September 30, 2002.

Under the termination agreement, the Company acquired all proprietary, development and commercial rights for the worldwide markets for the products developed by ERL. In exchange for this assignment, ERL has agreed to pay Elan a royalty on certain revenues that may be realized from the once-a-day Oxycodone product only that has been developed by ERL. In the future, the Company will be solely responsible to fund product development, which it will do from internal resources or through loans or investment by third parties.

The Company did not pay, nor did Elan receive any cash consideration under the termination agreement. Furthermore, the Company has the exclusive rights to the proprietary, development and commercial rights for the worldwide markets for two other products developed by ERL. The Company will not have to pay Elan royalties on revenues that may be realized from these products.

-15-

<PAGE>

ELITE PHARMACEUTICALS, INC.

PART I. ITEM 2

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
CONDITION AND RESULTS OF OPERATIONS

NINE MONTH PERIOD ENDED DECEMBER 31, 2002 COMPARED TO
THE NINE MONTH PERIOD ENDED DECEMBER 31, 2001

(CONTINUED)

In November 2001, Elite Labs received approval of its application to sell an additional $1,822,929 in New Jersey Net Operating Tax Losses under the New Jersey Economic Development Agency's Technology Business Tax Certificate

Program. Elite Labs expects to receive $137,818 of which $71,741 was received during the quarter ended December 31, 2001. Elite Labs received the remaining balance of $66,077 during the quarter ended December 31, 2002.

In November 2002, Elite Labs received approval of its application to sell additional $915,430 in New Jersey Net Operation Tax Losses Under the New Jersey Economic Development Agency's Technology Business Tax Certificate Program. Elite Labs received $71,674 during the quarter ended December 31, 2002.

In June 2001, the Company entered into two development contracts with a U.S. pharmaceutical company pursuant to which it agreed to develop two products in exchange for development fees, certain payments, royalties and manufacturing rights. Also, in September 2002, the Company entered into a manufacturing agreement with Ethypharm S.A. ("Ethypharm"). Under the terms of this agreement, the Company has initiated the manufacturing of a new prescription drug product for Ethypharm. The Company received an upfront manufacturing fee for the first phase of the technology transfer and billed an additional amount upon the completion of the first phase of manufacturing. The Company is entitled to receive additional fees in advance for the final phase of the manufacturing. In addition, upon FDA approval and if requested by Ethypharm, the Company will manufacture commercial batches of the product on terms to be agreed upon. During the three- and nine month periods ended December 31, 2002, the Company recognized total revenues of $365,000, pursuant to these agreements. While the Company believes that these arrangements will generate significant additional revenues in future periods, payments under these arrangements are dependent on a number of factors, including the successful development and commercialization of new products, which are uncertain and over which the Company has little or no control. Accordingly, stockholders are encouraged not to place undue reliance on these arrangements in evaluating the Company's business and prospects.

The Company plans to focus its efforts on the following areas: (i) to receive FDA approval for one or more of its fifteen oral controlled release pharmaceutical products already developed, either directly or through other companies; (ii) to commercially exploit these products either by licensure and the collection of royalties, or through the manufacture of tablets and capsules using the formulations developed by the Company, and (iii) to continue the development of new products and the expansion of its licensing agreements with other large multinational pharmaceutical companies including contract research and development projects, joint ventures and other collaborations. The Company has been issued three patents to date and has filed for two more patents. One of the patents was assigned to Celgene which has now licensed it to Novartis.

Results of Consolidated Operations

Three Months Ended December 31, 2002 Compared to Three Months Ended
    December 30, 2001

The Company's revenues for the three months ended December 31, 2002 were $152,500, a decrease of $321,097 over the comparable period of the prior year. For the three months ended December 31, 2002 and 2001, revenue consisted of product formulation fees of $0 and $245,597, respectively, earned in conjunction with the Company's joint venture in ERL. Revenues also consisted of research, development, and testing fees of $152,500 and $228,000, respectively, earned in conjunction with its distinct development, license, and manufacturing agreements. Elan's obligation to make payments to the Company or to ERL terminated upon the termination of the joint venture. The absence of payments from Elan will impact revenue for periods subsequent to September 30, 2002.

-16-

<PAGE>

ELITE PHARMACEUTICALS, INC.

PART I. ITEM 2

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
CONDITION AND RESULTS OF OPERATIONS

NINE MONTH PERIOD ENDED DECEMBER 31, 2002 COMPARED TO
THE NINE MONTH PERIOD ENDED DECEMBER 31, 2001

(CONTINUED)

General and administrative expenses for the three months ended December 31, 2002 were $450,024, an increase of $235,568 or 110% from the comparable period of the prior year. The increase in general and administrative expenses was substantially due to increases in legal and consulting fees as well as $145,785 in expenses resulting from a consent solicitation and a proxy solicitation with regard to the election of the Company's directors.

Research and development costs for the three months ended December 31, 2002 were $567,864, an increase of $136,625 or approximately 32% from the comparable period of the prior year. Research and development costs have increased primarily from the result of increased research and development wages, additional biostudies, laboratory supplies and raw materials used in the manufacturing and testing processes. The Company expects its research and development costs to increase in future periods as a result of the joint venture termination as the Company will be solely responsible to fund product

development, which it will do from internal resources or through loans or investment by third parties.

The Company's net loss for the three months ended December 31, 2002 was $1,151,602 as compared to $340,210 for the comparable period of the prior year. The increase in the net loss was primarily due to the increase in research and development, administrative expenses associated with a consent solicitation and a proxy solicitation with regard to the election of the Company's directors, and the charge of $242,338 relating to the exchange of warrants.

Nine months Ended December 31, 2002 vs. Nine months Ended December 30, 2001

The Company's revenue for the nine months ended December 31, 2002 were $556,310, a decrease of $381,248 over the comparable period of the prior year. For the nine months ended December 31, 2002 and 2001, revenues consisted of product formulation fees of $187,810 and $455,108, respectively, earned in conjunction with the Company's joint venture in ERL. Revenues also consisted of research and development, and testing fees of $367,500 and $481,450, respectively, earned in conjunction with its distinct development, license and manufacturing agreements. Elan's obligation to make payments to the Company or to ERL terminated upon the termination of the joint venture. The absence of payments from Elan will impact revenues for periods subsequent to September 30, 2002.

General and administrative expenses for the nine months ended December 31, 2002 were $1,297,046, an increase of $777,294, or approximately 350% from the comparable period of the prior year. The increase in general and administrative expenses was substantially due to increases in legal and consulting fees as well as $418,659 in expenses resulting from a consent solicitation and a proxy solicitation with regard to the election of the Company's directors.

Research and development costs for the nine months ended December 31, 2002, were $1,461,345, an increase of $400,040 or approximately 38% from the comparable period of the prior year. Research and development costs have increased primarily from the result of increased research and development wages, additional biostudies, laboratory supplies and raw materials used in the manufacturing and testing processes. The Company expects its research and development costs to increase in future periods as a result of the joint venture termination as the Company will be solely responsible to fund product development, which it will do from internal resources or through loans or investment by third parties.

The Company's net loss for the nine months ended December 31, 2002 was $2,886,161 as compared to $1,059,365 for the comparable period of the prior year. The increase in the net loss was primarily due to the increase in research and development, administrative expenses associated with a consent solicitation and a proxy solicitation with regard to the election of the Company's directors and the charge of $242,338 relating to the exchange of warrants.

-17-

<PAGE>

ELITE PHARMACEUTICALS, INC.

PART I. ITEM 2

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
CONDITION AND RESULTS OF OPERATIONS

NINE MONTH PERIOD ENDED DECEMBER 31, 2002 COMPARED TO
THE NINE MONTH PERIOD ENDED DECEMBER 31, 2001

(CONTINUED)

Material Changes in Financial Condition

The Company's working capital (total current assets less total current liabilities), which was $7,054,961 as of March 31, 2002, decreased to $4,338,588 as of December 31, 2002. The decrease in working capital is primarily due to the Company's net loss from operations partially offset by the receipt of $65,843 from the issuance of common stock and warrants in connection with the exercise of certain of the Company's Class A Warrants, and certain placement agent warrants issued in connection with the Company's 1997 private placement.

The Company experienced negative cash flow from operations of $1,632,427 for the nine months ended December 31, 2002, primarily due to the Company's net loss from operations of $2,437,711.

Liquidity and Capital Resources

To date, the Company's operations have not generated sufficient cash flow to satisfy the Company's capital needs. The Company has financed its operations primarily through the private sale of its equity and debt securities. The Company had working capital (current assets less current liabilities) of $4.3 million at December 31, 2002 compared with $7.7 million at December 31, 2001. Cash and cash equivalents at December 31, 2002 were $4.5 million, a decrease of $3.2 million from the $7.7 million reported at December 31, 2001.

Net cash used in operating activities was $1,632,000 during the nine months ended December 31, 2002, compared to $728,000 for the nine months ended December 30, 2001. Net cash used in operating activities during the nine months ended December 31, 2002 resulted primarily from the Company's net loss of $2.9 million, offset in part by a reduction in accounts receivable, and certain non-cash expenses. Net cash used in operating activities during the nine months

ended December 31, 2001 resulted primarily from a net loss of $1.1 million and lower accounts payable, offset in part by certain non-cash expenses.

Investing activities utilized net cash of $331,000 during the nine months ended December 31, 2002 and provided net cash of $81,000 during the nine months ended December 31, 2001. Net cash used in investing activities during the nine months ended December 31, 2002 resulted primarily from the acquisition of property and equipment to support the Company's growth, offset in part by an increase in restricted cash and the maturity of short-term investments. Net cash provided by investing activities during the nine months ended December 31, 2001 resulted primarily from an increase in restricted cash, partially offset by the acquisition of property and equipment.

Financing activities utilized net cash of $390,000 during the nine months ended December 31, 2002 and provided net cash of $1.1 million during the nine months ended December 31, 2001. Net cash used in financing activities during the nine months ended December 31, 2002 resulted primarily from the repurchase of treasury stock and the repayment of indebtedness, offset in part by the sale of common stock and warrants. Net cash provided by financing activities during the nine months ended December 31, 2001 resulted primarily from the sale of common stock and warrants, offset in part by the repayment of indebtedness.

The Company's capital expenditures aggregated $571,000 and $70,000 for the nine-month periods ended December 31, 2002 and 2001, respectively. Such expenditures consisted primarily of the acquisition of property and equipment necessary to support the Company's existing operations and expected growth. The Company anticipates that its capital expenditures will be approximately $650,000 for all of fiscal 2002, substantially all of which will relate to the acquisition of property and equipment to support the Company's operations.

-18-

<PAGE>

ELITE PHARMACEUTICALS, INC.

PART I. ITEM 2

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
CONDITION AND RESULTS OF OPERATIONS

NINE MONTH PERIOD ENDED DECEMBER 31, 2002 COMPARED TO
THE NINE MONTH PERIOD ENDED DECEMBER 31, 2001

(CONTINUED)

As described in Note 3 to the Company's consolidated financial statements, the Company has outstanding $2,635,000 in aggregate amount of bonds. The bonds bear interest at a rate of 7.75% per annum and are due on various dates between 2005 and thereafter. The bonds are secured by a first lien on the Company's facility in Northvale, New Jersey. Pursuant to the terms of the bonds, several restricted cash accounts have been established for the payment of bond principal and interest. Bond proceeds were utilized for the refinancing of the land and building the Company currently owns, for the purchase of certain manufacturing equipment and related building improvements and the maintenance of a $300,000 debt service reserve. All of the restricted cash, other than the debt service reserve, is expected to be expended within twelve months and is therefore categorized as a current asset on the Company's consolidated balance sheet as of December 31, 2002. Pursuant to terms of the bond indenture agreement pursuant to which the bonds were issued, the Company is required to observe certain covenants including covenants relating to the incurrence of additional indebtedness, the granting of liens and the maintenance of certain financial covenants. As of December 31, 2002, the Company was in compliance with the covenants contained in the bond indenture agreement.

The Company believes that its cash and cash equivalents will be sufficient to fund its operations for at least the next twelve months.

-19-

<PAGE>

PART I.  FINANCIAL INFORMATION (CONTINUED)

ITEM 3.      QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The Company has no investments in marketable securities as of December 31, 2002 or assets and liabilities which are denominated in a currency other than U.S. dollars or involve commodity price risks.

ITEM 4.      CONTROLS AND PROCEDURES

Within the 90 days prior to the date of this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to

Securities Exchange Act Rule 13a-14. Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in timely alerting them to material information relating to the Company (including its consolidated subsidiaries) required to be included in the Company's periodic SEC filings. There have been no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

PART II. OTHER INFORMATION

ITEM 1.        LEGAL PROCEEDINGS

On August 5, 2002, Harris Freedman, Sharon Will, Michael H. Freedman and certain of their respective affiliates (the "Freedman Group") commenced a consent solicitation (the "Consent Solicitation") to solicit consents in favor of the removal of Harmon Aronson, Donald S. Pearson and Eric L. Sichel as directors of the Company and in favor of the election of Harris Freedman, Sharon Will and Michael H. Freedman as directors. The Company opposed the Consent Solicitation as not being in the Company's best interests. The Consent Solicitation ended on October 4, 2002 with the Freedman Group failing to obtain the approval of the Company's stockholders who held a majority of the Company's common stock. In a consent solicitation, unless the consents received by the participants in the solicitation are actually submitted to an inspector for tabulation, it is not possible to know the actual number of stockholders who consented. In the Consent Solicitation, the Freedman Group did not submit the written consents that it received to the firm retained by the Company to tabulate the consents received. Thus, the Company does not know how many consents were obtained by the Freedman Group. The Freedman Group publicly acknowledged that it did not obtain consents from stockholders holding a majority of the Company's outstanding stock.

Following the Consent Solicitation, the Freedman Group filed a preliminary proxy statement with the Securities and Exchange Commission and expressed an intention to solicit proxies in favor of its nominees for director and to contest the election of directors at the Company's annual meeting of stockholders. The Freedman Group terminated its proxy solicitation on October 23, 2002 pursuant to the terms of a settlement agreement among the Company and the members of the Freedman Group (the "Settlement Agreement").

On August 27, 2002 in connection with the Consent Solicitation, the Company commenced an action in the United States District Court for the District of New Jersey (the "Action") against (i) the individual members of the Freedman Group, (ii) additional individuals whose identities, we contended, the Freedman Group was required to disclose but who were not listed in any of the Freedman Group's SEC filings and (iii) other unnamed defendants who were acting in concert with the disclosed and undisclosed members of the Freedman Group (collectively, the "Defendants"). The complaint sought injunctive relief against the Defendants on the basis that the Defendants violated the federal securities laws and the rules promulgated by the SEC thereunder by, among other things, filing a Schedule 13D more than ten days after the Defendants formed a "group" for purposes of Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), by failing to disclose all persons acting in concert with the Freedman Group and by acquiring additional shares of our stock during a period that is prohibited by the Act.

-20-

<PAGE>

PART II. OTHER INFORMATION (CONTINUED)

The Company also alleged that the Defendants violated Section 14(a) of the Exchange Act by filing a false and misleading proxy solicitation which failed to identify all the participants of the Freedman Group's consent solicitation. The complaint also alleged that the Defendants violated the SEC's proxy rules in conducting their consent solicitation by representing to the Company's stockholders the outcome of the consent solicitation process. The Company contended that the Freedman Group violated these stockholder-protection provisions of the federal securities laws in order to advance its efforts to take control of the Company.

On August 27, 2002, the Company applied to the Court for a temporary restraining order barring Defendants from any further contacts with the Company's stockholders, barring Defendants from any further violation of the federal securities laws, and compelling corrective disclosures to remedy the Section 13(d) and Section 14(a) violations. On September 6, 2002, the Court denied the Company's application for a temporary restraining order and granted the Company's

motion for expedited discovery. On October 1, 2002, the Court denied the Company's request for a preliminary restraining order. The Action was dismissed with prejudice by the Company on October 24, 2002 pursuant to the terms of the Settlement Agreement.

The Settlement Agreement provides that:

(i)    the Freedman Group agreed to terminate its proxy solicitation immediately and to support the election of the seven nominees for director recommended by the Company's Board of Directors for election at the Company's annual meeting of stockholders scheduled for December 12, 2002.

(ii)    the Company agreed to commence an exchange offer pursuant to which holders of the Company's Class A Warrants which expire on November 30, 2002 (the "Old Warrants") will have the opportunity to exchange those warrants for new warrants (the "New Warrants") upon payment to the Company of $0.10 per share of common stock issuable upon the exercise of the Old Warrants. The New Warrants will (a) be exercisable for the same number of shares of common stock as the Old Warrants, (b) have an exercise price of $5.00 per share (subject to adjustment in certain circumstances), (c) expire on November 30, 2005, and (d) except as set forth herein will have substantially all of the same other terms and conditions as the Old Warrants. The Exchange Offer will be made to eligible warrant holders irrespective of whether the Old Warrants have expired by their terms when the Exchange Offer is consummated. The New Warrants will not be transferable except pursuant to operation of law. The Exchange Offer must be registered under applicable federal and state securities laws and will only be made pursuant to an effective registration statement meeting applicable legal requirements.

(iii)    The Company agreed not to withdraw the nomination for directors for election at the Annual Meeting of Richard A. Brown, John A. Moore or John P. de Neufville unless any of such nominees dies, resigns or refuses to stand for election.

(iv)    The Company and the Freedman Group exchanged releases regarding the Consent Solicitation, the Action and other matters related thereto.

The Company estimates that the cost of fulfilling its obligations pursuant to the Settlement Agreement will be approximately $100,000. In connection with the Company's opposition to the Consent Solicitation and the preparation of the Company's preliminary proxy statement to oppose the Freedman Group's proxy solicitation, the Company incurred approximately $336,000 in expenses associated with advertising, printing, fees of attorneys, financial advisors, proxy solicitors, accountants, public relations, transportation, litigation and related expenses and filing fees. All of these expenses were borne by the Company. Such costs do not include the amount represented by salaries and wages of regular employees and officers.

Because this section is a summary, it does not describe every aspect of the Settlement Agreement. This summary is subject to and qualified in its entirety by reference to all of the provisions of the Settlement Agreement which is attached as Exhibit 10.1 to our Current Report on Form 8-K filed with the SEC on November 1, 2002.

-21-

<PAGE>

PART II. OTHER INFORMATION (CONTINUED)

ITEM 2.    CHANGES IN SECURITIES AND USE OF PROCEEDS
    Not applicable

ITEM 3.    DEFAULTS UPON SENIOR SECURITIES
    Not applicable

ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS
    See Item 1 of Part II-Legal Proceedings

The Annual Meeting of Elite's stockholders was held on December 12, 2002, at which time the stockholders elected the following slate of nominees to the Board of Directors: Atul M. Mehta, Harmon Aronson, Donald S. Pearson, Eric L. Sichel, John P. de Neufville, John A. Moore and Richard A. Brown. Election of the Board of Directors was the only matter submitted for

stockholder vote. There were 10,494,427 shares of outstanding capital stock of Elite entitled to vote at the record date for this meeting and there were present at such meeting, in persons or by proxy, stockholders holding 9,615,136 shares of Elite's common stock, which represented 91.6% of the total capital stock outstanding and entitled to vote. There 9,615,136 shares voted on the matter of the election of directors. The result of the votes cast regarding each nominee for office was:

| Nominee for Director | Votes For | Votes Withheld |
|---|---|---|
| Atul M. Mehta | 9,563,136 | 52,000 |
| Harmon Aronson | 9,565,136 | 50,000 |
| Donald S. Pearson | 9,565,136 | 50,000 |
| Eric L. Sichel | 9,565,136 | 50,000 |
| John P. de Neufville | 9,510,236 | 104,900 |
| John A. Moore | 9,510,236 | 104,900 |
| Richard A. Brown | 9,510,236 | 104,900 |

ITEM 5.     OTHER INFORMATION
            Not applicable

ITEM 6.     EXHIBITS AND REPORTS ON FORM 8-K

(a)     Exhibits:

        Exhibit 99.1 Certification by Atul M. Mehta pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

        Exhibit 99.2 Certification by Mark I. Gittelman pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

(b) Reports on Form 8-K.

        On October 10, 2002, the Company announced that the consent solicitation of Harris Freedman, Sharon Will and Michael H. Freedman, and their affiliates ended without sufficient consents being obtained to replace independent directors of Elite Pharmaceuticals, Inc.

        On October 11, 2002 the Company announced that it had entered into an agreement with Elan Corporation, plc ("Elan"), to acquire all of Elan's interest in a joint venture company Elite Research Ltd, which had been formed between the Company and Elan, effective September 30, 2002.

        On November 1, 2002 the Company announced that it had entered into a Settlement Agreement with Harris Freedman, Sharon Will, Michael H. Freedman and their affiliates regarding a proxy solicitation, a lawsuit brought by the Company and related matters.

        On January 31, 2003 the Company announced current business developments as well as an update as to the Company's pending S-4 Registration Statement filed with the Securities and Exchange Commission in connection with its Class A warrant exchange offer.

-22-

<PAGE>

CERTIFICATION AND SIGNATURES

        Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

                        ELITE PHARMACEUTICALS, INC.

Date:     2/13/2003          By: /s/ Atul M. Mehta
          ------------------     ------------------------------
                                 Atul M. Mehta
                                 President and Chief Executive Officer
                                 (Principal Executive Officer)

Date:     2/13/2003          By: /s/ Mark I. Gittelman
          ------------------     ------------------------------
                                 Mark I. Gittelman
                                 Chief Financial Officer and Treasurer
                                 (Principal Financial and Accounting Officer)

-23-

&lt;PAGE&gt;

## CERTIFICATION

I, Atul M. Mehta, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Elite Pharmaceuticals, Inc.;

2.  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.  Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

    (a)  designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    (b)  evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

    (c)  presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)  all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.  The registrant's other certifying officers and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

| 2/13/2003 | /s/ Atul M. Mehta |
|-----------|-------------------|
| Date      | Atul M. Mehta     |
|           | President and Chief Executive Officer |

-24-

&lt;PAGE&gt;

## CERTIFICATION

I, Mark I. Gittelman, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Elite Pharmaceuticals, Inc.;

2.  Based on my knowledge, this quarterly report does not contain

any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.  Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

    (a)  designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    (b)  evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

    (c)  presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)  all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.  The registrant's other certifying officers and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.


2/13/2003                          /s/ Mark I. Gittelman
-------------------------          -----------------------------------
Date                               Mark I. Gittelman
                                   Chief Financial Officer and Treasurer

                                   -25-

<PAGE>

</TEXT>
</DOCUMENT>

EXHIBIT G

10-Q 1 d10q.htm FORM 10-Q

**Table of Contents**

---

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# Form 10-Q

---

(Mark One)

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended June 30, 2005

Or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

Commission File No. 000-26355

# Intermix Media, Inc.

*(Exact Name of Registrant as Specified in its Charter)*

| **Delaware** | **06-1556248** |
|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |

**6060 Center Drive, Suite 300, Los Angeles, CA 90045**
**(310) 215-1001**
*(Address and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)*

**Securities registered pursuant to Section 12(b) of the Act:**
**None**

**Securities registered pursuant to Section 12(g) of the Act:**
**Common Stock, par value $.001 per share**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

As of August 10, 2005, there were 35,229,145 shares of the Registrant's common stock, par value $0.001 outstanding.

---

Table of Contents

Intermix Media, Inc.

Form 10-Q
For the Three Months Ended June 30, 2005

INDEX

|  |  | Page |
|---|---|---|
| **PART I. FINANCIAL INFORMATION** | | |
| Item 1. | Financial Statements | 3 |
| | Consolidated Balance Sheets — June 30, 2005 and March 31, 2005 | 3 |
| | Consolidated Statements of Operations — Three months ended June 30, 2005 and 2004 | 4 |
| | Consolidated Statements of Cash Flows — Three months ended June 30, 2005 and 2004 | 5 |
| | Notes to Consolidated Financial Statements | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Item 3. | Quantitative and Qualitative Disclosure About Market Risk | 41 |
| Item 4. | Controls and Procedures | 41 |
| **PART II. OTHER INFORMATION** | | |
| Item 1. | Legal Proceedings | 42 |
| Item 6. | Exhibits | 42 |
| Signatures | | 43 |

2

Table of Contents

## PART 1 – FINANCIAL INFORMATION
### Item 1.     Financial Statements

**Intermix Media, Inc.**
**Consolidated Balance Sheets**
**(in thousands, except par value data)**

| | June 30, 2005 (Unaudited) | March 31, 2005 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 14,562 | $ 14,153 |
| Restricted cash | 1,806 | 1,798 |
| Accounts receivable, net | 11,936 | 9,554 |
| Inventories, net | 4,032 | 2,742 |
| Prepaid expenses and other assets | 3,859 | 4,113 |
| Total current assets | 36,195 | 32,360 |
| Property and equipment, net | 9,488 | 6,514 |
| Goodwill | 21,169 | 21,168 |
| Other intangible assets, net | 4,954 | 5,465 |
| Deposits and other assets | 870 | 1,089 |
| Total assets | $ 72,676 | $ 66,596 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 5,926 | $ 6,912 |
| Accrued expenses | 7,333 | 5,169 |
| Deferred revenue | 2,756 | 2,931 |
| Income taxes payable | 440 | 201 |
| Current portion of debt obligations | 1,875 | 1,875 |
| Current portion of capitalized lease obligations | 13 | 24 |
| Total current liabilities | 18,343 | 17,112 |
| Long-term debt obligations, less current portion | 7,125 | 4,725 |
| Capitalized lease obligations, less current portion | 7 | 9 |
| Other long term liabilities | 181 | 85 |
| Minority Interest | 6,074 | 5,545 |
| Total liabilities | 31,730 | 27,476 |
| Stockholders' equity: | | |
| Preferred stock, $0.10 par value; 40,000 shares authorized; 7,056 and 7,077 shares issued and outstanding, respectively | 758 | 750 |
| Common stock, $0.001 par value; 250,000 shares authorized; 34,923 and 34,592 shares issued and outstanding, respectively | 35 | 34 |
| Additional paid-in capital | 96,219 | 95,564 |
| Accumulated deficit | (56,066) | (57,228) |
| Total stockholders' equity | 40,946 | 39,120 |
| Total liabilities and stockholders' equity | $ 72,676 | $ 66,596 |

*See Notes to Consolidated Financial Statements*

3

Table of Contents

**Intermix Media, Inc.**
**Consolidated Statements of Operations**
**(in thousands, except per share data - unaudited)**

| | Three Months Ended June 30, | |
| --- | --- | --- |
| | **2005** | **2004** |
| Revenues | $26,679 | $16,747 |
| Cost of revenues | 4,194 | 3,993 |
| Gross profit | 22,485 | 12,754 |
| Operating expenses: | | |
| Marketing and sales | 10,190 | 6,539 |
| Product development | 2,968 | 1,633 |
| General and administrative | 7,425 | 4,334 |
| Restatement professional fees | ---- | (337) |
| Amortization of other intangible assets | 511 | 267 |
| Total operating expenses | 21,094 | 12,436 |
| Operating income | 1,391 | 318 |
| Interest income (expense), net | 13 | (89) |
| Income from continuing operations before income taxes | 1,404 | 229 |
| Income taxes | (652) | (5) |
| Income from continuing operations | 752 | 224 |
| Loss from discontinued operations | ---- | (104) |
| Gain on sale of Skilljam (discontinued operation) | 1,000 | ---- |
| Minority interest, net of taxes | (530) | 10 |
| Net income | 1,222 | 130 |
| Preferred stock dividends and liquidation preference | (60) | (170) |
| Income allocated to preferred stockholders | (298) | (47) |
| Income (loss) to common stockholders | $    864 | $    (87) |
| Income (loss) per common share: | | |
| Continuing operations | $   0.02 | $   ---- |
| Gain on sale of Skilljam | 0.02 | ---- |
| Minority interest | (0.02) | ---- |
| Basic income (loss) per common share | $   0.02 | $   ---- |
| Diluted income (loss) per common share | $   0.02 | $   ---- |
| Basic weighted average common shares | 34,736 | 28,853 |
| Diluted weighted average common shares | 44,900 | 31,162 |

*See Notes to Consolidated Financial Statements*

4

Table of Contents

**Intermix Media, Inc.**
**Consolidated Statements of Cash Flows**
**(in thousands - unaudited)**

| | Three Months Ended June 30, | |
| --- | :---: | :---: |
| | 2005 | 2004 |
| Operating activities: | | |
| Net income | $ 1,222 | $ 130 |
| Net cash provided by discontinued operations | — | 90 |
| Adjustments to reconcile net income to net cash used in operating activities: | | |
| Depreciation and amortization of property and equipment | 573 | 379 |
| Amortization of other intangible assets | 511 | 267 |
| Other non-cash charges | 43 | 35 |
| Income taxes payable | 240 | (8) |
| Provision (benefit) for doubtful accounts | 76 | (93) |
| Minority interests | 530 | (10) |
| Changes in other current assets | (3,502) | (1,786) |
| Changes in current liabilities | 1,004 | (329) |
| Net cash provided by (used in) operating activities | 697 | (1,325) |
| Investing activities: | | |
| Purchases of property and equipment | (3,546) | (584) |
| Purchases of other intangible assets | — | (67) |
| Net cash used in investing activities | (3,546) | (651) |
| Financing activities: | | |
| Repayment of capital lease obligations | (13) | (292) |
| Proceeds from debt obligations | — | (212) |
| Proceeds from issuance of equipment financing notes | 2,400 | — |
| Proceeds from reduction in letter of credit | 248 | — |
| Proceeds from exercise of stock options and warrants | 623 | — |
| Net cash provided by (used in) financing activities | 3,258 | (504) |
| Change in cash and cash equivalents | 409 | (2,480) |
| Cash and cash equivalents, beginning of period | 14,153 | 6,245 |
| Cash and cash equivalents, end of period | $14,562 | $ 3,765 |
| Supplemental Cash Flow Information: | | |
| Cash paid for interest | $ 16 | $ 65 |
| Cash paid for income taxes | 434 | 60 |
| Supplemental Disclosures of Non-Cash Investing and Financing Activities: | | |
| Preferred stock dividends and liquidation preference | 60 | 170 |

*See Notes to Consolidated Financial Statements*

5

Table of Contents

**Intermix Media, Inc.**
**Notes to Consolidated Financial Statements**
**(unaudited)**

**Note 1.     The Company and Basis of Presentation**

Intermix Media, Inc., a Delaware Corporation (the "Company" or "Intermix"), is a "new media" company with a unique combination of popular and synergistic Internet entertainment properties and results driven Internet marketing and e-commerce businesses and assets. The Company utilizes proprietary technologies, compelling content, unique community features, analytical marketing and specialized e-commerce tools to generate predominantly advertising, subscription and e-commerce revenues. The Company operates in two business segments: the product marketing segment, referred to as Alena, and the network segment, referred to as the Intermix Network. The Intermix Network blends user-generated and proprietary online content that motivates users to spend more time on the Network and to invite their friends to join them. By integrating social networking applications, self publishing and viral marketing, the Intermix Network has grown to over 30 million U.S. visitors per month, ranking it among the most popular destinations for U.S. Internet users today. Intermix also leverages its optimization technologies, marketing methodologies and the Internet through its Alena unit, where it launches branded consumer product offerings. Alena expands Intermix's consumer reach by marketing select high margin and innovative products directly to the consumer across the Internet. In doing so, Alena cost-effectively builds consumer brands and creates additional offline revenue opportunities for the Company through strategic partnerships and joint ventures. The Company conducts operations from facilities located in Los Angeles, California; Mount Vernon, Washington, and Newton, Massachusetts.

These consolidated financial statements are unaudited and, in the Company's opinion, include all adjustments, consisting of normal recurring adjustments and accruals, necessary for the fair presentation of the consolidated balance sheets, operating results and cash flows for the periods presented. Operating results for the three months ended June 30, 2005 are not necessarily indicative of the results that may be expected for the fiscal year ended March 31, 2006. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been omitted in accordance with the rules and regulations of the Securities and Exchange Commission. These consolidated financial statements should be read in conjunction with the audited consolidated financial statements and accompanying notes included in the Company's Annual Report on Form 10-K for the year ended March 31, 2005, as amended.

**Note 2.     Accounting Policies**

**Use of estimates and assumptions**

The financial statements are prepared in accordance with accounting principles generally accepted in the United States of America. Preparing financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reported period. Examples of significant estimates used in preparing the accompanying financial statements include, but are not limited to: the carrying value of long-lived assets; valuation of assets acquired and liabilities assumed in business combinations; useful lives of intangible assets and property and equipment; revenue recognition; and the valuation allowances for receivables, inventories, sales returns, deferred income tax assets, and the value of stock options issued at the subsidiary level for the purpose of determining stock-based compensation. Actual results and outcomes may materially differ from management's estimates and assumptions.

**Business combinations**

Business combinations are accounted for by the purchase method of accounting. Under the purchase method, the purchase price is allocated to the underlying net assets of the business acquired based

6

Table of Contents

on their respective estimated fair values. The excess of the purchase price over the estimated fair values of the net assets acquired is recorded as goodwill. The judgments made in determining the estimated fair values and expected useful lives assigned to each class of assets and liabilities acquired can significantly impact net income. For example, different classes of assets will have useful lives that differ. Consequently, to the extent a longer-lived asset is assigned greater value under the purchase method than a shorter-lived asset, there may be less amortization recorded in a given period.

Determining the fair value of certain assets and liabilities acquired is subjective in nature and often involves the use of significant estimates and assumptions. The Company uses a one-year period following the consummation of acquisitions to finalize estimates of the fair values of assets and liabilities acquired. Two areas in particular that require significant judgment are estimating the fair values and related useful lives of identifiable intangible assets. While there are a number of different methods used in estimating the value of acquired intangibles, the two primarily approaches used are the discounted cash flow method and market comparison method. Some of the more significant estimates and assumptions inherent in the two approaches include projected future cash flows (including timing), discount rate reflecting the risk inherent in the future cash flows, perpetual growth rate, determination of appropriate market comparables, and the determination of whether a premium or a discount should be applied to comparables.

**Cash and cash equivalents**

The Company considers all highly liquid investments with remaining maturities of three months or less when acquired to be cash equivalents. The Company holds its cash in what it believes to be credit-worthy financial institutions, however cash balances exceed Federal Deposit Insurance Company (FDIC) insured levels. The Company has not experienced any losses in such accounts.

**Restricted cash and deposits**

At June 30, 2005 and March 31, 2005, the Company had $1,806,000 and $1,798,000, respectively, of funds held by banks as reserves against any possible charge backs and returns on credit card transactions related to customer disputes that are not offset against the Company's daily sales deposit activity. These amounts are reflected as restricted cash, and fluctuate based on a percentage of dollar volume processed by the merchant bank, during the trailing six-month period. Also included in the restricted cash balance at June 30, 2005, and March 31, 2005, there is an escrow account containing $1.0 million related to the deferred gain attributed to the sale of assets of the Company's SkillJam business in July 2004. The funds were released from the escrow account in August 2005 thereby allowing the deferred gain to be recognized during the first quarter of fiscal year 2006. In addition, the Company has $392,000 and $640,000 in certificates of deposit at June 30, 2005 and March 31, 2005, respectively, which collateralize operating and capital lease obligations. These certificates of deposit are classified as long-term deposits.

**Accounts Receivable**

Accounts receivable are recorded at the invoiced amount and are non-interest bearing. Concentrations of credit risk with respect to accounts receivable are believed to be limited due to the number, diversification and character of the customers and the Company's credit evaluation process. Typically, the Company has not required customers to provide collateral for such obligations.

**Allowance for doubtful accounts**

The Company provides an allowance for doubtful accounts by applying a partial reserve for all accounts receivable outstanding based upon historical experience. In addition, there is a specific reserve for accounts with a high likelihood of becoming uncollectible. Bad debt expense (benefit) was $76,000 for the first three months ended June 30, 2005 and ($93,000) for the three months ended June 30, 2004. The allowance for doubtful accounts was $602,000 at June 30, 2005 and $583,000 at March 31, 2005.

7

Table of Contents

**Inventories**

Inventories are stated at the lower of cost (determined using the first-in, first-out method) or market. At June 30, 2005, inventories consisted of finished goods. The Company periodically reviews the on hand inventory for excess and obsolete finished goods. Excess inventory is considered an on hand quantity that exceeds forecasted quantities to be sold within the following twelve months or after the expiration date. Obsolete inventory is determined by a review of products that cannot be profitably marketed at current industry advertising rates.

**Prepaid expenses**

Prepaid expenses are stated at the acquisition cost less amortization for services rendered as of the balance sheet date. The remaining balance is expensed in future periods, not to exceed 12 months from the balance sheet date.

**Property and equipment**

Property and equipment are stated at cost, less accumulated depreciation. Depreciation is computed using the straight-line method based upon the estimated useful lives of the assets or terms of the related capital lease agreements. Computers and equipment and purchased software are depreciated over five years. Depreciation of the assets is based on the in-service date, and maintenance and repairs are charged to expense as incurred.

**Goodwill and other intangible assets**

The Company records goodwill as the excess of the purchase price over the fair value of the identifiable net assets acquired and goodwill is not amortized. Other intangible assets with definite lives are amortized on a straight-line basis over periods ranging from three to seven years. In fiscal year 2002, certain other intangible assets were considered to have indefinite lives and were not amortized; however, in fiscal year 2003, the Company began amortizing the other intangible assets that had been previously classified as having indefinite lives.

The Company assesses the potential impairment of goodwill and other intangible assets with indefinite lives in the fourth quarter of each fiscal year, or whenever events or circumstances suggest that the carrying value may not be recoverable. The Company assesses the potential impairment of intangible assets with definite lives whenever events or circumstances suggest that the carrying value may not be recoverable. If the carrying value exceeds fair value, the Company recognizes an impairment loss for the excess. Fair value is determined based on the estimated future cash inflows on a discounted basis attributable to the asset less estimated future cash outflows attributable to the assets on a discounted basis. The assessment of the potential impairment of goodwill and other intangible assets requires significant judgment and estimates. The Company did not record any impairment of goodwill and other intangible assets with indefinite lives in the first quarter ended June 30, 2005.

**Accrued expenses**

Included in accrued expenses are $1,842,000 and $1,441,000 of accrued compensation at June 30, 2005 and March 31, 2005. Accrued expenses also includes payments due to affiliates of the Company for $2,847,000 and $1,508,000 at June 30, 2005 and March 31, 2005, respectively. Affiliates represent third party entities who have integrated the Company's offerings into their websites. In addition, accrued expenses includes estimated reserves for sales returns. The Company determines its estimated sales returns based on the Company's experience of the amount of sales actually returned for a refund, as defined in the return policy. Estimated reserves for sales returns were $502,000 at June 30, 2005 and $689,000 at March 31, 2005.

8

Table of Contents

**Revenues**

Product marketing revenue is generated primarily through the sale of products to customers over the Internet reduced by sales returns to arrive at net sales. Sales to customers are primarily on a continuity basis, in which customers agree to accept regularly scheduled shipments of selected products, as well as through individual orders of products. Under the Company's product continuity program, customers receive an initial shipment of the product they select on a risk-free trial basis. Revenue related to this initial shipment is deferred, and it accounts for the majority of total deferred revenues. If the customer returns the product within the risk-free period, the customer will receive no further shipments and the deferred revenue is reversed. If after the conclusion of the risk-free trial period the customer keeps the product, the customer's credit card is charged for the initial shipment and the deferred revenue related to the initial shipment of product is recognized. Revenue related to individual orders of products by customers is recognized upon shipment. Fulfillment of product orders is handled both internally and through third-parties, and in all cases the Company takes title to the goods prior to shipment. In addition, consigned inventory, held at third-party distribution facilities, is recorded in revenue upon the sale to the distributor's customer. Shipping and handling fees charged to customers are included in revenues, and shipping and handling costs are included in cost of revenues.

The Company recognizes advertising revenue upon fulfillment and delivery of customer advertising. The Company generates advertising revenues based on delivered quantities of advertising, action by the recipient of the advertising message, or upon revenue generation by the Company's customer. Revenues are recorded when delivery has occurred, the sales price is determinable and collection is probable. Third-party distribution fees are included in marketing and sales expense in the month the related advertising is earned.

Subscription and non-refundable membership revenues are recognized ratably over the term of the subscriptions or membership. Deferred revenue attributed to subscription and non-refundable membership revenues account for a small portion of total deferred revenues and consists primarily of subscription revenues billed in advance of the term of service. Upon commencement of the subscription or membership, the Company records deferred revenue for the fee charged. The deferred revenue is then recognized ratably over the period of the arrangement.

**Stock-based compensation**

The Company accounts for its stock option plan under the recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" using the intrinsic value-based method of accounting. Compensation expense is measured at the grant date as the difference between the fair value of the stock and the exercise price, if any. Compensation expense is recognized immediately if vesting is at issuance or ratably over the vesting period if the options vest over time. Common stock issued to vendors is valued at the closing market price on the date of issuance and other equity instruments granted to consultants and vendors are valued using the Black-Scholes option-pricing model.

The Company has adopted the disclosure provisions of Statement of Financial Accounting Standards No. 148 ("SFAS 148"), "Accounting for Stock-Based Compensation – Transition and Disclosure". The following table illustrates the effect on income (loss) to common stockholders and income (loss) per share to common stockholders had the Company applied the fair value recognition provisions of SFAS 148 to stock-based employee compensation (in thousands, except per share data):

| | Three Months Ended June 30, | |
| --- | --- | --- |
| | 2005 | 2004 |
| Income (loss) to common stockholders: | | |
| As reported | $    864 | $    (87) |
| Add: stock based compensation expense in income (loss) to common stockholders | — | — |
| Less: stock-based compensation expense determined by the fair value method | (680) | (620) |
| Add: expense allocated to preferred stockholders | 116 | 130 |
| Pro forma income (loss) to common stockholders | $    300 | $    (577) |
| Income (loss) to common stockholders: | | |
| Basic per share – as reported | $    0.02 | $    — |
| Basic per share – pro forma | 0.01 | (0.02) |
| Diluted per share – as reported | 0.02 | — |
| Diluted per share – pro forma | 0.01 | (0.02) |

9

Table of Contents

The Company's fair value calculation for pro forma purposes in the first quarter 2005 and 2006 was made using the Black-Scholes option-pricing model with the following assumptions:

|  | Three Months Ended June 30, | |
| --- | --- | --- |
|  | 2005 | 2004 |
| Expected volatility | 86% - 134% | 86% - 134% |
| Risk free interest rate | 2.33% - 5.72% | 2.33% - 5.72% |
| Expected lives | 5-6 years | 5-6 years |
| Dividend rate | ---- | ---- |

**Advertising costs**

Advertising costs, except for costs associated with direct-response advertising, are charged to marketing and sales expense when incurred. Included in marketing and sales expense for the first three months ended June 30, 2005 and 2004 was $6,198,000 and $3,853,000, respectively, of advertising and media space costs and affiliate commission costs, respectively.

**Income taxes**

Income tax expense is based on taxes payable or refundable for the current year and deferred taxes on temporary differences between amounts of income and expense that are not reported in the financial statements and income tax returns in the same year. Deferred tax assets and liabilities are included in the financial statements at currently enacted income tax rates applicable to the period in which the deferred tax assets and liabilities are expected to be realized or settled.

**Discontinued operations**

We sold the SkillJam business unit to CES Software PLC on July 30, 2004. The sale proceeds were $8 million and we realized a $4.7 million gain on sale of assets, net of $129,000 of income taxes. We paid off a related $1.2 million acquisition earn out obligation to a company owned by two SkillJam employees. A one year, $1 million escrow was established for certain indemnification obligations and the funds were released in August 2005; therefore, we recorded an additional $1 million gain on this sale. We believe this recognition of gain of $1 million to be reasonable because the Company has satisfied the provisions in the SkillJam purchase agreement regarding the release of the escrow funds. Although the Company's indemnity obligations continue beyond the term of the escrow period, we believe the remaining contingencies relating to patents or other matters relating to the acquisition will not have a material effect on the financial statements and the amounts of any such asserted contingencies are not reasonably estimatible or probable of assertion and sustained at this time. In addition, we will receive a percentage of the net revenue from the sale of the SkillJam technology to the buyer's European customers over five years. As of June 30, 2005 we have not received any payments with respect to this earn-out component.

10

Table of Contents

**Minority interest**

Minority interest for the three months ended June 30, 2005 and 2004 represents minority ownership in the Company's subsidiary MySpace, Inc. ("MySpace") and with Alena's joint venture agreement. The joint venture agreement relates to the product marketing arrangements with Alena as joint ventures with the supplier, inventor, or originator of certain products.

**Income per share**

Basic income per share is computed as net income (loss) less accretion of the Series A preferred stock, stock dividends on Series C preferred stock and income allocated to preferred stockholders divided by the weighted average number of common shares outstanding during the period. Diluted income per share gives effect to all potentially dilutive common shares outstanding during the period. The computation of diluted income per share does not assume the conversion or exercise of securities that would have an anti-dilutive effect. For the first quarter of fiscal year 2006, options to purchase 567,000 shares of stock were excluded from the computation of income per share because their effect is anti-dilutive. For the first quarter of fiscal year 2005, options to purchase 2,757,000 stock options, 30,000 stock purchase warrants, 5,892,000 shares of Series A and C preferred stock and 1,250,000 shares issuable upon exercise of convertible debt were excluded from the computation of diluted income per share because their effect is anti-dilutive.

The computation of basic and diluted income (loss) per common share is as follows (in thousands, except per share amounts):

|  | Three Months Ended June 30, | |
| --- | --- | --- |
|  | 2005 | 2004 |
| Income from continuing operations: | $    752 | $    224 |
| Preferred stock dividends and liquidation preference | (60) | (170) |
| Income allocated to preferred stockholders | (128) | (47) |
| Income to common stockholders - basic | 564 | 7 |
| Loss from discontinued operations | — | (104) |
| Gain on sale of SkillJam | 1,000 | — |
| Minority interest | (530) | 10 |
| Income allocated to preferred stockholders | (170) | — |
| Income (loss) to common stockholders | $    864 | $     (87) |
| Basic weighted average common shares | 34,736 | 28,853 |
| Conversion of preferred stock | 7,133 | 1,889 |
| Exercise of stock options | 2,977 | 382 |
| Exercise of stock purchase warrants | 54 | 38 |
| Diluted weighted average common shares | 44,900 | 31,162 |
| Income per common share: | | |
| Continuing operations | $    0.02 | $      — |
| Discontinued operations | — | — |
| Gain on sales of Skilljam | 0.02 | — |
| Minority Interest | (0.02) | — |
| Basic income per common share | $    0.02 | $      — |
| Diluted income per common share | $    0.02 | $      — |

11

Table of Contents

**Recent accounting pronouncements**

In March 2004, the Emerging Issues Task Force ("EITF") reached final consensus on EITF 03-6, "Participating Securities and the Two-Class Method under FASB Statement No. 128," which requires companies that have participating securities to calculate earnings per share using the two-class method. This method requires the allocation of undistributed earnings to common shares and participating securities based on the proportion of undistributed earnings that each would have been entitled to had all the period's earnings been distributed. Our Series A, B and C preferred stock are participating securities as defined in EITF 03-6. EITF 03-6 is effective for fiscal periods beginning after March 31, 2004 and earnings per share reported in prior periods must be retroactively adjusted to comply with EITF 03-6. The Company adopted EITF 03-6 in the quarter ended September 30, 2004. EITF 03-6 had no impact on prior year per share amounts because of the net losses for the prior periods.

In November 2004, the FASB issued Statement of Financial Accounting Standards No. 151 ("SFAS 151"), Inventory Costs, which amends the guidance in Accounting Research Bulletin (ARB) No. 43, Chapter 4, Inventory Pricing, to clarify the accounting for abnormal amounts of facility expense, freight, handling costs, and wasted material (spoilage). ARB 43, Chapter 4, previously stated "under some circumstances, items such as idle facility expense, excessive spoilage, double freight, and re-handling costs may be so abnormal as to require treatment as current period charges." SFAS 151 requires that those items be recognized as current period charges regardless of whether they meet the criterion of "so abnormal." In addition, SFAS 151 requires that allocation of fixed production overhead to the costs of conversion be based on the normal capacity of the production facilities. SFAS 151 is effective for fiscal years beginning after June 15, 2005. Although the Company will continue to evaluate the application of SFAS 151, management does not currently believe adoption will have a material impact on the Company's results of operations or financial position.

In December 2004, the FASB issued Statement of Financial Accounting Standards No. 123 (revised 2004) ("SFAS 123R"), Share-Based Payment. This statement addresses the accounting for transactions in which a company receives employee services in exchange for equity instruments of the company, or liabilities that are based on the fair value of the company's equity instruments or that may be settled by the issuance of equity instruments. SFAS 123R eliminates the ability to account for share-based compensation transactions using APB Opinion No. 25, and requires instead that such transactions be accounted for using a fair-value based method. The statement requires the cost of all forms of equity-based compensation granted to employees be recognized in a company's income statement and that such cost be measured at the fair value of the stock options. The new rules will be applied on one of two retroactive or prospective methods as defined in the statement. SFAS 123R as issued was to have been effective for quarters beginning after June 15, 2005. However, in April 2005, the SEC issued an order revising SFAS 123R such that it will now become effective for fiscal years beginning after June 15, 2005. The adoption of this standard will have a material impact on the Company's future income statements by increasing compensation expense for the value of stock options issued to employees. Current estimates of option values using the Black-Scholes method (see "Stock-based compensation" above) may not be indicative of results from valuation methodologies ultimately adopted in the quarter ended June 30, 2006. As such, the Company will implement SFAS 123R beginning with the first quarter of its fiscal year ending March 31, 2007.

In December 2004, the FASB issued Statement of Financial Accounting Standards No. 153 ("SFAS 153"), Exchanges of Nonmonetary Assets, which amends Accounting Principles Board (APB) Opinion No. 29, Accounting for Nonmonetary Transactions. The guidance in APB Opinion 29 is based on the principle that exchanges of nonmonetary assets should be measured based on the fair value of the assets exchanged. The guidance in APB Opinion 29, however, included certain exceptions to that principle. SFAS 153 amends APB Opinion 29 to eliminate the exception for nonmonetary exchanges of similar productive

12

Table of Contents

assets and replaces it with a general exception for exchanges of nonmonetary assets that do not have commercial substance. A nonmonetary exchange has commercial substance if the future cash flows of the entity are expected to change significantly as a result of the exchange. SFAS 153 is effective for fiscal periods beginning after June 15, 2005. Although the Company will continue to evaluate the application of SFAS 153, management does not currently believe adoption will have a material impact on the Company's results of operations or financial position.

**Reclassifications**

Prior year amounts in the financial statements related to the discontinued SkillJam business unit, the discontinued Body Dome product line and the reconfigured segment disclosures have been reclassified to conform to the current period presentation.

**Note 3.     Property and Equipment**

Property and equipment consists of the following (in thousands):

|  | June 30, 2005 | March 31, 2005 |
|---|---|---|
| Furniture and fixtures | $   285 | $   204 |
| Computers and equipment | 13,267 | 10,475 |
| Leasehold improvements | 263 | 84 |
| Purchased software | 1,464 | 1,083 |
|  | 15,279 | 11,846 |
| Less: accumulated depreciation | (5,791) | (5,332) |
|  | $ 9,488 | $ 6,514 |

Depreciation and amortization expense was $573,000 for the quarter ended June 30, 2005 and $379,000 for the quarter ended June 30, 2004.

**Note 4.     Goodwill and Other Intangible Assets**

The net carrying value of goodwill and other intangible assets was $26,123,000 as of June 30, 2005 and $26,633,000 as of March 31, 2005. Management assesses the potential impairment of goodwill and other intangible assets with indefinite lives to determine whether an impairment of value exists during its fourth fiscal quarter or whenever events or circumstances suggest that the Company value may not be recoverable. No indicators of impairment were identified in the quarter ended June 30, 2004 and 2005 respectively.

Other intangible assets consist of the following (in thousands):

|  | June 30, 2005 | March 31, 2005 |
|---|---|---|
| Customer lists | $ 2,398 | $ 2,398 |
| Domain names | 2,723 | 2,723 |
| License agreements | 316 | 316 |
| Websites | 2,638 | 2,638 |
| Other | 2,306 | 2,306 |
|  | 10,381 | 10,381 |
| Less: accumulated amortization | (5,427) | (4,916) |
|  | $ 4,954 | $ 5,465 |

Amortization expense for other intangible assets was $511,000, for the quarter ended June 30, 2005 and $267,000 for the quarter ended June 30, 2005. The weighted-average life of the Company's

13

<u>Table of Contents</u>

intangible assets equals 4.3 years. Amortization expense for other intangible assets for the future years ending March 31 is as follows (in thousands):

| | |
|---|---:|
| 2006 (remaining nine months) | $1,365 |
| 2007 | 1,194 |
| 2008 | 822 |
| 2009 | 572 |
| 2010 | 343 |
| | $4,296 |

**Note 5.     Debt Obligations and Capital Leases**

Debt obligations consist of the following (in thousands):

| | June 30, 2005 | March 31, 2005 |
|---|---:|---:|
| Settlement of Litigation (1) | $ 6,600 | $ 6,600 |
| Equipment Financing Notes (2) | 2,400 | — |
| | 9,000 | 6,600 |
| Less: current portion of debt obligations | (1,875) | (1,875) |
| | $ 7,125 | $ 4,725 |

(1)  Pursuant to the terms of the Company's agreement in principle with the Attorney General of the State of New York, the Company expects to pay a total of $7.5 million over three years to the State of New York. The $6.9 million reserve represents the present value of these payments, plus the related legal costs. Final resolution of this matter is subject to agreement by the parties on the specific provisions of, and the Court's issuance of, a stipulated consent decree memorializing the terms of the settlement.

(2)  In June 2005, the Company's subsidiary, MySpace entered into an Equipment Loan and Security Agreement with entities affiliated with Pinnacle Ventures, LLC and ORIX Venture Finance, LLC providing for MySpace to borrow up to $6 million in term loans over the next 12 months to finance the purchase of eligible equipment and pay related costs as defined in the Agreement. On June 21, 2005, Pinnacle and ORIX advanced $1.6 million and $800,000, respectively, under the Agreement. The advances will bear interest at a fixed rate equal to the prime rate plus 2.5% (8% for the first advance) and will be repaid on an interest-only basis for the first 12 months starting July 1, 2005 and will be fully amortized over a 24-month period starting July 1, 2006. Loans are secured by a first-priority lien on the financed equipment. The Equipment Loan and Security agreement does not contain any financial covenants by MySpace or any guaranty by the Company.

The following are payments due under capitalized leases and reflect the present value of future minimum rentals for future years ending March 31 (in thousands):

| | |
|---|---:|
| 2006 (remaining nine months) | $ 11 |
| 2007 | 6 |
| 2008 | 4 |
| Total minimum lease payments | 21 |
| Less: amounts representing interest | (1) |
| Present value of net minimum lease payments | 20 |
| Less: current portion of capital lease obligations | (13) |
| Long-term obligations under capital leases | $  7 |

FORM 10-Q

14

Table of Contents

Equipment with a cost of $330,000 at June 30, 2005 is collateral for the capital lease obligations.

Note 6.    Commitments and Contingencies

**Operating leases**

The Company leases various facilities under non-cancelable operating leases that expire within the next four years. Minimum lease payments under these non-cancelable operating leases for the future years ending March 31 are as follows (in thousands):

| | |
|---|---|
| 2006 (remaining nine months) | $1,393 |
| 2007 | 1,135 |
| 2008 | 446 |
| 2009 | 349 |
| Total | $3,323 |

Rent expense was $388,000 and $250,000 for the first three months of fiscal years 2006 and 2005, respectively.

**Legal proceedings**

As previously reported, on January 31, 2003 Arcade Planet, Inc. ("Arcade Planet"), a California corporation, filed a patent infringement complaint against the Company in the United States District Court for the District of Nevada. Arcade Planet alleges that the online skill-based gaming business owned and operated by the Company at the time of the filing of the lawsuit, and which the Company subsequently sold in July of 2004, infringed a patent held by Arcade Planet entitled the "918 Patent." In the complaint, Arcade Planet seeks to prevent future infringement of the 918 Patent and compensation for lost profits or royalty damages. In April 2003, the Company filed an answer denying Arcade Planet's allegations and seeking declaratory judgment from the Court that the Company has not infringed the 918 Patent and that the patent is invalid and unenforceable. In July 2003, the Court stayed this action pending reexamination by the United States Patent and Trademark Office ("USPTO") of substantial new questions of patentability affecting certain claims underlying the 918 Patent. There have not been any material developments in this matter since the Company's last report. In the event that the 918 Patent claims at issue survive or are reinstated, and Arcade Planet continues to pursue any claims of past infringement, the Company will reevaluate how to proceed.

As previously reported, a consolidated stockholder lawsuit styled as a class action under lead counsel and plaintiff is pending against the Company, several of its current and former officers and/or employees, and the Company's former auditor in the United States District Court for the Central District of California (the "Securities Litigation"). The Securities Litigation arises out of the Company's restatement of quarterly financial results for fiscal year 2003. As a result of mediation in November 2004, the parties entered into a Stipulation of Settlement in January 2005 pursuant to which the parties propose to settle the Securities Litigation for $5.5 million in cash paid by the Company's insurance carriers. As discussed in more detail below, one of the Company's insurance carriers, from whom the Company expects that approximately $1.3 million of the settlement will be paid, has reserved the right to seek reimbursement from the Company in the event it is determined that the carrier was not obligated to provide coverage for the lawsuit. The Court has preliminarily approved the settlement and formal notice of the settlement has been mailed to class members. The Court has scheduled a hearing regarding final approval of the settlement and dismissal of the lawsuit for September 19, 2005.

Also as previously reported, two purported stockholder derivative actions, which are substantially similar, were filed in May 2003 against various current and former directors, officers, and/or employees of

15

Table of Contents

the Company (collectively, the "Derivative Litigation"). One of the actions remains pending in the United States District Court for the Central District of California (the "Federal Court Derivative Action") and the other action, which was consolidated from two actions, was dismissed by the Superior Court of California for the County of Los Angeles in October 2004 (the "State Court Derivative Action"). The Derivative Litigation similarly arises out of the Company's restatement of quarterly financial results for fiscal year 2003 and includes claims of breach of fiduciary duty in connection with the restatement and allegedly improper insider sales of Company stock by one officer and one former Company employee. The plaintiff in the State Court Derivative Action has appealed the decision of the Superior Court to dismiss the lawsuit. The Company intends to oppose the appeal and petition the Appellate Court to affirm the dismissal. The Federal Court Derivative Action was stayed by mutual agreement of the parties since its inception pending determination of whether plaintiffs in the Securities Litigation will be able to state a claim against the defendants. In light of the anticipated settlement of the Securities Litigation, and unless a mutually acceptable resolution can be achieved, the Company expects, upon expiration of the stay of the matter, to move to dismiss the Federal Court Derivative Action on substantially the same grounds as the State Court Derivative Action.

In the event that the Securities Litigation settlement is not consummated, the plaintiffs in the State Court Derivative Action successfully appeal the decision of the court or the plaintiffs in the Federal Court Derivative Action seek to move forward with litigation, the Company intends to vigorously defend itself in the Securities Litigation and to address the Derivative Litigation as appropriate. Defending against existing and potential securities and class action litigation relating to the fiscal year 2003 accounting restatement would likely require significant attention and management resources and, regardless of the outcome, would result in significant legal expenses. If the Company's defenses are ultimately unsuccessful, or if the Company is unable to achieve a favorable settlement, the Company could be liable for large damage awards that could seriously harm its business and results of operations.

As previously reported, on January 22, 2004, Bridge Ventures, Inc. ("Bridge") and Saggi Capital Corp. ("Saggi"), both Florida corporations, filed a demand for arbitration pursuant to a settlement agreement between Bridge and Saggi on the one hand, and the Company on the other, dated as of February 13, 2003. The settlement agreement resolved, among other things, disputes relating to warrants to purchase Company common stock previously issued to Bridge and Saggi in connection with a consulting agreement between Saggi and the Company. The demand for arbitration filed by Bridge and Saggi alleges securities and common law fraud in connection with the settlement agreement based on Saggi's and Bridge's contention that the Company knew, or was reckless in not knowing, that its financial statements and public comments on financial results were materially inaccurate at the time of entering into the settlement agreement. Saggi and Bridge are seeking compensatory damages in excess of $968,000, punitive damages in an unspecified amount, and costs and fees. The Company disputes Saggi's and Bridge's claims and allegations, believes that they are without merit and intends to vigorously defend itself in this action. There have been no material developments in this matter since the Company's last report.

As noted above, one of the Company's insurance carriers, Royal Indemnity Company, Inc. ("Royal"), underwriter of the Company's excess director and officer liability policy (the "Excess Policy"), has agreed to fund approximately $1.3 million of the settlement of the amount in Securities Litigation while reserving its right, if any, to seek reimbursement from the Company in the event it is determined that Royal was not obligated to provide coverage for the lawsuit. Royal has also agreed to provide coverage for certain claims in the Securities and Derivative Litigation, if necessary, and in connection with the arbitration with Saggi and Bridge, subject in each instance to the limits and other terms and conditions of the policy. In May 2005, Royal filed an action in the United States District Court for the Central District of California for Declaratory Relief and Reimbursement. Royal sought adjudication of the rights and obligations of the parties under the Excess Policy and, in the event Royal was not obligated to provide coverage in connection with the Securities Litigation, reimbursement of amounts paid and to be paid for which coverage is not available. In July of 2004, Royal dismissed its lawsuit without prejudice. Royal has indicated that it will instead file a substantially similar lawsuit in California State Court absent some resolution of the matters and issues in the near future. The Company believes coverage is mandated under the policy and will seek to enforce its rights accordingly.

16

Table of Contents

As previously reported, Brad Greenspan, the Company's former Chairman and Chief Executive Officer who was asked to resign as CEO and was removed as Chairman in the Fall of 2003, threatened to file a lawsuit for claims he allegedly has against the Company, various of its current and former directors and officers, VantagePoint Venture Partners, a large stockholder in the Company ("VantagePoint"), and certain of VantagePoint's principals and affiliates. In a draft complaint Mr. Greenspan delivered to the Company, Mr. Greenspan alleged claims of libel and fraud against Intermix and various of its current and former officers and directors, claims of intentional interference with contract and prospective economic advantage, unfair competition and fraud against VantagePoint and certain of its affiliates and principals, and claims that the Company's forecasts of profitability leading up to the January 2004 annual shareholder meeting and associated proxy contest waged by Mr. Greenspan were false and misleading. These purported claims generally related to the Company's decision to consummate the VantagePoint financing in October 2003, Mr. Greenspan's contemporaneous separation from the Company, and matters arising during the proxy contest. Mr. Greenspan's draft complaint also alleged that the Company's acquisition of the assets of Supernation LLC in July of 2004 involved breaches of fiduciary duty. Mr. Greenspan subsequently notified the Company of his intent to instead pursue claims in a derivative action.

Also as previously reported, on February 10, 2005, Mr. Greenspan did indeed file a derivative complaint in Los Angeles Superior Court with substantially the same allegations as contained in the draft complaint previously provided to the Company. The complaint includes claims for breach of fiduciary duty, indemnification, unfair competition and fraud. Mr. Greenspan seeks remittance of compensation received by the various current and former director and officer defendants, unspecified damages, removal of various Company directors, disgorgement of unspecified profits, reformation of the Supernation purchase, punitive damages, fees and costs, injunctive relief and other remedies. The Company and other defendants have filed motions challenging the validity of the action and the Company is evaluating claims it and/or its current and former directors and officers may have against Mr. Greenspan. The Company's defense and pursuit of the foregoing may require significant time, attention and resources and, regardless of the outcome, may result in significant legal expenses.

As previously reported, on April 28, 2005, the Attorney General of the State of New York (the "NY AG") commenced an action against the Company for alleged unlawful and deceptive acts and practices associated with the Company's distribution of toolbar, redirect and contextual ad serving applications ("downloads"). The NY AG asserted that the Company and/or third parties distributed downloads that were installed by users without sufficient notice or consent and in a manner that made it difficult to locate and remove the programs. The petition seeks disgorgement of profits, civil penalties and other remedies. As previously announced, we reached an agreement in principle with the NY AG pursuant to which the Company expects to pay a total of $7.5 million over three years to the State of New York, and the Company will discontinue distribution of its adware, redirect and toolbar programs. Final resolution of this matter is subject to the Court's issuance of, and the parties' agreement to specific provisions of, a Stipulated Consent Decree memorializing the terms of the settlement. No assurance can be given that agreement on the specific terms of a Stipulated Consent Decree will be achieved or that any other requirements for final resolution of the matter will be satisfied. The Company does not expect the Stipulated Consent Decree to resolve any individual liability the Company's former CEO and Chairman, Brad Greenspan, may have for his role in the alleged conduct at issue, and the Company has agreed to cooperate with the NY AG in connection with any investigation concerning same. The Company has not admitted any wrongdoing or liability and expects the final agreement with the NY AG to reflect this fact. We voluntarily suspended any ongoing distribution of the relevant applications in April 2005, and the expected payments to New York exceed any and all profits associated with the Company's distribution of the subject downloadable applications. Nevertheless, other public or private entities could bring actions against the Company based on factual allegations and causes of action similar to those underlying the NY AG action. The cost of responding to or defending against any such investigations, regulatory proceedings or litigation (including those described below) could be significant and, if the Company is unsuccessful in its defense, the cost of any judgment or settlement in connection with such proceedings could have a material adverse effect on our business.

17

Table of Contents

As previously reported, in May 2005, the Company was served with a Statement of Claim filed by an individual in the Federal Court of Canada in Montreal. The Plaintiff in the action purports to act on behalf of an unspecified class of individuals who have been allegedly damaged by the Company's violation of provisions of Canada's 1985 Competition Act in connection with the Company's distribution of downloadable ad serving, redirect and toolbar programs. The plaintiff is seeking an award of unjust enrichment, civil penalties and costs in unspecified amounts. The Company has recently filed a motion seeking dismissal of the lawsuit on the grounds that the Court lacks jurisdiction over the alleged claims and over the Company and that the claims of the plaintiff are factually baseless. The Company disputes the allegations of the Statement of Claim, believes they are without merit and intends to vigorously defend itself in this matter.

A similar complaint has recently been filed by an individual against the Company in the in the United States District Court for the Central District of California. The Plaintiff in the action purports to act on behalf of all United States residents who, during the period from July 25, 2002 to the present, had spyware or adware put onto their computers by Intermix. The complaint alleges claims of trespass, unjust enrichment, violation of a California penal statute concerning unauthorized access to computers, computer systems and data, and unfair and deceptive business practices. The plaintiff is seeking an order certifying a class and appointing a class representative and class counsel, injunctive relief, disgorgement of ill-gotten gains, and an award of unspecified damages, attorneys' fees, costs and expenses.

On August 9, 2005, Beneficial Innovations, Inc. ("BII") filed a patent infringement complaint against Intermix and another unaffiliated company in the United States District Court for the Central District of California. BII alleges, on information and belief, that aspects of the Company's Grab.com website infringe a patent relating to a method and system for playing games on a network entitled the "702 Patent." In the complaint, BII seeks to enjoin the Company from infringing the 702 Patent and seeks unspecified compensatory damages, fees and costs. At this time, the Company cannot assess the likelihood of a favorable or unfavorable outcome in this litigation or the potential impact, if any, of the lawsuit on the Company's business, prospects and future results of operations.

## Note 7.    Stockholders' Equity and Equity Compensation Plans

As of June 30, 2005, there are 194,000 shares of Series A preferred stock outstanding that are convertible into 265,000 shares of common stock at the applicable conversion rate. As of June 30, 2005, there are 1,750,000 outstanding shares of Series B preferred stock and 5,111,575 outstanding shares of Series C and C-1 preferred stock all of which are convertible into 6,861,575 shares of common stock at the current conversion rates. In the three months ended June 30, 2005, 46,831 shares of Series B preferred were converted into 46,831 shares of common stock. In the three months ended June 30, 2005, no shares of Series A preferred stock were converted into shares of common stock.

The following is a summary of stock option activity (in thousands, except per share data):

|  | Three months ended June 30, 2005 | | Three months ended June 30, 2004 | |
| --- | --- | --- | --- | --- |
|  | Number of Options | Weighted Average Exercise Price | Number of Options | Weighted Average Exercise Price |
| Outstanding at beginning of year | 9,134 | $ 2.57 | 7,844 | $ 2.28 |
| Granted | 344 | 6.07 | 617 | 2.09 |
| Exercised | (285) | 7.81 | — | — |
| Cancelled | (2) | — | (631) | 2.33 |
| Outstanding at end of period | 9,191 | 2.81 | 7,830 | 2.25 |
| Exercisable at end of period | 4,418 | | 3,664 | |

The following table summarizes information about stock options outstanding at June 30, 2005 (in thousands, except per share data):

|  | Options Outstanding | Options Exercisable |
| --- | --- | --- |
|  | Weighted | Weighted |

| Per Share Price Range | Number | Average Exercise Price | Number | Average Exercise Price |
|---|---|---|---|---|
| $5.01-7.00 | 786 | $ 6.41 | 241 | $ 6.00 |
| 3.01-5.00 | 1,409 | 3.95 | 231 | 3.91 |
| 1.00-3.00 | 6,996 | 2.18 | 3,946 | 2.26 |
| | 9,191 | | 4,418 | |

18

Table of Contents

**MySpace stock compensation plan**

MySpace adopted a stock option plan in February 2005. Stock options under this plan may be granted to officers, directors, employees and consultants of MySpace. 1,438,640 shares of MySpace common stock have been reserved for issuance under the plan. As of June 30, 2005, 851,920 stock options were granted to employees. Stock options granted under the plan typically vest over four years, with 25% of the options vesting after 12 months and 75% vesting quarterly over the remaining three years.

**Employee stock purchase plan**

The Company has an employee stock purchase plan that can issue up to 1,250,000 shares of common stock. There were no shares issued or due to be issued under this plan for the quarter ended June 30, 2005.

**Warrants**

The Company has granted warrants to purchase common stock in connection with debt issuance and professional services. The following is a summary of warrant exercise activity (in thousands, except per share data):

|  | Three months ended June 30, 2005 | | Three months ended June 30, 2004 | |
| --- | --- | --- | --- | --- |
|  | Number of Warrants | Weighted Average Exercise Price | Number of Warrants | Weighted Average Exercise Price |
| Outstanding at beginning of year | 180 | $ 2.20 | 258 | $ 2.20 |
| Granted | — | | — | |
| Exercised | — | | — | |
| Cancelled | (10) | | — | |
| Outstanding at end of period | 170 | 4.12 | 258 | 2.20 |
| Exercisable at end of period | 170 | 4.12 | 258 | 2.20 |

**Note 8.     Income Taxes**

The components of the provision for income taxes for the three months ended June 30, are as follows (in thousands):

|  | 2005 | 2004 |
| --- | --- | --- |
| Federal: | | |
| Current | $466 | $— |
| Deferred | 72 | — |
| State: | | |
| Current | 93 | 5 |
| Deferred | 21 | — |
| Provision for income taxes | $652 | $ 5 |

19

Table of Contents

Income tax expense for the the three months ended ended June 30, 2005 for the Company and its entire tax return consolidated group members consisted only of state minimum taxes of $8,000. Income expense for the three months ended June 30, 2005 also includes regular federal and state income taxes related to MySpace, Inc. in the amount of $466,000 and $85,000, respectively. MySpace, Inc. is majority owned by the Company and it is not part of the Company's consolidated tax group. MySpace, Inc. will continue to pay taxes to the extent that it generates taxable income.

All corporations that are owned 50% or more by Intermix Media, Inc. have been included in the consolidated group for financial reporting purposes; however, for federal and state income tax reporting purposes, the regulations require that a corporation must be owned at least 80% or more to be included in the consolidated group.

The following is a reconciliation of the differences between the provision for income taxes at the federal statutory rate and the actual provision for income taxes for the three months ended June 30, 2005 and 2004 are as follows (in thousands):

|  | Three months ended June 30, | |
|  | 2005 | 2004 |
| --- | --- | --- |
| Provision at federal statutory tax rate | $    787 | $    — |
| State income taxes | 134 | 5 |
| Stock compensation | (497) | — |
| Other | 83 | — |
| Discontinued operations | — | — |
| Valuation allowance | 145 | — |
| Provision for income taxes | $    652 | $    5 |

At June 30, 2005, the Company's federal and state net operating loss carry forwards amounted to $40,424,000 and $14,133,000, respectively. In addition, these net operating loss carry forwards include $7,512,000 of losses created by the exercise of non-qualified stock options, and the early disposition of incentive stock options, the benefit of which will be recorded through stockholder's equity. The use of these net operating loss carry forwards will be recorded based on the order they originated. Unused net operating loss carry forwards begin to expire between 2021 and 2022. Management has provided for a full valuation allowance for net deferred tax assets of the Company and its subsidiaries only, as the realization is well beyond the twelve-month time horizon the Company is using for valuation purposes.

The utilization of net operating losses is subject to annual limitations if a change in ownership by 5% or more stockholders within a three-year period that aggregates 50 percentage points or more occurs.

Management has determined that as of November 18, 2003, the aggregate change in ownership by the Company's 5% stockholders had exceeded 50 percentage points within a three year period, thus utilization of the Company's net operating losses is limited with respect to its federal net operating loss carry forwards available on that date of approximately $26,900,000. All net operating losses occurring subsequent to that date are not subject to these limitations unless another change in ownership occurs that exceeds 50 percentage points in a three-year period. As of June 30, 2005, management has determined that no additional change in ownership exceeding 50 percentage points has occurred since November 18, 2003.

20

Table of Contents

Deferred tax assets and liabilities consist of the following (in thousands):

| | June 30, 2005 | March 31, 2005 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating loss carry forwards | $ 14,567 | $ 14,330 |
| Accounts receivable, inventories and accrued expenses | 2,690 | 2,825 |
| Goodwill and other intangible assets | (202) | (201) |
| Other | 35 | 32 |
| | 17,090 | 16,986 |
| Valuation allowance | (16,240) | (16,095) |
| Deferred tax liabilities: | | |
| Property and equipment | (856) | (804) |
| Net deferred tax assets (liabilities) | $        (6) | $        87 |

Deferred tax assets are recognized for future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. A valuation allowance is provided when management cannot determine whether it is more likely than not that the net deferred tax asset will be realized. The effect on deferred tax assets and liabilities of a change in the rates is recognized in income in the period that includes the enactment date.

Deferred tax assets of MySpace as of June 30, 2005 consist of primarily accrued expenses, reserves for bad debts, and depreciation and amortization in the amount of $173,000, offset by a deferred tax liability consisting of prepaid expenses in the amount of $179,000, for an overall net deferred tax liability of $6,000.

Note 9.     Segment Disclosures

Using the criteria established by Statement of Financial Accounting Standards No. 131, *Disclosures about Segments of an Enterprise and Related Information*, the Company currently operates in two business segments. The Company does not allocate any operating expenses other than direct cost of revenues to its segments, as management does not believe that allocating these expenses is material in evaluating the segment's performance.

Summarized information by segment from internal management reports is as follows (in thousands):

| | Three Months Ended June 30 | |
|---|---|---|
| | 2005 | 2004 |
| Revenues: | | |
| Product marketing | $13,945 | $10,557 |
| Network | 12,734 | 6,190 |
| Total revenues | $26,679 | $16,747 |
| Gross profit: | | |
| Product marketing | $ 9,964 | $ 6,767 |
| Network | 12,521 | 5,987 |
| Total gross profit | $22,485 | $12,754 |

21

Table of Contents

During the first quarter of fiscal year 2006, sales to two customers exceeded 10% of segment revenues. Sales to these two customers represented 14% and 10%, respectively of network segment revenues, and sales to the top 10 customers were approximately 56% of segment revenues. In the product marketing segment, sales to the top 10 customers were less than 2% of segment revenues. Revenues from the sale of Hydroderm, Body Shape and Dream Shape products were approximately 68%, 14% and 5%, respectively of product marketing revenues in the three month period ended June 30, 2005. Most of the products sold in the three month period ended June 30, 2005 were purchased from five vendors.

During the first quarter of fiscal year 2005, two customers exceeded 10% of segment revenues. These two customers represented 31% and 11%, respectively of network segment revenues. In the product marketing segment, sales to the top 10 customers were less than 1% of segment revenues. In the network segment, sales to the top 10 customers were approximately 54% of segment revenues. Revenues from the sale of Body Shape, Dream Shape and Hydroderm products were approximately 20%, 20% and 37%, respectively of first product marketing revenues in the three month period ended June 30, 2004. Most of the products sold in the three month period ended June 30, 2004 were purchased from the three vendors.

The Company does not allocate assets to business segments because product marketing and network segment assets minus liabilities, other than goodwill and other intangible assets, are not significant. Goodwill and other intangible assets by business segment are as follows (in thousands):

|                    | June 30, 2005 | March 31, 2005 |
|--------------------|--------------:|---------------:|
| Product marketing  | $       93    | $       94     |
| Network            | 26,024        | 26,532         |
| Corporate          | 6             | 7              |
| Total              | $26,123       | $26,633        |

## Note 10.  Subsequent Events

On July 8, 2005, the Company consummated the sale of 75,000 shares of common stock and five-year warrants to purchase an additional 11,250 shares of common stock at $4 per share to MySpace Ventures LLC ("MSV"), an entity owned by Company employees including Christopher DeWolfe, the chief executive officer of MySpace, for an aggregate purchase price of $300,000. As previously reported, the Company entered into an agreement to sell the shares and warrants to MSV, subject to certain conditions to closing, in December of 2004 in conjunction with the investment in the Company by affiliates of Redpoint Ventures on similar terms. As a managing member of MSV, Mr. DeWolfe received 50,000 shares of common stock and warrants to purchase 7,500 shares of common stock in the transaction. The shares and warrants are subject to piggyback registration rights.

On July 18, 2005, the Company entered into an Agreement and Plan of Merger with Fox Interactive Media, Inc., a subsidiary of News Corporation ("Fox"), Project Ivory Acquisition Corporation, a wholly owned subsidiary of Fox ("Merger Sub"), and News Corporation with respect to specified sections of the agreement (the "Merger Agreement"). The Merger Agreement provides that, upon the terms and subject to the conditions set forth therein, Merger Sub will merge with and into the Company, with the Company continuing as the surviving corporation and a wholly-owned subsidiary of Fox (the "Merger").

At the effective time of the Merger, each share of the Company's capital stock outstanding immediately prior to the effective time of the Merger (including any shares of Company common stock issued prior to the effective time upon the exercise of options or warrants or upon conversion of preferred stock), other than shares held by the Company, its wholly-owned subsidiaries, Fox or Merger Sub or by dissenting holders who properly exercise appraisal rights under Delaware law, will be automatically converted into the right to receive cash, without interest and less any applicable withholding taxes, in the amounts indicated in the chart below.

22

Table of Contents

| Capital Stock | | Cash Payment Amount |
| --- | --- | --- |
| Common Stock | $ | 12.00/share |
| Series A Convertible Preferred Stock | $ | 12.00/share |
| Series B Convertible Preferred Stock | $ | 14.60/share |
| Series C Convertible Preferred Stock | $ | 13.50/share |
| Series C-1 Convertible Preferred Stock | $ | 14.00/share |

Each outstanding option to purchase Company common stock that is vested as of the effective time of the Merger, including those options that vest as a result of the Merger, will be cancelled at the effective time of the Merger and the holder of such option will be entitled to receive a cash payment, without interest and less any applicable withholding taxes, equal to the product of the excess, if any, of $12.00 over the applicable option exercise price and the number of shares of Company common stock subject to such option (the "Option Spread").

Each outstanding option to purchase Company common stock is not vested as of the effective time of the Merger, and does not become vested as a result of the Merger (a "Company Unvested Option"), will be cancelled at the effective time of the Merger and the holder of such Company Unvested Option will be entitled to receive 50% of the Option Spread, payable in installments made when and if such Company Unvested Option would have vested, except that the option holder's right to receive these payments will be subject to certain conditions, including (a) continued employment of the holder of the option by News Corporation or its subsidiaries, (b) the execution of a waiver of existing contractual severance arrangements and non-compete agreement by the option holder prior to the effective time of the Merger (if the option holder is a specified executive of the Company that has an employment agreement with the Company providing for certain severance payments upon a termination of employment on or after a change of control), and (c) the execution of an agreement acceptable to Fox Interactive Media and the Company by the option holder prior to the effective time of the Merger (if the option holder is not a specified executive of the Company).

Consummation of the Merger is subject to customary conditions, including stockholder approval, absence of any law or order prohibiting the closing, and expiration or termination of the Hart-Scott-Rodino waiting period and certain other regulatory approvals. In addition, each party's obligation to consummate the Merger is subject to the accuracy of the representations and warranties of the other party and material compliance of the other party with its covenants. Prior to entering into the Merger Agreement, the Company's Board of Directors agreed to accelerate all unvested options to purchase Company common stock held by Richard Rosenblatt, the Company's Chief Executive Officer, effective immediately prior to the closing of the Merger.

In connection with the Merger, on July 18, 2005, the Company exercised its option to acquire the outstanding equity interest of MySpace that it does not already own for approximately $69 million pursuant to the Stockholders Agreement, dated February 11, 2005, by and among the Company and the stockholders party thereto, as amended. Pursuant to the terms of the Merger Agreement, Fox or Merger Sub is obligated to loan the Company up to $69 million to fund the Company's purchase of the MySpace stock upon the Company's request. However, if the Merger Agreement were to be terminated, this loan obligation of Fox and Merger Sub would also terminate, and the Company would be required to seek other funding to complete its purchase of the shares of MySpace stock that the Company does not already own. If the loan is funded by Fox or Merger Sub, its repayment will be secured secured by all of the Company's assets, including the stock that it holds in MySpace, Inc. and all rights with respect to that stock; in the event that the Merger Agreement terminates after the Company has drawn upon the loan from Fox and consummated the purchase option for the equity interests in MySpace, Inc. that it does not already own, it may not have, or be able to obtain, sufficient funds to repay such loan and Fox may consequently have the right to foreclose upon the Company's equity interests in MySpace, Inc. Completion of MySpace purchase is scheduled to occur on October 14, 2005.

The Company expects to incur approximately $9.0 million in professional fees and other expenses related to the negotiation of the Merger Agreement and the consummation of the Merger, a substantial portion of which will be accrued or paid during the quarter ended September 30, 2005. This amount

23

Table of Contents

consists primarily of fees of the Company's two financial advisors of approximately $6.4 million, of which $4.9 million is contingent upon successful completion of the Merger; an estimated $2 million in fees and expenses of the Company's outside legal counsel; and approximately $53,000 in fees and expenses of the Company's independent auditors. In addition, the Company expects to engage a proxy solicitation firm and will incur printing and mailing expenses for the preparation of a proxy statement in connection with a special meeting of stockholders to be held for the purpose of approving the Merger.

**Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Forward-Looking Statements**

*This Report contains "forward-looking statements" within the meaning of the Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Statements other than statements of historical fact are forward-looking statements for purposes of federal and state securities laws, including projections of earnings, revenue or other financial items; statements of the plans, strategies and objectives of management for future operations; statements concerning proposed new services or developments; statements regarding future economic conditions or performance; statements of belief; and statements of assumptions. Forward-looking statements may include the words "may," "could," "will," "estimate," "intend," "continue," "believe," "expect" or "anticipate" or other similar words. These forward-looking statements present our estimates and assumptions only as of the date of this report. Except for our ongoing reporting obligations, we do not intend, and undertake no obligation, to update any forward-looking statement. Although we believe that the expectations reflected in any of our forward-looking statements are reasonable, actual results could differ materially from those projected or assumed in any of our forward-looking statements. Our future financial condition and results of operations, as well as any forward-looking statements, are subject to change and to inherent risks and uncertainties. The factors impacting these risks and uncertainties are discussed in the section entitled "Risk Factors" and elsewhere in this report.*

**Recent Events**

On April 18, 2005, Lisa Terrill became our Chief Financial Officer.

On April 28, 2005, the Attorney General of the State of New York commenced an action against us seeking disgorgement of profits, civil penalties and other remedies in connection with alleged unlawful and deceptive acts and practices associated with our distribution of toolbar, redirect and contextual ad serving applications. On June 14, 2005, we announced a settlement in principle of the matter pursuant to which we expect to pay a total of $7.5 million over three years to the State of New York and will discontinue distribution of these applications. Final resolution of this matter is subject to agreement by the parties on the specific provisions of, and the Court's issuance of, a stipulated consent decree memorializing the terms of the settlement. See Note 6 – Commitments and Contingencies of Notes to Consolidated Financial Statements for information on legal proceedings.

On June 17, 2005, our subsidiary MySpace, Inc. ("MySpace") entered into an Equipment Loan and Security Agreement with entities affiliated with Pinnacle Ventures and ORIX Venture Finance LLC (the "Lenders") providing for MySpace to borrow up to $6 million in term loans over the next 12 months to finance the purchase of eligible equipment and related soft costs as defined in the agreement. Advances will bear interest at a fixed rate equal to the prime rate plus 2.5% (8% for the first advance) and will be repaid on an interest-only basis for the first 12 months following the date of the advance and fully amortized over a 24-month period thereafter. Loans are secured by a first-priority lien on the financed equipment. The Equipment Loan and Security agreement does not contain any financial covenants by MySpace or any guaranty by us; however, we were required to subordinate our outstanding $1.5 million loan to MySpace to any indebtedness incurred by MySpace in favor of the Lenders. In connection with this transaction, MySpace issued to the Lenders for nominal consideration warrants to purchase 41,958 shares of Series A preferred stock in MySpace. The warrants are exercisable for a period of ten years from the date of issuance.

24

Table of Contents

On July 8, 2005, we consummated the sale of 75,000 shares of our common stock and five-year warrants to purchase an additional 11,250 shares of our common stock at $4 per share to MySpace Ventures LLC, an entity owned by employees of MySpace, Inc., including Chris DeWolfe, the President of MySpace, Inc., for an aggregate purchase price of $300,000.

On July 18, 2005, we entered into an Agreement and Plan of Merger (the "Merger Agreement") providing for the merger of a wholly-owned subsidiary of Fox Interactive Media, Inc. with and into us such that following the merger we will be a wholly-owned subsidiary of Fox Interactive Media (the "Merger"), as described in Note 10 – Subsequent Events of Notes to Consolidated Financial Statements. In connection with the Merger, on July 18, 2005, we exercised our option to acquire the outstanding equity interests of MySpace that we do not already own for approximately $69 million. Completion of the MySpace purchase is scheduled to occur on October 14, 2005.

On July 29, 2005, we sold the assets of our ink cartridge business in exchange for a fixed amount of cash plus a percentage of the net revenue from sales made to existing customers over the next 24 months.

Business Segments

Overview

We are a "new media" company with a unique combination of popular and synergistic Internet entertainment properties and results driven Internet marketing and e-commerce businesses and assets. We utilize proprietary technologies, compelling content, unique community features, analytical marketing and specialized e-commerce tools to generate predominantly advertising, subscription and e-commerce revenues. We operate in two business segments: the product marketing segment, referred to as Alena, and the network segment, referred to as the Intermix Network. The Intermix Network blends user-generated and proprietary online content that motivates users to spend more time on the Network and to invite their friends to join them. By integrating social networking applications, self publishing and viral marketing, the Intermix Network has grown to over 30 million U.S. visitors per month, ranking it among the most popular destinations for U.S. Internet users today. Intermix also leverages its optimization technologies, marketing methodologies and the Internet through its Alena unit, where it launches branded consumer product offerings. Alena expands our consumer reach by marketing select high margin and innovative products directly to the consumer across the Internet. In doing so, Alena cost-effectively builds consumer brands and creates additional offline revenue opportunities for us through strategic partnerships and joint ventures.

Product marketing segment revenues consist of the sale of products directly to consumers through the Internet and to distributors. We also sold subscriptions to our websites and collected online activity-based fees in prior years. We sell various products through our ecommerce websites. We reach our customers predominately through online advertising, on both our owned and third-party websites, and television, radio and print advertising. These products include health and beauty products, cosmetic products, and to a small extent our ink cartridge business, which was sold in July 2005. In prior years, we sold a greater amount of ink cartridges and also collectibles, fitness products and various niche products. We continuously tests product offerings to determine customer acquisition costs and revenue potential, as well as to identify the most effective marketing programs.

The Intermix network is comprised of a diverse network of websites that provide entertainment and community oriented content. We earn advertising revenues through a variety of traditional ad units such as banner, skyscraper, pop-up and interstitial ads, rich media, targeted E-mail marketing, paid search marketing, lead generation marketing and affiliate marketing. Our advertising is primarily performance based with pricing based on the number of times our audience views the advertisement or performs a specific action in response to an ad. The Intermix Network has websites that generate subscription revenues, transaction-based revenues, and provide marketing services, in addition to websites that are primarily advertising based.

25

<u>Table of Contents</u>

**Critical Accounting Policies**

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires us to make estimates and judgments that affect our reported assets, liabilities, revenues, and expenses, and the disclosure of contingent assets and liabilities. We base our estimates and judgments on historical experience and on various other assumptions we believe to be reasonable under the circumstances. Future events, however, may differ markedly from our current expectations and assumptions. While there are a number of significant accounting policies affecting our consolidated financial statements, we believe that goodwill and other intangible assets impairment, revenue recognition and reserves for accounts receivable, inventories, sales returns and deferred tax assets are critical accounting policies involving the most complex, difficult and subjective estimates and judgments.

*Goodwill and other intangible assets impairment*

Goodwill and other intangible assets with indefinite useful lives are tested for impairment in the fourth quarter of each fiscal year, and whenever events or circumstances suggest that the carrying value may not be recoverable. Intangible assets with definite useful lives are tested for impairment whenever events or circumstances suggest that the carrying value may not be recoverable. Events or circumstances which could trigger an impairment review include a significant adverse change in business climate, an adverse action or assessment by a regulator, unanticipated competition, a loss of key personnel, significant changes in the manner of our use of acquired assets, the strategy for our overall business, or significant negative industry or economic trends.

Our principal consideration in determining impairment includes the strategic benefit to the Company of the particular assets as measured by expected future cash flows. An impairment loss would be reported to the extent that the carrying value of the assets exceeds the fair value as determined by discounted future cash flows attributable to the asset. As of June 30, 2005, there is no indication that the carrying value of our goodwill and intangible assets require impairment, notwithstanding any previous impairment of the carrying value of goodwill and other intangible assets.

*Revenue recognition*

Revenue is recognized when the price of the product or service is fixed or determinable, persuasive evidence of an arrangement exists, the service is performed or the product is shipped and collectibility of the resulting receivable is reasonably assured.

We recognize revenue upon provision of services or on shipment of products, unless such product is subject to a risk-free return period, in which case revenue related to the initial shipment is deferred and recognized upon the expiration of the risk-free period. Revenue includes shipping and handling charges. Product warehousing and fulfillment is handled internally as well as by third parties.

Revenues for subscriptions and memberships to our Internet websites are recognized ratably as earned over the term of the subscription or membership. Upon commencement of the subscription or membership, we record deferred revenue for the fee charged. This deferred revenue is then recognized ratably over the period of the arrangement.

Advertising revenue is earned from the sale of banner and button advertisements, pop-up and other Web-based advertising, and sponsorships of E-mail newsletters or areas of our websites. We recognize revenue from the sale of our banner and button advertisements, pop-up and other Web-based advertising in the period delivered. The arrangements are evidenced either by an insertion order or contract that stipulates the types of advertising to be delivered and pricing. Under certain arrangements, we charge fees to merchants based on the number of users who click on an advertisement or text link to visit websites of our merchant partners, which we refer to as a "click-through". Click-through arrangements are evidenced by a contract that stipulates the click-through fee. The fee becomes fixed and determinable upon delivery of the click-through and these revenues are recognized in the period in which the click-through is delivered to the merchant. Revenues relating to E-mail newsletters are derived from delivering advertisements to E-mail

26

Table of Contents

lists for advertisers and websites. Agreements are primarily short-term and revenues are recognized as services are delivered provided that we have no significant remaining obligations. In certain arrangements, we sell banner advertising, click-through programs, and E-mail newsletter or website sponsorships to customers as part of a bundled arrangement. For these arrangements, we allocate revenue to each deliverable based on the relative fair value of each deliverable. Revenue is recognized in these arrangements as we deliver on our obligation.

*Reserve for uncollectible accounts receivable*

We maintain an allowance for doubtful accounts to reduce billed accounts receivable to estimated realizable value. A considerable amount of judgment is required when we assess the realization of accounts receivable, including assessing the probability of collection and the current credit-worthiness of each customer. If the financial condition of our customers were to deteriorate, resulting in an impairment of their ability to make payments, an additional provision for doubtful accounts could be required. We initially record a provision for doubtful accounts based on our historical experience, and then adjust this provision at the end of each reporting period based on a detailed assessment of our accounts receivable and allowance for doubtful accounts. In estimating the provision for doubtful accounts, we consider the aging of the accounts receivable, trends within and ratios involving the age of the accounts receivable, the customer mix in each of the aging categories and the nature of the receivable, our historical provision for doubtful accounts, the credit worthiness of the customer, economic conditions of the customer's industry, and general economic conditions, among other factors. We did not experience material losses in the three months ended June 30, 2005 due to uncollectible accounts receivable.

*Reserve for excess and obsolete inventory*

The quantities of inventory on hand and their values are reviewed periodically for potentially excess and obsolete product or pricing. Consequently, we maintain an allowance for excess and obsolete inventory to reduce inventory cost to its estimated realizable value. A considerable amount of judgment is required when we assess the realization of inventory, including assessing the probability of sale and the current market demand for each product. We calculate an inventory reserve for estimated obsolescence or excess inventory based upon historical demand and assumptions about future demand for our products and market conditions. If actual market conditions for our products differ from those projected by management, and our estimates prove to be inaccurate, additional write-downs or adjustments to cost of revenues may be required. In the three months ended June 30, 2005, there has not been a material inaccuracy in management's judgment of the required reserve for excess and obsolete inventory.

*Reserve for sales returns*

We maintain an allowance for estimated customer sales returns. In determining the estimate of products that will be returned, we analyze historical returns, current economic trends, changes in customer demand and acceptance of our products, known returns we have not received and other assumptions. Similarly, we record reductions to revenue for estimated future credits to our advertising customers in the event that delivered advertisements do not meet contractual specifications. Should the actual amount of product returns or advertising credits differ from our estimates, adjustments to revenues may be required. In the three months ended June 30, 2005, there has not been a material inaccuracy in management's judgment of the required reserve for sales returns.

*Reserve for deferred tax assets*

We account for income taxes in accordance with the liability method for accounting for income taxes. Under this method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts and the tax basis of assets and liabilities. Deferred tax assets and liabilities are measured using the enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. We then assess the likelihood that

27

Table of Contents

our deferred tax assets will be recovered from future taxable income. To the extent that we believe that recovery is not assured, we establish a valuation allowance. When this allowance is established, or increases or decreases in the future, we increase or decrease our income tax expense. If our estimate of the likelihood of future taxable income proves to be incorrect, adjustments to income tax expense could be required. At June 30, 2005, we fully reserved for our deferred tax assets, since we believe that realization is not reasonably assured at this time. If we have operating income from continuing operations in the future, we will reassess the need to continue to fully reserve our deferred tax assets. The deferred tax assets of MySpace have not been reserved because management has determined that is more likely than not that the deferred tax assets will be realized.

**Results of Operations**

The following table sets forth consolidated statement of operations data expressed as a percentage of revenues:

|  | Three Months Ended June 30, | |
| --- | --- | --- |
|  | 2005 | 2004 |
| Revenues: | | |
| Product marketing | 52.3% | 63.0% |
| Network | 47.7 | 37.0 |
| Total | 100.0 | 100.0 |
| Cost of revenues: | | |
| Product marketing | 14.9 | 22.6 |
| Network | 0.8 | 1.2 |
| Total | 15.7 | 23.8 |
| Operating expenses: | | |
| Marketing and sales | 38.2 | 39.0 |
| Product development | 11.1 | 9.8 |
| General and administrative | 27.9 | 25.9 |
| Restatement professional fees | — | (2.0) |
| Amortization of other intangible assets | 1.9 | 1.6 |
| Total operating expenses | 79.1 | 74.3 |
| Operating income | 5.2 | 1.9 |
| Interest income (expense), net | 0.1 | (0.5) |
| Income from continuing operations before income taxes | 5.3 | 1.4 |
| Income taxes | (2.4) | (0.1) |
| Income from continuing operations | 2.9 | 1.3 |
| Loss from discontinued operations | — | (0.6) |
| Gain on sale of Skilljam (discontinued operation) | 3.7 | — |
| Minority Interest, net of taxes | (2.0) | 0.1 |
| Net income | 4.6% | 0.8% |

28

Table of Contents

**Revenues**

Revenues increased 59% to $26.7 million in the first quarter of fiscal year 2006 from $16.7 million in the first quarter of fiscal year 2005. The increase in revenues was attributable to growth in both business segments, with the product marketing segment producing $13.9 million in revenues in the first quarter of fiscal year 2006 compared to $10.6 million in the same quarter last year, and the network segment producing $12.7 million in revenues in the first quarter of fiscal year 2006 compared to $6.2 million in the same quarter last year.

For the first quarter of fiscal year 2006, product marketing segment revenues increased by 32% to $13.9 million compared to the same quarter last year. The Alena business unit produced $3.8 million in increased revenues in the first quarter of fiscal year 2006 compared to the same quarter last year due to higher continuity program sales of the Hydroderm lines in the current quarter. We also experienced a $584,000 decline in revenues at our ink cartridge business unit in the first quarter of fiscal year 2006, compared to the same quarter last year, due to lower spending on the acquisition of new customers.

For the first quarter of fiscal year 2006, network segment revenues increased by 106% to $12.7 million compared to the same quarter last year. The increase in revenues was primarily due to the growth of MySpace, the acquisition of Focalex, and to increased sales of branded advertising. We also saw an increase in subscription revenues at our Cases Ladder business due to an increase in the number of customers purchasing memberships and services.

**Cost of Revenues**

Cost of revenues is primarily associated with the product marketing segment and consists of the cost of products, warehouse, fulfillment and shipping, as well as credit card processing fees. The gross profit margin of the product marketing segment was 71% in the first quarter of fiscal year 2006 compared to 64% in the same quarter last year. The increase in gross profit margin in the first quarter of fiscal year 2006, compared to the same quarter in fiscal year 2005, was due to cost reduction in products sold, process improvements, lower shipping costs, an increase in product sold in the Alena business unit which historically has had a lower cost of revenues than the inkjet cartridge business unit, and the elimination of certain merchant credit card processing fees. We expect the gross profit margin for the product marketing segment to remain consistent for the remainder of fiscal year 2006.

**Marketing and Sales**

Marketing and sales expenses consist primarily of fees paid to third parties for media space, bad debts, advertising revenue sharing arrangements, promotional and advertising costs, personnel costs, commissions, agency and consulting fees and allocated overhead costs. We also has a direct sales force that sells our advertising inventory to advertisers and advertising agencies.

Marketing and sales costs were $10.2 million in the first quarter of fiscal year 2006 compared to $6.5 million in the first quarter of fiscal year 2005, and were 38% of revenues for the first quarter of fiscal year 2006 compared to 39% of revenues for the same quarter last year. The increase of $3.7 million was primarily due to the following: an increase of $2.2 million in fees paid to third-parties for online and offline media space consistent with the increase in revenues in connection with shared ad revenue arrangements, an increase of $820,000 in salary expense; an increase of $226,000 in commission expense, an increase of $215,000 in marketing expense, and an increase in advertising expense of $149,000.

We plan to continue to focus on enhancing our direct sales, marketing and customer care teams during fiscal year 2006 in an effort to continue growing our network's revenues while extending our relationship with Alena customers. Our strategy is to develop a longer-term relationship with our customers and enhance the lifetime value of that relationship. In fiscal year 2006, we intend to expand internal sales force to focus on selling directly to branded advertisers with the goal of increasing Intermix Network advertising rates and margins. Additionally, we intend to continue investing in the marketing and sales teams of Alena and Intermix

29

Table of Contents

Network with a view toward expansion beyond the online market. Consequently, we expect marketing and sales costs to increase but to remain relatively consistent as a percent of sales.

**Product Development**

Product development costs consist of payroll and related expenses for developing and maintaining our websites, developing and maintaining key proprietary technology and developing proprietary products and services. Product development costs increased to $3 million or 11% of revenues for the first quarter of fiscal year 2006, from $1.6 million or 10% of revenues for the same quarter last year. The increase was primarily attributable to $1.2 million in salaries, benefits, bonuses and recruiting fees related to an increase in information technology personnel.

**General and Administrative**

General and administrative costs consist of payroll and related costs for executive, finance, legal, human resources and administrative personnel, recruiting and professional fees, internet bandwidth, rent, insurance, depreciation and amortization and other general corporate expenses. General and administrative costs increased to $7.4 million, amounting to 28% of revenues for the first quarter of fiscal year 2006, from $4.3 million or 26% of revenues for the first quarter of fiscal year 2005. The increase of $3.1 million is primarily attributable to; an increase in employee compensation and benefits of $1 million, an increase in internet bandwidth fees of $824,000 due to increased traffic to network properties, an increase in legal costs of $440,000 due to increased litigation activity, an increase in professional services cost of $238,000 relating to compliance with Section 404 of the Sarbanes Oxley Act of 2002, and an increase in depreciation expense of $194,000 due to increase in fixed assets.

**Restatement Professional Fees**

There were no restatement related professional fees in the first quarter of fiscal year 2006. We recorded $337,000 of insurance reimbursement net of any restatement-related fees in the quarter ended June 30, 2004.

**Amortization of Other Intangible Assets**

In the first quarter of fiscal year 2006, amortization of other intangible assets was $511,000 compared to $267,000 in the same quarter last year. The increase was attributable to intangible assets acquired from Focalex and a step-up in the intangible assets basis in MySpace in connection with an investment made in MySpace by Redpoint and its affiliates.

**Income Taxes**

We recorded $8,000 of income tax expense in the first quarter of fiscal year 2006 for state minimum taxes due after the utilization of net operating loss carry forwards. We recorded a $5,000 tax provision for the first three months of fiscal year 2005 for state minimum income taxes.

We recorded $644,500 of income tax expense for MySpace in the first quarter of fiscal year 2006. Since MySpace was incorporated in February of 2005, there is no prior year comparison.

**Gain on sale of Skilljam**

We sold our SkillJam business unit to CES Software PLC on July 30, 2004. The sale proceeds were $8 million and we realized a $4.7 million gain on sale of assets, net of $129,000 of income taxes. We paid off a related $1.2 million acquisition earn-out obligation to a company owned by two SkillJam

30

Table of Contents

employees. At the time of the sale a one year, $1 million escrow was established for certain indemnification obligations and the funds were released in August 2005 without any claim against the escrow having been made; therefore, we recorded an additional $1 million gain on this sale. We believe this recognition of gain of $1 million to be reasonable because the Company has satisfied any other provisions in the SkillJam purchase agreement regarding the release of the escrow funds. Although the Company's indemnity obligations are ongoing, we believe the remaining contingencies relating to patents or other matters relating to the acquisition will not have a material effect on the financial statements and the amounts of any such asserted contingencies are not reasonably estimatible or probable of assertion and sustained at this time. In addition, we will receive a percentage of the net revenue from the sale of the SkillJam technology to the buyer's European customers over five years. As of June 30, 2005 we have not received any payments with respect to this earn-out component.

**Minority Interest**

We realized a minority interest loss of $530,000 (net of tax allocation) and a gain of $10,000 for the first quarters of fiscal years 2006 and 2005, respectively. Operating income is allocated to the minority owners based on their ownership percentage, thereby reducing our net income. Likewise, operating losses are allocated to the minority owners based on their ownership percentage, which reduces our net loss. For fiscal year 2006, the minority interest allocation related to MySpace and certain of Alena's joint ventures are expected to be material to the Company. Specific to the Alena's Hydroderm joint venture, the distribution of profits in the form of cash payments is expected to increase due to increases in offline product sales.

**Liquidity and Capital Resources**

Net cash provided by (used in) operating activities was $697,000 in the first quarter of fiscal year 2006 compared to $(1.3) million in the first quarter of fiscal year 2005. The net cash provided by operating activities in the first quarter of fiscal year 2006 was primarily due to an increase in current liabilities, minority interest, net income and partially offset by increase in current assets. The net cash used in operating activities in the first quarter of fiscal year 2005 was primarily due to an increase in current assets and a decrease in current liabilities, partially offset by the income from operations and non-cash expenses.

Net cash used in investing activities was $(3.5) million in the first quarter of fiscal year 2006 compared to $(651,000) in the first quarter of fiscal year 2005. Net cash used in investing activities in the first quarter of fiscal year 2006 was from purchase of property and equipment. Net cash used in investing activities in the first quarter of fiscal year 2005 was from purchase of computer and network equipment and the acquisition of Focalex, Inc.

Net cash provided by (used in) financing activities was $3.3 million in the first quarter of fiscal year 2006 compared to ($504,000) in the first quarter of fiscal year 2005. Net cash provided by financing activities in the first quarter of fiscal year 2006 includes the proceeds from issuance of a note in connection with equipment financing and proceeds from exercise of stock options and warrants. Net cash used in the first quarter of fiscal year 2005 included the repayment of capital lease and debt obligations.

As of June 30, 2005, we had $14.6 million of cash and cash equivalents and $1.8 million in restricted cash, and $11.8 million in working capital. As of March 31, 2005, we had $14.2 million in cash and cash equivalents, $1.8 million in restricted cash, and $9.7 million in working capital. The increase in total cash from March 31, 2005 to June 30, 2005 was primarily due to a decrease in deposits required for our office lease. The increase in working capital from March 31, 2005 to June 30, 2005 was primarily due to an increase in accounts receivable. As of June 30, 2005, MySpace had approximately $3.0 million in cash and cash equivalents, which is included in the same amount noted above.

In connection with the Merger, on July 18, 2005, the Company exercised its option to acquire the outstanding capital stock of MySpace that it does not already own pursuant to the Stockholders Agreement, dated February 11, 2005, by and among the Company and the stockholders party thereto, as amended.

31

Table of Contents

Pursuant to the terms of the Merger Agreement, Fox or Merger Sub is obligated to loan the Company up to $69 million to fund the Company's purchase of the MySpace stock upon request. However, if the Merger Agreement were to be terminated, this loan obligation of Fox and Merger Sub would also terminate, and the Company would be required to seek other funding to complete its purchase of the shares of MySpace stock that the Company does not already own. If the loan is funded by Fox or Merger Sub, its repayment will be secured by all of the Company's assets, including the stock that it holds in MySpace, Inc. and all rights with respect to that stock; in the event that the Merger Agreement terminates after the Company has drawn upon the loan from Fox and consummated the purchase option for the equity interests in MySpace, Inc. that it does not already own, it may not have, or be able to obtain, sufficient funds to repay such loan and Fox may consequently have the right to foreclose upon the Company's equity interests in MySpace, Inc.

The Company expects to incur approximately $9.0 million in professional fees and other expenses related to the negotiation of the Merger Agreement and the consummation of the Merger, a substantial portion of which will be accrued or paid during the quarter ended September 30, 2005. This amount consists primarily of fees of the Company's two financial advisors of approximately $6.4 million, of which $4.9 million is contingent upon successful completion of the Merger; an estimated $2 million in fees and expenses of the Company's outside legal counsel; and approximately $53,000 in fees and expenses of the Company's independent auditors. In addition, the Company expects to engage a proxy solicitation firm and will incur printing and mailing expenses for the preparation of a proxy statement in connection with a special meeting of stockholders to be held for the purpose of approving the Merger.

We believe that the combination of cash on hand and anticipated cash generated from operations will be sufficient to fund our existing business for at least the next twelve months.

**Off Balance Sheet Arrangements**

At June 30, 2005, we had no off-balance sheet financing arrangements or undisclosed liabilities related to special purpose, related party, or unconsolidated entities.

**Contractual Obligations**

We lease facilities and equipment under various capital and operating lease agreements expiring at various dates through March 2008.

Our material contractual obligations at June 30, 2005 are as follow (in thousands):

| Contractual Obligations | Total Amounts Committed | 9 Months Ended March 31, 2006 | March 31, 2007 | Thereafter |
|---|---|---|---|---|
| Equipment financing notes | $ 2,400 | $ — | $ 850 | $ 1,550 |
| Litigation Settlement | 6,600 | 1,538 | 1,538 | 3,524 |
| Capital lease obligations | 21 | 11 | 6 | 4 |
| Operating lease obligations | 3,323 | 1,393 | 1,135 | 795 |
| Total contractual obligations | $ 12,344 | $ 2,942 | $ 3,529 | $ 5,873 |

**Risk Factors**

*Litigation and regulatory proceedings regarding our historical distribution of download applications could seriously harm our business.*

On April 28, 2005, the Attorney General of the State of New York (the "NY AG") commenced an action against the Company for alleged unlawful and deceptive acts and practices associated with the

32

Table of Contents

Company's distribution of toolbar, redirect and contextual ad serving applications ("downloads"). As previously announced, we reached an agreement in principle with the NY AG pursuant to which the Company now expects to pay a total of $7.5 million over three years to the State of New York and will discontinue distribution of its adware, redirect and toolbar programs. Final resolution of this matter is subject to agreement by the parties on the specific provisions of, and the Court's issuance of, a Stipulated Consent Decree memorializing the terms of the settlement. See Note 6 – Commitments and Contingencies of Notes to Consolidated Financial Statements for information on this and other legal proceedings.

*Failure or circumvention of our controls or procedures could seriously harm our business.*

An internal control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no system of controls can provide absolute assurance that all control issues, mistakes and instances of fraud, if any, within the Company have been or will be detected. The design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and we cannot assure you that any design will succeed in achieving its stated goals under all potential future conditions. Any failure of our controls and procedures to detect error or fraud could seriously harm our business and results of operations.

*We are exposed to potential risks resulting from new internal control evaluation and attestation requirements under Section 404 of the Sarbanes-Oxley Act of 2002.*

We are currently evaluating our internal controls in order to allow management to report on, and our independent auditors to attest to, our internal controls, as required by Section 404 of the Sarbanes-Oxley Act of 2002. While we are working diligently to complete these evaluations on a timely basis, it is possible that we may encounter unexpected delays in implementing the requirements relating to internal controls. Therefore, we cannot be certain about the timing of the completion of our evaluation, testing and remediation actions or the impact that these activities will have on our operations. We also expect to continue to incur significant expenses as a result of performing the continuing system and process evaluation, testing and remediation required in order to comply with the management certification and auditor attestation requirements. We currently expect to incur between $2.0 million and $2.5 million in external, third party costs during fiscal year 2006 in order to achieve initial compliance with Section 404.

If we are not able to timely comply with the requirements set forth in Section 404, we might be subject to sanctions or investigation by regulatory authorities. Any such action could adversely affect our business and results of operations. Additionally, if we have underestimated the resources or time necessary to achieve compliance, resulting cost overruns could adversely impact our results of operations.

*If we are unable to continue to develop compelling entertainment and other content for our network of websites and electronic newsletters, the Company's traffic, subscriber and user base may be reduced and our revenues could decrease.*

The online business market is relatively new, rapidly evolving and intensely competitive, and we expect competition will further intensify in the future. Similarly, the competition for website traffic and subscribers, as well as advertising revenues, both on Internet websites and in more traditional media, is intense. Barriers to entry are currently minimal, and current and new competitors can launch new websites and features and services at a relatively low cost. Competitive factors in providing entertainment and multi-channel products and services via the Internet include name recognition, variety of value-added offerings, ease of use, price, quality of service, availability of customer support and technical expertise. Our prospects for achieving our business objectives will depend heavily upon our ability to continuously provide high quality, entertaining content, along with user-friendly website features and value-added Internet products and services. If we fail to continue to attract a high volume of traffic for our websites or a

33

Table of Contents

broad subscriber base, revenues could decrease and our business, results of operations and financial condition could be materially adversely affected.

*Our business depends on our server and network hardware and software and our ability to expand network capacity.*

The performance of our server and networking hardware and software infrastructure is critical to our business and reputation and our ability to attract Web users, advertisers, members and e-commerce partners to our websites. An unexpected and/or substantial increase in the use of our websites could strain the capacity of our systems, which could lead to slower response time or system failures. Any slowdowns or system failures could adversely affect the speed and responsiveness of our websites and diminish the experience for our customers and members. If the usage of our websites substantially increases, we may need to purchase additional servers, networking equipment and bandwidth to maintain adequate data transmission speeds, the availability of which may be limited or the cost of which may be significant. Any system failure that causes an interruption in service or a decrease in the responsiveness of our websites could reduce traffic on our websites and, if sustained or repeated, could impair our reputation and the attractiveness of our brands as well as reduce revenue and negatively impact our operating results.

We rely on many different software applications, many of which have been developed internally. If these software applications fail, it could adversely affect our ability to provide our services. If we receive a significant unexpected increase in usage and are not able to rapidly expand our transaction-processing systems and network infrastructure without any systems interruptions, it could seriously harm our business and reputation.

*We depend on strategic relationships with our partners.*

We expect to generate significant commerce and advertising revenues from strategic relationships with certain outside companies. However, there can be no assurance that our existing relationships will be maintained through their initial terms or that additional third-party alliances will be available to the Company on acceptable commercial terms, or at all. In addition, the announcement of the Company's pending merger with a subsidiary of Fox Interactive Media, Inc. (the "Merger") could adversely affect some of our existing relationships or our ability to enter into new strategic alliances. The inability to enter into new strategic alliances or to maintain any one or more of our existing strategic alliances could result in decreased third-party paid advertising and product and service sales revenue. Even if we are able to maintain our strategic alliances, there can be no assurance that these alliances will be successful or that our infrastructure of hardware and software will be sufficient to handle any potential increased traffic or sales volume resulting from these alliances.

*We have a concentration of our business in certain products and vendors, and in two customers.*

Revenues from the sale of Hydroderm, Body Shape, Dream Shape and Body by Jake Carb Manager product lines accounted for approximately 68%, 14%, and 5%, respectively, of the first quarter of fiscal year 2006 product marketing segment revenues. Most of the products we sold during the fiscal quarter were purchased from five vendors. In addition, revenues from Yahoo! Search Marketing (formerly Overture Services, Inc.) and Advertising.com, Inc. were approximately 14% and 10%, respectively, of the first quarter of fiscal year 2006 network segment revenues. These concentrations of our business in certain products, vendors and customers create the risk of adverse financial impact if we are not able to continue to sell these products or source these products from our current vendors. We believe that we can mitigate the financial impact of the loss of a key vendor by sourcing an alternative vendor, but we cannot predict the timing of locating and qualifying the alternative vendor, or the pricing and terms that the alternative vendor might offer.

34

Table of Contents

*Our success depends on retaining our current key personnel and attracting additional key personnel.*

The Company is dependent on the services of key personnel, including our senior management, vice presidents, and business unit managers. Due to the specialized knowledge of these individuals, as it relates to our Company and our operations, if they were to terminate employment, we could have difficulty hiring qualified individuals to replace the personnel in a timely manner. Consequently, operations and productivity surrounding the vacated position may be impaired and cause an adverse effect on operating results. In addition, our success depends on our continuing ability to attract, hire, train and retain highly skilled managerial, technical, financial, sales, marketing and customer support personnel, particularly in the areas of content development, product development, website design, and sales and marketing. Competition for qualified personnel is intense, and our ability to retain key employees, or to attract or retain other highly qualified personnel, may be affected by the announcement of the Merger and recent adverse changes in our business and regulatory environment.

*If we do not effectively manage our growth, our business will be harmed.*

The scope of our operations and our workforce has expanded significantly in recent years and, in particular, in the past six months, and may continue to expand in the future. This growth requires significant time and resources of senior management, and may distract from other business initiatives. In addition, our management has expended and will continue to expend significant time and resources in preparing for the completion of our merger with Fox Interactive Media. If we are unable to effectively manage continued growth or focus the necessary resources on operating our business, our earnings could be adversely affected. In addition, we rely on the effectiveness of our financial reporting and data systems, which have become increasingly complex due to rapid expansion and diversification. Management of our business depends on the timeliness and accuracy of information provided by these systems, and if we do not adapt these systems to the rapid changes in the business, our business could be adversely affected.

*We may not be able to continue to grow through acquisitions of other companies and we may not manage the integration of acquired companies successfully.*

If the Merger is not completed, our future growth and profitability may depend in part upon our ability to identify companies that are suitable acquisition candidates, to acquire those companies upon acceptable terms, and to effectively integrate and expand their operations within our infrastructure. We may not be able to identify additional candidates that are suitable for acquisition or to consummate desired acquisitions on favorable terms. Acquisitions involve a number of special risks including the diversion of management's attention to the assimilation of the operations and personnel of the acquired companies, adverse short-term effects on our operating results, and the potential inability to integrate financial and management reporting systems. A significant portion of our capital resources could be used for these acquisitions. Accordingly, we may require additional debt or equity financing for future acquisitions, which may not be available on terms favorable to us, if at all. Moreover, we may not be able to successfully integrate an acquired business into our business or to operate an acquired business profitably. It could have a material adverse effect on our business if we are not able to identify appropriate acquisition candidates or integrate and expand the operations of acquired companies without excessive costs, delays or other adverse developments.

*Our previous acquisitions and any future acquisitions may require us to incur significant charges for goodwill and other intangible assets.*

We are required to review our intangible assets for impairment when events or changes in conditions may prevent the Company from recovering the carrying value. Furthermore, goodwill is required to be tested for impairment at least once per year. We may be required to record a material charge to earnings in our financial statements during the period in which we analyze our intangible assets for impairment. Furthermore, future cash flows associated with our various advertising segment properties may decline due to changes in market conditions or technology, thereby requiring an impairment assessment of the property's goodwill and other intangible assets.

35

Table of Contents

***If we are unable to protect our trademarks and other proprietary rights, our reputation and brand could be impaired, and we could lose customers.***

We regard our trademarks, trade secrets and similar intellectual property as valuable to our business, and rely on trademark and copyright law, trade secret protection and confidentiality or license agreements with our employees, partners and others to protect our proprietary rights. There can be no assurance that the steps taken by us will be adequate to prevent misappropriation or infringement of our proprietary property. Some of our trademarks or service marks are registered with the United States Patent and Trademark Office, and we are currently applying for registration of a number of other trademarks and service marks. Completion of our applications for these trademarks and service marks may not be successful.

***If we are unable to protect our domain names, our reputation and brand could be impaired, and we could lose customers.***

We own numerous Internet domain names. National and international Internet regulatory bodies generally regulate the registration of domain names. The regulation of domain names in the United States and in other countries is subject to change. Regulatory bodies could establish additional top-level domains, appoint additional domain name registrars or modify the requirements for holding domain names. As a result, we might not be able to maintain our domain names or obtain comparable domain names in all the countries in which we conduct business, which could harm our business. Furthermore, the relationship between regulations governing domain names and laws protecting trademarks, service marks and similar proprietary rights is unclear and still evolving. Therefore, we might be unable to prevent third parties from acquiring domain names that infringe or otherwise decrease the value of our trademarks and other proprietary rights.

***We compete in new and rapidly evolving markets, which make it difficult to evaluate our future prospects based on historical operating results.***

We have historically repositioned our service and product offerings to adjust to evolving customer requirements and competitive pressures. Our prospects for financial success must be considered in light of the risks, expenses and difficulties frequently encountered by companies in new, unproven and rapidly evolving markets, such as the Internet market. To address these risks, we must, among other things, expand our customer base, respond effectively to competitive developments, continue to attract, retain and motivate qualified employees, and continue to upgrade our technologies. If we are not successful in further developing and expanding our entertainment content, product and services businesses, and other related business opportunities, our ability to generate and increase profitability may not be achieved and our market price may decline.

***Our quarterly and long-term operating results are volatile and difficult to predict.***

Due to the nature of our business, our future operating results may fluctuate. If we are unable to meet the expectations of investors and public market analysts, the market price of our common stock may decrease. We expect to experience fluctuations in future quarterly and annual operating results that may be caused by a variety of factors, many of which are outside our control. Factors that may affect our operating results include:

- our ability to increase our current level of e-commerce merchandise sales;

- our ability to purchase online advertising at competitive rates to attract new e-commerce customers;

- our reliance on three principal suppliers of e-commerce merchandise;

- our ability to retain existing users, attract new users and maintain user satisfaction;

- the announcement or introduction of new or enhanced content, websites, products and services, and strategic partnerships by us and our competitors;

- the level of use of the Internet and increasing consumer acceptance of the Internet for entertainment and the purchase of products and services;

- our ability to upgrade and develop our systems and infrastructure in a timely and effective manner; and

36

Table of Contents

- the amount and timing of operating costs and capital expenditures relating to expansion of our business, operations and infrastructure and the implementation of marketing programs, key agreements and strategic partnerships and general economic conditions.

*We may face litigation for information retrieved from the Internet.*

We could be sued for information retrieved from the Internet. Because material may be downloaded from websites and may be subsequently distributed to others, there is a potential that claims could be made against us, based on the nature and content of the material under legal theories such as defamation, negligence, copyright or trademark infringement or other theories. Such claims have been brought against online companies in the past. In addition, we could be exposed to liability for material that may be accessible through our products, services and websites, including claims asserting that, by providing hypertext links to websites operated by third parties, we are liable for wrongful actions by those third-parties through the websites. Although we carry general liability insurance, our insurance may not cover potential claims of this type, or the level of coverage may not be adequate to fully protect us against all liability that may be imposed. Any costs or imposition of liability or legal defense expenses that are not covered by insurance or are in excess of insurance coverage could reduce our working capital and have a material adverse effect on our business, results of operations and financial condition. Also, the legal effectiveness of the terms and conditions of use of our websites is not certain.

*Changes in government regulation and legal uncertainties could reduce demand for our products and services or increase the cost of doing business.*

Government regulation and legal uncertainties could increase our costs and risks of doing business on the Internet. There are currently few laws or regulations that specifically regulate commerce on the Internet. Moreover, it may take years to determine the extent to which existing laws relating to issues such as property ownership, defamation, taxation and personal privacy are applicable to the Internet. The application of existing laws, the adoption of new laws and regulations in the future, or increased regulatory scrutiny with respect to issues such as user privacy, pricing, taxation and the characteristics and quality of products and services, could create uncertainty in the Internet marketplace. The uncertainty created could reduce demand for our products and services, or increase the cost of doing business due to increased costs of litigation, regulatory inquiries or increased service delivery costs.

The CAN-SPAM Act of 2003, a federal law that impacts the way certain commercial E-mails are sent over the Internet, took effect January 1, 2004 and preempted most state commercial E-mail laws. Penalties for failure to comply with the CAN-SPAM Act include significant fines, forfeiture of property and imprisonment. This law and other laws or regulations that impact E-mail advertising could reduce our revenues.

The Federal Trade Commission and other governmental or regulatory bodies have increasingly focused on issues impacting online marketing practices and consumer protection. In our judgment, the marketing claims we make in advertisements we place to obtain new e-commerce customers are adequately supported. Governmental or regulatory bodies may make a different judgment about the adequacy of the support for the marketing claims we make. We could be subject to regulatory proceedings for past marketing campaigns, and we could be required to make changes in our future marketing claims, either of which could adversely affect our revenues.

*As our websites grow in popularity, we could be subjected to claims and incur compliance costs related to improper conduct by users.*

Websites that facilitate social interaction among users are core to the Company's growth strategy. Online social interaction involves inherent risks that are not unique to our sites. The anonymity provided by the Internet can facilitate unlawful behavior. The terms of use of our websites prohibit a broad range of

37

Table of Contents

unlawful or undesirable conduct. Nevertheless, although we have a variety of measures in place to enforce these terms of use, the nature of online social interaction poses enforcement challenges. We are unable to block access in all instances to users who are determined to gain access to our sites for improper motives. Although we do not believe that current law subjects the Company to liability for the activities of such users, this area of law is unsettled. Claims may be threatened or brought against us using various legal theories based on the nature and content of information that may be posted online or generated by our users. Investigating and defending any of these types of claims could be expensive, even to the extent that the claims do not ultimately result in liability.

*If the delivery of Internet advertising on the Web, or the delivery of our E-mail messages, is limited or blocked, demand for our products and services may decline.*

Our business may be adversely affected by the adoption by computer users of technologies that impact access to our products and services. For example, computer users may use software designed to filter or prevent the delivery of Internet advertising or deploy Internet browsers set to block the use of cookies. Microsoft Corporation has released Windows XP Service Pack 2 that adds pop-up blocking features to Internet Explorer. In addition, many Internet service providers and certain search engines have introduced anti-pop-up tools or agreed not to sell pop-ups to third parties. The number of computer users who employ these or other similar technologies is likely to increase, thereby diminishing the efficacy of our products and services. In the case that one or more of these technologies becomes widely adopted by computer users, demand for our products and services would decline.

We also depend on our ability to deliver E-mails through Internet service providers and private networks. Internet service providers are able to block messages from reaching their users and we do not have, nor are we required to have, agreements with any Internet service providers to deliver E-mails to their customers. As a result, we could experience periodic blockages of the delivery of E-mails to their customers, which would limit the effectiveness of our E-mail marketing. Some Internet service providers also use proprietary technologies to handle and deliver E-mail. If Internet service providers materially limit or block the delivery of our E-mails, or if our technology fails to be compatible with these Internet service providers' E-mail technologies, then our business, results of operations or financial condition could be materially and adversely affected. In addition, the effectiveness of E-mail marketing may decrease as a result of increased consumer resistance to E-mail marketing in general.

*Litigation and regulatory proceedings regarding the restatement of our financial statements could seriously harm our business.*

As previously reported, a consolidated stockholder lawsuit styled as a class action is pending against the Company, several of its current and former officers and/or employees, and the Company's former auditor (the "Securities Litigation"). The Securities Litigation arises out of the Company's restatement of quarterly financial results for fiscal year 2003. As a result of mediation in November 2004, the parties entered into a Stipulation of Settlement in January 2005 pursuant to which the parties propose to settle the Securities Litigation for $5.5 million in cash paid by the Company's insurance carriers. The Court has recently preliminarily approved the settlement and formal notice of the settlement has been mailed to class members. The Court has scheduled a hearing regarding final approval of the settlement and dismissal of the lawsuit for September 19, 2005. Also as previously reported, two purported stockholder derivative actions, which are substantially similar, were filed in May 2003 against various current and former directors, officers, and/or employees of the Company (collectively, the "Derivative Litigation"). One of the actions remains pending in Federal Court (the "Federal Court Derivative Action") and the other was dismissed by the Superior Court of California for the County of Los Angeles in October 2004 (the "State Court Derivative Action"). The Derivative Litigation similarly arises out of the Company's restatement of quarterly financial results for fiscal year 2003. See Note 6 – Commitments and Contingencies of Notes to Consolidated Financial Statements for more information on this and other legal proceedings.

38

Table of Contents

***We may be not able to keep pace with rapid technological changes in the Internet industry, which could cause us to lose customers and revenue.***

Rapid technological developments, evolving industry standards and user demands, and frequent new product introductions and enhancements characterize the market for Internet products and services. These market characteristics are exacerbated by the emerging nature of the market and the fact that many companies are expected to introduce new Internet products and services in the near future. Our future success will depend on our ability to continually improve our content offerings and products and services. In addition, the widespread adoption of developing multimedia-enabling technologies could require fundamental and costly changes in our technology and could fundamentally affect the nature, viability and measurability of Internet-based advertising and direct marketing, which may harm our business.

***Our operations could be significantly hindered by the occurrence of a natural disaster or other catastrophic event.***

Significant portions of our operations are located in California, which is susceptible to earthquakes and other natural disasters. In addition, our operations are susceptible to outages due to "rolling black-outs", fire, floods, telecommunication failures, break-ins, and other natural disasters. We have multiple website capacity to minimize disruption to our services; however, not all services provided by the Company are supported by such redundancy. Despite our implementation of network security measures, our services may become vulnerable to new computer viruses and similar disruptions from unauthorized tampering with our computer systems or personal computers for individuals.

***We may issue securities with rights superior to those of our common stock, which could materially limit the ownership rights of existing stockholders.***

The Merger Agreement generally prohibits us from issuing securities other than shares of common stock issuable upon conversion or exercise of outstanding shares of preferred stock, options or warrants. Nevertheless, if the Merger is not consummated, we may issue additional preferred stock at such time or times and for such consideration as the Board of Directors may determine. Each series of preferred stock is required to be designated so as to distinguish the shares thereof from the shares of all other series. The Board of Directors is expressly authorized, subject to the limitations prescribed by law and the provisions of our Certificate of Incorporation, to provide for the issuance of all or any shares of preferred stock, in one or more series, each with such designations, preferences, voting powers, relative, participating, optional or other special rights and privileges and such qualifications, limitations or restrictions thereof as are determined by the Board of Directors.

In addition, our Certificate of Incorporation authorizes "blank check" preferred stock. Our Board of Directors can set the voting, redemption, conversion and other rights relating to the preferred stock and can issue the stock in either a private or public transaction. The issuance of preferred stock may have the effect of delaying or preventing a change in control of the Company without further stockholder action and may adversely affect the rights and powers of the holders of our common stock, including voting rights, rights to receive dividends and rights to payments upon liquidation. In certain circumstances, the issuance of preferred stock could depress the market price of our common stock, and could encourage persons considering unsolicited tender offers or other unilateral takeover proposals to negotiate with our Board of Directors rather than pursue non-negotiated takeover attempts.

***We have many potentially dilutive securities outstanding.***

As of June 30, 2005, we had outstanding options to purchase 9,191,000 shares of Company common stock and warrants to purchase 170,000 shares of Company common stock.

39

Table of Contents

As of June 30, 2005, we had 194,000 shares of Series A preferred stock outstanding. The Series A preferred stock is convertible into common stock at the then-applicable conversion rate. The Series A preferred stock has a $3.60 per share liquidation preference that increases at the rate of 6% per annum. Each share of Series A preferred stock is convertible into common stock at a rate of one share of common stock for each $3.60 of liquidation preference. The liquidation preference was $4.94 as of June 30, 2005. Because of the 6% accretion factor, each share of Series A preferred stock will be converted into greater than one share of common stock. Prior to any conversion, the conversion price is also adjusted to account for any increase or decrease in the number of outstanding shares of common stock by stock split, stock dividend, or issuance of additional equity securities (other than those reserved as employee shares pursuant to any employee stock option plan) at a purchase price less than the then-current conversion price.

As of June 30, 2005, we had 1,750,000 shares of Series B preferred stock outstanding. The Series B preferred stock is convertible into common stock at the then-applicable conversion rate. The Series B preferred stock has a $2.60 per share liquidation preference. Each share of Series B is convertible into common stock at an initial rate of one share of common stock for each $2.60 of liquidation preference. Prior to any conversion, the conversion price is adjusted for any increase or decrease in the number of outstanding shares of common stock by stock split, stock dividend or other similar event. The conversion price per share of Series B may be adjusted downward if we issue additional equity securities other than certain excluded stock, without consideration or for consideration per share less than the then-current conversion price.

As of June 30, 2005, we had 3,786,575 shares of Series C preferred stock, and 1,325,000 shares of our Series C-1 preferred stock, outstanding. The Series C preferred stock is convertible into common stock at the then-applicable conversion rate. The Series C and C-1 preferred stock have a $1.50 and $2 per share liquidation preference, respectively. Each share of Series C is convertible into common stock at an initial rate of one share of common stock for each $1.50 of liquidation preference. Each share of Series C-1 is convertible into common stock at an initial rate of one share of common stock for each $2 of liquidation preference. Prior to any conversion, the conversion price is adjusted to account for any increase or decrease in the number of outstanding shares of common stock by stock split, stock dividend or other similar event. The conversion price per share of Series C or C-1 may be adjusted downward if we issue additional equity securities other than certain excluded stock, without consideration or for consideration per share less than the then-current conversion price. The Series C and C-1 preferred stockholders earn an 8% annual dividend paid in additional Series C or C-1 preferred stock, as the case may be, for a period of one year after issuance ("PIK Dividend"). All Series C PIK Dividend has been paid or issued. We will issue an additional 25,000 shares of Series C-1 preferred stock as PIK Dividend on September 30, 2005.

The issuance of common stock upon the exercise of outstanding options and warrants, or the conversion of any outstanding or newly issued shares of preferred stock, will cause dilution to existing common stockholders and could adversely affect the market price of our common stock. In addition, the Series A, Series B, Series C and Series C-1 preferred stock, the 1,643,000 shares of common stock issued in November 2003, the 1,000,000 shares of common stock and warrants to purchase 150,000 shares of common stock issued in December 2004, and the 75,000 shares of common stock and warrants to purchase 11,250 shares of common stock issued in July 2005 are unregistered and the holders of these securities have registration rights. If the Merger is not consummated, we anticipate filing a Form S-3, if available to us, to register the 1,000,000 shares of common stock and 150,000 shares of common stock underlying the warrants that were issued in December 2004. When the registration statement is filed and if the other registration rights are exercised and the stock is re-sold in the market, the market price of our common stock could be adversely affected.

***Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance if the Merger is not completed.***

The trading price of our common stock has been and may continue to be subject to wide fluctuations. During the first quarter ended June 30, 2005, the closing sale prices of our common stock ranged from $3.60 to $8.79 per share and the closing sale price on July 15, 2005, the last trading day prior

40

Table of Contents

to the announcement of the Merger, was $10.72 per share. The Merger Agreement provides for a cash payment in the amount of $12.00 for each outstanding share of our common stock at the time of closing. If the Merger is not consummated, our stock price may decline significantly or fluctuate in response to a number of events and factors, such as market expectations regarding strategic alternatives; quarterly variations in operating results; announcements of technological innovations or new services and media properties by us or our competitors; changes in financial estimates and recommendations by securities analysts; the operating and stock price performance of other companies that investors may deem comparable to us; and news reports relating to trends in our markets or general economic conditions.

In addition, the stock market in general, and the market prices for Internet-related companies in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. These broad market and industry fluctuations may adversely affect the price of our stock, regardless of our operating performance. Additionally, if the Merger is not consummated, volatility or a lack of positive performance in our stock price may adversely affect our ability to retain key employees, all of whom have been granted stock options.

Item 3.    Quantitative and Qualitative Disclosures about Market Risk

Our short-term investment policy and strategy is to ensure the preservation of capital, meet liquidity requirements, and optimize return in light of current credit and interest rate trends. We benchmark our performance by utilizing external banking executives to manage the short-term investments. The external banking executives adhere to our investment policies and also provide occasional research and market information that supplements internal research used to make credit decisions in the investment process.

We place our short-term investments in highly liquid securities issued by high credit quality issuers and, by policy, limits the amount of credit exposure to any one issuer. Our general policy is to limit the risk of principal loss and ensure the safety of invested funds by limiting market and credit risk. All highly liquid investments with initial maturities of three months or less are classified as cash equivalents. We do not have investments with maturities of greater than three months, except for certificates of deposit used as collateral on certain long-term operating leases.

Item 4.    Controls and Procedures Overview

In August 2003, we restated previously reported financial results for the first three quarters of fiscal year 2003 due to the discovery of accounting errors in our fiscal year 2003 quarterly financial statements. In response to the identified accounting errors, management significantly expanded the size of our accounting and finance departments and reviewed the adequacy of internal controls over financial reporting. We identified various deficiencies in the design or operation of internal controls in major business processes that could have an impact on financial reporting. Our independent auditors confirmed the continued existence of certain of these deficiencies during their audit of our fiscal year 2004 financial statements.

We implemented a number of remedial controls and other actions designed to improve our accounting and financial reporting procedures and controls in fiscal years 2004 and 2005. These changes constituted enhancing and restructuring the general ledger system, so that is more appropriate to the anticipated size and complexity of our business operations. The integration of the enhanced general ledger system with our existing business applications is ongoing, and management expects the integration to be completed in six to nine months.

We adopted supplemental control measures in fiscal years 2004 and 2005 that were designed to mitigate the effect of the identified control deficiencies, including the deficiencies confirmed by our independent auditors during their audit of our fiscal year 2004 financial statements. The supplemental control measures will be eliminated once the integrated general ledger system is fully implemented and other identified control deficiencies over financial reporting are corrected.

41

<u>Table of Contents</u>

We are currently evaluating our internal controls in order to allow management to report on, and our independent auditors to attest to, our internal controls, as required by Section 404 of the Sarbanes-Oxley Act of 2002. While we are working diligently to complete these evaluations on a timely basis, it is possible that we may encounter unexpected delays in implementing the requirements relating to internal controls. Therefore, we cannot be certain about the timing of the completion of our evaluation, testing and remediation actions or the impact that these activities will have on our operations since there is no precedent yet available by which to measure the adequacy of our compliance. We also expect to continue to incur significant expenses as a result of performing the continuing system and process evaluation, testing and remediation required in order to comply with the management certification and auditor attestation requirements. If we are not able to timely comply with the requirements set forth in Section 404, we might be subject to sanctions or investigation by regulatory authorities. Any such action could adversely affect our business and results of operations.

**Evaluation of Disclosure Controls and Procedures**

We have evaluated the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, as of June 30, 2005, the end of the period covered by this report. This evaluation was done under the supervision and with the participation of management, including our Chief Executive Officer and our Chief Financial Officer.

Our Chief Executive Officer and Chief Financial Officer have concluded that, as of June 30, 2005, our disclosure controls and procedures were effective at the reasonable assurance level to ensure that information we are required to disclose in the reports that we file with the Securities and Exchange Commission was recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.

**Changes to Internal Control over Financial Reporting**

There has been no material changes to the Internal control over financial reporting since previous reporting period.

**PART II – OTHER INFORMATION**

**Item 1.     Legal Proceedings**

See Note 6 – Commitments and Contingencies of Notes to Consolidated Financial Statements (Part 1, Item 1) for information on legal proceedings.

**Item 6.     Exhibits**

See Exhibit Index.

42

Table of Contents

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Intermix Media, Inc. (Registrant)

By:       /s/ Richard M. Rosenblatt

        **Richard M. Rosenblatt**
        **Chief Executive Officer**

By:       /s/ Lisa Terrill

        **Lisa Terrill**
        **Chief Financial Officer**
        **(Principal Financial Officer)**

Dated: August 15, 2005

43

Table of Contents

Exhibit Index

| Exhibit Number | Exhibit Title/Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger, dated as of July 18, 2005, by and among Fox Interactive Media, Inc., Project Ivory Acquisition Corporation and Intermix Media, Inc. (1) |
| 3.01 | Certificate of Incorporation of eUniverse, Inc. dated October 31, 2002(2) |
| 3.02 | Certificate of Designation of Series A 6% Convertible Preferred Stock of eUniverse, Inc., dated October 31, 2002(2) |
| 3.03 | Certificate of Amendment of Certificate of Designation of Series A 6% Convertible Preferred Stock of cUniverse, Inc., dated February 17, 2004(3) |
| 3.04 | Certificate of Designation of Series B Convertible Preferred Stock of eUniverse, Inc., dated October 31, 2002 (2) |
| 3.05 | Certificate of Amendment of Certificate of Designation of Series B Convertible Preferred Stock of eUniverse, Inc., dated February 17, 2004(3) |
| 3.06 | Certificate of Designation of Series C Convertible Preferred Stock of eUniverse, Inc., dated October 31, 2003 (4) |
| 3.07 | Certificate of Designation of Series C-1 Convertible Preferred Stock of eUniverse, Inc., dated October 31, 2003 (4) |
| 3.08 | Bylaws of Intermix Media, Inc.(5) |
| 10.01 | First Amendment to Sublease dated April 1, 2005, between Rubin Postaer and Associates and MySpace, Inc. (6) |
| 10.02 | Equipment Loan and Security Agreement dated June 17, 2005, between MySpace, Inc. and Pinnacle Ventures, L.L.C. as agent for the Lenders named therein* |
| 10.03 | Subordination Agreement dated June 17, 2005, between the Company and Pinnacle Ventures, L.L.C. as agent for the Lenders* |
| 10.04 | Amendment No. 1 to Stockholders Agreement dated June 17, 2005, among the Company, MySpace, Inc., MySpace Ventures LLC, affiliates of Redpoint Ventures and the Lenders* |
| 10.05 | Certificate of Amendment to the Certificate of Incorporation of MySpace, Inc., filed with the Delaware Secretary of State on June 16, 2005* |
| 10.06 | Amendment No. 2 to MySpace, Inc. 2005 Equity Incentive Plan (6) |
| 31.01 | Certification of the Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002* |
| 31.02 | Certification of the Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002* |
| 32 | Certification of the Chief Executive Officer and the Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002* |

\*   Filed herewith

(1)   Incorporated by reference to the Form 8-K filed on July 19, 2005

(2)   Incorporated by reference to the Form 8-K filed on January 9, 2003

(3)   Incorporated by reference to the Form 10-K filed on June 14, 2004

(4)   Incorporated by reference to the Form 8-K filed on November 6, 2003

(5)   Incorporated by reference to the Form 10-Q filed on August 13, 2004

(6)   Incorporated by reference to the Form 10-K filed on June 29, 2005

EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AD HOC COMMITTEE OF EQUITY          :
HOLDERS OF TECTONIC NETWORK, INC., :

        Plaintiff,          :

        v.          :     No. 06-665- GMS-MPT

          :

AROL WOLFORD; SHERWIN KRUG;       :
CHARLES MCROBERTS; JOHN            :
MCROBERTS; CHARLES PECCHIO, JR. ;  :
LAURA ROGERS; and THEO             :
VANDERBOOM,                         :

        Defendants.    :

          :

STATE OF GEORGIA    )
               ) ss.:
COUNTY OF FULTON    )

## AFFIDAVIT OF AROL WOLFORD

Personally appeared before the undersigned officer, duly authorized to administer oaths, Arol Wolford, who after being duly sworn, deposes and states as follows:

1.    I am over the age of eighteen and have personal knowledge of the matters set forth herein.

2.    At all times relevant hereto I served as an officer of Tectonic Network, Inc.

3.    The agreement attached hereto as Exhibit "1" is a true and correct copy of an agreement between Sharon Will, or her company Saggi Capital, and Tectonic Network, Inc.

4.    The agreement attached hereto as Exhibit "2" is a true and correct copy of an agreement between Harris Freedman, or his company Bridge Ventures, Inc., and Tectonic Network, Inc.

5.    Freedman and Will, or their companies, received $5,000 per month pursuant to their aforesaid agreements with Tectonic. From 2002 to 2006, both Freedman and Will received upwards of $190,000 for their services. Each provided "management consulting," which encompassed several roles. Among other things, Will provided investor relations services, and she is listed as the Investor Relations Contact on several of Tectonic's press releases. (Attached hereto as Exhibit "3" is a true and accurate copy of a press release she prepared.) As part of that role, she regularly assisted in soliciting investments. (Attached hereto as Exhibits "4" and "5" are true and correct copies of ROI-Investor Relations emails sent to Will.) Freedman also assisted in this effort. (Attached hereto are as Exhibits "6" and "7" are true and accurate copies of the Private Placement and Thank You emails sent to Will and Freedman.) Because of their role as investment relations consultants, they regularly received confidential financial and operational information about Tectonic. (Attached hereto as Exhibit "8" is a true and accurate copy of a Pro-Forma Balance Sheet –Confidential email sent to Will and Freedman.) Both individuals communicated heavily with the CEO and CFO of Tectonic, and they sometimes attended Board Meetings or communicated directly with the Board.

I declare under penalty of perjury under the laws of the State of Georgia that the foregoing is true and correct.

This 25th day of July, 2008.

_____
Arol Wolford

Sworn to and subscribed before
me this 25 day of July, 2008.

_____
Notary Public

EXHIBIT 1

 

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT ("Agreement") is made and entered into as of the 1st day of May, 2002, by and between RETURN ON INVESTMENT CORPORATION (formerly NET/TECH INTERNATIONAL, INC.), a corporation organized and existing under the laws of the State of Delaware ("ROI"), whose address is 1825 Barrett Lakes Boulevard, Suite 260, Kennesaw, GA 30144, and SAGGI CAPITAL CORP., a corporation organized and existing under the laws of the State of New York ("Saggi"), whose address is 9 Prospect Hill Road Ext., Pine Plains, NY 12567.

### WITNESSETH:

WHEREAS, ROI and Saggi are parties to that certain CONSULTING AGREEMENT dated January 12, 2000 (the "2000 Agreement"); and

WHEREAS, the parties desire to terminate the 2000 Agreement and to have Saggi provide certain consulting services and assistance to ROI subject to the terms, provisions, conditions and limitations set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises, the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto do hereby mutually covenant and agree as follows:

1.  Termination, Services, Payment, Term.  The 2000 Agreement is hereby terminated as of April 30, 2002, and is of no further force and effect.  Commencing with the date of this Agreement, Saggi will provide assistance to ROI as a management consultant.  ROI agrees to pay Saggi a fee for the services provided hereunder in the amount of $5,000.00 per month, commencing with the date of this Agreement and continuing for a total of thirty-four (34) months whereupon this Agreement shall be terminated unless extended in writing by the parties hereto.

2.  Warrants.  The parties agree that the warrants issued to Saggi in conjunction with the 2000 Agreement for the purchase of common stock of ROI (the "2000 Warrants") are not affected by this Agreement or the termination of the 2000 Agreement and shall remain in full force and effect.

3.  Assignment; Obligations.  Except as permitted herein, none of the parties to this Agreement may assign its respective rights and obligations hereunder without the prior written consent of the other parties hereto.  Each party hereunder shall be responsible for the payment of any costs or expenses incurred by such party related to this Agreement, whether or not this Agreement is terminated for any reason.  Upon any such termination, no party hereunder shall have any obligation related to this Agreement to any other party hereunder.

4.  Terminology and Section Headings.  All personal pronouns in this Agreement, whether used in the masculine, feminine or neuter gender shall include all other genders; the singular shall include the plural and the plural shall include the singular.  Titles of Paragraphs are for convenience only, and neither limit nor amplify the provisions of this Agreement.

5.    Binding Effect.  Subject to the restrictions on assignments set forth in this Agreement, this Agreement and the rights of the parties hereunder shall inure to the benefit of and be binding upon the parties and their respective legal representatives, successors and assigns.  Whenever in this Agreement a reference is made to one of the parties, such reference shall be deemed to include a reference to the legal representatives, successors and assigns of such party.

6.    Severability.  This Agreement shall be governed by and construed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations.  If any provision of this Agreement, or the application thereof to any person or circumstance, shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

7.    Interpretation.  In construing the terms and provisions of this Agreement, it is understood and agreed that no court or other interpretive body shall apply a presumption that the terms of this Agreement shall be more strictly or particularly construed against one party hereto by reason of the fact that said party, either directly or through its agents, prepared this Agreement, it being understood and agreed that all parties, either directly or through their agents, have fully participated in the preparation hereof.

8.    Definitions.  For purposes of this Agreement:

A.    Confidential Information means any and all data and information relating to ROI or its affiliates and their respective business activities (whether constituting a Trade Secret, as hereinafter defined, or not), (i) which is or has been disclosed to Saggi, or of which Saggi becomes aware as a consequence of or through Saggi's relationship with ROI, and (ii) which has value to ROI and is not generally known by its competitors or the public.  Confidential Information shall not include any data or information (i) that has been voluntarily disclosed to the public by ROI or has become generally known to the public (except where such public disclosure has been made by or through Saggi or by a third person or entity with the knowledge of Saggi without the written consent of ROI); (ii) that has been independently developed and disclosed by parties other than Saggi or ROI to Saggi or to the public generally without a breach of any obligation of confidentiality by any such person running directly or indirectly to ROI; or (iii) that otherwise enters the public domain through lawful means.  Confidential Information may include, but is not limited to, information relating to the financial affairs, products, processes, services, customers, research, development, inventions, manufacturing, purchasing, accounting, engineering, computer programs, sales plans, expansion plans, distribution systems and marketing of ROI.

B.    Trade Secrets means information including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  Trade Secrets shall not include any data or information (i) that has been voluntarily disclosed to the public by ROI (except where

such public disclosure has been made by or through Saggi or by a third person or entity with the knowledge of Saggi without the written consent of ROI; (ii) that has been independently developed and disclosed by parties other than Saggi or ROI to Saggi or to the public generally without a breach of any obligation of confidentiality by any such person running directly or indirectly to ROI; or (iii) that otherwise enters the public domain through lawful means.

    9.    <u>Confidential Information</u>.  All information given to Saggi by ROI, all services or other work performed by Saggi hereunder, and any updates thereto shall be deemed "Confidential Information" for purposes of this Agreement. During the term of this Agreement and for a period of two (2) years after the termination of this Agreement, (i) Saggi shall not use or disclose any of the Confidential Information without ROI's prior written permission, and (ii) Saggi will not, without the prior written permission of ROI, use the Confidential Information for any purpose other than that required for the services to be provided hereunder. Saggi represents that it has no obligations or commitments inconsistent with this Agreement. Upon termination of Saggi's relationship with ROI and ROI, Saggi shall promptly return to ROI all materials containing Confidential Information, including any and all extracts and copies thereof. Saggi agrees that the remedy at law of ROI would be inadequate as to any unauthorized use or disclosure of Confidential Information by Saggi and Saggi agrees that ROI shall be entitled to preliminary and permanent injunctions in any court of competent jurisdiction to prevent such unauthorized use or disclosure by Saggi.

    10.    <u>Independent Contractor</u>.  Saggi is an independent contractor and is not an agent, a partner or joint venture of ROI. Unless otherwise agreed to in advance in writing by ROI, Saggi shall be responsible for all of its own expenses related to activities hereunder. Saggi shall not, orally or in writing, accept, approve or execute any letter, document, order or agreement on behalf of, or in the name of ROI, nor shall Saggi represent itself to be an agent of ROI. Saggi shall be solely responsible for any and all taxes of any kind related to Saggi's compensation hereunder and the warrants granted hereunder and shall indemnify ROI against any claims related to such taxes.

    11.    <u>Indemnification</u>.  (a) <u>ROI Indemnity</u>.  ROI shall indemnify and hold harmless Saggi, its affiliates, officers, directors and partners, counsel, and controlling persons against any losses, claims, damages or liabilities (joint or several) to which it may become subject under the Securities Act of 1933 ("Act"), the Securities Exchange Act of 1934 ("Exchange Act") or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise solely out of or are based solely upon any of the following statements, omissions or violations (collectively a "Violation"): (i) any breach by ROI of any representation, warranty, or covenant condition of this Agreement (ii) any untrue statement or alleged untrue statement of a material fact contained in any registration statements filed with the Securities and Exchange Commission by ROI, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (iii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (iv) any violation or alleged violation by ROI of the Act or the Exchange Act, or (v) any violation or alleged violation by ROI of any state securities law or any rule or regulation promulgated under the Act, the Exchange Act or any state securities law. ROI shall reimburse Saggi, its affiliates, officers, directors or partners,

Securities Exchange Act of 1934 ("Exchange Act") or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise solely out of or are based solely upon any of the following statements, omissions or violations (collectively a "Violation"): (i) any breach by Saggi of any representation, warranty, or covenant condition of this Agreement (ii) any untrue statement or alleged untrue statement of a material fact contained in any documents created by Saggi, (iii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (iv) any violation or alleged violation by Saggi of the Act or the Exchange Act, or (v) any violation or alleged violation by Saggi of any state securities law or any rule or regulation promulgated under the Act, the Exchange Act or any state securities law.   Saggi shall reimburse ROI, its affiliates, officers, directors or partners, or controlling persons for any legal expenses incurred by them in connection with defending any such loss, claim, damage, liability or action.

12.     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.  Any litigation to enforce or interpret this Agreement shall take place in the state or federal courts located in the State of Delaware.  Such courts shall apply the law of the State of Georgia as to both substantive and procedural questions.

13.     Entire Agreement.  Except as specifically provided in this Agreement to the contrary, this Agreement constitutes the entire agreement between the parties hereto regarding the subject matter hereof, and no modification hereof shall be effective unless made a supplemental agreement in writing executed by the parties affected by such supplemental agreement.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed in multiple counterparts, each of which shall be deemed an original, with their respective seals affixed thereto all as of the date and year first above written.

RETURN ON INVESTMENT CORPORATION

By:_____
    Its:_____


SAGGI CAPITAL CORP.

By:_____
    Its:_____

4

DEC-22-2004 14:00 FROM:SAGGI CAPITAL          5183986369          TO:6787974602          P.001
          Dec 22 04 03:34p          roi                              770 517 4760          p.2

ADDENDUM

SAGGI CAPITAL CORP. CONSULTING AGREEMENT

This addendum to the consulting agreement between Saggi Capital Corp. ("Saggi") and Return On Investment Corp. dated May 2, 2002 (the "Agreement") provides for an extension of Saggi's services pursuant to the Agreement for an additional eighteen (18) months. Accordingly, the Agreement will terminate on August 31, 2006.

RETURN ON INVESTMENT CORP.

By: _____

SAGGI CAPITAL CORP.

By: _____

EXHIBIT 2

 

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT ("Agreement") is made and entered into as of the 1st day of May, 2002, by and between RETURN ON INVESTMENT CORPORATION (formerly NET/TECH INTERNATIONAL, INC.), a corporation organized and existing under the laws of the State of Delaware ("ROI"), whose address is 1825 Barrett Lakes Boulevard, Suite 260, Kennesaw, GA 30144, and BRIDGE VENTURES, INC., a corporation organized and existing under the laws of the State of Florida ("Bridge"), whose address is 1241 Gulf of Mexico Drive, Longboat Key, FL 34228.

### WITNESSETH:

WHEREAS, ROI and Bridge are parties to that certain CONSULTING AGREEMENT dated January 5, 2000 (the "2000 Agreement"); and

WHEREAS, the parties desire to terminate the 2000 Agreement and to have Bridge provide certain consulting services and assistance to ROI subject to the terms, provisions, conditions and limitations set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises, the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto do hereby mutually covenant and agree as follows:

1.     Termination, Services, Payment, Term. The 2000 Agreement is hereby terminated as of April 30, 2002, and is of no further force and effect. Commencing with the date of this Agreement, Bridge will provide assistance to ROI in acquisitions, mergers, and strategic planning. ROI agrees to pay Bridge a fee for the services provided hereunder in the amount of $5,000.00 per month, commencing with the date of this Agreement and continuing for a total of thirty-four (34) months whereupon this Agreement shall be terminated unless extended in writing by the parties hereto.

2.     Warrants. The parties agree that the warrants issued to Bridge in conjunction with the 2000 Agreement for the purchase of common stock of ROI (the "2000 Warrants") are not affected by this Agreement or the termination of the 2000 Agreement and shall remain in full force and effect.

3.     Assignment; Obligations. Except as permitted herein, none of the parties to this Agreement may assign its respective rights and obligations hereunder without the prior written consent of the other parties hereto. Each party hereunder shall be responsible for the payment of any costs or expenses incurred by such party related to this Agreement, whether or not this Agreement is terminated for any reason. Upon any such termination, no party hereunder shall have any obligation related to this Agreement to any other party hereunder.

4.     Terminology and Section Headings. All personal pronouns in this Agreement, whether used in the masculine, feminine or neuter gender shall include all other genders; the singular shall

include the plural and the plural shall include the singular. Titles of Paragraphs are for convenience only, and neither limit nor amplify the provisions of this Agreement.

5.    Binding Effect.  Subject to the restrictions on assignments set forth in this Agreement, this Agreement and the rights of the parties hereunder shall inure to the benefit of and be binding upon the parties and their respective legal representatives, successors and assigns.  Whenever in this Agreement a reference is made to one of the parties, such reference shall be deemed to include a reference to the legal representatives, successors and assigns of such party.

6.    Severability.  This Agreement shall be governed by and construed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations.  If any provision of this Agreement, or the application thereof to any person or circumstance, shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

7.    Interpretation.  In construing the terms and provisions of this Agreement, it is understood and agreed that no court or other interpretive body shall apply a presumption that the terms of this Agreement shall be more strictly or particularly construed against one party hereto by reason of the fact that said party, either directly or through its agents, prepared this Agreement, it being understood and agreed that all parties, either directly or through their agents, have fully participated in the preparation hereof.

8.    Definitions. For purposes of this Agreement:

A.    Confidential Information means any and all data and information relating to ROI or its affiliates and their respective business activities (whether constituting a Trade Secret, as hereinafter defined, or not), (i) which is or has been disclosed to Bridge, or of which Bridge becomes aware as a consequence of or through Bridge's relationship with ROI; and (ii) which has value to ROI and is not generally known by its competitors or the public.  Confidential Information shall not include any data or information (i) that has been voluntarily disclosed to the public by ROI or has become generally known to the public (except where such public disclosure has been made by or through Bridge or by a third person or entity with the knowledge of Bridge without the written consent of ROI); (ii) that has been independently developed and disclosed by parties other than Bridge or ROI to Bridge or to the public generally without a breach of any obligation of confidentiality by any such person running directly or indirectly to ROI; or (iii) that otherwise enters the public domain through lawful means.  Confidential Information may include, but is not limited to, information relating to the financial affairs, products, processes, services, customers, research, development, inventions, manufacturing, purchasing, accounting, engineering, computer programs, sales plans, expansion plans, distribution systems and marketing of ROI.

B.    Trade Secrets means information including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who

2

developed and disclosed by parties other than Bridge or ROI to Bridge or to the public generally without a breach of any obligation of confidentiality by any such person running directly or indirectly to ROI; or (iii) that otherwise enters the public domain through lawful means.

     9.    Confidential Information.  All information given to Bridge by ROI, all services or other work performed by Bridge hereunder, and any updates thereto shall be deemed "Confidential Information" for purposes of this Agreement.  During the term of this Agreement and for a period of two (2) years after the termination of this Agreement, (i) Bridge shall not use or disclose any of the Confidential Information without ROI's prior written permission, and (ii) Bridge will not, without the prior written permission of ROI, use the Confidential Information for any purpose other than that required for the services to be provided hereunder.  Bridge represents that it has no obligations or commitments inconsistent with this Agreement.  Upon termination of Bridge's relationship with ROI and ROI, Bridge shall promptly return to ROI all materials containing Confidential Information, including any and all extracts and copies thereof.  Bridge agrees that the remedy at law of ROI would be inadequate as to any unauthorized use or disclosure of Confidential Information by Bridge and Bridge agrees that ROI shall be entitled to ~~injunctive relief in any court of competent jurisdiction to prevent such~~

     10.    Independent Contractor.  Bridge is an independent contractor and is not an agent, a partner or joint venture of ROI.  Unless otherwise agreed to in advance in writing by ROI, Bridge shall be responsible for all of its own expenses related to activities hereunder.  Bridge shall not, orally or in writing, accept, approve or execute any letter, document, order or agreement on behalf of, or in the name of ROI, nor shall Bridge represent itself to be an agent of ROI.  Bridge shall be solely responsible for any and all taxes of any kind related to Bridge's compensation hereunder and the warrants granted hereunder and shall indemnify ROI against any claims related to such taxes.

     11.    Indemnification.  (a) ROI Indemnity.  ROI shall indemnify and hold harmless Bridge, its affiliates, officers, directors and partners, counsel, and controlling persons against any losses, claims, damages or liabilities (joint or several) to which it may become subject under the Securities Act of 1933 ("Act"), the Securities Exchange Act of 1934 ("Exchange Act") or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise solely out of or are based solely upon any of the following statements, omissions or violations (collectively a "Violation"): (i) any breach by ROI of any representation, warranty, or covenant condition of this Agreement (ii) any untrue statement or alleged untrue statement of a material fact contained in any registration statements filed with the Securities and Exchange Commission by ROI, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (iii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (iv) any violation or alleged violation by ROI of the Act or the Exchange Act, or (v) any violation or alleged violation by ROI

3

of any state securities law or any rule or regulation promulgated under the Act, the Exchange Act or any state securities law. ROI shall reimburse Bridge, its affiliates, officers, directors or partners, or controlling persons for any legal expenses incurred by them in connection with defending any such loss, claim, damage, liability or action.

(b) Bridge Indemnity. Bridge shall indemnify and hold harmless ROI, its affiliates, officers, directors and partners, counsel, and controlling persons against any losses, claims, damages or liabilities (joint or several) to which it may become subject under the Securities Act of 1933 ("Act"), the Securities Exchange Act of 1934 ("Exchange Act") or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise solely out of or are based solely upon any of the following statements, omissions or violations (collectively a "Violation"): (i) any breach by Bridge of any representation, warranty, or covenant condition of this Agreement (ii) any untrue statement or alleged untrue statement of a material fact contained in any documents created by Bridge, (iii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (iv) any violation or alleged violation by Bridge of the Act or the Exchange Act, or (v) any violation or alleged violation by Bridge of any state securities law or any rule or regulation promulgated under the Act, the Exchange Act or any state securities law. Bridge shall reimburse ROI, its affiliates, officers, directors or partners, or controlling persons for any legal expenses incurred by them in connection with defending any such loss, claim, damage, liability or action.

12.    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia. Any litigation to enforce or interpret this Agreement shall take place in the state or federal courts located in the State of Delaware. Such courts shall apply the law of the State of Georgia as to both substantive and procedural questions.

13.    Entire Agreement. Except as specifically provided in this Agreement to the contrary, this Agreement constitutes the entire agreement between the parties hereto regarding the subject matter hereof, and no modification hereof shall be effective unless made a supplemental agreement in writing executed by the parties affected by such supplemental agreement.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed in multiple counterparts, each of which shall be deemed an original, with their respective seals affixed thereto all as of the date and year first above written.

RETURN ON INVESTMENT CORPORATION

By:_____
    Its:_____

BRIDGE VENTURES, INC.

By:_____
    Its:_____

4

DEC 22 2004 3:11PM     BRIDGE VENTURES, INC.     212-750-6447     p.1
Dec 22 04 03:29p     roi     770 517 4760     p.3

ADDENDUM

BRIDGE VENTURES, INC. CONSULTING AGREEMENT

This addendum to the consulting agreement between Bridge Ventures, Inc. ("Bridge") and Return On Investment Corp. dated May 2, 2002 (the "Agreement") provides for an extension of Bridge's services pursuant to the Agreement for an additional eighteen (18) months. Accordingly, the Agreement will terminate on August 30, 2006.

RETURN ON INVESTMENT CORP.

By: _____

BRIDGE VENTURES, INC.

By: _____

EXHIBIT 3



SEARCH [_____] [Go]

Home | Latest News | Semi News | Most Popular | Research | Forums | Design | New Products | Careers | Blogs | Contact | Events | New | RSS

EE Times: Press Releases

### ROI Corporation Resolves Escrow, Closes Private Placement and Agrees to Acquire Three Companies Serving the Commercial Construction Industry

BizWire
(10/29/2003 9:06 AM EST)

☐ Print
☐ Email
☐ Reprints
☐ RSS
☐ Digital
☐ SHARE

Business Editors

KENNESAW, Ga.--(BUSINESS WIRE)--Oct. 29, 2003--

Pursues Strategic Growth Opportunities in the Construction Information Market

Return On Investment Corporation (OTCBB: ROIE) today announced the following transactions:

-- Settlement of the Escrow Agreement with ROI Board Members
-- Completion of a $643,000 Private Placement of Common Stock and Warrants
-- Agreement to Acquire BlueBolt
-- Agreement to Acquire SpecSource
-- Agreement to Acquire Construction Yellow Pages

"The return of a substantial amount of the previously escrowed shares to ROI, the closing of the private placement and completing these three acquisitions will help clear the way for accelerated growth in ROI's new construction information vertical market," said Arol Wolford, President and CEO. "By eliminating the escrowed shares, we will be able to accomplish the strategic financing and acquisition transactions with minimal dilution of our existing stockholders."

Settlement of Escrow with ROI Board Members

In October of 2000, ROI entered into an escrow agreement with three current members of its board of directors; Charles McRoberts, John McRoberts and Charles Pecchio, Jr. This escrow agreement provided that approximately 3.8 million shares of common stock be held in escrow for release to these directors on reaching certain financial milestones or upon a change of control. While these shares were held in escrow, the directors were permitted voting rights with respect to these shares.

Because ROI's management believed that having approximately 33% of the outstanding common stock in escrow was not conducive to ROI's strategic plans, a settlement was reached with the three directors providing for a release of a small portion of the shares in return for a forfeit of the majority of the escrowed shares to ROI. Under the terms of the escrow settlement agreement, approximately 3 million shares will be forfeited by the directors to ROI and returned to the treasury. A total of 750,000 shares were released on a pro rata basis to the three directors based on their ownership interests in the escrowed shares. The remaining 168,754 shares will remain in escrow through October 2006, to be released to one of the directors if the trading price of ROI common stock reaches and maintains certain price targets.

The terms of the escrow settlement agreement were approved by a special committee of disinterested directors consisting of Arol Wolford, Theo VanderBoom and Laura Rogers. The forfeit of the 3 million shares permitted ROI to close the private placement and pursue the strategic acquisitions described below with minimal potential dilution to existing stockholders. Because of Mr. Wolford's participation in the private placement and his interest in the acquisition transactions below, it is not expected that ROI's public float will be materially different following the consummation of all the transactions described.

Private Placement of Common Stock and Warrants

ROI has also completed a $643,000 private placement of common stock and warrants. In the financing, ROI issued 378,000 shares of common stock and warrants to purchase 378,000 shares of common stock, at a purchase price of $1.70 per unit. The warrants have an exercise price of $2.50 per share. Participants in the private placement included both Arol Wolford and John McRoberts (director), who each purchased 100,000 shares and who both received warrants to purchase 100,000 shares, and also included other non-executive management employees. ROI has agreed to register the common stock after one year if the shares cannot then be sold without registration, or within six months of its common stock being accepted for listing on the Nasdaq SmallCap or National Markets.

The shares of common stock and warrants sold in the private placement have not been registered under the Securities Act of 1933 and may not be subsequently offered or sold by the investors in the United States absent registration or an applicable exemption from the registration requirements.

Acquisition of BlueBolt

ROI has reached a definitive agreement to acquire BBN Acquisition, Inc. ("BlueBolt"), an online design resource for design professionals in the commercial interiors industry. The BlueBolt acquisition will extend ROI's strategic push into the commercial construction products market by enhancing its offerings with BlueBolt's aggregated product information web site. Arol Wolford owns approximately 39% of the outstanding common stock of BlueBolt and his daughter, Kristin Wolford, is a member of BlueBolt's board of directors.

Located in Durham, North Carolina, BlueBolt offers a unique web enabled dynamic database of standardized product information and color-accurate imagery comprising more than 50 brands of commercial interior finishes, primarily carpets and textiles used in commercial buildings. BlueBolt's product offerings have been developed over the last four years and BlueBolt currently has 8 employees.

Under the terms of the acquisition, ROI will issue 750,000 shares of restricted ROI common stock to the shareholders of BlueBolt and BlueBolt will merge with ROI's subsidiary, Tectonic Solutions, Inc. The acquisition is subject to customary closing conditions and approvals and is expected to close before the end of the calendar year.

Acquisition of SpecSource

ROI has also reached agreement to acquire all the assets of SpecSource.com, Inc., an online directory of commercial construction products manufacturers and their local supply chain of product representatives and distributors. The SpecSource acquisition will give ROI a leading online directory of resources in the commercial construction products industry. Arol Wolford is the controlling shareholder of SpecSource, owning approximately 91% of its equity.

Located in Indianapolis, Indiana, SpecSource provides design professionals with information about building product manufacturers including local contact information. SpecSource's online offering also profiles thousands of architects, engineers and contractors who are currently active in the commercial construction market. SpecSource has been in operation since 1992 and currently has 14 employees.

Under the terms of the acquisition, ROI, through its subsidiary Tectonic Solutions, Inc., will acquire substantially all of SpecSource's assets for 1,450,000 shares of restricted ROI common stock, a promissory note for $533,500 and the assumption of certain liabilities of SpecSource incurred in the ordinary course of business. The number of shares is subject to increase up to 2,000,000 and the note to a corresponding decrease in principal value if ROI's common stock trades below $1.57 at the date of closing. The note will be interest free and, until it matures in 10 years, payments will be contingent on ROI having a minimum of $5 million in cash, net of debt obligations, on its quarterly balance sheet. The acquisition is subject to customary closing conditions and approvals and is expected to close before the end of the calendar year.

In connection with a non-competition agreement entered into by one of the principals of SpecSource, ROI will also issue a $360,000 note on substantially the same terms as the note above.

Acquisition of Construction Yellow Pages

ROI has also reached agreement to acquire all the assets of Construction Yellow Pages LLC, a publisher of two regional comprehensive print directories for the commercial construction industry. Construction Yellow Pages complements ROI's entry into the commercial construction products database market with its comprehensive print directories that are specialized for local markets. Arol Wolford is the controlling member of Construction Yellow Pages, directly owning approximately 48% of its equity and indirectly owning an additional 12% by virtue of his controlling interest in SpecSource.

Located in Grand Rapids, Michigan, Construction Yellow Pages was formed in 2002 with the goal of developing the most comprehensive print directories for the commercial construction industry. As a counterpart to the electronic database of SpecSource, Construction Yellow Pages will give ROI access to the large portions of the commercial construction marketplace that is not yet online. Construction Yellow Pages currently has 16 employees.

Under the terms of the acquisition, ROI, through its subsidiary Tectonic Solutions, Inc., will acquire substantially all of Construction Yellow Pages' assets for 750,000 shares of restricted ROI common stock and the assumption of certain liabilities of Construction Yellow Pages incurred in the ordinary course of business. The agreement is subject to customary closing conditions and approvals and is expected to close before the end of the calendar year.

Tectonic Solutions Strategy

Manufactured building product sales are estimated to make up 40% or more of the $400 billion commercial construction industry which is part of the $960 billion-plus U.S. construction market (U.S. Census Bureau, 2002). ROI and Tectonic management believe that the manufactured product area of commercial construction represents one of the most underserved markets for the provision of information solutions. ROI has identified three delivery platforms that provide value to architects and engineers in finding and selecting products, to contractors in finding product distributors and subcontractor/installers, and to building product manufacturers and their distributors in creating higher market awareness and more efficient sales channels for their products. These platforms are as follows:

```
-- Paper and electronic directories
www.specsource.com;
www.constructionyellowpages.com
-- Product information websites aggregating certain product
categories
www.bluebolt.com
-- Custom application solutions for building product
manufacturers
www.tectonicsolutions.com
```

Richard Rast, Tectonic's EVP and GM said "We are extremely excited about these strategic acquisition opportunities. The combination of SpecSource, BlueBolt and Construction Yellow Pages with our existing Tectonic offerings will allow ROI to offer and deliver powerful, market-leading products and services on a variety of platforms. There is strong market synergy between these different businesses, allowing us to offer broader and deeper solutions to our construction industry customers."

About Return On Investment Corporation (www.roicorporation.com)

More than 85,000 businesses use ROI software to process payment transactions on virtually any computer and to connect IBM midrange systems to the rest of the world. GO Software, a subsidiary of ROI, is the number one independent provider of payment processing software that meets the needs of any merchant, regardless of transaction volume, platform, or sales environment. Tectonic Solutions, Inc., a subsidiary of ROI, is a solution provider that helps building product manufacturers and distributors improve the way they organize, display, and distribute their product information. Tectonic Solutions also helps designers and builders to more easily locate, understand, select, and purchase building products.

Forward Looking Statements

Statements that include the terms "believes", "intends", or "expects" are intended to reflect "forward looking statements" of the Company. The information contained herein is subject to various risks, uncertainties and other factors that could cause actual results to

differ materially from the results anticipated in such forward looking statements or paragraphs. Readers should carefully review the risk factors described in other documents the Company files from time to time with the Securities and Exchange Commission, including the most recent Annual Report on Form 10-KSB, Quarterly Reports on Form 10-QSB and any Current Reports on Form 8-K.

--30--YH/at* CONTACT: Media CONTACT: ROI Corporation, Kennesaw Mandy Ownley, 912-527-4414 or Investor Relations: Saggi Capital Corp. Sharon Will, 516-398-7830 KEYWORD: GEORGIA INDUSTRY KEYWORD: NETWORKING SOFTWARE HARDWARE COMPUTERS/ELECTRONICS MERGERS/ACQ SOURCE: ROI Corporation



PCB Design and Layout
Quality POB layout by Sr. Designers Done right the first time!
www.stiwofbaker.com

Ads by Google

EXHIBIT 4

From:           Sherwin Krug [sherwin.krug@roicorporation.com]
Sent:           Thursday, April 10, 2003 5:34 PM
To:             Sharon Will
Subject:        FW: ROI - Investor Relations

Sharon,

Emory Aspinwall the financial controller at GO Software told me that his doctor may be
interested in investing in ROI.  I thought it may be best if you called him to talk to him
about ROI.  His name and number is as follows:

Dr. Joseph Stubbs on 912-355-0516

Let me know your thoughts.

Thank you

Regards,

Sherwin

-----Original Message-----
From: emorya@gosoftware.com [mailto:emorya@gosoftware.com]
Sent: Tuesday, February 25, 2003 2:35 PM
To: Sherwin Krug
Cc: emorya@pccharge.net; roberts@gosoftware.com
Subject: RE: ROI - Investor Relations

Sherwin,

This is the person I talked to you about that may have an interest in
investing. If you have some investment information you could send him it
would be great.

Joesph T Stubbs MD
Georgia Eye Institute, Inc.
4720 Waters Avenue
Savannah, Ga. 31404

I would prefer he contact you going forward about any investment
opportunities as you would be better prepared to answer any specific
questions he might have.

He is a long term acquaintance and has been my eye doctor since 1968.

During my last yearly exam( Feb 19, 2003), he asked what I was doing since
I had retired. I described to him the business that I had become a part of
and what we had accomplished since I joined GO Software. I gave him a
little of the history of GO Software that was public knowledge. He then
asked if there was  information on the company that could be sent to him. I
informed him that I would check into it.

I told him the ROI market symbol and the web site for GO Software so he
could look at some of the information that was on line.

Thanks!

Emory Aspinwall
Chief Financial Officer
Go Software, Inc.

1

emorya@pccharge.net
T - 912-527-4405
F - 912-527-4531

http://www.gosoftware.com

EXHIBIT 5

| | |
|---|---|
| **From:** | Sherwin Krug |
| **Sent:** | Wednesday, May 12, 2004 9:20 AM |
| **To:** | Sharon Will |
| **Subject:** | Letter to Stephen Dart |
| **Attachments:** | ROI Cover Letter 5-11-04.doc |

Sharon – see attached for a copy of the letter sent yesterday to Stephen Dart via overnight mail.

Thank you

Sherwin

Sherwin Krug
CFO
ROI Corporation
1825 Barrett Lakes Blvd.
Suite 260
Kennesaw, GA 30144
Tel. 770-517-4750 x502
Fax.770-517-4760
sherwin.krug@roicorporation.com
www.roicorporation.com



March 11, 2004

Mr. Stephen Dart
c/o 700 Cass Street
Suite 200
Monterey, CA 93940

Dear Mr. Dart,

Attached for your signature are the following documents:

1. Confidential Memorandum of Terms for Private Placement of Return on Investment Corporation Common Stock.

2. Return On Investment Corporation Subscription Agreement.

3. Registration Rights Agreement.

4. Confidentiality Agreement.

5. Accredited Investor Questionnaire.

6. Risk Factors.

In order to subscribe for the Shares you must complete and sign the following documents noted below and return these document using the Airborne Express Package enclosed to my attention at the Company's address:

1. Return On Investment Corporation Subscription Agreement.

2. Registration Rights Agreement.

3. Confidentiality Agreement

4. Accredited Investor Questionnaire.

In addition, payment can be made by enclosing a check with returned documents or by wire transfer as follows:

Silicon Valley Bank
3003 Tasman Drive
Santa Clara, CA 95054

ABA: 121-140-399
For Credit of: Return on Investment Corporation
Credit Acct #: 3300413272
Contact: Nancy Williams
Telephone: (877) 886-4863

Please feel free to call me on 770-517-4750 x502 or Arol Wolford (President and CEO) on 404-733-5781 with any questions.

Sincerely,

Sherwin Krug
Chief Financial Officer

EXHIBIT 6

---

| | |
|---|---|
| **From:** | Sherwin Krug [sherwin.krug@roicorporation.com] |
| **Sent:** | Thursday, December 18, 2003 3:45 PM |
| **To:** | Sharon Will; 'Harris@saggicapital.com'; dan@ideaedge.com |
| **Subject:** | Private Placement Documents - All Documents |
| **Attachments:** | ROI Cover Letter 12-17-03.pdf; ROI Term Sheet 12-17-03.pdf; ROI Confidentiality Agreement 12-17-03.pdf; ROI Accredited Investor Questionnaire 12-17-03.pdf; ROI Subscription Agreement 12-17-03.pdf; ROI Registration Rights Agreement-PiggyBack 12-17-03.pdf; ROI Risk Factors for Private Placement 12-17-03.pdf; Form 10KSB 6-30-03.pdf; Form 10QSB 9-30-03.pdf |

Sharon, Harris and Dan,

Attached please find the following documents in connection with the PIPE transaction.

1. Cover Letter
2. Term Sheet
3. Confidentiality Agreement
4. Accredited Investor Questionnaire
5. Subscription Agreement
6. Registration Rights Agreement - Piggyback
7. Risk Factors Document
8. Form 10-KSB for the year ended June 30, 2003
9. Form 10-KSB for the quarter ended September 30, 2003

The cover letter outlines the documents to be provided to the selected group of accredited investors. If they are interested, then we should have them sign the Confidentiality Agreement. After that they should be given the Accredited Investor Questionnaire, the Subscription Agreement, the Registration Rights Agreement and the Company Disclosure documents (which included the 10-KSB for the year ended June 30, 2003, the 10-QSB for Q1 ended September 30, 2003 and the Risk Factors document). Other Company Disclosure documents (including the Form 10-KSB and 10-QSB) are available through a link to the SEC Filings at the www.roicorporation.com site or at the EDGAR site http://www.sec.gov/edgar/searchedgar/companysearch.html.

You will need to keep track of all interested investors that we have provided this information to (i.e. who received what document). This information should then be sent back to my attention. You will also need to verbally confirm that each investor understands that this material is not for dissemination.

Please have all prospective investors sign and send the Confidentiality Agreement to my attention on 770-517-4760.

All investors wishing to subscribe should use the following account for wiring of funds:

Silicon Valley Bank
3003 Tasman Drive
Santa Clara, CA 95054

ABA: 121140399
For Credit of: Return on Investment Corporation
Credit Acct #: 3300413272
Contact: Nancy Williams
Telephone: (877) 886-4863

In addition, please call Arol on 404-733-5781 or myself on 770-517-4750 x502 with any questions.

Thank you

Regards,

Sherwin Krug

Sherwin Krug
CFO
ROI Corporation
1825 Barrett Lakes Blvd.
Suite 260
Kennesaw, GA 30144
Tel. 770-517-4750 x502
Fax.770-517-4760
sherwin.krug@roicorporation.com
www.roicorporation.com

EXHIBIT 7

**From:**    Sherwin Krug
**Sent:**    Monday, March 15, 2004 4:40 PM
**To:**      Sharon Will; daniel.walsh@montaukfinancial.com; Harris Freedman
**Cc:**      Arol Wolford; Wolford Arol and Jane (arolw@bellsouth.net)
**Subject:** Thank You

Sharon, Dan and Harris – thank you for your tremendous help in getting the private placement completed. Looking forward to doing even more bigger and better things together.

Thank you

Regards,

Sherwin

---

Sherwin Krug
CFO
ROI Corporation
1825 Barrett Lakes Blvd.
Suite 260
Kennesaw, GA 30144
Tel. 770-517-4750 x502
Fax.770-517-4760
sherwin.krug@roicorporation.com
www.roicorporation.com

EXHIBIT 8

| From: | Sherwin Krug [sherwin.krug@roicorporation.com] |
|---|---|
| Sent: | Wednesday, December 10, 2003 3:16 PM |
| To: | Sharon Will |
| Cc: | 'Harris@saggicapital.com'; 'arolw@bellsouth.net'; 'arol@gosoftware.com' |
| Subject: | Pro-Forma Balance Sheet -Confidential |
| Attachments: | ROI Pro-Forma Balance Sheet 12-10-03.doc |

Sharon – please see Pro Forma balance sheet as requested. This includes all announced acquisitions including the Atomic acquisition on which we signed a letter of Intent last night.  While we do not as of yet have Board Approval, it looks pretty promising and we will be shooting for a close the first week of January.

Please call me with any questions.

Thank you

Regards,

Sherwin

---

Sherwin Krug
CFO
ROI Corporation
1825 Barrett Lakes Blvd.
Suite 260
Kennesaw, GA 30144
Tel. 770-517-4750 x502
Fax.770-517-4760
sherwin.krug@roicorporation.com
www.roicorporation.com

# EXHIBIT I

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TECTONIC NETWORK, INC. AND TECTONIC SOLUTIONS, INC., | Case No. 05-78966 05-78955 |
| Debtors. | (Jointly Administered Case No. 05-78966) |
| | Judge Massey |

**VERIFIED STATEMENT OF OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP AND COHEN POLLOCK MERLIN
AXELROD & SMALL, P.C. PURSUANT TO FED. R. BANKR. P.2019**

TO THE HONORABLE JAMES E. MASSEY
UNITED STATES BANKRUPTCY JUDGE:

Olshan Grundman Frome Rosenzweig & Wolosky LLP ("Olshan") and Cohen

Pollock Merlin Axelrod & Small P.C. ("Cohen"), co-counsel to the Ad Hoc Committee of Equity

Security Holders ("Ad Hoc Committee") makes the following statement pursuant to rule 2019 of

the Federal Rules of Bankruptcy Procedure on behalf of itself, the Ad Hoc Committee:

1.    **Names and Addresses Of Members Of Ad Hoc Committee**

As of the date hereof, the respective names and addresses of members of

the Ad Hoc Committee are as follows:

| | Name | Shares |
|---|---|---|
| 1. | Diane Will 9 Prospect Hill Ext. Pine Plains, NY 12567 | 30,000 |

| 2. | Bridge Ventures Inc.<br>Harris Frie<br>1241 Gulf of Mexico Drive<br>Longbrook Key, FL 34228 | 249,750 |
|----|----|----|
| 3. | Terri Watson<br>104 Old Post Road<br>Millerton, NY 1246 | 8,000 |
| 4. | Stephen M. Dalt Family Trust<br>DTD 7/21/01<br>700 Cass St., Suite 200<br>Monterey, CA 93940 | 100,000 |
| 5. | Justin W. Dart Trust<br>DTD 9/6/61<br>700 Cass St., St. 200<br>Monterey, CA 93940 | 100,000 |
| 6. | Dart Family Partnership II, L.P.<br>DTD 9/6/61<br>700 Cass St., St. 200<br>Monterey, CA 93940 | 100,000 |
| 7. | Ronny Doran<br>P.O. Box 7029<br>Ft. Worth, TX 76111 | 20,000 |
| 8. | Sharon Will<br>3014 S.W. 41st Ave.<br>Ocala, FL 34474 | 140,000 |
| 9. | Best Source Publishin<br>c/o Scott McLean<br>2025 E. Beltine Avenue<br>Grand Rapids, MI 49546 | 262,500 |
| 10. | Saggi Capital Corp.<br>9 Prospect Hill Ext.<br>Pine Plains, NY 12567 | 70,400 |
| 11. | Laura W. Dart Trust DTD 10/29/40<br>700 Cass St.<br>Monterey, CA 93940 | 100,000 |

2

| | | |
|---|---|---|
| 12. | Richard R. Rast<br>1611 Castle Pointe Drive<br>Castle Rock, CO 80104 | 398,824 |
| 13. | Joseph R. Roselle<br>56 Gillespie Avenue<br>Fair Haven, NJ 07704 | 40,000 |
| 14. | Dutchess Foundation<br>Muehle bach Strasse 6<br>Zurich, Switzerland CH 8008 | 215,000 |
| 15. | Saggi Capital<br>9 Prospect Hill Ext.<br>Pine Plains, NY 12567 | 97,600 |
| 16. | Don Will<br>150 N. Anoka Avenue<br>Avon Park, FL 33825 | 14,000 |
| 17. | White Rock Investments<br>c/o Joe Giamanco<br>4 White Rock Terrace<br>Holmdel, NJ 07733 | 140,000 |
| 18. | Lee Johnson<br>14750 El Camino Rd<br>Del Mar, CA 92014 | 75,000 |
| 19. | Lawrence Gorelick<br>Lawrence Gorelick DDS<br>  PC Retirement Trust<br>530 Route 6<br>Mahopac, NY 10451 | 34,500 |
| 20. | Peter Janowski<br>121 East 60th Street 6th Floor<br>New York, NY 10022 | 10,000 |
| 21. | Sharon Fuerst<br>389 Cousins Street<br>Yarmouth ME 04096 | 20,000 |
| 22. | Martin Beck<br>614 N. June Street<br>Los Angeles CA 90004 | 10,000 |

3

| 23. | Gary Kaplowitz<br>451 Run Creek Road<br>Suite 103<br>Henderson, NC 27536 | 2,700 |
|---|---|---|
| 24. | Henderson Orthopedics<br>451 Run Creek Road<br>Suite 103<br>Henderson, NC 27536 | 26,300 |
| 25. | David Iacometta<br>18 Woodbury Road<br>Hauppauge, NY 11788 | 18,000 |
| 26. | C. Ames Byrd<br>513 Market Street<br>Pocomoke City, MD 21851 | 10,000 |
| 27. | Stanley Ast<br>7 Clay Street<br>New City, NY 10956-7011 | 22,000 |
| 28. | Paul Becker<br>131 Mineola Blvd.<br>Mineola, NY 11501 | 7,285 |
| 29. | Donald Karsten<br>121 East 60th Street<br>6th Floor<br>New York, NY 10022 | 109,500 |
| 30. | Albert Saphier<br>4922 Bayway Place<br>Tampa, FL 33629 | 10,000 |
| 31. | Susan Freedman<br>180 Beech Street<br>Roslindale, MA 02131 | 9,500 |
| 32. | Theodore Miller<br>238 East 95th 6A<br>New York, NY 10128-3850 | 700 |

475221-2

| 33. | Robert Karsten<br>121 East 60th Street<br>6th Floor<br>New York, NY 10022 | 109,500 |
| 34. | Robert Wax<br>400 East 56th Street 32N<br>New York, NY 10022 | 10,000 |
| 35. | Murray Alon<br>64-40 Ellwell Crescent<br>Regal Park, NY 11374 | 65,000 |

2.    **Nature of Claims**

The members of the Ad Hoc Committee hold Equity Security interests in Debtors. The members of the Ad Hoc Committee have advised Olshan that, as of the date hereof, such members hold approximately $2,000,000 shares. Olshan reserves the right to revise and supplement these statements, including in particular as to the aggregate amount of claims held by the members of the Ad Hoc Committee.

3.    **Facts And Circumstances Of Counsel's Engagement**

The Ad Hoc Committee was formed subsequent to the commencement of these cases. The Ad Hoc Committee asked Olshan together with Cohen to serve as legal representative to the Ad Hoc Committee in these cases.

4.    **Claims or Interest of Counsel**

To he best of our knowledge, neither Olshan nor Cohen holds any claims or interests in the Debtors.

5

Date:  New York, NY
January 12, 2006

**OLSHAN GRUNDMAN FROME
   ROSENZWEIG & WOLOSKY LLP**
Michael S. Fox, Esq.
Thomas J. Fleming, Esq.
Frederick J. Levy, Esq.
Park Avenue Tower
65 East 55th Street
New York, New York  10022


By: /s/ Michael Fox _____


Date:  Atlanta, GA
January 12, 2006

**COHEN POLLOCK MERLIN
AXELROD
   & SMALL, P.C.**
Gus Small, Esq.
3350 Riverwood Parkway
Suite 1600
Atlanta, Georgia 30339
Telephone: (770) 818-1606


By: /s/ Gus Small _____


6

475221-2